Nos. 23-9514, 23-9521, 23-9533, 23-9534

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

———————————

STATE OF OKLAHOMA, et al.,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents*.

———————————

PETITION FOR REVIEW OF A FINAL AGENCY ACTION OF THE UNITED
STATES ENVIRONMENTAL PROTECTION AGENCY

———————————

**RESPONDENTS' CORRECTED APPENDIX TO
RESPONSE IN OPPOSITION TO PETITIONERS'
MOTION TO STAY THE FINAL RULE**

———————————

TODD KIM
   *Assistant Attorney General*

*Of Counsel:*
ROSEMARY HAMBRIGHT KABAN
DANIEL P. SCHRAMM
   *Office of General Counsel*
   *U.S. Environmental Protection*
    *Agency*
   *Washington, DC*

ALEX J. HARDEE
   *U.S. Department of Justice*
   *Environment and Natural Resources*
    *Division*
   *P.O. Box 7611*
   *Washington, DC 20044*

# TABLE OF CONTENTS

EPA, Final Rule, *Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 9336 (Feb. 13, 2023) ..................................................................................Ex. 1

EPA, 2015 Ozone NAAQS Interstate Transport SIP Disapprovals – Response to Comment (RTC) Document (Jan. 31, 2023)......................................................Ex. 2

EPA, Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I) (Mar. 27, 2018) ("March Memo")....Ex. 3

EPA, Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards (Aug. 31, 2018) ("August Memo") ..................................................................................... Ex. 4

EPA, Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards (Oct. 19, 2018) ("October Memo").................................................................... Ex. 5

Oklahoma, Certification of SIP Elements, Oklahoma's 110(a)(1) and 110(a)(2) "Infrastructure" State Implementation Plan Requirements for National Ambient Air Quality Standard for Ozone, Promulgated in 2015 ("Submission") (Oct. 25, 2018) .......................................Ex. 6

EPA Region 6, 2015 8-Hour Ozone Transport SIP Proposal, Technical Support Document ("TSD"), EPA-R06-OAR-2021-0801 (Feb. 2022) ..........................Ex. 7

Declaration of Rona Birnbaum, Director of the Clean Air Markets Division, Office of Atmospheric Protection, Office of Air and Radiation, EPA ("Birnbaum Declaration")....................................................................................Ex. 8

Declaration of Scott Mathias, Director of the Air Quality Policy Division, Office of Air and Radiation, EPA ("Mathias Declaration") ..............................................Ex. 9

EPA, Notice of Forthcoming EPA Action to Address Judicial Stay Orders (June 1, 2023)................................................................................................. Ex. 10

## <u>EXHIBIT 1</u>

EPA, Final Rule, *Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 9336 (Feb. 13, 2023)

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

[EPA–HQ–OAR–2021–0663; EPA–R02–OAR–2021–0673; EPA–R03–OAR–2021–0872; EPA–R03–OAR–2021–0873; EPA–R04–OAR–2021–0841; EPA–R05–OAR–2022–0006; EPA–R06–OAR–2021–0801; EPA–R07–OAR–2021–0851; EPA–R08–OAR–2022–0315; EPA–R09–OAR–2022–0394; EPA–R09–OAR–2022–0138; FRL–10209–01–OAR]

**Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule; final agency action.

**SUMMARY:** Pursuant to the Federal Clean Air Act (CAA or the Act), the Environmental Protection Agency (EPA or the Agency) is finalizing the disapproval of State Implementation Plan (SIP) submissions for 19 states regarding interstate transport and finalizing a partial approval and partial disapproval of elements of the SIP submission for two states for the 2015 8-hour ozone national ambient air quality standards (NAAQS). The ''good neighbor'' or ''interstate transport'' provision requires that each state's SIP contain adequate provisions to prohibit emissions from within the state from significantly contributing to nonattainment or interfering with maintenance of the NAAQS in other states. This requirement is part of the broader set of ''infrastructure'' requirements, which are designed to ensure that the structural components of each state's air quality management program are adequate to meet the state's responsibilities under the CAA. Disapproving a SIP submission establishes a 2-year deadline for the EPA to promulgate Federal Implementation Plans (FIPs) to address the relevant requirements, unless the EPA approves a subsequent SIP submission that meets these requirements. Disapproval does not start a mandatory sanctions clock. The EPA is deferring final action at this time on the disapprovals it proposed for Tennessee and Wyoming.

**DATES:** The effective date of this final rule is March 15, 2023.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–HQ–OAR–2021–0663. Additional supporting materials associated with this final action are included in certain regional dockets.

*See* the memo ''Regional Dockets Containing Additional Supporting Materials for Final Action on 2015 Ozone NAAQS Good Neighbor SIP Submissions'' in the docket for this action. All documents in the dockets are listed on the *https://www.regulations.gov* website. Although listed in the index, some information is not publicly available, *i.e.*, confidential business information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available through *https://www.regulations.gov* or please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section for additional information.

**FOR FURTHER INFORMATION CONTACT:** General questions concerning this document should be addressed to Mr. Thomas Uher, Office of Air Quality Planning and Standards, Air Quality Policy Division, Mail Code C539–04, 109 TW Alexander Drive, Research Triangle Park, NC 27711; telephone number: (919) 541–5534; email address: *uher.thomas@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Throughout this document ''we,'' ''us,'' and ''our'' refer to the EPA.

References to section numbers in roman numeral refer to sections of this preamble unless otherwise specified.

## I. General Information

### A. How can I get copies of this document and other related information?

The EPA established a Headquarters docket for this action under Docket ID No. EPA–HQ–OAR–2021–0663 and several regional dockets. All documents in the docket are listed in the electronic indexes, which, along with publicly available documents, are available at *https://www.regulations.gov.* Publicly available docket materials are also available in hard copy at the Air and Radiation Docket and Information Center, EPA/DC, William Jefferson Clinton West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC. Some information in the docket may not be publicly available via the online docket due to docket file size restrictions, such as certain modeling files, or content (*e.g.*, CBI). For further information on the EPA Docket Center services and the current status, please visit us online at *https://www.epa.gov/dockets.*

The EPA also established dockets in each of the EPA Regional offices to help

support the proposals that are now being finalized in this national action. These include all public comments, technical support materials, and other files associated with this final action. Each regional docket contains a memorandum directing the public to the headquarters docket for this final action. While all documents in regional dockets are listed in the electronic indexes at *https://www.regulations.gov,* some information may not be publicly available via the online dockets due to docket file size restrictions, such as certain modeling files, or content (*e.g.*, CBI). Please contact the EPA Docket Center Services for further information.

### B. How is the preamble organized?

**Table of Contents**

I. General Information
  A. How can I get copies of this document and other related information?
  B. How is the preamble organized?
  C. Where do I go if I have state-specific questions?
II. Background and Overview
  A. Description of Statutory Background
  B. Description of the EPA's 4-Step Interstate Transport Framework
  C. Background on the EPA's Ozone Transport Modeling Information
  D. The EPA's Approach to Evaluating Interstate Transport SIPs for the 2015 8-Hour Ozone NAAQS
III. The EPA's Updated Air Quality and Contribution Analysis
  A. Description of Air Quality Modeling for the Final Action
  B. Air Quality Modeling To Identify Nonattainment and Maintenance Receptors
  C. Air Quality Modeling To Quantify Upwind State Contributions
IV. Summary of Bases for Disapproval
  A. Alabama
  B. Arkansas
  C. California
  D. Illinois
  E. Indiana
  F. Kentucky
  G. Louisiana
  H. Maryland
  I. Michigan
  J. Minnesota
  K. Mississippi
  L. Missouri
  M. Nevada
  N. New Jersey
  O. New York
  P. Ohio
  Q. Oklahoma
  R. Texas
  S. Utah
  T. West Virginia
  U. Wisconsin
V. Response to Key Comments
  A. SIP Evaluation Process
  B. Application of the 4-Step Interstate Transport Framework
  C. Good Neighbor Provision Policy
VI. Statutory and Executive Orders Reviews
  A. Executive Orders 12866: Regulatory Planning and Executive Order 13563:

Improving Regulation and Regulatory Review

B. Paperwork Reduction Act (PRA)

C. Regulatory Flexibility Act (RFA)

D. Unfunded Mandates Reform Act of 1995 (UMRA)

E. Executive Order 13132: Federalism

F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

G. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks

H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution or Use

I. National Technology Transfer and Advancement Act (NTTAA)

J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

K. Congressional Review Act (CRA)

L. Judicial Review

*C. Where do I go if I have state-specific questions?*

The following table identifies the states covered by this final action along with an EPA Regional office contact who can respond to questions about specific SIP submissions.

| Regional offices | States |
|---|---|
| EPA Region 2: Kenneth Fradkin, Air and Radiation Division/Air Programs Branch, EPA Region 2, 290 Broadway, 25th Floor, New York, NY 10007. | New Jersey, New York. |
| EPA Region 3: Mike Gordon, Planning and Implementation Branch, EPA Region III, 1600 JFK Boulevard, Philadelphia, Pennsylvania 19103. | Maryland, West Virginia. |
| EPA Region 4: Evan Adams, Air and Radiation Division/Air Planning and Implementation Branch, EPA Region IV, 61 Forsyth Street SW, Atlanta, Georgia 30303. | Alabama, Kentucky, Mississippi. |
| EPA Region 5: Olivia Davidson, Air & Radiation Division/Air Programs Branch, EPA Region V, 77 W. Jackson Boulevard, Chicago, Illinois 60604–3511. | Indiana, Illinois, Michigan, Minnesota, Ohio, Wisconsin. |
| EPA Region 6: Sherry Fuerst, Air and Radiation Division, EPA Region 6, 1201 Elm Street, Suite 500, Dallas, Texas 75270. | Arkansas, Louisiana, Oklahoma, Texas. |
| EPA Region 7: William Stone, Air and Radiation Division, Air Quality Planning Branch, EPA Region VII, 11201 Renner Boulevard, Lenexa, Kansas 66219. | Missouri. |
| EPA Region 8: Adam Clark, Air and Radiation Division, EPA, Region VIII, Mailcode 8ARD–IO, 1595 Wynkoop Street, Denver, Colorado 80202. | Utah. |
| EPA Region 9: Tom Kelly, Air and Radiation Division, EPA Region IX, 75 Hawthorne St., San Francisco, California 94105. | California, Nevada. |

## II. Background and Overview

The following provides background for the EPA's final action on these SIP submissions related to the interstate transport requirements for the 2015 8-hour ozone NAAQS (2015 ozone NAAQS).

*A. Description of Statutory Background*

On October 1, 2015, the EPA promulgated a revision to the ozone NAAQS (2015 ozone NAAQS), lowering the level of both the primary and secondary standards to 0.070 parts per million (ppm) for the 8-hour standard.[1] Section 110(a)(1) of the CAA requires states to submit, within 3 years after promulgation of a new or revised standard, SIP submissions[2] meeting the applicable requirements of section 110(a)(2).[3] One of these applicable requirements is found in CAA section 110(a)(2)(D)(i)(I), otherwise known as the "good neighbor" or "interstate

transport" provision, which generally requires SIPs to contain adequate provisions to prohibit in-state emissions activities from having certain adverse air quality effects on other states due to interstate transport of pollution. There are two so-called "prongs" within CAA section 110(a)(2)(D)(i)(I). A SIP for a new or revised NAAQS must contain adequate provisions prohibiting any source or other type of emissions activity within the state from emitting air pollutants in amounts that will significantly contribute to nonattainment of the NAAQS in another state (prong 1) or interfere with maintenance of the NAAQS in another state (prong 2). The EPA and states must give independent significance to prong 1 and prong 2 when evaluating downwind air quality problems under CAA section 110(a)(2)(D)(i)(I).[4]

On February 22, 2022, the EPA proposed to disapprove 19 good neighbor SIP submissions from the States of Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, New Jersey, New York, Ohio, Oklahoma, Tennessee, Texas, West Virginia, and Wisconsin.[5]

On May 24, 2022, the EPA proposed to disapprove four additional good neighbor SIP submissions from the States of California, Nevada, Utah, and Wyoming.[6] On October 25, 2022, the EPA proposed to disapprove a new good neighbor SIP submission from Alabama submitted on June 21, 2022.[7] The EPA is deferring action on the proposals related to the good neighbor SIP submissions from Tennessee and Wyoming at this time. As explained in the notifications of proposed disapproval, the EPA's justification for each of these proposals applies uniform, nationwide analytical methods, policy judgments, and interpretation with respect to the same CAA obligations, *i.e.*, implementation of good neighbor requirements under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS for states across the country. The EPA's final action is likewise based on this common core of determinations. As indicated at proposal, the EPA is taking a consolidated, single final action

---

[1] National Ambient Air Quality Standards for Ozone, Final Rule, 80 FR 65292 (October 26, 2015). Although the level of the standard is specified in the units of ppm, ozone concentrations are also described in parts per billion (ppb). For example, 0.070 ppm is equivalent to 70 ppb.

[2] The terms "submission," "revision," and "submittal" are used interchangeably in this document.

[3] SIP revisions that are intended to meet the applicable requirements of section 110(a)(1) and (2) of the CAA are often referred to as infrastructure SIPs and the applicable elements under CAA section 110(a)(2) are referred to as infrastructure requirements.

[4] *See North Carolina* v. *EPA*, 531 F.3d 896, 909–11 (D.C. Cir. 2008) (*North Carolina*).

[5] 87 FR 9545 (February 22, 2022) (Alabama, Mississippi, Tennessee); 87 FR 9798 (February 22, 2022) (Arkansas, Louisiana, Oklahoma, Texas); 87 FR 9838 (February 22, 2022) (Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin); 87 FR 9498

(February 22, 2022) (Kentucky); 87 FR 9484 (February 22, 2022) (New Jersey, New York); 87 FR 9463 (February 22, 2022) (Maryland); 87 FR 9533 (February 22, 2022) (Missouri); 87 FR 9516 (February 22, 2022) (West Virginia).

[6] 87 FR 31443 (May 24, 2022) (California); 87 FR 31485 (May 24, 2022) (Nevada); 87 FR 31470 (May 24, 2022) (Utah); 87 FR 31495 (May 24, 2022) (Wyoming).

[7] 87 FR 64412 (October 25, 2022) (Alabama). Alabama withdrew its original good neighbor SIP submission on April 21, 2022. *Id.* at 64419.

on the proposed SIP disapprovals.[8] Included in this document is final action on 2015 ozone NAAQS interstate transport SIPs addressing CAA section 110(a)(2)(D)(i)(I) for Alabama, Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Texas, Utah, West Virginia, and Wisconsin. The 2015 ozone NAAQS interstate transport SIP submissions addressing CAA section 110(a)(2)(D)(i)(I) for Tennessee and Wyoming will be addressed in a separate action.

*B. Description of the EPA's 4-Step Interstate Transport Framework*

The EPA used a 4-step interstate transport framework (or 4-step framework) to evaluate each state's implementation plan submission addressing the interstate transport provision for the 2015 ozone NAAQS. The EPA has addressed the interstate transport requirements of CAA section 110(a)(2)(D)(i)(I) with respect to prior NAAQS in several regulatory actions, including the Cross-State Air Pollution Rule (CSAPR), which addressed interstate transport with respect to the 1997 ozone NAAQS as well as the 1997 and 2006 fine particulate matter standards,[9] the Cross-State Air Pollution Rule Update (CSAPR Update)[10] and the Revised CSAPR Update, both of which addressed the 2008 ozone NAAQS.[11]

Shaped through the years by input from state air agencies[12] and other

stakeholders on EPA's prior interstate transport rulemakings and SIP actions,[13] as well as a number of court decisions, the EPA has developed and used the following 4-step interstate transport framework to evaluate a state's obligations to eliminate interstate transport emissions under the interstate transport provision for the ozone NAAQS: (1) Identify monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (*i.e.,* nonattainment and/or maintenance receptors); (2) identify states that impact those air quality problems in other (*i.e.,* downwind) states sufficiently such that the states are considered "linked" and therefore warrant further review and analysis; (3) identify the emissions reductions necessary (if any), applying a multifactor analysis, to eliminate each linked upwind state's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions.

The general steps of this framework allow for some methodological variation, and this can be seen in the evolution of the EPA's analytical process across its prior rulemakings. This also means states have some flexibility in developing analytical methods within this framework (and may also attempt to justify an alternative framework altogether). The four steps of the framework simply provide a reasonable organization to the analysis of the complex air quality challenge of interstate ozone transport. As discussed further throughout this document, the EPA has organized its evaluation of the states' SIP submissions around this analytical framework (including the specific methodologies within each step as evolved over the course of the CSAPR rulemakings since 2011), but where states presented alternative approaches either to the EPA's methodological approaches within the framework, or organized their analysis in some manner that differed from it entirely, we have evaluated those analyses on their merits or, in some cases, identified why even if those approaches were acceptable, the state still does not have an approvable SIP submission as a whole.

*C. Background on the EPA's Ozone Transport Modeling Information*

In general, the EPA has performed nationwide air quality modeling to project ozone design values, which are used in combination with measured data to identify nonattainment and maintenance receptors at Step 1. To quantify the contribution of emissions from specific upwind states on 2023 ozone design values for the identified downwind nonattainment and maintenance receptors at Step 2, the EPA performed nationwide, state-level ozone source apportionment modeling for 2023. The source apportionment modeling projected contributions to ozone at receptors from precursor emissions of anthropogenic nitrogen oxides ($NO_X$) and volatile organic compounds (VOCs) in individual upwind states.

The EPA has released several documents containing projected design values, contributions, and information relevant to air agencies for evaluating interstate transport with respect to the 2015 ozone NAAQS. First, on January 6, 2017, the EPA published a notice of data availability (NODA) in which the Agency requested comment on preliminary interstate ozone transport data including projected ozone design values and interstate contributions for 2023 using a 2011 base year platform.[14] In the NODA, the EPA used the year 2023 as the analytic year for this preliminary modeling because that year aligns with the expected attainment year for Moderate ozone nonattainment areas for the 2015 ozone NAAQS.[15] On October 27, 2017, the EPA released a memorandum (October 2017 memorandum) containing updated modeling data for 2023, which incorporated changes made in response to comments on the NODA, and was intended to provide information to assist states' efforts to develop SIP submissions to address interstate transport obligations for the 2008 ozone NAAQS.[16] On March 27, 2018, the EPA issued a memorandum (March 2018 memorandum) noting that the same 2023 modeling data released in the

---

[8] In its proposals, the EPA stated "The EPA may take a consolidated, single final action on all the proposed SIP disapproval actions with respect to obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. Should EPA take a single final action on all such disapprovals, this action would be nationally applicable, and the EPA would also anticipate, in the alternative, making and publishing a finding that such final action is based on a determination of nationwide scope or effect." E.g., 87 FR 9463, 9475 n.51.

[9] *See* Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals, 76 FR 48208 (August 8, 2011).

[10] Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 81 FR 74504 (October 26, 2016).

[11] In 2019, the United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) remanded CSAPR Update to the extent it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). *Wisconsin* v. *EPA,* 938 F.3d 303, 313 (D.C. Cir. 2019) (*Wisconsin*). The Revised CSAPR Update for the 2008 Ozone NAAQS, 86 FR 23054 (April 30, 2021), responded to the remand of CSAPR Update in *Wisconsin* and the vacatur of a separate rule, the "CSAPR Close-Out," 83 FR 65878 (December 21, 2018), in *New York* v. *EPA,* 781 F. App'x. 4 (D.C. Cir. 2019).

[12] *See* 63 FR 57356, 57361 (October 27, 1998).

[13] In addition to CSAPR rulemakings, other regional rulemakings addressing ozone transport include the "$NO_X$ SIP Call," 63 FR 57356 (October 27, 1998), and the "Clean Air Interstate Rule" (CAIR), 70 FR 25162 (May 12, 2005).

[14] *See* Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 8-hour Ozone National Ambient Air Quality Standards (NAAQS), 82 FR 1733 (January 6, 2017).

[15] *See* 82 FR 1733, 1735 (January 6, 2017).

[16] *See* Information on the Interstate Transport State Implementation Plan Submissions for the 2008 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), October 27, 2017 ("October 2017 memorandum"), available in Docket No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

October 2017 memorandum could also be useful for identifying potential downwind air quality problems with respect to the 2015 ozone NAAQS at Step 1 of the 4-step interstate transport framework.[17] The March 2018 memorandum also included the then newly available contribution modeling data for 2023 to assist states in evaluating their impact on potential downwind air quality problems for the 2015 ozone NAAQS under Step 2 of the 4-step interstate transport framework.[18] The EPA subsequently issued two more memoranda in August and October 2018, providing additional information to states developing interstate transport SIP submissions for the 2015 ozone NAAQS concerning, respectively, potential contribution thresholds that may be appropriate to apply in Step 2 of the 4-step interstate transport framework, and considerations for identifying downwind areas that may have problems maintaining the standard at Step 1 of the 4-step interstate transport framework.[19]

Following the release of the modeling data shared in the March 2018 memorandum, the EPA performed updated modeling using a 2016-based emissions modeling platform (*i.e.*, 2016v1). This emissions platform was developed under the EPA/Multi-Jurisdictional Organization (MJO)/state collaborative project.[20] This collaborative project was a multi-year joint effort by the EPA, MJOs, and states to develop a new, more recent emissions platform for use by the EPA and states in regulatory modeling as an improvement over the dated, 2011-based platform that the EPA had used to project ozone design values and contribution data provided in the 2017 and 2018 memoranda. The EPA used the 2016v1 emissions to project ozone design values and contributions for 2023. On October 30, 2020, in the notice of proposed rulemaking for the Revised CSAPR Update, the EPA released and accepted public comment on 2023 modeling that used the 2016v1 emissions platform.[21] Although the Revised CSAPR Update addressed transport for the 2008 ozone NAAQS, the projected design values and contributions from the 2016v1 platform were also useful for identifying downwind ozone problems and linkages with respect to the 2015 ozone NAAQS.[22]

Following the final Revised CSAPR Update, the EPA made further updates to the 2016-based emissions platform to include updated onroad mobile emissions from Version 3 of the EPA's Motor Vehicle Emission Simulator (MOVES) model (MOVES3)[23] and updated emissions projections for electric generating units (EGUs) that reflect the emissions reductions from the Revised CSAPR Update, recent information on plant closures, and other inventory improvements. The construct of the updated emissions platform, 2016v2, is described in the "Technical Support Document (TSD): Preparation of Emissions Inventories for the 2016v2 North American Emissions Modeling Platform," hereafter known as the 2016v2 Emissions Modeling TSD, and is included in Docket No. EPA–HQ–OAR–2021–0663. The EPA performed air quality modeling using the 2016v2 emissions to provide projections of ozone design values and contributions in 2023 that reflect the effects on air quality of the 2016v2 emissions platform. The results of the 2016v2 modeling were used by the EPA as part of the Agency's evaluation of state SIP submissions with respect to Steps 1 and 2 of the 4-step interstate transport framework at the proposal stage of this action. By using the 2016v2 modeling results, the EPA used the most current and technically appropriate information for the proposed rulemakings that were issued earlier in 2022.

The EPA invited and received comments on the 2016v2 emissions inventories and modeling that were used to support proposals related to 2015 ozone NAAQS interstate transport. (The EPA had earlier published the emissions inventories on its website in September of 2021 and invited initial feedback from states and other interested stakeholders.[24]) In response to these comments, the EPA made a number of updates to the 2016v2 inventories and model design to construct a 2016v3 emissions platform which was used to update the air quality modeling. The EPA made additional updates to its modeling in response to comments as well. The EPA is now using this updated modeling to inform its final action on these SIP submissions. Details on the air quality modeling and the methods for projecting design values and determining contributions in 2023 are described in Section III and in the TSD titled "Air Quality Modeling TSD for the 2015 8-hour ozone NAAQS Transport SIP Final Actions", hereafter known as the Final Action AQM TSD.[25][26] Additional details related to the updated 2016v3 emissions platform are located in the TSD titled "Preparation of Emissions Inventories for the 2016v3 North American Emissions Modeling Platform," hereafter known as the 2016v3 Emissions Modeling TSD, included in Docket ID No. EPA–HQ–OAR–2021–0663.[27]

### D. The EPA's Approach To Evaluating Interstate Transport SIPs for the 2015 Ozone NAAQS

The EPA is applying a consistent set of policy judgments across all states for purposes of evaluating interstate transport obligations and the approvability of interstate transport SIP submissions for the 2015 ozone NAAQS under CAA section 110(a)(2)(D)(i)(I). These policy judgments conform with relevant case law and past agency practice as reflected in CSAPR and related rulemakings. Employing a nationally consistent approach is

---

[17] *See* Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), March 27, 2018 ("March 2018 memorandum"), available in Docket No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

[18] The March 2018 memorandum, however, provided, "While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the good neighbor provision. Any such determination would be made through notice-and-comment rulemaking." March 2018 memorandum at 2.

[19] *See* Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, August 31, 2018) ("August 2018 memorandum"); Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, October 19, 2018 ("October 2018 memorandum"), available in Docket No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-2015-ozone-naaqs.*

[20] The results of this modeling, as well as the underlying modeling files, are included in Docket No. EPA–HQ–OAR–2021–0663.

[21] *See* 85 FR 68964, 68981 (October 30, 2020).

[22] *See* the Air Quality Modeling Technical Support Document for the Final Revised Cross-State Air Pollution Rule Update, included in Docket No. EPA–HQ–OAR–2021–0663.

[23] 86 FR 1106. Additional details and documentation related to the MOVES3 model can be found at *https://www.epa.gov/moves/latest-version-motor-vehicle-emission-simulator-moves.*

[24] *https://www.epa.gov/air-emissions-modeling/2016v2-platform.*

[25] *See* Final Action AQM TSD in Docket ID No. EPA–HQ–OAR–2021–0663

[26] References to section numbers in roman numeral refer to sections of this preamble unless otherwise specified, and references to section numbers in numeric form refer to the Response to Comments document for this final action included in the docket.

[27] *See* 2016v3 Emissions Modeling TSD in Docket ID No. EPA–HQ–OAR–2021–0663.

particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving many smaller contributors. Effective policy solutions to the problem of interstate ozone transport going back to the NO$_X$ SIP Call have necessitated the application of a uniform framework of policy judgments to ensure an ''efficient and equitable'' approach. *See EPA* v. *EME Homer City Generation, LP,* 572 U.S. 489, 519 (2014) (*EME Homer City*). Some comments on EPA's proposed SIP disapprovals claim the EPA is imposing non-statutory requirements onto SIPs or that the EPA must allow states to take inconsistent approaches to implementing good neighbor requirements. Both views are incorrect; the EPA's use of its longstanding framework to evaluate these SIP submissions reflects a reasonable and consistent approach to implementing the requirements of CAA section 110(a)(2)(D)(i)(I), while remaining open to alternative approaches states may present. These comments are further addressed in Section V and the Response to Comment (RTC) document contained in the docket for this action, Docket ID No. EPA–HQ–OAR–2021–0663.

In the March, August, and October 2018 memoranda, the EPA recognized that states may be able to establish alternative approaches to addressing their interstate transport obligations for the 2015 ozone NAAQS that vary from a nationally uniform framework. The EPA emphasized in these memoranda, however, that such alternative approaches must be technically justified and appropriate in light of the facts and circumstances of each particular state's submission.[28] In general, the EPA continues to believe that deviation from a nationally consistent approach to ozone transport must be substantially justified and have a well-documented technical basis that is consistent with CAA obligations and relevant case law. Where states submitted SIP submissions that rely on any such potential concepts

as the EPA or others may have identified or suggested in the past, the EPA evaluated whether the state adequately justified the technical and legal basis for doing so. For example, the EPA has considered the arguments put forward by Alabama, Missouri, Ohio, Oklahoma, Texas, and Utah related to alternative methods of identifying receptors.[29] The EPA also has considered the arguments attempting to justify an alternative contribution threshold at Step 2 pursuant to the August 2018 memorandum made by Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Oklahoma, and Utah,[30] as well as criticisms of the 1 percent of the NAAQS contribution threshold made by Nevada and Ohio.[31] These topics are further addressed in Section V.B as well as the RTC document.

The EPA notes that certain potential concepts included in an attachment to the March 2018 memorandum require unique consideration, and these ideas do not constitute agency guidance with respect to interstate transport obligations for the 2015 ozone NAAQS. Attachment A to the March 2018 memorandum identified a ''Preliminary List of Potential Flexibilities'' that could potentially inform SIP development. However, the EPA made clear in both the March 2018 memorandum[32] and in Attachment A that the list of ideas was not endorsed by the Agency but rather ''comments provided in various forums'' on which the EPA sought ''feedback from interested stakeholders.''[33] Further, Attachment A stated, ''EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches.''[34] Attachment A to the March 2018 memorandum, therefore, does not constitute agency

guidance, but was intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders. To the extent states sought to develop or rely on one or more of these ideas in support of their SIP submissions, the EPA reviewed their technical and legal justifications for doing so.[35]

The remainder of this section describes the EPA's analytical framework with respect to analytic year, definition of nonattainment and maintenance receptors, selection of contribution threshold, and multifactor control strategy assessment.

### 1. Selection of Analytic Year

In general, the states and the EPA must implement the interstate transport provision in a manner ''consistent with the provisions of [title I of the CAA.]'' *See* CAA section 110(a)(2)(D)(i). This requires, among other things, that these obligations are addressed consistently with the timeframes for downwind areas to meet their CAA obligations. With respect to ozone NAAQS, under CAA section 181(a), this means obligations must be addressed ''as expeditiously as practicable'' and no later than the schedule of attainment dates provided in CAA section 181(a)(1).[36] Several D.C. Circuit court decisions address the issue of the relevant analytic year for the purposes of evaluating ozone transport air-quality problems. On September 13, 2019, the D.C. Circuit issued a decision in *Wisconsin,* remanding the CSAPR Update to the extent that it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). *See* 938 F.3d 303, 313.

On May 19, 2020, the D.C. Circuit issued a decision in *Maryland* v. *EPA* that cited the *Wisconsin* decision in holding that the EPA must assess the impact of interstate transport on air quality at the next downwind attainment date, including Marginal area attainment dates, in evaluating the basis for the EPA's denial of a petition under CAA section 126(b) *Maryland* v.

---

[28] March 2018 memorandum at 3 (''EPA also notes that, in developing their own rules, states have flexibility to follow the familiar four-step transport framework (using EPA's analytical approach or somewhat different analytical approaches within this steps) or alternative framework, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA.''); August 2018 memorandum at 1 (''The EPA and air agencies should consider whether the recommendations in this guidance are appropriate for each situation.''); October 2018 memorandum at 1 (''Following the recommendations in this guidance does not ensure that EPA will approve a SIP revision in all instances where the recommendations are followed, as the guidance may not apply to the facts and circumstances underlying a particular SIP.'').

[29] 87 FR 64421–64422 (Alabama); 87 FR 9540–9541 (Missouri); 87 FR 9869–9870 (Ohio); 87 FR 9820–9822 (Oklahoma); 87 FR 9826–9829 (Texas); and 87 FR 31480–31481 (Utah).

[30] 87 FR 64423–64424 (Alabama); 87 FR 9806–9807 (Arkansas); 87 FR 9852–9853 (Illinois); 87 FR 9855–9856 (Indiana); 87 FR 9509–9510 (Kentucky); 87 FR 9815–9816 (Louisiana); 87 FR 9861–9862 (Michigan); 87 FR 9557 (Mississippi); 87 FR 9541–9544 (Missouri); 87 FR 9819 (Oklahoma); 87 FR 31478 (Utah).

[31] 87 FR 31492 (Nevada); 87 FR 9871 (Ohio).

[32] ''In addition, the memorandum is accompanied by Attachment A, which provides a preliminary list of potential flexibilities in analytical approaches for developing a good neighbor SIP that may warrant further discussion between EPA and states.'' March 2018 memorandum at 1.

[33] March 2018 memorandum, Attachment A at A–1.

[34] *Id.*

[35] E.g., 87 FR 64423–64425 (Alabama); 87 FR 31453–31454 (California); 87 FR 9852–9854 (Illinois); 87 FR 9859–9860 (Indiana); 87 FR 9508, 9515 (Kentucky); 87 FR 9861–9862 (Michigan); 87 FR 9869–9870 (Ohio); 87 FR 9798, 9818–9820 (Oklahoma); 87 FR 31477–31481 (Utah); 87 FR 9526–9527 (West Virginia).

[36] For attainment dates for the 2015 ozone NAAQS, refer to CAA section 181(a), 40 CFR 51.1303, and Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 FR 25776 (June 4, 2018, effective August 3, 2018).

*EPA,* 958 F.3d 1185, 1203–04 (D.C. Cir. 2020) (*Maryland*). The court noted that ''section 126(b) incorporates the Good Neighbor Provision,'' and, therefore, ''EPA must find a violation [of section 126] if an upwind source will significantly contribute to downwind nonattainment at the *next downwind attainment deadline.* Therefore, the agency must evaluate downwind air quality at that deadline, not at some later date.'' *Id.* at 1204 (emphasis added). The EPA interprets the court's holding in *Maryland* as requiring the states and the Agency, under the good neighbor provision, to assess downwind air quality as expeditiously as practicable and no later than the next applicable attainment date,[37] which at the time of EPA's proposed and final actions on the SIPs addressed in this action is the Moderate area attainment date under CAA section 181 for ozone nonattainment. The Moderate area attainment date for the 2015 ozone NAAQS is August 3, 2024.[38] Thus, 2023 is now the appropriate year for analysis of interstate transport obligations for the 2015 ozone NAAQS, because the 2023 ozone season is the last relevant ozone season during which achieved emissions reductions in linked upwind states could assist downwind states with meeting the August 3, 2024, Moderate area attainment date for the 2015 ozone NAAQS.

The EPA recognizes that the attainment date for nonattainment areas classified as Marginal for the 2015 ozone NAAQS was August 3, 2021. Under the *Maryland* holding, any necessary emissions reductions to satisfy interstate transport obligations should have been implemented by no later than this date. At the time of the statutory deadline to submit interstate transport SIPs (October 1, 2018), many states relied upon the EPA's modeling of the year 2023, and no state provided an alternative analysis using a 2021 analytic year (or the prior 2020 ozone season). However, the EPA must act on SIP submissions using the information available at the time it takes such action,

and it is now past 2021. In this circumstance, the EPA does not believe it would be appropriate to evaluate states' obligations under CAA section 110(a)(2)(D)(i)(I) as of an attainment date that is wholly in the past, because the Agency interprets the interstate transport provision as forward looking. *See* 86 FR 23054, 23074; *see also Wisconsin,* 938 F.3d at 322 (rejecting Delaware's argument that the EPA should have used an analytic year of 2011 instead of 2017). Consequently, in this proposal the EPA will use the analytical year of 2023 to evaluate each state's CAA section 110(a)(2)(D)(i)(I) SIP submission with respect to the 2015 ozone NAAQS.

### 2. Step 1 of the 4-Step Interstate Transport Framework

In Step 1, the EPA identifies monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS in the 2023 analytic year. Where the EPA's analysis shows that a site does not fall under the definition of a nonattainment or maintenance receptor, that site is excluded from further analysis under the EPA's 4-step interstate transport framework. For sites that are identified as a nonattainment or maintenance receptor in 2023, the EPA proceeds to the next step of the 4-step interstate transport framework by identifying which upwind states contribute to those receptors above the contribution threshold.

The EPA's approach to identifying ozone nonattainment and maintenance receptors in this action gives independent consideration to both the ''contribute significantly to nonattainment'' and the ''interfere with maintenance'' prongs of CAA section 110(a)(2)(D)(i)(I), consistent with the D.C. Circuit's direction in *North Carolina.*[39]

The EPA identifies nonattainment receptors as those monitoring sites that are projected to have average design values that exceed the NAAQS and that are also measuring nonattainment based on the most recent monitored design values. This approach is consistent with prior transport rulemakings, such as the CSAPR Update, where the EPA defined nonattainment receptors as those areas that both currently measure nonattainment and that the EPA projects will be in nonattainment in the analytic year (*i.e.,* 2023).[40]

In addition, the EPA identifies a receptor to be a ''maintenance'' receptor for purposes of defining interference with maintenance, consistent with the method used in CSAPR and upheld by the D.C. Circuit in *EME Homer City Generation, L.P.* v. *EPA,* 795 F.3d 118, 136 (D.C. Cir. 2015) (*EME Homer City II*).[41] Specifically, the EPA identified maintenance receptors as those receptors that would have difficulty maintaining the relevant NAAQS in a scenario that takes into account historical variability in air quality at that receptor. The variability in air quality was determined by evaluating the ''maximum'' future design value at each receptor based on a projection of the maximum measured design value over the relevant period. The EPA interprets the projected maximum future design value to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor (*i.e.,* ozone conducive meteorology). The EPA also recognizes that previously experienced meteorological conditions (*e.g.,* dominant wind direction, temperatures, air mass patterns) promoting ozone formation that led to maximum concentrations in the measured data may reoccur in the future. The maximum design value gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur. The projected maximum design value is used to identify upwind emissions that, under those circumstances, could interfere with the downwind area's ability to maintain the NAAQS.

Recognizing that nonattainment receptors are also, by definition, maintenance receptors, the EPA often uses the term ''maintenance-only'' to refer to those receptors that are not nonattainment receptors. Consistent with the concepts for maintenance receptors, as described earlier, the EPA identifies ''maintenance-only'' receptors as those monitoring sites that have projected average design values above the level of the applicable NAAQS, but that are not currently measuring nonattainment based on the most recent official design values. In addition, those

---

[37] The EPA notes that the court in *Maryland* did not have occasion to evaluate circumstances in which the EPA may determine that an upwind linkage to a downwind air quality problem exists at Steps 1 and 2 of the interstate transport framework by a particular attainment date, but for reasons of impossibility or profound uncertainty the Agency is unable to mandate upwind pollution controls by that date. *See Wisconsin,* 938 F.3d at 320. The D.C. Circuit noted in *Wisconsin* that upon a sufficient showing, these circumstances may warrant flexibility in effectuating the purpose of the interstate transport provision.

[38] *See* CAA section 181(a); 40 CFR 51.1303; Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 FR 25776 (June 4, 2018, effective August 3, 2018).

[39] *See North Carolina,* 531 F.3d at 910–11 (holding that the EPA must give ''independent significance'' to each prong of CAA section 110(a)(2)(D)(i)(I)).

[40] *See* 81 FR 74504 (October 26, 2016). This same concept, relying on both current monitoring data

and modeling to define nonattainment receptor, was also applied in CAIR. *See* 70 FR 25241, 25249 (January 14, 2005); *see also North Carolina,* 531 F.3d at 913–14 (affirming as reasonable the EPA's approach to defining nonattainment in CAIR).

[41] *See* 76 FR 48208 (August 8, 2011). The CSAPR Update and Revised CSAPR Update also used this approach. *See* 81 FR 74504 (October 26, 2016) and 86 FR 23054 (April 30, 2021).

monitoring sites with projected average design values below the NAAQS, but with projected maximum design values above the NAAQS are also identified as "maintenance-only" receptors, even if they are currently measuring nonattainment based on the most recent official design values.

As discussed further in Section III.B., in response to comments, the Agency has also taken a closer look at measured ozone levels at monitoring sites in 2021 and 2022 for the purposes of informing the identification of additional receptors in 2023. We find there is a basis to consider certain sites with elevated ozone levels that are not otherwise identified as receptors to be an additional type of maintenance-only receptor given the likelihood that ozone levels above the NAAQS could persist at those locations through at least 2023. We refer to these as violating-monitor maintenance-only receptors ("violating monitors"). For purposes of this action, we use this information only in a confirmatory way for states that are otherwise found to be linked using the modeling-based methodology. The EPA intends to take separate action to address states that are linked only to one or more violating-monitor receptors.

3. Step 2 of the 4-Step Interstate Transport Framework

In Step 2, the EPA quantifies the contribution of each upwind state to each receptor in the 2023 analytic year. The contribution metric used in Step 2 is defined as the average impact from each state to each receptor on the days with the highest ozone concentrations at the receptor based on the 2023 modeling. If a state's contribution value does not equal or exceed the threshold of 1 percent of the NAAQS (*i.e.*, 0.70 ppb) for the 2015 ozone NAAQS), the upwind state is not "linked" to a downwind air quality problem, and the EPA, therefore, concludes that the state does not contribute significantly to nonattainment or interfere with maintenance of the NAAQS in the downwind states. However, if a state's contribution equals or exceeds the 1 percent threshold, the state's emissions are further evaluated in Step 3, considering both air quality and cost as part of a multi-factor analysis, to determine what, if any, emissions might be deemed "significant" and, thus, must be eliminated pursuant to the requirements of CAA section 110(a)(2)(D)(i)(I).

In this final action, the EPA relies in the first instance on the 1 percent threshold for the purpose of evaluating a state's contribution to nonattainment or maintenance of the 2015 ozone

NAAQS (*i.e.*, 0.70 ppb) at downwind receptors. This is consistent with the Step 2 approach that the EPA applied in CSAPR for the 1997 ozone NAAQS, which has subsequently been applied in the CSAPR Update and Revised CSAPR Update when evaluating interstate transport obligations for the 2008 ozone NAAQS, and in the EPA's proposals for this action. The EPA continues to find 1 percent to be an appropriate threshold. For ozone, as the EPA found in the CAIR, CSAPR, and CSAPR Update, a portion of the nonattainment problems from anthropogenic sources in the U.S. result from the combined impact of relatively small contributions, typically from multiple upwind states and, in some cases, substantially larger contributions from a subset of particular upwind states, along with contributions from in-state sources. The EPA's analysis shows that much of the ozone transport problem being analyzed in this action is still the result of the collective impacts of contributions from upwind states. Therefore, application of a consistent contribution threshold is necessary to identify those upwind states that should have responsibility for addressing their contribution to the downwind nonattainment and maintenance problems to which they collectively contribute. Continuing to use 1 percent of the NAAQS as the screening metric to evaluate collective contribution from many upwind states also allows the EPA (and states) to apply a consistent framework to evaluate interstate emissions transport under the interstate transport provision from one NAAQS to the next. *See* 81 FR 74518; *see also* 86 FR 23085 (reviewing and explaining rationale from CSAPR, 76 FR 48237–38, for selection of 1 percent threshold).

The EPA's August 2018 memorandum recognizes that in certain circumstances, a state may be able to establish that an alternative contribution threshold of 1 ppb is justifiable. Where a state relies on this alternative threshold in their SIP submission, and where that state determined that it was not linked at Step 2 using the alternative threshold, the EPA evaluated whether the state provided a technically sound assessment of the appropriateness of using this alternative threshold based on the facts and circumstances underlying its application in the particular SIP submission. The states covered by this action that rely on a contribution threshold other than 1 percent of the NAAQS in their 2015 ozone NAAQS good neighbor SIP submission are Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan,

Mississippi, Missouri, Oklahoma, and Utah. Ohio also criticized the 1 percent of the NAAQS threshold, though it acknowledged it was linked above either a 1 percent of the NAAQS or 1 ppb contribution threshold. Nevada also criticized the 1 percent of the NAAQS contribution threshold, but ultimately relied on it to support its submission.

In the proposals for this action, the EPA evaluated each states' support for the use of an alternative threshold at Step 2 (*e.g.*, 1 ppb), and additionally shared its experience since the issuance of the August 2018 memorandum regarding use of alternative thresholds at Step 2. The EPA solicited comment on the subject as it considered the appropriateness of rescinding the memorandum.[42] The EPA received numerous comments related to both the EPA's evaluation of SIP submissions relying on an alternative threshold, and the EPA's experience with alternative thresholds. The EPA is not, at this time rescinding the August 2018 memorandum; however, for purposes of evaluating contribution thresholds for the 2015 ozone NAAQS, the EPA continues to find the use of an alternative threshold problematic for the reasons stated at proposal. Regardless of the EPA's position on the August 2018 memorandum, the EPA continues to find that the arguments put forth in the SIP submissions of by Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Oklahoma, and Utah, as well as arguments in comments received on these actions, to be inadequate. *See* Section V.B.7 and the RTC Document for additional detail.

4. Step 3 of the 4-Step Interstate Transport Framework

Consistent with the EPA's longstanding approach to eliminating significant contribution and interference with maintenance, at Step 3, a multifactor assessment of potential emissions controls is conducted for states linked at Steps 1 and 2. The EPA's analysis at Step 3 in prior Federal actions addressing interstate transport requirements has primarily focused on an evaluation of cost-effectiveness of potential emissions controls (on a marginal cost-per-ton basis), the total emissions reductions that may be achieved by requiring such controls (if applied across all linked upwind states), and an evaluation of the air quality impacts such emissions reductions would have on the downwind receptors to which a state is linked; other factors may potentially be relevant if

---

[42] *See, e.g.,* 87 FR 9551.

adequately supported. In general, where the EPA's or state-provided alternative air quality and contribution modeling establishes that a state is linked at Steps 1 and 2, it will be insufficient at Step 3 for a state merely to point to its existing rules requiring control measures as a basis for SIP approval. In general, the emissions-reducing effects of all existing emissions control requirements are already reflected in the future year projected air quality results of the modeling for Steps 1 and 2. If the state is shown to still be linked to one or more downwind receptor(s) despite these existing controls, but that state believes it has no outstanding good neighbor obligations, the EPA expects the state to provide sufficient justification to support a conclusion by the EPA that the state has adequate provisions prohibiting ''any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will'' ''contribute significantly to nonattainment in, or interfere with maintenance by,'' any other State with respect to the NAAQS. *See* CAA section 110(a)(2)(D)(i)(I). While the EPA has not prescribed a particular method for this assessment, as many commenters note, the EPA expects states at a minimum to present a sufficient technical evaluation. This would typically include information on emissions sources, applicable control technologies, emissions reductions, costs, cost effectiveness, and downwind air quality impacts of the estimated reductions, before concluding that no additional emissions controls should be required.[43] The EPA responds to comment on issues related to Step 3 in Section V.B.8. and in the RTC document.

5. Step 4 of the 4-Step Interstate Transport Framework

At Step 4, states (or the EPA) develop permanent and federally-enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interfere with

maintenance of the NAAQS.[44] For a state linked at Steps 1 and 2 to rely on an emissions control measure at Step 3 to address its interstate transport obligations, that measure must be included in the state's SIP so that it is permanent and federally enforceable. *See* CAA section 110(a)(2)(D) (''Each such [SIP] shall . . . contain adequate provisions. . . .''). *See also* CAA section 110(a)(2)(A); *Committee for a Better Arvin* v. *EPA*, 786 F.3d 1169, 1175–76 (9th Cir. 2015) (holding that measures relied on by a state to meet CAA requirements must be included in the SIP).

**III. The EPA's Updated Air Quality and Contribution Analysis**

As noted in Section II, the EPA relied in part on its 2016v2 emissions platform-based air quality modeling to support its proposed interstate transport actions taken in 2022. Following receipt of comments, the EPA updated this modeling, incorporating new information received to create the 2016v3 emissions inventory and making additional updates to improve model performance. Using the 2016v3 emissions inventory, the EPA evaluated modeling projections for air quality monitoring sites and considered current ozone monitoring data at these sites to identify receptors that are anticipated to have problems attaining or maintaining the 2015 ozone NAAQS.

This section presents a summary of the methodology and results of the 2016v3 modeling of 2023, along with the application of the EPA's Step 1 and Step 2 methodology for identifying receptors and upwind states that contribute to those receptors. We also explain that current measured ozone levels based on data for 2021 and preliminary data for 2022 at other monitoring sites (*i.e.,* monitoring sites that are not projected to be receptors in 2023 based on air quality modeling) confirm the likely continuation of elevated ozone levels in 2023 at these locations and confirm that nearly all upwind states in this action are also linked above 1 percent of the NAAQS to one or more of these monitors.

While all of this information compiled by the EPA (both the modeling and monitoring data) plays a critical role in the basis for this final action, the EPA has also thoroughly evaluated the modeling information and other analyses and arguments presented by the upwind states in their SIP submittals. Our evaluation of the states' analyses was generally set forth in the

proposals, and the EPA in this final action has responded to comments on our evaluation of the various information and arguments made by states. The EPA's final decision to disapprove these states' SIP submittals is based on our evaluation of the entire record, recognizing that states possess the authority in the first instance to propose how they would address their significant contribution to air quality problems in other states. Nonetheless, as explained in the proposals, and in this document and supporting materials in the docket, we conclude that no state included in this action effectively demonstrated that it will not be linked to at least one air quality receptor in 2023, and none of these states' various arguments for alternative approaches ultimately present a satisfactory basis for the EPA to approve these states' SIP submissions.

*A. Description of Air Quality Modeling for the Final Action*

In this section, the Agency describes the air quality modeling performed consistent with Steps 1 and 2 of the 4-step interstate transport framework to (1) Identify locations where it expects nonattainment or maintenance problems with respect to the 2015 ozone NAAQS for the 2023 analytic year, and (2) quantify the contributions from anthropogenic emissions from upwind states to downwind ozone concentrations at monitoring sites projected to be in nonattainment or have maintenance problems for the 2015 ozone NAAQS in 2023. This section includes information on the air quality modeling platform used in support of the final SIP disapproval action with a focus on the base year and future base case emissions inventories. The EPA also provides the projection of 2023 ozone concentrations and the interstate contributions for 8-hour ozone. The Final Action AQM TSD in Docket ID No. EPA–HQ–OAR–2021–0663 contains more detailed information on the air quality modeling aspects supporting our final action on these SIP submissions.

1. Public Review of Air Quality Modeling Information for the Proposed Action

The EPA provided several opportunities to comment on the emissions modeling platform and air quality modeling results that were used for the proposed SIP submission actions. On September 20, 2021, the EPA publicly released via our web page updated emissions inventories (2016v2) and requested comment from states and

---

[43] Because no state included new enforceable emissions control measures in the submissions under review here, we focus our analysis on whether states justified that no additional controls were required. As examples of general approaches for how a Step 3 analysis could be conducted for their sources, states could look to the CSAPR Update, 81 FR 74504, 74539–51; CSAPR, 76 FR 48208, 48246–63; CAIR, 70 FR 25162, 25195–229; or the NOₓ SIP Call, 63 FR 57356, 57399–405. *See also* Revised CSAPR Update, 86 FR 23054, 23086–23116. Consistently across these rulemakings, the EPA has developed emissions inventories, analyzed different levels of control stringency at different cost thresholds, and assessed resulting downwind air quality improvements.

[44] The EPA notes that any controls included in an approved SIP are federally-enforceable.

MJOs on these data.[45] In January 2022, the EPA released air quality modeling results including projected ozone design values and contributions from 2023 based on the 2016v2 emissions. At that time the EPA indicated its intent to use these data to support upcoming transport rulemakings. Then, on February 22, 2022, the EPA published proposed disapprovals for 19 interstate transport SIP submissions using the modeling data released in January 2022 and the emissions inventories shared in September 2021.[46] The EPA provided a 60-day comment period on these proposals. On May 24, 2022, the EPA proposed disapprovals for an additional four states' interstate transport SIP submissions using the same modeling platform, and provided a 62-day comment period.[47] The EPA provided a 30-day comment period beginning on October 25, 2022, on the proposed disapproval of Alabama's June 21, 2022, SIP submission, which relied on the same modeling platform as the other noted proposals.[48] In addition to its proposed disapprovals, the EPA also proposed approval of Iowa's, Arizona's, and Colorado's SIP submissions using the 2016v2 modeling and provided 30-day comment periods. 87 FR 9477 (February 22, 2022) (Iowa); 87 FR 37776 (June 24, 2022) (Arizona); and 87 FR 27050 (May 6, 2022) (Colorado).

2. Overview of Air Quality Modeling Platform

The EPA used version 3 of the 2016-based modeling platform (*i.e.*, 2016v3) for the air quality modeling for this final SIP disapproval action. This modeling platform includes 2016 base year emissions from anthropogenic and natural sources and future year projected anthropogenic emissions for 2023.[49] The emissions data contained in the 2016v3 platform represent an update to the 2016 version 2 inventories used for the proposal modeling.

The air quality modeling for this final disapproval action was performed for a modeling region (*i.e.*, modeling domain) that covers the contiguous 48 states using a horizontal resolution of 12 x 12 km. The EPA used the CAMx version 7.10 for air quality modeling which is the same model that the EPA used for the proposed rule air quality modeling.[50] Additional information on the 2016-based air quality modeling platform can be found in the Final Action AQM TSD.

*Comments:* Commenters noted that the 2016 base year summer maximum daily average 8-hour (MDA8) ozone predictions from the proposal modeling were biased low compared to the corresponding measured concentrations in certain locations. In this regard, commenters said that model performance statistics for a number of monitoring sites, particularly those in portions of the West and in the area around Lake Michigan, were outside the range of published performance criteria for normalized mean bias (NMB) and normalized mean error (NME) of less than plus or minus 15 percent and less than 25 percent, respectively.[51] Commenters say the EPA must investigate the factors contributing to low bias and make necessary corrections to improve model performance in the modeling supporting final SIP actions. Some commenters said that the EPA should include NOₓ emissions from lightning strikes and assess the treatment of other background sources of ozone to improve model performance for the final action. Additional information on the comments on model performance can be found in the RTC document for this final SIP disapproval action.

*EPA Response:* In response to these comments the EPA examined the temporal and spatial characteristics of model under prediction to investigate the possible causes of under prediction of MDA8 ozone concentrations in different regions of the U.S. in the proposal modeling. The EPA's analysis indicates that the under prediction was most extensive during May and June with less bias during July and August in most regions of the U.S. For example, in the Upper Midwest region model under prediction was larger in May and June compared to July through September. Specifically, the normalized mean bias for days with measured concentrations greater than or equal to 60 ppb improved from a 21.4 percent under prediction for May and June to a 12.6 percent under prediction in the period July through September. As described in the AQM TSD, the seasonal pattern in bias in the Upper Midwest region improves somewhat gradually with time from the middle of May to the latter part of June. In view of the seasonal pattern in bias in the Upper Midwest and in other regions of the U.S., the EPA focused its investigation of model performance on model inputs that, by their nature, have the largest temporal variation within the ozone season. These inputs include emissions from biogenic sources and lightning NOₓ, and contributions from transport of international anthropogenic emissions and natural sources into the U.S. Both biogenic and lightning NOₓ emissions in the U.S. dramatically increase from spring to summer.[52][53] In contrast, ozone transported into the U.S. from international anthropogenic and natural sources peaks during the period March through June, with lower contributions during July through September.[54][55] To investigate the impacts of the sources, the EPA conducted sensitivity model runs which focused on the effects on model performance of adding NOₓ emissions from lightning strikes, using updated biogenic emissions, and using an alternative approach (described in more detail later in this section) for quantifying transport of ozone and precursor pollutants into the U.S. from international anthropogenic and natural sources. In the air quality modeling for proposal, the amount of transport from international sources was based on a simulation of the hemispheric version of the Community Multi-scale Air Quality

[45] *https://www.epa.gov/air-emissions-modeling/ 2016v2-platform.*

[46] These proposals are listed in footnote 5 of this action.

[47] The EPA also relied on this same modeling data to support proposed Federal Implementation Plans (FIPs) resolving interstate transport obligations for 27 states for the 2015 ozone NAAQS. 87 FR 20036 (April 6, 2022). The EPA allowed 60 days to receive comments on the proposed FIP rule, including acceptance of comment on the 2016v2 emissions inventory-based modeling platform. The EPA then allowed for an additional 15 days via an extension of the comment period. 87 FR 29108 (May 12, 2022).

[48] 87 FR 64412, 64413.

[49] The 2016v3 platform also includes projected emissions for 2026. However, the 2026 data are not applicable and were not used in this final action.

[50] Ramboll Environment and Health, January 2021, *https://www.camx.com.*

[51] Christopher Emery, Zhen Liu, Armistead G. Russell, M. Talat Odman, Greg Yarwood & Naresh Kumar (2017) Recommendations on statistics and benchmarks to assess photochemical model performance, Journal of the Air & Waste Management Association, 67:5, 582–598, DOI: 10.1080/10962247.1265027.

[52] Guenther, A.B., 1997. Seasonal and spatial variations in natural volatile organic compound emissions. Ecol. Appl. 7, 34–45. *http://dx.doi.org/ 10.1890/1051-0761(1997) 007[0034:SASVIN]2.0.CO;2.* Guenther, A., Hewitt, C.N., Erickson, D., Fall, R.

[53] Kang D, Mathur R, Pouliot GA, Gilliam RC, Wong DC. Significant ground-level ozone attributed to lightning-induced nitrogen oxides during summertime over the Mountain West States. NPJ Clim Atmos Sci. 2020 Jan 30;3:6. doi: 10.1038/ s41612–020–0108–2. PMID: 32181370; PMCID: PMC7075249.

[54] Jaffe DA, Cooper OR, Fiore AM, Henderson BH, Tonnesen GS, Russell AG, Henze DK, Langford AO, Lin M, Moore T. Scientific assessment of background ozone over the U.S.: Implications for air quality management. Elementa (Wash DC). 2018;6(1):56. doi: 10.1525/elementa.309. PMID: 30364819; PMCID: PMC6198683.

[55] Henderson, B.H., P. Dolwick, C. Jang, A., Eyth, J. Vukovich, R. Mathur, C. Hogrefe, N. Possiel, G. Pouliot, B. Timin, K.W. Appel, 2019. Global Sources of North American Ozone. Presented at the 18th Annual Conference of the UNC Institute for the Environment Community Modeling and Analysis System (CMAS) Center, October 21–23, 2019.

Model (H–CMAQ)[56] for 2016. The outputs from this hemispheric modeling were then used to provide boundary conditions for the national scale air quality modeling at proposal.[57] Overall, H–CMAQ tends to under predict daytime ozone concentrations at rural and remote monitoring sites across the U.S. during the spring of 2016 whereas the predictions from the GEOS-Chem global model[58] were generally less biased.[59] During the summer of 2016 both models showed varying degrees of over prediction with GEOS-Chem showing somewhat greater over prediction, compared to H–CMAQ. In view of those results, the EPA examined the impacts of using GEOS-Chem as an alternative to H–CMAQ for providing boundary conditions for the modeling supporting this final action.

For the lightning $NO_X$, biogenics, and GEOS-Chem sensitivity runs, the EPA reran the proposal modeling using each of these inputs, individually. Results from these sensitivity runs indicate that each of the three updates provides an improvement in model performance. However, by far the greatest improvement in modeling performance is attributable to the use of GEOS-Chem. In view of these results the EPA has included lightning $NO_X$ emissions, updated biogenic emissions, and international transport from GEOS-Chem in the air quality modeling supporting final SIP actions. Details on the results of the individual sensitivity runs can be found in the AQM TSD. For the air quality modeling supporting final SIP actions, model performance based on days in 2016 with measured

MDA8 ozone greater than or equal to 60 ppb is considerably improved (*i.e.,* less bias and error) compared to the proposal modeling in nearly all regions. For example, in the Upper Midwest, which includes monitoring sites along Lake Michigan, the normalized mean bias improved from a 19 percent under prediction to a 6.9 percent under prediction and in the Southwest region, which includes monitoring sites in Denver, Las Cruces, El Paso, and Salt Lake City, normalized mean bias improved from a 13.6 percent under prediction to a 4.8 percent under prediction.[60] In all regions, the normalized mean bias and normalized mean error statistics for high ozone days based on the modeling supporting final SIP actions are within the range of performance criteria benchmarks (*i.e.,* less than plus or minus 15 percent for normalized mean bias and less than 25 percent for normalized mean error).[61] Additional information on model performance information is provided in the AQM TSD. In summary, the EPA included emissions of lightning $NO_X$, as requested by commenters, and investigated and addressed concerns about model performance for the modeling supporting final SIP actions.

### 3. Emissions Inventories

The EPA developed emissions inventories to support air quality modeling for this final action, including emissions estimates for EGUs, non-EGU point sources (*i.e.,* stationary point sources), stationary nonpoint sources, onroad mobile sources, nonroad mobile sources, other mobile sources, wildfires, prescribed fires, and biogenic emissions that are not the direct result of human activities. The EPA's air quality modeling relies on this comprehensive set of emissions inventories because emissions from multiple source categories are needed to model ambient air quality and to facilitate comparison of model outputs with ambient measurements.

Prior to the modeling of air quality, the emissions inventories must be processed into a format that is appropriate for the air quality model to use. To prepare the emissions inventories for air quality modeling, the EPA processed the emissions

inventories using the Sparse Matrix Operator Kernel Emissions (SMOKE) Modeling System version 4.9 to produce the gridded, hourly, speciated, model-ready emissions for input to the air quality model. Additional information on the development of the emissions inventories and on data sets used during the emissions modeling process are provided in the document titled "Technical Support Document (TSD): Preparation of Emissions Inventories for the 2016v3 North American Emissions Modeling Platform," hereafter known as the "2016v3 Emissions Modeling TSD." This TSD is available in the docket for this action.[62]

### 4. Foundation Emissions Inventory

The 2016v3 platform is comprised of data from various sources including data developed using models, methods, and source datasets that became available in calendar years 2020 through 2022, in addition to data retained from the Inventory Collaborative 2016 version 1 (2016v1) Emissions Modeling Platform, released in October 2019. The 2016v1 platform was developed through a national collaborative effort between the EPA and state and local agencies along with MJOs. The 2016v2 platform used to support the proposed action included updated data, models and methods as compared to 2016v1. The 2016v3 platform includes updates implemented in response to comments along with other updates to the 2016v2 platform such as corrections and the incorporation of updated data sources that became available prior to the 2016v3 inventories being developed. Several commenters noted that the 2016v2 platform did not include $NO_X$ emissions that resulted from lightning strikes. To address this, lightning $NO_X$ emissions were computed and included in the 2016v3 platform.

For this final action, the EPA developed emissions inventories for the base year of 2016 and the projected year of 2023. The 2023 inventories represent changes in activity data and of predicted emissions reductions from on-the-books actions, planned emissions control installations, and promulgated Federal measures that affect anthropogenic emissions. The 2016 emissions inventories for the U.S. primarily include data derived from the 2017 National Emissions Inventory (2017

---

[56] Mathur, R., Gilliam, R., Bullock, O.R., Roselle, S., Pleim, J., Wong, D., Binkowski, F., and 1 Streets, D.: Extending the applicability of the community multiscale air quality model to 2 hemispheric scales: motivation, challenges, and progress. In: Steyn DG, Trini S (eds) Air 3 pollution modeling and its applications, XXI. Springer, Dordrecht, pp 175–179, 2012.

[57] Boundary conditions are the concentrations of pollutants along the north, east, south, and west boundaries of the air quality modeling domain. Boundary conditions vary in space and time and are typically obtained from predictions of global or hemispheric models. Information on how boundary conditions were developed for modeling supporting EPA's final SIP actions can be found in the AQM TSD.

[58] I. Bey, D.J. Jacob, R.M. Yantosca, J.A. Logan, B.D. Field, A.M. Fiore, Q. Li, H.Y. Liu, L.J. Mickley, M.G. Schultz. Global modeling of tropospheric chemistry with assimilated meteorology: model description and evaluation. J. Geophys. Res. Atmos., 106 (2001), pp. 23073–23095, 10.1029/2001jd000807.

[59] Henderson, B.H., P. Dolwick, C. Jang, A., Eyth, J. Vukovich, R. Mathur, C. Hogrefe, G. Pouliot, N. Possiel, B. Timin, K.W. Appel, 2022. Meteorological and Emission Sensitivity of Hemispheric Ozone and $PM_{2.5}$. Presented at the 21st Annual Conference of the UNC Institute for the Environment Community Modeling and Analysis System (CMAS) Center, October 17–19, 2022.

[60] A comparison of model performance from the proposal modeling to the final modeling for individual monitoring sites can be found in the docket for this final action.

[61] Christopher Emery, Zhen Liu, Armistead G. Russell, M. Talat Odman, Greg Yarwood & Naresh Kumar (2017) Recommendations on statistics and benchmarks to assess photochemical model performance, Journal of the Air & Waste Management Association, 67:5, 582–598, DOI: 10.1080/10962247.1265027.

[62] *See* Preparation of Emissions Inventories for the 2016v3 North American Emissions Modeling Platform TSD, also available at *https://www.epa.gov/air-emissions-modeling/2016v3-platform.*

NEI [63] and data specific to the year of 2016. The following sections provide an overview of the construct of the 2016v3 emissions and projections. The fire emissions were unchanged between the 2016v2 and 2016v3 emissions platforms. For the 2016v3 platform, the biogenic emissions were updated to use the latest available versions of the Biogenic Emissions Inventory System and associated land use data to help address comments related to a degradation in model performance in the 2016v2 platform as compared to the 2016v1 platform. Details on the construction of the inventories are available in the 2016v3 Emissions Modeling TSD. Details on how the EPA responded to comments related to emissions inventories are available in the RTC document for this action.

Development of emissions inventories for annual $NO_X$ and sulfur dioxide $(SO_2)$ emissions for EGUs in the 2016 base year inventory are based primarily on data from continuous emissions monitoring systems (CEMS) and other monitoring systems allowed for use by qualifying units under 40 CFR part 75, with other EGU pollutants estimated using emissions factors and annual heat input data reported to the EPA. For EGUs not reporting under part 75, the EPA used data submitted to the NEI by state, local, and tribal agencies. The final action inventories include updates made in response to comments on the proposed actions including the proposed SIP submission disapprovals and the proposed FIP. The Air Emissions Reporting Rule, (80 FR 8787; February 19, 2015), requires that Type A point sources large enough to meet or exceed specific thresholds for emissions be reported to the EPA via the NEI every year, while the smaller Type B point sources must only be reported to EPA every 3 years. In response to comments, emissions data for EGUs that did not have data submitted to the NEI specific to the year 2016 were filled in with data from the 2017 NEI. For more information on the details of how the 2016 EGU emissions were developed and prepared for air quality modeling, *see* the 2016v3 Emissions Modeling TSD.

The EPA projected 2023 baseline EGU emissions using version 6 of the Integrated Planning Model (IPM) (*www.epa.gov/airmarkets/powersector-modeling*). IPM, developed by ICF Consulting, is a state-of-the-art, peer-reviewed, multi-regional, dynamic, deterministic linear programming model of the contiguous U.S. electric power sector. It provides forecasts of least cost capacity expansion, electricity dispatch, and emissions control strategies while meeting energy demand and environmental, transmission, dispatch, and reliability constraints. The EPA has used IPM for over two decades to better understand power sector behavior under future business-as-usual conditions and to evaluate the economic and emissions impacts of prospective environmental policies. The model is designed to reflect electricity markets as accurately as possible. The EPA uses the best available information from utilities, industry experts, gas and coal market experts, financial institutions, and government statistics as the basis for the detailed power sector modeling in IPM. The model documentation provides additional information on the assumptions discussed here as well as all other model assumptions and inputs.[64] The EPA relied on the same model platform as in the proposals but made substantial updates to reflect public comments on near-term fossil fuel market price volatility and updated fleet information reflecting Summer 2022 U.S. Energy Information Agency (EIA) 860 data, unit-level comments, and additional updates to the National Electric Energy Data System (NEEDS) inventory.

The IPM version 6—Updated Summer 2021 Reference Case incorporated recent updates through the summer 2022 to account for updated Federal and state environmental regulations (including Renewable Portfolio Standards (RPS), Clean Energy Standards (CES) and other state mandates), fleet changes (committed EGU retirements and new builds), electricity demand, technology cost and performance assumptions from recent data for renewables adopting from National Renewable Energy Lab (NREL's) Annual Technology Baseline 2020 and for fossil sources from the EIA's Annual Energy Outlook (AEO) 2020. Natural gas and coal price projections reflect data developed in fall 2020 but updated in summer 2022 to capture near-term price volatility and current market conditions. The inventory of EGUs provided as an input to the model was the NEEDS fall 2022 version and is available on the EPA's website.[65] This version of NEEDS reflects announced retirements and under construction new builds known as of early summer 2022. This projected base case accounts for the effects of the final Mercury and Air Toxics Standards rule, CSAPR, the CSAPR Update, the Revised CSAPR Update, New Source Review enforcement settlements, the final Effluent Limitation Guidelines (ELG) Rule, the Coal Combustion Residual (CCR) Rule, and other on-the-books Federal and state rules (including renewable energy tax credit extensions from the Consolidated Appropriations Act of 2021) through early 2021 impacting emissions of $SO_2$, $NO_X$, directly emitted particulate matter, carbon dioxide $(CO_2)$, and power plant operations. It also includes final actions, up through the Summer 2022, the EPA has taken to implement the Regional Haze Rule and best available retrofit technology (BART) requirements. Documentation of IPM version 6 and NEEDS, along with updates, is in Docket ID No. EPA–HQ–OAR–2021–0663 and available online at *https://www.epa.gov/airmarkets/power-sector-modeling.*

Non-EGU point source emissions are mostly consistent with those in the proposal modeling except where they were updated in response to comments. Several commenters mentioned that point source emissions carried forward from 2014 NEI were not the best estimates of 2017 emissions. Thus, emissions sources in 2016v2 that had been projected from the 2014 NEI in the proposal were replaced with emissions based on the 2017 NEI. Point source emissions submitted to the 2016 NEI or to the 2016v1 platform development process specifically for the year 2016 were retained in 2016v3.

The 2023 non-EGU point source emissions were grown from 2016 to 2023 using factors based on AEO 2022 and reflect emissions reductions due to known national and local rules, control programs, plant closures, consent decrees, and settlements that could be computed as reductions to specific units by July 2022.

Aircraft emissions and ground support equipment at airports are represented as point sources and are based on adjustments to emissions in the January 2021 version of the 2017 NEI. The EPA developed and applied factors to adjust the 2017 airport emissions to 2016 and 2023 based on activity growth projected by the Federal Aviation Administration Terminal Area Forecast 2021,[66] the latest available version at the time the factors were developed.

---

[63] *https://www.epa.gov/air-emissions-inventories/2017-national-emissions-inventory-nei-technical-support-document-tsd.*

[64] Detailed information and documentation of the EPA's Base Case, including all the underlying assumptions, data sources, and architecture parameters can be found on the EPA's website at: *https://www.epa.gov/airmarkets/power-sector-modeling.*

[65] *Available at https://www.epa.gov/airmarkets/national-electric-energy-data-system-needs-v6.*

[66] *https://www.faa.gov/data_research/aviation/taf/.*

Emissions at rail yards were represented as point sources. The 2016 rail yard emissions are largely consistent with the 2017 NEI rail yard emissions. The 2016 and 2023 rail yard emissions were developed through the 2016v1 Inventory Collaborative process. Class I rail yard emissions were projected based on the AEO freight rail energy use growth rate projections for 2023 with the fleet mix assumed to be constant throughout the period.

The EPA made multiple updates to point source oil and gas emissions in response to comments. For the 2016v3 modeling, the point source oil and gas emissions for 2016 were based on the 2016v2 point inventory except that most 2014 NEI-based emissions were replaced with 2017 NEI emissions. Additionally, in response to comments, state-provided emissions equivalent to those in the 2016v1 platform were used for Colorado, and some New Mexico emissions were replaced with data backcast from 2020 to 2016. To develop inventories for 2023 for the 2016v3 platform, the year 2016 oil and gas point source inventories were first projected to 2021 values based on actual historical production data, then those 2021 emissions were projected to 2023 using regional projection factors based on AEO 2022 projections. This was an update from the 2016v2 approach in which actual data were used only through the year 2019, because 2021 data were not yet available. $NO_X$ or VOC reductions resulting from co-benefits to New Source Performance Standards (NSPS) for Stationary Reciprocating Internal Combustion Engines (RICE) are reflected, along with Natural Gas Turbine and Process Heater NSPS $NO_X$ controls and Oil and Gas NSPS VOC controls. In some cases, year 2019 point source inventory data were used instead of the projected future year emissions except for the Western Regional Air Partnership (WRAP) states of Colorado, New Mexico, Montana, Wyoming, Utah, North Dakota, and South Dakota. The WRAP future year inventory [67] was used in these WRAP states in all future years except in New Mexico where the WRAP base year emissions were projected using the EIA historical and AEO forecasted production data. Estimated impacts from the recent oil and gas rule in the New Mexico Administrative code 20.2.50 [68] were also included. Details on the development of the projected point and nonpoint oil and gas emissions inventories are available in the 2016v3 Emissions Modeling TSD in Docket ID No. EPA–HQ–OAR–2021–0663.

Onroad mobile sources include exhaust, evaporative, and brake and tire wear emissions from vehicles that drive on roads, parked vehicles, and vehicle refueling. Emissions from vehicles using regular gasoline, high ethanol gasoline, diesel fuel, and electric vehicles were represented, along with buses that used compressed natural gas. The EPA developed the onroad mobile source emissions for states other than California using the EPA's Motor Vehicle Emissions Simulator (MOVES). MOVES3 was released in November 2020 and has been followed by some minor releases that improved the usage of the model but that do not have substantive impacts on the emissions estimates. For 2016v2, MOVES3 was run using inputs provided by state and local agencies through the 2017 NEI where available, in combination with nationally available data sets to develop a complete inventory. Onroad emissions were developed based on emissions factors output from MOVES3 run for the year 2016, coupled with activity data (*e.g.,* vehicle miles traveled and vehicle populations) representing the year 2016. The 2016 activity data were provided by some state and local agencies through the 2016v1 process, and the remaining activity data were derived from those used to develop the 2017 NEI. The onroad emissions were computed within SMOKE by multiplying emissions factors developed using MOVES with the appropriate activity data. Prior to computing the final action emissions for 2016, updates to some onroad inputs were made in response to comments and to implement corrections. Onroad mobile source emissions for California were consistent with the updated emissions data provided by the state for the final action.

The 2023 onroad emissions reflect projected changes to fuel properties and usage, along with the impact of the rules included in MOVES3 for each of those years. MOVES emissions factors for the year 2023 were used. A comprehensive list of control programs included for onroad mobile sources is available in the 2016v3 Emissions Modeling TSD. Year 2023 activity data for onroad mobile sources were provided by some state and local agencies, and otherwise were projected to 2023 by first projecting the 2016 activity to year 2019 based on county level vehicle miles traveled (VMT) from the Federal Highway Administration. The VMT were held flat from 2019 to 2021 to account for pandemic impacts, and then projected from 2021 to 2023 using AEO 2022-based factors.[69] Recent updates to inspection and maintenance programs in North Carolina and Tennessee were reflected in the MOVES inputs for the modeling supporting this final action. The 2023 onroad mobile emissions were computed within SMOKE by multiplying the respective emissions factors developed using MOVES with the year-specific activity data. Prior to computing the final action emissions for 2023, the EPA made updates to some onroad inputs in response to comments and to implement corrections.

The commercial marine vessel (CMV) emissions in the 2016 base case emissions inventory for this action were based on those in the 2017 NEI. Factors were applied to adjust the 2017 NEI emissions backward to represent emissions for the year 2016. The CMV emissions are consistent with the emissions for the 2016v1 platform CMV emissions released in February 2020 although, in response to comments, the EPA implemented an improved process for spatially allocating CMV emissions along state and county boundaries for the modeling supporting this final action.

The EPA developed nonroad mobile source emissions inventories (other than CMV, locomotive, and aircraft emissions) for 2016 and 2023 from monthly, county, and process level emissions output from MOVES3. Types of nonroad equipment include recreational vehicles, pleasure craft, and construction, agricultural, mining, and lawn and garden equipment.[70] The nonroad emissions for the final action were unchanged from those at the proposal. The nonroad mobile emissions control programs include reductions to locomotives, diesel engines, and recreational marine engines, along with standards for fuel sulfur content and evaporative emissions. A comprehensive list of

[67] http://www.wrapair2.org/pdf/WRAP_OGWG_2028_OTB_RevFinalReport_05March2020.pdf.

[68] https://www.env.nm.gov/air-quality/ozone-draft-rule/ and https://www.srca.nm.gov/parts/title20/20.002.0050.html.

[69] VMT data for 2020 were the latest available at the time of final rule data development but were heavily impacted by the pandemic and unsuitable to project to 2023; in addition, it was determined that chaining factors based on AEO 2020 and AEO2021 obtain the needed factors led to unrealistic artifacts, thus only AEO 2022 data were used.

[70] Line haul locomotives are also considered a type of nonroad mobile source but the emissions inventories for locomotives were not developed using MOVES3. Year 2016 and 2023 locomotive emissions were developed through the 2016v1 process, and the year 2016 emissions are mostly consistent with those in the 2017 NEI. The projected locomotive emissions for 2023 were developed by applying factors to the base year emissions using activity data based on AEO freight rail energy use growth rate projections along with emissions rates adjusted to account for recent historical trends.

control programs included for mobile sources is available in the 2016v3 Emissions Modeling TSD.

For stationary nonpoint sources, some emissions in the 2016 base case emissions inventory come directly from the 2017 NEI, others were adjusted from the 2017 NEI to represent 2016 levels, and the remaining emissions including those from oil and gas, fertilizer, and solvents were computed specifically to represent 2016. Stationary nonpoint sources include evaporative sources, consumer products, fuel combustion that is not captured by point sources, agricultural livestock, agricultural fertilizer, residential wood combustion, fugitive dust, and oil and gas sources. The emissions sources derived from the 2017 NEI include agricultural livestock, fugitive dust, residential wood combustion, waste disposal (including composting), bulk gasoline terminals, and miscellaneous non-industrial sources such as cremation, hospitals, lamp breakage, and automotive repair shops. A recent method to compute solvent VOC emissions was used.[71]

Where comments were provided about projected control measures or changes in nonpoint source emissions, those inputs were first reviewed by the EPA. Those found to be based on reasonable data for affected emissions sources were incorporated into the projected inventories for 2023 to the extent possible. Where possible, projection factors based on the AEO used data from AEO 2022, the most recent AEO at the time available at the time the inventories were developed. Federal regulations that impact the nonpoint sources were reflected in the inventories. Adjustments for state fuel sulfur content rules for fuel oil in the Northeast were included along with solvent controls applicable within the northeast ozone transport region (OTR) states. Details are available in the 2016v3 Emissions Modeling TSD.

Nonpoint oil and gas emissions inventories for many states were developed based on outputs from the 2017 NEI version of the EPA Oil and Gas Tool using activity data for year 2016. Production-related emissions data from the 2017 NEI were used for Oklahoma, 2016v1 emissions were used for Colorado and Texas production-related sources to respond to comments. Data for production-related nonpoint oil and gas emissions in the States of Colorado, Montana, New Mexico, North Dakota, South Dakota, Utah, and Wyoming were obtained from the WRAP baseline inventory.[72] A California Air Resources Board-provided inventory was used for 2016 oil and gas emissions in California. Nonpoint oil and gas inventories for 2023 were developed by first projecting the 2016 oil and gas inventories to 2021 values based on actual production data. Next, those 2021 emissions were projected to 2023 using regional projection factors by product type based on AEO 2022 projections. A 2017–2019 average inventory was used for oil and natural gas exploration emissions in 2023 everywhere except for California and in the WRAP states in which data from the WRAP future year inventory[73] were used. NOₓ and VOC reductions that are co-benefits to the NSPS for RICE are reflected, along with Natural Gas Turbines and Process Heaters NSPS NOₓ controls and NSPS Oil and Gas VOC controls. The WRAP future year inventory was used for oil and natural gas production sources in 2023 except in New Mexico where the WRAP Base year emissions were projected using the EIA historical and AEO forecasted production data. Estimated impacts from the New Mexico Administrative Code 20.2.50 were included.

## B. Air Quality Modeling To Identify Nonattainment and Maintenance Receptors

This section describes the air quality modeling and analyses that the EPA performed in Step 1 to identify locations where the Agency expects there to be nonattainment or maintenance receptors for the 2015 ozone NAAQS in 2023. Where the EPA's analysis shows that an area or site does not fall under the definition of a nonattainment or maintenance receptor in 2023, that site is excluded from further analysis under the EPA's good neighbor framework.

### 1. Approach for Identifying Receptors

In the proposed actions, the EPA applied the same approach used in the CSAPR Update and the Revised CSAPR Update to identify nonattainment and maintenance receptors for the 2008 ozone NAAQS.[74] The EPA's approach gives independent effect to both the "contribute significantly to nonattainment" and the "interfere with maintenance" prongs of section 110(a)(2)(D)(i)(I), consistent with the D.C. Circuit's direction in *North Carolina*. Further, in its decision on the remand of CSAPR from the Supreme Court in the *EME Homer City II* case, the D.C. Circuit confirmed that the EPA's approach to identifying maintenance receptors in CSAPR comported with the court's prior instruction to give independent meaning to the "interfere with maintenance" prong in the good neighbor provision.[75]

In the CSAPR Update and the Revised CSAPR Update, the EPA identified nonattainment receptors as those monitoring sites that are projected to have average design values that exceed the NAAQS and that are also measuring nonattainment based on the most recent monitored design values. This approach is consistent with prior transport rulemakings, such as the NOₓ SIP Call and CAIR, where the EPA defined nonattainment receptors as those areas that both currently monitor nonattainment and that the EPA projects will be in nonattainment in the future compliance year.

The Agency explained in the NOₓ SIP Call and CAIR and then reaffirmed in the CSAPR Update that the EPA has the most confidence in our projections of nonattainment for those counties that also measure nonattainment for the most recent period of available ambient data. The EPA separately identified maintenance receptors as those receptors that would have difficulty maintaining the relevant NAAQS in a scenario that accounts for historical variability in air quality at that receptor. The variability in air quality was determined by evaluating the "maximum" future design value at each receptor based on a projection of the maximum measured design value over the relevant period. The EPA interprets the projected maximum future design value to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor (*i.e.*, ozone conducive meteorology). The EPA also recognizes that previously experienced meteorological conditions (*e.g.*, dominant wind direction, temperatures, and air mass patterns) promoting ozone formation that led to maximum concentrations in the measured data may reoccur in the future. The maximum design value gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur. The projected maximum design value is used to identify upwind emissions that, under those circumstances, could interfere with the downwind area's ability to maintain the NAAQS.

---

[71] *https://doi.org/10.5194/acp-21-5079-2021.*

[72] *http://www.wrapair2.org/pdf/WRAP_OGWG_Report_Baseline_17Sep2019.pdf.*

[73] *http://www.wrapair2.org/pdf/WRAP_OGWG_2028_OTB_RevFinalReport_05March2020.pdf.*

[74] *See* 86 FR 23078–79.

[75] *EME Homer City II*, 795 F.3d at 136.

Therefore, applying this methodology for this action, the EPA assessed the magnitude of the maximum projected design values for 2023 at each receptor in relation to the 2015 ozone NAAQS and, where such a value exceeds the NAAQS, the EPA determined that receptor to be a ''maintenance'' receptor for purposes of defining interference with maintenance, consistent with the method used in CSAPR and upheld by the D.C. Circuit in *EME Homer City II*.[76] That is, monitoring sites with a maximum design value that exceeds the NAAQS are projected to have maintenance problems in the future analytic years.

Recognizing that nonattainment receptors are also, by definition, maintenance receptors, the EPA often uses the term ''maintenance-only'' to refer to receptors that are not also nonattainment receptors. Consistent with the concepts for maintenance receptors, as described earlier, the EPA identifies ''maintenance-only'' receptors as those monitoring sites that have projected average design values above the level of the applicable NAAQS, but that are not currently measuring nonattainment based on the most recent official design values. In addition, those monitoring sites with projected average design values below the NAAQS, but with projected maximum design values above the NAAQS are also identified as ''maintenance only'' receptors, even if they are currently measuring nonattainment based on the most recent official certified design values.[77]

*Comment:* The EPA received comments claiming that the projected design values for 2023 were biased low compared to recent measured data. Commenters noted that a number of monitoring sites that are projected to be below the NAAQS in 2023 based on the EPA's modeling for the proposed action are currently measuring nonattainment based on data from 2020 and 2021. One commenter requested that the EPA determine whether its past modeling tends to overestimate or underestimate actual observed design values. If EPA finds that the agency's model tends to underestimate future year design values, the commenter requests that EPA re-run its ozone modeling, incorporating parameters that account for this tendency.

*EPA Response:* In response to comments, the EPA compared the projected 2023 design values based on the proposal modeling to recent trends in measured data. As a result of this analysis, the EPA agrees that current data indicate that there are monitoring sites at risk of continued nonattainment in 2023 even though the model projected average and maximum design values at these sites are below the NAAQS (*i.e.,* these sites would not be modeling-based receptors at Step 1). While the EPA has confidence in the reliability of the modeling for projecting air quality conditions and contributions in future years, it would not be reasonable to ignore recent measured ozone levels in many areas that are clearly not fully consistent with certain concentrations in the Step 1 analysis for 2023. Therefore, the EPA has developed an additional maintenance-only receptor category, which includes what we refer to as ''violating monitor'' receptors, based on current ozone concentrations measured by regulatory ambient air quality monitoring sites.

Specifically, the EPA has identified monitoring sites with measured 2021 and preliminary 2022 design values *and* 4th high maximum daily 8-hour average (MDA8) ozone in both 2021 and 2022 (preliminary data) that exceed the NAAQS as having the greatest risk of continuing to have a problem attaining the standard in 2023. These criteria sufficiently consider measured air quality data so as to avoid including monitoring sites that have measured nonattainment data in recent years but could reasonably be anticipated to not have a nonattainment or maintenance problem in 2023, in line with our modeling results. Our methodology is intended only to identify those sites that have sufficiently poor ozone levels that there is clearly a reasonable expectation that an ozone nonattainment or maintenance problem will persist in the 2023 ozone season. Moreover, the 2023 ozone season is so near in time that recent measured ozone levels can be used to reasonably project whether an air quality problem is likely to persist. We view this approach to identifying additional receptors in 2023 as the best means of responding to the comments on this issue in this action, while also identifying all transport receptors.

For purposes of this action, we will treat these violating monitors as an additional type of maintenance-only receptor. We acknowledge that the traditional modeling plus monitoring methodology we used at proposal and in prior ozone transport rules would otherwise have identified such sites as being in attainment in 2023. Because our modeling did not identify these sites as receptors, we do not believe it is sufficiently certain that these sites will be in nonattainment that they should be considered nonattainment receptors. In the face of this uncertainty in the record, we regard our ability to consider such sites as receptors for purposes of good neighbor analysis under CAA section 110(a)(2)(D)(i)(I) to be a function of the requirement to prohibit emissions that interfere with maintenance of the NAAQS; even if an area may be projected to be in attainment, we have reliable information indicating that there is a clear risk that attainment will not in fact be achieved in 2023. Thus, our authority for treating these sites as receptors at Step 1 in 2023 flows from the responsibility in CAA section 110(a)(2)(i)(I) to prohibit emissions that interfere with maintenance of the NAAQS. *See, e.g., North Carolina,* 531 F.3d at 910–11 (failing to give effect to the interfere with maintenance clause ''provides no protection for downwind areas that, *despite EPA's predictions,* still find themselves struggling to meet NAAQS due to upwind interference . . . .'') (emphasis added). Recognizing that no modeling can perfectly forecast the future, and ''a degree of imprecision is inevitable in tackling the problem of interstate air pollution,'' this approach in the Agency's judgement best balances the need to avoid both ''under-control'' and ''overcontrol,'' *EME Homer City,* 572 U.S. at 523. The EPA's analysis of these additional receptors further is explained in Section III.C.

However, because we did not propose to apply this expansion of the basis for regulation under the good neighbor provision receptor-identification methodology as the sole basis for finding an upwind state linked, in this action we are only using this receptor category on a confirmatory basis. That is, for states that we find linked based on our traditional modeling-based methodology in 2023, we find in this final analysis that the linkage at Step 2 is strengthened and confirmed if that state is also linked to one or more ''violating-monitor'' receptors. If a state is only linked to a violating-monitor receptor in this final analysis, we are deferring taking final action on that state's SIP submittal. This is the case for the State of Tennessee. Among the states that previously had their transport SIPs approved for the 2015 ozone NAAQS, the EPA has also identified a linkage to violating-monitor receptors for the State of Kansas. The EPA intends to further review its air quality modeling results and recent measured ozone levels, and we intend to address these states' good

---

[76] *EME Homer City II,* 795 F.3d at 136.

[77] *See https://www.epa.gov/air-trends/air-quality-design-values* for design value reports. At the time of this action, the most recent reports of certified design values available are for the calendar year 2021. The 2022 values are considered ''preliminary'' and therefore subject to change before certification.

neighbor obligations as expeditiously as practicable in a future action.

2. Methodology for Projecting Future Year Ozone Design Values

Consistent with the EPA's modeling guidance, the 2016 base year and future year air quality modeling results were used in a relative sense to project design values for 2023.[78] That is, the ratios of future year model predictions to base year model predictions are used to adjust ambient ozone design values up or down depending on the relative (percent) change in model predictions for each location. The EPA's modeling guidance recommends using measured ozone concentrations for the 5-year period centered on the base year as the air quality data starting point for future year projections. This average design value is used to dampen the effects of inter-annual variability in meteorology on ozone concentrations and to provide a reasonable projection of future air quality at the receptor under average conditions. In addition, the Agency calculated maximum design values from within the 5-year base period to represent conditions when meteorology is more favorable than average for ozone formation. Because the base year for the air quality modeling used in this final action is 2016, measured data for 2014–2018 (i.e., design values for 2016, 2017, and 2018) were used to project average and maximum design values in 2023.

The ozone predictions from the 2016 and future year air quality model simulations were used to project 2016–2018 average and maximum ozone design values to 2023 using an approach similar to the approach in the EPA's guidance for attainment demonstration modeling. This guidance recommends using model predictions from the 3 x 3 array of grid cells surrounding the location of the monitoring site to calculate a Relative Response Factor (RRF) for that site. However, the guidance also notes that an alternative array of grid cells may be used in certain situations where local topographic or geographical feature (e.g., a large water body or a significant elevation change) may influence model response.

The 2016–2018 base period average and maximum design values were multiplied by the RRF to project each of these design values to 2023. In this manner, the projected design values are grounded in monitored data, and not the absolute model-predicted future year

concentrations. Following the approach in the CSAPR Update and the Revised CSAPR Update, the EPA also projected future year design values based on a modified version of the "3 x 3" approach for those monitoring sites located in coastal areas. In this alternative approach, the EPA eliminated from the RRF calculations the modeling data in those grid cells that are dominated by water (i.e., more than 50 percent of the area in the grid cell is water) and that do not contain a monitoring site (i.e., if a grid cell is more than 50 percent water but contains an air quality monitor, that cell would remain in the calculation). The choice of more than 50 percent of the grid cell area as water as the criteria for identifying overwater grid cells is based on the treatment of land use in the Weather Research and Forecasting model (WRF). Specifically, in the WRF meteorological model those grid cells that are greater than 50% overwater are treated as being 100 percent overwater. In such cases the meteorological conditions in the entire grid cell reflect the vertical mixing and winds over water, even if part of the grid cell also happens to be over land with land-based emissions, as can often be the case for coastal areas. Overlaying land-based emissions with overwater meteorology may be representative of conditions at coastal monitors during times of on-shore flow associated with synoptic conditions or sea-breeze or lake-breeze wind flows. But there may be other times, particularly with off-shore wind flow, when vertical mixing of land-based emissions may be too limited due to the presence of overwater meteorology. Thus, for our modeling the EPA projected average and maximum design values at individual monitoring sites based on both the "3 x 3" approach as well as the alternative approach that eliminates overwater cells in the RRF calculation for near-coastal areas (i.e., "no water" approach). The projected 2023 design values using both the "3 x 3" and "no-water" approaches are provided in the docket for this final action. Both approaches result in the same set of receptors in 2023. That is, monitoring sites that are identified as receptors in 2023 based on the "3 x 3" approach are also receptors based on the "no water" approach.

Consistent with the truncation and rounding procedures for the 8-hour ozone NAAQS, the projected design values are evaluated after truncation to integers in units of ppb. Therefore, projected design values that are greater than or equal to 71 ppb are considered to be violating the 2015 ozone NAAQS.

For those sites that are projected to be violating the NAAQS based on the average design values in 2023, the Agency examined the measured design values for 2021, which are the most recent official measured design values at the time of this final action.

As noted earlier, the Agency proposes to identify nonattainment receptors in this rulemaking as those sites that are violating the NAAQS based on current measured air quality through 2021 and have projected average design values of 71 ppb or greater. Maintenance-only receptors include both: (1) Those sites with projected average design values above the NAAQS that are currently measuring clean data (i.e., ozone design values below the level of the 2015 ozone NAAQS in 2021) and (2) those sites with projected average design values below the level of the NAAQS, but with projected maximum design values of 71 ppb or greater. In addition to the maintenance-only receptors, ozone nonattainment receptors are also maintenance receptors because the projected maximum design values for each of these sites is always greater than or equal to the average design value. Further, as explained previously in this section, the EPA identifies certain monitoring sites as "violating monitor" maintenance-only receptors based on 2021 and 2022 measured ozone levels.

The monitoring sites that the Agency projects to be nonattainment and maintenance receptors for the ozone NAAQS in the 2023 base case are used for assessing the contribution of emissions in upwind states to downwind nonattainment and maintenance of the 2015 ozone NAAQS as part of this final action.

3. 2023 Nonattainment and Maintenance-Only Receptors for the Final Action

In this section we provide information on modeling-based design values and measured data for monitoring sites identified as nonattainment or maintenance-only receptors in 2023 for this final action. Table III.B–1 of this action contains the 2016-centered base period average and maximum 8-hour ozone design values, the 2023 projected average and maximum design values and the measured 2021 design values for monitoring sites that are projected to be nonattainment receptors in 2023. Table III.B–2 of this action contains this same information for monitoring sites that are projected to be maintenance-only receptors in 2023, based on air quality modeling. Table III.B–3 of this action contains the 2023 projected average and maximum design values and 2021 design values and 4th high

---

[78] U.S. Environmental Protection Agency, 2018. Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, $PM_{2.5}$, and Regional Haze, Research Triangle Park, NC. *https://www.epa.gov/scram/state-implementation-plan-sip-attainment-demonstration-guidance.*

MDA8 ozone concentrations and preliminary 2020 design values and 4th high MDA8 ozone concentrations for monitoring sites identified as violating monitor maintenance-only receptors. The design values for all monitoring sites in the U.S. are provided in the docket for this action. Additional details on the approach for projecting average and maximum design values are provided in the AQM TSD.

TABLE III.B–1—AVERAGE AND MAXIMUM 2016-CENTERED AND 2023 BASE CASE 8-HOUR OZONE DESIGN VALUES AND 2021 DESIGN VALUES (PPB) AT PROJECTED NONATTAINMENT RECEPTORS [a]

| Monitor ID | State | County | 2016 centered average | 2016 centered maximum | 2023 average | 2023 maximum | 2021 |
|---|---|---|---|---|---|---|---|
| 060650016 ................ | CA | Riverside ................... | 79.0 | 80.0 | 72.2 | 73.1 | 78 |
| 060651016 ................ | CA | Riverside ................... | 99.7 | 101 | 91.0 | 92.2 | 95 |
| 080350004 ................ | CO | Douglas .................... | 77.3 | 78 | 71.3 | 71.9 | 83 |
| 080590006 ................ | CO | Jefferson .................. | 77.3 | 78 | 72.8 | 73.5 | 81 |
| 080590011 ................ | CO | Jefferson .................. | 79.3 | 80 | 73.5 | 74.1 | 83 |
| 090010017 ................ | CT | Fairfield ................... | 79.3 | 80 | 71.6 | 72.2 | 79 |
| 090013007 ................ | CT | Fairfield ................... | 82.0 | 83 | 72.9 | 73.8 | 81 |
| 090019003 ................ | CT | Fairfield ................... | 82.7 | 83 | 73.3 | 73.6 | 80 |
| 481671034 ................ | TX | Galveston ................. | 75.7 | 77 | 71.5 | 72.8 | 72 |
| 482010024 ................ | TX | Harris ...................... | 79.3 | 81 | 75.1 | 76.7 | 74 |
| 490110004 ................ | UT | Davis ....................... | 75.7 | 78 | 72.0 | 74.2 | 78 |
| 490353006 ................ | UT | Salt Lake ................. | 76.3 | 78 | 72.6 | 74.2 | 76 |
| 490353013 ................ | UT | Salt Lake ................. | 76.5 | 77 | 73.3 | 73.8 | 76 |
| 551170006 ................ | WI | Sheboygan ............... | 80.0 | 81 | 72.7 | 73.6 | 72 |

[a] 2016-centered base period average design values and projected average and maximum design values are reported with 1 digit to the right of the decimal, as recommended in the EPA's modeling guidance. The 2016 maximum design values and 2021 design values are truncated to integer values consistent with ozone design value reporting convention in appendix U of 40 CFR part 50.

TABLE III.B–2—AVERAGE AND MAXIMUM 2016-CENTERED AND 2023 BASE CASE 8-HOUR OZONE DESIGN VALUES AND 2021 DESIGN VALUES (PPB) AT PROJECTED MAINTENANCE-ONLY RECEPTORS

| Monitor ID | State | County | 2016 centered average | 2016 centered maximum | 2023 average | 2023 maximum | 2021 |
|---|---|---|---|---|---|---|---|
| 040278011 ................ | AZ | Yuma ....................... | 72.3 | 74 | 70.4 | 72.1 | 67 |
| 080690011 ................ | CO | Larimer .................... | 75.7 | 77 | 70.9 | 72.1 | 77 |
| 090099002 ................ | CT | New Haven ............... | 79.7 | 82 | 70.5 | 72.6 | 82 |
| 170310001 ................ | IL | Cook ........................ | 73.0 | 77 | 68.2 | 71.9 | 71 |
| 170314201 ................ | IL | Cook ........................ | 73.3 | 77 | 68.0 | 71.5 | 74 |
| 170317002 ................ | IL | Cook ........................ | 74.0 | 77 | 68.5 | 71.3 | 73 |
| 350130021 ................ | NM | Dona Ana ................. | 72.7 | 74 | 70.8 | 72.1 | 80 |
| 350130022 ................ | NM | Dona Ana ................. | 71.3 | 74 | 69.7 | 72.4 | 75 |
| 350151005 ................ | NM | Eddy ........................ | 69.7 | 74 | 69.7 | 74.1 | 77 |
| 350250008 ................ | NM | Lea .......................... | 67.7 | 70 | 69.8 | 72.2 | 66 |
| 480391004 ................ | TX | Brazoria ................... | 74.7 | 77 | 70.4 | 72.5 | 75 |
| 481211034 ................ | TX | Denton ..................... | 78.0 | 80 | 69.8 | 71.6 | 74 |
| 481410037 ................ | TX | El Paso .................... | 71.3 | 73 | 69.8 | 71.4 | 75 |
| 482010055 ................ | TX | Harris ...................... | 76.0 | 77 | 70.9 | 71.9 | 77 |
| 482011034 ................ | TX | Harris ...................... | 73.7 | 75 | 70.1 | 71.3 | 71 |
| 482011035 ................ | TX | Harris ...................... | 71.3 | 75 | 67.8 | 71.3 | 71 |
| 530330023 ................ | WA | King ......................... | 73.3 | 77 | 67.6 | 71.0 | 64 |
| 550590019 ................ | WI | Kenosha ................... | 78.0 | 79 | 70.8 | 71.7 | 74 |
| 551010020 ................ | WI | Racine ..................... | 76.0 | 78 | 69.7 | 71.5 | 73 |

In total, in 2023 there are a total of projected 33 modeling-based receptors nationwide including 14 nonattainment receptors in 9 different counties and 19 maintenance-only receptors in 13 additional counties (Harris County, TX, has both nonattainment and maintenance-only receptors).

As shown in Table III.B–3 of this action, there are 49 monitoring sites that are identified as "violating-monitor" maintenance-only receptors in 2023. As noted earlier in this section, the EPA uses the approach of considering "violating-monitor" maintenance-only receptors as confirmatory of the proposal's identification of receptors and does not implicate additional linked states in this final action, Rather, using this approach serves to strengthen the analytical basis for our Step 2 findings by establishing that many upwind states covered in this action are also projected to contribute above 1 percent of the NAAQS to these additional "violating monitor" maintenance-only receptors.

Table III.B–3—Average and Maximum 2023 Base Case 8-Hour Ozone, and 2021 and Preliminary 2022 Design Values (ppb) and 4th High Concentrations at Violating Monitors[a]

| Monitor ID | State | County | 2023 average | 2023 maximum | 2021 | 2022 P | 2021 4th high | 2022 P 4th high |
|---|---|---|---|---|---|---|---|---|
| 40070010 | AZ | Gila | 67.9 | 69.5 | 77 | 76 | 75 | 74 |
| 40130019 | AZ | Maricopa | 69.8 | 70.0 | 75 | 77 | 78 | 76 |
| 40131003 | AZ | Maricopa | 70.1 | 70.7 | 80 | 80 | 83 | 78 |
| 40131004 | AZ | Maricopa | 70.2 | 70.8 | 80 | 81 | 81 | 77 |
| 40131010 | AZ | Maricopa | 68.3 | 69.2 | 79 | 80 | 80 | 78 |
| 40132001 | AZ | Maricopa | 63.8 | 64.1 | 74 | 78 | 79 | 81 |
| 40132005 | AZ | Maricopa | 69.6 | 70.5 | 78 | 79 | 79 | 77 |
| 40133002 | AZ | Maricopa | 65.8 | 65.8 | 75 | 75 | 81 | 72 |
| 40134004 | AZ | Maricopa | 65.7 | 66.6 | 73 | 73 | 73 | 71 |
| 40134045 | AZ | Maricopa | 62.3 | 62.3 | 73 | 75 | 79 | 73 |
| 40134008 | AZ | Maricopa | 65.6 | 66.5 | 74 | 74 | 74 | 71 |
| 40134010 | AZ | Maricopa | 63.8 | 66.9 | 74 | 76 | 77 | 75 |
| 40137020 | AZ | Maricopa | 67.0 | 67.0 | 76 | 77 | 77 | 75 |
| 40137021 | AZ | Maricopa | 69.8 | 70.1 | 77 | 77 | 78 | 75 |
| 40137022 | AZ | Maricopa | 68.2 | 69.1 | 76 | 78 | 76 | 79 |
| 40137024 | AZ | Maricopa | 67.0 | 67.9 | 74 | 76 | 74 | 77 |
| 40139702 | AZ | Maricopa | 66.9 | 68.1 | 75 | 77 | 72 | 77 |
| 40139704 | AZ | Maricopa | 65.3 | 66.2 | 74 | 77 | 76 | 76 |
| 40139997 | AZ | Maricopa | 70.5 | 70.5 | 76 | 79 | 82 | 76 |
| 40218001 | AZ | Pinal | 67.8 | 69.0 | 75 | 76 | 73 | 77 |
| 80013001 | CO | Adams | 63.0 | 63.0 | 72 | 77 | 79 | 75 |
| 80050002 | CO | Arapahoe | 68.0 | 68.0 | 80 | 80 | 84 | 73 |
| 80310002 | CO | Denver | 63.6 | 64.8 | 72 | 74 | 77 | 71 |
| 80310026 | CO | Denver | 64.5 | 64.8 | 75 | 77 | 83 | 72 |
| 90079007 | CT | Middlesex | 68.7 | 69.0 | 74 | 73 | 78 | 73 |
| 90110124 | CT | New London | 65.5 | 67.0 | 73 | 72 | 75 | 71 |
| 170310032 | IL | Cook | 67.3 | 69.8 | 75 | 75 | 77 | 72 |
| 170311601 | IL | Cook | 63.8 | 64.5 | 72 | 73 | 72 | 71 |
| 181270024 | IN | Porter | 63.4 | 64.6 | 72 | 73 | 72 | 73 |
| 260050003 | MI | Allegan | 66.2 | 67.4 | 75 | 75 | 78 | 73 |
| 261210039 | MI | Muskegon | 67.5 | 68.4 | 74 | 79 | 75 | 82 |
| 320030043 | NV | Clark | 68.4 | 69.4 | 73 | 75 | 74 | 74 |
| 350011012 | NM | Bernalillo | 63.8 | 66.0 | 72 | 73 | 76 | 74 |
| 350130008 | NM | Dona Ana | 65.6 | 66.3 | 72 | 76 | 79 | 78 |
| 361030002 | NY | Suffolk | 66.2 | 68.0 | 73 | 74 | 79 | 74 |
| 390850003 | OH | Lake | 64.3 | 64.6 | 72 | 74 | 72 | 76 |
| 480290052 | TX | Bexar | 67.1 | 67.8 | 73 | 74 | 78 | 72 |
| 480850005 | TX | Collin | 65.4 | 66.0 | 75 | 74 | 81 | 73 |
| 481130075 | TX | Dallas | 65.3 | 66.5 | 71 | 71 | 73 | 72 |
| 481211032 | TX | Denton | 65.9 | 67.7 | 76 | 77 | 85 | 77 |
| 482010051 | TX | Harris | 65.3 | 66.3 | 74 | 73 | 83 | 72 |
| 482010416 | TX | Harris | 68.8 | 70.4 | 73 | 73 | 78 | 71 |
| 484390075 | TX | Tarrant | 63.8 | 64.7 | 75 | 76 | 76 | 77 |
| 484391002 | TX | Tarrant | 64.1 | 65.7 | 72 | 77 | 76 | 80 |
| 484392003 | TX | Tarrant | 65.2 | 65.9 | 72 | 72 | 74 | 72 |
| 484393009 | TX | Tarrant | 67.5 | 68.1 | 74 | 75 | 75 | 75 |
| 490571003 | UT | Weber | 69.3 | 70.3 | 71 | 74 | 77 | 71 |
| 550590025 | WI | Kenosha | 67.6 | 70.7 | 72 | 73 | 72 | 71 |
| 550890008 | WI | Ozaukee | 65.2 | 65.8 | 71 | 72 | 72 | 72 |

[a]2022 preliminary design values are based on 2022 measured MDA8 concentrations provided by state air agencies to the EPA's Air Quality System (AQS), as of January 3, 2023.

*C. Air Quality Modeling To Quantify Upwind State Contributions*

This section documents the procedures the EPA used to quantify the impact of emissions from specific upwind states on ozone design values in 2023 for the identified downwind nonattainment and maintenance receptors. The EPA used CAMx photochemical source apportionment modeling to quantify the impact of emissions in specific upwind states on downwind nonattainment and maintenance receptors for 8-hour ozone.

CAMx employs enhanced source apportionment techniques that track the formation and transport of ozone from specific emissions sources and calculates the contribution of sources and precursors to ozone for individual receptor locations. The benefit of the photochemical model source apportionment technique is that all modeled ozone at a given receptor location in the modeling domain is tracked back to specific sources of emissions and boundary conditions to fully characterize culpable sources.

The EPA performed nationwide, state-level ozone source apportionment modeling using the CAMx Ozone Source Apportionment Technology/ Anthropogenic Precursor Culpability Analysis (OSAT/APCA) technique[79] to quantify the contribution of 2023 $NO_X$ and VOC emissions from all sources in each state to the corresponding projected ozone design values in 2023 at

[79] As part of this technique, ozone formed from reactions between biogenic VOC and $NO_X$ with anthropogenic $NO_X$ and VOC are assigned to the anthropogenic emissions.

air quality monitoring sites. The CAMx OSAT/APCA model run was performed for the period May 1 through September 30 using the projected future base case emissions and 2016 meteorology for this time period. In the source apportionment modeling the Agency tracked (*i.e.,* tagged) the amount of ozone formed from anthropogenic emissions in each state individually as well as the contributions from other sources (*e.g.,* natural emissions).

In the state-by-state source apportionment model run, the EPA tracked the ozone formed from each of the following tags:

• States—anthropogenic $NO_X$ emissions and VOC emissions from individual state (emissions from all anthropogenic sectors in a given state were combined);

• Biogenics—biogenic $NO_X$ and VOC emissions domain-wide (*i.e.,* not by state);

• Boundary Concentrations— concentrations transported into the air quality modeling domain;

• Tribes—the emissions from those tribal lands for which the Agency has point source inventory data emissions modeling platform (EPA did not model the contributions from individual tribes);

• Canada and Mexico— anthropogenic emissions from those sources in the portions of Canada and Mexico included within the modeling domain (the EPA did not model the contributions from Canada and Mexico separately);

• Fires—combined emissions from wild and prescribed fires domain-wide (*i.e.,* not by state); and

• Offshore—combined emissions from offshore marine vessels and offshore drilling platforms within the modeling domain.

The contribution modeling provided contributions to ozone from anthropogenic $NO_X$ and VOC emissions in each state, individually. The contributions to ozone from chemical reactions between biogenic $NO_X$ and VOC emissions were modeled and assigned to the "biogenic" category. The contributions from wildfire and prescribed fire $NO_X$ and VOC emissions were modeled and assigned to the "fires" category. That is, the contributions from the "biogenic" and "fires" categories are not assigned to individual states nor are they included in the state contributions.

For the Step 2 analysis, the EPA calculated a contribution metric that considers the average contribution on the 10 highest ozone concentration days (*i.e.,* top 10 days) in 2023 using the same approach as the EPA used in the proposed action and in the Revised CSAPR Update.[80] This average contribution metric is intended to provide a reasonable representation of the contribution from individual states to projected future year design values, based on modeled transport patterns and other meteorological conditions generally associated with modeled high ozone concentrations at the receptor. An average contribution metric constructed in this manner ensures the magnitude of the contributions is directly related to the magnitude of the ozone design value at each site.

The analytic steps for calculating the contribution metric for the 2023 analytic year are as follows:

(1) Calculate the 8-hour average contribution from each source tag to individual ozone monitoring site for the time period of the 8-hour daily maximum modeled concentrations in 2023;

(2) Average the contributions and average the concentrations for the top 10 modeled ozone concentration days in 2023;

(3) Divide the average contribution by the corresponding average concentration to obtain a Relative Contribution Factor (RCF) for each monitoring site;

(4) Multiply the 2023 average design value by the 2023 RCF at each site to produce the average contribution metric values in 2023;[81]

(5) Truncate the average contribution metric values to two digits to the right of the decimal for comparison to the 1 percent of the NAAQS screening threshold (0.70 ppb)

The resulting contributions from each tag to each monitoring site in the U.S. for 2023 can be found in the docket for this final action. Additional details on the source apportionment modeling and the procedures for calculating contributions can be found in the AQM TSD. The EPA's response to comments on the method for calculating the contribution metric can be found in the RTC document for this final action.

The largest contribution from each state that is the subject of this final action to modeled 8-hour ozone nonattainment and modeling-based maintenance receptors in downwind states in 2023 are provided in Table III.C–1 of this action. The largest contribution from each state to the additional "violating monitor" maintenance-only receptors is provided in Table III.C–2 of this action. All states that are linked to one or more nonattainment or maintenance-only receptors are also linked to one or more violating monitor maintenance receptors, except for Minnesota.

TABLE III.C–1—LARGEST CONTRIBUTION BY STATE TO DOWNWIND 8-HOUR OZONE NONATTAINMENT AND MAINTENANCE RECEPTORS IN 2023 (ppb)

| Upwind state | Largest contribution to a downwind nonattainment receptor | Largest contribution to a downwind maintenance-only receptor |
|---|---|---|
| Alabama | 0.75 | 0.65 |
| Arkansas | 0.94 | 1.21 |
| California | 35.27 | 6.31 |
| Illinois | 13.89 | 19.09 |
| Indiana | 8.90 | 10.03 |
| Kentucky | 0.84 | 0.79 |
| Louisiana | 9.51 | 5.62 |

---

[80] The use of daily contributions on the top 10 concentration days for calculating the average contribution metric is designed to be consistent with the method specified in the modeling guidance in terms of the number of days to use when projecting future year design values.

[81] Note that a contribution metric value was not calculated for any receptor at which there were fewer than 5 days with model-predicted MDA8 ozone concentrations greater than or equal to 60 ppb in 2023. Eliminating from the Step 2 evaluation any receptors for which the modeling does not meet this criterion ensures that upwind state

contributions are based on the days with the highest ozone projections. This criterion is consistent with the criterion for projecting design values, as recommended in the EPA's modeling guidance. In the modeling for this final action, the monitoring site in Seattle, Washington (530330023), was the only receptor that did not meet this criterion.

Table III.C–1—Largest Contribution by State to Downwind 8-Hour Ozone Nonattainment and Maintenance Receptors in 2023 (ppb)—Continued

| Upwind state | Largest contribution to a downwind nonattainment receptor | Largest contribution to a downwind maintenance-only receptor |
|---|---|---|
| Maryland | 1.13 | 1.28 |
| Michigan | 1.59 | 1.56 |
| Minnesota | 0.36 | 0.85 |
| Mississippi | 1.32 | 0.91 |
| Missouri | 1.87 | 1.39 |
| Nevada | 1.11 | 1.13 |
| New Jersey | 8.38 | 5.79 |
| New York | 16.10 | 11.29 |
| Ohio | 2.05 | 1.98 |
| Oklahoma | 0.79 | 1.01 |
| Texas | 1.03 | 4.74 |
| Utah | 1.29 | 0.98 |
| West Virginia | 1.37 | 1.49 |
| Wisconsin | 0.21 | 2.86 |

Table III.C–2—Largest Contribution to Downwind 8-Hour Ozone "Violating Monitor" Maintenance-Only Receptors (ppb)

| Upwind State | Largest contribution to a downwind violating monitor maintenance-only receptor |
|---|---|
| Alabama | 0.79 |
| Arkansas | 1.16 |
| California | 6.97 |
| Illinois | 16.53 |
| Indiana | 9.39 |
| Kentucky | 1.57 |
| Louisiana | 5.06 |
| Maryland | 1.14 |
| Michigan | 3.47 |
| Minnesota | 0.64 |
| Mississippi | 1.02 |
| Missouri | 2.95 |
| Nevada | 1.11 |
| New Jersey | 8.00 |
| New York | 12.08 |
| Ohio | 2.25 |
| Oklahoma | 1.57 |
| Texas | 3.83 |
| Utah | 1.46 |
| West Virginia | 1.79 |
| Wisconsin | 5.10 |

## IV. Summary of Bases for Disapproval

As explained in Section II, the EPA relies on the 4-step interstate transport framework to evaluate obligations under CAA section 110(a)(2)(D)(i)(I). At proposal, the EPA used this framework to guide its evaluation of each state's SIP submission. While the EPA used this framework to maintain a nationally consistent and equitable approach to interstate transport, the contents of each individual state's submission were evaluated on their own merits, and the EPA considered the facts and information, including information from the Agency, available to the state at the time of its submission, in addition to

more recent air quality and contribution information. Here we provide a brief, high level overview of the SIP submissions and the EPA's evaluation and key bases for disapproval. These summaries are presented for ease of reference and to direct the public to the most relevant portions of the proposals and final rule record for further information. The full basis for the EPA's disapprovals is available in relevant **Federal Register** notifications of proposed disapproval for each state, in the technical support documents informing the proposed and final action, and in the responses to comments in Section V and the RTC document. In general, except as otherwise noted, the comments and updated air quality information did not convince the Agency that a change from proposal was warranted for any state. The exceptions are that the EPA is deferring action at this time on the proposed disapprovals for Tennessee and Wyoming. Further, the EPA is finalizing partial approvals of prong 1 ("significant contribution to nonattainment") for Minnesota and Wisconsin because they are linked only to maintenance-only receptors; the EPA is finalizing a partial disapproval with respect to prong 2 ("interference with maintenance") obligations for these two states.

### A. Alabama

In the 2016v3 modeling, Alabama is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor. It is also linked to one violating-monitor maintenance-only receptor. Its highest-level contribution is 0.75 ppb to Galveston County, Texas (AQS Site ID 481671034).[82] A full

[82] The highest-magnitude downwind contribution from each state is based on the contributions to

summary of Alabama's June 21, 2022, SIP submission, as well as Alabama's previous submission history, was provided in the proposed SIP submission disapproval.[83] In its submission, Alabama advocated for discounting maintenance receptors through use of historical data trends. The EPA finds Alabama's approach is not adequately justified.[84] The EPA disagrees with Alabama's assessment of the 2016v2 modeling,[85] and further responds to comments on model performance in Section III. The EPA disagrees with Alabama's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2,[86] and further addresses the relevance of "significant impact levels" within the Prevention of Significant Deterioration program ("PSD SILs") in Section V.B.6. The EPA found technical flaws in Alabama's back trajectory analysis.[87] The State did not conduct an adequate Step 3 analysis, and the EPA identified several unsupported assertions in the SIP submission.[88] Alabama also argued in its SIP submission that it had already implemented all cost-effective controls. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[89] The EPA further addresses arguments related to

modeling-based receptors and does not consider the contributions to violating-monitor maintenance-only receptors. Each state's maximum contribution to downwind violating-monitor maintenance-only receptors is available in the Final Action AQM TSD.

[83] 87 FR 64419–64421.
[84] Id. at 64421–64422.
[85] Id. at 64422–64423.
[86] Id. at 64423–64424.
[87] Id. at 64424–64425.
[88] Id. at 64425–64426.
[89] Id.

mobile sources in Section V.C.1.[90] Additionally, as explained in Section V.B.9,[91] reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3. The State included no permanent and enforceable emissions controls in its SIP submission.[92] We provide further response to comments regarding Alabama's SIP submission in the RTC document. The EPA is finalizing disapproval of Alabama's interstate transport SIP submission for the 2015 ozone NAAQS.

### B. Arkansas

In the 2016v3 modeling, Arkansas is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and five maintenance-only receptors. It is also linked to seven violating-monitor maintenance-only receptor. Its highest-level contribution is 1.21 ppb to Brazoria County Texas (AQS Site ID 480391004). A full summary of Arkansas's October 10, 2019, SIP submission was provided in the proposed SIP submission disapproval.[93] The EPA disagrees with Arkansas's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2, and further addresses the relevance of PSD SILs in Section V.B.6.[94] The EPA also found technical flaws in Arkansas's ''consistent and persistent'' claims and back trajectory analysis,[95] and legal flaws in the state's arguments related to relative contribution.[96] The State did not conduct an adequate Step 3 analysis.[97] Arkansas argued in its SIP submission that it had already implemented all cost-effective controls. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[98] Further, the State's reliance on the cost-effectiveness thresholds in the CSAPR and CSAPR Update is insufficient for the more protective 2015 ozone NAAQS.[99] The State included no permanent and enforceable controls in its SIP submission.[100] We provide further response to comments regarding Arkansas's SIP submission in the RTC document. The EPA is finalizing disapproval of Arkansas's interstate

transport SIP submission for the 2015 ozone NAAQS.

### C. California

In the 2016v3 modeling, California is projected to be linked above 1 percent of the NAAQS to eight nonattainment receptors and four maintenance-only receptors. It is also linked to 26 violating-monitor maintenance-only receptor. Its highest-level contribution is 35.27 ppb to the nonattainment receptor located on the Morongo Band of Missions Indians reservation (AQS Site ID 060651016).[101] A full summary of California's October 1, 2018, SIP submission was provided in the proposed SIP submission disapproval.[102] The EPA found technical and legal flaws in California's geographic, meteorological, wildfire, and trajectories analysis, and the State's arguments related to local, international, and non-anthropogenic emissions.[103] The EPA further addresses the topic of international emissions in Section V.C.2. The State did not conduct an adequate Step 3 analysis.[104] California in its SIP submission argued that it had already implemented all cost-effective controls. However, California provided an insufficient evaluation of additional control opportunities to support such a conclusion.[105] Further, the State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for the more protective 2015

ozone NAAQS.[106] California included no permanent and enforceable emissions controls in its SIP submission[107] and argued that interstate transport is fundamentally different in the western U.S. than in the eastern U.S., to which the EPA responds in Section V.C.3.[108] We provide further response to comments regarding California's SIP submission in the RTC document. The EPA is finalizing disapproval of California's interstate transport SIP submission for the 2015 ozone NAAQS.

### D. Illinois

In the 2016v3 modeling, Illinois is projected to be linked above 1 percent of the NAAQS to two nonattainment receptors and three maintenance-only receptors. It is also linked to six violating-monitor maintenance-only receptor. Its highest-level contribution is 19.09 ppb to Kenosha County, Wisconsin (AQS Site ID 550590019). A full summary of Illinois's May 21, 2019, SIP submission was provided in the proposed SIP submission disapproval.[109] The EPA disagrees with Illinois's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[110] The state did not conduct an adequate Step 3 analysis.[111] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[112] The EPA also found technical and legal flaws in Illinois' arguments related to "on-the-way" controls, participation in the Lake Michigan Air Directors Consortium (LADCO), and international contributions.[113] The EPA further addresses the topic of international contribution in Section V.C.2. Further, as explained in Section V.B.9., states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[114] The State included no permanent and enforceable controls in its SIP submission.[115] We provide further response to comments regarding Illinois's SIP submission in the RTC document. The EPA is finalizing disapproval of Illinois's interstate

---

[90] See also id. at 64425–64426.

[91] See also id. at 64426.

[92] Id.

[93] 87 FR 9798, 9803–9806 (February 22, 2022).

[94] Id. at 9806–9807.

[95] Id. at 9808–9809.

[96] Id. at 9809–9810.

[97] Id. at 9809–9810.

[98] Id. at 9810.

[99] Id.

[100] Id. at 9811.

[101] We note that, consistent with the EPA's prior good neighbor actions in California, the regulatory ozone monitor located on the Morongo Band of Mission Indians ("Morongo") reservation is a projected downwind receptor in 2023. See monitoring site 060651016 in Table V.D–1. of this action. We also note that the Temecula, California, regulatory ozone monitor is a projected downwind receptor in 2023 and in past regulatory actions has been deemed representative of air quality on the Pechanga Band of Luiseño Indians ("Pechanga") reservation. See, e.g., Approval of Tribal Implementation Plan and Designation of Air Quality Planning Area; Pechanga Band of Luiseño Mission Indians, 80 FR 18120, at 18121–18123 (April 3, 2015); see also monitoring site 060650016 in Table V.D–1. of this action. The presence of receptors on, or representative of, the Morongo and Pechanga reservations does not trigger obligations for the Morongo and Pechanga Tribes. Nevertheless, these receptors are relevant to the EPA's assessment of any linked upwind states' good neighbor obligations. See, e.g., Approval and Promulgation of Air Quality State Implementation Plans; California; Interstate Transport Requirements for Ozone, Fine Particulate Matter, and Sulfur Dioxide, 83 FR 65093 (December 19, 2018). Under 40 CFR 49.4(a), tribes are not subject to the specific plan submittal and implementation deadlines for NAAQS-related requirements, including deadlines for submittal of plans addressing transport impacts. We also note that California's maximum contribution to a downwind state receptor is 6.31 ppb in Yuma County, Arizona (AQS Site ID 040278011).

[102] 87 FR 31448–31452.

[103] Id. at 31454–31457, 31460.

[104] Id. at 31458–31461.

[105] Id. at 31458.

[106] Id. at 31458–31459.

[107] Id. at 31461.

[108] See also id. at 31453.

[109] Id. at 9845.

[110] Id. at 9852–9853.

[111] Id. at 9853–9855.

[112] Id. at 9853.

[113] Id. at 9853–9854.

[114] See also id. at 9854.

[115] Id. at 9855.

transport SIP submission for the 2015 ozone NAAQS.

### E. Indiana

In the 2016v3 modeling, Indiana is projected to be linked above 1 percent of the NAAQS to four nonattainment receptors and six maintenance-only receptors. It is also linked to 10 violating-monitor maintenance receptors. Its highest-level contribution is 10.03 ppb to Racine County, Wisconsin (AQS Site ID 551010020). A full summary of Indiana's November 2, 2018, SIP submission was provided in the proposed SIP submission disapproval.[116] The EPA disagrees with Indiana's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[117] The State did not conduct an adequate Step 3 analysis.[118] The EPA found technical and legal flaws in Indiana's arguments related to ozone concentration and design value trends, the timing of expected source shutdowns, local emissions, international and offshore contributions, Indiana's portion of contribution, and Indiana's back trajectory analysis.[119] The EPA further addresses the topic of international emissions in Section V.C.2. Indiana argued that it would not be cost-effective to implement controls on non-EGUs. However, the State included an insufficient evaluation of additional emissions control opportunities, for any type of source, to support that conclusion.[120] The EPA also confirmed that EGU shutdowns identified by Indiana were included in the 2016v2 modeling,[121] and if they were valid and not included in the 2016v2 modeling, then they were incorporated into the 2016v3 modeling as explained in Section III and the 2016v3 Emissions Modeling TSD. Further, in Section V.B.9., states may not rely on non-SIP measures to meet SIP requirements.[122] The State included no permanent and enforceable emissions controls in its SIP submission.[123] We provide further response to comments regarding Indiana's SIP submission in the RTC document. The EPA is finalizing disapproval of Indiana's interstate transport SIP submission for the 2015 ozone NAAQS.

### F. Kentucky

In the 2016v3 modeling, Kentucky is projected to be linked above 1 percent of the NAAQS to two nonattainment receptors and one maintenance-only receptor. It is also linked to four violating-monitor maintenance-only receptor. Its highest-level contribution based on the 2016v3 modeling is 0.84 ppb to Fairfield County, Connecticut (AQS Site ID 090019003). A full summary of Kentucky's January 11, 2019, SIP submission was provided in the proposed SIP submission disapproval.[124] Although the EPA's 2016v3 modeling indicated a highest-level contribution below 1 ppb, the EPA disagrees with Kentucky's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[125] Further, Kentucky is linked above 1 ppb to a violating-monitor receptor. The EPA addresses the relevance of the PSD SILs in Section V.B.6. The Commonwealth did not conduct an adequate Step 3 analysis.[126] The EPA found technical and legal flaws in Kentucky's arguments related to the level and timing of upwind versus downwind-state responsibilities, $NO_X$ emissions trends and other air quality information, and back-trajectory analyses.[127] The EPA also found technical and legal flaws in certain State-level comments submitted by Midwest Ozone Group and attached to Kentucky's submission, including arguments related to international emissions.[128] The EPA further addresses the topics of international emissions in Section V.C.2. Kentucky in its SIP submission also argued that it had already implemented all cost-effective controls. However, the Commonwealth included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[129] As explained in Section V.B.9., states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[130] The EPA also confirmed in the proposed SIP submission disapproval that EGU shutdowns identified by Kentucky were included in the 2016v2 modeling, and yet Kentucky was still linked in that modeling.[131] Kentucky in its SIP submission advocated for lower interstate ozone transport responsibility for states linked only to maintenance-only receptors. The EPA finds Kentucky's arguments in this regard inadequately supported.[132] The Commonwealth included no permanent and enforceable emissions controls in its SIP submission.[133] We provide further response to comments regarding Kentucky's SIP submission in the RTC document. The EPA is finalizing disapproval of Kentucky's interstate transport SIP submission for the 2015 ozone NAAQS.

### G. Louisiana

In the 2016v3 modeling, Louisiana is projected to be linked above 1 percent of the NAAQS to two nonattainment receptors and five maintenance-only receptors. It is also linked to 10 violating-monitor maintenance-only receptor. Its highest-level contribution is 9.51 ppb to Galveston County Texas (AQS Site ID 481671034). A full summary of Louisiana's November 13, 2019, SIP submission was provided in the proposed SIP submission disapproval.[134] The EPA disagrees with Louisiana's arguments for application of a higher contribution threshold than 1 percent of the NAAQS and disagrees with Louisiana's criticisms of a 1 percent of the NAAQS contribution threshold at Step 2.[135] The EPA further addresses technical comments on the 1 percent of the NAAQS contribution threshold in Section V.B.4. Louisiana did not conduct an adequate Step 3 analysis.[136] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[137] The EPA also found technical flaws in Louisiana's "consistent and persistent" claims, assessment of seasonal weather patterns, surface wind directions, and back trajectory analysis.[138] The State included no permanent and enforceable controls in its SIP submission.[139] We provide further response to comments regarding Louisiana's SIP submission in the RTC document. The EPA is finalizing disapproval of Louisiana's interstate transport SIP submission for the 2015 ozone NAAQS.

[116] Id. at 9845–9847.
[117] Id. at 9855–9856.
[118] Id. at 9857–9861.
[119] Id. at 9858–9861.
[120] Id. at 9857–9858.
[121] Id. at 9858–9859.
[122] See also id. at 9861.
[123] Id.

[124] 87 FR 9498, 9503–9507 (February 22, 2022).
[125] Id. at 9509–9510.
[126] Id. at 9511–9515.
[127] Id. at 9512–9514.
[128] Id. at 9508, 9515. The state also did not explain its own views regarding the relevance of these materials to its submission. Id.
[129] Id. at 9511–9512.
[130] See also id. at 9512.

[131] Id. at 9511–9512.
[132] Id. at 9514–9515.
[133] Id. at 9515.
[134] Id. at 9811–9812.
[135] Id. at 9812, 9815–9816.
[136] Id. at 9814–9816.
[137] Id. at 9814, 9816.
[138] Id. at 9814–9816.
[139] Id. at 9816.

## H. Maryland

In the 2016v3 modeling, Maryland is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to three violating-monitor maintenance receptors. Its highest-level contribution is 1.28 ppb to New Haven County, Connecticut (AQS Site ID 090099002). A full summary of Maryland's October 16, 2019, SIP submission was provided in the proposed SIP submission disapproval.[140] The state did not conduct an adequate Step 3 analysis.[141] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[142] Further, as explained in Section V.B.9, states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[143] The EPA also confirmed in the proposed SIP submission disapproval that state emissions controls and regulations identified by Maryland were generally included in the 2016v2 modeling, and yet Maryland was still linked in that modeling.[144] The State included no permanent and enforceable controls in its SIP submission.[145] We provide further response to comments regarding Maryland's SIP submission in the RTC document. The EPA is finalizing disapproval of Maryland's interstate transport SIP submission for the 2015 ozone NAAQS.

## I. Michigan

In the 2016v3 modeling, Michigan is projected to be linked above 1 percent of the NAAQS to four nonattainment receptors and six maintenance-only receptors. It is also linked to eight violating-monitor maintenance receptors. Its highest-level contribution is 1.59 to Sheboygan County, Wisconsin (AQS Site ID 551170006). A full summary of Michigan's March 5, 2019, SIP submission was provided in the proposed SIP submission disapproval.[146] The EPA disagrees with Michigan's arguments for application of a higher contribution threshold than 1 percent of the NAAQS as well as criticisms of a 1 percent of the NAAQS contribution threshold at Step 2.[147] The

EPA further addresses technical comments on the 1 percent of the NAAQS contribution threshold in Section V.B.4 and addresses comments regarding the relevance of the PSD SILs in Section V.B.6. The State did not conduct an adequate Step 3 analysis.[148] Michigan argued in its SIP submission that additional controls would be premature and burdensome. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[149] The EPA found technical and legal flaws in Michigan's arguments related to upwind-state obligations as to maintenance-only receptors, international emissions, relative contribution, apportionment, and upwind versus downwind-state responsibilities.[150] The EPA further addresses the topics of mobile sources and international emissions in Sections V.C.1 and V.C.2, respectively. The EPA also confirmed in the proposed SIP submission disapproval that the EGU retirements identified by Michigan as not included in the 2011-based EPA modeling, as well as various Federal rules, were included in the 2016v2 modeling, and yet Michigan was still linked in that modeling.[151] The State included no permanent and enforceable emissions controls in its SIP submission.[152] We provide further response to comments regarding Michigan's SIP submission in the RTC document. The EPA is finalizing disapproval of Michigan's interstate transport SIP submission for the 2015 ozone NAAQS.

## J. Minnesota

In the 2016v3 modeling, Minnesota is projected to be linked above 1 percent of the NAAQS to one maintenance-only receptor. It is not linked to a violating-monitor maintenance-only receptor. Its highest-level contribution is 0.85 ppb to Cook County, Illinois (AQS Site ID 170310001). A full summary of Minnesota's October 1, 2018, SIP submission was provided in the proposed SIP submission disapproval.[153] Because Minnesota was not projected to be linked to any receptor in 2023 in the EPA's 2011-based modeling, comments argued that the EPA must approve the SIP submission and not rely on new modeling. The EPA responds to these comments in Section V.A.4. Although

the EPA acknowledges that Minnesota's Step 3 analysis was insufficient in part because the State assumed it was not linked at Step 2, this is ultimately inadequate to support a conclusion that the State's sources do not interfere with maintenance of the 2015 ozone NAAQS in other states in light of more recent air quality analysis.[154] The State included no permanent and enforceable emissions controls in its SIP submission.[155] We provide further response to comments regarding Minnesota's SIP submission in the RTC document. Although EPA proposed to disapprove both prong 1 and prong 2 of Minnesota's SIP submission, the present record, including the results of the 2016v3 modeling, indicates that Minnesota is not linked to any nonattainment receptors.[156] The EPA is finalizing a partial approval of Minnesota's interstate transport SIP submission for the 2015 ozone NAAQS as to prong 1 and a partial disapproval as to prong 2.

## K. Mississippi

In the 2016v3 modeling, Mississippi is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and two maintenance-only receptors. It is also linked to eight violating-monitor maintenance receptors. Its highest-level contribution is 1.32 ppb to Galveston County, Texas (AQS Site ID 481671034). A full summary of Mississippi's September 3, 2019, SIP submission was provided in the proposed SIP submission disapproval.[157] In its submission, Mississippi advocated for discounting receptors through use of historical data trends. The EPA finds Mississippi's approach is not adequately justified.[158] In the 2011-based modeling, Mississippi's contribution to receptors was above 1 percent of the NAAQS, but below 1 ppb. The EPA disagrees with Mississippi's arguments for application of a higher contribution threshold than

---

[140] Id. at 9469.
[141] Id. at 9470–9473.
[142] Id. at 9471, 9473.
[143] See also id. at 9471, 9473 n.46, 9474.
[144] Id. at 9472–9473.
[145] Id. at 9473–9474.
[146] Id. at 9847–9848.
[147] Id. at 9861–9862.

[148] Id. at 9863–9867.
[149] Id. at 9864.
[150] Id. at 9864–9867.
[151] Id. at 9866.
[152] Id. at 9867.
[153] Id. at 9867.

[154] Id. at 9868–9869.
[155] Id. at 9869.
[156] The EPA received a comment that it would be arbitrary and capricious for the EPA to finalize a full disapproval of Tennessee's good neighbor SIP submission (both prong 1 and prong 2) if EPA concluded the state is linked only to a maintenance-only receptor (prong 2). EPA is deferring final action on Tennessee's good neighbor SIP submission, but in reviewing linkages in the 2016v3 modeling we determined that Minnesota and Wisconsin are not linked above 1 percent of the NAAQS to any nonattainment receptors (prong 1) but are linked to maintenance-only receptors (prong 2); these states are receiving partial approvals and partial disapprovals.
[157] 87 FR 9554.
[158] Id. at 9556.

1 percent of the NAAQS at Step 2,[159] and further addresses the relevance of the PSD SILs in Section V.B.6. The state did not conduct a Step 3 analysis.[160] The State included no evaluation of additional emissions control opportunities in its SIP submission.[161] The State included no permanent and enforceable emissions controls in its SIP submission.[162] We provide further response to comments regarding Mississippi's SIP submission in the RTC document. The EPA is finalizing disapproval of Mississippi's interstate transport SIP submission for the 2015 ozone NAAQS.

*L. Missouri*

In the 2016v3 modeling, Missouri is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and three maintenance-only receptors. It is also linked to five violating-monitor maintenance receptors. Its highest-level contribution is 1.87 ppb to Sheboygan County, Wisconsin (AQS Site ID 551170006). A full summary of Missouri's June 10, 2019, SIP submission was provided in the proposed SIP submission disapproval.[163] In its submission, Missouri advocated for discounting certain maintenance receptors through use of historical data trends. The EPA finds Missouri's approach is not adequately justified.[164] The EPA disagrees with Missouri's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2, and further addresses comments regarding the August 2018 memorandum in Section V.B.7.[165] The State did not conduct a Step 3 analysis.[166] The State included no evaluation of additional emissions control opportunities in its SIP submission.[167] The State included no permanent and enforceable emissions controls in its SIP submission.[168] We provide further response to comments regarding Missouri's SIP submission in the RTC document. The EPA is

finalizing disapproval of Missouri's June 10, 2019, interstate transport SIP submission for the 2015 ozone NAAQS.

*M. Nevada*

In the 2016v3 modeling, Nevada is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to one violating-monitor maintenance receptor. Its highest-level contribution is 1.13 ppb to Weber County, Utah (AQS Site ID 490570002). A full summary of Nevada's October 1, 2018, SIP submission was provided in the proposed SIP submission disapproval.[169] Because Nevada was not projected to be linked to any receptor in 2023 in the EPA's 2011-based modeling, commenters on the proposed SIP submission disapproval argued that the EPA must approve the SIP submission and not rely on new modeling. The EPA responds to these comments in Section V.A.4. The EPA also responds to technical criticisms of the 1 percent of the NAAQS contribution threshold and the relevance of the PSD SILs in Section V.B.4 and in Section V.B.6, respectively. The State did not conduct a Step 3 analysis.[170] The State included no evaluation of additional emissions control opportunities in its SIP submission.[171] The State included no additional emissions controls in its SIP submission.[172] We provide response to comments specific to interstate transport policy in the western U.S. in Section V.C.3. We provide further response to comments regarding Nevada's SIP submission in the RTC document. The EPA is finalizing disapproval of Nevada's interstate transport SIP submission for the 2015 ozone NAAQS.

*N. New Jersey*

In the 2016v3 modeling, New Jersey is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to three violating-monitor maintenance receptors. Its highest-level contribution is 8.38 ppb to Fairfield County, Connecticut (AQS Site ID 090019003). A full summary of New Jersey's May 13, 2019, SIP submission was provided in the proposed SIP submission disapproval.[173] The State did not conduct an adequate Step 3 analysis.[174]

New Jersey argued in its SIP submission that existing controls were sufficient to address the State's good neighbor obligations. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[175] The State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for a more protective NAAQS.[176] The State included no permanent and enforceable emissions controls in its SIP submission.[177] We provide further response to comments regarding New Jersey's SIP submission in the RTC document. The EPA is finalizing disapproval of New Jersey's interstate transport SIP submission for the 2015 ozone NAAQS.

*O. New York*

In the 2016v3 modeling, New York is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to two violating-monitor maintenance receptors. Its highest-level contribution is 16.10 ppb to Fairfield County, Connecticut (AQS Site ID 090010017). A full summary of New York's September 25, 2018, SIP submission was provided in the proposed SIP submission disapproval.[178] The state did not conduct an adequate Step 3 analysis.[179] New York argued in its SIP submission that existing controls were sufficient to address the State's good neighbor obligations. However, the state included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[180] The State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for the more protective 2015 ozone NAAQS.[181] The State included no permanent and enforceable emissions controls in its SIP submission.[182] We provide further response to comments regarding New York's SIP submission in the RTC document. The EPA is finalizing disapproval of New York's interstate transport SIP submission for the 2015 ozone NAAQS.

*P. Ohio*

In the 2016v3 modeling, Ohio is projected to be linked above 1 percent of the NAAQS to four nonattainment receptors and five maintenance-only

---

[159] Id. at 9557.
[160] Id. at 9558.
[161] Id.
[162] Id.
[163] Id. at 9538–9540.
[164] Id. at 9540–9541.
[165] *See also* id. at 9541–9544.
[166] Id. at 9544.
[167] Id.
[168] We note that in comments, Missouri indicated its intent to submit a new SIP submission to the EPA, which would re-evaluate good neighbor obligations based on its 2016v2 linkages and provide an analysis that would include emissions reductions requirements. The EPA received this submission on November 1, 2022. The EPA explains its consideration of this new submission as separate SIP submission in the RTC document for this final action.

[169] 87 FR 31485, 31492–31493 (May 24, 2022).
[170] Id. at 31493.
[171] Id.
[172] Id.
[173] Id. at 9490–9491.
[174] Id. at 9496.

[175] Id.
[176] Id.
[177] Id. at 9496–9497.
[178] Id. at 9489–9490.
[179] Id. at 9492–9494.
[180] Id. at 9493.
[181] Id. at 9493–9494.
[182] Id. at 9494–9495.

receptors. It is also linked to nine violating-monitor maintenance receptors. Its highest-level contribution is 2.05 ppb to Fairfield County, Connecticut (AQS Site ID 090019003). A full summary of Ohio's September 28, 2018, SIP submission was provided in the proposed SIP submission disapproval.[183] In its submission, Ohio advocated for use of the Texas Commission on Environmental Quality (TCEQ)'s definition of maintenance receptors. The EPA finds that TCEQ's definition is legally and technically flawed,[184] and as a result Ohio's approach is also not adequately justified.[185] The EPA further evaluates TCEQ's technical arguments in a TSD prepared by regional modeling staff.[186] The EPA disagrees with Ohio's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[187] The EPA responds to technical criticisms of the 1 percent of the NAAQS contribution threshold in Section V.B.4. The State did not conduct an adequate Step 3 analysis.[188] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[189] The EPA found technical deficiencies in Ohio's unsubstantiated claims that emissions are overestimated.[190] The EPA also confirmed in the proposed SIP submission disapproval that several EGU and non-EGUs identified by Ohio were included in the 2016v2 modeling, and yet Ohio was still linked in that modeling.[191] The EPA summarizes the emissions inventories used in the 2016v3 modeling in Section III.A. Further, as explained in Section V.B.9, states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[192] The EPA finds legal flaws and deficiencies in Ohio's arguments related to upwind versus downwind-state responsibilities, the role of international emissions, relative contribution, and overcontrol.[193] The EPA discusses international emissions in Section V.C.2. The EPA disagrees with Ohio's arguments related to mobile sources.[194] We further address this topic in Section V.C.1. Ohio also argued in its SIP submission that it had already implemented all cost-effective controls. However, the state included no evaluation of additional emissions control opportunities to support such a claim.[195] Further, the State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for the more protective 2015 ozone NAAQS.[196] The State included no permanent and enforceable emissions controls in its SIP submission.[197] We provide further response to comments regarding Ohio's SIP submission in the RTC document. The EPA is finalizing disapproval of Ohio's interstate transport SIP submission for the 2015 ozone NAAQS.

### Q. Oklahoma

In the 2016v3 modeling, Oklahoma is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and one maintenance-only receptor. It is also linked to eight violating-monitor maintenance receptors. Its highest-level contribution is 1.01 ppb to Denton County, Texas (AQS Site ID 481210034). A full summary of Oklahoma's October 25, 2018, SIP submission was provided in the proposed SIP submission disapproval.[198] In its submission, Oklahoma advocated for use of TCEQ's definition of maintenance receptors and modeling to discount receptors in Texas. The EPA finds that TCEQ's definition is legally and technically flawed[199] and, as a result, Oklahoma's approach is also not adequately justified.[200] The EPA further evaluates TCEQ's technical arguments in the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal TSD (Evaluation of TCEQ Modeling TSD) prepared by regional modeling staff.[201] Comments argued against the use of updated modeling where linkages in the EPA's 2011-based modeling and later iterations of EPA modeling differ. The EPA addressed the change in identified linkages between the 2011-based modeling and the 2016v2 modeling in the proposed SIP disapproval,[202] and further responds to comments on the use of updated modeling in Section V.A.4. The EPA disagrees with Oklahoma's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2[203] and further addresses comments regarding the relevance of the PSD SILs in Section V.B.6. The State did not conduct an adequate Step 3 analysis.[204] Oklahoma argued in its SIP submission that it had already implemented all cost-effective controls. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[205] As explained in Section V.B.9, states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[206] Further, the State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for the more protective 2015 ozone NAAQS.[207] The EPA finds legal flaws in Oklahoma's argument related to collective contribution.[208] The State included no permanent and enforceable emissions controls in its SIP submission.[209] We provide further response to comments regarding Oklahoma's SIP submission in the RTC document. The EPA is finalizing disapproval of Oklahoma's interstate transport SIP submission for the 2015 ozone NAAQS.

### R. Texas

In the 2016v3 modeling, Texas is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and nine maintenance-only receptors. It is also linked to ten violating-monitor maintenance-only receptor. Its highest-level contribution is 4.74 ppb to Dona Ana County, New Mexico (AQS Site ID 350130021). A full summary of Texas's August 17, 2018, SIP submission was provided in the proposed SIP submission disapproval,[210] and additional details were provided in the Evaluation of TCEQ Modeling TSD. The EPA identified several technical flaws in TCEQ's modeling and analysis of modeling results.[211] In its submission, Texas advocated for use of its own definition of maintenance receptors and modeling. The EPA finds Texas's approach inadequately justified and

---

[183] Id. at 9849–9851.

[184] Id. at 9826–9829.

[185] Id. at 9869–9870.

[186] 2015 8-Hour Ozone Transport SIP Proposal TSD, in Docket ID No. EPA–R06–OAR–2021–0801 (hereinafter Evaluation of TCEQ Modeling TSD).

[187] Id. at 9871.

[188] Id. at 9871–9875.

[189] Id. at 9871–9875.

[190] Id. at 9872.

[191] Id.

[192] See also id. at 9874–9875.

[193] Id. at 9873–9874.

[194] Id.

[195] Id. at 9872–9873.

[196] Id. at 9874.

[197] Id. at 9875.

[198] Id. at 9816–9818.

[199] Id. at 9826–9829.

[200] Id. at 9820–9822.

[201] Evaluation of TCEQ Modeling TSD in Docket ID No. EPA–R06–OAR–2021–0801.

[202] 87 FR 9823.

[203] Id. at 9819.

[204] Id. at 9822–9824.

[205] Id. at 9822–9824.

[206] See also id. at 9822–9823.

[207] Id.

[208] Id. at 9823.

[209] Id. at 9824.

[210] Id. at 9824–9826.

[211] Id. at 9829–9830; Evaluation of TCEQ Modeling TSD.

legally and technically flawed.[212] The EPA further evaluated TCEQ's technical arguments in the Evaluation of TCEQ Modeling TSD. In comment on the proposal, Texas pointed to differences in linkages in the EPA's 2011-based modeling and 2016v2 modeling. The EPA addressed the change in identified linkages between the 2011-based modeling and the 2016v2 modeling in the proposed SIP submission disapproval,[213] and further responds to comments on the use of updated modeling in Section V.A.4. The State did not conduct an adequate Step 3 analysis.[214] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[215] The EPA found technical flaws in Texas's arguments related to ''consistent and persistent'' claims and its other assessments, including analysis of back trajectories.[216] The State included no permanent and enforceable emissions controls in its SIP submission.[217] We provide further response to comments regarding Texas's SIP submission in the RTC document. The EPA is finalizing disapproval of Texas's interstate transport SIP submission for the 2015 ozone NAAQS.

### S. Utah

In the 2016v3 modeling, Utah is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to four violating-monitor maintenance receptors. Its highest-level contribution is 1.29 ppb to Douglas County, Colorado (AQS Site ID 080350004). A full summary of Utah's January 29, 2020, SIP submission was provided in the proposed SIP submission disapproval.[218] In its submission, Utah argued that certain receptors in Colorado should not be counted as receptors for the purpose of 2015 ozone NAAQS interstate transport, but Utah's explanation is insufficient to discount those receptors.[219] The EPA disagrees with Utah's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[220] Utah suggested in its SIP submission that interstate transport is fundamentally different in the western U.S. than in the eastern U.S., an argument we have previously rejected and respond to further in Section V.C.3.[221] The State did not conduct an adequate Step 3 analysis.[222] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[223] The EPA finds technical and legal flaws in the State's arguments related to relative contribution, international and non-anthropogenic emissions, and the relationship of upwind versus downwind-state responsibilities.[224] The EPA further addresses the topics of international emissions in Section V.C.2 and wildfires in the RTC document. The EPA also confirmed in the proposed SIP submission disapproval that several anticipated controls identified by Utah were included in the 2016v2 modeling, and yet Utah was still linked in that modeling.[225] The State included no permanent and enforceable emissions controls in its SIP submission.[226] We provide further response to comments regarding Utah's SIP submission in the RTC document. The EPA is finalizing disapproval of Utah's interstate transport SIP submission for the 2015 ozone NAAQS.

### T. West Virginia

In the 2016v3 modeling, West Virginia is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to four violating-monitor maintenance receptors. Its highest-level contribution is 1.49 ppb to New Haven County, Connecticut (AQS Site ID 090099002). A full summary of West Virginia's February 4, 2019, SIP submission was provided in the proposed SIP submission disapproval.[227] The EPA finds technical and legal flaws in the State's examination of back trajectories and arguments related to mobile sources and international emissions.[228] The EPA further addresses the topics of mobile sources and international emissions in Section V.C.1 and in Section V.C.2, respectively. The State did not conduct an adequate Step 3 analysis.[229] West Virginia argued in its SIP submission that it had already implemented all cost-effective controls. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[230] The EPA also confirmed in the proposed SIP submission disapproval that specific EGU shutdowns identified by West Virginia were included in the 2016v2 modeling, which continued to show West Virginia was linked at Step 2.[231] As explained in Section V.B.9, a state may not rely on non-SIP measures to satisfy SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 2.[232] Further, the State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for a more protective NAAQS.[233] The State included no permanent and enforceable emissions controls in its SIP submission.[234] We provide further response to comments regarding West Virginia's SIP submission in the RTC document. The EPA is finalizing disapproval of West Virginia's interstate transport SIP submission for the 2015 ozone NAAQS.

### U. Wisconsin

In the 2016v3 modeling, Wisconsin is projected to be linked above 1 percent of the NAAQS to three maintenance-only receptors. It is also linked to five violating-monitor maintenance receptors. Its highest-level contribution is 2.86 ppb to Cook County, Illinois (AQS Site ID 170314201). A full summary of Wisconsin's September 14, 2018, SIP submission was provided in the proposed SIP submission disapproval.[235] The State did not assess in its SIP submission whether the state was linked at Step 2,[236] and did not conduct an adequate Step 3 analysis.[237] The State included an insufficient evaluation of additional emissions control opportunities.[238] Further, as explained in Section V.B.9, reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[239] The EPA found additional inadequacies and legal flaws in Wisconsin's.[240] The State included no permanent and enforceable emissions controls in its SIP submission.[241] We provide further response to comments regarding

[212] 87 FR 9826–9829.
[213] Id. at 9831.
[214] Id. at 9831–9834.
[215] Id. at 9831, 9834.
[216] Id. at 9832–9833, Evaluation of TCEQ Modeling TSD.
[217] 87 FR 9834.
[218] Id. at 31475–31477.
[219] Id. at 31480–31481.
[220] Id. at 31478.

[221] See also id. at 31479–31481, 31482.
[222] Id. at 31481–31483.
[223] Id. at 31482
[224] Id. at 31481–31483.
[225] Id. at 31483.
[226] Id.
[227] Id. at 9522–9524.
[228] Id. at 9526–9527, 9528.
[229] Id. at 9527–9532.

[230] Id. at 9528–9529.
[231] Id. at 9529–9530.
[232] See also id. at 9530–9532.
[233] Id. at 9531.
[234] Id. at 9532.
[235] Id. at 9851.
[236] Id. at 9875.
[237] Id. at 9875–9876.
[238] Id. at 9876.
[239] See also id.
[240] Id.
[241] Id. at 9876–9877.

Wisconsin's SIP submission in the RTC document. Although EPA proposed to disapprove both prong 1 and prong 2 of Wisconsin's SIP submission, the present record, including the results of the 2016v3 modeling, indicates that Wisconsin is not linked to any nonattainment receptors.[242] The EPA is finalizing a partial approval of Wisconsin's interstate transport SIP submission for the 2015 ozone NAAQS as to prong 1 and a partial disapproval as to prong 2.

**V. Response to Key Comments**

The EPA received numerous comments on the proposed action which are summarized in the RTC document along with the EPA's responses to those comments in Docket ID No. EPA–HQ–OAR–2021–0663. Each comment in its entirety is available in the relevant regional docket(s) for this action.[243] The following sections summarize key comments and the EPA's responses.

*A. SIP Evaluation Process*

1. Relationship Between Timing of Proposals To Disapprove SIPs and Promulgate FIPs

*Comment:* Comments alleged generally that the timing of the EPA's proposed actions on the SIP submissions in relation to proposed FIPs was unlawful, unfair, or both. Some comments claimed that the sequence of the EPA's actions is improper, unreasonable, or bad policy. Several commenters asserted that because the EPA proposed FIPs (or, according to some, promulgated FIPs, which is not factually correct) prior to finalizing disapproval of the state SIP submission, the EPA allegedly exceeded its statutory authority and overstepped the states' primary role in addressing the good neighbor provision under CAA section 110.[244]

*EPA Response:* The EPA disagrees. The EPA has followed the Clean Air Act provisions, which prescribe specified maximum amounts of time for states to make SIP submissions, for the EPA to act on those submissions, and for the EPA to promulgate FIPs if necessary, but do not prohibit the EPA from acting before that time elapses. Nothing relieves the EPA from its statutory obligation to take final action on complete SIP submissions before the Agency within the timeframes prescribed by the statute.[245] The EPA's proposed FIP does not constitute the "promulgation" of a FIP because the proposed FIP is not a final action that imposes any requirements on sources or states. And although the EPA's FIP authority is not at issue in this action, the EPA notes the Agency has been clear that it will not finalize a FIP for any state until predicate authority is established for doing so under CAA section 110(c)(1). 87 FR 20036, 20057 (April 6, 2022) ("The EPA is proposing this FIP action now to address twenty-six states' good neighbor obligations for the 2015 ozone NAAQS, but the EPA will not finalize this FIP action for any state unless and until it has issued a final finding of failure to submit or a final disapproval of that state's SIP submission."). The EPA strongly disagrees that *proposing* a FIP prior to proposing or finalizing disapproval of a SIP submission oversteps the Agency's authority. Indeed, the ability to propose a FIP before finalizing a SIP disapproval follows ineluctably from the structure of the statute, which, as the Supreme Court recognized in *EME Homer City,* does not oblige the EPA "to wait two years or postpone its [FIP] action even a single day." 572 U.S. at 509. If the EPA can finalize a FIP immediately upon disapproving a SIP, then surely the EPA must have the authority to propose that FIP before taking final action on the SIP submission. *Accord Oklahoma* v. *U.S.*

*EPA,* 723 F.3d 1201, 1223 (10th Cir. 2013).

It is true that the EPA would not be legally authorized to *finalize* a FIP for any state unless and until the EPA formally *finalizes* a disapproval of that state's SIP submission (or makes a finding of failure to submit for any state that fails to make a complete SIP submission), per CAA section 110(c), but the EPA has not yet finalized a FIP for any state for good neighbor obligations for the 2015 ozone NAAQS. Further, the sequencing of our actions here is consistent with the EPA's past practice in our efforts to timely address good neighbor obligations. For example, at the time the EPA proposed the CSAPR Update FIPs in December of 2015, we had not yet proposed action on several states' SIP submissions but finalized those SIP disapproval actions prior to finalization of the FIP.[246]

Additional comments on cooperative federalism are addressed in Section V.B.5.

Further, The D.C. Circuit in *Wisconsin* held that states and the EPA are obligated to fully address good neighbor obligations for ozone "as expeditiously as practical" and in no event later than the next relevant downwind attainment dates found in CAA section 181(a),[247] and states and the EPA may not delay implementation of measures necessary to address good neighbor requirements beyond the next applicable attainment date without a showing of impossibility or necessity.[248] It is important for the states and the EPA to assure that necessary emissions reductions are achieved, to the extent feasible, by the 2023 ozone season to assist downwind areas with meeting the August 3, 2024, attainment deadline for Moderate nonattainment areas. Further, the D.C. Circuit in *Wisconsin* emphasized that the EPA has the authority under CAA section 110 to structure its actions so as to ensure necessary reductions are achieved by the downwind attainment

---

[242] The EPA received a comment that it would be arbitrary and capricious for the EPA to finalize a full disapproval of Tennessee's good neighbor SIP submission (both prong 1 and prong 2) if EPA concluded the State is linked only to a maintenance-only receptor (prong 2).The EPA is deferring final action on Tennessee's good neighbor SIP submission, but in reviewing linkages in the 2016v3 modeling we determined that Minnesota and Wisconsin are not linked above 1 percent of the NAAQS to any nonattainment receptors (prong 1) but are linked to maintenance-only receptors (prong 2); these States are receiving partial approvals and partial disapprovals.

[243] *See* the memo "Regional Dockets Containing Additional Supporting Materials for Final Action on 2015 Ozone NAAQS Good Neighbor SIP Submissions" in the docket for this action, for a list of all regional dockets.

[244] The EPA notes the commenters' reference to FIPs in to proposed good neighbor FIPs for the 2015 ozone NAAQS that were proposed separately from this rulemaking action. 87 FR 20036 (April 6, 2022).

[245] Although the EPA anticipates responding to comments related to comments to the EPA's FIP authority in a separate FIP rulemaking, the EPA notes with regard to the procedural timing concerns raised in comments on this action that the Supreme Court confirmed in *EME Homer City Generation,* "EPA is not obliged to wait two years or postpone its action even a single day: The Act empowers the Agency to promulgate a FIP 'at any time' within the two-year limit." 572 U.S. 489 at 509. The procedural timeframes under CAA section 110 do not function to establish a norm or expectation that the EPA must or should use the full amount of time allotted, particularly when doing so would place the Agency in conflict with the more "central" statutory objective of meeting the NAAQS attainment deadlines in the Act. *EME Homer City,* 572 U.S. 489, 509 (2014). *See also Wisconsin,* 938 F.3d at 318, 322; *Sierra Club* v. *EPA,* 294 F.3d 155, 161 (D.C. Cir. 2002) (*Sierra Club*).

[246] The proposed CSAPR Update was published on December 3, 2015, and included proposed FIPs for Indiana, Louisiana, New York, Ohio, Texas, and Wisconsin. 80 FR 75705. At that time, the EPA had not yet even proposed action on good neighbor SIP submissions for the 2008 ozone NAAQS from Indiana, Louisiana, New York, Ohio, Texas, and Wisconsin; however, the EPA subsequently proposed and finalized these disapprovals before finalizing the CSAPR Update FIPs, published on October 26, 2016 (81 FR 74504). *See* 81 FR 38957 (June 15, 2016) (Indiana); 81 FR 53308 (August 12, 2016) (Louisiana); 81 FR 58849 (August 26, 2016) (New York); 81 FR 38957 (June 15, 2016) (Ohio); 81 FR 53284 (August 12, 2016) (Texas); 81 FR 53309 (August 12, 2016) (Wisconsin).

[247] *Wisconsin,* 938 F.3d at 313–14 (citing *North Carolina,* 531 F.3d at 911–12.

[248] *See Wisconsin,* 938 F.3d at 320.

dates,[249] the next of which for the 2015 ozone NAAQS is now the Moderate area attainment date of August 3, 2024.[250] The court pointed out that the CAA section 110 schedule of SIP and FIP deadlines is procedural whereas the attainment schedule is "central to the regulatory scheme[.]"[251] Thus, the sequence and timing of the EPA's action in disapproving these SIP submissions is informed by the need to ensure that any necessary good neighbor obligations identified in the separate FIP rulemaking are implemented as expeditiously as practicable and no later than the next attainment date. As explained in our proposed disapproval, analysis (and, if possible, implementation) of good neighbor obligations should begin in the 2023 ozone season. *See, e.g.,* 87 FR 9798, 9801–02 (Feb. 22, 2022). Indeed, states' and the EPA's analysis would have been more appropriately aligned with 2020, rather than 2023 (as had been presented in the EPA's March 2018 memorandum[252]), corresponding with the 2021 Marginal area attainment date. However, that clarification in legal obligations was not established by case law until 2020. *See Maryland,* 958 F.3d at 1203–04.

In short, nothing in the language of CAA section 110(c) prohibits the EPA from proposing a FIP as a backstop, to be finalized and implemented only in the event that a SIP submission is first found to be deficient and final disapproval action on the SIP submission is taken. Such an approach is a reasonable and prudent means of assuring that the statutory obligation to reduce air pollution affecting the health and welfare of those living in downwind states is implemented without delay, either via a SIP, or where such plan is deficient, via a FIP. The sequencing of the EPA's actions here is therefore reasonably informed by its legal obligations under the CAA, including in recognition of the fact that the implementation of necessary emissions reductions to eliminate

significant contribution and thereby protect human health and welfare is already several years delayed. The EPA shares additional responses related to the timing of 2015 ozone NAAQS good neighbor actions in Section V.A.

*Comment:* Some comments allege the EPA is depriving States of the opportunity to target specific emissions reductions opportunities, or the opportunity to revise their submissions at any point in the future.

*EPA Response:* The EPA disagrees. The EPA has repeatedly emphasized that states have the freedom at any time to develop a revised SIP submission and submit that to the EPA for approval, and this remains true. *See* 87 FR 20036, 20051 (April 6, 2022); 86 FR 23054, 23062 (April 30, 2021); 81 FR 74504, 74506 (Oct. 26, 2016). In the proposed FIPs, as in prior transport actions, the EPA discusses a number of ways in which states could take over or replace a FIP, *see* 87 FR 20036, 20149–51 (Section VII.D: "Submitting A SIP"); *see also id.* at 20040 (noting as one purpose in proposing the FIP that "this proposal will provide states with as much information as the EPA can supply at this time to support their ability to submit SIP revisions to achieve the emissions reductions the EPA believes necessary to eliminate significant contribution"). If, and when, the EPA receives a SIP submission that satisfies the requirements of CAA section 110(a)(2)(D)(i)(I), the Agency will take action to approve that SIP submission.

*Comment:* Some commenters assert that the EPA is disapproving SIP submissions for the sole purpose of pursuing an alleged objective of establishing nation-wide standards in FIPs. Other commenters point to the proposed FIPs to make arguments that the EPA's decision to finalize disapproval of the SIPs is an allegedly foregone conclusion or that the EPA has allegedly failed to provide the opportunity for meaningful public engagement on the proposed disapproval of the SIPs.

*EPA Response:* The EPA disagrees as the facts do not support this assertion. To date, the EPA has approved 24 good neighbor SIPs for the 2015 ozone NAAQS: Alaska,[253] Colorado,[254] Connecticut,[255] Delaware,[256] District of Columbia,[257] Florida,[258] Georgia,[259]

Hawaii,[260] Idaho,[261] Iowa,[262] Kansas,[263] Maine,[264] Massachusetts,[265] Montana,[266] Nebraska,[267] New Hampshire,[268] North Carolina,[269] North Dakota,[270] Oregon,[271] Rhode Island,[272] South Carolina,[273] South Dakota,[274] Vermont,[275] and Washington.[276]

The policy judgments made by the EPA in all actions on 2015 ozone NAAQS good neighbor SIP submissions, including approval actions, reflect consistency with relevant good neighbor case law and past agency practice implementing the good neighbor provision as reflected in the original CSAPR, CSAPR Update, Revised CSAPR Update, and related rulemakings. Employing a nationally consistent approach is particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving many smaller contributors. Effective policy solutions to the problem of interstate ozone transport dating back to the $NO_X$ SIP Call [63 FR 57356 (October 27, 1998)] have necessitated the application of a uniform framework of policy judgments to ensure an "efficient and equitable" approach. *See EME Homer City,* 572 U.S. at 519. In any case, the approach of the proposed transport FIP is not the subject of this SIP disapproval. This rulemaking does not impose any specific emissions control measures on the states. Nor is the EPA disapproving these SIP submittals because they did not follow exactly the control strategies in the proposed FIP—the EPA has repeatedly indicated openness to alternative approaches to addressing interstate pollution obligations, but for reasons explained elsewhere in the rulemaking record, the EPA finds that none of the states included in this action submitted approvable approaches to addressing those obligations.

The EPA disputes the contentions that the FIP proposal itself indicates that the EPA did not earnestly examine the SIP submissions for compliance with the CAA or have an appropriate rationale

[249] *Wisconsin,* 938 F.3d at 318 ("When EPA determines a State's SIP is inadequate, the EPA presumably must issue a FIP that will bring that State into compliance before upcoming attainment deadlines, even if the outer limit of the statutory timeframe gives the EPA more time to formulate the FIP.") (citing *Sierra Club,* 294 F.3d at 161).

[250] *See* CAA section 181(a); 40 CFR 51.1303; Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 FR 25776 (June 4, 2018, effective August 3, 2018).

[251] *Wisconsin,* 938 F.3d at 322 ("Delaware's argument leans too heavily on the SIP submission deadline. SIP submission deadlines, unlike attainment deadlines, are 'procedural' and, therefore, not 'central to the regulatory scheme.' ") (citing *Sierra Club,* 294 F.3d at 161).

[252] *See* March 2018 memorandum.

[253] 84 FR 69331 (December 18, 2019).
[254] 87 FR 61249 (October 11, 2022).
[255] 86 FR 71830 (December 20, 2021).
[256] 85 FR 25307 (May 1, 2020).
[257] 85 FR 5570 (January 31, 2020).
[258] 86 FR 68413 (December 2, 2021).
[259] Id.

[260] 86 FR 73129 (December 27, 2021).
[261] 85 FR 65722 (October 16, 2020).
[262] 87 FR 22463 (April 15, 2022).
[263] 87 FR 19390 (April 4, 2022).
[264] 86 FR 45870 (August 17, 2021).
[265] 85 FR 5572 (January 31, 2020).
[266] 87 FR 21578 (April 12, 2022).
[267] 85 FR 21325 (April 17, 2020).
[268] 86 FR 45870 (August 17, 2021).
[269] 86 FR 68413 (December 2, 2021).
[270] 85 FR 20165 (April 10, 2020).
[271] 84 FR 22376 (May 17, 2019).
[272] 86 FR 70409 (December 10, 2021).
[273] 86 FR 68413 (December 2, 2021).
[274] 85 FR 67653 (October 26, 2020).
[275] 85 FR 34357 (June 4, 2020).
[276] 83 FR 47568 (September 20, 2018).

for proposing to disapprove certain SIP submissions. The EPA also disputes that the FIP proposal indicates that the EPA did not intend to consider comments on the proposed disapprovals. Comments making claims the EPA did not follow proper administrative procedure have been submitted utilizing the very notice and comment process these comments claim the EPA is skipping, and these claims are factually unsupported. Comments related to the length of the comment period and claims of ''pretext'' are addressed in the RTC document.

*Comment:* Several comments pointed out how hard many states have worked to develop an approvable SIP submission.

*EPA Response:* The EPA acknowledges and appreciates states' efforts to develop approvable SIPs. Cooperative federalism is a cornerstone of CAA section 110, and the EPA strives to collaborate with its state partners. The timing of the EPA's 2015 ozone NAAQS good neighbor actions is not in any way intended to call into question any state's commitment to develop approvable SIPs. The EPA evaluated each SIP submission on its merits. The EPA relies on collaboration with state air agencies to ensure SIP submissions are technically and legally defensible, and the Agency's action here is in no way meant to undermine that collaboration between state and Federal partners respecting SIP development.

*Comment:* Several comments make various arguments about when the EPA can finalize FIPs. Some commenters argue that CAA section 110(c)(1) guarantees states an additional two years to correct their SIP submissions before the EPA finalizes a FIP. Others argue that the notice and comment requirements of the Administrative Procedures Act mandate that the EPA finalize a SIP submission disapproval before proposing a FIP. One commenter suggested that a state must be allowed to fully exhaust its judicial remedies to challenge a SIP submission disapproval before the EPA can promulgate a FIP. Commenters also raise concerns about the analysis and requirements in the proposed FIPs.

*EPA Response:* Comments opining on when the EPA is legally authorized to propose or finalize a FIP are outside the scope of this action. While the EPA acknowledges that the Agency has no obligation or authority to finalize a FIP until finalizing a disapproval of a SIP submission or determining that a state failed to submit a complete SIP submission (CAA section 110(c)(1)), this action is limited to determining whether the covered SIP submissions meet the requirements of CAA section

110(a)(2)(D)(i)(I). For the same reason, comments criticizing specific substantive requirements or implementation timelines in the proposed FIPs are beyond the scope of this action.

2. Requests for Additional Time To Revise SIP Submissions

*Comment:* Some commenters argue that the EPA must or should delay action on these SIP submissions so that states can reexamine and resubmit SIP submissions. Other commenters argue that states must be given more time to re-examine and resubmit their SIP submission for various reasons, including the substantive requirements in the proposed FIPs.

*EPA Response:* The EPA notes that there is no support in the Clean Air Act for such a delay. CAA section 110(a)(1) requires states to adopt and submit SIP submissions meeting certain requirements of CAA section 110(a)(2)(D)(i)(I), ''within 3 years (or such shorter period as the Administrator prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof).'' CAA section 110(a)(1). The submission deadline clearly runs from the date of promulgation of the NAAQS, which for the 2015 ozone NAAQS was October 1, 2015. 80 FR 65291 (Oct. 26, 2015). In addition, while the Administrator is given authority to prescribe a period shorter than three years for the states to adopt and submit such SIP submissions, the Act does not give the Administrator authority to lengthen the time allowed for CAA section 110(a)(2) submissions. And the EPA would be in violation of court-ordered deadlines if it deferred taking final action beyond January 31, 2023, for all but two of the states covered by this action.[277]

Comments asserting that the EPA must give more time to states to correct deficiencies and re-submit conflict with the controlling caselaw in that they would elevate the maximum timeframes allowable within the procedural framework of CAA section 110 over the attainment schedule of CAA section 181 that the D.C. Circuit has now held multiple times must be the animating focus in the timing of good neighbor obligations. The D.C. Circuit in *Wisconsin* held that states and the EPA are obligated to fully address good neighbor obligations for ozone ''as expeditiously as practical'' and in no

event later than the next relevant downwind attainment dates found in CAA section 181(a),[278] and the EPA may not delay implementation of measures necessary to address good neighbor requirements beyond the next applicable attainment date without a showing of impossibility or necessity.[279] Further, the court pointed out that the CAA section 110 schedule of SIP and FIP deadlines is procedural, and while the EPA has complied with the mandatory sequence of actions required under section 110 here, we are mindful of the court's observation that, as compared with the fundamental substantive obligations of title I of the CAA to attain and maintain the NAAQS, the maximum timeframes allotted under section 110 are less ''central to the regulatory scheme[.]''[280]

*Comment:* Other comments take the position that states are owed a second opportunity to submit SIP submissions before the EPA takes final action for various reasons, including claims that the EPA failed to issue adequate guidance or is otherwise walking back previously issued guidance. They allege that a state cannot choose controls to eliminate significant contribution until the EPA quantifies the contribution. Other comments argue that the EPA should not or cannot base the disapprovals on alleged shifts in policy that occurred after the Agency received the SIP submissions.

*EPA Response:* The EPA disagrees that the Agency was required to issue guidance or quantify individual states' level of significant contribution for 2015 ozone NAAQS good neighbor obligations, because as noted in *EME Homer City,* the Supreme Court clearly held that ''nothing in the statute places EPA under an obligation to provide specific metrics to States before they undertake to fulfill their good neighbor obligations.''[281] The Agency issued three memoranda in 2018 to provide modeling results and some ideas to states in the development of their SIP submissions. However, certain aspects of those discussions were specifically

---

[277] The EPA has no court-ordered deadline to take final action on the good neighbor SIP submission from Alabama dated June 21, 2022, or Utah's good neighbor SIP submission.

[278] *Wisconsin,* 938 F.3d at 313–14 (citing *North Carolina,* 531 F.3d at 911–12). On May 19, 2020, the D.C. Circuit in *Maryland,* applying the *Wisconsin* decision, held that the EPA must assess air quality at the next downwind attainment date, including Marginal area attainment dates, in evaluating the basis for the EPA's denial of a petition under CAA section 126(b). *Maryland,* 958 F.3d at 1203–04.

[279] *See Wisconsin,* 938 F.3d at 320.

[280] *Wisconsin,* 938 F.3d at 322 (''Delaware's argument leans too heavily on the SIP submission deadline. SIP submission deadlines, unlike attainment deadlines, are 'procedural' and therefore not 'central to the regulatory scheme.''') (citing *Sierra Club,* 294 F.3d at 161).

[281] *EME Homer City,* 572 U.S. at 510.

identified as not constituting agency guidance (especially Attachment A to the March 2018 memorandum, which comprised an unvetted list of outside stakeholders' ideas). Further, states' submissions did not meet the terms of the August or October 2018 memoranda addressing contribution thresholds and maintenance receptors, respectively. (*See* Section V.B for further discussion of these memoranda.) We acknowledge that the EPA reassessed air quality and states' contribution levels through additional modeling before proposing action on these SIP submissions. But that is not in any way an effort to circumvent the SIP/FIP process; rather it is an outcome of the reality that the EPA updated its modeling platform from a 2011 to a 2016 base year and updated its emissions inventory information along with other updates. There is nothing improper in the Agency improving its understanding of a situation before taking action, and the Agency reasonably must be able to act on SIP submissions using the information available at the time it takes such action. Those updates have not uniformly been used to disapprove SIPs—the new modeling for instance supported the approval of Montana's and Colorado's SIPs.[282] Nor has the new modeling prevented states from submitting new SIP submissions based on that modeling. For instance, the State of Alabama withdrew its prior submission in April of 2022, following our proposed disapproval, and submitted a new submission (further updated in June of 2022) analyzing the 2016v2 modeling used at proposal. The EPA is acting on that new submission and evaluating the new arguments the State developed regarding the more recent modeling. Nonetheless, as explained in the EPA's proposed disapproval of Alabama's new submission and in Section IV.A, the new arguments that Alabama has presented in its more recent submission do not lead the EPA to a contrary conclusion that its SIP submission should be approved.[283] This demonstrates two points contrary to commenters' contentions: first, the EPA is following the science and is making nationally consistent determinations at Steps 1 and 2, based on its review of each state's submission; and second, the fact that states made submissions based on the 2011-based modeling results presented in the March 2018

memorandum rather than on the most recent modeling results is not prejudicial to the outcome of the EPA's analysis, as our action on Alabama's more recent submission evaluating the State's arguments with respect to the newer, 2016-based modeling makes clear.

Contrary to commenters' arguments, the EPA had no obligation to issue further guidance, define obligations, or otherwise clarify or attempt to interpret states' responsibilities since the issuance of the 2018 memoranda, prior to acting on these SIP submissions. States themselves were aware or should have been aware of the case law developments in *Wisconsin* and in *Maryland,* which called into question the EPA's use of 2023 as the analytical year in the March 2018 memorandum. Those decisions were issued in 2019 and 2020 respectively, yet no state moved to amend or supplement their SIP submissions with analysis of an earlier analytical year or to otherwise bring their analyses into conformance with those decisions (*e.g.,* through fuller analysis of non-EGU emissions reduction potential or through treatment of international contribution). Given the Supreme Court's 2014 holding in *EME Homer City,* 572 U.S. at 508–510, which reversed a D.C. Circuit holding that the EPA *was* obligated to define good neighbor obligations,[284] states had no reason to expect the EPA would be obligated to issue further guidance to clarify requirements in the wake of those decisions. The EPA agrees with those commenters who point out that states have the first opportunity to assess and address obligations in implementing the NAAQS, but with that understanding in mind, it is notable that prior to the proposed disapprovals in February of 2022, no state moved to amend or supplement their SIP submission as the case law on good neighbor obligations evolved or in response to new modeling information as it became available.

Further, the EPA has evaluated state SIP submissions on the merits of what is contained in the submission, not the use of any particular modeling platform. The EPA disagrees with commenters' assertions that the EPA has proposed disapproval of a state's proposed SIP due to the use of a particular modeling platform. As noted previously, the EPA approved state SIP submissions that have used the earlier modeling. The EPA did not reach its conclusion to disapprove states' SIP submissions based on the use of the 2016v2

emissions platform standing alone. Use of that platform, or any other modeling platform, is not *ipso facto* grounds for disapproval at all. As evident in the proposed disapprovals and summarized in Section IV, the EPA evaluated the SIP submissions based on the merits of the arguments put forward in each SIP submission.

### 3. Alleged Harm to States Caused by Time Between SIP Submission and the EPA's Action

*Comment:* Many comments pointed to the EPA's statutory deadlines to take action on the SIP submissions to argue that the EPA's delay harmed the upwind state's interests because now the EPA may conclude they need to reduce their emissions to satisfy their good neighbor obligations in the separate FIP rulemaking whereas had the EPA acted by statutory deadlines using the older modeling, they might have had their SIP submissions approved. Some commenters suggest that the EPA never gave the state SIP submissions the appropriate review or suggest that the EPA's review of the SIP submissions was prejudiced by the FIP it had proposed.

*EPA Response:* The EPA acknowledges that the Agency's statutory deadlines to take final action on these SIP submissions generally fell in 2020 and 2021. However, the delay in acting caused no prejudice to the upwind states. First, this action to disapprove SIP submissions itself will not impose any requirements or penalties on any state or sources within that state. Second, these delays have primarily had the effect of deferring relief to downwind states and their citizens from excessive levels of ozone pollution under the good neighbor provision. Further, the EPA has generally had a practice of correcting its action on good neighbor SIP submittals if later information indicates that a prior action was in error—thus, it is not the case that simply having obtained an approval based on earlier modeling would have meant a state would be forever insulated from later being subject to corrective or remedial good neighbor actions. *See, e.g.,*86 FR 23056, 23067–68 (April 30, 2021) (error correcting Kentucky's approval to a disapproval and promulgating FIP addressing Kentucky's outstanding 2008 ozone NAAQS good neighbor obligations); 87 FR 20036, 20041 (April 6, 2022) (proposing error correction for Delaware's 2015 ozone NAAQS SIP approval to a disapproval based on updated air quality modeling). Finally, there is no basis in the CAA to use the Agency's own delay as a basis to nullify

---

[282] 87 FR 6095, 6097 at n. 15 (February 3, 2022) (Montana proposal); 87 FR 27050, 27056 (May 6, 2022) (Colorado, proposal), 87 FR 61249 (October 11, 2022) (Colorado, final).

[283] 87 FR 64412 (October 25, 2022).

[284] *EME Homer City Generation, L.P.* v. *EPA,* 696 F.3d 7 (D.C. Cir. 2012) (*EME Homer City I*).

the authority granted in the Act to address the nation's air pollution problems, as the statute itself contains other forms of adequate remedy. CAA section 304(a)(2) provides for judicial recourse where there is an alleged failure by the agency to perform a nondiscretionary duty, and that recourse is for the Agency to be placed on a court-ordered deadline to address the relevant obligations. *Accord Oklahoma,* 723 F.3d at 1223–24; *Montana Sulphur and Chemical Co.* v. *U.S. EPA,* 666 F.3d 1174, 1190–91 (9th Cir. 2012).

*Comment:* Some comments contend that the EPA's delay in acting on SIP submissions is a deliberate attempt to circumvent the SIP/FIP process, unduly burden the states, or to defer making information available to states. Comments allege that the EPA intentionally stalled an evaluative action until the perceived ''facts'' of the situation changed such that the analyses submitted by states were rendered outdated.

*EPA Response:* The EPA disagrees with both allegations. In this respect, it is important to review the recent history of the EPA's regulatory actions and litigation with respect to good neighbor obligations for both the 2008 and 2015 ozone NAAQS, and in particular, the substantial additional workload the Agency took on in the wake of the remand of the CSAPR Update in *Wisconsin.* In 2018, as the EPA issued the memoranda cited by commenters and planned to shift its focus to implementing the 2015 standards, it also issued the CSAPR Close-out, which made an analytical finding that there were no further obligations for 21 states for the 2008 standards following the CSAPR Update. 83 FR 65878 (Dec. 21, 2018). However, contrary to the EPA's understanding that it had fully addressed good neighbor obligations for the 2008 ozone NAAQS, the D.C. Circuit's decisions in *Wisconsin* (remanding the CSAPR Update) and in *New York* (vacating the CSAPR Close-out), forced the Agency to quickly pivot back to addressing remaining obligations under the 2008 standards. *Wisconsin* v. *EPA,* 938 F.3d 303 (D.C. Cir. 2019); *New York* v. *EPA,* 781 F. App'x 4 (D.C. Cir. 2019). The EPA was subject to renewed deadline suit litigation under CAA section 304, which led to a March 15, 2021, deadline to take final action on several states where FIPs had been remanded and were incomplete in the wake of the CSAPR Close-out vacatur. *New Jersey* v. *Wheeler,* 475 F.Supp.3d 308 (S.D.N.Y. 2020). Throughout 2020 and 2021, the EPA was therefore focused on an

unexpected rulemaking obligation to complete good neighbor requirements as to the states with remanded CSAPR Update FIPs. This led to the EPA proposing and then issuing an economically significant, major rule assessing additional EGU emissions reduction obligations as well as presenting updated air quality modeling analysis using novel techniques and presenting information on a host of non-EGU industrial sources for the first time, *i.e.,* the Revised CSAPR Update, 86 FR 23054 (April 30, 2021). That rule is now currently subject to judicial review in the D.C. Circuit, *Midwest Ozone Group* v. *EPA,* No. 21–1146 (D.C. Cir. argued Sept. 28, 2022).[285] The EPA has also been in the process of reviewing and acting upon many states' good neighbor SIPs where the available information indicates that an approval of the state's submission was appropriate.[286]

Finally, the Agency needed time to review and evaluate the SIP submissions in a coordinated fashion to act on all the states' submissions in a consistent manner. As the EPA explained in the proposed disapproval action, consistency in defining CAA obligations is critically important in the context of addressing a regional-scale pollutant like ozone. *See, e.g.,* 87 FR 9807 n.48. Through coordinated development of the bases for how the Agency could act on the SIP submissions, while also evaluating the contours of a potential Federal plan to implement obligations where required, the EPA sequenced its deliberations and decision making to maximize efficient, consistent, and timely action, in recognition of the need to implement any necessary obligations ''as

expeditiously as practicable.''[287] The downsides of commenters' policy preference in favor of giving states another opportunity to develop SIP submissions, or in first acting on each SIP submission before proposing a FIP, are that such a sequence of actions would have led to multiple years of additional delay in addressing good neighbor obligations. Even if such a choice was available to the Agency using the CAA section 110(k)(5) SIP call mechanism, it was entirely reasonable for the EPA to decline to use that mechanism in this instance. (EPA further addresses comments in support of a SIP call approach in the RTC document.)

In short, commenters' notion that the EPA was deliberately or intentionally deferring or delaying action on these SIP submissions to circumvent any required legal process or reach any specific result is simply incorrect. Commenters have not supplied any evidence to support the claim either that any legal process was circumvented or that the Agency's conduct was in bad faith. *See Biden* v. *Texas,* 142 S.Ct. 2528, 2546–47 (2022) (presumption of regularity attends agency action absent a ''strong showing of bad faith or improper behavior'') (citing *Citizens to Protect Overton Park* v. *Volpe,* 401 U.S. 302, 420 (1971); *SEC* v. *Chenery,* 318 U.S. 80, 87 (1943)).

4. Use of Updated Modeling

*Comment:* Comments allege that by relying on modeling not available at the time of SIP submission development, the EPA ''moved the goal post.'' Comments note the timeframes set out for action on SIPs, citing section 110 of the Act, and allege that by failing to act on SIP submissions in a timely manner and basing such actions on new modeling, the EPA imposes an arbitrary and capricious standard. Comments state that the EPA should not disapprove a SIP based on data not available to states during development of the SIP submissions or to the EPA during the period statutorily allotted for the EPA to take final action on SIP submissions.

*EPA Response:* In response to comments' claims that the EPA has inappropriately changed states' obligations for interstate transport by relying on updated modeling not available to states at the time they prepared their SIP submissions, the EPA disagrees. As an initial matter, the EPA disagrees with comment's claiming that the agency expected state air agencies to develop a SIP submission based on

---

[285] During this time, the EPA also fulfilled its obligations to act on several petitions brought by downwind states under section 126(b) of the CAA. These actions culminated in litigation and ultimately adverse decisions in *Maryland* and *New York* v. *EPA. Maryland v,* 958 F.3d; *New York* v. *EPA,* 964 F.3d 1214, 2020 WL 3967838 (D.C. Cir. 2020). Further review and action on these remands remains pending before the agency.

[286] In chronological order: 83 FR 47568 (September 20, 2018) (Washington); 84 FR 69331 (December 18, 2019) (Alaska); 84 FR 22376 (May 17, 2019) (Oregon); 85 FR 5570 (January 31, 2020) (Washington, DC); 85 FR 5572 (January 31, 2020) (Massachusetts); 85 FR 20165 (April 10, 2020) (North Dakota); 85 FR 21325 (April 17, 2020) (Nebraska); 85 FR 25307 (May 1, 2020) (Delaware); 85 FR 34357 (June 4, 2020) (Vermont); 85 FR 65722 (October 16, 2020) (Idaho); 85 FR 67653 (October 26, 2020) (South Dakota); 86 FR 45870 (August 17, 2021) (Maine and New Hampshire); 86 FR 68413 (December 2, 2021) (Florida, Georgia, North Carolina, and South Carolina); 86 FR 70409 (December 10, 2021) (Rhode Island); 86 FR 71830 (December 20, 2021) (Connecticut); 86 FR 73129 (December 27, 2021) (Hawaii); 87 FR 19390 (April 4, 2022) (Kansas); 87 FR 21578 (April 12, 2022) (Montana); 87 FR 22463 (April 15, 2022) (Iowa); and 87 FR 61249 (October 11, 2022) (Colorado).

[287] CAA section 181(a); *Wisconsin,* 938 F.3d at 313–14 (citing *North Carolina,* 531 F.3d at 911–12).

some unknown future data. The EPA recognizes that states generally developed their SIP submissions with the best available information at the time of their development. As stated in the proposals, the EPA did not evaluate states' SIP submissions based solely on the 2016v2 emissions platform (or the 2016v3 platform, which incorporates comments generated during the public comment period on the proposed SIP actions and which supports these final SIP disapproval actions). We evaluated the SIP submissions based on the merits of the arguments put forward in each SIP submission, which included any analysis put forward by states to support their conclusions. Thus, we disagree with commenters who allege the Agency has ignored the information provided by the states in their submissions. Indeed, the record for this action reflects our extensive evaluation of states' air quality and contribution analyses. *See* generally Section IV, which summarizes our evaluation for each state.

We disagree with commenters who advocate that the EPA's evaluation of these submissions must be limited to the information available to states at the time they made their submissions, or information at the time of the deadline for the EPA to act on their submissions. It can hardly be the case that the EPA is prohibited from taking rulemaking action using the best information available to it at the time it takes such action. Nothing in the CAA suggests that the Agency must deviate from that general principle when acting on SIP submissions. While CAA section 110(k)(2) specifies a time period in which the Administrator is to act on a state submission, neither this provision nor any other provision of the CAA specifies that the remedy for the EPA's failure to meet a statutory deadline is to arrest or freeze the information the EPA may consider to what was available at the time of a SIP submission deadline under CAA section 110. Indeed, in the interstate transport context, this would lead to an anomalous result. For example, the D.C. Circuit rejected an argument made by Delaware against the CSAPR Update air quality analysis that the EPA was limited to reviewing air quality conditions in 2011 (rather than 2017) at the time of the statutory deadline for SIP submittals. The court explained,

Delaware's argument leans too heavily on the SIP submission deadline. SIP submission deadlines, unlike attainment deadlines, are "procedural" and therefore not "central to the regulatory scheme." *Sierra Club*, 294 F.3d at 161. Nor can Delaware's argument be reconciled with the text of the Good Neighbor Provision, which prohibits upwind

States from emitting in amounts "which *will*" contribute to downwind nonattainment. 42 U.S.C. 7410(a)(2)(D)(i) (emphasis added). Given the use of the future tense, it would be anomalous for EPA to subject upwind States to good neighbor obligations in 2017 by considering which downwind States were once in nonattainment in 2011.

*Wisconsin,* 903 F.3d at 322. By the same token, here, holding the EPA to a consideration only of what information states had available regarding the 2023 analytic year at the time of their SIP submissions or at the time of a deadline under CAA section 110, would likewise elevate the "procedural" deadlines of CAA section 110 above the substantive requirements of the CAA that are "central to the regulatory scheme." Doing so here would force the Agency to act on these SIP submissions knowing that more recent refined, high quality, state-of-the-science modeling and monitoring data would produce a different result in our forward-looking analysis of 2023 than the information available in 2018. Nothing in the CAA dictates that the EPA must be forced into making substantive errors in its good neighbor analysis on this basis. We relied on CAMx Version 7.10 and the 2016v2 emissions platform to make updated determinations regarding which receptors would likely exist in 2023 and which states are projected to contribute above the contribution threshold to those receptors. As explained in the preamble of the EPA's proposed actions and further detailed in the document titled "Air Quality Modeling TSD: 2015 Ozone National Ambient Air Quality Standards Proposed Interstate Transport Air Plan Disapproval" and 2016v2 Emissions Inventory TSD, both available in Docket ID no. EPA–HQ–OAR–2021–0663, the 2016v2 modeling built off previous modeling iterations used to support the EPA's action on interstate transport obligations. The EPA continuously refines its modeling to ensure the results are as indicative as possible of air quality in future years. This includes adjusting our modeling platform and updating our emissions inventories to reflect current information.

Additionally, we disagree with comments claiming that the 2016v2 modeling results were sprung upon the states with the publication of the proposed disapprovals. The EPA has been publishing a series of data and modeling releases beginning as early as the publication of the 2016v1 modeling with the proposed Revised CSAPR Update in November of 2020, which could have been used to track how the EPA's modeling updates were potentially affecting the list of possible

receptors and linkages for the 2015 ozone NAAQS in the 2023 analytic year. The 2016-based meteorology and boundary conditions used in the modeling have been available through the 2016v1 platform, which was used for the Revised CSAPR Update (proposed in November of 2020, 85 FR 68964). The updated emissions inventory files used in the current modeling were publicly released September 21, 2021, for stakeholder feedback, and have been available on our website since that time.[288] The CAMx modeling software that the EPA used has likewise been publicly available for over a year. CAMx version 7.10 was released by the model developer, Ramboll, in December 2020. On January 19, 2022, we released on our website and notified a wide range of stakeholders of the availability of both the modeling results for 2023 and 2026 (including contribution data) along with many key underlying input files.[289]

By providing the 2016 meteorology and boundary conditions (used in the 2016v1 version) in fall of 2020, and by releasing updated emissions inventory information used in 2016v2 in September of 2021,[290] states and other interested parties had multiple opportunities prior to the proposed disapprovals in February of 2022 to consider how our modeling updates could affect their status for purposes of evaluating potential linkages for the 2015 ozone NAAQS. Further, by using the updated modeling results, the EPA is using the most current and technically appropriate information for this rulemaking. This modeling was not performed to "move the goal posts" for states but meant to provide updated emissions projections, such as additional emissions reductions for EGUs following promulgation of the Revised CSAPR Update for the 2008 ozone NAAQS, more recent information on plant closures and fuel switches, and sector trends, including non-EGU sectors. The construct of the 2016v2 emissions platform is described in the 2016v2 Emissions Modeling TSD contained in Docket ID No. EPA–HQ–OAR–2021–0663.

Finally, comments related to the timing of the EPA's action to disapprove these SIP submissions are addressed in Section V.A.1. The EPA notes the statute provides a separate remedy for agency action unlawfully delayed. In section 304 of the CAA, there is a

[288] *See https://www.epa.gov/air-emissions-modeling/2016v2-platform.*

[289] *See https://www.epa.gov/scram/photochemical-modeling-applications.*

[290] *https://www.epa.gov/air-emissions-modeling/2016v2-platform.*

process for filing suit against the EPA for its failure to comply with a non-discretionary statutory duty under the CAA. The appropriate remedy in such cases is an order to compel agency action, not a determination that the agency, by virtue of missing a deadline, has been deprived of or constrained in its authority to act. *See Oklahoma,* 723 F.3d at 1224 ("[W]hen 'there are less drastic remedies available for failure to meet a statutory deadline'—such as a motion to compel agency action— 'courts should not assume that Congress intended the agency to lose its power to act.' The Court 'would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake.'") (cleaned up) (quoting *Brock* v. *Pierce County,* 476 U.S. 253, 260 (1986)).

*Comment:* Comments state that it is inappropriate for the EPA to revise its emissions inventory and to conduct new air quality modeling without allowing an appropriate opportunity for stakeholder review and comment and that the EPA must allow public comment on any updated (*i.e.,* 2016v3) modeling prior to use by the EPA in a final action. Comments claim that the EPA must withdraw the proposed disapproval and provide states time to develop new SIP submissions based on the updated information.

*EPA Response:* The EPA has evaluated a wide range of technical information and critiques of its 2016v2 emissions inventory and modeling platform following a solicitation of public feedback as well the public comment period on this action (and the proposed FIP action) and has responded to those comments and incorporated updates into the version of the modeling being used in this final action (2016v3). *See* Section III, the Final Action AQM TSD, and Section 4 of the RTC document for further discussion.

The EPA's development of and reliance on newer modeling to confirm modeling used at the proposal stage is in no way improper and is simply another iteration of the EPA's longstanding scientific and technical work to improve our understanding of air quality issues and causes going back decades. Where the 2016v3 modeling produced a potentially different outcome for states from proposal, that is reflected in this action (*e.g.,* our deferral of final action on Tennessee and Wyoming's SIP submissions).

*Comment:* Comments allege that EPA's modeling results have been inconsistent, questioning the reliability of the results.

*EPA Response:* Although some commenters indicate that our modeling iterations have provided differing outcomes and are therefore unreliable, this is not what the overall record indicates. Rather, in general, although the specifics of states' linkages may change slightly, our modeling overall has provided consistent outcomes regarding which states are linked to downwind air quality problems. For example, the EPA's modeling shows that most states that were linked to one or more receptors using the 2011-based platform (*i.e.,* the March 2018 data release) are also linked to one or more receptors using the newer 2016-based platform. Because each platform uses different meteorology (*i.e.,* 2011 and 2016) it is not at all unexpected that an upwind state could be linked to different receptors using 2011 versus 2016 meteorology.

In addition, although a state may be linked to a different set of receptors, states are often linked to receptors in the same area that has a persistent air quality problem. These differing results regarding receptors and linkages can be affected by the varying meteorology from year to year, but this does not indicate that the modeling or the EPA or the state's methodology for identifying receptors or linkages is inherently unreliable. Rather, for many states these separate modeling runs all indicated: (i) that there would be receptors in areas that would struggle with nonattainment or maintenance in the future, and (ii) that the state was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (*e.g.,* a different set of receptors were identified to have nonattainment or maintenance problems, or a state was linked to different receptors in one modeling run versus another).

The EPA interprets this common result as indicative that a state's emissions have been substantial enough to generate linkages at Step 2 to varying sets of downwind receptors generated under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs. Under these circumstances, we think it is appropriate to proceed to a Step 3 analysis to determine what portion of a particular state's emissions should be deemed "significant." We also note that only four states included in the proposed disapprovals went from being unlinked to being linked between the 2011-based modeling provided in the March 2018 memorandum and the 2016v2-based modeling—Alabama, Minnesota, Nevada, and Tennessee.

## 5. Cooperative Federalism and the EPA's Authority

*Comment:* Many comments point to the concept of cooperative federalism as embodied in the CAA to make various arguments as to why the EPA cannot or should not be allowed to exercise its independent judgment in evaluating the arguments presented by the states in the SIP submissions, and some also argue that the EPA must approve each state's submission in deference to how states choose to interpret the CAA requirements they must meet.

*EPA Response:* The CAA establishes a framework for state-Federal partnership to implement the NAAQS based on cooperative federalism. Under the general model of cooperative federalism, the Federal Government establishes broad standards or goals, states are given the opportunity to determine how they wish to achieve those goals, and if states choose not to or fail to adequately implement programs to achieve those goals, a Federal agency is empowered to directly regulate to achieve the necessary ends. Under the CAA, once the EPA establishes or revises a NAAQS, states have the obligation and opportunity in the first instance to develop an implementation plan under CAA section 110 and the EPA will approve SIP submissions under CAA section 110 that fully satisfy the requirements of the CAA. This sequence of steps is not in dispute.

The EPA does not, however, agree with the comments' characterization of the EPA's role in the state-Federal relationship as being "secondary" such that the EPA must defer to state choices heedless of the substantive objectives of the Act; such deference would be particularly inappropriate in the context of addressing interstate pollution. The EPA believes that the comments fundamentally misunderstand or inaccurately describe this action, as well as the "'division of responsibilities' between the states and the federal government" they identify in CAA section 110 citing the *Train-Virginia* line of cases [291] and other cases.[292]

---

[291] *See Virginia* v. *EPA,* 108 F.3d 1397, 1407 (D.C. Cir. 1997) (*Virginia*) (quoting *Train* v. *Natural Resources Defense Council, Inc.,* 421 U.S. 60, 79 (1975) (*Train*)). The "Train-Virginia line of cases" are named for the U.S. Supreme Court case *Train,* 421 U.S. and to the D.C. Circuit case *Virginia,* 108 F.3d. The D.C. Circuit has described these cases as defining a "federalism bar" that generally recognizes states' ability to select emissions control measures in their SIPs so long as CAA requirements are met. *See, e.g., Michigan* v. *EPA,* 213 F.3d 663, 687 (D.C. Cir. 2000) (*Michigan*).

[292] *Union Elec. Co.* v. *EPA,* 427 U.S. 246 (1976), *Am. Elec. Power Co.* v. *Connecticut,* 565 U.S. 410 (2011), *Fla. Power & Light* v. *Costle,* 650 F.2d 579

Continued

Those cases, some of which pre-date the CAA amendments of 1990 resulting in the current Good Neighbor Provision,[293] stand only for the proposition that the EPA must approve state plans *if they* meet the applicable CAA requirements. But these cases say nothing about what those applicable requirements are. The EPA is charged under CAA section 110 with reviewing states' plans for compliance with the CAA and approving or disapproving them based on EPA's determinations. Thus, the EPA must ultimately determine whether state plans satisfy the requirements of the Act or not. Abundant case law reflects an understanding that the EPA must evaluate SIP submissions under the CAA section 110(k)(2) and (3).[294] If they are deficient, the EPA must so find, and become subject to the obligation to directly implement the relevant requirements through a Federal implementation plan under CAA section 110(c), unless EPA approves an applicable SIP first.[295]

The EPA responds in greater detail to these comments in the RTC document.

6. Availability of Guidance for SIP Submissions

*Comment:* Comments contend the EPA failed to issue guidance in a timely fashion by releasing its August 2018 memorandum 31 days prior to when SIPs addressing interstate ozone transport were due and issuing the October 2018 memorandum 18 days

(5th Cir. 1981), *Bethlehem Steel Corp.* v. *Gorsuch,* 742 F.2d 1028 (7th Cir. 1984), *Concerned Citizens of Bridesburg* v. *EPA,* 836 F.2d 777 (3d Cir. 1987), *North Carolina,* 531 F.3d 896, *Luminant,* 675 F.3d 917 (5th Cir. 2012), *Luminant Co. LLC* v. *EPA,* 714 F.3d 841 (5th Cir. 2013), *North Dakota* v. *EPA,* 730 F.3d 750 (8th. Cir. 2013), *EME Homer City II,* 795 F.3d 118 (D.C. Cir. 2015), and *Texas* v. *USEPA,* 829 F.3d 405 (5th Cir. 2016).

[293] The 1970 version of the Act required SIPs to include "adequate provisions for intergovernmental cooperation" concerning interstate air pollution. CAA section 110(a)(2)(E), 84 Stat. 1681, 42 U.S.C. 1857c–5(a)(2)(D). In 1977, Congress amended the Good Neighbor Provision to direct States to submit SIP submissions that included provisions "adequate" to "prohibit[t] any stationary source within the State from emitting any air pollutant in amounts which will . . . prevent attainment or maintenance [of air quality standards] by any other State." CAA section 108(a)(4), 91 Stat. 693, 42 U.S.C. 7410(a)(2)(E) (1976 ed., Supp. II). Congress again amended the Good Neighbor Provision in 1990 to its current form.

[294] *See, e.g., Virginia,* 108 F.3d at 1406. *See also, e.g., Westar Energy* v. *EPA,* 608 Fed. App'x 1, 3 (D.C. Cir. 2015) ("EPA acted *well within the bounds* of its delegated authority when it disapproved of Kansas's proposed [good neighbor] SIP.") (emphasis added); *Oklahoma,* 723 F.3d at 1209 (upholding the EPA's disapproval of "best available retrofit technology" (BART) SIP, noting BART "does not differ from other parts of the CAA—states have the ability to create SIPs, but they are subject to EPA review").

[295] *EME Homer City Generation,* 572 U.S. at 508–510.

after those SIPs were due. Some comments additionally claim that it is unreasonable for the EPA to disapprove SIP submissions based on standards that were not defined, mandated, or required by official guidance.

*EPA Response:* Comments' contention is unsupported by the statute or applicable case law. Regarding the need for the EPA's guidance in addressing good neighbor obligations, in *EME Homer City,* the Supreme Court clearly held that "nothing in the statute places the EPA under an obligation to provide specific metrics to States before they undertake to fulfill their good neighbor obligations." [296]

Nonetheless, as comments point out, the EPA issued three "memoranda" in 2018 to provide some assistance to states in developing these SIP submissions. In acting on the SIP submissions in this action, the EPA is neither rescinding nor acting inconsistently with the memoranda—to the extent the memoranda constituted agency guidance (not all the information provided did constitute guidance), information or ideas in the memoranda had not at that time been superseded by case law developments, and the memoranda's air quality and contribution data had not at that time been overtaken by updated modeling and other updated air quality information. While comments specific to each of those memoranda are addressed elsewhere in this record, we note in brief that each memorandum made clear that the EPA's action on SIP submissions would be through a separate notice-and-comment rulemaking process and that SIP submissions seeking to rely on or take advantage of any information or concepts in these memoranda would be carefully reviewed against the relevant legal requirements and technical information available to the EPA at the time it would take such rulemaking action.

## B. Application of the 4-Step Interstate Transport Framework

### 1. Analytic Year

*Comment:* One comment asserted that 2023 is not an appropriate analytical year because, according to the commenter, the EPA and at least some downwind states have not in fact implemented mandatory emissions control requirements associated with their nonattainment areas, and *North Carolina* and *Wisconsin* require that upwind and downwind state obligations must be implemented "on par." The

[296] *EME Homer City,* 572 U.S. at 510.

comment also characterizes the EPA's invocation of *Maryland* as an inappropriate shifting of regulatory burden to upwind states.

*EPA Response:* This is an incorrect interpretation of the D.C. Circuit's holdings in *North Carolina, Wisconsin,* and *Maryland,* which held that the EPA and the states must align good neighbor obligations to the extent possible with the downwind areas' attainment dates. These are set by the statute and remain fixed regardless of whether downwind areas are delayed in implementing their own obligations. It would be unworkable to expect that upwind states' obligations could be perfectly aligned with each downwind area's actual timetable for implementing the relevant emissions controls, and no court has held that this is the EPA's or the states' obligation under the good neighbor provision. Further, this ignores the fact that upwind states must also address their interference with maintenance of the NAAQS, as well as the *Maryland* court's holding that good neighbor obligations should be addressed by the Marginal area attainment date for ozone under subpart 2 of part D of title I of the CAA. Both circumstances may involve situations in which the home state for an identified downwind receptor does not have a specific obligation to plan for and implement specific emissions controls while an upwind state may nonetheless be found to have good neighbor obligations. But, as the *Maryland* court recognized, the absence of specific enumerated requirements does not mean the downwind state does not have a statutorily binding obligation subject to burdensome regulatory consequences: "Delaware must achieve attainment 'as expeditiously as practicable,'" and "an upgrade from a marginal to a moderate nonattainment area carries significant consequences . . . ." *Maryland,* 958 F.3d at 1204.

Further, where any downwind-state delays are unreasonable or violate statutory timeframes, the CAA provides recourse to compel the completion of such duties in CAA section 304, not to defer the elimination of significant contribution and thereby expose the public in downwind areas to the elevated pollution levels caused in part by upwind states' pollution. Regardless, in this action, 2023 aligns with the Moderate area attainment date in 2024, and all of the downwind nonattainment areas corresponding to receptor locations identified at Step 1 in this action are already classified as being in Moderate nonattainment or have been reclassified to Moderate and the relevant states face obligations to submit

SIP submissions and implement reasonably available control technologies (RACT) by January 1, 2023. *See* 87 FR 60897, 60899 (October 7, 2022). The EPA further responds to this comment in the RTC document.

## 2. Attachment A to the March 2018 Memorandum

*Comment:* Comments state that states conducted their analyses based on the flexibilities listed in Attachment A of the March 2018 Memorandum. Comments cite the part of the memorandum where the EPA notes that "in developing their own rules, states have flexibility to follow the familiar four-step transport framework (using [the] EPA's analytical approach or somewhat different analytical approaches within these steps) or alternative frameworks, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA." Comments state that the EPA's disapproval of SIP submissions that took advantage of the flexibilities is arbitrary and capricious because the EPA has changed, without communication, its consideration of what is deemed to be the "necessary provisions" required for an approvable SIP submission too late in the SIP submission process and because, in disapproving these SIPs, the EPA is applying a consistent set of policy judgments across all states.

*EPA Response:* Comments mistakenly view Attachment A to the March 2018 memorandum releasing modeling results as constituting agency guidance. The EPA further disagrees with commenters' characterization of the EPA's stance regarding the "flexibilities" listed (without analysis) in Attachment A. Attachment A to the March 2018 memorandum identified a "Preliminary List of Potential Flexibilities" that could potentially inform SIP development.[297] However, the EPA made clear in that attachment that the list of ideas were not suggestions endorsed by the Agency but rather "comments provided in various forums" from outside parties on which the EPA sought "feedback from interested stakeholders."[298] Further, Attachment A stated, "EPA is not at this time making any determination that the ideas discussed later are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches."[299] Attachment A to the March 2018 memorandum, therefore, does not constitute agency

guidance, but was intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders. The EPA emphasized in this memorandum that any such alternative approaches must be technically justified and appropriate in light of the facts and circumstances of each particular state's submittal.[300] As stated in the proposed SIP disapprovals,[301] the March 2018 memorandum provided that, "While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the good neighbor provision." [302] In this final SIP disapproval action, the EPA again affirms that certain concepts included in Attachment A to the March 2018 memorandum require unique consideration, and these ideas do not constitute agency guidance with respect to transport obligations for the 2015 ozone NAAQS.

In response to comments' claims that since the time transport SIP submissions were submitted to the EPA for review, the EPA has changed, without communication, its consideration of what is deemed to be the "necessary provisions" required for an approvable SIP submission, the EPA disagrees. As comments note, and as stated in the proposed disapproval notifications, the EPA recognizes that states have discretion to develop their own SIP transport submissions and agrees that states are not bound to using the 4-step interstate transport framework the EPA has historically used. However, states must then provide sufficient justification and reasoning to support their analytical conclusions and emissions control strategies. *See, e.g.,* 87 FR 9798, 9801. In the SIP submissions being disapproved in this action, no state provided any enforceable emissions control strategies for approval into their SIP. The EPA has evaluated the merits of each state's arguments as to why no additional emissions reduction requirements are needed to satisfy their obligations under CAA section 110(a)(2)(D)(i)(I) for the more protective 2015 ozone NAAQS. While the EPA used its own 4-step interstate

transport framework as a guide for its review to ensure a consistent and equitable evaluation of each states' submissions, the EPA has also considered states' individual arguments without predetermining the EPA's conclusions about the state's transport obligations.

It was never the Agency's intent in sharing Attachment A that states would invoke one or more of the potential "flexibilities" that outside parties advocated for as a basis for concluding that no additional emissions controls were necessary to address interstate transport for the more protective 2015 ozone NAAQS without proper justification. Nothing in Attachment A suggested that was the Agency's intended objective. Indeed, where certain approaches identified in Attachment A might have produced analytical conclusions requiring upwind states to reduce their emissions, no state invoking Attachment A followed through with implementing those controls. We observe this dynamic at work in Kentucky's submission, because Kentucky appended comments from the Midwest Ozone Group to its submission that demonstrated that applying a "weighted" approach to allocating upwind-state responsibility at Step 3 would have resulted in an emissions control obligation on Kentucky's sources, yet the State offered no explanation in its submittal why it was not adopting that approach or even what its views on that approach were. *See* 87 FR 9515. As another example, Michigan cited Attachment A to the March 2018 in developing a methodology for calculating significant contribution under which Michigan would have been responsible for eliminating up to 0.12 ppb of contribution to downwind receptors; however, the State suggested that uncertainty caused by modeling "noise" was too great to either require emissions reductions or demonstrate that Michigan had any linkages to receptors at all. *See* 87 FR 9860–9861. However, this explanation did not, as an analytical matter, demonstrate a level of scientific uncertainty which might allow for ignoring the results,[303]

---

[297] March 2018 memorandum, Attachment A.
[298] *Id.*
[299] *Id.*

[300] March 2018 memorandum.
[301] E.g., 87 FR 9487.
[302] *See* Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), March 27, 2018, available in docket EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

[303] Scientific uncertainty may only be invoked to avoid comporting with the requirements of the CAA when "the scientific uncertainty is so profound that it precludes . . . reasoned judgment" *Massachusetts* v. *EPA,* 127 S.Ct. 1438 (2007). *See Wisconsin,* 938 F.3d at 318–19 ("Scientific uncertainty, however, does not excuse EPA's failure to align the deadline for eliminating upwind States' significant contributions with the deadline for downwind attainment of the NAAQS."). *See also EME Homer City,* 795 F.3d at 135–36 ("We will not invalidate EPA's predictions solely because there might be discrepancies between those predictions
Continued

particularly when the Agency has implemented good neighbor requirements at levels of ''significant contribution'' comparable to or even less than 0.12 ppb. *See Wisconsin,* 938 F.3d at 322–23 (rejecting Wisconsin's argument that it should not face good neighbor obligations for the 2008 ozone NAAQS on the basis that its emission reductions would only improve a downwind receptor by two ten-thousandths of a part per billion).

The EPA continues to neither endorse the ''flexibilities'' in Attachment A, nor stakes a position that states are precluded from relying on these concepts in the development of their good neighbor SIP submissions, assuming they could be adequately justified both technically and legally. This has been demonstrated through the EPA's extensive evaluation of the merits of each states' SIP submissions, including their attempted use of flexibilities and derivatives of the EPA's historically applied 4-step interstate transport framework.[304]

3. Step 1: October 2018 Memorandum

*Comments:* Comments claimed that the EPA is not honoring its October 2018 memorandum, which they claim would allow for certain monitoring sites identified as maintenance-only receptors in the EPA's methodology to be excluded as receptors based on historical data trends. They assert that the EPA is inappropriately disapproving SIP submissions where the state sufficiently demonstrated certain monitoring sites should not be considered to have a maintenance problem in 2023.

*EPA Response:* The October 2018 memorandum recognized that states may be able to demonstrate in their SIPs that conditions exist that would justify treating a monitoring site as not being a maintenance receptor despite results from our modeling methodology identifying it as such a receptor. The EPA explained that this demonstration could be appropriate under two circumstances: (1) the site currently has ''clean data'' indicating attainment of the 2015 ozone NAAQS based on measured air quality concentrations, or (2) the state believes there is a technical

reason to justify using a design value from the baseline period that is lower than the maximum design value based on monitored data during the same baseline period. To justify such an approach, the EPA anticipated that any such showing would be based on an analytical demonstration that: (1) Meteorological conditions in the area of the monitoring site were conducive to ozone formation during the period of clean data or during the alternative base period design value used for projections; (2) ozone concentrations have been trending downward at the site since 2011 (and ozone precursor emissions of $NO_X$ and VOC have also decreased); and (3) emissions are expected to continue to decline in the upwind and downwind states out to the attainment date of the receptor. EPA evaluated state's analyses and found no state successfully applied these criteria to justify the use of one of these alternative approaches. The air quality data and projections in Section III indicate that trends in historic measured data do not necessarily support adopting a less stringent approach for identifying maintenance receptors for purposes of the 2015 ozone NAAQS. In fact, as explained in Section III, the EPA has found in its analysis for this final action that, in general, recent measured data from regulatory ambient air quality ozone monitoring sites suggest a number of receptors with elevated ozone levels will persist in 2023 even though our traditional methodology at Step 1 did not identify these monitoring sites as receptors in 2023. Thus, the EPA is not acting inconsistently with that memorandum—the factual conditions that would need to exist for the suggested approaches of that memorandum to be applicable have not been demonstrated as being applicable or appropriate based on the relevant data.

We further respond to comments related to the identification of receptors at Step 1 the RTC document.

4. Step 2: Technical Merits of a 1 Percent of the NAAQS Contribution Threshold

*Comment:* Several comments contend that for technical reasons, the 0.70 ppb threshold is inappropriate for determining whether a state is linked to a downwind receptor at Step 2 of the 4-step interstate transport framework. Comments state that the degree to which errors exist in modeling ozone concentrations and contributions make it inappropriate for a threshold as low as 0.70 ppb to be used. Some comments further state that the 0.70 ppb threshold is inappropriate because the

concentration threshold is lower than what monitoring devices are capable of detecting. Comments reference the reported precision of Federal reference monitors for ozone and the rounding requirements found in 40 CFR part 50, appendix U, Interpretation of the Primary and Secondary National Ambient Air Quality Standards for Ozone, for support. Comments note that the 1 percent contribution threshold of 0.70 ppb is lower than the manufacturer's reported precision of Federal reference monitors for ozone and that the requirements found in appendix U truncates monitor values of 0.70 ppb to 0 ppb.

*EPA Response:* The EPA disagrees that a 1 percent of the NAAQS contribution threshold at Step 2 is ''inappropriate'' for the 2015 ozone NAAQS due to modeling biases and errors. The explanation for how the 1 percent contribution threshold was originally derived is available in the 2011 CSAPR rulemaking. *See* 76 FR 48208, 48236–38 (Aug. 8, 2011). The EPA has effectively applied a 1 percent of the NAAQS threshold to identify linked upwind states in three prior FIP rulemakings and numerous state-specific actions. The D.C. Circuit has declined to establish bright line criteria for model performance. In upholding the EPA's approach to evaluating interstate transport in CSAPR, the D.C. Circuit held that it would not ''invalidate EPA's predictions solely because there might be discrepancies between those predictions and the real world. That possibility is inherent in the enterprise of prediction.'' *EME Homer City II,* 795 F.3d at 135. The court continued to note that ''the fact that a 'model does not fit every application perfectly is no criticism; a model is meant to simplify reality in order to make it tractable.' '' *Id.* at 135–36 (quoting *Chemical Manufacturers Association* v. *EPA,* 28 F.3d 1259, 1264 (DC Cir. 1994). *See also Sierra Club* v. *EPA,* 939 F.3d 649, 686–87 (5th Cir. 2019) (upholding the EPA's modeling in the face of complaints regarding an alleged ''margin of error,'' noting challengers face a ''considerable burden'' in overcoming a ''presumption of regularity'' afforded ''the EPA's choice of analytical methodology'') (citing *BCCA Appeal Grp.* v. *EPA,* 355 F.3d 817, 832 (5th Cir. 2003)).

Furthermore, it is not appropriate to compare the bias/error involved in the estimation of total ozone to the potential error in the estimation of the subset of ozone that is contributed by a single state.[305] For example, on a specific day

---

and the real world. That possibility is inherent in the enterprise of prediction.'').

[304] Nor in the course of this evaluation has the EPA uniformly ruled out the concepts in Attachment A. For example, we noted at proposal that California's identification of a flexibility in Attachment A related to excluding certain air quality data associated with atypical events may be generally consistent with the EPA's modeling guidance, but this does not affect the ultimate determination that California's SIP is not approvable. *See* 87 FR 31454.

[305] See, *e.g.,* 87 FR 9798 at 9816.

the modeled versus monitored ozone value may differ by 2 ppb but that is a relatively small percentage of the total modeled ozone, which for a receptor of interest would be on the order of 70 ppb. It would be unrealistic to assign all of the 2 ppb discrepancy in the earlier example to the estimated impact from a single state because the 2 ppb error would be the combination of the error from all sources of ozone that contribute to the total, including estimated impacts from other states, the home state of the receptor, and natural background emissions.

To address comments that compare the 0.70 ppb threshold to the Federal reference monitors for ozone and the rounding requirements found in 40 CFR part 50, appendix U, the EPA notes that the comment is mistaken in applying criteria related to the precision of monitoring data to the modeling methodology by which we project contributions when quantifying and evaluating interstate transport at Step 2. Indeed, contributions by source or state cannot be derived from the total ambient concentration of ozone at a monitor at all but must be apportioned through modeling. Under our longstanding methodology for doing so, the contribution values identified from upwind states are based on a robust assessment of the average impact of each upwind state's ozone-precursor emissions over a range of scenarios, as explained in the Final Action AQM TSD. This analysis is in no way connected with or dependent on monitoring instruments' precision of measurement. *See EME Homer City II,* 795 F.3d 118, 135–36 ("'[A] model is meant to simplify reality in order to make it tractable.'").

5. Step 2: Justification of a 1 Percent of the NAAQS Contribution Threshold

*Comment:* Comments contend that the EPA has not provided enough basis for reliance on the 0.70 ppb threshold, claiming that its use is therefore arbitrary and capricious.

*EPA Response:* The EPA is finalizing its proposed approach of consistently using a 1 percent of the NAAQS contribution threshold at Step 2. This approach ensures both national consistency across all states and consistency and continuity with our prior interstate transport actions for other NAAQS. Comments have not established that this approach is either unlawful or arbitrary and capricious.

The 1 percent threshold is consistent with the Step 2 approach that the EPA applied in CSAPR for the 1997 ozone NAAQS, which has subsequently been applied in the CSAPR Update and

revised CSAPR Update when evaluating interstate transport obligations for the 2008 ozone NAAQS. The EPA continues to find 1 percent to be an appropriate threshold. For ozone, as the EPA found in CAIR, CSAPR, and CSAPR Update, a portion of the nonattainment and maintenance problems in the U.S. results from the combined impact of relatively small contributions from many upwind states, along with contributions from in-state sources and other sources. The EPA's analysis shows that much of the ozone transport problem being analyzed for purposes of evaluating 2015 ozone NAAQS SIP obligations is still the result of the collective impacts of contributions from many upwind states. Therefore, application of a consistent contribution threshold is necessary to identify those upwind states that should have responsibility for addressing their contribution to the downwind nonattainment and maintenance problems to which they collectively contribute. Where a great number of geographically dispersed emissions sources contribute to a downwind air quality problem, which is the case for ozone, EPA believes that, in the context of CAA section 110(a)(2)(D)(i)(I), a state-level threshold of 1 percent of the NAAQS is a reasonably small enough value to identify only the greater-than-de minimis contributers yet is not so large that it unfairly focuses attention for further action only on the largest single or few upwind contributors. Continuing to use 1 percent of the NAAQS as the screening metric to evaluate collective contribution from many upwind states also allows the EPA (and states) to apply a consistent framework to evaluate interstate emissions transport under the interstate transport provision from one NAAQS to the next. *See* 81 FR 74504, 74518. *See also* 86 FR 23054, 23085 (reviewing and explaining rationale from CSAPR, 76 FR 48208, 48236–38, for selection of 1 percent threshold).

Further, the EPA notes that the role of the Step 2 threshold is limited and just one step in the 4-Step interstate transport framework. It serves to screen in states for further evaluation of emissions control opportunities applying a multifactor analysis at Step 3. Thus, as the Supreme Court has recognized, the contribution threshold essentially functions to exclude states with "de minimis" impacts. *EME Homer City,* 572 U.S. at 500.

*Comment:* Commenters contend that the EPA cannot use the 1 percent threshold as a determination for significance.

*EPA Response:* To clarify, the EPA does not use the 1 percent of the NAAQS threshold as the definition of "significance." Rather, a state's contribution equals or exceeds the 1 percent of the NAAQS threshold, the EPA expects states to further evaluate their emissions to determine whether their emissions constitute significant contribution or interference with maintenance. The contribution threshold is a screening threshold to identify states which may be "contributing" to an out of state receptor. The EPA has maintained this interpretation of the relevant statutory language across many rulemakings, though commenters continue to confuse the Step 2 threshold with a determination of "significance," which it is not. *See EME Homer City,* 572 U.S. at 500–502 (explaining the difference between the "screening" analysis at Steps 1 and 2 whereby the EPA "excluded as de minimis any upwind State that contributed less than one percent of the . . . NAAQS" and the "control" analysis at Step 3 whereby the EPA determined "cost thresholds" to define significance).

Further, the EPA's air quality and contribution modeling for ozone transport is based on application of the model in a relative sense rather than relying upon absolute model predictions. All models have limitations resulting from uncertainties in inputs and scientific formulation. To minimize the effects of these uncertainties, the modeling is anchored to base period measured data in the EPA's guidance approach for projecting design values. Notably, the EPA also uses our source apportionment modeling in a relative sense when calculating the average contribution metric (used to identify linkages). In this method the magnitude of the contribution metric is tied to the magnitude of the projected average design value which is tied to the base period average measured design value. The EPA's guidance has recommended against applying bright-line criteria for judging whether statistical measures of model performance constitute acceptable or unacceptable model performance.

The Agency continues to find that this method using the CAMx model to evaluate contributions from upwind states to downwind areas is reliable. The agency has used CAMx routinely in previous notice and comment transport rulemakings to evaluate contributions relative to the 1 percent threshold for both ozone and $PM_{2.5}$. In fact, in the original CSAPR, the EPA found that "[t]here was wide support from commenters for the use of CAMx as an

appropriate, state-of-the science air quality tool for use in the [Cross-State Air Pollution] Rule. There were no comments that suggested that the EPA should use an alternative model for quantifying interstate transport." 76 FR 48229 (August 8, 2011). In this action, the EPA has taken a number of steps based on comments and new information to ensure to the greatest extent the accuracy and reliability of its modeling projections at Step 1 and 2, as discussed elsewhere in this document.

## 6. Step 2: Prevention of Significant Deterioration Significant Impact Levels

*Comment:* Several comments insist that when identifying an appropriate linkage threshold at Step 2 of the 4-step framework, the EPA should consider or rely on the 1 ppb significant impact level (SIL) for ozone used as part of the prevention of significant deterioration PSD permitting process. Comments reference the EPA's April 17, 2018, guidance memorandum, "Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program" (SIL guidance), as well as the EPA's March 2018 memorandum's Attachment A flexibilities to lend support to their opinion that the 1 ppb SIL should also be used to determine linkages at Step 2.

*EPA Response:* The EPA's SIL guidance relates to a different provision of the Clean Air Act regarding implementation of the prevention of significant deterioration (PSD) permitting program. This program applies in areas that have been designated attainment of the NAAQS and is intended to ensure that such areas remain in attainment even if emissions were to increase as a result of new sources or major modifications to existing sources located in those areas. This purpose is different than the purpose of the good neighbor provision, which is to assist downwind areas (in some cases hundreds or thousands of miles away) in resolving ongoing nonattainment of the NAAQS or difficulty maintaining the NAAQS through eliminating the emissions from other states that are significantly contributing to those problems. In addition, as discussed earlier, the purpose of the Step 2 threshold within the EPA's interstate transport framework for ozone is to broadly sweep in all states contributing to identified receptors above a de minimis level in recognition of the collective-contribution problem associated with regional-scale ozone transport. The threshold used in the context of PSD SIL serves an entirely different purpose, and so it does not follow that they should be made equivalent. Further, comments incorrectly associate the EPA's Step 2 contribution threshold with the identification of "significant" emissions (which does not occur until Step 3), and so it is not the case that the EPA is interpreting the same term differently.

The EPA has previously explained this distinction between the good neighbor framework and PSD SILs. *See* 70 FR 25162, 25190–25191 (May 12, 2005); 76 FR 48208, 48237 (August 8, 2011). Importantly, the implication of the PSD SIL threshold is not that single-source contribution below this level indicates the absence of a contribution or that no emissions control requirements are warranted. Rather, the PSD SIL threshold addresses whether further, more comprehensive, multi-source review or analysis of air quality impacts are required of the source to support a demonstration that it meets the criteria for a permit. A source with estimated impacts below the PSD SIL may use this to demonstrate that it will not cause or contribute (as those terms are used within the PSD program) to a violation of an ambient air quality standard, but is still subject to meeting applicable control requirements, including best available control technology, designed to moderate the source's impact on air quality.

Moreover, other aspects of the technical methodology in the SIL guidance compared to the good neighbor framework make a direct comparison between these two values misleading. For instance, in PSD permit modeling using a single year of meteorology the maximum single-day 8-hour contribution is evaluated with respect to the SIL. The purpose of the contribution threshold at Step 2 of the 4-step good neighbor framework is to determine whether the average contribution from a collection of sources in a state is small enough not to warrant any additional control for the purpose of mitigating interstate transport, even if that control were highly cost effective. Using a 1 percent of the NAAQS threshold is more appropriate for evaluating multi-day average contributions from upwind states than a 1 ppb threshold applied for a single day, since that lower value of 1 percent of the NAAQS will capture variations in contribution. If EPA were to use a single day reflecting the maximum amount of contribution from an upwind state to determine whether a linkage exists at Step 2, comments' arguments for use of the PSD SIL might have more force. However, that would likely cause more states to become linked, not less. And in any case, consistent with the method in our modeling guidance for projecting future attainment/nonattainment, the good neighbor methodology of using multiple days provides a more robust approach to establishing that a linkage exists at the state level than relying on a single day of data.

## 7. Step 2: August 2018 Memorandum

*Comment:* Comments assert that in the August 2018 memorandum the EPA committed itself to approving SIP submissions from states with contributions below 1 ppb, and so now the EPA should or must approve the good neighbor SIP submission from any state with a contribution below 1 ppb, either based on modeling available at the time of the state's SIP submission or at any time.

*EPA Response:* These comments mischaracterize the content and the EPA's application of August 2018 memorandum. Further, the EPA disputes that the EPA misled states or that the EPA has not appropriately reviewed SIP submissions from states that attempted to rely on an alternative contribution threshold at Step 2.

Specifically, the EPA's August 2018 memorandum provided an analysis regarding "the degree to which certain air quality threshold amounts capture the collective amount of upwind contribution from upwind states." [306] It interpreted "that information to make recommendations about what thresholds *may* be appropriate for use in" SIP submissions (emphasis added).[307] Specifically, the August 2018 memorandum said, "Because the amount of upwind collective contribution capture with the 1 percent and the 1 ppb thresholds is generally comparable, overall, we believe it *may* be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2 of the 4-step framework in developing their SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS." (emphasis added).[308] Thus, the text of the August 2018 memorandum does not guarantee that any state with a contribution below 1 ppb has an automatically approvable good neighbor SIP. In fact, the August 2018 memorandum indicated that "[f]ollowing these recommendations does not ensure that EPA will approve a SIP revision in all instances where the recommendations are followed, as the guidance may not apply to the facts and circumstances underlying a particular SIP. Final decisions by the EPA to approve a particular SIP revision will

---

[306] August 2018 memorandum, page 1.
[307] August 2018 memorandum, page 1.
[308] August 2018 memorandum, page 4.

only be made based on the requirements of the statute and will only be made following an air agency's final submission of the SIP revision to the EPA, and after appropriate notice and opportunity for public review and comment.'' [309] The August 2018 memorandum also stated, ''EPA and air agencies should consider whether the recommendations in this guidance are appropriate for each situation.'' [310] The EPA's assessment of every SIP submission that invoked the August 2018 memorandum considered the particular arguments raised by the state.[311]

*Comment:* Some comments allege that the EPA representatives led the states to believe that their SIP submission would be approved on the basis of a 1 ppb contribution threshold. The comments further claim that the EPA has now since reversed course on its August 2018 memorandum and imposed new requirements on states that were not included in the EPA's guidance. One comment suggested EPA switched position without explanation from the August 2018 guidance to its proposed disapprovals, which it viewed as unlawful under *FCC* v. *Fox TV Stations, Inc.,* 556 U.S. 502 (2009).

*EPA Response:* As an initial matter, we note that the salience of these comments is limited to only a handful of states. The August 2018 memorandum made clear that the Agency had substantial doubts that any threshold greater than 1 ppb (such as 2 ppb) would be acceptable, and the Agency is affirming that a threshold higher than 1 ppb would not be justified under any circumstance for purposes of this action. No comment provided a credible basis for using a threshold even higher than 1 ppb. So this issue is primarily limited to the difference between a 0.70 ppb threshold and a 1.0 ppb threshold. Therefore, we note that this issue is only relevant to a small number of states whose only contributions to any receptor are above 1 percent of the NAAQS but lower than 1 ppb. Under the 2016v3 modeling of 2023 being used in this final action, those states with contributions that fall between 0.70 ppb and 1 ppb included in this action are Alabama, Kentucky, and Minnesota.

The EPA disagrees with comments' claims that the Agency has reversed course on applying the August 2018 memorandum. In line with the memorandum, the EPA evaluated every justification put forward by every state covered by this SIP disapproval action that attempted to justify an alternative threshold under the August 2018 memorandum, which are Alabama,[312] Arkansas,[313] Illinois,[314] Indiana,[315] Kentucky,[316] Louisiana,[317] Michigan,[318] Mississippi,[319] Missouri,[320] and Oklahoma,[321] and Utah.[322] The EPA also addressed criticisms of the 1 percent of the NAAQS contribution threshold made by Ohio [323] and Nevada.[324] (The topic of the EPA's input during state's SIP-development processes is further discussed in the RTC document.)

For this reason, the EPA disagrees with comment that case law reviewing changes in agency positions as articulated in *FCC* v. *Fox TV Stations, Inc.,* is applicable to this action. The Agency has not imposed a requirement that states must use a 1 percent of the NAAQS threshold (which would reflect a change in position from the August 2018 memorandum). Rather, under the terms of the August 2018 memorandum, the Agency has found that Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Nevada, Ohio, Oklahoma, and Utah have not made a sufficient showing that the use of an alternative contribution threshold is justified for those States. Even if it were found that the Agency's position had fundamentally changed between this rulemaking action and the August 2018 memorandum (which we do not concede to be the case), we do not believe that any state had a legitimate reliance interest that would be sufficient to overcome the countervailing public interest that is served in declining to approve a state's use of the 1 ppb threshold where the state did not have adequate technical justification. First, neither states nor the emissions sources located in those states have incurred any compliance costs based on the August 2018 memorandum. Second, it

is not clear that any states invested much of their own public resources in developing state-specific arguments in support of a 1 ppb threshold. As the EPA observed at proposal, in nearly all submittals, the states did not provide the EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. In one case, the EPA's proposed approval of Iowa's SIP submittal, ''the *EPA expended its own resources to attempt to supplement the information submitted by the state,* in order to more thoroughly evaluate the state-specific circumstances that could support approval.'' E.g., 87 FR 9806–07 (emphasis added). The EPA emphasizes again that it was the EPA's sole discretion to perform this analysis in support of the state's submittal, and the Agency is not obligated to conduct supplemental analysis to fill the gaps whenever it believes a state's analysis is insufficient. *Id.*

We acknowledge that certain states may have assumed the EPA would approve SIP submissions from states whose contribution to any receptor was below 1 ppb, but that assumption reflected a misunderstanding of the August 2018 memorandum, and in any case, an assumption is not, as a legal matter, the same thing as a reliance interest.

The EPA is not formally rescinding the August 2018 memorandum in this action or at this time, but since guidance memoranda are not binding in the first place, it is not required that agencies must ''rescind'' a guidance the moment it becomes outdated or called into question. As the Agency made clear in the August 2018 memorandum, all of EPA's proposals for action on interstate transport SIP submissions are subject to rulemaking procedure, including public notice and comment, before the EPA makes a final decision.

Although the EPA is not formally revoking the August 2018 memorandum at this time, and we have separately found that no state successfully established a basis for use of a 1 ppb threshold, we also continue to believe, as set forth in our proposed disapprovals, that national ozone transport policy associated with addressing obligations for the 2015 ozone NAAQS is not well-served by allowing for less protective thresholds at Step 2. Furthermore, the EPA disagrees that national consistency is an inappropriate consideration in the context of interstate ozone transport. The Good Neighbor provision, CAA section 110(a)(2)(D)(i)(I), requires to a unique degree of concern for consistency, parity, and equity across

[309] August 2018 memorandum, page 1.

[310] August 2018 memorandum, page 1.

[311] 87 FR 64423–64424 (Alabama); 87 FR 9806–9807 (Arkansas); 87 FR 9852–9853 (Illinois); 87 FR 9855–9856 (Indiana); 87 FR 9508–9511 (Kentucky); 87 FR 9812–9813 (Louisiana); 87 FR 9861–9862 (Michigan); 87 FR 9557 (Mississippi); 87 FR 9541–9543 (Missouri); 87 FR 31492 (Nevada); 87 FR 9870–9871 (Ohio); 87 FR 9818–9820 (Oklahoma); 87 FR 31477–31451 (Utah).

[312] 87 FR 64423–64424.

[313] 87 FR 9806–9807.

[314] 87 FR 9852–9853.

[315] 87 FR 9855–9856.

[316] 87 FR 9508–9511.

[317] 87 FR 9812–9813.

[318] 87 FR 9861–9862.

[319] 87 FR 9557.

[320] 87 FR 9541–9543.

[321] 87 FR 9818–9820.

[322] 87 FR 31477–31451.

[323] 87 FR 9870–9871.

[324] 87 FR 31492.

state lines.[325] For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. Based on the EPA's review of good neighbor SIP submissions to-date and after further consideration of the policy implications of attempting to recognize an alternative Step 2 threshold for certain states, the Agency now believes the attempted use of different thresholds at Step 2 with respect to the 2015 ozone NAAQS raises substantial policy consistency and practical implementation concerns. The availability of different thresholds at Step 2 has the potential to result in inconsistent application of good neighbor obligations based solely on the strength of a state's SIP submission at Step 2 of the 4-step interstate transport framework. From the perspective of ensuring effective regional implementation of good neighbor obligations, the more important analysis is the evaluation of the emissions reductions needed, if any, to address a state's significant contribution after consideration of a multifactor analysis at Step 3, including a detailed evaluation that considers air quality factors and cost. While alternative thresholds for purposes of Step 2 may be "similar" in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of an alternative threshold would allow certain states to avoid further evaluation of potential emissions controls while other states with a similar level of contribution would proceed to a Step 3 analysis. This can create significant equity and consistency problems among states.

One comment suggested that the EPA could address this potentially inequitable outcome by simply adopting a 1 ppb contribution threshold for all states. However, the August 2018 memorandum did not conclude that 1 ppb would be appropriate for all states, and the EPA does not view that conclusion to be supported at present. The EPA recognized in the August 2018 memorandum that on a nationwide basis there was some similarity in the amount of total upwind contribution captured between 1 percent and 1 ppb. However, while this may be true in some sense, that is hardly a compelling basis to move to a 1 ppb threshold for

[325] The EPA notes that Congress has placed on the EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. *See* CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

every state. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3 (*e.g.,* roughly 7 percent of total upwind state contribution was lost according to the modeling underlying the August 2018 memorandum; in the EPA's 2016v2 and 2016v3 modeling, the amount lost is 5 percent). Further, this logic has no end point. A similar observation could be made with respect to any incremental change. For example, should the EPA next recognize a 1.2 ppb threshold because that would only cause some small additional loss in capture of upwind state contribution as compared to 1 ppb? If the only basis for moving to a 1 ppb threshold is that it captures a "similar" (but actually smaller) amount of upwind contribution, then there is no basis for moving to that threshold at all. Considering the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference with maintenance of the NAAQS in other states as well as the broad, regional nature of the collective contribution problem with respect to ozone, we continue to find no compelling policy reason to adopt a new threshold for all states of 1 ppb.

It also is unclear why use of a 1 ppb threshold would be appropriate for all states under a more protective NAAQS when a 1 percent of the NAAQS contribution threshold has been used for less protective NAAQS. To illustrate, a state contributing greater than 0.75 ppb but less than 1 ppb to a receptor under the 2008 ozone NAAQS was "linked" at Step 2 using the 1 percent of the NAAQS contribution threshold, but if a 1 ppb threshold were used for the 2015 ozone NAAQS, then that same state would not be "linked" to a receptor at Step 2 under a NAAQS that is set to be more protective of human health and the environment. Consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which used a Step 2 threshold of 1 percent of the NAAQS for two less protective ozone NAAQS), is an important consideration. Continuing to use a 1 percent of NAAQS approach ensures that if the NAAQS are revised and made more protective, an appropriate increase in stringency at Step 2 occurs, to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of fully addressing interstate transport obligations. *See* 76 FR 48208, 48237–38.

One comment identified that if the EPA were to use a 1 percent of the

NAAQS contribution threshold, the EPA would be obligated to seek feedback on that contribution threshold through a public notice and comment process. The EPA's basis and rationale for every SIP submission covered by this final SIP disapproval action, including the use of a 1 percent of the NAAQS contribution threshold, was in fact presented for public comment. The EPA received, and is addressing in this action, many detailed comments about contribution thresholds. Further, the EPA's application of a 1 percent of the NAAQS threshold has been consistently used in notice-and-comment rulemakings beginning with the CSAPR rulemaking in 2010–2011 and including both FIP actions (CSAPR Update and Revised CSAPR Update) and numerous actions on ozone transport SIP submissions. In each case, the 1 percent of the NAAQS threshold was subject to rigorous vetting through public comment and the Agency's response to those comments, including through analytical evaluations of alternative thresholds. *See, e.g.,* 81 FR 74518–19. By contrast, the August 2018 memorandum was not issued through notice-and-comment rulemaking procedures, and the EPA was careful to caveat its utility and ultimate reliability for that reason.

*Comment:* Some comments claim that the EPA is applying the August 2018 memorandum inconsistently based on the EPA's actions with regard to action good neighbor SIP submissions from Iowa and Oregon for the 2015 ozone NAAQS and Arizona's good neighbor SIP submission for the 2008 ozone NAAQS.

*EPA Response:* The EPA disagrees that there is any such inconsistency. The EPA withdrew a previously proposed approval of Iowa's SIP submission where the Agency had attempted to substantiate the use of a 1 ppb contribution threshold, and re-proposed and finalized approval of that SIP based on a different rationale using a 1 percent of the NAAQS contribution threshold. 87 FR 9477 (Feb. 22, 2022); 87 FR 22463 (April 15, 2022). As explained earlier in this section, this experience of the EPA attempting to justify 1 ppb for a state through additional air quality analysis, where the state had not conducted an analysis the Agency considered to be sufficient is part of the reason the Agency is moving away from attempting to justify use of this alternative contribution threshold.

The EPA also disputes the claim that Oregon and Arizona were the only states "allowed" to use a 1 ppb threshold. The EPA approved Oregon's SIP submission for the 2015 ozone NAAQS on May 17,

2019, and both Oregon and the EPA relied on a 1 percent of the NAAQS contribution threshold. 84 FR 7854, 7856 (March 5, 2019) (proposal); 84 FR 22376 (May 17, 2019) (final). In our FIP proposal for the 2015 ozone NAAQS, the EPA explained it was not proposing to conduct an error correction for Oregon even though updated modeling indicated Oregon contributed above 1 percent of the NAAQS to monitors in California, because the specific monitors in California are not interstate ozone transport ''receptors'' at Step 1. *See* 87 FR 20036, 20074–20075 (April 6, 2022). The EPA solicited public comment on its approach to Oregon's contribution to California receptors as part of the 2015 ozone NAAQS transport FIP development, and the Agency has not yet taken final action on that FIP. In 2016, the EPA previously approved Arizona's good neighbor SIP for the earlier 2008 ozone NAAQS based on a similar rationale with regard to certain monitors in California in 2016. 81 FR 15200 (March 22, 2016) (proposal); 81 FR 31513 (May 19, 2016) (final rule). The Agency's view with respect to its evaluation of both Arizona and Oregon is that specific monitors in California are not interstate ozone transport ''receptors'' at Step 1. The EPA has not approved or applied an alternative Step 2 threshold for any state.

Comments related to the specific circumstances of an individual state and/or its arguments put forth in its SIP submission as it pertains to the August 2018 Memorandum are further addressed in the RTC document.

## 8. Step 3: States' Step 3 Analyses for the 2015 Ozone NAAQS

*Comment:* Comments state that the EPA has not provided any guidance on what an appropriate Step 3 analysis would entail, and therefore any decision where the Agency rejects a Step 3 analysis is arbitrary and capricious. One comment claims that not a single state has successfully made a Step 3 demonstration leading to an approvable interstate transport SIP for the 2015 ozone NAAQS. Comments note that there is no requirement in the CAA that states must complete an analysis similar to the EPA's, and the EPA cannot substitute its own judgment for that of the state's in crafting a SIP. Rather, the EPA is obligated to defer to state choices. One comment asserts that the EPA is required to interpret the term ''significant contribution'' in a manner ''which ties contribution to an amount which contributes significantly to downwind maintenance or nonattainment problems.'' Another comment claims the EPA is

intentionally exploiting the Supreme Court decision in *EME Homer City* to justify any requirements it deems necessary to further Federal policy decisions. Some comments identify that some states did not conduct a Step 3 analysis in their submitted SIPs because, using the flexibilities provided in the 2018 memoranda, these states concluded in Step 1 and Step 2 that no controls were required. One comment suggests that the EPA propose an 18-month period to allow these states to proceed with Steps 3 and 4.

*EPA Response:* The EPA disagrees that it is obligated to defer to states' choices in the development of good neighbor SIP submissions. As required by the Act, the EPA has evaluated each of the SIP submissions for compliance with the CAA, including whether an adequate Step 3 analysis was conducted—or whether states had offered an approvable alternative approach to evaluating their good neighbor obligations—and found in each case that what these states submitted was not approvable. The Supreme Court has recognized that the EPA is not obligated to provide states with guidance before taking action to disapprove a SIP submission. *EME Homer City,* 572 U.S. at 508–10. Nonetheless, throughout the entire history of the EPA's actions to implement the good neighbor provision for ozone, starting with the 1998 NO$_X$ SIP Call, we have consistently adopted a similar approach at Step 3 that evaluates emissions reduction opportunities for linked states applying a multifactor analysis. States could have performed a similar analysis of emissions control opportunities. The EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings; however, SIPs addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit ''any source or other type of emissions activity within the State'' from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, States seeking to rely on an alternative approach to defining ''significance'' must use an approach that comports with the statute's objectives to determine whether and to what degree emissions from a state should be ''prohibited'' to eliminate emissions that will ''contribute significantly to nonattainment in, or interfere with maintenance of'' the NAAQS in any other state. Further, the approach selected must be reasonable and technically justified. Therefore,

while the EPA does not direct states to use a particular framework, nonetheless, each state must show that its decision-making was based on a ''technically appropriate or justifiable'' evaluation.

Further, the Agency has a statutory obligation to review and approve or disapprove SIP submittals according to the requirements of the Clean Air Act. *See* CAA section 110(k)(3). And the Agency is empowered to interpret those statutory requirements and exercise both technical and policy judgment in acting on SIP submissions. Indeed, the task of allocating responsibility for interstate pollution particularly necessitates Federal involvement. *See EME Homer City,* 572 U.S. at 514 (''The statute . . . calls upon the Agency to address a thorny causation problem: How should EPA allocate among multiple contributing upwind States responsibility for a downwind State's excess pollution?''); *see also Wisconsin,* 938 F.3d at 320. Further, we have consistently disapproved states' good neighbor SIP submissions addressing prior ozone NAAQS when we have found those states linked through our air quality modeling and yet the state failed to conduct an analysis of emissions control opportunities, or such analysis was perfunctory or otherwise unsatisfactory. We have been upheld in our judgment that such SIPs are not approvable. *See Westar Energy* v. *EPA,* 608 Fed. App'x 1, 3 (DC Cir. 2015) (''EPA acted *well within the bounds* of its delegated authority when it disapproved of Kansas's proposed SIP.'') (emphasis added).

With respect to the assertion that no state has successfully avoided a FIP with an approvable Step 3 analysis, we note first that at this time, no final FIP addressing the 2015 ozone NAAQS has been promulgated. More directly to the point, no state submission that is the subject of this disapproval action offered any additional emissions control measures. While it is conceivable that a Step 3 analysis may result in a determination that no additional controls are needed, EPA expects that such circumstances will generally be rare, else the CAA's interstate transport provisions are rendered ineffective. For example, the EPA determined in the CSAPR Update that even though the District of Columbia and Delaware were linked to out of state receptors at Steps 1 and 2 of the 4-step interstate transport framework, no additional control measures were required of either jurisdiction. As to the District of Columbia, we found that there were no affected EGU sources that would fall under the CSAPR Update's control program. For Delaware, we found that

there were no emissions reductions available from any affected sources for any of the emissions control stringencies that were analyzed. *See* 81 FR 74504, 74553. No state's submission covered in this action contained an emissions control analysis that would allow for these types of conclusions to be reached for all of its sources.[326] States generally did not conduct any comparative analysis of available emissions control strategies—nor did they prohibit any additional ozone-precursor emissions.

We are unclear what another comment intends in asserting that the EPA is required to interpret "significant contribution" in a manner "which ties contribution to an amount which contributes significantly to downwind maintenance or nonattainment problems." The EPA disagrees that: (1) It has imposed or mandated a specific approach to Step 3 in this action, (2) this action established a particular level of emissions reduction that states were required to achieve, or (3) it mandated a particular methodology for making such a determination. To the extent the comment suggests that the Agency cannot mandate that states use cost as a method of allocating responsibility in their transport SIPs, first, the Agency has not done so. Further, as to whether cost could be used as a permissible method of allocating responsibility, the comment ignores the Supreme Court's holding to the contrary in *EME Homer City*, 572 U.S. at 518, and the D.C. Circuit's earlier holding to the same effect in *Michigan*, 213 F.3d at 687–88, both of which upheld the EPA's approach of using uniform cost-effectiveness thresholds to allocate upwind state responsibilities under the good neighbor provision for prior NAAQS. While this approach may be reasonable to apply again for the 2015 ozone NAAQS (and the EPA has proposed to do so in the proposed FIP action published on April 6, 2022), the EPA did not impose such a requirement on states in developing SIP submissions, nor is the EPA finding any SIP submission not approvable based on a failure to use this particular methodology.

In its March 2018 memorandum, Attachment A, the Agency acknowledged that there could be multiple ways of conducting a Step 3 analysis. The Agency did not endorse any particular approach and noted the Attachment was merely a list of stakeholder ideas that the EPA was not recommending any state follow. The apparent result of this "flexibility," however, was that no state presented a Step 3 analysis that resulted in including any enforceable emissions reductions to address good neighbor obligations for the 2015 ozone NAAQS in their interstate transport SIP submittals. Likewise, the comment here did not include information or analysis establishing that any particular alternative Step 3 approach should have been approved or that any state performed such an analysis in a manner that would have addressed "significant contribution" even in the manner the comment appears to be suggesting.

Notably, materials appended to one State's SIP submission, developed by the Midwest Ozone Group (MOG), did present an analysis applying an approach to "significant contribution" that was based on calculating a proportional share of each state's contribution to a downwind receptor, and this methodology would have imposed on that State's, Kentucky's, sources an obligation to eliminate 0.02 ppb of ozone at the relevant receptor. *See* 87 FR 9507. While the EPA does not endorse or here evaluate the merits of such an approach, it is noteworthy that the State in that instance did not adopt that approach, did not impose that obligation on its sources through enforceable measures by revising its SIP, and offered no explanation for its decision not to do so. *See id.* 9516 ("This approach would have imposed additional emissions reductions for Kentucky sources. Kentucky's final SIP did not consider MOG's proposal and did not provide an explanation for why it was rejecting this approach to allocating upwind emissions reductions, even though it appended this recommendation to its SIP submittal.").

### 9. Step 4: Attempt To Rely on FIPs in a SIP Submission

*Comment:* One comment states that FIPs or other Federal emissions control measures do not have to be incorporated into and enforceable under state law to be an approvable SIP measure. They view it as acceptable for a state to rely in its SIP Submission on the emissions reductions achieved by prior ozone transport FIPs, such as the CSAPR Update or the Revised CSAPR Update, as a permissible means of achieving emissions reductions to eliminate significant contribution for the 2015 ozone NAAQS.

*EPA Response:* The EPA disagrees. As the EPA has noted on page 16 of our September 2013 memorandum "Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act sections 110(a)(1) and 110(a)(2)" (2013 Infrastructure SIP Guidance): "a FIP is not a state plan and thus cannot serve to satisfy the state's obligation to submit a SIP."[327] Indeed, the general principle that measures relied on to meet states' CAA obligations must be part of the SIP has been recognized by courts, such as in *Committee for a Better Arvin*, 786 F.3d 1169 (9th Cir. 2015).

This principle is grounded in the recognition that if such measures are not rendered enforceable within the SIP itself, then they may be modified or amended in ways that would undermine the basis for the state's reliance on them, while the approved SIP itself would purport to have addressed the relevant obligation merely by outdated reference to that modified or nonexistent control measure residing outside the SIP. For example, to be credited for attainment demonstration purposes, requirements that may otherwise be federally enforceable (such as new source review permit limits or terms in federally enforceable consent orders), must be in the state's implementation plan so that they could not later be changed without being subject to the EPA's approval. This principle is instrumental to ensuring that states cannot take credit for control measures that might be changed (even by the EPA itself) without the EPA's required approval action under CAA section 110, which includes the obligation to ensure there is no interference or backsliding with respect to all applicable CAA requirements. *See* CAA section 110(l). *See also Montana Sulfur and Chemical Co.* v. *EPA*, 666 F.3d 1174, 1195–96 (9th Cir. 2012) ("The EPA correctly reads 42 U.S.C. 7410(a)(2) as requiring states to include enforceable emissions limits and other control measures *in the plan itself*.") (emphasis in original); 40 CFR 51.112(a) ("Each plan must demonstrate that the measures, rules, and regulations *contained in it* are adequate to provide for the timely attainment and

---

[326] We note that California's SIP submission is not approvable at Step 3, despite the fact that the EPA has not identified NOX emissions control opportunities at the state's EGUs. Nonetheless, the SIP submission is not approvable because the state attempted to rely on the CSAPR Update cost threshold to justify a no-control determination when that threshold was in relation to a partial remedy for a less protective NAAQS, and even if it could be reasonably concluded that no emissions reductions are appropriate at EGUs in California, the SIP submission did not conduct an adequate analysis of emissions control opportunities at its non-EGU industrial sources. *See* 87 FR 31459–60.

[327] Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2), September 13, 2013 (available at *https://www.epa.gov/sites/default/files/2015-12/documents/guidance_on_infrastructure_sip_elements_multipollutant_final_sept_2013.pdf*).

maintenance of the national standard that it implements.'') (emphasis added).

The EPA has applied this same interpretation in implementing other infrastructure SIP requirements found in CAA section 110(a)(2). For example, in implementing CAA section 110(a)(2)(C), (D)(i)(II), (D)(ii), and (J) relating to the permitting program for PSD, the EPA has developed FIPs that incorporate by reference provisions codified at 40 CFR 51.21, and some states have taken delegation of that FIP to implement the relevant requirements. But the EPA does not and cannot approve the state as having met these infrastructure SIP elements, even by virtue of taking delegation of the FIP. *See, e.g.,* 83 FR 8818, 8820 (March 1, 2018). Likewise, under one of the pathways presented in our 2013 Infrastructure SIP Guidance, the EPA does not approve SIPs addressing interstate visibility transport obligations under CAA section 110(a)(2)(D)(i)(II) (''prong 4'') until the state itself has a fully approved regional haze plan, and states cannot rely on the CSAPR ''better than BART'' FIPs to meet their prong 4 requirements until they have replaced that FIP with an approved SIP. *See, e.g.,* 84 FR 13800, 13801 (April 8, 2019); 84 FR 43741, 43744 (Aug. 22, 2019).

The comment does not provide contrary examples where the EPA has approved, as a SIP-based emissions control program, requirements that are established through Federal regulation or other types of emissions control programs that are outside the SIP. It is true that in the first two steps of the 4-step interstate transport framework, the EPA conducts air quality modeling based on emissions inventories reflective of on-the-books state and Federal emissions control requirements, to make determinations about air quality conditions and contribution levels that can be anticipated *in the baseline* in a future analytic year. If the comment's examples were intended to reference this consideration of Federal measures in prior actions on SIP submittals, the EPA agrees that it does consider such measures at these steps of its analysis, and the EPA has consistently taken this approach throughout its prior ozone transport actions. But here we are discussing Step 3 and 4 of the framework, where states that have been found to contribute to downwind nonattainment and maintenance problems, *e.g.,* are linked at Steps 1 and 2 to an out of state receptor, would need to evaluate their continuing emissions to determine what if any of those emissions should be deemed ''significant'' (*e.g.,* Step 3) and eliminated through enforceable

emissions control requirements (*e.g.,* Step 4). The EPA is not aware of any good neighbor SIP submission that it has approved where a state purported to eliminate its significant contribution (*e.g.,* satisfy Steps 3 and 4) simply by referring to Federal measures that were not included in its SIP and enforceable as a matter of state law. Finally, it bears emphasizing that the EPA's assessment of the 2015 ozone transport SIPs has already accounted for the emissions-reducing effects of both the CSAPR Update and the Revised CSAPR Update in its baseline air quality modeling at Steps 1 and 2, and so pointing to either of those rules as measures that would eliminate significant contribution at Step 3, for purposes of the 2015 ozone NAAQS, would be impermissible double-counting.

## C. Good Neighbor Provision Policy

### 1. Mobile Source Emissions

*Comment:* Several comments assert that mobile source emissions within the home state of the location of receptors are the primary source of nonattainment problems in downwind areas. Some comments additionally state that a larger portion of their own upwind state emissions is from mobile source emissions. These comments request that the EPA focus on these emissions sources rather than stationary sources to reduce ongoing nonattainment problems. These comments claim mobile sources are federally regulated and, therefore, the EPA bears the responsibility to either take action to reduce mobile source emissions nationwide or encourage downwind states to implement strategies to reduce their own local mobile source emissions.

*Response:* The EPA recognizes that nationwide, mobile sources represent a large portion of ozone-precursor emissions and, as such, would be expected to have a large impact on nonattainment and maintenance receptors.

The EPA has been regulating mobile source emissions since it was established as a Federal agency in 1970 and is committed to continuing the effective implementation and enforcement of current mobile source emissions standards and evaluating the need for additional standards.[328] The

EPA believes that the $NO_X$ reductions from its Federal programs are an important reason for the historical and long-running trend of improving air quality in the United States. The trend helps explain why the overall number of receptors and severity of ozone nonattainment problems under the 1997 and 2008 ozone NAAQS have declined. As a result of this long history, $NO_X$ emissions from onroad and nonroad mobile sources have substantially decreased and are predicted to continue to decrease into the future as newer vehicles and engines that are subject to the more recent and more stringent standards replace older vehicles and engines.[329]

The EPA included mobile source emissions in the 2016v2 modeling used to support the proposal of these SIP disapproval actions to help determine state linkages at Steps 1 and 2 of the 4-step interstate transport framework and has done likewise in its 2016v3 modeling. However, whether mobile source emissions are a large portion of an upwind or downwind state's $NO_X$ emissions, and whether they represent a large portion of the contribution to downwind nonattainment and maintenance receptors, does not answer the question regarding the adequacy of an upwind state's SIP submission. The question is whether ''any source or other type of emissions activity'' (in the collective) in an upwind state is contributing significantly to downwind receptors, *see* CAA section 110(a)(2)(D)(i). A state's transport SIP must include a technical and adequate justification to support its conclusion that the state has satisfied its interstate transport obligations for the 2015 ozone NAAQS.

To the extent that comments argue that mobile source emissions should be the focus of emissions reductions for the purposes of resolving interstate transport obligations, states could have provided such an analysis for how mobile source reductions might achieve necessary reductions. *See, e.g.,* 70 FR 25209. However, states conducted no such analysis of methods or control techniques that could be used to reduce mobile source emissions, instead claiming that states cannot control mobile source emissions, as this is a federally-regulated sector, or states cannot reasonably control these emissions. States do have options, however, to reduce emissions from certain aspects of their mobile source

---

[328] On December 20, 2022, the EPA finalized more stringent emissions standards for $NO_X$ and other pollutants from heavy-duty vehicles and engines, beginning with model year 2027. *See https://www.epa.gov/regulations-emissions-vehicles-and-engines/final-rule-and-related-materials-control-air-pollution.* The EPA is also developing new multi-pollutant standards for light-

and medium-duty vehicles as well as options to address pollution from locomotives.

[329] *https://gispub.epa.gov/air/trendsreport/2022/#home.*

sectors, and to the extent a state is attributing its contribution to out of state receptors to its mobile sources, it could have conducted an analysis of possible programs or measures that could achieve emissions reductions from those sources. (For example, a general list of types of transportation control measures can be found in CAA section 108(f).[330])

State-specific issues raised by comments are further addressed in the RTC document.

2. International Contributions

*Comment:* Several comments state that international emissions contribute to nonattainment and maintenance receptors downwind, and these emissions are not within the jurisdiction of the states. They advocate for the EPA should considering this when acting on SIP submissions. Some comments claim that, in the west, international contributions are even greater than in eastern portions of the U.S. and support their notion that the EPA's evaluation of interstate transport should take special consideration of unique regional factors when determining upwind state obligations, or that the Agency should otherwise explain why it is still inappropriate to factor in higher international contributions, as the Agency has done in Oregon's case.

*Response:* The EPA responded to similar arguments related to international emissions included in the SIP submissions of Arkansas, California, Illinois, Indiana, Kentucky, Michigan, Missouri, Ohio, Utah, Wyoming, and West Virginia in the proposed disapprovals.[331] No comments on the proposed disapprovals provided new information to indicate the EPA's initial assessment was incorrect. These comments' reasoning related to international emissions is inapplicable to the requirements of CAA section 110(a)(2)(D)(i)(I). The good neighbor provision requires states and the EPA to address interstate transport of air pollution that significantly contributes

to downwind states' ability to attain and maintain the NAAQS. Whether emissions from other states or other countries also contribute to the same downwind air quality issue is typically not relevant in assessing whether a downwind state has an air quality problem, or whether an upwind state is significantly contributing to that problem. (Only in rare cases has EPA concluded that certain monitoring sites should not be considered receptors at Step 1 due to the very low collective upwind-state contribution at those receptors. *See* the RTC document.) States are not obligated under CAA section 110(a)(2)(D)(i)(I) to act alone to reduce emissions in amounts sufficient to resolve a downwind receptor's nonattainment or maintenance problem. Rather, states are obligated to eliminate their own "significant contribution" to that receptor or "interference" with the ability of other states to attain or maintain the NAAQS. The statutory standard is, fundamentally, one of contribution, not causation.

Indeed, the D.C. Circuit in *Wisconsin* specifically rejected petitioner arguments suggesting that upwind states should be excused from good neighbor obligations on the basis that some other source of emissions (whether international or another upwind state) could be considered the "but-for" cause of downwind air quality problem. *See Wisconsin,* 938 F.3d at 323–324. The court viewed petitioners' arguments as essentially an argument "that an upwind state 'contributes significantly' to downwind nonattainment only when its emissions are the sole cause of downwind nonattainment." *Id.* at 324. The court explained that "an upwind state can 'contribute' to downwind nonattainment even if its emissions are not the but-for cause." *Id.* at 324–325. *See* also *Catawba County* v. *EPA,* 571 F.3d 20, 39 (DC Cir. 2009) (rejecting the argument "that 'significantly contribute' unambiguously means 'strictly cause'" because there is "no reason why the statute precludes EPA from determining that [an] addition of [pollutant] into the atmosphere is significant even though a nearby county's nonattainment problem would still persist in its absence"); *Miss. Comm'n on Envtl. Quality* v. *EPA,* 790 F.3d 138, 163 n.12 (DC Cir. 2015) (observing that the argument that "there likely would have been no violation at all . . . if it were not for the emissions resulting from [another source]" is "merely a rephrasing of the but-for causation rule that we rejected in Catawba County"). Therefore, a state is not excused from eliminating its significant contribution on the basis that

international emissions also contribute some amount of pollution to the same receptors to which the state is linked.

To the extent comments compare the influence of international emissions with the EPA's treatment of receptors in California to which Oregon contributes greater than 0.70 ppb, the EPA responds to these comments in the RTC document.

3. Western Interstate Transport Policy

*Comment:* Several comments argue that the EPA should consider an alternative approach to evaluating interstate transport in the western U.S. Comments assert there are considerations unique to the western states, such as increased background, international, and wildfire contributions to ozone concentrations in the west. Some commenters believe a "case-by-case" assessment is more appropriate for evaluating western states' interstate transport obligations, as they claim the EPA had done for the 2008 ozone standards. They additionally argue that the EPA modeling is not able to accurately project ozone concentrations in the west because of these factors, along with the west's unique topographical influence on ozone transport.

*Response:* The EPA disagrees that either its nationwide photochemical grid modeling or the 4-step interstate transport framework for ozone cannot generally be applied to states in the western region of the U.S. and has maintained that position consistently throughout numerous actions.[332] Though at times the EPA has found it appropriate to examine more closely discreet issues for some western states,[333] the 4-step interstate transport framework itself is appropriate for assessing good neighbor obligations of western states in the absence of those circumstances. The EPA evaluated the contents of the western states' SIP submissions covered by this action on the merits of the information the states provided. As described at proposal and reiterated in Section IV, the EPA is finalizing its disapproval of California,

---

[330] In making this observation, the EPA is not suggesting that mobile source emissions reductions are necessarily required to address a state's good neighbor obligations, but merely pointing out that if the state itself attributes the problem to mobile sources, then it is reasonable to expect that further analysis of such control strategies would be explored.

[331] 87 FR 9798, 9809–9810 (Feb. 22, 2022) (Arkansas); 87 FR 31443, 31460–31461 (May 24, 2022) (California); 87 FR 9854 (Illinois); 87 FR 9859–9860 (Indiana); 87 FR 9498, 9508 (Feb. 22, 2022) (Kentucky); 87 FR 9838, 9865 (Michigan); 87 FR 9533, 9543 (Feb. 22, 2022) (Missouri); 87 FR 9838 at 9874 (Ohio); 87 FR 31470, 31482 (May 24, 2022) (Utah); 87 FR 9516, 9527 (Feb. 22, 2022) (West Virginia); 87 FR 31495, 31507 (May 24, 2022) (Wyoming).

[332] For a discussion of this history, *see* for example 87 FR 31480–81 (proposed disapproval of Utah SIP submission) and 87 FR 31453–56 (proposed disapproval of California SIP submission).

[333] *See, e.g.,* Approval of Arizona's 2008 ozone NAAQS interstate transport SIP submission, 81 FR 15200 (March 22, 2016) (Step 1 analysis concluding certain monitors in California should not be considered interstate transport receptors for purposes of the good neighbor provision for the 2008 ozone NAAQS); *see also* 87 FR 61249, 61254–55 (Oct. 11, 2022) (in approving Colorado's interstate transport SIP for the 2015 ozone NAAQS, analyzing unique issues associated with wintertime inversion conditions in certain western areas).

Nevada, and Utah's SIP submissions. This final determination is based on these evaluations, as well as the EPA's 2016v2 and 2016v3 modeling following stakeholder feedback.

The EPA continues to find it appropriate to rely on the results of its nationwide modeling in the western U.S., despite comments concerning the ability for the EPA's modeling to accurately project ozone concentrations and contributions in western states, as well as its ability to support the EPA's 4-step framework for assessing interstate transport. The EPA's nationwide photochemical grid modeling considers multiple complex factors, including those raised in comments, such as terrain complexities, variability in emissions (*e.g.*, wildfire emissions), meteorology, and topography. While the EPA continues to believe its 2016v2 modeling performs equally as well in both the west and the east, the EPA has adjusted its 2016v3 modeling to ensure its predictions more closely replicate the relative magnitude of concentrations and day-to-day variability that are characteristic of observed 8-hour daily maximum ozone concentrations in each region, as explained in Section III.A and the RTC document. As such, the EPA continues to find its modeling reliable for characterizing ozone concentrations and contribution values in the western U.S. Further responses regarding the reliability of the EPA's modeling in the western U.S. is provided in the RTC document.

The EPA disagrees with comments noting that the Agency took an alternative approach for western states when assessing interstate transport obligations under the 2008 ozone NAAQS. As explained in our proposed disapproval of California's 2015 ozone NAAQS interstate transport SIP submission, while the EPA has in limited circumstances found unique issues associated with addressing ozone transport in western states, the EPA has consistently applied the 4-step interstate transport framework in western states, as it has done here, and has identified ozone transport problems in the west that are similar to those in the east.[334][335] At proposal, the EPA addressed states' arguments regarding the impact of unique factors such as topography and, as part of the EPA's evaluation of the contents of the SIP submission, provided explanation as to why the EPA found the states' arguments did not

support their conclusions regarding long range transport of ozone in the west.[336]

While comments point to relatively higher level of contributions from non-anthropogenic, local, or international contributions in the west as reason for evaluating interstate transport differently in the west, a state is not excused from eliminating its significant contribution due to contributions from these sources, where the data shows that anthropogenic emissions from upwind states also contribute collectively to identified receptors at levels that indicate there to be an interstate contribution problem as well. As stated in Section V.C.2, a state is not excused from eliminating its significant contribution on the basis that international emissions also contribute some amount of pollution to the same receptors to which the state is linked. This same principle applies broadly to other arguments as to which emissions are the "cause" of the problem; the good neighbor provision established a contribution standard, not a but-for causation standard. *See Wisconsin*, 938 F.3d at 323–25.

## VI. Statutory and Executive Order Reviews

Additional information about these statutes and Executive orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Orders 12866: Regulatory Planning and Executive Order 13563: Improving Regulation and Regulatory Review

This action is not a significant regulatory action and was, therefore, not submitted to the Office of Management and Budget for review.

### B. Paperwork Reduction Act (PRA)

This action does not impose an information collection burden under the provisions of the Paperwork Reduction Act. This final action does not establish any new information collection requirement apart from what is already required by law. This finding relates to the requirement in the CAA for states to submit SIPs under CAA section 110(a)(2)(D)(i)(I) addressing interstate transport obligations associated with the 2015 ozone NAAQS.

### C. Regulatory Flexibility Act (RFA)

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This action will not impose any requirements on small entities. This action is disapproving SIP submissions for not containing the necessary provisions to satisfy interstate transport requirements under CAA section 110(a)(2)(D)(i)(I).

### D. Unfunded Mandates Reform Act of 1995 (UMRA)

This action does not contain any unfunded mandate as described in UMRA 2 U.S.C. 1531–1538 and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments or the private sector.

### E. Executive Order 13132: Federalism

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the National Government and the states, or on the distribution of power and responsibilities among the various levels of government.

### F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

This action has tribal implications. However, this action does not impose substantial direct compliance costs on federally recognized tribal governments, nor preempt tribal law. This action includes disapproving the portion of Oklahoma's SIP submission addressing the state's good neighbor obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS and applies to certain areas of Indian country as discussed in Section IV.C of the proposed action, "Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 Ozone National Ambient Air Quality Standards" (87 FR 9798 at 9824, February 2, 2022). However, this action does not impose substantial direct compliance costs on federally recognized tribal governments because no actions will be required of tribal governments. This action will also not preempt tribal law as no Oklahoma tribe implements a regulatory program under the CAA, and thus does not have applicable or related tribal laws. The EPA consulted with tribal officials under the EPA Policy on Consultation and Coordination with Indian Tribes early in the process of developing this regulation to permit them to have meaningful and timely input into its development. A summary of that

---

[334] 87 FR 31443, 31453.
[335] 81 FR 74503, 74523.

[336] *See, e.g.,* 87 FR 31443, 31457. The EPA evaluated California's qualitative consideration of unique topographic factors that may influence the transport of emissions from sources within the state to downwind receptors in Colorado and Arizona. The EPA concluded that the State's arguments do not present sufficient evidence that called into question the results of the EPA's modeling.

consultation is provided in the file "2015 Ozone Transport OK Tribal Consultation Meeting Record 3–3–2022,'' in the docket for this action.

## G. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks

The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2–202 of the Executive order. This action is not subject to Executive Order 13045 because it merely disapproves SIP submissions as not containing the necessary provisions to satisfy interstate transport requirements under CAA section 110(a)(2)(D)(i)(I).

## H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution or Use

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

## I. National Technology Transfer and Advancement Act (NTTAA)

This rulemaking does not involve technical standards.

## J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

Executive Order 12898 (Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations, 59 FR 7629, Feb. 16, 1994) directs Federal agencies to identify and address "disproportionately high and adverse human health or environmental effects" of their actions on minority populations and low-income populations to the greatest extent practicable and permitted by law. The EPA defines environmental justice (EJ) as "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies." The EPA further defines the term fair treatment to mean that "no group of people should bear a disproportionate burden of environmental harms and risks, including those resulting from the negative environmental consequences of industrial, governmental, and commercial operations or programs and policies."

Under the CAA, the Administrator is required to approve a SIP submission that complies with the provisions of the Act and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, the EPA's role is to review state choices, and approve those choices if they meet the minimum criteria of the Act. As articulated in this final action, the EPA is determining that certain SIPs do not meet certain minimum requirements, and the EPA is disapproving those SIPs. Specifically, this action disapproves certain SIP submissions as not containing the necessary provisions to satisfy "good neighbor" requirements under CAA section 110(a)(2)(D)(i)(I). The EPA did not perform an EJ analysis and did not consider EJ in this action. The CAA and applicable implementing regulations neither prohibit nor require such an evaluation. In a wholly separate regulatory action, the EPA will fully address the CAA "good neighbor" requirements under section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS as it regards the SIP disapprovals included in this final action. Consideration of EJ is not required as part of this action, and there is no information in the record inconsistent with the stated goal of E.O. 12898 of achieving EJ for people of color, low-income populations, and Indigenous peoples.

## K. Congressional Review Act (CRA)

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

## L. Judicial Review

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the D.C. Circuit: (i) when the agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, but "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to the EPA complete discretion whether to invoke the exception in (ii).[337]

This rulemaking is "nationally applicable" within the meaning of CAA section 307(b)(1). In this final action, the EPA is applying a uniform legal interpretation and common, nationwide analytical methods with respect to the requirements of CAA section 110(a)(2)(D)(i)(I) concerning interstate transport of pollution (i.e., "good neighbor" requirements) to disapprove SIP submissions that fail to satisfy these requirements for the 2015 ozone NAAQS. Based on these analyses, the EPA is disapproving SIP submittals for the 2015 ozone NAAQS for 21 states located across a wide geographic area in eight of the ten EPA Regions and ten Federal judicial circuits. Given that on its face this action addresses implementation of the good neighbor requirements of CAA section 110(a)(2)(D)(i)(I) in a large number of states located across the country and given the interdependent nature of interstate pollution transport and the common core of knowledge and analysis involved in evaluating the submitted SIPs, this is a "nationally applicable" action within the meaning of CAA section 307(b)(1).

In the alternative, to the extent a court finds this action to be locally or regionally applicable, the Administrator is exercising the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). In this final action, the EPA is interpreting and applying section 110(a)(2)(D)(i)(I) of the CAA for the 2015 ozone NAAQS based on a common core of nationwide policy judgments and technical analysis concerning the interstate transport of pollutants throughout the continental U.S. In particular, the EPA is applying here the same, nationally consistent 4-step interstate transport framework for assessing obligations for the 2015 ozone NAAQS that it has applied in other nationally applicable rulemakings, such as CSAPR, the CSAPR Update, and the Revised CSAPR Update. The EPA is relying on the results from nationwide photochemical grid modeling using a 2016 base year and 2023 projection year as the primary basis for its assessment of air quality conditions and pollution contribution levels at Step 1 and Step 2 of that 4-step framework and applying a nationally uniform approach to the identification of nonattainment and

---

[337] In deciding whether to invoke the exception by making and publishing a finding that an action is based on a determination of nationwide scope or effect, the Administrator takes into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of agency resources.

maintenance receptors across the entire geographic area covered by this final action.[338] The EPA has also evaluated each state's arguments for the use of alternative approaches or alternative sets of data with an eye to ensuring national consistency and avoiding inconsistent or inequitable results among upwind states (*i.e.,* those states for which good neighbor obligations are being evaluated in this action) and between upwind and downwind states (*i.e.,* those states that contain receptors signifying ozone nonattainment or maintenance problems).

The Administrator finds that this is a matter on which national uniformity in judicial resolution of any petitions for review is desirable, to take advantage of the D.C. Circuit's administrative law expertise, and to facilitate the orderly development of the basic law under the Act. The Administrator also finds that consolidated review of this action in the D.C. Circuit will avoid piecemeal litigation in the regional circuits, further judicial economy, and eliminate the risk of inconsistent results for different states, and that a nationally consistent approach to the CAA's mandate concerning interstate transport of ozone pollution constitutes the best use of agency resources. The EPA's responses to comments on the appropriate venue for petitions for review are contained in the RTC document.

For these reasons, this final action is nationally applicable or, alternatively, the Administrator is exercising the complete discretion afforded to him by the CAA and finds that this final action is based on a determination of nationwide scope or effect for purposes of CAA section 307(b)(1) and is publishing that finding in the **Federal Register**. Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the District of Columbia Circuit by April 14, 2023.

## List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Ozone.

**Michael S. Regan,**
*Administrator.*

For the reasons set forth in the preamble, 40 CFR part 52 is amended as follows:

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

## Subpart B—Alabama

■ 2. Section 52.56 is added to read as follows:

### § 52.56   Control strategy: Ozone.

(a) The state implementation plan (SIP) revision submitted on June 21, 2022, addressing Clean Air Act section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

(b) [Reserved]

## Subpart E—Arkansas

■ 3. Section 52.174 is amended by adding paragraph (b) to read as follows:

### § 52.174   Control strategy and regulations: Ozone.

\* \* \* \* \*

(b) The portion of the SIP submittal from October 10, 2019, addressing Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

## Subpart F—California

■ 4. Section 52.223 is amended by adding paragraph (p)(7) to read as follows:

### § 52.223   Approval status.

\* \* \* \* \*

(p) \* \* \*

(7) The interstate transport requirements for Significant Contribution to Nonattainment (Prong 1) and Interstate Transport—Interference with Maintenance (Prong 2) of Clean Air Act (CAA) section 110(a)(2)(D)(i)(I).

■ 5. Section 52.283 is amended by adding paragraph (h) to read as follows:

### § 52.283   Interstate Transport.

\* \* \* \* \*

(h) *2015 ozone NAAQS.* The 2018 Infrastructure SIP Revision, submitted on October 1, 2018, does not meet the following specific requirements of Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone national ambient air quality standards (NAAQS).

(1) The requirements of CAA section 110(a)(2)(D)(i)(I) regarding significant contribution to nonattainment of the 2015 ozone NAAQS in any other State and interference with maintenance of the 2015 ozone NAAQS by any other State.

(2) [Reserved]

## Subpart O—Illinois

■ 6. Section 52.720 is amended in the table in paragraph (e), under the heading "Section 110(a)(2) Infrastructure Requirements," by revising the entry for "2015 Ozone NAAQS Infrastructure Requirements" to read as follows:

### § 52.720   Identification of plan.

\* \* \* \* \*

(e) \* \* \*

EPA-APPROVED ILLINOIS NONREGULATORY AND QUASI-REGULATORY PROVISIONS

| Name of SIP provision | Applicable geographic or non-attainment area | State submittal date | EPA approval date | Comments |
|---|---|---|---|---|
| \* | \* | \* | \* | \* |
| Section 110(a)(2) Infrastructure Requirements | | | | |

[338] In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. *See* H.R. Rep. No. 95–294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402–03.

EPA-APPROVED ILLINOIS NONREGULATORY AND QUASI-REGULATORY PROVISIONS—Continued

| Name of SIP provision | Applicable geographic or non-attainment area | State submittal date | EPA approval date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| 2015 Ozone NAAQS Infrastructure Requirements. | Statewide ... | 5/16/2019 and 9/22/2020. | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | All CAA infrastructure elements under 110(a)(2) have been approved except (D)(i)(I) Prongs 1, 2, which are disapproved, and no action has been taken on (D)(i)(II) Prong 4. |

### Subpart P—Indiana

■ 7. Section 52.770 is amended in the table in paragraph (e) by adding an entry for ''Section 110(a)(2) Infrastructure Requirements for the 2015 Ozone NAAQS'' after the entry for ''Section 110(a)(2) Infrastructure Requirements for the 2008 8-Hour Ozone NAAQS'' to read as follows:

**§ 52.770   Identification of plan.**

\*   \*   \*   \*   \*

(e) \* \* \*

EPA-APPROVED INDIANA NONREGULATORY PROVISIONS AND QUASI-REGULATORY PROVISIONS

| Title | Indiana date | EPA approval | Explanation |
|---|---|---|---|
| * | * | * | * |
| Section 110(a)(2) Infrastructure Requirements for the 2015 Ozone NAAQS. | 11/2/2018 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | All CAA infrastructure elements have been approved except (D)(i)(I) Prongs 1 and 2, which are disapproved, and no action has been taken on the visibility portion of (D)(i)(II). |
| * | * | * | * |

### Subpart S—Kentucky

■ 8. Section 52.930 is amended by adding paragraph (n) to read as follows:

**§ 52.930   Control strategy: Ozone.**

\*   \*   \*   \*   \*

(n) *Disapproval.* The state implementation plan (SIP) revision submitted on January 11, 2019, addressing Clean Air Act section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

### Subpart T—Louisiana

■ 9. Section 52.996 is amended by adding paragraph (b) to read as follows:

**§ 52.996   Disapprovals.**

\*   \*   \*   \*   \*

(b) The SIP submittal from November 13, 2019, addressing Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS is disapproved.

### Subpart V—Maryland

■ 10. Section 52.1076 is amended by adding paragraph (gg) to read as follows:

**§ 52.1076   Control strategy plans for attainment and rate-of-progress: Ozone.**

\*   \*   \*   \*   \*

(gg) *Disapproval.* EPA is disapproving Maryland's October 16, 2019, State Implementation Plan (SIP) revision intended to address the Clean Air Act (CAA) section 110(a)(2)(D)(i)(I) interstate transport requirements for the 2015 8-hour ozone national ambient air quality standard (NAAQS).

### Subpart X—Michigan

■ 11. Section 52.1170 is amended in the table in paragraph (e), under the heading ''Infrastructure,'' by revising the entry for ''Section 110(a)(2) infrastructure requirements for the 2015 ozone NAAQS'' to read as follows:

**§ 52.1170   Identification of plan.**

\*   \*   \*   \*   \*

(e) \* \* \*

EPA-APPROVED MICHIGAN NONREGULATORY AND QUASI-REGULATORY PROVISIONS

| Name of nonregulatory SIP provision | Applicable geographic or non-attainment area | State submittal date | EPA approval date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| **Infrastructure** | | | | |

EPA-APPROVED MICHIGAN NONREGULATORY AND QUASI-REGULATORY PROVISIONS—Continued

| Name of nonregulatory SIP provision | Applicable geographic or non-attainment area | State submittal date | EPA approval date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| Section 110(a)(2) infrastructure requirements for the 2015 ozone NAAQS. | Statewide ... | 3/8/2019 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | *Approved CAA elements:* 110(a)(2)(A), (B), (C), (D)(i)(II) Prong 3, D(ii), (E)(i), (F), (G), (H), (J), (K), (L), and (M). *Disapproved CAA elements:* 110(a)(2)(D)(i)(I) Prongs 1 and 2, and 110(a)(2)(D)(i)(II) Prong 4. No action on CAA element 110(1)(2)(E)(ii). |
| * | * | * | * | * |

## Subpart Y—Minnesota

■ 12. Section 52.1220 is amended in the table in paragraph (e) by revising the entry for "Section 110(a)(2) Infrastructure Requirements for the 2015 Ozone NAAQS" to read as follows:

**§ 52.1220   Identification of plan.**

*       *       *       *       *

(e) * * *

EPA-APPROVED MINNESOTA NONREGULATORY PROVISIONS

| Name of nonregulatory SIP provision | Applicable geographic or non-attainment area | State submittal date/ effective date | EPA approved date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| Section 110(a)(2) Infrastructure Requirements for the 2015 Ozone NAAQS. | Statewide ... | 10/1/2018 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | Fully approved for all CAA elements except transport elements of (D)(i)(I) Prong 2, which are disapproved, and no action has been taken on the visibility protection requirements of (D)(i)(II). |

## Subpart Z—Mississippi

■ 13. Section 52.1273 is amended by adding paragraph (b) read as follows:

**§ 52.1273   Control strategy: Ozone.**

*       *       *       *       *

(b) *Disapproval.* The state implementation plan (SIP) revision submitted on September 3, 2019, addressing Clean Air Act section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

## Subpart AA—Missouri

■ 14. Section 52.1323 is amended by adding paragraph (p) to read as follows:

**§ 52.1323   Approval status.**

*       *       *       *       *

(p) For the 2015 8-hour ozone NAAQS:

(1) *Disapproval.* Missouri state implementation plan (SIP) revision submitted on June 10, 2019, to address the Clean Air Act (CAA) infrastructure requirements of section 110(a)(2) for the 2015 8-hour ozone NAAQS, is disapproved for section 110(a)(2)(D)(i)(I) (prongs 1 and 2).

(2) [Reserved]

## Subpart DD—Nevada

■ 15. Section 52.1472 is amended by adding paragraph (k) to read as follows:

**§ 52.1472   Approval status.**

*       *       *       *       *

(k) *2015 8-hour ozone NAAQS.* The SIP submittal from October 1, 2018, is disapproved for Clean Air Act (CAA) section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the NDEP, Clark County, and Washoe County portions of the Nevada SIP submission.

## Subpart FF—New Jersey

■ 16. Section 52.1586 is amended by adding paragraph (c) and reserved paragraph (d) to read as follows:

**§ 52.1586   Section 110(a)(2) infrastructure requirements.**

*       *       *       *       *

(c) *2015 8-hour ozone NAAQS*—(1) *Disapproval.* New Jersey SIP revision submitted on May 13, 2019, to address the CAA infrastructure requirements of section 110(a)(2) for the 2015 8-hour ozone NAAQS, is disapproved for section 110(a)(2)(D)(i)(I) (prongs 1 and 2).

(2) [Reserved]

(d) [Reserved]

## Subpart HH—New York

■ 17. Section 52.1683 is amended by adding paragraph (v) to read as follows:

**§ 52.1683   Control strategy: Ozone.**

*       *       *       *       *

(v) *Disapproval.* The portion of the SIP revision submitted on September 25, 2018, addressing Clean Air Act section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the 2015 ozone NAAQS is disapproved.

## Subpart KK—Ohio

■ 18. Section 52.1870 is amended in the table in paragraph (e), under "Infrastructure Requirements," by revising the entry for "Section 110(a)(2) infrastructure requirements for the 2015 ozone NAAQS" to read as follows:

**§ 52.1870  Identification of plan.**

\*    \*    \*    \*    \*

(e) \* \* \*

### EPA-APPROVED OHIO NONREGULATORY AND QUASI-REGULATORY PROVISIONS

| Title | Applicable geographic or non-attainment area | State date | EPA approval | Comments |
|---|---|---|---|---|
| \* | \* | \* | \* | \* |
| **Infrastructure Requirements** | | | | |
| Section 110(a)(2) infrastructure requirements for the 2015 ozone NAAQS. | Statewide ... | 9/28/2018 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | Approved CAA elements: 110(a)(2)(A), (B), (C), (D)(i)(II) prongs 3 and 4, (E), (F), (G), (H), (J), (K), (L), and (M). Elements (D)(i)(I) prongs 1 and 2 are disapproved. |
| \* | \* | \* | \* | \* |

### Subpart LL—Oklahoma

■ 19. Section 52.1922 is amended by adding paragraph (c) to read as follows:

**§ 52.1922  Approval status.**

\*    \*    \*    \*    \*

(c) The portion of the SIP submittal from October 25, 2018, addressing Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

### Subpart SS—Texas

■ 20. Section 52.2275 is amended by:
■ a. Removing the first paragraph (m); and
■ b. Adding paragraph (o).
The addition reads as follows:

**§ 52.2275  Control strategy and regulations: Ozone.**

\*    \*    \*    \*    \*

(o) *Disapproval.* The portion of the SIP submittal from September 12, 2018, addressing Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS is disapproved.

### Subpart XX—West Virginia

■ 21. Section 52.2520 is amended in the table in paragraph (e) by adding the entry ''Section 110(a)(2) Infrastructure Requirements for the 2015 8-Hour Ozone NAAQS'' at the end of the table to read as follows:

**§ 52.2520  Identification of plan.**

\*    \*    \*    \*    \*

(e) \* \* \*

| Name of non-regulatory SIP revision | Applicable geographic area | State submittal date | EPA approval date | Additional explanation |
|---|---|---|---|---|
| \* | \* | \* | \* | \* |
| Section 110(a)(2) Infrastructure Requirements for the 2015 8-Hour Ozone NAAQS. | Statewide ... | 2/4/2019 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | Disapproval—EPA is disapproving West Virginia's February 4, 2019, State Implementation Plan (SIP) revision intended to address the CAA section 110(a)(2)(D)(i)(I) interstate transport requirements for the 2015 8-hour ozone national air quality standard (NAAQS). |

### Subpart YY—Wisconsin

■ 22. Section 52.2591 is amended by adding paragraph (l) to read as follows:

**§ 52.2591  Section 110(a)(2) infrastructure requirements.**

\*    \*    \*    \*    \*

(l) *Partial approval/disapproval.* In a September 14, 2018, submission, WDNR certified that the State has satisfied the infrastructure SIP requirements of section 110(a)(2)(A) through (H), and (J) through (M) for the 2015 ozone NAAQS. For section 110(a)(2)(D)(i)(I), prong 1 is approved and prong 2 is disapproved.

EPA did not take action on any other elements. We will address the remaining requirements in a separate action.

[FR Doc. 2023–02407 Filed 2–10–23; 8:45 am]

**BILLING CODE 6560–50–P**

## EXHIBIT 2

EPA, 2015 Ozone NAAQS Interstate Transport SIP Disapprovals – Response to

Comment (RTC) Document (Jan. 31, 2023)

# 2015 Ozone NAAQS Interstate Transport SIP Disapprovals –
# Response to Comment (RTC) Document

This Response to Comments (RTC) document, together with the notice of final action titled Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-hour Ozone National Ambient Air Quality Standards (NAAQS), presents the Environmental Protection Agency's (EPA) responses to public comments received on the EPA's proposal of 21 state implementation plan (SIP) actions included in this final action.

The EPA has addressed all significant issues raised in timely public comments. The EPA received 84 individual written comment submissions during the public comment periods. Table 1 provides the commenter name, the commenter abbreviated name which may also be used within this document, and links to the commenter's submission in the docket for this action. This document, together with the notice of final action, should be considered collectively as the EPA's response to all significant comments pertaining to the states included in this action.

## Table 1: Commentor Acronyms & IDs

| Commentor Name | Acronym | ID |
|---|---|---|
| Air Pollution Control Program, Missouri Department of Natural Resources | MDNR | 01 |
| Alabama Department of Environmental Management | ADEM | 02 |
| Alabama Power Company | APC | 03 |
| Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative | APC et al. | 04 |
| Ameren Missouri | | 05 |
| Anonymous | | 06 |
| Arkansas Department of Energy and Environment, Division of Environmental Quality | ADEQ | 07 |
| Arkansas Electric Cooperative Corporation | AECC | 08 |
| Arkansas Environmental Federation | AEF | 09 |
| Arkansas Forest & Paper Council | AF&PC | 10 |
| Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association | AECT et al. | 11 |
| California Air Resources Board | CARB | 12 |
| City Utilities of Springfield, Missouri | CU | 13 |
| Cleco Corporate Holdings LLC | Cleco | 14 |
| Ducote, Samuel | | 15 |
| Eagle Materials Inc. | Eagle | 16 |
| Emley, Margaret | | 17 |
| Energy Security Partners | ESP | 18 |
| Entergy Services, LLC | ESL | 19 |
| Environmental Federation of Oklahoma | EFO | 20 |
| Evergy, Inc. | | 21 |
| Hagerty, Logan | | 22 |
| Idaho Power Company | IPC | 23 |
| Kaw Nation | | 24 |
| Kentucky Division for Air Quality | KDAQ | 25 |
| Louisiana Chemical Association | LCA | 26 |

| Louisiana Department of Environmental Quality | LDEQ | 27 |
| Louisiana Electric Utility Environmental Group | LEUEG | 28 |
| Maryland Department of the Environment | MDE | 29 |
| Midwest Ozone Group | MOG | 30 |
| Minnesota Pollution Control Agency | MPCA | 31 |
| Mississippi Department of Environmental Quality | MDEQ | 32 |
| Nevada Division of Environmental Protection | NDEP | 33 |
| New Jersey Department of Environmental Protection | NJDEP | 34 |
| NRG Texas Power LLC | NRG | 35 |
| Ohio Utilities and Generators Group | OUG | 36 |
| Oklahoma Department of Environmental Quality | ODEQ | 37 |
| PacifiCorp | | 38 |
| Sierra Club | | 39 |
| Southwestern Electric Power Company | SEPC | 40 |
| Tennessee Department of Environment and Conservation | TDEC | 41 |
| Texas Commission on Environmental Quality | TCEQ | 42 |
| Texas Transport Working Group | | 43 |
| The Luminant Companies | | 44 |
| United States Steel Corporation | U.S. Steel | 45 |
| Utah Associated Municipal Power System | UAMPS | 46 |
| Utah Division of Air Quality | UDAQ | 47 |
| Utah Petroleum Association and the Utah Mining Association | UPA & UMA | 48 |
| West Virginia Department of Environmental Protection | WVDEP | 49 |
| WildEarth Guardians | WEG | 50 |
| Wisconsin Department of Natural Resources | WDNR | 51 |
| Xcel Energy | | 52 |

The responses presented in this document supplement the responses to comments that appear in the notice of final action and addresses comments not discussed in the notice of final action. The EPA took great care in presenting comment excerpts accurately in this document (either verbatim or paraphrased), though did make some formatting adjustments for the ease of use of this document. Complete and original copies of the comment letters, including some footnotes, tables, charts, etc. which were not reproduced in this document are available in the dockets listed in the memo "Regional Dockets Containing Additional Supporting Materials for Final Action on 2015 Ozone NAAQS Good Neighbor SIP Submissions" found in the docket for this action. Although portions of the notice of final action are paraphrased in this response to comment (RTC) document, to the extent such paraphrasing introduces any confusion or apparent inconsistency, the notice of final action itself remains the definitive statement of the rationale for the final action. This document, together with the notice of final action, should be considered collectively as the EPA's response to all significant comments submitted on the EPA's proposed disapprovals of SIPs addressing Clean Air Act (CAA) section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS.

As stated in the preamble, the EPA is not taking final action on Tennessee's SIP submission, and the SIP submission from Alabama which EPA proposed to disapprove on February 22, 2022 has since been

withdrawn by the state. However, the docket that included the EPA's proposed action on Alabama and Tennessee's submissions also included action on other states' SIP submissions (Mississippi and Kentucky) that are being finalized in this action. In an effort to be responsive to all comments that may have broader relevance to this action, EPA has considered all comments submitted in this docket and responded as appropriate. However, where comments address EPA's proposal with respect to issues specific to Tennessee, the Agency defers responding to those comments and has made note of this in this document where appropriate. EPA has included and responds to the comments received on the EPA's proposal of Alabama's June 21, 2022 submission, proposed on October 25, 2022.

## Table of Contents

Table 1: Commentor Acronyms & IDs ..................................................................................... 2

Table 2: Abbreviations and Acronyms .................................................................................. 8

1   Comments Related to Rulemaking Procedure ................................................................. 12

  1.1   Timing of SIP Actions .............................................................................................. 12

  1.2   Guidance for SIP Submissions ................................................................................. 29

  1.3   Attachment A to the March 2018 Memorandum ....................................................... 37

  1.4   Use of Updated Modeling ......................................................................................... 42

  1.5   States' Step 3 Analysis ............................................................................................. 62

  1.6   EPA Input During SIP Submission Development ...................................................... 68

  1.7   Length of Comment Period ....................................................................................... 79

  1.8   Docket Document Availability ................................................................................... 86

2   Analytic Year of 2023 ......................................................................................................... 89

3   Emissions Inventories ........................................................................................................ 97

  3.1   Emissions Inventory - General ................................................................................. 97

  3.2   Emissions Inventory – Non-EGUs ............................................................................ 97

  3.3   Emissions Inventory – EGUs .................................................................................... 120

    3.3.1   Unit Corrections ............................................................................................... 120

    3.3.2   EPA's Integrated Planning Model (IPM) ......................................................... 124

    3.3.3   Other EGU Inventory-Related Comments ....................................................... 130

4   Air Quality Modeling ......................................................................................................... 135

  4.1   Modeling Design - General ...................................................................................... 135

    4.1.1   Modeling Design - Lake Michigan .................................................................. 136

    4.1.2   Modeling Design - Western States ................................................................. 154

  4.2   Model Performance .................................................................................................. 156

    4.2.1   Model Performance at Lake Michigan ............................................................. 156

    4.2.2   Model Performance at Western States ............................................................ 166

  4.3   Model Error vs Contribution Threshold ................................................................... 184

5   Updates to Modeling and Changes in Linkages ............................................................. 188

6   Step 1 ................................................................................................................................. 206

  6.1   Projected Air Quality Problems ................................................................................ 206

    6.1.1   Western Receptors .......................................................................................... 206

6.1.2    Receptors Linked to Texas .................................................................................. 209

6.1.3    Meteorologically Adjusted Ozone Trends ........................................................ 216

6.2    EPA Methodology for Determining Maintenance Receptors ................................. 217

6.3    TCEQ's Alternative Methodology for Determining Maintenance Receptors ........... 220

6.4    October 2018 Memorandum ................................................................................... 232

6.5    Certain Monitoring Sites in California at Step 1 ..................................................... 234

7    Step 2 ................................................................................................................................ 238

7.1    Methodology for Determining Future Year Contributions ..................................... 238

7.2    Contributions .......................................................................................................... 251

7.3    1 Percent as a Contribution Threshold ................................................................... 257

7.4    August 2018 Memorandum ..................................................................................... 267

7.5    Maintenance-Only Linkages ................................................................................... 300

8    Step 3 ................................................................................................................................ 303

8.1    Determination of Significant Contribution ............................................................. 303

8.2    Alleged De Minimis Contribution ........................................................................... 316

8.3    Existing and Future State Controls .......................................................................... 321

8.4    Modeling and CAA Section 179B Guidance ............................................................ 333

8.5    Air Quality Factors .................................................................................................. 339

8.6    Cost Thresholds ...................................................................................................... 342

8.7    "Consistent and Persistent" Contribution .............................................................. 347

8.8    Hybrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) Model ........... 354

8.9    Allegations of Inconsistency with Other Recent EPA Actions ................................. 372

9    Controls ............................................................................................................................ 376

9.1    Supplemental Submission ...................................................................................... 376

9.2    Over-Control ........................................................................................................... 377

10    Legal Comments Not Otherwise Addressed Elsewhere ..................................................... 379

10.1    Venue ...................................................................................................................... 379

10.2    SIP Call ..................................................................................................................... 394

10.3    Cooperative Federalism and the EPA's Authority .................................................. 398

10.4    Reliance on FIP Measures ....................................................................................... 437

10.5    Comments Alleging "Pretext" or Intent to Require Generation Shifting................. 439

10.6    Allegation that Disapprovals of Western State SIP Submissions was Predetermined ............ 440

10.7    EPA's Response to Comment on Proposed Actions Related to Alabama ................................. 446

11    Miscellaneous .................................................................................................................... 448

11.1    Incorporation of Other's Comments by Reference ................................................. 448

11.2    CAA Section 126 Petitions ....................................................................................... 451

11.3    Transport Policy ...................................................................................................... 452

11.4    Transport Policy- Western State Ozone Regulation ............................................... 458

11.5    International Contributions ..................................................................................... 462

11.6    Economic Impacts ................................................................................................... 463

11.7    Environmental Justice ............................................................................................. 467

11.8    Mobile Sources Emissions ...................................................................................... 468

11.9    Typographical Concerns .......................................................................................... 476

11.10    Tribal Concerns ..................................................................................................... 477

11.11    Executive Order 13132 .......................................................................................... 479

11.12    Consent Decrees ................................................................................................... 480

11.13    General Recommendations .................................................................................... 483

11.14    Out of Scope ......................................................................................................... 486

11.15    Out of Scope - Comments on the Proposed FIP .................................................... 489

## Table 2: Abbreviations and Acronyms

| | |
|---|---|
| ADEM | Alabama Department of Environmental Management |
| ADEQ | Arkansas Department of Energy and Environment, Division of Environmental Quality |
| AECC | Arkansas Electric Cooperative Corporation |
| AECT | Association of Electric Companies of Texas |
| AEF | Arkansas Environmental Federation |
| AEO | Annual Energy Outlook |
| AF&PC | Arkansas Forest & Paper Council |
| AL | Alabama |
| APA | Administrative Procedures Act |
| APC | Alabama Power Company |
| APCA | Anthropogenic Precursor Culpability Assessment |
| AQAT | Air Quality Assessment Tool |
| AQM TSD | Air Quality Modeling Technical Support Document |
| ASC | Air Stewardship Coalition |
| ASTM | American Society of Testing and Materials |
| AZ | Arizona |
| BACM | Best Available Control Measures |
| BACM | Best Available Control Measures |
| BACT | Best Available Control Technology |
| BARCT | Best Available Retrofit Control Technology |
| CA | California |
| CAA | Clean Air Act |
| CAIR | Clean Air Interstate Rule |
| CAMx | Comprehensive Air Quality Model with Extensions |
| CARB | California's Air Resources Board |
| CDPHE | Colorado Department of Public Health and Environment |
| CenSARA | Central States Air Resources Agencies |
| CH4 | Methane |
| CO | Colorado |
| COMAR | Code of Maryland Regulations |
| CSAPR | Cross-State Air Pollution Rule |
| CT | Connecticut |
| CU | City Utilities of Springfield, Missouri |
| D.C. | District of Columbia |
| DE | Delaware |
| DFW | Dallas-Fort Worth |
| DM/NFR | Denver Metro / North Front Range |
| DV | Design value |
| ECHO | Enforcement and Compliance History Online |
| EFO | Environmental Federation of Oklahoma |
| EGUs | Electric Generating Units |

8

| | |
|---|---|
| EMP | Emissions Modeling Platform |
| EO | Executive Order |
| EPA | Environmental Protection Agency |
| ERTAC | Eastern Regional Technical Advisory Committee |
| ESL | Entergy Services, LLC |
| ESP | Energy Security Partners |
| FIP | Federal Implementation Plan |
| FR | Federal Register |
| GHG | Greenhouse gases |
| HEED | Electric generating unit |
| HQ | Headquarters |
| hr | Hour |
| HYSPLIT | Hybrid Single-Particle Lagrangian Integrated Trajectory |
| IL | Illinois |
| IN | Indiana |
| IPC | Idaho Power Company |
| IPM | Integrated Planning Model |
| iSIP | Infrastructure State Implementation Plan (SIP) |
| KDAQ | Kentucky Division for Air Quality |
| Km | Kilometer |
| LADCO | Lake Michigan Air Directors Consortium |
| LCA | Louisiana Chemical Association |
| LDEQ | Louisiana Department of Environmental Quality |
| LEUEG | Louisiana Electric Utility Environmental Group |
| LEV | Low-Emissions Vehicle |
| LMOS | Lake Michigan Ozone Study |
| MACT | Maximum achievable control technology |
| MARAMA | Mid-Atlantic Regional Air Management Association, Inc. |
| MDA8 | Maximum daily 8-h average |
| MDE | Maryland Department of the Environment |
| MDEQ | Mississippi Department of Environmental Quality |
| MDNR | Missouri Department of Natural Resources |
| MI | Michigan |
| MO | Missouri |
| MOG | Midwest Ozone Group |
| MOVES | Motor Vehicle Emissions Simulator |
| MPCA | Minnesota Pollution Control Agency |
| MPE | Model Performance Evaluation |
| MW | Megawatt |
| MWe | Megawatts electric |
| NAAQS | National Ambient Air Quality Standards |
| Nbias | Normalized bias |
| NDEP | Nevada Division of Environmental Protection |

| | |
|---|---|
| NEEDS | National Electric Energy Data System |
| NEI | National Emissions Inventory |
| NJ | New Jersey |
| NNSR | Nonattainment New Source Review |
| NO$_2$ | Nitrogen dioxide |
| NODA | Notice of Data Availability |
| NOX | Nitrogen oxides |
| NPRM | Notice of proposed rulemaking |
| NRG | NRG Texas Power LLC |
| NSR | New Source Review |
| NV | Nevada |
| NW | Northwest |
| NWF | Northern Wasatch Front |
| NYMA | New York Metropolitan Area |
| NYS DEC | New York State Department of Conservation |
| O$_3$ | Ozone |
| OAQPS | Office of Air Quality Planning and Standards |
| OAR | Office of Air and Radiation |
| ODEQ | Oklahoma Department of Environmental Quality |
| OH | Ohio |
| OK | Oklahoma |
| OTC | Ozone Transport Commission |
| OUG | Ohio Utilities and Generators Group |
| PA | Pennsylvania |
| PM | Particulate matter |
| PM2.5 | PM with a diameter of 2.5 micrometers or less; fine particulate |
| ppb | Parts per billion |
| PSD | Prevention of Significant Deterioration |
| RACT | Reasonably available control technology |
| RCF | Relative Contribution Factor |
| RCU | Revised CSAPR Update |
| RFF | Relative Response Factors |
| RFG | Reformulated gasoline |
| RTC | Response to Comments |
| SAFETEA | Safe, Accountable, Flexible, Efficient Transportation Equity Act |
| SCCT | Simple cycle and regenerative combustion turbines |
| SCR | Selective catalytic reduction |
| SEPC | Southwestern Electric Power Company |
| SIP | State Implementation Plan |
| SNCR | Selective Non-Catalytic Reduction |
| SSM | Startup, shutdown, and malfunction |
| TCEQ | Texas Commission on Environmental Quality |
| TDEC | Tennessee Department of Environmental Conservation |

| | |
|---|---|
| TIP | Tribal Implementation Plan |
| TN | Tennessee |
| tpy | Tons per year |
| TSD | Technical Support Document |
| TX | Texas |
| U.S. | United States |
| U.S.C. | United States Code |
| UAMPS | Utah Associated Municipal Power System |
| UDAQ | Utah Division of Air Quality |
| UMA | Utah Mining Association |
| UPA | Utah Petroleum Association |
| UT | Utah |
| VOC | Volatile organic compounds |
| WDNR | Wisconsin Department of Natural Resources |
| WEG | WildEarth Guardians |
| WESTAR | Western States Air Resources Council |
| WI | Wisconsin |
| WRAP | Western Regional Air Partnership |
| WVDEP | West Virginia Department of Environmental Protection |
| yr | Year |
| ZEV | Zero-Emissions Vehicle |

# 1   Comments Related to Rulemaking Procedure

## 1.1   Timing of SIP Actions

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Further, EPA's proposed disapproval of Missouri's SIP and the imposition of a proposed FIP gives Missouri no real opportunity to address EPA's concerns and revise our SIP at step-3.

**Commenter:** Arkansas Environmental Federation

**Commenter ID:** 09

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

DEQ should be permitted time to analyze, address and/or correct any deficiencies identified by EPA before finalizing a FIP. Although EPA might generally have the authority under Section 7410(c)(1)(B) to issue a FIP at any time prior to the 2-year deadline after disapproval, nevertheless, CAA Section 7410(c)(1) contemplates that a state would be provided time to correct any deficiency and that EPA has the discretion to allow up to two years for correction of any deficiency.  EPA's determination about whether a FIP should be promulgated immediately as to a specific state should be based on a state-specific analysis since a State may bring a particularized, as-applied challenge to a nationwide or regional transport rule.

II. EPA's Proposed SIP Disapproval and FIP Proposal is Out of Sequence.

EPA's approach to taking action to disapprove the DEQ SIP and simultaneously promulgate a FIP, instead of allowing DEQ to submit revisions to its SIP, effectively impairs ADEQ's ability to make a state-specific over-control analysis. EPA does not have the authority to impose requirements that result in over-control, nor does it have the authority to mandate a particular control for a state.  In fact, EPA seeks comment on its proposed FIP as to whether its FIP results in over-control with respect to Arkansas.  EPA has the process backwards. Under EPA's analysis based on the 2016 modeling platform, the single Michigan maintenance receptor that Arkansas analyzed in its SIP submission is no longer an issue.  Yet now, EPA has identified receptors in Texas that it claims are adversely impacted by Arkansas emissions and has imposed control requirements without allowing Arkansas the opportunity to evaluate EPA's newly-purported linkages to Texas and determine the appropriate emissions reductions, if any,

12

necessary from Arkansas sources to address these purported linkages. Consequently, EPA's SIP disapproval and its proposed FIP are linked, and EPA should not finalize its FIP with respect to Arkansas until DEQ has been given a reasonable amount of time to respond.

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Timing of EPA's Proposed Rule

Under the Clean Air Act §110(k), EPA has six months to determine whether or not a state's SIP submittal is complete once it is received from the state. From the time of the completeness determination, EPA has twelve months to finalize an approval or disapproval of the state's submission. For the Arkansas Transport SIP, the deadline for EPA final action was November 7, 2020. EPA failed to meet its statutory deadline for acting on the Arkansas Transport SIP. Not until EPA was sued by environmental organizations and EPA conducted new analyses to effectively supersede analyses provided by the previous EPA administration for use by states in SIP development did EPA issue a proposed action on the Arkansas Transport SIP.

EPA failed to meet its statutory deadline for acting on the Arkansas Transport SIP. Not until EPA was sued by environmental organizations and EPA conducted new analyses to effectively supersede analyses provided by the previous EPA administration for use by states in SIP development did EPA issue a proposed action on the Arkansas Transport SIP.

EPA had all of the information necessary based on the best available science to approve the interstate component of the Arkansas Transport SIP submittal when its action was due on November 7, 2020.

[…]

Simply put, EPA did not act on 2015 Ozone Transport SIPs in a timely manner. As EPA notes in the proposed disapproval, decision points are made based on information available at the time. Had EPA reviewed the SIP in the timeframe required by federal law, the information available at the time—the same information that states used to inform their decisions—would have ensured that states did not waste time on robust analyses of available data for the purposes of making sound, evidence-based decisions. EPA stalled an evaluative action until the perceived "facts" of the situation changed such that timely state analyses were rendered outdated. Because EPA did not act on SIP submissions in a timely manner as required by the Clean Air Act, and instead intended their assessment of Transport SIPs to be "forward looking," states have been put at a clear disadvantage in the final stages of the SIP process.

The Arkansas Transport SIP submittal clearly demonstrated, based on the information available at the time, that the Arkansas SIP contains adequate provisions to ensure that in-state emissions activities do not "significantly" contribute to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state. DEQ requests that EPA withdraw its proposed disapproval and instead fully approve

13

the Arkansas Transport SIP. In the alternative, EPA should allow DEQ the customary two years post-disapproval to address identified deficiencies in the Arkansas Transport SIP and to resubmit to EPA, prior to issuing a federal implementation plan.

[…]

States must undertake SIP development with limited technical resources, so the states rely heavily on EPA data and EPA guidance in their decision-making. The threshold decision is fundamental to further steps in the Interstate Transport Framework analysis. Therefore, this late-stage decision by EPA is unreasonable. DEQ finds that this decision effectively forces states to fail in meeting EPA's vacillating interpretation of what is necessary for SIPs to meet interstate transport obligations.

[…]

DEQ does not believe that EPA has the information necessary to broad-stroke disapprove the Arkansas Transport SIP. DEQ requests that EPA take pause on final SIP and FIP actions for the state until DEQ (or EPA) has completed further analysis of linkages from emission sources and activities in the state to determine if there are sources or emissions activities in the state that significantly contribute to the newly identified nonattainment receptor or interfere with maintenance of the NAAQS in Texas, and if so, to adopt appropriate control strategies to prohibit the significant contribution(s).

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

If EPA proceeds with disapproval on the basis of its new analysis, EPA should allow Texas to revise its SIP submission.

EPA did not act on Texas's SIP submission within the CAA's statutory timeframe. Due to EPA's own delay in acting, EPA has deviated from its long-standing practice of giving states an opportunity to address new information or analysis and, potentially, develop and submit revisions to EPA before the Agency issues a FIP. In proposing a FIP and announcing that it intends to finalize the FIP concurrently with or soon after it finalizes disapprovals of Transport SIPs, it is clear that EPA is not affording states and other commentors a meaningful opportunity to integrate their concerns into the final action.

The CAA requires that, once a SIP is deemed complete, EPA must act on the SIP within 12 months. TCEQ submitted its SIP on August 17, 2018. To comply with the CAA, EPA should have proposed to approve or disapprove the SIP by February 2020. EPA, however, did not propose to disapprove Texas's SIP submission until February 22, 2022, as the result of a consent decree. Due to EPA's own delay and the accelerated timeline required by the consent decree, EPA is proposing to deny commentors the opportunity to respond to the new data and analysis. Moreover, EPA has previously allowed states to revise disapproved SIPs, consistent with CAA Section 110(c)(1), prior to issuing a FIP. EPA's accelerated

14

timeline for issuing a FIP, which resulted from EPA's own delay, effectively penalizes Texas for timely submitting its SIP.

**Commenter:** City Utilities of Springfield, Missouri

**Commenter ID:** 13

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

EPA decision to disapprove seems arbitrary and capacious in terms of timing, implementation schedule, and level of reductions. Missouri has not been given time to redress EPA disapproval concerns within their current plans to either enhance or supplement the record. EPA changed the modeled receptors in upwind states attributed to Missouri's contribution. Changes at this point in time will unduly burden MDNR's ability to implement rule changes outside the normal review and oversight process. Missouri will be forced to absorb the Federal Plan allocation methodology without appropriate consent, comment and justification.

**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

Under CAA § 110, states retain primary authority to address their ozone transport obligations until EPA has taken *final* action on a SIP submission. If a state submits a SIP that does not adequately fulfill these obligations, EPA is required to disapprove the SIP within 18 months. Because a disapproval is a substantive rule "affecting individual rights and obligations," EPA is required to go through notice-and-comment rulemaking in finalizing its decision. Only after such disapproval is finalized, can EPA promulgate a FIP in its place, which must similarly go through notice-and-comment. Here, however, EPA issued a Proposed FIP *before* issuing its Proposed Disapproval of Nevada's SIP, based on EPA's "anticipate[d]" determination that pending SIP submissions "may not have adequate provisions… to address [the states'] interstate transport obligations for the 2015 ozone NAAQS."

For EPA to issue its Proposed FIP before fulfilling it mandatory duty to timely act on the proposed Nevada SIP is the very hallmark of unreasonable agency action. CAA § 110(k) requires EPA to take final action to approve or disapprove a state's SIP, once submitted, within 18 months. However, EPA exceeded this deadline by over 2 years. Nevada submitted a revised SIP addressing interstate transport obligations under the 2015 Ozone NAAQS on October 1, 2018. Under Section 110(k) of the CAA, EPA was required to act on this submission by April 1, 2020—instead, EPA did not issue its Proposed Disapproval until May 24, 2022.

15

**Commenter:** Environmental Federation of Oklahoma

**Commenter ID:** 20

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In particular, EFO supports DEQ's assessment that EPA has overstepped its authority by circumventing the normal SIP development and approval process in a number of ways, including but not limited to: […] proposing a replacement Federal Implementation Plan (FIP) before the state even has a chance to review the proposed SIP disapproval.


**Commenter:** Idaho Power Company

**Commenter ID:** 23

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

The Proposed Disapproval circumvents notice-and-comment requirements.

EPA exceeded its authority under the CAA in proposing a FIP prior taking final action on the Proposed Disapproval. The CAA allows EPA to promulgate a FIP only "after the Administrator finds that a State failed to make a require submission . . . or disapproves a state implementation plan submission."

As discussed above, under the CAA, states retain primary authority to address their ozone transport obligations until EPA has taken final action on a SIP submission. If a state submits a SIP that does not adequately fulfill these obligations, EPA is required to disapprove the SIP within 18 months. Because a disapproval is a substantive rule "affecting individual rights and obligations," EPA is required to go through notice-and-comment rulemaking in finalizing its decision.[29] Only after such disapproval is finalized can EPA promulgate a FIP in its place,[30] which must similarly go through notice-and-comment.

Here, EPA proposed a FIP more than two years after it was statutorily obligated to respond to Nevada's SIP submission and more than a month before publishing the Proposed Disapproval—which is largely based on modeling and data *unavailable to Nevada at the time it developed its SIP*. In other words, Nevada held up its side of the cooperative federalism bargain struck by the Clean Air Act, but EPA did not. This is the very hallmark of unreasonable agency action. Nevada submitted a revised SIP addressing interstate transport obligations under the 2015 Ozone NAAQS on October 1, 2018. Under CAA Section 110(k), EPA was required to act on this submission by April 1, 2020, 18 months after Nevada submitted its SIP. EPA published its Proposed Disapproval more than two years after this deadline had passed, on May 24, 2022.

[29] *See, e.g.,* Chrysler Corp. v. Brown, 441 U.S. 281, 302 (1979).
[30] *See* 42 U.S.C. § 7410(c)(1) (requiring Administrator to promulgate FIP "at any time within 2 years after" disapproving a SIP). While the Supreme Court held in *EPA v. EME Homer City Generation* that, under this provision,

"EPA is not obliged to wait two years or postpone its action even a single day," the Court noted that this authority applies "[*a*]*fter* EPA has disapproved a SIP." 572 U.S. 489, 509 (2014) (emphasis added)

**Commenter:** Kentucky Division for Air Quality

**Commenter ID:** 25

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Lack of Timeliness of EPA Action

Kentucky disagrees with EPA's proposed disapproval of its State Implementation Plan (SIP) regarding the interstate transport requirements for the 2015 8-hour ozone national ambient air quality standards (NAAQS) because EPA's inaction prohibited Kentucky from addressing any deficiencies identified or submitting a revised SIP for approval. Kentucky's final 2015 8-hour Ozone NAAQS Infrastructure SIP (I-SIP) was transmitted to EPA on January 9, 2019, and included the interstate transport requirements. EPA did not make a completeness determination within 60 days, and the SIP was deemed complete by operation of law under 42 U.S.C. § 7410(k)(1)(B) six months later, on July 9, 2019. Once a completeness determination occurs by operation of law, EPA has 12 months to take action on the SIP submittal. EPA was required to act on Kentucky's entire I-SIP by July 9, 2020. EPA approved the majority of the SIP requirements on July 1, 2020, and approved sections addressing Clean Air Act (CAA) sections 110(a)(2)(C), 110(a)(2)(D)(i) Prong 3, 110(a)(2)(J), and 110(a)(2)(K) via a second approval on October 2, 2020.  However, EPA took no action on the requirements for Interstate Transport, specifically prongs 1 and 2, until February 22, 2022, over 12 months past the statutorily required date for action.

EPA's delayed disapproval of Kentucky's I-SIP regarding prongs 1 and 2 of CAA section 110(a)(2)(D)(i)(1) prevented Kentucky from addressing deficiencies or submitting SIP revisions. Kentucky would appreciate the opportunity to address these identified deficiencies through a revised SIP submission, which may eliminate the need for a Federal Implementation Plan.

**Commenter:** Louisiana Department of Environmental Quality

**Commenter ID:** 27

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Louisiana submitted the Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards SIP on November 12, 2019, and EPA issued a "completeness finding" on November 14, 2019. According to Federal Clean Air Act (FCAA) §110(k)(2), "within 12 months of a determination ... the [EPA] Administrator shall act on the submission in accordance with paragraph (3)." Paragraph three (3) addresses full and partial approval and disapproval. The FCAA is silent on the state's recourse if EPA fails to act, which leads us to the current proposal. In this proposed disapproval, EPA presents modeling results that change the predicted impacts on downwind states. It is important to

note that these modeling results were not available to states prior to the initial submittal.  If the disapproval of the proposed SIP is finalized, EPA has a two-year timeframe to develop a Federal Implementation Plan (FIP) to address the relevant interstate transport requirements. Alternatively, EPA could approve a subsequent SIP submittal that meets these requirements. EPA proposed the FIP on April 6, 2022 some 43 days later.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851, EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

EPA's accelerated approach to denial of these plans is inconsistent with the CAA

As evidenced by these several proposals for disapproval of Good Neighbor SIPs that accompanied this, EPA has begun an accelerated denial of the efforts of upwind states' and to implement a new transport rule and in doing so has taken an approach that is inconsistent with applicable law and appropriate science. This accelerated effort disenfranchises not only meaningful technical analysis of the agency's proposals but also curtails meaningful participation by all stakeholders.

Section 110(c) of the CAA states that "The [EPA] Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator" if he: (1) finds that a state has failed to make a required submission or that the state plan submitted "does not satisfy" the minimum criteria in Section 110(k)(1)(A), or (2) "disapproves a State implementation plan submission in whole or in part," unless the State corrects the deficiency and the Administrator approves the correction before the Administrator promulgates the plan.

In the event of a justified disapproval, EPA then is required to promulgate a Federal Implementation Plan ("FIP") within two years unless the State corrects the deficiency before promulgation of the FIP.  At issue in connection with the subject proposed SIP disapprovals are two initial considerations. First, EPA must offer adequate justification for the proposed disapprovals. As will be discussed extensively in these comments, EPA has not adequately demonstrated the basis for its actions.

[…]

Again, these comments will illustrate EPA is improperly advancing implementation plan denials, while threatening with an imminent FIP proposal published in the Federal Register on April 6, 2022.

[…]

The Clean Air Act does not mandate promulgation of a FIP in such an abbreviated time frame.  The CAA allows FIP action any time within 2 years after the Administrator finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the

18

minimum criteria or disapproves a state implementation plan submission in whole or in part. The CAA also specifically provides for the State to be allowed the opportunity to correct any deficiencies. We urge EPA to revise its proposals to allow States an appropriate opportunity to respond to EPS's findings of deficiency.

**Commenter:** Mississippi Department of Environmental Quality

**Commenter ID:** 32

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

However, EPA did not act on [Mississippi's] submittal for nearly two and a half years. Now, within one week of proposing to disapprove the "good neighbor" portion of Mississippi's 2015 $O_3$ NAAQS iSIP, the EPA administrator has signed a proposed Federal Implementation Plan (FIP) to impose on the state. The imposition of the FIP is premature and unnecessary as MDEQ has demonstrated its commitment to develop and submit an approvable iSIP and has historically strived to meet and exceed its obligations.

[…]

[T]he proposed FIP should not be imposed until MDEQ is given a reasonable opportunity to address the alleged deficiencies in the iSIP and to resolve the modeling errors referenced herein.

[…]

MDEQ respectfully requests that EPA work collaboratively with MDEQ, allowing appropriate time for the development and submittal of a revised iSIP, and not impose the proposed FIP on Mississippi, which would be unnecessarily burdensome to Mississippians.

**Commenter:** Nevada Division of Environmental Protection

**Commenter ID:** 33

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA failed to act on the Nevada's iSIP by the 2020 statutory deadline. As of late 2021, despite the long-standing process for review and prioritization of the SIP backlog (namely the SIP Management Plan) EPA provided zero communication to NDEP on any significant aspect of the Nevada iSIP review and approval process nor did EPA provide any substantive feedback on Nevada's 2018 iSIP submission.

[…]

In contrast to its repeated failure for over 3 years to collaborate with NDEP on review of Nevada's 2018 iSIP, in less than 6 months:

- EPA ran and used results from a new modeling platform unavailable to NDEP at the time of the 2018 iSIP;
- Proposed a new ozone FIP; and
- Proposed to disapprove Nevada's iSIP.

EPA has taken these actions over a very short period without providing meaningful state consultation, nor providing Nevada the time and resources to consider the new modeling results in the context of the originally required 2018 iSIP submission.

[…]

NDEP requests that EPA withdraw the Proposed Regulation to provide the opportunity for NDEP to meaningfully collaborate with EPA on this important effort and to evaluate, and if appropriate, propose a revision to Nevada's ISIP to meet our interstate transport obligations for the 2015 ozone NAAQS given EPA's decision to primarily rely on the new emissions platform.

NDEP stands by its commitment to continuing to review new air quality monitoring information as it becomes available to ensure that NDEP's negative declaration in the 2018 ISIP is still supported, if given a reasonable opportunity and resources. NDEP request a reasonable opportunity to consider a) the new information about downwind contribution that is available based on the new modeling platform; b) potentially consider a demonstration of the appropriateness of a different threshold [EPA recognizes that NDEP may not have considered analyzing the reasonableness and appropriateness of a larger threshold of 1% (namely 1 ppb) in the iSIP submittal, because at the time the "State did not contribute above 1 percent of the NAAQS to a projected downwind non-attainment or maintenance receptor" (Section III.A of the proposed rule)]; and c) permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary to eliminate downwind contribution.


**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA Should Allow States to Submit Revised SIPs Before Issuing a FIP

Oklahoma maintains its SIP is approvable as submitted. However, EPA should afford states the opportunity to address aspects of their SIPs that EPA has identified as deficient. EPA states on page 9801 of the proposed disapproval, "Where states submitted SIPs that rely on any such potential 'flexibilities' as may have been identified or suggested in the past, the EPA will evaluate whether the state adequately justified the technical and legal basis for doing so."  Oklahoma notes that few, if any, of the flexibilities offered by EPA in the 2018 Tsirigotis Memos have been approved when states have developed SIPs relying on those flexibilities. EPA's proposed decision to disapprove states' approaches in their SIPs warrants the opportunity for states to revise their SIPs to address deficiencies identified by EPA. Further, where EPA has decided states have failed to meet "the technical and legal basis" for the

20

flexibilities, the burden shifts and it is incumbent on EPA to more clearly articulate the justification, both technical and legal, that EPA would find acceptable. Alternatively, it may be the case that EPA finds no justification that satisfies these criteria. If that is the case, then EPA needs to say so. In any event, states should be afforded the opportunity to revise their SIPs, ideally before the proposed disapproval is noticed, but certainly before the disapproval is finalized. Now it appears that EPA is moving forward on a FIP without providing the states the opportunity to modify their SIPs to accommodate the actual policies by which EPA will review those SIPs. This is bad policy and undermines the cooperative and collaborative relationship between states and EPA.

[…]

EPA Failed to Adequately Include State Participation

Oklahoma takes issue with EPA's "wait and then hurry-up" approach to interstate air pollution transport rulemaking. The delay in EPA's evaluation of Oklahoma's ozone transport SIP in combination with the extended wait for EPA to develop the FIP, predictably ended up with EPA responding to a court order to issue a rule in a short time frame with a process that fails to adequately include state participation.  To begin with, the development of the modeling platform should have concluded before EPA used the platform for this rulemaking. ODEQ and other air quality agencies worked together to develop a letter from Michael Vince (the Executive Director of the Central States Air Quality Agencies or CenSARA) to Peter Tsirigotis, dated July 29, 2021 (included as Attachment C hereto). The letter makes the point that, if air agencies are to be given the opportunity to provide meaningful feedback on the emissions inputs used by EPA in rulemaking, they should have the opportunity to review and comment on the Emissions Modeling Platform (EMP) before it is used in federal rulemaking. EPA did allow agencies the opportunity to review an updated version of the EMP, but the version that was ultimately used to develop the proposed disapproval of Oklahoma's ozone transport SIP (and to develop the proposed FIP) had not been released and did not undergo state review in advance of its deployment in support of EPA's rule development.

It should also be noted that EPA's delay shortens the lead time available to address ongoing nonattainment and maintenance problems due to upwind contributions.

[…]

Furthermore, it should be noted that the proposed disapproval was considerably late, as Section 110(k)(2) of the CAA states that EPA must take action within 12 months of a "complete" SIP submission. The maximum amount of time EPA can take to deem a SIP submittal complete is 6 months, therefore, even accounting for this timeline, EPA's action falls way behind the statutory requirement. Had EPA reviewed and approved Oklahoma's SIP submittal during its statutorily required timeframe, EPA would have been measuring Oklahoma's SIP submittal against comparable data. Because EPA took so long to act on SIP submittals, EPA created a situation where the standard under which states developed their SIPs was no longer the standard against which those SIPs were judged.


**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA's Proposed Disapproval, and the already-published Proposed FIP, interfere with Utah's right to remedy any problems with its SIP.

In failing to observe the appropriate process, EPA has undermined the cooperative federalism underpinning Section 110 of the CAA. EPA attempts to paper over this role reversal by saying that states can always prepare a SIP later to replace the Proposed FIP. However, EPA will not approve any proposed replacement SIP prior to finalizing the Proposed FIP, and the Proposed FIP sets insurmountable standards for any subsequent SIP revision. The Proposed Disapproval will force Utah sources to begin compliance efforts almost immediately due to the incredibly tight timeframes in the Proposed FIP. The tight deadlines for compliance in the Proposed FIP essentially eliminate any reasonable opportunity for Utah to develop, and EPA to approve, a revised SIP in accordance with EPA's new approach to interstate transport, which goes beyond CAA standards.

As long as Utah can submit evidence to show that emission reductions from sources in its boundaries will not significantly impact the downwind monitors, its SIP satisfies the requirements of the good neighbor provision, and EPA must approve it. However, in the past, EPA has provided states sufficient time to make corrections or submit additional clarifications if necessary to achieve the good neighbor provision via their own SIPs.[22]  PacifiCorp asks EPA to do the same in this instance. EPA should acknowledge Utah's authority and, if necessary, allow Utah time to provide additional evidence for Step 2 and, if necessary, to re-evaluate Steps 3 and 4 of EPA's four-step methodology. Utah is uniquely positioned to identify the right mix of requirements for the unique emission sources in its jurisdiction and to determine how best to align those requirements with other regional regulatory efforts that target some of the same units and pollutants, like regional haze. EPA's extended delay in issuing the Proposed Disapproval should not serve as a pretext for preventing Utah from finalizing an approvable SIP.

[22] *See, e.g.,* 84 FR 3,389, 3,390 (Feb. 12, 2019) (approving Wyoming's good neighbor SIP after Wyoming submitted supplemental information requested by EPA).

**Commenter:** PacifiCorp (Attachment - Berkshire Hathaway Energy (BHE) Company Comments on Proposed Ozone Transport Rule)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA Should Work with Western States to Prepare SIPs that Achieve Necessary Ozone Reductions as Part of a Just and Orderly Transition.

The western states where BHE operates affected EGUs (Nevada, Wyoming, and Utah) submitted their good neighbor SIPs to EPA between October 2018 and October 2019, years in advance of EPA's Proposed Rule. Each of these SIPs, in reliance upon EPA guidance and modeling, demonstrated that there were no significant impacts on ozone nonattainment and maintenance in downwind states. Yet EPA took no action on these SIP submissions for two and a half to three and a half years. It was not until February 2022, when EPA signed the Proposed Rule imposing a FIP on these states (later publishing it for public notice and comment on April 6), that these states learned that EPA did not intend to approve their good neighbor SIPs. EPA did not even propose disapproval for these SIPs until May 23, 2022, a full month and a half after proposing its FIP. And EPA has yet to finalize disapproval (the proper legal predicate for a FIP). What's more, EPA's disapproval of these SIPs is based on a shift in its thinking in the years since the SIPs were originally submitted.

[…]

EPA attempts to paper over the role reversal of the Proposed Rule by saying that states can always prepare a SIP later for EPA approval. However, EPA has not yet finalized disapproval of the Nevada, Utah, and Wyoming SIPs. In the past, EPA has provided states sufficient time to implement the good neighbor provision via their own SIPs, even when supplemental information and analysis may have been required. BHE asks EPA to do the same in this instance. Provisions in the Proposed Rule impose SIP requirements not found in the CAA and essentially eliminate any reasonable opportunity for states to make a future SIP submission. BHE encourages EPA to respect the cooperative federalism principles in the CAA as the right way to achieve the best path forward.

[…]

EPA has now disavowed its prior guidance without allowing states an opportunity to react. In doing so, EPA has claimed for itself the authority Congress granted to states, not to EPA. EPA attempts to paper over this role reversal by saying that states can always prepare a SIP later for EPA approval. BHE supports the opportunity for states to submit their own SIP to replace the proposed FIP, but unless EPA can approve the SIP prior to finalizing the Proposed Rule, the Proposed Rule will nevertheless force covered sources to begin compliance efforts almost immediately due to the incredibly tight timeframes in the rule. The tight deadlines for compliance in the Proposed Rule will essentially eliminate any reasonable opportunity for states to develop and EPA to approve a SIP in accordance with EPA's new approach to interstate transport unless EPA can commit to a more rapid review and approval process than it has conducted in the past.

For EPA's recognition of the states' authority to submit a replacement SIP to have any real meaning, EPA would need to move at least as quickly in reviewing and approving replacement SIPs as it has moved in imposing the federal plan contained in the Proposed Rule. In addition, states would need sufficient time to develop a replacement SIP, which would require the same kinds of complex analyses EPA conducted to develop the Proposed Rule. In the past, EPA has provided states sufficient time to implement the good neighbor provision via their own SIPs, and BHE asks EPA to do the same in this instance.

Regardless of timing, EPA should also acknowledge state authority to re-evaluate steps 3 and 4 of EPA's four-step methodology by identifying and implementing the measures needed to eliminate what EPA has defined to be a significant contribution to downwind receptors, rather than requiring states to

demonstrate that their measures, along with federal measures, will achieve reductions commensurate with installation of SCR on coal-fired EGUs by the 2026 ozone season. States are uniquely positioned to identify the right mix of requirements for the unique emission sources in their jurisdictions and to determine how best to align those requirements with other regulatory efforts that target some of the same units and pollutants, like regional haze. As long as a state can submit modeling to show that emission reductions from sources in its state will eliminate the downwind impact that EPA has defined as significant, its SIP should satisfy the requirements of the good neighbor provision and EPA must approve it.

**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA has put states in an impossible position by waiting to take action on SIP submittals that occurred in 2018 and basing such actions on modeling that has been consistently changing since 2018 and is still undergoing public comment. EPA quickly followed its proposed iSIP Disapproval with the proposed Federal Implementation Plan EPA will put in place as it is highly unlikely that states will have the time to revise their SIPs and resubmit them to EPA for consideration before the final Federal Implementation Plan will take effect. EPA must respect states' role in creating a compliant SIP.

**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The EPA prematurely prepared a proposed FIP before finalizing action on Texas' timely submitted SIP revision to address 2015 eight-hour ozone standard interstate transport requirements. Texas submitted its 2015 Ozone NAAQS Transport SIP Revision to the EPA on August 17, 2018. The EPA had over three years to review the SIP revision prior to proposing the February 22, 2022, disapproval of the FCAA, §110(a)(2)(D)(i)(I) interstate transport elements. Further, the EPA has developed a proposed FIP before the proposed disapproval is final. Under FCAA §110(c)(1), the Administrator shall promulgate a FIP at any time within two years *after* the Administrator "disapproves a State Implementation Plan in whole or in part, unless the State corrects the deficiency, and the Administrator approves the plan or plan revisions, before the Administrator promulgates such a Federal Implementation Plan." EPA has not yet disapproved the Texas transport SIP, and yet has clearly signaled that it intends to include Texas in such a FIP directly upon finalizing the disapproval action. Although the Supreme Court has recognized that "disapproval of a SIP, without more, triggers EPA's obligation to issue a FIP" and this action can occur "at any time" within those two years (*EPA v. EME Homer City Generation LP, et. al.*, 572 US 489, 490 (2014)),

24

in this instance EPA has not disapproved Texas' SIP. And unlike the fact pattern in EME Homer, Texas has not had an opportunity to challenge the EPA's disapproval of that SIP. Although EPA is under no obligation to wait two years to issue a FIP, it does have to comply with the congressional scheme. The disapproval of the SIP triggers EPA's authority to issue the FIP. In this case, EPA is indeed "altering Congress' SIP and FIP schedule." *Id.* at 491.

The EPA has conducted extensive work to include Texas in a proposed FIP to address interstate transport for Texas under the 2015 eight-hour ozone standard before disapproval of Texas SIP. Although the EPA proposed disapproving the Texas SIP submittal one month prior to the proposed FIP, there has been no final action on that proposal. Additionally, there was no indication from EPA during the years of work that went into the development of this FIP that the Texas SIP was inadequate, nor was Texas afforded any opportunity to correct the deficiencies that EPA believes are present in the SIP. Had the EPA reviewed the 2015 Ozone NAAQS Transport SIP Revision before developing a proposed FIP, the purpose of which is to correct deficiencies in such a SIP, Texas would have had the opportunity contemplated by the FCAA to correct any problems with its SIP in a timely fashion and avoid the imposition of the FIP.

This is clearly distinguishable from the argument in *EME Homer City* that was dismissed by the Supreme Court. The Court said that EPA did not have to give states an opportunity to correct a SIP before issuing the FIP. Instead, in the present case EPA is stating that they not only can, but "must necessarily be able to" propose a FIP before taking final action to disapprove a SIP. That was not the holding in *EME Homer City* and is inconsistent with the Congress' SIP and FIP schedule in the FCAA.

[…]

If the EPA had acted on the TCEQ's SIP submission in a timely manner, the only available data would have been the EPA's 2011-base modeling. Therefore, it is arbitrary and unreasonable for the EPA to evaluate the TCEQ's submission based upon data that was unavailable to the TCEQ during the development and submittal of its SIP revision.

**Commenter:** The Luminant Companies

**Commenter ID:** 44

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In satisfaction of its obligation under Section 110(a)(2)(D), TCEQ submitted a timely SIP revision addressing its good neighbor obligation for the 2015 ozone NAAQS on August 17, 2018. A SIP submittal is deemed complete by operation of law if EPA has not otherwise found the submittal to be insufficient within six months. Then, EPA has twelve months following a completeness determination to act on that SIP. Therefore, the Clean Air Act required EPA to approve or disapprove Texas's SIP no later than February 17, 2020. Rather than review Texas's submittal in a timely manner, EPA delayed its action beyond the statutorily prescribed deadline and developed non-statutory, post-hoc modeling and analyses by which it now proposes to judge Texas's submittal.

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

U. S. Steel respectfully notes that in its proposed disapproval, U.S. EPA made some critical errors and, therefore, we believe that in the spirit of cooperative federalism, that U.S. EPA reconsider the State submittals and approve the SIP submittals; or if U.S. EPA still finds deficiencies with the SIPs, that the states be given the opportunity to correct any asserted deficiencies before U.S. EPA proceeds with promulgating a final rule disapproving the SIPs and issuing a Federal Implementation Plan (FIP). It is significant to note that Congress contemplated States be given an opportunity to correct deficiencies with SIPs (before U. S. EPA proceeds with a FIP) when enacting the Clean Air Act. The actions in disapproving the SIP and proceeding with issuing a FIP (even before the SIP is disapproved) runs afoul of the process afforded to States and federal cooperative federalism.

[…]

<u>Even if the SIPs Did Not Satisfy EPA Approval Criteria, States Should be Given the Opportunity to Supplement the SIP Submittal or Otherwise Correct the Asserted Deficiencies Before U.S. EPA finalizes Disapproval of the SIP and Proceeds with a Federal Implementation Plan</u>

U. S. Steel notes that U.S. EPA's action in disapproving SIPs that were submitted to U.S. EPA years ago and now years later is proposing to disapprove the SIPs and not giving the State an opportunity to supplement the SIP submittal or otherwise correct the asserted deficiencies is inconsistent with Congress' intent for the Federal government and States to work collaboratively on ensuring the NAAQS are maintained.

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's Proposal to disapprove Arkansas's SIP while also promulgating a FIP is not the proper timing of rulemaking on this issue. EPA not allowing DEQ to submit revisions to the SIP, this action impairs the state's ability to make state specific analyses regarding over-reach on controls by EPA. DEQ should be permitted time to analyze, address and/or correct any deficiencies identified by EPA before finalizing a FIP. Although EPA might generally have the authority under Section 7410(c)(1)(B) to issue a FIP at any time prior to the 2-year deadline after disapproval (<u>EME Homer</u> S.Ct., 134 S.Ct. 1584 (2014)), nevertheless, CAA Section 7410(c)(1) contemplates that a state would be provided time to correct any deficiency and that EPA has the discretion to allow up to two years for correction of any deficiency.

26

EPA's determination about whether a FIP should be promulgated immediately as to a specific state should be based on a state-specific analysis since a State may bring a particularized, as-applied challenge to a nationwide or regional transport rule (EME Homer on remand, 795 F.3d 118 (D.C. Cir. 2015). EPA should not move to finalize the proposed FIP with respect to Arkansas until DEQ has been provided adequate time to review and respond.

**Commenter:** Utah Petroleum Association and the Utah Mining Association

**Commenter ID:** 48

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Utah relied on the guidance in good faith and EPA should honor that in good faith. If EPA persists on disavowing its still intact guidance, it should at a minimum offer Utah an opportunity to make corrections and updates to its IT SIP before imposing a FIP.

**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket IDs:** EPA-R05-OAR-2022-0006

**Comment:**

Timeframe allowed for state response to SIP Disapproval:

While the Clean Air Act (CAA) allows states up to 2 years from SIP disapproval to issue a response to EPA, the proposed FIP, with a scheduled final date of December 15, 2022, does not allow for that two-year commitment period to take place. We believe that Congress provided for that timeline for a reason. There are cases, such as this one, where is appears there are reasonable technical disagreements that should be fully evaluated and resolved before EPA moves on to the next step in the process.

**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket IDs:** EPA-R06-OAR-2021-0801

**Comment:**

Timeframe allowed for state response to SIP Disapproval:

While the Clean Air Act (CAA) allows states up to 2 years from SIP disapproval to issue a response to EPA, the proposed FIP, with a scheduled final date of December 15, 2022, does not allow for that two-

year commitment period to take place. Xcel Energy believes that Congress provided for that timeline for a reason. There are cases, like here, where is appears there are reasonable technical disagreements that should be fully evaluated and resolved before EPA moves on to the next step in the process.

*Response*

As a general matter, the EPA disagrees that the EPA is forgoing the process required by statute, or that the EPA is taking "accelerated action" on interstate transport state implementation plans (SIPs) for the 2015 ozone NAAQS. See Section V.A.1. of the preamble for responses to comments related to the relationship between timing of proposals to disapprove SIPs and promulgate federal implementation plans (FIPs), Section V.A.2. of the preamble for responses to comments related to requests for more time to revise SIP submissions, and Section V.A.3. of the preamble for responses to comments related to alleged harms to states caused by time between SIP submission and the EPA's action.

Some commenters argue that the EPA should approve the SIP submissions. However, the EPA disagrees that the SIP submissions for any state included in this final rule provided an approvable interstate transport analysis or adequate provisions to eliminate significant contribution or interference with maintenance. Rather, following review of comments received on the proposed notices and in consideration of all additional data made available through the notice and comment process, the EPA finds the SIP submissions covered by this action are deficient to address the statutory requirements of the Clean Air Act (CAA), as detailed in the proposals and reiterated in this final action. See generally preamble Section IV.

In response to PacifiCorp's claim that EPA has historically "provided states sufficient time to make corrections or submit additional clarifications if necessary to achieve the good neighbor provision via their own SIPs" which points to the EPA's approval of Wyoming's prong 2 good neighbor SIP for the 20188 ozone NAAQS, the EPA notes that the EPA initially disapproved prong 2 of Wyoming's 2008 ozone NAAQS good neighbor SIP submission. 82 FR 9153 (February 3, 2017). EPA later approved a subsequent submission from Wyoming addressing prong 2, which the state submitted on October 17, 2018. 84 FR 3389 (February 12, 2019, signed February 6, 2019). CAA section 110(c)(1) requires EPA to promulgate a federal implementation plan (FIP) "at any time within 2 years" after disapproving a SIP submission, unless the State corrects the deficiency, and the EPA approves the plan. In the case of Wyoming for the 2008 ozone NAAQS, the state submitted, and the EPA approved, a SIP, so the EPA did not promulgate a FIP. While EPA generally seeks to work with states on the development of approvable SIPs, the timing depends on each situation and is always subject to the procedural requirements and deadlines of CAA section 110 as well as ensuring the substantive requirements of the Act will be met.

The EPA notes in response to PacifiCorp's comment that the Agency is not taking final action on Wyoming's good neighbor SIP submission for the 2015 ozone NAAQS in this action and also that the EPA is not using the proposed FIP (87 FR 20036; April 6, 2022) as a benchmark for any state in this final action.

The EPA notes in response to Xcel's comment that no consent decree established a deadline for the EPA to finalize a 2015 ozone NAAQS good neighbor FIP for any state by December 15, 2022.

Other issues raised by these comments are addressed in Sections II.C, III, and V.A.4 of the preamble and in the following sections: Sections 1.3 (Attachment A to the March 2018 Memorandum), 1.4 (Use of Updated Modeling), 1.6 (EPA Input During SIP Submission Development), 1.7 (Length of Comment Period), 4 (Air Quality Modeling), 5 (Updates to Modeling and Changes in Linkages), 9.2 (Over-Control), 10.3 (Cooperative Federalism and the EPA's Authority), 10.6 (Allegation that Disapprovals of Western State SIP Submissions was Predetermined), 11.6 (Economic Impacts), and 11.12 (Consent Decrees).

## 1.2   Guidance for SIP Submissions

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

[T]he Air Program notes that EPA has not ever provided any guidance on what an appropriate step-3 analysis would entail, which makes any decision where it rejects a step-3 analysis arbitrary and capricious.

[…]

EPA has offered no guidance to states on developing step-3 demonstrations in their good neighbor SIPs.

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In the Proposed Rule, EPA seeks comment on rescinding recommendations presented to states in EPA's March 2018 Memorandum upon which many states relied in their analyses. By changing the rules so late in the game, EPA has left its partner states with no room for participation in the implementation process. Ultimately, a state that was unresponsive to obligations set in motion by the 2015 ozone NAAQS would be in the same position as any other state that submitted a well supported Transport Plan.

**Commenter:** Maryland Department of the Environment

**Commenter ID:** 29

**Docket ID:** EPA-R03-OAR-2021-0872

**Comment:**

EPA has not developed any official guidance on the necessary elements or analysis that a state is required to submit as part of an approvable Good Neighbor SIP. It is unreasonable for EPA to propose to disapprove Maryland's 2015 Good Neighbor SIP, in part, on the basis that Maryland did not submit a "sufficient technical evaluation" that is not defined, mandated, or required.

The Good Neighbor SIP has been a required SIP element since the implementation of the 1997 8- hour ozone standard. In the intervening 24 years, EPA has issued no official guidance for states to use in developing an approvable Good Neighbor SIP. It is unclear what standard or criteria EPA uses to determine approvability. The lack of guidance allows EPA broad latitude to disapprove SIPs for a variety of reasons and disincentivizes states from submitting a required CAA element. Inevitably, the lack of guidance creates an uneven playing field between the states.

The only direction EPA has supplied is a March 2018 memorandum entitled *Information on the Interstate Transport Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)*. This memo included an extended discussion on potential flexibilities in analytical approaches that states *could* use in developing their Good Neighbor SIPs. EPA stated:

> ...*EPA is open to alternative frameworks to address good neighbor obligations or considerations outside the four-step process. The purpose of this attachment [Attachment A] is to identify potential flexibilities to inform SIP development and seek feedback on these concepts*. EPA is not at this time making any determination that the ideas considered below are consistent with the requirements of the CAA, nor are we specifically recommending states use these approaches. Determinations regarding states' obligations under the good neighbor provision would be made through notice-and-comment rulemaking.

The potential flexibilities included nearly 20 alternate analytical approaches for states to use in their Good Neighbor SIPs. However, as EPA made clear, the document and accompanying flexibilities was not a final determination on an approvable Good Neighbor SIP structure, and final determinations on any flexibilities in a state's SIP would be made through notice-and-comment rulemaking on that submittal.

[...]

The only thing states have to rely on is the four-step framework that EPA uses to assess interstate transport. EPA has never expounded upon what elements are required to ensure an approvable SIP in each of the four steps. States are thus left to address each of the four steps as best they can.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851

**Comment:**

EPA improperly asserts that its three 2015 ozone NAAQS Good Neighbor SIP flexibility guidance memoranda should no longer be considered applicable to development of the SIPs that are the subject of its proposed disapprovals.

In 2018, EPA published three guidance documents describing the process by which states could incorporate various "flexibilities" into their Good Neighbor SIPs. All of the documents were issued by the USEPA, Director of Office of Air Quality Planning and Standards Peter Tsirigotis.

The March 27, 2018, Tsirigotis memo, styled "Information on Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards Under Clean Air Act Section 110(a)(2)(D)(i)(I)," was addressed to EPA Regional Air Directors in all EPA Regions.  The memo states,

> [t]he purpose of this memorandum is to provide information to states and the Environmental Protection Agency Regional offices as they develop or review state implementation plans (SIPs) that address section 110(a)(2)(D)(i)(I) of Clean Air Act (CAA), also called the "good neighbor" provision, as it pertains to the 2015 ozone National Ambient Air Quality Standards (NAAQS). Specifically, this memorandum includes EPA's air quality modeling data for ozone for the year 2023, including newly available contribution modeling results, and a discussion of elements previously used to address interstate transport. In addition, the memorandum is accompanied by Attachment A, which provides a preliminary list of potential flexibilities in analytical approaches for developing a good neighbor SIP that may warrant further discussion between EPA and states.

The August 13, 2018, Tsirigotis guidance memo, styled "Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards," also was addressed to EPA Regional Air Directors in all EPA Regions. The memo states,

> "[t]he purpose of this memorandum is to provide analytical information regarding the degree to which certain air quality threshold amounts capture the collective amount of upwind contribution from upwind states to downwind receptors for the 2015 ozone National Ambient Air Quality Standards (NAAQS). It also interprets that information to make recommendations about what thresholds may be appropriate for use in state implementation plan (SIP) revisions addressing the good neighbor provision for that NAAQS . . . [t]his document does not substitute for provisions or regulations of the Clean Air Act (CAA), nor is it a regulation itself. Rather, it provides recommendations for states using the included analytical information in developing SIP submissions, and for the Environmental Protection Agency (EPA) Regional offices in acting on them. Thus, it does not impose binding, enforceable requirements on any party. State air agencies retain the discretion to develop good neighbor SIP revisions that differ from this guidance.

31

The October 19, 2018, Tsirigotis guidance memo is titled "Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 11 0(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards," also was addressed to EPA Regional Air Directors in all EPA Regions. As in the first two memoranda, the memo stated,

> [t]he purpose of this memorandum is to present information that states may consider as they evaluate the status of monitoring sites that the Environmental Protection Agency (EPA) identified as potential maintenance receptors with respect to the 2015 ozone national Ambient Air Quality Standards (NAAQS) based on EPA' s 2023 modeling. States may use this information when developing state implementation plans (SIPs) for the 2015 ozone AAQS addressing the good neighbor provision in Clean Air Act (CAA) section 110(a)(2)(D)(i)(I). In brief this document discusses (1) using alternative technical methods for projecting whether future air quality warrants identifying monitors as maintenance receptors and (2) considering current monitoring data when identifying monitoring sites that although projected to be in attainment as described below, should be identified as maintenance receptors because of the risk that they could exceed the NAAQS due to yearto-year (i.e., inter-annual) variability in meteorological conditions.(emphasis added).

In the ensuing two years and six months since the last guidance document was published, EPA has known that states might be incorporating the 2018 guidance into Good Neighbor SIP submittals and has made no public statement saying that it would not honor its guidance. Moreover, all of the subject 19 Good Neighbor SIPs have been pending before the Agency between two and one-half and almost four years with only one proposed action by EPA – the proposed approval of Iowa's Good Neighbor SIP that incorporated the 2018 guidance in a March 2, 2020, proposal at 85 Fed. Reg. 12,232. Now, nearly three years after the first Tsirigotis memo was published and two and a half years after the last published, EPA is attempting to assert that these documents are archival in nature and trying to walk back the proposed Iowa approval (*See* 87 Fed. Reg. 9,477, February 22, 2022).

As EPA states in the proposed disapproval notices for Illinois, Indiana, Michigan, Minnesota, Ohio, and Wisconsin (87 Fed. Reg. 9,838 at 9,841)):

> In the March, August, and October 2018 memoranda, the EPA recognized that states may be able to establish alternative approaches to addressing their interstate transport obligations for the 2015 8-hour ozone NAAQS that vary from a nationally uniform framework. The EPA emphasized in these memoranda, however, that such alternative approaches must be technically justified and appropriate considering the facts and circumstances of each state's submittal.  In general, the EPA continues to believe that deviation from a nationally consistent approach to ozone transport must be substantially justified and have a well-documented technical basis that is consistent with relevant case law. Where states submitted SIPs that rely on any such potential "flexibilities" as may have been identified or suggested in the past, the EPA will evaluate whether the state adequately justified the technical and legal basis for doing so.
>
> EPA notes that certain concepts included in an attachment to the March 2018 memorandum require unique consideration, and these ideas do not constitute Agency guidance with respect to transport obligations for the 2015 ozone NAAQS. Attachment A to the March 2018

32

memorandum identified a "Preliminary List of Potential Flexibilities" that could potentially inform SIP development. However, EPA made clear in that Attachment that the list of ideas were not suggestions endorsed by the Agency but rather "comments provided in various forums" on which the EPA sought "feedback from interested stakeholders." Further, Attachment A stated, "EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches." Attachment A to the March 2018 memorandum, therefore, does not constitute Agency guidance, but was intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders. To the extent states sought to develop or rely on these ideas in support of their SIP submittals, EPA will thoroughly review the technical and legal justifications for doing so.

This disavowal of EPA's guidance this late SIP development process is an arbitrary abuse of authority. The Administrative Procedures Act allows federal agencies such as EPA to issue guidance without following rulemaking procedures. 5 U.S.C. § 553. Although Agency guidance is not binding on regulated parties, such parties are permitted to rely on Agency guidance as the Agency's public statement of how it intends to construe the statutes and rules it governs. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96–97 (2015). Indeed, Tsirigotis expressly notes in his 2018 memos that states could rely on the information provided in the memos, including the "alternative technical methods" authorized by the memos, when developing their SIPs in compliance with CAA Good Neighbor Provisions.

Once an agency issues guidance to regulated parties, the agency cannot "simply disregard" the substance of its guidance and rely on "post hoc justifications" when deciding whether regulated parties have acted in accordance with such guidance. *Hoosier Env't Council v. Nat. Prairie Indiana Farmland Holdings, LLC*, No. 4:19-CV-71 DRL-JEM, 2021 WL 4477152, at **13, 16 (N.D. Ind. Sept. 29, 2021). Doing so constitutes an arbitrary and capricious action by the agency. Id. at *17. By waiting for years and until after states complied with EPA's 2018 guidance to backtrack on the guidance, add a new requirement, not in the guidance, that alternative methods used by states in their SIPs must be "substantially justified and have a well-documented technical basis," and disapprove SIPs on that basis, EPA is engaging in arbitrary and capricious actions. EPA should alter its position and encourage states to take advantage of these flexibilities, as appropriate, and to incorporate these guidance flexibilities into their Good Neighbor SIPs.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

In the ensuing period of time since the last guidance document was published, EPA has known that states might be incorporating the 2018 guidance into Good Neighbor SIP submittals and has made no public statement saying that it would not honor its guidance.

**Commenter:** Ohio Utilities and Generators Group

**Commenter ID:** 36

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

US EPA's proposed disapproval is inconsistent with its own guidance.


**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Oklahoma objects to the proposed disapproval. This objection is based on many reasons, generally including the unfair outcomes for states created by EPA's refusal to acknowledge and apply in good faith legitimate guidance memoranda issued by EPA in 2018.

[…]

In 2018, EPA's Office of Air Quality Planning and Standards Director, Peter Tsirigotis, issued three memoranda regarding SIP development for interstate transport for the 2015 ozone NAAQS. These memoranda were held out to states as providing possible guidance for development of ozone transport SIPs, and states relied on these memos accordingly. Notably, states' infrastructure SIPs for the 2015 ozone NAAQS, including the transport portion of the SIP, were due to EPA on October 1, 2018. Yet, EPA issued these memos in March, August, and October of 2018. The October EPA memo was issued *after* the deadline for SIP submittal.

[…]

EPA's failure to recognize its own guidance, and the predicament it has now put states in that face a SIP disapproval and subsequent FIP, undermines the cooperative nature of the EPA-state relationship.

[…]

EPA has, without explanation, arbitrarily and capriciously changed its policy position through its refusal to acknowledge the legitimacy of states' good faith reliance on EPA guidance memoranda.

[…]

During the preparation of its SIP, a state agency cannot move forward unless the flexibilities, design values, and general guidance offered in the memos may be relied upon

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA's rejection of flexibilities identified by its own Guidance is arbitrary and not well founded.

States have wide discretion in determining how to achieve the NAAQS, including their interstate transport obligations, and EPA cannot force the states to adopt approaches reflecting the Agency's policy preferences. A "SIP basically embodies a set of choices . . . that the state must make for itself in attempting to reach the NAAQS with minimum dislocation."[65] EPA also cannot substitute its own judgment or a one-size-fits-all approach for that of the states when crafting a SIP, as the courts have recognized over and over. This is especially true when a state's SIP relied on guidance put forth by EPA.

[65] *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777, 780–81 (3rd Cir. 1987); *see also Com. of Virginia.*, 108 F.3d at 1410 (CAA Section 110 "does not enable EPA to force particular control measures on the states.").

**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The EPA failed to issue guidance in a timely manner for states to use in developing transport SIP revisions for the 2015 eight-hour ozone NAAQS. It is unreasonable and arbitrary for the EPA to require state SIP revisions to include recommendations from memoranda and/or guidance issued after states have submitted their revisions.

Developing a SIP revision is a years long process that requires complex technical analysis and compliance with lengthy procedural requirements. Texas timely submitted its 2015 Ozone NAAQS Transport SIP Revision on August 17, 2018, to meet the October 1, 2018, statutory deadline for states to submit infrastructure and transport SIP revisions for the 2015 eight-hour ozone NAAQS. Thirty-one days before the SIP revisions were statutorily required to be submitted, the EPA issued its Analysis of Contribution Thresholds Memo on August 31, 2018. Eighteen days after this statutory deadline, the EPA further issued its Considerations for Identifying Maintenance Receptors Memo (Maintenance Receptor Guidance) on October 18, 2018. It is unreasonable and arbitrary for the EPA to expect, much less require, that states comply with the recommendations in these guidance documents that were issued either days before the deadline or after the deadline considering that SIP revisions are complex and time consuming endeavors.

Texas' transport SIP revision was developed prior to these late issued EPA memos. Texas reasonably relied on EPA's September 13, 2013, guidance on development and submission of infrastructure SIPs

35

since that was the only formal guidance available at the time to assist Texas in development of its SIP revision in order to meet the statutory deadline for submittal.

In order to meet statutory deadlines, states do not have the option of waiting for the EPA to provide updated guidance before proceeding with SIP development, review, and submittal; states must proceed to develop submittals based on information available at the time. It is unreasonable to expect states to review and/or incorporate recommendations after a SIP revision has been submitted. As a result of the EPA's lack of timely updated transport guidance for the 2015 eight-hour ozone standard, Texas was forced to expend effort and resources to develop its SIP revision without fully knowing how the EPA would evaluate Texas' transport obligation.

The EPA has previously taken the position that failure to timely submit a SIP revision is sufficient reason for the EPA to issue a FIP. Therefore, states must diligently develop SIP revisions to meet those statutory deadlines. The EPA's failure to update its guidance in a timely manner for the development of transport SIP revisions was arbitrary and unreasonable because states cannot delay and must develop these revisions with guidance currently available. The EPA's actions put states in the untenable position of developing SIP revisions without knowing what the EPA might expect, or simply accepting that EPA will impose its own requirements in a potential FIP. This is an absurd result of the EPA's failure to issue timely guidance.

Finally, guidance documents are non-binding recommendations that have not gone through formal rulemaking. The EPA has consistently failed to promulgate a rule that would instruct states in how, exactly, they should evaluate and meet potential transport actions, much less provide such a rule in a timely fashion that would allow states to meet the statutory requirement to demonstrate they have met their transport obligations within three years of promulgation of a new standard. For example, the EPA could have included criteria for evaluating transport obligations in the promulgation of the 2015 ozone NAAQS itself, and yet made no mention of how states should consider or meet transport obligations. In the absence of either such a rule, or even timely guidance, states such as Texas have tried to meet a target that the EPA has not defined. Furthermore, if the EPA had proposed and finalized a rule that specified requirements for transport at the same time that it proposed or even when it finalized the 2015 ozone NAAQS, states would have been able to evaluate such requirements and provide appropriate feedback to the EPA on any such rule. That is the purpose of the rulemaking process. The EPA's failure to provide states this opportunity through the rulemaking process without the threat of an already proposed FIP continues to circumvent the cooperative federalism structure that Congress developed in the FCAA.


**Commenter:** West Virginia Department of Environmental Protection

**Commenter ID:** 49

**Docket ID:** EPA-R03-OAR-2021-0873

**Comment:**

During the three years following DAQ's SIP submittal and EPA's failure to timely review it, which culminated in this proposed disapproval, EPA reevaluated and modified without communication to states what it considers as acceptable "necessary provisions" to meet the requirements of the 2015 Ozone Good Neighbor SIP. DAQ contends it is impossible for states to predict, much less meet, SIP requirements which are in constant fluctuation, poorly or not defined, and never acted upon by EPA.

Historically DAQ prepared and assembled state implementation plans per a generally standardized acceptable structure that included the four-step interstate framework. DAQ utilized this format when it assembled the WV 2015 Ozone Good Neighbor SIP per the 2018 SIP Interstate Transport Information Memorandum. EPA's apparent abandonment of the standard in this disapproval perplexes DAQ and further underscores EPA's inability to timely communicate required shifting SIP structure to the states. This disfunction violates cooperative federalism and lends uncertainty to the states and the regulated community.

*Response*

See Section V.A.6. of the preamble for the EPA's general responses to these comments.

In response to Arkansas Department of Environmental Quality, the EPA clarifies that the EPA took comment on rescinding the August 2018 Memorandum, and that all states must comply with CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS.

In response to Midwest Ozone Group, the EPA did in fact formally rescind the first proposed approval of Iowa's good neighbor SIP submission. 87 FR 9477 (February 22, 2022). The EPA re-proposed and finalized an approval of Iowa's good neighbor SIP on an entirely different basis. 87 FR 9477 (February 22, 2022); 87 FR 22463 (April 15, 2022).  This was explained at proposal. *See, e.g.*, 87 FR 9498, 9509 (February 22, 2022). Midwest Ozone Group is incorrect about the number of actions the EPA has taken through April 2022 on good neighbor SIP submissions for the 2015 ozone NAAQS; the EPA also approved 23 good neighbor SIP submissions through that time, which is detailed in Section V.A.1 of the preamble.

Other issues raised by these comments are addressed in Sections II.D., V.B.2., V.B.3. and V.B.7. of the preamble and the following sections: Sections 1.4 (Use of Updated Modeling), 5 (Updates to Modeling and Changes in Linkages), 6.4 (October 2018 Memorandum), 7.4 (August 2018 Memorandum), 8.1 (Determination of Significant Contribution), 10.2 (SIP Call), and 10.3 (Cooperative Federalism and the EPA's Authority).

## 1.3   Attachment A to the March 2018 Memorandum

*Comments*

**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

37

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

States Have Significant Discretion to Determine Measures Needed to Fulfill Their Interstate Transport Obligations.

Section 110(a)(2)(D)(i)(I) of the CAA requires states to address interstate transport by preparing SIPs that "contain adequate provisions prohibiting . . . any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard." This language leaves substantial discretion to the states in determining both their significant contributions and the reduction measures necessary to eliminate them.

EPA has recognized, in guidance, that states have discretion to apply their own analyses to both assess and address their interstate transport obligations—in its March 2018 Guidance, EPA explicitly noted that "in developing their own rules, states have flexibility to follow the familiar four-step transport framework (using EPA's analytical approach or somewhat different analytical approaches within these steps) or alternative frameworks, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA." EPA also evaluated certain flexibilities proposed by states and other stakeholders, consistent with EPA's "guiding principle" of "supporting states' position as 'first actors' in developing SIPs that address section 110(a)(2)(D) of the CAA." While EPA emphasized that it was not concluding that the particular flexibilities assessed were consistent with the requirements of the CAA, these flexibilities demonstrate the broad range of analyses states can conduct that can fulfill interstate transport obligations. Further, EPA recognized broad state flexibility in its Proposed Disapproval, noting that "EPA has not prescribed to states any specific methodology for developing SIP submissions."

In performing its limited oversight role under the CAA, EPA cannot substitute its own judgment for that of the states, and in particular, cannot "force particular control measures on the states."

**Commenter:** Hagerty, Logan

**Commenter ID:** 22

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

One common issue prevented several of the five states from drafting an adequate SIP. The states sharing this common issue were Illinois, Michigan, and Ohio. The issue was a document titled "Attachment A to the March 2018 Memorandum." The states erroneously used this EPA-provided memorandum as justification for how their SIPs met the EPA standards. The modeling data within that memorandum was only intended to "generate further discussion around potential approaches to addressing ozone transport among interested stakeholders." The proposed rule also states the

38

memorandum included a provision that the memorandum was not intended to be a formal determination in meeting required components of an SIP.

If Attachment A to the March 2018 Memorandum is easily understood to not be agency guidance in drafting an SIP, there are two explanations as to why Illinois, Michigan, and Ohio committed this large error. Either (1) state environmental offices recognized this Memorandum was not agency guidance and intentionally used it to create an invalid SIP, or (2) the state agencies unintentionally used the Memorandum as guidance owed to a lack of clarity of the part of the EPA. The latter explanation seems more likely, because all the states who misused the 2018 Memorandum are in EPA Region 5.

**Commenter:** Idaho Power Company

**Commenter ID:** 23

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA has recognized in guidance that states have discretion to apply their own analyses to both assess and address their interstate transport obligations—in its March 2018 Guidance, EPA explicitly noted that "in developing their own rules, states have flexibility to follow the familiar four-step transport framework (using EPA's analytical approach or somewhat different analytical approaches within these steps) or alternative frameworks, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA."

EPA also evaluated and approved certain flexibilities proposed by states and other stakeholders, consistent with EPA's "guiding principle" of "supporting states' position as 'first actors' in developing SIPs that address section 110(a)(2)(D) of the CAA." While EPA emphasized that it was not concluding that the particular flexibilities assessed were consistent with the requirements of the CAA, these flexibilities demonstrate the broad range of analyses states can conduct that can fulfill interstate transport obligations. Further, EPA recognized broad state flexibility in its Proposed Disapproval, noting that "EPA has not prescribed to states any specific methodology for developing SIP submissions."

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

As EPA stated in the March 2018 Tsirigotis Memo, the memo was intended to be used not only by states, but as guidance for the EPA regions, as well. Generally, staff from the states and regions work together in developing SIP submittals and, accordingly, states provide EPA regional staff with periodic updates on progress toward SIP submittals. During the development process of Oklahoma's ozone transport SIP, Oklahoma discussed with EPA Region 6 its intent to use the flexibilities offered in the

Tsirigotis memos. Therefore, during the final stages of SIP development in 2018, EPA Region 6 was on notice of Oklahoma's intent to use the flexibilities offered in the Tsirigotis memos.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA published the Flexibility Guidance in 2018 to assist the states with developing their SIPs, and again, Utah relied on that guidance. The Guidance emphasized that flexibility is allowed when developing a good neighbor SIP:

> states have flexibility to follow the familiar four-step transport framework (using EPA's analytical approach or somewhat different analytical approaches within these steps) or alternative frameworks, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA. . . . Over the next few months, EPA will be working with states to evaluate potential additional flexibilities for states to consider as they develop their good neighbor SIPs for the 2015 ozone NAAQS. Attachment A provides a preliminary list of potential flexibilities that may warrant additional discussion. *EPA looks forward to discussing these and other potential flexibilities with states over the next few months, which will help inform states' development of their good neighbor SIP submittals.* [(emphasis added)]

The list of potential flexibilities included "identify[ing] the emissions reductions (if any)" from a downwind state that could "prevent an identified upwind state from contributing significantly to those downwind air quality problems" in the Step 3 analysis. The Attachment A flexibilities also included analyzing the impact of international emissions on the downwind state.

Again, Utah (and numerous other states) followed EPA's suggestions in the Flexibility Guidance to consider "the relatively large impact of so-called 'uncontrollable' emissions (i.e., international and non-anthropogenic emissions) and home state emissions at the Colorado receptors, as well as emissions reductions already achieved as a result of other regulatory programs." EPA agrees that these factors were identified in Attachment A to the Flexibility Guidance, and EPA has recognized the flexibility afforded to states in developing good neighbor provisions in this and other guidance documents.

Nonetheless, EPA rejected Utah's analysis of each of the flexibilities without informing any of the states that it had changed course and would not accept the considerations listed in Attachment A. And this rejection came too late for Utah to make adjustments or provide additional information in response. For example, Attachment A recommended considering international emissions and "the role of background ozone levels [to] appropriately account for international transport." Attachment A also suggested that "air quality, cost, or emission reduction factors **should be weighed differently** in areas where international contributions are relatively high." Utah analyzed this factor, reasonably determining that international emissions contributed in excess of 50% of ozone at the subject monitors and that such "relatively high" international contributions should be considered in Step 3.

40

But EPA now says the "flexibilities could not be considered by the states," and specifically states that international emissions and "other non-anthropogenic" emissions are "*irrelevant*." After informing the states that they could, even should, consider international emissions, EPA now, without warning or notice, says its guidance is "irrelevant". Such actions are arbitrary and capricious.

In the Proposed Disapproval, EPA treated the other considerations Utah relied on in the Step 3 analysis in a similar fashion. Utah considered another "flexibility" from the Flexibility Guidance – the "current and projected local emissions and whether downwind areas have considered and/or used available mechanisms for regulatory relief," and determined that this factor impacted Utah's good neighbor SIP analysis. Again, EPA now finds these in-state emissions are not "relevant" for the Denver area nonattainment receptors. This about face was all the more shocking to Utah because it had worked closely with EPA throughout developing and submitting what it had been assured was an approvable SIP. EPA has rejected the use of these "flexibilities" in numerous SIP disapproval actions across the country, catching state after state by surprise.

**Commenter:** Utah Division of Air Quality

**Commenter ID:** 47

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The UDAQ disagrees with EPA's disapproval of the SIP for the following reasons. First, through coordination with EPA Region 8, UDAQ developed and submitted what the agency thought to be a fully approvable SIP that met EPA's guidance and requirements at the time. The EPA's change of position at these late stages of the SIP process wastes the state's resources and time devoted to this rulemaking.

**Commenter:** West Virginia Department of Environmental Protection

**Commenter ID:** 49

**Docket ID:** EPA-R03-OAR-2021-0873

**Comment:**

DAQ contends that at the time of submittal the WV 2015 Ozone Good Neighbor SIP contained all "necessary provisions" as were then currently required by EPA to constitute an approvable SIP. DAQ utilized the March 27, 2018 EPA memorandum guidance from Office of Air Quality Planning and Standards ("OAQPS") Director Peter Tsirigotis titled *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)* ("2018 Interstate Transport SIP Information Memorandum" and included as Appendix C of the SIP) during preparation of the SIP. During the three years following DAQ's SIP submittal and EPA's failure to timely review it, which culminated in this proposed disapproval, EPA

41

reevaluated and modified without communication to states what it considers as acceptable "necessary provisions" to meet the requirements of the 2015 Ozone Good Neighbor SIP.

*Response*

Attachment A to the March 2018 Memorandum is not Agency guidance. See Sections II.D and V.B.2 of the preamble for the EPA's general response to these comments.

In response to comments from West Virginia Department of Environmental Protection, the EPA's explanation of the deficiencies in West Virginia's SIP submission were explained at proposal. See 87 FR 9524-9532 (February 22, 2022). In response to PacifiCorp, the EPA's explanation of the deficiencies in Nevada's SIP submission were explained at proposal. See 87 FR 31492-31494 (May 24, 2022).

Other issues raised by these comments are addressed in Section V.C.2. of the preamble and in Sections 1.6 (EPA Input During SIP Submission Development), 4.2 (Model Performance), 5 (Updates to Modeling and Changes in Linkages), 10.3 (Cooperative Federalism and the EPA's Authority), and 11.4 (Transport Policy – Western State Ozone Regulation).


## 1.4   Use of Updated Modeling


*Comments*


**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

The Air Program notes that EPA's proposed disapproval goes on to point out that the updated modeling has identified four additional receptors (all in the Lake Michigan area) that Missouri is now linked to. These receptors were not identified as linked receptors in the previous modeling relied upon in our SIP submission. EPA uses this as further evidence to justify their proposed disapproval. This sleight-of-hand move by EPA is a direct attack on Missouri's right to develop its own SIP. If EPA is going to move the target more than two years after the submission is made and use that tactic to justify its action, then a proposed disapproval cannot be the appropriate action. [...] Such action would instead favor stripping states of their rights and imposing hundreds of millions of dollars in compliance costs without adequate justification or the opportunity for states to update and retain control over their SIP. For these reasons, EPA must withdraw the proposed disapproval and take action to approve Missouri's submission.


**Commenter:** Alabama Department of Environmental Management

42

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

ADEM submitted its 8-hr Ozone iSIP in August 2018, and after that date several rounds of additional modeling were performed evaluating the impacts of upwind States on predicted future nonattainment and maintenance monitors, including modeling in both 2021 and 2022 for the 2023 and 2026 future years. This modeling was based on data that EPA collected, analyzed and published years after Alabama's submittal. In an effort to quickly provide a SIP based on the newer modeling (February 2022), ADEM rescinded the 2018 SIP, and presented EPA with a revised SIP, including a Weight of Evidence (WOE) argument based on the readily available data.

[…]

The revised SIP package was submitted largely because of the impossible task of evaluating the revised modeling, given the time and resources involved. EPA cannot expect States to evaluate future scenarios when submitting SIPs, especially when the modeling is performed years after the original SIP submission is made.

Additionally, it should be noted that the purpose of an iSIP is to verify that the State has the authority to address the regulations of the Clean Air Act (CAA), not to determine if, and by how much, an upwind State may impact a downwind monitor. If EPA intended to use updated modeling to assess impacts at future nonattaining and maintenance receptors, a call for plan revisions should have occurred, allowing EPA to incorporate and rely on modeling and monitoring data, while providing States the opportunity to review the data and incorporate any changes, if needed, without the need for a FIP call.

Further, based on the timeline after submittal of the 2018 SIP, EPA did not meet its statutory review time to determine completeness, which should have taken place in February 2020. Given that the modeling, which EPA is basing the disapproval on, was not available until February 2022, EPA cannot hold States to an impossible standard when developing SIPS.

**Commenter:** Alabama Power Company

**Commenter ID:** 03

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Notably, EPA's proposal to rely on recent analysis and data not available to the state either at the time of its SIP submission or during EPA's statutory review period is unfair to the state. Just as "[a]gency actions must be assessed according to the statutes and regulations in effect at the time of the relevant activity," EPA's approval or disapproval of a SIP should adhere to the guidance, data, and evidence available and on the record at the time of EPA's timely review of the SIP.[18] Under Section 110 of the Act, EPA has 12 months after its completeness determination to fully or partially approve, disapprove, or

conditionally approve the SIP.[19] Taking into account the time EPA is afforded to determine "completeness" of a SIP submittal, EPA had at most until the end of February 2020 to act on ADEM's SIP. The recent modelling EPA has decided to rely on in its current review of Alabama's 2018 SIP submittal was not available in February 2020. Nor has it been available for thorough and complete review and analysis by Alabama. EPA should not disapprove a SIP based on extra-record data not available either to the state during its development of the SIP nor to EPA during the period statutorily allotted for EPA to take final action on SIP submissions.[20]

[18] *Texas v. EPA*, 829 F.3d 405, 430 (5th Cir. 2016) (citing *Caring Hearts Pers. Home Servs., Inc. v. Burwell*, No. 14-3243, 2016 WL 3064870 (10th Cir. May 31, 2016)); *see also Wisconsin v. EPA*, 938 F.3d 303, 336 (D.C. Cir. 2019) (suggesting in dicta that the state may attack EPA's "reliance on data compiled after the SIP action deadline" in challenging EPA's disapproval of a SIP (but not if challenging the subsequent FIP)).
[19] 42 U.S.C. § 7410(k)(2)
[20] *See Sierra Club v. EPA*, 356 F.3d 296, 308 (D.C. Cir. 2004) ("To require states to revise completed plans every time a new model is announced would lead to significant costs and potentially endless delays in the approval process."). Where new information arises, and if the criteria applicable to the provision are satisfied, EPA can exercise its authority under section 7410(k)(5) to ensure SIPs satisfy the Act. This procedure guarantees states the opportunity to draft SIPs in light of any such new data or analysis, which would not be available if EPA could act on post-record material to disapprove a SIP.


**Commenter:** Ameren Missouri

**Commenter ID:** 05

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

USEPA has improperly proposed to disapprove of Missouri's good neighbor SIP based on modeling which was not in the SIP submittal and was unavailable to Missouri or the public during the development of the Missouri Good Neighbor SIP.


**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Timing of EPA's Proposed Rule.

EPA had all of the information necessary based on the best available science to approve the interstate component of the Arkansas Transport SIP submittal when its action was due on November 7, 2020. Yet, EPA Headquarters "red-lighted" work by the EPA regions on these submittals unless EPA's 2017 modeling results indicated that a state's overall contribution to identified nonattainment and maintenance areas was less than the threshold EPA had previously used to identify linkages for its Cross-State Air Pollution Rule FIP for the 1997 ozone NAAQS. It is DEQ's understanding that EPA regions did

not begin drafting actions on other submittals until after Downwinders at Risk, et al., sued EPA for failure to act within Clean Air Act time frames.

Had EPA reviewed the SIP in the timeframe required by federal law, the information available at the time—the same information that states used to inform their decisions—would have ensured that states did not waste time on robust analyses of available data for the purposes of making sound, evidence-based decisions. EPA stalled an evaluative action until the perceived "facts" of the situation changed such that timely state analyses were rendered outdated.

EPA released two "updates" for modeling that were not made available to states in a timeframe reasonable for inclusion in national program goals or state plans. 2016v1 was made available two years after state plans were due to EPA, but EPA contends this data is useful for determining design values and linkages to downwind areas (Step 1 of EPA's recommended four-step framework for evaluating interstate transport). EPA's 2016v2 modeling—which EPA now purports is the measuring rod by which state plans should be evaluated—was released by EPA to the states at the same time EPA was writing its proposed disapproval and proposed FIP. EPA thus moved the target on what should be evaluated for transport SIPs one and one-half years after the AR Transport SIP was deemed complete by EPA and four years after the SIPs were due.

[...]

EPA proposes to primarily rely on a different modeling platform (EPA's 2016 v2 modeling12) for its evaluation of Arkansas's SIP submittal instead of the modeling data that EPA made available to the states for development of the Transport SIPs for the 2015 ozone NAAQS (EPA's March 2018 Memorandum). The EPA's 2016v2 modeling platform was developed as an update to EPA's 2016v1 modeling platform. A 2011 modeling platform was used to generate the data provided to states for SIP development in the March 2018 Memorandum. Among other updates to 2016v2, this platform incorporated updated emissions data, which represent emissions for the 2016 base year, as well as projected emissions for the 2023, 2026, and 2032 future years. As ADEQ pointed out in its SIP submittal, different modeling platforms and inventory assumptions can yield different results. It is no surprise then that changing the modeling platform may yield different ozone source apportionment results. ADEQ finds that it is not reasonable for EPA to provide states with modeling data for use in SIP development only to perform new modeling years later and then tell states that their decision-making, which was based on the data available to them at the time is flawed.

[...]

If EPA believes insists that it must consider newer data in its review of state Transport SIPs, then DEQ requests that EPA correct its emissions inventories, rerun the model using the updated 2016v2 platform, and issue a Notice of Data Availability based on its updated modeling prior to finalizing action on the Arkansas Transport SIP.

[...]

DEQ expended hundreds of hours of staff time and other resources to perform a robust analysis and scientifically-based evaluation of the information that was available at the time of SIP development. EPA's disapproval moves the target on nonattainment and maintenance receptors that must be

evaluated by primarily relying on data that was not available to the state at the time of SIP development and was not available when EPA was statutorily required to act on the Arkansas Transport SIP. This conduct is inconsistent with the cooperative federalism framework for air quality protection under the Clean Air Act.

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In the Proposed Disapproval, EPA relied on a new modeling platform that was released years after Texas's timely SIP submittal and mere months before EPA proposed to deny Texas's SIP. Texas and the public had no notice of the post-statutory period analysis EPA intended to apply to determine whether to approve the SIP and now has no opportunity to evaluate EPA's new platform and associated analytical framework. In fact, the modeling files supporting EPA's new analysis were provided just days before the comment deadline on this action.

EPA's new modeling, which EPA used in an attempt to quantify Texas's "significant contribution," is not a lawful basis for disapproving Texas's SIP. Before finalizing its disapproval, EPA should provide Texas stakeholders an opportunity to evaluate the new modeling platform. The CAA grants states the primary authority to implement the NAAQS and allows EPA to step in only where the state has failed in its duty. Here, Texas did not fail in its duty. TCEQ relied on the most current information available to it at the time the SIP was drafted and timely submitted a complete SIP meeting the CAA's requirements and EPA should judge the SIP solely on that basis.

**Commenter:** Cleco Corporate Holdings LLC

**Commenter ID:** 14

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The Agency reviewed the Louisiana SIP, for which LDEQ relied on modeling data found in the March 27, 2018 guidance memorandum (March 27, 2018, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section (D)(i)(I)*), and used the 2016v2 emissions platform to evaluate the Louisiana SIP. The Technical Support Document for 2016v2 was not made available until 2022 which was after the Louisiana SIP submittal. In addition, EPA relied on the air quality modeling performed using CAMx version 7.10, which was released in January 2021. This release also took place after the Louisiana SIP was submitted.

46

Although EPA is issuing an invitation in the Proposal for public comment on the updated 2023 modeling, which uses the 2016v2 emissions platform, EPA should not rely on modeling and data that was not available at the time of the SIP submittal deadline and has not been updated based on public comment. Instead, EPA should evaluate the Louisiana SIP based on the modeling data referred to in the March 27, 2018 memorandum (March 27, 2018, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section (D)(i)(I))* and subsequent 2018 guidance documents. At least, EPA should incorporate needed revisions to the 2016v2 modeling platform based on comments provided by the states and other stakeholders as provided in this docket and then re-analyze the Louisiana SIP based on the updated/corrected modeling platform before issuing a final rule on the Louisiana SIP.

**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

Nevada adopted a broad and intentionally overinclusive approach to assessing its interstate transport obligations, using EPA's latest contribution modeling, released just months prior in March 2018, "to identify and quantify contributions greater than 0.5 percent of the 2015 ozone NAAQS resulting from Nevada's anthropogenic emissions" for further analysis. [. . .] Nevada relied on EPA's modeling, emphasizing that "[a]lthough models can always be refined and there may be differences in certain approaches to technical issues as the NDEP has commented, it is the NDEP's position that the USEPA's modeling is state-of-the-science given the USEPA's constraints."

Nevada reviewed its contributions to receptors in California and Colorado under this framework, considering relative intrastate contributions and overall interstate contributions. Based on this extensive analysis, Nevada determined that "the contribution of 2023 base case anthropogenic NOx and VOC emissions from sources within Nevada to any projected 2023 nonattainment or maintenance receptor at greater than 0.5 percent of the NAAQS is limited to two states, California and Colorado." However, for each of these receptors, "Nevada's contribution… [was] less than one percent of the 2015 ozone NAAQS," meaning that under EPA's own analytical approach, Nevada was not linked to downwind air quality problems and that no further reductions measures were necessary.

Despite Nevada's highly conservative assessment of its interstate transport obligations, EPA's Proposed Disapproval nevertheless concludes, based on new air quality modeling using the 2016v2 emissions platform, that Nevada is now linked to 2 receptors in Utah. Nevada's contribution to these receptors is between 0.86 ppb and 0.89 ppb, which falls below the 1 ppb linkage threshold determined by Nevada to be more appropriate for Western states, where "interstate contributions… are relatively small, especially given the large contributions from background and intrastate emissions." EPA unreasonably imposes its own analysis in evaluating Nevada's SIP, rather than determining whether Nevada's analysis was reasonable.

Further, EPA's analysis relies on modeling that was not available until 3 years after Nevada was required to submit its SIP revision in response to EPA's revision to the ozone NAAQS on October 1, 2015. Under the CAA, states are required to submit revised SIPs within 3 years after EPA revises the NAAQS. Nevada met this 3-year deadline by submitting its revised SIP on October 1, 2018, relying on modeling that EPA released just 6 months prior. Nevada specifically determined that EPA's data represented the "best available data with which to conduct Nevada's transport analysis," which EPA does not dispute in its Proposed Disapproval. Rather, EPA asserts that "[b]y using the updated modeling results, the EPA is using the most current and technically appropriate information for this proposed rulemaking." However, EPA fails to consider whether Nevada's analysis using the best available data at the time was reasonable and fails to even acknowledge the substantial change imposed by EPA's new modeling, increasing Nevada's contribution to Utah receptors from under 0.5% of the NAAQS to above EPA's 1% threshold.

**Commenter:** Environmental Federation of Oklahoma

**Commenter ID:** 20

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In particular, EFO supports DEQ's assessment that EPA has overstepped its authority by circumventing the normal SIP development and approval process in a number of ways, including but not limited to: … fourth, relying on data not available to the state for either review or use.

**Commenter:** Evergy, Inc.

**Commenter ID:** 21

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

EPA's updated modeling for Missouri identified four new receptors near Lake Michigan. This comes two years after the Missouri Department of Natural Resources (MDNR) Public submitted the Missouri SIP.

**Commenter:** Kentucky Division for Air Quality

**Commenter ID:** 25

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA's Use of Revised Modeling Data Not Available to States prior to Deadline for 2015 Infrastructure Submittal

At the time of Kentucky's final 2015 Ozone I-SIP submittal, there were several guidance documents from EPA as well as modeling data available to review and use for the Interstate Transport demonstration. Specifically, two memos from EPA's Office of Air Quality Planning and Standards (OAQPS), dated March 27, 2018, and August 31, 2018, were available. Additionally, EPA provided updated modeling information with the March 27, 2018 memo for states to consider in developing their Interstate Transport SIPs. Kentucky used the information provided in EPA's March 27, 2018 memo and associated modeling, and the recommended 1 part per billion (ppb) threshold from the August 31, 2018 memo to evaluate the impacts that Kentucky emissions may have on downwind monitors.

In the current action, EPA has proposed disapproval of Kentucky's Interstate Transport requirements of the I-SIP submittal based on a second version of newly modeled data that was not made available to Kentucky until well past the statutory deadline for Kentucky's I-SIP submittal and EPA's action regarding that submittal. Specifically, EPA states, "EPA must act on SIP submittals using the information available at the time it takes such action." In the spirit of cooperative federalism, Kentucky would appreciate and expect the opportunity to submit a revised SIP in accordance with the revised data and modeling, rather than having the SIP disapproved after the fact.

Identification of newly impacted monitors without opportunity for States to review and develop an appropriate SIP submittal

EPA is taking action to disapprove the remaining Interstate Transport portion of Kentucky's SIP submittal using newly updated data, specifically the 2016v2 platform, which was not available at the time of Kentucky's I-SIP submittal. Additionally, the monitors previously linked as being impacted by Kentucky have changed with the newly available data. Kentucky was not afforded the opportunity to evaluate the potential linkages or provide additional information regarding these potential linkages. Specifically, using the 2016v2 platform, EPA has identified the Bucks County, PA monitor and the New Haven, CT monitor as linked to Kentucky in using the newly updated data. The Bucks County, MD monitor was not listed as either a nonattainment or maintenance monitor in the modeling data provided with the March 2018 memo. As such, Kentucky was not afforded the opportunity to evaluate the potential impact of emissions for either area prior to submitting the 2015 Ozone I-SIP. An opportunity to submit a revised SIP would provide Kentucky with the ability to review the 2016v2 platform, as well as the data and modeling associated with the platform.


**Commenter:** Louisiana Chemical Association

**Commenter ID:** 26

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA failed to act on the Louisiana Transport SIP timely, which led to LDEQ and the EPA performing the required analysis under differing modeling data sets.

Pursuant to CAA §110(k), SIP submissions are deemed complete by operation of law six months after receipt by EPA. Thus, the Louisiana Transport SIP was deemed complete by operation of law on May 19,

49

2020. EPA must approve or disapprove, in whole or in a part, SIP submissions within 12 months of the SIP submissions being deemed complete. CAA §110(k)(2). Thus EPA was required to act on the Louisiana Transport SIP by May 19, 2021. EPA did not publish its proposed disapproval of the Louisiana Transport SIP until February 22, 2022, nearly a year after it was due. [footnote: EPA entered into a consent decree in the case of *Downwinders at Risk et al. v. Regan*, No. 21-cv-03551 (N.D. Cal), which required EPA to issue proposed rules to act on a number of pending 2015 ozone NAAQS interstate transport SIP submissions, including Louisiana's, by April 30, 2022. Under that consent decree, EPA agreed to take final action by December 15, 2022. The Consent Decree became effective upon by the Court on January 12, 2022.]. The deadlines in the CAA were purposefully enacted by Congress to prevent the exact situation that has arisen here – state reliance on current data and guidance being reviewed by an EPA that later has changed information, guidance, or methods.

The Louisiana Transport SIP relies on the 2023 modeling data released in the October 2017 Guidance and presented in the March 27, 2018 guidance document entitled: *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section (D)(i)(I)* ("2015 Ozone NAAQS Memo"). The EPA issued two more guidance documents, the August 2018 and October 2018 Guidance, which provide additional information to states developing interstate transport SIP submissions for the 2015 Ozone NAAQS.

One month before LDEQ submitted the Louisiana Transport SIP, EPA released an updated modeling platform using 2016-based emissions. The platform was developed by the National Emissions Inventory Collaborative. The EPA used the 2016v1 emissions inventory in its subsequent modeling to project ozone design values and contributions for 2023. Thereafter, the platform was updated as 2016v2. In addition to reviewing the Louisiana Transport SIP under the March 2018 Guidance, EPA used the 2016v2 emissions platform to evaluate the Louisiana Transport SIP. The Technical Support Document for 2016v2 was not available until 2022. The EPA also relied on the air quality modeling performed using Comprehensive Air-quality Model with extensions (CAMx) version 7.10, which was released in January 2021, long after the Louisiana Transport SIP was submitted.

LCA supports the use of the most current and technically appropriate information in developing and reviewing SIP submissions. However, EPA is only now accepting comments on the updated 2023 modeling, which uses the 2016v2 emissions inventory platform. It is not reasonable for EPA to rely on modeling and data that (i) was not available at the time of the SIP submittal deadline and (ii) has not been updated based on public comment. EPA must evaluate the Louisiana Transport SIP based on the modeling data referred to in the *2015 Ozone NAAQS Memo* and subsequent guidance documents. At a minimum, EPA must incorporate needed revisions to the 2016v2 modeling platform based on comments provided by the states and other stakeholders as provided in this docket and then re-analyze the Louisiana Transport SIP based on the updated/corrected modeling platform before issuing a final rule on the Louisiana Transport SIP.

**Commenter:** Louisiana Department of Environmental Quality

**Commenter ID:** 27

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

LDEQ submitted the mandatory 2015 ozone transport SIP on Nov. 12, 2019, based on EPA's Model 2016v1. However, EPA unjustly and prejudicially based the disapproval on the updated version, 2016v2, which includes refinements that have not been peer reviewed. Furthermore, this modeling was performed after the SIP deadline.

Significant differences are present in EPA's modeling used for LDEQ's 2019 submittal and the modeling used to theorize the disapproval proposal. This points to substantial alterations to model inputs parameters. States were not allowed to review or comment on the newer model and or inputs prior to use in the disapproval process.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851, EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

EPA's intention to revise its emission inventory and to conduct new air quality modeling without allowing an appropriate opportunity for stakeholder review and comment is inappropriate

EPA notes in the proposed disapprovals that, after the modeling it conducted in support of earlier transport rules, e.g., CAIR, CSAPR, CSAPR Update, CSAPR Closeout, and Revised CSAPR Update, the agency revised the emission inventory used in the modeling to assess the efficacy of prior transport rules. EPA conducted new modeling using the revised inventory. The agency describes the process as follows:

> Following the Revised CSAPR Update final rule, the EPA made further updates to the 2016 emissions platform to include mobile emissions from the EPA's Motor Vehicle Emission Simulator MOVES3 model 17 and updated emissions projections for electric generating units (EGUs) that reflect the emissions reductions from the Revised CSAPR Update, recent information on plant closures, and other sector trends. The construct of the updated emissions platform, 2016v2, is described in the emissions modeling technical support document (TSD) for this proposed rule. (emphasis added).

In December 2021, MOG and other stakeholders submitted detailed comments on the 2016v2 emission inventory platform in an effort to correct errors that existed in that platform. EPA's efforts to revise this emission inventory platform at this time raises the question about whether EPA intends to update the modeling that has been used as the basis for the SIP disapprovals and the proposed FIP - but only in support of the final rule.

While MOG urges EPA to rely on modeling that accurately reflects current on-the-books regulatory requirements and up-to-date emission inventories, we strenuously object to the possibility that EPA

51

would conduct any such additional modeling to support a final rule and not provide the opportunity for that data to be reviewed, analyzed and commented on in advance of any final decision on the subject SIP disapproval (or for that matter the related proposed FIP). These concerns were also expressed earlier, in July 2021, by several MJOs (Westar, LADCO, SESARM, MARAMA, and CENSARA).

**Commenter:** Minnesota Pollution Control Agency

**Commenter ID:** 31

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

EPA's proposed disapproval of Minnesota's 2015 Ozone Transport SIP does not assess the quality of Minnesota's original submittal. Minnesota was identified as a non-significant contributor (below 0.7 parts per billion) to any ozone monitors in the 2018 modeling performed by both EPA and Lake Michigan Air Directors Consortium (LADCO). Minnesota did not complete steps three or four of the 2015 Ozone Transport SIP based on that information. Minnesota's original submittal should have been approved based on contribution information available from both EPA and LADCO at that time.

EPA is now proposing to use a revised 2016 modeling platform, EPA 2016 version 2 emissions modeling platform (2016v2 EMP) to support a remedy for the Interstate Transport Rule for the 2015 Ozone National Ambient Air Quality Standard (NAAQS).

**Commenter:** Maryland Department of the Environment

**Commenter ID:** 29

**Docket ID:** EPA-R03-OAR-2021-0872

**Comment:**

Additionally, MDE has been disadvantaged by EPA's delay in acting to approve or disapprove its 2015 Good Neighbor SIP, which was submitted to EPA on October 16, 2019. EPA published its proposed disapproval on February 22, 2022, and relied in part on "newer, updated modeling performed by the EPA which was not available when MDE submitted its supplemental SIP." By delaying its decision on Maryland's submittal for nearly 2.5 years, EPA moved the goal post for Maryland—an act the DC Circuit admonished in *New York v. EPA*, 964 F.3d 1214, 1223 (D.C. Cir. 2020). While MDE agrees that EPA should use current data and look toward the next applicable attainment date when approving SIPs or issuing FIPs, an over 2-year gap between submittal and approval allows for newer technology to be developed and relied upon, with no notice to states. If EPA were to review and approve or disapprove SIPs within the timeframes required by the CAA, EPA would likely conduct its review based on the same modeling and data that is available at the time SIPs are submitted by states. This would not only provide clear parameters to both EPA and states, but could also result in timely emissions reductions and attainment of the 2015 ozone NAAQS.

**Commenter:** Nevada Division of Environmental Protection

**Commenter ID:** 33

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA then suddenly released a new modeling platform for ozone interstate transport in October 2021, and then failed to provide or allow states such as Nevada adequate time, resources, and technical support to critically review the model. Instead, EPA abruptly announced that is expected "to use this information in upcoming rulemaking actions, including ozone transport actions" and did not provide NDEP time to check critical model inputs, such as background contributions and emissions from the transportation sector.

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA Has Unpredictably Changed the Rules Mid-Process

The proposed disapproval dismisses ODEQ's analysis regarding the six monitors that established the initial linkage between Oklahoma and downwind nonattainment and maintenance problems. 87 Fed. Reg. 9818. In accord with the flexibilities offered in the 2018 Tsirigotis memos, the Oklahoma SIP demonstrated that Oklahoma emissions had impacts below the significance threshold at three of the monitors. Oklahoma's SIP included a weight-of-evidence prediction that the remaining three receptors would be in attainment in 2023. In fact, EPA's more recent modeling confirms the accuracy of that prediction for two of these receptors. However, in the proposed disapproval EPA now argues Oklahoma's emissions are linked to only two monitors, one of which is completely different than any originally identified.

Notably, ODEQ relied on EPA's modeling released with its March 2018 Memo to identify the initial six impacted receptors in step 1 of the 4-step framework. Yet, in a surprising development, EPA moved the goal posts by using completely different modeling for its decision to disapprove Oklahoma's SIP and thereby identified a new receptor supposedly impacted by Oklahoma. It stands to reason that, were Oklahoma to address impacts to those monitors in a SIP modification, it is entirely possible that EPA would find one or more different monitors to establish the linkage in a future rulemaking. This type of whiplash decision-making by EPA leaves states unable to predict the outcomes of their efforts— or even where to aim. There should be some basic measure of predictability for where the goal posts stand.

Furthermore, it should be noted that the proposed disapproval was considerably late, as Section 110(k)(2) of the CAA states that EPA must take action within 12 months of a "complete" SIP submission.

53

The maximum amount of time EPA can take to deem a SIP submittal complete is 6 months, therefore, even accounting for this timeline, EPA's action falls way behind the statutory requirement. Had EPA reviewed and approved Oklahoma's SIP submittal during its statutorily required timeframe, EPA would have been measuring Oklahoma's SIP submittal against comparable data. Because EPA took so long to act on SIP submittals, EPA created a situation where the standard under which states developed their SIPs was no longer the standard against which those SIPs were judged.

[…]

EPA failed to Adequately Include State Participation

[…] To begin with, the development of the modeling platform should have concluded before EPA used the platform for this rulemaking. ODEQ and other air quality agencies worked together to develop a letter from Michael Vince (the Executive Director of the Central States Air Quality Agencies or CenSARA) to Peter Tsirigotis, dated July 29, 2021 (included as Attachment C hereto). The letter makes the point that, if air agencies are to be given the opportunity to provide meaningful feedback on the emissions inputs used by EPA in rulemaking, they should have the opportunity to review and comment on the Emissions Modeling Platform (EMP) before it is used in federal rulemaking. EPA did allow agencies the opportunity to review an updated version of the EMP, but the version that was ultimately used to develop the proposed disapproval of Oklahoma's ozone transport SIP (and to develop the proposed FIP) had not been released and did not undergo state review in advance of its deployment in support of EPA's rule development.


**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Comment #1: EPA's Poorly Timed Model Releases Undermine States' Abilities to Demonstrate Compliance with CAA §110(a)(2)(D)

The proposed disapproval discusses EPA's modeling efforts at some length, and that discussion is informative regarding the frequency of model updates and the total amount of time required for EPA to finish its own modeling work—modeling that EPA now indicates states should have been using to develop their iSIPs.

1. January 2017- EPA Notice of Data Availability- EPA requested comment on preliminary interstate ozone transport data including projected ozone design values and interstate contributions for 2023 using a 2011 base year platform.
2. October 2017- EPA issued a memorandum containing updated modeling data "which incorporated changes made in response to comments on the [January 2017] NODA."

3. March 2018 – EPA issued a new memorandum including newly available contribution modeling data for 2023 to assist states in evaluating their impact on potential downwind air quality problems for the 2015 8-hour ozone NAAQS

EPA then states that since the release of all the modeling information noted above, and subsequent to the 2018 submittal of Tennessee's iSIP, EPA performed updated modeling using a 2016-based emissions modeling platform (2016v1) to project ozone design values and contributions for 2023. Specifically, on October 30, 2020, the Notice of Proposed Rulemaking for the Revised CSAPR Update included updated 2023 modeling that used the 2016v1 emissions platform. Following the revised CSAPR update final rule, EPA states it continued to make updates to the 2016 emission platform, updated emissions projections, etc. and performed air quality modeling of the 2016v2 emissions using the most recent version of the Comprehensive Air Quality Modeling with Extensions (CAMx) photochemical modeling version 7.10.

EPA proposes to primarily rely on modeling based on "the updated and newly available" 2016v2 emissions platform in evaluating the state iSIP submission and is, in fact, accepting public comment on this updated 2023 modeling using the 2016v2 emissions platform at the very same time EPA proposes to disapprove Tennessee's ISIP. EPA has spent the greater part of five years revising and updating the modeling that it now relies upon to disapprove Tennessee's iSIP. This approach establishes an impossible standard for states and leaves open the very real possibility that no state will be successful in developing an iSIP under future standards.

[…]

Comment #3: EPA may not disapprove Tennessee's Infrastructure SIP based on Prong 2 of CAA §110(a)(2)(D)(i)(I) because Tennessee satisfied its Good Neighbor obligations in its 2018 iSIP submission.

EPA now proposes to disapprove Tennessee's SIP submission, based on data EPA published in 2021 and 2022 finding that Tennessee is "linked" to a single maintenance receptor in Denton County, Texas. EPA is suggesting that Tennessee's 2018 technical analysis was flawed because it failed to consider future data that were not collected until years after the original submission was made, which would have required Tennessee to perform Steps 3 and 4. As EPA puts it: "Because the entire technical basis for Tennessee's submittal is that the State is not linked at Step 2, EPA proposes to disapprove Tennessee's SIP submission based on EPA's finding that a linkage does exist."

Nonetheless, EPA now proposes to disapprove Tennessee's SIP submission, based on data EPA published in 2021 and 2022 finding that Tennessee is "linked" to a single maintenance receptor in Denton County, Texas. EPA is suggesting that Tennessee's 2018 technical analysis was flawed because it failed to consider *future* data that were not collected until years after the original submission was made, which would have required Tennessee to perform Steps 3 and 4. As EPA puts it: "Because the entire technical basis for Tennessee's submittal is that the State is not linked at Step 2, EPA proposes to disapprove Tennessee's SIP submission based on EPA's finding that a linkage does exist."

As we noted in Comment #1, EPA's entire approach and rationale in this proposed disapproval makes it impossible for any SIPs a state might submit under the 2015 ozone standard or any future NAAQS to demonstrate compliance with CAA §110(a)(2)(D) because not only must a state consider the evidence available at the time of submission, but a state must also possess the ability to consider *future* evidence that might demonstrate significant contributions to downwind nonattainment or interference with

55

maintenance in a downwind state. The proposed disapproval of Delaware's iSIP in the *Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard* perfectly illustrates this point. In Section IV.C.1 of the preamble to the proposed rule ("Correction of EPA's Determination Regarding Delaware's SIP Submission and Its Impact on EPA's FIP Authority for Delaware"), EPA addresses Delaware's Good Neighbor obligations as follows:

> In 2020, the EPA approved an infrastructure SIP submission from Delaware for the 2015 ozone NAAQS, which in part addressed the good neighbor provision at CAA section 110(a)(2)(D)(i)(I). The EPA concluded that, based on the modeling results presented in a 2018 March memorandum and using a 2023 analytic year, Delaware's largest impact on any potential downwind nonattainment or maintenance receptor was less than 1 percent of the NAAQS. As a result, the EPA found that Delaware would not significantly contribute to nonattainment or interfere with maintenance in any other state. Therefore, ***the EPA approved the portion of Delaware's infrastructure SIP that addressed CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS*** . . . .

> Subsequent to the release of the modeling data shared in the March 2018 memorandum and EPA's approval of Delaware's 2015 ozone NAAQS good neighbor SIP submission, the EPA performed updated modeling, as described in Section V of this action. The data from this updated air quality modeling now show that Delaware is projected to contribute more than 1 percent of the NAAQS to downwind receptors in Bristol, Pennsylvania, in the 2023 analytic year. Therefore, in light of the modeling data, ***EPA is proposing to find that its approval of Delaware's 2015 ozone NAAQS infrastructure SIP submission, with regard only to the portion addressing the good neighbor provision at CAA section 110(a)(2)(D)(i)(I), was in error. Section 110(k)(6) of the CAA gives the Administrator authority, without any further submission from a state, to revise certain prior actions, including actions to approve SIPs, upon determining that those actions were in error***. The modeling data demonstrate that EPA's prior conclusion that Delaware will not significantly contribute to nonattainment or interfere with maintenance in any other state in the 2023 analytic year was incorrect, which means that EPA's approval of Delaware's good neighbor SIP submission was in error. . . .

> As discussed in greater detail in the sections that follow, the EPA is proposing to determine that there are additional emissions reductions that are required for Delaware to satisfy its good neighbor obligations for the 2015 ozone NAAQS. The analysis on which the EPA proposes this conclusion for Delaware is the same, regionally consistent analytical framework25 on which the Agency proposes FIP action for the other states included in this proposal. The Agency recognizes that it is possible, based on updated information for the final rule—as applied within a regionally consistent analytical framework—that Delaware (or other states for which the EPA proposes FIPs in this action) may be found to have no further interstate transport obligation for the 2015 ozone NAAQS. If such a circumstance were to occur, the EPA anticipates that it would not finalize this proposed error correction or may modify the error correction such that the approval of Delaware's portion of the SIP as it relates to its good neighbor obligations may be affirmed.

This structure runs contrary to the principle articulated by the Supreme Court in *EPA v. EME Homer City Generation, L.P.* that EPA must work toward an "efficient and equitable solution to the allocation

problem the Good Neighbor Provision requires the Agency to address." Instead, EPA's imposition of such an unworkable approach is a textbook failure to comply with EPA's obligation to "select from among reasonable options" under the *Chevron* framework [footnote: 572 U.S. at 492 (citing *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001))] and imposes an entirely arbitrary and capricious standard that states are effectively incapable of following.

The Clean Air Act does not envision nor suggest that states be held to an impossible standard when developing SIPs. Because EPA has provided no evidence that Tennessee was "linked" to any downwind states when it submitted its 2018 SIP revision, EPA may not disapprove Tennessee's Infrastructure SIP based on Prong 2 of CAA §110(a)(2)(D)(i)(I) and therefore should withdraw its proposed disapproval.

[…]

EPA has put states in an impossible position by waiting to take action on SIP submittals that occurred in 2018 and basing such actions on modeling that has been consistently changing since 2018 and is still undergoing public comment.


**Commenter:** The Luminant Companies

**Commenter ID:** 44

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Rather than review Texas's submittal in a timely manner, EPA delayed its action beyond the statutorily prescribed deadline and developed non-statutory, post-hoc modeling and analyses by which it now proposes to judge Texas's submittal.

[…]

And EPA cannot consider its post-hoc modeling and analyses that were not available as of its statutory deadline to act to justify its action.[41] Accordingly, EPA must approve Texas's SIP based on the data available by the statutory deadline so long as it satisfies the statutory requirements, which it does, as discussed below.[42]

[…]

In support of Texas's SIP, consistent with its expertise, TCEQ conducted modeling to discharge its statutory duty to ensure its SIP contains adequate provisions to ensure that emissions from Texas will not "contribute significantly" to downwind nonattainment or maintenance receptors for purposes of the 2015 ozone NAAQS. It was not until after TCEQ developed and proposed its SIP revision, including its modeling, that EPA issued guidance to states on their development of interstate transport SIP revisions for the 2015 ozone NAAQS. Nonetheless Texas's SIP revision was consistent with the guidance EPA had provided at the time of TCEQ's submittal. EPA points to modeling it released in 2022, nearly four years after TCEQ submitted its SIP, to support its proposed disapproval.  EPA's post hoc modeling is not a lawful ground for disapproval.

[…]

[41] *See Wisconsin v. EPA*, 938 F.3d 303, 336 (D.C. Cir. 2019) (suggesting that a state may challenge EPA's "reliance on data compiled after the SIP action deadline"); *see also Sierra Club v. EPA*, 356 F.3d 296, 308 (D.C. Cir. 2004) ("To require states to revise completed plans every time a new model is announced would lead to significant costs and potentially endless delays in the approval process.").

[42] If necessary in light of new data, EPA may later issue a SIP call requiring a state to amend its SIP.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

When formulating its Interstate Transport Ozone SIP, Utah properly relied on the modeling data provided by EPA to the states in 2017-18 and the Modeling Guidance[1]. However, rather than judge Utah's SIP by using the same 2017-18 modeling data it had provided, EPA instead chose to analyze a newer data set that was unavailable to Utah at the time it developed its SIP. Notably, instead of the 2018 Modeling Guidance data, EPA relied on "the Agency's most recently available modeling (2016v2) to identify upwind contributions and linkages to downwind air quality problems in 2023." This is the same modeling EPA relied on for the Proposed FIP. This reliance is arbitrary because Utah has not been afforded a meaningful opportunity to review and incorporate the same modeling upon which EPA bases its decisions.

[…]

*EPA should not evaluate Utah by newer modeling data not available when the Utah SIP was submitted.*

Notably, EPA's reliance on recent analysis and data not available to the state at the time of Utah's SIP submission and never provided during EPA's statutory review period is unfair to the state, resulting in an arbitrary and capricious action. Just as "[a]gency actions must be assessed according to the statutes and regulations in effect at the time of the relevant activity,"[29] EPA's approval or disapproval of a SIP should adhere to the guidance, data, and evidence available and on the record at the time of a state's required submission of the SIP.

In relation to the Proposed Disapproval, Utah submitted the Utah Ozone Transport SIP to EPA on January 29, 2020. The SIP submission was determined complete by operation of law. Rather than rely on the same data and information available to Utah at the time it drafted its SIP, EPA primarily relies "on modeling based on the updated and newly available 2016v2 emissions platform in evaluating these submissions with respect to Steps 1 and 2 of the 4-step interstate transport framework." EPA's "updated" modeling wasn't even released until 2021, a year after Utah submitted its SIP. EPA should not disapprove a SIP based on extra-record data not available to the State during its development of the SIP.

---

[1] U.S. Environmental Protection Agency, 2018. Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM2.5, and Regional Haze, Research Triangle Park, NC. https://www3.epa.gov/ttn/scram/guidance/guide/O3-PM-RH-Modeling_Guidance-2018.pdf

[29] *See Texas v. EPA*, 829 F.3d 405, 430 (5th Cir. 2016).

**Commenter:** Utah Division of Air Quality

**Commenter ID:** 47

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

[T]he proposed disapproval relies heavily on modeling results that were unavailable to the state during the development of the SIP.

EPA's Proposed Disapproval Relies on the Modeling Results That Were Unavailable During the SIP Development

The EPA indicates that its proposed decision to disapprove Utah's SIP relies heavily on using the updated modeling platform 2016v2. The EPA explains that "by using the updated modeling results, the EPA is using the most current and technically appropriate information for this proposed rulemaking." However, as EPA knows, these results were not available to the states during the development and submittal of the interstate transport SIPs. Because SIP planning is a lengthy process, it is unacceptable for EPA to use modeling results for their rulemaking that were developed after state SIP preparation. As with all planning, SIP revisions are a representation of the best available data and modeling at that time. Using results from a modeling effort that post-dated the states' SIP development period is an additional example of EPA changing expectations without issuing appropriate and timely guidance. By relying on modeling results not available during the time of state SIP development, EPA is setting a precedent that creates significant uncertainty for any planning effort, further eroding the trust required for effective state and federal cooperation. This is clearly inconsistent with the cooperative federalism structure of the CAA.

**Commenter:** West Virginia Department of Environmental Protection

**Commenter ID:** 49

**Docket ID:** EPA-R03-OAR-2021-0873

**Comment:**

In the WV 2015 Ozone Good Neighbor SIP, DAQ applied independent modeling performed by Alpine Geophysics utilizing 2023 projected emissions. Alpine modeled at a finer 4-km grid within the maintenance and nonattainment receptor areas rather than the 12-km grid utilized by EPA. Also, at this time, the Lake Michigan Air Directors Consortium ("LADCO") regional planning organization ("RPO") performed similar modeling. All three of these efforts modeled remarkably comparable impacts at the downwind monitor locations. As such, DAQ is further puzzled by EPA's abandonment of its own modeling results by this proposed disapproval action.

*Response*

See Section V.A.4. of the preamble for our general response to comments on the use of updated modeling to support the EPA's action. The EPA notes that the EPA is not disapproving any SIP submission for its choice of modeling. The EPA's evaluations of each SIP submission were explained at proposal. *See, e.g.,* 87 FR 9867-9869 (February 22, 2022) (Minnesota); 87 FR 9818-9824 (February 22, 2022) (Oklahoma); 87 FR 31492-31493 (May 24, 2022) (Nevada); and 87 FR 31477-31483 (May 24, 2022) (Utah). We respond to several additional specific comments here.

One commenter claimed, "By delaying its decision on Maryland's submittal for nearly 2.5 years, the EPA moved the goal post for Maryland—an act the DC Circuit admonished in *New York v. EPA*, 964 F.3d 1214, 1223 (D.C. Cir. 2020)." First, as explained in the preamble, the timing of the EPA's action is not moving the goal posts, nor does availing ourselves of the most recent 2015 ozone transport modeling and monitoring information do so. Second, *New York* is inapposite. The court there found fault with the EPA's denial of a CAA section 126(b) petition from New York, which had identified many upwind-state sources with relatively large $NO_x$ emissions that the state alleged significantly contributed in violation of the good neighbor provision. The court found the EPA's explanation for why the state had not made out at least a facially plausible showing of significant contribution to be arbitrary and capricious. The court noted that downwind petitioning states may lack the ability to conduct the kinds of analysis the Agency's denial suggested may be required and also found internal inconsistencies in the Agency's position during litigation. None of that is relevant here. First, this holding was not about air quality determinations, but rather Step 3 analysis of source emissions reduction potential. Second, upwind states are charged by the Act with evaluating, defining, and prohibiting their sources' significant contribution. Unlike a downwind jurisdiction, they possess all requisite authority to undertake an analysis of emissions and emissions reduction potential within their borders. *See generally* CAA section 110(a)(2). Nor is the Agency obligated to define "significant contribution" for upwind states before acting on these SIP submissions. *See EPA v. EME Homer City*, 572 U.S. 489, 508-09 (2014).

APC and PacifiCorp both cite *Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016) to argue that "EPA's approval or disapproval of a SIP should adhere to the guidance, data, and evidence available and on the record at the time of EPA's timely review of the SIP." In *Texas*, the 5th Circuit granted a preliminary stay of the EPA's disapproval of Oklahoma's and Texas' regional haze SIP submissions and promulgation of FIPs and did not reach the merits of either the EPA's assessment of the SIP submissions' compliance with the requirements of the CAA or the FIPs.[2] Although the court noted that the EPA proposed amendments to the regional haze rule subsequent to Texas and Oklahoma submitting regional haze SIP submissions, that proposal was not relevant to the submissions before the court.[3] Moreover, the EPA has not promulgated any regulations to implement CAA section 110(a)(2)(D)(i)(I). Rather, EPA is applying its

---

[2] *Texas v. EPA*, 829 F.3d 405 (5th. Cir. 2016)

[3] *See, e.g.*, Protection of Visibility: Amendments to Requirements for State Plans; Proposed Rule, 81 Fed. Reg. 26941, 26944 (May 4, 2016) (explaining that the proposed "changes would apply to periodic comprehensive state implementation plans developed for the second and subsequent implementation periods and for progress reports submitted subsequent to those plans." And that EPA "[did] not intend for the proposed changes to affect the development of state plans for the first implementation period or the first progress reports due under the existing Regional Haze Rule.")

longstanding framework for implementing CAA section 110(a)(2)(D)(i)(I) while recognizing and considering any alternative approaches states presented. EPA further notes that to the extent APC objects to EPA's consideration of 2016v2 modeling or the updated 2016v3 modeling (adjusted in response to public comment on this action), Alabama's June 21, 2022, SIP submission was submitted after the EPA made the 2016v2 modeling available and included arguments with respect to that modeling, which the EPA has evaluated in this final action.

APC, The Luminant Companies, and PacifiCorp quote *Sierra Club v. EPA*, 356 F.3d 296, 308 (D.C. Cir. 2004): "To require states to revise completed plans every time a new model is announced would lead to significant costs and potentially endless delays in the approval process." In that case, Sierra Club challenged EPA's conditional approval of Maryland, Virginia, and Washington, D.C.'s attainment plans to address the Washington, D.C. Metropolitan Area's "Severe" classification for several reasons. 356 F.3d at 300. One reason was that the rate-of-progress plans relied on an older emissions model (MOBILE5 as opposed to the more recent MOBILE6). *Id*. EPA regulation specifically required states to use the latest emission model available during the development their rate-of-progress plans for the purposes of meeting Severe requirements, CAA section 172(c)(3); 40 CFR 51.112(a)(1), but because MOBILE6 became available one month before these SIP submissions were submitted, the EPA accepted the rate-of-progress plan based on MOBILE5. 356 F.3d at 308. The court agreed it was reasonable for EPA to not require Maryland, Virginia, and Washington, D.C. to revise their rate-of-progress plans using MOBILE6. *Id*. The EPA notes the timing consideration quoted by commenters related to attainment planning in a Serious nonattainment area. Here, however, the EPA has no regulations that require any state to use any particular type of model to address statutory requirements under CAA section 110(a)(2)(D)(i)(I), nor is the EPA disapproving any SIP submission on the basis of its choice of modeling (as compared to EPA's evaluation of the *results* of the modeling). Further, the *Sierra Club* case does not stand for the proposition that EPA is prevented from considering the most up-to-date data in assessing whether upwind states may be potentially significantly contributing to downwind nonattainment or maintenance.

APC and The Luminant Companies cite *Wisconsin v. EPA*, 938 F.3d 303, 336 (D.C. Cir. 2019) for the premise that the EPA's disapproval of a SIP submission on the basis of "reliance on data compiled after the SIP action deadline" may be challenged.  The EPA acknowledges that *Wisconsin* noted such was the States' argument, but the D.C. Circuit did not opine on the validity of the assertion since it was not relevant to the court's evaluation of the CSPAR Update FIP.

A comment specifically pointed to the EPA's proposed error correction of its approval of Delaware's SIP submission (which is a component of the proposed FIP rulemaking published April 6, 2022) to suggest the EPA had created an unworkable standard for states. The commenter went on to argue that the EPA must approve Tennessee's SIP submission based on the information available at the time Tennessee submitted it to the EPA. However, this argument is illogical. If the EPA were to do that, it would be treating Delaware and Tennessee dissimilarly. In fact, the proposed error correction for Delaware only illustrates the futility of commenters' arguments for using outdated information to approve their SIP submissions. Had the EPA done that, then just as it proposed for Delaware, the Agency would likely have simply conducted error corrections of those approvals in light of the updated projections of air quality and contributions in 2023 that are now available.

61

Finally, it bears observance that if the EPA's evaluation of information regarding 2023 projections was arrested at the time of some deadline in the past or with the issuance of some older set of modeling results, then the purpose of notice and comment rulemaking would itself be frustrated, because no matter what arguments commenters could make about more recent or current real-world conditions or updated projections regarding 2023, the Agency would be forced to ignore them. As an example, the EPA would be obligated to ignore many of the comments on these proposals providing updates to the EPA's emissions inventories, which we have considered in developing the 2016v3 modeling of 2023.

In response to Louisiana Chemical Association, the EPA clarifies that the Agency found Louisiana's SIP submission complete on November 15, 2019. In response to Tennessee Department of Environment and Conservation, the EPA notes that the Agency is deferring final action on Tennessee's good neighbor SIP submission at this time. In response to Midwest Ozone Group, the EPA notes that the Agency met with Multi-Jurisdictional Organizations such as Central States Air Resource Agencies and others in Summer 2021 to discuss the concerns outlined in the July 2021 letter cited in the comment.[4] The EPA subsequently made emissions data available on September 20, 2021, as discussed in more detail in the preamble in Sections II.C and III.A.1.

Other issues raised by these comments are addressed in the preamble in Sections II.C, II.D, III.A.1., V.A., and V.B.2, and V.A.6 , as well as in Section 1.2 (Guidance for SIP Submissions), Section 5 (Updates to Modeling and Changes in Linkages), 6.1.2 (Step 1 Receptors Linked to Texas), 7.4 (August 2018 Memorandum), 8.1 (Determination of Significant Contribution), 10.2 (SIP Call), and 10.3 (Cooperative Federalism and the EPA's Authority).


## 1.5   States' Step 3 Analysis


*Comments*


**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

[T]he Air Program notes that EPA has not ever provided any guidance on what an appropriate step-3 analysis would entail, which makes any decision where it rejects a step-3 analysis arbitrary and capricious. The following paragraphs explain the flaws of EPA's step-3 analysis that it has proposed in the FIPs for 26 states, including Missouri.

[…] Further, EPA's step 3 process completely ignores the real question at hand with the enabling statute, which ties contribution to an amount which contributes significantly to downwind maintenance or

---

[4] See "Meeting With States and MJOs on 8-18-2021" in the docket for this action.

nonattainment problems. Instead, EPA completely ignores the statutory contribution issue and instead is imposing controls that suit federal policy choices regardless of their impact on the downwind receptors that EPA used as justification for disapproving the SIPs to begin with.

[...]

The mere fact that it appears extremely unreasonable, if not impossible, for many states to attempt to address their good neighbor obligations through application of step-3 magnifies the overreach of the federal executive branch in these actions. EPA has offered no guidance to states on developing step-3 demonstrations in their good neighbor SIPs Not a single state has successfully made a step-3 demonstration to avoid a FIP. Every single state that is contributing above the 1 percent threshold (except for Oregon, as noted previously) is having their SIP disapproved, and the proposed FIP will control and impose unnegotiable costs on citizens and sources in those states. This shows again that EPA's action will strip state energy choices from the states and place them into the hands of EPA if these disapprovals are held to stand.


**Commenter:** Arkansas Environmental Federation

**Commenter ID:** 09

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA also cannot substitute its own judgement for that of the state's in crafting a SIP, as the courts have recognized.).[15] Accordingly, the fact that EPA has consistently applied Step 3 of its 4-Step framework to identify "significant" emissions contributions for its ozone transport Federal Implementation Plans ("FIPs") and "this interpretation of the statute has been upheld by the Supreme Court," has no bearing on whether a state's different choices for its own SIP are approvable under the CAA. In determining whether a state's emissions significantly contribute to nonattainment or interfere with maintenance, EPA explains that "states must complete an analysis similar to the EPA's. Yet there is no requirement in the CAA that states must complete an analysis similar to EPA's nor has EPA attempted to adopt regulatory standards that purport to define the regulatory requirements for interstate transport SIPS. The very cases cited by EPA, the Supreme Court and the D.C. Circuit Court of Appeals have ruled that such plans may not result in controls that reduce emission by more than the amount necessary to achieve attainment.[18]

---

[15] *Bridesburg*, 836 F.2d at 781 (quoting *Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975)) (internal citations and quotations omitted) ("EPA has limited authority to reject a SIP . . . . The [CAA] gives the Agency no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of [Section 110(a)(2)], and the Agency may devise and promulgate a specific plan of its own only if a State fails to submit an implementation plan which satisfies those standards.").

[18] EPA acknowledges that pursuant to *EME Homer City* decision, it cannot "require [] an upwind state to reduce emissions by more than the amount necessary to achieve attainment in every downwind state to which it is linked" for to do so would be "over-control". 87 Fed. Reg. 200098-99. It further admits that its current modeling demonstrates weakness in its conclusions regarding Arkansas' linkages, and calls into question inclusion of non-EGUs in the state plan. *Id.* One tenet of EPA proposed disapproval is that Arkansas' analysis did not include non-

EGUs (87 Fed. Reg. 9810), yet EPA's own modeling seems to indicate that the opposite - that to go beyond is in fact over control. Id. Either way - and without waiver - this confusion regarding modeled results, ever-changing linkages, and phantom necessity of control, particularly in Arkansas, highlights the unfairness and inefficiency of EPA's chosen process for this rule making, its numerous dockets, and the companion rule making proposing to institute a FIP for Arkansas on the heels of this ill-conceived proposed disapproval.

**Commenter:** Louisiana Electric Utility Environmental Group

**Commenter ID:** 28

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA also cannot substitute its own judgment for that of the state's in crafting a SIP, as the courts have recognized.[11] Accordingly, the fact that EPA has consistently applied Step 3 of its 4- Step framework to identify "significant" emissions contributions for its ozone transport Federal Implementation Plans ("FIPs") and "this interpretation of the statute has been upheld by the Supreme Court," has no bearing on whether a state's different choices for its own SIP are approvable under the CAA. In determining whether a state's emissions significantly contribute to nonattainment or interfere with maintenance, EPA explains that "states must complete an analysis similar to the EPA's (or an alternative approach to defining "significance" that comports with CAA requirements.)" Yet, there is no requirement in the CAA that states must complete an analysis similar to EPA's and EPA has not attempted to adopt regulatory standards that purport to define the regulatory requirements for interstate transport SIPs.

[11] *Bridesburg*, 836 F.2d at 781 (quoting *Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975)) (internal citations and quotations omitted) ("EPA has limited authority to reject a SIP . . . . The [CAA] gives the Agency no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of [Section 110(a)(2)], and the Agency may devise and promulgate a specific plan of its own only if a State fails to submit an implementation plan which satisfies those standards.").

**Commenter:** The Luminant Companies

**Commenter ID:** 44

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA proposes to go beyond the actual requirements of the Clean Air Act and evaluate Texas's SIP according to new, non-statutory standards. Specifically, EPA proposes to reject TCEQ's expert modeling projections of future design values and TCEQ's quantification and assessment of Texas's "significant contribution" in favor of its own modeling. However, EPA's quantification and assessment of a State's "significant contribution" to downwind nonattainment or maintenance issues is *not* a requirement of the Act.[30] The Clean Air Act does not provide EPA the authority to second-guess TCEQ and disapprove its SIP simply because TCEQ's modeling does not match EPA's modeling or because EPA believes TCEQ's modeling "*may* understate" projected design values or there is "*potential* underestimation."[31] The

64

standard that EPA applies to Texas's SIP and its supporting technical analysis in the Proposed Disapproval has no basis in the Clean Air Act. EPA has announced its preference for a "nationally consistent approach," but this preference cannot override the clear and settled intent of Congress that states be permitted to implement different and varying approaches if they choose. Nor can EPA's policy goal heighten or alter the standard set out in the Clean Air Act for a state's SIP submittal such that a "deviation" from EPA's preferred approach "must be substantially justified," as EPA claims. Plainly put, EPA does not write SIPs. EPA's competing view of Texas's contribution or its potential to interfere with maintenance in downwind States, and EPA's overconservative methodology for determining these things, are not requirements of the Act, nor has EPA promulgated regulations addressing this. In fact, EPA has recognized that it "has not directed states that they must conduct [their] analysis in precisely the manner the EPA has done in its prior regional transport rulemakings[.]" In fact, EPA has taken inconsistent approaches (none of which are grounded in the statute), previously stating that states must only use an assessment of significant contribution that is "comparable" to EPA's preferred approach in order to have its SIP approved.[34]

[30] [*EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7 (D.C. Cir. 2012)] at 47 (Id. at 47 ("Nowhere does the [Clean Air Act] place a requirement on EPA to quantify each State's amount of 'significant contribution' to be eliminated pursuant to the 'good neighbor' provision[.]").

[31] EPA Region 6, 2015 8-Hour Ozone Transport SIP Proposal, Technical Support Document, Docket No. EPAR06-OAR-2021-0801-0002, at 39, 66 (Feb. 2022) ("Proposed TSD") (emphasis added).

[34] *See* [Guidance for State Implementation Plan (SIP) Submissions to Meet Current Outstanding Obligations Under Section 110(a)(2)(D)(i) for the 8-Hour Ozone and PM2.5 National Ambient Air Quality Standards (Aug. 15, 2006)] at 5.

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's Proposal is a Fundamental Change in Policy and is Not in Line With Previous CSAPR Policy-Making

As mentioned previously, under current EPA policy it is not possible for a state to be certain that any quantity of NOx emissions reductions will comply with the good neighbor requirements without waiting for the completion of Step 3 of the CSAPR framework. Because Step 3 is to be undertaken during the development of the FIP, the approach adopted by EPA in its proposed FIP represents a substantive change in policy, rather than an extension of the current approach. EPA's CSAPR approach was challenged in the courts and survived those challenges, giving EPA confidence in the fundamental appropriateness of actions taken previously. However, the previous CSAPR remedies constitute a different policy approach than the present EPA proposed action, which has metamorphosed into a form substantively different from its previous versions

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851

**Comment:**

In the absence of any guidance from EPA related to the assessment of Step 3 control measures, EPA should defer to state plans which evaluate such control measures.

While EPA's proposed disapprovals criticize states for failing to conduct an appropriate Step 3 analysis, EPA makes it clear that it has not established guidelines for how states should conduct that analysis. EPA's treatment of this issues is illustrated by the following statement made by EPA in addressing the Tennessee SIP:

> While the EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete something like the EPA's analysis (or an alternative approach to defining "significance" that comports with the statute's objectives) to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment in or interfere with maintenance of" the NAAQS in any other state. Tennessee did not conduct such an analysis in its SIP submission.

It is apparent that most states did little or no Step 3 analysis because, with many incorporating the 2018 flexibilities that EPA advised could be used in 2015 NAAQS Good Neighbor SIPs, they concluded in either Step 1 or 2 that no controls were required. The proposed Good Neighbor SIP disapprovals should therefore not impose a FIP without first allowing the states, working with their respective MJOs for a regional approach, an opportunity to conduct a Step 3 analysis better tailored to their state and/or region.

Rather than a wholesale disapproval of 19 state Good Neighbor SIPs, EPA should propose an 18-month period for states to proceed with Steps 3 and 4, especially since the EGU-only approach is insufficient and the other source contributions provide even more opportunity for the development of state- and region-specific control strategies that would likely be more cost effective and avoid the over-control that occurs with a generic FIP approach.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

66

Rather than a wholesale disapproval of state Good Neighbor SIPs, EPA should propose an 18-month period for states to proceed with Steps 3 and 4, especially since the EGU-only approach is insufficient and the other source contributions provide even more opportunity for the development of state- and region-specific control strategies that would likely be more cost effective and avoid the over-control that occurs with a generic FIP approach.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The CAA does not require states to address their Good Neighbor obligations in a specific manner, nor does it "enable EPA to force particular control measures on the states." EPA has not adopted any nationwide regulatory standards that purport to define the requirements for interstate transport SIPs with respect to the 2015 ozone NAAQS. Specifically, EPA has previously explained that "[t]he precise nature and contents of such a submission is not stipulated in the statute. [Therefore,] EPA believes that the contents of the SIP submission required by section 110(a)(2)(D)(i) may vary depending upon the facts and circumstances related to the specific NAAQS." This is one of the reasons the CAA assigns development of implementation plans to the states – they are able to use their local knowledge and familiarity with regional conditions to best design the right type of plan for their location and citizens' values and priorities.

EPA claims it "has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings." But EPA rejects the flexibilities it previously provided to the states and instead insists on a one-size-fits-all approach when assessing significant contribution to NAAQS. In fact, EPA's disapprovals force Utah and other states to "complete something similar to EPA's analysis" or "an alternative approach" that meets EPA's policy choices and preferred methods.

The Proposed Disapproval fails to recognize EPA's limited role and obligation: "the Administrator shall approve [a SIP or SIP revision] as a whole if it meets all of the applicable requirements of this chapter." EPA has long recognized its limited role, as stated in a recent SIP approval: [T]he Administrator is required to approve a SIP submission that complies with the provisions of the CAA and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, EPA's role is to approve state choices, provided that they meet the criteria of the CAA.

*Response*
The EPA did not define "significant contribution" for any state in this action, nor is the EPA required to do so. *EPA v. EME Homer City*, 572 U.S. 489, 508-09 (2014). See Section V.B.8. of the preamble for the EPA's general response to these comments.

A comment cites a notice in the *Federal Register* as "87 Fed. Reg. 200098-99" regarding the EPA's interpretation of the *EME Homer City* decision related to over control. Based on context, the EPA assumes the comment was referring to the proposed good neighbor FIPs for Arkansas and other states for the 2015 ozone NAAQS. *See* 87 FR 20098-99 (April 6, 2022). In that proposal the EPA stated, "Although the court described over control as going beyond what is needed to address nonattainment, EPA interprets the holding as not impacting its approach to defining and addressing both nonattainment and maintenance receptors."

In any case, this comment is inapposite as it relates to the EPA's non-final analysis of potential emissions controls in the proposed FIP rather than to the EPA's evaluation of Arkansas's SIP submission. In the proposed SIP submission disapproval, the EPA explained that Arkansas' reliance on air quality information or factors was generally not sufficient at Step 3 to establish that no further emissions controls would be appropriate in Arkansas. *See* 87 FR at 9808-10 (February 22, 2022). The EPA further explained that Arkansas' analysis was deficient for failing to fully analyze both additional electric generating unit (EGU)and non-EGU controls. *See id.* at 9810-11. While in the proposed FIP the EPA acknowledged that there was a potential for overcontrol if the full suite of the non-EGU controls as proposed were included in the FIP's control strategy for Arkansas, the EPA ultimately proposed to determine that such over-control was not sufficiently established to justify not proposing the full suite of non-EGU controls for Arkansas sources. *See* 87 FR 20099. Thus, there is no inconsistency between the two proposals: the EPA's evaluation of the SIP submission established that the state had not conducted a proper Step 3 analysis of either EGU or non-EGU control opportunities; and in the proposed FIP, the EPA proposed to apply both the EGU and non-EGU control strategies in Arkansas and proposed to find there was insufficient evidence of overcontrol. Even if the EPA were to determine in a final FIP rulemaking that no further emissions controls are warranted for some sub-set of these sources, that would not change the fact that the Arkansas SIP submission's Step 3 analysis is deficient and not approvable.

The EPA explained the deficiencies of Texas's SIP submission at proposal. *See* 87 FR 9826-9834 (February 22, 2022) and in the technical support document (TSD) titled "Region 6 2015 8-Hour Ozone Transport SIP Proposal TSD", in Docket ID No. EPA-R06-OAR-2021-0801 (hereinafter Evaluation of Texas Commission on Environmental Quality (TCEQ) Modeling TSD). The EPA is not taking final action on Tennessee's Good Neighbor SIP submission for the 2015 ozone NAAQS in this action.

Other issues raised by these comments are addressed in Sections III, V.A.2., V.A.6., V.B.2., V.B.3., and V.B.7. of the preamble and the following Sections: 4.2 (Model Performance), 6.4 (October 2018 Memorandum), 6.5 (Certain Monitoring Sites in California at Step 1) 10.2 (SIP Call), 10.3 (Cooperative Federalism and the EPA's Authority), 11.6 (Economic Impacts).


## 1.6   EPA Input During SIP Submission Development


*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

EPA shared no information as to its basis for the SIP disapproval prior to promulgating it, and the FIP, as proposed, will impose hundreds of millions of dollars in compliance costs per year on all Missouri citizens who purchase electricity, and potentially, on any citizen of the state that may depend on power plants and other manufacturing industries in the state for their work and their livelihood. Prior to the proposed FIP, EPA has offered no indication as to what might be acceptable under a step-3 analysis. This puts states in an impossible position to submit an approvable SIP if they are unable to avoid obligations under steps 1 and 2. However, EPA's proposed FIPs shows that it is willing and eager to impose crippling costs on states to pursue federal policy choices over state-protected decisions with no regard for the impact that such costly controls have on the upwind states where EPA imposes the FIPs.

[…]

EPA should be required to submit comments on SIPs if it thinks the proposed SIPs have the potential for controversial action and explain the issues EPA has with any proposed SIP submission. It is unreasonable for EPA to sit on SIP submittals for years with no communication to states as to its intentions for disapprovals and proposed FIPs that will impose hundreds of millions of dollars in annual compliance costs that will be passed down to citizens in their state. EPA's current action with the proposed FIP shows that it intends to invoke its power from the Homer City case to impose whatever costs it determines to be reasonable on any state where it can produce modeling showing that the state hits the low and arbitrary 1 percent threshold.

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Arkansas DEQ discussed methodology, modeling, and rationale with EPA early in the process and throughout SIP development. EPA offered suggestions for refinement based on initial drafts, and provided additional input during the public comment period for the 2015 Ozone Transport SIP draft and associated rulemaking. There was at no point during this process any indication from EPA that this plan or DEQ's rationale was not approvable as DEQ was developing it, as long as the state provided rational, science-based justification for the state's decisions. DEQ did so.

In addition, EPA provided input on DEQ's HYSPLIT modeling analysis during the comment period for the SIP and DEQ made adjustments to its modeling in response to EPA's comments. If EPA contends that HYSPLIT modeling is not informative for the purposes of SIP decision-making, this should have been

69

stated in early conversations between the agency and DEQ, before DEQ performed HYSPLIT modeling, or during the public comment period (rather than suggesting modifications to DEQ's methodology, resulting in additional state resources invested in HYSPLIT modeling to bolster the SIP submittal in response to EPA comments). See EPA comments and DEQ responses to comments on 2015 Ozone Transport SIP, included here as Appendix A.


**Commenter:** Arkansas Environmental Federation

**Commenter ID:** 09

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

[Arkansas] DEQ has worked diligently to meet the NAAQS requirements for the 2015 ozone standard, as outlined below. Significant work was required to develop the information necessary to formulate the SIP based on EPA guidance at the time as shown by the following chronology, which involved interaction with local stakeholders including AEF. Once that information was developed and a proposed plan prepared, DEQ undertook the required state-rulemaking and legislative action. DEQ worked collaboratively with EPA Region 6 throughout the process. Numerous discussions were held by DEQ and EPA Region 6 to inform DEQ's development of an appropriate SIP. DEQ responded to questions and comments from EPA Region 6 to develop the SIP. Additionally, DEQ developed additional information in response to EPA Region 6's comments in a collaborative effort that EPA has now abandoned. In spite of these efforts, EPA missed the statutorily mandated deadline to act on DEQ's SIP submission even though the SIP was approvable.


**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Due to EPA's own delay and the accelerated timeline required by the consent decree, EPA is proposing to deny commentors the opportunity to respond to the new data and analysis.[29]

[29] This is further compounded by the fact that EPA did not submit comments on Texas's proposed SIP during TCEQ's public comment period. If EPA had concerns about TCEQ's SIP submission, EPA should have raised concerns during TCEQ's public comment period for the draft SIP. This would have allowed TCEQ to revise the SIP submission to address EPA's concerns prior to finalizing it and submitting it to the Agency. *See* EPA, SIP PROCESSING MANUAL, WHAT IS A SIP?, https://cfpub.epa.gov/oarwebadmin/sipman/sipman/mContent.cfm?chap=1&filePos=4 (last visited Apr. 25, 2022) ("EPA should prepare comments on the proposed revisions and either testify at the hearing and submit comments, or submit comments during the state's public comment period. States are required by law to provide the public and EPA 30 days to review and comment on proposed revisions to the SIP.").

**Commenter:** Environmental Federation of Oklahoma

**Commenter ID:** 20

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In particular, EFO supports DEQ's assessment that EPA has overstepped its authority by circumventing the normal SIP development and approval process in a number of ways, including but not limited to: [...]providing no indication of the upcoming SIP disapproval[.]

**Commenter:** Evergy, Inc.

**Commenter ID:** 21

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

MDNR claims that EPA did not reach out to discuss new modeling results nor identify any issues with Missouri's SIP during the course of those two years prior to proposing to disapprove the SIP and to implement a Federal Implementation Plan (FIP).

**Commenter:** Maryland Department of the Environment

**Commenter ID:** 29

**Docket ID:** EPA-R03-OAR-2021-0872

**Comment:**

Maryland did adopt the CSAPR Update into its SIP. Maryland submitted its CSAPR Update Incorporation by Reference ("IBR") SIP #20-03 in response to direction from EPA Region 3 that Maryland could not continue to be subject to the CSAPR Update and also submit a Good Neighbor SIP. In order for the Good Neighbor SIP for the 2008 Ozone NAAQS to be approved, EPA Region 3 directed that CSAPR and the CSAPR Update must be incorporated into Maryland's regulations if MDE wanted to cite the rule(s) when addressing the state's Good Neighbor obligations.[3]

MDE committed to including the CSAPR Update in Maryland's SIP in August 2019. The regulation was proposed in December 2019, and was finalized into Maryland's regulations at COMAR 26.11.28 on March 23, 2020. Maryland's Good Neighbor SIP for the 2015 Ozone NAAQS states:

> On October 26, 2016, the EPA finalized an update to CSAPR for the 2008 ozone NAAQS by issuing the CSAPR Close-Out [text error - "CSAPR Update"]. Maryland has been complying with the CSAPR Update limits and has committed to incorporating the Federal regulation into state

71

regulations and a State SIP. This will resolve any outstanding issues related to replacement of the CSAPR Update and FIP in Maryland or additional analysis of Maryland's regulations.[4]

On October 16, 2019, Maryland submitted its 2015 Good Neighbor SIP, which committed to the CSAPR Update IBR. The incorporation was finalized within 6 months and effective for over a year and a half after Maryland's 2015 Good Neighbor SIP was submitted to EPA. It was therefore reasonable to cite it and rely on it (in part) in Maryland's 2015 Good Neighbor SIP.

On March 15, 2021, EPA finalized the Revised CSAPR Update ("RCU") in order to resolve 21 states' transport obligations for the 2008 Ozone NAAQS. EPA made a procedural error[5] by finalizing the RCU as the FIP solution prior to disapproving Good Neighbor SIPs submitted by the states. EPA realized this error and to remedy it, EPA Region 3 asked Maryland to withdraw both the Good Neighbor SIP for the 2008 Ozone NAAQS and Maryland's IBR of the CSAPR Update into the state SIP. EPA stated that Maryland's transport obligations for the 2008 Ozone NAAQS were met by the RCU and that withdrawing the SIP would not affect any other Maryland actions.

It is unreasonable for EPA to use Maryland's compliance with EPA's directive against it now. EPA is estopped from such action because Maryland reasonably relied on EPA's direction that withdrawal of the 2008 Good Neighbor SIP and IBR would not affect its pending 2015 Good Neighbor SIP submittal. At least, in the spirit of public transparency and consistent with the concept of cooperative federalism upon which the CAA is based, EPA should have acknowledged in the proposed disapproval that the IBR SIP was withdrawn at EPA's request to correct EPA's procedural error. The federal/state relationship is built on trust and that trust is jeopardized when EPA regional offices are not fully transparent with their state counterparts.

[3] See August 2019 letter from MDE to Mr. Cosmo Servidio: "EPA has informed MDE that Maryland cannot continue to be subject to the CSAPR Update and the Federal Implementation Plan (FIP) and also submit a good neighbor SIP… In an effort to expedite EPA's approval process [for SIP #18-05 - Good Neighbor SIP for the 2008 ozone NAAQS] and based on guidance of EPA Region 3 staff, MDE is currently working to incorporate by reference the federal CSAPR Update into the Code of Maryland Regulations. This should resolve any outstanding issues that were related to replacement of the CSAPR Update and the FIP in Maryland or additional analysis of Maryland's regulations."
[4] Maryland SIP #19-02: *Implementation, Maintenance, and Enforcement of the 0.070 ppm 8-hour Ozone National Ambient Air Quality Standard State Implementation Plan §110(a)(2)(D) MD 70 ppb Ozone Transport SIP*. Pg. 10
[5] See discussion related to submission of CSAPR IBR SIP #20-03 and message from C. Servidio

**Commenter:** Mississippi Department of Environmental Quality

**Commenter ID:** 32

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

MDEQ worked collaboratively with EPA Region 4 to properly respond to interstate transport, or "good neighbor," requirements and submitted what we believed EPA considered an approvable iSIP in September 2019.

**Commenter:** Nevada Division of Environmental Protection

**Commenter ID:** 33

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA has repeatedly failed to meaningfully collaborate with NDEP on how to best address Nevada's interstate ozone transport obligations.

After EPA revised the ozone NAAQS in 2015, NDEP spent its limited resources to prepare and submit Nevada's iSIP by the required deadline of October 1, 2018, relying on EPA's March 2018 modeling results to establish that no out-of-state downwind receptors were impacted by Nevada sources.

EPA failed to act on Nevada's iSIP by the 2020 statutory deadline. As of late 2021, despite the long-standing process for review and prioritization of the SIP backlog (namely the SIP Management Plan) EPA provided zero communication to NDEP on any significant aspect of the Nevada iSIP review and approval process nor did EPA provide any substantive feedback on Nevada's 2018 iSIP submission.

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA Comments on Oklahoma's SIP Submittal Did Not Reflect Its Intent to Disapprove, Indicating Implied Consent for Use of 1 ppb Significance Threshold

As EPA stated in the March 2018 Tsirigotis Memo, the memo was intended to be used not only by states, but as guidance for the EPA regions, as well. Generally, staff from the states and regions work together in developing SIP submittals and, accordingly, states provide EPA regional staff with periodic updates on progress toward SIP submittals. During the development process of Oklahoma's ozone transport SIP, Oklahoma discussed with EPA Region 6 its intent to use the flexibilities offered in the Tsirigotis memos. Therefore, during the final stages of SIP development in 2018, EPA Region 6 was on notice of Oklahoma's intent to use the flexibilities offered in the Tsirigotis memos.

On August 14, 2018, Oklahoma published for public comment Oklahoma's I-SIP Submittal, which included the ozone transport SIP. On September 17, 2018 (the final day of the comment period), Oklahoma received a letter containing comments on said SIP submittal from EPA Region 6 (Attachment B). In its comments, EPA Region 6 suggested that ODEQ incorporate information from the August 2018 Tsirigotis Memo into the SIP submittal, stating:

> We suggest you factor in information from the EPA memo of August 31, 2018, "Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport

73

State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards." The results of the analysis found in this memo would be a better justification for use of 1 parts per billion (ppb) threshold than the current narrative on a 1 ppb threshold.

Thus, not only is there an absence of comment on the record from EPA that Oklahoma should not rely on the 2018 Tsirigotis Memos or use the 1 ppb threshold, but EPA actually encouraged ODEQ to rely further on said memos to support the use of a 1 ppb threshold in the final SIP, which amounts to implied consent from EPA for the reasonableness of the 1 ppb threshold and reliance on the 2018 Tsirigotis Memos in demonstrating that reasonableness. Thus, EPA's position in the proposed SIP disapproval contradicts the 2018 Tsirigotis Memos and the comment letter from Region 6.


**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The EPA failed to provide Texas with formal comments on the adequacy of its analysis during the public comment period for the SIP revision.

The EPA did not comment on the adequacy of the TCEQ's analysis during the public comment period for the 2015 Ozone Transport SIP Revision. The TCEQ and EPA Region 6 participated in discussions regarding the proposed SIP revision, and the TCEQ answered questions from the EPA on the planned SIP submittal and provided additional data to the EPA. The EPA did not indicate that the information provided failed to address its concerns. The lack of EPA comment did not allow the TCEQ to address the issues outlined in the EPA's proposed disapproval in the adopted 2015 Ozone Transport SIP revision.


**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

[Arkansas] DEQ has expended an enormous amount of time and worked diligently to meet the NAAQS for ozone. DEQ worked to develop the information necessary to formulate the SIP, developed a proposed plan, and undertook the required state-rulemaking and legislative action. DEQ also worked collaboratively with EPA Region 6. Numerous discussions were held by DEQ and EPA Region 6 to inform DEQ's development of an appropriate SIP.  DEQ responded to questions and comments from EPA Region 6 to develop the SIP.  Additionally, DEQ developed additional information in response to EPA Region 6's comments as a part of a collaborative process that EPA has now abandoned.

**Commenter:** Utah Division of Air Quality

**Commenter ID:** 47

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The benefit of cooperative federalism is having the autonomy to do what's best for the state, but do so in partnership with EPA to ensure that the CAA intent and requirements are met.

In this same spirit, UDAQ engaged early and often with our counterparts at Region 8 in the development of our interstate transport SIP. Through this collaboration and EPA's guidance, Utah selected the alternative threshold of 1 ppb. […] Thus, UDAQ was surprised when EPA proposed to include Utah in the proposed FIP, and subsequently disapproved the state's SIP based in large part on the selection of the 1 ppb over the 1% of the NAAQS threshold. If the 1 ppb threshold was in fact inappropriate for the development of this SIP, EPA should have communicated that view to UDAQ during the early engagement and development process or during the state's public comment period. Additionally, EPA released no new guidance directing states to use a 1% threshold either prior to or after SIP submittal deadlines.

*Response*

Some commenters assert that the EPA did not provide sufficient input to states during the development of the SIP submissions, while others allege that the EPA led the states astray or implied to states that the SIP submissions were approvable. The EPA is required under CAA section 110 to review a SIP submission revision that has been formally submitted; based on the EPA's determination of whether that submission meets applicable CAA requirements, the EPA must then approve or disapprove the SIP submission. There is no CAA requirement that the EPA must review, evaluate, and comment on a state's draft SIP submission revision during the state rulemaking process, and no legal basis for states to assume that the EPA's silence during a state public comment period constitutes the Agency's endorsement of such SIP submission revision. Where the EPA did communicate views to these states on draft SIP submission revisions, the EPA disagrees that such preliminary feedback should now bind the Agency, and the EPA disagrees that we could in any way lawfully provide "implied consent" to states regarding their draft SIP submissions before they have completed the required rulemaking processes at both the state and federal level. After all, EPA cannot assure any state in advance of the EPA's public notice and comment process what the EPA's final action on a SIP submission will be. *Catawba County v. EPA*, 571 F.3d 20, 34 (D.C. Cir. 2009) ("[a]n agency pronouncement is not deemed a binding regulation merely because it may have some substantive impact, as long as it leave[s] the administrator free to exercise his informed discretion.") citing *Panhandle Producers & Royalty Owners Ass'n v. Econ. Regulatory Admin.*, 822 F.2d 1105, 1110 (D.C. Cir. 1987) (quoting *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537 (D.C. Cir. 1986) (internal quotation marks omitted))).

The EPA encourages state air agencies to engage as early as possible with the Agency on the development of any SIP submission revisions in an effort to address all technical and policy approvability issues prior to submitting a final SIP submission package and appreciates states' willingness to involve

regional offices at the initial SIP submission development stage. Further, the EPA makes its best efforts to work closely with states, but EPA cannot be expected to provide states definitive guidance on what will ultimately be approvable. Nonetheless, the suggestions we made to states on their SIP submissions in this instance are not inconsistent with the final action we are now taking.

Other issues raised by these comments are addressed in Section V.A.3., V.A.6., and V.B.7. of the preamble and the following sections: 1.1 (Timing of SIP Actions), 1.2 (Guidance for SIP Submissions), 7.4 (August 2018 Memorandum), 10.3 (Cooperative Federalism and the EPA's Authority), 11.6 (Economic Impacts), and 11.12 (Consent Decrees).

We now address specific concerns about the EPA input during the SIP development process of specific states.

<u>Arkansas</u>

Regarding Arkansas, the EPA specifically commented on Arkansas' draft SIP submission that "EPA disagrees with ADEQ on the applicability of the prevention of significant deterioration (PSD) significant impact level (SIL) to a one parts per billion (ppb) threshold for assessing linkages to downwind receptors because EPA's analysis for the SIL did not contain information that could be used to evaluate the collective contribution from upwind states at downwind receptors, a key element for consideration given the regional nature of ozone transport." This is consistent with the EPA's position on this topic in this action. Further, in response to this comment, ADEQ made no changes to its final SIP submission. This is one example (of many) where the EPA provided feedback to a state during the SIP submission development process that the state chose not to include or act upon. It is inauthentic to characterize the disapproval of Arkansas' SIP submission as being an abandonment of collaborative process when there were specific EPA comments that went unaddressed by the state SIP submission, which contributed to the final SIP submission being deficient.

The EPA noted in our comments to ADEQ on their draft SIP submissions, the state's back trajectory analysis "would give additional perspective on the representativeness of EPA's modeling to examine the yearly frequency" and that "[c]omparing the frequency in 2011 to the other years analyzed would help determine if the frequency for 2011 was anomalous."[5] The EPA noted a number of concerns with the analysis. *Id.* The EPA's review found that Arkansas' analysis did not suggest that the modeled base year of 2011 used in EPA's 2011-based modeling was anomalous compared with other years. 87 FR 9809. We address additional comments related to the EPA's technical concerns and conclusions from ADEQ's HYSPLIT analysis in Section 8.8.

<u>Maryland</u>

EPA's proposed disapproval of Maryland's SIP submission made the point that "relying on a FIP at Step 3 is per se not approvable if the state has not adopted that program into its SIP . . ." 87 FR 9463, 9471 (Feb. 22, 2022). This point was made in the context of addressing Maryland's argument that the Cross-State Air Pollution Rule (CSAPR) Update FIP (which the EPA promulgated to partially address good neighbor obligations for the 2008 ozone NAAQS) satisfied the state's good neighbor obligations for the

---

[5] The EPA's comment letter on ADEQ's draft SIP submission was attached to their SIP submission and is available in Docket ID. No. EPA-R06-OAR-2021-0801 (Document ID No. EPA-R06-2021-00801-0003).

2015 ozone NAAQS The statement that the EPA made at proposal is a correct statement of the EPA's interpretation of CAA section 110(a)(2), which is that FIP provisions cannot be relied upon to meet SIP obligations unless the FIP provisions are incorporated into the SIP.  (This aspect of Maryland Department of the Environment (MDE's) comment is further responded to in Section V.B.9 of the preamble regarding reliance on FIP measures. MDE complains, however, that EPA itself encouraged the state to withdraw its August 2018 SIP submission, which would have incorporated the CSAPR Update into its SIP and replaced the CSAPR Update FIP. MDE claims the EPA's change in advice to the state leading to the withdrawal of that submission was due to our own "procedural error," and that the EPA cannot now use the lack of incorporation into its SIP submission of the CSAPR Update as a basis for disapproval. These comments reflect a misunderstanding of the procedural history and omit certain key facts.

First, to review the series of actions we took to address Maryland's good neighbor obligations for the 2008 ozone NAAQS: On December 31, 2012, Maryland submitted a SIP submission to address the requirements of CAA section 110(a)(2)(D)(i)(I) with respect to the 2008 ozone NAAQS. On April 20, 2016, Maryland withdrew its good neighbor SIP submission. On July 20, 2016, the EPA published a finding of failure to submit a complete good neighbor SIP submission to address the requirements of CAA section 110(a)(2)(D)(i)(I) with respect to the 2008 ozone NAAQS for Maryland (81 FR 47040). On October 26, 2016, the EPA published a FIP for Maryland in the CSAPR Update addressing the requirements of CAA section 110(a)(2)(D)(i)(I) with respect to the 2008 ozone NAAQS. However, the EPA did not determine that the CSAPR Update FIP fully addressed the requirements of CAA section 110(a)(2)(D)(i)(I). On August 8, 2018, Maryland submitted a new SIP submission intended to fully address good neighbor requirements for the 2008 ozone NAAQS by adopting the CSAPR Update emissions trading program into its SIP. On December 21, 2018, the EPA published a determination in the CSAPR Close-Out that the CSAPR Update FIP for Maryland fully addressed the requirements of CAA section 110(a)(2)(D)(i)(I) for the 2008 ozone NAAQS (83 FR 65878, effective February 19, 2019).

However, following the D.C. Circuit decisions in 2019 in *Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019) and *New York v. EPA*, 781 Fed. App'x 4, 7 (D.C. Cir. 2019), to remand the CSAPR Update and vacate the CSAPR Close-Out, the CSAPR Update FIP could no longer be said to fully correct the CAA section 110(a)(2)(D)(i)(I) deficiency identified in the July 20, 2016 finding of failure to submit. EPA promulgated an updated FIP for Maryland and several other states in the Revised CSAPR Update, and this FIP established a new emissions budget for Maryland's EGUs as well as a new Group 3 emissions trading program, which entirely replaced the Group 2 program that had been promulgated in the CSAPR Update. 86 FR 23054 (April 30, 2021).

At that point, Maryland's August 2018 submission adopting the CSAPR Update program was no longer approvable as a remedy to its "significant contribution" under the 2008 ozone NAAQS, because the CSAPR Update FIP for Maryland was replaced by a new, more stringent emissions control program. It was at that point that the EPA encouraged Maryland to withdraw its August 2018 submission. The withdraw of the submission saved resources for all parties as it avoided the EPA having to go through a rulemaking process to disapprove that submission. Maryland remained free to adopt the Revised CSAPR Update FIP requirements into its SIP should it have chosen to do so.

In any case, the EPA's disapproval of Maryland's 2015 ozone NAAQS good neighbor SIP submission was not based solely upon non-incorporation of the CSAPR Update requirements into Maryland's SIP. Even if

the CSAPR Update—or even the Revised CSAPR Update—had been incorporated into the SIP, it wouldn't have even *partially* satisfied an appropriate Step 3 and Step 4 analysis. This is because the EPA has already included the emissions-reducing effects of both the CSAPR Update and the Revised CSAPR Update in its baseline air quality modeling at Steps 1 and 2 (in both the 2016v2 and 2016v3 modeling), and so pointing to either of those rules as measures that would eliminate significant contribution at Step 3, for purposes of the 2015 ozone NAAQS, would be impermissible double-counting. Further, the CSAPR Update only partially addressed interstate transport obligations for the less protective 2008 ozone NAAQS. Maryland offered no explanation why those requirements would be sufficient to satisfy Maryland's good neighbor obligations for the more protective 2015 ozone NAAQS. And there are yet additional reasons cited in the EPA's proposed disapproval that this comment does not address, such as Maryland's failure to evaluate other nitrogen oxides (NOx) emitting sources at Step 3 and to analyze potential NOx emission controls, costs, and effect on downwind receptors. These were independently sufficient bases to disapprove Maryland's 2015 ozone NAAQS good neighbor SIP submission. *See* 87 FR 9463 (Feb. 22, 2022).

Mississippi

The EPA agrees with the commenter's (MDEQ) statement about the collaborative efforts from both MDEQ and EPA Region 4 (as well as headquarters) to support the state's development of their 2015 ozone NAAQS transport SIP submission in 2019. The EPA worked with MDEQ to develop their 2015 ozone NAAQS transport SIP submissions based on information available at the time that Mississippi initiated their SIP development process through the final SIP submission. At that time, it was believed based on the 2011-based modeling that Mississippi would not be linked above 1 percent of the NAAQS to any out of state receptors in 2023. However, as discussed in the proposal and elsewhere in this final action, the EPA's updated modeling now shows the state is projected to be linked.

Oklahoma

During the development of Oklahoma's SIP submission, the EPA did suggest to Oklahoma that it "factor in information" from the August 2018 memorandum in their rationale for using a 1 ppb contribution threshold at Step 2, as that would be a "better justification" than arguments the state had drafted.[6] This suggestion, standing alone, cannot reasonably be understood as a final endorsement of the appropriateness of a 1 ppb contribution threshold for Oklahoma. The EPA did not indicate that the August 2018 memorandum pre-approved the use of a 1 ppb contribution threshold. Rather, it suggested Oklahoma improve the draft rationale. The topics of the August 2018 memorandum and Oklahoma's arguments related to the appropriateness of an alternative contribution threshold for the state are addressed in more detail in the preamble in Section V.B.7 and in Section 7.4 (August 2018 Memorandum).

Texas

Commenters (AECT et al., TCEQ) claim the EPA gave no indication that TCEQ's submission may not be approvable, additionally citing the EPA's SIP Processing Manual, available on EPA's website, to support

---

[6] A copy of the EPA's comments on Oklahoma's draft SIP submission are included in Docket ID No. EPA-HQ-OAR-2021-0663.

their argument that EPA should have done so.[7]  However, as TCEQ acknowledges, the EPA staff did in fact meet with TCEQ staff to discuss the submission. As explained elsewhere in this response, there is no obligation or requirement that EPA needed to have done so. Further, given the technical complexity of TCEQ's submittal (which included its own modeling efforts), it is understandable that EPA staff would not have been able to offer views at that point as to how the Agency may ultimately act on the submission.

## 1.7   Length of Comment Period

*Comments*

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Further, commenters note that EPA did not provide affected stakeholders sufficient time to analyze and comment on EPA's proposed disapproval. EPA provided only 30 days for comments, which ended on the Friday within the Thanksgiving holiday. The State of Alabama made a reasonable request for additional time to provide comments on this highly technical and data-intensive issue, but EPA refused to grant that or any extension. EPA offered no rationale or explanation as to why additional time could not be afforded, only claiming it was "unnecessary." But EPA should defer to the State of Alabama to determine whether additional time to prepare its comments is necessary and only deny such a request for compelling reasons. EPA offered no such reasons and none exist. By denying the State's request for an extension to the notice and comment period, EPA failed to provide stakeholders with adequate time to evaluate the proposed requirements and failed to acknowledge that this is the only opportunity for stakeholders to identify and comment on the flaws in EPA's analysis. Allowing adequate time for comments is also significant because stakeholders provide comments to EPA in order to preserve their opportunity to bring errors to the attention of a reviewing court.

**Commenter:** Ameren Missouri

**Commenter ID:** 05

---

[7] EPA SIP Manual, available at https://cfpub.epa.gov/oarwebadmin/sipman/sipman/mIntro.cfm?chap=0&i=1. Though cited by commenters for the proposition that the EPA must provide comments to states on draft SIP submissions, the page cited by commenters notes that "Drafts are not required but can benefit the State if the submittal is controversial or if the State anticipates requesting parallel processing by resolving the majority of issues up front."

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

<u>USEPA needs to provide additional time to comment on the Missouri SIP disapproval for post processing of model data review and comment per APA.</u>

**Commenter:** Arkansas Department of Energy and Environment, Divison of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

[A]DEQ has performed a preliminary review of whether additional control measures for Arkansas are necessary to fulfill its interstate obligations for the 2015 ozone NAAQS based on the new EPA identified linkages. The length of the comment period does not provide adequate time to perform HYSPLIT modeling, which based on EPA's proposal, would be dismissed without adequate consideration, or photochemical modeling.

**Commenter:** Cleco Corporate Holdings LLC

**Commenter ID:** 14

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Cleco requests a 60-day extension of the comment period for the Proposal.

Cleco again requests a 60-day extension of the comment deadline for the Proposal. Due to the great volume of information in which EPA based its SIP disapprovals, additional time is necessary for review of the material which includes the state-specific 4-Step Interstate Transport results, the EPA's Ozone Transp01i Modeling under the 2016v2 platform, and the EPA's after-the-fact change from the EPA 2018 memorandum (2011 base year) to the 20 l 6v2 modeling (2016 base year).

Any of these reasons should be sufficient justification to extend the comment deadline. Taken together, these reasons should convince EPA to grant Cleco' s request for a 60-day extension. Cleco asks EPA to reconsider this request.

**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA has unlawfully circumvented notice-and-comment requirements for its Proposed SIP Disapproval.

[…]

In addition, EPA is effectively depriving members of the public from meaningfully engaging with its Proposed Disapproval by issuing it after its Proposed FIP. The comment period for this Proposed Disapproval did not open until over a month after EPA published its Proposed FIP—the comment period for the Proposed FIP closed before *any* commenters had a chance to submit comments on the Proposed SIP Disapproval. This puts commenters in the untenable position of having to provide feedback on EPA's comprehensive and complex Proposed FIP without first understanding Nevada's obligations under the CAA.

**Commenter:** Idaho Power Company

**Commenter ID:** 23

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

Additionally, by proposing the FIP first, EPA has made clear that the finalization of the Proposed Disapproval was a foregone conclusion, effectively circumventing required rulemaking procedures by treating the Proposed Disapproval as final before giving any consideration to public comments. The Administrative Procedure Act's ("APA's") notice-and-comment procedures require EPA to "give interested persons an opportunity to participate in the rule making" before a rule is finalized.[32] Soliciting public comment "allow[s] the agency to benefit from the expertise and input of the parties who file comments with regard to the proposed rule" and "see[s] to it that the agency maintains a flexible and open-minded attitude towards its own rules," creating important safeguards against arbitrary or unreasonable agency action.[33] EPA cannot remain flexible and open-minded in its consideration of the Proposed Disapproval where the Proposed FIP depends on this disapproval being finalized. EPA has effectively finalized the Proposed Disapproval in a manner that circumvents its responsibility to respond to public comments.[34] Such a procedural shortcut is anathema to the APA's carefully crafted rulemaking structure.[35]

Finally, the CAA gives EPA up to *two years* after the disapproval of a SIP to promulgate a FIP. Because of EPA's own failure to act on SIP submissions in a timely manner and the resulting consent decree, the Agency has accelerated the process, issuing a proposed FIP prior to issuing proposed SIP disapprovals. The comment period for EPA's Proposed Disapproval did not open until ***over a month after*** EPA published its proposed FIP, meaning that the comment period for the proposed FIP closed before many commenters had a chance to submit comments on the Proposed Disapproval. This put commenters in the untenable position of having to provide feedback on EPA's comprehensive and complex Good Neighbor Plan without first understanding Nevada's obligations under the CAA. Such an accelerated timeline, with multiple overlapping comment periods out-of-sync with the CAA, significantly limited the public's ability to fully assess EPA's action and provide meaningful comment.

81

[29] *See, e.g.*, Chrysler Corp. v. Brown, 441 U.S. 281, 302 (1979).

[30] *See* 42 U.S.C. § 7410(c)(1) (requiring Administrator to promulgate FIP "at any time within 2 years after" disapproving a SIP). While the Supreme Court held in *EPA v. EME Homer City Generation* that, under this provision, "EPA is not obliged to wait two years or postpone its action even a single day," the Court noted that this authority applies "[*a*]*fter* EPA has disapproved a SIP." 572 U.S. 489, 509 (2014) (emphasis added)

[32] 5 U.S.C. § 553(c).

[33] *See McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1325 (D.C. Cir. 1988) (internal citations omitted).

[34] *See City of Portland, Oregon v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007) (emphasizing that an agency must respond to comments that "raise points relevant to the agency's decision and ... if adopted, would require a change in an agency's proposed rule").

[35] *See Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) (emphasizing that agency action "must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made").

**Commenter:** Louisiana Electric Utility Environmental Group

**Commenter ID:** 28

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

As a part of these comments, LEUEG also requests a 60-day extension of the comment deadline for EPA's Proposed SIP Disapproval relating to Louisiana. LEUEG is aware of numerous requests for extensions by industry stakeholders and believes EPA's rejections of these requests to date is unreasonable and unwarranted under the circumstances. As noted in other requests, more time is plainly necessary for review of the 4-step Interstate Transport results, EPA's Ozone Transport Modeling under the 2016v2 platform, and EPA's after-the-fact change from its 2018 memorandum (2011 base year) to the 2016v2 modeling (2016 base year) by the state agencies and stakeholders.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851

**Comment:**

This accelerated effort disenfranchises not only meaningful technical analysis of the agency's proposals but also curtails meaningful participation by all stakeholders.

[…]

Second, EPA has not provided adequate public notice and comment as required by law.

[…]

The 60-day comment period is too short to allow review and analysis of the proposed denials for multiple states.

EPA eight proposed Good Neighbor SIP disapprovals would result in disapproval of Good Neighbor SIPs submitted by 19 states regarding interstate transport for the 2015 8-hour ozone national ambient air quality standard. Significantly, EPA established a comment period of only 63 days that applies to all eight proposals for all 19 states. The sheer number of EPA proposed actions regarding these Good Neighbor SIPs alone is evidence that the comment period allowed by EPA is grossly insufficient. Compounding the challenge for stakeholders of the inadequate comment period on these eight proposed disapprovals, EPA also proposed a 181-page transport rule on April 6, 2022, during the pendency of the comment period on these eight proposed disapprovals. The comment period on the transport rule is also 60 days, ending June 6, 2022.

MOG has been an active participant in transport rule development since the 1997 NOx SIP Call and continues to be keenly interested in the development of air pollution regulations that are based on sound science. MOG has undertaken independent modeling and verification of EPA modeling in the past and offered comments on how to improve the accuracy and completeness of those efforts in prior comments on various transport rules.

As a result of its continued interest in the transport issue, MOG has developed technical capabilities that allow it to analyze and verify the science behind both Good Neighbor SIPs proposed by states and EPA actions to approve or disapprove them. MOG is acutely aware that preparation of proper technical analyses of Good Neighbor SIPs involves the use of complicated dispersion models that take substantial execution time. MOG's significant experience in these matters also makes clear that simultaneous analysis of eight proposed rulemakings in addition to analyzing a 181-page transport rule that involves the same ozone NAAQS as the Good Neighbor SIPs dramatically complicates the analysis process.

The totality of these now nine pending rulemakings necessitates a period substantially longer than the allowed 63 days to allow stakeholders, including MOG, to analyze the proposed rules in parallel and prepare comprehensive comments that will better inform the rulemaking process, and EPA has utterly failed to allow sufficient time for that to happen.


**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

The 60-day comment period is too short to allow review and analysis of the proposed denials for multiple states. EPA proposed Good Neighbor SIP disapprovals would result in disapproval of Good Neighbor SIPs submitted by states regarding interstate transport for the 2015 8-hour ozone national ambient air quality standard. Significantly, EPA established a comment period of only 60 days that applies to all proposals.

[...]

The totality of these pending rulemakings necessitates a period substantially longer than the allowed 63 days to allow stakeholders, including MOG, to analyze the proposed rules in parallel and prepare comprehensive comments that will better inform the rulemaking process, and EPA has utterly failed to allow sufficient time for that to happen.

**Commenter:** Utah Petroleum Association and the Utah Mining Association

**Commenter ID:** 48

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Even though EPA jumped the gun, it must consider comments on this action fairly and completely.

[...]

EPA jumped the gun. The timing of this Proposed Disapproval, six weeks after proposing a FIP as part of the GNR, is out of order and contrary to the requirements of the CAA, which requires that a Disapproval **be finalized** before EPA promulgates a FIP such as the GNR.

The timeline suggests that EPA has no intention of paying heed to the comments on the Proposed Disapproval. Such disregard for comments would be a violation of required administrative procedures. EPA must fairly and completely consider all comments submitted.

Furthermore, with both actions in the proposal phase, comments on the Proposed Disapproval and the Proposed GNR are inextricably linked.

*Response*

The EPA disagrees that it provided insufficient time for public comment. The EPA has provided more than adequate time for the public to review the technical bases underlying this action. Congress' presumptive minimum period for public comment on CAA regulations is 30 days. *See* CAA section 307(h). The comment period of at least 60 days for each of the proposed disapprovals is twice that amount of time. (Due to time constraints, EPA was only able to provide a 30-day comment period on its proposed disapproval of Alabama's June 21, 2022 SIP submission—although there were 60 days to comment on the February 24, 2022 proposed disapproval of its earlier submission, which the state withdrew during the comment period). Some commenters state that that the EPA failed to provide sufficient public process, however the commenters here actually participated in this public notice and comment process, in many cases submitting detailed and lengthy comments.

Furthermore, the 2016-based meteorology and boundary conditions used in the modeling have been available through the 2016v1 platform, which was used for the Revised CSAPR Update (proposed in October of 2020, 85 FR 68964; October 30, 2020). The updated emissions inventory files used in the current modeling were publicly released September 21, 2021, for stakeholder feedback, and have been

available on our website since that time.[8] The Comprehensive Air Quality Modeling with Extensions (CAMx) modeling software that EPA used has likewise been publicly available for some time: CAMx version 7.10 was released by the model developer, Ramboll, in December 2020. And on January 19, 2022, we released on our website and notified a wide range of stakeholders of the availability of both the modeling results for 2023 and 2026 (including contribution data) along with many key underlying input files.[9]

By providing the 2016 meteorology and boundary conditions (used in the 2016v1 version) in fall of 2020, and by releasing updated emissions inventory information used in 2016v2 in September of 2021 we gave states and other interested parties multiple opportunities prior to our February 2022 proposals to consider how our modeling updates could affect their status for purposes of evaluating potential linkages for the 2015 ozone NAAQS. We also supplied the full suite of modeling files (roughly 15 terabytes) to those who requested them; while the EPA acknowledges the process of delivering such large files can take time, we do not believe having all of those files is necessary for the public to be able to comment meaningfully on the proposals here.

In any case, for those who wished to comment on the EPA's modeling through reviewing all of those files and/or through running their own modeling, we note that the EPA used the same 2016v2 modeling of 2023 for all of its proposed SIP submission actions and the proposed FIP. Commenters could comment (and did comment) through any of those public comment periods on the modeling, and the EPA has an obligation to consider such comments to the extent in-scope in taking this final action. Given the overlapping timing of most of the EPA's proposals, there was at least one public comment period open at all times on the proposals using that modeling from Feb. 22, 2022, when the first set of disapprovals were issued, through July 25, 2022 (the close of the public comment period on the proposed disapprovals of several western states). That is effectively a combined comment period of 153 days, and is more than sufficient, in the EPA's view, to allow for meaningful comment.[10]

Finally, it is true that the EPA has consent decree deadlines to take final action on most SIP submissions covered by this action by January 31, 2023 (extended by stipulation of the parties from December 15, 2022).[11] But the amount of time the EPA could provide for public comment was also informed by our substantive obligation to see that interstate transport obligations for the 2015 ozone NAAQS are addressed as expeditiously as practicable and no later than the next attainment date. *See Wisconsin*, 938 F.3d at 313-20.

---

[8] *See* https://www.epa.gov/air-emissions-modeling/2016v2-platform.

[9] *See* https://www.epa.gov/scram/photochemical-modeling-applications.

[10] Further, because EPA is acting on a new SIP submission from Alabama using the 2016v2 modeling, we note that yet another comment period was open with respect to the application of the 2016v2 modeling in assessing good neighbor obligations for the 2015 ozone NAAQS from the date of that proposal, October 25, 2022, through November 25, 2022. *See* 87 FR 64412.

[11] *New York et al. v. Regan, et al.*, No. 1:21-CV-00252 (S.D.N.Y.) (IN, KY, MI, OH, TX, WV); *Our Children's Earth Foundation v. EPA*, No. 20-8232 (S.D.N.Y.) (NY); *Downwinders at Risk et al. v. Regan*, No. 21-cv-03551 (N.D. Cal.) (AR, CA, IL, IN, KY, LA, MD, MI, MN, MS, MO, NV, NJ, NY, OH, OK, TX, WV, WI).

Under these circumstances, and mindful of the legal and procedural obligations applicable to the EPA, as established by Congress and the courts, the comment period length was appropriate and consistent with the requirements of the CAA and the Administrative Procedure Act (APA).[12]

The EPA disagrees with Arkansas Division of Environmental Quality's characterization of EPA's analysis of Arkansas's good neighbor SIP submission for the 2015 ozone NAAQS. 87 FR 9798, 9806-9811 (February 22, 2022).

Other issues raised by these comments are addressed in Section V.A.1. of the preamble and in the following sections: Sections 1.2 (Guidance for SIP Submissions), 1.5 (State's Step 3 Analysis), 1.8 (Docket Document Availability), and 10.6 (Allegation that Disapprovals of Western State SIP Submissions was Predetermined).

## 1.8   Docket Document Availability

*Comment*

**Commenter:** Ameren Missouri

**Commenter ID:** 05

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

USEPA has not made available post processing of model data from the revised modeling in the Docket for the proposed disapproval of the Missouri Good Neighbor SIP and only references the files in another docket[9] which wasn't posted until 40 days after the proposed Missouri GNS disapproval. Making matters worse, interested parties were required to request the files from USEPA directly because the files were not in the posted public docket decreasing the available review time even more. Requiring interested parties to search two dockets and then request USEPA's data and analysis underlying this action and wait for a response from USEPA fails to meet the transparency in government standard set by this administration. USEPA needs to provide additional time to comment on the Missouri SIP disapproval so that the post processing of model data can be reviewed and commented on in accordance with the intent of the Administrative Procedures Act.

[9] The modeling relied upon as further proof of Missouri being linked to nonattainment in another state was included as part of USEPA's proposed CSAPR FIP for the 2015 Ozone Standard published in the Federal Register on April 6, 2022 under a separate docket. The public docket available on the internet for the proposed FIP did not contain any of the model post processing files with modeled contribution data for Missouri so that it could be reviewed. That data had to be requested separately (after searching both dockets).

---

[12] Section 553 of the Administrative Procedure Act requires that federal agencies provide general notice of proposed rulemaking by publication in the Federal Register and to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. 553(b), (c).

*Response*

All information supporting the proposed disapproval of Missouri's SIP submission, including the data to which the commenter refers, was publicly docketed on or before February 22, 2022. Because of their size (around 15 terabytes), the full modeling files could not be posted online and so were held on data drives at EPA's Docket Center, as is routine for extremely large files, where it could be requested by interested parties. See 87 FR 9534 (February 22, 2022). Comments on the length of the comment period are addressed in Section 1.7 (Length of Comment Period).

*Comment*

**Commenter:** Louisiana Department of Environmental Quality

**Commenter ID:** 27

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA formulated part of their proposed disapproval on results from the journal article "Improved estimation of trends in U.S. ozone concentrations adjusted for interannual variability in meteorological conditions," authored by several EPA members/employees and one external author. This article was not peer reviewed, neither is it available without purchase. The article should be made available in the Docket with other supplementary materials. "Although this article has been reviewed by the U.S. EPA and approved for publication, it does not necessarily reflect the U.S. EPA's policies or views." Atypically, the subject matter of the article is accounted for in tweaks to the 2016v2 modeling.

*Response*

The EPA does not place certain docket materials, such as copyrighted material or documents protected as Confidential Business Information on the Internet (*i.e.*, regulations.gov), but such docket materials are available for public review in person in the EPA Regional office or at the EPA Docket Center Reading Room in Washington, D.C., as applicable.[13]  The article cited by the EPA to which the Louisiana Department of Environmental Quality (LDEQ) is referring is protected by copyright, so the article's title was listed in the online Docket (EPA-R06-OAR-2021-0801), while the hard copy of the article is available for public viewing in person at the EPA Region 6 office. Further, the preamble to the proposed rulemaking directed the public to https://www.epa.gov/dockets for further information on the EPA Docket Center Services, which include assisting the public with accessing particular documents in the docket.

---

[13] Access EPA Dockets, *available at* https://www.epa.gov/dockets/access-epa-dockets (last accessed January 31, 2023).

Regarding the comment about peer review, the article was published in the *Atmospheric Environment* journal, [14] which requires peer review. The peer review requirement for the journal is listed in their author's guide:

> This journal operates a single anonymized review process. All contributions will be initially assessed by the editor for suitability for the journal. Papers deemed suitable are then typically sent to a minimum of two independent expert reviewers to assess the scientific quality of the paper.[15]

The article in question was reviewed by three independent experts and accepted for publication with minor revisions.

---

[14] Atmospheric Environment, *available at* https://www.sciencedirect.com/journal/atmospheric-environment (last accessed January 31, 2023).

[15] Atmospheric Environment, Author Information Pack at 9, *available at* https://www.elsevier.com/wps/find/journaldescription.cws_home/246?generatepdf=true. (Last accessed January 13, 2023).

## 2 Analytic Year of 2023

*Comments*

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

These comments highlight the agency's failure to align the responsibilities of upwind and downwind states as it selected the analytical year for evaluating the Good Neighbor Provisions of the CAA. In the case on the Kentucky plan, this failure is even more significant because Kentucky specifically noted the disparity that exists between upwind states and those downwind states that significantly delayed the imposition of nonattainment controls on sources within their own nonattainment areas. 87 Fed. Reg. at 9505. Kentucky demonstrated emissions from local sources in nonattainment areas were not properly regulated resulting in on-going nonattainment impermissibly shifting the burden of emission controls to upwind states. EPA response to the Kentucky plan fails to address the alignment issue and defaults to the selection of 2023 as the appropriate analytic year. EPA did not assess the extent of delay of downwind states emissions reductions programs on nonattainment. *Id.* at 9512.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

These comments also highlight the agency's failure to align the responsibilities of upwind and downwind states as it selected the analytical year for evaluating the Good Neighbor Provisions of the CAA. EPA's response to the Missouri plan failed to address the alignment issue defaulting to the selection of 2023 as the appropriate analytic year. EPA failed to assess the extent of delay of downwind states emissions reductions programs on nonattainment.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851, EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

EPA's selection of 2023 as the analytical year for its assessments of the state plans fails to align the obligation of upwind states with downwind states inasmuch as certain nonattainment areas have delayed implementation of nonattainment controls until 2025 and beyond

Comment: EPA's statutory duty is to harmonize the Good Neighbor Provision of CAA §110(a)(2)(D)(i) with nonattainment and maintenance requirements of CAA §172 so that compliance burdens are aligned among upwind and downwind states.  MOG is not critical of the downwind state plans to the extent those plans are designed and demonstrated to achieve attainment within the attainment deadlines.  MOG is, however, critical of EPA for disapproving upwind state Good Neighbor Plans without consideration of the timing of the implementation of nonattainment controls by downwind states - effectively shifting the burden of additional controls to the upwind states.

The Wisconsin remand concluded that EPA exceeded its statutory authority under the Good Neighbor Provision "by issuing a Rule that does not call for upwind States to eliminate their substantial contributions to downwind nonattainment in concert with the attainment deadlines."

Wisconsin, 938 F.3d at 318.  The Wisconsin remand directed EPA to address the downwind state "deadline" in such a manner as to "harmonize" the deadlines of upwind and downwind states and to apply "parallel timeframes." Id. at 312, 314. The D.C. Circuit repeatedly has explained the CAA directive to "harmonize" and manage the relationship described as parallel between the Good Neighbor obligations for upwind states and statutory attainment deadlines for downwind areas. That relationship is one of "par," using the Court's term, meaning to be judged on a common level with the other. With this proposed disapproval, EPA ignores the obvious relationship between the downwind states' obligation to implement controls to attain the standard relative to the obligation of an upwind state to not significantly contribute to the nonattainment at issue.

This Court in North Carolina v. EPA, 531 F.3d 896 (D.C. Cir. 2008), found that EPA did not explain why it did not coordinate the Good Neighbor Provision with the Clean Air Interstate Rule to provide a sufficient level of protection to downwind states.

Despite CAA §110(a)(2)(D)(i)'s requirement that upwind contributions to downwind nonattainment be "consistent with the provisions of [Title I]," EPA did not make any effort to harmonize CAIR's Phase Two deadline for upwind contributors to eliminate their significant contribution with the attainment deadlines for downwind areas... As a result, downwind nonattainment areas must attain NAAQS for ozone and PM2.5 without the elimination of upwind states' significant contribution to downwind nonattainment, forcing downwind areas to make greater reductions than CAA §110(a)(2)(D)(i)(I) requires. Id. (emphasis added).  The D.C. Circuit described its North Carolina ruling in the Wisconsin remand as follows:

> We explained that EPA needed to "harmonize" the "Phase Two deadline for upwind
> contributors to eliminate their significant contribution with the attainment deadlines for

90

> downwind areas." ... . Otherwise, downwind areas would need to attain the NAAQS "without the elimination of upwind states' significant contribution."

Wisconsin, 938 F.3d at 314 (emphasis added). The Wisconsin remand explained, "In sum, under our decision in North Carolina, the Good Neighbor Provision calls for elimination of upwind States' significant contributions on par with the relevant downwind attainment deadlines." Id. at 315 (emphasis added). The Wisconsin opinion explains further:

> The Good Neighbor Provision, as North Carolina emphasized, requires upwind States to eliminate their significant contributions to downwind pollution "consistent with the provisions of this subchapter," i.e., Title I of the Clean Air Act. 42 U.S.C. §7410(a)(2). One of the "provisions of this subchapter" is §7511(a)(1), which in turn requires downwind areas in moderate non-attainment to attain the NAAQS by July 20, 2018.

Id. at 315-16. The Wisconsin remand summarizes that "it is the statutorily designed relationship between the Good Neighbor Provision's obligations for upwind states and the statutory attainment deadlines for downwind areas that generally calls for parallel timeframes." Id. at 316.

EPA, however, takes the following actions. It interprets the court's holding in Maryland v. EPA, 958 F. 3d 1185 (D.C. Cir. 2020) as requiring the states and the Agency, under the good neighbor provision, to assess downwind air quality as expeditiously as practicable and no later than the next applicable attainment date, which is now the Moderate area attainment date under CAA §181 for ozone nonattainment. The Moderate area attainment date for the 2015 8-hour ozone NAAQS is August 3, 2024. The EPA provides that it believes that 2023 is now the appropriate year for analysis of interstate transport obligations for the 2015 8-hour ozone NAAQS because the 2023 ozone season is the last relevant ozone season during which achieved emissions reductions in linked upwind states could assist downwind states with meeting the August 3, 2024, Moderate area attainment date for the 2015 8-hour ozone NAAQS." 87 Fed. Reg. 9,487-8. EPA is inappropriately shifting the burden to the transport states.

For New York's disapproved transport plan, EPA offers the following criticism, "under the Wisconsin decision, states and the EPA may not delay implementation of measures necessary to address good neighbor requirements beyond the next applicable attainment date without a showing of impossibility or necessity. See 938 F.3d at 320. In those cases where the measures identified by the State had implementation timeframes beyond the next relevant attainment dates the submission did not offer a demonstration of impossibility of earlier implementation of those control measures. Similarly, the State's submittal is insufficient to the extent the implementation timeframes for identified control measures were left unidentified, unexplained, or too uncertain to permit the EPA to form a judgment as to whether the timing requirements for good neighbor obligations have been met. 87 Fed. Reg. 9,494. This narrative illustrates the disconnect between standards to which downwind plans are held versus the standards to which upwind plans are held. Both plans must be aligned with the same timeframes.

Within the Clean Air Act, Subchapter 1, Part D titled "Plan Requirements for Nonattainment Areas" is found Subpart 1 titled "Nonattainment Areas in General." Subpart 1 includes Section 177 addressing new motor vehicle emissions standards in state plans for nonattainment areas. It is apparent that the CAA contemplated the option of developing nonattainment plans per Section 172 to address certain new motor vehicles or new motor vehicle emissions. For those approved downwind nonattainment

91

plans that include motor vehicle emissions reduction strategies for achieving attainment, delay in implementation beyond the attainment date is unacceptable under CAA §179. Delay in implementation of committed controls by a downwind state shifts the emissions reduction burdens onto upwind states if EPA fails to engage in alignment of the dates upon which each of the states must satisfy nonattainment strategy performance.

This issue of imbalance was specifically addressed by D.C. Circuit in the Wisconsin remand as an appropriate basis for extending the compliance deadline for upwind states. In that case the Court stated that: "if a modified attainment deadline applies to downwind States, EPA may be able, if justified, to make a corresponding extension for an upwind State's good neighbor obligations." Wisconsin, 938 F.3d at 317.

Nowhere in its discussion of the regulatory framework underlying these proposals does EPA recognize the alignment obligation as articulated in the Wisconsin remand.

*Response*

Although the commenter criticizes the EPA's selection of 2023 as an appropriate analytic year, they do not identify their preferred alternative, nor are their arguments against 2023 compelling. The EPA maintains its position that 2023 is an appropriate analytic year and comports with the relevant caselaw.

The commenter misreads the *North Carolina v. EPA*, 550 F.3d 1176 (D.C. 2008), *Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019), and *Maryland v. EPA*, 958 F.3d 1185 (D.C. Cir. 2020) decisions as calling for good neighbor emissions controls to be aligned with the timing of the *implementation* of nonattainment controls by downwind states. However, the D.C. Circuit has never held that, and such a requirement is both untethered to the statute and almost certainly unworkable in practice. It would necessitate coordinating the activities of multiple states with the EPA regional and headquarters offices to a level of fine-tuning that effectively could preclude the implementation of good neighbor obligations altogether. Indeed, the commenter offers no explanation how the EPA or upwind states should coordinate upwind emissions control obligations for states linked to multiple downwind receptors whose states may be implementing their requirements on different timetables. Far less drastic mechanisms than subjecting people living in downwind receptor areas to continuing high levels of air pollution caused in part by upwind-state pollution are available if the actual implementation of mandatory CAA requirements in the downwind areas is delayed: CAA section 304(a)(2) provides for judicial recourse where there is an alleged failure by the Agency to perform a nondiscretionary duty, and that recourse is for the Agency to be placed on a court-ordered deadline to address the relevant obligations. *Accord Oklahoma v. U.S. EPA*, 723 F.3d 1201, 1223-24 (10th Cir. 2013); *Montana Sulphur and Chemical Co. v. U.S. EPA*, 666 F.3d 1174, 1190-91 (9th Cir. 2012).

What in fact the D.C. Circuit has repeatedly emphasized is that the *statutory attainment dates* are the relevant downwind deadlines the EPA must align with in implementing the good neighbor provision. In *Wisconsin*, the court held, "In sum, under our decision in *North Carolina*, the Good Neighbor Provision calls for elimination of upwind States' significant contributions on par with the relevant downwind attainment deadlines." *Wisconsin*, 938 F.3d. at 321. After that decision, the EPA interpreted *Wisconsin* as limited to the attainment dates for Moderate or higher classifications under CAA section 181 on the

basis that Marginal nonattainment areas have reduced planning requirements and other considerations. *See, e.g.,* 85 FR 29882, 29888–89 (May 19, 2020) (proposed approval of South Dakota's 2015 ozone NAAQS good neighbor SIP). However, on May 19, 2020, the D.C. Circuit in *Maryland v. EPA*, 958 F.3d 1185 (D.C. Cir. 2020), applying the *Wisconsin* decision, held that the EPA must assess air quality at the next downwind attainment date, including Marginal area attainment dates under CAA section 181, in evaluating the basis for the EPA's denial of a petition under CAA section 126(b). 958 F.3d at 1203-04. After *Maryland*, the EPA acknowledged that the Marginal attainment date is the first attainment date to consider in evaluating good neighbor obligations. *See, e.g.*, 85 FR 67653, 67654 (Oct. 26, 2020) (final approval of South Dakota's 2015 ozone NAAQS good neighbor SIP).

The relevance of CAA sections 172, 177, and 179 to the selection of the analytic year in this action is not clear. The commenter cites these provisions to conclude that EPA did not appropriately consider downwind attainment deadlines and the timing of upwind good neighbor obligations. These provisions are found in subpart I, and while they may have continuing relevance or applicability to aspects of ozone nonattainment planning requirements, the nonattainment dates for the 2015 ozone NAAQS flow from subpart 2 of title I of the CAA, and specifically CAA section 181(a). Applying that statutory schedule to the designations for the 2015 ozone NAAQS, the EPA has promulgated the applicable attainment dates in its regulations at 40 CFR 51.1303. The effective date of the initial designations for the 2015 ozone NAAQS was August 3, 2018 (83 FR 25776, June 4, 2018, effective August 3, 2018).[16] Thus, the first deadline for attainment planning under the 2015 ozone NAAQS was the Marginal attainment date of August 3, 2021, and the second deadline for attainment planning is the Moderate attainment date of August 3, 2024. If a Marginal area fails to attain by the attainment date it is reclassified, or "bumped up," to Moderate. Indeed, the EPA has just completed a rulemaking action reclassifying many areas of the country from Marginal to Moderate nonattainment, including all of the areas where downwind receptors have been identified in our 2023 modeling as well as many other areas of the country. 87 FR 60897, 60899 (Oct. 7, 2022).

Other than under the narrow circumstances of CAA section 181(a)(5) (discussed further below), the EPA is not permitted under the CAA to extend the attainment dates for areas under a given classification; that is, no matter when the EPA finalizes a determination that an area failed to attain by its attainment date and reclassifies that area, the attainment date remains fixed, based on the number of years from the area's initial designation. *See, e.g.,* CAA section 182(i) (authorizing the EPA to adjust any applicable deadlines for newly reclassified areas "other than attainment dates"). As the D.C. Circuit has repeatedly made clear, the statutory attainment schedule of the downwind nonattainment areas under subpart 2 is rigorously enforced and is not subject to change based on policy considerations of the EPA or the states.

> [T]he attainment deadlines, the Supreme Court has said, are "the heart" of the Act. *Train v. Nat. Res. Def. Council*, 421 U.S. 60, 66, 95 S. Ct. 1470, 43 L.Ed.2d 731 (1975); *see Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002) ("the attainment deadlines are central to the regulatory scheme") (alteration and internal quotation marks omitted). The Act's central object is the "attain[ment] [of] air quality of specified standards [within] a specified period of time." *Train*, 421 U.S. at 64–65, 95 S. Ct. 1470.

---

[16] September 24, 2018, for the San Antonio area. 83 FR 35136 (July 25, 2018).

*Wisconsin*, 938 F.3d at 316. *See also Natural Resources Defense Council v. EPA*, 777 F.3d 456, 466-68 (D.C. Cir. 2014) (*NRDC*) (holding the EPA cannot adjust the section 181 attainment schedule to run from any other date than from the date of designation). *See also id.* at 468 ("EPA identifies no statutory provision giving it free-form discretion to set Subpart 2 compliance deadlines based on its own policy assessment concerning the number of ozone seasons within which a nonattainment area should be expected to achieve compliance.") (citing and quoting *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 484, (2001)) ("The principal distinction between Subpart 1 and Subpart 2 is that the latter eliminates regulatory discretion that the former allowed."). Furthermore, as the court in *NRDC* noted, "[T]he 'attainment deadlines ... leave no room for claims of technological or economic infeasibility.'" 777 F.3d at 488 (quoting *Sierra Club,* 294 F.3d at 161) (internal quotation marks and brackets omitted).

With the exception of the Uinta Basin, which does not have an identified receptor in this action, no Marginal nonattainment area met the conditions of CAA section 181(a)(5) to obtain a one-year extension of the Moderate area attainment date. 87 FR 60899. Thus, all Marginal areas (other than Uinta) that failed to attain have been reclassified to Moderate. *Id.* (And the New York City Metropolitan nonattainment area was initially classified as Moderate (see below for further details).). Even if the EPA had extended the attainment date for any of the downwind areas, it is not clear that it would necessarily follow that the EPA must correspondingly extend or delay the implementation of good neighbor obligations. While the *Wisconsin* court recognized extensions under CAA section 181(a)(5) as a possible source of timing flexibility in implementing the good neighbor provision, 938 F.3d at 320, the EPA and the states are still obligated to implement good neighbor reductions as expeditiously as practicable and are also obligated under the good neighbor provision to address "interference with maintenance." Areas that have obtained an extension under section 181(a)(5) or which are not designated as in nonattainment could still be identified as struggling to maintain the NAAQS, and the EPA is obligated under the good neighbor provision to eliminate upwind emissions interfering with the ability to maintain the NAAQS as well. *North Carolina*, 531 F.3d at 908-11. Thus, while an extension under CAA 181(a)(5) may be a source of *flexibility* in the timing of implementation of good neighbor obligations, as *Wisconsin* recognized, it is not the case that the EPA *must* delay or defer good neighbor obligations for that reason, and neither the D.C. Circuit nor any other court has so held.

The commenter is therefore incorrect to the extent that they argue the selection of 2023 as an analytic year for upwind obligations results in the misalignment of downwind and upwind state obligations. To the contrary, both downwind and upwind state obligations are driven by the statutory attainment date of August 3, 2024, for Moderate areas, and the last year that air quality data may impact whether nonattainment areas are found to have attained by the attainment date is 2023. That is why, in the recent final rulemaking determinations that certain Marginal areas failed to attain by the attainment date, bumping those areas up to Moderate, and giving them SIP submission deadlines and reasonably available control measures (RACM) and reasonably available control technology (RACT) implementation deadlines, the EPA set the attainment SIP submission deadlines for the bumped up Moderate areas to be January 1, 2023. *See* 87 FR 60897, 60900 (Oct. 7, 2022). The implementation deadline for RACM and RACT is also January 1, 2023. *Id.* This was in large part driven by the EPA's ozone implementation regulations, 40 CFR 51.1312(a)(3)(i), which previously established a RACT implementation deadline for initially classified Moderate as no later than January 1, 2023, and the modeling and attainment demonstration requirements in 40 CFR 51.1308(d), which requires a state to provide for implementation

94

of all control measures needed for attainment no later than the beginning of the attainment year ozone season (i.e., 2023). Given this regulatory history, the EPA can hardly be accused of letting states with nonattainment areas for the 2015 ozone NAAQS avoid or delay their mandatory CAA obligations.

The commenter focuses on the EPA's evaluation of New York's good neighbor SIP submission to argue the EPA is treating upwind and downwind states dissimilarly. The argument conflates New York's role as both a downwind and an upwind state. In evaluating the Good Neighbor SIP submission that New York submitted, the EPA identified as a basis for disapproval that the state emissions control programs New York cited included implementation timeframes to achieve the reductions, let alone ensure they were achieved by 2023. 87 FR 9484, 9494 (Feb. 22, 2022). The EPA conducted the same inquiry into other states' claims regarding their existing or proposed state laws or other emissions reductions claimed in their SIP submissions. *See, e.g.,* 87 FR at 9472-73 (evaluating claims regarding emissions reductions anticipated under Maryland's state law); 87 FR at 9854 (evaluating claims regarding emissions reductions anticipated under Illinois' state law). Consistent with its treatment of the other upwind states included in this action, the EPA is disapproving New York's good neighbor SIP submission for the 2015 ozone NAAQS because its arguments did not demonstrate that it had fully prohibited emissions significantly contributing to out of state nonattainment or maintenance problems.

The commenter attempts to contrast this evaluation with what it believes is the EPA's permissive attitude toward delays by downwind states, specifically claiming that "certain nonattainment areas have delayed implementation of nonattainment controls until 2025 and beyond." This apparently references New York's simple cycle and regenerative combustion turbines (SCCT) controls, which the commenter cited elsewhere in its comments. New York's SCCT controls were not included by New York in the submission under the EPA review in this action, nor was the prior approval of the SCCT controls reexamined by the EPA or reopened for consideration by the Agency in this action. Although not part of this rulemaking, the EPA notes that the SCCT controls were approved by the EPA as a SIP strengthening measure and not to satisfy any specific planning requirements for the 2015 ozone NAAQS under CAA section 182. 86 FR 43956, 43958 (Aug. 11, 2021). The SCCT controls submitted to the EPA were already a state rule, and the only effect under the CAA of the EPA approving them into New York's SIP was to make them federally enforceable. 86 FR 43956, 43959 (Aug. 11, 2021). In other words, approval of the SCCT controls did not relieve New York of its nonattainment planning obligations for the 2015 ozone NAAQS.

The EPA notes that the New York-Northern New Jersey-Long Island, NY-NJ-CT nonattainment area was initially designated as in Moderate nonattainment. 83 FR 25776 (June 4, 2018). Pursuant to this designation, New York was required to submit a RACT SIP submission and an attainment demonstration no later than 24 months and 36 months, respectively, after the effective date of the Moderate designation. CAA section 182; 40 CFR 51.1308(a), 51.1312(a)(2). NY submitted a RACT SIP plan for the 2015 ozone standards on January 29, 2021,[17] and the EPA is currently evaluating that submission. New York has not yet submitted its attainment demonstration, which was due August 3, 2021. Further, the New York-Northern New Jersey-Long Island, NY-NJ-CT nonattainment area remains subject to the Moderate nonattainment area date of August 3, 2024; if it fails to attain the 2015 ozone NAAQS by

---

[17] See https://edap.epa.gov/public/extensions/S4S_Public_Dashboard_2/S4S_Public_Dashboard_2.html.

August 3, 2024, it will be reclassified to Serious nonattainment, resulting in additional requirements on the New York nonattainment area.

In any case, regardless of the status of New York's and the EPA's efforts in relation to the New York-Northern New Jersey-Long Island, NY-NJ-CT nonattainment area (which are outside the scope of this action), the EPA's evaluation of 2023 as the relevant analytic year in assessing New York's and other states' good neighbor obligations is entirely consistent with the statutory framework and court decisions calling on the agency to align these obligations with the downwind areas' statutory attainment schedule. That principle holds regardless of the specific timing of the implementation of downwind states' emissions controls.

# 3  Emissions Inventories

## 3.1  Emissions Inventory - General

*Comment*

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Arkansas and more than 20 other states and regional groups submitted comments, suggestions, and corrections to EPA for the emissions inventories datasets for the 2016v2 modeling platform.[14] However, the modeling data that EPA proposes to primarily rely upon in its disapproval of the Arkansas Transport Plan does not reflect corrections to the modeling platform in response to state comments. EPA should understand that failing to incorporate state-provided corrections to that data while moving forward with issuing proposed actions essentially bars states from performing their role under the CAA.

[…]

In response to comments from the MJOs and states, EPA partially updated the 2016v2 platform emissions inventories datasets for future modeling runs.[15] However, the modeling that EPA is primarily relying upon in its disapproval was performed before states could offer feedback and still contains all the errors that states previously identified. Although DEQ disagrees with EPA's choice to substitute new modeling data for the data that was available when the state was developing its plan, EPA should understand that failing to incorporate state-provided corrections to that data while moving forward with issuing proposed actions essentially bars states from performing their role under the Clean Air Act.

[14] Index of /Air/emismod/2016/v2/reports/comments at
https://gaftp.epa.gov/Air/emismod/2016/v2/reports/comments/
[15] https://gaftp.epa.gov/Air/emismod/2016/v3/preliminary_updates/

*Response:*

The EPA has incorporated updates as appropriate into its 2016v3 modeling platform based on pre-proposal feedback and information provided in public comments on the 2016v2 platform.

## 3.2  Emissions Inventory – Non-EGUs

*Comment*

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

For point sources (ptnonipm) DEQ suggests that EPA consider examining the use of 2017 NEI data and adjusting the dataset to create a 2016 base year. The 2017 data is more recent and if a backward base year projection is necessary, then it would be a one year projection (2017 to 2016) and not two years (2014 to 2016).

According to EPA's 2016v2 TSD, for sources outside of the Mid-Atlantic Regional Air Management Association (MARAMA) region, the maximum future year projection factor was capped at 1.25. Also the future year projection factor was capped at a maximum of 2.5 if SCC/NAICS combinations with criteria pollutant emissions >100 tons/year for the ptnonipm sector. However, the ptnonipm includes future year projection factors that are greater than 1.25 for various facilities outside of MARAMA region where the total annual emissions are less than 100 tons, including a future year projection factor as high as 1.468. DEQ does not know the origin of these greater than 1.25 exceptions to the TSD language and whether they are possibly a result of state-submitted refinement data, which would be reliable sources.

The future year projection factor for NOx emissions from "Honeywell International Inc. – Hopewell" (unit# 20375813) in Virginia is 6.79 for 2026 in the 2016v2 platform and was 0.63 for 2028 in 2016v1 platform. DEQ conducted trend analyses to evaluate some future year projection factors and DEQ's analysis for this source does not appear to support a future year projection factor of 6.79 and may support a future year projection factor of 0.62; however, Virginia may have suggested the 6.79 as the appropriate value and, if so, would likely be the best source of this data. DEQ suggests that EPA verify the above example, possibly with Virginia if data was not already provided by Virginia, and other similar examples.  [Figure 1 available in full comment]


*Response*

The EPA concurs with the suggestion by the commenter to use 2017 National Emissions Inventory (NEI) data to represent 2016 instead of data projected from 2014. The EPA implemented this approach into the 2016v3 platform where a matching source could be identified in the 2017 NEI, however, data submitted specifically for the year 2016 are used, where available.  The EPA also updated the approach for developing 2023 non-EGU point source emissions in the 2016v3 platform to make use of 2019 NEI point source data as the basis for 2023 non-EGU point source emissions for source not related to oil and gas production. Thus, the maximum projection factor of 1.25 is no longer relevant in the 2016v3 inventory for 2023.  This approach applies to Honeywell International Inc. – Hopewell for 2023 emissions.  As the analytic year for this action is 2023, projections for years later than 2023 are not relevant for the identification of receptors and linkages at Steps 1 and 2 of the 4-step interstate transport framework.

*Comment*

**Commenter:** Cleco Corporate Holdings LLC

**Commenter ID:** 14

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA should incorporate needed revisions to the 2016v2 modeling platform based on comments provided by the states and other stakeholders as provided in this docket and then re-analyze the Louisiana SIP based on the updated/corrected modeling platform before issuing a final rule on the Louisiana SIP.

*Response*

In response to the commenter's requests that the EPA reanalyze its modeling based on comments received, the EPA has re-evaluated its emissions inventories to create the 2016v3 emissions modeling platform and re-run the air quality models and related analyses using the 2016v3 inventories. Specifically, with regards to Louisiana, the state continues to have a linkage to one or more downwind receptors as indicated in the preamble in Sections III.C and IV.G.

*Comment*

**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA's new modeling fails to account for significant emissions reductions that have occurred since 2016.

The Proposed SIP Disapproval is based on updated air quality modeling, using EPA's newly released 2016v2 Model. This modeling platform relies on emissions inventory data from the base year of 2016 to develop future year emissions inventories using sector-specific methods. The 2016v2 update "draws on data from the 2017 National Emissions Inventory," incorporating "2016-specific state and local data along with adjustment methods appropriate for each sector." Based on projected future emissions inventories from this model for 2023, 2026, and 2032, EPA assessed nonattainment and maintenance-only receptors, as well as linked states, for purposes of evaluating state SIP submittals. While EPA's updated modeling accounts for certain updates between 2014 and 2016 in developing its baseline emissions inventory for 2016, 2016v2 does not capture enforceable emissions limits and emissions reductions from 2016 to present in modeling emissions in 2023 and 2026. These emissions reductions significantly impact EPA's assessment of nonattainment and maintenance-only receptors in these future years, and call into question EPA's determination that Nevada remains linked to downwind air quality problems.

Since 2016, at least fifteen Nevada facilities, identified in Table 1, have entered consent decrees requiring enforceable NOx emissions reduction totaling at least 1,676 tpy, apart from additional reductions that EPA has not quantified. EPA's determination that Nevada is linked to downwind air quality problems fails to account for these enforceable emission reductions because they fall outside EPA's 2016v2 modeling update.

Eagle believes that the marginal link between Nevada and downwind receptors has been eliminated by these additional enforceable emission reductions. In its Proposed SIP Disapproval, EPA determined that Nevada was linked to downwind air quality problems based on air quality projections and state contributions identified in Table 2 [(table in full comment)], below. Nevada's maximum contribution to these receptors is 0.19 ppb above EPA's 0.70 ppb linkage threshold. Because Nevada's modeled contribution to downwind receptors is so low, even a small reduction in projected emissions could reduce Nevada's level of contribution to these receptors below the 0.70 ppb threshold. Accordingly, Eagle urges EPA account for these additional NOx reductions in evaluating Nevada's interstate transport obligations in its SIP submittal.

**Table 1: Enforceable Consent Decrees Impacting Nevada NOx Emissions, 2016 – Present**

| EPA Case No. | Facility Name | Date of Final Order | Estimated NO$_x$ Emissions Reductions |
|---|---|---|---|
| NVCCHA200162193 | Lhoist North America of Arizona – Apex Plant | 7/5/2016 | Unknown |
| NVCCHA200162109 | Titanium Metals Corp. Henderson Facility | 5/17/2017 | Unknown |
| 09-2011-0506 | Fernley Plant | 10/30/2018 | 1676 tpy |
| NVCCHA200171077 | Republic Services Renewable Energy LLC | 1/29/2019 | Unknown |
| NVCCHA200172874 | Caesars Entertainment Corp. | 3/28/2019 | Unknown |
| NVCCHA200172890 | Robertsons Ready Mix | 3/28/2019 | Unknown |
| NVCCHA200172891 | Wells Cargo Inc. | 3/28/2019 | Unknown |
| NVCCHA200179749 | Nevada Ready Mix | 9/26/2019 | Unknown |
| NVCCHA200191116 | Aggregate Industries Sloan Quarry | 7/22/2020 | Unknown |
| NVCCHA200192550 | Blue Diamond Hill Gypsum | 09/24/2020 | Unknown |
| NVCCHA200192633 | Titanium Metals Corp. Henderson Facility | 11/30/2020 | Unknown |
| NVCCHA200196170 | Pabco Building Products, LLC | 5/26/2021 | Unknown |
| NVCCHA200199608 | Robertsons Ready Mix | 08/02/2021 | Unknown |
| NVCCHA200199945 | EMD Acquisition LLC | 9/23/2021 | Unknown |
| NVCCHA200199607 | Blue Diamond Hill Gypsum | 10/1/2021 | Unknown |

*Response*

In response to commenter's claims that the EPA's emissions inventories did not include emissions reductions from the facilities identified in the comment, the EPA has evaluated the information provided by the commenter regarding these consent decrees.

Regarding commenter's statement that the EPA has not quantified Nevada facilities subject to enforcement related consent decree for $NO_X$ emissions reductions, the commenter tabulated names of these facilities and their estimated $NO_X$ emissions reductions in Table 1 of the comment letter that is duplicated above. For each row of the table, the comment document provides footnotes with web links to the EPA's database Enforcement and Compliance History Online (ECHO). However, with the exception of the Fernley Plant, the estimated $NO_X$ emissions reductions for 14 of the 15 sources in the table are reported as "Unknown". To develop the 2023 non-EGU emissions in the 2016v3 platform, the EPA started with the 2019 NEI point source inventory, as it was the latest complete point source inventory at the time of the modeling. The EPA was able to identify some of the sources in the commenter's table in the NEI, although four facilities could not be found in the NEI with $NO_X$, volatile organic compound (VOC), or particulate matter (PM) emissions. The facilities that could not be found and the civil penalty from ECHO listed in parentheses were Caesars Entertainment Corp. ($9,125), Robertsons Ready Mix ($7,250 and $3,120), Nevada Ready Mix (case not found in ECHO), and EMD Acquisition LLC ($12,640). The penalties were modest with a maximum of $12,640. For the facilities that were found in the NEI, the actual annual $NO_X$ emissions in tons from the 2016 inventory in the 2016v3 platform and the 2019 NEI point inventory plus the modeled emissions in the modeled 2016v3 2023 inventory are shown in Table 3-1. The emissions in Table 3-1 were derived from facility and unit-level summaries of 2016v3 point source emissions provided in the docket for this action.

*Table 3-1 Recent and Projected Emissions for Nevada Facilities in Table 1*

| Facility Name | 2016 NOx (tons) | 2019 NOx (tons) | 2023 NOx (tons) |
|---|---|---|---|
| Lhoist North America of Arizona – Apex Plant | 1,219 | 1,108 | 1,151 |
| Titanium Metals Corp. Henderson Facility | 10 | 24 | 24 |
| Fernley Plant | 1,090 | 1,796 | 1,796 |
| Republic Services Renewable Energy LLC | 43 | 14 | 14 |
| Wells Cargo Inc. | 20 | 7 | 7 |
| Aggregate Industries Sloan Quarry | 7 | 19 | 19 |
| Blue Diamond Hill Gypsum | N/A | 66 | 66 |
| Titanium Metals Corp. Henderson Facility | 10 | 24 | 24 |
| Pabco Building Products, LLC | 218 | 198 | 198 |

The only facilities in Table 3-1 with more than 70 tons of $NO_X$ emissions in 2019 are: Lhoist North America of Arizona – Apex Plant, Fernley Plant, and Pabco Building Products, LLC. In ECHO[18], the Lhoist case is marked as resolved as of 2/1/2017, with a civil penalty of $7,500. We presume that any resulting

---

[18] *https://echo.epa.gov/enforcement-case-report?activity_id=3601452966*

emission reductions would have been implemented in time to be reflected in the 2019 NEI. The Pabco Building Products consent decree was from 2021, so any impacts would not be reflected in the 2019 NEI. The ECHO status for Pabco[19] is listed as resolved as of 6/8/2021 and the civil penalty was $7,600.  Given the actual $NO_X$ emissions in the 2019 NEI, the likely reduction in 2023 that could have been achieved even if all emissions were eliminated in 2023 is about 200 tons per year (tpy) of $NO_X$, while the total annual modeled anthropogenic $NO_X$ in Nevada in 2023 is projected at 42,260 tons.
Thus, even a reduction of that level would not impact Nevada's contribution to other states.

The summary for the Fernley case in ECHO[20] is, "U.S. Environmental Protection Agency reached a settlement with the Nevada Cement Company to install new air pollution control technology at its Fernley, Nev. facility and replace a heavy-duty diesel truck and a diesel railcar mover at the facility with clean emissions vehicles to address alleged violations of federal CAA regulations. The pollution controls and clean emissions vehicles will reduce NOx emissions by approximately 1,140 tpy. Nevada Cement Company also paid a civil penalty of $550,000 as part of the settlement."

The EPA located the consent decree in *United States* v. *Nevada Cement Company, Inc.,* Civil Action No. 17-302 (D. Nev.), which was amended in 2018. As amended, Section V.A of the consent decree requires installation and operation either of Selective Non-Catalytic Reduction (SNCR) or catalytic filter bags with ammonia injection and provides that EPA may require installation of low NOx burners. A copy of these documents are available in the docket for this action.

A review of a June 19, 2020 issuance of two minor revisions to the operating permit for the Nevada Cement Company shows an allowance of discharge of $NO_X$ to the atmosphere that will not exceed 475.84 pounds per hour, nor more than 2,084.20 tons per 12-month rolling period from the #1 Kiln, and an allowance of discharge of $NO_X$ to the atmosphere that will not exceed 475.84 pounds per hour, nor more than 2,084.20 tons per 12-month rolling period from the #2 Kiln.   The EPA contacted the Permitting Branch, Bureau of Air Pollution Control Nevada Division of Environmental Protection, Department of Conservation and Natural Resources seeking the status of installation and operation of SNCR at the Nevada Cement Company's Fernley Plant. The supervisor promptly responded that she has confirmed with the facility that the SNCR has been installed and is operational on the kilns prior to October 2022.   A copy of this document is made available in docket for this action. We note that the actual 2019 emissions and the modeled 2023 emissions listed in Table 3-1 are about 1,800 tons, which is significantly less than the total of the modified operating permit level of 4,168 tpy total for the two kilns and is therefore a reasonable representation of the $NO_X$ emissions from this facility for 2023.

In summary, for all facilities except the Fernley Plant, the commenter has not provided adequate information regarding $NO_X$ decreases for the EPA to fully evaluate commenter's dispute of the linkage results for these sources.  Following the EPA's analysis, the civil penalties for the cases other than Fernley in the ECHO database were modest, indicating that the level of reductions would have been minimal. Furthermore, an examination of the EPA-approved Regulations at 40 CFR 52.1470(c), and the EPA-approved state source-specific permits at 40 CFR 52.1470(d) for Nevada did not show any of these sources to have made these reductions pursuant to enforceable and permanent requirements of the

---

[19] *https://echo.epa.gov/enforcement-case-report?activity_id=3602495139*
[20] *https://echo.epa.gov/enforcement-case-report?activity_id=2600059825*

state's SIP. For Fernley, the modeled emissions are substantially less than the permitted emissions, so while the installation of the SNCR will reduce emissions once they are fully installed and operating, the EPA modeled the emissions in 2023 at only 43% of the modified level in the permit and therefore was at a reasonable level to support the contribution analysis.

Given the detailed review of the consent decrees listed in Table 1 and their expected impacts all being too small to make a difference, except potentially for Fernley (which we have otherwise accounted for per above), we have sufficiently accounted for these comments in the final rule emissions inventory. Our analysis projects Nevada to contribute more than 1 percent of the NAAQS to downwind receptors, as noted in the preamble in Section III.C. and Section IV.M.


*Comment*

**Commenter:** Louisiana Chemical Association

**Commenter ID:** 26

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA failed to take into account population decreases based on the 2020 census.

In addition to the inventory issues discussed above, EPA did not take into account the population decrease in Louisiana based on the 2020 census. This affects various source emission calculations, including many nonpoint source emissions. For Louisiana (and other states outside of the MARAMA), the EPA used historical census populations to project nonpoint sources.  A ratio of 2016 population to 2014 population was used to create a growth factor that was applied to certain sources. This analysis was then used to calculate census-based growth for certain sectors and certain activities, including: industrial solvent maintenance coatings, industrial adhesive applications, residential and commercial portable gas cans, wastewater treatment recovery, etc.

In performing this analysis, EPA did not consider the 2020 census which showed that Louisiana's population growth from 2010-2020 was only 2.7 percent overall.[53] The majority of parishes in Louisiana experienced decreases in population. For example, Cameron Parish, which shares a border with southeast Texas experienced a -17.9% population change from 2010 to 2020 and Caddo Parish, which shares a border with Texas near Dallas experienced a -6.7% population change over the same time period. In fact, of the seven parishes that share a border with Texas, four experienced a negative change in population and two experienced an increase less than 3%.

At a minimum, EPA must incorporate needed revisions to the 2016v2 inventory based on the population changes shown in the 2020 Census and then re-analyze the Louisiana Transport SIP based on the updated/corrected modeling platform before issuing a final rule on the Louisiana Transport SIP.

[53] *See Louisiana State Profile, 2020 Census, available at: https://www.census.gov/library/stories/state-bystate/louisiana-population-change-between-census-decade.html; see also Louisiana's population continues to shrink: Stats show nearly 13K decline between 2019, 2020*, The Advocate, January 29, 2020 (available at: https://www.theadvocate.com/baton_rouge/news/business/article_3833634c-5cdc-11eb-951d-

b39a30651d28.html); *Population declines in most Louisiana parishes, except for the suburbs, new estimates show*, Nola.com, March 25, 2022 (available at: https://www.nola.com/news/politics/article_fc5ff816-aba5-11ec-b605-234640609e50.html) ("The vast majority of Louisiana's parishes continued to shrink in the year after the 2020 census, drops that represented a continuation of a long-term trend that was exacerbated and sped up – in some cases dramatically – by the impacts of the pandemic and the devastation of Hurricane Laura, according to new estimates.").

*Response*

The EPA disagrees with the Louisiana Chemical Association's (LCA's) claim that EPA's emissions inventory projections are flawed because the EPA failed to consider that the population in Louisiana is projected to decrease, impacting the growth factor used to project non-point source emissions in the state. The population-based growth method from 2014 to 2016 for the base year was used in the 2016v2 platform used at proposal.  For the final rule modeling with 2016v3, data from 2017 NEI were used instead of using population-based factors to grow from 2014 to 2016, as 2017 NEI is a more recent inventory than 2014 NEI.  Based on U.S. Census data,[21] the population of Louisiana increased by 2% from 2010 to 2021. The commenter seems to contradict their own claim that Louisiana's population is decreasing by identifying that between 2010 and 2020, Louisiana's population increased overall by 2.7 percent. Further, and as the commenter notes, population data are only used to project emissions for a few Source Classifications Codes (SCCs) that impact $NO_X$ in the EPA's 2016v2 and 2016v3 platforms. A spreadsheet listing the SCCs that are projected based on human population is available in the docket for this action.  These factors increased Louisiana's $NO_X$ emissions in 2023 by only 2 tons statewide in 2016v2.  A spreadsheet showing state total emissions by SCC is available with the 2016v3 state total summaries in the docket for this action. Human population change is also used to project solvent VOC emissions. In the 2016v3 platform, the solvent emissions were projected to grow by 3.7% from 2016 to 2023. This is equivalent to 1,400 tons additional VOC out of 231,000 tons of anthropogenic VOC and 1.6M tons of VOC including biogenic and fire emissions. A change in VOC emissions of this magnitude would not have a noticeable result in ozone concentrations or contributions. Overall, the limited use of human population changes in projecting emissions from 2016 to 2023 does not have a significant impact on ozone precursor emissions in Louisiana.

*Comment*

**Commenter:** Louisiana Chemical Association

**Commenter ID:** 26

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

*The 2016v2 inventory contains sources that are permanently closed and fails to include emissions reduction projects in Louisiana.*

---

[21] *https://www.census.gov/quickfacts/fact/table/LA/PST045221.*

Some of the discrepancies may be explained by issues with the inventory used. According to the Technical Support Document for the 2016v2 platform ("2016v2 TSD"), the platform "draws on data from the 2017 National Emissions Inventory (NEI), although the inventory was updated to represent the year 2016 through the incorporation of 2016-specific state and local data along with adjustment methods appropriate for each sector."

For instance, the non-EGU point source sector emissions in the 2016v2 platform have been updated from the 2016 NEI point inventory and 2016v1 with certain changes. However, LCA believes that EPA has failed to include a number of federally enforceable consent decrees for non-EGUs in its model, which has served to overestimate emissions from Louisiana. In addition to the Cabot Facility consent decree referenced in the 2016v2 TSD, the following consent decrees were also entered since 2016:

[See pages 12-14 of comment letter for specific list of consent decrees and facility information identified by commenter.].


*Response*

In response to LCA's claims that the EPA's emissions inventories include emissions from sources in Louisiana that have permanently shut down, the EPA has evaluated the information provided by the commenter regarding these reductions and the status of the emissions at the facilities listed as planned closures is as follows:

> Sterlington Power is not in the 2016v3 inventories for 2023 and is therefore modeled as closed.

> US Convent Refinery has 234 tons $NO_X$ in 2016 and 290 tons $NO_X$ in 2023 in the 2016v3 platform and is not closed. The commenter claims this facility closed in 2019, although LA DEQ reported 290 tons of $NO_X$ in the preliminary 2020 NEI.  In addition, on February 24, 2022, *The Baton Rouge Advocate* reported that Shell confirmed the refinery will be revived as an alternative fuel complex,[22] and therefore it is not appropriate to remove the emissions in the 2023 modeling.

> Phillips 66 Alliance Refinery $NO_X$ emissions in the 2016v3 platform are approximately the same in 2016 at 813 tons as the modeled emissions in 2023 at 872 tons.  The commenter states that this will be converting to a terminal facility, but no details are provided on the timing for this conversion or the expected impact to the emissions and thus the emissions are retained in the 2016v3 platform.

Emissions for point sources used in the modeling by facility and unit are included in the docket for this action. Regarding reductions in emissions due to consent decrees or other enforceable measures: The installation of controls at Firestone Polymers by August 15, 2022, was too late to be reflected in the 2023 emissions used for modeling, although the 2023 NOx emissions are a minimal 44 tpy and a reduction would have virtually no impact on the contribution analysis.

The general approach used by the EPA to develop the 2016v3 platform point source emissions for 2023 was to start with the 2019 NEI point source inventory, as the most recent complete point inventory at

---

[22] *See* https://www.theadvocate.com/baton_rouge/news/business/shell-confirms-shuttered-convent-facility-will-become-an-alternative-fuels-complex/article_ad522d06-95ad-11ec-9457-bb64f61e4803.html.

the time the modeling was performed.  Next, known closures were applied, and growth was reflected for some industries based on Annual Energy Outlook (AEO) 2022 industrial projections.  Finally, controls from known control programs were applied.

To review the specific reductions listed in this comment, the EPA used the agency interest and document numbers provided by the commenter to download permit information from EDMS[23] for the identified facilities and specified dates. The status of the 2016v3 emissions for facilities noted as having decrees or other enforceable measures to reduce permitted emissions more than 100 tons for $NO_x$ or VOC are as follows:

> The Dow Company consent decree[24] effective January 19, 2021, calls for 5,689 tpy of VOC reduction and 127 tpy  of $NO_x$ reductions at Dow and Union Carbide facilities in Freeport Texas, Hahnville Louisiana, Plaquemine Louisiana, and Orange Texas. Union Carbide is a wholly owned subsidiary of Dow Chemical Co.  Dow is required to install controls on covered flares to reduce emissions.  The compliance deadlines in Hahnville are 12/31/2023 and 12/31/2024 for Olefins 1 and 2, respectively. The compliance deadline for Plaquemine is 10/1/2021 for the first control system, and 12/31/2025 for the second and larger control system.  The distribution in the targeted reduction between the facilities and between the states of Louisiana and Texas is not clear from the consent decree. As a result, it was not possible to implement specific reductions in the 2016v3 platform.  In the 2016v3 platform, non-EGU NOx emissions from The Dow Company facilities in Louisiana in 2023 are modeled as 2,763 tpy while 2019 NEI emissions are 2,703 tpy.  The VOC emissions from The Dow Company facilities in the 2019 NEI are 1,294 tpy and are modeled as 1,294 tons in 2023 inventories in the 2016v3 platform.

> Columbia chemicals company (aka Birla Carbon) has a consent decree effective June 1, 2018, with a targeted permit reduction of 661 tons of $NO_x$. Documentation for a permit modification provided August 26, 2022 (EDMS #13452282) shows that the permit is in the process of being updated to a total of 106 tpy, and that the current permitted value for $NO_x$ is 803 tpy. The 803 tpy permitted value was enacted March 27, 2017 (EDMS #10551099) and as of January 22, 2023 is still the most recent final permit for the facility. The emissions in 2023 in the 2016v3 platform were modeled at 632 tpy, thus the modeled emissions are within the permitted level as of January 22, 2023

> The Arcosa Lightweight Aggregates – Erwinville has a permit modification effective March 24, 2020 (EDMS #12122066) with a reduction in $NO_x$ emissions of 106 tons for a final permitted level of 896 tons of $NO_x$.  The emissions in 2023 for the 2016v3 platform are modeled as 363 tpy, the same as 2019 emissions and are within the permitted value.

> As of August 26, 2021, Cabot Corporation at the Villa Platte Plant has permitted NOx emissions of 1565 tpy (EDMS #12874234). The emissions for this plant for 2023 in the 2016 v3 modeling platform are 1,101 tpy and are therefore within the permitted level.

---

[23] https://edms.deq.louisiana.gov/edmsv2/quick-search
[24] https://www.epa.gov/sites/default/files/2021-01/documents/thedowchemicalcompany.pdf

As of March 20, 2019, Orion Engineered Carbon at the Ivanhoe plant has a permitted level of 204tpy (EDMS #11574517), a reduction in permitted emissions of 1,156 tons.  The permitted NOx emissions were later updated on July 28, 2022 to 272 tpy (EDMS #13406525). The actual emissions in 2016 were 797 tons, and the modeled emissions for 2023 in the 2016v3 platform were held constant at the 2019 level of 733 tpy.  The NOx emissions were thus potentially overstated by about 460 tpy as compared to the permitted level for 2023. The total anthropogenic point source NOx from Louisiana modeled in 2016v3 for 2023 is 126,100 tons and the total anthropogenic NOx is 247,700 tons.  Thus, even a 460 tpy overstatement of $NO_x$ from this facility would have virtually no impact on the contribution analysis.

Union Carbide Corp.  has a planned reduction in permitted $NO_x$ at its Olefin 1 and Olefin 2 plants of 122 tons effective March 9, 2021.  Based on the Louisiana EDMS system document ID #12642791, the first plant would realize the emissions reduction by fourth quarter of 2023 an the second by fourth quarter of 2024.  As of January 22, 2023, the most recent permit for the facility (EDMS #13192411) allows for 2,031 tpy of $NO_x$.  The amount modeled for 2023 in the 2016v3 platform is 1,655 tons, which is well within the permitted level.

The permit issued for Morehouse Bioenergy as of 10/6/2021 (EDMS #12918003) allows for 183 tons of $NO_x$ and 218 tons of VOC. The $NO_x$ modeled in 2023 for the 2016v3 platform is 114 tpy, which is within the stated value of the permit.  The VOC modeled for the facility in 2023 for the 2016v3 platform is equal to the 2019 emissions level of 1,046 tons.  The preliminary 2020 NEI emissions are higher than the 2019 emissions at 1,169 tons and had not yet shown the planned reduction in VOC to be effective in late 2021.  The total point source VOC included in the 2016v3 platform 2023 inventory is 64,700 tpy and the total of all anthropogenic VOC from Louisiana is 231,600 tpy. Thus, the potential overstatement of 930 tons from this facility would have virtually no impact on the contribution analysis.

The permits referenced above have been downloaded from EDMS and are available in the docket for this action. The changes for the remaining sources were under 100 tons of $NO_x$ or VOC and are not reviewed in detail above, but the modeled point source emissions levels by unit as compared to 2019 and other recent-year levels are available in a unit-level comparison workbook in the docket for this action. The total annual anthropogenic $NO_x$ emissions modeled in 2023 for Louisiana is 247,700 tons and the total annual anthropogenic VOC emissions modeled is 231,600 tons. Reviewing many of the above examples shows that the permitted emissions are often substantially higher than the actual emissions. Thus, a reduction in permitted emissions does not necessarily correlate to a similar reduction in actual emissions.  It is not appropriate to simply subtract the change in permit emissions from actual emissions, except in situations when the actual emissions are very close to the permitted level.

 Other issues raised by this comment related to EGUs in Louisiana are addressed in Section 3.3 (Emissions Inventory—EGUs).

*Comment*

**Commenter:** Minnesota Pollution Control Agency

**Commenter ID:** 31

107

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

EPA is now proposing to use a revised 2016 modeling platform, EPA 2016 version 2 emissions modeling platform (2016v2 EMP) to support a remedy for the Interstate Transport Rule for the 2015 Ozone National Ambient Air Quality Standard (NAAQS). EPA requested comments on the platform by December 17, 2021, and MPCA provided comments to Alison Eyth and the EmissionsModeling@epa.gov mailbox on December 15, 2021. In those comments, MPCA stated that the 2016v2 EMP and derivative modeling platforms will likely also be used by EPA for subsequent rule-making and technical evaluations for the next few years, as it is now being used in EPA's proposed disapproval of Minnesota's 2015 Ozone Transport SIP.

MPCA would like to reiterate our comments on the 2016v2 EMP for EPA's consideration based on issues identified by Minnesota and LADCO and other member states. Our comments identify three areas for improvement in the 2016v2 EMP:

1. Non-electricity generation stationary (non-EGU) point source emissions controls

2. Future year emissions projections for various point and non-point inventory sectors

[...]

Non-EGU point source emissions controls

LADCO worked with member states to identify the highest-emitting sources and applicable control technology information for non-EGU stationary point sources in the region. We generated a spreadsheet with the highest-emitting non-EGU sources in 2016 for each LADCO state. The spreadsheet includes columns for state input on emissions control information for each of the sources. The LADCO Emissions Workgroup worked to identify base year emissions controls and potential emissions controls for nonEGU point sources in the region. Given that EPA has included non-EGU point sources in the remedy for the states' obligations under the 2015 Ozone NAAQS Transport Rule, Minnesota reviewed the control information for this sector and provided information to EPA on actual, existing controls at the largest sources in the region.

The attached spreadsheet, nonegu_control_factors_survey_10252021 (MN Sources).xlsx, identifies control information and future emission rate changes for several Minnesota sources in columns S through V. The control information identified accounts for the installation of low NOX burners at the taconite facilities in Minnesota as part of the Regional Haze Taconite Federal Implementation Plan (FIP). Based on our estimates, we're expecting just under 11,000 tons per year (TPY) in NOX reductions due to the controls required by the Taconite FIP. MPCA first commented that we believed it was important to have these significant reductions included in the 2016v2 inventory for non-EGUs, and again request that EPA do so. See below for the summary of approximate emission reductions.

- 2,100 TPY at Minorca Mine

- 2,300 TPY at Hibbing Taconite

- 700 TPY at United Taconite

- 3,600 TPY at US Steel Keetac

- 2,100 TPY at US Steel Minntac

Future year emissions projections for various point and non-point inventory sectors

LADCO used EPA-generated emissions projection reports and identified a list of Source Classification Codes (SCCs) that we believe have incorrect future year projection rates. The 2016v2 EMP projection rates are not consistent either with real-world emissions trends or regional emissions projection information. We request that EPA replace the 2016v2 EMP projections for these sources with the updated rates provided by LADCO.

The attached spreadsheet, LADCO_EPA2016v2_Projections_Comments.xlsx, includes the list of the SCCs with alternative projection information and LADCO comments on the sources of the alternative information.

*Response*

In response to commenter's (Minnesota Pollution Control Agency Association (MPCA)) statement that the EPA should consider the comments it submitted on EPA's 2016v2 emissions inventories in December 2021, the EPA acknowledges receipt of MPCA's comments regarding updated emissions inventory data on point-source non-EGU sources in Minnesota, as well as data on point and non-point sources submitted in comments in the proposed action on Minnesota's SIP submission. The EPA thanks MPCA for this information and has considered, and incorporated as appropriate, this information in the 2016v3 emissions inventories.

In regard to the reflection of implemented and expected controls in the 2023 inventory, in the 2016v3 platform, the EPA started with the 2019 NEI point source inventory as the most recently available complete inventory at the time the 2016v3 platform modeling was performed, and then reflected impacts of known closures and controls in the intervening years.  Specifically for the Taconite-related sources mentioned by the commenter, the EPA incorporated draft year 2021 emissions into the 2023 inventory, as these were the latest available for those sources.  In the provided spreadsheet on non-EGU control factors, implementation dates for controls range from dates in 2018 through 2020 and would therefore be included in the 2021 emissions values used in the 2016v3 platform emissions for 2023.

These emissions estimates are reflective of the current status of efforts to implement best available retrofit technology (BART) FIP requirements for these sources. In particular, a revised emissions limit for the Minntac facility was finalized in March 2021, (86 FR 12095; March 2, 2021), and the emissions projections used for Minntac based on 2021 data are reflective of that limit. The EPA is still in the process of reconsidering and setting BART emissions limits for the remaining taconite facilities in Minnesota.[25] Using 2021 emissions data for these units provides the best emissions data at this time and until final BART emissions limits are set.  As noted already, the EPA only considers emissions reductions

---

[25] Petitions for review and petitions for reconsideration of EPA's 2016 BART FIP, 81 FR 21672 (Apr. 12, 2016), remain pending and settlement discussions with the taconite facilities are ongoing. *See* Petition for Judicial Review, *U.S. Steel Corp. v. U.S. EPA*, No. 18-1249 (8th Cir. Feb. 2, 2018).

from rules that are final. To the extent the commenter is referencing any emissions reductions from the second planning period of the Regional Haze Program, the EPA notes that it has not yet taken final action on the second planning period Regional Haze SIP submission from the MPCA.[26] Although the EPA acknowledges the efforts the state has made to develop a SIP submission, the EPA cannot incorporate non-final or uncertain emissions reductions into its transport modeling platform.

For airports, nonroad, and oil and gas-related natural gas engines, the EPA reviewed these factors and did not accept the revised projection factors as the provided rationales were not found to be credible when the EPA explored available data sources for these source categories. The EPA did accept the revised factor of 1.0 for nonpoint distillate as we found that industrial distillate sales are flat or declining since 2016.[27] More information is available in the 2016v3 Emissions Modeling TSD (the EPA notes that the 2016v3 Emissions Modeling TSD contains information for the years 2016, 2023, and 2026; however, years after 2023 are not relevant to this action, which is focused on the 2023 analytic year).

With regard to provided alternative projection rates for commercial aircraft (a uniform factor of 1.15), and factors equal to 1.0 (i.e., constant emissions) for two-stroke pleasure craft on waterways, two-stroke snowmobiles, and industrial natural gas usage in the point oil and gas sector, the EPA disagrees with some of the provided factors following a review of the listed data sources and the emissions data. For aircraft, because it is not appropriate to use a single projection factor for all airports the EPA instead used airport-specific projection factors based on the 2021 Terminal Area Forecast released in June 2022 as the basis for the projection factors in the 2016v3 platform. With the EPA's method, projection factors are based on expected changes to traffic at major airports and expected state-level changes in traffic at smaller airports. For pleasure craft, the EPA found data from the National Marine Manufacturers Association that indicated that pleasure craft sales were not on the decline in the early 2020s and therefore retained the emissions estimates from EPA's Motor Vehicle Emission Simulator version 3 (MOVES3). The EPA agrees that snowmobile usage is flattening, but because the ozone season snowmobile emissions are minimal, the EPA retained the emissions estimates from MOVES3. The EPA disagrees that employment levels were a good surrogate for emissions from natural gas engines on pipelines and instead uses information related to expected trends in natural gas usage based on factors in the AEO 2022. The EPA agrees that the use of distillate oil is flat or declining and accepted the proposed projection factor of 1.0 for those sources. More details on the EPA projection methods and updates in the 2016v3 platform are described in the 2016v3 Emissions Modeling TSD.

A response to the portion of the comment related to the Eastern Regional Technical Advisory Committee (ERTAC) versus IPM is included in Section 3.3.2 (EPA's Integrated Planning Model (IPM)of this RTC document.

---

[26] 87 FR 52856, August 30, 2022. Minnesota was one of 15 states named in a Finding of Failure to Submit a SIP which satisfies the visibility protection requirements of the Clean Air Act (CAA), as described in implementing regulations, for the regional haze second planning period. Minnesota submitted a second planning period Regional Haze SIP submission to the EPA on December 22, 2022.

[27] https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=KD0VISNUS1&f=A

*Comment*

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

The Proposed Disapproval is not based upon Accurate Projected Emission Estimates and the Model Over-Predicts Impacts

The emission estimates from sources that would be affected by the rule are incorrect; and do not reflect the actual projected emissions. These emission estimates do not include reductions that have been and will be implemented under other actions.

For example, it does not appear that U.S. EPA has considered current and projected emission reductions that have resulted from years of effort by both U.S. EPA and the taconite industry in revising the Federal Implementation Plan (FIP) for regional haze in Minnesota. In addition, undoing or redoing the evaluations and productive efforts that have occurred for over 10 years that have resulted in significant NOx reductions that have been shown to be technologically and economically feasible is inefficient and inappropriate. In sum, these efforts, and most importantly, these reductions must be considered in U. S. EPA's evaluation.

While U. S. Steel disagrees with EPA's proposed threshold of 1 percent, if the data are corrected and incorporated into modeling for Minnesota, it would show that Minnesota's contribution impact is less than EPA's 1 percent proposed "interference" threshold as previously demonstrated by LADCO and U. S. EPA.

*Response*

In response to commenter's claim that emissions from sources in Minnesota are overestimated, because the EPA failed to consider emissions reductions from programs such as Regional Haze, in the 2016v3 emissions for 2023, EPA used actual 2021 emissions provided by the MPCA that accounted for reductions implemented as of that year. As noted already, the EPA only considers emissions reductions from rules that are final.

*Comment*

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

**Non-EGU Point Sources** – Oklahoma respectfully requests that EPA use 2017 National Emissions Inventory (NEI) data for all non-EGU point sources rather than the data currently in the 2016v2 EMP. The temporal profile for these facilities is not weather dependent as is the case for the EGU sector, and ODEQ does not think that will raise any concerns regarding the coupling of emissions data and weather that may be likely to lead to ozone formation at sites experiencing difficulties attaining or maintaining attainment of the NAAQS. In addition, a number of errors were noted during ODEQ's review of the 2016v2 EMP and the 2017 NEI data corrects those errors. For non-EGU point sources, some of the problems ODEQ observed may be associated with PM-2.5 augmentation performed by EPA on data submitted to the 2016 Emissions Inventory System (EIS). In some cases, it appears that there was an assumption that ODEQ's primary PM2.5 represented only the filterable component, but that was not the case.[12]

**Oil & Gas Sector** – For the facilities whose emissions ODEQ submitted as oil and gas sector point sources in the 2017 NEI, Oklahoma requests that EPA use the 2017 NEI data rather than the data in the 2016v2 EMP. As was the case for other non-EGU point sources, ODEQ believes that the 2017 NEI data are more representative of actual facility emissions. With regard to area oil and gas emissions, ODEQ recommends use of the 2017 NEI data for the production segment.

[12] Primary fine particulate matter with an aerodynamic diameter less than or equal to 2.5 micrometers (PM-2.5) is composed of filterable and condensable components. If a state agency supplies only the filterable component in its submission to the EIS, EPA will augment those data to yield total PM-2.5. In Oklahoma's case, ODEQ submitted total PM-2.5 and no augmentation should have been performed.

*Response*

In response to commenter's request that the EPA use 2017 NEI data for all non-EGU point sources instead of 2016v2 EMP data, the EPA has updated the point source inventories to use 2017 NEI for emissions projected from 2014, although the 2016 point source emissions were retained where they reflected year 2016-specific data. Similarly, the EPA has accepted the Oklahoma Department of Environmental Quality's (DEQ's) request to use 2017 NEI for emissions from point source oil and gas sources. In response to commenter's claims that issues with inventory data may be associated with PM2.5 augmentation completed by EPA, the EPA notes that PM augmentation is not relevant for ozone-focused modeling. Finally, the EPA accepted the comment to use 2017 data for production-related area (i.e., nonpoint) oil and gas emissions in Oklahoma in the 2016v3 platform.

*Comment*

**Commenter:** PacifiCorp (Attachment – Ramboll Evaluation)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

112

Missing Anthropogenic Emission Controls in the DM/NFR NAA Will Result in Reductions in Future Year Ozone Design Values

EPA used the MOVES3 mobile source emissions model to define mobile source emissions for the 2016, 2023 and 2026 emission scenarios. MOVES3 uses vehicle sales through 2020 to define the level of Electric Vehicle (EV) sales penetration for each year. However, MOVES3 assumes zero EV sales in Colorado for year 2021 and newer years, presumably because EV sales are not a federally enforceable control measure. This is clearly an incorrect assumption as EV sales in 2021 were greater than previous years.

On January 17, 2019, the Governor of Colorado issued Executive Order B 2019 00221 to support a transition to zero emission vehicles. The Colorado Electric Vehicle Plan 2020 lays out the blueprint for increasing sales of EVs stablishing a target of almost a million EVs in the state by 2030, which is approximately half of how many vehicles are currently in Colorado. Thus, increased EV sales are a reality in Colorado and assuming no EV sales from 2021 on in MOVES3 will overstate future year NOX and VOC emissions in the DM/NFR NAA and other areas in Colorado resulting in EPA overstating the 2023 and 2026 ozone design values in their Proposed Transport Rule.

The Clean Air Act (CAA) allows California to set its own motor vehicle emission emissions standards provided they are no less stringent than the Federal standards. Under Section 177 of the CAA (42 U.S.C. 7507), states are allowed to opt-in to California's Low-Emissions Vehicle (LEV) criteria pollutants and greenhouse gas (GHG) emissions regulations and Zero Emissions Vehicle (ZEV) regulations. Colorado is one of 14 Section 177 states that have adopted the California motor vehicle emission standards, which includes a ZEV mandate that is mainly EVs. Thus, EV sales in Colorado from 2021 are a reality and legally binding under Section 177 of the CAA and assuming there are none, as in the Proposed Transport Rule, is incorrect and will overstate Colorado VOC and NOX emissions in 2023 and 2026 resulting in overstating 2023 and 2026 ozone design values at nonattainment/maintenance receptors in the DM/NFR NAA.

On April 13, 2022, EPA proposed to redesignate the DM/NFR ozone NAA from Serious to Severe under the 2008 ozone NAAQS due to failure to attain by the July 20, 2021 attainment date for a Serious ozone NAA. As a Severe ozone NAA, the DM/NFR NAA will be subject to additional requirements that will reduce NOX and VOC emissions. One such mandatory requirement for a Severe ozone NAA is the implementation of reformulated gasoline (RFG) in the NAA that will reduce NOX and VOC emissions resulting in reduced ozone concentrations. The Proposed Transport Rule 2026 ozone design value projections did not account for the fact that RFG will be mandatory in the DM/NFR NAA resulting in an overstatement of 2026 emissions and 2026 ozone design values.


*Response*
The commenter mentions the impact of the California's CAA waiver on other states like Colorado and noted that those emissions must be accounted for accurately. Any state that had adopted California's Low-Emissions Vehicle LEV criteria pollutant and Zero-Emissions Vehicle (ZEV) regulations at the time the EPA was building its 2016v2 emission profiles and projections would have seen those emissions changes included in the modeling. Specifically, because Colorado adopted the LEV rule prior to 2019,

113

this is reflected in the modeling. Because Colorado did not adopt its ZEV regulations until after 2019, these programs are not accounted for in the 2016v2 modeling.

The Colorado Electric Vehicle Plan 2020[28] says that by "achieving its goal of 940,000 EVs by 2030, the state could see significant environmental benefits that include emission reductions. As noted in the 2018 Colorado Electric Vehicle Plan, Colorado could experience an annual reduction of ozone forming pollutants estimated at 800 tons of NOx, 800 tons of volatile organic compounds (VOC)." If these numbers are correct, the ozone season ozone-precursor emissions would be reduced by approximately 600 tons, which is only 0.6 percent of the total ozone-precursor emissions projected for Colorado, and only by 2030, well after the 2023 analytic year. These changes, alone, are unlikely to bring the state of Colorado back into attainment for the 2015 ozone NAAQS. Emission reductions that will come from forthcoming reformulated gasoline (RFG) requirements will most likely be too small on their own, or in combination with other planned vehicle programs in the state, to change the attainment status of Denver.  We note that the emission rates included in MOVES3 reflect the national Tier 3 program, which harmonizes emission rates for $NO_x$ and VOC with the California LEV program starting with model year 2017 and are applied in all states.

For the 2016v3 modeling platform, the EPA used actual vehicle populations by fuel type (e.g., gasoline, diesel, electric) and by county for all states, not the assumptions of these populations in MOVES3.  For the proposal modeling, the populations based on registration data from the calendar year 2017 and for the final rule modeling the starting populations for future years were initially populated from actual registration data for the year 2020 and were then projected to the modeling year 2023 using fuel-specific trends based on the AEO 2022.

*Comment*

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

The emission estimates from other sources, including those in Illinois, Indiana, Ohio and Michigan – and in particular, emissions from the iron and steel sources in those states, are overstated and are inconsistent with prior state submittals.

*Response*

The EPA disagrees with the commenter that iron and steel emissions have been overstated in its modeling. Further, the commenter has not provided data suggesting why it believes emissions from iron and steel sources in Illinois, Indiana, Ohio, and Michigan are overstated, nor has the commenter

---

[28] The Colorado Electric Vehicle Plan 2020 can be accessed via *https://energyoffice.colorado.gov/zero-emission-vehicles/colorado-ev-plan-2020.*

explained how the EPA's modeling overstates these emissions. In the 2016v3 platform, EPA based 2023 non-EGU point emissions for facilities other than Taconite facilities on actual 2019 emissions as these are state-submitted data for the NEI and are consistent with operations in recent years. Any closures known to take effect by 2023 were applied along with the impacts of known control programs.

*Comment*

**Commenter:** Utah Petroleum Association and the Utah Mining Association

**Commenter ID:** 48

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The 2011 base emissions year in the modeling provided by EPA to use in IT SIPs is out of date and not predictive of current downwind influences.

In its IT SIP, Utah documented its substantial emission reductions occurring after the baseline model year, a 30% reduction in VOC emissions and a 37% reduction in NOx by 2017 based on the latest triennial emission inventory at the time of IT SIP submittal. These reductions came about at least in part due to controls implemented on sources for the PM2.5 Serious nonattainment SIP and controls implemented on oil and gas sources operating in the Uinta Basin. Some reductions resulted from ongoing motor vehicle fleet turnover and implementation of Tier 3 fuels.

Without modeling the substantial emission reductions, we cannot know how much these reductions would reduce the downwind influence. We can only consider these reductions as weight of evidence and to demonstrate that Utah has already implemented the types of controls that might be required in an IT SIP, as Utah has done in its IT SIP.

EPA should take these substantial reductions into account when it considers whether Utah has more than a threshold contribution to a downwind State.

*Response*

In response to the commenter's criticism of the EPA's 2011 base year emissions being out of date for use to support the EPA action on interstate transport, we first note that the EPA's 2016v2 modeling relied on in part at proposal, does not use 2011 as its base year, but instead uses 2016. This is for the exact reason the commenter states; 2016 provides more up-to-date data. With the collaborative development of the 2016-based inventories, the EPA believes this modeling provides up-to-date air quality projections. That said, no SIP submission is being disapproved on the grounds that the state relied on older versions of EPA or non-EPA modeling. The EPA has more recent data than the 2011 base year emissions included in the 2016v2 and 2016v3 emissions platform modeling. The EPA explained at proposal why Utah's reference to Best Available Control Technology (BACT) and Best Available Control Measures (BACM) for the Salt Lake City PM$_{2.5}$ nonattainment area, implementing controls on oil and gas sources in the Uinta Basin, and implementation of Tier 3 gasoline was insufficient to support a

conclusion that the state has no outstanding good neighbor obligations for the 2015 ozone NAAQS. See 87 FR 31477-31483 (May 24, 2022).

*Comment*

**Commenter:** WildEarth Guardians

**Commenter ID:** 50

**Docket ID:** EPA-R06-OAR-2021-0801-0042

**Comment:**

Thank you for the opportunity to offer public comments regarding EPA's proposed disapproval of Texas's 2015 Ozone Interstate Transport State Implementation Plan (SIP). WildEarth Guardians supports EPA's ultimate decision to disapprove the Texas SIP proposal. However, because neither Texas's nor EPA's ozone modeling results appear to accurately reflect the true impact of emissions from Texas on ozone pollution levels in New Mexico, we request that EPA take a closer look at this issue as it finalizes its SIP disapproval and formulates a Federal Implementation Plan (FIP) for Texas. In particular, we request that EPA ensure that ozone precursor emissions from Texas's oil and gas industry, including in the Permian Basin straddling the Texas-New Mexico border, are fully accounted for in EPA's modeling, and that EPA's FIP ensures that these emissions do not significantly contribute to future exceedances of the ozone NAAQS at monitoring sites in southeastern New Mexico. Guardians requests that EPA revisit its assumptions regarding emissions from the oil and gas industry – particularly in the booming Permian Basin – to ensure that its modeling efforts provide a realistic projection of ozone pollution levels at sites significantly impacted by such emissions.

*TCEQ Modeled 2023 Design Values in New Mexico*

With oil and gas development and production booming in the Permian Basin, it is critical that EPA fully evaluate the impact of oil and gas sector emissions on ozone pollution levels in New Mexico. With monitored design values in southern and southeastern New Mexico currently well in exceedance of the 2015 NAAQS, it is highly unlikely that these receptors will achieve attainment by 2023. As EPA explained in the Technical Support Document ("TSD") for the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal that it would not expect ozone design values to decrease by more than 0-1 ppb per year. As such, the 2020 and 2021 design values in southern and southeastern New Mexico suggest that monitors in these areas will likely see 2023 ozone design values that continue to significantly exceed the 2015 ozone NAAQS, thus warranting future year modeling and state contribution analysis to determine whether upwind states are inappropriately causing or contributing to ozone violations.

[table in full comment]

In light of the well-documented ozone pollution problem documented at monitoring sites in southern and southeastern New Mexico, we request EPA apply the analysis described in Sections 1 and 2 of the Technical Support Document (TSD) for the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal to TCEQ's modeled 2023 design values for Eddy County and Dona Ana County monitors in New Mexico, identified below.

[table in full comment]

Specifically, we request EPA evaluate recent design value monitored trends in Dona Ana and Eddy Counties to determine what potential design value declines – if any – could be expected by 2023. Using this information, we request EPA compare the TCEQ modeled 2023 design values for the monitors in these counties to the 2020 monitored design value and preliminary 2021 design value and determine whether TCEQ's modeling is underestimating future ozone design values in this region of New Mexico. Accurately determining whether monitors in Southern and Southeast New Mexico qualify as nonattainment or maintenance receptors is essential because TCEQ identified Texas anthropogenic emission sources as contributing well in excess of 1% of the NAAQS, or 0.70 ppb, to the vast majority of monitors in New Mexico – a potentially significant contribution to nonattainment or interference with maintenance. Accordingly, given the likelihood that these monitoring sites are likely to remain in exceedance of the 2015 NAAQS by the 2023 attainment deadline, it is critical that EPA's analysis take into account Texas's significant contribution to ozone pollution in southern and southeastern New Mexico. Understanding Texas's contribution is an essential first step towards ensuring that a Good Neighbor FIP for Texas take the steps needed to ensure that emissions from Texas – including those from the oil and gas industry – do not significantly contribute to non-attainment in New Mexico.

*Response*

In response to commenter's request that the EPA revisit its emissions inventories and projections of the oil and gas sector in the Permian Basin, the EPA notes that since the release of the 2016v2 inventories, the EPA has continued to work with the states to further refine these inventories for the 2016v3 platform. In particular, the EPA worked with New Mexico Environment Department to improve the characterization of oil and gas emissions in New Mexico in the 2016v3 platform. As a result, the EPA modified the base year inventories for New Mexico submitted by the Western Regional Air Partnership (WRAP), as well as projections for New Mexico and Texas to better reflect the emissions for the Permian Basin. Details of these changes can be found in the Emissions Modeling TSD, in the docket for this action (docket ID No. EPA-HQ-OAR-2021-0663).

The EPA addresses comments related to model performance and design in Section 4 (Air Quality Modeling) of the RTC.

*Comments*

**Commenter:** Wisconsin Department of Natural Resources

**Commenter ID:** 51

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

EPA should review Wisconsin's December 2021 comments on the 2016v2 emissions modeling platform and incorporate this information in future versions of the platform.

On December 15, 2021, the WDNR provided comments on EPA's draft 2016v2 emissions modeling platform. EPA has indicated that states should use this notice and comment opportunity to resubmit

these comments to EPA to ensure they are in the record. The WDNR is therefore providing those comments again as an enclosure to this letter. EPA should evaluate WDNR's comments and incorporate the suggested changes when it revises its 2016 platform for use in future regulatory actions, such as a final 2015 ozone NAAQS transport rule.

**Commenter:** Wisconsin Department of Natural Resources (Attachment – 2021 comments)

**Commenter ID:** 51

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

Control and Growth Assumptions for Industrial Point Sources

4. There are several industrial point source retirements and committed controls in Wisconsin that are not included in EPA's projected 2023, 2026 and 2032 emissions (see Table 2). The EPA should integrate these retirements and controls into its projected emissions.

5. The petroleum coke growth factor of 1.98 for A-M Kaukauna paper mill (Agency FID 445031180) unit B11 process #5 and unit B09 process #3 is inappropriate. The EPA should instead use a growth factor equivalent to the growth factor of coal of 0.88 for this facility. Petroleum coke throughput at this facility is expected to be proportional to coal throughput or less.

Table 2 – Wisconsin Industrial Point Source Post-2016 Retirements and Controls [available in full comment]

Control and Growth Assumptions for Mobile Sources

6. Commercial Marine Vessels. The EPA's Technical Support Document for the draft 2016v2 Platform (dated September 2021) states that the commercial marine emissions in 2016v2 are the same as those in 2016v1 (see pages 57 and 61). However, the draft 2016v1 Platform provides two sets of commercial marine emissions:

• One nationwide, with the files dated during January and February 2020. The data for these emissions can be accessed at the following links:

https://gaftp.epa.gov/Air/emismod/2016/v1/2016emissions/
https://gaftp.epa.gov/Air/emismod/2016/v1/2023emissions/
https://gaftp.epa.gov/Air/emismod/2016/v1/2028emissions/

• A second focused on the Great Lakes area, with the files dated later, during May 2020. These files cover two modeling domains:

o DO3: Parts of four states[6] surrounding Lake Michigan

o DO2: A larger domain surrounding the Great Lakes, including all or parts of 16 states[7] and part of Canada

118

The data for these emissions can be accessed at the following link:
https://gaftp.epa.gov/Air/emismod/2016/v1/2016emissions/cmv_other_grids/

The commercial marine emissions in the draft 2016v2 Platform match those in the first (nationwide) set cited above. The emissions within the states covered in the second (Great Lakes) set are not updated to match the emissions in that set. The EPA should either update the commercial marine emissions within the DO2 and DO3 modeling domains to match the May 2020 data or document why the earlier nationwide emissions estimates are preferable.

[6] These four states are: Illinois, Indiana, Michigan, and Wisconsin.
[7] These 16 states are: Arkansas, Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, New York, Ohio, Oklahoma, Pennsylvania, Tennessee, West Virginia, and Wisconsin.

*Response*

The EPA acknowledges receipt of the commenter's comments on the 2016v2 emissions inventories in December 2021, which were also attached to their comment on the proposal. In the 2016v3 inventories used for the final rule modeling, the EPA has taken these comments into consideration. The EPA ensured that three units at Georgia-Pacific Consumer Products LP and specific units at Green Bay Packaging Inc. Mill Division were not included in the 2023 projected inventories in the 2016v3 platform due to unit retirements. The EPA confirmed that the specified control devices were associated with the Cardinal FG and ND Paper units in the inventories used to model 2023 in the 2016v3 platform. Regarding the units at the A-M Kaukauna paper mill, the EPA updated its projection methods for the 2016v3 platform. The emissions in 2023 are now projected to be 91% and 92% of the 2016 emissions at the two units as opposed to having higher emissions in 2023 as was projected in the 2016v2 platform. The emissions at these units are projected to decrease further by 2026 in the 2016v3 platform, although the 2026 emissions numbers are not relevant to this action.

Regarding the comment on the Commercial Marine Vessel (CMV) inventories, there were multiple sets of inventories in the 2016v2 platform because the EPA provided CMV emissions on finer than 12 kilometer (km) grids (D02 and D03) at the request of the Lake Michigan Air Directors Consortium (LADCO) to support air quality modeling on fine grids in their region. The D03 and D02 emissions are out of scope with respect to this action as these data were not used in the EPA modeling and were only used in LADCO modeling. However, the EPA did respond to a request by LADCO to provide emissions compatible with the 2016v3 platform on those grids.

*Comment*

**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

EPA's disapproval of the MN SIP is based on revised EPA modeling that the MPCA, in their comments, has identified flaws with (including the failure to consider substantial planned NOC emissions reductions).

*Response*

The EPA received comments from MPCA as commenter suggests and has responded to those comments in this final action. The EPA has updated its emissions inventories for Minnesota sources to reflect input MPCA provided in its comment letter, and these updates are included in the 2016v3 modeling.

## 3.3    Emissions Inventory – EGUs

### 3.3.1    Unit Corrections

*Comments*

**Commenter:** Louisiana Chemical Association

**Commenter ID**: 26

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Finally, the following EGU sources have converted or retired coal-fired units and/or installed emissions controls to reduce emissions in Louisiana:

- Big Cajun II, Unit 2 was converted from coal to natural gas in 2015 and generates 540 megawatts. The conversion sharply reduced emissions of sulfur, mercury, nitrogen oxide and particulate matter. Other technologies installed to reduce nitrogen oxide emissions include Selective Non-Catalytic Reduction ("SNCR") technology in May 2014

- At Big Cajun II, Unit 1 and Unit 3, Selective Non-Catalytic Reduction ("SNCR") technology was installed to reduce nitrogen oxide emissions in May 2014

- Big Cajun II, Unit 1, a coal-fired unit, will retire or be refueled to natural gas by December 2025 as part of a consent decree agreement

- Planned retirement or conversion of Rodemacher Unit 2 at Brame Energy Center, which is a 523-megawatt generating unit predominately powered by coal which will retire or cease burning coal in 2028 through EPA approval of the CCR Part A Demonstration-submittal and/or Brame Energy Center's ELG Notice of Plan Participation

- Retirement of Dolet Hills Power Station, a 642-megawatt coal-fired generating unit, took place in December 2021.

Thus, the EPA inventory used for the modeling does not account for all relevant emission reductions. As discussed above, at a minimum, EPA must incorporate needed revisions to the 2016v2 inventory and then re-analyze the Louisiana Transport SIP based on the updated/corrected modeling platform before issuing a final rule on the Louisiana Transport SIP.

**Commenter:** Mississippi Department of Environmental Quality

**Commenter ID:** 32

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EMISSION SOURCES The air quality modeling results from the 2016v2 Emissions Modeling Platform indicate that by 2026, emissions occurring in Mississippi will no longer contribute to nonattainment nor significantly contribute/interfere with maintenance at any downwind receptor, even without actions to reduce emissions from Mississippi sources. However, it is important to note that many emissions reductions are scheduled or have taken place at Mississippi facilities since 2016, which is the emissions year the 2016v2 platform is based on. These include:

- Mississippi Power Company's plan to shut down Plant Watson Unit 4, a 2,760 MMBtu natural gas fired boiler, in December 2023 and to retire all coal units at Plant Daniel no later than December 2027.
- Cooperative Energy Plant RD Morrow's retirement of all coal units in 2018 and replacement with natural gas combined cycle units.
- Entergy Mississippi Plant Baxter Wilson's retirement of Unit 2, a 6,680 MMBtu natural gas fired boiler with fuel oil backup, in 2018 and plans to shut down the remaining Unit 1, a 4,790 MMBtu natural gas fired boiler with fuel oil backup, in May 2023.
- Entergy Mississippi Plant Rex Brown's retirement of Unit 4, a 2,130 MMBtu natural gas fired boiler with fuel oil backup, in 2018 and the remaining Unit 5, a fuel oil fired combustion turbine, in 2019.  Plant Rex Brown is now completely shut down.

These significant emissions reductions from Mississippi sources alone should be adequate to allow EPA to approve a revised Mississippi iSIP.


**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

ODEQ has provided informal feedback to the EPA concerning the 2016 v2 EMP and those comments are also provided below.

EGU Sector - ODEQ has identified a few minor updates that should be made to Version 6 of the National Electric Energy Data System (NEEDS) and those updates are included in Attachment D.

[Attachment D is available in its entirety in the original comment letter.]


**Commenter:** PacifiCorp (Attachment - Berkshire Hathaway Energy (BHE) Company Comments on Proposed Ozone Transport Rule)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

BHE has identified significant $NO_X$ emission reductions in Wyoming that are not taken into account by EPA's analysis. There are a number of required and planned control projects and retirements scheduled at PacifiCorp units in the coming years that will accomplish significant emission reductions that EPA should consider when determining whether it is warranted to include Wyoming in the scope of the Proposed Rule. In particular, PacifiCorp will be converting Jim Bridger Units 1 and 2 to natural gas by 2024 and has committed to retire or cease burning coal at five other units: Naughton Units 1 and 2 prior to 2026, and Dave Johnston Unit 3 by the end of 2027, and Dave Johnston Units 1 and 2 by 2028. The cessation of coal combustion on Naughton Units 1 and 2 and Dave Johnston Units 1, 2 and 3 will provide NOx reductions of 2,945 tons compared to 2021 ozone season emissions. As with Utah, EPA's underlying analysis for the Proposed Rule includes major errors in the emissions attributable to PacifiCorp's, which resulted in NOx emissions in Wyoming that are several times larger than the NOx emission estimates used in Steps 1 and 2.

[…]

1. Potential Technical Errors in Proposal – Appendix A Proposed Rule State Emissions Budget Calculations and Engineering Analytics

[…]Some 2023 allocations appear to result from the assumption that LNB/OFA have not been installed for Hunter Unit 3 and Naughton Unit 1. Both units currently utilize LNB/OFA. Additional corrections are also requested for the Jim Bridger Units 1 and 2 and the Dave Johnston Unit 1.

[…]

**iv. Wyoming Dave Johnston Unit 1 should be rated at a capacity of 93 MW**

EPA lists Dave Johnston Unit 1 with a capacity greater than 100 MW. However, the most recent data indicates the correct capacity during ozone season is 93 MW. BHE asks EPA to correct the capacity of Dave Johnston Unit 1 and adjust the associated allocations for Wyoming accordingly.


**Commenter:** Wisconsin Department of Natural Resources (Attachment – 2021 comments)

**Commenter ID:** 51

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

The EPA should include the most recent information on utilities' publicly available retirement or fuel-switching plans for EGUs in the updated 2016v2 Platform. Wisconsin utilities have publicly announced shutdown dates by 2025 at three power plants (see Table 1), and EPA should ensure these shutdowns are reflected in the Power Sector Modeling Platform v6 forecasts (EPA currently forecasts these EGUs to operate through 2032). In addition, EPA should ensure its EGU model forecasts do not shut down EGUs that have not yet announced plans for retirement, including Wisconsin's Manitowoc Public Utilities (ORIS ID 4125). The WDNR is also providing this list of upcoming retirements, or continued operation, within the Clean Air Markets Power Sector Modeling Contact Form, as requested by EPA.

[...]

Table 1 – Wisconsin EGU Scheduled Retirements

| Facility | Unit ID | ORIS | Retirement Date |
|---|---|---|---|
| South Oak Creek | 5 | 4041 | 1/1/2024 |
| South Oak Creek | 6 | 4041 | 1/1/2024 |
| South Oak Creek | 7 | 4041 | 1/1/2025 |
| South Oak Creek | 8 | 4041 | 1/1/2025 |
| Weston | 2 | 4078 | 1/1/2024 |
| Columbia | 1 | 8023 | 1/1/2024 |
| Columbia | 2 | 8023 | 1/1/2025 |

*Response*

The EPA has incorporated information from these comments and additional feedback from power sector stakeholders and others into the power sector emissions projections that are used in the final photochemical grid modeling (2016v3) where the EPA has reviewed and determined that information to be sufficiently reliable and appropriate for use. We do not include in our baseline modeling projections at Steps 1 and 2 emissions changes at power plants or other emissions sources that are not sufficiently certain to occur, for example, if such projected emissions changes are only anticipated under proposed but not finalized state or federal rules, or where the potential retirement or conversion of units is not sufficiently committed to be considered reliable. A table with the units included in these comments, along with the changes, reflected in the National Electric Energy Data System (NEEDS) is included in a file titled "SIP Approval Comments – EGU Units.xls" contained in the docket for this action. We note that action on Wyoming's SIP submittal is not included in this action, and comments regarding allowance allocations or any other elements of other proposed rules are likewise outside the scope of this action.

### 3.3.2    EPA's Integrated Planning Model (IPM)

*Comments*

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

For the ptegu sector:

1. For regional haze purposes, DEQ previously compared future year projections in EPA's 2016v1 platform and the v16.1 future year projections developed by the Eastern Regional Technical Advisory Committee (ERTAC), deciding ERTAC's v16.1 future year projections were more appropriate than EPA's Integrated Planning Model (IPM) future year projections that informed EPA's 2016v1 platform. So it may be informative to conduct a thorough comparison of ERTAC's v16.1(or a future update) and EPA's 2016v2 (or a future update) to evaluate future year projections if EPA continues to choose to use IPM instead of ERTAC.

2. If EPA choses to continue to use IPM instead of ERTAC, then DEQ suggests that EPA communicate with states to seek any updates and/or corrections prior to conducting IPM modeling as is done by ERTAC.

3. For some sectors (e.g., solvents, nonpt, nonroad), EPA's 2016v2 platform future year projections utilized Energy Information Agency's (EIA) Annual Energy Outlook (AEO) 2021 data. However, according to the TSD, the ptegu IPM modeling used AEO 2020 data (e.g., demand, gas and coal market assumptions, cost and performance of fossil generation technologies, among others). The latest AEO 2021 was released on February 3, 2021 and DEQ suggests that EPA update the 2016v2 using the latest AEO data in all sectors. Table 4.2 of EPA's 2016v2 TSD reported total 2026 NOx emission for Arkansas as 9,258 tons; however, summing the three files (summer, winter, and wintershld) for both cems and noncems data for the ptegu sector indicates the total 2026 NOx emissions for Arkansas as being 9,273 tons. DEQ did not make this comparison for others states. DEQ suggests that EPA identify the source of the discrepancy in the above example and conduct the same comparison for other states.

4. IPM modeling for the 2032 future year includes emissions for the Entergy Arkansas White Bluff plant. However, a state and federally enforceable administrative order requires the cessation of coal-fired operations by no later than December 31, 2028 and any possible operation beyond 2028 is unknown and would require future permitting action if ambient air emissions are to be emitted. DEQ suggests that EPA zero out emissions beyond 2028 for Entergy Arkansas White Bluff.

5. IPM modeling for the 2032 future year includes emissions for the Entergy Arkansas White Bluff plant. However, a state and federally enforceable administrative order requires the cessation of coal-fired operations by no later than December 31, 2028 and any possible operation beyond

2028 is unknown and would require future permitting actions if ambient air emissions are to be emitted. DEQ suggests that EPA zero out emissions beyond 2028 for this facility.

6. IPM 2032 projections show zero NOx emissions for the winter shoulder months (March, April, October, and November) for the Flint Creek, Plum Point, Arkansas Electric Thomas B Fitzhugh Corp, and Harry D. Mattison Power plants in Arkansas. Also, IPM projected zero SO2 emissions for Plum Point, Flint Creek, Union Power Station, and others in 2032 for the winter shoulder months. IPM projected zero NOx and SO2 emissions for Independence plant in 2026 for the same shoulder moths. Historical data consistently shows both NOx and SO2 emissions for all of these facilities in these months. DEQ suggests that EPA re-examine this data and potentially other IPM projections in Arkansas and in other states as DEQ did not evaluate this beyond the above examples.

7. IPM did not project 2026 emissions for the Flint Creek Power Plant, but did project 2032 emissions. We suggest EPA re-examining including 2026 emissions for this facility.

8. IPM did not project 2026 and 2032 ptegu sector emissions for the John W. Turk Power Plant. However, IPM did project 2026 and 2032 ptnonipm sector emissions for this facility of NOx at less than 1 ton and SO2 at less than 1 ton. Historical NOx and SO2 emissions for the John W. Turk Power Plant are presented in Figure 2. EPA should include appropriate 2026 and 2032 ptegu sector emissions and verify the 2026 and 2032 ptnonipm sector emissions for the John W. Turk Power Plant. [Figure 2 available in full comment]

9. IPM did not project 2026 ptegu sector emissions for the Plum Point Energy Station. However, IPM did project 2026 ptnonipm sector for this facility of NOx at 1.96 tons and SO2 at 0.07 ton. Historical emissions for the Plum Point Energy Station are presented in Figure 3. In addition, IPM did project 2032 ptegu emissions, although the 2032 ptegu future year projection was a 62% reduction for SO2 emissions from a 2021 baseline. For the Plum Point Energy Station, EPA should include appropriate 2026 ptegu sector emissions, verify the 2026 ptnonipm sector emissions, and verify the reasonableness of the 2032 ptegu SO2 emissions. [Figure 3 available in full comment]

10. PM 2026 projected NOx emissions from the ARK Elec Co-Op-Oswald Generating Station are Unit G7: 172 tons, Unit G6: 115 tons, and Unit G5: 115 tons. IPM 2032 projected NOx emissions are Unit G7: 160 tons, Unit G6: 107 tons, and Unit G5: 107 tons. Table 1 provides gross load from IPM future year projections and a 5-year average of historical data (2017-2021) for these units. The 2011-2021 historical NOx emissions for these units are provided in Figure 4. EPA should verify the reasonableness of projected 2026 and 2032 NOx emissions for all of this facility's units and potentially for IPM-projected emissions at other facilities. [Table 1 and Figure 4 available in full comment]


**Commenter:** Minnesota Pollution Control Agency

**Commenter ID:** 31

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

Stationary point EGU growth rate differences between the ERTAC vs IPM models

LADCO recognizes that EPA uses the IPM to estimate future year EGU emissions, and that the IPM projection methodology differs from the ERTAC EGU model that is endorsed by the Multi-Jurisdictional Organizations and the majority of the states in the eastern half of the country. Minnesota would also like to indicate our support for the use of ERTAC EGU projections in the 2016v2 EMP and ask EPA to consider replacing IPM projections with ERTAC EGU projections for sources in the LADCO region in subsequent modeling platforms.

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In addition, ODEQ suggests that EPA model future year emissions from the EGU sector using the Eastern Regional Technical Advisory Committee's (ERTAC) EGU Projections Tool rather than the Integrated Planning Model (IPM). This request is a departure for Oklahoma from our previous request when ODEQ submitted comments on the modeling platform in advance of the CSAPR Update. However, ODEQ has worked more closely with the ERTAC development team and we believe that, at this time, the ERTAC EGU Forecasting Tool does a superior job forecasting hourly emissions, especially on high electricity demand days and better meets Oklahoma's needs as well as those of our sister agencies.

**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The EPA did not consider all of the information provided to it by the TCEQ.

The TCEQ disagrees with the potential concerns that the EPA raises with regards to the TCEQ's modeling of electric generating units and boundary conditions. The EPA in the "*EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document*" discusses potential concerns about the electric generating unit (EGU) emissions and boundary conditions in TCEQ's modeling. The EPA fails to acknowledge the additional analysis provided to the EPA via email on June 6, 2016, detailing the differences in 2023 EGU emissions by state in the TCEQ modeling with the various EGU emissions projections available at the time TCEQ's SIP was developed. The comparison showed that the EGU emissions included in TCEQ's modeling were comparable to emissions in EPA's Engineering Analysis and the latest emissions available in the Air Market's Program Database.

**Commenter:** Wisconsin Department of Natural Resources (Attachment – 2021 comments)

**Commenter ID:** 51

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

The EPA should integrate the Eastern Region Technical Advisory Committee (ERTAC) EGU model forecasts into the updated 2016v2 Platform. The WDNR recognizes that EPA uses the Integrated Planning Model (IPM) to estimate future year EGU emissions, and that the IPM projection methodology differs from the ERTAC EGU model that is endorsed by the multi-jurisdictional organizations (MJOs) and the majority of the states in the eastern half of the country. States are using the ERTAC EGU model to consolidate and update technical information for the current State EGU fleets and to forecast the best understanding of how those fleets will change into the future in regard to planned retirements of specific units (e.g., the Wisconsin EGU retirements listed in Table 1 ), changes in fuels by specific units, responses to existing air emissions related regulations (State and Federal), and any planned new installations of retrofit emission control devices.

[(Table 1 is available in the full comment, as well as in WDNR's comment excerpt above.)]

*Response*

The EPA disagrees with commenters who suggest the Integrated Planning Model (IPM) is an inadequate or unreliable modeling tool to analyze the power sector. We conducted the air quality modeling for the final rule incorporating updated EGU emissions projections (available at: https://www.epa.gov/power-sector-modeling/supporting-documentation-2015-ozone-naaqs-actions) reflecting fleet and other input updates as of Summer 2022, which also includes updates from commenters and through the pre-proposal request for input on our emissions inventories.

Several commentors suggested EPA replace its use of the Integrated Planning Model (IPM) with ERTAC. One commentor also suggested that ERTAC is more transparent compared to IPM. IPM, developed by ICF Consulting, is a state-of-the-art, peer-reviewed,[29] multi-regional, dynamic, deterministic linear programming model of the contiguous U.S. electric power sector. It provides forecasts of least cost capacity expansion, electricity dispatch, and emission control strategies while meeting energy demand and environmental, transmission, dispatch, and reliability constraints. The EPA has used IPM for almost three decades to better understand power sector behavior under future business-as-usual conditions and to evaluate the economic and emission impacts of prospective environmental policies. The model is designed to reflect electricity markets as accurately as possible. The EPA uses the best available information from utilities, industry experts, gas and coal market experts, financial institutions, and government statistics as the basis for the detailed power sector modeling in IPM. For the modeling used

---

[29] IPM has been peer reviewed periodically evaluating transparency of inputs and documentation, adequacy of modeling capabilities, and appropriateness of the modeling platform use for regulatory and strategic power sector analysis. The modeling platform and its documentation has consistently been found appropriate and adequate for regulatory analysis by the independent peer reviewers with a lot to commend. The IPM Peer Review of v6 and the Response to Peer Review can be found at: https://www.epa.gov/power-sector-modeling/ipm-peer-reviews

in support of the proposed disapprovals, the EPA has provided extensive documentation[30] of the input assumptions and methodology that go into the EPA's use of IPM. For this action, the EPA used an updated version of power sector modeling.[31]

Additionally, EPA staff routinely meets with stakeholders to discuss IPM inputs and results, including comparisons to ERTAC. Therefore, EPA believes IPM, including the versions of IPM projections used at proposal and final, is both transparent and well-suited to analyze EGU emissions while reflecting the impacts of changes to the EGU fleet, projected changes to electricity demand, changes in fuel prices, and state and federal policies as of Summer 2022.

One commenter mentioned that the state's projections of the EGU emissions for 2023 are comparable to the EGU emissions from EPA's engineering analytics tool for 2023. We agree in general that ERTAC is similar to the "engineering analysis" approach that we have used for some transport applications, such as in the Revised CSAPR Update, in that both are designed to be more rooted in recent operating behavior. However, we observe that IPM is capturing much of this behavior while also accounting for additional economic-based operational changes that may be expected in the future. Indeed, at proposal, the EPA reviewed LADCO modeling using ERTAC, which was relied on by some SIP submissions addressed in this action, particularly the Great Lakes states in Region 5, and that modeling supports the same conclusions regarding those states' linkages as our CAMx modeling using IPM. *See* 87 FR 9838.

Thus, there do not seem to be any apparent differences in the ultimate regulatory results for purposes of this action as between some states' ERTAC-based power sector modeling and the use of IPM, nor have commenters here established such a difference. This is not surprising. In EPA's Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS (86 FR 23054), EPA reaffirmed its Step 1 and Step 2 findings using an EGU emissions inventory from EPA's engineering analytics tool in conjunction with its air quality assessment tool (AQAT) to estimate air quality impacts and upwind state contributions. The emissions inventory derived through the engineering analytics and subsequent AQAT sensitivity analysis led to the same Step 1 and Step 2 findings as the IPM-based EGU emissions inventory and related CAMx modeling results.

The EPA's documentation includes all the detailed assumptions and data sources that are included as input that is underlying in the version of IPM that is used to help inform power plant air regulatory and legislative efforts for more than two decades. The model has been tailored to meet the unique environmental considerations important to the EPA - including various national (legislative), federal, and state level measures - while also fully capturing the detailed and complex economic and electric dispatch dynamics of power plants across the country. The EPA's goal is to explain and document the Agency's use of the model in a transparent and publicly accessible manner, while also providing for concurrent channels for improving the model's assumptions and representation by soliciting constructive feedback to improve the model. In addition to soliciting feedback, the EPA has also commissioned peer reviews, including of the latest version IPM v6. The recommendations from these peer reviews and the EPA's

---

[30] https://www.epa.gov/power-sector-modeling/documentation-epas-power-sector-modeling-platform-v6-summer-2021-reference

[31] The updated Power Sector Modeling input data, results, and corresponding documentation used for this final action are available at https://www.epa.gov/power-sector-modeling/supporting-documentation-2015-ozone-naaqs-actions.

128

response are available on the EPA's website (https://www.epa.gov/power-sector-modeling/ipm-peer-reviews). These efforts include making all inputs and assumptions to the model, as well as output files from the model, publicly available on EPA's website and in the regulatory docket.

The EPA has and will continue to discuss modeling inputs and outputs of the IPM and ERTAC projections with any interested parties. We note some differences here. The EGU emissions from IPM are projected at the seasonal level based on economic dispatch, rather than historic behavior. These seasonal values are then temporally allocated (i.e., post-processing IPM outputs based on historical emission patterns) to create hourly emissions for use in the air quality modeling. The ERTAC tool assigns the hourly emissions utilizing historical emissions patterns based on different methods and makes different assumptions about which units will increase/decrease operation in individual hours based on historical operation. Consequently, even if the seasonal emission estimates are identical between IPM and ERTAC on a state, regional, or even unit basis, the final hourly projected emissions will be different and have corresponding different effects on projected air quality. Consequently, when commenters state that ERTAC should be used rather than IPM, they may be preferring the hourly emissions utilized in ERTAC rather than that used by EPA based on the seasonal IPM outputs and EPA's hourly temporal allocation methodology that is independent of IPM. These comments are not specific enough for EPA to make changes to the current temporalization methodology, which we continue to find sufficiently reliable to inform this action.

IPM creates a consistent nationwide projection and can account for effects of regulatory programs that may have differential effects on different units throughout the domain. For example, in IPM, emission budgets reflect the recently finalized Revised CSAPR Update, and account for the changes in unit dispatch relative to units that are not included in the program. The ERTAC tool, while well-refined and consistently updated for particular states or even regions (e.g., LADCO)—and may be appropriately used for air quality modeling by those entities for those areas—is not necessarily appropriate for a nationwide assessment where consistent emissions projections and air quality modeling are necessary.

Arkansas provided several comments regarding the projection of EGU emissions for 2026 and later years. In the proposed action, EPA relied on the same modeling data to support the proposed FIP for the 2015 ozone NAAQS. However, the projections of 2026 and 2032 data are not applicable and were not used for this final action. EPA did incorporate into NEEDS any changes that addressed regulatory, enforcement, permitting, or other operational data affecting EGU units. If those changes occur after 2023, they are not relevant to our action here on state SIP submissions.

ADEQ also provided comments regarding emission values included in the emissions modeling TSD. There are minor differences that transpire when emissions are processed into hourly values input to the air quality model and then summed back up again to provide the summary values in the emissions modeling TSD. This level of difference is negligible and has no impact on the final air quality modeling results.

In response to TCEQ's comment, the EPA searched for the email identified in the comment. The EPA located an email matching the description in the comment provided to EPA on June 6, 2018 (not June 6,

2016 as TCEQ commented), which was after TCEQ and EPA had verbally discussed EPA's review comments and concerns on TCEQ's proposed SIP submission.[32]

In the Evaluation of TCEQ Modeling TSD [33] for the proposed disapproval EPA indicated "TCEQ did not use latest EGU emissions available at the time they proposed the SIP that incorporated reductions from CSAPR Update/latest ERTAC projections in their modeling. It was unclear if this made any substantial changes in the modeling analysis without updating the EGU emissions and redoing the modeling."

One of the attachments to the June 6, 2018 email was a spreadsheet file showing EGU ozone season NOx emissions totals for each state for purposes of TCEQ's modeled years of 2012 and 2023. TCEQ also included in the attachment similar state-wide total EGU NOx ozone season summaries that used a newer version of ERTAC (v 2.7 that was available at the time) for 2011 and 2016; an EPA engineering analysis summary for 2016, CSAPR II Cap[34]; and 2017 Ozone season emissions summary. TCEQ's 2012 modeled emissions for Texas EGUs that used ERTAC v2.6 is about 10% (5,563 tpy) lower than what TCEQ provided as the CSAPR Update ozone season NOx.[35] There is also a difference between the 2023 TCEQ modeled emission rates and the 2017 ozone season emission rate-data in EPA's AMPD database, as well as EPA's engineering analysis for 2016, which are both higher than what TCEQ modeled for 2023. It appears that TCEQ subtracted emissions for some coal-fired EGUs that shut down in 2018 in Texas but did not reassess if other facilities would increase emissions due to the shutdowns. We note that there are also changes in the other state emissions totals that could also result in changes in modeled values.

Thus, there are important and unexplained differences in the modeled inventories (both base period and future) that Texas sent compared to the data available in EPA's comprehensive EGU databases. Overall, the EPA's assessment is that the data in the June 6, 2018 email does not change EPA's concerns and conclusions in the Evaluation of TCEQ Modeling TSD related to TCEQ's EGU emissions estimates for 2012 and 2023 in their modeling.

### 3.3.3   Other EGU Inventory-Related Comments

*Comment*

**Commenter:** Midwest Ozone Group

---

[32] Email from TCEQ to EPA June 6, 2018 and attachments have been added to this Docket ID No. EPA–HQ–OAR–2021–0663.

[33] Evaluation of TCEQ Modeling TSD at 71, (EPA-R06-OAR-2021-0801-0002) in Docket ID No. EPA-R06-OAR-2021-0801.

[34] TCEQ labeled as CSAPR II CAP.  It is unclear if this was the CSAPR Update CAP but the values match with information in the CSAPR Update "Allowance Allocation Final Rule TSD"; August 2016 in EPA Docket ID No. EPA-HQ-OAR-2015-0500. TCEQ did not indicate if this represented a specific year emission inventory so it is unclear what year the inventory represented.

[35] Excel Spreadsheet with EPA's review notes is added as a separate document in the docket EPA–HQ–OAR–2021–0663.

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851, EPA-R08-OAR-2022-0315*, EPA-R09-OAR-2022-0394*, EPA-R09-OAR-2022-0138*

*A condensed version of MOG's comment appears in these dockets

**Comment:**

EPA's modeling and emission inventories must include the control programs and related permitted emission limits on ozone precursors that significantly impact air quality design values in 2023 and beyond.

Downwind states and regulated entities are on an ever-changing path to manage the complex implementation of emissions reductions programs to address local and regional impacts on ambient air quality. EPA's modeling of applicable emission control programs to assess attainment strategies supports the iterative nature of these programs. 87 Fed. Reg. 9,484, 9,494 (February 22, 2022). Private sector and government investments in emission reduction strategies are considerable. As EPA engages in proposed denials of the 2015 Ozone NAAQS Good Neighbor State Implementation Plans, the agency has the burden and obligation to assess both upwind and downwind emissions reductions programs. The modeling relied upon for these proposals; however, EPA fails to provide a wholistic assessment of these emission control requirements.

The following examples are illustrative of the types of emission control programs that EPA must include in the emission inventory that is being modeled to support the proposal disapprovals:

- The Illinois Environmental Protection Agency, as reflected on its website, is currently promulgating several new and older Cook County (ozone nonattainment) pending permit applications (Title V and Federally Enforceable State Operating Permits) to address gas-fired generators, to include emergency generators that had previously not been permitted or recently had been replaced. In certain instances, enforcement actions were initiated to bring the emergency and demand response generators within the regulatory program. EPA does not explain its assessment methodology for these types of emissions reductions relative to Good Neighbor SIP review and assessment. In addition, it appears that EPA did not take into account "The Illinois Energy Law, AKA, Climate and Equitable Jobs Act (CEJA) "as an applicable control program. This new law became effective in September 2021 and significantly limits the emissions of NOx from all existing gas fired EGUs in Illinois. Each unit >25 MW cannot exceed its 3-year (2018-2020) baseline actual emissions on a 12-month rolling basis beginning Oct. 1, 2021. Significantly, the law also requires all coal fired plants to retire no later than 2030.
- The New York State Department of Environmental Conservation ("NYDEC") has developed recent controls for simple cycle and regenerative combustion turbines ("SCCT" or "peaking units" noted by the agency as being inefficient and approaching 50 years of age. Yet, while the agency has estimated controls will result in a 4.8 ppb significant air quality improvement to nonattainment monitors within the New York Metropolitan Nonattainment Area (NYMA), implementation is delayed until 2025 and beyond. NYDEC also recently has imposed NOx

131

controls on distributed generation units, which as with peaking units, has been structured to delay implementation of controls beyond the applicable attainment date as part of the attainment plan proposed for approval by EPA. 87 Fed. Reg. 4,530 (Jan. 28, 2022).

- The Wisconsin Department of Natural Resources, Air Management Program has initiated a number of permitting actions in response to designation of Kenosha County as serious nonattainment. Many of those actions have been implemented as recently as the last 24 months imposing new NOx and VOC emission reductions. It is also noteworthy that some regulated facilities are seeking relief from additional non-attainment reductions in advance of EPA approval of a partial redesignation of Kenosha County as attainment for the 2008 ozone standard. EPA does not explain its methodology for assessing these types of downwind emissions reduction strategies relative to review of Good Neighbor SIP.

EPA's attention also is directed to examples of state and federal air program elements that warrant review by EPA for impact on the efficacy of attainment strategies. The Wisconsin Department of Natural Resources regulations include Chapter NR 436 titled, "Emission Prohibition, Exceptions, Delayed Compliance Orders and Variances." NR 436.03(2)(c) provides,

> Emissions in excess of the emission limitation set in chs. NR 400 to 499 may be allowed in the following circumstances:
>
> (c) The use of emergency or reserve equipment needed for meeting high peak loads, testing of the equipment or other uses approved by the department. Such equipment must be specified in writing as emergency or reserve equipment by the department. Upon startup of this equipment notification must be given to the department which may or may not give approval for continued equipment use.

The Wisconsin regulation is just one example of an exemption that could impact attainment strategies. It is likely there are several other similar provisions in other state programs that warrant careful assessment by EPA.

Consideration of these upwind and downwind state control programs are critical not only to assure the correct modeling results in the future analytical year, but also to allow an assessment of the alignment of the emission reduction burdens of the upwind and downwind states, as will be discussed in the next comment.

*Response*

In response to the commenter's claim that the EPA should incorporate emissions reductions from Illinois's pending permitting actions, it is the EPA's standard practice to only consider emissions reductions from rulemakings or permitting actions that have been finalized. With regards to "The Illinois Energy Law, or the Climate and Equitable Jobs Act", the EPA's 2016v2 modeling used for the Notice of Proposed Rulemaking (NPRM) does not take emissions reductions from this state rule into consideration. However, we have accounted for this law in the 2016v3 modeling. The EPA also notes that the rule's requirement for all coal-fired plants to retire by 2030 would not force emissions reductions by the 2023 ozone season.

132

In regard to commenter's insinuation that the NYDEC's recent rule requiring controls on certain SCCT units are inappropriately misaligned with the attainment schedule of the NYMA nonattainment area, this is not a relevant comment on the inventory for 2023. However, the EPA notes that the prior approval of the SCCT controls (approved by the EPA as a SIP strengthening measure) is not reopened for consideration by the Agency in this action. The EPA previously responded to the Midwest Ozone Group's (MOG's) comments on the SCCT controls in the notice for that separate final action. *See* 86 FR 43956, 43957-43958 (August 11, 2021). We further respond to MOG's comments on this topic in Section 2 of this document.

In response to commenter's claim that the EPA should incorporate emissions reductions from Wisconsin's pending permitting actions to address the Kenosha County's nonattainment status for the 2008 ozone standard, it is the EPA's standard practice to only consider emissions reductions from rulemakings that have been finalized.

With respect to state and federal regulations that impact the efficacy of attainment strategies, the commentor provided an example of an exemption program in Wisconsin that could potentially be used under emergency or sporadic events. The commentor included text from the regulation but did not provide any examples or data on how it may have been used and its impact on ozone precursor emissions. In addition, the regulation allows for state officials to approve or deny the request. The EPA cannot determine how state officials will react or address this during these emergency or sporadic events. The EPA has incorporated any applicable EGU control programs developed by the states, including for the state of Wisconsin, into its projections and modeling. A listing and discussion of these regulations and control programs can be found in chapter three of the EPA's documentation for IPM. This can be viewed at https://www.epa.gov/system/files/documents/2021-09/table-3-30-state-power-sector-regulations-included-in-epa-platform-v6-summer-2021-refe.pdf.  For non-EGUs, the point source inventory includes state-submitted routine emissions data for calendar year 2019 is used as the basis for the projected 2023 emissions along with impacts of unit closures and control programs in the intervening years. Emissions in excess of permitted limits could occur during specific, typically short-term, periods of time and those emissions would be included in the inventories provided by the state if they were reported as routine emissions.

*Comment*

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA's intention to revise its emission inventory and to conduct new air quality modeling without allowing an appropriate opportunity for stakeholder review and comment is inappropriate

EPA notes in the proposed disapprovals that, after the modeling it conducted in support of earlier transport rules, e.g., CAIR, CSAPR, CSAPR Update, CSAPR Closeout, and Revised CSAPR Update, the agency revised the emission inventory used in the modeling to assess the efficacy of prior transport rules. EPA conducted new modeling using the revised inventory. The agency describes the process as follows:

> Following the Revised CSAPR Update final rule, the EPA made further updates to the 2016 emissions platform to include mobile emissions from the EPA's Motor Vehicle Emission Simulator MOVES3 model 17 and updated emissions projections for electric generating units (EGUs) that reflect the emissions reductions from the Revised CSAPR Update, recent information on plant closures, and other sector trends. The construct of the updated emissions platform, 2016v2, is described in the emissions modeling technical support document (TSD) for this proposed rule. (emphasis added).

In December 2021, MOG and other stakeholders submitted detailed comments on the 2016v2 emission inventory platform in an effort to correct errors that existed in that platform. EPA's efforts to revise this emission inventory platform at this time raises the question about whether EPA intends to update the modeling that has been used as the basis for the SIP disapprovals and the proposed FIP -but only in support of the final rule.

While MOG urges EPA to rely on modeling that accurately reflects current on-the-books regulatory requirements and up-to-date emission inventories, we strenuously object to the possibility that EPA would conduct any such additional modeling to support a final rule and not provide the opportunity for that data to be reviewed, analyzed and commented on in advance of any final decision on the subject SIP disapproval (or for that matter the related proposed FIP). These concerns were also expressed earlier, in July 2021, by several MJOs (Westar, LADCO, SESARM, MARAMA, and CENSARA).

*Response*

In response to commenters' assertion that it is inappropriate for EPA to conduct new air quality modeling without allowing for an additional opportunity for stakeholder review and comment, EPA disagrees with this in a number of ways. First, as explained in Sections III.A.1. and V.A.4. of the preamble, EPA solicited comment on its inventories and modeling in a number of venues stretching from September 2021 to the close of the comment period of four disapproval actions in July 2022. EPA has, in response to the updated information received, developed an updated modeling run based on the 2016v3 emissions modeling platform, to take this updated information into consideration to inform EPA's final actions. Where EPA has felt it warranted, EPA has incorporated the updated information into its emissions inventories to best project future air quality conditions and take informed final action on the SIPs.

Other issues raised by this comment are addressed in the following sections in this RTC document: Sections 1.7 (Length of the Comment Period).

# 4   Air Quality Modeling

## 4.1   Modeling Design - General

*Comment*

**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment**:

The EPA also fails to acknowledge that the TCEQ provided additional information summarizing the change in modeled ozone contribution at monitors attributable to boundary conditions when boundary conditions accounted for changes in future year emissions. The EPA did not request additional analyses or express concerns with TCEQ's modeling after the additional information was provided in June 2018.

*Response*

TCEQ commented that an email and two spreadsheets (one discussing statewide EGU emissions and another spreadsheet documenting 2012 and 2023 boundary conditions contributions to receptors that Texas identified in their modeling) were provided to EPA on June 6, 2016. EPA searched and found the email was actually sent June 6, 2018 after TCEQ and EPA had verbally discussed EPA's review comments and concerns on TCEQ's proposed SIP.  This information was provided before the final SIP was submitted. The EPA has reviewed these files and found this information does not result in a change in EPA's overall review of TCEQ's SIP nor does it resolve the other issues the EPA identified that make TCEQ's SIP not approvable.  TCEQ's EGU emissions spreadsheet is addressed in Section 3.3.3.

Regarding boundary conditions, we had noted in the Evaluation of TCEQ Modeling TSD[36] that TCEQ had used 2023 emissions from a modeling scenario that included some estimated changes based on climate modeling. Our analysis indicated the actual impact could not be quantified based on the information provided by TCEQ but that the actual impact of using these modified boundary conditions were expected to be a relatively small contribution to the total modeled concentrations in TCEQ's transport SIP modeling and would not be expected to significantly change the total model concentrations.

One of the attachments to the June 6, 2018 email was a spreadsheet file showing boundary condition contributions to receptors that TCEQ identified as having a greater than 0.7 ppb contribution from Texas emissions in their 2023 modeling. The boundary conditions source apportionment results provided by TCEQ to the EPA included the 2012 and 2023 average boundary conditions at each receptor identified by TCEQ in Colorado, California, and Arizona in their SIP. The 10 days modeled for the future design value calculations were used by TCEQ. The 10-day average change in contributions from boundary conditions

---

[36] Evaluation of TCEQ Modeling TSD at 76.

in 2012 compared to 2023 ranged from a 0.08 ppb decrease to a 1.11 ppb increase at these receptors.[37] The percent change (i.e., 2023 values compared to 2012 values) in boundary condition contributions on average for these 10 days ranges  from a slight decrease of 0.4% to a maximum increase of 3.9%.  While for most receptors the contribution from boundary conditions increased, overall, the increase in 2023 is relatively small compared to the total contribution from boundary conditions. These would be even smaller changes compared to the total modeled concentration taking into account all contribution sources. Thus, our assessment of these values comports with our view in the Evaluation of TCEQ Modeling TSD that we did not expect this information to result in large changes to total ozone modeled concentrations. Overall, the EPA's current assessment (Changes in total boundary conditions contribution were -0.4% to 3.9%) is that the data in the June 6, 2018 email does not change the EPA's overall assessment of TCEQ's SIP.

### 4.1.1   Modeling Design - Lake Michigan

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

The Air Program notes that recent studies aimed at improving the understanding of the cause of high ozone concentrations near Lake Michigan have been conducted in recent years. EPA must incorporate the knowledge learned in these studies into updated modeling before such modeling could be used for such significant regulatory determinations as the proposed disapproval of Missouri's SIP, or the proposed FIP. The Lake Michigan Ozone Study released in May of 2019, is likely the most comprehensive and current study about ozone concentrations in this region of the country. In the study, there are recommendations for a finer grid resolution in the modeling to better characterize and predict ozone concentrations in this area of the county. With the low model performance and the significant costs of the regulatory outcomes that are based on the modeling, EPA must follow this recommendation and seek to re-model this region using a finer grid than the 12 km grid currently included in EPA's updated modeling. At a minimum, EPA should use a 4 km grid and preferably a 1.33 km grid around all maintenance and nonattainment receptors in order to help improve model performance in this region of the country.

Other findings of the Lake Michigan Ozone Study reveal that NOx emissions, particularly from upwind states like Missouri, may have little to no impact on ground-level ozone concentrations in the region where the receptors that Missouri is linked to are located. This is because on high ozone days, ozone

---

[37] Excel Spreadsheet "BCAPCA-Attribution Change between Base-and-Future EPA R6 notes.xlsx" in Docket EPA–HQ–OAR–2021–0663.

levels in these areas are sensitive to changes in emissions of volatile organic compounds (VOC) and not NOx. Regions where this is the case are often referred to as being VOC-limited areas. Figure 2, from the study shows that the areas where the monitors that Missouri is linked to in the updated modeling are VOC-limited on high ozone days. This means that reductions in NOx emissions will have little-to-no impact on reducing ozone concentrations at these problem monitors. Therefore, it follows that NOx emissions from Missouri are not the cause and cannot be the basis for EPA's proposed disapproval of our SIP nor the foundations for the imposition of new NOx controls in a FIP to address Missouri's good neighbor obligations.

This technical information was available during EPA's updated modeling efforts, and calls into question EPA's typical modeling practices for this SIP disapproval action. EPA must reform the model for this region of the country before the modeling can be used to justify disapproving Missouri's SIP. Further, the proposed "fix" in the federal plan takes none of this information into account. If the receptors where Missouri is linked to are VOC-limited, as this study indicates, any assertion that NOx emissions in Missouri are significantly contributing to nonattainment or interfering with maintenance at these downwind receptors is flawed on a technical and foundational level.

**Commenter:** Ameren Missouri

**Commenter ID:** 05

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

In order to capture the inland penetration of the lake breeze (WRF-CHEM) needs accurate Lake Michigan water temps and correct model physics options. EPA's use of the Pleim-Xiu Land Service Model (LSM) (EPA, 2022) does not adequately capture the lake breeze inland penetration (Abdioskouei & et al, 2019). Use of NOAH LSM does a much better job at capturing the lake breeze inland penetration.

USEPA's proposed disapproval of the Missouri Good Neighbor SIP for the 2015 Ozone Standard errs by not evaluating and including most recent scientific studies on ozone formation along Lake Michigan (2017 Lake Michigan Ozone Study (LMOS 2017)).

[...]

Nowhere in USEPA's proposed disapproval of the Missouri Good Neighbor SIP does USEPA analyze or even mention the LMOS 2017 study or the resulting data. USEPA ignores the wealth of information collected during the LMOS 2017 study and the resulting peer reviewed research published as a result. Nowhere in the docket for the proposed disapproval of the Missouri Good Neighbor SIP (Docket ID: EPA-R07-OAR-2021-0851) does EPA mention LMOS 2017. Nowhere in the Technical Support Document for the updated modeling EPA now references as an independent basis for asserting that Missouri emissions are now linked to two nonattainment and one maintenance monitor(s) near Lake Michigan in Wisconsin and one maintenance monitor on the Chicago, IL Lakeshore does EPA discuss the implications and findings of LMOS 2017 study on the ability of the regional modeling conducted by EPA to reproduce the chemistry of ozone production at the Lake Michigan Land/Water interface.

[…]

USEPA fails to mention the LMOS 2017 study or its relevance to the modeling underlying this action. This failure to evaluate the results of LMOS 2017 and incorporate the scientific improvements identified by the peer reviewed and published research resulting from that study is a critical error. EPA has an obligation to evaluate LMOS 2017 as it pertains to the proposed disapproval of the Missouri Good Neighbor SIP.

USEPA's proposed disapproval of the Missouri Good Neighbor SIP for the 2015 Ozone Standard is arbitrary and capricious because it relies on Ozone Modeling inconsistent with the scientific findings from the LMOS 2017.

[…] Because the model as used by USEPA is not properly set up to handle the complex chemistry and meteorology at the shores of Lake Michigan, it cannot accurately characterize ozone concentrations at the monitors to which USEPA tries to link to Missouri emissions.

In order to capture the inland penetration of the lake breeze (WRF-CHEM) needs accurate Lake Michigan water temps and correct model physics options. EPA's use of the Pleim-Xiu Land Service Model (LSM) (EPA, 2022) does not adequately capture the lake breeze inland penetration (Abdioskouei & et al, 2019). Use of NOAH LSM does a much better job at capturing the lake breeze inland penetration.

[…]

Modeling performed by USEPA (EPA, 2022) and the LMOS 2017 study (Abdioskouei & et al, 2019) both showed a significant negative bias in predicted ozone concentrations along the Lake Michigan shoreline. LMOS 2017 study researchers/scientists have experimented with increasing anthropogenic VOC emissions and decreasing anthropogenic NOx emissions. These changes to the model emission inventory inputs improved air quality model performance reducing the negative bias. VOC speciation and spatio-temporal release patterns should also be reviewed. This evaluation by the LMOS 2017 participants indicates that the USEPA model choices result in the model being unable to properly reproduce the chemistry of ozone production and the VOC/NOx ratios at the monitors along the Lake Michigan shoreline. These are the same monitors that USEPA now proposes to determine are linked to Missouri emissions in this proposed SIP disapproval.

USEPA's failure to assess and incorporate the peer reviewed studies and scientific data resulting from the LMOS 2017 and utilize the findings from that study to properly model ozone source apportionment is arbitrary and capricious.

[…]

Peer reviewed research conducted utilizing the data collected during the LMOS study in 2017 indicates that Lake Michigan ozone episodes have a significant VOC limited component. In contrast, USEPA claims the 2016v2 air quality modeling conducted for the newly proposed FIP shows that ozone pollution is "largely NOx limited".

**Commenter:** Midwest Ozone Group

138

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851

**Comment:**

Furthermore, to adequately capture the inland penetration of the lake breeze, the LMOS report also cites the need for accurate Lake Michigan water temperatures and correct model physics options. EPA's use of the Pleim-Xiu Land Service Model (LSM) 15 does not adequately capture the lake breeze inland penetration. A review of wind vector observations (from the Meteorological Assimilation Data Ingest System (MADIS) network16) compared to modeled wind vectors on RRF and significantly contributing days at nonattainment monitors highlights the differences in wind direction and speed during many hours of these predicted high ozone episodes.

*Response*

The EPA disagrees with these comments.  While the Lake Michigan Ozone (LMOS) 2019 preliminary report,[38] which describes the analyses of data from the LMOS 2017 field campaign, provides valuable scientific insights into some of the fine-scale meteorological conditions and chemistry that affect the formation and advection of high ozone concentrations onshore from over Lake Michigan, the study was not designed to quantify or evaluate the impacts on ozone exceedances at monitors along the lake from more distant sources in upwind states. For instance, during the 2017 LMOS field campaign there were no upwind aircraft or land-based measurements of ozone and precursor concentrations aloft to quantify transport of pollutants into the Lake Michigan area. Also, the April 2019 report is characterized by the authors as "preliminary", and the report notes that meteorological modeling sensitivity tests are on-going. Regarding the use of the Pleim-Xiu Land Surface Model, there is no quantitative information in the report that compares the performance of this method to the NOAH LSM.[39] In view of the exploratory nature of the on-going analyses of the LMOS field campaign measurements and modeling, it would be inappropriate and impractical for the EPA to change course and change how we develop meteorology for air quality modeling for this final action based on the preliminary information in this report.

Responses to comments on the relevance of local-scale chemical regimes, fine-scale modeling, and model performance for this final action can be found in section 4.2.

*Comment*

**Commenter:** City Utilities of Springfield, Missouri

**Commenter ID:** 13

---

[38] 2017 Lake Michigan Ozone Study (LMOS) Preliminary Finding Report, April 22, 2019.
https://www.ladco.org/wp-content/uploads/Research/LMOS2017/LMOS_LADCO_report_revision_apr2019_v8.pdf
[39] National Centers for Environmental Prediction, Oregon State University, Air Force, Hydrology Lab-NWS (Noah) Land-Surface Model (LSM) User's Guide (May 2011). https://www.jsg.utexas.edu/noah-mp/files/Users_Guide_v0.pdf

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Modeled inputs for Missouri sources should be reviewed and adequately scrutinized.

*Response*

The EPA has reviewed the base year and projected emissions from Missouri as part of our response to comments on the emissions data the EPA used as input to the air quality modeling at for the proposed SIP disapprovals. As a result of this review, the EPA has made numerous updates to the emissions inventories used as input to the final rule air quality modeling. Information on these updated emissions can be found in the 2016v3 Emissions Modeling TSD, which is in the docket for this final rule, as well as in Section 3 of this RTC and in Section III of the preamble.

*Comment*

**Commenter:** City Utilities of Springfield, Missouri

**Commenter ID:** 09

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

EPA's selection of four (4) new modeled receptor sites along the Lakeshore area should have been thoroughly vetted with the MDNR Air Program.

*Response*

See Section V.A.4. of the preamble for our general response on the use of updated modeling and responses to additional comments on the topic in Section 1.4.

*Comment*

**Commenter:** City Utilities of Springfield, Missouri

**Commenter ID:** 09

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

The SIP disapproval, and by extension the EPA's proposed FIP, overestimates MO's "good neighbor" contributions while diminishing localized anthropogenic NOx sources. Recent LADCO studies indicate problems with EPA model "over prediction" which need to be investigated and resolved.

*Response*

The commenter does not identify or provide any information to support the claim that the EPA "overestimates" Missouri's contribution while diminishing localized anthropogenic $NO_x$ sources. Although this comment did not provide any specific information to identify the "recent LADCO studies," the EPA's response to comments that rely upon the preliminary findings from the 2017 Lake Michigan Ozone Study are provided elsewhere in Section 4.1.1. Comments regarding the substance of the EPA's proposed 2015 ozone Good Neighbor Rule are beyond the scope of this action.

*Comment*

**Commenter:** City Utilities of Springfield, Missouri

**Commenter ID:** 09

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Additional NOx reductions in Missouri and particularly southwest Missouri will not result in improved ambient concentrations in updated model runs at receptors in Wisconsin or along Lake Michigan north of Chicago, Illinois.

*Response*

We first note that this action does not impose any emissions reduction for sources in Missouri. To the extent that commenters imply that a lack of air quality impacts on downwind receptors from reduced upwind emissions in Missouri is reason to approve the State's SIP, we disagree.

The EPA disagrees that $NO_x$ emissions from Missouri are not impacting receptors along Lake Michigan or that reductions of those emissions in Missouri would not reduce ozone concentrations at those receptors. We first note that this rule does not impose any emissions reduction for sources in Missouri. To the extent that commenters imply that a lack of air quality impacts on downwind receptors from reduced upwind emissions in Missouri is reason to approve the State's SIP, we disagree. To illustrate, the EPA points to the source apportionment modeling to quantify the contributions from EGU emissions in each state in 2026, as described in the air quality modeling TSD used to support the EPA's April 2022 proposed 2015 ozone Good Neighbor Rule. Because emissions are generally projected to be higher in 2023 than 2026, and this analysis is only focused on EGU emissions (rather than all anthropogenic ozone-precursor emissions in Missouri), this analysis provides a helpful indicator of the extent of impact of $NO_x$ emissions from Missouri on other states, including receptors around Lake Michigan. Figure 4-1 shows the spatial field of average contributions from EGUs in Missouri calculated using the contributions on the top-10 ozone concentrations days in each 12x12 km model grid cell. The figure shows that emissions from EGUs in Missouri have widespread regional impacts including locations along Lake Michigan in Wisconsin and Michigan in the areas north of Chicago, Illinois, where receptors have been identified in the EPA's 2011, 2016v2, and 2016v3 based modeling. Based on this analysis, controls on

Missouri EGUs would lower the contribution from these sources and thereby improve ozone concentrations in these areas.



*Figure 4-1 Contribution from EGU emissions in Missouri on average for the top-10 ozone concentrations days in 2026*

*Comment*

**Commenter:** City Utilities of Springfield, Missouri

**Commenter ID:** 09

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

The current model runs show that Missouri's contribution to ground level ozone at these receptors is approximately 1 ppb, which is within the margin of error of the model. Assessment of significance contribution from Missouri that is tied to 1% or 0.7 ppb is beyond the model's capability.

*Response*

The response to comments on the EPA's use of a 1 percent of the 2015 Ozone NAAQS contribution screening threshold at Step 2 of the 4-step interstate transport framework can be found in Section V of the preamble for this final action and in section 4.3 of the RTC.

*Comment*

**Commenter:** City Utilities of Springfield, Missouri

**Commenter ID:** 09

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Upon further inspection, the design value at each receptor indicates a downward trend (especially during the last two years), even as Missouri utility ozone season NOx emissions increased in 2020 and 2021. This is inconsistent with EPA's presumption that Missouri utilities contribute significantly to nonattainment or interfere with maintenance of the standard. The following table summarizes the most recent available trends.

| Monitor Receptors | 2016-2018 DV | 2017-2019 DV | 2018-2020 DV |
|---|---|---|---|
| Kenosha - Water Tower | 77 | 74 | 74 |
| Chiwaukee Prairie Stateline | 79 | 75 | 74 |
| Racine - Payne & Dolan | 78 | 74 | 73 |
| Evanston Water Plant | 77 | 75 | 75 |

*Response*

Firstly, the EPA has not found in this action that Missouri has significant contributions to downwind receptors, rather the EPA identified that Missouri is "linked" above the Step 2 contribution threshold to downwind receptors and thereby is potentially significantly contributing to nonattainment or interference with maintenance, but the state failed to properly analyze emissions reduction opportunities despite its linkage. The EPA's evaluation of Missouri's SIP submission was explained at proposal. 87 FR 9533, 9540-9544 (February 22, 2022). Second, the commenter did not provide Missouri EGU ozone season $NO_X$ emissions in 2020, 2021 or any prior years to support this comment's claim. In response to this comment the EPA analyzed the ozone season EGU $NO_X$ emissions for Missouri available from the EPA Power Sector Programs Progress Report web site.[40] The ozone season EGU $NO_X$ emissions for 2000, 2010, 2020, and 2021 are provided in Table 4-1. These data show that EGU $NO_X$ emissions in Missouri exhibit a long-term downward trend, however that trend has flattened since 2010, with only slightly lower emissions in the 2020 ozone season compared to 2021.

---

[40] https://www3.epa.gov/airmarkets/progress/reports/index.html

Table 4-1 Ozone Season NOx Emissions from EGUs in Missouri

| 2000 | 2010 | 2020 | 2021 |
|------|------|------|------|
| 65,569 | 25,467 | 21,234 | 20,080 |

This trend alone does rebut the conclusion of the EPA's analysis at Steps 1 and 2 that Missouri is linked to one or more downwind receptors and that additional emissions reductions may be warranted to eliminate "significant contribution." Additional comments on air quality factors are addressed in Section 8.5 (Air Quality Factors).

*Comment*

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851

**Comment:**

EPA's modeling fails to recognize the inadequacy of EPA's approach to addressing downwind nonattainment with the 2015 ozone NAAQS.

Review of historic emission changes and observed design values at linked downwind nonattainment monitors in Connecticut and Wisconsin indicates that controls associated with recently applied regulation and strategies to reduce NOx emissions from upwind EGU sources has nominal impact on ozone formation. As seen in the Figure 1 below, the relative design values at key receptors in 2020 is about the same (ratio near 1.0) compared to 2011. In contrast, EGU NOx emissions (yellow bar) from upwind CSAPR states have been reduced by over 65 percent in this same period and onroad NOx emissions (blue bar) from these states have been reduced by over 60 percent. All other anthropogenic categories (red bar) show a NOx emission reduction of only 27 percent over this period.

[(bar chart in full comment)]
Figure 1. Relative ozone season NOx emission reduction from CSAPR identified upwind states and ozone design values at downwind receptors in Wisconsin and Connecticut between 2011 and 2020.

These data demonstrate that recent control strategies, directed toward regional EGU NOx emissions are not having the intended impact on downwind ozone concentrations. In support of this observation, recent ozone source apportionment modeling of state-source sector contribution by Alpine Geophysics shows small ozone contribution from NOx emissions from EGUs. Given the relatively small contribution of EGU NOx and even smaller contribution of non-EGU NOx to ozone concentrations at relevant monitors predicted by USEPA's modeling platform, additional control of emissions from either sector will have little, if any, impact on ozone concentrations at these downwind receptors.

Several downwind nonattainment monitors in urban areas around Lake Michigan have recently been shown to be largely unresponsive to ozone reduction strategies consisting of regional interstate NOx

144

control and that high ozone days in the region were predominantly VOC-limited in nature. This was demonstrated in multiple ozone episodes extensively evaluated in the Lake Michigan Air Directors Consortium (LADCO) Lake Michigan Ozone Study (LMOS) 2017 study where ozone precursor measurements indicated relative increases in VOC concentrations with increases in ozone and where biogenic VOC increases outpaced those of anthropogenic VOC.

In contrast to the peer reviewed research resulting from the 2017 LMOS data collection effort, EPA recently documented its support for additional NOx controls in stating that its "review of the portion of the ozone contribution attributable to anthropogenic NOX emissions versus VOC emissions from each linked upwind state leads the Agency to conclude that the vast majority of the downwind air quality areas addressed by the proposed rule under are primarily NOX-limited, rather than VOC-limited." [footnote: 87 Fed. Reg. 20,076 [Proposed FIP]] However, the current situation is that the modeling as conducted does not accurately characterize ozone levels on high ozone days, underpredicting by 10 + ppb, which is a huge error. Other studies indicate that, in order to better match actual conditions, the model needs less NOx and higher windspeeds at lower levels. The model is therefore telling us that *less* NOx means *more* ozone. That also means that, proportionally, the attribution of ozone to out of state NOx predicts a higher impact than is actually occurring.

The modeled VOC and NOx emission tracers in EPA's Anthropogenic Precursor Culpability Assessment (APCA) modeling can give a general indication of the VOC/NOx sensitivity, but EPA assigning definitive numerical values to that sensitivity provides inaccurate projections, especially using APCA that is known to have a bias toward attributing ozone to NOx emitting anthropogenic sources under VOC sensitive conditions. As documented in the CAMx v 7.10 User's Guide, "when ozone formation is due to biogenic VOC and anthropogenic NOx under VOC-limited conditions (a situation where OSAT would attribute ozone production to biogenic VOC), APCA attributes ozone production to the anthropogenic NOx present. Using APCA instead of OSAT results in more ozone formation attributed to anthropogenic NOx sources and less ozone formation attributed to biogenic VOC sources." Here, it is believed that as applied in this case (with biogenic emissions as an uncontrollable source group), EPA has overestimated the efficacy of NOx controls on these receptors as modeled results have a bias toward attributing more ozone formed to NOx emissions than VOC emissions.

*Response*

The commenter asserts that ozone concentrations at downwind monitoring sites in Wisconsin and Connecticut are not trending downward despite concomitant $NO_x$ emissions reductions in upwind states. In response, the EPA analyzed the ozone trends over the past 10 years (i.e., 2012 to 2021) at 8 downwind monitoring sites located along or near coastal Connecticut and 11 downwind monitoring sites along or near the shoreline of Lake Michigan, including 8 sites in Wisconsin and 3 sites in Michigan. The monitoring sites included in this analysis are identified in Table 4-2.  Each of these sites had a 2012 measured design values exceeding the 2015 ozone NAAQS. Table 4-2 also provides the percent *reduction* in ozone design values by site from 2012 to 2021.  Contrary to the claim by the commenter, the reductions are not near zero. Overall, the average reductions from 2012 to 2021 at the sites in Connecticut, Wisconsin, and Michigan are 7.3 percent, 13.1 percent, and 11.3 percent, respectively.

Each of these monitoring sites has seen a downward trend in design values over the most recent 10-year period, as illustrated in Figure 4-2, 4-3, and 4-4.

*Table 4-2 Percent reduction in design values from 2012 to 2021 at monitoring sites in coastal areas of Connecticut, Wisconsin, and Michigan*

| Connecticut Monitoring Sites | Percent Reduction in Design Value |
|---|---|
| 090010017 Greenwich | 4% |
| 090011123 Danbury | 16% |
| 090013007 Stratford | 5% |
| 090019003 Westport | 6% |
| 090079007 Middlesex | 8% |
| 090090027 New Haven | 5% |
| 090099002 Madison | 6% |
| 090110124 Groton | 10% |
| *Average* | 7% |

| Wisconsin Monitoring Sites | Percent Reduction in Design Value |
|---|---|
| 550290004 Door Co | 10% |
| 550590019 Chiwaukee | 12% |
| 550710007 Manitowoc Co | 15% |
| 550790010 Milwaukee - S Health Center | 15% |
| 550790085 Milwaukee - Bayside | 15% |
| 550890008 Milwaukee - Grafton | 11% |
| 550890009 Milwaukee - Harrington | 9% |
| 551170006 Sheboygan - Kohler Andrae | 17% |
| *Average* | 13% |

| Michigan Monitoring Sites | Percent Reduction in Design Value |
|---|---|
| 260050003 Allegan Co | 11% |
| 260210014 Berrien Co | 13% |
| 261210039 Muskegon Co | 10% |
| *Average* | 11% |

146



*Figure 4-2 Ozone design value trends (ppb) at monitoring sites near coastal Connecticut*



*Figure 4-3 Ozone design value trends (ppb) at monitoring sites near the shoreline of Lake Michigan in Wisconsin*

147



*Figure 4-4 Ozone design value trends (ppb) at monitoring sites near the shoreline of Lake Michigan in Michigan*

It is important to recognize that trends in ozone design values reflect the combined effects of changes in ozone precursor emissions (i.e., $NO_X$ and VOC) and interannual variability in ozone conducive meteorology. In this regard, we considered the effects of meteorology on ozone concentrations in order to reveal the response of ozone to changes in precursor emissions. A recent published analysis describes a technique to analyze trends in ozone concentrations adjusted for interannual variability in meteorological conditions (Wells, et al.).[41] This technique adjusts monitored maximum daily average 8-hour (MDA8) ozone concentrations for meteorological effects using various statistical and mathematical methods, further explained in the Well, et al. analysis, to enable the analysis of the long-term trends in ozone concentrations due to changes in precursor emissions. Specifically, the technique provides meteorological adjusted MDA8 ozone values (mean, median, 90th percentile, and 98th percentile) for monitors in the continental U.S. Of particular interest is the 98th percentile values as they generally align with 4th High MDA8 monitored ozone concentrations that are used in calculating design values.

The EPA analyzed the "met-adjusted" 98th percentile MDA8 ozone concentrations for the monitoring sites in Table 4-2 for the years 2010 through 2021. In addition, we separately analyzed the met-adjusted 98th percentile data for the 3 nonattainment receptors in Coastal Connecticut (i.e., Greenwich, Madison, Stratford, and Westport). For each of these four areas we calculate the multi-monitoring site average

---

[41] Wells, B., Dolwick, P., Eder, B., Evangelista, M., Foley, K., Mannshardt, E., et al. (2021). Improved estimation of trends in U.S. ozone concentrations adjusted for interannual variability in meteorological conditions. *Atmospheric Environment*, *248*, 118234.

measured and met-adjusted 98th percentile MDA8 ozone concentrations for each of the years from 2010 through 2021. We then used the resulting yearly average 98th percentile concentrations to calculate three-year running average measured and met-adjusted concentrations. The resulting area-wide average measured and met-adjusted 98th percentile MDA8 ozone concentrations are illustrated in Figures 4-5, 4-6, 4-7, and 4-8. The average 98th percentile trends show that the met-adjusted concentrations have much less interannual variability and exhibit a more consistent downward trend in each of the three areas. Considering that the trends in met-adjusted data provides a clear indication of the decrease in ozone concentrations from reductions in emissions, we disagree with the commenter's contention that recently applied regulation and strategies to reduce $NO_x$ emissions from upwind EGU sources has had a nominal impact on ozone formation.



*Figure 4-5 Trends in 3-year running average measured and met-adjusted 98th percentile ozone concentrations aggregated for 8 monitoring sites near the shoreline of coastal Connecticut*

149



*Figure 4-6 Trends in 3-year running average measured and met-adjusted 98th percentile ozone concentrations aggregated for 4 receptor sites along coastal Connecticut*



*Figure 4-7 Trends in 3-year running average measured and met-adjusted 98th percentile ozone concentrations aggregated for 8 monitoring near the shoreline of Lake Michigan in Wisconsin*



*Figure 4-8 Trends in 3-year running average measured and met-adjusted 98th percentile ozone concentrations aggregated for 3 monitoring sites near the shoreline of Lake Michigan in Michigan*

The EPA is not requiring any emissions reductions in this action, and comments on the substance of the proposed 2015 ozone Good Neighbor Rule, such as proposed $NO_X$ controls, are beyond the scope of this rulemaking. However, to the extent the commenter is making these arguments to dispute this final action, the EPA disagrees with the commenter's claims that ozone contributions from EGU and non-EGU $NO_X$ emissions are relatively small and that additional controls from either sector would have little, if any, impact on ozone concentrations at downwind receptors in Connecticut and Wisconsin. To illustrate, the EPA points to the source apportionment modeling for EGUs and for non-EGUs by state using the projected emissions for 2026 in 2016v2 (before accounting for proposed controls in the FIP), as described in the Air Quality Modeling Technical Support Document (AQM TSD) for the proposed 2015 ozone Good Neighbor Rule. Tables 4-3 and 4-4 provide the percent of anthropogenic contribution from EGU plus non-EGU emissions for each of the 13 upwind states linked to receptors in Connecticut and Wisconsin, based on the proposed 2015 ozone Good Neighbor Rule air quality modeling for 2026. The data indicate that contributions from EGUs and non-EGUs are 20 to 50 percent of the state total anthropogenic contribution for all but 3 of these states (i.e., Maryland, New Jersey, New York). Since contributions from EGUs and non-EGUs represent a non-trivial portion of the overall state total contribution, we would expect that EGU and non-EGU emissions reductions would provide meaningful improvements in ozone concentrations at downwind receptors. Nonetheless, the EPA reiterates that the proposed 2015 ozone Good Neighbor Rule is not being used as a benchmark for assessing SIP submissions in this action.

*Table 4-3 Percent Contributions from Upwind States Linked to Connecticut Receptors*

| Connecticut | IN | KY | MD | MI | NJ | NY | OH | PA | VA | WV |
|---|---|---|---|---|---|---|---|---|---|---|
| 090010017 Greenwich | - | - | - | 37% | 10% | 14% | 36% | 31% | - | - |
| 090013007 Stratford | 36% | 50% | 18% | 37% | 11% | 15% | 37% | 32% | 21% | 39% |
| 090019003 Westport | 53% | 50% | 19% | 29% | 11% | 18% | 32% | 23% | 20% | 36% |
| 090099002 Madison | 34% | 48% | 18% | 33% | 13% | 13% | 36% | 33% | 22% | 37% |

*Table 4-4 Percent Contributions from Upwind States Linked to Wisconsin Receptors*

| Wisconsin | IL | IN | MI | MO | OH | TX |
|---|---|---|---|---|---|---|
| 550590019 Chiwaukee Prairie | 24% | 33% | 32% | 37% | 35% | 22% |
| 550590025 Kenosha | 15% | 55% | 29% | 26% | 36% | 21% |
| 551010020 Racine | 16% | 54% | 30% | 36% | 35% | 21% |

The commenter refers to the 2019 preliminary report on the Lake Michigan Ozone Study (LMOS) 2017 field campaign which was conducted "to address persistent violations of the ozone NAAQS in the coastal communities along the western shore of Lake Michigan" and claim that downwind nonattainment monitors in urban areas around Lake Michigan have recently been shown to be largely unresponsive to ozone reduction strategies consisting of regional interstate $NO_x$ control and that high ozone days in the region were predominantly VOC-limited in nature.

The EPA disagrees with this comment. First, the 2017 LMOS field study supporting the LMOS 2019 preliminary report focused on local ozone production and photochemical plume transport over the lake and along the shoreline, not the effects of regional transport. While the report concluded that local ozone production at the Zion measurement site near Chicago was VOC limited, ozone production at the measurement site in Sheboygan was $NO_x$-limited on half of the days with high ozone measurements. Second, the analysis in the report identified the presence of two different *local* photochemical regimens driving ozone production at the Sheboygan LMOS site which indicates the potential for different causes of high observed ozone. The LMOS 2019 preliminary report also states, "On high ozone days, the lowest lakeshore ozone concentrations are typically found in the areas with high emissions of nitrogen oxides (NOx), such as in central Chicago and northwestern Indiana. The highest concentrations are found downwind of the high NOx sources in rural and suburban coastal areas." Third, the LMOS 2019 preliminary report notes that "regional background is characterized by elevated $H_2O_2/HNO_3$ ratios (used to infer NOx vs VOC-limited conditions), suggestive of NOx-limited ozone production." Thus, the results of the LMOS 2017 field study, as described in the report, field study actually *support* a conclusion that upwind regional $NO_x$ reductions combined with local $NO_x$ and VOC reductions would be an effective approach for reducing high ozone concentrations in this area.

Regarding the comment about "the modeling" underpredicting ozone concentrations by 10+ ppb on high ozone days, it is not clear whether the commenter is referring to modeling performed as part of the LMOS 2017 field campaign or the EPA's 2016v1 or 2016v2 modeling.  The EPA has made substantial updates to its 2016-based modeling platform in response to public comments. These updates have significantly improved model performance. The EPA's response to comments on the EPA's model performance can be found in Section III of the preamble, and in Section 4.2 (Model Performance).

The commenter also refers to "[o]ther studies" that the commenter claims indicate that, in order to better match actual conditions (i.e., improve model performance), the model needs less $NO_x$ and higher windspeeds at lower levels. However, the commenter fails to identify these other studies. The commenter concludes from these other studies that "the model is therefore telling us that less NOx means more ozone. That also means that, proportionally, the attribution of ozone to out of state NOx predicts a higher impact than is actually occurring."

Assuming the commenter may be referring to the LMOS preliminary report, the EPA recognizes that this report does describe emissions perturbation air quality model runs which show improved model performance on the June 2, 2017 high ozone day at both the Zion field study site and a monitoring site in Chicago by reducing baseline $NO_x$ emissions by 50 percent and increasing hydrocarbon (HC) emissions by a factor of 5. However, the applicability of these results is very limited and must be viewed with the understanding that the baseline emissions for the LMOS modeling were derived from emissions for 2011, not 2017 - which was when the field study was conducted. As described in the LMOS 2019 preliminary report, the 2011 NEI $NO_x$ emissions were uniformly reduced by 28 percent in an attempt to account for changes in emissions between 2011 and 2017, while VOC emissions from 2011 were used without any adjustment. A comparison of 2011 vs 2017 NEI $NO_x$ and VOC emissions for the three states within the field study modeling domain (i.e., Illinois, Indiana, and Wisconsin) indicates that 2017 $NO_x$ emissions were 38 percent lower, and VOC emissions were 18 percent lower in 2017 compared to 2011. In addition, the relative change in emissions between 2011 and 2017 varied by sector such that a uniform scaling factor applied to 2011 would not necessarily provide a representative estimate of the spatial distribution of emissions in 2017. Thus, the results of the LMOS emissions sensitivity runs are not immediately or inherently relevant to other air quality model applications, and these results, which are dependent on the emissions assumptions for the LMOS modeling and applicable to photochemistry within the local area, do not provide information to judge the attribution or impacts of upwind state $NO_x$ emissions on ozone concentrations at receptors within the Lake Michigan area.

The commenter also claims that the Anthropogenic Precursor Culpability Assessment tool (APCA) in the CAMx model, which the EPA used to quantify upwind state contributions to downwind receptors at Step 2 of the 4-step interstate framework, is biased toward attributing more ozone to $NO_x$ emissions and, as a result, EPA has overestimated the potential efficacy of $NO_x$ controls on these (Lake Michigan area) receptors. The EPA notes that the Agency is not defining "significant contribution" at Step 3 for any state covered by this action. To clarify the issue raised by the commenter, however, the EPA notes that the CAMx Ozone Source Apportionment Tool (OSAT) and APCA use the ratio of the production rates of hydrogen peroxide and nitric acid as the indicator to classify ozone formation as being limited by $NO_x$ or VOC. This ratio is used in OSAT to assign ozone production to sources of $NO_x$ versus sources of VOC depending on the magnitude of this ratio. Ozone formation is classified as being $NO_x$-limited when the

153

ratio is less than the 0.35 and VOC limited when the ratio is above this threshold.[42] As stated in the CAMx User's Guide, the APCA tool operates similar to OSAT, except that

> APCA recognizes that certain emissions categories are not controllable (e.g., biogenic emissions) and that apportioning ozone production to these categories does not provide information that is relevant to development of control strategies. To address this, in situations where OSAT would attribute ozone production to non-controllable emissions, APCA re-allocates that ozone production to the controllable precursors that participated in ozone formation with the non-controllable precursor. For example, when ozone formation is due to biogenic VOC and anthropogenic NOx under VOC-limited conditions (a situation where OSAT would attribute ozone production to biogenic VOC), APCA attributes ozone production to the anthropogenic NOx present. Using APCA instead of OSAT results in more ozone formation attributed to anthropogenic NOx sources and less ozone formation attributed to biogenic VOC sources.[43]

Considering the construct and purpose of APCA, as stated by the model developers, EPA does not agree with the comment that using APCA overstates the efficacy of $NO_X$ controls. *See also Wisconsin*, 938 F.3d at 323-24 (upholding use of APCA approach to apportionment).

The EPA's response to comments on model performance and fine scale modeling can be found in Section 4.2 (Model Performance).


## 4.1.2   Modeling Design - Western States


*Comment*

**Commenter:** PacifiCorp (Attachment – Ramboll Evaluation)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

**Missing Emissions in Proposed Transport Modeling Results in Overstating Utah's and Wyoming's Ozone Contribution to Receptors in the DM/NFR NAA**

The Proposed [FIP] Transport Rule CAMx modeling failed to include $NO_X$ emissions from lightning (LNOx). This is particularly important in the Front Range area of Colorado where summer thunderstorms regularly occur. Emissions from lightning can be a significant source of $NO_X$ concentrations and resultant ozone formation. Zhang and co-workers (2003) estimate that 5% of the annual and 14% of the summer $NO_X$ emissions in the U.S. comes from lightning. Kang and co-workers (2020) analyzed the effects of

---

[42] Ramboll Environment and Health, January 2021, *http://www.camx.com*.

[43] Ramboll Environ, 2021. User's Guide Comprehensive Air Quality Model with Extensions version 7.1, www.camx.com. Ramboll Environ International Corporation, Novato, CA.

including LNOx emissions and found they were particularly important for simulating ozone in the U.S. Mountain West States (MWS), which include Colorado, Utah and Wyoming, and found LNOx emissions could increase MDA8 ozone concentrations by up to 17 ppb and concluded "summertime surface-level O3 levels in the MWS region could be significantly influenced by lightning NO$_x$." (Kang et al., 2020). If naturally occurring LNOx emissions were included in the Proposed [FIP] Transport Rule CAMx modeling that would increase the total MDA8 ozone concentrations at the DM/NFR NAA receptors resulting in a reduced Utah and Wyoming Contributions Factors and lower Utah and Wyoming ozone contributions to 2023 and 2026 ozone design values at the DM/NFR NAA receptors.

*Response*

Although this comment is directly about the proposed 2015 ozone Good Neighbor Rule, the EPA sees it as relevant for 2016v3 modeling generally. As described in Section III.A.2 of the preamble, the EPA included NO$_x$ emissions from lightning strikes in the 2016v3 emissions inventory used for the air quality modeling of this final action. The method for including these emissions in the modeling is described in the 2016v3 Emissions Modeling TSD which can be found in the docket for this final action.

*Comment*

**Commenter:** PacifiCorp (Attachment – Ramboll Evaluation)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA developed the 2016v2 modeling platform 2016, 2023, 2026 and 2032 model-ready emissions for the CMAQ model and converted them to the CAMx format using a CMAQ2CAMx emissions converter. In doing the CMAQ to CAMx emissions conversion for the Proposed [FIP] Transport Rule CAMx modeling, EPA dropped methane (CH4) emissions and some secondary organic aerosol (SOA) precursor species. The SOA precursors probably have minimal effect on ozone formation but methane acts like a low reactive VOC in ozone formation so in higher concentrations can affect and increase ozone concentrations. Since methane is not classified as a VOC it is not included in many criteria pollutant emissions inventories. Methane is treated two ways in CAMx. First, there is a global background value of 1.75 ppm was used in CAMx v7.1, which was the version in the Proposed [FIP] Transport Rule. Note that the global background methane in CAMx was recently updated to 1.85 ppm in the April 2022 release of CAMx v7.2. Second, there is an excess methane species (ECH4) in the CAMx model that is added to the global background methane in the photochemical mechanism. When running a CMAQ2CAMx converter, the CMAQ methane species is typically mapped to the CAMx ECH4 species, but EPA failed to do this and dropped the CMAQ methane emissions. The Denver-Julesburg (D-J) Basin is a large oil and gas (O&G) development and production area that partly resides in the DM/NFR ozone NAA. The D-J basin O&G sources emit methane emissions that should have been included in the Proposed Transport Rule CAMx modeling. If EPA had included ECH4 emissions in the Proposed Transport Rule CAMx modeling that would have increased the 2023 and 2026 total MDA8 ozone concentrations at receptors in the DM/NFR

155

NAA thereby reducing the CF and Utah's and Wyoming's ozone contributions to 2023 and 2026 ozone design values at the three nonattainment/maintenance receptors in the DM/NFR NAA.

*Response*

The EPA disagrees with this comment. First, the comment is speculative. The commenter provided no analyses, data, or references to support their hypothesis that including a higher amount of global background methane or adding methane emissions in EPA's modeling would have increased model predicted ozone concentrations in the Denver area or decreased ozone contributions from Utah or Wyoming to those receptors. Moreover, the commenter fails to acknowledge that the ozone source apportionment tools in the latest version of CAMx are not designed to include methane emissions. Thus, it is not possible to quantify the impact of methane emissions using this model. Furthermore, the commenter is focused on the contribution to local ozone production of methane emissions from oil and gas production in Colorado but fails to consider the contributions from methane emissions from oil and gas production in both Utah and Wyoming.  Following the commenter's logic, adding methane emissions in the EPA's modeling would *increase*, not decrease the contributions from these two states to receptors in Denver.

## 4.2    Model Performance
### 4.2.1    Model Performance at Lake Michigan

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

The updated modeling to identify the newly linked receptors is performing outside the acceptable range for model performance and cannot be used as the basis for disapproving Missouri's SIP

Complex photochemical modeling applications must be high-performing and technically sound to make determinations at Step 1 and Step 2 of EPA's framework, where the results are used to justify billions of dollars of new regulatory costs. Without a well-performing model, the technical foundation and basis does not exist for determining: first the need for new control requirements (Steps 1 and 2), and second the stringency level of the new control requirements (Step 3).

[…]

While the updated modeling has resolved all of the linkages that Missouri was required to analyze at step 2 in our SIP submission, the updated modeling also identified four new receptors to which Missouri

156

is linked at Step 2. Figure 1, displays these four newly identified receptors that Missouri is linked to in the updated modeling. While EPA's model is not performing within one percent in any region of the country, as may very well be needed to justify the use of a one percent threshold at Step 2, the model is not even performing within well-establish acceptable ranges in the only region of the country (Upper Midwest) where Missouri is still linked to problem receptors in the updated modeling. All four of the newly identified receptors are located near the shoreline of Lake Michigan (one in Chicago, IL and three in Wisconsin). While EPA's model performance evaluation shows that on a nationwide basis, it meets the established acceptable criteria for model performance, in Missouri's case there is only one region of the country where there are linked receptors at Step 2, and the model performs the worst in this region and outside the acceptable range, as discussed below.

[…]

The acceptable ranges for photochemical model performance are outlined in the 2017 document titled *Recommendations on statistics and benchmarks to assess photochemical model performance*. The document includes the following recommended benchmarks for model performance statistics for MDA8 levels for ozone:

• Normal mean bias (NMB) goal: less than or equal to ±5 percent;

• NMB criteria: less than or equal to ±15 percent;

• Normal mean error (NME) goal: less than or equal to ±15 percent; and

• NME criteria: less than or equal to ±25 percent.

In January of 2022, EPA released a document to accompany the updated modeling titled *Air Quality Modeling for the 2016v2 Emissions Platform Technical Support Document*. Table A-1 of this document [available in full comment] provides the NBE and the NME associated with the updated modeling for all the climate regions of the country. In the Upper Midwest, the NMB for all days with MDA8 above 60 ppb is -19.1 percent and the NME for these days is 19.5 percent. This shows that for this region of the country the model is performing outside the both the goal and acceptable criteria for NMB and outside the goal but within the acceptable criteria for NME. In addition, in EPA's document titled *CAMx 2016v2 MDA8 O3 Model Performance Stats by Site*, it shows that the model is also severely underperforming for the four specific receptors linked to Missouri in the updated modeling. The NMB at the Cook County, IL receptor is -14.50 percent with an NME of 15.20 percent. The NMBs at the two Kenosha County, WI receptors are -24.36 percent and -18.94 percent with NMEs of 25.29 percent and 18.94 percent. The NMB for the Racine County, WI receptor is -23.49 percent with an NME of 24.16 percent. These values are all outside established model performance goals, and the model is performing outside the acceptable range at each receptor with respect to NMB (except for the Illinois receptor where the NMB is within 0.5 percent of the acceptable criteria limit). With a model that is so severely underperforming at the only receptors where Missouri is linked, it cannot be acceptable to use the modeling results as the technical foundation to establish linkages at Step 2, which will result in the imposition of billions of dollars of control costs for Missouri sources.

**Commenter:** Ameren Missouri

**Commenter ID:** 05

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

5. The modeling used to determine Missouri's "significant contribution" to nonattainment in USEPA's step 2 is shown by USEPA's own data that it cannot accurately predict ozone concentrations at the monitors critical to the Missouri SIP. This inaccuracy is significant enough that use of the model without changes to link Missouri emissions to nonattainment is arbitrary and capricious.

[Paraphrase: Modeling is too inaccurate to reliably establish a link based on an evaluation of the model outputs for the monitors critical to the MO SIP on days used to establish the relative contribution factor.

The performance of USEPA's modeling at the Lake Michigan monitors is so poor, that USEPA cannot rely on the results based on an Alpine assessment of modeling files.]9. USEPA's use of the RCF and RRF to determine MO's significant contribution compounds the modeling inaccuracies

The USEPA's post processing of model data to estimate future year design values as well as state contributions to those future years utilizes two values calculated based on model outputs for various future modeled days. The first is the Relative Reduction Factor (RRF) which the modeling TSD for the FIP describes as the fractional change in the modeled MDA8 ozone between the base and future year. The RRF is calculated as the average of the ratios of the future year modeled MDA8 ozone concentrations to the modeled top 10 base year (2016) MDA8 ozone concentrations. As detailed earlier, at monitor locations along land water interfaces like the Lake Michigan shoreline, the USEPA CTM has difficulty reproducing observed ozone concentration in the base year (2016). The inability to reproduce the actual observed concentrations in the base year is an error that is caried forward in the models calculation future year MDA8 ozone concentrations. The error can be estimated based on the normalized mean error of the base year modeled MDA8 ozone concentrations of the days used to calculate the RRF. The RRF which is the average ratio of the two modeled concentrations on the top 10 modeled base year concentrations has the same relative error. The RRF is then multiplied by the actual observed ozone design value for the base year (2016) to estimate the future year design value for that monitor location. The error in the design value calculation is equal to the normalized mean error for the RRF calculation.

Similarly, the Relative Contribution Factor (RCF) for a state is the average of the ratio of the modeled future year Ozone Source Apportionment Tool (OSAT) output for a state by the total modeled concentration for the top 10 future year modeled days. The error in the RCF calculation is similar to the RRF error. The RCF error can be estimated based on the normalized mean error of the base year modeled MDA8 ozone concentrations of the days used to calculate the RCF.

When USEPA then multiplies the RCF by the future year design value (which is based on the RRF calculation) it is compounding (multiplying) the error in the RCF by the error in the RRF. The result is that the error in the estimate of a state's contribution is larger than the sum of the errors for the RCF and the RRF.

158

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's modeling underlying its assessment of TCEQ'S modeling is erroneous, arbitrary and capricious.

EPA's 2016v2 modeling platform demonstrates systematic bias and error in predicting ozone in the Chicago and Lake Michigan areas and is not an adequate tool to establish the purported linkage between Texas and the Chicago areas that EPA identified. EPA's 2016v2 modeling does not pass well-accepted performance standards in air quality planning, and cannot be the basis for a reasoned decision on Texas's SIP. The performance of EPA's 2016v2 modeling in the upper Midwest disqualifies it as a predictor of future design values and contributions at these sites. As noted in the attached analysis prepared by Sonoma Technology, EPA's modeling platform has dramatic bias and errors as a predictor of ozone in the Midwest. Such inaccuracies affect EPA's Relative Response Factor ("RRF"), which is then used to project future year design values, and can result in the model mistaking the response to emissions changes. In other words, a model with this level of bias and error tends to portray more controls as being needed to demonstrate modeled attainment than are actually necessary to attain or maintain the NAAQS. This is just one potential consequence of relying on a model with these performance problems. The directionality of the effects cannot be known, and thus regulatory decisions cannot reliably be based on results from such modeling. Because the model is performing so poorly, it is unreliable to determine whether any controls are necessary to address interstate transport between Texas and the upper Midwest. As the CAA only requires that a Good Neighbor SIP contain "adequate provisions" to prohibit significant contributions to nonattainment or interference with maintenance of the NAAQS, such inaccuracies in EPA's model point to overcontrol of upwind sources. Such a result is contrary to the CAA and cannot support disapproval of Texas's SIP.

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association (Attachment – Sonoma Technology)

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The Water Tower Site in Kenosha shows that the model is not capturing the highest observed MDA8 through most of the ozone season. For example, the second-highest ozone day of the season is underestimated by approximately 30 ppb, and the model entirely missed the early season multi-day ozone episode in late-May. The Chicago-Alsip site shows a similar inability of the model to capture high ozone, but mostly in the months of May and June when a large number of the highest MDA8 ozone occur. Additionally, the model fails to capture the highest observed MDA8 concentration of the ozone

159

season and underestimates this August day by approximately 20 ppb. At the Chicago-Evanston site, the model also inaccurately predicts high ozone episodes in May and June.

 The inaccuracies at these key sites in EPA's 2016v2 modeling demonstrate a systematic performance problem with the 2016v2 platform at these sites in the Chicago and Lake Michigan areas, especially during the spring. This is an important issue given that these monitors are linked to emissions from up to 6 upwind states in the proposed rulemaking. EPA concludes that the "days with high modeled concentrations are generally also days with high measured concentrations…", but this conclusion is less meaningful if the model is inaccurately predicting the MDA8 ozone on those days at these sites. The average of the top 10 MDA8 modeled ozone days is used to calculate the Relative Response Factor (RRF), which is used to project base design values to the future year. But days with modeled MDA8 ozone ≤ 60 ppb, which could be erroneously missed due to the substantial bias in EPA's model, would be excluded. Thus, for example, the ozone event at Kenosha – Water Tower in late May would be missed in the RRF calculations. As emphasized in EPA's attainment modeling guidance, the use of the model in a relative sense helps to mitigate the effect of model biases on individual days. However, negative bias in the model's ozone performance can still contribute to a bias in the RRF (Hu et al., 2021). If the RRF is biased high, the model will underpredict the response to emissions changes, and thus more emission controls would be needed to demonstrate modeled attainment. This is just one potential consequence of relying on a model with these performance problems. The magnitude and directionality of biases in the RRF (and thus the predicted future-year design values) were not evaluated for this modeling platform, but regulatory decisions cannot reliably be based on modeling results from sites in the upper Midwest that are demonstrating a systematic performance problem. Hu et al. (2021) also emphasize the importance of good model performance (particularly having a low bias) in air quality management.

In attainment planning, performance "benchmarks" are used to provide an appropriate and consistent context to assess general confidence in the modeling results and for judging the suitability of a model for a particular application. EPA does not recommend using these benchmarks as a "pass/fail" indicator, but statistical results that are outside the range of the benchmarks often indicate performance issues that call into question the suitability of the model and thus should be addressed. According to EPA, about two-thirds of other recent peer-reviewed and regulatory air quality modeling applications had NMB less than ±15% and NME less than 25% for ozone. This defines a benchmark of reasonable ozone model performance. At several upper Midwest ozone monitoring sites, the bias (NMB) is substantially greater than ±15% (and as large as -24.4%) and the error (NME) approaches 25%. In terms of ozone concentrations, the mean bias is as large as -17.1 ppb at the Kenosha Water Tower Site, which is substantial given that the mean observed ozone was 70.1 on days when MDA8 ozone was 60 ppb or greater.

In summary, EPA's 2016v2 modeling platform performs poorly at sites in the upper Midwest that are linked to Texas in the proposed disapproval. The 2016v2 platform, as presented in the proposal documentation, does not reliably predict ozone formation at these upper Midwest monitors.

Figure 1. [available in full comment]

High ozone episodes in the Great Lakes region are strongly tied to the complex lake-land breeze circulation patterns that influence the formation and transport of ozone in the region, especially at monitoring sites within a few kilometers of the lakeshore. As a result, photochemical grid models have

difficulties reproducing high ozone events in this region (Qin et al., 2019). A further complexity is that the Chicago area is one of the few regions in the United States where ozone is still characterized at times by "VOC-limited" chemistry, which can dampen the responsiveness of ozone to NOx emission controls (Koplitz et al., 2021). EPA's 2016v2 modeling for the proposed Transport Rule was conducted using a 12 km by 12 km spatial grid resolution. Spatial resolution of the underlying model may be one reason why EPA's 2016v2 platform performed poorly on high ozone days in the Great Lakes region. A finer resolution grid would be needed to fully resolve the atmospheric features in these complex regions (LADCO, 2017).

*Other modeling platforms [such as TCEQ's 2012 based modeling] show better model performance than EPA's 2016v2 modeling.*

Other attainment modeling platforms have outperformed EPA's 2016v2 platform in the Lake Michigan region. As an example, Table 4 shows the model performance of MDA8 ozone ≥ 60 ppb for TCEQ's 2012-based platform, used in TCEQ's Transport SIP, at the sites in the region that EPA linked to Texas using its 2016 platform. The TCEQ platform predictions show better model performance across the sites that EPA linked to Texas. NMB for these sites using the TCEQ platform ranges from -4.59 to 2.78% and NME ranges from 10.22% to 14.48%. At the Kenosha – Water Tower site specifically, the TCEQ platform shows less NMB by almost a factor of 5 (-4.59% TCEQ vs. -24.36% EPA) and less NME by a factor of 2 (11.22% TCEQ vs. 25.29% EPA).

Table 4. [available in full comment]


**Commenter:** Evergy, Inc.

**Commenter ID:** 21

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Another major concern is underperformance of the updated modeling that links Missouri to the newly identified receptors. This model is not sufficiently accurate for the Upper Midwest when compared to the goal and acceptable criteria for the normal mean bias. Similarly, the model exceeds the goal for normal mean error outlined in the acceptable ranges for photochemical model performance in the 2017 document titled *Recommendations on statistics and benchmarks to assess photochemical model performance*. This underperformance has immense consequence when considering that a small shift in the model to move above or below the 1 percent of the 2015 ozone standard has an impact equivalent to millions of dollars on Missouri residents.


**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The table below further exemplifies the problem of modeling sensitivities. It contains data for the ozone monitors located in the Illinois portion of the Chicago, Illinois-Indiana-Wisconsin Nonattainment Area. Note that of the 12 ozone monitors, only one Site 170310032 exceeds the 1% NAAQS threshold of 0.7 ppb. This site barely exceeded the contribution threshold, measuring at 0.75 ppb. This measurement could be misleading since Site 170310032 is located less than 0.2 miles from Lake Michigan. This calls into question the accuracy of the contribution as the location could be greatly influencing the results as models often have difficulties near water-land boundaries. Furthermore, the average of the Oklahoma impact for the 12 monitors equates to 0.41 ppb, well under the 1% limit.

[Table is available in full comment]


**Commenter:** The Luminant Companies

**Commenter ID:** 44

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Specifically, as explained in the analysis prepared by Sonoma Technology that is attached to the comments submitted by the Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council, and Texas Oil & Gas Association, EPA's 2016v2 modeling has a significant bias for receptors in the Ohio Valley and Midwest, including Illinois and Wisconsin, which makes it unreliable for purposes of projecting future design values in these areas.  This bias would in turn impact EPA's Relative Response Factor ("RRF") and can cause the model to underpredict impacts from changes in emissions. Essentially, as applied to Texas, EPA's model would require emission reductions beyond those necessary to achieve attainment in downwind states because the biased RRF makes it appear that additional controls are needed when, in fact, they are not.

This constitutes unlawful overcontrol with respect to Texas and cannot form the basis for disapproval of Texas's SIP. In contrast, the modeling platform used by TCEQ has been shown to have better model performance and be more accurate for receptors in the Ohio Valley and Midwest and particularly the Lake Michigan region. Accordingly, EPA provides no technically justified basis to second-guess TCEQ's model in favor of its own flawed modeling.


**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851

**Comment:**

The problem monitors in Connecticut, Wisconsin, and Illinois are not properly characterized by EPA's modeling since they are located at the interface between land and water.

EPA's ozone attainment modeling guidance states that:

> "[t]he most important factor to consider when establishing grid cell size is model response to emissions controls. Analysis of ambient data, sensitivity modeling, and past modeling results can be used to evaluate the expected response to emissions controls at various horizontal resolutions for both ozone and PM2.5 and regional haze. If model response is expected to be different (and presumably more accurate) at higher resolution, then higher resolution modeling should be considered. If model response is expected to be similar at both high and low(er) resolution, then high resolution modeling may not be necessary. *The use of grid resolution finer than 12 km would generally be more appropriate for areas with a combination of complex meteorology, strong gradients in emissions sources, and/or land-water interfaces in or near the nonattainment area(s)*" (emphasis added)

EPA's modeling in support of the proposed disapprovals simulated a national domain using a 12km grid resolution domain wide. While this makes running a national, regional simulation easier from a technical perspective, it neglects the important issue of the complex meteorology and/or land-water interfaces in or near the nonattainment or maintenance monitors of interest. Indeed, EPA's choice of a 12 km grid is an arbitrary choice in contravention of its own guidance when modeling Illinois, Wisconsin, and Connecticut monitors because these monitors are at landwater interfaces.

Photochemical modeling along coastlines is complex for two reasons. First, the temperature gradients along land/water interfaces can lead to localized on-shore/off-shore flows; and secondly, the photochemical model formulation spreads the emissions in a grid cell throughout the full grid volume of the cell.

Figures 4 and 5 present two unique areas in the eastern U.S. that is challenged by these complex meteorologic issues at land-water interfaces. For each monitor associated with this proposed rule and located in Connecticut along the Long Island Sound (Figure 4) and in Wisconsin and Illinois along the shore of Lake Michigan (Figure 5), EPA's published model performance evaluation (MPE) metrics for ozone have been reviewed on a day specific basis.

[image in full comment]

Figure 4. Long Island Sound shoreline monitors located on land/water interface.

[image in full comment]

Figure 5. Lake Michigan shoreline monitors located on land/water interface.

Studies indicate that air quality forecast models typically predict large summertime ozone abundances over water relative to land and that meteorology around Lake Michigan and the Long Island Sound is distinctly unique; both shortcomings warrant individualized attention and a finer grid resolution to best explore actual conditions.

163

The 3x3 neighborhood of grid cells used in determining the design values of the relative response factor (RRF) at land-water interface monitors extends into the noted water bodies. Under current guidance, the top ten modeled days within this 3x3 matrix are used in determining this RRF for each monitor with any cell identified as 50 percent or more water, except for cells including monitors, which are omitted from the calculations.

When the individual days selected for RRF calculation are reviewed at many of these monitors, it is seen that the performance of the model to replicate observed concentrations are outside of comparable acceptable ranges. Table 1 below provides a list of top 10 days at the Kenosha monitor in Wisconsin and comparisons of daily modeled maximum daily average 8-hour ozone concentrations (highlighted in green) and observations on the same date in 2016. These are the dates selected in EPA's modeling to represent highest modeled days used in estimating future year design values.

As can be seen in these Tables, several days selected for RRF calculation have modeled ozone concentrations that fall outside of normally acceptable normalized bias (NBias) boundaries (±15%), either because of over (positive bias) or under (negative bias) predictions compared to observed concentrations on those days. In fact, at the Kenosha monitor example below, four of the ten selected days fall outside of the ±15% bias metric (highlighted in orange in the Table below).

[Table 1 available in full comment]

The LMOS 2017 study also shows that for Lake Michigan coastal monitors the air quality model even at a 4 km resolution does not simulate the proper timing and structure of the land/lake breeze or the inland penetration of elevated ozone concentrations. A review of this LMOS study states "To reproduce the timing and magnitude of the ozone time series at coastal monitors, ozone production over the lake must be correctly simulated; furthermore, details of the lake breeze must be accurate——timing, horizontal extent, and vertical structure." Based on recommendations from the LMOS 2017 study research team, a horizontal resolution of at most 1.3 km is required to reasonably resolve the complex meteorology of the air/water interface for the great lakes and coastal ocean areas. The LMOS 2017 Study researchers believe that a 1.3 km grid spacing will assist in the resolution of the large ozone concentration gradients that often occur along the shoreline as well as the inland penetration of the lake breeze circulation.

Similar results are seen at the example Fairfield, Connecticut nonattainment monitor (Table 2) where again four of the ten days are outside of the ±15% normalized bias range; including the top modeled day at the receptor (modeled value of 91.64 ppb and an observed value of 67.13 ppb).

[Table 2 available in full comment]

As these examples show, days where modeled ozone was predicted at concentrations differing up to ± 24 ppb are being used to estimate future year ozone concentrations and to make determinations of nonattainment, maintenance, and significant contribution from upwind sources.

[…]

On many days with relatively simple meteorology, EPA-developed wind fields using the Weather Research and Forecasting (WRF) Model agree with the MADIS observed winds. However, the modeled winds have strong disagreement with the observed meteorology on June 15, July 7, July 27 and August

4, 2016, the four days when the CAMx model predicted the highest ozone concentrations and are thus used in estimating RRFs and future year ozone design values. The following presents an example on August 4, 2016, the day with the highest model estimated MDA8 ozone concentrations at the Kenosha, Wisconsin monitor.

In Figures 6 through 8 below, the black wind vectors are the wind fields used in the CAMx model. For clarity only every third grid cell is presented. The red vectors are the hourly observed wind vectors from the MADIS archive. The hourly results from 1200 CDT through 1600 CDT are presented in these Figures. The observations clearly show a broad persistent land to lake flow long the Wisconsin shoreline while the model shows a persistent lake to land flow in this same region during this same period. For this timeframe, when the model is estimating the highest ozone for the ozone season at this receptor, the model has the winds flowing from the lake to the shore while the observations are winds flowing from the shore to the lake.

[Figures 6-10 available in full comment]

In addition to grid size resolution and complex meteorology issues, modeling performed by EPA17 and the LMOS 2017 study both showed a negative bias in predicted ozone concentrations in the Lake Michigan region. LMOS 2017 study researchers have experimented with increasing anthropogenic VOC emissions and decreasing anthropogenic NOx emissions. These emission changes improved air quality model performance reducing the negative bias. VOC speciation and spatio-temporal release patterns should also be reviewed. This evaluation by the LMOS 2017 research scientists indicates there are significant errors in the quantity and speciation of the VOC/NOx emissions used in the EPA's air quality modeling platform to characterize state contribution to ozone in Step 2 of EPA's analyses linking these states to critical nonattainment monitors.

For these reasons, EPA must consider finer grid resolution modeling over the Lake Michigan domain to adequately capture ozone formation and significant contribution at receptors located on complex land-water interfaces because model evaluation shows that the model fails to adequately characterize ozone production at these monitors. Absent a wholesale revision of EPA's modeling protocol, MOG believes that EPA's use of modeling with poor performance at critical monitors amounts to an arbitrary and capricious decision when used to establish linkages under Step 2.


**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

Minnesota Pollution Control Agency (MPCA) 2015 Ozone NAAQS State Disapproval Comments:

Xcel Energy endorses the comments filed by the Minnesota Pollution Control Agency (MPCA) in response to EPA's SIP disapproval for Minnesota. In addition to EPA not including all the NOx emission reductions taking place within the state, the EPA erred in the approach taken modeling the influence

Lake Michigan has on receptor sites located near the air/water shoreline boundaries, which was factored into the modeling performed by Lake Michigan Air Directors Consortium (LADCO) supporting Minnesota's SIP submittal. We understand that other parties, such as Midwest Ozone Group (MOG), will provide more detail on this matter in their comments.

**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Texas Commission on Environmental Quality (TCEQ) 2015 Ozone NAAQS State Disapproval Comments:

Xcel Energy endorses the comments filed by the Texas Commission on Environmental Quality (TCEQ) in response to EPA's SIP disapproval for Texas. The EPA erred in the approach taken to modeling the influence Lake Michigan has on the receptor sites located near the air/water shoreline boundaries in Cook County Illinois, Kenosha, and Racine Wisconsin, which was factored into the modeling performed by both TCEQ, further supported by comments filed by the Association of Electric Companies of Texas (AECT) and the associated modeling analysis performed by Sonoma Technology.

*Response*

The EPA responds to comments regarding model performance in both Section 4.2.1 and Section 4.2.2.

Comments included here in Section 4.2.1. raise issues besides model performance. Comments on the proposed FIP are out of the scope of this action. The EPA is not requiring any controls in this action. Other topics raised by these comments are addressed in the following sections of this RTC document: 1.4 (Use of Updated Modeling), 4.1.1 (Modeling Design – Lake Michigan), 5 (Updates to Modeling and Changes in Linkages), 9.2 (Over-Control), 10.3 (Cooperative Federalism and the EPA's Authority), and 11.6 (Economic Impacts).

### 4.2.2   Model Performance at Western States

*Comments*

**Commenter:** Nevada Division of Environmental Protection

**Commenter ID:** 33

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

166

As stated in NDEP's June 21, 2022 comment letter (attached) on the Proposed Federal Implementation Plan for Regional Ozone Transport for the 2015 Ozone NAAQS EPA-HQ-OAR-2021-0668 (Proposed FIP), the Proposed FIP fails to consider Nevada's (and Western States) uniqueness, including local industry, topography (including high elevations and variations), geography, population, meteorology, vast open range landscapes, and wildfires.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The Colorado ozone SIP modeling provides more reliable and accurate 2023 and 2026 ozone projections than the new and problematic modeling EPA relied on to disapprove Utah's SIP for several reasons:

1. The Colorado SIP CAMx modeling was tailored to simulate ozone in the relevant Denver Metro area. EPA's modeling, on the other hand, was national modeling not optimized to simulate ozone in the relevant, western mountain area.

2. The Colorado SIP CAMx modeling used a higher grid resolution (4-km) while EPA's modeling relies on a national-scale coarse 12-km grid resolution that is not as effective at replicating the complicated meteorology in the Rocky Mountain region due, in part, to poor representation of terrain features that impact ozone formation and transport.

3. The Colorado SIP CAMx modeling was a better match for observed ozone. EPA's CAMx modeling has an ozone underestimation bias that falls short of EPA's own requirements.

4. The higher resolution grid size and meteorology of the Colorado ozone SIP CAMx modeling produces higher ozone due to local emissions. This also results in more ozone reductions from the local emission controls (e.g., mobile sources) and thus lower projected future-year ozone levels at the affected monitors than EPA's CAMx modeling.

**Commenter:** PacifiCorp (Attachment – Ramboll Evaluation)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

4.5.1 Effects of Higher Resolution 4-km Grid in DM/NFR SIP Modeling

[…] In order to properly simulate ozone formation in the DM/NFR NAA, a high resolution grid cell size needs to be used. All of the Denver ozone SIPs in the past have used a 4-km grid resolution to simulate the correct meteorology and chemistry and resolve the urban plumes so that the model has a chance to

167

reproduce the highest observed ozone concentrations. Use of a coarse 12-km grid will instantaneously disperse emissions across a grid cell volume that is almost an order of magnitude larger than when a 4-km grid size is used making it difficult for the model to reproduce the high observed ozone peaks due to overdiluting the ozone concentrations and its precursors.

Note that use of a coarse 12-km grid resolution will also reduce ozone peaks due to local sources in the Upwind State due to failure to resolve urban and other highly concentrated ozone precursor emission sources (e.g., industrial facilities, O&G, etc.) and their resultant ozone plumes. However, by the time the ozone and precursor concentrations from the Upwind State travel 100s of miles to the receptor in the downwind state the "plumes" will be many 12-km grid cells across so that the effects of the coarse resolution on underestimating ozone concentrations at the receptor in the downwind state due to emissions in the Upwind State is less important.

[...]

4.5.2 Effects of Higher Resolved Meteorological Inputs on Ozone Concentrations in the DM/NFR Ozone SIP Modeling

Obtaining the correct depiction of meteorology is critically important for simulating ozone formation in the complex terrain conditions of the DM/NFR NAA. [...]

4.5.2.1 Conceptual Model of Ozone Formation in the DM/NFR NAA

The DM/NFR 2020 Serious ozone SIP for the 2008 ozone NAAQS (RAQC and CDPHE, 2020) included a report "Conceptual Model of High Ozone for the Denver Metro/North Front Range" (Ramboll, 2020). The highest ozone concentrations in the DM/NFR NAA are due to a combination of ozone transport and locally generated ozone under specific meteorological regimes that favor ozone photochemistry and limited dispersion. Reddy and Pfister (2016) explored the relationships between meteorology and ozone in the Rocky Mountain states and concluded that increases in upper-level high pressure strength "lead to high July ozone in much of the western U.S., particularly in areas of elevated terrain near urban sources with high emissions of NO2 and other ozone precursors." In addition to bringing warmer temperatures, upper-level ridges in this region reduce westerly winds at the surface and aloft to allow cyclic terrain-driven circulations that reduces transport away from sources. This includes the formation of thermally driven upslope flows along the Front Range in the Denver NAA where ozone and ozone precursors are transported up the slopes during the day and can return at night to lower elevations in large scale basin drainage (downslope) flows. Upper-level ridges can also increase background ozone concentrations within the ridge. Ozone and $NO_x$ concentrations build locally, and deeper vertical mixing in this region provides a potential mechanism for recapture of ozone in layers aloft (e.g., from transport or remnants of the previous days ozone) that are mixed down to the surface.

The three key elements of a conceptual model for high-concentration ozone episodes along Colorado's Front Range are:

1. The presence of an upper-level high pressure system or ridge.

2. Reduced westerly winds, especially during the day.

3. Thermally-driven upslope flow towards the Continental Divide during the day and downslope drainage flows into the Platte Valley at night. This diurnal cycle of winds enhances the potential for the accumulation of ozone precursors and ozone within the region, especially when this cyclic pattern recurs over a period of several days.

4.5.2.2 Requirements for WRF Meteorological Model to Reproduce DM/NFR NAA Ozone Conceptual Model

In order for the Weather Research and Forecasting (WRF) meteorological model to reproduce the meteorological conditions that lead to the highest ozone concentrations in the Denver NAA it needs to be able to simulate the high pressure system/ridge and the thermally driven slope flows. Getting the high pressure system or ridge correctly requires using analysis fields as inputs into WRF that reflects their presence that are used in the WRF initial and boundary conditions (IC/BC) and four-dimensional data assimilation (FDDA) inputs. Such analysis fields that contain the presence of the high pressure/ridges include the North American Mesoscale Forecast System (NAM[29]) analysis fields that were used in the WRF simulations to develop the CAMx 2016 meteorological inputs for both the DM/NFR 2023 Severe/Moderate ozone SIP and Proposed Transport Rule CAMx 2016 modeling platforms.

For WRF to obtain an accurate depiction of the thermally driven slope flows requires the terrain inputs for the model to be representative of actual terrain. Use of a 12-km grid resolution smooths the terrain and greatly reduces the terrain heights and the elevation differences of the "slopes" of the terrain along the Front Range. The slope between western Denver County to the continental divide spans approximately 7,800 feet in elevation using a 4-km grid resolution but only approximately 4,500 feet in elevation change using the 12-km grid resolution. Thus, WRF's ability to reproduce the thermally driven daytime upslope and nighttime downslope flows will be severely compromised using a 12-km grid resolution and simulated much more accurately using a 4-km grid resolution because a 12-km grid resolution fails to resolve the terrain in the region.

The higher resolution complex terrain in the 4-km data, and in reality, will also affect transport of ozone and precursors from Wyoming to the Denver NAA differently than if a 12-km grid resolution is used. The higher variable wind fields from more highly resolved terrain features will disperse ozone and precursors from Wyoming as they are transported to the Denver NAA than if a 12-km grid resolution is used that smooths the actual terrain features.

**[…]**

4.5.3 Comparison of CAMx Ozone Model Performance and Its Implications

[Ramboll] conducted an ozone model performance of the CAMx 2016 base case simulation used in the Proposed Transport Rule and compared it to the ozone performance of the DM/NFR 2023 Severe/Moderate ozone SIP CAMx S17 2016 base case simulation. At this time, only limited publicly available information is available on ozone model performance for the DM/NFR ozone SIP CAMx S17 2016 base case from presentations given at the May 18, 2022 RAQC Ozone Modeling Forum.

Ozone model performance goals and criteria have been established by Emery and co-workers (2016) for the Normalized Mean Bias (NMB) and Normalized Mean Error (NME) model performance metrics. The

169

NMB ozone model performance goal is ≤±5% and the NMB ozone performance criterion is ≤±15%. The NME ozone model performance goal and criterion are ≤15% and ≤25%, respectively.

[...]

The DM/NFR ozone SIP CAMx 2016 base case ozone performance is clearly performing better than the EPA Proposed Transport Rule CAMx 2016 base case at all four sites in the DM/NFR NAA. The EPA CAMx 2016 base case exhibits an ozone underestimation bias, which was expected given the coarse 12-km grid resolution used. At CHAT, the Proposed Transport Rule CAMx 2016 base case has an NMB underestimation of -7.6% while the DM/NFR 2023 Severe/Moderate ozone SIP has essentially zero bias (0.1%). The underestimation bias in the Proposed Transport Rule CAMx 2016 base case is even greater at the RFNO (-8.1%), NREL (-8.4%) and FTCW (-12.5%) sites while the DM/NFR ozone SIP CAMx 2016 base case bias achieves the bias performance goal by a wide margin.

[...]

Ozone attainment/nonattainment is determined by the ozone design value (DV) that is defined as the three-year average of the fourth highest maximum daily average 8-hour (MDA8) ozone concentrations. Thus, how well the model simulates the four highest observed MDA8 ozone concentrations is an important model performance attribute. The highest observed MDA8 ozone concentration at Chatfield during 2016 was 86.6 ppb that was underestimated by the Proposed Transport Rule CAMx 2016 base case (74.9 ppb) by 11.7 ppb (-13.5%). Whereas, the DM/NFR ozone SIP CAMx 2016 base case highest estimated ozone concentration at Chatfield (86.4) matched the observed value (86.6 ppb) almost exactly (within 0.2 ppb or 0.0% difference). The fourth highest observed MDA8 ozone concentration at Chatfield (78.0 ppb) is underestimated by the Proposed Transport Rule CAMx 2016 base case (71.9 ppb) by 6.1 ppb (-7.8%), while the DM/NFR ozone SIP CAMx base case fourth highest ozone at Chatfield (78.1 ppb) matches the observed fourth highest ozone very well (0.1 ppb and 0.0% difference).[...] The ozone under-prediction bias of the Proposed Transport Rule CAMx 2016 base case at RFNO is even greater than at CHAT with the four highest observed ozone concentrations underestimated by -11% to -19%. The DM/NFR ozone SIP CAMx 2016 base case also underestimates the four highest observed MDA8 ozone concentrations at RFNO but the underestimation bias (-4% to -10%) is approximately half of the Proposed Transport Rule underestimation bias. For example, the observed fourth highest MDA8 ozone at RFNO (79.5%) is underestimated by the Proposed Transport Rule by -11% (70.9 ppb) but is only underestimated by the DM/NFR ozone SIP CAMx 2016 base case by -4% (76.3 ppb), which achieves the ≤±5% ozone performance goal.

[...]

4.6 Conclusions On Future Year Projected Ozone Design Values at DM/NFR Nonattainment/Maintenance Receptors

Based on scientific technical arguments, the coarse 12-km grid resolution used in the Proposed Transport Rule CAMx modeling will likely overstate future year design value projections. This was confirmed by the DM/NFR 2023 Severe/Moderate ozone SIP CAMx 4-km grid resolution modeling that produced lower future year projected design values resulting in Chatfield and Rocky Flats North no longer being nonattainment/maintenance receptors in 2026.

170

[...]

Utah was linked to three receptors in the DM/NFR NAA (CHAT, RFNO and NREL). Two of these receptors (CHAT and RFNO) become attainment receptors based on the refined DM/NFR Severe/Moderate ozone SIP CAMx modeling, although NREL receptor remained a nonattainment receptor in the DM/NFR ozone SIP CAMx modeling (see Table 4-5 [available in full comment]). However, Utah has a 0.90 ppb ozone contribution to the NREL receptor in 2026 and, as discussed in Chapter 7, this contribution is not a statistically significant contribution to an ozone design value. This argues that Utah should also not be subject to the 2026 EGU and non-EGU controls in the Proposed Transport Rule.

5.2 Coarse Grid Resolution Will Understate Ozone Contributions due to Local Sources Resulting in Overstating Utah's and Wyoming's Ozone Contribution at DM/NFR NAA Receptors

For all the reasons presented in Chapter 4 of this report, the use of the coarse 12-km grid resolution in the Proposed Transport Rule  CAMx modeling will dilute the ozone and precursor concentrations in the DM/NFR ozone NAA resulting in an understatement of modeled ozone concentrations due to local sources than if a finer grid cell size was used (e.g., 4-km).  With higher modeled ozone concentrations due to local sources at receptors in the DM/NFR NAA that would increase the total MDA8 ozone concentrations and reduce the Utah and Wyoming CF resulting in reductions in Utah's and Wyoming's contribution to 2023 and 2026 ozone design values at DM/NFR NAA receptors.

**Commenter:** Utah Division of Air Quality

**Commenter ID:** 47

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The UDAQ has provided extensive comments on the substantial limitations and problems with the modeling used to justify the inclusion of Utah in the proposed FIP. These limitations are significant and include inappropriate modeling resolution, inadequate modeling of atmospheric transport, significant negative modeling bias, and a likely misrepresentation of the atmospheric chemical regime as a result of issues with the inventories used.

*Response*

Commenters describe the "conceptual model" of local scale meteorological conditions that are typically associated with high ozone concentrations measured in areas around Lake Michigan and in western states where the EPA has identified nonattainment and/or maintenance-only receptors in 2023. Commenters claim that the EPA's projected design values and contributions for receptors in these areas are flawed because the horizontal resolution of the EPA's modeling (i.e., 12 km) is too coarse to properly resolve the emissions and meteorological conditions that lead to locally high ozone concentrations associated with the land/water interface in coastal areas and in complex terrain. In this regard, commenters argue that EPA must use "fine scale modeling" (i.e., 4 km resolution or 1 km resolution) to

properly simulate ozone concentrations and the response to emissions changes, and thus provide credible projections of design values and contributions for such areas. Commenters support their claim by pointing to model performance statistics from the EPA's modeling for 2016, which commenters say is biased low compared to the corresponding measured ozone concentrations at receptors in Coastal Connecticut, the Lake Michigan area, and in Colorado and Utah. Commenters then allege that the modeled response to emissions reductions (i.e., Relative Response Factors - RRFs) is correlated with base year model bias. That is, the commenters contend that the low-bias in the 2016 base year modeling implies that the model's response to the emissions reductions between 2016 and 2023 is also underpredicted. The commenters state that underpredicting model response results in design values in 2023 that are too high and, therefore, the projected design values *overstate* the magnitude and extent of the ozone problem in 2023. Commenters support these claims by noting that fine scale modeling performed for Colorado and the Lake Michigan area has less bias and error and produces lower projected design values compared to the EPA's 12 km modeling. The commenters then allege that the error associated with underprediction in the base year is compounded in the calculation of future year contributions such that the contribution metric values calculated by the EPA overstate the magnitude of contributions from upwind states. Finally, noting that projected design values and contributions are calculated based on the top 10 modeled concentrations days, commenters say that the EPA must discard from these calculations any days that do not meet certain model performance benchmarks.

The EPA agrees that fine-scale meteorological conditions associated with the land water interface coupled with the spatial distribution of ozone precursor emissions presents a challenge for modeling ozone formation and urban scale transport that affect monitoring sites in Coastal Connecticut and near the shoreline of Lake Michigan. The EPA also agrees that modeling for areas located in complex terrain, such as Denver and Salt Lake City present a similar challenge.

As described below, the EPA disagrees with commenter's assertion that fine scale modeling is required in order to provide scientifically sound projections of ozone design values and contributions to assess interstate ozone transport for this action. In addition, the EPA disagrees that model performance benchmarks cited by commenters should be applied when identifying which days to use when calculating projected design values and contributions. The EPA also disagrees with the notion that the magnitude of model response is correlated with base year model bias and error such that modeling that underpredicted measured concentrations also underpredicts model response.

Regarding comments on the use of fine scale modeling with respect to model performance, as stated in the EPA's modeling guidance, the use of fine scale modeling should be considered for the purpose of identifying local control strategies that will provide for attainment of the NAAQS in such areas. The guidance goes on to say "If model response is expected to be different (and presumably more accurate) at higher resolution, then higher resolution modeling should be considered. If model response is expected to be similar at both high and low(er) resolution, then high resolution modeling may not be necessary."

To gauge the adequacy of model performance for regulatory applications, the EPA's modeling guidance recommends comparing model performance statistics from the base year model run (e.g., 2016) to model performance from other recent state-of-the-science model applications. Specifically, the EPA guidance recommends that "air agencies compare their evaluation results against similar modeling

exercises to ensure that the model performance approximates the quality of other applications. Recent literature reviews (Simon et al, 2012; Emery et al., 2017)[44,45] summarize photochemical model performance for applications published in the peer-reviewed literature between 2006 and 2015. These reviews may serve as a resource for identifying typical model performance for state of the science modeling applications." The EPA has followed this guidance in evaluating the adequacy of model performance for the air quality modeling performed for the proposal and final transport actions.

The model performance criteria for MDA8 ozone concentrations recommended by Emery et al., are in the table below.

*Table 4-5 Model Performance Criteria for MDA8 Ozone Concentrations*

| Metric | Criteria |
|---|---|
| Normalized Mean Bias (NMB) | ≤ ± 15% |
| Normalized Mean Error (NME) | < 25% |
| Correlation Coefficient (r) | > 0.5 |

The EPA notes that the commenter's complaints were based on model performance for the 2016v2 modeling that EPA used for the proposed disapprovals. As described in the 2016v3 Emissions Modeling TSD and the Final Action AQM TSD, for this final action the EPA is using the 2016v3 platform which includes numerous updates made in response to comments on the proposal. Model performance for ozone with the 2016v3 platform is substantially improved compared to model performance with 2016v2 (see the Final Action AQM TSD for details on modeling performance for 2016v3).

In this RTC we present a comparison of model performance and projected design values at receptors in 2023 based on the EPA's 2016v3 modeling to the corresponding model performance and projected design values from fine scale modeling covering the Lake Michigan area, Coastal Connecticut, and Denver.

The tables below provide model performance statistics based on CAMx modeling performed by LADCO,[46] the New York State Department of Conservation (NYS DEC)[47] and Ramboll for the Denver

---

[44] Simon et al Simon, H., Baker, K. R., Phillips, S, (2012), Compilation and interpretation of photochemical model performance statistics published between 2006 and 2012, *Atmos Environ*, 61, 124-139.

[45] Emery, C., Liu, z., Russell, A.G., Odman, M.T., Yarwood, G., Kumar, N., (2017), Recommendations on Statistics and Benchmarks to Assess Photochemical Model Performance, Journal of the Air and Waste Management Association, 67:5, 582-598, doi:/10.1080/10962247.2016.1265027.

[46] Attainment Demonstration Modeling for the 2015 Ozone National Ambient Air Quality Standard Technical Support Document. Lake Michigan Air Directors Consortium. September 21, 2022.

[47] Yum, J., E. Zalewsky, Y. Tian, and K. Civerolo. Comparison of the CAMx performance of 2016 based modeling platforms at 12 km and 4 km resolution. 20th Annual CMAS Conference, November 01-05, 2021.

Northern Front Range ozone implementation plan[48] along with performance statistics based on the EPA's 2016v3 modeling.[49] Normalized mean bias and normalized mean error statistics are used to compare model performance from the EPA's 12 km modeling to 4 km modeling from these other model applications.[50] Note that data from LADCO and Ramboll are based on "two-way nested" modeling in which a fine-scale grid is embedded within a coarse scale regional domain during the model simulation. With this configuration, there are no independent predictions at 12 km. The NYS DEC performed independent modeling at 4 km and at 12 km. Note also that each group calculated statistics for different time periods during the ozone season. The LADCO statistics are based on days with measured ozone concentrations above 60 ppb, whereas the Ramboll statistics are based on data for all days. Both sets of statistics (i.e., with and without using a cut-off of 60 ppb) are available for the NYS DEC modeling. In all cases, the EPA 2016v3 model performance statistics were calculated for the same days that were used by LADCO, NYS DEC, and Ramboll for their applications. Finally, the differences in model performance and projected design values between the EPA's 12 km modeling and the 4 km modeling from LADCO, NYS DEC, and Ramboll cannot be solely attributable to differences in grid resolution. Other factors, such as differences in 2016 and 2023 emissions used in each model application also have some effects on the results. In this respect, the NYS DEC modeling may provide the most consistent comparison between 4 km and 12 km modeling since both sets of modeling relied on similar emissions inputs.

*Table 4-6 Model Performance Statistics Based on LADCO's Modeling and EPA's 2016v3 Modeling*

| | | | Statistics for __April – September (Percent)__ | | | |
|---|---|---|---|---|---|---|
| | | | **Normalized Mean Bias** *Days Above 60 ppb* | | **Normalized Mean Error** *Days Above 60 ppb* | |
| Site ID | State | Receptor | LADCO 4 km | EPA 12 km | LADCO 4 km | EPA 12 km |
| 170310001 | IL | Alsip | -12.0 | 0.2 | 12.0 | 10.9 |
| 170314201 | IL | Northbrook | -14.5 | -3.9 | 14.5 | 10.5 |
| 170317002 | IL | Evanston | -1.8 | -0.9 | 13.8 | 9.6 |
| 550590019 | WI | Chiwaukee | -11.1 | -12.9 | 15.5 | 16.9 |
| 551010020 | WI | Racine | -7.9 | -10.9 | 14.1 | 15.2 |
| 551170006 | WI | Sheboygan | -11.4 | -11.6 | 11.4 | 13.2 |

[48] Morris, R., T. Shah, M. Rodriguez, C-J Chien, and P. Vennam. Air Quality Technical Support Document (AQTSD) for the Denver Metro/North Front Range 2023 Severe/Moderate Ozone State Implementation Plan. Ramboll. August 2022.

[49] For this analysis, the EPA leveraged existing, readily available, model performance statistics based on modeling by LADCO, the NYS DEC, and Ramboll for these receptors. In this regard, the data from these organizations may, in some cases, reflect preliminary modeling.

[50] The normalized mean bias is calculated by first subtracting the modeled values from the corresponding observed values paired in space and time. Then, the sum of these differences is divided by the sum of the observed concentrations. The normalized mean error is calculated in a similar manner except that the sum of the absolute value of the differences is divided by the sum of the observations. Both normalized mean bias and normalized mean error are expressed as a percent.

*Table 4-7 Model Performance Statistics Based on NYS DEC's Modeling and EPA's 2016v3 Modeling (Percent)*

| | | | Statistics for May – June (Percent) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Normalized Mean Bias *Days Above 60 ppb* | | | | Normalized Mean Error *Days Above 60 ppb* | | |
| Site ID | State | Receptor | NYS DEC 4 km | NYS DEC 12 km | EPA 12 km | | NYS DEC 4 km | NYS DEC 12 km | EPA 12 km |
| 90010017 | CT | Greenwich | -12.8 | -6.5 | -7.3 | | 14.7 | 12.7 | 8.3 |
| 90013007 | CT | Stratford | -7.5 | -8.9 | -1.9 | | 9.7 | 15.7 | 13.1 |
| 90019003 | CT | Westport | -12.0 | -10.0 | -3.8 | | 12.2 | 10.7 | 7.9 |
| 90099002 | CT | Madison | -5.0 | -7.1 | -3.3 | | 7.2 | 8.7 | 7.3 |

*Table 4-8 Model Performance Statistics Based on NYS DEC's Modeling and EPA's 2016v3 Modeling (July-August)*

| | | | Statistics for July - August | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Normalized Mean Bias *Days Above 60 ppb* | | | | Normalized Mean Error *Days Above 60 ppb* | | |
| Site ID | State | Receptor | NYS DEC 4 km | NYS DEC 12 km | EPA 12 km | | NYS DEC 4 km | NYS DEC 12 km | EPA 12 km |
| 90010017 | CT | Greenwich | -8.1 | -3.3 | -9.8 | | 11.8 | 12.8 | 11.9 |
| 90013007 | CT | Stratford | -9.7 | -5.2 | -0.3 | | 15.6 | 12.2 | 12.4 |
| 90019003 | CT | Westport | -13.0 | -3.5 | -0.1 | | 17.1 | 13.2 | 12.7 |
| 90099002 | CT | Madison | -7.2 | -3.5 | 0.4 | | 14.4 | 10.8 | 9.8 |

*Table 4-9 Model Performance Statistics Based on NYS DEC's Modeling and EPA's 2016v3 Modeling (May-June)*

| | | | Statistics for May - June | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Normalized Mean Bias *All Days (no "ppb" cut-off)* | | | | Normalized Mean Error *All Days (no "ppb" cut-off)* | | |
| Site ID | State | Receptor | NYS DEC 4 km | NYS DEC 12 km | EPA 12 km | | NYS DEC 4 km | NYS DEC 12 km | EPA 12 km |
| 90010017 | CT | Greenwich | -5.8 | 0.0 | -0.5 | | 12.4 | 13.6 | 12.7 |
| 90013007 | CT | Stratford | -10.4 | -9.2 | -5.5 | | 14.9 | 17.3 | 15.4 |
| 90019003 | CT | Westport | -13.0 | -5.8 | -2.9 | | 17.2 | 15.3 | 12.2 |
| 90099002 | CT | Madison | -5.0 | -4.2 | -1.2 | | 9.7 | 10.8 | 9.4 |

*Table 4-10 Model Performance Statistics Based on Ramboll's Modeling and EPA's 2016v3 Modeling*

| | | | Statistics for **June 1 - August 20** | | | |
| | | | **Normalized Mean Bias** *All Days* *(no "ppb" cut-off)* | | **Normalized Mean Error** *All Days* *(no "ppb" cut-off)* | |
| Site ID | State | Name | Denver 4 km | EPA 12 km | Denver 4 km | EPA 12 km |
|---|---|---|---|---|---|---|
| 80350004 | CO | Chatfield | 0.1 | 3.8 | 9.2 | 10.1 |
| 80590006 | CO | Rocky Flats | -0.4 | 2.1 | 8.8 | 9.4 |
| 80590011 | CO | NREL | -2.0 | 1.8 | 8.6 | 10.7 |
| 80690011 | CO | Ft Collins | -2.5 | -3.0 | 7.8 | 9.2 |

Comparing model performance using 12 km versus 4 km modeling does not support the commenter's contention that model performance using fine scale, 4 km modeling results in model performance superior to what is obtained with 12 km modeling, even at receptors where the magnitude of ozone concentrations are highly affected by complex meteorological conditions. The data in the above tables show that normalized mean bias and normalized mean error statistics for both the 4 km and 12 km modeling are well within the range of the performance criteria recommended by Emery et al., and endorsed by the commenters at nearly all of these receptors. At some of the receptors in Coastal Connecticut and near the shoreline of Lake Michigan there is notably less bias in the EPA's 12 km modeling compared to 4 km modeling at the same receptor. At the NREL and Ft Collins receptors in Denver, the bias with 12 km modeling and 4 km modeling are similar. At the other two receptors in Denver, model bias is less at 4 km. The results of this analysis indicate that model bias and error in the EPA's 2016v3 12 km modeling is comparable, overall, to model performance using 4 km modeling.

Regarding comments on the use of fine scale modeling with respect to projected design values, the EPA compared projected design values for 2023 from the 4 km modeling performed by LADCO, the NYS DEC, and Ramboll to the EPA's projections for 2023 based on the 2016v3 modeling. These data are provided in the tables below. The data from LADCO and Ramboll are based on the application of the "3 x 3" approach for projecting design values. The NYS DEC provided two sets of projected design values; one set based on the "3 x 3" approach and a second set based on the "no water, except monitor grid cell" approach. To maintain consistency in this analysis, all the design values in the tables below, including the EPA's 12 km modeling, are based on the "3 x 3" approach.

The comparison of design values based on 12 km modeling to the corresponding design values based on 4 km modeling indicates that projected average DVs from the EPA 12km modeling are similar to those from the LADCO 4 km modeling and that both the LADCO and the EPA modeling identify the same set of monitors that have projected average design values that exceed the NAAQS (i.e., Chiwaukee and Sheboygan).  A comparison of 12 km and 4 km design values for receptors in Coastal Connecticut shows that 3 of the 4 Connecticut receptors have lower projected 2023 average DVs in the NYC DEC 12km modeling compared to 4 km resolution. At these receptors the EPA 12 km 2023 average design values are lower than both the 4 km and 12km based NYS DEC projected average DVs at all the Connecticut

receptors. Finally, comparing the 4 km Ramboll modeling to the 12 km EPA modeling for receptors in Colorado indicates that the projected average design values are very similar (within 1 ppb at 3 of the 4 receptors). The data show here refute the claims by commenters that 12 km modeling will lead to systematically higher projected DVs compared to modeling simulations conducted at 4 km resolution which could result in a greater potential for overcontrol using 12 km modeling.

*Table 4-11 Comparison of Design Values for 2023 from LADCO's 4 km Modeling and EPA's 2016v3 Modeling*

| Site ID | State | Receptor | 2021 DV | Preliminary 2022 DV | LADCO 4 km 2023 Average DV | EPA 12 km 2023 Average DV | EPA 12 km 2023 Maximum DV |
|---|---|---|---|---|---|---|---|
| 170310001 | IL | Alsip | 71 | 72 | 67.5 | 68.2 | 71.9 |
| 170314201 | IL | Northbrook | 74 | 74 | 68.0 | 68.4 | 71.8 |
| 170317002 | IL | Evanston | 73 | 74 | 68.9 | 69.1 | 71.9 |
| 550590019 | WI | Chiwaukee | 74 | 75 | 71.6 | 72.0 | 73.0 |
| 551010020 | WI | Racine | 73 | 75 | 69.5 | 70.0 | 71.8 |
| 551170006 | WI | Sheboygan | 72 | 75 | 75.1 | 73.0 | 73.9 |

*Table 4-12 Comparison of Design Values for 2023 from NYS DEC's 4 km Modeling and EPA's 2016v3 Modeling*

| Site ID | State | Receptor | 2021 DV | Preliminary 2022 DV | NYS DEC 4 km 2023 Average DV | NYS DEC 12 km 2023 Average DV | EPA 12 km 2023 Average DV | EPA 12 km 2023 Maximum DV |
|---|---|---|---|---|---|---|---|---|
| 090010017 | CT | Greenwich | 79 | 77 | 75.2 | 73.9 | 72.0 | 72.6 |
| 090013007 | CT | Stratford | 81 | 81 | 77.1 | 76.0 | 73.3 | 74.2 |
| 090019003 | CT | Westport | 80 | 80 | 77.9 | 78.6 | 74.3 | 74.5 |
| 090099002 | CT | Madison | 82 | 79 | 73.7 | 72.0 | 71.2 | 73.3 |

*Table 4-13 Comparison of Design Values for 2023 from Ramboll's 4 km Modeling and EPA's 2016v3 Modeling*

| Site ID | State | Receptor | 2021 DV | Preliminary 2022 DV[51] | Ramboll 4 km 2023 Average DV | EPA 12 km 2023 Average DV | EPA 12 km 2023 Maximum DV |
|---|---|---|---|---|---|---|---|
| 80350004 | CO | Chatfield | 83 | 83 | 70.6 | 71.3 | 71.9 |
| 80590006 | CO | Rocky Flats | 81 | 83 | 70.3 | 72.8 | 73.5 |
| 80590011 | CO | NREL | 83 | 84 | 73.4 | 73.5 | 74.1 |
| 80690011 | CO | Ft Collins | 77 | 77 | 70.4 | 70.9 | 72.1 |

Regarding commenter's assertion that days with model performance outside the range of the performance criteria recommended by Emery, et al., should be removed from the data set used to calculate projected design values and contributions, the EPA finds this approach to be inconsistent with the intended use of these criteria. These benchmarks are based on model performance aggregated across multiple monitors and many days. In this respect, it is expected that even in model applications that meet these benchmarks there would be some monitor/days with model bias and error that is outside the range of the benchmarks. It is therefore not appropriate to use these benchmarks to screen individual sites or days. Specifically, in Emery, et al., the authors "do not make recommendations for model performance benchmarks for individual monitors, recognizing that the importance of model performance at a specific site is application-specific." In addition, the authors state "For ozone, we recommend calculating statistics over temporal scales of roughly 1 week (an episode), not to exceed 1 month."

Even though the EPA disagrees with commenter's assertion to "throw out" specific days at individual monitors for which model performance does not meet the criteria, out of an abundance of caution, the EPA performed a sensitivity analysis for selected receptors in which the projected 2023 design values and contributions were recalculated after removing individual days that fell outside the Emery et al., criteria for normalized mean bias and/or normalized mean error. The EPA chose receptors in Coastal Connecticut, the Lake Michigan area, Dallas, and Denver for this analysis. The specific receptors included in this sensitivity analysis are Stratford, Connecticut, Chicago/Evanston, Illinois, Dallas/Denton, Texas, and Denver/Rocky Flats, Colorado.

In this sensitivity analysis the EPA first examined the normalized bias and normalized error on each day to determine if model performance on the days used to project design values and/or calculations fell outside the range of the criteria. Days with performance outside the range of the criteria were removed from the calculation of project design values and contributions. Next, using data for the remaining days, the EPA recalculated Relative Response Factors (RRFs) which were then applied to the 2016-centered base period average and maximum design value to re-projected the 2023 design values. The EPA then recalculated the Relative Contribution Factor for each upwind state to downwind receptor combination.

---

[51] It should be noted that both EPA and Ramboll modeling of 2023 project ozone levels substantially lower than recent measured ozone levels at the four Colorado receptors, which are all well above the 2015 ozone NAAQS for both certified 2021 DVs and preliminary 2022 DVs.

The recalculated RCFs were then applied to the recalculated 2023 average design values to calculate a new set of contribution metric values. The number of top 10 days at each receptor that were replaced with data from other days when recalculating projected design values and contributions is given in the table below. For example, at the Stratford receptor, model performance on 4 of the top 10 days used to calculate RRFs was outside the range of the criteria. The data for these days were removed. Then the concentrations on days with performance within the range of the criteria were re-ranked to identify a new set of top 10 days. In the calculation of the average contribution metric, 5 of the original top 10 days at this receptor were replaced with data from other days.

*Table 4-14 Top 10 Days Replaced After Recalculating Projected Design Values and Contributions*

| | | Number of Original Top 10 Days Replaced in this Sensitivity Analysis | |
|---|---|---|---|
| Site ID | Receptor | Recalculated Design Values | Recalculated Contributions |
| 090013007 | Stratford | 4 | 5 |
| 170317002 | Evanston | 7 | 7 |
| 481210034 | Denton | 0 | 1 |
| 080590006 | Rocky Flats | 0 | 1 |

The table below provides the projected 2023 average and maximum design values without the removal of any days (i.e., Final Action design values) and the recalculated 2023 design values after removing days with model performance outside the range of the criteria (i.e., days commenters claim have "poor performance"). The data in the table below indicates that there is less than a ppb difference between the two sets of design values at Stratford and Evanston even though data on nearly half (Stratford) and more than half (Evanston) of the days used to project design values were replaced with data from other days.

*Table 4-15 Final Action Design Values Versus Sensitivity Scenario Design Values*

| | | | Projected 2023 Design Values (ppb) | | | |
|---|---|---|---|---|---|---|
| | | | Final Action | | Sensitivity | |
| Site ID | State | Receptor | Average DV | Maximum DV | Average DV | Maximum DV |
| 090013007 | CT | Stratford | 72.9 | 73.8 | 72.1 | 73.0 |
| 170317002 | IL | Evanston | 68.5 | 71.3 | 69.2 | 72.0 |
| 481210034 | TX | Denton Airport | 69.8 | 71.6 | 69.8 | 71.6 |
| 080590006 | CO | Rocky Flats | 72.8 | 73.5 | 72.8 | 73.5 |

The following tables provide the contribution metric values for upwind states linked to the Stratford, Connecticut, Chicago/Evanston, Illinois, Dallas/Denton, Texas, and Denver/Rocky Flats, Colorado receptors for this final action (i.e., no days removed) and the sensitivity scenario (i.e., days removed based on model performance). The highlighted contributions in these tables identify contributions that exceed the 1 percent of the NAAQS screening threshold. The data indicate that removing days with "poor performance" does not appear to result in any systematic bias in the magnitude of contributions. That is, contributions increase for some states linked to a particular receptor while contributions from other upwind states linked to that same receptor decrease. For example, at Evanston the contribution from Wisconsin dropped by 50 percent, whereas the contribution from Arkansas nearly doubled to a level above the screening threshold. In addition, after removing days with "poor performance" the contribution from Louisiana increased to above the threshold. Although the contribution from Michigan to Stratford dropped to below the screening threshold after removing days with "poor performance", the contribution from this state to Evanston more than doubled. Also, although Illinois contributes below the threshold to Stratford after removing days with "poor performance", Illinois contributes well above the threshold to receptors in Wisconsin. The results of this sensitivity analysis indicate that the EPA's findings in this final action are robust with respect to consideration of daily model performance at individual monitoring sites.

180

*Table 4-16 Sensitivity Analysis - Stratford, CT Receptor*

| Upwind State | Stratford, CT (090013007) | |
|---|---|---|
| | **2023 Contribution (ppb)** | |
| | **Final Action** | **Sensitivity** |
| IL | **0.72** | 0.50 |
| IN | **1.18** | **0.74** |
| KY | **0.80** | **0.84** |
| MD | **0.96** | **1.12** |
| MI | **1.38** | 0.48 |
| NJ | **7.22** | **7.94** |
| NY | **12.70** | **12.66** |
| OH | **2.04** | **1.79** |
| PA | **5.43** | **6.62** |
| VA | **1.15** | **1.25** |
| WV | **1.35** | **1.68** |

*Table 4-17  Sensitivity Analysis - Evanston, IL Receptor*

| Upwind State | Evanston, IL (170317002) | |
|---|---|---|
| | **2023 Contribution (ppb)** | |
| | **Final Action** | **Sensitivity** |
| AR | 0.46 | **0.88** |
| IN | **6.40** | **7.01** |
| LA | 0.14 | **0.70** |
| MI | **1.11** | **2.50** |
| MO | **1.18** | **1.04** |
| OH | **0.96** | **1.49** |
| TX | **1.85** | **0.86** |
| WI | **2.32** | **1.17** |

*Table 4-18  Sensitivity Analysis - Denton Airport, TX Receptor*

| Upwind State | Denton Airport, TX (481210034) | |
|---|---|---|
| | 2023 Contribution (ppb) | |
| | Final Action | Sensitivity |
| AR | 0.92 | 0.89 |
| LA | 2.87 | 2.68 |
| MS | 0.91 | 0.85 |
| OK | 1.01 | 1.09 |

*Table 4-19  Sensitivity Analysis - Rocky Flats, CO Receptor*

| Upwind State | Rocky Flats, CO (080590006) | |
|---|---|---|
| | 2023 Contribution (ppb) | |
| | Final Action | Sensitivity |
| CA | 1.44 | 1.15 |
| UT | 1.17 | 1.12 |

Finally, in response to comments that claim at the EPA's projected design values used to identify receptors are too high as a result of base year model underprediction, the EPA conducted an analysis to determine if there is any clear relationship between base year (i.e., 2016) model bias and the response of the EPA's CAMx modeling to emissions changes between 2016 and 2023. The figures below show model bias on individual days as a function of model response on the days at the Chicago/Evanston, Denver/Rocky Flats, and Dallas/Denton receptors. The plots are based on days with modeled MDA8 ozone concentrations greater than or equal to 60 ppb in the set of grid cells used to project 2023 design values. As evident from these plots, there is no discernable relationship between model bias and model response. Thus, base year model under prediction of measured data does not translate into an under prediction of model response and an over prediction of projected design values.



*Figure 4-9*



*Figure 4-10*



*Figure 4-11*

Comments on the proposed FIP are out of the scope of this action. Other topics raised by these comments are addressed in the following sections: 11.4 (Transport Policy – Western State Ozone Regulation).

## 4.3   Model Error vs Contribution Threshold

*Comments*

**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

In EPA's proposed disapproval of the revised SIP, comments were made on the model performance statistics included in the WOE analysis. The purpose of pointing out the statistics was not to evaluate the numbers themselves, but to look at the magnitude of the numbers that would be considered as acceptable performance. The idea was that performance statistics are often acceptable at 10, 20 even 30%, yet 1% (0.71) is sufficient enough to identify an upwind State as culpable to a predicted

nonattainment or maintenance receptor. This is a disconnect, and ADEM contends that the model cannot accurately estimate impacts at such small numbers.

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

ADEM's third factor suggests that EPA's models cannot accurately replicate monitor concentrations, given the small concentrations at issue, and, as commenters set out, the modeled contributions are less than the acceptable modeling error range.

[…]

Even when considering Alabama's SIP in the context of EPA's FIP framework, EPA's rationale for proposing to disapprove Alabama's SIP proves inadequate. Under Step 2, EPA gives little or no credence to the evidence in the record calling into question its model performance …

In evaluating EPA's model performance and contribution threshold of 0.70 ppb, levels assigned to Alabama fall within the noise of EPA's model. In the proposed disapproval, EPA discounts the modeling error and bias identified by ADEM, claiming that "base year model performance statistics that are derived from measured and modeled data strictly paired in space and time are not useful as the sole measure for gauging the ability of the model to adequately estimate future year average contributions on the order of 0.70 ppb on high ozone days representative of the magnitude of measured concentrations at the receptor." However, EPA claims the opposite in its Air Quality Modeling Technical Support Document. Specifically, EPA admits that the agency relies on the error and bias analysis, which indicates errors of 20-25% in some circumstances, to justify its "projections of expected future year ozone concentrations and contributions." Moreover, to the extent EPA was mistaken and this modeling error does not address errors in contributions, then EPA's model fails the basic bulwark against inappropriate reliance on modeling by failing to assess the potential for and rate of error.

While the 20% error in EPA's modeling may be defensible for some purposes, it is not defensible with respect to the assessment of Alabama's SIP submittal. For example, Alabama's modeled contribution to the Texas receptors lies within the modeling error range EPA identifies as acceptable. In other words, Alabama has been modeled to contribute to downwind monitors above the 1% "screening metric" by an amount that is less than the level of error that EPA has asserted is acceptable. This weighs heavily in favor of approving Alabama's SIP.

**Commenter:** Mississippi Department of Environmental Quality

**Commenter ID:** 32

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

[technical support document] shows significant levels of bias and error (+/-7.8 to 9.1 ppb) in the South region, the region which both Mississippi and Texas are considered a part of for the purpose of this model. The imperceivable contributions from Mississippi sources (i.e., ≤ 1.14 ppb) on modeled concentrations at any monitor in Texas fall well within the error range and should be further scrutinized to evaluate whether Mississippi's contribution is, in fact, significant.

**Commenter:** Utah Petroleum Association and the Utah Mining Association

**Commenter ID:** 48

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Photochemical modeling, especially for the western United States, lacks the level of accuracy needed to reliably differentiate a contribution of 0.7 ppb hundreds of miles downwind. Utah described this in their comments on EPA's March 27, 2018, guidance memo regarding Interstate Transport SIPs for the 2015 Ozone NAAQS: Due to the complex terrain, meteorology, distance between sources and receptors, and somewhat coarse-grained modeling inputs the margin of error in the transport modeling in the Intermountain West is about 15%. If we applied this margin of error to determine those States that contribute significantly to ozone in downwind States, 15% of the 70-ppb ozone NAAQS suggests that controls would only be required in States contributing 10 ppb or more to downwind ozone. This is more in line with the contributions to downwind States in the northeastern part of the United States.

*Response*

EPA generally responds to these comments in Section V.B.4 of the preamble, and further addresses these commenters here.

Commenters indicate that when the amount of contributions calculated is within the EPA's margin of error, the EPA should apply additional scrutiny to evaluate whether the upwind contribution is deemed significant.

The EPA does consider additional factors beyond whether the state is linked at step 2 before determining what emissions, if any, are deemed significant and require emissions reductions. The EPA performs this determination at Step 3 of the 4-step interstate transport framework, where the EPA considers additional factors, such as cost and the impact of emissions reductions to identify what emissions have a significant impact on nonattainment or interference with maintenance of the NAAQS at a downwind receptor.

To the extent that commenters suggest the EPA consider a less stringent threshold as a result of modeling uncertainty at Step 2, the EPA disagrees with this notion. The Agency uses the CAMx model to evaluate contributions from upwind states to downwind areas. The Agency has used CAMx in previous notice and comment rulemakings to evaluate contributions relative to the 1 percent threshold for both

186

ozone and PM2.5. In fact, in the original CSAPR, the EPA found that "[t]here was wide support from commenters for the use of CAMx as an appropriate, state-of-the science air quality tool for use in the [Cross-State Air Pollution] Rule. There were no comments that suggested that EPA should use an alternative model for quantifying interstate transport." 75 FR 48229 (August 8, 2011).

The comments related to the EPA's action on Alabama's SIP submission do not provide any additional technical analysis that would prevent the Agency from reasonably determining that Alabama contributes above 1 percent of the NAAQS at one nonattainment receptor based on the updated 2016v3 modeling platform for 2023. Moreover, comments misunderstand the ozone model performance evaluation and how the Agency assess linkages.

As discussed in the proposal, the EPA evaluates linkages using the multi-day average contribution from each upwind state to each downwind receptor based on daily contributions from the state to the receptor for the days with the highest model-predicted future year concentrations. 87 FR 64412 at 64423, (October 25, 2022). The modeled data are intended to represent future year ozone concentrations and contributions associated with ozone conducive meteorological conditions and transport patterns typical for high ozone episodes at the receptor. In this regard, base year model performance statistics that are derived from measured and modeled data strictly paired in space and time are not useful as the sole measure for gauging the ability of the model to adequately estimate future year average contributions on the order of 0.70 ppb on high ozone days representative of the magnitude of measured concentrations at the receptor. As explained in EPA's Final Action AQM TSD in the docket for this action, the performance of our modeling is within the generally accepted performance parameters for modeling of this type.

The EPA concedes that its modeling cannot perfectly project air quality levels and contributions in a future year; however, that is not the relevant standard. *See Appalachian Power Co. v. EPA*, 135 F.3d 791, 805-6 (D.C. Cir. 1998) (explaining that a model need not perfectly fit every data point). The EPA has successfully applied its CAMx modeling platform across many CAA regulatory actions. The EPA continues to find the modeling reliable for purposes of the Step 1 and Step 2 analyses of the 4-step interstate transport framework. The EPA further responds to these and related comments in sections V.B.4-6 of the preamble.

187

# 5   Updates to Modeling and Changes in Linkages

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Missouri is no longer linked to any of the receptors that EPA used to evaluate Missouri's good neighbor SIP submission. The downwind receptors evaluated in Missouri's good neighbor SIP submission include –

- receptor ID 260050003, Allegan, MI;
- receptor ID 261630019, Wayne, MI;
- receptor ID 480391004, Brazoria, TX;
- receptor ID 482011039, Harris, TX;
- receptor ID 550790085 Milwaukee, WI; and
- receptor ID 551170006, Sheboygan, WI.

In EPA's updated modeling used to support the disapproval of Missouri's SIP and the proposed FIP for 26 states, none of these receptors are linked to Missouri. The following paragraphs explain how this change in the technical basis for Missouri's good neighbor obligations affect the submission with respect to each of the receptors analyzed and included in Missouri's good neighbor SIP for the 2015 ozone standard that the Air Program submitted in 2019.

In Missouri's good neighbor SIP submission in 2019, the Air Program demonstrated that the Allegan, MI monitor met the conditions included in EPA's October 2018 memorandum to not be considered a maintenance receptor because the site would not be a receptor in 2023. In the proposed disapproval, EPA rejected the argument stating that the summer of 2011 was an unusually cool summer in the upper Midwest despite updated information added to the SIP to support this assertion in response to EPA comment on Missouri's SIP submission. However, as demonstrated in EPA's updated modeling, the Allegan monitor has indeed dropped off as a maintenance receptor. The maximum 2023 projected design value for that monitor in the updated modeling is 68.4 ppb, well below the threshold of 70.9 needed to escape the label of a maintenance receptor under EPA's 4-step framework. For this reason, it is clear that Missouri's analysis and demonstration held true, and EPA's denial of it in the proposed disapproval is disproved by EPA's own modeling. Therefore, EPA must accept the demonstration included in Missouri's good neighbor SIP submission for this monitor. Failure to do so would constitute arbitrary and capricious action that would ignore EPA's own data.

For the Wayne, MI monitor, EPA's updated modeling shows this receptor as no longer being a maintenance receptor. The maximum 2023 projected design value for that monitor in the updated modeling is 66.6 ppb. In Missouri's good neighbor SIP submission, this was a maintenance receptor with

a maximum 2023 design value of 71.0 ppb, which is the lowest possible maximum design value that would cause it to receive the label of a maintenance receptor. In Missouri's SIP submission, the Air Program utilized the flexibility in EPA's August memo, to avoid linkage with this receptor because Missouri's projected contribution was below 1 ppb. EPA rejected that assessment in the proposed disapproval stating that Missouri failed to provide sufficient technical justification for use of the flexibility offered in the August memo. Obviously, the fact that the maximum design value was equal to the minimum value needed to be labeled a maintenance receptor, it follows that any improvement at all would have taken care of this receptor, which is clearly supportive of a 1 ppb threshold. Nonetheless, as shown in EPA's own updated modeling, this monitor is cleared of additional analysis at Step 1. For all of these reasons, EPA's determination to not accept Missouri's demonstration for this monitor is clearly flawed, and constitutes arbitrary and capricious action by EPA since it ignores its own data that argues for approving the state's determination for this monitor.

For the Brazoria, TX monitor, EPA's updated modeling shows that Missouri is no longer linked to this monitor because Missouri's contribution is 0.55 ppb, which is below 1 percent of the 2015 ozone standard. In our SIP submission, the Air Program utilized the flexibility in EPA's August memo, to avoid linkage with this receptor because Missouri's projected contribution was below 1 ppb. In the previous modeling, Missouri's contribution to this receptor was 0.88 ppb. Our SIP submission demonstrated that this monitor was not significantly impacted by upwind state contributions, and instead the receptor status was largely the result of contribution from local sources and international (Mexico) emissions. This is substantially similar to EPA's own determination in their latest actions associated with the proposed disapproval and the proposed FIP with respect to linkages between Oregon and California, where Oregon is absolved of their linkages to California for this very reason. However, EPA treats Missouri differently by denying this same basis for the determination that a 1 ppb threshold was appropriate as stated in our SIP submission. Further, the updated modeling provides even more proof that the analysis in our SIP was appropriate for this monitor, as Missouri's upwind contribution has now fallen below the significant contribution threshold (even without the 1 ppb flexibility provided for in EPA's August memo). For all of these reasons, EPA's determination to not accept Missouri's demonstration for this monitor is clearly flawed, and constitutes arbitrary and capricious action by EPA since it ignores its own data that argues for approving the state's determination for this monitor.

For the Harris, TX monitor, EPA's updated modeling shows this receptor as no longer being a maintenance receptor. The maximum 2023 projected design value for that monitor in the updated modeling is 68.5 ppb. In Missouri's good neighbor SIP submission, this was a nonattainment receptor with a maximum 2023 design value of 73.5 ppb. Missouri's contribution to this monitor was 0.88 ppb, thus qualifying it for the use of the flexibility offered in EPA's August memo. Similarly to the Brazoria monitor, Missouri's SIP submission explained that this monitor was not significantly impacted by upwind state contributions, and instead the receptor status was largely the result of contribution from local sources and international (Mexico) emissions. While EPA uses this same basis for approving Oregon's SIP using the updated modeling when it comes to 15 separate linkages in California that are at or above the 1 percent threshold and two receptors with contributions above 1 ppb, EPA denies this basis as included in Missouri's SIP submission for justifying the removal of the Harris, TX monitor linkage with Missouri at Step 2. Further, the updated modeling does not even include upwind state contributions for this monitor because there were fewer than five days where the modeled predicted maximum daily 8-hour

189

average (MDA8) was above 60 ppb. This provides even further evidence that this is no longer a linked problem receptor for Missouri. For all of these reasons, EPA's determination to not accept Missouri's demonstration for this monitor is clearly flawed, and constitutes arbitrary and capricious action by EPA since it ignores its own data that argues for approving the state's determination for this monitor.

For the Milwaukee, WI monitor, EPA's updated modeling shows this receptor as no longer being a maintenance receptor. The maximum 2023 projected design value for that monitor in the updated modeling is 68.4 ppb. In Missouri's good neighbor SIP submission, this was a nonattainment receptor with a maximum 2023 design value of 73.0 ppb. Missouri's contribution to this monitor was 0.93 ppb, thus qualifying it for the use of the flexibility offered in EPA's August memo. Similarly to the Wayne, MI monitor, Missouri's SIP submission explained that this monitor should qualify for the flexibility afforded in EPA's August memo, because Missouri's contribution was below 1 ppb and that the use of a 1 ppb threshold for this receptor would capture 79.4 percent of the total contribution from upwind states and 83 percent of the upwind state contributions captured through the use of a 0.7 ppb threshold. These values are higher than the nationwide average values included in the August memo that were the basis for EPA stating the use of a one ppb threshold may be appropriate. However, in the proposed disapproval, EPA denied this rationale claiming that insufficient technical justification was provided for use of the 1 ppb flexibility. Now, EPA ignores their own updated modeling when evaluating Missouri's SIP, which not only no longer predicts this receptor as a nonattainment or maintenance receptor, but does not even calculate upwind state contributions for the receptor because there were fewer than five days where the modeled-predicted MDA8 was above 60 ppb. This provides even further evidence that this is no longer a linked problem receptor for Missouri. For all of these reasons, EPA's determination to not accept Missouri's demonstration for this monitor is clearly flawed, and constitutes arbitrary and capricious action by EPA since it ignores its own data that argues for approving the state's determination for this monitor.

For the Sheboygan, WI monitor, EPA's updated modeling still projects this receptor to be a nonattainment receptor, but the modeling does not include any upwind state contributions because there were fewer than five days where the model-predicted MDA8 was above 60 ppb. Clearly, the model is underperforming with respect to this receptor in the updated modeling. However, in using the rationale in Missouri's SIP submission with the previous modeling, this monitor was impacted so heavily by in-state and neighboring state emissions that the use of a threshold even higher than 1 ppb was appropriate. Where in-state and two neighboring state emissions contributed 31.9 ppb of the design value in the previous modeling, it belittles any case or justification for bringing in Missouri as a linked state to this monitor. The Air Program notes that EPA submitted no comments with regard to the use of a 2 ppb significant contribution threshold for this monitor, which implies EPA was satisfied with the rationale included in the SIP at the time of submittal, and only now, after years of sitting on the submission does EPA reverse course and explain in highly generic terms that it will not accept Missouri's demonstration for this monitor. With the low model performance at this receptor, and the substantially unique position of the level of contribution coming from the states bordering Lake Michigan, there is certainly insufficient information to conclude that this receptor should cause Missouri's SIP to be disapproved. For all of these reasons, EPA's determination to not accept Missouri's demonstration for this monitor is clearly flawed, and constitutes arbitrary and capricious action by EPA since it ignores its own data that argues for approving the state's determination for this monitor.

The fact that Missouri is no longer linked to any of the receptors analyzed in our SIP submission provides adequate cause and justification to conclude that EPA's proposed disapproval is inappropriate. EPA's updated modeling is proof that the SIP Missouri submitted adequately evaluated and demonstrated that Missouri had addressed its good neighbor SIP obligations at Step 2 for every receptor evaluated in the submission. However, EPA ignores these facts in its proposed disapproval, not even giving them lip service. This arbitrary and capricious action shows that EPA cherry-picked information to make its case, and ignored relevant, inconvenient facts in the record that do not support EPA's conclusion.

The Air Program notes that EPA's proposed disapproval goes on to point out that the updated modeling has identified four additional receptors (all in the Lake Michigan area) that Missouri is now linked to. These receptors were not identified as linked receptors in the previous modeling relied upon in our SIP submission. EPA uses this as further evidence to justify their proposed disapproval. This sleight-of-hand move by EPA is a direct attack on Missouri's right to develop its own SIP. If EPA is going to move the target more than two years after the submission is made and use that tactic to justify its action, then a proposed disapproval cannot be the appropriate action. If EPA desires to make a formal finding that Missouri's SIP is inadequate because of these newly identified receptors, it must approve our original SIP and then issue a SIP call to provide Missouri a chance to address the receptors that have been newly identified in the updated modeling. Failure to do so, would circumvent EPA's obligation to put forth any effort for cooperative federalism as envisioned in the Clean Air Act. Such action would instead favor stripping states of their rights and imposing hundreds of millions of dollars in compliance costs without adequate justification or the opportunity for states to update and retain control over their SIP. For these reasons, EPA must withdraw the proposed disapproval and take action to approve Missouri's submission.

[...]

The Air Program notes again that none of the monitors that Missouri is linked to in the updated modeling were linked monitors in the previous modeling that Missouri had evaluated and demonstrated against at step 2 in our previous SIP submission. Therefore, the Air Program objects to the use of these monitors as a basis for the SIP disapproval and the proposed imposition of a FIP.


**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Interstate Transport Framework Step 1: Identification of Downwind Air Quality Problems

As a result of EPA's choice to substitute new modeling for the modeling data provided to states for development of SIP submittals, the attainment and maintenance receptors identified for Step 1 of the Interstate Transport Framework differ. As specified by EPA, DEQ used 2023 future year results provided in EPA's March 2018 Memorandum to identify nonattainment and maintenance receptors. In the Proposed Rule, EPA proposes to rely primarily upon 2023 and 2026 future year results from the 2016v2

modeling platform. Based on this new modeling data, the only receptor that DEQ identified as having a potential linkage to Arkansas at Step 2 of the framework (Allegan County, MI) is no longer among the areas identified as nonattainment and maintenance receptors in Step 1. EPA's choice to primarily rely on new information instead of the demonstrations that the state made using data provided by EPA at the time of SIP development degrades ADEQ's confidence that it can rely upon technical information provided by EPA for decision-making in any future iterations. The proposed reliance by EPA on new information effectively renders the extensive analyses performed by DEQ during the development of the Arkansas Transport SIP as irrelevant. DEQ believes this erodes the cooperative federalism framework and degrades the working relationship between DEQ and EPA Region 6 and EPA Headquarters.

EPA maintains that "differing results [do not] mean that the modeling or the EPA methodology for identifying receptors or linkages is inherently unreliable," and goes on to say that "Arkansas was linked to **some set** of these receptors, even if [...] Arkansas was linked to **different receptors** in one modeling run versus another) [emphasis added]. EPA's argument is contradictory; something cannot be "inherently reliable" (i.e., "dependable") if it does not produce the same results with consistency. The inconsistency in results in EPA modeling gives further weight of support to the state utilizing resources at its disposal (including HYSPLIT modeling) to augment and ground-truth information provided by EPA to determine **which set** of receptors to evaluate for linkages in Step 2 and "significant contribution" in Step 3 of the interstate transport framework recommended by EPA for this type of analysis.

[...]

Interstate Transport Framework Step 2: Identifying Linkages

[...]

Substituting the data that Arkansas relied upon in its SIP development and the threshold that Arkansas chose to identify linkages results in a different set of linkages than DEQ identified in its SIP. In its 2019 submittal, DEQ identified one maintenance receptor, Allegan County (Arkansas projected contribution = 1.64 ppb), based on modeling results from EPA's March 2018 Memorandum. In EPA's 2022 disapproval of DEQ's 2019 submittal, based on EPA's 2016v2 modeling platform, EPA identified four maintenance receptors—481210034, Denton, TX (Arkansas projected contribution = 0.76 ppb); 480391004, Brazoria, TX (Arkansas projected contribution = 1.39 ppb,); 482011034, Harris, TX (Arkansas projected contribution = 1.38 ppb); and 482011035, Harris, TX (Arkansas projected contribution = 1.34 ppb)—and one nonattainment receptor—482010055, Harris, TX (Arkansas projected contribution = 1.00 ppb)—as linked to Arkansas. Had this updated modeling information been available at the time of SIP development, DEQ would have focused its analysis of potential linkages in Texas instead of the receptor in Michigan.

To give perspective from a state's standpoint, EPA's 2016v2 modeling indicates that one Texas monitor linked to Arkansas emissions (Brazoria County, 480391004), and projected by EPA 2016v1 modeling to be in nonattainment in 2023, is now projected to achieve attainment without further controls. DEQ did not perform an analysis for the Brazoria County monitor because Arkansas's contribution was below DEQ's analytical threshold of 1 ppb. Three Texas monitors (Denton County, 481210034; Harris County, 482011034; and Harris County, 482011035) are projected by both the 2016v1 and 2016v2 modeling to be maintenance-only in 2023. One Arkansas-linked Texas monitor (Harris County, 482010055),

previously projected by the 2016v1 modeling to be in attainment in 2023 is now projected by the updated modeling to be in nonattainment in 2023. Essentially, EPA provided states with one set of data and "linkages" upon which states based their SIP submittals, then proposed to disapprove the same SIPs based on a completely different set of data. DEQ finds that this decision is arbitrary and capricious, and amounts to a bait and switch, allowing the EPA to usurp the states.

In summary, EPA's 2016v2 modeling in support of EPA's SIP disapproval identified three receptors with "linkages" to Arkansas that were not originally identified at the time of SIP development. Of the top five linked receptors listed in the 2016v2 modeling and disapproval, only two were also listed in EPA's March 2018 Memorandum (i.e., the state was only made aware of three supposed "linkages" to downwind receptors in EPA's 2022 proposed disapproval of the state's SIP submission). The contributions for these two receptors ranked third and fifth in EPA's March 2018 Memorandum (both receptors were below DEQ's threshold), and ranked first and fifth in EPA's 2016v2 modeling, with an increase of 0.49 ppb and 0.18 ppb, respectively. This caused a receptor that was originally modeled to show a contribution that was below DEQ's threshold (0.90 ppb contribution) to sharply increase past the threshold in the updated modeling (1.39 ppb contribution). The receptor with the second-highest contribution identified in EPA's 2016v2 modeling and disapproval ranked sixth in modeling results from EPA's March 2018 Memorandum; again, a downwind receptor that was well below the threshold at the time DEQ was developing the SIP (0.54 ppb contribution) modeled with more than one and one-half times the contribution in EPA's 2016v2 modeling results (1.38 ppb contribution).  At the time of SIP development, DEQ could not predict that modeling conducted four years after the SIP submittal was due to EPA would produce such varied results on the receptors the state was analyzing in its submission; nor could DEQ appropriately focus limited state resources on the receptors with which EPA is now concerned in their disapproval. The state submitted a robust and well-justified SIP, based on information available to DEQ at the time. EPA disregards this fact.

[…]

DEQ agrees that some of the newly identified linkages now meet the state's threshold for further analysis of emissions sources in the state, and while EPA did not undertake this analysis before proposing a FIP with costly emissions reductions across broad sectors, Arkansas, now aware of a different set of linkages, is working on a new analysis based on the updated modeling results provided by EPA in the proposed disapproval.


**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment**:

Nevada adopted a broad and intentionally overinclusive approach to assessing its interstate transport obligations, using EPA's latest contribution modeling, released just months prior in March 2018, "to identify and quantify contributions greater than 0.5 percent of the 2015 ozone NAAQS resulting from

193

Nevada's anthropogenic emissions" for further analysis. Despite its belief that EPA's 1% linkage threshold was inappropriate for "use in the western United States," the state applied this threshold in order to take a "very conservative approach" to determining whether Nevada was linked to any downwind air quality problems. Nevada relied on EPA's modeling, emphasizing that "[a]lthough models can always be refined and there may be differences in certain approaches to technical issues as the NDEP has commented, it is the NDEP's position that the USEPA's modeling is state-of-the-science given the USEPA's constraints."

Nevada reviewed its contributions to receptors in California and Colorado under this framework, considering relative intrastate contributions and overall interstate contributions. Based on this extensive analysis, Nevada determined that "the contribution of 2023 base case anthropogenic NOx and VOC emissions from sources within Nevada to any projected 2023 nonattainment or maintenance receptor at greater than 0.5 percent of the NAAQS is limited to two states, California and Colorado." However, for each of these receptors, "Nevada's contribution... [was] less than one percent of the 2015 ozone NAAQS," meaning that under EPA's own analytical approach, Nevada was not linked to downwind air quality problems and that no further reductions measures were necessary.

Despite Nevada's highly conservative assessment of its interstate transport obligations, EPA's Proposed Disapproval nevertheless concludes, based on new air quality modeling using the 2016v2 emissions platform, that Nevada is now linked to 2 receptors in Utah. Nevada's contribution to these receptors is between 0.86 ppb and 0.89 ppb, which falls below the 1 ppb linkage threshold determined by Nevada to be more appropriate for Western states, where "interstate contributions... are relatively small, especially given the large contributions from background and intrastate emissions." EPA unreasonably imposes its own analysis in evaluating Nevada's SIP, rather than determining whether Nevada's analysis was reasonable.

[...]

During the 2 year period in which EPA failed to perform its statutory duty to act on Nevada's SIP submission, EPA completed significant new modeling using its newly released 2016v2 Model, finalized in 2022. Based on this new model, released more than 3 years after Nevada submitted its revised SIP and nearly 2 years after EPA was required to act on this SIP submission, EPA substantially altered its analysis of downwind air quality problems and state linkages. Nevada relied on EPA's previous modeling in assessing its interstate transport obligations, concluding based on this modeling that it "would contribute below 1 percent of the NAAQS to receptors in 2023 and was therefore not 'linked' to any other state." However, EPA's new modeling completely altered this analysis, finding that Nevada is linked to two receptors in Utah, in Salt Lake County and Davis County. EPA's use of entirely new modeling moved the goal Nevada attempted to meet in good faith, well after EPA was required to take final action on the state's SIP submission.

**Commenter:** Evergy, Inc.

**Commenter ID:** 21

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Six receptors were identified in the original modeling relied upon for the Missouri SIP submission. EPA then updated the modeling and determined that all six of these receptors are no longer linked to Missouri. The lack of any linkage with the updated modeling should be adequate to justify EPA approving the SIP. EPA's updated modeling for Missouri identified four new receptors near Lake Michigan.

**Commenter:** Idaho Power Company

**Commenter ID:** 23

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

Nevada's SIP fulfills the state's Good Neighbor obligations.

Nevada reasonably concluded that it is not linked to significant downwind air quality problems. Nevada adopted a broad and intentionally overinclusive approach to assessing its interstate transport obligations, using EPA's latest contribution modeling, released just months prior in March 2018, "to identify and quantify contributions greater than 0.5 percent of the 2015 ozone NAAQS resulting from Nevada's anthropogenic emissions" for further analysis. Despite its belief that EPA's 1% linkage threshold was inappropriate for "use in the western United States," the state applied this threshold in order to take a "very conservative approach" to determining whether Nevada was linked to any downwind air quality problems. Nevada relied on EPA's modeling, emphasizing that "[a]lthough models can always be refined and there may be differences in certain approaches to technical issues as the NDEP has commented, it is the NDEP's position that the USEPA's modeling is state-of-the-science given the USEPA's constraints."

Nevada reviewed its contributions to receptors in California and Colorado under this framework, considering relative intrastate contributions and overall interstate contributions. Based on this extensive analysis, Nevada determined that "the contribution of 2023 base case anthropogenic NOx and VOC emissions from sources within Nevada to any projected 2023 nonattainment or maintenance receptor at greater than 0.5 percent of the NAAQS is limited to two states, California and Colorado." However, for each of these receptors, "Nevada's contribution… [was] less than one percent of the 2015 ozone NAAQS," meaning that under EPA's own analytical approach, Nevada was not linked to downwind air quality problems and that no further reductions measures were necessary.

[…]

Despite Nevada's highly conservative assessment of its interstate transport obligations, EPA's Proposed Disapproval nevertheless concludes, based on new air quality modeling using the 2016v2 emissions platform—which was not available to Nevada when developing its SIP—that Nevada is now linked to 2 receptors in Utah. Nevada's contribution to these receptors is between 0.86 ppb and 0.89 ppb, which falls below the 1 ppb linkage threshold determined by Nevada to be more appropriate for Western

states, where "interstate contributions…are relatively small, especially given the large contributions from background and intrastate emissions." Yet, EPA arbitrarily deems these contributions "significant" for the purposes of assessing the adequacy of Nevada's SIP.

Importantly, EPA's analysis relies on modeling that was not available until 3 years after Nevada timely submitted its revised SIP. Under the CAA, states are required to submit revised SIPs within 3 years after EPA revises the NAAQS. EPA's revision of the ozone NAAQS on October 1, 2015 triggered this obligation. Nevada submitted its revised SIP to EPA on October 1, 2018, relying on modeling that EPA released just 6 months prior. Nevada specifically determined that EPA's data represented the "best available data with which to conduct Nevada's transport analysis," which EPA does not dispute in its Proposed Disapproval. Rather, EPA asserts that "[b]y using the updated modeling results, the EPA is using the most current and technically appropriate information for this proposed rulemaking." However, EPA fails to consider whether Nevada's analysis using the best available data at the time was reasonable and fails to even acknowledge the substantial change imposed by EPA's new modeling, increasing Nevada's contribution to Utah receptors from under 0.5% of the NAAQS to above EPA's 1% threshold.

**Commenter:** Minnesota Pollution Control Agency

**Commenter ID:** 31

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

The MPCA supports EPA's goal of reducing ozone precursors and their transport to protect the environment and human health across states. However, EPA's proposed disapproval of Minnesota's 2015 Ozone Transport SIP does not assess the quality of Minnesota's original submittal. Minnesota was identified as a non-significant contributor (below 0.7 parts per billion) to any ozone monitors in the 2018 modeling performed by both EPA and Lake Michigan Air Directors Consortium (LADCO). Minnesota did not complete steps three or four of the 2015 Ozone Transport SIP based on that information. Minnesota's original submittal should have been approved based on contribution information available from both EPA and LADCO at that time.

EPA is now proposing to use a revised 2016 modeling platform, EPA 2016 version 2 emissions modeling platform (2016v2 EMP) to support a remedy for the Interstate Transport Rule for the 2015 Ozone National Ambient Air Quality Standard (NAAQS).

**Commenter:** Nevada Division of Environmental Protection

**Commenter ID:** 33

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA has provided an unsupportable and illogical basis for disapproval of Nevada's 2018 iSIP. EPA states: "However, as mentioned above, the EPA has <u>newly available information</u> that indicates that sources in Nevada are linked to downwind air quality problems for the 2015 ozone standards. We therefore propose that Nevada <u>was required</u> to assess additional emissions control opportunities, and we propose to disapprove its submission because Nevada did not so." [(emphasis added)] EPA's basis for disapproval is rooted in a condition that would have been impossible for NDEP to meet, essentially reasoning that NDEP should have known the results of EPA's most recent modeling completed in 2021 when Nevada was preparing the 2018 iSIP.

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Results of the EPA's Step 1 and Step 2 Modeling and Findings for Oklahoma (Modeling Sensitivities)

As stated in Section III, above, EPA identified different receptors in the proposed disapproval than were identified in the original modeling on which Oklahoma relied in its SIP. EPA states in the proposed disapproval:

> We recognize that the results of the EPA (2011 and 2016 base year) modeling indicated different receptors and linkages at Steps 1 and 2 of the 4-Step interstate transport framework. These differing results regarding receptors and linkages can be affected by the varying meteorology from year to year, but we do not think the differing results mean that the modeling or the EPA methodology for identifying receptors or linkages is inherently unreliable. 87 Fed. Reg. 9823.

It should also be specifically noted that the number of receptors EPA linked to Oklahoma decreased from six to just two. Furthermore, only one receptor remained consistent between the two modeling runs, and the expected contribution regarding that receptor decreased. This information demonstrates how sensitive the models can be to changes over time. More specifically, it exemplifies how, as time progresses and the model does not have to project as far into the future, the results change. The differences in the modeling results have skewed heavily towards a decrease in the number of (and contribution to) receptors linked to Oklahoma. Therefore, due to the discrepancies in the modeling, ODEQ argues that Oklahoma is not clearly linked to any receptors that EPA has linked to Oklahoma.

The table below further exemplifies the problem of modeling sensitivities. It contains data for the ozone monitors located in the Illinois portion of the Chicago, Illinois-Indiana-Wisconsin Nonattainment Area. Note that of the 12 monitors, only Site 170310032 exceeds the 1% NAAQS threshold of 0.7 ppb. This site barely exceeded the limit, measuring at 0.75 ppb. However, this measurement could be misleading since Site 170310032 is located less than 0.2 miles from Lake Michigan. This location could be greatly influencing the results as models often have difficulties near water-land boundaries. Furthermore, the average of the Oklahoma impact for the 12 monitors equates to 0.41 ppb, well under the 1% limit.

197

| Site ID | State | County | 2016-Centered Avg | 2016-Centered Max | 2020 DV | 2023 Avg No Water | 2023 Max No Water | OK 2023 |
|---|---|---|---|---|---|---|---|---|
| 170310001 | Illinois | Cook | 73.0 | 77 | 75 | 69.6 | 73.4 | 0.55 |
| 170310032 | Illinois | Cook | 72.3 | 75 | 74 | 69.8 | 72.4 | 0.75 |
| 170310076 | Illinois | Cook | 72.0 | 75 | 69 | 69.3 | 72.1 | 0.35 |
| 170311003 | Illinois | Cook | 68.3 | 69 | 73 | 65.6 | 66.3 | 0.45 |
| 170311601 | Illinois | Cook | 69.3 | 70 | 71 | 65.2 | 65.8 | 0.15 |
| 170313103 | Illinois | Cook | 62.7 | 64 | 65 | 59.5 | 60.8 | 0.24 |
| 170314002 | Illinois | Cook | 68.7 | 72 | 71 | 66.5 | 69.7 | 0.33 |
| 170314007 | Illinois | Cook | 72.0 | 74 | 71 | 68.7 | 70.6 | 0.35 |
| 170314201 | Illinois | Cook | 73.3 | 77 | 77 | 69.9 | 73.4 | 0.36 |
| 170317002 | Illinois | Cook | 74.0 | 77 | 75 | 70.1 | 73.0 | 0.52 |
| 170436001 | Illinois | DuPage | 69.7 | 71 | 71 | 65.8 | 67.0 | 0.45 |
| 170971007 | Illinois | Lake | 73.7 | 75 | 72 | 68.6 | 69.9 | 0.57 |

After a monumental effort to understand ozone and precursor transport by EPA, State, and Local Air Quality Agencies, the Ozone Transport Assessment Group, published an Executive Report in 1997. In the Recommendations Section under Major Modeling/Air Quality Conclusions, it states "Regional NOx reductions are effective in producing ozone benefits, the more NOx reduced the greater the benefit. Ozone benefits are greatest where emission reductions are made and diminish with distance."

The modeling and assessment efforts for the Clean Air Interstate Rule (CAIR) and the CSAPR demonstrate that how the state of Oklahoma impacts a downwind state depends as much on the meteorology of the chosen modeling time-period as it does the emissions.

In the modeling process, measured data is input into a meteorological model, and then a combination of some measured data—but mostly calculated data—is input into an emissions model. These outputs are then input into an air quality model. Considering the variable flow and conversion of data in the process, the results become more estimation than reality.


**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA may not disapprove Tennessee's Infrastructure SIP based on Prong 2 of CAA §110(a)(2)(D)(i)(I) because Tennessee satisfied its Good Neighbor obligations in its 2018 iSIP submission.

As discussed in Comment #2, once an upwind state has determined that it is not "linked" to a downwind state under Framework Step 2, there is no reason to continue to Steps 3 and 4. This is precisely the conclusion that Tennessee reached in its 2018 iSIP submission to EPA, and EPA understands exactly why Tennessee did so. As EPA itself notes in the iSIP Disapproval: "the most recently available EPA modeling at the time Tennessee submitted its SIP submittal indicated the State did not contribute above 1 percent

of the NAAQS to a projected downwind nonattainment or maintenance receptor." In other words, EPA acknowledges that Tennessee was not "linked" to any downwind states in 2018 based on then-available data and modelling, and therefore would not have been required to complete Steps 3 and 4 of the interstate transport framework analysis.

Nonetheless, EPA now proposes to disapprove Tennessee's SIP submission, based on data EPA published in 2021 and 2022 finding that Tennessee is "linked" to a single maintenance receptor in Denton County, Texas. EPA is suggesting that Tennessee's 2018 technical analysis was flawed because it failed to consider *future* data that were not collected until years after the original submission was made, which would have required Tennessee to perform Steps 3 and 4. As EPA puts it: "Because the entire technical basis for Tennessee's submittal is that the State is not linked at Step 2, EPA proposes to disapprove Tennessee's SIP submission based on EPA's finding that a linkage does exist."

As we noted in Comment #1, EPA's entire approach and rationale in this proposed disapproval makes it impossible for any SIPs a state might submit under the 2015 ozone standard or any future NAAQS to demonstrate compliance with CAA §110(a)(2)(D) because not only must a state consider the evidence available at the time of submission, but a state must also possess the ability to consider *future* evidence that might demonstrate significant contributions to downwind nonattainment or interference with maintenance in a downwind state. The proposed disapproval of Delaware's iSIP in the *Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard* perfectly illustrates this point. In Section IV.C.1 of the preamble to the proposed rule ("Correction of EPA's Determination Regarding Delaware's SIP Submission and Its Impact on EPA's FIP Authority for Delaware"), EPA addresses Delaware's Good Neighbor obligations as follows:

[see full comment for comment's excerpt of 87 FR 20036 (April 6, 2022)]

This structure runs contrary to the principle articulated by the Supreme Court in *EPA v. EME Homer City Generation, L.P.* that EPA must work toward an "efficient and equitable solution to the allocation problem the Good Neighbor Provision requires the Agency to address." Instead, EPA's imposition of such an unworkable approach is a textbook failure to comply with EPA's obligation to "select from among reasonable options" under the *Chevron* framework and imposes an entirely arbitrary and capricious standard that states are effectively incapable of following.

The Clean Air Act does not envision nor suggest that states be held to an impossible standard when developing SIPs. Because EPA has provided no evidence that Tennessee was "linked" to any downwind states when it submitted its 2018 SIP revision, EPA may not disapprove Tennessee's Infrastructure SIP based on Prong 2 of CAA §110(a)(2)(D)(i)(I) and therefore should withdraw its proposed disapproval.


*Response*

The EPA explained at proposal that the EPA's proposed disapprovals relied both on an evaluation of the information supplied by the states in their submissions and on the updated version of modeling available at the time of proposal (2016v2) *see, e.g.*, 87 FR 9801, a point reiterated in the final preamble in Section V.A. EPA responds generally to comments related to the use of updated modeling in Section V.A.4 of the preamble.

199

In recent years, the EPA has continually leveraged public input to improve the modeling used to support its assessment of good neighbor transport obligations for the 2008 ozone NAAQS and 2015 ozone NAAQS, a process starting with the release of a notice of data availability in January 2017 and continuing through the comment period of this action, as detailed in the preamble in Sections II.C. and III.A. The 2016v2 emissions modeling files have been available for comment since September 2021,[52] and the meteorological data has been available as used in the 2016v1 platform since October of 2020 (with the release of the proposed Revised CSAPR Update) By providing the modeling platform on September 20, 2021, and requesting that comments be provided to EPA's emissions modeling group by December 17, 2021, and also providing ample time for comment on the proposals throughout 2022, the EPA gave stakeholders and interested parties sufficient opportunity to review and comment on the data used to develop the 2016v2 modeling.

The EPA incorporated public comments received on proposals related to 2015 ozone NAAQS interstate transport to update its emissions inventories and other model inputs, some examples of which are detailed in the EPA's response to comments in Section 3 (Emissions Inventories). The final rule modeling using the 2016v3 platform was performed using updated emissions projections, such as additional emissions reductions for electric generating units (EGUs) that reflect the emissions reductions following promulgation of the Revised CSAPR Update for the 2008 ozone NAAQS, more recent information on plant closures and fuel switches, and other sector trends. The construct of the updated emissions platform is described in the 2016v3 Emissions Modeling technical support document (TSD) contained in the docket of this rulemaking. The final rule modeling additionally took into consideration feedback from commenters to improve overall model performance. Thus, by using the updated modeling results based on the new 2016v3 platform, the EPA appropriately took commenter feedback into consideration when finalizing this rulemaking and used the most current and technically appropriate information to do so.

These commenters raise two distinct, but related, circumstances associated with EPA's use of updated modeling to inform its action on the SIP submittals. Commenters referring to the Arkansas, Missouri, and Oklahoma submissions generally acknowledge that these states were linked above 1 percent of the NAAQS (and also 1 ppb) to a set of receptors in the 2011-based modeling of 2023 released in the March 2018 memorandum. They complain, however, that the EPA's new modeling resulted in a new set of linkages, which the states were unable to address since these linkages were unknown at the time of SIP submission. Commenters on the Minnesota, Nevada, and Tennessee disapprovals assert that the states were not linked to any receptors above 1 percent of the NAAQS in the EPA's 2011-based modeling released in the March 2018 memorandum and so these states did not have an opportunity to address any linkages now identified in the updated EPA modeling.

The EPA will take these two sets of comments in turn, noting that the EPA responds to general claims regarding the timing of the EPA's action on SIPs and its use of updated modeling in Section V.A of the Preamble. Other issues raised by these comments are addressed in Sections V.A and V.B of the preamble and in the following sections of this RTC document: 1.1 (Timing of SIP Actions), 1.4 (Use of Updated Modeling), 4.2.1 (Model Performance at Lake Michigan), 7.1 (Methodology for Determining Future Year Contributions),  7.4 (August 2018 Memorandum), 10.2 (SIP Call),10.3 (Cooperative

---

[52] https://www.epa.gov/air-emissions-modeling/2016v2-platform.

Federalism and the EPA's Authority), 11.3 (Transport Policy), 11.4 (Transport Policy-Western State Ozone Regulation), 11.6 (Economic Impacts), and 11.15. (Out of Scope – Comments on the Proposed FIP).

Different Linkages

With regard to ADEQ's claims, we recognize that the results of the EPA's 2011-based modeling released in the March 2018 memorandum and the 2016v2 modeling (2016 base year) identified different linkages for Arkansas at Steps 1 and 2 of the 4-step framework. In Arkansas's SIP submission, based on a 1 ppb contribution threshold and relying primarily on EPA's 2011-based modeling, ADEQ identified only one projected maintenance receptor, Allegan County, MI, and no projected nonattainment receptors linked to Arkansas in 2023. The EPA summarized Arkansas's analysis of this linkage at proposal. 87 FR at 9803-05. The EPA evaluated ADEQ's analysis and identified substantial technical concerns with the basis for ADEQ's conclusions that it should not be considered linked to that receptor. 87 FR at 9808-09. In other words, the EPA finds Arkansas's submission deficient on its own terms.

ADEQ also argues that changes in linkages between modeling iterations suggests that the EPA's modeling is unreliable. Here, the EPA disagrees. When multiple rounds of modeling, each more up-to-date than the last, continue to confirm certain upwind states are linked, it actually *reinforces* the EPA's conclusion that the upwind state is contributing to receptors at Step 2 of the 4-step framework. A change in modeling output from the 2011-based modeling to the 2016-based modeling results in part from the shift to a more recent meteorological year and other updates. It is completely reasonable and acceptable for the Agency to update its modeling platform periodically, and it is imminently reasonable to do so before taking final rulemaking action.

ADEQ explains that it would have spent a greater effort examining linkages to Texas receptors if it had known the 2016v2 modeling results when it was preparing its SIP submission. The EPA responds that the 2011-based modeling, 2016v2 modeling, and 2016v3 modeling all identify that Arkansas contributes more than 1 percent of the NAAQS to the Brazoria County, Texas receptor (AQS Site ID 480391004), but Arkansas chose to apply a 1 ppb contribution threshold and did not closely examine that linkage in its submission.

We do not think the differing results between the 2011-based and 2016-based modeling of 2023 mean that the modeling or the EPA methodology for identifying Arkansas's receptors or linkages is inherently unreliable. Rather, these separate modeling runs indicated (1) that there were receptors that would struggle with nonattainment or maintenance in the future, and (2) that Arkansas was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (e.g., a different set of receptors were identified to have nonattainment or maintenance problems, or Arkansas was linked to different receptors in one modeling run versus another). We think this common result indicates that Arkansas's emissions were substantial enough to generate linkages at Steps 1 and 2 to some set of downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs. Under these circumstances, we think it would have been appropriate for the state to proceed to a Step 3 analysis to determine what portion of Arkansas's emissions should be deemed "significant." In making this observation, we do not now consider the earlier modeling results included in the EPA's March 2018 memorandum to be of equal reliability relative to the more recent EPA 2016v2 or 2016v3 modeling. However, where alternative or

older modeling generated linkages, even if those linkages differ from linkages in the EPA 2016v2 modeling, that information provides further evidence, not less, in support of a conclusion that the state is required to proceed to Step 3 to further evaluate its emissions.

Commenters on the proposal as to Missouri similarly argue that the set of receptors to which Missouri is linked changed from the 2011-based to the 2016-based modeling of 2023. But the same response applies. Missouri Department of Natural Resources (MDNR) and Evergy argue that because the 2016v2 modeling projects that Missouri does not have any of the same linkages that were identified in the 2011-based modeling, that EPA must approve Missouri's SIP submission. The EPA disagrees that the 2016v2 modeling validates the assessment of receptors Missouri made in its SIP submission. The EPA summarized Missouri's analysis of these linkages based on the EPA's 2011-based modeling at proposal. 87 FR at 9539-9540. The EPA evaluated MDNR's analysis, including its rationale for applying a 1 ppb contribution threshold, and identified substantial legal and technical concerns with the basis for MDNR's conclusions that it should not be considered linked to any receptors or that Missouri has no outstanding good neighbor obligations for the 2015 ozone NAAQS. 87 FR at 9540-9544. In other words, the EPA finds Missouri's submission deficient on its own terms. The EPA also notes that the difference between a 1 percent of the NAAQS threshold and a 1 ppb threshold is not meaningful to the conclusion that Missouri is linked at Step 2, because Missouri contributes more than 1 ppb to a downwind receptor in 2023 both in the modeling relied on by the state and in the additional modeling developed by EPA to inform both the proposed and final actions (2016v2 and 2016v3).  At proposal, the EPA analyzed MDNR's arguments attempting to establish that in spite of the EPA's modeling it was not linked to the receptors as the EPA had found in the March 2018 memorandum. The EPA found for multiple reasons that those arguments were not approvable. *See* 87 FR at 9540-43. Thus, even accepting an argument that the EPA should not consider information beyond that available to a state in the development of its SIP submission (a position we do not agree with but adopt for the sake of argument), the SIP submission would have been disapproved based on that analysis and even if there was no additional modeling for the EPA to rely on. In short, the commenter has not established that the EPA's review of the arguments advanced by MDNR, as explained in our proposal, was in error in terms of the specific reasoning that MDNR had advanced. Nonetheless, the EPA then went on to find that different linkages existed between Missouri and out of state receptors based on the updated, 2016v2 modeling, *see* 87 FR at 9543-44, which is again confirmed by the 2016v3 modeling. Commenter has not established that these modeled linkages are in error.

In response to ODEQ, the EPA agrees that both changes in emission inputs and meteorology can impact modeling results. However, the EPA does not agree that the trend in the number of linkages or levels of contribution from Oklahoma in iterations of the EPA's modeling relieves Oklahoma of further obligations, or that changes in linkages amount to "discrepancies" that support a conclusion that Oklahoma is "not clearly linked" to receptors.  We also disagree that the EPA methodology for identifying receptors or linkages is unreliable. Rather, the EPA's separate modeling runs continued to show (1) that there were receptors that would struggle to attain or maintain the NAAQS in the future, and (2) that Oklahoma was linked to some set of these receptors, even if the receptors and linkages differed from one model run to the next. This common result indicates that Oklahoma's emissions are substantial enough for EPA's contribution assessment to generate linkages at Steps 1 and 2 to some set of downwind receptors, under varying assumptions and meteorological conditions, even if the precise

set of linkages changed between modeling runs. In sum, the continued identification of Oklahoma linkages with updated modeling reinforces the conclusion that the state is potentially significantly contributing to nonattainment or interfering with maintenance in another state.

The EPA cannot accept the arguments advanced by ADEQ, Evergy, MDNR, and ODEQ that Arkansas, Missouri, and Oklahoma should not be considered linked to downwind receptors when the record as a whole establishes: both in the 2011 and 2016-based modeling of 2023, such linkages do exist, and the EPA explained in proposing this action why the states' arguments, taken on their own merits and without regard to the updated modeling, were still not approvable. This is no "sleight of hand" but simply an evaluation of the totality of the information before the Agency.

<u>Unlinked to Linked</u>

In response to comments related to states that were not considered linked to a downwind receptor (i.e., maximum contribution to a downwind receptor was less than 0.7 ppb) in the 2011-based modeling but were linked in EPA's 2016v2-based modeling, the EPA first notes that the Agency is not taking final action on its proposed disapproval of Tennessee's 2015 ozone NAAQS good neighbor SIP submission in this action, but does recognize that the comments made by Tennessee Department of Environment and Conservation regarding Tennessee are similar to those made by Eagle Materials, Idaho Power Company, Minnesota Pollution Control Agency, and Nevada Division of Environmental Protection related to Minnesota and Nevada.

Commenters particularly took issue with the EPA's discussion of the deficiencies in Minnesota and Nevada's Step 3 analyses, interpreting the language in the proposal as EPA expecting these states to predict the future. The EPA is not holding any state to such a standard. The EPA acknowledges that identified linkages and levels of contribution from Minnesota and Nevada changed between the 2011-based modeling and the 2016v2 modeling. However, given that the later iteration of modeling is more up-to-date than the 2011-based modeling, the best conclusion to derive from these differences is that Minnesota and Nevada are potentially significantly contributing to nonattainment and/or interference with maintenance receptors and, as a result, the analyses presented in the SIP submissions cannot support the states' conclusions. (It bears repeating that EPA never indicated when it released the March 2018 Memorandum providing the 2011-based modeling results for 2023 that those results would guarantee any state a SIP approval. To the contrary, the memorandum advised that EPA would evaluate and act on SIP submissions through a future rulemaking action.)

Minnesota's good neighbor SIP submission concluded based on LADCO and EPA 2011-based modeling that the state would not be linked to any other state in 2023 and that ozone trends and existing limits and controls made it "reasonably certain" that the state will not significantly contribute to nonattainment or interference with maintenance in any other state.[53] The EPA cannot agree with this conclusion on the rationale presented in the SIP submission. EPA's 2016v1 modeling, using a 2016 base year and accounting for Minnesota limits and controls, was released in 2020 and identified that

---

[53] Infrastructure/110(a) requirements for the 2015 Ozone National Ambient Air Quality Standard (October 1, 2018) at 13.

Minnesota was linked to one or more downwind receptors.[54] LADCO was an integral part of the collaborative process to develop the 2016v1 emissions inventories, and Minnesota provided input as well (for example, onroad vehicle miles traveled and populations for 2016)[55]. Minnesota's comments on the 2016v2 modeling were incorporated into 2016v3 modeling as described in Section 3 of the RTC document; both also identify that Minnesota is linked. Additional details about the development of the 2016v3 emission inventories are available in the 2016v3 Emissions Modeling TSD. The EPA described its assessment of Minnesota's SIP submission at proposal, 87 FR 9868-9869, and responds to comments in the RTC document on the topic of air quality factors in Section 8.5 and the topic of existing and future controls in Section 8.3. The EPA explains its assessment of the 2016v3 modeling in relation to Minnesota in the preamble in Section IV.J. The 2016v3 Emissions Modeling TSD contains information about the changes to the emissions inventories between the 2016v2 and 2016v3 platforms.

NDEP's good neighbor SIP submission for Nevada said that

> [a]lthough models can always be refined and there may be differences in certain approaches to technical issues as the NDEP as commented, it is the NDEP's position that the USEPA's modeling is state-of-the-science given the USEPA's constraints. It is also the NDEP's position that the USEPA's contribution modeling is the best available data with which to conduct Nevada's transport analysis.[56]

The submission examined Nevada's contribution to receptors in California and Colorado based on the EPA's 2011-based modeling at Step 2.[57] Based on the EPA's 2011-based modeling, NDEP concluded at Step 3 that Nevada was not linked and so determined, on that reason alone, that no emissions reductions were necessary for the state to resolve its good neighbor obligations for the 2015 ozone NAAQS.[58] NDEP offered no other explanation for why Nevada's SIP submissions satisfied the requirements of CAA section 110(a)(2)(D)(i)(I) .[59] NDEP also stated in its iSIP submission on the topic of CAA section 110(a)(2)(D)(i)(I) that

---

[54] 87 FR 9868 at n.94 ("These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform which became available to the public in the fall of 2020 in the Revised CSAPR Update, as noted in Section I. That modeling showed that Minnesota had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in 2023. These modeling results are included in the file 'Ozone Design Values And Contributions Revised CSAPR Update.xlsx' in docket EPA–HQ– OAR–2021– 0663.").

[55] See the "Emissions Modeling Technical Support Document for the 2016v1 Emissions Modeling Platform" available in the Revised CSAPR Update docket as item EPA-HQ-OAR-2020-0272-0187.

[56] The Nevada Division of Environmental Protection Portion of the Nevada State Implementation Plan for the 2015 Ozone NAAQS: Demonstration of Adequacy (October 1, 2018), Appendix E at E-5. The Clark County and Washoe County portions of Nevada's good neighbor SIP submission for the 2015 ozone NAAQS were identical to NDEP's. Clark County Portion of the Nevada State Implementation Plan to Meet the Ozone Infrastructure SIP Requirements of Clean Air Act Section 110(a)(2) (August 2018), Appendix E; The Washoe County Portion of the Nevada State Implementation Plan to Meet the Ozone Infrastructure SIP Requirements of Clean Air Act Section 110(a)(2) (July 26, 2018), Appendix E.

[57] The Nevada Division of Environmental Protection Portion of the Nevada State Implementation Plan for the 2015 Ozone NAAQS: Demonstration of Adequacy (October 1, 2018), Appendix E at at E-5 – E-10.

[58] *Id.* at E-11.

[59] *Id.*

Nevada commits to continue to review new air quality information as it becomes available to ensure that this negative declaration is still supported by such information.[60]

As explained previously in this response and in Section V.B.4 of the preamble, the EPA's 2011-based modeling is no longer state-of-the-science, and updated modeling no longer supports NDEP's conclusion, and so the EPA cannot approve NDEP's SIP submission on the rationale provided.  As for NDEP's commitment to review new air quality modeling to ensure its conclusions related to good neighbor obligations remain "supported," the EPA observes that NDEP has not submitted a subsequent SIP submission even though the EPA's updated 2016v1 modeling, released in 2020, identified Nevada was linked to one or more receptors,[61] and the 2016v2 modeling, released in February 2022, indicated the same. The EPA's incorporation of comments related to emissions inventories in Nevada for the 2016v3 modeling platform is described in Section 3 (Emissions Inventories).

Given the information available to the EPA on the record before the Agency, the EPA cannot find that Minnesota or Nevada's SIP submissions contain adequate measures sufficient to eliminate significant contribution to nonattainment (Nevada) or interference with maintenance (Minnesota and Nevada) in any other state. The basis for these disapprovals is not intended to fault state agencies for developing SIP submissions using the modeling available to them at the time the SIP submissions were developed. A SIP disapproval is not punitive in any case, and states are free to develop an approvable SIP submission following a disapproval.  The disapproval is simply a determination that the submissions before the EPA do not meet the CAA's requirements, based on the record of information before it at the time it acts.

In response to the comment regarding the EPA's proposed error correction of the prior approval of Delaware's good neighbor SIP submission for the 2015 ozone NAAQS, comments on the proposed FIP are beyond the scope of this rulemaking; however, the EPA notes that an error correction under CAA section 110(k)(6) is a revision of an EPA action due to a determination that the EPA's action was in error, not that a state failed to "consider *future* evidence." *See, e.g.*, 86 FR 23056, 23067-68 (April 30, 2021) (error correcting EPA's previous approval of Kentucky's 2008 ozone NAAQS good neighbor SIP in response to the holdings of *Wisconsin* and *New York*).

---

[60] *Id.* at 9.

[61] 87 FR 31492 n. 55 ("These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform which became available to the public in the fall of 2020 in the Revised CSAPR Update, as noted in Section I. That modeling showed that Nevada had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in 2023. These modeling results are included in the file 'Ozone Design Values and Contributions Revised CSAPR Update.xlsx' in docket EPA–HQ–OAR–2021–0663.").

# 6    Step 1

## 6.1    Projected Air Quality Problems

### 6.1.1    Western Receptors

*Comment*

**Commenter:** WildEarth Guardians

**Commenter ID:** 50

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

While EPA's latest ozone modeling appears to more accurately project future year ozone design values than past EPA ozone modeling iterations, EPA's modeling continues to project unusually and unrealistically high declines in ozone design values ("DVs") by 2023, particularly at monitors in states with significant oil and gas activity, such as Colorado and Texas. WEG is concerned that EPA's modeled 2023 design values underestimate future 2023 design values and, as a result, fail to properly identify nonattainment and maintenance receptors.

[…]

EPA compared recent monitoring values and reasonably anticipated decreases in ozone design values on the order of approximately 0-1 ppb/yr (i.e., at most 3-4 ppb from 2020-2023) both within Texas and in other parts of the country. Based on this and other analysis, EPA determined that monitors with 2020 design values 4 to 7 ppb above the NAAQS and preliminary 2021 design values 1 to 5 ppb above the NAAQS are unlikely to attain the NAAQS and would likely need even more ozone DV decreases to not be considered a maintenance receptor. Drops in 8-hour ozone DVs on average of 7 ppb or more in three years at multiple monitors in this Colorado Front Range area and drops in 8-hour ozone DVs on average of 7.56 ppb or more in three years at many monitors in the Texas area would not typically be expected to occur unless there is an unexpectedly large change in emissions and/or large change in meteorological conduciveness for ozone generation. And yet, EPA's own modeling continues to forecast 2023 design values that would require ozone to decline by levels well beyond 3 to 4 ppb without identifying any corresponding large emission reductions not already accounted for in the modeling to be implemented in the 2021-2023 timeframe. In particular, EPA's modeled 2023 design values in Colorado and Texas in many cases projects even greater design value declines than forecast by the Texas Council of Environmental Quality in its 2015 Ozone Interstate Transport SIP.

[…]

The significant design value reductions EPA anticipates in 2023 resulted in EPA's failure to identify (and/or correctly identify) monitors as nonattainment or maintenance receptors for purposes of ozone transport analysis.

[…]

206

We request EPA explain the basis for why it is reasonable to expect ozone design value declines of these magnitudes at these and other monitoring sites that recorded 2020 or 2021 design values greater than or equal to 74 ppb.

We also request EPA incorporate modeling parameters into its ozone model that appropriately cap the amount by which ozone design values decline per year, according to EPA's analysis in its TSD for the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal.8 After incorporating these modeling parameters, we request EPA re-run its ozone transport model to identify more representative and realistic future year design values. If EPA declines this request, we request EPA explain the basis for its decision.

Lastly, we request EPA conduct a comparative analysis of past EPA ozone modeling projections and the actual observed design values to determine whether EPA ozone modeling tends to overestimate or underestimate future year design values. If EPA finds that the agency's models tend to underestimate future year design values, we request EPA re-run its ozone modeling, incorporating parameters that account for this tendency. If EPA declines this request, we further request EPA explain the basis for its decision.

*Response*

The response to this comment can be found in Section III of the preamble for this final action.

*Comments*

**Commenter:** WildEarth Guardians

**Commenter ID:** 50

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In New Mexico: WEG states that EPA either chose not to model or not to report modeled results for future year design values for some monitors in New Mexico, including the monitors in Eddy and Lea Counties. Our understanding is that this may be because EPA modeling of the 2016 base year did not result in greater than or equal to five modeled maximum daily average 8-hour ("MDA8") ozone concentrations in excess of 60 parts per billion (ppb) at these monitor sites. The 2020 and 2021 design values in southern and southeastern New Mexico suggest that monitors in these areas will likely see 2023 ozone design values that continue to significantly exceed the 2015 ozone NAAQS, thus warranting future year modeling and state contribution analysis to determine whether upwind states are inappropriately causing or contributing to ozone violations. We request that EPA confirm exactly why it chose not to model future year design values for the monitors in Eddy and Lea Counties. In doing so, we request EPA provide the MDA8 ozone concentrations it modeled for the 2016 base year for the Eddy County and Lea County monitors in New Mexico.

207

WEG states that if EPA's modeled 2016 base year did not produce greater than or equal to five MDA8 ozone concentration greater than 60 ppb at certain New Mexico monitors, such as those in Carlsbad and Hobbs, they ask that EPA explain why it considers this modeling accurate or representative of ozone conditions in these areas. Given actual monitoring data, any model that fails to produce at least five MDA8 ozone concentrations in Eddy and Lea Counties in 2016 likely contains significant flaws. For the past seven years, the monitors in Eddy County and Lea County have consistently recorded 8-hour ozone concentrations well above 60 ppb. Moreover, for the 2016 base year, EPA's excel file at Docket ID: EPA-HQ-OAR-2021-0663- 0013 identified 10 observed days exceeding 60 ppb at the City of Carlsbad monitor, 23 observed days exceeding 60 ppb at the Carlsbad Caverns National Park monitor, and 13 observed days exceeding 60 ppb at the City of Hobbs monitor. We request EPA help us fully understand its rationale for not modeling future year emissions at these monitors and conducting the associated state contribution analysis. If it is the case that EPA's model does not generate greater than or equal to five MDA8 ozone concentrations at these monitors, we further request EPA evaluate why its modeling protocol is generating such divergent results compared to actual monitoring data. We further ask that EPA explain its rationale for not modeling future year emissions at these monitors given the dramatic increase in ozone design values since 2016.

As we discuss further below, EPA explained in the Technical Support Document ("TSD") for the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal that it would not expect ozone design values to decrease by more than 0-1 ppb per year. As such, the 2020 and 2021 design values in Southeast New Mexico suggest that monitors in this area will likely see 2023 ozone design values that exceed the 2015 ozone NAAQS and, thus, warrant future year modeling and state contribution analysis to determine whether upwind states are inappropriately causing or contributing to ozone violations.

WEG also requests that EPA explain what legal, regulatory, or guidance provisions – if any – prohibit EPA from including Southeast New Mexico monitors from its ozone transport modeling and analysis. Absent future year modeling, EPA effectively has identified the monitors in Southeast New Mexico as attainment rather than as nonattainment or maintenance receptors. This constructive determination plainly contradicts the current ozone concentrations and design values and trends, and violates the Clean Air Act.


**Commenter:** WildEarth Guardians

**Commenter ID:** 50

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In light of the well-documented ozone pollution problem documented at monitoring sites in southern and southeastern New Mexico, WEG requests that EPA apply the analysis described in Sections 1 and 2 of the Technical Support Document (TSD) for the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal to TCEQ's modeled 2023 design values for Eddy County and Dona Ana County monitors in New Mexico, identified below. Specifically, they request EPA evaluate recent design value monitored trends in Dona Ana and Eddy Counties to determine what potential design value declines – if any – could be

expected by 2023. Using this information, we request EPA compare the TCEQ modeled 2023 design values for the monitors in these counties to the 2020 monitored design value and preliminary 2021 design values and determine whether TCEQ's modeling is underestimating future ozone design values in this region of New Mexico. Accurately determining whether monitors in Southern and Southeast New Mexico qualify as nonattainment or maintenance receptors is essential because TCEQ identified Texas anthropogenic emission sources as contributing well in excess of 1% of the NAAQS, or 0.70 ppb, to the vast majority of monitors in New Mexico – a potentially significant contribution to nonattainment or interference with maintenance. Accordingly, given the likelihood that these monitoring sites are likely to remain in exceedance of the 2015 NAAQS by the 2023 attainment deadline, it is critical that EPA's analysis take into account Texas's significant contribution to ozone pollution in southern and southeastern New Mexico. Understanding Texas's contribution is an essential first step towards ensuring that a Good Neighbor FIP for Texas take the steps needed to ensure that emissions from Texas – including those from the oil and gas industry – do not significantly contribute to non-attainment in New Mexico.

*Response*

As described in the preamble for this final action, the EPA is relying upon projected 2023 design values and contributions based on the 2016v3 modeling platform. This platform reflects updates made in response to comments on the 2016v2 platform used for the proposed disapprovals. The final action modeling's projected 2023 average and maximum design values and the contributions from Texas to monitors in Dona Ana and Eddy counties are provided in the table below. The data in the table show that the monitors in Dona Ana and Eddy counties each have projected 2023 average design values below the NAAQS but projected maximum design values above the NAAQS. As described in the preamble, the EPA identifies such monitors as maintenance-only receptors. In addition, based on the EPA's 2016v3 modeling, emissions from Texas contribute well above the 1 percent of the NAAQS screening threshold to projected 2023 ozone design values at these four monitoring sites.

*Table 6-1 2023 Average/Maximum Design Values and Texas Contributions to Monitors in Dona Ana and Eddy Counties*

| County | AQS ID | 2023 Average/ Maximum Design Values (ppb) | 2021 Measured Design Value (ppb) | Texas Contributions (ppb) |
|---|---|---|---|---|
| Dona Ana | 350130021 | 70.8/72.1 | 80 | 4.74 |
| Dona Ana | 350130022 | 69.7/72.4 | 75 | 3.59 |
| Eddy | 350151005 | 69.7/74.1 | 77 | 1.91 |
| Lea | 350250008 | 69.8/72.2 | 66 | 2.17 |

## 6.1.2    Receptors Linked to Texas

*Comments*

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's assessment of TCEQ's 2023 future year projections was arbitrary and capricious. EPA inappropriately relied on its own "ballpark" estimates of future ozone observations to assess the reliability of TCEQ's modeling of those future conditions. A non-modeled "ballpark" evaluation of future design values against estimated future year observations is not a valid technical basis to conclude that TCEQ's 2012 platform was less reliable than EPA's 2016v2 platform at predicting Chicago-region ozone.

[From Sonoma Technology Attachment:] EPA's use of estimated future ozone observations that are yet to occur is not an appropriate basis to analyze a model's reliability to project future design values. The projected 2023 design values from TCEQ's modeling (with a 2012 base year) are similar to projected 2023 design values that were estimated from two other credible air quality modeling platforms with a 2011 base year. As part of EPA's rationale for the proposed disapproval of TCEQ's Transport SIP, EPA compared TCEQ's 2023 ozone design value projections to estimated future year observations of ozone at downwind receptors in Illinois, Wisconsin, and Michigan. EPA also compared TCEQ's 2023 ozone design values at these receptors with 2023 ozone design values calculated from EPA's 2016v2 modeling. EPA concluded that TCEQ's projections likely underestimated future ozone levels and likely prevented TCEQ from identifying nonattainment/maintenance receptors in those states. While there may be some challenges to evaluating modeled estimates of future air quality concentrations, EPA's use of estimated future ozone observations that are yet to occur is not an appropriate or robust approach for such an evaluation. In assessing TCEQ's 2023 future design values, EPA analyzed observed ozone design value trends between 2011 and 2020 and used the ozone trend between those years to estimate the range of ozone design values that might be anticipated in 2023. EPA acknowledged that this approach for estimating future observed DVs is only a "ballpark" estimate, is not as exact as developing new modeling, and does not reflect any legal or policy judgements. EPA uses this estimate to conclude that ozone DVs will decrease at most by 3-4 ppb between 2020 and the 2023 future year. EPA then compares the resulting "estimated" 2023 monitor DV to the TCEQ modeled 2023 future DV. For the subset of monitors in Illinois, Wisconsin, and Michigan with 2020 DVs ≥ 74 ppb, EPA calculates the average amount of decrease in DVs needed to match TCEQ's 2023 projection is around 9 ppb, which is more than 3-4 ppb average decrease over three years that EPA estimates using its "ballpark" approach. EPA concludes that decreases in the ozone DV of 9 ppb in three years do not typically occur but for large changes in emissions and/or meteorology, and therefore proposes to find that TCEQ's model underestimates future DVs. However, long-term (10 year) trends in the ozone DV are not always indicative of how the actual DV will change in a shorter (3 year) time period. Even within EPA's 10-year analysis period, the DVs at Chicago area monitors have changed by 9 ppb or more over a three-year period (see Table 5 [available in full comment]). EPA's modeling guidance recommends a model

210

performance evaluation of the base year to establish whether an air quality model is performing acceptably and can be considered reliable for estimating future design values. EPA found that TCEQ's base year model performance evaluation was reasonable. A non-modeled "ballpark" evaluation of future design values against estimated future year observations is not a valid technical basis to conclude that TCEQ's 2012 platform was less reliable than EPA's 2016v2 platform at predicting Chicago-region ozone. Evaluations of modeled future year DVs and the air quality model's response to emissions changes are more robust and reliable when they are based on actual observed air quality data, as done by Pegues et al. (2012), Foley et al. (2015). EPA's substitution of a "ballpark" estimate of future observations departs from accepted norms for evaluating modeled future-year ozone concentrations.

EPA concluded that TCEQ's 2023 projected design values were understated, but TCEQ's projected design values were comparable to future design values projected by two other modeling platforms with a 2011 base year that were both released in 2018: one from EPA, and one from the Lake Michigan Air Directors Consortium (LADCO). Both platforms were developed in support of the Interstate Transport "Good Neighbor" Provision for the 2015 8-hour ozone NAAQS. The projected 2023 design values from these modeling platforms are compared to the 2023 projected design value from TCEQ's modeling in Table 9 [available in full comment]. The Illinois Environmental Protection Agency used the modeling results from both EPA's and LADCO's 2011-based platforms to support its maintenance plan for the Illinois portion of the Chicago ozone nonattainment areas for the 2008 NAAQS, which EPA recently proposed to approve. In its proposed approval of the maintenance plan and redesignation, EPA noted that both sets of 2023 modeling results provided evidence that ozone concentrations will continue to decrease across the Chicago nonattainment area, consistent with TCEQ's justification.

**Commenter:** The Luminant Companies

**Commenter ID:** 44

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In an effort to manufacture errors in TCEQ's future modeling projections, EPA points not to real world data or even to competing multi-grid modeling, but to its own back of the envelope guesses about the future. Drawing conclusions about one model by comparing its results to those of another model cannot be definitive and is only a surrogate for a comparisons of the models themselves. Even worse, here, EPA uses what it admits is only "a ballpark estimate" to evaluate TCEQ's modeling. But in no way can EPA's "ballparking" be considered more reliable than TCEQ's sophisticated photochemical modeling. EPA's rationale is not only unlawful, but it is dangerous precedent for future SIP submissions and review.

Regardless, even using its unfounded comparison, the best EPA can say is that TCEQ's modeling is "likely underestimating future ozone levels, which "may have prevented TCEQ from identifying nonattainment/maintenance receptors." Ultimately, EPA can only conclude that TCEQ's projections "may understate anticipated ozone levels" in certain downwind areas, which is not a valid basis for disapproval. Moreover, EPA disregards the fact that TCEQ's modeling, in fact, is conservative, as it includes NOX emissions from eight EGUs that have since shut down, totaling approximately 4,885 tons

211

of NOX for the 2023 ozone season. EPA's "ballpark estimate" approach is too flawed in its premise and too insufficient in its conclusions to discredit the highly sophisticated modeling performed by TCEQ and does not show that TCEQ has failed to satisfy any statutory standard.  Rather, TCEQ's projections of future design values appropriately identify downwind nonattainment/maintenance receptors.

**Commenter:** The Luminant Companies

**Commenter ID:** 44

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

TCEQ's projected design values, which EPA criticizes for not matching its "ballpark estimates," nevertheless align with the projections of other modeling platforms that EPA has recently endorsed. Specifically, a modeling platform developed by EPA itself that was released in 2018 and a modeling platform from the Lake Michigan Air Directors Consortium ("LADCO") produce design values comparable to that of TCEQ's. EPA has approved both of these other models for purposes of the 2015 ozone NAAQS. Therefore, it is apparent that EPA's second-guessing of TCEQ's approach by feigning concern about the results of TCEQ's modeling projections is disingenuous. EPA's inconsistent treatment of the various models is arbitrary and capricious and cannot support EPA's disapproval.

**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

TCEQ disagrees with the EPA's use of updated 2016 base year modeling to evaluate TCEQ's Transport SIP submittal since the modeling data was unavailable at the time TCEQ developed its SIP revision. The EPA's use of modeling platform and monitoring data that was unavailable at the time TCEQ developed its Transport SIP revision is arbitrary and unreasonable. The TCEQ submitted its 2015 Ozone NAAQS Transport SIP Revision to the EPA on August 17, 2018. EPA did not issue the modeling platform it uses in this proposed disapproval until September 2021 (which included the 2016 base year), nearly three years after the statutory deadline for SIP revisions submissions. Obviously, TCEQ did not have access to this modeling platform and data when it developed its SIP revision. However, the TCEQ did use the latest modeling data it had available and made significant improvements on EPA's method. Additionally, the EPA has issued no rules regarding the use of EPA's modeling and monitoring data in the development of Transport SIP revisions.

The only other modeling data available at the time the TCEQ started developing its Transport SIP revision was the EPA's 2011-base year modeling. For monitors identified by EPA as nonattainment or maintenance and linked to Texas in 2023, the TCEQ modeled 2023 design values are similar to the

preliminary modeling EPA conducted for the 2015 Ozone NAAQS Preliminary Interstate Transport Assessment, as seen in Table 1, EPA and TCEQ Modeled Design Values in 2023 from EPA 2016, EPA 2011, and TCEQ 2012 Modeling. This 2011-base modeling by the EPA is similar to the TCEQ's modeling and also shows attainment with the 2015 NAAQS for the monitors EPA identifies as maintenance or nonattainment linkages in its 2016v2 modeling. In fact, for four of the five monitors for which comparable 2010-2012 monitoring data exist, the TCEQ modeled 2023 design values are higher than the EPA 2011-base modeled design values. The TCEQ contends that the difference in base year and increased projection time may explain the lower TCEQ 2023 design values compared with EPA 2023 design values based on 2016 base year modeling. In Table 1 below, the EPA nonattainment design value is based on the average of the three design values in the five-year base year period and the maintenance design value is based on the maximum of these three design values.

Table 1: EPA and TCEQ Modeled Design Values in 2023 from EPA 2016, EPA 2011, and TCEQ 2012 Modeling.

| Receptor (Site ID, County, State) | Nonattainment / Maintenance (EPA 2016v2 2023) | EPA 2016v2: 2023 Nonattainment/ Maintenance Design Value (ppb) | EPA 2011v6.3: 2023 Nonattainment/ Maintenance Design Value (ppb) | TCEQ 2012: 2023 Nonattainment/ Maintenance Design Value (ppb) |
|---|---|---|---|---|
| 170310001, Cook County, IL | Maintenance | 69.6/73.4 | 63.3/65.1 | 60/58 |
| 170310032, Cook County, IL | Maintenance | 69.6/73.4 | 57.6/60.0 | 68/66 |
| 170314201, Cook County, IL | Maintenance | 69.9/73.4 | 56.6/58.4 | 64/62 |
| 170317002, Cook County, IL | Maintenance | 70.1/73.0 | 54.1/57.0 | 66/65 |
| 550590019, Kenosha County, WI | Nonattainment | 72.8/73.7 | 59.7/61.9 | 67/66 |
| 550590025, Kenosha County, WI | Maintenance | 69.2/72.3 | No 2010-2012 monitoring data | No 2010-2012 monitoring data |
| 551010020, Racine County, WI | Nonattainment | 71.3/73.2 | No 2010-2012 monitoring data | No 2010-2012 monitoring data |

Based on this information, if the EPA had relied on modeling conducted for 2023 using emission information available when the TCEQ was required to submit its SIP revision, such as the 2011v6.3 platform, it would not have identified the monitors listed above as nonattainment or maintenance monitors because modeled 2023 design values were below 71 ppb.

Analysis of the EPA and TCEQ modeling also shows greater difference between the predicted 2023 design values and the observed 2020 design values as the prediction time lengthens. Figure 2, Difference in Design Value Predicted in 2023 versus Observed in 2020. Predictions are from the EPA 2011 modeling (upper left), TCEQ 2012 modeling (upper right), and EPA 2016 modeling (lower) shows that the mean difference across common monitors decreases from -6.20 ppb for a 12-year prediction time, to -6.08 for

an 11-year prediction, to -4.34 for a seven-year prediction time. The shaded interquartile range of the distribution also tightens with decreasing prediction time, indicating uniformly better prediction. Note that the TCEQ 2012 modeling shows a similar design value difference to the EPA 2011 modeling indicating similar performance. The difference in design values is largely explained by the shorter prediction time, as seen in Figure 2, Difference in Design Value Predicted in 2023 versus Observed in 2020 versus Length of Prediction, where the TCEQ 2012 modeling is shown as the eleven-year prediction length roughly on the linear trend of the three models. The TCEQ chose to use a 2012 base year since it was the most comprehensive, non-anomalous, and best modeling platform available when the modeling needed to commence to meet the SIP development and submittal deadlines.

**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The EPA erred in the approach taken to modeling the influence Lake Michigan has on the receptor sites located near the air/water shoreline boundaries in Cook County Illinois, Kenosha, and Racine Wisconsin, which was factored into the modeling performed by TCEQ and others, further supported by comments filed by the Association of Electric Companies of Texas (AECT) and the associated modeling analysis performed by Sonoma Technology.

[…]

3. EPA's Air Plan Proposed Approval finding Illinois Portion of the Chicago-Naperville, Illinois Indiana-Wisconsin Area to Attainment of the 2008 Ozone Standard

On March 10th, 2022 EPA proposed to designate that the Illinois portion of the Chicago Naperville, IL-IN-WI area (Chicago area) in attainment for the 2008 ozone National Ambient Air Quality Standards. Cook County, the receptor area linked to Texas's designation as exceeding the contribution threshold, makes up a large portion of the Chicago area. The approval goes on to state:

*"While modeling is not required, Illinois cited photochemical modeling performed by EPA and LADCO in support of the interstate transport ''Good Neighbor'' provision of the CAA for the 2015 ozone NAAQS. These modeling results project the highest 2023 average design values to be 0.0662 and 0.0668, well below the 2008 ozone NAAQS. Compared to actual monitored 2009-2013 average design values, both sets of 2023 modeling results show large decreases in ozone concentrations, especially in the heart of the urban area and at the critical monitors at the north of the nonattainment area along the shore of Lake Michigan. These results provide evidence that ozone will continue to decrease across the entire nonattainment area."*

The region's ozone design values from both the LADCO and EPA's modeling results show the region below the 2008 standard, below the 2015 threshold of 0.070 ppb, and that ozone concentrations are expected to continue to decrease across the area. This result conflicts with the finding that Texas is

214

linked to contributing above the impact threshold in Illinois/Chicago in evaluating its SIP for the 2015 Ozone NAAQS. At a minimum, it raises the question as to why EPA found the 2016v2 modeling platform to be superior to the TCEQ photochemical analysis in determining Texas's contribution in modeling efforts performed for the 2015 Ozone NAAQS.

Given the adverse effects this proposed FIP has on grid reliability, and a states' economy, EPA should utilize appropriate modeling techniques, collaborative engagement with impacted states and allow states whose SIPs are disapproved adequate opportunity to respond and provide updated SIP submissions.

*Response*

In response to comments regarding projected design values for 2023 at monitoring sites in the Lake Michigan areas, as provided in Table 1 from TCEQ's comment document, the EPA compared these model-projected average and maximum design values to projected design values based on EPA's 2016v3 modeling as well as to 2021 final design values. The modeling-based design values for 2023 from TCEQ's comment document (i.e, EPA 2016v2, EPA 2011v6.3, and TCEQ 2012) along with projected average and maximum design values based on EPA's 2016v3 modeling and the 2021 design values are shown in the table below (Table 6-2). Comparing the projected maximum design values from TCEQ's 2012-based modeling to the 2021 measurement-based design values indicates that TCEQ's projections are likely to largely understate 2023 design values. The EPA's older 2011-based design values also appears to be low-biased. In contrast, the EPA's 2016-based projected maximum design values provide a more credible projection of what design values may be in 2023 at these monitoring sites. The fact that the EPA's 2016-based projections more closely align with recent measured data serves to underscore the importance of the EPA's move to this new platform to provide the most credible data for evaluating interstate contributions in this action.

215

*Table 6-2 Comparison of Modeling-based Design Values to 2021 Measured Design Values*

| Receptor (Site ID, County, state) | Nonattainment / Maintenance (EPA 2016v2 2023) | EPA 2016v2: 2023 Nonattainment/ Maintenance Design Value (ppb) | EPA 2011v6.3: 2023₃ Nonattainment/ Maintenance Design Value (ppb) | TCEQ 2012: 2023 Nonattainment/ Maintenance Design Value (ppb) | EPA 2016v3: 2023 Nonattainment/ Maintenance Design Value (ppb) | 2021 Measured Design Value (ppb) |
|---|---|---|---|---|---|---|
| 170310001, Cook County, IL | Maintenance | 69.6/73.4 | 63.3/65.1 | 60/58 | 68.2/71.9 | 71 |
| 170310032, Cook County, IL | Maintenance | 69.6/73.4 | 57.6/60.0 | 68/66 | 67.3/69.8 | 75 |
| 170314201, Cook County, IL | Maintenance | 69.9/73.4 | 56.6/58.4 | 64/62 | 68.0/71.5 | 74 |
| 170317002, Cook County, IL | Maintenance | 70.1/73.0 | 54.1/57.0 | 66/65 | 68.5/71.3 | 73 |
| 550590019, Kenosha County, WI | Nonattainment | 72.8/73.7 | 59.7/61.9 | 67/66 | 70.8/71.7 | 74 |
| 550590025, Kenosha County, WI | Maintenance | 69.2/72.3 | No 2010-2012 monitoring data | No 2010-2012 monitoring data | 67.6/70.7 | 72 |
| 551010020, Racine County, WI | Nonattainment | 71.3/73.2 | No 2010-2012 monitoring data | No 2010-2012 monitoring data | 69.7/71.5 | 73 |

Comments related to EPA's use of updated modeling can be found in Sections III and V.B.4 of the preamble and in Sections 1.4 (Use of Updated Modeling) and 5 (Updates to Modeling and Changes in Linkages). Comments related to the timing of EPA's action can be found in Section V.A of the preamble and Section 1.1 (Timing of SIP Actions).

### 6.1.3   Meteorologically Adjusted Ozone Trends

*Comment*

**Commenter:** Louisiana Department of Environmental Quality

**Commenter ID:** 27

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA used variable selection and quantile regression, an unproven technique that the states were not afforded the opportunity to review and provide comment.

*Response*

The EPA disagrees with this comment. The variable selection and quantile regression technique that the EPA is using to analyze ozone trends after adjusting for the influence of interannual variability in meteorology was published in a peer-reviewed journal, Atmospheric Environment, in March 2021.[62] States and stakeholders had an opportunity to review this article during the proposal comment period of this action. The EPA responds to other comments about this document from LDEQ in Section 1.8 (Docket Document Availability).

## 6.2   EPA Methodology for Determining Maintenance Receptors

*Comment*

**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Alabama suggests the Denton County receptor is not actually a future maintenance receptor. Had EPA followed the TSD, Alabama could not have contributed significantly at the Denton County, Texas receptor because the model results would not have identified the receptor as a future nonattainment or maintenance area, given EPA did not have ten days of "high-ozone" for the receptor.

There is some question whether the Denton County, Texas receptor (481210034) is actually a future maintenance receptor at all. When looking at EPA's modeling technical support document (TSD), the basic approach for calculating the average contribution metric includes averaging the Maximum Daily Average 8-hr concentration (MDA8) in 2023 using the following steps:

1. For the model grid cells containing an ozone monitoring site, calculate the 8-hour average contribution from each source tag to each monitoring site for the time period of the 2023 modeled MDA8 ozone concentration on each day;

2. Average the MDA8 concentrations for the top 10 modeled ozone concentration days in 2023 and average the 8-hour contributions for each of these same days for each tag (Alabama);

---

[62] Wells, B., Dolwick, P., Eder, B., Evangelista, M., Foley, K., Mannshardt, E., et al. (2021). Improved estimation of trends in U.S. ozone concentrations adjusted for interannual variability in meteorological conditions. *Atmospheric Environment*, *248*, 118234.

217

3. Divide the 10-day average contribution for each tag by the corresponding 10-day average concentration to obtain a Relative Contribution Factor (RCF) for each tag at each monitor; and

4. Multiply the 2023 average design values by the corresponding RCF to produce the average contribution metric value for each tag at each monitoring site in 2023.

To avoid including contributions on days that are well below the NAAQS, EPA applied a criterion that five or more of the top 10 model-predicted concentrations days must have MDA8 concentrations ≥ 60 ppb in order to calculate a valid contribution metric. The Denton County monitor used to calculate Alabama's contribution meets this minimum criterion, but only barely– monitor ID 481210034 had only six modeled days above 60 ppb and only one day above 70 ppb (Table 5 [available in full comment]). Those six days (not 10) were used to calculate an average contribution of 0.71 ppb for Alabama. Interpreting the language in the technical support document suggests that EPA should have calculated Alabama's average contribution using all ten days. If all ten days are used, Alabama's contribution clearly falls below EPA's established 0.71 ppb threshold, with a tenth-highest value of 57.39 ppb. It is also important to note that, of 153 modeled days, only one day (September 21) exceeded 70 ppb at all.


*Response*

This comment confuses the distinct analytical steps and data sources for making determinations at Step 1 and at Step 2. As explained at proposal, at Step 1, the EPA applied the same approach used in the CSAPR Update and the Revised CSAPR Update (86 FR 23078–79) to identify nonattainment and maintenance receptors for the 2008 ozone NAAQS. *See, e.g.*, 87 FR 64416-64417 (October 25, 2022). This method at Step 1, using the 2016v2 modeling, identified the Denton receptor. Commenter does not explain why that method is improper, e.g., why the use of a relative response factor to ground future projections to historical data is not appropriate. Commenter takes issue more specifically with the Step 2 methodology for calculating contribution, which is different from Step 1. However, the EPA's approach for calculating the future year average contribution metric provides a technically reliable estimate of contributions. In calculating the average contribution metric, the EPA typically uses modeled contributions on the 10 days in the future year with the highest model-predicted concentrations. In part because the formation of ozone from precursor emissions can be nonlinear and dependent on meteorological conditions, the response of ozone to emission reductions can vary from day to day. For cases in which the base year model simulation does not have 10 days with ozone values greater than or equal to 60 ppb at a site, we use all days with ozone greater than or equal to 60 ppb, as long as there were at least 5 days that meet this criterion.  At monitor locations with less than 5 days with modeled 2016 base year ozone greater than or equal to 60 ppb, no RRF or DVF is calculated for the site and the monitor in question was not included in this analysis.

Consistent with EPA's modeling guidance, when calculating the contribution metric values, EPA applied a criterion that 5 or more of the top 10 model-predicted concentration days must have MDA8 concentrations greater than or equal to 60 ppb in the future year to calculate a valid contribution metric. The criterion of having at least 5 days with MDA8 ozone concentrations greater than or equal to 60 ppb was chosen to avoid including contributions on days that are well below the NAAQS in the calculation of the contribution metric. Using 5 days with MDA8 ozone greater than or equal to 60 ppb

aligns with recommendations in the EPA's air quality modeling guidance for projecting future year design values.

Thus, the EPA disagrees with the comment that the contributions to the receptor in Denton, Texas should be based on all of the top 10 days even though there were only 6 days with modeled ozone greater than or equal to 60 ppb. The EPA's response to comments on the methodology can be found in Section 7.1 (Methodology for Determining Future Year Contributions).

*Comment*

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

In criticizing Alabama's SIP as providing "limited supporting information to show that the Denton County, Texas, maintenance receptor is unlikely to violate the NAAQS in 2023," EPA points to its October 2018 memorandum providing guidance for use in evaluating maintenance receptors. In the October 2018 memorandum, EPA stated that "[m]eteorological conditions including temperature, humidity, winds, solar radiation, and vertical mixing affect the formation and transport of ambient ozone condition." Attachment A to these comments supplements the modeling provided by ADEM in its 2022 SIP and includes model runs on June 19, 2021, for the Denton County receptor that include pressure, ambient air temperature, solar radiation flux, relative humidity, mix layer depth, and rainfall.

EPA also criticized ADEM for only including a centerline; however, what ADEM provided is all that can be produced using the NOAA HYSPLIT Model. EPA suggested no potential alternatives that could be used for analysis. Instead, the back trajectories were run for each hour on June 19, 2021, from 0000 to 1800 UTC for 10, 250, and 500 meters to provide a swath of the state that air packets could have moved over.

The October 2018 Memorandum also provides the basis for using this data for analysis, stating that, "[i]n general, below average temperatures are an indication that meteorological conditions are unconducive for ozone formation, whereas above average temperatures are an indication that meteorology is conducive to ozone formation." The model shows that ambient air temperatures warmed as the air moved towards Texas from 30$^o$F, 65$^o$F, and 80$^o$F to 80$^o$F, 80$^o$F, and 100$^o$F for the 500m, 250m, and 10m trajectories, respectively. This model also shows the air stalling over southwest Texas before moving north to Denton County, especially for the 10m trajectory where the air spent nearly two and a half days in Texas. This model shows that meteorological conditions were not conducive for ozone formation in Alabama, but rather ozone was formed locally.

Again, air normally does not move westward from Alabama into Texas on high ozone days, and when it does, "significant" amounts of ozone precursors are not produced by EGUs nor is ozone formation conducive in Alabama. By removing Alabama's contribution to the Denton County, Texas monitor, such monitor would no longer be a maintenance monitor in accordance with the October 2018 Memorandum.

*Response*

In the October 2018 memorandum on page 4 the EPA states that a "state could justify exclusion of a monitoring site as a maintenance receptor, notwithstanding modeling projections showing a maximum design value exceeding the 2015 ozone NAAQS." The memorandum describes technical analyses and information that the EPA expects states to include with their SIP submission to justify excluding specific monitoring states that would otherwise be identified as maintenance receptors. As stated in the memorandum, one element of the justification should be a showing that "meteorological conditions in the area of the monitoring site were conducive to ozone formation during the period of clean data or during the alternative base period design value used for projections." Appendix A to the October 2018 Memorandum states that "Ozone is more readily formed on warm, sunny days when the air is stagnant and/or when the winds are favorable for transport from upwind source areas." Appendix A includes information that states could use to support an analysis of ozone conducive meteorological conditions.

The commenter's argument for justifying that Alabama should not be linked to the Denton County receptor was not based on an analysis of meteorological conditions *in the area of the monitoring site* in terms of whether the temperatures in the area were warmer of cooler than normal, as stated in the October 2018 memorandum. Rather, the commenter chose to examine temperatures along the path of trajectory on a particular day. The commenter used these data to claim that the air warmed along the trajectory path from Alabama to the Denton County receptor. The commenter then argued that the meteorology was unconducive to ozone formation over Alabama. This argument is technically flawed. Simply because the air parcel temperature warmed between Alabama and Denton, or that there was unconducive meteorology over Alabama, does not provide a technically sound justification that the meteorology was unconducive to ozone formation over Denton. Furthermore, it appears that the commenter made a typographical error when reporting that the air temperature was $30°$ F (i.e, below freezing) at 500m given that the trajectory was created for a day in June and the temperatures were $65°$F and $80°$F at 250m and 10m, respectively.

The EPA's response to the portion of the comment related to interpreting the centerline of the trajectory can be found in Section 8.8 (Hybrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) Model).

## 6.3    TCEQ's Alternative Methodology for Determining Maintenance Receptors

*Comments*

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

TCEQ's methodology for selecting maintenance monitors was appropriate and justified in accordance with an EPA October 2018 guidance memo that provided certain flexibilities including the use of a DV from the base period that is not the maximum design value.

TCEQ's choice to use the latest measured DV over the relevant base period instead of the maximum measured DV was reasonable given the history of ozone design values since 2012, the meteorology during the 2012-2014 period, and emissions trends from 2010-2019

The data does not support EPA's conclusion that the 2012-2014 period was "not particularly conducive to ozone formation, at least for many receptors" compared to the 2010-2012 and 2011-2013 periods (TCEQ's alternative approach for selecting maintenance receptors involved selecting the 2012-2014 DV). Nationally, 2012 was among the highest ozone years since 2005-2007 even when statistically adjusting for meteorological variability (Figure 2). Any ozone design value that included 2012 would have included at least one year with exceptionally conducive meteorology for high ozone.

Direct text: "...TCEQ's methodology for selecting maintenance monitors was appropriate and justified. As noted above, the CAA does not require a specific process for the selection of maintenance monitors. EPA's preferred approach for selecting maintenance receptors involves determining the maximum future design value ("DV") at each receptor based on a projection of the maximum measured DVs over the relevant base period. However, states are not required to utilize EPA's approach. EPA issued a memorandum in October 2018 providing guidance on potential flexibilities and alternative methods that states may use with technical justification to identify maintenance receptors, including the use of a DV from the base period that is not the maximum design value. TCEQ's choice to use the latest measured DV over the relevant base period instead of the maximum measured DV was technically justified and reasonable given the history of ozone design values since 2012, the meteorology during the 2012–2014 period, and emissions trends from 2010– 2019. TCEQ sufficiently explained these expert choices in its SIP submittal. EPA's approach for selecting maintenance monitors necessitates an overly conservative estimate of the maximum projected future-year design values and overly conservative selection of receptors.

Likewise, EPA's assessment of TCEQ's 2023 future year projections was arbitrary and capricious. EPA inappropriately relied on its own "ballpark" estimates of future ozone observations to assess the reliability of TCEQ's modeling of those future conditions. EPA cannot substitute its own simplified guesses about future conditions for TCEQ's robust modeling. EPA's "ballpark" estimate is not an objective measure of the reliability of TCEQ's modeling nor is it a valid technical or legal basis for evaluating future ozone. Such a method fails to demonstrate that TCEQ's SIP does not comply with the Act. As outlined by the Sonoma Technology analysis, sound air quality planning is based on valid and accurate modeled predictions grounded on actual observed ozone levels. Relying on its own flawed future year ozone estimates, EPA asserts that TCEQ's modeling underestimates future (2023) ozone levels and that the TCEQ method is flawed. According to EPA, these underestimations likely prevented TCEQ from identifying nonattainment and/or maintenance receptors. However, TCEQ's projected design values are comparable to future DVs projected by two other modeling platforms released in 2018 and recently embraced by EPA: one from EPA itself, and one from the Lake Michigan Air Directors Consortium ("LADCO"). Both platforms were developed and approved in support of air quality planning for interstate transport under the 2015 ozone NAAQS. The Illinois Environmental Protection Agency

used the modeling results from both the EPA and LADCO platforms to support its maintenance plan for the Illinois portion of the Chicago ozone nonattainment areas for the 2008 NAAQS. In its proposed approval of the maintenance plan and redesignation, EPA noted that both sets of 2023 ozone predictions provided evidence that ozone concentrations will continue to decrease across the Chicago region."

(From Attachment: Sonoma Technology) - In response to comments received through stakeholder outreach, EPA issued a memorandum in October 2018 ("October 2018 Memorandum" 16) providing guidance on potential flexibilities and alternative methods that states may use with technical justification to identify maintenance receptors, including the use of a DV from the base period that is not the maximum design value. TCEQ's Transport SIP used an appropriate and well-supported alternative approach for selecting maintenance receptors. Whereas EPA's approach for selecting maintenance receptors involves projecting the maximum measured DVs over the relevant base period, TCEQ's alternative approach involves projecting the latest measured DV over the relevant base period, regardless of whether that most recent DV was the highest of the three. TCEQ's analysis did not identify the monitors in Illinois and Wisconsin as maintenance (or nonattainment) receptors, in contrast to EPA's analysis based on its 2016v2 modeling platform. TCEQ's alternative approach for selecting maintenance receptors was technically credible and justified by the data. TCEQ's choice to use the latest measured DV over the relevant base period instead of the maximum measured DV was reasonable given the history of ozone design values since 2012, the meteorology during the 2012-2014 period, and emissions trends from 2010-2019.

Table 6 [available in full comment]  shows the monitored ozone design values at 7 receptors in Illinois and Wisconsin that were linked to Texas by EPA's 2016v2 modeling. In EPA's approach, the maximum future DV would have been projected from the maximum of the three design values that encompassed the 2012 base year (the base period is shaded in grey; the maximum DVs are italicized). In TCEQ's approach, the most recent DV during the base period was selected (i.e., 2012-2014 DV, shown in bold). At three of the sites (Cook – South, Cook – Evanston, and Kenosha – Chiwaukee), the 2012-2014 DV was the highest DV observed in any year since. The future-year design values projected from the 2012-2014 DVs calculated by TCEQ for these sites would have adequately captured any future high ozone years that have occurred since then in light of local and regional NOx emissions reductions that have occurred since 2010 and are expected into the future. The maximum DVs during the 2012-2014 period that would have been selected using EPA's methodology are also shown in Table 5 [available in full comment]. At the same three sites (Cook – South, Cook – Evanston, and Kenosha – Chiwaukee) the maximum DVs during this period were also the highest DV observed in any year dating back to at least 2007 (Table 6). For these three sites, using EPA's approach for selecting maintenance receptors would not be reasonable because the future DVs would be projected from a baseline DV that was historically high and unlikely to be repeated in the future regardless of meteorological conditions.

Analyzing emissions trends is important when considering whether a maintenance monitor is likely to violate the NAAQS in the future analytic year. Table 7 [available in full comment] shows the emissions in the Chicago ozone nonattainment area in 2010 and 2019, showing a substantial decrease (almost 40%) in NOx emissions in the region. Additional reductions are expected through 2035 (Table 8 [available in full comment]). In its maintenance plan for the 2008 ozone NAAQS, Illinois successfully demonstrated that the improvement in ozone air quality in the Chicago area was caused by actual emission reductions,

not by unusually favorable meteorological conditions, and that those air quality improvements were due to permanent and enforceable emissions reductions that will keep the region in attainment of the 2008 ozone NAAQS.

Finally, in its proposed disapproval of TCEQ's Transport SIP, EPA concluded that the 2012-2014 period was "not particularly conducive to ozone formation, at least for many receptors" compared to the 2010-2012 and 2011-2013 periods (TCEQ's alternative approach for selecting maintenance receptors involved selecting the 2012-2014 DV). The data does not support EPA's conclusion. Nationally, 2012 was among the highest ozone years since 2005-2007 even when statistically adjusting for meteorological variability (Figure 2). Any ozone design value that included 2012 would have included at least one year with exceptionally conducive meteorology for high ozone. As EPA notes (and as also seen in Figure 2), the meteorology in 2011 was also conducive to high ozone. However, based on the observed ozone data, the recent and future projected emissions trends in the Chicago nonattainment area, and the Illinois maintenance plan for the area that EPA is proposing to approve, it is unlikely a recurrence of exceptionally conducive meteorological conditions (even for two consecutive years) would result in a recurrence of the high ozone DVs observed in the Chicago area in 2010-2012 (the 2012 DV) and 2011-2013 (the 2013 DV).


**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's approach to selecting maintenance monitors is overly conservative when based on DVs that are at their historical high. When local and regional NOx emissions are declining rapidly over time, there can be circumstances when the maximum DV from the base period is no longer an appropriate basis to identify receptors that may be at risk of exceeding the NAAQS in the future, even considering inter-annual variability in meteorological conditions.

From Sonoma Technology Attachment: EPA's Approach to Selecting Maintenance Monitors is Not Supported - EPA's approach for selecting maintenance receptors involves determining the maximum future DV at each receptor based on a projection of the maximum measured DVs over the relevant base period. As it pertains to the August 17, 2018, TCEQ Transport SIP that EPA is proposing to disapprove as part of this rulemaking, the base modeling year was 2012, and thus the relevant base period for TCEQ's Transport SIP was 2012-2014.

According to EPA, the projected maximum future DV is intended to yield a reasonable projection of future air quality under a scenario in which meteorological conditions conducive to producing high ozone concentrations may reoccur. However, as discussed in more detail below, when local and regional NOx emissions are declining rapidly over time, there can be circumstances when the maximum DV from the base period is no longer an appropriate basis to identify receptors that may be at risk of exceeding

the NAAQS in the future, even considering inter-annual variability in meteorological conditions. In these circumstances, EPA's approach to selecting maintenance monitors is overly conservative when based on DVs that are at their historical high.

**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

[T]he EPA fails to adequately justify its claim that the TCEQ did not provide sufficient technical basis for its use of an alternative methodology to identify maintenance receptors.

[…]

The TCEQ has provided a sufficient technical basis for its use of an alternative methodology to identify maintenance monitors.

The EPA claims that the TCEQ did not provide sufficient technical justification for its approach and that the TCEQ's use of the latest monitored design value did not account for inter-annual variability in ozone conducive conditions. The EPA observes that the TCEQ's maintenance monitor identification methodology accounts for variations in meteorological conditions only over a three-year period compared to the five-year period accounted for in the EPA's method. The EPA does not provide sufficient justification for why five years of meteorological conditions adequately capture interannual variability while three years cannot. The latest three years best describe the ozone conditions closest to the future year. The EPA also does not address the fact that the modeled future design values are based on a single base year that is explicitly modeled and are therefore most impacted by the meteorological conditions in that single base year. It should be noted that both the TCEQ's method and the EPA's method use a single base year. The TCEQ's method used the latest three-year design value to reflect the most recent atmospheric conditions of each area, considering meteorology and emissions information.

The EPA states that since the EPA method identifies more monitors as maintenance monitors it is the more rigorous method. However, the "Good Neighbor" provision is not intended to be an exercise to find the greatest number of monitors likely to have air quality issues but to find the monitors mostly likely to have air quality issues due to significant contribution from upwind states.

The EPA further analyzed 21 monitors that had contributions greater than 0.7 ppb in either TCEQ or EPA modeling. The EPA claims that the TCEQ's methodology was flawed because the future year nonattainment design value (determined based on the use of average of three monitored design values as base design value, DVB) is less than the future year maintenance design value (determined based on the use of the latest of three monitored design values as DVB). The EPA discusses in detail how the difference between the nonattainment and maintenance design value in TCEQ's methodology is smaller than the difference in EPA's methodology. However, the EPA fails to discuss that of the 21 monitors, 15 monitors that were identified as maintenance monitors by the EPA's methodology were also identified

as maintenance monitors by TCEQ's methodology. In addition, the EPA fails to provide justification on why maintenance design values being lower than nonattainment design values is troubling. For a monitor to have maintenance issues, the future year design value only needs to exceed the standard of 70 ppb not the nonattainment design value.

The EPA further states that the TCEQ's methodology identified a monitor that would be nonattainment but not maintenance as proof that the TCEQ methodology is flawed. However, the EPA does not provide any justification for why every monitor that is modeled nonattainment should also be a maintenance monitor. If, as the EPA contends, monitors face maintenance issues solely due to inter-annual variability of meteorological conditions, it is also possible that the monitors could attain the standard due to favorable meteorology. In practice, a maintenance monitor should only have a transport linkage if it is in an area redesignated as attainment and a subsequent exceedance was shown to be caused by a transport issue, despite local controls and contingency measures. Otherwise, any reductions that might be required from upwind states to help that particular monitor maintain the standard would be overcontrol on the part of EPA.

The EPA should not disapprove the TCEQ's Transport SIP Revision based on the TCEQ's use of an alternative methodology for identifying maintenance monitors. The TCEQ's method for identifying maintenance monitors aligns with criteria regarding monitored design value trends specified in the EPA's Maintenance Receptor Guidance Memo and is scientifically defensible.

Despite the EPA issuing the Maintenance Receptor Guidance until after the statutory SIP revision submission deadline has passed and thus, depriving the TCEQ of this information during the preparation of Texas' SIP revision, the TCEQ did show that ozone concentrations have been trending downward since 2011 at monitoring sites for which the TCEQ modeling showed linkages. Such a trend is a condition in the Maintenance Receptor Guidance for states to choose an alternative maintenance monitor selection method. The EPA's disapproval conflates instances in which a design value is greater than the previous year with lack of a downward trend. The TCEQ contends that a downward trend of design values since 2011 can have individual design values that are higher than design values in the previous year and still comprise a downward trend over a longer period. The EPA appears to have misunderstood the TCEQ's reasons for choosing the 2014 regulatory design value as the DVB when estimating modeled future year maintenance design values. The TCEQ chose the 2014 regulatory design value because it was the latest design value and best represented current conditions and not because it is the lowest.

Further, for the monitors the EPA linked to Texas based on its 2016v2 modeling, only five of the seven monitors have valid design values in 2014. Out of those five, three had their highest design values in 2014. Emissions trends from the EPA's National Emissions Inventory (NEI) in Illinois and Wisconsin, where the seven monitors are located, show consistent decreases from 2010 through 2020. The EPA's meteorologically-adjusted ozone trends show that ozone values in the Central and East North Central United States, where the linked monitors are located, are much higher in 2012 due to meteorology, which was represented explicitly in the TCEQ's modeling. However, there hasn't been a consecutive three-year period from 2000 through 2020 that has had ozone conducive conditions similar to 2012. Therefore, if TCEQ had followed the EPA's methodology, TCEQ would have used the 2012 monitored regulatory design value as the DVB, which would have ignored the downward trend in design values and resulted in the misidentification of monitors as maintenance monitors.

225

**Commenter:** The Luminant Companies

**Commenter ID:** 44

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

TCEQ's Maintenance Monitor Selection Properly Identified Maintenance Receptors for Purposes of the 2015 Ozone NAAQS

EPA similarly second-guesses TCEQ's maintenance receptor methodology in proposing to disapprove Texas's SIP because, EPA says, TCEQ has not adopted an identical approach to EPA. Specifically, EPA would rely on the *maximum* design value during the 5-year base period to identify future maintenance receptors, whereas TCEQ relied on the most recent design value from the relevant base period when identifying future maintenance receptors to ensure that its projection appropriately captured emission trends. EPA claims that its method of selecting maintenance receptors "was upheld in the EME Homer City litigation." But this is irrelevant for EPA's analysis of Texas's SIP—EPA's method is not codified and has not been deemed the only appropriate way to identify maintenance receptors for the 2015 ozone NAAQS or any other NAAQS for that matter. Simply because EPA would take a different approach does not mean TCEQ's approach was inappropriate or not technically sound.

Further, although EPA itself recognizes that "it is not mandatory to follow the EPA's modeling guidance," TCEQ's approach does, in fact, align with guidance EPA issued in October 2018, which recognized that the use of differing design values from the base period may be appropriate. TCEQ has provided significant technical justification for its maintenance methodology approach, and the approach provides reasonable and supportable results. EPA's complaints that the years associated with the design values used by TCEQ "*may not have* had meteorological conditions particularly conducive for formation of high ozone concentrations" or that TCEQ "*may* effectively 'double count' emission trends" are insufficient to support a finding by EPA that Texas's SIP is technically deficient under the statutory requirements of the Clean Air Act. Such speculation is not a valid basis for disapproval. Further, it is EPA's own approach to identifying maintenance receptors that is flawed, as EPA relied on design values that were historically extreme. This inappropriately inflates EPA's future projected design values. Therefore, using EPA's approach would require reductions from upwind states that are not necessary for maintenance of the NAAQS—a form of unlawful overcontrol.

Importantly, EPA's role in reviewing SIP submissions is narrowly tailored under the Clean Air Act. As EPA has previously explained, "Congress assigned to states the primary responsibility to implement the NAAQS[.]" If a SIP is deemed complete, "the Administrator shall approve such submittal as a whole if it meets all the applicable requirements of this chapter[.]" Thus, if a SIP submission "meets all of the applicable [Clean Air Act] requirements, the EPA must approve it." In the proposal here, EPA has strayed outside the statute and established court precedent to propose disapproval simply because TCEQ's modeling is not the same as EPA's.

226

*Response*

The EPA disagrees that the use of only the latest 3-year period (of a 5-year baseline period) for calculating a DV properly accounts for the effects of meteorological variability for the purpose of identifying projected maintenance receptors. Rather, the use of a 3-year average has the effect of discounting or even ignoring, not accounting for, the effects of inter-annual variability in ozone conducive meteorology. TCEQ'S alternative methodology for determining maintenance receptors used the most recent design value of the three DVs, regardless of whether the most recent design value was highest or lowest. The "Modeling Guidance for Demonstrating Air Quality Goals for Ozone, PM2.5, and Regional Haze" from November, 2018 notes that 1 or more years of meteorological conditions which are not conducive to ozone formation in either the base year period or the most recent design value period will have the effect of making it appear that an area is closer to attaining the NAAQS than would otherwise be the case if more typical meteorological conditions had occurred. An area may appear to be on track to attain the NAAQS (or close to attaining) but, in reality, may need substantial additional emissions reductions to attain under average or above average meteorological conditions.[63]

The EPA disagrees that the deficiencies we identified with TCEQ's approach to identifying maintenance receptors were based on speculation or that EPA proposed to disapprove TCEQ's approach because it was not identical to our approach. Rather, in our proposed disapproval we stated that TCEQ's approach to identifying maintenance receptors, which uses only the most recent design value, is flawed because it fails to adequately consider interannual variability in ozone-conducive meteorology that may cause certain receptors to struggle to maintain the NAAQS in ozone conducive years. The *North Carolina* decision made clear that in interpreting the good neighbor provision, upwind states' and the EPA's obligations to reduce emissions must account for variable conditions that could cause an area that is sometimes attaining the NAAQS to fall out of attainment. *North Carolina v. EPA*, 531 F.3d 896, 908-911 (D.C. Cir. 2008). *See also Wisconsin,* 938 F.3d at 327 ("Variations in atmospheric conditions and weather patterns can bring maintenance receptors into nonattainment even *without* elevated emissions.") In both our proposal and accompanying Evaluation of TCEQ Modeling TSD, we explained that TCEQ did not adequately demonstrate that the 2014 DV used was necessarily conducive to ozone formation. Additionally, we showed how the 2014 Design Value used by TCEQ included years where the meteorology was not particularly conducive to ozone formation as compared to other years in the 5-year base period. Thus, TCEQ's approach to identifying maintenance receptors fails to appropriately account for variable conditions that could cause an area to struggle to maintain the NAAQS in ozone conducive years.

The EPA also disagrees that its approach relies on design values that were historically extreme. Rather, the EPA's approach to identifying a "maintenance" receptor for purposes of defining interference with maintenance, is consistent with the method used in the CSAPR and upheld by the D.C. Circuit in *EME Homer City Generation, L.P. v. EPA,* 795 F.3d 118, 136 (D.C. Cir. 2015) ("With the Transport Rule, EPA created a distinct category of maintenance receptors that could independently trigger an upwind state's good neighbor obligations. Therefore, the Transport Rule complied with *North Carolina*'s requirement that EPA give the nonattainment and maintenance prongs 'independent significance.'") Specifically, the EPA identified maintenance receptors as those receptors that would have difficulty maintaining the

---

[63] *See* EPA's "Modeling Guidance for Demonstrating Air Quality Goals for Ozone, PM2.5, and Regional Haze" from November 2018, page 174.

relevant NAAQS in a scenario that takes into account historical variability in air quality at that receptor. The variability in air quality was determined by evaluating the ''maximum'' future DV at each receptor based on a projection of the maximum measured DV over the relevant period. The EPA interprets the projected maximum future DV to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor (i.e., ozone conducive meteorology). The EPA also recognizes that previously experienced meteorological conditions (e.g., dominant wind direction, temperatures, air mass patterns) promoting ozone formation that led to maximum concentrations in the measured data may reoccur in the future. Thus, the EPA finds that the maximum DV gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur.

In addition, in response to this comment and others, the EPA compared the projected 2023 maximum design values based on the 2016v3 modeling for this final action to the corresponding 2021 and preliminary 2022 design values based on measured data at individual monitoring sites nationwide. The table below provides the projected 2023 maximum design values at modeling-based receptor sites nationwide along with the difference between these maximum design value and the measured design values in 2021 and 2022 (preliminary). The data in the table indicate that of the 33 receptors projected maximum 2023 design values are more than 1 ppb lower than the corresponding 2021 (2022) preliminary design values at 24 (22) receptors. In addition, EPA has identified 49 monitoring sites that are projected to be in attainment based on model-projected 2023 average and maximum design value but are measuring nonattainment based on 2021 and preliminary 2022 data. As described in the preamble of this final action, the EPA has identified these sites as "violating-monitor" maintenance-only receptors in 2023. Thus, current measured data indicate that EPA's method for identifying modeling-based maintenance-only receptors based on projected base period measured maximum design values does not "inflate" design values that are expected in 2023. Rather, the data suggest that the EPA's approach may actually understate the magnitude and geographic extent of the ozone nonattainment and/or maintenance problem in 2023.

The EPA has placed in the docket of this final action a data file that contains the model-projected average and maximum design values for 2023 and the 2021 and preliminary 2022 data for monitoring sites nationwide.

Other topics in these comments are addressed in Section 10.3 (Cooperative Federalism and the EPA's Authority).

*Table 6-3 Comparison of Projected 2023 Maximum Design Values and Measured Design Values in 2021 and 2022 (Preliminary)*

| AQS ID | State | County | 2023 Max DV | 2023 Max DV – 2021 DV | 2023 Max DV – 2022 DV (Preliminary) |
|---|---|---|---|---|---|
| 40278011 | Arizona | Yuma | 72.1 | 5.1 | 4.1 |
| 60650016 | California | Riverside | 73.1 | -4.9 | -3.9 |
| 60651016 | California | Riverside | 92.2 | -2.8 | 2.2 |
| 80350004 | Colorado | Douglas | 71.9 | -11.1 | -11.1 |
| 80590006 | Colorado | Jefferson | 73.5 | -7.5 | -9.5 |
| 80590011 | Colorado | Jefferson | 74.1 | -8.9 | -9.9 |
| 80690011 | Colorado | Larimer | 72.1 | -4.9 | -4.9 |
| 90010017 | Connecticut | Fairfield | 72.2 | -6.8 | -4.8 |
| 90013007 | Connecticut | Fairfield | 73.8 | -7.2 | -7.2 |
| 90019003 | Connecticut | Fairfield | 73.6 | -6.4 | -6.4 |
| 90099002 | Connecticut | New Haven | 72.6 | -9.4 | -6.4 |
| 170310001 | Illinois | Cook | 71.9 | 0.9 | -0.1 |
| 170314201 | Illinois | Cook | 71.5 | -2.5 | -2.5 |
| 170317002 | Illinois | Cook | 71.3 | -1.7 | -2.7 |
| 350130021 | New Mexico | Dona Ana | 72.1 | -7.9 | -8.9 |
| 350130022 | New Mexico | Dona Ana | 72.4 | -2.6 | -2.6 |
| 350151005 | New Mexico | Eddy | 74.1 | -2.9 | -2.9 |
| 350250008 | New Mexico | Lea | 72.2 | 6.2 | 6.2 |
| 480391004 | Texas | Brazoria | 72.5 | -2.5 | -0.5 |
| 481210034 | Texas | Denton | 71.6 | -2.4 | -4.4 |
| 481410037 | Texas | El Paso | 71.4 | -3.6 | Missing 2022 DV |
| 481671034 | Texas | Galveston | 72.8 | 0.8 | 2.8 |
| 482010024 | Texas | Harris | 76.7 | 2.7 | 7.7 |
| 482010055 | Texas | Harris | 71.9 | -5.1 | -5.1 |
| 482011034 | Texas | Harris | 71.3 | 0.3 | -0.7 |
| 482011035 | Texas | Harris | 71.3 | 0.3 | -0.7 |
| 490110004 | Utah | Davis | 74.2 | -3.8 | -4.8 |
| 490353006 | Utah | Salt Lake | 74.2 | -1.8 | -1.8 |
| 490353013 | Utah | Salt Lake | 73.8 | -2.2 | -3.2 |
| 530330023 | Washington | King | 71.0 | 7.0 | 1.0 |
| 550590019 | Wisconsin | Kenosha | 71.7 | -2.3 | -3.3 |
| 551010020 | Wisconsin | Racine | 71.5 | -1.5 | -3.5 |
| 551170006 | Wisconsin | Sheboygan | 73.6 | 1.6 | -1.4 |

229

*Comment*

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

MOG specifically objects to EPA's approach to implementation of the flexibility guidance issued by EPA in 2018 for the specific application by states to the development of 2015 ozone NAAQS Good Neighbor SIPs.  With respect to Ohio, we note that Ohio EPA ("OEPA") specifically provided significant technical support justifying an alternative approach for determining maintenance-only receptors. To support its justification, OEPA provided an alternate method of future design value projection using the most recent 3-year design values (DV) from the analytic years rather than the highest 3-year DVs from the 5-year period. This was further supported with declining VOC and NOx emission trends and observed air quality improvement at each of the impacted monitors. OEPA also supported its calculations with information on inter-annual meteorological variability and the divergence from long-term temperature trends in the years 2011, 2012, and 2013 (the early years of the 5-year period).  With these data and their supporting calculations, OEPA was able to demonstrate that the monitoring sites identified as maintenance are not reasonably expected to have difficulty maintaining the standards in 2023. EPA's rejection of that demonstration is clearly in error.

*Response*

The EPA disagrees that the use of only the latest three 3-year period (of a 5-year baseline period) for calculating a DV properly accounts for the effects of meteorological variability for the purpose of identifying projected maintenance receptors. Rather, the use of a 3-year average has the effect of discounting or even ignoring, not accounting for, the effects of inter-annual variability in ozone conducive meteorology. TCEQ'S alternative methodology for determining maintenance receptors used the most recent design value of the three DVs, regardless of whether the most recent design value was highest or lowest. The "Modeling Guidance for Demonstrating Air Quality Goals for Ozone, PM2.5, and Regional Haze" from November, 2018 notes that 1 or more years of meteorological conditions which are not conducive to ozone formation in either the base year period or the most recent design value period will have the effect of making it appear that an area is closer to attaining the NAAQS than would otherwise be the case if more typical meteorological conditions had occurred. An area may appear to be on track to attain the NAAQS (or close to attaining) but, in reality, may need substantial additional emissions reductions to attain under average or above average meteorological conditions.[64]

With respect to the commenter's assertions that Ohio EPA "provided significant technical support justifying an alternative approach, the EPA disagrees. As stated in the proposed rulemaking, Ohio EPA's

---

[64] *See* EPA's "Modeling Guidance for Demonstrating Air Quality Goals for Ozone, PM2.5, and Regional Haze" from November, 2018, page 174.

proffered explanation for using the most recent design value to identify maintenance receptors was that the latest design value "takes into consideration . . . any emissions reductions that might have occurred."87 FR at 9870 (citing TCEQ submission at 3–39 to 3–40.) Ohio EPA in its submission did not explain why or how this methodology identifies those areas that may be meeting the NAAQS or that may be projected to meet the NAAQS but may nevertheless struggle to maintain the NAAQS, given interannual variability in ozone conducive meteorology. In fact, because the TCEQ's methodology adopted by Ohio EPA uses the most recent design value to capture more recent emissions reductions rather than capture variable conditions, the methodology appears to be aimed at limiting receptors which could be identified as maintenance receptors, compared to EPA's methodology, which was designed to identify those areas that might struggle to maintain the NAAQS in ozone conducive conditions.

Ohio EPA provided the following ozone DV trend data for the four eliminated monitors spanning 2000-2017.[65] While the submission uses these data to show overall decreasing trends, EPA highlights that the figure provided shows stagnant or increasing ozone DVs from 2014 onward. For three out of the four maintenance receptors Ohio EPA identified via the TCEQ method, the 2013 DV was the lowest of the three DVs in the 5-year base period. While Ohio EPA attributes this to emission reduction measures, the EPA considers this to highlight the selectiveness of the TCEQ method and the aforementioned lack of accounting for meteorological variability. The figure demonstrates variability in ozone DV trends that would have been incorporated using the highest of the three DVs in the 5-year base period. Further, the meteorological plots provided in OEPA's submission show maximum temperatures from 2011 through 2013. In two of the three years used for the 2013 design value calculation, maximum temperatures were not above average in Ohio. In those years, (2011 and 2013), there are areas in Ohio that experienced less than average temperatures. The EPA does not believe these plots demonstrate that this design value period fully accounts for meteorological variability, and it would be more appropriate to use the EPA method of the maximum of the three design value periods. Ohio EPA's analysis of meteorological information did not discuss or consider how other meteorological factors that are typically associated with high ozone episodes such as humidity, solar radiation, vertical mixing, and/or other meteorological indicators such as cooling-degree days to confirm whether conditions affecting these monitors may have been conducive to ozone formation during the 2009 through 2013 base period. In addition, the ozone trends data provided in the Ohio EPA submittal indicate that several of the receptors in Coastal Connecticut to which Ohio is linked by more than 1 ppb continue to measure ozone design values close to or exceeding 80 ppb with no overall downward trend in the most recent data in the submittal.[66]

---

[65] "Figure 4. Ozone Design Value Trends- Maintenance Monitors Eliminated with Texas Approach"; "Ohio's Interstate Pollution Transport Analysis 2015 Ozone Standard", September 2018 included as Appendix 3 of Ohio 2015 Ozone Infrastructure SIP (Document ID EPA-R05-OAR-2022-006-006).
[66] *See* "2010 Thru 2021 Ozone Design Values.xlsx" in docket ID No. EPA-HQ-OAR-2021-0663.



*Figure 6-1 Ozone Trends Figure from Ohio EPA SIP Submission*

In any event, Ohio EPA's use of an alternative approach to identifying maintenance receptors does not result in a dispositive change in receptor status for purposes of EPA's evaluation of Ohio EPA's SIP submission at Step 1 because Ohio EPA did not reach the conclusion that there were no receptors in 2023 or claim at Step 2 that Ohio was not linked to any receptor on the basis of the use of an alternative definition of maintenance receptor.

## 6.4  October 2018 Memorandum

*Comments*

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

MOG specifically objects to EPA's approach to implementation of the flexibility guidance issued by EPA in 2018 for the specific application by states to the development of 2015 ozone NAAQS Good Neighbor SIPs. With respect to Ohio, we note that Ohio EPA ("OEPA") specifically provided significant technical support justifying an alternative approach for determining maintenance-only receptors. To support its justification, OEPA provided an alternate method of future design value projection using the most

232

recent 3-year design values (DV) from the analytic years rather than the highest 3-year DVs from the 5-year period. This was further supported with declining VOC and NOx emission trends and observed air quality improvement at each of the impacted monitors. OEPA also supported its calculations with information on interannual meteorological variability and the divergence from long-term temperature trends in the years 2011, 2012, and 2013 (the early years of the 5-year period). With these data and their supporting calculations, OEPA was able to demonstrate that the monitoring sites identified as maintenance are not reasonably expected to have difficulty maintaining the standards in 2023. EPA's rejection of that demonstration is clearly in error.

**Commenter:** Mississippi Department of Environmental Quality

**Commenter ID:** 32

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Also, in EPA's proposed decision to disapprove Mississippi's iSIP, EPA suggests that MDEQ failed to use the most recent (i.e., 2018) available data. However, EPA fails to recognize that certified 2018 Texas monitor data had not been released at the time MDEQ began the public comment period for the proposed iSIP; therefore, MDEQ did in fact use the most recent certified Texas monitor data when drafting the "good neighbor" portion of the Mississippi iSIP. While it is our position that to disapprove Mississippi's iSIP on this basis is, at best, arbitrary and capricious, at the very least the proposed FIP should not be imposed until MDEQ is given a reasonable opportunity to address the alleged deficiencies in the iSIP and to resolve the modeling errors referenced herein.

*Response*

We respond to general comments about the October 2018 memorandum in Section V.B.3 of the preamble.

In response to one commenter's (MDEQ) contention that they did rely on the most recent monitoring data available at the time of its submission to support its use of an alternative maintenance receptor definition, and that EPA's evaluation of their submittal was therefore erroneous, the EPA disagrees. The Specifically, the commenter is referring to the available ozone design value for the Harris County, Texas Deer Park monitoring site (ID 482011039) in Houston and EPA's statement that the SIP submission did not meet the criteria set out in the October 2018 memorandum including an assessment of the available ozone design values at the monitor at the time. The state relied on the 2014 to 2017 design values at the Deer Park receptor (i.e., 69 ppb, 67 ppb, and 68 ppb, respectively) as the basis for stating that this receptor met EPA's definition of a maintenance receptor.

The EPA disagrees with the commenter that the 2018 design value for the Deer Park monitor was not available at the time Mississippi gave public notice of their transport SIP submission. In fact, the EPA's official comments on the draft SIP submission during the state's public comment period indicates that the 2015-2017 3-year design value of 68 ppb was not the most current available data for the Deer Park

233

monitor but rather 2016-2018 design value of 71 ppb for the site was above the 2015 standard, suggesting that the 2018 data for the monitor was in fact available at the time the state public noticed the submission in August of 2019. In addition, the 2018 data would have been certified by the time the state made its submission.

The EPA responds to APC et al.'s comment related to the October 2018 memorandum in Section 6.2. The EPA responds to comments on timing in the preamble in Section V.A.


## 6.5   Certain Monitoring Sites in California at Step 1

*Comments*

**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA also argues that the threshold should not be permitted at 1 ppb to retain national consistency within the program. However, EPA's own action in its approval of the Oregon SIP negates this argument. A review of the EPA modeling data indicates that Oregon had contribution to 14 monitors in California that are predicted to exceed the standard in 2023, some with contributions greater than 1 ppb. Yet, EPA approved the Oregon SIP stating that Oregon did not significantly contribute to nonattainment or maintenance sites. National consistency was obviously not an obstacle to approval in this case.


**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Even if EPA were able to show that a 1 ppb threshold is unreasonable and unjustified, EPA could find that the Denton and Harris County monitoring sites are not properly regarded as receptors under Step 1 of its "FIP" analysis. EPA did just that for Oregon—allowing an exception to the 1 percent threshold for Oregon's transport SIP for the 2015 ozone NAAQS. As explained in EPA's recently published proposed FIP, EPA found that, although Oregon was linked above the 1 percent threshold "to several monitoring sites in California," it determined that these monitoring sites "should not be treated as receptors for purposes of determining interstate transport obligations of upwind states" because Oregon's total cumulative contribution to any of the sites was only 2.8 percent, each site only had one upwind state contribution above the 1 percent of the NAAQS, and the monitoring sites were "overwhelmingly

234

impacted by in-state emission." EPA also explained that a similar finding had been made for Arizona's 2008 ozone NAAQS transport SIP for other monitoring sites in California, where Arizona's contribution ranged from 2.5 to 4.4 percent. EPA, therefore concluded that these monitoring sites should not be considered receptors under Step 1 of the 4-step framework and that Oregon did not contribute significantly to nonattainment or interfere with maintenance of the NAAQS in any downwind state. Similarly, as set out above, Alabama's modelled contributions to the Denton and Harris sites are low—6 and 7 percent, respectively—and in-state emissions vastly outweigh upwind contributions. Thus, Alabama's contributions to these sites are not significant. EPA should address this analysis prior to any final action on Alabama's 2022 SIP.

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

For the Brazoria, TX monitor, EPA's updated modeling shows that Missouri is no longer linked to this monitor because Missouri's contribution is 0.55 ppb, which is below 1 percent of the 2015 ozone standard. In our SIP submission, the Air Program utilized the flexibility in EPA's August memo, to avoid linkage with this receptor because Missouri's projected contribution was below 1 ppb. In the previous modeling, Missouri's contribution to this receptor was 0.88 ppb. Our SIP submission demonstrated that this monitor was not significantly impacted by upwind state contributions, and instead the receptor status was largely the result of contribution from local sources and international (Mexico) emissions. This is substantially similar to EPA's own determination in their latest actions associated with the proposed disapproval and the proposed FIP with respect to linkages between Oregon and California, where Oregon is absolved of their linkages to California for this very reason. However, EPA treats Missouri differently by denying this same basis for the determination that a 1 ppb threshold was appropriate as stated in our SIP submission.

For the Harris, TX monitor, EPA's updated modeling shows this receptor as no longer being a maintenance receptor. The maximum 2023 projected design value for that monitor in the updated modeling is 68.5 ppb. In Missouri's good neighbor SIP submission, this was a nonattainment receptor with a maximum 2023 design value of 73.5 ppb. Missouri's contribution to this monitor was 0.88 ppb, thus qualifying it for the use of the flexibility offered in EPA's August memo. Similarly to the Brazoria monitor, Missouri's SIP submission explained that this monitor was not significantly impacted by upwind state contributions, and instead the receptor status was largely the result of contribution from local sources and international (Mexico) emissions. While EPA uses this same basis for approving Oregon's SIP using the updated modeling when it comes to 15 separate linkages in California that are at or above the 1 percent threshold and two receptors with contributions above 1 ppb, EPA denies this basis as included in Missouri's SIP submission for justifying the removal of the Harris, TX monitor linkage with Missouri at Step 2.

235

**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA's proposed action is inconsistent with EPA's prior finding for Oregon, in which it deviated from the 1% NAAQS threshold in determining that Oregon was not linked to downwind states. Approval of Oregon's SIP, while denying Tennessee's SIP, belies EPA's assertion that the Agency is applying a nationally uniform approach to nonattainment and maintenance receptors and a nationally uniform approach to contribution threshold analysis.

*Response*

The EPA approved Oregon's good neighbor SIP submission for the 2015 NAAQS on May 17, 2019 (84 FR 22376). In a separate rulemaking action from this one (87 FR 20036, April 6, 2022), the EPA explained why the Agency was not pursuing an error correction of that approval on the basis of the EPA's proposed assessment of relevant monitoring sites in California at Step 1. The EPA's proposed treatment of Oregon and assessment of certain monitors in California in that separate rulemaking action is beyond the scope of this action. Nonetheless, we respond to these comments here to the extent that the proposed FIP analysis raises, according to these commenters, a consistency issue with our treatment of states that are included in this disapproval action.

The EPA proposed in the April 2022 transport FIP that certain monitoring sites in California should not be considered receptors at Step 1 for the purpose of assessing 2015 ozone NAAQS interstate transport obligations. 87 FR 20036, 20075. The EPA did not propose a different contribution threshold at Step 2 for Oregon or for western states generally, nor did the EPA propose this conclusion based on any evaluation at Step 3 of emissions reduction opportunities in Oregon.

In the FIP proposal, we pointed out that California receptors are heavily impacted by in-state emissions. The basis for our proposed determinations with respect to these sites is not the level of in-state contribution but rather the fact that the contribution from upwind states is so low. The elevated ozone levels at these sites may be attributable to biogenic emissions, international emissions, or boundary-conditions, in addition to in-state anthropogenic emissions. Our proposal was not intended to suggest that a certain level of in-state anthropogenic emissions influenced our treatment of these sites under the good neighbor provision. Rather, the critical point was that the total level of impact from upwind states at these California sites is so low. The 4-step interstate transport framework that the Agency has applied to address interstate ozone transport is informed by the "collective contribution" problem observed throughout many areas of the country (i.e., the fact that total ozone levels are the result of many small contributors over a wide geographic area). That approach generally continues to make good sense throughout most of the country based on our air quality and contribution analysis to-date and in this final action. A limited circumstance, which we previously observed with respect to certain California

236

sites in acting on Arizona's 2008 ozone NAAQS good neighbor SIP submission, presents the exception. Where total contribution from upwind states is as low as 1.4 percent and only one state contributes above 1% of the NAAQS, that monitoring site does not, in the EPA's view, suffer from an interstate contribution problem. See the EPA's response to comments in Section 8.2 (Alleged De Minimis Contribution) for further discussion of the topic of collective contribution.

Although commenters claim that this same consideration could be applied at other receptors across the country to reach the same conclusion (i.e., eliminate other receptors outside California at Step 1), nowhere else do we project such a low total upwind contribution and with only a single upwind state contributing at or above one percent of the NAAQS.

The EPA did not view it to be necessary to establish a bright-line threshold in proposing this determination and disagrees with commenters who assert such a threshold is needed now. As we noted in the FIP proposal, the level of total upwind-state impact at the California monitoring sites at issue for Oregon (2.8 percent) is less than the amount for which we issued a similar determination in approving Arizona's good neighbor SIP submission for the 2008 ozone NAAQS (4.4 percent). 81 FR 15200 (March 22, 2016) (proposal); 81 FR 31513 (May 19, 2016) (final rule).  Thus, the proposed analysis, if finalized, is consistent with that precedent. If the proposed finding for Oregon is finalized, there would still be no other state covered by this disapproval action with linkages to receptors that fall within the analytical circumstances of the analysis for either Oregon or Arizona.

Nor does it matter that there are several monitoring sites in California for which this circumstance exists. The same observation can be made for each one of these sites: the level of total upwind-state contribution is small enough that they should not be considered interstate-transport receptors.

# 7   Step 2

## 7.1   Methodology for Determining Future Year Contributions

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

EPA's updated modeling shows that Missouri's contribution to linked receptors is below 1 percent of the standard on all days where the modeled MDA8 is below the level of the 2015 ozone standard.

In EPA's methodology for determining contributions at Step 2, it uses the average contributions from the upwind states for the top ten modeled days that are above 60 ppb for the MDA8. If there are fewer than 10 modeled days with MDA8 above 60 ppb for the receptor, then EPA uses the average of those days for however many values are available if there are at least five days with modeled MDA8 values above 60 ppb. This approach is consistent with EPA's traditional approach to the good neighbor SIP obligation to establish linkages at Step 2. However, the approach has serious flaws. Under this approach, emissions from upwind states can still be considered significant contribution even if the modeled MDA8 on a particular day is actually below the level of the 2015 ozone standard, which is what the good neighbor provision is intended to address. If a state is contributing above one percent of the level of the standard to a problem monitor on days when that same problem monitor is not having any ozone concentration concern with respect to the standard, those values should not count against the upwind state when determining whether the upwind state is linked at Step 2.

For example, even if an upwind state were contributing to ozone concentrations at a monitor at levels of 20 percent of the standard on a particular day, the good neighbor provision would not apply if the monitor didn't measure an exceedance of the standard that day. So, the good neighbor provision does not restrict contribution from upwind states at downwind monitors on days when ozone concentrations at the downwind monitor are below the health-based standard established by EPA (i.e., the NAAQS). The use of contribution data on days where the monitor is complying with the standard is therefore arbitrary and capricious action on the part of EPA that results in the addition of states that are not contributing significantly to nonattainment or interfering with maintenance.

EPA provided the Air Program with the list of the MDA8 values for all modeled days for the receptors to which Missouri is linked to in the updated modeling. The list also includes the corresponding upwind state contribution on each of the modeled days. In that dataset, there is not a single day where the modeled MDA8 value at any of the receptors linked to Missouri is both above 70 ppb and Missouri's contribution is above 1 percent of the standard (0.7 ppb). As explained in the paragraphs above, upwind state contributions on days where the model is predicting the receptor to be in compliance with the

238

standard cannot be used to justify a linkage with Missouri at Step 2. This is another reason why EPA's proposed disapproval of Missouri's SIP is flawed and cannot stand.

**Commenter:** Ameren Missouri

**Commenter ID:** 05

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

1. USEPA's most recent CAMX modeling platform 2016v2 referenced in USEPA's proposed disapproval of the Missouri Good Neighbor SIP for the 2015 Ozone Standard shows that the monitors to which USEPA linked to Missouri in the previous model platform (2016v1) are not actually linked to Missouri, providing independent verification that Missouri emissions are not significantly contributing to nonattainment or maintenance at those monitors and further evaluation is moot.

[...]

7. To the extent that USEPA includes Missouri emission source contributions on days when the relevant monitors were observed to be in attainment of the standard or are modeled to be in attainment of the standard, USEPA is improperly determining Missouri's "significant contribution" in Step 2 of its analysis.

[...] By including days that monitors are in attainment in the modeling analysis of a state's contribution to ozone levels, USEP A is determining the average contribution to ozone concentrations at the relevant monitor to the top ten modeled ozone concentrations in a year. But by including days monitors attain the standard, USEPA's analysis is not showing the average contribution by a state to ozone nonattainment at the monitor under Step 2 of its analysis as is required by the language in the Act. USEP A must properly calculate on a state's anthropogenic contribution to days where a monitor is both observed in the base year to exceed the standard (71 ppb or above) and is modeled in the future year to exceed the standard (71 ppb or above) in order to link a state's emissions to nonattainment.

Because only the contribution to nonattainment is required to be prohibited by Good Neighbor SIPs (GNS), EPA errs by including a contribution by a state that is not prohibited when determining state level contributions. It is not reasonable for USEPA to assume that contributions from nonadjacent states on days when the monitors show attainment of the standard can be compared to USEPA Step 2 thresholds for linking states to a monitor and thereby determining if a state's emission sources significantly contribute to nonattainment. It is not reasonable to assume that the conditions that transport NOx and/or ozone from Missouri up to Lake Michigan on days when a monitor on the Lake Michigan shore and/or the model shows the monitor is in attainment of the standard contribute to nonattainment at all without some showing in the record. It is likely that on days when ozone (in amounts above 0.70 ppb) is transported into the Chicago NAA from states like Missouri and impact the Lake Michigan shoreline monitors at issue are not the same days when stagnated air persists around the monitors and which are conducive to ozone formation and high ozone levels.

239

*Response*

The EPA disagrees with comments that say the average contribution metric that the EPA uses to evaluate upwind state contributions in Step 2 of the four-step transport framework should only be calculated based on days with measured exceedances or days with model-predicted exceedances in 2023. Commenters object to the EPA's methodology for calculating contribution at Step 2 because the top ten high ozone days, utilized for calculating the relative contribution factor (RCF), may include days with measured and/or future year modeled values below the NAAQS. This concern fundamentally misunderstands the intended use of modeling for projecting future year design values and contributions between Steps 1 and 2. For the purpose of projecting future design values, the EPA's modeling guidance recommends using data for the top-ten modeled ozone concentrations days using a minimum threshold of 60 ppb when calculating relative response factors (RRF). That is, any days with model-predicted MDA8 ozone concentrations below 60 ppb in the base year (e.g., 2016) are not included in the calculation of the projected design value.[67] The RRF plays an important role in projecting future year design values at Step 1. Rather than taking the projected 2023 results themselves as definitive of future air quality conditions, the RRF methodology applies the change in modeled air quality between the base and future year and then applies that to the historical monitored ozone levels at each receptor, thus grounding modeled change to real-world data.

In the contribution analysis at Step 2, we use the modeled concentrations and modeled contributions for the future year to derive a relative contribution factor (RCF) working from the *modeled* 2023 future year (not the 2016-based monitoring data). The RCF is calculated as the ratio of the 2023 average contribution to the 2023 average ozone concentration, where the averages are based on the top 10 ozone concentration days in 2023. It is important to note that the top 10 concentration days in 2023 may not be the same as the top 10 concentration days in 2016 monitoring data or 2016 base year modeling. Because the average contribution metric is intended to reflect upwind state impacts in 2023, it would be illogical to base that average value in 2023 on measured data or model predictions for the 2016 base year, 7 years earlier. The RCF is then applied to the projected 2023 average design value (taken from Step 1 following the use of RRF, not just the 2023 CAMx projection) in a manner similar, in concept, to the method for projecting design values.

Step 2 analysis starts from the premise that downwind receptors have already been properly identified using the methodology at Step 1. At Step 2, the question is who is contributing to those receptors, for which EPA's methodology provides a reliable answer using modeling and the RCF approach. As noted above, the approach for selecting days to calculate the contribution metric is designed to align with recommendations in the EPA's modeling guidance for projecting future year design values. Following the selection of days, the approach for calculating the average contribution metric then determines what proportion of the ozone formed on those days, on average, was attributable to emissions from each upwind state or other source.

Regarding the comment that that the EPA should use data on days with *measured* exceedances in 2016 when calculating the contribution metric, since the purpose of this metric is to evaluate contributions for a *future year*, for which actual measured concentrations cannot be known prior to their occurrence,

---

[67] In addition, for monitoring sites where there are fewer than 5 days with model-predicted ozone greater than or equal to 60 ppb, EPA's guidance recommends not calculating a projected design value for those monitoring sites.

it would be inappropriate to base future year contributions on days which may have relatively low model-predicted ozone even if those days happen to have measured values in 2016 that exceeded the NAAQS. The EPA addressed and rejected a substantially similar comment in the Revised CSAPR Update. *See* 86 FR 23054, 23085 (April 30, 2021).

The EPA incorporated public comments received on the proposals to update its emissions inventories and model design, as described in the preamble and in the Final Action AQM TSD. In the 2023 modeling using the v3 platform Missouri is linked above a 1 percent of the NAAQS contribution threshold to four downwind receptors (i.e., Chicago/Evanston, Kenosha/Chiwaukee, Racine, and Sheboygan). The average contribution metric values that link Missouri to these states are 1.39 ppb, 1.01 ppb, 1.19 ppb, and 1.87 ppb, respectively.

Out of an abundance of caution, the EPA performed a sensitivity analysis to examine the contribution from Missouri to these 4 receptors if the contributions were based only on those days with measured exceedances in 2016 at each receptor.  The table below provides average contribution metric values for Missouri's contributions to each of these receptors if this metric was based solely on daily modeled contributions on days with measured exceedances at each receptor. While we do not agree that this is a superior or even appropriate method of calculating contribution, the results of this sensitivity analysis indicate that even if the average contributions were based only on days with measured ozone that exceeds the NAAQS, Missouri would still be linked to all four of these receptors using the 1 percent of the NAAQS threshold (or even a 1 ppb threshold).

*Table 7-1 Sensitivity Analysis of Missouri Contributions Based on Contributions on Days with Measured Exceedances*

| | Number of Days with Measured Exceedances in 2016 | Average Contribution Metric (ppb) |
| --- | --- | --- |
| Evanston | 7 | 0.72 |
| Kenosha/Chiwaukee | 14 | 1.62 |
| Racine | 8 | 1.18 |
| Sheboygan | 4 | 1.59 |

The EPA performed a similar sensitivity analysis in response to commenter's concerns regarding the use of model-predicted days below the NAAQS in 2023 when calculating the average contribution metric. In this sensitivity analysis the EPA first identified all days with predicted MDA8 ozone concentrations greater than or equal to 71 ppb in 2023 at each of the four receptors to which Missouri is linked based on the EPA's 2016v3 modeling. The table below provides the average contribution metric values for Missouri's contribution to each receptor based on this analysis. Also provided in the table are the number of exceedance days in 2023 and the range in 2023 MDA8 ozone concentrations on days included in the calculations. Because there are fewer than 5 days with predicted exceedances at the Racine and Sheboygan receptors, data for additional days (2 for Racine and 3 for Sheboygan) were included in the calculations for these two receptors. While we do not agree that this is a superior or even appropriate method of calculating contribution, the results of this sensitivity analysis shows that Missouri would still be linked in 2023 to each of these four receptors even if the contribution metric was

based on projected exceedance days alone (Evanston and Kenosha/Chiwaukee) or on exceedance days combined with other days above 60 ppb (Racine and Sheboygan)

Table 7-2

*Table 7-2 Sensitivity Analysis of Missouri Contributions Based on Contributions on Days with Modeled Exceedances*

|  | Number of Days with Modeled Exceedances in 2023 | Range of Concentrations in 2023 in this Sensitivity Analysis | Average Contribution Metric (ppb) |
|---|---|---|---|
| Evanston | 9 | 71.6 - 83.8 | 1.06 |
| Kenosha/Chiwaukee | 6 | 71.0 - 84.1 | 0.98 |
| Racine | 3 | 69.1 - 75.8 | 1.10 |
| Sheboygan | 2 | 67.9 - 75.2 | 1.10 |

*Comment*

**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

TCEQ's methodology for determining future contributions is consistent with EPA modeling guidance.

The EPA Modeling Guidance provides details on the model values and the grid cells to use when estimating the future year design value as part of the modeled attainment test. The TCEQ's methodology to determine a state's contribution to the future aligns with the method used to estimate future year design values. The TCEQ's methodology is internally consistent as the grid cell and top ten days used in the design value calculation are the same as those used to estimate the source (state) contribution. The TCEQ's methodology follows the EPA modeling guidance while the EPA's methodology does not. The TCEQ has repeatedly raised concerns about the EPA's method to determine future year contributions since the EPA approach does not align with the calculation of the future year nonattainment and maintenance design values with respect to the model grid cell and top ten days used.

The EPA should only use contributions from days in the calculation of the relative response factor when calculating an upwind state's contributions to future design values. Using one set of days to calculate the future year design value that is the basis for a monitor's future attainment status (attainment/maintenance/nonattainment) and a different set to determine the states' contribution to that design value is inconsistent and arbitrary.

Further, the EPA uses concentrations from the grid cell containing the monitor to determine state contributions while using concentrations at the grid cell with the maximum modeled concentration in a "3x3" array centered on the monitor when calculating design values. The EPA's approach could result in the use of modeled concentrations from different grid cell locations potentially disconnecting the future year contributions from the future year design values.

The TCEQ's approach uses modeled concentrations from the grid cell on the days that were used in the design value calculation to determine future year contributions. The TCEQ's method is consistent, and the EPA failed to provide a rational justification for its concerns with regards to the TCEQ's approach.

*Response*

As explained in the previous response, the EPA's method for calculating contribution is designed to align with recommendations in the EPA's modeling guidance for projecting future year design values and allows for the effective identification of linked upwind states at Step 2.

The EPA believes that its approach for calculating the future year average contribution metric, as described in the preamble and the Final Action AQM TSD for this final action, provides a more technically reliable estimate of contributions than the method suggested by the commenter. In calculating the average contribution metric, the EPA uses modeled contributions on the 10 days in the future year with the highest model-predicted concentrations. In part because the formation of ozone from precursor emissions can be nonlinear and dependent on meteorological conditions, the response of ozone to emission reductions can vary from day to day. In this regard, the days with the highest model-predicted ozone concentrations in the 2016 base year that are used for projecting ozone design values may not be among the highest ozone days in the future analytic year. In this situation, the calculation of the average contribution metric could inappropriately exclude days with higher concentrations in the future year in favor of lower future-concentration days that happened to correspond to the highest days in 2016. In addition, ignoring the concentrations in the future year could result in including contributions on low ozone days with modeled ozone concentrations below 60 ppb in the calculation of the average contribution metric. Among other things, this runs a risk of identifying states as linked that are, in fact, actually not linked considering contributions on high ozone days in 2023 at the receptor.

Based on the air quality modeling for this final action, Texas is linked to 10 downwind nonattainment or maintenance-only receptors. Of these 10 receptors, the contributions from Texas to the 6 receptors in Illinois and Wisconsin are likely to be those most influenced by applying an alternative contribution calculating method since these receptors are more distant and therefore more subject to day-to-day differences in long-range transport wind flows compared to the 4 receptors in New Mexico that are located near the border with Texas. In this regard, the EPA recalculated Texas' average contribution using a method akin to the method proffered by the commenter. Specifically, in this method the average contribution metric was calculated based on the daily contributions on the same set of days used to project the 2023 design value at each of these receptors. The contributions from Texas to the receptors in Illinois and Wisconsin based on the EPA's method and the alternative method are provided in the table below. While we do not agree that the alternative approach is a superior or even

243

appropriate method of calculating contribution, the results show that Texas would still be linked to each of these receptors using the alternative method.

*Table 7-3 Comparison of Texas' Contributions Using the EPA's Method and the Alternative Method*

| | | | Contributions from Texas in 2023 | |
| | | | EPA Method | TCEQ Method |
| AQS ID | State | Receptor | | |
|---|---|---|---|---|
| 170310001 | Illinois | Chicago/Alsip | 1.09 | 1.11 |
| 170314201 | Illinois | Chicago/Northbrook | 1.05 | 1.65 |
| 170317002 | Illinois | Chicago/Evanston | 1.95 | 1.81 |
| 550590019 | Wisconsin | Kenosha | 1.54 | 1.47 |
| 551010020 | Wisconsin | Racine | 1.57 | 1.56 |
| 551170006 | Wisconsin | Sheboygan | 1.03 | 1.02 |

It is obviously impossible for the EPA, or anyone, to predict which exact days in a future year will have high ozone levels, nor does it make sense to analyze contribution on modeled days of low ozone concentration. The EPA's methodology is reasonable in projecting where ozone problems are likely to recur in a future year (at Step 1), and, by using the highest predicted 2023 MDA8 ozone days with a minimum threshold (at Step 2), identifying who is contributing to those problems under the conditions for high ozone formation at those locations in the future.

*Comment*

**Commenter:** PacifiCorp (Attachment – Ramboll Evaluation)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The Proposed Transport Rule Upwind State ozone contribution metric to a downwind nonattainment/maintenance receptor used a contribution factor (CF) as the average of the Upwind State ozone contribution divided by the average total ozone at the receptor where the averaging was performed over the top 10 modeled 2023 ozone days. The CF was multiplied by the receptor's 2023 and 2026 ozone design values to obtain the Upwind State ozone contribution to the receptor (see Section 1.4 for detailed description of how Wyoming's ozone contribution to the 2023 ozone design value at Chatfield receptor was calculated). The use of 10 days in the ozone contribution metric is arbitrary and not supported by any standard, guidance or technical basis. Below we analyze alternative Upwind State ozone contribution metrics that are based on previous CSAPR rules, based on EPA guidance or based on the 2015 ozone NAAQS rather than the arbitrary selection of 10 days.[(The following comment excerpt is paraphrased.)]

EPA's use of the Anthropogenic Precursor Culpability Assessment (APCA) probing tool instead of the Ozone Source Apportionment Technology (OSAT) will overstate Utah's and Wyoming's contributions to ozone design values at downwind receptors because APCA allocates ozone formed from Utah and Wyoming anthropogenic NOx emissions reacting with biogenic VOC emissions under VOC-limited ozone formation conditions to the Wyoming NOx emissions instead of to the biogenic VOC emissions. Unlike OSAT, APCA is not a true ozone source apportionment because it expresses a bias toward assigning ozone formed to one type of Source Group over another, which is why it is called a culpability assessment and not an ozone source apportionment.

The cumulative effects of EPA missing emissions, using a coarse 12-km grid spacing and WRF meteorological inputs, and using APCA instead of OSAT would likely reduce Wyoming's contribution to 2023 and 2026 ozone design values at Chatfield to below the 1 percent of the 2015 ozone NAAQS significance threshold.

For Utah the case is not quite as clear whether the cumulative effects of all the deficiencies in the Proposed Transport Rule would be sufficient to reduce the ozone contributions at DM/NFR NAA receptors to below the significance threshold used in the Proposed Transport Rule. An explicitly CAMx ozone source apportionment simulation correcting these Proposed Transport Rule deficiencies is needed, but there was insufficient time to conduct such a simulation given the short comment period.

For all these reasons' EPA's Proposed Transport Rule overstates Utah's and Wyoming's ozone contributions.

Ramboll's Independent CAMx 2023 APCA and OSAT Source Apportionment Simulation for the Western States Lowers Utah and Wyoming contributions:

The CAMx 2023 western states APCA modeling results were processed for the three nonattainment/maintenance receptors in the DM/NFR NAA and our Upwind state ozone contribution results exactly matched those in the Proposed Transport Rule (e.g., Wyoming had a 0.81 ppb ozone contribution to 2023 ozone design value at Chatfield). Table 5-1 [available in full comment] compare the western state ozone contributions at the four key monitoring sites in the DM/NFR ozone NAA from our western states CAMx 2023 APCA and OSAT ozone source apportionment modeling. As expected, the state with the largest difference in the APCA and OSAT ozone source apportionment modeling ozone contributions was for Colorado (-18%) as there is more VOC-limited ozone formation in the Denver Metro urban area containing the receptors than in the more rural areas.

For Wyoming, the CAMx 2023 APCA ozone source apportionment had a 0.81 ppb contribution to CHAT that was 0.12 ppb above EPA's level needed to have an insignificant contribution (0.69 ppb) using the Proposed Transport Rule significant contribution threshold (0.70 ppb). Using the CAMx OSAT ozone source apportionment, Wyoming's contribution to CHAT is 0.75 ppb that is 0.06 ppb lower than APCA and half-way to being below EPA's significant contribution threshold so that is a significant effect.

For Utah, the CAMx 2023 OSAT ozone source apportionment modeling had a 0.02 to 0.04 ppb lower ozone contribution at DM/NFR NAA receptors compared to using the APCA probing tool.

*Response*

As explained elsewhere in Section 7.1, the EPA's method for calculating contribution follows the EPA's modeling guidance and is a longstanding and appropriate approach to assessing contribution at Step 2.

Based on the source apportionment modeling by the commenter using OSAT, both Wyoming and Utah remain linked to the Chatfield receptor in Denver. The EPA's response to comments regarding the use of the APCA source apportionment technique is in Section 4.1.2. We are deferring final action at this time on Wyoming's SIP submission, pending further review of the updated air quality and contribution modeling and analysis.

*Comment*

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Upwind State Ozone Contributions at Downwind State Receptors are Overstated. ([Ramboll,] Chapter 5).

The Proposed Rule overstates upwind state 2023 and 2026 ozone contributions to ozone design values at receptors in downwind states in a number of ways. For example, EPA's modeling ignored certain emissions, such as $NO_X$ formed by lightning, which occurs frequently in the Front Range area and can represent as much as 14% of summer ozone formation. EPA's coarse grid resolution, described in Chapter 4 of the Ramboll Report, also understates local emissions and ozone contributions, which has the ultimate effect of overstating upwind state contributions. Other choices made by EPA in conducting the Proposed Rule's CAMx ozone source apportionment modeling, such as the selected meteorological inputs and culpability assessment, further overstate upwind contributions.

*Response*

As described in Section III.A.2 of the preamble, and in response to this issue raised by commenters, the EPA included $NO_X$ emissions from lightning strikes in the 2016v3 emissions inventory used for the air quality modeling of this final action. *See* Preparation of Emissions Inventories for the 2016v3 North American Emissions Modeling Platform TSD (2016v3 Emissions Modeling TSD), available in the docket and at https://www.epa.gov/air-emissions-modeling/2016v3-platform. The method for including these emissions in the modeling are described in this document.

The EPA's response to comments on culpability assessment modeling can be found in Section 4.1.2.

The EPA's response to comments on model grid resolution and associated meteorology can be found in Section 4.

*Comments*

**Commenter:** Wisconsin Department of Natural Resources

**Commenter ID:** 51

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

1. EPA does not identify Wisconsin's Sheboygan Kohler-Andrae monitor as a 2023 nonattainment monitor in any proposal and must correct this omission.

EPA's evaluation of state transport SIPs is incomplete because it does not include the Sheboygan Kohler-Andrae monitor. As noted above, EPA's 2023 "no water" modeling results indicate that the Sheboygan monitor (Site ID 551170006) will have a 2023 average design value of 73.6 ppb and a 2023 maximum design value of 74.5 ppb. Applying EPA's CSAPR methodology, Sheboygan is considered a "nonattainment" monitor, since its average projected design value is above the 2015 ozone NAAQS. However, Sheboygan is not identified in any of EPA's proposed 2015 ozone transport SIP disapprovals (for Region 5, or any other region) as a 2023 nonattainment monitor, even as other monitors in Wisconsin (such as those in Racine and Kenosha) were properly included. Since Sheboygan clearly meets EPA's criteria as a nonattainment monitor, EPA should review all its 2015 transport SIP proposals and identify Sheboygan as a 2023 nonattainment monitor whenever appropriate.

2. EPA must identify all the states that are linked to the Sheboygan monitor in 2023.

Since Sheboygan was not identified by EPA as a nonattainment monitor in any submittal, EPA subsequently did not identify states linked to the monitor using EPA's "1% of the NAAQS" criteria (that is, a contribution equal or greater than 0.70 ppb). Based on contribution data for the Sheboygan monitor provided separately by EPA to WDNR, seven states are shown to contribute at least 0.70 ppb to Sheboygan in 2023 (Table 2). These states therefore would be linked to the monitor for transport purposes.

[Table 2 available in full comment]

To be consistent with the CSAPR four-step framework, EPA needs to identify that these states contribute to Sheboygan and therefore have transport obligations to that monitor. The WDNR also recommends that EPA independently review its contribution data for the Sheboygan monitor to confirm that no additional states should be identified as significant contributors beyond those listed above.

3. EPA must adjust its methods for selecting monitors for transport assessment to ensure monitors like Sheboygan are not omitted in the future.

[…]

EPA needs to adjust its methods for selecting monitors for transport assessment so that its transport modeling includes, by default, contribution data for <u>all</u> monitors with projected average or maximum

future year design values above the ozone standard being assessed (including Sheboygan, when that monitor so qualifies).

**Commenter:** Wisconsin Department of Natural Resources

**Commenter ID:** 51

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

1. EPA does not identify Wisconsin's Sheboygan Kohler-Andrae monitor as a 2023 nonattainment monitor in any proposal and must correct this omission.

EPA's 2023 "no water" modeling results indicate that Sheboygan monitor (Site ID 551170006) will have a 2023 average design value of 73.6 ppb and a 2023 maximum design value of 74.5 ppb. Applying EPA's CSAPR methodology, Sheboygan is considered a "nonattainment" monitor, since its average projected design value is above the 2015 ozone NAAQS. However, as noted above, Sheboygan is not identified in any of EPA's proposed 2015 ozone transport SIP disapprovals (including those in Region 7) as a 2023 nonattainment monitor, even as other monitors in Wisconsin (such as those in Racine and Kenosha) were properly included. Sheboygan is a monitor of regulatory significance that is projected to have the highest ozone design values in the Midwest. Since Sheboygan clearly meets EPA's criteria as a nonattainment monitor, EPA needs to review all of its 2015 transport SIP proposals and identify Sheboygan as a 2023 nonattainment monitor whenever appropriate.

2. EPA must identify Texas and Arkansas as states that are linked to the Sheboygan monitor in 2023.

Since Sheboygan was not identified by EPA as a nonattainment monitor in any submittal, EPA subsequently did not identify states linked to the monitor using EPA's "1% of the NAAQS" criteria (that is, a contribution equal or greater than 0.70 ppb). Based on contribution data for the Sheboygan monitor provided separately by EPA to WDNR, seven states, including Texas and Arkansas in Region 6, are shown to contribute at least 0.70 ppb to Sheboygan in 2023 (see Table). These states therefore would be linked to the monitor for transport purposes.

[Table 1 in full comment]

To be consistent with the CSAPR four-step analytic framework, EPA must identify Texas and Arkansas as states contributing to Sheboygan and that therefore having transport obligations to that monitor. The WDNR also recommends that EPA independently review its contribution data for the Sheboygan monitor to confirm that no additional states should be identified as significant contributors beyond those listed above.

*Response*

The EPA has identified the Sheboygan monitor as a nonattainment receptor in the air quality modeling for this final action, and the daily contribution data meet the criterion of a minimum of 5 days with

248

future year MDA8 modeled ozone concentrations greater than or equal to 60 ppb. In this regard, the EPA has calculated contributions to the Sheboygan receptor (Receptor ID: 551170006). The upwind states that contribute greater than or equal to 0.70 ppb screening threshold in this final action are Illinois, Indiana, Michigan, Missouri, Ohio, and Texas. The average contribution metric values from these states to the Sheboygan receptor can be found in the Final Action Air Quality Modeling TSD.

As explained in the Air Quality Modeling TSD for the proposal, as well as the Air Quality Modeling TSD for the final rule, both in docket No. EPA–HQ–OAR–2021–0663, the methodology for calculating contributions is based on the average of daily contributions on the days with the top 10 model-predicted MDA8 ozone concentrations greater than or equal to 60 ppb in the future year modeling. If there are fewer than 10 modeled days that meet this criterion for the given receptor, then the average contribution is calculated based on the remaining days greater than or equal to 60 ppb, providing that there are at least five days with modeled MDA8 values greater than or equal to 60 ppb. Average contribution metric values are not calculated for a receptor if there are fewer than 5 days with future year modeled MDA8 ozone concentrations at or above this threshold.

The basis for using the average contribution as the metric for evaluating upwind state contributions with respect to the 0.70 ppb screening threshold and the basis for requiring a minimum of 5 days with MDA8 ozone concentrations for calculating the average contribution metric is that the magnitude of contributions from upwind states can have very large day-to-day variability. The variability in contributions is the result of different multi-day transport wind patterns combined with the relative proximity of the upwind state to the downwind receptor.

The following tables illustrates the variability in daily contributions on the set of days used to calculate the average contribution metric values from upwind states linked to the Sheboygan receptor based on the modeling for this final action. At this receptor there are 9 days in 2023 with predicted concentrations greater than or equal to 60 ppb. The data for these 9 days are used in calculating the average contribution metric values for this receptor.

The first table provides the daily contributions by day for each upwind state. The second table provides the daily contributions for each upwind state ranked by the magnitude of the contribution. In both tables the bold/highlighted text denotes contributions greater than 0.70 ppb. Viewed together, the tables show that the upwind states closest to Sheboygan (i.e., Illinois, Indiana, and Michigan) have by far the largest contributions. For the other, more distant, upwind states, the difference in contributions across the top concentrations can be quite large. For example, the contributions from Missouri, Ohio, and Texas are each greater than 1 ppb on June 15. However, in contrast, on August 18 the contribution from Missouri is more than 5 ppb, while the contributions from both Ohio and Texas are well below the 1 percent threshold. In addition, the days with high contributions from nearby upwind states are not the same days for the more distant upwind states (i.e., Missouri, Ohio, and Texas). For example, on August 4 the contribution from Ohio is 3.65 ppb while the contributions from Missouri and Texas on this same day are much lower at 0.17 ppb and 0.34 ppb, respectively.

The ranked-ordered daily contributions in the second table illustrate the sharp contrast in the magnitude of contributions across the distribution of values. That is, the contributions from the 3 more distant states are either very high or very low. As an example, the 5th highest contribution from Missouri is 2.24 ppb, whereas the 6th highest contribution is nearly an order of magnitude lower at 0.37 ppb.

The EPA's methodology is designed to help ensure that the resulting average metric values are not biased toward only the days with the highest or lowest contributions. This provides a high degree of confidence that on average over these top days, each of these states contribute to the Sheboygan receptor's ozone concentrations.

In this regard, the EPA continues to find that its approach for calculating the average contribution metric is appropriate in that it provides a robust projection of contributions that can be expected in future years.

*Table 7-4*

| Date | Daily 8-Hour Averge Contributions (ppb) from Linked Upwind States in 2023 | | | | | |
|---|---|---|---|---|---|---|
| | IL | IN | MI | MO | OH | TX |
| May 24 | 14.41 | 4.14 | 1.15 | 2.32 | 0.46 | 0.82 |
| June 10 | 12.58 | 4.19 | 0.82 | 2.45 | 0.06 | 3.15 |
| June 15 | 8.35 | 3.15 | 0.61 | 2.24 | 1.08 | 1.62 |
| June 19 | 7.37 | 8.19 | 0.95 | 0.13 | 2.92 | 0.11 |
| June 25 | 8.41 | 12.84 | 3.05 | 0.37 | 4.60 | 0.65 |
| July 11 | 16.25 | 11.58 | 0.90 | 2.25 | 0.00 | 0.71 |
| July 20 | 15.80 | 10.19 | 1.17 | 0.31 | 0.02 | 0.86 |
| August 04 | 15.49 | 16.20 | 4.45 | 0.17 | 3.65 | 0.34 |
| August 18 | 16.18 | 3.11 | 0.05 | 5.20 | 0.00 | 0.26 |

*Table 7-5*

| Rank | Rank-Ordered Daily 8-Hour Averge Contributions (ppb) from Linked Upwind States in 2023 | | | | | |
|---|---|---|---|---|---|---|
| | IL | IN | MI | MO | OH | TX |
| Highest | 16.25 | 16.20 | 4.45 | 5.20 | 4.60 | 3.15 |
| | 16.18 | 12.84 | 3.05 | 2.45 | 3.65 | 1.62 |
| | 15.80 | 11.58 | 1.17 | 2.32 | 2.92 | 0.86 |
| | 15.49 | 10.19 | 1.15 | 2.25 | 1.08 | 0.82 |
| | 14.41 | 8.19 | 0.95 | 2.24 | 0.46 | 0.71 |
| | 12.58 | 4.19 | 0.90 | 0.37 | 0.06 | 0.65 |
| | 8.41 | 4.14 | 0.82 | 0.31 | 0.02 | 0.34 |
| | 8.35 | 3.15 | 0.61 | 0.17 | 0.00 | 0.26 |
| Lowest | 7.37 | 3.11 | 0.05 | 0.13 | 0.00 | 0.11 |

250

## 7.2    Contributions

*Comment*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

With respect to the receptor in Chicago, IL, to which the updated modeling links Missouri, no other receptors in Cook County, IL are linked to Missouri at Step 2. This calls into question the validity and assuredness of the model performance when it comes to the source apportionment techniques. In EPA's spreadsheet listing the design values and upwind state contributions, there are 10 receptors located in Cook County with available data all located in relatively close proximity to the newly identified linked receptor for Missouri. While the contribution identified from Missouri for the one linked receptor in Cook County is 0.94 ppb, the receptor with the next highest Missouri contribution is 0.56 ppb, approximately 40 percent less. From a practical standpoint it makes no sense that Missouri is contributing to this single receptor above the 1 percent threshold since there are nine other monitors in the same county where Missouri's contribution is at least 40 percent less than the modeled contribution to that problem receptor. This calls into question the ability of the model to determine significant contribution levels and the arbitrary nature of the 1 percent threshold at Step 2.

*Response*

The commenter states that in the 2016v2 modeling used for the proposed actions, Missouri was linked to only one of the five receptors in Cook County, IL. The commenter notes that the contribution to the monitor to which Missouri was linked (i.e., Evanston, monitor ID 170317002) was 0.94 ppb, but Missouri's contribution to the receptor with the next highest contribution was 0.56 ppb[68]. The commenter then claims that the large difference in the magnitude of contributions from Missouri to receptors within a single county calls into question the ability of the EPA's modeling to determine which contributions are significant. Commenters also claim the disparity in contributions underscores the arbitrary nature of the 1 percent threshold at Step 2.

The EPA disagrees with this comment. First, the EPA's average contribution metric which is used in Step 2 to evaluate each state's contribution with respect to the 1 percent of the NAAQS screening threshold is based on the multi-day average concentration and contribution on the top 10 concentration days greater than or equal to 60 ppb in 2023 at each receptor. The differences in average contributions from Missouri to the five receptors in Cook County as noted by the commenter are the result of differences in which days are used to calculate the average contribution metric. That is, because there are large spatial gradients in ozone concentrations in Cook County on some days, which may be due, either fully or in

---

[68] Missouri's average contribution to the five receptors in Cook County ranges from 0.20 ppb to 0.94 ppb at receptors in Cook County.

part, to the effects of the complex, local scale meteorological conditions associated with lake breeze from Lake Michigan, the average contribution at each receptor can be based on a different set of days. Because the magnitude of contributions from Missouri (and other upwind states) can vary by large amounts from day to day, in response to day to day differences in regional transport wind flows, the use of different days in the calculations can result in large differences in the average contribution among the five receptors.

The effects of day to day variability in the concentrations and contributions used to calculate the average contribution metric are evident from the data in the table below. This table provides the daily MDA8 ozone (i.e., O3) concentrations and contributions from Missouri to each of the five receptors in Cook County on the collective set of days used to calculate the average contribution metric at each receptor (concentrations and contributions are in units of ppb). In this table the data are ranked from highest to lowest based on the magnitude of the daily contributions from Missouri to the Evanston, Illinois receptor. The MDA8 concentrations shaded gray denote the days used to calculate the average contribution metric at each receptor. Daily contributions from Missouri that are greater than or equal to 1 percent of the NAAQS (i.e., 0.70 ppb) are shaded orange. The data in the table show that the days with the highest contributions from Missouri (i.e., contribution values shaded orange) occur on a consistent set of days at nearly all the receptors (the exception being July 23 when the contributions from Missouri to two receptors are above the threshold, whereas the contributions to the other three are below the threshold.) That is, days with high contributions from Missouri at one receptor are, with one exception, also the days with high contributions from Missouri at the other receptors. Thus, the modeling is consistent in terms of which days are most impacted by emissions from Missouri at the Cook County receptors. Looking at the concentration and contribution data on the specific days used in calculating the average contribution metric at each receptor (i.e., MDA8 concentrations shaded gray) confirms that the differences between receptors in the magnitude of daily MDA8 ozone concentrations are the cause of the large difference in the average contribution from Missouri to these receptors. For example, at the Evanston receptor, four of the days used to calculate the average contribution are well above 0.70 ppb. The Alsip receptor also has high contributions from Missouri on these same days, but the MDA8 ozone concentrations on these days are well below 60 ppb such that none of these high contribution days are included in calculating the average contribution at this receptor.[69] Thus, as this analysis clearly demonstrates, the EPA finds that its contribution modeling provides consistent results in terms of the contributions from Missouri to the receptors in Cook County and that receptor to receptor difference in the average contribution from Missouri is the result of differences in the magnitude of model-predicted ozone concentrations at individual receptor on specific days.

See also Section 4.2 for the EPA's response to comments on coarse scale (i.e., 12 km) modeling.

---

[69] Note that there are fewer than 10 days with model predicted MDA8 ozone concentrations in 2023 that meet the 60 ppb criteria. In this regard, the average contributions at this receptor are based on the data for the seven days that meet this criterion.

*Table 7-6*

| Month | Day | Evanston (170317002) MDA8 O3 | Missouri | Alsip (170310001) MDA8 O3 | Missouri | So. Water Plant (170310032) MDA8 O3 | Missouri | COM ED (170310076) MDA8 O3 | Missouri | Northbrook (170314201) MDA8 O3 | Missouri |
|---|---|---|---|---|---|---|---|---|---|---|---|
| July | 7 | 67.0 | 3.32 | 46.8 | 3.11 | 51.4 | 3.14 | 48.2 | 2.77 | 61.8 | 2.59 |
| June | 15 | 67.6 | 2.09 | 54.7 | 1.22 | 60.3 | 1.56 | 55.2 | 1.31 | 54.6 | 1.62 |
| July | 22 | 61.2 | 1.92 | 57.0 | 1.53 | 63.1 | 1.96 | 56.7 | 1.70 | 55.6 | 1.54 |
| June | 25 | 65.4 | 0.89 | 55.4 | 1.10 | 57.1 | 0.83 | 56.1 | 1.06 | 62.0 | 1.12 |
| August | 10 | 62.0 | 0.48 | 67.5 | 0.50 | 60.9 | 0.41 | 68.2 | 0.51 | 67.7 | 0.59 |
| June | 19 | 61.7 | 0.44 | 55.3 | 0.52 | 56.7 | 0.47 | 56.6 | 0.52 | 58.4 | 0.49 |
| July | 23 | 64.6 | 0.43 | 63.3 | 0.90 | 67.3 | 0.68 | 70.9 | 0.81 | 75.4 | 0.52 |
| August | 3 | 63.5 | 0.42 | 61.3 | 0.25 | 66.0 | 0.31 | 62.0 | 0.33 | 64.7 | 0.45 |
| July | 18 | 55.1 | 0.13 | 70.7 | 0.22 | 61.5 | 0.18 | 69.4 | 0.16 | 59.1 | 0.10 |
| August | 4 | 74.7 | 0.07 | 58.2 | 0.05 | 62.0 | 0.05 | 60.3 | 0.05 | 70.9 | 0.07 |
| August | 2 | 57.4 | 0.05 | 55.2 | 0.09 | 56.9 | 0.06 | 60.4 | 0.08 | 65.3 | 0.07 |
| July | 19 | 56.0 | 0.01 | 70.7 | 0.04 | 68.1 | 0.04 | 76.2 | 0.04 | 66.2 | 0.01 |
| July | 25 | 51.2 | 0.00 | 70.9 | 0.00 | 57.4 | 0.00 | 64.2 | 0.00 | 49.0 | 0.00 |
| July | 27 | 74.4 | 0.00 | 57.9 | 0.00 | 66.1 | 0.00 | 62.8 | 0.00 | 72.5 | 0.00 |
| July | 26 | 60.8 | 0.00 | 66.8 | 0.00 | 61.4 | 0.00 | 69.6 | 0.00 | 67.4 | 0.00 |

*Comment*

**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Tennessee's modeled contribution may be overstated because EPA did not have ten days of "high-ozone" for the monitor

EPA's modeling technical support document summarizes the basic approach for calculating the average contribution metric[.] […] The Denton County monitor used to calculate Tennessee's contribution meets this minimum criterion, but only barely – monitor ID 481210034 had only six modeled days above 60 ppb and only one day above 70 ppb (Table 5). Those six days (not 10) were used to calculate an average contribution of 0.94 ppb for Tennessee. Our reading of the technical support document suggests that EPA should have calculated Tennessee's average contribution using all ten days. If all ten days are used, Tennessee's contribution falls to 0.73 ppb, a value that exceeds the 1% value but only by a marginal amount. If all ten days are used, the tenth-highest value is 57.39 ppb. Tennessee also notes that of 153 modeled days, only one day (September 21) exceeded 70 ppb at all.

[Table 5 available in full comment]

*Response*

The commenter contends that, according to the approach described in the Air Quality Modeling TSD to support proposed SIP actions, the average contributions at the Denton County, TX should have been based on model predictions from the top 10 concentrations days. Instead, the EPA used the contributions on the top six modeled days above 60 ppb to calculate the avg contribution from upwind states to this receptor, because the EPA's modeling did not have at least 10 "high ozone days" in 2023. The commenter points out that there was only one day in the ozone season when the modeled concentration at this receptor was above 70 ppb. The average contribution based on six days was 0.94 ppb, whereas the contribution would be 0.73 ppb if the data on the top 10 days was used. The commenter notes that 0.73 ppb exceeds the 1 percent threshold by only a small margin.

The EPA first notes that in this action, the EPA is not taking final action on the state whose contributions are in question, Tennessee. The EPA will take final action on this state at a later point in time. However, to the extent that the commenter questions the methodology that the EPA has applied nationwide to calculate upwind state contributions, we are responding to this comment.

The EPA's methodology for projecting design values and calculating upwind contributions is explained in the 2016v2 modeling's Air Quality Modeling TSD "2015 Ozone National Ambient Air Quality Standards Proposed Interstate Transport Air Plan Disapproval," found in the docket for this action, docket ID No. EPA–HQ–OAR–2021–0663. The EPA's methodology for projecting design values and contributions is in accordance with the EPA's guidance for attainment demonstration modeling (US EPA, 2018). The criterion of having at least 5 days with MDA8 ozone concentrations greater than or equal to 60 ppb was chosen to avoid including contributions on days that are well below the NAAQS in the calculation of the contribution metric. Using 5 days with MDA8 ozone greater than or equal to 60 ppb aligns with recommendations in EPA's air quality modeling guidance for projecting future year design values. The EPA continues to find it appropriate to follow this methodology in projecting ozone concentrations and contributions in future years.

In this instance, as the commenter also points out under the alternative methodology presented, Tennessee would still contribute greater than 0.70 ppb to the Denton receptor using the 2016v2 modeling platform and, therefore, Tennessee would still be considered "linked" at step 2 of the 4-step interstate transport framework if we had continued to rely on that modeling for final action. In fact, in the sensitivity modeling completed using GEOS-Chem, there were 10 days greater than or equal to 60 ppb in 2023 at the Denton receptor. Using the data for all 10 days results in an avg contribution from Tennessee to Denton of 0.71 ppb.

*Comments*

**Commenter:** Louisiana Chemical Association

**Commenter ID:** 26

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's projected nonattainment and maintenance receptors with Louisiana linkages are different under the 2016v2 model than they were under the *2015 Ozone NAAQS Memo* model. EPA does not explain why the models produce differing linked receptors but alleges without justification that this does not call the 2016v2 model accuracy/credibility into question. The differences are summarized below. The orange cells are receptors that are identified as Louisiana linkages in the 2015 Ozone NAAQS Memo results spreadsheet but not the 2016v2 results spreadsheet, or vice versa.

[table in full comment]

The fact that every single receptor shows an increase in Louisiana's contribution ***despite a decrease in ozone precursor emissions*** in Louisiana calls into question the legitimacy of input data for the 2016v2 model.

[table in full comment]

The modeling of Texas contributions to Louisiana monitors (see table) suggests decreases in the Texas emissions inventory over time and projections of increases in the Louisiana inventories.


**Commenter:** Louisiana Department of Environmental Quality

**Commenter ID:** 27

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Measured verifiable data shows that ozone precursor (NOx and VOC) emissions have decreased, demonstrating that existing regulations are functioning properly to ensure cleaner air for our citizens, and by extension, our state neighbors. Statewide ozone precursor levels are as follow:

[table in full comment]

The data unmistakably demonstrates that there is less transport, yet EPA has determined that EPA contributes more in the future.

[table in full comment]

This calls into question the reliability of the EPA's modeling.


*Response*

In response to commenter's claims that the EPA's modeling may be unreliable, the commenter claims unspecified modeling results demonstrate an increase in contribution from Louisiana at certain receptors between 2017 and 2028, despite a decrease in emissions between 2015 and 2020. The source

of data for both tables in this comment is not identified. It appears the commenter may be using the EPA's modeling of 2017 using a 2011-based modeling platform, and modeling of 2028 using the 2016v1 platform from the Revised CSAPR Update. We did not model 2028 using the 2016v2 platform, nor is 2028 a relevant analytic year for this action, falling five years beyond the 2023 analytic year associated with the Moderate area attainment date. In any case, the EPA notes that the correlation drawn by the commenter is flawed. The commenter's analysis fails to consider critical factors that influence the level of contributions from upwind states determined in different modeling platforms. The commenter is apparently comparing, on the one hand, contributions based on 2011 meteorology using emissions projected for 2017 from the 2011-based platform to, on the other hand, contributions based on 2016 meteorology with emissions projected for 2028 from the 2016v1 platform. The difference in contributions is a result of differences in transport wind flows in 2011 compared to 2016, as well as differences in the magnitude and spatial distribution of emissions in 2017 compared to 2028. Further, overall declines in emissions of ozone precursors in Louisiana from 2015 to 2020 do not in themselves establish that the state is not still contributing to receptors in 2023.

In the table below, to illustrate how the state's contribution would change using a consistent set of emissions inventory data and meteorology, we compare Louisiana's contributions to certain monitoring sites in 2023 and 2026 based on modeling from the 2016v3 platform. This illustrates that the contributions to receptors in eastern Texas from sources in Louisiana in 2026 are less than the contributions in 2023, but are still nonetheless well above the 1% threshold for Step 2 purposes. The EPA notes, however, that 2026 is beyond the next applicable attainment date and is not a relevant year for this action.

*Table 7-7*

| AQS ID | Location | Average Contribution from Louisiana (ppb) | | Percent Change |
|---|---|---|---|---|
| | | 2023 | 2026 | 2026 vs 2023 |
| 480391004 | Brazoria/Manvel Croix Park | 5.21 | 5.03 | -3.5% |
| 481210034 | Dallas/Denton Airport | 2.87 | 2.77 | -3.5% |
| 481671034 | Galveston | 9.51 | 9.37 | -1.5% |
| 482010024 | Houston/Aldine | 4.75 | 4.57 | -3.8% |
| 482010055 | Houston/Bayland Park | 5.49 | 5.30 | -3.5% |
| 482011034 | Houston/East | 5.62 | 5.43 | -3.4% |
| 482011035 | Houston/Clinton | 5.44 | 5.25 | -3.5% |

Other issues raised by these comments are addressed in the following sections: 1.4 (Use of Updated Modeling), 1.7 (Length of Comment Period), 5 (Updates to Modeling and Changes in Linkages), and 8.5 (Air Quality Factors).

*Comment*

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

The emission estimates from other sources, including those in Illinois, Indiana, Ohio and Michigan – and in particular, emissions from the iron and steel sources in those states, are overstated and are inconsistent with prior state submittals. Finally, separate from the emission estimates, the modeling used in the disapproval over-predicts impacts from the upwind states and sources.

*Response*

The EPA's response to comments on emissions inventories can be found Section 3. The comment provided no basis for claiming that the EPA's modeling for the proposed disapproval actions over-predicts impacts from upwind states.

## 7.3   1 Percent as a Contribution Threshold

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

EPA's 4-step framework provides for a finding of significant contribution or linkage at a level of one percent of the 2015 ozone standard. Due to this, the 4-step framework as applied by EPA, results in decisions that some states are able to narrowly avoid or narrowly be brought in to the FIP requirements based on extremely small changes to the modeling results. Therefore, if EPA's application of step 2 holds with a one percent threshold for establishing linkages, which it should not, as discussed at length in later comments, an underperforming model is unacceptable. If EPA claims that a one percent threshold is appropriate for establishing linkages, then arguments could be made that the model should be able to predict within one percent the ozone concentrations that have been measured in the past in the base case modeling scenario (modeling using past known meteorology and emission levels and comparing it to actual measured ozone concentrations).

[…]

EPA's application of a 1 percent of the standard contribution as the threshold (1 percent threshold) to establish significant contribution is arbitrary and unjustified. In the proposed FIP, EPA states its reasoning simply as the fact that the threshold is the same value it has used in the past under previous CSAPR regulations. In EPA's original CSAPR, it justifies the use of the 1 percent contribution with a generic statement about how in many cases relatively small contributions from many states can collectively contribute in significant amounts to the downwind problem. However, the only analysis that EPA has performed in these latest CSAPR actions is in its August 2018 memo where EPA concluded and recommended that a higher threshold may be appropriate. The memo goes into great detail about the level of downwind contribution captured at various thresholds and uses this as the basis for suggesting that an alternative (higher) threshold may be appropriate.

EPA has offered no analysis in their proposed disapproval nor in their proposed FIP to justify the continued use of a 1 percent threshold. If the generic reasoning in the original CSAPR still stands that relatively small contributions from many states can collectively contribute in significant amounts, then EPA could supposedly pick an even lower threshold for significant contribution and it would assuredly prevail, and bring more states into this predicament. On the converse, EPA, despite all of the new modeling and upwind state contribution data it now has available, offers no reasoning as to why a higher threshold is not appropriate. This is a complete reversal in the stance EPA took with its August 2018 memo where thorough analysis was used to potentially justify such higher thresholds. The lack of reasoning and justification, and instead just pointing to the fact that EPA has successfully used the threshold in similar regulations before, is evidence that calls into question whether EPA is able to adequately justify the use of a 1 percent threshold in light of the data before it. EPA must adequately explain how the data from the updated modeling justifies the use of a 1 percent threshold and then re-propose and take comment on that rationale. Failure to do so before promulgating a final disapproval or final promulgation of a FIP would rob states and the public from an informed public participation process that will result in billions of dollars of costs and future policy implications that could defer even greater authority of this federal agency over state sovereign rights.

[…]

Further, the real effects of EPA using, without justification, the 1 percent threshold sheds even more light on the inappropriateness of this approach. EPA states in its disapproval that it had previously attempted to justify the use of an alternative threshold for the state of Iowa in a proposed approval of their good neighbor SIP, because Iowa had no linkage to any receptors above a 1 ppb contribution, which EPA's August memo sought to allow. In Missouri's proposed disapproval, EPA states that it attempted to augment Iowa's submission to allow for the use of the 1 ppb threshold for that state, but that it was not moving forward with that proposal. EPA offers no reasoning or justification for why it could not move forward with that proposal, and instead decided to approve Iowa's SIP because the updated modeling did not include any linked receptors to Iowa because the highest contribution from Iowa for any remaining linked receptors in the updated modeling is below the 1 percent threshold. As a result, EPA is proposing to approve Iowa's SIP, but for a different reason that what EPA proposed earlier. This determination only magnifies the arbitrary nature of the 1 percent threshold, where states can fall

in and out of billions of dollars of compliance costs that are federally mandated based on relatively minor changes in the modeling results.

**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA's selection of 1% is arbitrary. It could have just as easily adopted 1 ppb as its threshold in the first place, as requested by many States, but it chose 1% apparently due to the additional 5% (7% in the 2018 modeling) of emissions reductions provided. Information is not readily available to determine if EPA actually investigated whether implementing the 1 ppb threshold in its reduction methodology in the proposed FIP would have been sufficient to address the attainment and maintenance issues in question. While EPA has the ability to set the thresholds for the program, it does not have the right to require overcontrol of source emissions purely as a method of reducing overall emissions or imposing restrictions on target source categories. If the reductions necessary could have been achieved at the 1 ppb threshold, the 1% threshold requirements clearly demonstrate an overcontrol situation.

Lastly, if the 1% threshold is considered a bright line for SIP approval, then rulemaking should be undertaken with technical supporting documentation and opportunity for notice and comment. Absent rulemaking, the States, who are responsible for the development and implementation of SIPs, will use best judgement and sound scientific principles, regarding all available information in said development and implementation.

**Commenter:** Louisiana Chemical Association

**Commenter ID:** 26

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The use of 1% of the NAAQS threshold for modeled contribution as the sole definition of significant contribution is inappropriate for the 2015 Ozone NAAQS since the more stringent .7ppb (1%) threshold is an order of magnitude smaller than the biases and errors typically documented for regional photochemical modeling (cited Simon et al., 2012). In fact, although modeling bias (difference between monitored and modeled values) has been reduced over the last 10-15 years with updated CMAX modeling versions, summertime NOx bias still remains above the 1% threshold, particularly in the South, including Louisiana. (cited Toro, C, et al. 2021. Evaluation of 15 years of modeled atmospheric oxidized nitrogen compounds across the contiguous United States). The EPA screening level now being used to evaluate Louisiana's SIP is a fraction of a part per billion – an incredibly low value. EPA has provided no scientific support for a 1% screening level to be always applied for every NAAQS without consideration

259

of factors such as the ability to discern ozone impacts of precursors at such infinitesimally small values and model performance. Although EPA addresses the bias limitations of the modeling in the Proposed Rule, it does not explain why the 1 ppb threshold is arbitrary and capricious and should not be used.

**Commenter:** Louisiana Department of Environmental Quality

**Commenter ID:** 27

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's discussion of 1% of the standard (or 0.07 ppb) versus 1 part per billion (ppb) is silent on linkages to Sheboygan WI, which LDEQ used, yet dismisses the use on linkage to other monitors because the 2016v2 modeling show increased transport.

This discussion is moot. Use of 1% of the standard is problematic as EPA's own performance specifications for automated analyzers allow up to 2.5 ppb as "noise" according to Table B-1, Subpart 53.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA ignores a significant EPA study supporting use of the 1 ppb threshold. Admittedly, EPA determined the one-percent threshold was appropriate when it first adopted the original CSAPR rule. This was based on 2011 modeling analysis that compared a 5% threshold, a 1% threshold, and ½% threshold. Based on this modeling analysis, EPA concluded that the upwind capture rates under the 1% and ½% threshold options were similar, indicating that little benefit would be achieved with the lower threshold. EPA did find that raising the threshold to 5% would leave too many upwind states and emission sources unregulated.

EPA conducted further analysis in 2018 when it issued the Threshold Guidance that re-analyzed the minimum threshold using a tighter range of options and more up-to-date modeling techniques and data. Specifically, EPA evaluated the difference in capture rates between the previous threshold of 0.7 ppb (1%), a threshold of 1 ppb, and a threshold of 2 ppb. Like the 2011 analysis, EPA's 2018 analysis again concluded that the difference between the two lower options—0.7 ppb and 1 ppb—was minimal, while the higher threshold of 2 ppb left too many emissions unregulated. As a result, EPA considered capture rates at the 0.7 ppb and 1 ppb thresholds to be generally comparable, and thus concluded that "it may be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold," in addressing interstate transport under the CAA good neighbor provision. Notably, a threshold of 1 ppb is just 1.4% of the ozone standard of 70 ppb, and therefore would round down to 1%.

260

[…]

*EPA's insistence on a 1 percent threshold is not based on sound reasoning or science.*

EPA engaged in robust statistical analysis in other guidance that defined a Significant Impact Level ("SIL") for ozone to be used as part of the PSD permitting process (setting it at 1 ppb) ("SILs Memo"). The purpose of the SILs Memo was to provide an ozone level "for the permitting authority to conclude that the proposed source will not cause or contribute to a violation of a National Ambient Air Quality Standard (NAAQS)." That analysis was peer-reviewed by three independent economic statisticians employed as faculty at major U.S. universities. But the SILs Memo was not just limited to PSD permitting. As stated in their associated statistical analysis report:

> The statistical methods and analysis detailed in this report focus on using the conceptual framework of *statistical significance* to calculate levels of change in air quality concentrations that have a 'significant impact' or an 'insignificant impact' on air quality degradation. *Statistical significance* is a well-established concept with a basis in commonly accepted scientific and mathematical theory. This analysis examines *statistical significance* for a range of values measured by air quality monitors. The statistical methods and data reflected in **this analysis may be applicable for multiple regulatory applications** where EPA and state agencies seek to quantify a level of impact on air quality that they consider to be either 'significant' or 'not significant'.

EPA found that the "technical analysis may have utility in several contexts." Moreover, EPA recommended in the SILs Memo that the 1 ppb SIL for ozone should "apply to the NAAQS everywhere, regardless of the class of the airshed." This statement by EPA is directly contrary to EPA's statements about use of the SILs in its disapproval of so many states' good neighbor SIPs. The SILs analysis further supports use of the 1 ppb significance threshold and undermines EPA's claim that Utah's use of a 1 ppb ozone NAAQS threshold is inconsistent with EPA's past analysis.

**Commenter:** PacifiCorp (Attachment - Berkshire Hathaway Energy (BHE) Company Comments on Proposed Ozone Transport Rule)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA determined the one-percent threshold was appropriate when it first adopted the original CSAPR rule based on a 2011 modeling analysis that compared results under a five-percent threshold, a one-percent threshold, and a half-percent threshold. EPA's analysis compared the "capture rates" for the different options—i.e., the percentage of total upwind contribution that would be regulated under the different thresholds under consideration. Based on its modeling analysis, EPA concluded that the capture rates under the one-percent and half-a-percent options were similar, indicating that little benefit would be achieved with the lower threshold, but that raising the threshold to five percent would leave too many upwind states and emission sources unregulated. BHE asks EPA to reconsider its

261

minimum contribution threshold. Unless EPA can identify some rational basis for preferring its older and now outdated 2011 analysis, the 2018 analysis appears superior and more appropriate for both identifying significant contributions and evaluating the possibility of over-control.

[…]

In addition, as noted above, EPA has already determined in another context that two ozone design values (DV) that differ by less than 1 ppb are not statistically significantly different from each other, based on the statistical analysis use to define 1 ppb ozone as the Significant Impact Level (SIL) for the Prevention of Significant Deterioration (PSD) program. EPA's own demonstration that 1 ppb is not statistically significant confirms that 1 ppb is an appropriate de minimis threshold. Further discussion of this point is provided in the enclosed report from Ramboll evaluating the EPA modeling analysis underlying the Proposed Rule.


**Commenter:** PacifiCorp (Attachment – Ramboll Evaluation)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Wyoming's and Utah's Ozone Contribution Is Not Statistically Significant According to EPA's Statistical Analysis

[…]

EPA has conducted a robust statistical analysis to demonstrate that two ozone design values (DV) that differ by less than 1 ppb are not statistically significantly different from each other. The analysis was performed to define the 1 ppb ozone Significant Impact Level (SIL) that is used as part of the Prevention of Significant Deterioration (PSD) permitting process to define an ozone level "for the permitting authority to conclude that the proposed source will not cause or contribute to a violation of a National Ambient Air Quality Standard (NAAQS)." That analysis was peer reviewed by three independent economic statisticians employed as faculty at major U.S. universities. Therefore, EPA should not consider contributions to be significant unless they are greater than 1 ppb. At that threshold, Wyoming would not significantly contribute to any downwind receptor. Also, at that threshold, Utah would not significantly contribute to any downwind receptor based on the more tailored RAQC / CDPHE modeling discussed above (Ramboll, Chapter 4).

[…]

EPA's Justification for the 1 Percent of the 2015 NAAQS Significance Threshold in the Proposed Transport Rule is Unfounded

On August 31, 2018, EPA released a Memorandum whose purpose was "*to provide analytical information regarding the degree to which certain air quality threshold amounts capture the collective amount of upwind contribution from upwind states to downwind receptors for the 2015 ozone National*

*Ambient Air Quality standard (NAAQS)*." (Tsirigotis, 2018b, pp. 1). The 2018 Memorandum evaluated significant ozone contribution thresholds of 1 ppb, 2 ppb and 1 percent of the 2015 ozone NAAQS (0.70 ppb) and concluded "*Based on the data and analysis summarized here, the EPA believes that a threshold of 1 ppb may be appropriate for states to use to develop SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS.*" (Tsirigotis, 2018b, pp. 3). This conclusion is technically justifiable given the statistical analysis EPA conducted to justify the 1 ppb SIL (EPA, 2018a).

In the Proposed Transport Rule, EPA discusses their 2018 Memorandum for states to use alterative ozone contribution thresholds in their good neighbor SIPs and offers a specious argument why use of a single threshold of 1 percent of the 2015 NAAQS is needed as "*the Agency now believes using different thresholds at Step 2 with respect to the 2015 ozone NAAQS raises substantial policy consistency and practical implementation concerns.*" (EPA, 2022, pp. 20073). [H]owever, EPA doesn't mention that the EPA 2018 Memorandum believed that a 1 ppb threshold is appropriate for states to use and its use as the single significance threshold would also alleviate the policy concerns of using multiple significance thresholds that EPA was concerned about. The Proposed Transport Rule then goes on to note that the 1 ppb threshold "*has the disadvantage of losing a certain amount of total upwind contribution*" compared to the 1 percent of the NAAQS threshold and "*there does not appear to be a compelling policy imperative in moving to a 1 ppb threshold.*" (EPA, 2022, pp. 20074). There is, however, a very powerful and compelling technical argument for moving to a 1 ppb significant contribution threshold based on EPA's statistical analysis to justify the 1 ppb ozone SIL that demonstrated two ozone DVs that differ by 1 ppb or less are not statistically significantly different from each other (EPA, 2018a).

**Commenter:** Sierra Club

**Commenter ID:** 39

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

First, Sierra Club strongly supports EPA's observation that "consistency in requirements and expectations across all states is essential" in regulating emissions to address a regional air pollutant such as ozone. As EPA correctly observes, utilizing different contribution thresholds for different states "would allow certain states to avoid further evaluation of potential emissions controls while other states must proceed to a Step 3 analysis," creating "significant equity and consistency problems among states." Indeed, a lack of uniformity in the stringency of control measures being applied to sources in upwind and downwind states is a significant cause of the persistent ozone nonattainment issues in many downwind areas. States that contribute above a fixed amount to a downwind nonattainment or maintenance area should, uniformly, be included in EPA's Step 3 analysis.

[…]

Third, Sierra Club agrees with EPA that consistency also counsels in favor of retention of the 1% contribution threshold. The 2018 Guidance Memorandum identified no reasoned basis for deviating from EPA's consistent prior actions and guidance on this issue, and Sierra Club perceives none other

than to simply reduce the number of states obligated to address their significant contributions to downwind nonattainment and maintenance. But shrinking the pool of states working to address regional ozone transport simply shifts the burden even more heavily to the downwind states, many of which contribute comparatively little to their own nonattainment and already control their in-state sources to a degree unmatched by their upwind counterparts.


**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA has not engaged in the rulemaking required under the Clean Air Act to establish 1 percent of the NAAQS as a bright-line SIP approval threshold for compliance with the 2015 8-Hour Ozone NAAQS, so EPA cannot disapprove Tennessee's SIP for a standard that has not been properly promulgated.

[N]either the 2015 8-Hour Ozone NAAQS, nor the implementation standards contain the 1% of the NAAQS compliance threshold for State SIPs.

While has EPA previously used a 1% significance threshold to address interstate transport, these metrics have been applied to issue SIP calls (e. g., the NOX SIP Call and CAIR NOX Ozone Season Trading Program) or to adopt Federal Implementation Plans in the absence of a SIP submittal. EPA's use of 1% is generally reasonable in such instances, because no state action has taken place (i. e., the state has not submitted a SIP), the state may provide comments and technical information on EPA's action (i.e., the 1% threshold is a rebuttable proposition to which the state may object), and – most importantly – the final result is a *rulemaking*, which complies with the applicable provisions of CAA section 307(d). It is well established that states have primary responsibility to develop and implement the SIP. However, in this instance EPA has decided to substitute its own judgement in place of the state's by imposing a 1% threshold on certain states (but not others as discussed in Comment #6) without engaging in the required rulemaking to impose this as a uniform standard to determine whether an upwind state is linked at Step 2 of the Framework. If, as EPA indicates, most states cannot justify or utilize an alternative standard in practice, then the 1% threshold has, by implication, become a critical approvability threshold for a SIP addressing the Good Neighbor provision and, as such, must be promulgated as a rulemaking, technically and legally supported, with an opportunity for notice and comment. If EPA wishes to establish a bright-line metric for review of infrastructure SIPs, then it should promulgate that metric through rulemaking under CAA section 307(d).


**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

<u>One Percent Contribution Criterion is Not Appropriate as it is Lower than What U.S. EPA Advised States and it is Lower Than What Can be Supported Based on the Precision of the Modeling</u>

U. S. Steel notes that while U.S. EPA may believe the modeling used to support its disapproval of the SIPs is accurate and precise, the accuracy and precision of the modeling does not support an impact threshold of 0.70 ppb. U.S. EPA needs to consider the accuracy and the precision of the modeling when determining an appropriate "interference" threshold. U. S. Steel acknowledges that a model cannot necessarily be "perfect" as U. S. EPA points out, but the U. S. EPA's decisions and impacts to the regulated need to reflect the model's accuracy and precision.

**Commenter:** Utah Petroleum Association and the Utah Mining Association

**Commenter ID:** 48

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA should not apply the same downwind threshold contribution in the western United States that it applies in the east.

EPA judged the Utah IT SIP based on a threshold contribution of 0.7 ppb to downwind States, but numerous other influences affect ozone in the west, meaning that such a small contribution can be difficult to predict with any accuracy. In their comments on the Proposed GNR, the Western States Air Resources Council ("WESTAR") stated:

> *Air quality in the WESTAR region is influenced by both human activities and natural phenomena. Baseline air quality and the sources of impacts to that baseline differ based on local industry, geography, population, meteorology, and other state or regional conditions. Across the West, high elevations, extreme variations in topography, vast landscapes, and variable weather patterns influence air quality. The West is also disproportionately affected by wildfires, high wind dust events, volcanic activity, and international transport of pollutants. Pollutant sources, methods of dispersion, and types of affected areas in the West are quite different from those in the eastern United States.*

While EPA strives for consistency, being consistent does not always mean being the same. The differentiating factors in the WESTAR comments must be considered. At a minimum, these factors point to greater uncertainty in air quality modeling. Considering the myriad of factors lending uncertainty to modeling results, the 0.7 ppb threshold contribution is too low.

*Response*

The EPA responds to these comments in the preamble in Section V.B. Specifically, comments regarding the technical merits and justification of a 1 percent of the NAAQS contribution threshold are addressed

in Section V.B.4. and Section V.B.5. of the preamble, respectively. Comments advocating use of the Prevention of Significant Deterioration Significant Impact Level as the contribution threshold at Step 2 are addressed in Section V.B.6. of the preamble.

As the EPA recognized when it first applied this threshold in CSAPR, using a threshold expressed as a percentage of the NAAQS allows for the threshold to become more stringent in proportion to the increased protectiveness of public health and the environment when the EPA revises the NAAQS. 76 FR 48208, 48238 (Aug. 8, 2011) (The "approach is readily applicable to any current and future NAAQS and would automatically adjust the stringency of the transport threshold to maintain a constant relationship with the stringency of the relevant NAAQS as they are revised."). No state or commenter has explained why this well-considered policy is unlawful or arbitrary and capricious.

One commenter pointed to the EPA's proposed error correction of the EPA's prior approval of Delaware's SIP submission in a separate rulemaking proceeding to argue that updates to modeling make the threshold too small, as a states' contribution can change to be above or below a 1 percent of the NAAQS contribution threshold after updates are made to the modeling. But the same would be true for any threshold, including 1 ppb. Some states that would fall just above a 1 ppb threshold could be anticipated to make (and indeed, several included in this action do make) virtually identical arguments as the states that are just over the 1 percent of the NAAQS threshold.

Additionally, in the case of every state covered by this action, with the exception of Alabama, Kentucky, and Minnesota, the difference between a 1 percent threshold and a 1 ppb threshold is irrelevant to the decision here because linkages are present above the 1 ppb level in the 2016v3 modeling.

Another commenter argued that 1 percent of the NAAQS fails limits of modeling and monitoring capability and so violates the requirement from *Michigan v. EPA*, 213 F.3d 663 (D.C. Cir. 2012) for EPA to establish a "measurable contribution" before identifying the amount of "significant contribution." *Michigan*, 231 F.3d at 684. Another commenter apparently references Table B-1 to subpart B of 40 CFR Part 53 (performance limit specifications for automated methods), to make a similar argument regarding the capabilities of monitoring equipment. We address the comments on whether monitoring technology accuracy is relevant in Section V.B.4 of the preamble. There is also no conflict with *Michigan*. Contributions as low as 1 percent of the NAAQS (and impacts at even lower levels) are reliably measured through our modeling to calculating and apportioning contribution.

Other issues raised by these comments are addressed in the preamble in Sections V.A.4., V.B.2., V.B.6., V.B.7., and V.C.2. and in the following sections: Sections 1.2 (Guidance for SIP Submissions), 1.4 (Use of Updated Modeling), 4.2 (Model Performance), 5 (Updates to Modeling and Changes in Linkages), 7.2 (August 2018 Memorandum), 9.2 (Over-Control), 10.3 (Cooperative Federalism and the EPA's Authority), 11.4 (Transport Policy – Western State Ozone Regulation), and 11.5 (International Contributions). Further explanation of the EPA's contribution calculation can be found in the Final Action Air Quality Modeling TSD, in the docket for this action.

## 7.4    August 2018 Memorandum

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

The use of the 1 percent threshold is assuredly arbitrary and capricious, and EPA offers no justification or reasoning for its selection of that threshold in Missouri's SIP disapproval to counter this claim. EPA's disapproval only states that in light of the fact that it has not found any state's justification adequate for the use of a different threshold at step 2, it no longer thinks it is advisable to consider using different thresholds to establish linkages at step 2. However, EPA does not go on to defend its use of the 1 percent threshold, and simply assumes that because it was able to use it before, it must be able to use it again without question or any consideration of the new facts and data that are now available with the updated modeling. This assumption is flawed, and without providing this reasoning and an opportunity for public notice and comment, the proposed disapproval cannot stand without a re-proposal that clearly articulates the reasoning for the 1 percent threshold, or any other threshold EPA decides to use. Further, the real effects of EPA using, without justification, the 1 percent threshold sheds even more light on the inappropriateness of this approach. EPA states in its disapproval that it had previously attempted to justify the use of an alternative threshold for the state of Iowa in a proposed approval of their good neighbor SIP, because Iowa had no linkage to any receptors above a 1 ppb contribution, which EPA's August memo sought to allow. In Missouri's proposed disapproval, EPA states that it attempted to augment Iowa's submission to allow for the use of the 1 ppb threshold for that state, but that it was not moving forward with that proposal. EPA offers no reasoning or justification for why it could not move forward with that proposal, and instead decided to approve Iowa's SIP because the updated modeling did not include any linked receptors to Iowa because the highest contribution from Iowa for any remaining linked receptors in the updated modeling is below the 1 percent threshold. As a result, EPA is proposing to approve Iowa's SIP, but for a different reason that what EPA proposed earlier. This determination only magnifies the arbitrary nature of the 1 percent threshold, where states can fall in and out of billions of dollars of compliance costs that are federally mandated based on relatively minor changes in the modeling results. Delaware is in a similar, but completely opposite, situation as Iowa that sheds even more light on the arbitrary nature of such a low significant contribution threshold. In the previous modeling, Delaware's contribution levels were below the 1 percent threshold, and now EPA is proposing to reverse their approval of Delaware's SIP and bring them into the FIP. Such monumental changes in EPA's approval status based solely on the latest modeling analysis shows that if these proposed disapprovals and proposed FIP are allowed to stand that no state can ever be assured that their good neighbor obligations have actually been met. Delaware has not relaxed any control measures between the final approval of their SIP and the proposed reversal of that approval. Yet, EPA is now proposing to impose a FIP on Delaware. This goes to show that the significant contribution value of

267

1 percent, which either requires hundreds of millions of dollars of compliance costs, or no costs whatsoever, is not justifiable or equitable in any way. EPA states in their proposed disapproval of Missouri's SIP that consideration of alternative significant contribution thresholds would raise serious concerns about equity among states, but this action shows that such a low contribution threshold at step 2 will certainly have the same effect. States are at the mercy of the modeling, and anytime EPA wishes, it may update the modeling and reverse course on the inclusion of a state resulting in the imposition of a detrimentally costly FIP. For all of these reasons, EPA's selection for a 1 percent threshold, or any other threshold, in the proposed disapproval cannot stand without a re-proposal that clearly articulates the explanation in light of the most recent data why such a threshold is appropriate.

**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

In November 2018 Iowa submitted its 2015 ozone transport SIP which relied on EPAs 2023 modeling as presented in EPNs memorandum from March 2018 to identify downwind receptors that may be impacted by Iowa emissions. Iowa concluded that the State did not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other State. Iowa referred to the analytic information in EPAs August 2018 memorandum as a basis to use a 1 ppb contribution threshold when evaluating the State contribution to downwind receptors. Iowa identified two downwind receptors to which it was contributing between 1% and 1 ppb. In the March 2020 proposed approval, EPA proposed to determine that Iowa was justified in applying a 1 ppb threshold for purposes of evaluating upwind State linkages. EPA stated that the amount of upwind contribution captured with the 1% and 1 ppb thresholds is generally comparable on average across all receptors, therefore EPA concluded that it may be reasonable and appropriate for States to use the alternate threshold of 1 ppb. This conclusion led EPA to propose approval of Iowa's transport SIP submittal, which relied on a 1 ppb contribution threshold. When the updated 2016v2 modeling was released, Iowa was shown to contribute less than the threshold of 1% of the 2015 ozone NAAQS to all downwind receptors. This finding led EPA to withdraw the March 2020 proposed approval that relied on a 1 ppb threshold and to re-propose approval based on the new modeling and on the fact that Iowa's contribution to all other States was now below 1% of the 2015 ozone NAAQS. While this action by EPA is appropriate based on the new modeling results,  the fact that EPA had full intentions to approve Iowa's November 2018 transport SIP submittal that relied on a 1 ppb threshold is an obvious indication that EPA agreed that this alternative threshold was adequate and approvable. This fact goes completely against EPAs current reasoning that the use of a 1 ppb alternate contribution threshold is unacceptable due to the negative effects it would have on national consistency and policy issues.

[…]

In response to ADEM's SIP submittal, EPA contends that ADEM did not provide sufficient technical justification for using a 1 ppb threshold instead of EPA's arbitrary 1% threshold. In fact, EPA states it was

268

not providing a methodology for justifying a 1 ppb threshold and that all States that had attempted to had not successfully demonstrated a sufficient technical justification. EPA is fully aware that few, if any, States have the resources available to provide the additional modeling necessary to demonstrate a technical justification. Additionally, EPA did not provide additional technical information for why the 1 ppb threshold is not appropriate.

EPA can update and/or revise guidance but cannot simply disregard guidance that has not been withdrawn. The August 2018 memo states that "the amount of upwind collective contribution captured with the 1% and 1 ppb thresholds is generally comparable, and that it may be reasonable and appropriate to use the 1 ppb threshold". In fact, EPA did just that when conducting the Iowa WOE analysis for the 2015 ozone NAAQS. The analysis asked the question "What are the impacts of individual upwind States linked at 1 ppb or higher to the receptor?" In evaluating individual upwind States' contributions to the Denton County and Harris County, Texas receptors, Alabama's impacts, 0.71 and 0.88 ppb, respectively, represents 9% of the impact of upwind States above 1% at the Denton County receptor, while for the Harris County receptor, the impact is 10.6% of the impact of upwind States above 1%. Said another way, the Alabama contributions of 0.71 ppb (Denton) and 0.88 ppb (Harris) represent 6% and 7% of the total impact of upwind States. Alabama is significant at neither monitor relative to the 1 ppb threshold, nor is the State significant at either threshold for the 2026 future year.

For the upwind States above 1 ppb, three States are identified for the Denton County receptor (LA, MS, OK), and three States (AR, LA, MS), likewise are identified for the Harris County receptor.

[table in full comment]

The impacts of the States above 1 ppb is 5.55 ppb (45% of total upwind contributions) for the Denton County receptor, and 7.43 ppb (63% of total up-wind contributions) for the Harris Count receptor.

The table below lists the contributions Using the two thresholds for the Denton County (481210034) and Harris County (482010055), Texas receptors, considering all upwind States' contributions as well as States with contributions of ≥1% (0.71ppb), and States with contributions ≥1 ppb.

[table in full comment]

As can be seen in the table above, the impacts of upwind State contributions, in total, are less than half the contribution from Texas. Further, the impacts of the offshore, fires and biogenic sectors exceed the contribution from Alabama sources.

[…]

EPA states in the proposed disapproval that ADEM "did not identify any periods of clean data for the Denton County, Texas maintenance receptor for which meteorological conditions could be assessed to determine whether particular summers have ozone conducive or unconducive meteorology during a period of clean data." In looking at the 8-hr design values for the Denton County receptor, the trend is downward (Figure 1).

Of even more importance are the reductions in precursor emissions (NOx) for Alabama, Louisiana, Arkansas and Mississippi. Reductions on the order of 40 - 50% have occurred since 2011 (Figure 2). Texas NOx emissions have also shown a 36% decrease over the same time period, although the

269

statewide NOx emissions in Texas in many cases dwarf the other the other states. When looking at EGU and non-EGU NOx sources, it should be noted that Texas' emissions are many orders of magnitude greater than Alabama's. This is also the case in both the on-road and non-road sectors. While the design value for the Harris County, Texas receptor remains relatively unchanged, the NOx reductions both within and at upwind States are still notable.

[Figure 1 and Figure 2 are in the full comment]

In the EPA WOE analysis that was conducted for Iowa, EPA looked at the impact of in-state emissions on ozone levels relative to the collective upwind impacts. The upwind States' contribution to the Denton County receptor (481210034) is 17% (12.2 ppb) of the 2023 average ozone design value, as compared to 39% or 27.3 ppb from in-state sources, with Alabama's contribution of 0.71 ppb only contributing 6% to the total contribution of all upwind States at the Denton County receptor.

Alabama is ranked 6th and last when using EPA's 1% significance threshold (Table 1). When looking at both the Denton and Harris County receptors, ADEM compared the year to year NOx changes at both the ozone and NOx monitors, which are co-located (Figures 3 and 4).  While statewide NOx emissions are declining, the NOx concentrations at the receptors do not reflect what is being seen across the State, indicating that local NOx sources, such as vehicles, may play a bigger role in the formation of ozone, not transported precursors.

[Table 1, Figure 3, and Figure 4 in full comment]

Another issue of note is that with the continued reductions in NOx, it is unclear how lower NOx emissions in the 2022 modeling resulted in higher concentrations relative to the 2021 modeling which assumably reflected higher NOx emissions.

Based on the assessment of NOx emissions from Alabama and other upwind States, Alabama's contribution to the 2023 average ozone design value relative to Texas and other upwind States, and supplemental NOx data, ADEM asserts that NOx emissions in 2023 will have an insignificant impact on the Denton County, Texas monitor.

[…]

In the EPA WOE analysis completed for Iowa, EPA considered the linkages between the upwind States' impact on the nonattainment or maintenance receptor, specifically in relation to the two thresholds, 1% (0.71 ppb) and 1 ppb. For the Denton County receptor, in addition to Alabama, there are two other upwind States that contribute between 0.71 and 1 ppb, Arkansas and Tennessee. The collective contribution for those two States is 14% of the total upwind contributions. While Tennessee and Alabama are not linked to any other receptor above 1 ppb, Arkansas is linked above 1 ppb to other monitors in Texas. For the Harris County receptor, Alabama is the only State with a contribution between the two thresholds, with a total contribution of 7% of the total upwind contribution. The difference between the thresholds, as shown above are 7.4% (0.88 ppb) for the Harris County receptor, and 19.7% (2.41 ppb) for the Denton County receptor. These percentages are in line with the analysis EPA completed for Iowa, which indicated that an alternative threshold could be supported.

Additionally, it is worth looking at the number of linkages for each State to 2023 nonattainment and maintenance receptors. For the Denton County receptor Alabama is only linked to two receptors, one nonattainment receptor (Harris County, Texas- 482010055) and one maintenance receptor (Denton County, Texas- 481210034). With respect to all linkages identified, Alabama is ranked 18th of 23 for non-attainment receptors, and 21st out of 27 for all linkages. At 1 ppb, Alabama is not linked to any receptors, nonattainment or maintenance, and Alabama is not linked to any receptors in 2026, regardless of the threshold.

Based on Alabama's ranking when considering which States are linked to future nonattainment and or maintenance receptors as well as the magnitude of the linkages (between 1% (0.71ppb) and 1 ppb for both receptors), this supports an alternative threshold of significance.


**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Specifically, ADEM's SIP submission package identifies multiple factors that support its analysis: […] (4) application of an alternative contribution threshold. Each of these factors suggests that Alabama sources do not contribute significantly to ozone concentrations in Texas and that further regulation of Alabama sources would not appreciably decrease ozone concentrations in Texas.

[…]

Finally, ADEM argues that 1 ppb is a reasonable and acceptable contribution threshold in this case.

[…]

EPA contends that ADEM's "arguments in support of using a 1 ppb threshold are not approvable," however, this is not the correct standard by which to review the SIP. The threshold is merely a proxy EPA has instituted in its 4-step framework in order to determine potential state linkages in step 2. Whereas EPA proposes to rely on a 1 percent (0.7 ppb) threshold for "evaluating a State's contribution to nonattainment or maintenance of the 2015 8-hour ozone NAAQS . . . at downwind receptors" based on a theory of consistency, other thresholds have been utilized in the past. EPA concedes that it previously recognized that a 1 ppb contribution threshold is "justifiable" in "certain circumstances." There is ample evidence in the record, which is ignored by EPA, that this is one of those circumstances. While EPA attempts to brush off Alabama's alternative contribution threshold by stating that "nearly every State that attempted to rely on a 1 ppb threshold did not provide sufficient information and analysis to support a determination that an alternative threshold was reasonable or appropriate," it fails to consider the evidence in the record. By ignoring that evidence, EPA has not explained why a 1 ppb threshold is not reasonable. Support, including technical analysis, for the alternative threshold proposed by ADEM is set out below.

First, despite EPA's newly articulated theory that alternative thresholds raise "policy consistency and practical implementation concerns," EPA has allowed for flexibility in determining contribution thresholds. EPA's August 2018 memorandum on contribution thresholds states that "the amount of upwind collective contribution captured using a 1 ppb threshold is generally comparable to the amount captured using a threshold equivalent to 1 percent of the NAAQS" and "[b]ecause the amount of upwind collective contribution captured with the 1 percent and 1 ppb thresholds is generally comparable, overall, we believe it may be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold." Moreover, EPA has not identified any evidence to suggest that the use of an alternative threshold would actually harm air quality; instead it seems EPA's focus is on expanding its 4-step FIP framework at the expense of cooperative federalism and the states' right to implement their own standards to ensure interstate air quality.

Furthermore, in the Iowa Infrastructure SIP for the 2015 Ozone NAAQS, EPA proposed to approve the use of a 1 ppb threshold for two downwind receptors where Iowa's contribution was between 1 percent and 1 ppb. In the proposed rule for Iowa's SIP, EPA presented an analysis to support the use of a 1 ppb contribution threshold. First, EPA considered whether, for these specific receptors, the 1 ppb threshold captures a comparable amount of upwind collective contribution as a 1 percent threshold (as stated in the August 2018 EPA memorandum). Then, EPA conducted a WOE analysis to evaluate the following three factors to determine whether a 1 ppb threshold was appropriate for the two receptors:

1. How does the impact of in-state emissions on ozone levels at this receptor compare to collective upwind impacts?

2. What are the impacts of individual upwind states linked at 1 ppb or higher to the receptor?

3. Are individual upwind states impacting this receptor between 1 percent and 1 ppb linked above 1 ppb to *other* receptors?

After applying these factors, EPA concluded that "the 1 ppb contribution threshold is reasonable and appropriate to support the conclusion that [Iowa's use] . . . will not contribute" to either receptor at issue.

According to EPA "Alabama does not provide discussion or analysis containing information specific to the State or a receptor analysis for the affected monitors . . . to evaluate whether the alternative threshold was appropriate to apply with respect to the monitors to which Alabama was linked." However, state-specific information and analysis is exactly what was included in the SIP submittal package. Alabama's proposed SIP revision package included an analysis—which was provided to EPA—assessing each of these factors for the Denton and Harris County monitors and found that a 1 ppb threshold is equally appropriate for analyzing Alabama's contribution to those areas. The following analysis applies the three factors to the Denton County monitor and the Harris County monitor and compares the results to those from the Iowa SIP approval. EPA ignores this analysis in its proposed disapproval.

*Denton County, Texas*

Applying the first factor (impact of in-state emissions on ozone levels at this receptor compared to collective upwind impacts) to data from the Denton County monitor, upwind states collectively

272

contribute 17% (12.2 ppb) to the 2023 average ozone design value, as compared to 39% (27.3 ppb) from in-state emissions, thus in-state emissions have a much larger impact than upwind sources on this receptor. Under the second factor (impacts of individual upwind states linked at 1 ppb or higher to the receptor), three upwind states contribute above 1 ppb to this receptor, with a collective contribution of 5.55 ppb (or 45% of all upwind contributions) versus Alabama's modelled contribution, which is 0.71 ppb, or 6% of the total contribution of all upwind states. Therefore, a significant portion of upwind contribution will be captured by states linked at or above 1 ppb. Considering the third factor (individual upwind states impacting this receptor between 1 percent and 1 ppb linked above 1 ppb *other* receptors), in addition to Alabama, there are two other upwind states—Arkansas and Tennessee—that are modelled to contribute between 1 percent and 1 ppb to this receptor. The collective contribution of these two additional states is 1.70 ppb (14% of total upwind contributions). Tennessee and Alabama are not linked to any other receptor at or above 1 ppb. However, Arkansas is linked to several other receptors in Texas at or above 1 ppb, thus, Arkansas's emission reductions for other linkage receptors would also likely benefit this receptor.

*Harris County, Texas*

Applying the three factors to the Harris County monitor, first, upwind states collectively contribute 17% (11.9 ppb) to the 2023 average ozone design value, as compared to 40% (28.3 ppb) from in-state emissions, thus in-state emissions have a much larger impact than upwind sources on this receptor. Under the second factor, three upwind states contribute 1 ppb or more to this receptor, with a collective contribution of 7.4 ppb (or 62% of all upwind contributions) versus Alabama's modelled contribution which is 0.88 ppb, or 7% of the total contribution of all upwind states. Therefore, a significant portion of upwind contribution will be captured by states linked at or above 1 ppb. Third and finally, there are no other states that contribute between 1 percent and 1 ppb to this receptor. In addition, Alabama is not linked to any other state at or above 1 ppb.

Comparing these results to those in the Iowa three-factor analysis, we see that, unlike Iowa, the first factor here highlights that in-state, not upwind, contributions have a larger impact on these receptors. In Iowa's case, upwind contributions were much higher than in-state contributions to the receptors at issue. This factor weighs in favor of a 1 ppb threshold for Alabama. Turning to the second factor, Alabama's modelled contributions to the receptors at issue are 6-7% of all upwind contributions, whereas states linked with a contribution above 1 ppb account for approximately 45-60% of all upwind contributions. Therefore, like Iowa, a substantial amount of upwind contribution from states will be captured by a 1 ppb threshold. Finally, the third factor also supports a 1 ppb threshold for Alabama in the case of Harris County since no other state contributions lie between 1 percent and 1 ppb. For Denton County, of the two states other than Alabama that are between the two thresholds, Arkansas is linked elsewhere above 1 ppb—this situation is similar to that of Iowa and the Allegan receptor, where one other state had additional linkages above 1 ppb, meaning that emission reductions by that state would benefit the receptor at issue.

In addition to these three factors, like for Iowa, collective upwind ozone contribution captured with a 1 percent threshold is comparable to the contribution captured with a 1 ppb threshold for both Denton and Harris counties. At the Denton monitor, a 1 percent threshold captures contributions of 7.96 ppb and a 1 ppb threshold captures contributions of 5.55 ppb (or 70% of the upwind contribution that would

273

be captured using a 1 percent threshold). At the Harris County receptor, a 1 percent threshold captures 8.31 ppb and a 1 ppb threshold captures 7.43 ppb (or 89% of upwind contributions that would be captured using a 1 percent threshold). For comparison, the 1 ppb threshold captured 83% and 94% of contributions to the receptors (Milwaukee and Allegan, respectively) at issue in the Iowa SIP. Thus, at over 89% capture, the 1 ppb threshold is easily appropriate for the Harris County receptor. Though the percentage captured by the 1 ppb threshold is slightly lower for the Denton monitor, this is because the monitor is so close to attainment. There is only a 2.4 ppb difference in the amount captured, which is also comparable to that in Iowa, where there was a 4.8 ppb difference in the amount of contributions captured using a 1 percent versus a 1 ppb threshold for Milwaukee and a 2.2 ppb difference for Allegan.

This "state specific" analysis demonstrates that, based on the factors set out by EPA, a 1 ppb significant threshold is reasonable and appropriate for Alabama, as the amount of upwind collective contribution captured with the 1 percent and 1 ppb thresholds is generally comparable and Alabama's overall modelled contributions to the receptors at issue is small. Surely, this analysis meets EPA's bar for "technical data relevant to Alabama" demonstrating why a 1 ppb threshold is reasonable.

[table in full comment]

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Although EPA has not revoked the August 2018 Memorandum, EPA attempts to justify why they no longer consider this memorandum "guidance" and why they now specify that all states should conform to their policy choice with respect to the arbitrary 1% threshold. ADEQ finds that it is unreasonable for EPA to transform into a requirement that which was initially packaged and delivered to states as one of several options. This puts states at a critical disadvantage, as state rulemaking and the associated SIPs take years to develop, and early EPA guidance and conversations with EPA Regional Offices are the first pillars of state SIP development. States must undertake SIP development with limited technical resources, so the states rely heavily on EPA data and EPA guidance in their decision-making. The threshold decision is fundamental to further steps in the Interstate Transport Framework analysis. Therefore, this late-stage decision by EPA is unreasonable. DEQ finds that this decision effectively forces states to fail in meeting EPA's vacillating interpretation of what is necessary for SIPs to meet interstate transport obligations.

[…]

In the Proposed Rule, EPA proposes to substitute its arbitrary 1% threshold for the threshold used by DEQ in the Arkansas Transport SIP to identify potential linkages between Arkansas and identified nonattainment and maintenance areas. Consistent with EPA's August 2018 Memorandum, DEQ selected a 1 part per billion (ppb) threshold for identifying linkages between Arkansas and nonattainment and maintenance receptors. EPA now attempts to dismiss its own guidance by attempting to add, post hoc, a

274

requirement that DEQ should base its use of the 1 ppb threshold on "an evaluation of state specific circumstances." The August 2018 memo contains no such directive. Instead, the memo contains boilerplate language that "each state should consider whether the recommendations in this guidance are appropriate for each situation." Because of the interstate nature of the SIP, there are no "state-specific circumstances" with regard to the linkage threshold. DEQ instead chose to follow the plain meaning of the "consider" language and the spirit of guidance in the August 2018 memo. That is, it was the clear intent that the EPA, at the time of the August 2018 memo, wanted each state to exercise its rational and independent judgement as to whether the 1 ppb threshold was an appropriate measure to identify linkages. The appropriateness of this threshold was supported in ADEQ's SIP by multiple facts. First, EPA's August 2018 memorandum provided evidence that a 1 ppb threshold is generally comparable to a 1% threshold for the 2015 ozone NAAQS. Second, 1 ppb is a threshold used for another program to determine whether a PSD source has a significant impact that causes or contributes to a violation of a NAAQS or PSD increment. Third, 1 ppb is the significant digit for reporting ozone monitoring data. These three pieces of evidence support DEQ's selection of a 1 ppb threshold for determining what the state considers to be a potential linkage to nonattainment and maintenance receptors. In its proposed disapproval, EPA dismisses the weight of evidence provided by ADEQ in its choice of the 1 ppb threshold and substitutes its own policy for the state's without any evidence to support their 1% threshold other than to state that the 1% threshold captures marginally more contributions. Unlike EPA's arbitrary threshold, DEQ's threshold for evaluating linkages is based on a robust weight-of-evidence.

[…]

EPA's proposed disapproval also conflates a "linkage" based on its arbitrary 1% threshold with "significant contribution" that automatically imposes some emission reduction obligation on sources or emissions activities in a state. The threshold, whether 1% or 1 ppb, is a screening device triggering further analysis to determine whether particular emissions sources and activities within a state are "significantly" contributing to nonattainment or interfering with maintenance in another state. Arkansas's obligation is to prohibit "any source or other type of emissions activity within the State from emitting any air pollutant in amounts [that will] contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard." A "linkage" in and of itself is not a "source" or "emission activity" and is not a construct established under the Clean Air Act. It is a tool EPA established in guidance to assist states (and themselves) in evaluating whether there may be a source or emission activity in one state that is emitting an air pollutant(s) in an amount that may "significantly" contribute to nonattainment in or interfere with maintenance by any other State. In the Arkansas Transport SIP, DEQ made use of a 1 ppb threshold as a tool for determining whether further inquiry into potential "significant" contribution or interference by a source or emission activity is required (Step 3 of EPA's interstate transport framework).

[…]

Determination of linkages and significant contributions occurs at separate steps in the four-step analysis. DEQ does not agree that a 1% linkage to an entire state is the same as a significant contribution from a source or emissions activity. The state's obligation is not to eliminate an arbitrary threshold (or to

reduce emissions such that a neighboring state that may be its own primary contributor to nonattainment is not overburdened by their own obligations), but to determine if any emissions sources or emissions activity in the state are significantly contributing to a downwind nonattainment receptor or interfering with maintenance of the NAAQS by a downwind state and respond accordingly to mitigate significant contributions.

With respect to EPA's proposed disapproval of Arkansas's SIP, EPA is proposing to disapprove of Arkansas's use of an alternative 1 parts per billion ("ppb") threshold to identify whether Arkansas is "linked" to projected nonattainment and/or maintenance receptors in other states, in part due to EPA's determination that use of an alternative threshold "may be impractical or otherwise inadvisable for a number of additional policy reasons." EPA also claims that "it is not clear that national ozone transport policy is best served by allowing for less stringent thresholds at Step 2." Instead, EPA believes the appropriate threshold to determine linkages is 1 percent of the 2015 ozone NAAQS (i.e., 0.70 ppb).

[…]

Likewise, EPA's claim that it may be impracticable to apply an alternative threshold is an inappropriate basis for rejecting a state's choice. Impracticality, like policy reasons, plays no part in whether a SIP meets the applicable CAA requirements.  EPA's analysis of whether the DEQ SIP complied with CAA requirements should have been limited to the rules, guidance and information existing at the time of DEQ's SIP submittal and not on EPA's new policy judgments.

[…]

With this proposal, EPA indicates that the agency does not support state-justified alternatives that differ from the arbitrary line drawn by EPA in the Proposed Rule. EPA's discussion in the Proposed Rule indicates that the agency does not consider the recommendations that EPA presented to states in the EPA's August 2018 guidance as viable alternatives to a one-size-fits-all EPA implementation of policy in 2022. The agency goes on to say they will "evaluate whether the state adequately justified the technical and legal basis" for any alternative compliance options that a state proposed. But, then EPA states that the August 2018 memo and its Attachment A "do not constitute agency guidance," though the title of the document in question is "Preliminary List of Potential Flexibilities." At the time the memo was released, seven months before state plans were due to EPA, it was clearly intended by EPA to provide guidance to the states. (See sentences 6 and 10 of the memo.) Four years later, EPA now rejects its former position and is attempting to substitute the states' policy judgments with its own.


**Commenter:** Arkansas Environmental Federation

**Commenter ID:** 09

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Further, EPA cannot base disapproval of a SIP on the fact that states, even when following the 4-Step interstate transport framework that EPA has established, may apply different thresholds in Step 2 of the

framework, which would have "the potential to result in inconsistent application of interstate transport obligations based solely on the strength of a state's SIP submittal at Step 2 of the 4-Step framework." The states, in the first instance, have wide discretion in determining how to achieve the NAAQS, including their interstate transport obligations, and EPA cannot force the states to adopt approaches reflecting the Agency's policy preferences for consistency in interstate transport obligations. A "SIP basically embodies a set of choices . . . *that the state must make for itself* in attempting to reach the NAAQS with minimum dislocation."[14]

[14] *Bridesburg*, 836 F.2d at 780–81 (emphasis added); *see also Com. of Va.*, 108 F.3d at 1410 (D.C. Cir.) (CAA Section 110 "does not enable EPA to force particular control measures on the states.").


**Commenter:** Cleco Corporate Holdings LLC

**Commenter ID:** 14

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The writer of the August 2018 memorandum provides information and argument which is summarized at the end that "*Because the amount of upwind collective contribution captured with the 1 percent and 1 ppb thresholds is generally comparable, overall, we believe it may be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2 of the 4-step framework in developing their SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS.*" Again, the memorandum does not call for the party utilizing the 1 ppb threshold to conduct "appropriate additional analysis". But as found in the Louisiana SIP, LDEQ did consider whether the recommendation for the August 31, 2018 guidance was appropriate for the situation and this was documented in the SIP. That is, *The LDEQ has maintained that an arbitrary threshold of 1% of the NAAQS for significant contribution to nonattainment or interference with maintenance is not applicable because the value is not detectable by the monitor and following the manner in which a design value is calculated, one percent of the standard would be truncated to zero. Therefore, Louisiana will use the flexibility allowed in the March 2018 memorandum allowing the use of 1 ppb*. In addition, LDEQ further indicated in the SIP, *the use of 1 % of the NAA QS threshold for modeled contribution as the sole definition of significant contribution is inappropriate for the 2015 ozone NAAQS since the more stringent 0. 7 ppb threshold is an order of magnitude smaller than the biases and errors typically documented for regional photochemical modeling (Simon et al., 2012)*. It's obvious that LDEQ considered whether the recommendation for this guidance was appropriate for the situation.

However, EPA goes on to indicate in the Proposal that now its position is that although it has not revoked the guidance in the August 2018 memorandum, it no longer considers the August 2018 memorandum guidance's approval of reliance on the 1 ppb screening threshold as proper. It is inappropriate for EPA to change course on what was presented in its August 2018 memorandum analysis because many in the regulated community relied upon it in the crafting of their state implementation plans. Cleco encourages the Agency to continue to support the August 2018 memorandum as written.

277

**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA unreasonably departed from a 1 ppb linkage threshold.

EPA previously articulated a policy finding it reasonable for states to apply a 1 ppb linkage threshold in assessing their ozone transport obligations. While the APA does not prevent EPA from changing its prior policies, EPA must, at minimum, acknowledge such a change and provide a reasonable explanation. In articulating its explanation, EPA "cannot ignore its prior factual findings that contradict its new policy nor ignore reliance interests." Rather, EPA must "show that 'there are good reasons' for the new policy and 'that the agency believes it to be better, which the conscious change of course adequately indicates.'"

EPA's August 2018 Guidance specifically concluded "that a threshold of 1 ppb may be appropriate for states to use to develop SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS." In making this determination, EPA emphasized that "the amount of upwind collective contribution captured using a 1 ppb threshold is generally comparable to the amount captured using a threshold equivalent to 1 percent of the NAAQS," noting that the difference in captured emissions was only 7% when summed across all receptors and was "of a similar magnitude" at individual receptors.

However, in its Proposed SIP Disapproval, EPA notes that "its experience since the issuance of the August 2018 memorandum regarding use of alternative thresholds at Step 2… leads the Agency to now believe it may not be appropriate to continue to attempt to recognize alternative contribution thresholds at Step 2." EPA explains that a 1 ppb threshold "*may* be impractical or otherwise inadvisable" for the following reasons:

- "[C]onsistency in requirements and expectations across all states is essential,"

- "Consistency with past interstate transport actions… is also important," and

- "[T]he 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation."

EPA does not adequately explain its change in position. In its August 2018 Memo, EPA determined that a 7% loss in total upwind state contribution did not interfere with state interstate transport obligations, but in the Proposed SIP Disapproval, EPA concludes that a 5% loss is unacceptable. EPA's only explanation for this about-face is "the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference of the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone," which does not address why a 5% difference would not still eliminate *significant* contributions—particularly when EPA applies a marginal cost threshold as a proxy for significance at the next step of its analysis. EPA also apparently requires a

278

"compelling policy imperative" for changing this threshold from 0.70 ppb, but does not apply the same standard to changing the threshold from 1 ppb.

**Commenter:** Environmental Federation of Oklahoma

**Commenter ID:** 20

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In particular, EFO supports DEQ's assessment that EPA has overstepped its authority by circumventing the normal SIP development and approval process in a number of ways, including but not limited to: [...] fifth, ignoring, or at least mischaracterizing, its own final guidance to the states.

**Commenter:** Idaho Power Company

**Commenter ID:** 23

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

Finally, EPA unreasonably departs from its own policy finding it reasonable for states to apply a 1 ppb linkage threshold in assessing their ozone transport obligations. EPA's August 2018 Guidance specifically concluded "that a threshold of 1 ppb may be appropriate for states to use to develop SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS." EPA inexplicably changes course in the Proposed Disapproval, claiming that "its experience since the issuance of the August 2018 memorandum… leads the Agency to now believe it may not be appropriate to continue to attempt to recognize alternative contribution thresholds," like the 1 ppb threshold. EPA's only explanation for this about-face is "the core statutory objective of ensuring elimination of *all* significant contribution to nonattainment or interference of the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone," which is nonsensical because EPA applies a marginal cost threshold as a *proxy for significance at the next step* of its analysis.

**Commenter:** Kentucky Division for Air Quality

**Commenter ID:** 25

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA Reversal on use of 1% Contribution Threshold

279

In the August 2018 memo, EPA states, "The data in the tables below indicate that, for the 2015 ozone NAAQS, the amount of upwind collective contribution captured using a 1 ppb threshold is generally comparable to the amount captured using a threshold equivalent to 1 percent of the NAAQS. Overall, using a 1 ppb threshold captures 70 percent, which is a similar and only slightly lower amount of contribution." Due to the close correlation between the use of a 1% threshold and a 1 ppb threshold, Kentucky chose to use the 1 ppb threshold for screening purposes in Step 2 of the framework, following EPA's published guidance. EPA has not provided any new information for rejecting the use of the 1 ppb threshold. Rather, the proposed rule states, "EPA's experience since the issuance of that [August 2018] memorandum has revealed substantial programmatic and policy difficulties in attempting to implement this approach." In this proposed action, EPA is relying on the 1% threshold to evaluate a state's contribution to a nonattainment or maintenance monitor. EPA identifies the need for consistency in its evaluation across all its Interstate Transport requirements, for all NAAQS.

**Commenter:** Louisiana Electric Utility Environmental Group

**Commenter ID:** 28

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

With respect to EPA's proposed disapproval of Louisiana's SIP, EPA is proposing to disapprove of Louisiana's use of an alternative 1 ppb threshold to identify projected nonattainment and/or maintenance receptors in other states, in part due to EPA's determination that use of an alternative threshold "may be impractical or otherwise inadvisable for a number of additional policy reasons." Impracticality, like policy reasons, play no part in whether a SIP meets the applicable CAA requirements.

Further, EPA cannot base disapproval of a SIP on the fact that states, even when following the 4-Step interstate transport framework that EPA has established, may apply different thresholds in Step 2 of the framework, which would have "the potential to result in inconsistent application of interstate transport obligations based solely on the strength of a state's SIP submittal at Step 2 of the 4-Step framework." The states, have wide discretion in determining how to achieve the NAAQS, including their interstate transport obligations and EPA cannot force the states to adopt approaches reflecting the Agency's policy preferences for consistency in interstate transport obligations. A "SIP basically embodies a set of choices . . . *that the state must make for itself* in attempting to reach the NAAQS with minimum dislocation."

**Commenter:** Louisiana Chemical Association

**Commenter ID:** 26

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

LDEQ relied on the EPA's 2018 August Guidance and applied the 1 ppb screening limit in performing Step 2 of its analysis. Based on the 1 ppb screening limit, the monitors in Michigan and Wisconsin were not flagged for further analysis as the modeled contributions from Louisiana sources at those receptors were all less than 1 ppb:

Milwaukee, WI…………………………………..0.72

Sheboygan, WI…………………………………..0.84

Allegan, MI…………………………………..0.70

The August 2018 Guidance notes that the contribution captured with the 1 ppb threshold versus a 0.70 ppb threshold for Milwaukee, Sheboygan, and Allegan are as follows: 83.0%, 91.8%, and 94.2%. Thus, it was reasonable for the LDEQ to rely on the August 2018 Guidance approval of the 1 ppb screening threshold to exclude these locations from further analysis. Moreover, as noted by the LDEQ in the Louisiana Transport SIP: "In addition, the use of 1% of the NAAQS threshold for modeled contribution as the sole definition of significant contribution is inappropriate for the 2015 Ozone NAAQS since the more stringent 0.7 ppb threshold is an order of magnitude smaller than the biases and errors typically documented for regional photochemical modeling (Simon et al., 2012)." In fact, although modeling bias (difference between monitored and modeled values) has been reduced over the last 10-15 years with updated CMAX modeling versions, summertime NOx bias still remains above the 1% threshold, particularly in the South, including Louisiana.

Now, EPA's position, as indicated in the Proposed Rule, is that although EPA has not revoked the guidance in the August 2018 memorandum, it no longer considers the August 2018 memorandum guidance's approval of reliance on the 1 ppb screening threshold as proper. It is inappropriate for EPA to "pull the rug" out from under states who reasonably relied upon EPA guidance that was scientifically based and not arbitrary simply because EPA now believes a different approach is preferable. Based on similarities in the contributions captured using a 1 ppb threshold and the 0.07 ppb (1%) threshold and the fact that the bias in modeling is greater than 1% for this type of regional photochemical modeling (particularly, bias towards overprediction in the Southern states for summertime ozone), LDEQ's reliance on a 1 ppb threshold to screen out the Michigan and Wisconsin monitors noted above was reasonable. The EPA screening level now being used to evaluate Louisiana's SIP is a fraction of a part per billion – an incredibly low value. EPA has provided no scientific support for a 1% screening level to be always applied for every NAAQS without consideration of factors such as the ability to discern ozone impacts of precursors at such infinitesimally small values and model performance. Although EPA addresses the bias limitations of the modeling in the Proposed Rule, it does not explain why the 1 ppb threshold is arbitrary and capricious and should not be used given the similarities in results provided in the August 2018 Guidance.

Accordingly, the EPA's proposed disapproval of LDEQ's use of the 1 ppb screening threshold, including as it relates to the exclusion of the Wisconsin and Michigan monitors from further transport analysis, was unreasonable and fails to comport with the federalism principles inherent in the CAA. EPA must allow states the opportunity to use reasonable alternatives to the 1% screening threshold.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Finally, EPA misstates Missouri's argument with respect to contribution. In accordance with the flexibility provisions in the EPA's August 31, 2018, guidance memo, Missouri demonstrated that its emissions and their contribution to ozone in Wisconsin, Texas, and Michigan were not significant in comparison to local emissions. Missouri demonstrated that its emissions were less than 2% of NAAQS and were generally small in comparison with local, background and international contributions, which were larger than the Missouri emissions in some cases. EPA's failure to acknowledge that Missouri emissions were not significant in comparison to other sources exceeds the agency's discretionary authority.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851

**Comment:**

The August 13, 2018, Tsirigotis guidance memo, styled "Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards," also was addressed to EPA Regional Air Directors in all EPA Regions.  The memo states,

> "[t]he purpose of this memorandum is to provide analytical information regarding the degree to which certain air quality threshold amounts capture the collective amount of upwind contribution from upwind states to downwind receptors for the 2015 ozone National Ambient Air Quality Standards (NAAQS). It also interprets that information to make recommendations about what thresholds may be appropriate for use in state implementation plan (SIP) revisions addressing the good neighbor provision for that NAAQS . . . [t]his document does not substitute for provisions or regulations of the Clean Air Act (CAA), nor is it a regulation itself. Rather, it provides recommendations for states using the included analytical information in developing SIP submissions, and for the Environmental Protection Agency (EPA) Regional offices in acting on them. Thus, it does not impose binding, enforceable requirements on any party.  State air agencies retain the discretion to develop good neighbor SIP revisions that differ from this guidance."

In the ensuing two years and six months since the last guidance document was published, EPA has known that states might be incorporating the 2018 guidance into Good Neighbor SIP submittals and has made no public statement saying that it would not honor its guidance. Moreover, all of the subject 19

282

Good Neighbor SIPs have been pending before the agency between two and one-half and almost four years with only one proposed action by EPA – the proposed approval of Iowa's Good Neighbor SIP that incorporated the 2018 guidance in a March 2, 2020, proposal at 85 Fed. Reg. 12,232.  Now, nearly three years after the first Tsirigotis memo was published and two and a half years after the last was published, EPA is attempting to assert that these documents are archival in nature and trying to walk back the proposed Iowa approval (*See* 87 Fed. Reg. 9,477, February 22, 2022).

[…]

Once an agency issues guidance to regulated parties, the agency cannot "simply disregard" the substance of its guidance and rely on "post hoc justifications" when deciding whether regulated parties have acted in accordance with such guidance. *Hoosier Env't Council v. Nat. Prairie Indiana Farmland Holdings, LLC*, No. 4:19-CV-71 DRL-JEM, 2021 WL 4477152, at **13, 16 (N.D. Ind. Sept. 29, 2021). Doing so constitutes an arbitrary and capricious action by the agency. Id. at *17. By waiting for years and until after states complied with EPA's 2018 guidance to backtrack on the guidance, add a new requirement, not in the guidance, that alternative methods used by states in their SIPs must be "substantially justified and have a well-documented technical basis," and disapprove SIPs on that basis, EPA is engaging in arbitrary and capricious actions. EPA should alter its position and encourage states to take advantage of these flexibilities, as appropriate, and to incorporate these guidance flexibilities into their Good Neighbor SIPs.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

The August 13, 2018, Tsirigotis guidance memo, styled "Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards," also was addressed to EPA Regional Air Directors in all EPA Regions. […]

In the ensuing period of time since the last guidance document was published, EPA has known that states might be incorporating the 2018 guidance into Good Neighbor SIP submittals and has made no public statement saying that it would not honor its guidance.

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

283

Comment 1: States Relied in Good Faith on Flexibilities Offered in EPA Memos, but the Memos Are Not Being Honored by EPA

In developing its 2018 Ozone Infrastructure SIP, specifically the good neighbor/ozone transport provisions of said SIP, ODEQ relied on all three 2018 Tsirigotis Memos. However, ODEQ relied on the March and August 2018 Tsirigotis Memos for the flexibilities described herein, specifically the decision to use a 1 ppb significance threshold. EPA stated in the August 2018 Tsirigotis Memo, on page 4:

> Because the amount of upwind collective contribution captured with the 1 percent and 1 ppb thresholds is generally comparable, overall, we believe it may be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an Page 4 of 15 alternative to a 1 percent threshold, at Step 2 of the 4-step framework in developing their SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS.

States, including Oklahoma, relied in good faith on the flexibilities that were held out by the Tsirigotis memos—and with good reason, since EPA encouraged states to rely on said memos during SIP development. Because EPA now refuses to honor the statements in said memos, EPA has created an unpredictable, uncooperative, and inequitable landscape that states now must attempt to navigate. EPA's failure to recognize its own guidance, and the predicament it has now put states in that face a SIP disapproval and subsequent FIP, undermines the cooperative nature of the EPA-state relationship.

The states' good faith reliance on EPA—not just reliance on the 2018 Tsirigotis memos, but reliance on EPA itself, through ordinary avenues of cooperative federalism—in ozone transport SIP development has now put states at a disadvantage. Oklahoma acted in good faith during its SIP development process by continually paddling the channels of communication with EPA Region 6, apprising EPA of Oklahoma's SIP development plans as both a courtesy and to avoid a disapproval. At no point during the SIP development process was Oklahoma on notice that its proposed SIP would be disapproved on the grounds that reliance on the 2018 Tsirigotis Memos was inappropriate. EPA has, without explanation, arbitrarily and capriciously changed its policy position through its refusal to acknowledge the legitimacy of states' good faith reliance on EPA guidance memoranda.

Comment 6: Oklahoma's Proposed Threshold of 1 ppb is Appropriate and Justified

EPA states in the proposed disapproval that it "recognized in the August 2018 memorandum that there was some similarity in the amount of total upwind contribution captured (on a nationwide basis) between 1 percent and 1 ppb. However, the EPA notes that while this may be true in some sense, that is hardly a compelling basis to move to a 1 ppb threshold." 87 Fed. Reg. 9819. This is a gross mischaracterization of the statements made by EPA in the August 2018 Tsirigotis Memo. The August 2018 Tsirigotis Memo concluded that "using a 1 ppb threshold is generally comparable to the amount captured using a threshold equivalent to 1 percent of the NAAQS." August 2018 Tsirigotis Memo, page 4. It further states, "The data in Table 2 indicate that the percent of upwind contribution captured by a 1 percent and 1 ppb threshold at individual receptors are also of a similar magnitude at most sites." *Id.* EPA further concluded:

> Because the amount of upwind collective contribution captured with the 1 percent and 1 ppb thresholds is generally comparable, overall, we believe it may be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2

of the 4-step framework in developing their SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS. *Id*. at 4.

For states like Oklahoma, with very low contributions to upwind states, the use of the 1 ppb contribution threshold versus the 1% of the NAAQS threshold is appropriate and justified based on the conclusions drawn by EPA in its August 2018 memo.

**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Comment #4: While a consistent approach is desirable for evaluating Infrastructure SIPs, EPA may not disregard its own guidance and must respect the states' role in creating a compliant SIP.

As noted in Comments #2 and #3 and conceded by EPA, Tennessee satisfied the primary (1% of NAAQS) threshold at the time of its 2018 iSIP submittal based on then-available data. However, in the iSIP Disapproval, EPA also expressed reservations about the 1 ppb (alternate) threshold that Tennessee discussed in its 2018 submittal on the grounds that "Tennessee did not provide additional discussion or analysis . . . which is necessary to evaluate the state-specific circumstances that could support approval of an alternative threshold." Therefore, while it is not necessary for Tennessee to use this alternate threshold to prove that its 2018 submission was compliant, it takes the opportunity to do so to preserve the ability to use an alternate threshold in the future, in conformance with EPA policy.

Tennessee agrees with EPA's discussion in the iSIP Disapproval that the 1 percent of the NAAQS threshold in Step 2 of the Framework is one reasonable (though not the exclusive) approach for assessing a state's contribution to downwind nonattainment, but believes that EPA's proposed disapproval fails to consider an essential issue: EPA may update or revise its previously-established guidance, but may not simply disregard its own established guidance that has not actually been withdrawn.[32]

In explaining its proposed disapproval of the use of an alternate threshold in Tennessee's 2018 SIP submission, EPA extensively discussed its August 31, 2018, memorandum on the topic (the "August 2018 memorandum"). This August 2018 memorandum, which EPA extensively cites in the iSIP Disapproval and has not been rescinded, recognized that in certain circumstances, a state may be able to establish that an alternative contribution threshold of 1 ppb is justifiable. The memorandum explains that when a state relies on this alternative threshold to determine that it is not linked to a downwind nonattainment or maintenance area, EPA will evaluate whether the state provided a technically sound assessment of the alternative threshold based on the facts and circumstances in the particular SIP submission, as follows:

> Following these recommendations does not ensure that the EPA will approve a SIP revision in all instances where the recommendations are followed, as the guidance may not apply to the facts

285

and circumstances underlying a particular SIP. Final decisions by the EPA to approve a particular SIP revision will only be made based on the requirements of the statute and will only be made following an air agency's final submission of the SIP revision to the EPA, and after appropriate notice and opportunity for public review and comment. Interested parties may raise comment about the appropriateness of the application of this guidance to a particular SIP revision. *The EPA and air agencies should consider whether the recommendations in this guidance are appropriate for each situation*.

The SIP Disapproval further explains that since issuing the August 2018 memorandum, EPA has identified the following substantial programmatic and policy difficulties in attempting to implement this approach:

- EPA believes, based on the review of 49 good neighbor SIP submittals for the 2015 ozone NAAQS, that nearly every state that attempted to rely on a 1 ppb threshold did not provide sufficient information and analysis to support a determination that an alternative threshold was reasonable or appropriate for that state. For instance, in nearly all submittals, the states did not provide EPA with analysis specific to their state or the receptors to which its emissions are potentially linked.

- EPA notes that for the March 2, 2020, proposed approval of Iowa's SIP submittal, the Agency expended its own resources to supplement the information submitted by the state, in order to more thoroughly evaluate the state-specific circumstances that could support approval. This analysis was performed at EPA's sole discretion, the Agency was not obligated to conduct supplemental analyses for each SIP, and the Agency no longer intends to undertake supplemental analysis of SIP submittals with respect to alternative thresholds at Step 2.

- EPA now believes that allowing for alternative Step 2 thresholds may be impractical or otherwise inadvisable for a number of additional policy reasons. For a regional air pollutant such as ozone, EPA now takes the position that consistency in requirements and expectations across all states is essential, and the availability of different thresholds at Step 2 creates the potential for inconsistent application of good neighbor obligations based solely on the strength of a state's implementation plan submittal at Step 2 of the 4-step interstate transport framework. Specifically, EPA argues that the use of an alternative threshold would allow certain states to avoid further evaluation of potential emission controls while other states must proceed to a Step 3 analysis, which EPA believes can create significant equity and consistency problems among states.

- The proposed disapproval states that it is not clear that national ozone transport policy is best served by allowing for less stringent thresholds at Step 2. EPA argues that while there is some similarity in the amount of total upwind contribution captured (on a nationwide basis) between 1% and 1 ppb, the 1 ppb threshold loses a certain amount of total upwind contribution for further evaluation at Step 3. Based on core statutory objective of eliminating all significant contribution to nonattainment or interference with maintenance, as well as the broad, regional nature of ozone transport, EPA believes, "there does not appear to be a compelling policy imperative in allowing some states to use a 1 ppb threshold while others rely on a 1 percent of the NAAQS threshold."

Notwithstanding these concerns, EPA goes out of its way to note that "EPA is not at this time rescinding the August 2018 memorandum." EPA's proposed disapproval attempts to have it both ways—by confirming that the underlying guidance has not been withdrawn, but also asserting—after-the-fact—that the Step 2 1-ppb threshold identified in the August 2018 memorandum is (almost) universally inappropriate because: (1) a number of states in this particular round of SIPs did not provide EPA with analysis specific to their state or the receptors to which its emissions are potentially linked; and (2) allowing for alternative significance thresholds may be impractical or otherwise inadvisable for a number of additional policy reasons.  For the following reasons, we believe that EPA is incorrect on both points:

1. Tennessee's 2018 iSIP submittal used then-current modeling, which indicated that Tennessee's downwind contribution was less than both appliable Step 2 thresholds: the default threshold of 1% of the ozone NAAQS and the alternate 1 ppb threshold. While EPA had the opportunity to provide comments to Tennessee's 2018 submittal during a comment period (which closed three years ago), EPA identified no inadequacy regarding the use of an alternate threshold during the original public participation process and offered no comments, during either pre-draft review or formal public participation, to indicate that an alternate threshold was problematic or that Tennessee should supplement its demonstration to account for a 1 ppb alternative threshold (see Appendix A for a copy of EPA's comment letter). Furthermore, Tennessee could not have justified an alternate significance threshold in 2018 because the data required for a proper technical analysis (i.e., model results showing downwind contributions between 0.70 ppb and 1 ppb) **were not available** at that time. Part II of these comments (technical comments) demonstrate, based on EPA's most recent modeling, why a 1 ppb significance threshold is appropriate for Tennessee. Since EPA did not make these data available at the time of our original submittal, EPA must fully consider an alternate threshold based on information provided at this time.

2. As discussed in more detail in comment #7, EPA itself has not consistently applied the 1% of the NAAQS threshold in determining whether upwind states are 'linked'. Instead, EPA has determined that there are circumstances in which the 1% of the NAAQS threshold should not be used, as discussed in the proposed Federal Implementation Plan that it published in connection with this rulemaking.

EPA has put states in an impossible position by waiting to act on SIP submittals that occurred in 2018 and basing such actions on modeling that has been consistently changing since 2018 and is still undergoing public comment. EPA quickly followed its proposed iSIP Disapproval with the proposed Federal Implementation Plan EPA will put in place as it is highly unlikely that states will have the time to revise their SIPs and resubmit them to EPA for consideration before the final Federal Implementation Plan will take effect.  Consistent with the 2018 memorandum that EPA has not withdrawn, Tennessee must be given the chance to have the information presented in the technical comments considered. EPA risks making an arbitrary and capricious decision by disapproving Tennessee's use of the alternate 1ppb threshold in its infrastructure iSIP without fully considering the information cited within these comments, because EPA would be disregarding its own practice and published guidance by doing so.

[…]

287

While Tennessee's downwind contribution is "significant" when measured by a bright-line threshold of 1% of the NAAQS, this contribution occurs at only a *single* monitor, that monitor is maintenance-only, and Tennessee's contribution, based on EPA's own modeling, is less than the 1 ppb alternative threshold established by prior EPA guidance. Tennessee believes that the attached evaluation of the modeling data for this monitor demonstrates that this contribution is not significant, in accordance with EPA's prior guidance in the August 2018 memorandum.

1. Tennessee does not contribute more than 1% of the NAAQS to any nonattaining downwind monitor.

[...]

**2**. Tennessee contributes more than 1% of the NAAQS to <u>only one</u> maintenance-only downwind monitor.

[...]

Another element to consider when evaluating the significance of upwind contributions is the total number of linkages – states with significant interstate transport problems contribute to multiple downwind states or monitoring locations.

[...]

[Table 3 in full comment]

Table 3 shows that Tennessee is ranked at the bottom with respect to nonattainment linkages (since none exist) and one step above the bottom with respect to total linkages. For the other two states with a single linkage (Delaware and Wyoming), both linkages are for nonattainment, rather than maintenance monitors. Stated more clearly, Tennessee crosses EPA's 1% contribution threshold, but that contribution is sufficiently marginal that an alternative threshold of 1 ppb is worthy of consideration. Of the 26 upwind states identified in Table 4, ten states (California, Indiana, Kentucky, Maryland, Michigan, New Jersey, New York, Ohio, Virginia, and West Virginia) are linked to two or more states with nonattaining monitors, and six states (California, Indiana, Missouri, Ohio, Oklahoma, and Texas) are linked to two or more downwind states with maintenance-only monitors. As noted above, Tennessee is linked to a single maintenance-only monitor in a single state. These facts, considered as a whole, support the consideration of a 1 ppb alternative threshold for significance.

[...]

Tennessee considered the following additional factors based on our review of EPA's 2020 proposal to approve Iowa's infrastructure SIP (85 FR 12232).

***How does the impact of in-state emissions on ozone levels at this receptor compare to collective upwind impacts?*** Tennessee reviewed the model results and determined that the cumulative upwind contribution (all upwind states with contribution greater than 0 ppb) was 12.24 ppb (17.0% of the 2023 maximum concentration) compared to in in-state contribution of 27.30 ppb from sources within Texas (37.8% of the 2023 maximum concentration). Of upwind contributors, Tennessee is ranked fourth, based on EPA's methodology for calculating the contribution (Table 8). However, Tennessee's relative contribution must be weighed against other factors, including the low number of high-ozone days and back-trajectory analyses.

288

[Table 8 in full comment]

***What are the impacts of individual upwind states linked at 1 ppb or higher to the receptor?*** Table 8 above indicates that three states (Louisiana, Oklahoma, and Mississippi) contribute greater than 1 ppb to the Denton County monitor, and these states account for 45.3% of the total upwind state contribution.

***Are individual upwind states impacting this receptor between 1 percent and 1 ppb linked above 1 ppb to other receptors?*** Arkansas contributes greater than 1 ppb for four other maintenance receptors in Texas. Alabama and Tennessee do not contribute 1 ppb or greater to any other nonattainment or maintenance receptors.

Tennessee believes that a 1 ppb significance threshold is justifiable in light of the facts enumerated within this document. EPA's most recent modeling data demonstrate that emission sources in Tennessee will not contribute significantly to nonattainment in another state and will not interfere with maintenance in another state. Therefore, Tennessee's SIP complies with the requirements of CAA §110(a)(2)(D) for the 2015 ozone NAAQS.

[32] See *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books".) (citing *United States v. Nixon*, 418 U.S. 683, 696 (1974)).

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA's Threshold Guidance provided states a pathway to use a 1 ppb threshold for significant impacts on downwind monitors. Utah and almost every other state followed this pathway, but EPA has now changed its mind and rejects the very pathway it opened for all of these states for "policy reasons". Utah relied on the Threshold Guidance to justify using the 1 ppb threshold at Step 2 as a basis to assert that Utah would not be linked to some projected downwind nonattainment or maintenance receptors and that other linkages were not significant given other EPA-suggested considerations. See Sub-Section II.d below. In the Proposed Disapproval, EPA insists that only a 1 percent ("%") threshold, or 0.7 ppb, can be used. EPA explains it has moved on from the positions it stated in the August 2018 Threshold Guidance, and EPA ultimately applies the 1% threshold to justify the Proposed Disapproval. EPA should allow use of the 1 ppb threshold.

[...]

*i. The fact that EPA's new 1 ppb interpretation runs contrary to 49 states' understanding signals error.*

In the Proposed Disapproval EPA states:

289

Following receipt and review of 49 good neighbor SIP submittals for the 2015 8-hour ozone NAAQS, the EPA's experience has been that nearly every state that attempted to rely on a 1 ppb threshold did not provide sufficient information and analysis to support a determination that an alternative threshold was reasonable or appropriate for that state.

The fact that nearly every state got it wrong is more an indication that EPA changed course without notice than that the states are unable to read and interpret EPA guidance. While technically retaining the Threshold Guidance, EPA proposes to disapprove numerous state submissions that relied on the guidance, including Utah's SIP, claiming that those states should have somehow done more analysis than EPA required in the memo, and asserting without explanation that consistency is needed across the country. This is an about face for EPA, which clarified in a previous ozone rulemaking that western states should not be treated the same as other areas of the country because the different geography, meteorology, background ozone levels, wildfire impacts and stratospheric ozone events in the West necessitated case-by-case treatment. To justify its about face, EPA now claims that the Threshold Guidance may only be relied on, even for high altitude western states like Utah, when a state meets its new, unannounced standards by providing "a technically sound assessment of the appropriateness of using this alternative threshold based on the facts and circumstances underlying its application in the particular SIP submission." EPA's new demand for the states to provide a technical analysis to support the use of the 1 ppb threshold identified in the August 2018 Threshold Guidance is inconsistent with EPA's earlier communications with Utah (and other states) and with the stated purpose of the Threshold Guidance, which was to "provide analytical information" and to allow states to use that "information to make recommendations about what thresholds may be appropriate for use" in SIPs. EPA is essentially punishing Utah and almost all other states for using the "recommendation" that EPA made in the Threshold Guidance.

Like so many states, Utah used the 1 ppb threshold in its Interstate Transport Ozone SIP. In fact, EPA commented on Utah's use of the 1 ppb threshold and recommended that it rely on the Threshold Guidance to do so. In EPA's comments on Utah's SIP during the state rulemaking process, EPA instructed: "[g]iven that the draft analysis makes use of the 1 ppb threshold, the EPA recommends the state review the August 31, 2018 Memo and the associated rationale for the use of this threshold." Utah did just that, providing analysis in its SIP based on the August 2018 Threshold Guidance and supporting the use of the 1 ppb threshold with data and analysis. Utah and the numerous other states were not acting unreasonably to rely on EPA's Threshold Guidance, particularly when EPA published the Threshold Guidance for that very purpose during the very time states were drafting their SIPs. EPA was aware of Utah's reliance on the Threshold Guidance, and provided direction to Utah supporting its use of the Threshold Guidance.

Despite the fact that the Threshold Guidance was based on the same principles as EPA's 2011 analysis and was improved through use of a tighter range of options and more current data and modeling, EPA now all but disavows it. Moreover, EPA is proposing to disapprove of Utah's use of an alternative 1 ppb threshold in part due to EPA's determination that use of an alternative threshold "may be impractical or otherwise inadvisable for a number of additional policy reasons." Under the appliable requirements of the CAA, changing policy reasons play no part in authorizing EPA to disapprove a SIP.

290

PacifiCorp asks EPA to reconsider its minimum contribution threshold because EPA has not identified any rational basis for preferring its older—and now superseded—2011 analysis. The 2018 analysis is superior and more appropriate for both identifying significant contributions and avoiding the likelihood of over-control. EPA should not disapprove Utah's Interstate Transport Ozone SIP based on an unfounded requirement to only use the 1 percent threshold.

*i. EPA's new "after-the-fact" standard on a 1 ppb threshold is arbitrary and capricious.*

While EPA may claim some deference for its decision-making, it is not unlimited. EPA cannot act in a manner that is inconsistent with the authorizing statute or that is arbitrary and capricious. The agency must "articulate . . . a rational connection between the facts found and the choice made." Particularly applicable here, when an agency's "new policy rests upon factual findings that contradict those which underlay its prior policy, or when its prior policy has engendered serious reliance interests," the Administrative Procedure Act requires an agency to provide "a more detailed justification" than it otherwise would. Here, Utah and other states undoubtedly relied on the Threshold Guidance and "engendered serious reliance interests." EPA acknowledges as much in the Proposed Disapproval. EPA's failure to acknowledge and account for Utah's "reliance interests" renders its Proposed Disapproval both arbitrary and capricious.

**Commenter:** PacifiCorp (Attachment - Berkshire Hathaway Energy (BHE) Company Comments on Proposed Ozone Transport Rule)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA Used an Arbitrary Ozone Contribution Metric. Use of Other Reliable Metrics Show Wyoming Has an Insignificant Ozone Contribution. (Chapter 6).

[…]

In 2018, EPA issued a guidance memorandum that re-analyzed the minimum threshold using a tighter range of options and more up-to-date modeling techniques and data. Specifically, EPA evaluated the difference in capture rates between the previous threshold of 0.7 ppb (one percent), a threshold of 1 ppb, and a threshold of 2 ppb. Like the 2011 analysis, EPA's 2018 analysis again concluded that the difference between the two lower options—0.7 ppb and 1 ppb—was minimal, while the higher threshold left too many emissions unregulated. As a result, EPA considered capture rates at the 0.7 ppb and 1 ppb thresholds to be generally comparable, and thus concluded that "it may be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold," in addressing interstate transport under the Clean Air Act good neighbor provision. Notably, a threshold of 1 ppb is 1.4 percent of the ozone standard of 70 ppb, and therefore rounds down to 1 percent if truncated.

Despite the fact that the 2018 analysis was based on the same principles as the 2011 analysis and was improved by use of a tighter range of options and more current data and modeling, EPA now all but disavows it. While technically retaining the 2018 memo, EPA has proposed to disapprove numerous state submissions that relied on the memo, claiming that those states should have somehow done more analysis than EPA did itself in writing the memo, and asserting without explanation that consistency is needed across the country.

**Commenter**: Sierra Club

**Commenter ID:** 39

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA Should Formally Rescind Its 2018 Alternative Contribution Threshold Guidance Memorandum

For years, EPA has relied on a 1% contribution threshold for determining whether an upwind state's contribution to a downwind nonattainment or maintenance monitor was "significant" for purposes of implementing Section 110(a)(2)(D)(i)(I). EPA applied this 1% contribution threshold in the Cross-State Air Pollution Rule in 2011, again in the CSAPR Update in 2016, and in the Revised CSAPR Update in 2021.58 Sierra Club supports EPA's proposed retention of the 1% contribution threshold and, for the reasons identified below, urge EPA to formally rescind its 2018 Guidance Memorandum.

In its Proposed Disapproval, EPA reaffirmed its use of a 1% contribution threshold for Screening at Step 2 of the interstate transport framework. EPA identified several reasons the alternative contribution thresholds discussed in the 2018 Guidance Memorandum were less appropriate, explaining that "experience since the issuance of that [2018 Guidance M]emorandum has revealed substantial programmatic and policy difficulties in attempting to implement this approach." However, EPA did not propose to rescind the 2018 Guidance Memorandum. For the reasons identified by EPA itself and for additional reasons described below, the Sierra Club urges EPA to rescind the 2018 Guidance Memorandum.

[…]

Second, Sierra Club disputes the 2018 Guidance Memorandum's characterization of the upwind contribution captured by a 1 ppb threshold and a 1% threshold as "generally comparable" and agrees with the Agency's observation in its Proposed Disapproval that, even if this were "true in some sense," it "is hardly a compelling basis to move to a 1 ppb threshold." Indeed, as EPA now observes, "the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference of the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone" counsel in favor of establishing a contribution threshold that pulls in more, not less, of the upwind emissions that are contributing to nonattainment and maintenance issues. Moreover, as EPA points out, an important virtue of a contribution threshold set as a percentage of the NAAQS is that, as the stringency of the NAAQS increases, "an appropriate increase in stringency at Step 2 occurs, so as to ensure an appropriately larger amount of total upwind-state contribution is captured

292

for purposes of fully addressing interstate transport for the more stringent NAAQS." Removing nearly 1/3 of the contributing upwind emissions at Step 2—as would occur with the use of a 1 ppb contribution threshold—as would increase the cost and challenge of ameliorating ozone nonattainment in areas affected by ozone transport.

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

U. S. Steel further notes that affected states and the regulated community reasonably relied on 1 ppb threshold that U.S. EPA found to be appropriate; and it is inappropriate for U. S. EPA now to unilaterally disapprove any SIP because in its SIP submittal, the state used a 1 ppb threshold.

**Commenter:** Utah Division of Air Quality

**Commenter ID:** 47

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The benefit of cooperative federalism is having the autonomy to do what's best for the state, but do so in partnership with EPA to ensure that the CAA intent and requirements are met.

In this same spirit, UDAQ engaged early and often with our counterparts at Region 8 in the development of our interstate transport SIP. Through this collaboration and EPA's guidance, Utah selected the alternative threshold of 1 ppb. As noted in the guidance, the use of an alternative threshold provides greater flexibility to states while SIPs are developed. Specifically, the guidance states that "a threshold of 1 ppb may be appropriate for states to use to develop SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS", since "the amount of upwind collective contribution captured with the 1 percent and 1 ppb threshold is generally comparable overall." Thus, UDAQ was surprised when EPA proposed to include Utah in the proposed FIP, and subsequently disapproved the state's SIP based in large part on the selection of the 1 ppb over the 1% of the NAAQS threshold.

**Commenter:** Utah Petroleum Association and the Utah Mining Association

**Commenter ID:** 48

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

293

Utah followed existing EPA guidance, which EPA has not withdrawn and should honor.

In general, EPA uses a 1% of the National Ambient Air Quality Standard ("NAAQS") contribution threshold to downwind States in evaluating IT SIPs. For the 2015 ozone NAAQS, this equates to 0.7 ppb. However, in August 2018, EPA published guidance for alternate thresholds and stated that it believes a threshold of 1 ppb may be appropriate.

In the Proposed GNR, published long after the due date for States to submit IT SIPs, EPA stated that it now believes that it may not be appropriate to recognize alternate contribution thresholds. In the Proposed Disapproval, EPA stated that it views 1% of the NAAQS to be more appropriate.

EPA cannot simply change its mind on the guidance nearly three years after issuing it and more than two years after Utah (and other states) relied on it, without providing a well-reasoned explanation and formal withdrawal of the guidance. EPA has not provided a well-reasoned explanation nor a formal withdrawal of the guidance.

[…]

Utah's IT SIP includes a lengthy weight-of-evidence analysis showing how its approach matches other interstate transport SIP approvals and EPA guidance, including the following: Analysis showing how Utah meets the recommendations of EPA's August 2018 memo discussing the possible use of different contribution thresholds.


**Commenter:** West Virginia Department of Environmental Protection

**Commenter ID:** 49

**Docket ID:** EPA-R03-OAR-2021-0873

**Comment:**

DAQ also asserts EPA is inconsistent with its definition of screening threshold impacts in relation to downwind receptor (monitor) linkage. In an August 31, 2018 memorandum from OAQPS Director Peter Tsirigotis to regional air divisions directors titled Analysis of Contribution Thresholds for Use in Clean air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards ("Threshold Memorandum"), EPA compared alternative thresholds of 1 and 2 ppb (0.001 and 0.002 ppm, respectively) to be consistent with previous thresholds of one percent of the 2015 ozone NAAQS standard (1% of 70 ppb, equal to 7 ppb or 0.0007 ppm) for the purposes of screening threshold for SIP development. EPA stated within the Threshold Memorandum, "Based on the data and analysis summarized here, the EPA believes that a threshold of 1 ppb may be appropriate for states to use to develop SIP revisions addressing the good neighbor provisions for the 2015 ozone NAAQS." In this proposed disapproval action, it appears EPA has abandoned these alternatives in favor of the one percent definition.

*Response*

Our primary response to these comments is in Section V.B.7 of the preamble. Here we address in more detail several specific arguments raised by commenters.

The EPA disagrees with some commenters' assertion that the EPA's proposed approval of Iowa's SIP submission is proof the EPA previously viewed the 1 ppb alternative threshold was "adequate and approvable" in all instances, but subsequently changed position. As the EPA explained at proposal, the first proposal for Iowa specifically examined "state-specific circumstances" as contemplated by the August 2018 Memorandum. *See, e.g.*, 87 FR 66418 (citing 87 FR 9477 (Feb. 22, 2022)) Even if the EPA had finalized the Iowa approval on the basis of the first proposal, doing so would have been specific to Iowa's state-specific circumstances. The EPA evaluated each interstate transport SIP submission based on the merits of the arguments put forward in each SIP submission. However, in all submissions that relied on the EPA's August 2018 memo—where that threshold would have been a dispositive basis to exclude the state from further analysis—the EPA determined the submissions did not provide the EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. This is true even for Iowa's submission, as explained at proposal. *See, e.g.,* 87 FR 64418.

Other topics raised by these comments are addressed in the preamble in Sections V.A.4. (technical merits), V.A.5. (justification), V.A.6. (guidance), V.B.6. (PSD SILs), V.B.7. (basis for approval of Iowa's SIP), and in the following sections: Sections 1.2 (Guidance for SIP Submissions), 1.4 (Use of Updated Modeling), 1.6 (EPA Input During SIP Submission Development), 4.2 (Model Performance), 5 (Updates to Modeling and Changes in Linkages), 7.2 (Contributions), 10.3 (Cooperative Federalism and the EPA's Authority), 11.3 (Transport Policy), and 11.8 (Mobile Sources).

The EPA responds to specific issues raised by commenters about the appropriateness of an alternative contribution threshold for specific states:

Alabama

Alabama did not provide a sufficient technical analysis to justify the use of an alternative 1 ppb threshold in its submission. 87 FR 64423-25. Alabama's SIP submission simply states that ADEM agrees with EPA's rationale set out in the August 2018 memorandum that the amount of upwind collective contribution captured with the 1 percent and 1 ppb thresholds was generally comparable. But the August 2018 Memorandum anticipated that states would evaluate whether the alternative threshold was appropriate under their specific facts and circumstances, not that the use of the alternative threshold would be automatically approvable.

ADEM and Alabama Power Company (APC) et al. claim that 1 ppb is an appropriate contribution threshold to use for Alabama and conduct an assessment fashioned to emulate the EPA's assessment in the now withdrawn proposal related to Iowa. Concluding that 1 ppb is generally similar to 1 percent, they next examine the factors that the EPA considered in the now withdrawn proposal related to Iowa to conclude that 1 ppb is an appropriate contribution threshold for Alabama.

The EPA does not agree that this assessment justifies the use of a 1 ppb contribution threshold for Alabama. As an initial matter, ADEM did not supply anything like this analysis in their SIP submission. This highlights the potential unfairness we identified as a policy concern at proposal, in that allowing some states to attempt to justify alternative thresholds could result in inconsistent treatment of states

295

based on the quality of the analysis they conducted. Further, as EPA explained at proposal, there is an administrative cost to public agencies, including the EPA, in going through the burden of conducting this type of analysis for each state, or for each set of comments on SIP actions, where the difference being evaluated is merely between a 1% and 1 ppb threshold, and the objective of using 1 ppb for certain states and sources is to excuse themselves from further analysis, thus shifting the burden of addressing interstate transport onto other upwind states and the downwind home state. Further, although commenter attempts to replicate the *proposal* analysis for Iowa, we never finalized that analysis and withdrew it. The factors in that analysis do not constitute a final agency policy or precedent on how a state-specific, 1 ppb-threshold analysis should be conducted. At proposal for this state's disapproval and others included in this action, we explained that we would not be undertaking this analysis where states failed to conduct it themselves.

All of that said, we further conclude that these comments still fail, even under the terms of the Iowa-proposal factors, to justify the use of a 1 ppb threshold for Alabama. Alabama's contribution alone at the Denton County (Airport) and Harris County (Houston Bayland Park) receptors in Texas in the 2016v2 modeling represents about 6 and 7 percent respectively of the total upwind state contribution at either monitor. Further, the loss in capture of total upwind-state contribution at 1 ppb versus 1 percent at these receptors is not trivial and well exceeds the ~7% losses contemplated in the August 2018 memorandum. For example, as noted by these comments, two other states are identified with contribution to the Denton County, TX receptor between 1 percent of NAAQS and 1 ppb. If we were to approve a 1 ppb threshold, one of those state's contributions would go unaddressed as well (Tennessee), constituting a loss, when in addition to Alabama's, of about 18 percent of the upwind state contribution over 1 percent at this receptor. That value is more than twice the 7% loss of upwind contribution figure that was identified as *potentially* acceptable in the August 2018 memorandum. Further, the treatment of Arkansas in this analysis would discount the loss of its contribution to this receptor, solely on the basis of its linkage above 1 ppb to other receptors—the idea being that if Arkansas were required to make emissions reductions in relation to those receptors, then it might incidentally benefit this receptor. While the EPA proposed to consider contribution in this way in the Iowa proposal, this is actually not consistent with the way EPA has considered the relevance of incidental effects in prior transport actions such as CSAPR Update and the Revised CSAPR Update. Reliance on such incidental effects introduces an inequitable situation in which states may be able to evade good neighbor obligations in reliance on the incidental effects of other states' efforts. *See* 81 FR at 74550. The EPA cannot agree that it is appropriate to treat Arkansas' contribution to this receptor as irrelevant simply because it contributes above 1 ppb to other receptors. If Arkansas's contribution were to be included in this analysis, then the total loss of contribution at the Denton receptor (using 2016v2) is actually on the order of 25 percent of total upwind state contribution.

Turning to the 2016v3 modeling used for this final action, these results are reinforced. In the 2016v3 modeling Alabama is linked in 2023 to the modeling-based receptor in Galveston, Texas. The total collective contribution from all upwind states is 26 percent of total ozone at this receptor. Of the 5 upwind states linked to this receptor, 3 contribute between 1 percent and 1 ppb. Using a 1 ppb threshold would represent a loss of about 19 percent of the total upwind contribution above 1 percent. In addition, Alabama's contribution to this receptor represents 30 percent of the total contribution that would be lost using a 1 ppb threshold. In addition, in our final rule analysis we note that Alabama is also

linked to the Pilot Point violating-monitor maintenance-only receptor in Denton County, Texas at which the collective contribution from upwind states is 18 percent of the total ozone at this receptor in 2023. Of the 6 upwind states linked to this receptor, 4 contribute between 1 percent and 1 ppb. Using a 1 ppb threshold would represent a loss of about 41 percent of the total upwind contribution above 1 percent at the Denton Pilot Point receptor. In addition, Alabama's contribution to this receptor represents 25 percent of the total contribution that would be lost using a 1 ppb threshold.

As we explain in the proposals and in the preamble of the final action, interstate ozone transport remains a collective-contribution problem involving many smaller contributors, and so the effect of approving a 1 ppb threshold needs to be reviewed for its holistic impacts. In this case, we do not find that the record would support approving a 1 ppb threshold for Alabama, even if we were to apply the factors used in the withdrawn Iowa proposal. ADEM observes that "it is unclear how lower NOx emissions in the 2022 modeling resulted in higher concentrations relative to the 2021 modeling" despite "continued reductions in NOx." If ADEM meant to question the validity of EPA's modeling with this statement, the EPA responds to comments on model performance in Section 4.2. If ADEM meant to say "contributions" instead of "concentrations," the EPA addresses a similar comment in Section 7.2. In response to the claim that EPA ignored evidence in the record when evaluating Alabama's SIP submission, specifically APC's comments submitted on the draft SIP submission during the state's public notice and comment period, which were included as attachment to Alabama's submission, the EPA disagrees. As noted in the proposal, Alabama did not explicitly discuss the comments it received during their state public comment period from Alabama Power Company and Sierra Club; Alabama only identified one specific assertion from their state public comment period as part of their response to public comments. Additionally, because SIP submissions are required to include a compilation of public comments received, it is not notable that these comment letters were attached to Alabama's SIP submission. 40 CFR Part 51, Appx V, 2.1(h). Thus, the EPA determined that Alabama's June 21, 2022, SIP submission did not rely on the legal, technical, or policy arguments provided in comments except as expressly stated by Alabama. In their own comment on this action, Alabama did not indicate that the EPA's assumption of Alabama's intention regarding the purpose of the inclusion of the comments from Alabama Power Company and Sierra Club on the submission was incorrect. *See* EPA-R04-OAR-2021-0841-0033. It remains unclear what the state's view is of and whether and to what extent the comments from APC and Sierra Club constitute an expression of the state's own position on its submission. Therefore, the EPA believes that the commenter is mistaken that the APC and Sierra Club comments received during the state's public comment process were explicitly embraced by Alabama as part of the state's SIP submission package. The EPA evaluated the information the state put forth in the SIP submission package and those specific arguments the state specifically acknowledged as part of their final SIP submission package.

Arkansas

One commenter argues that Arkansas provided sufficient analysis in the state's SIP submission to justify a conclusion that a 1 ppb contribution threshold is appropriate for the state. The EPA disagrees. The EPA's August 2018 memorandum explained that a 1 ppb contribution threshold "may" be appropriate,[70] and that "air agencies should consider whether the recommendations in this guidance are appropriate

---

[70] August 2018 memorandum, page 4.

for each situation."[71] Arkansas did not do that. In the SIP submission, Arkansas Division of Environmental Quality (ADEQ) (1) concluded based on the EPA's nationwide collective contribution comparison of different thresholds in the August 2018 memorandum that 1 percent and 1 ppb are generally comparable, (2) asserted that the prevention of significant deterioration significant impact level are sufficiently analogous to Step 2 of the 4-step interstate transport  framework to support 1 ppb, and (3) concluded that 40 CFR part 50, Appendix U supports truncating to 0 a value of 0.7 ppb (1 percent of the NAAQS). 87 FR 9798, 9804 (Feb. 22, 2022). Arkansas identified it contributed more than 1 percent of the NAAQS but less than 1 ppb to three receptors in Texas, 87 FR 9804, but none of its justifications for a 1 ppb contribution threshold were related to those receptors or Arkansas's contributions to them. The EPA is unpersuaded that any of Arkansas's arguments supported a conclusion that a 1 ppb threshold is appropriate for Arkansas. In response to Arkansas Environmental Federation's comment that EPA cannot disapprove a SIP submission on the basis of a state's use of alternate contribution threshold, the EPA notes that Arkansas's SIP submission identified Arkansas as contributing more than 1 ppb to one or more downwind receptors. 87 FR 9798, 9804 (Feb. 22, 2022). Thus, the difference between a 1 percent of the NAAQS threshold and a 1 ppb threshold is not meaningful to the conclusion that Arkansas is linked at Step 2, because Arkansas contributes more than 1 ppb to a downwind receptor in 2023 both in the modeling relied on by the state and in the additional modeling developed by EPA to inform both the proposed and final actions (2016v2 and 2016v3).

Kentucky

The EPA disagrees with Kentucky Division for Air Quality that Kentucky followed the August 2018 Memorandum. Kentucky identified that it contributed more than 1 percent of the NAAQS but less than 1 ppb to four receptors in Connecticut and Wisconsin (and more than 1 ppb to one receptor in Maryland), 87 FR 9504. Kentucky simply applied EPA's rationale presented in the August 2018 memorandum (i.e., that the amount of *nationwide* upwind collective contribution captured with the 1 percent and 1 ppb thresholds was generally comparable) without discussion or analysis specific to Kentucky or the receptors in Connecticut and Wisconsin, as anticipated in the August 2018 memorandum.[72] 87 FR 9509-9510. Given the absence of technical analysis to support the use of a 1 ppb threshold under the facts and circumstances relevant to Kentucky and its linked receptors, the EPA determines that Kentucky's submission does not provide a sufficient justification to support the use of a 1 ppb contribution threshold.

Louisiana

A commenter argues that a 1 ppb contribution threshold is appropriate for Louisiana, regardless of Louisiana's contributions of more than 1 percent of the NAAQS but less than 1 ppb to Milwaukee, Sheboygan, and Allegan because the contribution captured with the 1 ppb threshold at those sites would be 83.0%, 91.8%, and 94.2%, respectively. The EPA notes that Louisiana did not provide that information in its submission, and in the 2016v3 modeling for this final action, Louisiana is linked to 7 receptors in Texas, but is not linked to Milwaukee, Sheboygan, or Allegan in this updated modeling. However, the EPA disagrees with commenters that Louisiana's SIP submission supports a conclusion that

---

[71] August 2018 memorandum, page 1.
[72] *Id.* ("air agencies should consider whether the recommendations in this guidance are appropriate for each situation.")

a 1 ppb threshold is an appropriate contribution threshold for Louisiana for any receptor, because Louisiana's justification is flawed. The EPA's August 2018 memorandum explained that a 1 ppb contribution threshold "may" be appropriate,[73] and that "air agencies should consider whether the recommendations in this guidance are appropriate for each situation."[74] LDEQ's SIP submission attempted to justify the state's use of a 1 ppb threshold based on concerns over the use of a 1 percent threshold, namely alleging that it is an arbitrarily small value. *See* 87 FR 9798, 9811 (Feb. 22, 2022). In the EPA's view, a criticism of a threshold of 1 percent of the NAAQS does not constitute a state-specific justification for the use of an alternative contribution threshold. We have responded to various criticisms of the 1 percent threshold in Sections V.B.4.-V.B.7 of the preamble. Further, in the SIP submission, LDEQ identified Louisiana as contributing more than 1 ppb to one or more downwind receptors and so conceded Louisiana is linked at Step 2 in Louisiana's SIP submission. The difference between a 1 percent of the NAAQS threshold and a 1 ppb threshold is not meaningful to the conclusion that Louisiana is linked at Step 2 because Louisiana contributes more than 1 ppb to a downwind receptor both in the modeling relied on by the state and in the modeling relied on by EPA in this final action.

Oklahoma

The EPA disagrees with Oklahoma Department of Environmental Quality that Oklahoma's rationale for supporting the use of a 1 ppb contribution threshold is justified under the text of the August 2018 memorandum. The EPA's August 2018 memorandum explained that a 1 ppb contribution threshold "may" be appropriate,[75] and that "air agencies should consider whether the recommendations in this guidance are appropriate for each situation."[76] Oklahoma did not do that.

In its SIP submission, Oklahoma identified that the state contributed more than 1 percent of the NAAQS but less than 1 ppb to three receptors in Texas and Wisconsin. 87 FR 9817. Instead of considering whether a 1 ppb contribution threshold would be appropriate for Oklahoma as to these specific receptors, Oklahoma's SIP submission pointed to the EPA's PSD SILs Guidance. The EPA addresses comment related to the PSD SILs guidance in Section V.B.6. of the preamble. The EPA also does not agree with the blanket statement in the comment that the August 2018 memorandum supports a conclusion that 1 ppb contribution is appropriate for any state with "low contributions." Somewhat similar issues regarding Oklahoma are addressed in Section 11.3.

Tennessee

The EPA is not taking final action on Tennessee's submission at this time.

One commenter suggests that because Tennessee is linked to a single maintenance-only monitor in a single state above one percent compared to other upwind states linked to multiple nonattainment and maintenance receptors, this supports the consideration of a 1 ppb alternative threshold. To the extent this may be considered an issue more broadly relevant than just to Tennessee, EPA disagrees with the commenter's assumption that an upwind state's number of downwind linkages justifies an alternative

---

[73] August 2018 memorandum, page 4.
[74] August 2018 memorandum, page 1.
[75] August 2018 memorandum, page 4.
[76] August 2018 memorandum, page 1.

threshold. Tennessee's analysis of the number of upwind linkages does not provide evidence that a 1 ppb threshold would effectively capture an appropriate degree of upwind-state collective contribution, even if only to a single identified downwind receptor. The commenter also asserts that Tennessee's contribution to a downwind maintenance-only receptor is sufficiently marginal that an alternative threshold of 1 ppb should be considered. The EPA notes that the commenter does not clarify their definition of a marginal contribution in the context of a collective contribution problem, or why 1 ppb appropriately excludes "marginal" contribution in some way that 1 percent does not—indeed, as explained in Section V.B.7, while 1 ppb may be considered "similar" to 1 percent, it still causes some loss of upwind contribution from further analysis for elimination and in that respect would reflect a weakening of the Step 2 threshold for the more protective 2015 ozone NAAQS. No commenter has explained why this incongruity is an acceptable outcome in light of the purpose of the statute.

Utah

The EPA disagrees that Utah's SIP submission justified the use of a 1 ppb threshold pursuant to the August 2018 Memorandum.  The EPA reviewed the analysis UDAQ provided in its SIP submission and concluded that UDAQ did not adequately explain how a 1 ppb threshold would be justified with respect to Denver area receptors, as explained at proposal. 87 FR 31478. The difference between a 1 percent of the NAAQS threshold and a 1 ppb threshold is not meaningful to the conclusion that Utah is linked at Step 2, because Utah identified it contributes more than 1 ppb to four downwind receptors. Utah is also projected to contribute more than 1 ppb to one or more downwind receptors in the updated modeling developed by EPA to inform both the proposed and final actions (2016v2 and 2016v3).

The EPA does not agree that the recommendation it made in reviewing a pre-submission version of Utah's SIP submission, that UDAQ review the August 2018 memorandum, can reasonably be construed as an endorsement of the appropriateness of the 1 ppb threshold for the state of Utah.


## 7.5   Maintenance-Only Linkages

*Comment*
**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Tennessee contributes more than 1% of the NAAQS to <u>only one</u> maintenance-only downwind monitor.

[…]

EPA's proposed disapproval of Tennessee's Infrastructure SIP based on Prong 1of CAA §110(a)(2)(D)(i)(I) is without merit and has no factual basis or support because EPA does not allege that Tennessee emissions significantly contribute to nonattainment of the NAAQS in another state.

EPA's proposed disapproval of Tennessee's Infrastructure SIP ("iSIP") relative to Prong 1 is not only arbitrary and capricious in that it lacks any factual merit, but it also lends evidence to support Tennessee's concern, discussed throughout these comments, that EPA intends to set an impossible standard whereby states are held accountable for technical data that has yet to be produced and cannot be known to states at the time they develop and submit their iSIPs. The iSIP Disapproval discusses the two ''prongs'' contained in CAA section 110(a)(2)(D)(i)(I) used to evaluate whether a SIP satisfies the Good Neighbor provision: the SIP must contain adequate provisions prohibiting any source or other type of emissions activity within the state from emitting air pollutants in amounts that will: (i) significantly contribute to nonattainment of the NAAQS in another state (prong 1); or (ii) interfere with maintenance of the NAAQS in another state (prong 2).  Under the precedent established in *North Carolina v. EPA*, EPA and states must give independent significance to each prong when evaluating downwind air quality problems under CAA §110(a)(2)(D)(i)(I).  EPA has developed a 4-step "interstate transport framework" (the "Framework") to evaluate whether a state's SIP satisfies both prongs of its Good Neighbor obligations to eliminate interstate transport emissions.  Under Step 1, EPA identifies monitoring sites in NAAQS nonattainment or maintenance areas, then in Step 2 determines whether the emissions from states that are upwind of these sites impact the air quality in the downwind states, such that the upwind states are "linked". An upwind state is only "linked" if its contribution value equals or exceeds "the threshold of 1 percent of the NAAQS (i.e., 0.70 ppb for the 2015 8-hour ozone NAAQS)" to a downwind state.  If an upwind state is not "linked", then EPA "concludes that the state does not significantly contribute to nonattainment or interfere with maintenance of the NAAQS in the downwind states" and Steps 3 (identifying required emissions reductions) and 4 (adopting permanent and enforceable control strategies) become moot because the upwind state is not required to make any emission reductions.

In the iSIP Disapproval, EPA does not argue or present any evidence to suggest that Tennessee has or is projected to significantly contribute to nonattainment of the NAAQS in another state (prong 1) for the applicable timeframes. Instead, EPA states:

> …EPA performed updated air quality modeling to project design values and contributions for 2023. These data were examined to determine if Tennessee contributes at or above the threshold of 1 percent of the 2015 8-hour ozone NAAQS (0.70ppb) to any downwind nonattainment or maintenance receptor. As shown in Table 3 [available in full comment], the date indicated that in 2023, emissions from Tennessee contribute greater than 1 percent of the standard to the **maintenance-only** receptor in Denton County, Texas…

The Denton County, TX receptor is the sole receptor to which Tennessee is projected to be linked in 2023 and EPA provides no evidence to the contrary.  However, in Section II.C.4. of the iSIP Disapproval "EPA is proposing to find that the portion of Tennessee's September 13, 2018, SIP submission… does not meet the State's interstate transport obligations because it fails to contain the necessary provisions to eliminate emissions that ***will contribute significantly to nonattainment*** or interfere with maintenance of the 2015 8-hour ozone NAAQS in any other state." This statement is plainly false, Tennessee does not contribute significantly to nonattainment for the 2015 8-hour ozone NAAQs in any other state.

Because EPA does not allege or present any information in the iSIP Disapproval that Tennessee emissions significantly contribute to nonattainment of the NAAQS in another state, EPA may not disapprove Tennessee's Infrastructure SIP based on Prong 1 of CAA §110(a)(2)(D)(i)(I).

301

[...]

In the absence of a significant contribution to downwind states, Tennessee should not be required to include either Framework Step 3 (multifactor analyses) or Framework Step 4 (permanent and enforceable reductions) in its infrastructure SIP

Tennessee notes that its original 2018 infrastructure SIP submission was based upon modeling data that were current at the time of submittal, and that the submittal was made available for EPA review and comment. If EPA properly resolves the issues identified above with the alternative significance threshold, then Tennessee is not linked at step 2, making steps 3 and 4 not applicable, making the issues identified by EPA in these steps moot and therefore insufficient grounds for disapproval of the SIP.

*Response*

The EPA is deferring final action on Tennessee's good neighbor SIP submission for the 2015 ozone NAAQS at this time. As explained in Sections IV.J and IV.U of the preamble, the EPA is now finalizing partial disapprovals (i.e., at prong 2) for states included in this action that are only linked to maintenance-only receptors, which are Minnesota and Wisconsin. Other issues raised by this comment are addressed in Section 1.4 (Use of Updated Modeling) and Section 5 (Updates to Modeling and Changes in Linkages).

# 8    Step 3

## 8.1    Determination of Significant Contribution

*Comment*

**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

The WOE analysis presented arguments concerning the contribution threshold, an emissions evaluation, and an analysis of the meteorology, through back trajectories, which in total justified, to the State's satisfaction, that Alabama will not significantly contribute to downwind nonattainment or maintenance in 2023 or beyond.

[…]

Weight of Evidence (WOE) Analysis:

In the revised SIP submitted in April of this year, a WOE analysis was provided in an effort to highlight concerns with the modeling system and associated inputs and outputs. WOE analyses are not new and have historically been relied on when modeling predictions are close to the air quality goal, or, in this case a "significant contribution" to future NAAQS non-attainment and maintenance areas. EPA has utilized and approved the use of WOE analyses in SIP actions for years, most recently for the 2008 ozone NAAQS SIPs for New Mexico and Wyoming, as well as the 2015 ozone NAAQS for Alaska and Hawaii. As stated in the April submittal, a WOE analysis relies on assessing the <u>available</u> information and weighing the data by considering the relevance and quality of the information through <u>qualitative and quantitative analysis</u>. In the April submittal, ADEM evaluated the meteorological influence on the predicted Denton and Harris County, Texas receptors, as well as an assessment of Alabama's emissions sources, concerns over model performance and issues with the significance threshold relied on by EPA in the February modeling. As part of these comments, ADEM is submitting additional information to bolster the WOE argument presented in April, given additional time and resources. Additional analyses of emissions, linkages, meteorology and further justification for an alternate significance level are being provided below.

*Response*

With limited circumstances in which certain unique analytical needs justified it, the EPA generally has not taken an alternative approach to western states in its assessment of interstate transport under the 2015 ozone NAAQS. See Section V.C.3 of the preamble. As explained at proposal while the EPA has in limited circumstances found unique issues associated with addressing ozone transport in western states, the EPA has otherwise consistently applied the 4-step interstate transport framework in western states

303

and has identified ozone transport problems in the west that are similar to those in the east. *See, e.g.,* 87 FR 31453.

Commenter cites EPA's approval of the good neighbor SIP submissions from New Mexico and Wyoming for the 2008 ozone NAAQS and Alaska and Hawaii for the 2015 ozone NAAQS. It should be noted that our use of a weight of evidence approach for Alaska and Hawaii was driven by the fact that we did not have CAMx modeling that could be used to evaluate those state's emissions. *See, e.g.,* 86 FR 53571, 53574 (September 28, 2021) (Hawaii). Similarly, in our approach to Colorado for the 2015 ozone NAAQS, we used analysis beyond modeling to assess potential contribution to the Uinta Basin, again because the CAMx modeling was not designed for evaluating the wintertime inversion conditions that were at issue. 87 FR 61249, 61253-61255 (October 11, 2022). The approvals for New Mexico and Wyoming were for a less protective NAAQS, also involved somewhat unique analytical circumstances, and did not reflect a wholesale setting aside of the four-step framework. In any case, the commenter has not established that the factors that were relevant to our analysis in those actions are present with respect to Alabama.

As explained in the proposed disapproval of Alabama's April 2022 SIP submission, the EPA disagrees that Alabama's analysis, which the state characterizes as a weight of evidence analysis, is sufficient to support a conclusion that the state does not contribute significantly to nonattainment or interference with maintenance. 87 FR 64421-64426. The information provided by ADEM in comments on this action does not change the EPA's determination.

Alabama's SIP submission does not analyze future emissions reduction opportunities beyond pointing to existing $NO_X$ emission reductions from SIP-approved and Federal measures. Alabama's submission cursorily evaluates $NO_X$ emissions from point and mobile source categories from the 2017 NEI and suggests there is a steep decline in emissions from major sources in the state. However, Alabama does not include a comprehensive accounting of facilities in the state and does not include a sufficient analysis of potential $NO_X$ emissions control technologies, their associated costs, estimated emissions reductions, and downwind air quality improvements for the purpose of identifying what additional emission controls may be necessary to eliminate their significant contribution.

For example, Alabama does not provide details to demonstrate why, how, or to what magnitude NOx emissions from sources in Alabama, Louisiana, Arkansas, Mississippi, or Texas are expected to continue to decline through the next attainment date for the Dallas-Fort Worth-Arlington, Texas, area. Further, Alabama does not show how NOx reductions could potentially affect nonattainment or maintenance issues – or Alabama's contribution to such issues – in future years.

Likewise, comparisons between Alabama's emissions and other states' emissions, including home-state emissions, do not address whether some portion of Alabama's contributions to downwind receptors may be deemed significant. The ozone transport problem in the United States results from the collective impacts of relatively small contributions from a number of upwind states. As presented in the Final Action AQM TSD, a substantial fraction of ozone at nonattainment and maintenance receptors comes from this collective contribution from upwind states. The cumulative impact of emissions reductions from upwind states and sources is an important part of resolving the impact of transported emissions on downwind air quality problems.

The EPA addresses ADEM's comments related to the August 2018 memorandum in Section 7.4, air quality factors in Section 8.5, and back trajectory analyses in Section 8.8. The EPA responds to comments on the contribution threshold in Section V.B.5 of the preamble and in Sections 7.2 and 7.3, and further comments on the EPA's emissions inventories and modeling in Sections 3 and 4, respectively.

*Comment*

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA proposes to disapprove Alabama's 2022 SIP submission without determining in the first instance whether Alabama's SIP is approvable under Section 110(a)(2)(D)(i)(I) of the Clean Air Act.  Instead, EPA evaluated Alabama's SIP solely with reference to EPA's "4-step interstate transport framework."  Under this framework, EPA proposed to determine that certain undefined Alabama emissions contribute significantly to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in two counties in Texas.  EPA's proposal makes multiple errors.

First, as demonstrated by ADEM's 2022 SIP submittal package, based on a weight of evidence ("WOE") analysis, and by applying the requirements of the Clean Air Act, Alabama sources do not significantly contribute to nonattainment in or interfere with maintenance by any other state.  Alabama is not required to assess its emissions contribution using EPA's 4-step Federal Implementation Plan ("FIP") framework, and EPA may not disapprove Alabama's SIP relying solely on an application of the limited and outdated 4-step approach.  Instead, Alabama's SIP package demonstrates that under the plain meaning of the Act, its SIP must be approved.  EPA fails to adequately consider ADEM's WOE analysis and the evidence in the record supporting it.  As explained below, because Alabama's 2022 SIP satisfies all requirements of the Clean Air Act, EPA must approve Alabama's SIP revision.

[…]

B. ADEM's Use of a Weight of Evidence Analysis to Address the Good Neighbor Obligations for the 2015 Ozone NAAQS Satisfies the Requirements of the Clean Air Act

As noted above, Alabama advances a WOE analysis to support its determination that emissions from Alabama are not significantly contributing to downwind nonattainment or maintenance issues in downwind states. In doing so, Alabama looks at several factors and concludes they all weigh in favor of the determination that no sources in Alabama are contributing significantly to downwind ozone issues. In the proposed disapproval, EPA uses a "4-step interstate transport framework to evaluate" the State's SIP submittal; however, EPA has been clear that states may satisfy the "good neighbor" obligation in a variety of ways. EPA has explained that "[t]he precise nature and contents of such a submission is not stipulated in the statute. [Therefore,] EPA believes that the contents of the SIP submission required by section 110(a)(2)(D)(i) may vary depending upon the facts and circumstances related to the specific

305

NAAQS." For example, EPA "has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings."

While EPA acknowledges in the proposed disapproval that Alabama's SIP submission is "not organized by EPA's 4-Step Framework for assessing good neighbor obligations," it nevertheless shoehorns Alabama's submission into that FIP framework in order to analyze it. But EPA cannot use its SIP review process (in which EPA *shall* approve a SIP if it meets the requirements of the Clean Air Act) to force this FIP framework on states. Instead, EPA should consider ADEM's WOE analysis only in the context of the requirements of the plain language of the Act. Because Congress did not define the term "contribute significantly" or mandate that EPA or the States determine whether a contribution is "significant" in any particular manner, EPA and the States have analyzed this obligation in various ways in the past. Generally, these approaches have looked to various factors impacting air quality and cost-effectiveness. For example, in prior EPA rulemakings to address the "good neighbor" obligation, to determine what states were "significant" contributors to downwind nonattainment, EPA stated that its goal was to "determine whether [each upwind State] has emissions whose contributions to downwind nonattainment problems are <u>large and/or frequent enough</u> to be of concern."[31]

EPA has utilized, and approved the use of, weight of evidence analyses in interstate transport SIP actions for years,[32] and ADEM's proposal is appropriate and consistent with the EPA's analysis for other states. Indeed, EPA recently assessed Kansas's SIP submissions addressing the "good neighbor" obligation for the 2010 sulfur dioxide ($SO_2$) NAAQS.[33] Kansas "conducted a weight of evidence analysis to examine whether . . . emissions from [that state] adversely affect attainment or maintenance of the 2010 SO2 NAAQS in downwind states."[34] EPA did not insist on reviewing the SIP under any 4-step FIP framework and instead performed an evaluation of that WOE analysis and, in fact, performed its own WOE analysis, under the two "prongs" of Section 110(a)(2)(D)(i)(I): (1) significant contribution to nonattainment of the NAAQS in another state; and (2) interference with maintenance of the NAAQS in another state.[35] EPA and Kansas considered actual monitoring data, modeling data, emissions data from sources within the relevant state, and information on mobile source emissions in border counties in their "Prong 1" analysis of significant contribution to nonattainment.[36] The "Prong 2" analysis regarding maintenance areas built on the Prong 1 analysis and further considered emission trends and regulatory programs that had already led to or were expected to lead to reductions in emissions.[37]

ADEM has relied on many of the same factors identified in its WOE analysis for its proposed SIP revision such as emissions from Alabama sources, modeling information, and regulatory programs that have led to emission reductions. EPA should weigh each factor to determine whether Alabama has satisfied the two "prongs" of its "good neighbor" obligation as it did with Kansas. Alabama's SIP satisfies all of the requirements of the Clean Air Act, and, considering the weight of the evidence, EPA should approve Alabama's SIP just as it did with Kansas's SIP.

---

[31] 63 Fed. Reg. 57,356, 57,381 (Oct. 27, 1998) (emphasis added).

[32] *See, e.g.*, Approval and Promulgation of Air Quality Implementation Plans; Wyoming; Interstate Transport for the 2008 Ozone National Ambient Air Quality Standards, 84 Fed. Reg. 3,389 (Feb. 12, 2019); Air Plan Approval; New Mexico; Interstate Transport Requirements for the 2008 Ozone NAAQS, 84 Fed. Reg. 66,098 (Dec. 3, 2019); Air Plan Approval; Hawaii; Interstate Transport for the 2015 Ozone NAAQS, 86 Fed. Reg. 53,571 (Sept. 28, 2021); Air Quality State Implementation Plans; Approvals and Promulgations: Alaska; Interstate Transport Requirements for the 2015 Ozone Standard, 84 Fed. Reg. 26,041 (June 4, 2019).

[33] 86 Fed. Reg. 31,645 (June 15, 2021).
[34] *Id.* at 31,648.
[35] *Id.*
[36] *Id.* at 31,645-52.
[37] *Id.* at 31,652-53.

*Response*

With respect to commenter's assertions that the EPA did not evaluate or determine whether Alabama's SIP submission is approvable under Section 110(a)(2)(D)(i)(I), EPA disagrees.  The EPA's notice of proposed rulemaking explains why Alabama's SIP submission did not appropriately apply a "weight of evidence" (WOE) analysis to determine Alabama will not significantly contribute to downwind nonattainment or maintenance in 2023 or beyond. *See* 87 FR 64412. The EPA assessed the details of Alabama's SIP submission on their own merits and provided explanations as to why the SIP submission did not provide analysis sufficient for the EPA to approve the submittal. *See id.* The EPA has provided additional detail with respect to the weight of evidence approach above, in response to comments by ADEM.

Similarly, the EPA has addressed comments regarding the use of a WOE approach in interstate transport submissions, as well as the weight of evidence approach used by Alabama in responding to ADEM's comments, above.

Commenter's comparisons to the Kansas 2010 sulfur dioxide ($SO_2$) analysis containing a weight of evidence approach do not persuade the EPA to adopt commenter's preferred analysis using weight of evidence for Alabama's submission as to interstate transport under the 2015 ozone NAAQS. First, as the EPA explains in the NPRM for Kansas and Nebraska: "[I]nterstate transport of $SO_2$ is unlike the transport of fine particulate matter ($PM_{2.5}$) or ozone, in that $SO_2$ is not a regional pollutant and does not commonly contribute to widespread nonattainment over a large (and often multi-state) area. . . . $SO_2$ transport is therefore a unique case and requires a different approach." 86 FR 31645 (June 15, 2021); 86 FR 43960 (August 11, 2021). Second, with respect to the $SO_2$ transport analysis for Kansas, various monitoring and modeling results indicated that there were no violations or maintenance issues in nearby states close enough to be impacted by $SO_2$ transport from Kansas (e.g., on the scale of around 50 kilometers or less), and the various additional pieces of evidence that EPA looked at supported those conclusions; in the case here, where modeling results project Alabama to contribute to downwind nonattainment and maintenance receptors, a much more robust analysis of emissions sources and emissions control opportunities would be required than what was provided by Alabama to conclude that no emissions from Alabama should be deemed "significant." *See id.*

In response to commenter's claim that the EPA is forcing a FIP framework on states or failing to limit its evaluation of ADEM's "WOE" analysis to the context of the requirements of the Act, see Section V.B.6. of the preamble. The EPA addresses comments about the EPA's statutory authority in Section 10.3.

*Comment*

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In EPA's proposed disapproval, EPA purports that DEQ did not conduct an adequate analysis of emissions from the sources and other emission activity from within the state to determine whether its contributions were significant. DEQ finds that EPA is objectively wrong in this assertion. DEQ performed a robust analysis of emissions activities within the state that had the potential to significantly contribute to nonattainment or interfere with maintenance of the NAAQS in other states. This analysis covered all sources in Arkansas with elevated stacks[20] (including both EGUs another industrial sources) that are under DEQ's regulatory authority. EPA inaccurately states in the proposed disapproval that DEQ's analysis under Step 3 only focuses on EGUs. DEQ focused analysis on emissions of NOx, as most VOC emissions within Arkansas are not anthropogenic, and are therefore uncontrollable.[21]

[20] DEQ chose to focus analysis on elevated stack sources because emissions from such sources are more likely to penetrate through the atmospheric mixing layer and thus be transported long distances.

[21] According to the EPA 2014 National Emission Inventory, emissions from biogenic sources make up eighty-two percent of the Arkansas VOC emission inventory. Point sources contribute only two percent of total VOC emissions to Arkansas's VOC emission inventory, thus VOCs were not further examined.

*Response*

The EPA explained the deficiencies in Arkansas's SIP submission at proposal. 87 FR 9808-9811. Related issues raised by this commenter are addressed in Section 8.6.

*Comment*

**Commenter:** City Utilities of Springfield, Missouri

**Commenter ID:** 13

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

In essence, City Utilities (CU) believes that EPA erred in disapproving Missouri's SIPs that addressed interstate transport or the "good neighbor" provisions, for the 2015 8-hour ozone NAAQS

[…]

A. EPA failed to adequately justify why Missouri's "good neighbor" SIP was disapproved and provided no recourse to supplement the regulatory action. City Utilities generally supports efforts by the Missouri Department of Natural Resources (MDNR) Air Program to redress deficiencies EPA identified in

Missouri's SIP. EPA's burden to determine certainty that Missouri emissions are a significant contributing influence on ambient monitor receptors in downwind States has not been met.

*Response*

The EPA explained the deficiencies in Missouri's SIP submission at proposal, 87 FR 9540-9544. The commenter did not indicate with reasonable specificity their concern with the EPA's assessment. The EPA cannot legally extend Missouri's deadline to submit a SIP submission; similar comments are addressed in the preamble in Section V.A.2 and in Section 1.1. The EPA received a second good neighbor SIP submission addressing the 2015 ozone NAAQS from Missouri on November 1, 2022, as discussed in more detail in Section 9. The EPA is not required to identify what amounts of contribution are "significant" in acting on a good neighbor SIP submission. *See EME Homer City*, 572 U.S. at 509 ("Nor does the Act condition the duty to promulgate a FIP on EPA's having first quantified an upwind state's good neighbor obligations."). The EPA has found that the Missouri SIP submission, as well as each state's submission included in this action, is deficient at Step 3 for a variety of reasons; indeed, neither Missouri nor any other state identified any emissions from its sources or emissions activity as being significant and therefore in need of prohibition. The deficiencies in these analyses could be, and have been, identified in this action, well before the need to evaluate these submissions against any specific benchmark of "significance."

*Comments*

**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

Nevada reasonably applied a technical evaluation of its significant contributions to downwind air quality problems, guided by EPA's Guidance and the requirements of the CAA. EPA cannot now impose rigid requirements using its own analysis, and must instead evaluate Nevada's chosen framework against the requirements of Section 110(a)(2)(D)(i)(I).

**Commenter:** Idaho Power Company

**Commenter ID:** 23

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

Nevada reasonably applied a technical evaluation of its significant contributions to downwind air quality problems, guided by EPA's Guidance and the requirements of the CAA, and *timely* submitted its SIP for approval. EPA cannot now impose requirements based on its own preferences, but must instead evaluate Nevada chosen framework against the requirements of Section 110(a)(2)(D)(i)(I).

*Response*

The EPA explained the deficiencies in Nevada's SIP submission is the proposal at 87 FR 31492-31493. The EPA responds to these and similar comments in Section V.B.8. of the preamble and Section 10.3 of the RTC document.

*Comment*

**Commenter:** Maryland Department of the Environment

**Commenter ID:** 29

**Docket ID:** EPA-R03-OAR-2021-0872

**Comment:**

EPA now proposes to disapprove Maryland's SIP, in part, because it "does not offer an alternative modeling assessment showing that projected reductions in Maryland's emissions... would eliminate the contribution Maryland's emissions make to non-attaining or maintenance monitors." This determination is arbitrary and capricious in several respects.

As an initial matter, EPA's position establishes a false requirement that EPA's own transport rules do not adhere to. It is unreasonable to require Maryland to demonstrate that its SIP "would eliminate the contribution Maryland's emissions make to non-attaining or maintenance monitors." Section 110(a)(2)(D)(i)(I) only requires that Maryland eliminate its significant contribution, not all contributions.

Second, it is unclear what "alternative modeling" would be required for SIP approval. EPA's memo does not require that "alternative modeling" be provided in each of the 20 alternate analytical approaches discussed in its memo. In apparent acknowledgement of that fact, EPA's disapproval contends that the flexibilities were only "intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders". However this position, like its remanded decision in *New York v. EPA*, 964 F.3d 1214, 1223 (D.C. Cir. 2020), is an unreasonable moving target.

[…]

In its 2015 Good Neighbor SIP, Maryland followed EPA's four step framework (without taking advantage of any flexibilities), and conducted a thorough Step 3 analysis (as discussed in Section C) showing that it has resolved its significant contribution to downwind nonattainment and maintenance areas.

EPA states that Maryland's Step 3 analysis is insufficient, in part, because the Step 3 analysis Maryland provided was not what EPA was expecting. EPA states: At Step 3 of the 4-step interstate transport framework, Maryland did not include an accounting of all of the NOx ["Nitrogen Oxides"] emitting

facilities in the state along with an analysis of potential NOx emissions control technologies, their associated costs, estimated emissions reductions, and downwind air quality improvements.

However, Maryland cannot reasonably be expected to know what EPA requires when EPA has never articulated a specific set of analytical requirements. EPA acknowledges that it has issued no guidance on what elements must be required in the Good Neighbor SIP. EPA states:

> While the EPA has not prescribed a particular method for this assessment, the EPA expects states at a minimum to present a sufficient technical evaluation. This would typically include information on emissions sources, applicable control technologies, emissions reductions, costs, cost effectiveness, and downwind air quality impacts of the estimated reductions, before concluding that no additional emissions controls should be required.

Maryland provided exactly that by explaining each of the regulations on a set of sources, evaluated the expected emissions from the sources that were anticipated to provide the maximum amount of reductions at a high cost-per-ton value, and found that they were sufficient to address the state's Good Neighbor obligations. Maryland also discussed the state's other NOx (and Volatile Organic Compound ("VOC")) regulations, which provide further assurance that the state has eliminated its significant contribution to downwind nonattainment and maintenance areas. EPA is thus obligated to engage in an actual evaluation of Maryland's submittal, not simply declare it to be "insufficient" based on an amorphous set of expectations. If the EPA should finalize its disapproval of the submittal on the basis that it is insufficient, EPA must document all the metrics and analysis used in the final disapproval of Maryland's 2015 Good Neighbor SIP at Step 3 and provide official guidance that details what a "sufficient technical evaluation" entails.

> To that regard, EPA's proposed disapproval does not require states to complete a Step 3 analysis in precisely the same manner that EPA has in previous transport actions. All EPA says is necessary for a "sufficient technical evaluation" is "something similar" to EPA's analysis to determine whether and to what degree emissions should be eliminated to address significant contribution.

As detailed in Section C, MDE has met those Step 3 requirements. MDE used the only known benchmark at the time of its submittal, a NOx mass cap of 3,828 tons per ozone season at a cost effectiveness of $1,400/ton, to demonstrate that the state's aggressive emissions reductions programs outlined in its 2015 Good Neighbor SIP have far exceeded that threshold, thereby satisfying its Good Neighbor obligations for the 2015 ozone NAAQS. It is unreasonable for EPA to propose to disapprove Maryland's 2015 Good Neighbor SIP on the basis that the elements it has not articulated, and says are not required, were not present in Maryland's SIP submission.

*Response*

The EPA agrees that the CAA does not require Maryland, or any state, to show that it has eliminated all of its contribution to downwind nonattainment.  The standard in CAA section 110(a)(2)(D)(i)(I) is that a SIP submission for a new or revised NAAQS must contain adequate provisions prohibiting any source or other type of emissions activity within the state from emitting air pollutants in amounts that will *significantly* contribute to nonattainment or interfere with maintenance of the NAAQS in another state

311

(emphasis added). The proposal was clear on this in its description of the 4-step interstate transport framework when it stated that "… if a state's contribution equals or exceeds the 1 percent threshold, the state's emissions are further evaluated in Step 3, considering both air quality and cost as part of a multi-factor analysis, to determine what, if any, emissions might be deemed "significant" and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I)." 87 FR 9468.

The EPA said in full in the proposal that:

> Maryland's 2019 SIP submission lacks an analysis of the effect that Maryland's adopted emission reductions would have on the specific downwind monitors which the EPA's March 2018 memorandum modeling analysis and 2016v2 emissions platform analysis determined that Maryland sources contribute more than 1 percent to nonattainment or interference with maintenance. Maryland's SIP submission disputes neither the significant contribution from Maryland nor the ''linkages'' between Maryland emissions and these downwind nonattainment or maintenance monitors. Further, although Maryland objects to the modeling assessment included with the EPA's March 2018 Memorandum, it does not offer an alternative modeling assessment showing that projected reductions in Maryland's emissions, as outlined in its 2019 SIP submittal, would eliminate the contribution Maryland's emissions make to nonattaining or maintenance monitors identified by the EPA's 2018 memorandum modeling assessment, or to those in the more recent 2016v2 emissions platform assessment. Maryland's modeling assessment in its 2019 SIP submittal merely explores the varying effects that various emission reduction strategies in eastern states would have on ozone nonattainment in general, rather than the effect Maryland's reductions would have on non-attaining or maintenance monitors to which it is linked.

87 FR 9474. The EPA's statement about Maryland not offering alternative modeling was not a suggestion that Maryland was obligated to examine alternative modeling. Rather, the statement was intended as a factual observation that Maryland did not rebut, or attempt to rebut, the conclusion in the very modeling on which Maryland relied – that the state contributes above the contribution threshold. Thus, EPA would have expected Maryland to provide an analysis supporting a conclusion that despite those contributions Maryland was not significantly contributing to nonattainment or interference with maintenance.

Although Maryland identified a number of emissions control requirements, in general, the emissions reducing effects of all existing emissions control requirements are already reflected in the air quality results of the modeling for Steps 1 and 2. And yet Maryland was still identified as linked above 1 percent of the NAAQS contribution threshold to one or more downwind receptors at Step 2. 87 FR 9473. The EPA explained at proposal why Maryland provided an insufficient analysis at Step 3 to support a conclusion that the state's good neighbor obligations for the 2015 ozone NAAQS are resolved. 87 FR 9471. MDE's comment here does not change the EPA's assessment of Maryland's SIP submission. A related comment is addressed in Section 8.3.

The EPA address comment related to availability of guidance in Section 1.2. The EPA responds to MDE's argument based on *New York v. EPA* in Section 1.4.  The EPA addresses comments about existing and future state controls in Section 8.3.

*Comment*

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

COMMENT 4: EPA's Backwards Approach to Transport SIP Approvals Renders States' Burdens Unknowable at the Time of SIP Development

As was mentioned in Section III and in Comment 1, Oklahoma relied extensively on the projected design values and guidance offered in the three 2018 Tsirigotis Memos. Theses memos coupled with the Cross-State Air Pollution Rule (CSAPR) framework establish the criteria by which EPA determines whether an upwind state is making a significant contribution to nonattainment or maintenance issues at monitors located in downwind states. As will be discussed in more detail later, there are two criteria, or "prongs" as Oklahoma has called them, both of which must be met to establish this significant contribution to nonattainment or interference with maintenance. In essence the "significant contribution" language in the Clean Air Act has been operationally defined as meeting both of the following prongs: (1) air quality modeling must show that the total anthropogenic NOx emissions from the upwind state must meet or exceed a contribution threshold at a downwind monitor that is having trouble attaining the ozone standard (i.e., steps 1 and 2 of the CSAPR 4-step framework) and (2) the upwind state must have some quantity of NOx emissions reductions available at a uniform cost threshold (i.e., steps 3 and 4 of the CSAPR 4-step framework). The determination of the quantity of emissions that must be reduced to eliminate the downwind contribution happens at Step 3 of the CSAPR framework, a step that occurs only after considerable work to model the relationship between upwind states' emissions and downwind concentrations. During the preparation of its SIP, a state agency cannot move forward unless the flexibilities, design values, and general guidance offered in the EPA memos to avoid needing to conduct a Step 3 analysis. Further, if modeling appears to show that the state's contributions meet or exceed the contribution threshold, the state cannot determine the magnitude of NOx emissions reductions needed (if any at all) until EPA completes its work on Step 3 of the CSAPR framework. These uncertainties yield a complicated and confusing burden where a state's obligations are fundamentally unknowable at the time a state is required to develop its SIP.

[…]

COMMENT 8: Demonstrating "No Linkage" Should Have Been Sufficient

As noted in the proposed disapproval at 87 Fed. Reg. 9824, the Oklahoma SIP did not identify any NOx emission reductions beyond those required by the CSAPR Update, which establishes an ozone-season NOx trading program for all Oklahoma fossil-fueled electricity generating units (EGUs) with a nameplate generating capacity of more than 25 MWe that produce electricity for sale. Oklahoma determined there was no need to identify NOx emissions reductions because demonstrating no significant contribution to a downwind monitor under prong 1 should have been sufficient on its own. This is because, as already stated above, the significance determination under the CSAPR framework is fundamentally two-pronged, and if either prong is not satisfied then the state does not contribute significantly to downwind

313

nonattainment or maintenance. Oklahoma's SIP addressed the first prong (i.e., Steps 1 and 2) and demonstrated that there was no linkage to a downwind monitor. Having made that demonstration, ODEQ did not need to address the second prong (i.e., Steps 3 and 4), and therefore did not need to identify additional NOx emission reductions.

Additionally, adequately addressing the second prong represents an unreasonable burden due to the complexity of Step 3 of the CSAPR framework. The level of complexity is demonstrated in this description from the "Ozone Transport Policy Analysis Proposed Rule TSD:"

> In order to establish EGU $NO_X$ emissions control stringencies for each linked upwind state, EPA first identifies various possible uniform levels of $NO_X$ control stringency based on available EGU $NO_X$ control strategies and represented by cost thresholds. The EGU emission reductions pertaining to each level of control stringency are derived using historical data, engineering analyses, and the Integrated Planning Model (IPM) for the power sector as described in sections B and C of this TSD. A similar assessment for one scenario was done for non-EGUs. Next, EPA uses the ozone Air Quality Assessment Tool (AQAT) to estimate the air quality impacts of the upwind state emissions reductions on downwind ozone pollution levels for each of the assessed cost threshold levels. Specifically, EPA looks at the magnitude of air quality improvement at each receptor at each level of control, it also examines whether receptors change status (shifting from either nonattainment to maintenance, or from maintenance to attainment), and looks at the individual contributions of each state to each of its receptors.

The photochemical modeling that is used to connect emissions from upwind states to nonattainment and maintenance receptors in downwind states is so complicated and takes so long to run that EPA uses a simpler tool, the Air Quality Assessment Tool or AQAT, to check each intermediate sub-step to see whether the emissions reductions at a particular cost threshold are sufficient to bring the downwind monitors into attainment of the NAAQS. The AQAT was not available when the Oklahoma Transport SIP was developed and submitted. In fact, the AQAT was not released until March 24, 2022. It is an unreasonable burden to expect states, with fewer resources than the EPA, to perform a level of analysis that taxes the EPA's abilities and resources.


*Response*

In response to the commenter's claim that the EPA should approve Prongs 1 and 2 of CAA section 110(a)(2)(D)(i)(I) for Oklahoma, we note that in its submission ODEQ refers to Steps 1 and 2 of the 4-step interstate transport framework collectively as Prong 1 and Steps 3 and 4 of the 4-step interstate transport framework collectively as Prong 2. The EPA has consistently used the term "prongs" to refer instead to the requirements found in CAA section 110(a)(2)(D)(i). There are two so-called ''prongs'' within CAA section 110(a)(2)(D)(i)(I). A SIP submission for a new or revised NAAQS must contain adequate provisions prohibiting any source or other type of emissions activity within the state from emitting air pollutants in amounts that will significantly contribute to nonattainment of the NAAQS in another state (prong 1) or interfere with maintenance of the NAAQS in another state (prong 2).

In response to commenter's claims that the level of analysis required at Step 3 of the 4-step interstate transport framework is overly burdensome for states, the EPA disagrees this is necessarily the case, and

314

even if the analytical burden is great, this would not be a reason to approve deficient SIP submissions. While the EPA appreciates the work required by states in these actions, the Supreme Court confirmed that the states have the first obligation to prepare and submit state plans that prohibit the appropriate levels of emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS in other states. In *EPA v. EME Homer City Generation, L.P.*, the Supreme Court clearly held that "nothing in the statute places the EPA under an obligation to provide specific metrics to states before they undertake to fulfill their good neighbor obligations." 572 U.S. at 509.

The EPA disagrees that the work involved in performing a Step 3 analysis necessitates the identification of so-called "flexibilities," so that states can avoid having to conduct further analysis of emissions-control opportunities or avoid imposing any emissions reduction obligations on their sources. The core statutory objective of the good neighbor provision is to ensure elimination of all significant contribution to nonattainment or interference of the NAAQS in other states. Allowing flexibility for the purpose of avoiding the work required to assess whether a state's emissions contribute significantly to downwind states is inconsistent with the requirements of the statute and would render the good neighbor provision ineffective. As noted in the preamble, the EPA's experience has been that in general, states that attempted to rely on the flexibilities mentioned in previous EPA memos did not provide sufficient state-specific analysis to justify their appropriateness.

The EPA disagrees that it must conduct its own quantification and analysis of cost-effective controls in evaluating a state's SIP submission, or do this analysis on behalf of the state. *See EME Homer City*, 572 U.S. at 509. That is the state's responsibility, and if it has not done that analysis (or an alternative analysis that comports with the Act), then the SIP submission is not approvable. This action is not determining what, if any, cost effective controls exist at Step 3 of the 4-step interstate transport framework—nor need it, if the state's submission is lacking in such an analysis. Instead, the EPA is evaluating the states' interstate transport SIP submissions to determine whether the submissions satisfy the statutory obligations at CAA section 110(a)(2)(D)(i)(I). In order for the EPA to approve a state's SIP submission, a state's chosen approach must contain an adequate technical justification and be consistent with the requirements of the CAA. ODEQ stated that controls imposed through the 2016 CSAPR Update FIP were the only reasonable controls to require. EPA noted in its proposal that the EPA's 2016v2 modeling incorporated emission reductions from prior ozone transport rulemakings, including the CSAPR Update and the Revised CSAPR Update, and even with those reductions, modeling still shows that Oklahoma is linked to downwind receptors. Where a state's submission simply relies on controls and cost thresholds from previous ozone transport actions without explaining why that cost threshold remains appropriate or evaluating other potentially cost-effective controls, it fails to provide an adequate justification and thus is deficient. Additional comments on issues raised by the comment are addressed in Sections 8.3 (Existing and Future State Controls) and 8.6 (Cost Thresholds).

*Comment*

**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

315

**Comment:**

The TCEQ disagrees with EPA's claim that it does not use the 0.7 ppb contribution threshold as the 'sole' determinant of significant contribution from upwind states because the EPA evaluated potential emission reductions in upwind states to determine whether potential emissions reductions are significant to downwind monitors.

The EPA claims that by evaluating if a state has sufficient emission reductions to remove the 0.7 ppb contribution to a downwind nonattainment or maintenance monitor, the EPA's 4-step methodology does not use the 0.7 ppb as the 'sole' determinant of significant contribution and that EPA's methodology is similar to the TCEQ's weight of evidence methodology. However, the EPA is conflating the ability to mitigate contributions with whether the contribution itself is significant in its approach. The potential for emissions reductions should not be used as justification for significant contribution. Significant contribution should be established prior to determining if emissions reductions are needed as the TCEQ did in its transport analysis.

*Response*

This comment expresses an inaccurate description of the 4-step interstate transport framework, in that the EPA does not in fact define "significance" by reference to the Step 2 "contribution" threshold. We acknowledge that TCEQ in its SIP submission attempted to provide an alternative approach in its analysis that would have concluded it does not have "significant" emissions prior to conducting any analysis of emissions reduction opportunities. Rather, the state attempted to use a variety of additional "air quality factors" to justify the non-significance of its emissions. For reasons explained in the proposed disapproval, the EPA finds TCEQ's approach is not approvable. *See* 87 FR at 9831-34. Thus, our analysis (including our evaluation of TCEQ's modeling and methodological choices) establishes that the state does contribute to receptors out of state, and the state's reasoning for why none of those contributions should be considered "significant" is not approvable.

## 8.2   Alleged De Minimis Contribution

*Comments*

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Second, ADEM points out that statewide $NO_x$ emissions from point sources in Alabama continue to decline and most emissions are from mobile sources, which would only contribute to local ozone. This factor is further supported by the fact that Alabama is not projected by EPA's modeling to be linked to

any other state's nonattainment or maintenance in 2026, based solely on existing SIP requirements.[40] Any additional mandates for reductions in emissions from point sources in Alabama would have disproportionately small impacts on ozone concentrations in Texas. In fact, EPA only projects an improvement of 0.17 ppb and 0.36 ppb at the Denton and Harris County monitors, respectively, in 2023 as a result of emission reductions.[41] And only approximately 0.015 ppb and 0.038 ppb of those reductions might be considered attributable to Alabama.[42] These are vanishingly small amounts that do not constitute any common sense understanding of potentially significant contribution. Indeed, every other "linked" state contributes more to these monitors than Alabama.

[41] 87 Fed. Reg. at 20,092.
[42] "Linked" states are only projected to contribute 7.97 ppb and 8.34 ppb to the Denton and Harris County monitors, respectively, in 2023. *See* EPA, Ozone Air Quality Assessment Tool (AQAT), available at https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs. Alabama accounts for 9% and 11% of that total linked contribution to each receptor, respectively. Therefore, it could be assumed that 9% and 11% of the total improvement at those receptors from emission reductions at those receptors is due to Alabama. This assumption is likely conservative and the influence on the Texas receptors is actually less.

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Because the modeling that EPA provided to the states at the time of SIP development did not include sector-specific tagging, DEQ examined sources with elevated stacks to determine whether any sources in Arkansas were anticipated to significantly contribute to nonattainment or interfere with maintenance. Because DEQ had additional information about EGU emissions, DEQ performed additional analysis for this source type. As previously discussed, the analysis focused solely on Allegan County, MI because that was the only receptor DEQ identified as being potentially linked to Arkansas—although DEQ's HYSPLIT analysis suggests that this linkage is not persistent or consistent. The data presented in the Arkansas Transport SIP indicates that EGUs in Arkansas are not significantly contributing to nonattainment or interfering with maintenance in Allegan County, MI. The data also show that controlling emissions activities in Arkansas would not be an effective way of reducing the ozone concentrations in Allegan County—particularly when looking at Arkansas's relative contribution to the Allegan County monitor compared to the proximity and quantity of emissions in other states near to Allegan County. DEQ did not perform similar analyses for the receptors identified by EPA in their disapproval because the data upon which those "linkages" were identified was not available and DEQ adequately justified its 1 ppb threshold.

[...]

EPA's modeling projects that the Harris County, TX monitor (482010055) will not attain the 2015 ozone NAAQS by 2023. Therefore, new control measures are necessary to bring Harris County into attainment. However, Arkansas's relatively small contribution to this monitor based on EPA's 2016v2 modeling does not indicate that new controls for Arkansas sources is an effective means of bringing this area into

317

attainment and that it is unlikely that a particular emission source or emission activity in Arkansas will significantly contribute to nonattainment or interfere with maintenance at that monitor.

**Commenter:** PacifiCorp (Attachment – Ramboll Evaluation)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Tables 1-3 and 1-4 summarize the contributions of Wyoming and Utah EGU and PacifiCorp EGU NOX emissions to 2023 ozone design values at receptors in the DM/NFR ozone NAA. The EGU contributions were obtained using the Proposed Transport Rule Step 2 CAMx 2023 APCA ozone source apportionment modeling state ozone contributions assuming that the EGU fraction of that ozone contribution was proportional to the EGU NOX emissions fraction to the state's total anthropogenic NOX emissions. The EGU fraction of the Wyoming and Utah total anthropogenic NOX emissions was taken from the pie charts above. The PacifiCorp EGU fraction of each of the states total EGU NOX emissions is from Table 3-2 in Chapter 3.

The Wyoming EGU contribution to the 2023 ozone design at the CHAT monitor is 0.14 ppb, or 0.19%. Using the Proposed Transport Rule Step 1&2 data the PacifiCorp EGUs contribution to the 2023 ozone AvgDV at CHAT is 0.05 ppb, or 0.06%.

Utah EGUs are estimated to contribution 0.22 to 0.29 ppb to the 2023 ozone design values at the three sites in the DM/NFR NAA, which represents 0.30% to 0.40% of the design value (Table 1-3). PacifiCorp EGUs are estimated to contribute 0.10-0.12 ppb or 0.13-0.17% to the 2023 ozone AvgDV at the three sies in the DM/NFR NAA.

Thus, the Wyoming and Utah EGU and PacifiCorp EGU ozone contributions to the 2023 ozone design values in the DM/NFR NAA are quite small and probably not even measurable.

Table 1-3. Contributions of Wyoming and Utah EGU NOX emissions to 2023 ozone design values at receptors in the DM / NFR ozone NAA.

| Receptor | 2023 Ozone AvgDV (ppb) | 2023 State Ozone Contribution (ppb) | 2023 State EGU Contribution | | |
|---|---|---|---|---|---|
| | | | State Total Anthropogenic NOX Emissions | EGU Ozone Contribution (ppb) | EGU Ozone Contribution (%) |
| Wyoming | | | | | |
| CHAT | 71.7 | 0.81 | 17% | 0.14 | 0.19% |
| Utah | | | | | |
| CHAT | 71.7 | 1.37 | 21% | 0.29 | 0.40% |
| RFNO | 72.6 | 1.10 | 21% | 0.23 | 0.32% |
| NREL | 73.8 | 1.06 | 21% | 0.22 | 0.30% |

Table 1-4. Contributions of Wyoming and Utah PacifiCorp EGU NOX emissions to 2023 ozone design values at receptors in the DM/NFR ozone NAA.

| Receptor | 2023 Ozone AvgDV (ppb) | 2023 State Ozone Contribution (ppb) | 2023 PacifiCorp State EGU Contribution | | |
|---|---|---|---|---|---|
| | | | State Total Anthropogenic NOX Emissions | EGU Ozone Contribution (ppb) | EGU Ozone Contribution (%) |
| Wyoming | | | | | |
| CHAT | 71.7 | 0.81 | 6% | 0.05 | 0.06% |
| Utah | | | | | |
| CHAT | 71.7 | 1.37 | 9% | 0.12 | 0.17% |
| RFNO | 72.6 | 1.10 | 9% | 0.10 | 0.14% |
| NREL | 73.8 | 1.06 | 9% | 0.10 | 0.13% |

*Response*

The contributions from no state covered by this action, including Alabama, Arkansas, or Utah, are so small that the states have proven they do not significantly contribute to nonattainment or interfere with maintenance.

In the NO$_X$ SIP Call, the EPA adopted a "collective contribution" approach to determining whether sources "contribute" to nonattainment downwind. 63 FR 57376 (Oct. 27, 1998). The EPA said that:

> EPA believes that each ozone nonattainment problem at issue in today's rulemaking is the result of emissions from numerous sources over a broad geographic area. The contribution from sources in an upwind State must be evaluated in this context. This ''collective contribution'' nature of the ozone problem supports the proposition that the solution to the problem lies in a range of controls covering sources in a broad area, including upwind sources that cause a substantial portion of the ozone problem. This upwind share is typically caused by NOx emissions from sources in numerous States. States adjacent to the State with the nonattainment problem generally make the largest contribution, but States further upwind, collectively, make a contribution that constitutes a large percentage in the context of the overall problem.

63 FR 57386.

EPA adopted the same approach to quantifying the level of states' significant contribution to downwind nonattainment areas in CAIR as it used in the NO$_X$ SIP Call, based on the determination in the NO$_X$ SIP Call that downwind ozone nonattainment is due to the impact of emissions from numerous upwind sources and states. CAIR, 70 FR 25162, 25172 (May 12, 2005).

Citing to prior determinations made in the NO$_X$ SIP Call and CAIR, EPA continued to find a collective contribution problem impacting downwind ozone nonattainment and maintenance areas in CSAPR. 76 FR 48208 (Aug. 8, 2011). Specifically, EPA found "that the total 'collective contribution' from upwind sources represents a large portion of PM$_{2.5}$ and ozone at downwind locations and that the total amount of transport is composed of the individual contribution from numerous upwind states." *Id.* at 48237.

The EPA continued to hold this view in the CSAPR Update: "The EPA continues to find that the total collective contribution from upwind states' sources represent a significant portion of the ozone

concentrations at downwind nonattainment and maintenance receptor locations." 81 FR 74519 (Oct. 26, 2016). Further, the D.C. Circuit, in upholding EPA's approach to allocating responsibility at Step 3, rejected Wisconsin's argument that it should not face good neighbor obligations for the 2008 ozone NAAQS in the CSAPR Update on the basis that its emission reductions would only improve a downwind receptor by two ten-thousandths of a part per billion. *Wisconsin v. EPA*, 938 F.3d 303, 322–23 (D.C. Cir. 2019) (citing *EPA v. EME Homer*, 572 U.S. 489, 524 (2014)).

In evaluating ozone transport, the EPA continues to place great importance on collective contribution, including in the context of evaluating SIP submissions. For example, Alabama is linked to the Galveston, Texas receptor and also to the Denton/Pilot Point, Texas violating-monitor maintenance-only receptor. The collective upwind contribution to Galveston is 26 percent of the total ozone in 2023 at this receptor. In addition, at the Denton/Pilot Point receptor, the collective upwind contribution is 18 percent of the total ozone in 2023 at this receptor. Also, ADEQ says any reductions from Arkansas won't "be effective" at assisting Harris County, TX monitor (482010055) attain. The EPA notes that in the 2016v3 modeling, Arkansas is linked to 6 receptors in Brazoria, Denton, Galveston, and Harris counties Texas. The collective contribution from upwind states to these receptors as a percent of total ozone ranges from 14 percent to 26 percent. Utah's highest contribution is to the Chatfield receptor in Douglas County, Colorado where the collective contribution is 8 percent of the total ozone. These measures of the baseline contribution from upwind states rebut any generalized assertions that reductions in these emissions would not be impactful when implemented across the linked upwind geography.

In their comment Alabama Power Company et al. provides no basis for claiming that "additional mandates for reductions in emissions from point sources in Alabama would have disproportionately small impacts on ozone concentrations in Texas," nor do they provide a basis for claiming that mobile source emissions reductions would only reduce ozone locally. In addition, commenter's generalized assertions regarding overall emissions trends and the causes of poor air quality are not an adequate substitute for an evaluation of significant contribution in 2023. Commenter's evaluation does not reflect an adequate comparison between baseline emissions, and the air quality impacts of additional emissions control opportunities in Alabama, much less the inclusion in the SIP submission of enforceable emissions controls that would render those projected reductions permanent and enforceable. In this action, the EPA does not necessarily agree with the comment's calculation of Alabama's air quality impacts based on the estimated air quality improvements as a result of the EPA's April 2022 proposed FIP's emissions reductions and the state's proportion of overall ozone concentrations at the downwind receptors to which the state was linked based on 206v2 modeling. Even still, we note that these estimated air quality impacts alone are not reason to believe Alabama's contributions are not significant. As mentioned previously, the D.C. Circuit rejected Wisconsin's argument that it should not face good neighbor obligations for the 2008 ozone NAAQS in the CSAPR Update on the basis that its emission reductions would only improve a downwind receptor by two ten-thousandths of a part per billion. *Wisconsin v. EPA*, 938 F.3d 303, 322–23 (D.C. Cir. 2019) (citing *EPA v. EME Homer*, 572 U.S. 489, 524 (2014)).

ADEQ's argument that eliminating its own significant contribution to a linked receptor is "ineffective" is unsupported and not a convincing argument that Arkansas has resolved its good neighbor obligations for the 2015 ozone NAAQS, as explained in the proposal. *See, e.g.*, 87 FR 9809-9810. The EPA addresses comments deferring to ADEQ's existing controls to ensure the State does not violate the good neighbor

provision below, in Section 8.3. The EPA addresses comment related to updates to modeling and changes to linkages in Section 5.

In response to PacifiCorp's Ramboll Attachment, the EPA notes first that the EPA is deferring final action on Wyoming's SIP submission. Second, the EPA reiterates that the Agency is not requiring any controls on any source in this action.

The EPA addresses comments on HYSPLIT Model analysis in Section 8.8 of this RTC.

## 8.3   Existing and Future State Controls

*Comments*

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

In addition, emissions will decrease due to existing provisions of the SIP, including New Source Performance Standards (such as subpart KKKK) and existing CSAPR programs (due to retirements and new unit set aside).

[…]

ADEM clearly explains that the State of Alabama has implemented several programs in recent years that have resulted in a reduction of ozone precursor emissions, such as $NO_x$. Meanwhile, EPA admonishes ADEM for not including in its Step 3 analysis "future emissions reduction opportunities beyond pointing to $NO_x$ emission reductions from SIP-approved and Federal measures." EPA does not explain why the programs ADEM identifies—including the Tier 1 and 2 mobile source rules, the nonroad Diesel Rule, the 2007 Heavy-duty Highway Rule, New Source Performance Standards, National Emission Standards for Hazardous Air Pollutants, and CSAPR—are insufficient means by which to achieve future reduction in emissions. EPA is seemingly requiring that Alabama present new control measures to show future emissions reductions. However, it should not matter whether the control measures utilized by Alabama to achieve emissions reductions are new measures for new measures' sake or measures implemented through existing programs or the existing SIP. EPA fails to recognize this distinction and the more important fact that, under these existing programs, Alabama's emissions are already low and will continue to fall. For example, under the existing SIP, emissions from Alabama were well below levels that EPA would deem significant on the relevant dates, as shown in Section C. iii.

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Four out of five of the newly-identified Arkansas linkages are projected maintenance receptors. These receptors are anticipated to attain the NAAQS based on existing control measures. Therefore, significant increases in emissions could interfere with attainment and maintenance of the NAAQS. However, DEQ's prevention of significant deterioration new source review process adequately prohibits emissions from a new source or modification to an existing source in an amount that could contribute to nonattainment or interfere with maintenance of the NAAQS. Therefore, asserting that additional control measures on existing sources are necessary to address EPA-identified linkages to those receptors is not reasonable.

**Commenter:** California Air Resources Board

**Commenter ID:** 12

**Docket ID:** EPA-R09-OAR-2022-0394

**Comment:**

The Act requires the interstate transport portion of the SIP to contain adequate provisions to prohibit emissions from within the state from significantly contributing to nonattainment or interfering with maintenance of the 2015 Ozone NAAQS due to downwind transport to impacted states, including California. CARB agrees it is important to address ozone interstate transport in order to protect public health and welfare of all. CARB also accepts the latest modeling from EPA's analysis which indicated linkages between California and eight nonattainment areas and four maintenance areas.

California has authority under the Act to set its own stricter-than-federal mobile source emissions regulations. Congress provided this authority to address the dominant role that mobile sources play in the poor air quality within the state, considering California's population, climate, and topography. California's pioneering mobile source control programs have paved the way for numerous federal mobile source control programs that have since provided national public health benefits. This additional increment of more robust mobile source controls has been implemented by CARB to expedite attainment of air quality standards within California.

California has the only two areas (Los Angeles-South Coast Air Basin and San Joaquin Valley) in the nation that are extreme nonattainment areas for the 2015 Ozone NAAQS, whereby the State and local districts are constantly looking for aggressive emissions reductions with additional benefits of reducing downwind transport of ozone and ozone precursors of Oxides of Nitrogen ($NO_x$) and Volatile Organic Compounds (VOCs). In the proposed transport FIP, EPA focuses on $NO_x$ emissions reductions, and finds that the "$NO_x$ emissions reductions required in the proposed rule would fully eliminate these states' significant contributions to downwind air quality problems for the 2015 Ozone NAAQS." California's latest statewide emissions estimates projected for the summer months of 2026 from CARB's Criteria Pollutant Emission Inventory Database (CEPAM2022 v1.01 Summer season) indicate that approximately

75 percent of anthropogenic NO$_X$ emissions in California are from mobile sources, with only approximately 15 percent being from stationary source fuel combustion categories.

In December 2021, CARB adopted a new regulation, California's Heavy-Duty Vehicle Inspection and Maintenance program which will ensure heavy-duty vehicles have properly functioning emissions control systems and that malfunction repairs are completed in a timely manner. This regulation is projected to single-handedly reduce NO$_X$ emissions by over 25,000 tpy in 2026. Additionally, CARB's 2022 State SIP Strategy lists an assortment of measures providing an additional 7,500 tpy reduction in NO$_X$ emissions in 2026. The 2022 State SIP Strategy that will be considered at a public meeting of the CARB Board later this year, together with measures from the 2016 State SIP Strategy that were very recently adopted and not accounted for in EPA's transport modeling, will result in the additional reduction of nearly 32,500 tons of NO$_X$ emissions in 2026. In contrast, the proposed FIP estimates 1,666 tpy of NO$_X$ emission reductions from non-electric generating unit (EGU) sources. CARB's new mobile source control measures will provide about 20 times more NO$_X$ emission reductions than were specified in the proposed FIP. Given California's mix of emissions sources and our unique authority, it is most appropriate for CARB to focus on reducing mobile source emissions to mitigate California's impact on downwind neighbors.

**Commenter:** Louisiana Department of Environmental Quality

**Commenter ID:** 27

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA finds in its proposal that Louisiana's November 2019 submittal does not meet the obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 NAAQS in downwind states based upon EPA's 4- step interstate transport framework.

LDEQ has an established Part 70 air permitting program, approved by EPA. The program's regulations set forth obligations that industry must follow prior to construction. All permit applications must show that their potential to emit emissions meets the prevention of significant deterioration (PSD) or nonattainment new source review requirements (NNSR). To date, there have been no FCAA § 126 actions filed against Louisiana. FCAA § 126 gives a state the authority to ask EPA to set emissions limits for specific sources of air pollution in other states that significantly contribute to nonattainment or interfere with maintenance of one or more NAAQS in the petitioning state.

**Commenter:** Maryland Department of the Environment

**Commenter ID:** 29

**Docket ID:** EPA-R03-OAR-2021-0872

**Comment:**

C. The Step 3 analysis in Maryland's 2015 Good Neighbor SIP demonstrates that the State has resolved its significant contribution to downwind nonattainment and maintenance areas.

[…]

MDE disagrees that it failed to provide a well-documented evaluation of its efforts to address significant contributions to downwind states. Maryland evaluated its aggressive in-state emissions reductions programs and found that they provide all available emissions reductions at a significant cost-per-ton threshold, thus satisfying the CAA's Good Neighbor requirements. Without any guidance from EPA on what constitutes an approvable Good Neighbor SIP (as discussed in Section B), MDE used EPA's past transport actions as a guideline for how to assess its sources and what emissions reductions may be necessary.

EPA's past transport rules, CSAPR, the CSAPR Update, and the RCU all aimed to achieve reductions of ozone-forming emissions from facilities required to report emissions pursuant to EPA's Part 75 Clean Air Markets Division ("CAMD") reporters – the majority of said reductions coming from coal-fired EGU's with Selective Catalytic Reduction ("SCR") controls. As such, the main component of emissions reductions in Maryland's 2015 Good Neighbor SIP are from Maryland's coal-fired EGU's.

MDE first cited the emissions reductions from the CSAPR Update, which capped Maryland's NOx emissions at 3,828 tons per ozone season beginning in 2017. That rule established a cost-effectiveness threshold of $1,400 per ton of NOx" reduced as the point at which all significant contributions of emissions have been addressed from coal-fired EGUs with SCR controls.

MDE agrees with EPA's conclusion that the CSAPR Update was intended to provide NOx emissions reductions for a less-stringent NAAQS. MDE also agrees with EPA that the cost-effectiveness threshold for the CSAPR Update may not be sufficient for a more stringent NAAQS.16 That is why MDE did not rely solely on the CSAPR Update to satisfy its significant contribution for the lower 2015 ozone NAAQS. MDE also relies on the Maryland NOx Rule (*Control of NOx Emissions from Coal-Fired Electric Generating Units* [footnote: See Code of Maryland Regulations ("COMAR") 26.11.38.03 and 26.11.38.05.]) which sets daily unit-specific emission rate limits as well as 30-day fleet-wide emission rate limits resulting in actual emissions rates well below those achieved by either the CSAPR Update or Revised CSAPR Update FIPs. That regulation, which is part of Maryland's SIP, requires all Maryland coal-fired EGUs with post combustion controls (both SCR and Selective Non-catalytic Reduction ("SNCR") controlled units) to operate and optimize the controls for maximally practicable NOx reductions every day of the ozone season. This approach goes beyond the simple ozone season NOx mass cap provided by the CSAPR Update. This rule provides *more* NOx reductions than the CSAPR Update and requires sources to spend more than the CSAPR Update's benchmark of $1,400/ton.

By way of example, the bar chart below shows ozone season CSAPR Update budgets and ozone season NOx mass for Maryland, Pennsylvania, Virginia and West Virginia. States with emissions limited by only the CSAPR Update had consistently similar NOx emissions year-over-year, while Maryland's emissions were consistently well below the CSAPR Update budget. Pennsylvania and Virginia are, on average, 20-25% below the budget and West Virginia is almost always on budget. By contrast, Maryland is typically 30-60% below the budget. This is due, in large part, to Maryland's NOx rule, which went into place in

324

2015, and requires more emissions reductions than the CSAPR Update, as would be necessary for the more stringent 2015 standard.

[bar chart available in comment]

Furthermore, when Maryland's NOx Rule was implemented, it was anticipated that the affected sources would have to spend approximately $5,733 per ton of NOx reduced. This is well above EPA's minimum $1,400/ton threshold it set for the less stringent standard. In effect, Maryland requires its sources to reduce NOx by 30-60% more and spend 310% more in cost-per-ton of NOx reduced for a standard that is 5 parts per billion ("ppb") (or 6%) lower.

As EPA did not set a cost-per-ton threshold at which significant contribution for the more stringent NAAQS has been resolved, Maryland concluded that requiring more emissions reductions at a higher cost threshold is sufficient to address its significant contribution to downwind nonattainment and maintenance areas.

To further ensure that Maryland explored all possible emissions reductions, MDE also cited other emissions control programs that limit statewide emissions. Those include, but are not limited to, NOx and VOC Reasonably Available Control Technology ("RACT") regulations, as well as area, non-EGU, point, and mobile source measures.

At the time of submission, MDE concluded that its Step 3 analysis was complete and the emission reduction control programs identified in Maryland's 2015 Good Neighbor SIP fully addresses the state's significant contribution to downwind nonattainment and maintenance areas.

EPA's recently released proposed transport FIP for the 2015 Ozone NAAQS confirms this conclusion. On February 28, 2022, EPA released a pre-publication version of the FIP for the 2015 Ozone NAAQS which includes proposed seasonal emissions budgets and a cost-per-ton significant contribution level for EGUs. This included immediate optimization of installed controls as well as retrofit of new controls in 2026. EPA also proposed emission rate limits for certain other industrial stationary sources (referred to generally as non-EGUs. A comparison of the proposed FIP limits for both EGUs and non-EGUs in Maryland to the limits Maryland imposes on its sources demonstrates that Maryland's limits are more stringent.

The proposed FIP demonstrates that Maryland's aggressive EGU emissions controls are more stringent on two fronts.

First, Maryland's EGU Regulation is more stringent than the FIP. The proposed FIP establishes a seasonal emissions budget based on coal-fired EGUs with SCR's operating at an average emission rate of 0.08 pounds per million British thermal units ("lbs/mmBtu"). The FIP's emissions budgets are based on coal-fired EGUs with SCR's reducing NOx at a cost of $1,800/ton. Conversely, COMAR 26.11.38 requires daily optimization of the installed SCR and SNCR controls. Optimization is assured by requiring Maryland's SCR equipped sources to limit daily emissions to a rate no higher than 0.08 lbs/mmBtu, with most limited to 0.07 lbs/mmBtu. The only SNCR still operating in Maryland, AES Warrior Run, has a daily emissions limit of 0.10 lbs/mmBtu and almost exclusively operates below 0.08 lbs/mmBtu. COMAR 26.11.38 is estimated to cost over $5,000 per ton of NOx reduced. Therefore, Maryland's regulations are more stringent than the proposed FIP because (1) maximum practicable emissions reductions through

325

optimization of the installed controls is required every day instead of seasonally, (2) the optimized NOx emission rate is equivalent to or lower than the proposed FIP rate, and (3) the cost-per-ton of NOx reductions is significantly higher than the value in the proposed FIP. COMAR 26.11.38 has resolved significant contributions for EGUs.

Second, the proposed FIP demonstrates that there are no additional emissions reductions from Maryland's EGUs. The state budget calculations for the FIP in 2023 through 2026 does not require any additional NOx reductions from Maryland's coal-fired EGUs equipped with SCRs. EPA flagged all of Maryland's units as already optimized or retired. EPA's only EGU NOx reductions in Maryland were obtained from a single coal-fired, circulating fluidized bed EGU equipped with an SNCR (AES Warrior Run), which reduced the state's ozone season NOx by 8 tons from a 2021 level. The FIP indicates that would be achieved by requiring AES Warrior Run to meet an ozone season average NOx emission rate of 0.071 lbs/mmBtu in each of the future year ozone seasons. As EPA notes in the same analysis, 2019-2021 emissions data indicates that this unit currently achieves an ozone season average emission rate of 0.066 lbs/mmBtu. Examining all three years of data from the state budget calculations for the FIP demonstrates that AES Warrior Run is already optimized beyond EPA's expectations, and no further emissions reductions are required. Optimization in Maryland, and at this specific unit, has already been achieved through the Revised CSAPR Update and COMAR 26.11.38. Maryland has resolved significant contributions for EGUs.

Similarly, the proposed FIP demonstrates that Maryland's aggressive non-EGU emissions controls are more stringent than EPA's replacement solution. [footnote: The FIP proposed emission rate limits for multiple non-EGU source categories. MDE is only responding to the source categories where such facilities exist in the State.]

Maryland has two cement and concrete manufacturing facilities that would be subject to the limits in the Proposed FIP. Holcim Inc operates a preheater/precalciner cement kiln with a NOx limit imposed by MDE of 1.8 lbs/ton clinker, which is 35.7% lower than EPA's proposed limit of 2.8 lbs/ton clinker. Maryland's limit achieves an additional 213.59 tons of NOx reductions per year. Lehigh Cement Company operates a precalciner cement kiln with a NOx limit imposed by MDE of 2.4 lbs/ton clinker, which is 4.3% higher that EPA's proposed limit of 2.3 lbs/ton clinker. EPA's proposed limit achieves an additional 107.14 tons of NOx reductions per year. Maryland's limits on cement and concrete manufacturing facilities provide a net gain of approximately 100 tpy in emissions reductions. Maryland's regulations are more stringent than the proposed EPA FIP limit. While EPA's proposed FIP does not anticipate requiring emissions reductions from Maryland's Cement facilities at the time of proposal, Maryland has resolved significant contributions for cement and concrete manufacturing.

Maryland has two pipeline transportation of natural gas facilities that would be subject to the limits in the proposed FIP. Transcontinental Gas Pipeline Company operates seven lean burn 2-cycle engines rated at 2,050 brake horsepower and three lean burn 2-cycle engines rated at 2,100 brake horsepower. Texas Eastern Transmission, L.P. operates two lean burn 2-cycle engines rated at 5,500 brake horsepower. The EPA proposed FIP limit for this source category is 3 grams per horsepower-hour (Hp-Hr). The Maryland limit of 125 ppmv is at least 40% more stringent. The proposed FIP would not require any further reductions from this sector. Maryland has resolved significant contributions from pipeline transportation of natural gas.

EPA's proposed FIP, which is purported to completely resolve the state's significant contribution, would not require any further emissions reductions from EGU or non-EGU sources beyond what Maryland imposes on its sources. Maryland's emission reduction control programs identified in the 2015 Good Neighbor SIP are sufficient to resolve the state's significant contribution to downwind nonattainment and maintenance areas and SIP achieves more reductions than the FIP can provide.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Finally, EPA improperly dismisses Kentucky's insistence that EPA assess "on-the- books" or "on-the-way" controls. EPA's rejection is based upon Kentucky's failure to quantify these reductions "in a meaningful way or demonstrate that the downwind improvements from these regulations and programs would be sufficient to eliminate the Commonwealth's significant contribution or interference with maintenance." [87 Fed. Reg. 9505] at 9512. In doing so, EPA fails to recognize that it is EPA's burden to assure that all such control programs are properly addressed in its analysis. The agency's attempt to shift this burden to the states is inappropriate. EPA's actions are inconsistent with the concept of cooperative federalism. It is EPA's task to marshal its significant multi-state resources to assess these types of "on-the-books" and "on-the-way" programs.

**Commenter:** New Jersey Department of Environmental Protection

**Commenter ID:** 34

**Docket ID:** EPA-R02-OAR-2021-0673

**Comment:**

NJDEP acknowledges that the EPA is disapproving its SIP so that it can be fully addressed in the proposed FIP.  A review of this proposed rule indicates that many of the requirements are similar to, if not exactly the same as, control measures already implemented in New Jersey for over a decade. The reductions required for EGU's located in New Jersey are mostly attributed to currently planned unit shutdowns. New Jersey is pleased that EPA is addressing non-EGU sources in the proposed rule, which will finally bring nearby and upwind states in line with New Jersey's standards. Considering the proposed rule expects 0% emissions reductions from non-EGU sources located in New Jersey, this supports New Jersey's GN SIP as a full remedy to addressing its transport contributions well ahead of the 2015 Ozone FIP.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

In the Proposed Disapproval, EPA admits that Utah's analysis included reductions in emissions of VOCs and NOx "through a combination of regulatory actions" and EPA agrees that these reductions are "beneficial in reducing VOCs and NOx in the State. However, EPA argues that the emissions reductions have been considered in EPA's modeling as "on-the-books" controls and that most of the emissions reductions were VOCs. EPA, for the first time and without any relevant scientific analysis or CAA authority to do so, argues that NOx emissions reductions are more important than VOCs for ozone reduction. The precise mixture of NOx and VOC emissions to achieve ozone reductions is a complex and unresolved issue in the West. It is one of the reasons that EPA has recognized western ozone analyses must be determined on a case-by-case basis. EPA cannot simply reject Utah's SIP because the emissions reductions come from VOCs. If Utah's SIP is effective at reducing its ozone contribution below thresholds levels, then EPA cannot criticize how that is done.


**Commenter:** Utah Petroleum Association and the Utah Mining Association

**Commenter ID:** 48

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Utah's IT SIP includes a lengthy weight-of-evidence analysis showing how its approach matches other interstate transport SIP approvals and EPA guidance, including the following:

[…]

- Analysis in Utah's SIP showing significant reductions in emissions in Utah after the time of EPA's modeling study quantifying impacts to downwind States, including a number of actions related to applying Best Available Control Technology and Best Available Control Measures for the Salt Lake City PM2.5 nonattainment area, implementing controls in the Uinta Basin on oil and gas sources to reduce ozone formation, and implementation of Tier 3 gasoline

Several of these show that Utah does not have a ***significant*** influence on ozone in Colorado. While EPA tries to explain in the Proposed Disapproval why it does not accept Utah's reasoning on these points, EPA's explanations ring hollow in the face of the evidence that EPA already made up its mind to disapprove the Utah IT SIP, namely that the Proposed GNR includes a FIP in lieu of the IT SIP for Utah and other States. For these reasons and the other reasons stated above, EPA should approve Utah's IT SIP.

328

*Response*

As explained at proposal, in general, the EPA already includes on-the-books rules in its transport modeling. *See e.g.*, 87 FR 9472. In the SIP submissions, some states pointed out existing state rules, retirements, consent decrees, etc. which they believed were not accounted for in the EPA's modeling, and the EPA determined whether the cited controls should be included in the 2016v2 modeling (and if not, the reasons for that and the EPA's explanation for why it did not change the Agency's conclusions). *See e.g.*, 87 FR 9472. Therefore, the EPA disagrees with Alabama Power Company et al., which argues that the EPA did not explain at proposal why Alabama's recitation of existing state controls was insufficient to support a conclusion the state has no outstanding good neighbor obligations for the 2015 ozone NAAAQS. The EPA did so. 87 FR 64425-64426. In response to Utah Petroleum Association and Utah Mining Association, the EPA explained at proposal why Utah's reference to then-forthcoming Best Available Control Technology (BACT) for the Salt Lake City $PM_{2.5}$ nonattainment area, implementing controls on oil and gas sources in the Uinta Basin, and implementation of Tier 3 gasoline was insufficient to support a conclusion that the state has no outstanding good neighbor obligations for the 2015 ozone NAAQS. *See* 87 FR 31482-31483.

The EPA updated emissions inventories and modeling from 2016v2 to 2016v3 in response to public comment, including comments identifying state rules, etc. commenters believed were not accounted for in the 2016v2 modeling. *See* Preamble Section III.A.; 2016v3 Emissions Modeling TSD. In response to Alabama Power Company et al., the EPA notes that the rules they identified (Tier 1 and 2 mobile source rules, the nonroad Diesel Rule, the 2007 Heavy-duty Highway Rule, New Source Performance Standards, National Emissions Standards for Hazardous Air Pollutants, and existing CSAPR Programs) as well as newer rules are included in the 2016v3 modeling. *See* 2016v3 Emissions Modeling TSD. In response to Utah Petroleum Association and Utah Mining Association, the EPA notes that the Tier 3 program is included in the EPA's 2016v3 modeling. *Id.* Moreover, as explained in Section III.A. of the Preamble, the 2016v3 modeling projects that, despite these controls, every state covered by this action is projected to contribute more than 1 percent of the NAAQS to one or more downwind receptor.

Some commenters compared some of their state rules to the proposed level of stringency in the proposed FIP. The EPA disagrees with the premise of the comment from New Jersey Department of Environmental Protection that the EPA's disapproval of New Jersey's SIP submission is motivated by including the state in a FIP. The EPA explained the deficiencies in New Jersey's SIP submission at proposal (*See* 87 FR 9484; February 22, 2022). This action does not disapprove state submissions by comparison to the proposed FIP as a benchmark. While the emissions control strategies of the proposed FIPs do not form a definitive benchmark in our evaluation of these submissions, we do note that in the proposed FIPs, despite what some commenters assert, the EPA found emissions reduction opportunities at its proposed Step 3 emissions control stringency levels for all states that are covered in this disapproval action.

EPA addresses other issues raised in these comments below and elsewhere in this Response to Comment document, including in Section 5 (Updates to Modeling and Changes in Linkages), Section 10.6 (Allegations that Disapprovals of Western State SIP Submissions was Predetermined), Section 11.2 (CAA Section 126 Petitions), and Section 11.8 (Mobile Source Emissions).

<u>PSD Programs</u>

In response to comments suggesting that PSD programs are sufficient to satisfy states' good neighbor obligations, the EPA disagrees, as explained at proposal in relation to existing minor source, PSD, and NNSR permitting programs:

> [T]here are likewise important distinctions between the permitting program requirements and interstate transport requirements, including but not limited to: (i) The permitting programs generally apply only to new sources or major modification of existing sources; (ii) the evaluation of impacts on attainment and maintenance in other states in the context of a permit for a single source may not be as robust and have the same geographic scope as that undertaken by states and the EPA for purposes of section 110(a)(2)(D)(i)(I); and (iii) the timing of the permitting process evaluation may have no bearing on the NAAQS at issue (i.e., a permit issued in 2005 would not have considered impacts vis a vis the 2015 8-hour ozone NAAQS). Further, existing sources may have been permitted under a new source permitting program years or even decades ago, before more effective or cheaper emissions control technologies became available.

> Thus, even if the permitting programs address new sources of emissions for the intended purposes of those programs, it does not necessarily follow that they automatically meet all other CAA requirements as well. The EPA disagrees, therefore, with the conclusion that the existence of these permitting programs resolves the issue of whether there are additional control measures that the State should impose specifically for purposes of eliminating significant contribution to nonattainment or interference with maintenance at downwind receptors for the 2015 8-hour ozone NAAQS.

87 FR 9529 (West Virginia) (footnote omitted).

In particular, the PSD permitting program applies in areas that have been designated as in attainment of the NAAQS and is intended to ensure that such areas remain in attainment even if emissions were to increase as a result of new sources or major modifications to existing sources located in those areas. This purpose is different than the purpose of the good neighbor provision, which is to assist downwind areas (in some cases hundreds or thousands of miles away) in resolving ongoing nonattainment of the NAAQS or difficulty maintaining the NAAQS through eliminating the emissions from other states that are significantly contributing to those problems. Although Arkansas and Louisiana may have EPA-approved PSD programs, that does not alleviate the states of their interstate transport responsibility, as these are two separate provisions under the CAA serving two separate purposes.

Further, ADEQ and LDEQ did not sufficiently explain how their states' PSD programs could eliminate Arkansas and Louisiana's potential significant contributions to downwind receptors, as these programs would only apply to potential future source emissions, as opposed to existing emissions in the state. Where sources have adopted enforceable emissions reductions, the EPA has accounted for this in its emissions inventories used as an input to its modeling, as described in the 2016v3 Emissions Modeling TSD.

We additionally note that the justification provided in the comment regarding Arkansas' obligations as to maintenance receptors, even if accepted as valid (which EPA does not), does not address the state's linkage to a nonattainment receptor.[77]

Mobile Source Controls

In response to CARB's claims regarding the high proportion of mobile source emissions in California, the EPA recognizes that mobile sources represent a large portion of $NO_x$ emissions in California and therefore those emissions would be expected to affect downwind nonattainment and maintenance receptors.

However, even if mobile source emissions are a large portion of California's $NO_x$ emissions, and even if they represent a large portion of the state's contribution to downwind nonattainment and maintenance receptors, this would not support a basis to approve the adequacy of California's 2015 ozone transport SIP submission. These in-state, anthropogenic emissions are assigned to the state for purposes of determining the state's contribution to receptors at Step 2. For the 2016v3 platform, CARB provided updated onroad, nonroad, and locomotive emissions for 2023 and 2026 and these were incorporated in the modeling for Steps 1 and 2. In its comment letter, CARB states that it accepts the EPA's modeling analysis indicating that emissions from California are linked to downwind nonattainment and maintenance receptors in other states. The state's transport SIP submission also acknowledged the linkage with other states but concluded their emissions did not significantly affect nonattainment or interfere with maintenance in another state. Because the EPA's modeling showed a linkage at steps 1 and 2 between emissions in California and nonattainment or maintenance receptors in downwind areas, and CARB did not provide information to refute the EPA's analysis or provide an adequate analysis equivalent to or alternative to EPA's step 3 analysis determining whether any controls were available to eliminate any potential significant contributions, California's SIP submission remains deficient. As such, the EPA must disapprove California's SIP submission for failing to satisfy the statutory requirements of CAA section 110(a)(2)(D)(i)(I).

We commend CARB on its emissions reductions measures to reduce $NO_x$ emissions from mobile sources in the state. To the extent that CARB is arguing that $NO_x$ emissions reductions anticipated from the EPA's proposed FIP are small in comparison to newly approved and soon to-be-adopted state measures, we note that comments on the proposed FIP are outside the scope of this action. In addition, we note any emissions reductions that are anticipated beyond 2023 cannot appropriately be taken into account in evaluating contribution in this action. EPA responds to other comments about mobile sources in Section 11.8 (Mobile Source Emissions).

Maryland's $NO_x$ Rule and Limits on Certain Non-EGU Source Categories

The EPA disagrees with the claim that Maryland's step 3 analysis shows that the state has resolved its significant contribution to downwind nonattainment and maintenance-only receptors for the 2015 ozone NAAQS. 87 FR 9470-9473. EPA's 2016v3 modeling platform accounts for actual emissions from

---

[77] Arkansas was also linked to a nonattainment receptor in EPA's proposed modeling (2016v2) in Harris County, Texas (AQS Site ID 482010055). Arkansas is linked to a nonattainment receptor in Galveston County, Texas (AQS Site ID 481671034) based on 2016v3 modeling. For further explanation of Arkansas' changed linkages between the 2016v2 and 2016v3 modeling see Sections 1.4 and 5.

Maryland's EGUs equipped with Selective Catalytic Reduction (SCR) and SNCR through 2021 and projected emissions for these EGUs in 2023 taking into account announced shutdowns and the effects of all CSAPR regulations through the Revised CSAPR Update. Even taking into account Maryland's 2015 $NO_x$ rule, the 2016v3 modeling still projects that sources in Maryland are linked to downwind nonattainment and maintenance-only receptors. Preamble Section III.C. In its SIP submission, Maryland does not dispute that it is linked at Step 2.

Regarding Maryland's claims that its existing $NO_x$ Rule at Code of Maryland Regulations (COMAR) 26.11.38 achieves more emission reductions from coal-fired EGUs equipped with SCRs than EPA's CSAPR Update, and required sources to spend more than the CSAPR Update's benchmark of $1,400/ton, as explained in the proposal the CSAPR Update is not an appropriate benchmark for measuring whether Maryland has met the good neighbor requirements of the CAA for the more protective 2015 ozone NAAQS. 87 FR 9471. Additionally, the EPA found that between the time the Agency issued the CSAPR Update and the Revised CSAPR Update, the $1,400/ton threshold used in the CSAPR update was no longer the appropriate cost threshold to eliminate significant contribution, even for the less protective [78]

To the extent that Maryland is claiming, at Step 3, that there are no further $NO_x$ emission reductions to be obtained from Maryland sources at a reasonable marginal cost per ton, the EPA disagrees that the SIP submission supports that conclusion. 87 FR 9470-9473. The substance of the proposed FIP, including proposed controls, are beyond the scope of the rulemaking, and in any event are not being used as a benchmark to disapprove any state's SIP submission in this action.

MDE believes certain requirements in MDE's state-level regulations or enforceable permit limits applicable to non-EGUs are more stringent than the limits in the proposed FIP. First, in order to be creditable under the Clean Air Act, all such emissions reductions needed to be included in the SIP submission for EPA approval and made permanent and federally enforceable; state-law requirements, permits, and other measures that are not in the SIP cannot be counted as eliminating the state's significant contribution. Further, MDE presented no analysis of the air quality impacts of these non-EGU controls on downwind receptors as part of Maryland's SIP submission. The examples identified by the commenter do not substitute for a Step 3 analysis and are insufficient to support a conclusion that Maryland has resolved its good neighbor obligations for the 2015 ozone NAAQS.

Finally, Maryland's comparison of individual source-level controls to the limits in the proposed FIP fails to take into account the overall effect of all the limits in the proposed FIP. In isolation, some of Maryland's existing limits may be more stringent than the limits used in the proposed FIP. However, applying the uniform cost-effectiveness thresholds, the proposed FIP is expected to provide a reduction of around 45 tons of ozone season $NO_x$ from the state. Although this is a potentially relatively small reduction from Maryland's sources compared to other states, it is, under the EPA's proposed approach, more enforceable emissions reductions than the state has offered beyond the current baseline. Maryland has not offered a satisfactory alternative approach to defining significance, and under the EPA's proposed approach, because the state has made relatively greater progress in reducing its

---

[78] *See* 82 FR 23054, 23088 (April 30, 2021) ("The CSAPR Update found $1,400 per ton was a level of uniform control stringency that represented turning on idled SCR controls. EPA uses the same costing methodology, but updating for input cost increases (e.g., urea reagent) to arrive at $1,600 per ton in this rule (while also updated from 2011 dollars to 2016 dollars).").

emissions compared to other states, its reduction obligation would be relatively small. While the proportion of significant contribution from a single upwind state may be relatively small, the effect of eliminating the contribution on a uniform-stringency basis from all linked upwind states can be quite large. Allowing Maryland to rely only on its existing limits in its regulations, which modeling has shown does not resolve its contribution, in the absence of an evaluation of additional emissions control opportunities, would be inconsistent with the analysis, and potential emissions control obligations, expected of other upwind contributing states. In Maryland's SIP submission, the state did not assess the availability of additional emissions controls or provide justification as to why additional air quality controls were not required. Instead, Maryland merely identified what their existing regulations currently required. Still, the Good Neighbor Plan for the 2015 8-hour Ozone NAAQS FIP is not yet final and the EPA is not using the FIP as a direct benchmark in its action on states' plans here. The limits which have been proposed for Maryland and to which the state is drawing a comparison in these comments could change. Additionally, the limits within the FIP are not within the scope of this action.

Additional topics are addressed in Section 8.6 (Cost Thresholds) and Section 10.3 (Cooperative Federalism and the EPA's Authority).

<u>VOCs</u>

The EPA does not dispute that VOCs are precursors to ozone. Revised CSAPR Update, 86 FR 83087 (April 30, 2021). The EPA does not agree that Utah's reliance on existing VOC controls measures in their SIP submission is sufficient to support a conclusion that the state has no outstanding good neighbor obligations for the 2015 ozone NAAQS, particularly in light of the fact that Utah did not examine potential emissions reduction opportunities at sources contributing greater amounts of ozone precursor emissions. *See* 87 FR 31483.


## 8.4   Modeling and CAA Section 179B Guidance


*Comments*


**Commenter:** Utah Petroleum Association and the Utah Mining Association

**Commenter ID:** 48

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA's persistence in applying a 0.7 ppb contribution threshold is wholly inconsistent with EPA's proposed disapproval of the 179B demonstration for Utah's Northern Wasatch Front ozone nonattainment area ("NWF"). In the NWF case, EPA strongly criticized the modeling for underpredicting local ozone production and, as a result, EPA did not agree with the model demonstration of 6 to 8 ppb international influence on NWF ozone. On the other hand, EPA's modeling also shows significant underprediction of both Utah and Denver ozone by as much as 10 to 20 ppb on high ozone days, and yet

EPA used these model results despite the poor performance to evaluate downwind impacts of only 1 ppb or 0.7 ppb. The model simply does not have the accuracy for these small predictions to be reliable. The inconsistencies in EPA's approach between the two different but simultaneous rulemakings pose an unacceptable dichotomy.

Furthermore, EPA questioned the accuracy of 2 to 3 ppb in Texas' model for its 179B demonstration for the San Antonio ozone nonattainment area ("SAT") because the 2 to 3 ppb influence falls within the range of model uncertainty. If modeling does not have enough accuracy in the SAT case to show a 2-3 ppb impact, it also does not have enough accuracy to show a 0.7 ppb or 1 ppb impact for the IT SIPs. In fact, in the SAT case, Texas developed a model specifically for SAT, a more detailed and accurate exercise than EPA's larger modeling domain and coarser grid for the interstate transport evaluations, and the San Antonio geographical area lacks the complex terrain of Salt Lake City and Denver. Therefore, the SAT modeling likely has less inherent inaccuracy.

EPA cannot have it both ways. If a 6 to 8 ppb difference and a 2 to 3 ppb difference do not have sufficient accuracy to show upwind impacts in the NWF and SAT 179B demonstrations, respectively, then a 1 ppb or 0.7 ppb difference would not be sufficiently accurate in Utah's IT SIP, considering the magnitude of inherent error in the modeling. EPA's inconsistent approaches pose an arbitrary standard. EPA should not persist in applying the 0.7 ppb threshold. To continue to do so would go beyond the bounds of the CAA which requires addressing significant downwind contributions.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

As explained in the BHE Comments and expert analysis provided by Ramboll, EPA's chosen modeling, however, has several unexplained inconsistencies. Moreover, EPA rejected the very type of modeling it relies on to support the Proposed Disapproval when it denied the state of Utah's recent request for an ozone exception. As Utah explained, "EPA used a similar level of modeling bias [as] grounds for denying Utah's recently submitted 179B(b) demonstration. . . while simultaneously upholding an extensive federal action that has widespread national implications [based on similarly biased modeling]." It is arbitrary and capricious for EPA to reject Utah's 179B(b) demonstration due to model underperformance while simultaneously using a model with highly similar underperformance limitations as justification to disapprove Utah's Intestate Transport SIP.

**Commenter:** PacifiCorp (Attachment - Berkshire Hathaway Energy (BHE) Company Comments on Proposed Ozone Transport Rule)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA rejected the very type of modeling it relies on to support the Proposed Rule when it denied the state of Utah's recent request for an ozone exception. As the state of Utah has explained, EPA relies on the 2016v2 model, which has a high negative bias, to support the Proposed Rule. The negative bias indicates that EPA's model is underpredicting either transport or local photochemical production (or some combination of both). EPA cited a similar negative bias in Utah's recent 179B(b) demonstration as one reason for rejecting Utah's ozone demonstration. It is arbitrary and capricious for EPA to reject Utah's 179B(b) demonstration due to model underperformance while simultaneously using a model with similar underperformance limitations as justification to include Utah and other western states in the FIP.

Finally, BHE understands that because of these significant errors EPA is considering remodeling for the Proposed Rule, and BHE supports any efforts to take into account the issues presented here and in more detail in the Ramboll Report.

*Response*

Several commenters claimed that it is arbitrary and capricious for the EPA to reject Utah's 179B(b) demonstration due to model underperformance while simultaneously using a model with similar underperformance limitations as justification to include Utah and other western states in the FIP.

First, CAA sections 110(a)(2)(D)(i) and 179B are different provisions to address distinct issues and are governed by their own respective requirements. It would be unreasonable to apply the same criteria to different CAA requirements.

Second, we disapproved Utah's 179B demonstration for many different reasons, as described in detail in the TSD, RTC and final rule (*See* Technical Support Document ("TSD"), Northern Wasatch Front (NWF), Utah: Failure to Attain 2015 Ozone National Ambient Air Quality Standard by Attainment Date; Reclassification and Disapproval of International Emissions Demonstration January 2022, *found at* Regulations.gov at EPA-HQ-OAR-2021-0742-0043). The EPA will not here restate all our reasons for disapproving Utah's 179B demonstration, as that information is provided in the TSD, RTC, and final rule for that action. Comments relating to CAA section 179B are outside the scope of this action. The model performance was simply considered in the context of the information provided and in the context of the conclusion being drawn.

In addition, the EPA disagrees with the interpretation of model performance implications as stated by the commenter. With respect to model performance, the EPA notes that the type of conclusions needed for CAA section 179B and for the proposed interstate transport FIP have very different implications for the evaluation submitted by the state. The NWF submission and accompanying report suggests that US-regional and international transport of ozone to Utah is well simulated, while local contributions are likely underpredicted. The effects of an underprediction of local ozone contribution would overstate the relative role of international contributions in the context of a CAA section 179B demonstration. The same underprediction of local ozone contributions could understate the contribution of NWF emissions to ozone at monitors in other states.

335

As described in the Final Action AQM TSD for this final rule, the EPA performed air quality modeling using the 2016v3 platform which includes updates made in response to comments on the proposal modeling. The table below provides NMB and NME model performance statistics at individual monitoring sites in the NWF for June through August for both the 2016v2 and 2016v3 modeling. The EPA v3 model performance information, provided in Table 4-X is substantially improved compared to both the EPA v2 modeling and the Ramboll modeling submitted in the state's 179B demonstration. The data show that model performance improved when looking across all days and on just those days with MDA8 ozone > 60 ppb. Note that the statistics for the 2016v3 modeling are well within the range of the performance criteria for NMB (<+15%) and NME (<25%) offered by Emery et.al. (2017). In contrast to EPA's 2016v3 modeling, the 2016 Ramboll modeling presented in Utah's 179B(b) petition cited by the commenters had average NMB and NME of -6% and 10% for all days in the period June through August and -12% and 13% for those days with observed MDA8 ozone $\geq$ 60 ppb. In summary, model performance concerns for monitors in the NWF expressed by the commenters have been addressed in the EPA's 2016v3 modeling. The statistics for the updated modeling at the monitors in the table below are well within the range of performance criteria offered by Emery et.al. (2017) for NMB ($\leq$ +15%) and NME ($\leq$ 25%).

The EPA addresses other topics in Section 8.4 (Modeling and CAA Section 179B Guidance).

*Table 8-1*

| June - August MDA8 O3 Stats for All Days | | | | | | |
|---|---|---|---|---|---|---|
| | | | 2016v2 Proposal Modeling | | 2016v3 Updated Modeling | |
| Site ID | County | Site | NMB (%) | NME (%) | NMB (%) | NME (%) |
| 490110004 | Davis | Bountiful Viewmont | -6.8 | 10.9 | 0.3 | 9.5 |
| 490353006 | Salt Lake | Hawthorne | -5.2 | 10.8 | 1.0 | 11.0 |
| 490353013 | Salt Lake | Herriman | -12.5 | 13.2 | -5.3 | 9.5 |
| 490450004 | Tooele | Erda | -7.6 | 11.0 | -0.4 | 9.3 |
| 490570002 | Weber | Ogden | -7.7 | 10.6 | -1.0 | 8.9 |
| 490571003 | Weber | Harrisville | -12.5 | 13.5 | -6.0 | 9.4 |

| June - August Stats for Days with Obs MDA8 O3 $\geq$ 60 ppb | | | | | | |
|---|---|---|---|---|---|---|
| | | | 2016v2 Proposal Modeling | | 2016v3 Updated Modeling | |
| Site ID | County | Site | NMB (%) | NME (%) | NMB (%) | NME (%) |
| 490110004 | Davis | Bountiful Viewmont | -14.0 | 14.6 | -6.8 | 9.2 |
| 490353006 | Salt Lake | Hawthorne | -14.1 | 16.4 | -8.1 | 11.1 |
| 490353013 | Salt Lake | Herriman | -16.4 | 16.6 | -9.3 | 10.9 |
| 490450004 | Tooele | Erda | -15.9 | 16.7 | -8.6 | 10.8 |
| 490570002 | Weber | Ogden | -15.5 | 15.7 | -8.2 | 9.8 |
| 490571003 | Weber | Harrisville | -16.4 | 16.5 | -9.4 | 9.9 |

*Comment*

**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

[T]he TCEQ's use of a weight of evidence approach to determine significant contribution is consistent with the EPA's modeling guidance, "*Modeling Guidance for Demonstrating Air Quality Goals for Ozone, PM2.5, and Regional Haze*" (EPA Modeling Guidance) and the approach laid out in "*Guidance on the Preparation of Clean Air Act Section 179B Demonstrations for Nonattainment Areas Affected by International Transport of Emissions*," (179B Guidance) where a determination of significant contribution is made if sources outside of a nonattainment area impact a nonattainment area in the context of a 179B demonstration. When air quality modeling is used in the context of attainment and 179B demonstrations, the EPA requires states to provide supplemental analysis to support the modeling results, such as local factors and emission trends. However, in the context of the "Good Neighbor" provision, the EPA dismisses the additional analyses provided by the TCEQ as qualitative assessments that, while informative, do not provide quantitative assessments. The EPA's reliance on chemical transport models as the sole arbiter of significant contribution contradicts its own modeling guidance, which states that "…supplemental analyses may provide information which may provide further support for the outcome of the modeled test or *may indicate a different outcome than the modeled test*."[4] (Emphasis added.) It should be noted that the 179B Guidance is prescriptive and lays out a weight of evidence approach that relies on more than source apportionment modeling results to determine impacts from international sources. The EPA's heavy reliance on source apportionment modeling and disregard of additional evidence in the context of interstate transport is arbitrary and inconsistent with its guidance on international transport.

[4] Page 170 of the EPA Modeling Guidance, https://www.epa.gov/sites/production/files/2020- 10/documents/o3-pm-rh-modeling_guidance-2018.pdf

*Response*

In response to commenter's claims regarding TCEQ's weight of evidence approach to evaluating its significant contribution, which TCEQ indicates was based on guidance under CAA section 179B,  CAA section 110(a)(2)(D)(i)(I) and CAA section 179B are different provisions to address different problems and are governed by their own respective requirements, and as such do not require the same approach to implementation. We have addressed this previously in prior ozone transport rules. *See* CSAPR Update, 81 FR 74535-36 (Oct. 26, 2016). As we explained there:

> The specific terms of section 179B outline which nonattainment area requirements will and will not apply upon approval of a section 179B demonstration, none of which apply directly to upwind states via section 110(a)(2)(D)(i)(I). In particular, the good neighbor provision does not require upwind areas to ''demonstrate attainment and maintenance'' of the NAAQS. Rather, the statute requires upwind states to prohibit emissions which will ''contribute significantly to

337

nonattainment'' or ''interfere with maintenance'' of a NAAQS. While upwind states must address their fair share of downwind air quality problems, the EPA has not interpreted this provision to hold upwind areas responsible for bringing downwind areas into attainment. Therefore, the relief provided by section 179B(a) and (b) from the obligation to demonstrate attainment, extension of the attainment date, and mandatory reclassifications, is simply not applicable to downwind states. Even if section 179B were in some manner applicable to upwind states' transport obligations, the EPA does not believe that the contribution of international emissions should impact EPA's identification of downwind nonattainment and maintenance receptors affected by the interstate transport of emissions. These receptors represent areas that the EPA projects will have difficulty attaining and maintaining the NAAQS, and which therefore require adequate safeguards to protect public health and welfare. The EPA therefore does not agree that, when identifying downwind air quality problems for purposes of interstate transport, section 179B requires that we subtract the contributions of international emissions from the projected design values. This would be inconsistent with EPA's approach to area designations and is simply not required by the plain language of the statute. Moreover, such an interpretation would allow downwind and upwind areas to make no efforts to address clear violations of the NAAQS, leaving the area's citizens to suffer the health and environmental consequences of such inaction. Moreover, just as any state with a nonattainment area— including downwind states—must take reasonable steps to control emissions even where an area is impacted by international emissions, the EPA believes that it is appropriate for upwind states to also adopt reasonable emissions controls to lessen the impact of emissions generated in their state and subsequently transported to downwind areas. As noted in Section IV of the preamble, the EPA does not view the obligation under the good neighbor provision as a requirement for upwind states to bear all of the burden for resolving downwind air quality problems. Rather, it is an obligation that upwind and downwind states share responsibility for addressing air quality problems. If, after implementation of reasonable emissions reductions by an upwind state, a downwind air quality problem persists, whether due to international emissions or emissions originating within the downwind state, the EPA can relieve the upwind state of the obligation to make additional reductions to address that air quality problem. But the statute does not absolve the upwind state of the obligation to make reasonable reductions in the first instance.

We note that the EPA was upheld in its approach to the treatment of international contribution in *Wisconsin*, 938 F.3d at 323-24. See also our response to comment at Section V.C.2 in the preamble.

The EPA's CAA section 179B guidance says nothing to the contrary. As stated in the EPA's *Guidance on the Preparation of Clean Air Act Section 179B Demonstrations for Nonattainment Areas Affected by International Transport of Emissions*, "EPA notes that an upwind state that is considering or has an approved section 179B demonstration must still meet its obligations for contributions to downwind states under CAA section 110(a)(2)(D). Likewise, an upwind state that contributes to a downwind state that is considering or has an approved section 179B demonstration must still meet its obligations for contributions to that downwind state, per CAA section 110(a)(2)(D). Policy governing whether an air agency can take into account emissions emanating from outside the U.S. in developing a plan to meet its interstate transport obligation for any NAAQS is outside the scope of this guidance."

338

In response to commenters' claims that the EPA did not consider more than source apportionment modeling as part of our evaluation of TCEQ's SIP submission, we disagree that we apply source apportionment modeling as the sole determinant of "significant contribution" nor was it the only information we looked to in evaluating TCEQ's SIP submission with respect to Steps 1 or 2. For example, in projecting average and maximum design values we used the most recent measured ozone design values in conjunction with the modeling results to identify potential nonattainment or maintenance sites in the relevant future years. Further, we reviewed the "weight of evidence" analysis and information provided by TCEQ. As explained in greater detail in the Evaluation of TCEQ Modeling TSD, we did not find that the additional analyses performed by TCEQ provided sufficient evidence to refute the modeling results that indicated that emissions from Texas were linked to downwind nonattainment or maintenance receptors at contributions of 0.70 ppb or greater. Further, although Texas asserted that its weight of evidence analysis is a permissible way to interpret which contributions are "significant" because that analysis examines whether there was a ''persistent and consistent pattern of contribution on several days with elevated ozone'' we found that such pattern, as explained in detail in the Evaluation of TCEQ Modeling TSD, is already established by a modeled linkage at Step 2. See Section 8.7 ("Consistent and Persistent" Contribution) of this document. In addition, as described more fully in Section 8.8 (Hybrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) Model) below, and in the Final Action AQM TSD, the EPA also performed a back trajectory analysis for projected receptors in 2023 that were identified based on the 2016v3 platform used for this final action. The results of this trajectory analysis confirm the EPA's modeling-based finding that Texas is linked to downwind receptors in 2023.

## 8.5   Air Quality Factors

*Comments*

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

EPA contends that, under Step 3 of its 4-step framework, Alabama does not provide sufficient evidence "regarding future emissions reduction opportunities beyond pointing to $NO_X$ emission reductions from SIP-approved and Federal measures." EPA goes on to state that Alabama "does not include a sufficient analysis of potential $NO_X$ emission control technologies, their associated costs, estimated emissions reductions, and downwind air quality improvements" to support the claim that the ongoing decline in $NO_X$ emissions from stationary sources in Alabama are sufficient to eliminate any significant contributions from the state. According to EPA, "states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and access potential, additional emissions reduction opportunities." This is exactly what Alabama's SIP submittal package provides. Once again,

EPA's evaluation ignores specific evidence in the record on the continuous decline in NOX emissions expected in Alabama.

Specifically, ADEM presented evidence in comments attached to the SIP submission that $NO_X$ emissions from EGUs in Alabama have decreased from 27,674 tons in 2016 to 14,708 tons in 2021, with similar reductions during the ozone season in particular from 11,612 tons during the 2016 ozone season to 6,648 tons during the 2021 ozone season.[89] Further, the state-wide average emission rate of $NO_X$ from EGUs has dropped by over 35% during that same time period, with an average emission rate in 2021 of 0.043 lb/MMBtu.[90] This is well below EPA's backstop emission rate for coal-fired EGUs of 0.14 lb/MMBtu in its proposed FIP. Therefore, not only are overall emissions decreasing, but sources have taken measures to become better controlled for $NO_X$ in recent years. Clearly, Alabama Power and Southern Power's comments provide evidence to support ADEM's determination that the "overwhelming majority . . . of EGUs are already fully controlled for NOX[.]"

[89] Based on information provided in EPA's Clean Air Markets Database for the State of Alabama and EPA's Ozone Transport Policy Analysis Proposed Rule Technical Support Document.
[90] EPA's Clean Air Markets Database provides that Alabama's statewide $NO_X$ emissions from CSAPR $NO_X$ Annual Program sources in 2016 were 27,674 tons with a total heat input of 810,490,815 MMBtu. This equates to a statewide average emission rate of 0.068 lb/MMBtu. Alabama's statewide $NO_X$ emissions in 2021 were 14,708 tons with a total heat input of 688,699,255 MMBtu. This equates to a statewide average emission rate of 0.043 lb/MMBtu.


**Commenter:** Louisiana Chemical Association

**Commenter ID:** 26

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

It is significant that all areas of Louisiana have shown _decreases_ in eight-hour ozone design values over the past 15 years and all areas in Louisiana are below the 2015 ozone NAAQS of 70 ppb.[31] Further, annual point source category emissions inventory data collected since the last periodic emissions inventory, 2014 through 2017, indicates a continued trend of ozone precursor emissions reductions. Anthropogenic emissions have decreased a combined 3% between 2014 and 2017.[32] This fact supports the position that Louisiana sources do not pose ozone problems in state and are even less likely to do so out of state. In light of compliance with the ozone NAAQS throughout Louisiana, it is scarcely plausible that Louisiana emissions are "significantly" contributing to ozone NAAQS issues in Dallas and Houston. It is particularly notable that the design values in the western parishes of Louisiana are among the lowest in the state as show in the chart below of the 2014-2016 DV values from the _2015 Ozone NAAQS Memo_:[33]

| 220170001 | Louisiana | Caddo | ..................................... | 64 |
| 220190009 | Louisiana | Calcasieu | ..................................... | 64 |
| 220190002 | Louisiana | Calcasieu | ..................................... | 68 |

[31] La. SIP Submission, Section 2.3.1.
[32] _Id._

[33] Results spreadsheet for *2015 Ozone NAAQS* Memo model analysis, available at:
https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.epa.gov%2Fsites%2Fdefault%2Ffiles%2F2018- 05%2Fupdated_2023_modeling_dvs_collective_contributions.xlsx&wdOrigin=BROWSELINK (last accessed 4/15/2022) and in the docket at: EPA-HQ-OAR-2021-0663-0019.

*Response*

The EPA disagrees that the overall emissions trends or the lack of nonattainment areas in a state, alone, can serve as an adequate basis for determining whether a state contributes significantly to downwind receptors in other states. The EPA's 2016v2 modeling utilized an updated emissions platform and inventory to capture more recent ozone design trends and emissions. The original starting point for the emission inventories used in the 2016v2 modeling was the 2016v1 platform. The 2016v1 data were updated with information and methods from the 2017 NEI, MOVES3, and updated inventory methodologies. Activity data and other inputs provided during the 2016v1 development process were retained in 2016v2 where appropriate.

The EPA responds to the claim that the Alabama Power Company's (and Sierra Club's) comments on Alabama's SIP submission were actually part of rationale supporting Alabama's SIP submission in Section 7.4.

In any event, the EPA does not agree that the EGU emissions trends cited by Alabama Power Company provide evidence that EGUs in Alabama are already fully controlled for $NO_X$. Many states' EGU emissions trends have been downward in recent years; that does not mean emissions from these sources are not still potentially significantly contributing to violation of the good neighbor provision. To the extent that these downward trends are attributable to enforceable emissions controls or retirements, these changes would generally already be taken into account in EPA's modeling, which indicates that Alabama still contributes above 1 percent of the NAAQS to one or more downwind receptors. Moreover, even if the average annual emission rate for all EGUs in the state in 2021 was 0.043 lb/MMBtu, this statistic is not inherently meaningful, nor is it sufficient to support a conclusion that Alabama has no unresolved good neighbor obligations for the 2015 ozone NAAQS.  Further, pointing to the backstop emission rate for coal-fired EGUs in EPA's proposed FIP is also not helpful to the commenter's case. First, the proposed FIP's level of emissions control is not used as a benchmark for our evaluation of state SIP submissions in this action. More to the point, Alabama Power is comparing an average annual emission rate for all of the EGUs in Alabama, irrespective of the fuel used (e.g., including natural gas-fired facilities), with the proposed FIP's backstop daily emission rate, which is for large coal-fired EGUs and would be applied on a unit-specific basis.

In response to Louisiana Chemical Association, the EPA does not agree that ozone design values in Louisiana or anthropogenic emission trends from 2014-2017 have not discount EPA's robust investigation into whether emissions from Louisiana are leaving the state and potentially significantly contributing to nonattainment or maintenance in other states. While the EPA acknowledges that all areas in Louisiana are currently in attainment for the 2015 ozone NAAQS and it may be the case that overall anthropogenic ozone-precursor emissions trends decreased from 2014 and 2017 in the state, the EPA disagrees that this establishes that continuing emissions from Louisiana are not significantly contributing to nonattainment or interfering with maintenance in other states. Emission inventories utilized for EPA's 2023 modeling include increases and reductions in anthropogenic emissions in

Louisiana. Neither the state or other commenters supplied information that there were such a degree of additional reductions that EPA had not already characterized in the 2023 modeling that would result in changes to the impacts from Louisiana's emissions, such that the state would not be linked to receptors in Texas. Nor did the state supply a satisfactory Step 3 analysis regarding its continuing emissions. 87 FR 9814-9816.

## 8.6   Cost Thresholds

*Comments*

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Furthermore, EPA states that cost-effectiveness of available emission reductions must be evaluated at Step 3 but then ignores the discussion on the availability of cost-effective emissions reductions included in the materials attached to ADEM's SIP submission. Specifically, this evidence shows that EGUs in the state cannot make any further cost-effective NOX reductions. For example, NOX was emitted from EGUs in Alabama at an average rate of 0.04 lbs/MMBtu during the 2021 ozone season. This rate already meets the aggressive rate that EPA has Indicated would be considered cost-effective for coal units retrofitted with new selective catalytic reduction ("SCR") beginning in 2026. More specifically, only 3 of the 84 EGUs in Alabama have been identified by EPA as potentially eligible for cost-effective controls, but each of these units, as demonstrated below, is, in fact, either already controlling NOX emissions in a cost-effective manner, or will have changed to lower emitting fuel prior to the 2023 ozone season. In light of this, none of the EGUs in Alabama can reduce NOX further in a cost-effective manner.

 [Information about Plant Gaston Unit 5, Plant Barry Unit 4, and Plant Harris Unit 1A]

Because no cost-effective reductions are, in fact, available from any of these units, which are the only units from which such reductions could potentially be considered,[101] then no units in Alabama can be regarded as causing significant contribution to or interference of maintenance with downwind receptors. EPA must consider this analysis in its final action on Alabama's 2022 SIP.

[101] [EPA, Appendix A: Proposed Rule State Emission Budget Calculations and Engineering Analytics, available at https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs.]
[102] 87 Fed. Reg. at 64,420.

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Although DEQ did not identify any emissions sources or activities within the state as "significantly" contributing to nonattainment or interfering with maintenance in another state, DEQ performed a cost analysis for NOx emission reductions from the highest emitting sources in Arkansas. DEQ ultimately focused its evaluation of costs of potential control strategies on EGUs, but only after evaluating NOx emissions from all elevated emission sources in Arkansas. DEQ observed during evaluation a natural break between EGUs and non-EGUs when it examined the top NOx emitting sources in the state. The highest-emitting non-EGU emitted less than half of the emissions from the lowest-emitting EGU. This was a reasonable breakpoint for emissions data. Additionally, DEQ focused the analysis in this manner using the framework EPA used for selecting sources for a reasonable progress analysis in their Regional Haze FIP for Arkansas.

For context, in the 2016 Arkansas Regional Haze FIP, now replaced by approved Arkansas SIP revisions, EPA performed a reasonable progress analysis to determine whether any additional control strategies were necessary to ensure reasonable progress towards natural visibility conditions in the 2008 – 2018 time period. In starting their analysis, EPA analyzed $SO_2$ and NOx emissions inventories for point sources and identified three facilities, which the EPA determined were the largest contributors to these emissions. Collectively, these facilities were responsible for 84% of point $SO_2$ point source emissions and, more directly related to the Arkansas Transport SIP submittal, 55% of NOx point source emissions in the state. EPA decided not to perform further evaluations of lower-emitting non-EGU sources. DEQ drew a similar line in the natural break between EGUs and non-EGUs in their contribution to NOx emissions with consideration of the fact that the lowest-emitting EGU emits over double that of the highest emitting non-EGU facility in the state. If considerations of the largest emitters and natural break points are an adequate argument for source selection for emission reduction strategy analysis when provided by EPA, then such arguments should be equally adequate when provided by the state in which the argument applies.

DEQ did not define a bright line threshold for what control strategies the state considers cost-effective. DEQ did, however, note that its cost analyses showed that the cost-effectiveness values of controls greatly exceeded metrics that EPA used in past ozone transport federal implementation plans. In DEQ's most recent Regional Haze Planning Period II SIP draft, DEQ provides updated cost-effectiveness values in 2019 dollars for SCR and SNCR at Flint Creek and at Independence Units 1 and 2 with a calculated range of $5,771 to $24,084 for implementation of these controls. In consideration of the cost-effectiveness threshold of $5,086 for EGUs in the Regional Haze context, the cost of implementing SCR and SNCR exceeds what the state considers reasonable, especially when considering the remaining life-time of facilities such as White Bluff and Independence, which are set to cease coal-fired operations in 2028 and 2030, respectively. For comparison, EPA's proposed FIP costs of control averaging $11,000 per ton (for coal-fired EGUs) and $7,700 per ton (for oil- and gas-fired EGUs) is beyond excessive and lacks consideration of factors known by EPA, such as scheduled facility closures. This is much higher than costs considered reasonable for other Clean Air Act programs. For context, refer to EPA's Regulatory Impact Analysis for the Final Revised Cross-State Air Pollution Rule (CSAPR) Update for the 2008 Ozone NAAQS 2021, Regulatory Impact Analysis of the Cross-State Air Pollution Rule (CSAPR) Update for the

343

2008 National Ambient Air Quality Standards for Ground-Level Ozone, 2016, and DEQ's compilation of costs for the Regional Haze planning period two SIP.

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

EPA is intentionally exploiting the Supreme Court decision in EME Homer City vs. EPA to justify any costs or requirements it deems necessary to further federal policy decisions. The court decision permitted EPA to impose cost effective controls on any state that was deemed to be a significant contributor so long as such controls don't result in over-control of any state. However, the decision did not indicate what might be considered "cost effective controls". For this reason, EPA is using this decision to assume new authority to implement anything it deems as a "cost effective control" requirement.

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The Proposed Disapproval Excludes Quantification of Cost-Effective Controls and Is Therefore Deficient

EPA's proposed disapproval of the Oklahoma SIP is *prima facie* deficient because it fails to include a quantification of the cost-effective controls from Step 3 of the CSAPR framework (i.e., EPA did not complete "prong 2" in the proposed disapproval). It is impossible to determine whether a state meets or fails to meet its good neighbor obligations under Section 110(a)(2)(D)(i)(I) of the CAA without satisfying *both* prongs of the two-prong CSAPR determination (i.e., prong 1 is completion of steps 1 and 2 of the CSAPR 4-step framework, and prong 2 is completion of steps 3 and 4). EPA claims it has satisfied the first prong establishing a linkage between Oklahoma emissions and downwind air quality problems. Oklahoma disagrees with the reasoning behind that claim. However, even granting that claim (for the sake of argument only), EPA makes no attempt to complete step 3 of the CSAPR framework (i.e., prong 2). That is, in the proposed disapproval, EPA makes no effort to quantify the cost-effective NOx emissions reductions that will yield sufficient downwind air quality benefits. EPA may argue that the quantification of those NOx emission reductions occurs after the fact in the development of the FIP. However, until a FIP is finalized, EPA has failed to complete its evaluation of the Oklahoma SIP. As such EPA establishes an inappropriate burden, requiring states to look into the future, anticipate EPA's work on federal rulemaking, and incorporate those anticipated findings in a SIP submitted years before EPA is set to begin its efforts. This process is arbitrary and capricious, and it subverts the principle of cooperative federalism enshrined in the CAA.

344

EPA states in the proposed disapproval:

> The 2015 ozone NAAQS is a more stringent and more protective air quality standard, it is reasonable to expect control measures or strategies to address interstate transport under this NAAQS to reflect higher marginal control costs. As such, the marginal cost threshold of $1,400/ton for the CSAPR Update (which addresses the 2008 ozone NAAQS and is in 2011$) is not an appropriate cost threshold and cannot be approved as a benchmark to use for interstate transport SIP submissions for the 2015 ozone NAAQS. 87 Fed. Reg. 9823.

ODEQ takes exception with this statement on a fundamental level. As technological advances and innovations occur in the environmental field, it should not be considered a foregone conclusion that control equipment must increase in cost over time. EPA should not dismiss outright that control measures equivalent in cost to previous iterations of the ozone NAAQS could be sufficiently protective for downwind states, especially if EPA is also expecting non-electric generating units (non-EGUs) to be considered for possible reductions.

[…]

EPA's Proposal is a Fundamental Change in Policy and is Not in Line With Previous CSAPR Policy-Making

As mentioned previously, under current EPA policy it is not possible for a state to be certain that any quantity of NOx emissions reductions will comply with the good neighbor requirements without waiting for the completion of Step 3 of the CSAPR framework. Because Step 3 is to be undertaken during the development of the FIP, it is appropriate to note that the approach adopted by EPA in its proposed FIP represents a substantive change in policy, rather than an extension of the current approach. EPA's CSAPR approach was challenged in the courts and survived those challenges, giving EPA confidence in the fundamental appropriateness of actions taken previously. However, the previous CSAPR remedies constitute a different policy approach than the present EPA proposed action, which has metamorphosed into a form substantively different from its previous versions.

*Response*

Substantive comments on the proposed FIPs, including the proposed cost-effectiveness thresholds therein, are outside the scope of this action and will not be addressed.

This action is not determining what, if any, cost effective controls exist at Step 3 of the 4-step interstate transport framework, and the EPA disagrees that it must include a quantification of cost-effective controls to be able to disapprove the SIP submissions at issue in this action. *See EME Homer City*, 572 U.S. at 509. Instead, the EPA is evaluating the states' interstate transport SIP submissions to determine whether they satisfy the statutory obligations of CAA section 110(a)(2)(D)(i)(I). Where a state put forward an assessment of what it considered to be cost-effective, the EPA assessed that claim for approvability. *See e.g.*, 87 FR 64426 (Alabama), 87 FR 9810 (Arkansas), 87 FR 9822-9823 (Oklahoma).

EPA further disputes that the Agency is "intentionally exploiting the Supreme Court decision in EME Homer City vs. EPA to justify any costs or requirements it deems necessary to further federal policy

345

decisions." EPA is not promulgating any requirements in this action. If the commenter is referring to the proposed FIP, the comment is out of the scope of this action.

Alabama Power Company et al. suggest there are no cost-effective controls available from any EGUs in Alabama. The EPA disagrees with the assertion that the information provided in their comment letter is sufficient evidence to support ADEM's claim that the majority of EGUs in Alabama are already fully controlled for $NO_x$. Commenter claims that in the proposed FIP, the EPA identified only three EGUs (Plant Gaston Unit 5, Plant Barry Unit 4, Plant Harris Unit 1A) for which there are potential cost-effective controls. Commenter asserts that these units are already adequately controlling $NO_x$ emissions or will change to lower emitting fuel by 2023. First, those changes were not included in Alabama's transport SIP to be approved as permanent and enforceable emissions-control requirements so they cannot be relied upon. The Good Neighbor provision requires the "prohibition" of emissions that significantly contribute in the SIP itself. Second, these statements made about the three identified units do not satisfy a Step 3 multifactor analysis that more comprehensively analyzes emissions control opportunities across the state of Alabama. The SIP submission is insufficient to support a conclusion that Alabama has no outstanding obligations under CAA section 110(a)(2)(D)(i)(I). Whether Alabama may be shown through a full assessment of emissions control opportunities to have a substantial additional amount of emissions control opportunity or only very little, anecdotal information regarding the emissions profile of a small number of units does not replace an approvable Step 3 analysis by a state regarding the identification of emissions that significantly contribute for purposes of the 2015 ozone NAAQS. *See also* Section 8.3 addressing a similar comment raised by MDE.

The EPA explained the deficiencies with Arkansas' cost-effectiveness analysis in the proposal. 87 FR 9810. There, the EPA also emphasized that "Relying on the CSAPR Update's (or any other CAA program's) determination of cost-effectiveness without further Step 3 analysis is not approvable. Cost-effectiveness must be assessed in the context of the specific CAA program; assessing cost-effectiveness in the context of ozone transport should reflect a more comprehensive evaluation of the nature of the interstate transport problem, the total emissions reductions available at several cost thresholds, and the potential air quality impacts of those reductions at downwind receptors." *Id.* The EPA similarly disagrees with the comment that analysis conducted under the regional haze program is appropriate for conducting a cost-effectiveness analysis in the context of the good neighbor provision. Regional Haze is a different program, with a different purpose. Typically, the analysis of cost-effectiveness in the context of regional haze involves a detailed, facility-specific evaluation of multiple potential control technologies and is weighed with other statutory factors. The result of a BART five-factor or Reasonable Progress four-factor analysis is typically a control determination coupled with an enforceable emissions limit. Even if a similar approach could be applied to interstate ozone transport (and we note again there are many differences between these programs), Arkansas did nothing of this kind in its SIP submission. Finally, the "break point" that ADEQ identified between non-EGUs and EGUs was based solely on a comparison of emissions, with no examination of emissions-reduction potential or relative cost-effectiveness of such options. As such, this was not an approval basis on which to exclude non-EGU emissions sources from further analysis.

The EPA explained the deficiencies with Oklahoma's cost-effectiveness analysis in the proposal. 87 FR 9822-9823. As for the concern raised by ODEM that the marginal cost threshold for the less protective 2008 ozone NAAQS may in fact be suitable for the more protective 2015 ozone NAAQS due to advances

346

in technology and in consideration of reductions in emissions from non-EGUs, the commenter did not provide sufficient evidence to support a finding that a marginal cost threshold of $1,400/ton from the CSAPR Update is appropriate for EGUs in Oklahoma for the 2015 ozone NAAQS or that applying that cost-effective threshold on EGUs in the state would resolve the state's good neighbor obligations for the 2015 ozone NAAQS. In any event, states may not rely on FIPs in a SIP submission, as discussed in more detail in the preamble in Section V.B.9.

Comments on cooperative federalism are addressed in Section 10.3.

## 8.7 "Consistent and Persistent" Contribution

*Comments*

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's proposed disapproval points out that DEQ concluded that the CAMx modeled potential linkage to Allegan County was not "persistent or consistent" without defining what is meant by "persistent" or "consistent." Of the 608 back-trajectories evaluated for those ninety-five elevated ozone days, only 6.74% of those back-trajectories passed through Arkansas with the number varying greatly from year to year (i.e., 93% did NOT pass through Arkansas). Although DEQ did not define a bright line for "persistent and consistent," swings in linked elevated ozone day back trajectories from year to year shows a lack of consistency. The very low percentage of back trajectories' paths that passed through Arkansas prior to reaching Allegan County on high ozone days indicates that impacts from Arkansas sources to Allegan County are not persistent. DEQ did not perform this analysis for the Texas receptors because those receptors did not meet DEQ's threshold for a potential linkage based on the data available at the time of SIP development.

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

D. EPA should not rely on anomalous 2012 modeling results in determining linkages between Texas and Colorado and other western states.

EPA appears to rely in part on purported linkages between Texas and Colorado and western states based on a selective interpretation of TCEQ's 2012-based platform modeling. Such an inference would be erroneous. 2012 was an extreme ozone event year for Colorado and other western states. EPA should not rely on 2012 modeling results to determine whether Texas contributes significantly to nonattainment or interferes with maintenance of NAAQS in those states. Data from 2012 shows that it was among the highest ozone years since 2005 to 2007, even when statistically adjusting for meteorological variability. [footnote: Attachment 1, at 13-14.]

In Texas's SIP submission, TCEQ identified monitors in Colorado which were appropriate for additional investigation but, based on its analysis, determined that emissions from Texas did not contribute significantly to nonattainment or interfere with maintenance at the tagged Colorado monitors. TCEQ's HYSPLIT trajectory analysis, in particular, showed that the vast majority of observed high ozone days from 2007 through 2016 at the linked Colorado monitors were not associated with transport from or near Texas, supporting TCEQ's claim that there was not a persistent and consistent pattern of contribution from Texas sources. TCEQ's conclusion that Texas does not contribute significantly or interfere with maintenance of the NAAQS at the linked Colorado monitors is consistent with EPA's modeling, using base years of 2011 and 2016, which did not link Texas to ozone monitors in Colorado.

[From Attachment 1 - Technical Comments on Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards; Docket No. EPA-R06-OAR-2021-0801 prepared by Sonoma Technology:]

With minor deviations, TCEQ used EPA's 4-Step Transport Framework in its Texas Transport SIP submittal. As part of "Step 1" TCEQ identified nonattainment/maintenance monitors in Colorado. In "Step 2" TCEQ reported modeling suggesting Texas' anthropogenic emissions contributing more than 0.70 ppb of ozone on high modeled ozone days. However, in "Step 3" TCEQ found the emissions from Texas did not contribute significantly to nonattainment or interfere with maintenance at the tagged Colorado receptors. In support of these observations, we note that multiple rounds of transport modeling conducted by EPA using base years of 2011 and 2016 did not link Texas to ozone monitors in Colorado, as the modeled contributions for future year 2023 were below the 0.75 ppb or 0.70 ppb thresholds (1% of the applicable NAAQS). The use of a different base year by TCEQ (2012), compared to EPA's transport modeling (2011 and 2016), was likely the biggest contributing factor as to why TCEQ's modeling showed larger ozone contributions from Texas at the Colorado monitors. Nationally, 2012 was among the highest ozone years since 2005-2007 even when statistically adjusting for meteorological variability (Figure 2). 2012 appeared to be a relatively high ozone year in Colorado as well, and there were a larger number of extreme events in Colorado in 2012 compared to other years (*see* Figure 3-41 of TCEQ's Transport SIP). The HYSPLIT trajectory analysis conducted by TCEQ as part of its SIP submittal showed that the vast majority of *observed* high ozone days from 2007 through 2016 at the tagged Colorado monitors were not associated with transport from or near Texas, supporting TCEQ's position that there was not a persistent and consistent pattern of contribution from Texas. The number of trajectories that did originate from Texas on the high *observed* ozone days was higher in 2012 compared to other years, indicating a connection between the high ozone year and anomalous regional meteorological conditions. EPA's modeling from 2011 and 2016, did not show such a pattern of transport in at least two other years that were, on average, also conducive to high ozone. Accordingly, TCEQ's 2012-based modeling results suggesting a link to Colorado and other western states appears to

348

be anomalous, and not reflective of a meaningful and sustained link between Texas and ozone values in those states.

**Commenter:** Cleco Corporate Holdings LLC

**Commenter ID:** 14

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The LDEQ HYSPLIT modeling demonstrates the absence of a persistent and consistent pattern of contribution of pollutants to Texas monitors from Louisiana.

**Commenter:** Louisiana Electric Utility Environmental Group

**Commenter ID:** 28

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's analysis of Louisiana's approach for defining significant contribution with respect to whether there is a "persistent and consistent" pattern of contribution from the state appears largely focused on explaining that the state's approach is inferior to EPA's rather than on explaining why the state's determination does not comport with the CAA.

Accordingly, EPA's Proposed Disapproval of Louisiana's SIP falls short and EPA has overstepped its authority under the CAA. EPA should re-evaluate Louisiana's SIP on the basis of whether the SIP meets the applicable requirements of the CAA, not on the basis of whether Louisiana made different choices than EPA would have made had it been the decision-maker with respect to fulfilling the state's Good Neighbor obligation to address interstate transport of ozone under Section 110(a)(2)(D)(i)(I) of the CAA. EPA also must avoid any policy determinations or a desire to adopt a "national ozone transport policy" in evaluating Louisiana's SIP.

**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The EPA mischaracterizes the purpose and analytic details in the TCEQ's weight of evidence, invalidating the EPA's conclusions regarding the impact of Texas emissions.

In the "*EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document*" the EPA states that the TCEQ used its weight of evidence to counter the modeling results. This is a misinterpretation of the purpose of the weight of evidence. The TCEQ used the weight of evidence not to determine if Texas contributed *at all* to linked monitors but rather to determine if Texas contributes to those monitors *significantly and persistently*.

*Response*

In the proposed disapprovals, the EPA explained its assessment of claims at Step 3 made by several states that there is not a "persistent and consistent" level of contribution from their states to receptors. See 87 FR 9808-9809 (Arkansas); 87 FR 9812-9815 (Louisiana); 87 FR 9831-9834 (Texas). *See also* Evaluation of TCEQ Modeling TSD, at 76-100.[79] As explained at proposal, these arguments are in effect an attempt to dispute the contribution finding at Step 2.

> To be clear, the modeling establishing linkages of [Arkansas/Louisianas] to downwind nonattainment and maintenance receptors already establishes that there is a consistent and persistent pattern of contribution on elevated ozone days from [these states] to other states. That is because EPA's methodology for projecting future year ozone concentrations accounts for precisely these concerns . . . by looking only at days with elevated ozone levels.

87 FR at 9808, 9814. (The EPA has acknowledged an inadvertent error in our description of the Step 2 analysis in this language from proposal (see Section 11.9 – Typographical Concerns), but the quoted language adequately conveys the intended meaning. The EPA further explains this point below in relation to the same arguments raised by TCEQ.).

While the EPA rejects that a so-called "persistent and consistent" analysis of contribution is appropriate to excuse states from analysis of emissions control opportunities at Step 3 (again, because the fact that a state's emissions "contribute" to high ozone levels at receptors is already established at Step 2), the EPA further evaluates here several aspects of this issue as raised by commenters.

The EPA notes that ADEQ only provided a "persistent and consistent" analysis for the Allegan, Michigan receptor and did not provide a "persistent and consistent" analysis for receptors in Texas that Arkansas was linked in EPA's 2011 base year modeling that ADEQ's SIP used. The EPA notes that both the EPA's 2016v2 base year modeling used at proposal and the latest 2016v3 modeling for this final action continue to identify that Arkansas is linked to Texas receptors with a maximum contribution of 1.21 ppb to a receptor in Brazoria County Texas (AQS Site ID 480391004). As discussed in the proposed disapproval, the EPA does not agree that ADEQ's analysis for Allegan, Michigan receptor showed that Arkansas's contribution was not "persistent and consistent." Furthermore, this point is not necessary to support disapproval, because Arkansas did not present such arguments as to its linkages to multiple receptors in Texas.

The EPA disagrees that it mischaracterizes the TCEQ's weight of evidence analysis. TCEQ's comment is not exactly accurate as the EPA appreciates that the state was indeed attempting to argue at Step 3 that contributions found at Step 2 are not "significant." However, the EPA's point is that the basis for that

---

[79] Evaluation of TCEQ Modeling TSD (EPA-R06-OAR-2021-0801-0002) in Docket ID No. EPA-R06-OAR-2021-0801.

argument (i.e., the degree of persistence or consistency in the contribution) is not supportable as a Step 3 factor when the Step 2 analysis has already confirmed that the contribution from a state is in fact impacting receptors on the days when they are projected to have high ozone levels. The ozone transport modeling conducted by the TCEQ and the EPA already factors in whether contribution is sufficient to be considered "consistent and persistent" when determining projected contributions. In calculating contribution from a state to a particular receptor, the EPA averages the MDA8 concentrations for the top 10 modeled ozone concentration days in the future year (in this case 2023) at the receptor and averages the corresponding 8-hour average contributions for each of these same days from each state. Then the EPA divides the 10-day average contribution for each state by the corresponding 10-day average concentration to obtain a Relative Contribution Factor (RCF) for each state at each monitor. The EPA requires there be at least 5 days in which the model-predicted concentration days are equal to or greater than 60 ppb in the future year before determining a state's contribution. TCEQ's method for calculating contribution differs from the EPA's in the selection of days used but still uses up to 10 days (with a minimum of 5 days) for calculating the average contribution in determining linkages. Thus, both TCEQ's modeling and the EPA's modeling inherently consider whether a state's contribution is sufficiently persistent and consistent, and TCEQ's "weight of evidence" approach fails to demonstrate that contribution from Texas to downwind receptors is not consistent and persistent.

Therefore, the EPA's view is that the modeling results from multiple modeling analyses using the top 5 to 10 high-ozone days for contribution analysis already establish that a so-called "persistent and consistent" linkage exists. In addition to TCEQ's modeling showing linkages on this basis to receptors in the western U.S., in this case there is also the EPA's modeling results for 2023 working from a 2011 base period and 2016 base period that show linkages from Texas to other areas. The EPA's review in the proposal indicated that Texas' emissions have linkages to downwind receptors in other states with a variation of receptors due to different meteorology and emissions base periods resulting from the use of different modeled years (see 87 FR 9833-9834). The EPA also indicated on page 100 of the Evaluation of TCEQ Modeling TSD:

> Other factors/WOE analysis does not provide sufficient compelling technically supported information to counter the conclusions from photochemical modeling in terms of linkages from Texas to downwind receptors.

> TCEQ indicated that Texas contribution should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. We note that modeling for three different years of meteorology (2011, 2012, and 2016) have all indicated that Texas was linked to downwind nonattainment and/or maintenance receptors. We think this consistent result indicates that Texas's emissions are substantial enough to link Texas to downwind receptors, under varying assumptions and meteorological conditions which further indicates that there is a persistent pattern of Texas' emissions contributing above 1 % to ozone at downwind nonattainment and/or maintenance receptors.

The EPA evaluated each component of the analysis that TCEQ included in their weight of evidence analysis and concluded that the information was not sufficient to refute or counter the modeling results showing linkages.

Regarding comments as to whether the EPA should utilize TCEQ's 2012 based modeling results in disapproving TCEQ's SIP: As noted in the proposal (87 FR 9832-9834) and the Evaluation of TCEQ Modeling TSD, the EPA has concerns with some of the details of TCEQ's HYSPLIT back trajectories, including how some were screened out, which limits the conclusions that can be drawn from TCEQ's HYSPLIT analysis and does not refute the modeling findings indicating linkages. *See also* Section 8.8 (Hybrid Single Particle Lagrangian Integrated Trajectory (HYSPLIT) Model). Still, as at proposal, TCEQ's conclusions that 2012 had more back trajectories that reached Texas than most years for many of the Colorado monitors appears consistent with TCEQ identifying linkages to Colorado when the EPA's 2016 based modeling did not (FR 87 9833).

Based on the information available, the EPA tends to agree with the comment that the use of a different base year by TCEQ (2012), compared to the EPA's transport modeling (2011 and 2016), was likely the biggest contributing factor as to why TCEQ's modeling showed larger ozone contributions from Texas at the Colorado monitors.  EPA does not agree that 2012 was necessarily an anomalous year or was an extreme year for ozone in Denver, but meteorology did seem to favor high ozone concentrations in the west and transport of Texas' emissions to this region compared to other years that the EPA has modeled.[80] The EPA's modeling of other years has continued to show that Texas has linkages with other areas of the U.S. But for purposes of this disapproval action, the EPA does not agree that TCEQ's 2012 based modeling results indicating linkages to receptors in the western U.S. should be entirely discounted or ignored.

Overall TCEQ's modeling showed linkages for a year that may have favored higher ozone in the western U.S. and the EPA's 2011 base year modeling and EPA's 2016v2 modeling both indicated Texas had linkages to other areas of the U.S. (likely due to differing meteorology as the commenter noted) that was cited in the proposed disapproval. TCEQ's 2023 (2012 base meteorology) and the EPA's 2023 modeling (2011 and 2016 base meteorology) have consistently shown that Texas' anthropogenic emissions are large enough to result in linkages to receptors in downwind states even with differing meteorology and base periods that have resulted in different linkages. The EPA has also conducted HYPSLIT analysis for the Midwest area receptors that Texas is linked in the EPA's 2016v3 modeling (see Section 8.8) that indicates Texas is often an upwind contributing state during the 12 years of exceedances for which back trajectories were performed, thus indicating that the EPA's modeled linkages using CAMx are robust and not anomalies.

In response to LEUEG's claim that the EPA failed to appropriately demonstrate that Louisiana's Step 3 arguments were inadequate and, instead, only drew a comparison of the state's Step 3 analysis to its own Step 3 analysis the EPA typically applies when determining significant contribution, the EPA disagrees. Independent of how the EPA has typically performed a Step 3 analysis, the EPA identified critical flaws with LDEQ's Step 3 analysis. 87 FR 9812-9816. Instead of conducting analysis to determine whether and to what degree emissions from Louisiana should be prohibited to eliminate emissions that will contribute significantly to nonattainment in or interfere with maintenance of the 2015 ozone

---

[80] Even if these conditions were "extreme" or "anomalous," neither commenter or TCEQ adequately justifies why these conditions would not merit mitigation under the Good Neighbor Provision in light of the statutory obligation to resolve "interference with maintenance" of the NAAQS in other states, including through recognition of interannual variability in air quality. *See* 87 FR at 9820 (discussing *North Carolina*, 531 F.3d 896, 909-11, and subsequent case law).

NAAQS in other states, LDEQ's SIP submission attempts to downplay linkages between Louisiana and downwind receptors by alleging that Louisiana's contribution to these receptors is not sufficiently "consistent and persistent." Irrespective of the EPA's historical approach at Step 3, we reject that this can be a valid factor for analysis at Step 3 when this degree of linkage is already established at Step 2, for the same reasons as explained above in relation to TCEQ's arguments.

LDEQ relied on their HYSPLIT analysis and general wind rose analysis to support their assertion that there was not a "persistent and consistent" pattern of contribution. The EPA indicated in the proposal that LDEQ's trajectories on ozone exceedances days at receptors in Texas indicated they passed through Louisiana 28% of the time (28% of the 99 trajectories). LDEQ proffered that some of these back trajectories did not pass directly over areas with emissions, but the EPA noted that LDEQ did not consider that the back trajectories only represent a centerline and there are areas on either side of the centerline that would also be contributing areas. Further, in the EPA's view, back trajectories occurring over an upwind state 25% of the time represents a relatively large percentage of time and robustly confirms rather than calls into question the EPA's modeling results. LDEQ's analysis did not provide evidence that was contrary to the conclusions of the EPA's photochemical modeling analyses, regardless of whether this is considered relevant at Step 3 or Step 2 (though, again, the EPA views this as a Step 2 question).

As explained in the Air Quality Modeling Technical Support Document for 2015 Ozone NAAQS Transport SIP Proposed Actions included in Docket ID No. EPA-HQ-OAR-2021-0663, the modeling that both the EPA and LDEQ relied on already establishes a sufficiently persistent and consistent contribution because the contribution analysis relies on an average contribution over 10 days. Based on the 2016v3 modeling for this final action, Louisiana is linked to 7 receptors in Texas. The table below provides a count of the number of days that Louisiana contributes above 0.70 ppb, 2 ppb, 5 ppb, and 10 ppb during the top 10 concentration days used to calculate Louisiana's average contribution metric value at each of these receptors. The data indicate that Louisiana contributes at or above the 0.70 ppb screening threshold on nearly all of the top 10 concentration days at each receptor. In fact, Louisiana contributes ozone in amounts greater than or equal to 5 ppb and, in some cases greater than or equal to 10 ppb at 6 of the 7 receptors. These data serve to confirm that there is a "persistent and consistent" pattern of high contributions to receptors in Texas from emissions sources in Louisiana.

353

*Table 8-2*

| AQS SiteID | County | Site Name | Days Greater Than or Equal to 0.70 ppb | Days Greater Than or Equal to 2 ppb | Days Greater Than or Equal to 5 ppb | Days Greater Than or Equal to 10 ppb |
|---|---|---|---|---|---|---|
| 482010055 | Harris | Houston Bayland Park | 8 | 7 | 5 | 2 |
| 482010024 | Harris | Houston Aldine | 8 | 5 | 4 | 1 |
| 481210034 | Denton | Denton Airport | 8 | 6 | 2 | 0 |
| 481671034 | Galveston | Galveston | 8 | 8 | 7 | 5 |
| 482011035 | Harris | Clinton | 9 | 6 | 5 | 2 |
| 482011034 | Harris | Houston East | 9 | 6 | 5 | 2 |
| 480391004 | Brazoria | Manvel Croix Park | 9 | 7 | 5 | 1 |

Accordingly, LDEQ's approach is flawed, and as a result, Louisiana's SIP submission fails to support a conclusion that it satisfies the statute's requirement of prohibiting any source or other type of emissions activity within the State from emitting air pollutants which will contribute significantly to or interfere with maintenance of the NAAQS in other states. The EPA responds to comments about EPA's statutory authority under the CAA in Section 10.3 (Cooperative Federalism and the EPA's Authority).

## 8.8  Hybrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) Model

*Comments*

**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Meteorological Influence

Part of the WOE analysis submitted with the revised SIP in April evaluated the meteorology associated with high ozone days at the Denton and Harris County, Texas monitors. Additional analysis has been completed to attempt to further flesh out some of the issues with the meteorology.

As presented in the analysis, back trajectories were included for both the Harris County and Denton County, Texas receptors for high ozone days (8-hr ozone greater than 70 ppb). Additionally, an assessment of Alabama's air quality during and previous to those high days was provided. In part, we have modified our analysis to be consistent with the form of the standard and the resulting back trajectories are included (Figures 5 – 32). For the 4 highest 8-hr ozone days over the 2019-2021 period (27 days total for both receptors), for both areas (Denton and Harris County), on only <u>one</u> of the days

354

does the back trajectory pass through Alabama, specifically June 18, 2021 for the Harris County receptor, and June 19, 2021 for the Denton County receptor. On both of those days, the plume centerline passes over western and northern Alabama. Looking at the emissions sources of NOx in those areas, primarily EGU NOx, there are no large industrial NOx sources in those areas.

[Figures 5-32 available in full comment]

For the Harris County receptor, wind roses were developed for the 2016 calendar year (Figure 33), as well as the top 10 8-hr ozone days for the year. For the yearly wind rose, the Harris County receptor (482010055) wind rose is not in line with wind roses at the other monitors in the area. In particular, other Harris County monitors show a predominant north/south component, while the wind rose for the Harris County receptor (482010055) shows a distinct east/west component. Monitors closer to the bay in east Houston that would logically reflect a bay breeze don't during 2016. Subsequently, a 2017 wind rose (Figure 34) was generated for the monitors, and the Harris County receptor is more in line with the other monitors. Since the meteorology for 2016 was forecast to 2023 and beyond, the differences in the wind roses is important. Also identified on the map (Figures 43 and 44) are the maximum concentrations from Alabama NOx sources. It should be noted that the higher concentrations are on the west side of Houston, and lower on the east side, which lies closer to Alabama.

[Figures 33-34 available in full comment]

Next, wind roses were developed for the top 10 ozone days, consistent with the way EPA summarizes calculating high ozone days, to evaluate the wind flow regionally. The meteorological site is very close in proximity to the Harris County receptor (482010055). The resulting wind roses show varied wind patterns on the 10 highest days (Figures 35-44). Five of the ten days had a significant number of calms (40+%). Several of the days, five in total, appear to show wind flow patterns that do not line up with possible impacts from Alabama. On a majority of the days, the winds are generally less than 10 mph. Given the calm to low wind speeds identified on these wind roses, higher concentrations on these days are likely due to recirculation.


**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Specifically, ADEM's SIP submission package identifies multiple factors that support its analysis: (1) meteorological influence[.]

The first factor demonstrates that weather patterns do not support a finding that emissions from Alabama contributed to ozone concentrations at the Denton and Harris County monitors. Back trajectories provided by ADEM indicate that air moving over Alabama seldom moved into Denton and Harris counties, and emissions from sources in Alabama were low on the relevant days. EPA ignores the

essential point of ADEM's HYSPLIT analysis and EPA's own data confirms that contribution by Alabama to Denton and Harris counties would be insignificant and infrequent.

[…]

82.  iii. HYSPLIT Trajectories Emissions from Alabama Sources Are Not Linked to Ozone Exceedances Recorded in Texas

ADEM includes in its WOE analysis a HYSPLIT model of back trajectories to demonstrate that ozone concentrations in Alabama were relatively low on the days preceding high ozone events at downwind receptors in Denton and Harris counties. EPA criticizes the back trajectory analysis on the basis that ADEM fails to consider ozone-precursor emissions in its analysis, stating "it has long been understood that ozone concentrations in downwind areas are affected . . . [by] ozone formed downwind from the ozone-precursor emissions, such as NOx, in the upwind state." EPA entirely overlooks the principal point of Alabama's HYSPLIT analysis: air rarely moves from Alabama westward into Texas. Of the 31 days that the Harris County monitor showed an ozone exceedance from 2018-2020, the HYSPLIT analysis confirms that air moved from Alabama into Harris County on only 4 occasions. Likewise, for Denton County, air travelled westward from Alabama on only 3 occasions out of 26 exceedance days. In other words, Alabama establishes convincingly that Alabama emissions are highly unlikely, just as a starting point, to contribute to ozone formation in Dallas or Houston.

EPA goes on to explain that, despite low ozone in the upwind state, "sources and other emissions activities in that State nonetheless may be emitting ozone-precursor emissions in amounts sufficient to contribute ozone above one percent of the NAAQS to the high-ozone event that occurs at the downwind receptor." However, as this section will explain, on the days leading up to the high ozone events at the Texas receptors, ozone-precursor emissions in Alabama were low.

In order to determine whether Alabama sources of $NO_x$ emissions could be considered to "significantly contribute" to ozone nonattainment or maintenance issues in Texas, the commenters evaluated statewide EGU emissions of NOX on the days that could have led to ozone formation at the Denton or Harris County monitors. The commenters used the HYSPLIT data presented in Alabama's SIP submittal to identify when air packets travelled over Alabama preceding the affected days at each monitor. EPA's own CAMD database provided the total $NO_x$ emissions for the relevant day. Each daily NOX emission total is compared to the level of $NO_x$ emissions that EPA has defined as "significant" for EGUs in Alabama. Specifically, the ozone-season $NO_x$ emissions budget proposed by EPA for Alabama in its proposed FIP was prorated across the days in the ozone season and that total was then ratioed by 75% in accordance with EPA's methodology for setting the "daily backstop" rate. Thus, for Alabama EGUs, EPA defines total daily significant contribution as 73 tons.

| Date of Monitor Exceedance (Harris County) | Date of Air Packet Over Alabama | Daily Emissions Defined as "Significant" by EPA (Tons) | Actual $NO_x$ Emissions on Relevant Date (Tons) | Percent Below Significance |
|---|---|---|---|---|
| July 26, 2019 | July 24, 2019 | 73 | 56 | **-23%** |
| July 26, 2019 | July 25, 2019 | 73 | 52 | **-29%** |
| Sept. 5, 2019 | Sept. 3, 2019 | 73 | 58 | **-21%** |

| Sept. 6, 2019 | Sept. 3, 2019 | 73 | 58 | **-21%** |
| June 18, 2021 | June 16, 2021 | 73 | 41 | **-41%** |

| Date of Monitor Exceedance (Denton County) | Date of Air Packet Over Alabama | Daily Emissions Defined as "Significant" by EPA (Tons) | Actual NO$_X$ Emissions on Relevant Date (Tons) | Percent Below Significance |
|---|---|---|---|---|
| June 19, 2021 | June 17, 2021 | 73 | 41 | **-41%** |
| Aug. 4, 2021 | Aug. 2, 2021 | 73 | 52 | **-29%** |
| Sept. 12, 2021 | Sept. 10, 2021 | 73 | 39 | **-46%** |

As these data plainly show, emissions from Alabama EGUs on the relevant days were low, and well below any reasonable conception of "significant contribution." As a result, EPA should conclude that sources in Alabama are not contributing to nonattainment or maintenance in Texas and it is plain Alabama's SIP already contains measures sufficient to prohibit actual contribution to any downwind ozone concerns.[82]

[82] In addition, while EPA points out that "vectors of [ADEM's] back trajectories only show the center line of air flow" and do not capture the full "breadth of the air currents," 87 Fed. Reg. at 64,425, EPA fails to analyze which sources are in the region these air currents pass through. Identification and consideration of the actual sources contributing to interstate transport of emissions is essential to EPA's review of SIPs under the "good neighbor" provision. *See* 42 U.S.C. § 7410(a)(2)(D)(i) ("prohibit[] . . . any source . . . from . . . contribut[ing] significantly").

*Response*

The EPA found that emissions in Alabama were linked to downwind receptors in Harris County (monitoring site 482010055) and Denton County (monitoring site 481210034) based on the 2016v2 modeling performed for the proposed disapproval. The commenters claim that Alabama should not be linked to these receptors because they claim that air rarely moves from Alabama west toward Texas on days with measured exceedance at these downwind receptors. The commenters rely upon analyses of near ground-level wind flow (i.e., wind roses) and HYSPLIT-based multi-day back trajectories on days with measured exceedances at these two receptors to support their claims that Alabama should not be linked to these receptors.

The EPA disagrees that the Agency should conclude that sources in Alabama do not contribute to nonattainment or maintenance receptors in Texas. First, regional pollutant transport occurs when ozone precursor emissions (i.e., NO$_X$ and VOCs) from sources an upwind state are emitted into the air and form ozone. The photochemical reactions that form ozone also form "by-product" pollutant that are "recycled" to form additional ozone farther downwind. The ozone and by-product pollutant species are vertically mixed due to dispersion and updrafts/downdrafts within the daytime boundary layer (i.e., the mixed layer) during the day. Variations in wind speed and direction between the ground and the mid-to top of the daytime mixed layer can result in different transport patterns aloft than near the ground. In addition, pollutants that remain aloft during the day or are emitted aloft overnight above the very shallow nighttime surface layer can be transported long distances due to the effects of the "nocturnal

357

jet" which is a high-speed ribbon of air that forms above the top of the nighttime surface layer. In addition, wind speed typically increases with height within the mixed layer, because the effects of surface roughness, which reduces wind speed near the ground, diminishes with height. Pollutants transported downwind aloft are typically brought down to the ground on subsequent days beginning in mid-morning as the height of the mixed layer rises. By this process pollutants transported aloft from upwind states can contribute to high ozone concentrations at monitoring sites in downwind states. While wind roses and trajectories based on data near or within a few hundred meters of the ground are useful for analyzing local scale transport (i.e., within an urban area) such analyses generally will not provide particularly reliable or meaningful information on long-range, multi-day transport of ozone and by-product pollutants aloft.

In the EPA's 2016v3 modeling for this final action, Alabama was found to contribute above the 0.70 ppb screening threshold to two maintenance-only receptors (i.e., Galveston, Texas and Dallas/Denton-Pilot Point).[81] The EPA ran HYSPLIT to create back trajectories from the Galveston receptor, among others, on days with measured ozone exceedances during the 12 years from 2010 through 2021. The map below shows the back trajectory analysis for the Galveston receptor-based trajectories at 500 m and 750 m (i.e., generally in the mid portion of the daytime mixed layer). The map provides a visual representation of areas typically upwind wind of Galveston on days with measured exceedances at this receptor. The trajectories indicate that the air can travel from east to west such that Alabama is upwind of Galveston on exceedance days. This result confirms the EPA's finding that Alabama is linked to receptors in Texas. The EPA's back trajectory analysis is described in the Final Action AQM TSD.



<hr />

[81] Note that in the 2016v2 modeling used for the proposed action, Alabama was linked to the South Airport receptor in Denton, Texas. In the final modeling Alabama is linked to the Pilot Point "violating monitor" maintenance-only receptor in Denton.

The EPA addresses comments related to existing controls in Section 8.3 (Existing and Future State Controls). It is the state's responsibility to identify and then prohibit any source or other type of emissions activity from emitting any pollutant in amounts which will contribute significantly to nonattainment or interfere with maintenance in other states in a SIP under CAA section 110(a)(2)(D)(i)(I). It is not the Agency's burden in evaluating a SIP submission for compliance with the requirements of CAA section 110(a)(2)(D)(i)(I) to conduct an analysis of which of the state's individual sources or other type of emissions activity might be deemed significant. The EPA's analysis at Step 2 measures the total anthropogenic contribution of emissions from the upwind state. Once contribution passes the threshold, we proceed to Step 3. The Alabama SIP submission's cursory discussion of emissions sources and reduction potential in the state does not constitute an adequate Step 3 analysis (or appropriate substitute or alternative to such an analysis). We do not concede commenter APC et al.'s characterization of the proposed approach to "significance" in the proposed FIPs is correct; however, the analysis is irrelevant in any case because the state itself conducted no such analysis, and that is what we are evaluating. The EPA is not requiring controls on any states or any sources in this action, and comments on the substance of the proposed FIP are beyond the scope of this rulemaking.

*Comment*

**Commenter:** Arkansas Department of Energy and Environment, Divison of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's proposed disapproval also dismisses ADEQ's HYSPLIT modeling used to identify whether a potential linkage was significant as irrelevant. While DEQ agrees that CAMx is a state-of-the science tool, this does not mean that other tools cannot be informative. In addition, EPA provided input on DEQ's HYSPLIT modeling analysis during the comment period for the SIP and DEQ made adjustments to its modeling in response to EPA's comments. If EPA contends that HYSPLIT modeling is not informative for the purposes of SIP decision-making, this should have been stated in early conversations between the agency and DEQ, before DEQ performed HYSPLIT modeling, or during the public comment period (rather than suggesting modifications to DEQ's methodology, resulting in additional state resources invested in HYSPLIT modeling to bolster the SIP submittal in response to EPA comments). See EPA comments and DEQ responses to comments on 2015 Ozone Transport SIP, included here as Appendix A.

EPA's argument regarding the HYSPLIT central path in the proposed disapproval was not raised during preproposal consultation or the comment period for the SIP. Indeed, EPA doesn't quantify the degree to which they believe a back-trajectory should pull in areas on each side horizontally and vertically in their proposed FIP. This argument by EPA in their proposed disapproval leaves DEQ with no information about what EPA believes would be an appropriate buffer around the back-trajectories if DEQ were to reevaluate how it interpreted HYSPLIT data to address EPA's alleged concern.

DEQ continues to assert that its HYSPLIT analysis provides meaningful insight as to whether the potential linkages identified by CAMx are consistent and persistent. EPA's CAMx modeling only looks at five to ten

elevated ozone days. For comparison, DEQ's HYSPLIT analysis evaluated ninety-five elevated ozone days over the course of a ten-year period.

*Response*

As noted in comments to ADEQ and in our proposal (FR 87 9804-9809) EPA has concerns with ADEQ's HYSPLIT methodologies, including screening out back trajectories based on the start height and the start time of the back trajectories. We noted these concerns in our comments on ADEQ's proposed SIP and indicated that this technique is not standard and has not been used by EPA in our trajectory analyses such as Appendix E of the CSAPR Update AQ Modeling TSD.[82] As footnoted in the proposal (FR 87 9809) both ADEQ and TCEQ both screened out back trajectories based on start height, and we discussed how this was inappropriate in the Evaluation of TCEQ Modeling TSD, pages 81-86.  We also identified concerns with screening of HYSPLIT back trajectories when the centerline passed near but not through Arkansas because Arkansas has some very large point sources near the Arkansas state line that could be contributing (FR 87 9809). When using the HYSPLIT model it is understood that the HYSPLIT back trajectory results are a central path that represents the centerline of the particles' path and there are areas on each side horizontally and vertically that also contribute to the concentrations at the end point. The horizontal and vertical areas that potentially contribute to concentrations at the endpoint grow wider from the centerline the further back in time the trajectory goes. Therefore, a HYSPLIT centerline does not have to pass directly over emissions sources or emission-source areas but merely relatively near emission source areas for those areas to contribute to concentrations at the trajectory endpoint and trajectories that were close to Arkansas but did not necessarily pass through can still indicate the opportunity for contribution from Arkansas' emissions and should not necessarily be excluded from the count of trajectories that indicate Arkansas could contribute. The HYSPLIT model does have the capability to create trajectories that reflect the dispersion of pollutants based on variations in meteorology, atmospheric turbulence and other physical processes.[83] However, the back trajectories created by the commenter were not based on this version of the model.

ADEQ's SIP submission included the inappropriate screening of back trajectories based on start height and start time despite these concerns and for this reason, in addition to the centerline concerns, EPA determined that the results were not valid.  EPA did not indicate in the proposal that back trajectory analyses are never useful, just that Arkansas's trajectories were flawed. The EPA finds that back trajectory analysis can be potentially useful as a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model linkages, so long as the limited utility of this analysis is fully appreciated in comparison to photochemical grid modeling for characterizing ozone transport over long distances.

We did note in the proposal that while we disagreed with ADEQ's methodologies, their results did not show that either 2011 (base year meteorology from EPA's 2011 modeling results used in ADEQ's SIP) or the newer 2016 based meteorology (EPA modeling using 2016v2 and 2016v3 emission inventories) were

---

[82] Appendix E of the Air Quality Modeling TSD for the Final CSAPR Update can be found in docket EPA-HQ-OAR-2015-0500 (Document ID is EPA-HQ-OAR-2015-0500-0575)

[83] NOAA's HYSPLIT Atmospheric Transport and Dispersion Modeling System," *Bulletin of the American Meteorological Society* 96, 12 (2015): 2059-2077.

anomalous. We note that EPA's 2011, 2016v2, and 2016v3 modeling results all indicate Arkansas is linked to receptors in Texas. In response to other comments in this Section (Section 8.8) EPA has conducted HYSPLIT back trajectories for some of the receptors in Texas to which Arkansas has been identified as linked. The results of the trajectory analysis corroborate and add confidence to the upwind/downwind linkages.

## Comments

**Commenter:** Cleco Corporate Holdings LLC

**Commenter ID:** 14

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The LDEQ HYSPLIT modeling demonstrates the absence of a persistent and consistent pattern of contribution of pollutants to Texas monitors from Louisiana.

For identified monitors in Texas, LDEQ performed HYSPLIT modeling to examine the significance of contribution under the 1 ppb threshold. LDEQ followed EPA's suggestion that it provide back trajectories for all high ozone days for the Texas (Houston and Dallas area) monitors. This involved the providing of back trajectories for 99 exceedances during the 2015- 2018 season. It's interesting that, while EPA suggested (perhaps requested) LDEQ to conduct back trajectory analysis, in the Proposal it now opposes LDEQ's use of the HYSPLIT back trajectory analysis. The Agency indicates that HYSPLIT is only a corollary analysis for examining the general plausibility of the photochemical model linkages and that the use of back trajectories do not quantitatively evaluate the magnitude of the existing photochemical contributions because the "calculations do not account for any air pollution formation, dispersion, transformation, or removal processes as influenced by emissions, chemistry, deposition, etc." EPA should explain why the HYSPLIT analysis cannot be relied upon due to these reasons and also more thoroughly explain why the use of back trajectories is not sufficient to determine significant contribution. Nevertheless, the back trajectory analyses showed that on high ozone days at the Texas receptors that were identified using the March 27, 2018 memorandum (March 27, 2018, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section (D)(i)(I)*), only 28% of the trajectories traveled in or through Louisiana. Of that 28%, only 8% originated in Louisiana. In addition, of the 28% of the trajectories, only 35% originated in or crossed the industrialized part of the State. Considering that EPA proposed that LDEQ conduct the HYSPLIT analyses and also considering the results of the analyses, Cleco believes the modeling demonstrates the absence of a persistent and consistent pattern of contribution and therefore the absence of contribution-significance under the 1 ppb threshold.

**Commenter:** Louisiana Chemical Association

361

**Commenter ID:** 26

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

b. LDEQ's use of the HYSPLIT Model to establish that there were no persistent or consistent relationships between the cited Texas receptors and Louisiana air emissions was proper.

In its significant contribution analysis, LDEQ identified monitors in the Dallas/Fort Worth and Houston/Galveston areas for further review under the 1 ppb screening standard: Denton Airport South (Dallas); FAA Site off Alta Vista Road (Dallas); Croix Parkway (Houston); Aldine Mail Road (Houston); and Durant Street (Houston). LDEQ's process for analyzing the significance of contributions in the Louisiana Transport SIP included: an applicable weather pattern analysis; wind rose analysis; and use of the Hybrid Single Particle Lagrangian Integrated Trajectory ("HYSPLIT") Model developed by the National Oceanic and Atmospheric Administration ("NOAA").

In its comments to the proposed Louisiana Transport SIP, EPA noted that to strengthen the analysis, LDEQ "should provide individual back trajectories for all high ozone days in the Houston or DFW area during the baseline period." EPA provided a link to the existing analyses from the Texas Commission on Environmental Quality. LDEQ accepted this comment and, to address EPA's recommendation, LDEQ provided back trajectories for 99 ozone exceedances at the identified receptors that occurred during the 2015-2018 ozone season with data derived from the TCEQ website.

Specifically, for the days of ozone standard exceedances at the Houston and Dallas area monitors during 2016, 2017 and 2018, LDEQ used the HYSPLIT Model to illustrate backward trajectories for the air parcels present at the monitors when the exceedances occurred. As discussed in the Louisiana Transport SIP, "the projections depict a composite of four backwards trajectories starting at the location of the monitor and tracking the air in reverse for seventy-two hours. Each projection accounts for one eight-hour exceedance period with the four trajectories beginning their routes at the six, four, two and zero hour marks." LDEQ also performed additional modeling/ to evaluate the exceedances that revealed trajectories originating in or crossing Louisiana to include Mixing Depth (in meters) and provide one trajectory for the beginning of each hour of the daily eight-hour ozone exceedance for the exceedance to identify the areas of the state most often impacting Texas monitor exceedances.

LDEQ's HYSPLIT back trajectory analysis showed that on high ozone days in Texas at the receptors identified using the *2015 Ozone NAAQS Memo*, only 28% of the trajectories traveled in or through Louisiana. Of that 28%, only 8% originated in Louisiana. Moreover, of the 28% of the trajectories, only 35% originated in or crossed the industrialized part of the State.

Although EPA requested LDEQ to conduct back trajectory analysis, in the Proposed Rule EPA now opposes LDEQ's use of the HYSPLIT back trajectory analysis. According to EPA, back trajectory analysis is a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model 'linkages.'" The EPA goes on to indicate that the use of back trajectories does not quantitatively evaluate the magnitude of the existing photochemical contributions because the "calculations do not account for any air pollution formation, dispersion, transformation, or removal processes as influenced by emissions, chemistry, deposition,

362

etc." Still, EPA does not explain why the HYSPLIT analysis cannot be relied upon for these reasons. EPA should more thoroughly explain why the use of back trajectories is not sufficient to determine significant contribution.

Further, the HYSPLIT back trajectories presented in the Louisiana Transport SIP call into question the plausibility of EPA's proposed linkages based on both the *2015 Ozone NAAQS Memo* and the <u>2016v2</u> model. This is especially true given Texas's large contributions to Louisiana receptors.

[…]

In sum, LDEQ's analysis based on the HYSPLIT Model and additional mixing depth models that show no likely impact from Louisiana emissions, is also consistent with Louisiana's compliant ozone design values throughout the state, the trend of decreases in ozone precursor emissions from Louisiana sources. EPA had the opportunity to disapprove of LDEQ's use of the HYSPLIT model. Instead, EPA commented on ways to strengthen the method, which LDEQ followed in developing the final Louisiana Transport SIP. LDEQ modeled the likely route of an air parcel transported to the receptors during ozone exceedance instances and demonstrated that of the 99 instances modeled, less than one third of the routes were from or through Louisiana, with a fractional amount originating in Louisiana. This is sufficient to show that there is no persistent and consistent pattern of significant contribution by Louisiana on the days with elevated ozone at the Texas area monitors. Therefore, Louisiana's contribution to the identified Texas receptors should not be deemed significant.

*Response*

The EPA evaluated Louisiana's HYSPLIT analysis in the proposal. 87 FR 9812-9815. The EPA does not believe that HYSPLIT analyses are sufficient to determine significant contribution because HYSPLIT trajectory analyses, as run by LDEQ, do not provide any quantitative measure of contribution (see responses to comments above). Quantitative contributions are necessary to evaluate the magnitude of an upwind state's contribution to downwind receptors with respect to the 1 percent of the NAAQS screening threshold used in Step 2 of the 4-step interstate transport framework. As noted in the proposal (87 FR 9815) HYSPLIT does not account for air pollution formation from emissions of pre-cursors (NOx and VOC emissions react to form ozone for example), dispersion, transformation, or removal processes as influenced by chemistry, deposition, etc., so the trajectories cannot be used to develop quantitative amounts for how much ozone was formed at the downwind receptor from emissions of pre-cursors in the state of Louisiana. The commenter failed to provide any rationale or methodologies explaining how trajectory analyses can be used alone to determine significant contribution. EPA did provide comments and recommend LDEQ perform HYSPLIT analyses to evaluate the transport meteorology as a way to refine the technical analysis that LDEQ was performing for their SIP (See responses to other comments in Section 1.6 related to EPA comments on proposed SIPs). Moreover, the EPA's Guideline on Air Quality Models[84] specifically states that "Control agencies with jurisdiction over areas with ozone problems should use photochemical grid models to evaluate the relationship between precursor species and ozone." Because the amount of interstate ozone transport is dependent in large part on the ability to credibly quantify ozone and precursor species concentrations,

---

[84] *Guideline on Air Quality Models* ("Appendix W" to 40 CFR Part 51), section 5.3.1, page 5213.

the EPA believes that photochemical grid modeling, rather than trajectories designed to track transport of non-reactive (i.e., inert) pollutants, is the appropriate method for evaluating interstate contributions.

The EPA ran HYSPLIT to create back trajectories from each of these receptors, among others, on days with measured ozone exceedances during the 12 years from 2010 through 2021. The maps below show the back trajectories from the Denton and Houston receptors for elevations of 500 m and 750 m (i.e., generally in the mid portion of the daytime mixed layer).[85] These maps provide a visual representation of areas typically upwind wind of the Denton and Houston/Bayland receptors on days with measured exceedances at these locations. The trajectories indicate that the air can travel from east to west such that Louisiana is upwind of the Denton and Houston receptors on days when ozone exceeds the NAAQS. This result confirms the EPA's finding that Louisiana is linked to these receptors in Texas.



---

[85] The back trajectory map shown here are also provided in a response to other comments in this section of the document.

364



The EPA addresses comments about EPA's input during SIP development in Section 1.6.

*Comment*

**Commenter:** Mississippi Department of Environmental Quality

**Commenter ID:** 32

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

METEOROLOGY/MONITORED DATA

Meteorological research regarding EPA's reliance on the air quality modeling for the 2016v2 Emissions Modeling Platform and Mississippi's alleged significant (i.e., ≥1% threshold) contributions to receptors in Texas is attached to this correspondence. This research indicates Mississippi has no significant contributions to monitors in Brazoria (Manvel Croix Park, site ID# 48031004), Denton (Denton Airport South, site ID# 481210034), or Harris County (Houston Bayland Park, site ID# 482010055), TX for nitrogen oxide ($NO_X$) and volatile organic compounds (VOC) pollutants to contribute to secondary O3 formation. In most occurrences of high $O_3$ days in Brazoria, Denton, and Harris County, TX, the Houston and/or Dallas core-based statistical areas (CBSA), as applicable, are under very stagnant conditions with minimal mixing, allowing $O_3$ to build. Thorough research shows no correlation when Brazoria, Denton, and Harris County, TX experience an easterly fetch (i.e., easterly winds), which is the only time Mississippi emissions could conceivably contribute to high $O_3$ in these areas.

[...]

Attachment: Meteorological Review of Contributions from Mississippi to Brazoria, Denton, and Harris County, TX National Ambient Air Quality Standards for Ozone Exceedances

Based upon air quality modeling for the 2016v2 Emissions Platform, the Environmental Protection Agency (EPA) has proposed that Mississippi significantly contributes to nonattainment or interferes with maintenance of the national ambient air quality standards (NAAQS) for ozone ($O_3$) for the following monitors in Texas:

- Site ID #480391004 - Manvel Croix Park in Brazoria County (located in Houston, TX core-based statistical area (CBSA))
- Site ID #481210034 - Denton Airport South in Denton County (located in Dallas, TX CBSA)
- Site ID #482010055 - Houston Bayland Park in Harris County (located in Houston, TX CBSA)

Regarding meteorological influence, Mississippi has a negligible effect on VOC/NOx transport to contribute downwind to Texas air monitoring sites. On days where Harris, Brazoria, and Denton NAAQS exceedances occur, the $O_3$ development was locally driven, as shown by the following back trajectories.

[Images in comment]

*Response*

The EPA disagrees with the commenter that Mississippi does not contribute to high ozone at downwind receptors in Texas. In the EPA's 2016v3 modeling for this final action the Agency found that Mississippi contributes above the 0.70 ppb screening threshold to three receptors in 2023: Denton County (monitor 481210034), Galveston County (monitor 481671034), and Houston/Bayland (monitor 482010055). The EPA ran HYSPLIT to create back trajectories from each of these receptors, among others, on days with measured ozone exceedances during the 12 years from 2010 through 2021. The maps below show the back trajectories from the Denton and Houston receptors for elevations of 500 m and 750 m (i.e., generally in the mid portion of the daytime mixed layer).[86] These maps provide a visual representation of areas typically upwind wind of the Denton and Houston/Bayland receptors on days with measured exceedances at these locations. The trajectories indicate that the air can travel from east to west such that Mississippi is upwind of the Denton and Houston receptors on days when ozone exceeds the NAAQS. This result confirms the EPA's finding that Mississippi is linked to these receptors in Texas.

---

[86] The back trajectory map is provided in a response to other comments in this section of the document.





*Comment*

**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

4. Back-Trajectory Analysis Supports a Finding of No Significant Contribution

Tennessee reviewed the four highest ozone days (or the five highest days where there are multiple days with the same fourth-high concentration) for calendar years 2018, 2019, 2020, and 2021 at the Denton County site (Table 6) and calculated five-day back-trajectories for air parcels ending up at 10 m above ground level at the monitor. Only two of the 18 exceedance events (October 8, 2020, and June 19, 2021) had air movement tracing back to Tennessee (Figure 1, with individual back trajectories included in Appendix A). For all other high-ozone days identified in Table 6, the back-trajectory analysis indicates that Tennessee was not a contributor.

[Table 6 available in full comment]

Table 6: 2018-2021 Highest Ozone Concentrations at AQS Site ID 481210034

[Figure 1 available in full comment]

Figure 1: 2018 through 2021 Five-Day Back Trajectories, Annual Four Highest Ozone Days at 48-121-0034

Tennessee reviewed the back trajectory analyses, and the air parcels passed through west Tennessee on October 8, 2020 and June 19, 2021. For all other high-ozone days identified in Table 6, the back-trajectory analysis indicates that Tennessee was not a contributor.

- For the October 8, 2020, event, the air parcel passes through Tennessee on October 5 at just under 500 m above ground level.
- For the June 19, 2021, event, the air parcel passes through Tennessee on June 15-16. The back-trajectory analysis for this event is unusual because the air parcel passes close to ground level as it moves through Tennessee, then it is lifted upward to about 1,000 meters before gradually returning to ground level.

East-to-west travel of air masses is relatively uncommon, and Tennessee notes that both of the events identified here were associated with tropical systems to the east of Texas (Hurricane Delta on October 8, 2020, and Tropical Storm Claudette on June 19, 2021), which block a normal zonal west-east flow (Figure 2).

[Figure 2 available in full comment]

Figure 2: Hurricane Delta and Tropical Storm Claudette


*Response*
The EPA is not taking final action on Tennessee's good neighbor SIP submission for the 2015 ozone NAAQS in this action.


*Comment*
**Commenter:** Texas Commission on Environmental Quality

**Commenter ID:** 42

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In addition, the following errors in the EPA's Technical Support Document (TSD) make its SIP disapproval invalid:

- On pages 81-86 of the TSD, the EPA states concerns with the trajectory parameters used by the TCEQ. The TCEQ's trajectory parameters were set at ranges typically used for analyses of this kind. This is not a legitimate basis for disapproval since the EPA did not provide specific guidance on acceptable parameters for this application. In other applications (for example the Guidance on the Preparation of Clean Air Act Section 179B Demonstrations for Nonattainment Areas Affected by International Transport of Emissions), the EPA has provided specific trajectory parameters required for approval.
- The EPA incorrectly describes the start time of the TCEQ's trajectories. The EPA states "TCEQ used the 1st hour of the 8-hour exceedance as the start time" (page 82 of TX TSD). The Texas SIP clearly states on page 3-53 that "The time of daily maximum one-hour ozone on the elevated eight-hour ozone day was used as the starting hour for each trajectory." The EPA's concerns regarding the start time of trajectories are based on an erroneous reading of the document and thus should not be considered in evaluating the Texas SIP revision.
- On page 82, the EPA states that the TCEQ should have also used an additional 100 meters above ground level (m AGL) start height for the trajectories; however, trajectories with too low of a start height may hit the ground. Once a trajectory hits the ground it loses accuracy and may no longer provide useful data, especially when considering the distance between the source and receptor in the TCEQ's analysis. The National Oceanic and Atmospheric Administration (NOAA) recommends start heights that are located in the middle of the planetary boundary layer. Start heights at 500 m AGL are well within these standard parameters; therefore, disagreement regarding trajectory start height is not a legitimate reason to discount the TCEQ analysis or disapprove this Texas SIP revision.
- The TCEQ used scientifically appropriate filtering criteria on its trajectories. As stated above, NOAA recommends start heights located in the middle of the mixing layer. Trajectories that hit the ground may be inaccurate and removing them to analyze more significant trajectories was appropriate in the context of the weight of evidence analysis. All trajectory endpoints that met these two criteria were presented regardless of whether they were in the mixing layer over Texas. The analysis only filtered endpoints within the mixing layer over Texas as an additional analysis to describe trajectories that show more meaningful transport patterns. The EPA has no scientific basis for concluding that the TCEQ inappropriately filtered trajectories. The analysis only filtered endpoints within the mixing layer over Texas as an additional analysis to describe trajectories that show more meaningful transport patterns.

*Response*

The EPA disagrees with the commenter that the TCEQ SIP should be approved because the commenter takes issue with some of EPA's technical comments on the trajectory analyses included as part of the information in their proposed SIP. The EPA's rationale for the disapproval of Texas's SIP Submission was

explained at proposal. *See* 87 FR 9826-9834.[87] The EPA appreciates the clarifying points from commenter regarding aspects of the HYSPLIT analysis with which the Agency took issue at proposal.

In regard to the first bullet related to trajectory parameters, as noted in the Evaluation of the TCEQ Modeling TSD we disagree that 72 hours was a long enough period to calculate back trajectories since some of the trajectories ended before fully transporting over Texas or before potentially entering Texas. In regard to the second bullet, we appreciate the clarification that we mischaracterized the start time for the HYSPLIT trajectories that they are not at the start of the 8-hour period of the MDA8 but at the hour that had the maximum 1-hour value during the eight hours in the MDA8.

In regard to the second bullet, we appreciate the clarification that we mischaracterized the start time for the HYSPLIT trajectories and that they are not at the start of the 8-hour period of the MDA8 but at the hour that had the maximum 1-hour value during the eight hours in the MDA8.  In regard to the third bullet, we often run 100 meter start heights (as is mentioned in the 179b guidance that commenter referred to in its first bullet) and felt this was especially important since TCEQ was screening out some 500 and 1000 meter start heights based on the planetary boundary layer height. Also related to the third bullet EPA does not agree that centerline trajectories that touch the ground should be screened out in this type of analysis. In regard to the fourth bullet, we disagree with screening the start height with the planetary boundary layer mix height as the MDA8 is made up of 8-hours and TCEQ's method bases dropping the trajectory for that day even though some of the hours in the MDA8 eight hour period may have been well below the mix height indicating that day should be evaluated for transport. EPA also disagrees with screening the centerline endpoints over Texas with the planetary boundary layer height as the vertical dispersion at the distances from the Colorado receptors would be expected to have contributing air from above and below the planetary boundary layer.

With the exception of the clarification of the start hour on the trajectories, the EPA continues to take issue with technical aspects of the back trajectory analysis. The commenter's points still do not resolve all of the issues that the EPA identified in its TSD, such as the need to run the trajectories for a sufficient length of time and inappropriate screening out of trajectories. *See* Evaluation of TCEQ's Modeling TSD at 81-86. Nonetheless, as these issues generally relate to TCEQ's arguments regarding potential linkages in its own modeling to Colorado and California (which are not found in EPA's modeling), these technical matters do not materially alter the bases for the EPA's disapproval as to Texas.

For this final action, the EPA conducted its own HYSPLIT back trajectory analysis for projected modeling-based nonattainment and maintenance receptors in 2023. As part of this analysis back trajectories were created for each of the 10 downwind receptors to which Texas is linked based on the 2016v3 modeling used for this final actions. EPA ran these trajectories 96 hours (longer than the 72 hours that TCEQ ran their back trajectories). These receptors are identified in the table below.

---

[87] The EPA further explained its rationale in the Evaluation of TCEQ Modeling TSD in Docket ID No. EPA-R06-OAR-2021-0801.

*Table 8-3 Receptors Linked to Texas in 2023 Based on the 2016v3 Modeling*

| Receptors Linked to Texas in 2023 Based on the 2016v3 Modeling | | | |
|---|---|---|---|
| AQS ID | State | County | Location |
| 170310001 | Illinois | Cook | Chicago/Alsip |
| 170314201 | Illinois | Cook | Chicago/Northbrook |
| 170317002 | Illinois | Cook | Chicago/Evanston |
| 350130021 | New Mexico | Dona Ana | Las Cruces/Desert View |
| 350130022 | New Mexico | Dona Ana | Las Cruces/Santa Teresa |
| 350151005 | New Mexico | Eddy | Carlsbad/BLM |
| 350250008 | New Mexico | Lea | Hobbs |
| 550590019 | Wisconsin | Kenosha | Chiwaukee Prairie |
| 551010020 | Wisconsin | Racine | Racine |
| 551170006 | Wisconsin | Sheboygan | Sheboygan |

The EPA created HYSPLIT-based back trajectories for days when measured ozone concentrations exceeded the NAAQS at each of these receptors over the 12 year period from 2010 to 2021. The maps below show the back trajectory analysis for three of these receptors, the Chicago/Northbrook, Sheboygan, and Carlsbad area receptors, based trajectories at 500 m and 750 m (i.e., generally in the mid portion of the daytime mixed layer). The maps provide a visual representation of areas typically upwind wind of the Chicago/Northbrook, Sheboygan, and Carlsbad receptors on days with measured exceedances at these receptors (trajectory paths are similar for the other receptors identified in the table above). The trajectory paths serve to reinforce the EPA's finding that Texas is linked to these receptors in this final action. The EPA's back trajectory analysis is more fully described and the results for all 10 receptors are provided in the Final Action AQM TSD.



371



## 8.9   Allegations of Inconsistency with Other Recent EPA Actions

*Comments*

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

E. EPA's conclusions in its disapproval of Texas's SIP conflict with other recent EPA actions.

EPA recently proposed to redesignate the Illinois portion of the Chicago area to attainment of the 2008 ozone NAAQS[46] and finalized redesignation of the Wisconsin portion of the Chicago nonattainment area.[47] In EPA's proposed redesignation, the Agency recognized that 2011-based modeling performed by EPA and LADCO in support of the interstate transport requirements for the 2015 ozone NAAQS projected that "the highest 2023 average design values to be 0.0662 and 0.0668" for Illinois's Chicago monitors.[48] In contrast to EPA's position in the Proposed Disapproval that four of Illinois's Chicago monitors will have average DVs of 69.6 ppb to 70.1 ppb in 2023, the modeling cited in EPA's proposed redesignation projects that the Illinois's Chicago monitors will be well under the 2015 ozone NAAQS of 70 ppb in 2023.

EPA viewed this 2011-based modeling of 2023 DVs favorably and as additional support for redesignation, noting that "[t]hese results provide evidence that ozone concentrations will continue to decrease across the entire nonattainment area," despite the fact that EPA's 2016v2 modeling platform was available.  As explained by Sonoma Technology, the EPA and LADCO results agree with TCEQ's conclusion: Chicago-region monitors do not satisfy EPA's tests for "nonattainment" or "maintenance" monitors for purposes of interstate transport planning.

EPA's conflicting positions on modeling and on the Chicago-area monitors' ability to attain the 2015 ozone NAAQS further show how EPA's Proposed Disapproval is arbitrary and capricious as to EPA's determination that Texas's emissions contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at certain Chicago-area monitors.

[46] Illinois Redesignation Proposal, 87 Fed. Reg. 13,668.
[47] Air Plan Approval; Wisconsin; Redesignation of the Wisconsin Portion of the Chicago-Naperville, Illinois-Indiana-Wisconsin Area to Attainment of the 2008 Ozone Standard, 87 Fed. Reg. 21,027 (Apr. 11, 2022).
[48] Illinois Redesignation Proposal, 87 Fed. Reg. at 13,679 n.5.


**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

3. EPA's Air Plan Proposed Approval finding Illinois Portion of the Chicago-Naperville, Illinois Indiana-Wisconsin Area to Attainment of the 2008 Ozone Standard

On March 10th, 2022 EPA proposed to designate that the Illinois portion of the Chicago Naperville, IL-IN-WI area (Chicago area) in attainment for the 2008 ozone National Ambient Air Quality Standards. Cook

County, the receptor area linked to Minnesota's designation as exceeding the contribution threshold, makes up a large portion of the Chicago area. The approval goes on to state:

*"While modeling is not required, Illinois cited photochemical modeling performed by EPA and LADCO in support of the interstate transport "Good Neighbor" provision of the CAA for the 2015 ozone NAAQS. These modeling results project the highest 2023 average design values to be 0.0662 and 0.0668, well below the 2008 ozone NAAQS. Compared to actual monitored 2009—2013 average design values, both sets of 2023 modeling results show large decreases in ozone concentrations, especially in the heart of the urban area and at the critical monitors at the north of the nonattainment area along the shore of Lake Michigan. These results provide evidence that ozone concentrations will continue to decrease across the entire nonattainment area."*

The finding that the region's ozone design values from both the LADCO and EPA s modeling results show 1. That the region is below the 2008 standard, 2. That the region is also below the 2015 threshold of 0.070ppb, and 3. that ozone concentrations are expected to continue to decrease across the region, conflicts with the finding that Minnesota is linked to contributing above the impact threshold in Illinois/Chicago for the 2015 Ozone NAAQS. At a minimum, it raises the question as to why EPA found the 2016v2 modeling platform to be superior to the LADCO photochemical analysis in determining Minnesota's contribution in modeling efforts performed for the 2015 Ozone NAAQS.

**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

3. EPA's Air Plan Proposed Approval finding Illinois Portion of the Chicago-Naperville, Illinois Indiana-Wisconsin Area to Attainment of the 2008 Ozone Standard

On March 10th, 2022 EPA proposed to designate that the Illinois portion of the Chicago Naperville, IL-IN-WI area (Chicago area) in attainment for the 2008 ozone National Ambient Air Quality Standards. Cook County, the receptor area linked to Texas's designation as exceeding the contribution threshold, makes up a large portion of the Chicago area. The approval goes on to state:

*"While modeling is not required, Illinois cited photochemical modeling performed by EPA and LADCO in support of the interstate transport "Good Neighbor" provision of the CAA for the 2015 ozone NAAQS. These modeling results project the highest 2023 average design values to be 0.0662 and 0.0668, well below the 2008 ozone NAAQS. Compared to actual monitored 2009—2013 average design values, both sets of 2023 modeling results show large decreases in ozone concentrations, especially in the heart of the urban area and at the critical monitors at the north of the nonattainment area along the shore of Lake Michigan. These results provide evidence that ozone concentrations will continue to decrease across the entire nonattainment area."*

The region's ozone design values from both the LADCO and EPA's modeling results show the region below the 2008 standard, below the 2015 threshold of 0.070 ppb, and that ozone concentrations are expected to continue to decrease across the area. This result conflicts with the finding that Texas is

374

linked to contributing above the impact threshold in Illinois/Chicago in evaluating its SIP for the 2015 Ozone NAAQS. At a minimum, it raises the question as to why EPA found the 2016v2 modeling platform to be superior to the TCEQ photochemical analysis in determining Texas's contribution in modeling efforts performed for the 2015 Ozone NAAQS.

*Response*

The EPA disagrees that there is any meaningful conflict between the air quality projections in this action and certain observations the Agency made in a footnote to a proposed action on March 10, 2022. In that notice, the EPA proposed to find that the Illinois portion of the Chicago-Naperville, IL-IN-WI area is attaining the 2008 ozone NAAQS. 87 FR 13668 (March 10, 2022). This action, as acknowledged by commenter, only applies to the 2008 ozone NAAQS. However, the EPA noted in that proposal that "while modeling is not required" to support that action, there was modeling by EPA and LADCO suggesting that average design values in 2023 may be as low as around 66 ppb. *Id.* at 13679 n.5. This observation was not necessary to support that proposal, and the Agency did not cite to or otherwise explain the basis for the statement in this footnote. However, this appears to have been in reference to the EPA's older modeling of 2023, which has of course been updated in the 2016v2 modeling used at proposal and the 2016v3 modeling used at final, both of which now project that ozone levels in the Chicago area will remain above the 2015 ozone NAAQS in 2023. In fact, when the EPA finalized this proposal, it made no further reference to that older modeling as a basis for its action or otherwise, and in response to adverse comments highlighting the EPA's updated transport modeling, we acknowledged: "EPA's ozone transport modeling indicates that, barring further emissions reductions, this area will continue to have difficulty attaining or maintaining the 2015 NAAQS in 2024." 87 FR 30821, 30826 (May 20, 2022). Subsequently, in the EPA's final "Determinations of Attainment by the Attainment Date" (DAAD) rule for the 2015 ozone NAAQS, the EPA found that the Chicago-Naperville (IL-IN-WI) nonattainment area had failed to attain the NAAQS and had design values of 79 ppb, 77 ppb, and 76 ppb for the 2018-2020 period. 87 FR 60904 (Oct. 7, 2022). As such, the EPA reclassified the area to Moderate nonattainment, and that area is now subject to a January 1, 2023, deadline among other things to submit a SIP submission revision implementing RACM/RACT. *Id.* at 60900.

Consistent with the information presented by the EPA in these final actions in May and October of this year, the EPA's latest ozone transport modeling indicates that this area will continue to have difficulty attaining or maintaining the 2015 ozone NAAQS in 2023. Further, the EPA's modeling of the contributions to that ongoing air quality problem used in this action further indicates that these elevated ozone levels are due in part to the emissions of ozone-precursor pollutants transported from upwind states, such as Minnesota and Texas. Therefore, the EPA disagrees with commenters that our analysis in this action conflicts with other EPA actions.

## 9   Controls

### 9.1   Supplemental Submission

*Comment*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Although Missouri disagrees with virtually every aspect of the proposed disapproval and the proposed FIP, the Air Program is willing to supplement our SIP submission to address the comments we responded to with regards to continuous operation of NOx control equipment on our affected sources. The Air Program acknowledges that in the last three years, while EPA has not acted on our good neighbor SIP submission, that certain units have not run their NOx control technology. Our response to EPA's comments about this issue indicated that the control technology was likely to be utilized with the imposition of the CSAPR Update; however, this has not been the case in 2020 and 2021 where Missouri has exceeded its assurance level both years. EPA points to these reasons in its FIP proposal as to why EPA must impose never-before-seen stringent levels of assurance requirements in the proposed FIPs. However, the Air Program plans to develop a supplement to Missouri's SIP to ensure the continued operation of all installed NOx control technology at all power plants in the state.

In light of the intended supplement to Missouri's good neighbor SIP submission, the Air Program requests that when EPA updates the modeling for any final disapproval or final FIP, that no emission reductions between baseline levels and control case levels be included for any Missouri power plant that has a Selective Catalytic Reduction (SCR) control device currently installed. The control case levels should be assumed for any SCR controlled units in any updated modeling that EPA conducts to support these final rules. The Air Program will stay in close communication with EPA Region 7 to communicate the status of the intended SIP supplement with regard to this issue.

*Response*

The EPA is not requiring controls on sources in Missouri or any other state in this action.

The EPA received a second good neighbor SIP submission addressing the 2015 ozone NAAQS from Missouri on November 1, 2022. Although Missouri identified this submission as a "supplement," the EPA pointed out in a comment letter to Missouri DNR on a draft version of the submission that we view this submission as a separate SIP submission, which does not impact our pre-existing obligation (now subject

376

to court-ordered deadline) to act on Missouri's original transport submittal.[88] We further note that the letter identified several concerns the Agency had with the State's approach in its draft submission. The EPA will evaluate that submission, including how the state addressed the concerns in our letter, at the time we act on that submission.

## 9.2   Over-Control

### Comment

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Because no cost-effective reductions are, in fact, available from [Plant Gaston Unit 5, Plant Barry Unit 4, Plant Harris Unit 1A], which are the only units from which such reductions could potentially be considered, then no units in Alabama can be regarded as causing significant contribution to or interference of maintenance with downwind receptors. EPA must consider this analysis in its final action on Alabama's 2022 SIP. Even more, requiring Alabama to reduce emissions in 2023 would result in over-control because EPA's own modeling finds that Alabama will be in compliance with the good neighbor provision by 2026 without making any reductions.[102] Any reductions made now would be costly and would result in no real benefit to future good neighbor compliance.

[102] 87 Fed. Reg. at 64,420.

### Response

See Section 8.6 for the EPA's response regarding Alabama Power Company et al.'s claim that there are no cost-effective reductions available at certain EGUs in Alabama and whether the information provided constitutes a satisfactory Step 3 evaluation for the state of Alabama.

The EPA disagrees with the commenter's assertion that any additional $NO_x$ emissions for EGUs in the state in 2023 results in over control because the EPA's modeling indicates no downwind contribution in 2026 and any reductions made now would be costly and no provide any benefits for future GNP obligations. The EPA's action to disapprove Alabama's transport SIP submission evaluates the state's interstate transport SIP submission to determine whether the current package satisfies the statutory obligations at CAA 110(a)(2)(D)(i)(I). This action is not determining what, if any, cost effective controls exist at Step 3 of the 4-step interstate transport framework. Rather, we find Alabama simply did not conduct an adequate analysis at Step 3.

---

[88] See "Comments on Missouri State Implementation Plan Revision Addressing Interstate Transport for the 2015 Ozone Standard", August 18, 2022. Available in the docket for this action.

The claim that any good neighbor emissions-reduction obligations that may be needed and achievable by 2023 are overcontrol based on projections that the state may not have a linkage by 2026 is in direct conflict with the holdings of *North Carolina*, 531 F.3d 896, 912 (D.C. Cir. 2008), *Wisconsin,* 938 F.3d 303, 313-20 (D.C. Cir. 2019), *Maryland*, 958 F.3d 1185, 1203-04 (D.C. Cir. 2020), and *New York v. EPA*, 964 F.3d 1214, 1226 (D.C. Cir. 2020), because 2026 is beyond the next attainment date, which is August 3, 2024. As explained in the preamble in Section II.D.1, 2023 is the relevant analytic year associated with that attainment date, and so the appropriate year for which the EPA conducted its evaluation of state submittals in this action.

However, the EPA is not requiring any controls from Alabama or any other state in this action. Comments on the substance of the proposed FIP action are beyond the scope of this rulemaking.

378

# 10 Legal Comments Not Otherwise Addressed Elsewhere

## 10.1 Venue

*Comments*

**Commenter:** Alabama Power Company

**Commenter ID:** 03

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Lastly, if EPA were to finalize its proposal on ADEM's now withdrawn 2018 SIP submittal, EPA's belief that its action would be "nationally applicable" or, in the alternative, "based on a determination of nationwide scope or effect" is incorrect and should not be finalized. EPA's action is a locally or regionally applicable action only, and review is proper only in the appropriate regional circuit. When determining whether an action is locally or regionally applicable under Section 7607(b)(1), one must "look only to the face of the [action], rather than to its practical effects."[21] A primary consideration is whether the action's "application beyond the instant case is limited by its own terms."[22] EPA's proposal is "limited by its own terms." It applies only to three states in a single EPA region. And EPA separately reviews and addresses each state's SIP submittal and has proposed action based on the unique attributes and facts of each state.

Moreover, EPA's proposal is not "based on a determination of nationwide scope or effect" simply because "EPA interprets and applies section 110(a)(2)(d)(i)(I) . . . based on a common core of nationwide policy judgments and technical analysis[.]"[23] The actual determinations EPA relies on in its proposal are state-specific determinations related to the particularities of each state's SIP. Therefore, EPA's proposal to find that its action is "based on a determination of nationwide scope or effect" is flawed, and EPA should not finalize this proposed finding.

[21] *Am. Road & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 456 (D.C. Cir. 2013).
[22] *Sierra Club v. EPA*, 926 F.3d 844, 849 (D.C. Cir. 2019)
[23] 87 Fed. Reg. at 9,562.

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Finally, if EPA were to finalize its proposal, EPA's belief that its action would be "nationally applicable" or, in the alternative, "based on a determination of nationwide scope or effect" is incorrect and should not be finalized.[104] EPA's action is a locally or regionally applicable action only and review is proper only

379

in the appropriate regional circuit. When determining whether an action is locally or regionally applicable under Section 7607(b)(1), one must "look only to the face of the [action], rather than to its practical effects."[105] A primary consideration is whether the action's "application beyond the instant case is limited by its own terms."[106] EPA's proposal is "limited by its own terms"—it applies only to Alabama.

Moreover, EPA's proposal is not "based on a determination of nationwide scope or effect" simply because "EPA interprets and applies section 110(a)(2)(d)(i)(I) . . . based on a common core of nationwide policy judgments and technical analysis[.]"[107] The actual determinations EPA relies on in its proposal are state-specific determinations related to the particularities of Alabama's SIP. Therefore, EPA's proposal to find that its action is "based on a determination of nationwide scope or effect" is flawed, and EPA should not finalize this proposed finding.

[104] [87 Fed. Reg.] at 64,427.
[105] *Am. Road & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 456 (D.C. Cir. 2013).
[106] *Sierra Club v. EPA*, 926 F.3d 844, 849 (D.C. Cir. 2019).
[107] 87 Fed. Reg. at 64,427.

**Commenter:** Arkansas Environmental Federation

**Commenter ID:** 09

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

III. The Appropriate Venue for Hearing Challenges to the Proposed Disapproval of Arkansas's SIP Is the Eighth Circuit.

EPA claims that the appropriate venue for challenges to EPA's final action on the interstate transport SIPs for Louisiana, Arkansas, Texas, and Oklahoma is the U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit").[26] Under Section 307(b)(1) of the CAA, for purposes of determining venue for challenges to EPA actions, the relevant questions are whether the action is: (1) a nationally applicable action; (2) a locally or regionally applicable action; or (3) a locally or regionally applicable action based on a determination that has nationwide scope or effect.[27]

EPA claims that the proposed rulemaking, if finalized, would be a "nationally applicable" action under CAA Section 307(b)(1) because it would address four states, located in three different Federal judicial circuits, and "would apply uniform, nationwide analytical methods, policy judgments, and interpretation with respect to the same CAA obligations."[28] EPA's reasoning is insufficient to make the final rulemaking a "nationally applicable" action and it would be inconsistent with EPA's recent final rulemaking approving the ozone interstate transport SIPs for Florida, Georgia, North Carolina, and South Carolina.[29] Despite the fact that rulemaking applied to four states located in two different Federal judicial circuits, and also relied on EPA's 4-Step interstate transport framework, EPA did not determine that action was nationally applicable, with judicial review available only in the D.C. Circuit. Instead, EPA determined that judicial review of that rule must be filed in the United States Court of Appeals *for the appropriate circuit*.[30]

380

In the alternative to determining that the final rulemaking would be "nationally applicable," "the Administrator intends to exercise the complete discretion afforded to him under the CAA to make and publish a finding that the final action … is based on a determination of 'nationwide scope or effect.'"[31] However, despite the Agency's unsupported claim, EPA is not afforded "complete discretion" in proposing to find that the final rulemaking would be based on a determination of "nationwide scope or effect" within the meaning of CAA Section 307(b)(1). Courts do not defer to EPA's determination of venue.[32] Likewise, there is no provision in CAA Section 307(b)(1) that gives EPA the exclusive authority to determine whether an action is based on a determination of nationwide scope or effect.[33] Rather, the CAA "provides a clear metric by which a court can assess the scope or effect of the relevant determinations. The reviewing court merely asks whether the scope or effect of the determinations is nationwide."[34]

EPA's intent to "apply uniform, nationwide analytical methods, policy judgments, and interpretation with respect to the same CAA obligations" in this and other ozone transport SIP rulemakings would not transform any of the final rulemakings into one that is "based on a determination of nationwide scope or effect." Indeed, it would be arbitrary and capricious for EPA to apply non-uniform analytical methods, inconsistent policy judgments, and inconsistent interpretations to the various state ozone transport SIP submittals.[35] If EPA relies on the same concept or interpretation in "other final agency action, it will be subject to judicial review upon challenge" to that separate action.[36] In approving the interstate transport SIPs for Georgia, Florida, North Carolina, and South Carolina, EPA relied on the same 4-Step framework on which it relied for this Proposal and yet EPA made no claim that its approval of those states' SIPs was based on a determination of nationwide scope or effect, in direct contrast to this rulemaking.[37]

Despite EPA's claim that its final rulemaking with respect to the ozone transport SIPs for Arkansas, Louisiana, Texas, and Oklahoma will be nationally applicable or based on a determination of nationwide scope or effect, EPA's final action on these states' SIPs will be locally or regionally applicable, and *not* based on a determination of nationwide scope or effect. "The question of applicability turns on the legal impact of the action as a whole."[38] Here, EPA's proposed action is limited to a single EPA region and directly impacts only four states. This is the prototypical example of a regionally applicable action. Although EPA claims to be applying uniform, nationwide analytical methods, policy judgments, and interpretations, EPA's proposed disapprovals are inherently state-specific and depend on the "facts and circumstances of each particular state's submittal."[39] Accordingly, petitions for review of EPA's final action with respect to the interstate ozone transport SIPs may be brought only in the court of appeals for the appropriate circuit. For EPA's final action with respect to Arkansas's SIP, that will be the U.S. Court of Appeals for the Eighth Circuit.

---

[26] 87 Fed. Reg. at 9835.

[27] See 42 U.S.C. § 7807(b)(1); see also Texas v. EPA, 829 F.3d 405, 418 (5th Cir. 2016)

[28] 87 Fed. Reg. at 9835.

[29] Air Plan Approval; FL, GA, NC, SC; Interstate Transport (Prongs 1 and 2) for the 2015 8-Hour Ozone Standard, 86 Fed. Reg. 68,413 (Dec. 2, 2022)

[30] 86 Fed. Reg. at 68,430.

[31] 87 Fed. Reg. at 9835

[32] *Texas v. EPA*, 829 F.3d 405, 417–18 (5th Cir. 2016).

[33] *Id* at 420.

[34] *Id*.

381

[35] As noted above, however, policy judgments should not be a factor in whether or not an interstate transport SIP is approvable.

[36] *Sierra Club v. EPA*, 926 F.3d 844, 849 (D.C. Cir. 2019).

[37] *See* 86 Fed. Reg. 68,413.

[38] *Texas*, 829 F.3d at 419; *accord Texas v. EPA*, No. 10-60961, 2011 WL 710598, at *2 (5th Cir. Feb. 24, 2011) (unpublished) ("Determining whether an action by the EPA is regional or local on the one hand or national on the other should depend on the location of the persons or enterprises that the actio n regulates rather than on where the effects of the action are felt." (internal quotation omitted)).

[39] 87 Fed. Reg. at 9801.

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA's claim that petitions for review of the Proposed Disapproval, if finalized, must be filed in the U.S. Court of Appeals for the D.C. Circuit is erroneous. For purposes of determining venue, the relevant questions to consider are whether the Proposed Disapproval is: 1) a nationally applicable action; 2) a locally or regionally applicable action; or 3) a locally or regionally applicable action based on a determination that has nationwide scope or effect.[52]

EPA's Proposed Disapproval is locally or regionally applicable under CAA Section 307(b)(1). "The question of applicability turns on the legal impact of the action as a whole."[53] Here, EPA's proposed disapproval of Texas's SIP applies only to Texas. EPA has cited no authority to support its apparent position that lumping multiple separate actions into one notice converts those individual actions into a single action for purposes of the statute's venue provision. Even taking EPA's entire *Federal Register* notice into account, EPA's proposed action is limited to a single EPA region and directly impacts only four states. Even together, this is the prototypical example of a regionally applicable action. Although EPA claims to be applying uniform, nationwide analytical methods, policy judgments, and interpretations, EPA's proposed disapprovals are inherently state-specific and depend on the "facts and circumstances of each particular state's submittal."[54] Accordingly, "petitions for review of SIP disapprovals may be brought only in the court of appeals 'for the *appropriate* circuit,'" that is, the regional circuit.[55]

EPA's reasoning that the proposed disapproval is nationally applicable is arbitrary and capricious. EPA previously determined that judicial review of its approval of four interstate transport SIP submissions should be filed in the U.S. Court of Appeals for the appropriate circuit, *not* the U.S. Court of Appeals for the D.C. Circuit which is the appropriate venue for nationally applicable agency actions. In December 2021, EPA approved the interstate transport SIP submissions for Florida, Georgia, North Carolina, and South Carolina.[56] This final rule applies to four states located in two different Federal judicial circuits. EPA, however, did not determine that this final rule was nationally applicable or based on a determination of nationwide scope or effect. Rather, EPA determined that judicial review of this rule must be filed in the United States Court of Appeals for the appropriate circuit.[57] Similarly, in EPA's

proposed approval of Iowa's interstate transport SIP, which was published on the same day as the Proposed Disapproval, EPA was silent as to whether the rule would have national applicability or be based on a determination of nationwide scope or effect.[58]

EPA's proposed disapproval is not nationally applicable nor is it based on a determination that has nationwide scope or effect. Therefore, the proper venue for judicial review of the proposed disapproval of Texas's SIP is the U.S. Court of Appeals for the Fifth Circuit. For the purposes of the CAA's venue provision, "'the relevant determinations are those that lie at the core of the agency action,' not determinations that are 'peripheral or extraneous.'"[59] "Section 7607(b)(1) . . . looks to the 'determination' that the challenged action is 'based on.' These determinations are the justifications the agency gives for the action and they can be found in the agency's explanation of its action. They are the reason the agency takes the action that it does."[60] "Determinations are not of nationwide scope or effect if they are 'intensely factual determinations such as those related to the particularities of the emissions sources in Texas.'"[61]

Even if concepts or interpretations from the proposed action are applied in other rulemakings, that is irrelevant to the venue inquiry, because it is "typical" for the "interpretative reasoning offered by [EPA] . . . [to have] precedential effect in future EPA proceedings . . . , including regionally and locally applicable ones."[62] EPA's consistent interpretation of the CAA does not transform the action into one that is "based on a determination of nationwide scope or effect." Rather, if EPA relies on the same concept or interpretation in "other final agency action, it will be subject to judicial review upon challenge" to that separate action.[63] In approving interstate transport SIPs for the 2015 ozone NAAQS for Georgia, Florida, North Carolina and South Carolina, EPA also relied on the same four-step framework on which it relied for the Proposed Disapproval, and yet, EPA made no claim that its approval of those states' SIPs was based on a determination of nationwide scope or effect, in direct contrast to the Proposed Disapproval.[64]

Furthermore, despite the Agency's unsupported claim in the Proposed Disapproval, EPA is not afforded "complete discretion" in proposing to find that the Proposed Disapproval is based on a determination of "nationwide scope or effect" within the meaning of CAA Section 307(b)(1). Courts do not defer to EPA's determination of venue.[66] Likewise, there is no provision in CAA Section 307(b)(1) that gives EPA the exclusive authority to determine whether an action is based on a determination of nationwide scope or effect.[67]

---

[52] 42 U.S.C. § 7807(b)(1); Texas v. EPA, 829 F.3d 405, 418 (5th Cir. 2016).

[53] *Texas*, 829 F.3d at 419; *accord Texas v. EPA*, No. 10-60961, 2011 WL 710598, at *2 (5th Cir. Feb. 24, 2011) (unpublished) ("Determining whether an action by the EPA is regional or local on the one hand or national on the other should depend on the location of the persons or enterprises that the action regulates rather than on where the effects of the action are felt." (internal quotation omitted)).

[54] Proposed Disapproval, 87 Fed. Reg. at 9,801.

[55] [*EME Homer City Generation v. EPA*], 696 F.3d [7 (D.C. Cir. 2012)] at 44 n.6 (Judge Rogers, dissenting) (emphasis in original)

[56] Air Plan Approval; FL, GA, NC, SC; Interstate Transport (Prongs 1 and 2) for the 2015 8-Hour Ozone Standard, 86 Fed. Reg. 68,413 (Dec. 2, 2022) ("FL, GA, NC, SC Approval").

[57] Id. at 68,420.

[58] Air Plan Approval; Iowa; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 87 Fed. Reg. 9,477 (Feb. 22, 2022).

59 Texas v. EPA, 706 Fed. Appx. 159, 164 (5th Cir. 2017) (quoting *Texas*, 829 F.3d at 419).

60 *Texas*, 829 F.3d at 419.

61 Texas, 706 Fed. Appx. at 164 (quoting *Texas*, 829 F.3d at 421).

62 *Sierra Club v. EPA*, 926 F.3d 844, 850 (D.C. Cir. 2019); *see also Texas*, 829 F.3d at 423 ("Nor are we persuaded . . . that whatever precedential effect the Final Rule has shows that it is based on determinations with nationwide scope or effect.").

63 *Sierra Club*, 926 F.3d at 849.

64 Compare FL, GA, NC, SC Approval, 86 Fed. Reg. at 68,420 ("[P]etitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by January 31, 2022.") *with* Proposed Disapproval, 87 Fed. Reg. at 9,835 ("EPA anticipates that this proposed rulemaking, if finalized, would be "nationally applicable" . . . If the EPA takes final action on this proposed rulemaking[, in the alternative,] the Administrator intends to exercise the complete discretion afforded to him under the CAA to make and publish a finding that the final action (to the extent a court finds the action to be locally or regionaly applicable is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1).").

65 Proposed Disapproval, 87 Fed. Reg. at 9,835.

66 *Texas*, 829 F.3d at 417–18.

67 *Id*. at 420 n.19.


**Commenter:** Louisiana Electric Utility Environmental Group

**Commenter ID:** 28

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

B. The Appropriate Venue for Hearing Challenges to the Proposed Disapproval of Louisiana's SIP Is the Fifth Circuit.

EPA claims that the appropriate venue for challenges to EPA's final action on the interstate transport SIPs for Louisiana, Arkansas, Texas, and Oklahoma is the U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit").[15] Under Section 307(b)(1) of the CAA, for purposes of determining venue for challenges to EPA actions, the relevant questions are whether the action is: (1) a nationally applicable action; (2) a locally or regionally applicable action; or (3) a locally or regionally applicable action based on a determination that has nationwide scope or effect.[16]

EPA claims that the proposed rulemaking, if finalized, would be a "nationally applicable" action under CAA Section 307(b)(1) because it would address four states, located in three different Federal judicial circuits, and "would apply uniform, nationwide analytical methods, policy judgments, and interpretation with respect to the same CAA obligations."[17] EPA's reasoning is insufficient to make the final rulemaking a "nationally applicable" action and it would be inconsistent with EPA's recent final rulemaking approving the ozone interstate transport SIPs for Florida, Georgia, North Carolina, and South Carolina.[18] Despite the fact that rulemaking applied to four states located in two different Federal judicial circuits, and also relied on EPA's 4-Step interstate transport framework, EPA did not determine that action was nationally applicable, with judicial review available only in the D.C. Circuit. Instead, EPA determined that judicial review of that rule must be filed in the United States Court of Appeals for the appropriate circuit.[19]

384

In the alternative to determining that the final rulemaking would be "nationally applicable," "the Administrator intends to exercise the complete discretion afforded to him under the CAA to make and publish a finding that the final action … is based on a determination of 'nationwide scope or effect.'"[20] However, despite the Agency's unsupported claim, EPA is not afforded "complete discretion" in proposing to find that the final rulemaking would be based on a determination of "nationwide scope or effect" within the meaning of CAA Section 307(b)(1). Courts do not defer to EPA's determination of venue.[21] Likewise, there is no provision in CAA Section 307(b)(1) that gives EPA the exclusive authority to determine whether an action is based on a determination of nationwide scope or effect.[22] Rather, the CAA "provides a clear metric by which a court can assess the scope or effect of the relevant determinations. The reviewing court merely asks whether the scope or effect of the determinations is nationwide."[23]

EPA's intent to "apply uniform, nationwide analytical methods, policy judgments, and interpretation with respect to the same CAA obligations" in this and other ozone transport SIP rulemakings would not transform any of the final rulemakings into one that is "based on a determination of nationwide scope or effect." Indeed, it would be arbitrary and capricious for EPA to apply non-uniform analytical methods, inconsistent policy judgments, and inconsistent interpretations to the various state ozone transport SIP submittals. If EPA relies on the same concept or interpretation in "other final agency action, it will be subject to judicial review upon challenge" to that separate action.[24] In approving the interstate transport SIPs for Georgia, Florida, North Carolina, and South Carolina, EPA relied on the same 4-Step framework on which it relied for this Proposal and yet EPA made no claim that its approval of those states' SIPs was based on a determination of nationwide scope or effect, in direct contrast to this rulemaking.[25]

Despite EPA's claim that its final rulemaking with respect to the ozone transport SIPs for Arkansas, Louisiana, Texas, and Oklahoma will be nationally applicable or based on a determination of nationwide scope or effect, EPA's final action on these states' SIPs will be locally or regionally applicable, and *not* based on a determination of nationwide scope or effect. "The question of applicability turns on the legal impact of the action as a whole."[26] Here, EPA's proposed action is limited to a single EPA region and directly impacts only four states. This is the prototypical example of a regionally applicable action. Although EPA claims to be applying uniform, nationwide analytical methods, policy judgments, and interpretations, EPA's proposed disapprovals are inherently state-specific and depend on the "facts and circumstances of each particular state's submittal."[27] Accordingly, petitions for review of EPA's final action with respect to the interstate ozone transport SIPs may be brought only in the court of appeals for the appropriate circuit. For EPA's final action with respect to Louisiana's SIP, that will be the U.S. Court of Appeals for the Fifth Circuit.

---

[15] 87 Fed. Reg. at 9835.

[16] *See* 42 U.S.C. § 7807(b)(1); *see also Texas v. EPA*, 829 F.3d 405, 418 (5th Cir. 2016).

[17] 87 Fed. Reg. at 9835.

[18] Air Plan Approval; FL, GA, NC, SC; Interstate Transport (Prongs 1 and 2) for the 2015 8-Hour Ozone Standard, 86 Fed. Reg. 68,413 (Dec. 2, 2022).

[19] 86 Fed. Reg. at 68,430;

[20] 87 Fed. Reg. at 9835.

[21] *Texas v. EPA*, 829 F.3d 405, 417–18 (5th Cir. 2016).

[22] *Id* at 420.

[23] *Id*.

[24] *Sierra Club v. EPA*, 926 F.3d 844, 849 (D.C. Cir. 2019).

[25] *See* 86 Fed. Reg. 68,413.

[26] *Texas*, 829 F.3d at 419; *accord Texas v. EPA*, No. 10-60961, 2011 WL 710598, at *2 (5th Cir. Feb. 24, 2011) (unpublished) ("Determining whether an action by the EPA is regional or local on the one hand or national on the other should depend on the location of the persons or enterprises that the action regulates rather than on where the effects of the action are felt." (internal quotation omitted)).

[27] 87 Fed. Reg. at 9801.

**Commenter:** The Luminant Companies

**Commenter ID:** 44

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

IV. EPA's Proposal Is Locally or Regionally Applicable Only and Should be Subject to Review in the "Appropriate Circuit"

The Proposed Disapproval is a locally or regionally applicable action only, and review is only proper in the appropriate regional circuit.[56] "The question of applicability turns on the legal impact of the action as a whole."[57] SIP disapprovals are the prototypical locally or regionally applicable action, and challenges "may be brought only in the court of appeals 'for the *appropriate* circuit[.]'".[58] The Proposed Disapproval, on its face, addresses Texas's SIP independently. Simply because EPA has chosen to combine its review of multiple, independent SIP submissions in a single proposal does not transform EPA's action into a "nationally applicable" action. And even looking to EPA's combined action, the Proposed Disapproval only relates to four states in a single EPA region, and EPA addresses each state's SIP independently. Specifically, the action only has legal effect in those states[59] and has no impact beyond the single EPA region. In reality, the Proposed Disapproval separately reviews and addresses each of the four states' SIP submittals and has proposed action based on the unique circumstances of each state.[60] Thus, the action is "locally or regionally applicable" under the Clean Air Act's judicial review provision.[61]

Moreover, the Proposed Disapproval is not "based on a determination of nationwide scope or effect." For the purposes of the Clean Air Act's venue provision, "'the relevant determinations are those that lie at the core of the agency action,' not determinations that are 'peripheral or extraneous.'"[62] "Section 7607(b)(1) . . . looks to the 'determination' that the challenged action is 'based on.' These determinations are the justifications the agency gives for the action and they can be found in the agency's explanation of its action. They are the reason the agency takes the action that it does."[63] "Determinations are not of nationwide scope or effect if they are 'intensely factual determinations' such as those 'related to the particularities of the emissions sources in Texas."[64] And, even if concepts or interpretations from the proposed action are applied in other rulemakings, that is irrelevant to the venue inquiry, because it is "typical" for "the interpretative reasoning offered by [EPA] . . . [to have] precedential effect in [other] EPA proceedings . . . , including regionally and locally applicable ones."[65] EPA's consistent interpretation of the Clean Air Act does not transform an action into one that is "based on a determination of nationwide scope or effect." Rather, if EPA relies on a concept or interpretation

386

set forth in "other final agency action, it will be subject to judicial review upon challenge" to that separate action. [66]

Here, the Proposed Disapproval relies on the specific details and attributes of each state's individual and unique SIP submittal. As EPA itself explained in the Proposed Disapproval, it must analyze the approach taken by a given state to determine whether it is "technically justified and appropriate in light of the facts and circumstances of each particular state's submittal."[67] And EPA has done just that—EPA's proposal with respect to Texas's SIP was "[b]ased on the EPA's evaluation of [Texas's] SIP submission[.]"[68] EPA looked to the specific modeling and weight of evidence analysis provided by TCEQ to assess the approvability of Texas's SIP.[69] EPA's claim that it is interpreting the interstate transport obligation "based on a common core of nationwide policy judgments and technical analysis"[70] is irrelevant for purposes of determining venue, as EPA's analysis as applied to the particular facts of each state is subject to review in the appropriate regional circuit.  It should be expected that EPA will always act based on a common core of nationwide policy judgments at some level.  It cannot be the case that venue is appropriate in the local circuits only when EPA deviates from its standard practices. The actual determinations EPA relies on in its Proposed Disapproval are "intensely factual determinations" such as those related to the particularities of each state's SIP. Therefore, the "nationwide scope or effect" "exception" to the "default presumption" of regional court review is not applicable here,[71] and EPA should not finalize its proposed finding.

[56] 42 U.S.C. § 7607(b)(1).
[57] *Texas*, 829 F.3d at 419.
[58] [*EME Homer City Generation, L.P. v. EPA*], 696 F.3d [7 (D.C. Cir. 2012)] at 44 n.6.
[59] *Texas v. EPA*, 706 Fed. Appx. 159, 164 (5th Cir. 2017).
[60] *See, e.g.*, 87 Fed. Reg. at 9,824-34 (performing Texas-specific analysis).
[61] *Texas*, 829 F.3d at 419.
[62] *Texas*, 706 Fed. Appx. at 165 (quoting *Texas*, 829 F.3d at 419).
[63] *Texas*, 829 F.3d at 419.
[64] Texas, 706 Fed. Appx. at 165 (quoting *Texas*, 829 F.3d at 421).
[65] *Sierra Club v. EPA*, 926 F.3d 844, 850 (D.C. Cir. 2019); *see also Texas*, 829 F.3d at 423 ("Nor are we persuaded . . . that whatever precedential effect the Final Rule has shows that it is based on determinations with nationwide scope or effect.").
[66] *Sierra Club*, 926 F.3d at 849.
[67] 87 Fed. Reg. at 9,801.
[68] *Id*. at 9,826.
[69] *Id*. at 9,824.
[70] *Id*. at 9,835.
[71] *Texas*, 829 F.3d at 419-21.

**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

387

Comment #8: The iSIP Disapproval is not a Nationally Applicable Regulation and does not have nationwide scope or effect, therefore the DC Circuit is not the exclusive venue for challenge

EPA argues that the ISIP Disapproval is "nationally applicable within the meaning of CAA section 307(b)(1) because it would take final action on SIP submittals for the 2015 8-hour ozone NAAQS for the states of Alabama, Mississippi, and Tennessee, which are located in three different Federal judicial circuits."[56] However, CAA section 307(b)(1) makes it clear that a "petition for review of the Administrator's action in approving or promulgating any implementation plan under section 110 . . . which is *locally or regionally applicable* may be filed *only* in *the United States Court of Appeals for the appropriate circuit*." And EPA has omitted to mention that all three of these states share boundaries with one another and are all located within the same EPA Region, but do happen to fall in different judicial circuits due to historical happenstance[58].

Therefore, EPA's argument is misplaced; instead, the Court of Appeals for the D.C. Circuit, where venue would be found for "nationally applicable" matters under section 307(b)(1), holds that "EPA's action in approving or promulgating any implementation plan [is] . . . the *prototypical locally or regionally applicable action that may be challenged only in the appropriate regional court of appeals*."[59] In the case of three contiguous states, venue would be improper in the D.C. Circuit because the iSIP Disapproval is a "prototypical . . . regionally applicable action".

Notwithstanding this provision, a petition for review may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. The proposed disapproval states that this action would be "nationally applicable" within the meaning of CAA §307(b)(1) because it would take final action on SIP submittals that are located in three different Federal judicial circuits (the Eleventh Circuit, the Fifth Circuit, and the Sixth Circuit, respectively) and would apply uniform, nationwide analytical methods, policy judgments, and interpretation with respect to the same CAA obligations. EPA's proposed finding is insufficient and should be withdrawn.

---

[56] 87 FR 9545, 9561.

[57] CAA §307(b)(1) (emphasis added).

[58] Regarding the geographic split of Alabama, Mississippi, and Tennessee between different judicial circuits, Tennessee notes that EPA could have published the proposed disapprovals for all three states in separate notices but declined to do so.

[59] *Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 455 (D.C. Cir. 2013).


**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

Judicial Review of Any Disapproved SIP Belongs in the Appropriate Circuit Court for the State

The disapproval of the individual SIPs does not have nationwide effect regardless how U.S. EPA attempts to characterize its proposed action. If finalized as proposed, the rule would result in the disapproval of SIPs for Illinois, Indiana, Michigan, Minnesota, Ohio, and Wisconsin. Each SIP has individual, unique sources, and unique air quality aspects. The SIP submittals are unique to each State. Each state has different types of sources. The issues are unique to each State. The impacts of disapproving these State SIPs are local and regional to the affected states and industries in those states. While U.S. EPA may prefer to have a "one size fits all" approach in developing a FIP to replace these SIPs; this does not change the fact that Congress gave States primary responsibility to adopt State Implementation Plans. The individual State submittals are unique to the individual State and sources; and disapproval of any SIP is presumably unique to the individual State.

*Response*

CAA section 307(b)(1) establishes two routes by which venue may be proper in the D.C. Circuit. First, the D.C. Circuit is "the exclusive venue when EPA's challenged action is 'nationally applicable' rather than 'locally or regionally applicable.'" *Sierra Club v. EPA*, 47 F.4th 738, 742-43 (D.C. Cir. 2022). "Second, and alternatively, venue also lies exclusively in [the D.C. Circuit] if an otherwise 'locally or regionally applicable' action 'is based on a determination of nationwide scope or effect' and EPA 'finds and publishes that such action is based on such a determination.'" *Id.* at 743. For the reasons provided below, this final action is nationally applicable. Alternatively, if a court finds this action to be locally or regionally applicable, the Administrator is exercising his complete discretion to find and publish that this action is based on a determination of nationwide scope or effect.

<u>Nationally Applicable</u>

To determine whether an action is "nationally applicable" or "locally or regionally applicable," a court "'look[s] only to the face of the agency action, not its practical effects.'" *Chevron U.S.A. Inc. v. EPA*, 45 F.4th 380, 386 (D.C. Cir. 2022) (quoting *Sierra Club*, 926 F.3d 844, 849). Venue turns on the nature of the agency "action," not the nature of a petitioner's challenge. *ATK Launch Systems, Inc. v. EPA*, 651 F.3d 1194, 1197 (10th Cir. 2011) (holding that "this court must analyze whether the regulation itself is nationally applicable, not whether the effects complained of or the petitioner's challenge to that regulation is nationally applicable"); *Texas v. EPA*, 829 F.3d 405, 419 (5th Cir. 2016) ("The question of applicability turns on the legal impact of the action as a whole"); *S. Ill. Power Coop. v. EPA*, 863 F.3d 666, 670 (7th Cir. 2017). On its face, this final rulemaking is "nationally applicable" because it directly applies to 21 states located in ten federal judicial circuits and in eight EPA regions across the entire continental United States.

Specifically, in this action the EPA is disapproving the good neighbor SIPs submitted by Alabama, Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Texas, Utah, West Virginia, and Wisconsin based on a uniform legal interpretation and common, nationwide analytical methods with respect to the requirements of CAA section 110(a)(2)(D)(i)(I) concerning interstate transport of pollution (i.e., the EPA's 4-step interstate ozone transport framework for the 2015 ozone NAAQS). This disapproval is based on the EPA's conclusion that the good neighbor SIPs submitted by all of these states fail to contain adequate provisions to prohibit, consistent with the provisions of title I of the CAA, any source or other

389

type of emissions activity within each state from emitting any air pollutant in amounts that will contribute significantly to nonattainment in, or interfere with maintenance by, any other state with respect to the 2015 ozone NAAQS, as required by CAA section 110(a)(2)(D)(i). The immediate legal effect of this disapproval is that the EPA is now obligated under CAA section 110(c)(1) to promulgate one or more Federal implementation plans (FIPs) that satisfy the requirements of CAA section 110(a)(2)(D)(i) for the 2015 ozone NAAQS for all of these states.

The EPA is relying on the results from nationwide photochemical grid modeling using a 2016 base year and 2023 projection year as the primary basis for its assessment of air quality conditions and pollution contribution levels at Step 1 and Step 2 of the EPA's 4-step interstate transport framework and applying a nationally uniform approach to the identification of nonattainment and maintenance receptors across the entire geographic area covered by this final action. The EPA has also evaluated each state's arguments for the use of alternative approaches or alternative sets of data with an eye to ensuring national consistency and avoiding inconsistent or inequitable results among upwind states (i.e., those states for which good neighbor obligations are being evaluated in this action) and between upwind and downwind states (i.e., those states that contain receptors signifying ozone nonattainment or maintenance problems). Given that on its face this action addresses implementation of the good neighbor requirements of CAA section 110(a)(2)(D)(i)(I) in a large number of states located across the country and given the interdependent nature of interstate pollution transport and the common core of knowledge and analysis involved in evaluating the SIP submissions, this is a "nationally applicable" action within the meaning of CAA section 307(b)(1). This action derives from the EPA's "national interpretation" of CAA section 110(a)(2)(D)(i) and "any challenge thereto belongs in the D.C. Circuit." *ATK Launch Systems, Inc. v. EPA*, 651 F.3d 1194, 1200 (10th Cir. 2011).

The EPA disagrees with commenters' suggestion that all the EPA actions on implementation plans must be "locally or regionally applicable" actions subject to review in the regional circuit courts. Commenters correctly note that in *Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453 (D.C. Cir. 2013) (hereafter *ARTBA*), the D.C. Circuit stated that "EPA's 'action in approving or promulgating any implementation plan' is the prototypical 'locally or regionally applicable action' that may be challenged only in the appropriate regional court of appeals." 705 F.3d at 455. But that case involved the EPA's approval of a SIP submission from a single state. The court in *ARTBA* did not state that *every* EPA action on an implementation plan under CAA section 110 must be a "locally or regionally applicable action," nor did the court's venue decision address any SIP action beyond the one before the court – i.e.*,* the EPA's approval of a particular SIP submission from California. To the extent commenters intended to cite *ARTBA* for the proposition that the regional circuit courts are the exclusive venue for any challenge to any EPA "action in approving or promulgating any implementation plan under [CAA section 110]," that claim is incorrect and unsupported by the statutory text. We note that although the Administrator's promulgation of Federal implementation plans under section 110(c) for multiple states under the good neighbor provision would constitute actions "promulgating [an] implementation plan under [CAA section 110]," judicial challenges to these actions have historically been heard in the D.C. Circuit Court of Appeals. Indeed, regional courts of appeals have transferred petitions for review of those FIPs or related actions on SIPs to the D.C. Circuit on at least two occasions over petitioners' opposition. *West Virginia Chamber of Commerce v. Browner*, 1998 WL 827315, at *6 (4th Cir. 1998); *Cedar Falls Utilities v. U.S. EPA*, No. 16-4504 (8th Cir. filed Feb. 22, 2017).

The EPA also disagrees with commenters' claim that the geographic applicability of the EPA's proposed rules dictates venue, as only final actions are subject to judicial review under CAA section 307(b)(1). We note, however, that the EPA signaled its intent in each of the proposed rules to take a single, nationally applicable final action. *See, e.g.,* 87 FR 9498, 9516 n.73 (February 22, 2022). Additionally, all of the proposed rules leading to this final action were supported by a national docket maintained by the EPA Headquarters and containing the key modeling files, data, and support documents that were used in the EPA's nationwide photochemical grid modeling analysis. *See, e.g.,* 87 FR 9484, 9485 (February 22, 2022).

One commenter cited to a December 2021 EPA action approving good neighbor SIPs for Florida, Georgia, North Carolina, and South Carolina in which the EPA stated that "[u]nder section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by" a specified date (*see* 86 FR 68413, 68420 (Dec. 2, 2021)), claiming that the EPA treated this prior multi-state SIP approval action as locally or regionally applicable and that it is therefore arbitrary and capricious to treat the final rule promulgated today as nationally applicable. We note that, in the December 2021 rulemaking, the EPA stated only that venue would lie in the "appropriate circuit" and did not indicate whether the D.C. Circuit or a regional circuit court would be the appropriate circuit. In any case, commenters fail to identify anything in the December 2021 rulemaking that undermines the EPA's conclusion that the final action here is nationally applicable.

*Nationwide Scope or Effect*

Under CAA section 307(b)(1), an EPA action which is locally or regionally applicable may be filed only in the United States Court of Appeals "for the appropriate circuit" with one exception: if the locally or regionally applicable action (i) "is based on a determination of nationwide scope or effect," and (ii) the Administrator "finds and publishes that such action is based on such a determination," venue lies exclusively in the D.C. Circuit.  The venue provision of the Act thus expressly grants the EPA complete discretion to determine whether to invoke an exception to the general rule that challenges to locally or regionally applicable actions be heard in the appropriate regional circuits. As the D.C. Circuit recently held in *Sierra Club v. EPA*, 47 F.4th 738 (D.C. Cir. 2022), the "EPA's decision whether to make and publish a finding of nationwide scope or effect is committed to the agency's discretion and thus is unreviewable."[89] Although "[a] court may review whether an action by EPA is nationally applicable, as well as whether locally or regionally applicable action is based on a determination of nationwide scope or effect *when EPA so finds and publishes*…. A court may not 'second-guess' the agency's discretionary decision to make and publish (or not) a finding of nationwide scope or effect."[90] For these reasons, the EPA disagrees with commenters' claim that the EPA lacks discretion to make and publish a finding that this action is based on a determination of nationwide scope or effect.

The Administrator is exercising the complete discretion afforded to him by the CAA to make and publish a finding that, if a court finds this action to be locally or regionally applicable, this action is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). Thus, even

---

[89] 47 F.4th at 745 (D.C. Cir. 2022); *see also Texas v. EPA*, 983 F.3d 826, 835 (5th Cir. 2020) ("when a locally applicable action is based on a determination of nationwide scope or effect, the EPA has discretion to select the venue for judicial review").

[90] 47 F.4th at 746 ("The Act offers 'no basis on which a reviewing court could properly assess' the agency's discretionary decision" to make a nationwide scope or effect finding) (emphases added).

if this action is locally or regionally applicable, challenges to it may only be brought in the D.C. Circuit. All of the factors discussed above that support the EPA's conclusion that this action is nationally applicable, as explained further here, also support the Administrator's finding that this action is based on a determination of nationwide scope or effect. In this final action, the EPA is interpreting and applying CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS based on a common core of nationwide policy judgments and technical analysis concerning the interstate transport of pollutants throughout the continental U.S. In particular, the EPA is applying here the same, nationally consistent 4-step interstate transport framework for assessing good neighbor obligations for the 2015 ozone NAAQS that it has applied in other nationally applicable rulemakings, such as CSAPR, the CSAPR Update, and the Revised CSAPR Update. The EPA is relying on the results from nationwide photochemical grid modeling using a 2016 base year and 2023 projection year as the primary basis for its assessment of air quality conditions and pollution contribution levels at Step 1 and Step 2 of the EPA's 4-step interstate transport framework and applying a nationally uniform approach to the identification of nonattainment and maintenance receptors across the entire geographic area covered by this final action.[91] While the commenter is correct that the EPA has evaluated the particulars of each state's submission, our findings with respect to these submissions are nationally consistent and based on determinations of nationwide scope or effect. The EPA has evaluated each state's arguments for the use of alternative approaches or alternative sets of data with an eye to ensuring national consistency and avoiding inconsistent or inequitable results among upwind states (i.e., those states for which good neighbor obligations are being evaluated in this action) and between upwind and downwind states (i.e., those states that contain receptors signifying ozone nonattainment or maintenance problems).

Additionally, the EPA in this action has set forth its views on the importance of a nationally uniform approach to contribution-threshold analysis at Step 2 and has evaluated states' arguments in support of a non-uniform approach. In this final action, we respond to these arguments in a nationally coordinated fashion, informed in part by the importance of ensuring consistency and fair and equitable treatment of both upwind contributing states and downwind states impacted by upwind pollution. Similarly, the EPA has also determined that other arguments from states regarding the other three steps of the 4-step interstate transport framework are insufficient to support approval of the SIP submissions. In many cases these arguments are highly similar to one another. The EPA's determinations with respect to these issues rest on the same or highly similar grounds, across all of the states covered by this action. Section V of the preamble presents consolidated responses to comments on these cross-cutting issues. All of these determinations have nationwide scope or effect.

The EPA therefore disagrees with commenters' claim that this action is "inherently state-specific" and dependent on the "facts and circumstances" of each particular SIP submission and the particularities of each state's air quality and emissions sources. In any case, even if this action is locally or regionally applicable, venue for any challenge to it is proper only in the D.C. Circuit because the action is based on

---

[91] In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. *See* H.R. Rep. No. 95-294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402-03.

one or more determinations of nationwide scope or effect and the Administrator is exercising his complete discretion to find and publish that it is based on such determinations.

Additionally, the Administrator finds that this is a matter on which national uniformity in judicial resolution of any petitions for review is desirable, to take advantage of the D.C. Circuit's administrative law expertise, and to facilitate the orderly development of the basic law under the Act. The Administrator also finds that consolidated review of this action in the D.C. Circuit will avoid piecemeal litigation in the regional circuits, further judicial economy, and eliminate the risk of inconsistent results for different states, and that a nationally consistent approach to the CAA's mandate concerning interstate transport of ozone pollution constitutes the best use of Agency resources.

Commenters fail to support their argument that "courts do not defer to EPA's determination of venue," and it is not clear what the commenters mean in asserting that CAA section 307(b)(1) does not give the EPA "exclusive authority" to find that an action is based on a determination of nationwide scope or effect. As the *Sierra Club* court noted, courts may review whether a locally or regionally applicable action is based on a determination of nationwide scope or effect *when EPA so finds and publishes.* But the decision whether to make and publish a finding of nationwide scope or effect is committed to agency discretion by law.

Finally, the EPA disagrees with commenters' claim that the EPA's decision not to publish a "nationwide scope or effect" finding in its December 2021 action approving good neighbor SIPs for Florida, Georgia, North Carolina, and South Carolina (86 FR 68413 (Dec. 2, 2021)) prohibits the EPA from making a "nationwide scope or effect" finding in this action. Whether or not the EPA invoked the exception in CAA section 307(b)(1) for transferring venue to the D.C. Circuit in a prior action, that prior action has no bearing on the EPA's discretion to invoke the exception here. The CAA allows the EPA to direct locally or regionally applicable actions that are "based on a determination of nationwide scope or effect" to the D.C. Circuit, but it does not require the EPA to send such cases there, nor does it provide any criteria for the Agency's exercise of its discretion.[92]

The commenter correctly notes that the EPA has approved interstate transport SIPs for the 2015 ozone NAAQS for many states throughout the country that were found not to contribute above the one percent of NAAQS threshold at Step 2 and, in these actions, made no finding that the actions were based on determinations of nationwide scope or effect. However, the absence of such a finding in one action provides no basis for challenging the Agency's finding in another. Given the far greater degree of technical and policy judgment with respect to numerous national-scale issues that the EPA has exercised in this action as part of the EPA's review of these SIP submissions, it is reasonable for the EPA to seek national consistency in the judicial resolution of any petitions for review of this action.

---

[92] *See Texas v. EPA*, 983 F.3d at 834-35 (5th Cir. 2020); *see also Sierra Club v. EPA,* 47 F.4th 738, 746 (D.C. Cir. 2022) (noting that "[i]n deciding whether to make and publish a finding of nationwide scope or effect—and thus to direct review to [the D.C. Circuit], as opposed to a regional circuit—EPA may weigh any number of considerations").

## 10.2  SIP Call

*Comments*

**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Additionally, it should be noted that the purpose of an iSIP is to verify that the State has the authority to address the regulations of the Clean Air Act (CAA), not to determine if, and by how much, an upwind State may impact a downwind monitor. If EPA intended to use updated modeling to assess impacts at future nonattaining and maintenance receptors, a call for plan revisions should have occurred, allowing EPA to incorporate and rely on modeling and monitoring data, while providing States the opportunity to review the data and incorporate any changes, if needed, without the need for a FIP call.

**Commenter:** Kentucky Division for Air Quality

**Commenter ID:** 25

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Many states that submitted a 2015 Ozone Transport SIP to EPA for approval did use the 1 ppb threshold. Given the reliance on the August 2018 memo, it would have been appropriate for EPA to, via a SIP Call, rescind the memo and request that states submit revised SIPs that did not use the 1 ppb threshold.

In this proposed action, EPA is relying on the 1% threshold to evaluate a state's contribution to a nonattainment or maintenance monitor, EPA identifies the need for consistency in its evaluation across all of its Interstate Transport requirements, for all NAAQS. Kentucky believes retraction of the August 2018 memo and issuance of a call for plan revisions under 42 U.S.C. § 7410(k)(5) would further promote consistency across states' evaluations of their SIPs,

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851, EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

EPA does not offer explanation for not electing to work with the states to develop a state implementation plan call pursuant to 110(k)(5) which provides for up to 18 months for states to address flaws in the disapproved SIPs. These accelerated actions by the agency clearly indicate that transparency is not a priority. EPA should, instead, have provided updated guidance, updated modeling, instructions on addressing specific state deficiencies, and adequate time for state response.

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

If EPA desires to make a formal finding that Missouri's SIP is inadequate because of these newly identified receptors, it must approve our original SIP and then issue a SIP call to provide Missouri a chance to address the receptors that have been newly identified in the updated modeling. Failure to do so, would circumvent EPA's obligation to put forth any effort for cooperative federalism as envisioned in the Clean Air Act.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Where new information arises that is critical to ensure compliance with the Act, EPA has authority under section 7410(k)(5) to ensure SIPs are revised to satisfy the Act. This procedure gives states the opportunity to re-draft SIPs in light of any such new data or analysis. By acting on post-record material to disapprove a SIP, EPA denies states this opportunity.

*Response*

The EPA disagrees that the Agency was required to explain why it did not exercise its discretion under CAA section 110(k)(5), which allows the EPA to require a state "to revise the [SIP] as necessary" [w]henever the Administrator deems a SIP is "substantially inadequate to attain or maintain the relevant [NAAQS][.]" This "SIP call" authority is discretionary with the Agency, and nothing in the statute obligates EPA to first provide states a second opportunity to submit approvable SIPs before promulgating FIPs. *See EME Homer City*, 572 U.S. at 509.

As a preliminary matter, commenters have not raised an issue that is actually within scope of the present action, which is the decision to disapprove the SIP submissions that are before the Agency as

required by CAA section 110(k)(2) and (3). The deadline established for the EPA action on a SIP submission under CAA section 110(k)(2) is not altered or displaced by the fact that the EPA has discretionary authority to issue a SIP call under CAA section 110(k)(5). Additionally, the EPA's evaluation of a SIP submission pursuant to CAA section 110(k)(3) to determine whether the submission "meets all of the applicable requirements of this chapter" is similarly not altered or displaced by the fact that the EPA has discretionary authority to issue a SIP call under CAA section 110(k)(5). The FIP that the EPA proposed in April of 2022 is not a component of this present action. Further, the larger policy considerations that may have informed the Agency's consideration of *when* to act on these SIP submissions are also not within the scope of this action.

In this action, the Agency is acting on the SIP submissions that are before it, as required by CAA section 110(k)(2) and (3), and therefore, comments urging the Agency to issue a SIP call pursuant to CAA section 110(k)(5) are effectively requesting that the Agency engage in an additional rulemaking effort separate from this action.[93] Without offering any final determination on that suggestion, which is beyond the scope of this action, a SIP call, if undertaken as an alternative to the present action, would effectively cause a delay of several years in implementing interstate transport obligations for the 2015 ozone NAAQS.  Thus, if this even were a reviewable question with respect to the Agency's action here, it is reasonable for the Agency not to embark on that course of action.

Commenters problematically prioritize giving states further opportunities to submit an approvable SIP before EPA promulgates a FIP, rather than prioritizing the statutory obligation to eliminate pollution significantly contributing to nonattainment and interfering with the NAAQS in other states as expeditiously as practicable. Commenters' policy preference is not required by the Act; importantly, it is in tension with the Act's substantive mandates. It is entirely appropriate for the Agency to not pursue a discretionary SIP call in the circumstances here, where expeditious action to address outstanding obligations is paramount, delays have already occurred, and the Agency seeks to address an area of CAA implementation (interstate air pollution at the regional scale) where EPA historically has been obligated to exercise its FIP authority to achieve necessary emissions reductions.

The EPA does not rule out the possibility of using mechanisms such as CAA section 110(k)(5) or the promulgation of an obligations rule to inform states' development of transport SIP submissions for future NAAQS revisions. In the context of this NAAQS, at this time, however, such an approach would further delay the implementation of good neighbor obligations that the courts have already found the EPA is past due in addressing. *See, e.g., Maryland v. EPA*, 958 F.3d 1185, 1203-04 (D.C. Cir. 2020). To illustrate this, under the EPA's current sequencing of actions, upon finalization of this action disapproving SIP submissions, and if the Agency finalizes the proposed FIP sometime in early 2023, the EPA will be able to ensure emissions reductions to address good neighbor obligations beginning in the

---

[93] We note as well that EPA is obligated to act on these SIP submissions pursuant to multiple federal consent decrees, which were entered to resolve litigation alleging that EPA had already missed statutory deadlines pursuant to CAA section 110(k)(2). EPA is aware of no authority, and commenters cite none, that would authorize EPA not to act on these submittals and instead take the alternate course of issuing a SIP call under 110(k)(5). Further, EPA has an obligation to promulgate a FIP under CAA section 110(c)(1) upon final action disapproving these SIP submittals, unless EPA first approves a SIP revision. Thus, commenters have not explained how, even if EPA issued a SIP call as a separate action in relation to good neighbor obligations for the 2015 ozone NAAQS, this would alter the schedule of actions it is obligated to undertake by virtue of 110(k)(2), (3), and (c)(1).

2023 ozone season. By contrast, even under a relatively aggressive timetable for issuing a SIP call, these emission reductions could easily be delayed by as much as three years or more. (This estimate takes into account the time needed to propose and finalize action issuing the SIP call, the time needed for states to develop, take comment on, and submit SIP revisions, the time needed for the EPA to propose and finalize action on those SIP revisions, and the time needed to propose and promulgate a FIP, if necessary.)

During the time needed to implement a SIP call as commenters suggest, the EPA would have allowed significant contribution to continue through both the 2024 Moderate area attainment date and quite possibly the 2027 Serious area attainment date, missing not one but two critical attainment dates (the "ultimate failsafe" in the words of the *Wisconsin* court, 938 F.3d at 317) in implementing CAA obligations that are at "the heart of the Act," *id.* at 316 (quoting *Train v. NRDC*, 421 U.S. 60, 66 (1975)). The EPA would have been required to proceed through not one but two additional rulemaking efforts (both the SIP call, and actions on SIP submissions in response to the SIP call). And the EPA would have allowed this to occur even though, as the *Wisconsin* court also recognized,

> When EPA determines that a State's SIP is inadequate, EPA presumably must issue a FIP that will bring that State into compliance before upcoming attainment deadlines, even if the outer limit of the statutory timeframe gives EPA more time to formulate the FIP. *See Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002) ("the attainment deadlines remain intact" even if procedural deadlines are missed or changed). The same is true when a State's SIP fails to provide for the full elimination of the State's significant contributions to downwind nonattainment.

*Id.* at 318.

Consistent with the court's observations in this passage, under the EPA's approach, the EPA is able to take final action on these SIP submissions in this action, thereby establishing predicate FIP authority (as needed) before the start of the 2023 ozone season. By proposing a FIP in April of 2022, EPA is also in a position to finalize that FIP in time for the 2023 ozone season, thus beginning implementation of needed emissions reductions to eliminate significant contribution in the analytic year associated with the next relevant attainment date for the 2015 ozone NAAQS. Further, with that proposal, EPA was also able to put states and sources on notice of its proposed expectations regarding what level of emissions reductions would be needed to eliminate the amounts of emissions significantly contributing to nonattainment and interfering with maintenance. *See* 87 FR 20040, 20149-51. Following promulgation of a FIP, states may replace that FIP with a SIP so long as the substantive CAA obligations are achieved. The FIP, if finalized, would provide a degree of information comparable to what EPA would include in a SIP call in terms of identifying with specificity the level of emissions reductions each state is expected to implement.[94] Thus, the EPA's approach does not even sacrifice the key benefit commenters apparently hope to achieve via a SIP call, which is a level of certainty for states regarding their good neighbor obligations to allow them to formulate approvable SIP submissions.

---

[94] As discussed in the cited passage of the proposed FIP, EPA always allows states the opportunity to implement a different mix of emissions controls than it has implemented through a FIP so long as the overall CAA obligation is met.

We reiterate that our reasoning as to the disadvantages of conducting a SIP call—as well as the potential timing for finalizing FIP actions—is not within the scope of this action and is offered simply to illustrate the disadvantages associated with this alternative sequence of steps advocated for by many commenters. We further acknowledge that there are many circumstances under the CAA where a SIP call may be an appropriate mechanism to ensure that the SIP complies with the CAA and that states are adequately fulfilling their CAA obligations to implement the NAAQS. The EPA has even used this tool to address good neighbor obligations (as per the 1998 NOX SIP Call[95]) and may do so again under appropriate circumstances in the future. However, there is nothing in the CAA that *requires* the agency to issue SIP calls instead of acting on SIP submissions under CAA section 110(k)(2) and (3) that are not approvable. This irreducible statutory fact is not changed even if the EPA is accused of failing to issue guidance that was sufficiently clear or prescriptive to states before their original SIP submissions were due—the EPA has no such obligation. *See EME Homer City*, 572 U.S. at 508-11. Here, it is reasonable not to further delay fulfilling the EPA's mandatory duty to act on these SIP submissions by embarking on a discretionary SIP call.

## 10.3  Cooperative Federalism and the EPA's Authority

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

EPA is intentionally exploiting the Supreme Court decision in EME Homer City vs. EPA to justify any costs or requirements it deems necessary to further federal policy decisions.

**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

---

[95] Notably, the NOX SIP Call was judicially stayed by the D.C. Circuit Court of Appeals, and this led EPA to exercise its independent authority to directly federally regulate sources violating the good neighbor provision in response to petitions under CAA section 126(b), an action which that same court subsequently upheld. *See Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1039 (D.C. Cir. 2001).

Absent rulemaking, the States, who are responsible for the development and implementation of SIPs, will use best judgement and sound scientific principles, regarding all available information in said development and implementation.

[…]

From a legal perspective, it is important to note that the Clean Air Act (CAA) does not mandate how States address the Good Neighbor provisions of Section 110(a)(2)(D)(i). More specifically, EPA has stated that the contents of SIP submissions "may vary depending on the facts and circumstances". Given that States have the primary responsibility to develop and implement the SIP, ADEM contends that Alabama reserves the right to submit a revised SIP, using the criteria that the State deems appropriate and consistent with the CAA.


**Commenter:** Alabama Power Company

**Commenter ID:** 03

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

However, even if ADEM had not withdrawn its 2018 SIP submittal, EPA should not finalize its proposed disapproval of Alabama's 2018 submittal. The Act "expressly gave the states initial responsibility for determining the manner in which air quality standards were to be achieved."[8] EPA must review state plans to confirm the state has discharged its obligations, but "EPA's role is to approve state choices, provided that they meet the criteria of the CAA."[9] Accordingly, if a state's submission satisfies the statutory criteria, EPA cannot disapprove its SIP submission.[10]

With specific regard for the "good neighbor" aspect of state SIPs, EPA has been clear that states may satisfy this obligation in a variety of ways. EPA has explained that "[t]he precise nature and contents of a good neighbor provision is not stipulated in the statute. [Therefore,] EPA believes that the contents of the SIP submission required by section 110(a)(2)(D)(i) may vary depending on the facts and circumstances related to the specific NAAQS."[11] For example, EPA "has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings."[12]

Accordingly, EPA could not determine the adequacy of Alabama's 2018 SIP submittal based on non-statutory, policy preferences.[13] The law is well-established that states are granted this same discretion with respect to SIP provisions regarding interstate transport. In fact, a state's authority in adopting a SIP is the same as EPA's authority with regard to implementing Federal Plans.[14] Because Alabama is primarily responsible for "adequately" identifying and eliminating any "significant contribution," EPA could only disapprove Alabama's SIP if it failed to "'explain whether or not emissions from the state' significantly contribute to nonattainment in other states."[15] EPA's proposed disapproval would undermine the well-established cooperative federalism approach of the CAA, where "air pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments."[16] On the applicable and timely record, that is, excluding the post-hoc analysis offered by

399

EPA in 2022, it is plain that Alabama's submission satisfied the statutory requirements of the CAA. Moreover, were it not moot, even in light of EPA's new analyses, Alabama's 2018 SIP submittal, when considered as a whole and in view of EPA's 2018 Guidance, should not be disapproved.[17]

[8] *See* 42 U.S.C. § 7410(a) (requiring States to submit plans to implement, maintain, and enforce NAAQS); *see also Com. of Va. v. EPA*, 108 F.3d 1397, 1407 (D.C. Cir. 1997), *modified on reh'g*, 116 F.3d 499 (D.C. Cir. 1997) (the CAA "expressly gave the states initial responsibility for determining the manner in which air quality standards were to be achieved").

[9] 87 Fed. Reg. 21,027, 21,028 (Apr. 11, 2022)

[10] *See* 42 U.S.C. § 7410(k)(3).

[11] *See* EPA, *Guidance for State Implementation Plan (SIP) Submissions to Meet Current Outstanding Obligations Under Section 110(a)(2)(D)(i) for the 8-Hour Ozone and PM2.5 National Ambient Air Quality Standards* 3 (Aug. 15, 2006), https://www3.epa.gov/ttn/naaqs/aqmguide/collection/cp2/20060815_harnett_final_section_110(a)(2)(D)(i)_guidance.pdf ("2006 Guidance").

[12] 87 Fed. Reg. at 9,554.

[13] *See Luminant Generation Co., L.L.C. v. EPA*, 675 F.3d 917, 927-29 (5th Cir. 2012) (rejecting EPA's attempt to enforce non-statutory requirements through SIP review process); *Com. of Va.*, 108 F.3d at 1410 (stating that CAA Section 110 "does not enable EPA to force particular control measures on the states."); *see also Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777, 780-81 (3d Cir. 1987) ("[A] SIP basically embodies a set of choices . . . that the state makes for itself in attempting to reach the NAAQS with minimum dislocation.).

[14] *Cf. EME Homer City Generation v. EPA*, 696 F.3d 7, 47-48 (D.C. Cir. 2012) (Judge Rogers, dissenting), *rev'd on other grounds*, 572 U.S. 489 (2014) ("EME Homer I").

[15] *See Westar Energy, Inc. v. EPA, 608 F. App'x 1, *3 (D.C. Cir. 2015) (*quoting EPA, *Guidance on SIP Elements Required Under Sections 110(a)(1) and (2) for the 2006 24–hour Fine Particle (PM2.5) National Ambient Air Quality Standards (NAAQS)* 3 (Sept. 25, 2009)) (affirming EPA disapproval where Kansas had not analyzed the downwind impact of in-state emissions and had not concluded that its in-state emissions did not contribute).

[16] 42 U.S.C. § 7401(a)(3).

[17] See attached comments of Alabama Power and Southern Power on ADEM's proposed SIP withdrawal and replacement, April 15, 2022, which are incorporated herein by reference.

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

A. ADEM Has the Primary Authority for Addressing its "Good Neighbor" Obligation Under the Clean Air Act

Under the Clean Air Act, a state's SIP must include, among other things, provisions prohibiting emissions from sources in the state that will "contribute significantly to nonattainment in, or interfere with maintenance by, any other state with respect to" the 2015 ozone NAAQS.[15] Although EPA has the primary responsibility in establishing air quality standards, the Clean Air Act "expressly gave the states initial responsibility for determining the manner in which air quality standards were to be achieved."[16] In other words, states are given the first opportunity to create a reasonable SIP that ensures compliance with the Clean Air Act. Importantly, the Clean Air Act does not mandate that states address their "good

neighbor" obligation under any particular framework;[17] rather, states have broad discretion in developing their SIP provisions.

Moreover, although EPA has adopted regulations that govern the SIP submittal process generally, EPA has not adopted any additional regulatory standards that define the requirements for Clean Air Act Section 110(a)(2)(D)(i)(I) interstate transport SIPs related to the 2015 ozone standard.[18] Notably, EPA has established regulatory standards for other NAAQS, thus, EPA's silence here indicates there are no specific requirements states must meet in crafting their interstate transport SIPs for the 2015 ozone NAAQS. Because EPA's regulations are silent on this matter, EPA must approve of ADEM's SIP if the SIP package "explain[s] whether or not emissions for the state significantly contribute to nonattainment in other states."[19] No single approach is required, as states have taken various approaches to addressing this obligation, and EPA has approved these different approaches.[20] The "4-step framework" favored by EPA is not in the Clean Air Act, nor does the Act mandate a certain analytical approach for interstate transport. In other words, while EPA's 4-step framework may or may not be appropriate for evaluating some future EPA *FIP*, it does not apply to EPA's review of Alabama's *SIP* submittal.

Ultimately, "EPA's role is to approve state choices, provided that they meet the criteria of the CAA."[21] EPA cannot assess the adequacy of Alabama's 2022 SIP submittal based on non-statutory, policy preferences.[22] Accordingly, if a state's submission satisfies the statutory criteria, EPA must approve the SIP.[23] Rather than respect Alabama's primary role in the development of its SIP, EPA's proposed disapproval undermines the well-established cooperative federalism approach of the CAA, where "air pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments."[24] Because Alabama's 2022 SIP satisfies the requirements of the Clean Air Act, including "'explaining whether or not emissions from the state' significantly contribute to nonattainment in other states,"[25] EPA must approve Alabama's SIP.

[15] 42 U.S.C. § 7410(a)(2)(D)(i).

[16] *Com. of Va. v. EPA*, 108 F.3d 1397, 1407 (D.C. Cir. 1997), *modified on reh'g*, 116 F.3d 499 (D.C. Cir. 1997); *see also* 42 U.S.C. § 7401(a)(3) ("[A]ir pollution control at its source is the primary responsibility of States and local governments[.]").

[17] *See* EPA, *Guidance for State Implementation Plan (SIP) Submissions to Meet Current Outstanding Obligations Under Section 110(a)(2)(D)(i) for the 8-Hour Ozone and PM2.5 National Ambient Air Quality Standards*, at 3 (Aug. 15, 2006), available at https://www3.epa.gov/ttn/naaqs/aqmguide/collection/cp2/20060815_harnett_final_section_110(a)(2)(D)(i)_guid anc e.pdf ("The precise nature and contents of [a SIP] submission [are] not stipulated in the statute.").

[18] However, EPA has done so for other NAAQS. See 40 C.F.R. §§ 51.123–.124.

[19] *Westar Energy, Inc. v. EPA*, 608 Fed. App'x 1, *3 (D.C. Cir. 2015).

[20] *See, e.g.*, Air Plan Approval; Hawaii; Interstate Transport for the 2015 Ozone NAAQS, 86 Fed. Reg. 53,571 (Sept. 28, 2021); Air Quality State Implementation Plans; Approvals and Promulgations: Alaska; Interstate Transport Requirements for the 2015 Ozone Standard, 84 Fed. Reg. 26,041 (June 4, 2019).

[21] 87 Fed. Reg. 21,027, 21,028 (Apr. 11, 2022)

[22] *See Luminant Generation Co., L.L.C. v. EPA*, 675 F.3d 917, 927-29 (5th Cir. 2012) (rejecting EPA's attempt to enforce non-statutory requirements through SIP review process); *Com. of Va.*, 108 F.3d at 1410 (stating that CAA Section 110 "does not enable EPA to force particular control measures on the states."); *see also Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777, 780-81 (3d Cir. 1987) ("[A] SIP basically embodies a set of choices . . . that the state makes for itself in attempting to reach the NAAQS with minimum dislocation.").

[23] *See* 42 U.S.C. § 7410(k)(3).

[24] 42 U.S.C. § 7401(a)(3).

[25] *See Westar Energy*, 608 Fed. App'x at *3 (quoting EPA, *Guidance on SIP Elements Required Under Sections 110(a)(1) and (2) for the 2006 24–hour Fine Particle (PM2.5) National Ambient Air Quality Standards (NAAQS)* 3 (Sept. 25, 2009)) (affirming EPA disapproval where Kansas had not analyzed the downwind impact of in-state emissions and had not concluded that its in-state emissions did not contribute).

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

IX. The Federal-State Partnership

One of the most important pillars of our federal-state regulatory framework under the Clean Air Act is the concept of cooperative federalism. One-size-fits-all policies are in direct conflict with cooperative federalism, as these policies do not reflect the nuances of a state's individual circumstances. By setting in place an overarching policy without attention to state individuality (such as EPA's 1% threshold or its control strategy under the proposed FIP), the federal government initiates an effort to coerce local and state entities into conformity with national policy. At minimum, if a federal agency ultimately decides to dismiss requested state input, then the federal government must take on a role in an advisory capacity and one with increasing collaboration and support, especially through provision of additional funding and technical resources.[28]

In this latest action by EPA, the agency attempts to set local policy goals by dismissing individual state analyses, and having a FIP waiting in the wings constitutes an "or else" coercive strategy by the EPA. EPA's concurrent proposal of a FIP with their proposed disapprovals instead of providing states with the customary two years to submit a corrective SIP revision is clear evidence that EPA prefers a national policy in contravention of Congress' intent that states be the primary policy makers with respect to implementing the NAAQS.

States have limited resources, and use what is at their disposal to meet requirements under the Clean Air Act. Suddenly, EPA is very specific about which tools states should use for policy assessment at the state-level, with no consideration of the resource constraints faced by state regulators. In the disapproval, EPA states that DEQ's analysis "does not consider …impacts on assessed controls at downwind receptors." This type of analysis is only possible through photochemical modeling, a method that the state was unable to do in-house at the time of SIP development, is costly, and was seemingly not necessary based on the guidance in place during the time of SIP development. Much of the technical basis for states' analyses comes from existing EPA modeling and guidance. It is not ideal, but it is what states are faced with, and historically, this has been acceptable methodology. DEQ acted in confidence, based on continued feedback from EPA at that time, that its alternative methods of analysis were sufficiently robust, and spent significant resources to reach the conclusions presented in the SIP submittal. For EPA to require an expensive modeling exercise for approvability, without providing the means to do so, is essentially creating an unfunded mandate.

[…]

Ultimately, EPA is undermining the framework of the Clean Air Act as established by Congress, and has changed direction on states after conclusion of the SIP development process. The proposed disapproval of the Arkansas Transport SIP and the proposed FIP will force installation of costly controls that are unnecessary for addressing specific Clean Air Act interstate transport requirements for the 2015 ozone NAAQS. In its disapproval, EPA dismisses sound reasoning and science-based evidence presented by the state and makes a bid to wholesale replace state rationale and policy decisions with its own. In no way is this equitable, nor is it the type of collaboration that the Clean Air Act affords state and federal partners tackling such multijurisdictional issues.

[...]

X. Conclusion

EPA's disapproval of Arkansas's 2015 Ozone Transport SIP is an example of a failure in cooperative federalism. EPA failed to meet its statutory deadline to act on Arkansas's SIP submittal. Then, after being sued for this failure, EPA moves the goal post on what they believe is required to satisfy Clean Air Act Section 110(a)(2)(D) requirements by dismissing its previous guidance without revoking it and substituting data that EPA provided in 2017 for states to rely upon in their submittals with new data. EPA further dismisses the weight of evidence used as part of Arkansas's decision-making process with respect to how the state defines a "significant contribution," how the state selected sources for a cost analysis of NOx reduction strategies, and the state's decisions on whether the cost of additional controls are reasonable. EPA then proposes to substitute its own policies for those that the state has demonstrated are reasonable and consistent with the Clean Air Act. With this action and their proposed FIP for the State of Arkansas, EPA fails to acknowledge that Congress gave states, not EPA, the primary authority in establishing plans to protect air quality standards.

[28] "The Evolution of Cooperative Federalism," April 15, 2021. https://online.law.tulane.edu/blog/the-evolution-ofcooperative-federalism

**Commenter:** Arkansas Environmental Federation

**Commenter ID:** 09

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

I. EPA Has a Narrow Role in the SIP Process

EPA's proposed disapproval of Arkansas's interstate transport SIP for the 2015 ozone NAAQS exceeds the Agency's authority under the Clean Air Act ("CAA"). The CAA creates a system of cooperative federalism whereby EPA "determines the ends—the standards of air quality—while states are given the initiative and broad responsibility to determine the means to achieve those ends."[2]  Accordingly, the CAA grants states the authority to develop plans addressing the NAAQS[3] and the states have extensive discretion in what their plans encompass.[4] The states' primary role in developing SIPs under Section 110 also extends to the "Good Neighbor" obligation in CAA Section 110(a)(2)(D)(i)(I) to develop SIPs to address interstate transport.[5]

EPA's role is limited once a state submits a SIP. According to Section 110 of the CAA, the Administrator *shall* approve [a SIP or SIP revision] as a whole if it meets all of the applicable requirements of this chapter."[6] EPA has long recognized its limited role; most recently in a SIP approval earlier this month:

> [T]he Administrator is required to approve a SIP submission that complies with the provisions of the CAA and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, EPA's role is to approve state choices, provided that they meet the criteria of the CAA.[7]

Given EPA's limited role it is inappropriate for EPA to propose "to apply a consistent set of *policy judgements* across all states for purposes of evaluating interstate transport obligations and the approvability of interstate transport SIP submittals for the 2015 ozone NAAQS,"[8] including for the proposed disapproval of Arkansas's SIP. EPA goes on to state that its

> policy judgments reflect consistency with relevant case law and past agency practice as reflected in the CSAPR and related rulemakings. Nationwide consistency in approach is particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving many smaller contributors.[9]

Furthermore, these policy judgments, which EPA is now attempting to enforce as binding on the states and regulated facilities through EPA's actions on the SIP, have not been through proper notice and comment as required by law and thus are unenforceable.

[...]

EPA's policy judgments, upheld by courts in support of its *Federal* rulemakings to address interstate transport, have no place in determining whether a SIP meets the applicable CAA requirements. Despite the "regional-scale pollution problem" of ozone transport, Congress granted authority to the states, in the first instance, to determine how to address interstate ozone transport. Imposing EPA's policy preferences on the states improperly negates their authority to develop their own SIPs to address interstate transport and the Agency's policy preferences fail to determine whether the states have complied with the *law* in developing their interstate transport SIPs.

---

[2] *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777, 779 (3rd. Cir. 1987) (citing *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028, 1036 (7th Cir. 1984)).

[3] *See* 42 U.S.C. § 7410(a) (requiring States to submit plans to implement, maintain, and enforce NAAQS); *see also Com. of Va. v. EPA*, 108 F.3d 1397, 1407 (D.C. Cir.), decision modified on reh'g, 116 F.3d 499 (D.C. Cir. 1997) (stating that the CAA "expressly gave the states initial responsibility for determining the manner in which air quality standards were to be achieved.").

[4] *See Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976) ("Each State is given wide discretion in formulating its plan."); *Train v. NRDC*, 412 U.S. 60, 79 (1975) ("[EPA] is relegated by the [Clean Air] Act to a secondary role in the process of determining and enforcing the specific, source-by-source emission limitations which are necessary if the national standards it has set are to be met."); *Fla. Power & Light Co. v. Castle*, 650 F.2d 579, 587 (5th Cir. 1981) ("The great flexibility accorded the states under the Clean Air Act is further illustrated by the sharply contrasting, narrow role to be played by EPA.").

[5] *See North Carolina v. EPA*, 531 F.3d 896, 923 (D.C. Cir. 2008) ("the text of section 110 . . . establishes the state as the appropriate primary administrative unit to address interstate transport of emissions.") (citations omitted); *see also Michigan v. EPA*, 213 F.3d 663, 671 (D.C. Cir. 2000).

[6] 42 U.S.C. § 7410(k)(3) (emphasis added).

[7] Air Plan Approval; Wisconsin; Redesignation of the Wisconsin Portion of the Chicago-Naperville, Illinois-Indiana Wisconsin Area to Attainment of the 2008 Ozone Standard, 87 Fed. Reg. 21,027, 21,028 (Apr. 11, 2022).
[8] 87 Fed. Reg. 9798, 9801 (Feb. 22, 2022) (emphasis added).
[9] *Id.*

**Commenter:** Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council and Texas Oil & Gas Association

**Commenter ID:** 11

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

A. The Texas SIP meets all statutory requirements, and EPA should approve it.

The Act gives states the authority to develop SIPs to implement the NAAQS in the first instance.[3] EPA, on the other hand, is "plainly . . . relegated by the Act to a secondary role in the process of determining and enforcing the specific, source-by-source emissions limitations."[4] While EPA is tasked with reviewing SIPs, the Agency cannot substitute its judgment for the state's.[5] "EPA's role is to approve state choices, provided that they meet the criteria of the CAA."[6]

The "Good Neighbor" or "interstate transport" provisions of the CAA require that SIPs "contain adequate provisions prohibiting . . . any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard."[7] If an interstate transport SIP meets these requirements, the Act directs the Administrator to approve the SIP revision.[8]

The CAA does not require states to address their Good Neighbor obligations in a specific manner, nor does it "enable EPA to force particular control measures on the states."[9] EPA has not attempted to adopt nationwide regulatory standards that purport to define the requirements for interstate transport SIPs with respect to the 2015 ozone NAAQS.[10] Specifically, EPA's separate quantification and assessment of a state's "significant contribution" to downwind nonattainment or maintenance issues is *not* a requirement of the Act and may not form the basis for disapproval of a SIP.[11] EPA has previously explained that "[t]he precise nature and contents of such a submission is not stipulated in the statute. [Therefore,] EPA believes that the contents of the SIP submission required by section 110(a)(2)(D)(i) may vary depending upon the facts and circumstances related to the specific NAAQS."[12]

EPA has recognized this flexibility afforded to states in its guidance documents[13] and in the Proposed Disapproval. In its 2006 Guidance, EPA asserted that states may establish their own framework for significant contribution "using considerations comparable to those used by EPA in evaluating significant contribution."[14]  The statute does not require that states use an approach "comparable" with EPA's own.[15] In recognition of state flexibility, in the Proposed Disapproval, EPA recognized that it "has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings."[16] The Proposed Disapproval fails to recognize this flexibility, and instead asserts a "one-size-fits-all" approach to assessing significant contribution.

405

Accordingly, EPA may not require Texas to adopt EPA's non-statutory, after-the-fact policy preferences through the SIP review process.[17] States are granted this same discretion with respect to SIP provisions regarding interstate transport. EPA's reliance on the "regional nature" of ozone transport, and its desire "to apply a consistent set of *policy judgments* across all states for purposes of evaluating interstate transport obligations and the approvability of interstate transport SIP submittals for the 2015 ozone NAAQS,"[18] have no bearing on whether a state's SIP is approvable or not. States, not EPA, are primarily responsible for quantifying and preventing their own significant contribution.[19] Therefore, EPA could only disapprove Texas's SIP if it failed to explain "whether or not emissions from the state significantly contribute to nonattainment in other states."[20]

In Texas's SIP, TCEQ provided an "analysis of ozone design value and emissions trends in Texas, a modeling analysis of the impacts of Texas's emissions on other states, and a discussion of existing ozone control strategies to demonstrate that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in another state."[21] TCEQ explained its three-step approach to determine whether emissions from Texas contribute significantly to nonattainment or interfere with maintenance at downwind monitors in another state and provided appropriate justification – through the examination of several factors, such as "design value trends, number of elevated ozone days, back trajectory analysis on elevated ozone days, modeled concentrations on future expected elevated ozone days, total interstate contributions at tagged monitors, and responsiveness of ozone to Texas emissions"[22] – to support its determination that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS at the linked downwind monitors. Texas's SIP fulfilled the requirements of the CAA by showing that the control measures currently in place are adequate to prevent in-state sources from significantly contributing or interfering with maintenance of the NAAQS. TCEQ also provided a robust technical justification for its determinations. Texas's SIP "contain[s] adequate provisions" addressing interstate transport, and EPA must approve Texas's SIP.[23]

In proposing to disapprove the SIP, EPA overstepped its statutory authority under the CAA. EPA is not authorized to judge Texas's submission based on EPA's new quantification of the State's "significant contribution" or "interference with maintenance." EPA's view of Texas's contribution or its potential to interfere with maintenance in downwind States, and EPA's methodology for determining these issues, are not requirements of the Act and thus cannot be the basis for disapproval. EPA should approve Texas's SIP based on the data available to TCEQ by the statutory deadline. EPA may not, as addressed below, disapprove Texas's SIP based on a new and deeply flawed analysis.

[4] Train v. Natural Res. Def. Council, Inc., 421 U.S. 60, 79 (1975); *see also* Am. Elec. Power Co. v. Connecticut, 565 U.S. 410, 428 (2011) ("The Act envisions extensive cooperation between federal and state authorities, generally permitting each State to take the first cut at determining how best to achieve EPA emissions standards within its domain.") (internal citations omitted).

[5] *See* 42 U.S.C. § 7410(k)(3) ("[T]he Administrator *shall* approve [a SIP or SIP revision] as a whole if it meets all of the applicable requirements of this chapter.") (emphasis added).

[6] Air Plan Approval; Iowa; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 87 Fed. Reg. 9,477, 9,483 (Feb. 22, 2022).

[7] 42 U.S.C. § 7410(a)(2)(D)(i)(I).

[8] *Id.* at § 7410(k)(3).

[9] *Com. of Va.*, 108 F.3d at 1410.

[10] Compare with 40 C.F.R. §§ 51.123, 52.124 (outlining requirements for NOx and SO2 SIPs).

[11] EME Homer City Generation v. EPA, 696 F.3d 7, 47 (D.C. Cir. 2012) (Judge Rogers, dissenting), reversed on other grounds, 134 S.Ct. 1584 (2014) ("*EME Homer I*") ("Nowhere does the CAA place a requirement on EPA to quantify each State's amount of 'significant contribution' to be eliminated pursuant to the 'good neighbor' provision[.]").

[12] EPA, Guidance for State Implementation Plan (Sip) Submissions to Meet Current Outstanding Obligations Under Section 110(A)(2)(D)(I) for the 8-Hour Ozone And PM2.5 National Ambient Air Quality Standards 3 (Aug. 15, 2006), https://www3.epa.gov/ttn/naaqs/aqmguide/collection/cp2/20060815 _harnett_final_section_110(a)(2)(D)(i)_guidance.pdf ("2006 Guidance").

[13] *See* EPA, Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(A)(2)(D)(I)(I), at 6 (Mar. 27, 2018) ("March 2018 Guidance") ("States may consider using this national modeling to develop SIPs that address requirements of the good neighbor provision for the 2015 ozone NAAQS. . . . States may also choose to use other information to identify nonattainment and maintenance receptors relevant to development of their good neighbor SIPs."); EPA, Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 11 0(A)(2)(D)(I)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards 4 (Oct. 19, 2018) ("EPA has identified two potential flexibilities that states may use to identify maintenance receptors with an appropriate technical demonstration.") ("October 2018 Guidance").

[14] 2006 Guidance, at 5.

[15] *See* 42 U.S.C. § 7410(a)(2)(D)(i)(I) (only requiring that SIPs "contain adequate provisions prohibiting . . . any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard.").

[16] Proposed Disapproval, 87 Fed. Reg. at 9,810.

[17] Luminant Generation Company LLC v. EPA, 675 F.3d 917, 927–29 (5th Cir. 2012) (rejecting EPA attempt to enforce non-statutory requirements through SIP review process); *Com. of Va.*, 108 F.3d at 1410 (D.C. Cir.) (stating that CAA Section 110 "does not enable EPA to force particular control measures on the states."); *see also* Concerned Citizens of Bridesburg, 836 F.2d 777, 780–81 ("[A] SIP basically embodies a set of choices . . . that the state must make for itself in attempting to reach the NAAQS with minimum dislocation.).

[18] Proposed Disapproval, 87 Fed. Reg. at 9,801 (emphasis added).

[19] *EME Homer I*, 696 F.3d at 49 (Judge Rogers, dissenting) ("States are fully capable of measuring interstate transport of emissions by conducting modeling, and they have done so before and continue to do so[.]").

[20] *See* Westar Energy, Inc. v. EPA, 608 Fed. Appx. 1, *3 (D.C. Cir. 2015) (citing EPA, Guidance on Sip Elements Required Under Sections 110(A)(1) and (2) for the 2006 24–Hour Fine Particle (PM2.5) National Ambient Air Quality Standards (NAAQS) at 3 (Sept. 25, 2009) (affirming EPA disapproval where Kansas had not analyzed the downwind impact of in-state emissions and had not concluded that its in-state emissions did not contribute).

[21] TCEQ, Revisions to the State Of Texas Air Quality Implementation Plan Concerning Federal Clean Air Act Sections 110(A)(1) And (2) Infrastructure, at ES-1 (Aug. 8, 2018)

[22] Id. at 7-1.

[23] 42 U.S.C. § 7410(a)(2)(D)(i)(I); id. at § 7410(k)(3)

**Commenter:** Ducote, Samuel

**Commenter ID:** 15

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

As a resident of Louisiana, I opposed the EPA's proposed disapproval of Louisiana's SIP. Louisiana's SIP meets the standards and obligations necessary to obtain the NAAQS as set forth by the EPA. The disapproval of the SIP solely regarding the potential effect of the "Good neighbor" provisions is a demonstration of regulatory overreach. In short, the Louisiana State Implementation Plan was designed

by the Louisiana Department of Environmental Quality to meet the NAAQS 'within' state boundaries. The state SIP was designed by LDEQ to meet the NAAQS within state boundaries. Allowing the EPA disapprove Louisiana's SIP on speculative "good neighbor" grounds is not a valid exercise of regulatory authority consistent with the text and purpose of the CAA. I strongly oppose the EPA's decision here. As a region of this nation responsible for fueling the needs of the nation, the Louisiana-Texas-Arkansas-Oklahoma region needs to extend special "good neighbor" exceptions for the contribution to the nation at large, especially considering the states have valid SIPs in place that meets the NAAQS requirements within each state individually.

**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

II. Nevada's Proposed SIP Meets Statutory Requirements and EPA Must Therefore Approve It.

The CAA makes clear that *states* have the primary responsibility to develop and implement emissions control measures for sources within their jurisdiction in meeting the Act's requirements.[20] While EPA provides administrative oversight in reviewing SIPs, the Agency is also "plainly . . . relegated by the Act to a secondary role in the process of determining and enforcing the specific, source-by-source emissions limitations,"[21] and cannot instead substitute its judgment for that of the state.[22] EPA has itself recognized its limited authority, noting in a recent SIP action that "EPA's role is to approve state choices, provided that they meet the criteria of the CAA."[23] In its Proposed SIP Disapproval, however, EPA oversteps this limited oversight authority by imposing its own assessment of Nevada's interstate transport obligations, rather than appropriately limiting its review to whether the state's assessment was reasonable. Because Nevada's Proposed SIP satisfies the state's interstate transport obligations under the Act, EPA must approve it.

A. States Have Significant Discretion to Determine Measures Needed to Fulfill Their Interstate Transport Obligations.

Section 110(a)(2)(D)(i)(I) of the CAA requires states to address interstate transport by preparing SIPs that "contain adequate provisions prohibiting . . . any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard." This language leaves substantial discretion to the states in determining both their significant contributions and the reduction measures necessary to eliminate them.

[…]

In performing its limited oversight role under the CAA, EPA cannot substitute its own judgment for that of the states, and in particular, cannot "force particular control measures on the states." Nevada

408

reasonably applied a technical evaluation of its significant contributions to downwind air quality problems, guided by EPA's Guidance and the requirements of the CAA. EPA cannot now impose rigid requirements using its own analysis, and must instead evaluate Nevada's chosen framework against the requirements of Section 110(a)(2)(D)(i)(I).

[…]

III. EPA's Proposed Disapproval is Unreasonable and Oversteps EPA's Authority Under the Clean Air Act.

In evaluating Nevada's SIP Submittal, EPA must assess (1) whether Nevada is "linked" to downwind air quality problems, based on a reasonable linkage threshold; and (2) whether Nevada has fulfilled its ozone transport obligations by submitting an approvable SIP, based on the requirements of the CAA. EPA's evaluation is unreasonable for each of these factors.

[20] *See* 42 U.S.C. § 7410(a) (requiring States to submit plans to implement, maintain, and enforce NAAQS). *See also Com. of Va. v. EPA*, 108 F.3d 1397, 1407 (D.C. Cir.), decision modified on reh'g, 116 F.3d 499 (D.C. Cir. 1997) (stating that the CAA "expressly gave the states initial responsibility for determining the manner in which air quality standards were to be achieved."); *Am. Elec. Power Co. v. Connecticut*, 565 U.S. 410, 428 (2011) ("The Act envisions extensive cooperation between federal and state authorities, generally permitting each State to take the first cut at determining how best to achieve EPA emissions standards within its domain.") (Internal citations omitted).

[21] *Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975).

[22] *See* 42 U.S.C. § 7410(k)(3) (emphasizing that EPA "shall approve [a SIP or SIP revision] as a whole if it meets all of the applicable requirements of this chapter.") (Emphasis added).

[23] Air Plan Approval; Iowa; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 87 Fed. Reg. 9,477, 9,483 (Feb. 22, 2022).

**Commenter:** Environmental Federation of Oklahoma

**Commenter ID:** 20

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In particular, EFO supports DEQ's assessment that EPA has overstepped its authority by circumventing the normal SIP development and approval process in a number of ways, including but not limited to: first, by evaluating the SIP based on federal policy decisions rather than law; […] EPA's actions represent a blatant disregard for cooperative federalism and for the state's extensive efforts at developing a SIP that met all requirements in place at the time of submittal.

Moreover, EFO, along with DEQ, questions the rationality of any federal action that places any significant (relative to more localized emissions) burden on Oklahoma industry for air quality improvements in Dallas, TX and Chicago, IL. This is truly the tail wagging the dog.

**Commenter:** Evergy, Inc.

**Commenter ID:** 21

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Evergy disagrees with EPA's proposal to disapprove the State of Missouri's June 10, 2019, Interstate Transport SIP. The primary concern with the disapproval of the Missouri SIP is EPA's disregard for the concept of cooperative federalism. In enacting the CAA, Congress emphasized that "air pollution control at its source is the primary responsibility of States and local governments," but that federal leadership "is essential for the development of cooperative Federal, State, regional, and local programs to prevent and control air pollution."  42 U.S.C. § 7401.

[…]

EPA has not provided Missouri the opportunity to update and retain control over their SIP. This goes against the policy of cooperative federalism.


**Commenter:** Idaho Power Company

**Commenter ID:** 23

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

A. States have substantial discretion in implementing the Good Neighbor provisions.

Section 110(a)(2)(D)(i)(I) of the CAA requires states to address interstate transport by preparing SIPs that "contain adequate provisions prohibiting . . . any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard." This language leaves substantial discretion to the states in determining both their significant contributions and the reduction measures necessary to eliminate them.

[…]

In performing its limited oversight role under the CAA, EPA cannot substitute its own judgment for that of the states, and in particular, cannot "force particular control measures on the states."[5]

[…]

C. The Proposed Disapproval oversteps EPA's statutorily assigned role.

The Proposed Disapproval boils down to EPA substituting its judgment for that of Nevada, which it may not do under the Clean Air Act. While EPA "determines the ends—the standards of air quality," the CAA *gives* states "the initiative and broad responsibility to determine the means to achieve those ends."[13] EPA, by contrast, is "relegated . . . to a secondary role" in the SIP process.[14] As EPA has acknowledged, in the Good Neighbor context, "EPA's role is to approve state choices, provided that they meet the criteria of the CAA."[15]

410

In the Proposed Disapproval, EPA oversteps its limited role by unreasonably substituting its own analysis in evaluating Nevada's SIP, rather than determining whether Nevada's analysis was reasonable.

[5] *Com. of Va. v. EPA*, 108 F.3d 1397, 1410 (D.C. Cir.), *decision modified on reh'g*, 116 F.3d 499 (D.C. Cir. 1997)
[13] *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777, 779 (3rd. Cir. 1987) (citing *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028, 1036 (7th Cir. 1984)).
[14] *Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975); *see also Am. Elec. Power Co. v. Connecticut*, 565 U.S. 410, 428 (2011) ("The Act envisions extensive cooperation between federal and state authorities, generally permitting each State to take the first cut at determining how best to achieve EPA emissions standards within its domain.") (internal citations omitted).
[15] Air Plan Approval; Iowa; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 87 Fed. Reg. 9,477, 9,483 (Feb. 22, 2022).

**Commenter:** Kentucky Division for Air Quality

**Commenter ID:** 25

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Since the requirement for submitting an Infrastructure SIP for each NAAQS was implemented, Kentucky has provided a document demonstrating that the state has the authority, regulations, and required programs in place to address all requirements of CAA section 110(a). Beginning with the 2008 Ozone NAAQS, EPA significantly changed their perspective regarding the purpose of the I-SIP, requiring an in-depth technical demonstration, with extensive modeling, data analysis, and demonstration of whether or not potential upwind emissions are contributing to downwind problems. Kentucky maintains that the purpose of the I-SIP is to verify that the state has the authority, regulations, and programs in place to address the requirements of the CAA, not to determine if, and how much, an upwind source may be impacting a downwind monitor.

**Commenter:** Louisiana Electric Utility Environmental Group

**Commenter ID:** 28

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

A. EPA Has a Narrow Role in the SIP Process

EPA's proposed disapproval of Louisiana's interstate transport SIP for the 2015 ozone NAAQS exceeds the Agency's authority under the Clean Air Act ("CAA"). The CAA creates a system of cooperative federalism whereby EPA "determines the ends—the standards of air quality—while states are given the initiative and broad responsibility to determine the means to achieve those ends."[1] Accordingly, the CAA grants states the authority to develop plans addressing NAAQS[2] and the states have extensive discretion in what their plans encompass.[3] The states' primary role in developing SIPs under Section 110 also

extends to the "Good Neighbor" obligation in CAA Section 110(a)(2)(D)(i)(I) to develop SIPs to address interstate transport.[4]

EPA's role is limited once a state submits a SIP. According to Section 110 of the CAA, the Administrator *shall* approve [a SIP or SIP revision] as a whole if it meets all of the applicable requirements of this chapter."[5] EPA has long recognized its limited role; most recently in a SIP approval earlier this month:

> [T]he Administrator is required to approve a SIP submission that complies with the provisions of the CAA and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, EPA's role is to approve state choices, provided that they meet the criteria of the CAA.[6]

Given EPA's limited role, it is inappropriate for EPA to propose "to apply a consistent set of *policy judgments* across all states for purposes of evaluating interstate transport obligations and the approvability of interstate transport SIP submittals for the 2015 ozone NAAQS," including for the proposed disapproval of Louisiana's SIP.

[...]

The states, in the first instance, have wide discretion in determining how to achieve the NAAQS, including their interstate transport obligations, and EPA cannot force the states to adopt approaches reflecting the Agency's policy preferences for consistency in interstate transport obligations. A "SIP basically embodies a set of choices . . . that the state must make for itself in attempting to reach the NAAQS with minimum dislocation."[10]

EPA also cannot substitute its own judgment for that of the state's in crafting a SIP, as the courts have recognized.[11]

[...]

Accordingly, EPA's Proposed Disapproval of Louisiana's SIP falls short and EPA has overstepped its authority under the CAA. EPA should re-evaluate Louisiana's SIP on the basis of whether the SIP meets the applicable requirements of the CAA, not on the basis of whether Louisiana made different choices than EPA would have made had it been the decision-maker with respect to fulfilling the state's Good Neighbor obligation to address interstate transport of ozone under Section 110(a)(2)(D)(i)(I) of the CAA. EPA also must avoid any policy determinations or a desire to adopt a "national ozone transport policy" in evaluating Louisiana's SIP.

---

[1] *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777, 779 (3rd. Cir. 1987) (citing *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028, 1036 (7th Cir. 1984)).

[2] *See* 42 U.S.C. § 7410(a) (requiring States to submit plans to implement, maintain, and enforce NAAQS); *see also Com. of Va. v. EPA*, 108 F.3d 1397, 1407 (D.C. Cir.), decision modified on reh'g, 116 F.3d 499 (D.C. Cir. 1997) (stating that the CAA "expressly gave the states initial responsibility for determining the manner in which air quality standards were to be achieved.").

[3] *See Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976) ("Each State is given wide discretion in formulating its plan."); *Train v. NRDC*, 412 U.S. 60, 79 (1975) ("[EPA] is relegated by the [Clean Air] Act to a secondary role in the process of determining and enforcing the specific, source-by-source emission limitations which are necessary if the national standards it has set are to be met."); *Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 587 (5th Cir. 1981)

("The great flexibility accorded the states under the Clean Air Act is further illustrated by the sharply contrasting, narrow role to be played by EPA.").

[4] *See North Carolina v. EPA*, 531 F.3d 896, 923 (D.C. Cir. 2008) ("the text of section 110 . . . establishes the state as the appropriate primary administrative unit to address interstate transport of emissions.") (citations omitted); *see also Michigan v. EPA*, 213 F.3d 663, 671 (D.C. Cir. 2000).

[5] 42 U.S.C. § 7410(k)(3) (emphasis added).

[6] Air Plan Approval; Wisconsin; Redesignation of the Wisconsin Portion of the Chicago-Naperville, Illinois-Indiana-Wisconsin Area to Attainment of the 2008 Ozone Standard, 87 Fed. Reg. 21027, 21028 (Apr. 11, 2022).

[10] *Bridesburg*, 836 F.2d at 780–81 (emphasis added); *see also Com. of Va.*, 108 F.3d at 1410 (D.C. Cir.) (CAA Section 110 "does not enable EPA to force particular control measures on the states.").

[11] *Bridesburg*, 836 F.2d at 781 (quoting *Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975)) (internal citations and quotations omitted) ("EPA has limited authority to reject a SIP . . . . The [CAA] gives the Agency no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of [Section 110(a)(2)], and the Agency may devise and promulgate a specific plan of its own only if a State fails to submit an implementation plan which satisfies those standards.").

**Commenter:** Maryland Department of the Environment

**Commenter ID:** 29

**Docket ID:** EPA-R03-OAR-2021-0872

**Comment:**

EPA's proposed FIP, which is purported to completely resolve the state's significant contribution, would not require any further emissions reductions from EGU or non-EGU sources beyond what Maryland imposes on its sources. Maryland's emission reduction control programs identified in the 2015 Good Neighbor SIP are sufficient to resolve the state's significant contribution to downwind nonattainment and maintenance areas and SIP achieves more reductions than the FIP can provide. As such, EPA's proposed disapproval inappropriately supplants judgement for that of the state. As various courts have explained, the CAA is a cooperative federalism regime, under which the EPA sets required air quality standards but with the states holding primary responsibility to create plans which achieve them. EPA has no authority to disapprove Maryland's choices of emissions limitation in preference of its own suite of controls, where Maryland has submitted a SIP, which satisfies the requirements of CAA § 110(a)(2)(D). *Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60, 79 (1975). To the contrary, "the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation." *Id.* Due to the suite of federally enforceable regulations and permits applicable to Maryland's sources already provide for greater overall emissions reductions from the EGUs and Non-EGU sources than EPA's proposed FIP, EPA's proposed disapproval of Maryland's SIP is arbitrary, capricious, and contrary to the CAA.

**Commenter:** The Luminant Companies

**Commenter ID:** 44

**Docket ID:** EPA-R06-OAR-2021-0801

413

**Comment:**

A. The Clean Air Act Gives States the Primary Authority to Address Interstate Transport

The Clean Air Act creates a cooperative federalism structure that divides authority between the federal government and the states.[5] Within this structure, EPA defines the air quality goals for the nation, and the states and local governments implement plans to achieve those standards. Accordingly, "[t]he Act assigns responsibility to the EPA for identifying air pollutants and establishing [the NAAQS.] . . . The states, by contrast, bear the primary responsibility for implementing those standards."[6] In other words, "air pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments,"[7] and "[t]he structure of the Clean Air Act indicates a congressional preference that states, not EPA, drive the regulatory process."[8]

With respect to the NAAQS, EPA is required to review the NAAQS at five year intervals and make revisions where necessary.[9] Pursuant to this obligation, on October 1, 2015, EPA revised the primary and secondary ozone NAAQS to establish a new 8-hour average standard of 70 parts per billion (ppb).[10] The Clean Air Act then directs states to submit a revision to their SIP within three years after EPA promulgates a new or revised NAAQS in order to address the new NAAQS.[11] Among those requirements is the state's "good neighbor" or "interstate transport" obligation under 42 U.S.C. § 7410(a)(2)(D)(i)—that is, a state's SIP must "contain adequate provisions . . . prohibiting . . . any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will . . . contribute significantly to nonattainment in, or interfere with maintenance by, any other state" with respect to the NAAQS.[12] Under the statute, the default is that states will address interstate transport in their SIPs, not EPA in a FIP—a concept which EPA's approach here disregards by assuming that a national approach is the only way to adequately address interstate transport.

[…]

Importantly, EPA's role in reviewing SIP submissions is narrowly tailored under the Clean Air Act. As EPA has previously explained, "Congress assigned to states the primary responsibility to implement the NAAQS[.]"[16] If a SIP is deemed complete, "the Administrator *shall* approve such submittal as a whole if it meets all the applicable requirements of this chapter[.]"[17] Thus, if a SIP submission "meets all of the applicable [Clean Air Act] requirements, the EPA <u>must</u> approve it."[18] In the proposal here, EPA has strayed outside the statute and established court precedent to propose disapproval simply because TCEQ's modeling is not the same as EPA's.

Although the Clean Air Act directs states to address interstate transport, the Clean Air Act does not mandate that states address this obligation in any particular manner. EPA has adopted some regulations that govern the SIP submittal process in general, but EPA has not adopted any regulatory standards that define the requirements for interstate transport SIPs related to the 2015 ozone standard.[19] And EPA itself has recognized that the Clean Air Act gives states flexibility with respect to SIP submissions. EPA has explained that "[t]he precise nature and contents of [a SIP] submission [are] not stipulated in the statute."[20] Further, "EPA believes that the contents of the SIP submission required by section 110(a)(2)(D)(i) may vary depending upon the facts and circumstances related to the specific NAAQS."[21] Accordingly, states have broad discretion in developing SIP provisions to address interstate transport, as

414

courts and EPA have recognized,[22] and EPA must approve state choices when reviewing SIP submissions, provided that they meet the criteria of the Clean Air Act.[23]

B. EPA's Proposal Ignores the Cooperative Federalism Approach of the Clean Air Act

In light of the states' broad discretion, EPA may not ignore the cooperative federalism structure of the Clean Air Act and ignore the statutory SIP review process in order to enforce its policy preferences or guidance on states.[24] Nor can EPA use Section 110 "to force particular control measures on the states[.]"[25] The Clean Air Act "expressly gave the states initial responsibility for determining the manner in which air quality standards were to be achieved,"[26] and the states, not EPA, are primarily responsible for quantifying and preventing their own significant contribution.[27]

The "regional nature" of ozone transport does not give EPA any greater authority over a SIP, as EPA assumes in the proposal here.[28] In fact, EPA has "unambiguously stated its interpretation that States [have] an independent obligation under section 110(a) to submit 'good neighbor' SIPs regardless of whether EPA first quantified each State's emission reduction obligations."[29] And that is precisely what TCEQ did here. Nonetheless, in the Proposed Disapproval, EPA has turned the Clean Air Act's well-established cooperative federalism regime on its head. Under EPA's approach here, a state could never issue a satisfactory interstate transport SIP, which is clearly contrary to the statute and court precedent.

EPA proposes to go beyond the actual requirements of the Clean Air Act and evaluate Texas's SIP according to new, non-statutory standards. Specifically, EPA proposes to reject TCEQ's expert modeling projections of future design values and TCEQ's quantification and assessment of Texas's "significant contribution" in favor of its own modeling. However, EPA's quantification and assessment of a State's "significant contribution" to downwind nonattainment or maintenance issues is *not* a requirement of the Act.[30] The Clean Air Act does not provide EPA the authority to second-guess TCEQ and disapprove its SIP simply because TCEQ's modeling does not match EPA's modeling or because EPA believes TCEQ's modeling "*may* understate" projected design values or there is "*potential* underestimation."[31] The standard that EPA applies to Texas's SIP and its supporting technical analysis in the Proposed Disapproval has no basis in the Clean Air Act.

EPA has announced its preference for a "nationally consistent approach," but this preference cannot override the clear and settled intent of Congress that states be permitted to implement different and varying approaches if they choose. Nor can EPA's policy goal heighten or alter the standard set out in the Clean Air Act for a state's SIP submittal such that a "deviation" from EPA's preferred approach "must be substantially justified," as EPA claims.[32] Plainly put, EPA does not write SIPs. EPA's competing view of Texas's contribution or its potential to interfere with maintenance in downwind States, and EPA's overconservative methodology for determining these things, are not requirements of the Act, nor has EPA promulgated regulations addressing this. In fact, EPA has recognized that it "has not directed states that they must conduct [their] analysis in precisely the manner the EPA has done in its prior regional transport rulemakings[.]"[33] In fact, EPA has taken inconsistent approaches (none of which are grounded in the statute), previously stating that states must only use an assessment of significant contribution that is "comparable" to EPA's preferred approach in order to have its SIP approved.[34]

Such discretion and flexibility is essential, as states must retain sufficient authority to discharge their obligations under the Clean Air Act. It would be illogical for Congress to impose a burden on the states

that they cannot reasonably discharge on their own but instead must wait for EPA let them know what precisely to do, as EPA proposes here. The Supreme Court has expressly held that this is not the case.[35] In fact, EPA has specifically expressed that the Clean Air Act "plac[es] an independent obligation" on states to address their "good neighbor" obligation "regardless of whether EPA ha[s] prospectively quantified its amount of 'significant contribution.'"[36] And EPA recognized the ability of states to undertake such an obligation, acknowledging that "[s]tates are fully capable of measuring interstate transport of emissions by conducting modeling, and they have done so before and continue to do so[.]"[37] This is logical, as "State air quality divisions are no strangers to complex air quality and meteorological modeling of interstate transport of emissions."[38] Using its expertise in modeling, Texas has discharged its obligation just as the Clean Air Act envisions here.

EPA cannot now ignore Congress's clear language in the Clean Air Act and usurp the states' role in the NAAQS process. Regardless of whether EPA prefers a nationally uniform method for addressing ozone transport, that is not what Congress mandated. As EPA has explained, "the Administrator is required to approve a SIP submission that complies with the provisions of the [Clean Air Act] and applicable Federal regulations."[39] Thus, EPA's preference for states to rely on a certain approach cannot be the basis for disapproval. Ultimately, EPA can only disapprove Texas's SIP if it "fails to explain whether or not emissions from the state significantly contribute to nonattainment in other states," as required by the Clean Air Act.[40]

[5] *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012).

[6] *Id.* (internal citations and quotations omitted).

[7] 42 U.S.C. § 7401(a)(3).

[8] *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016).

[9] 42 U.S.C. § 7409(d).

[10] 80 Fed. Reg. 65,292, 65,292 (Oct. 26, 2015).

[11] 42 U.S.C. § 7410(a)(1).

[12] Id. § 7410(a)(2)(D).

[16] *See* Brief of EPA at 13, *Texas v. EPA*, No. 18-60606 (5th Cir. Mar. 8, 2019).

[17] *See Luminant Generation*, 675 F.3d at 921 ("With regard to implementation, the Act confines the EPA to the ministerial function of reviewing SIPs for consistency with the Act's requirements."); *see also* Brief of EPA at 14, *Texas v. EPA*, No. 18-60606 (5th Cir. Mar. 8, 2019) ("EPA must approve the SIP if it meets the Act's requirements." (citing 42 U.S.C. § 7410(k)(3) and *Union Elec. Co. v. EPA*, 427 U.S. 246, 251 (1976))).

[18] *Luminant Generation*, 675 F.3d at 922 (emphasis added).

[19] However, EPA has done so for other NAAQS. See 40 C.F.R. §§ 51.123-.124.

[20] *See* EPA, *Guidance for State Implementation Plan (SIP) Submissions to Meet Current Outstanding Obligations Under Section 110(a)(2)(D)(i) for the 8-Hour Ozone and PM2.5 National Ambient Air Quality Standards*, at 3 (Aug. 15, 2006), *available at* https://www3.epa.gov/ttn/naaqs/aqmguide/collection/cp2/20060815 _harnett_final_section_110(a)(2)(D)(i)_guidance.pdf ("2006 Guidance").

[21] Id.

[22] *See EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7, 47-48 (D.C. Cir. 2012) (Rogers, J., dissenting), *reversed on other grounds*, 134 S. Ct. 1584 (2014) ("*EME Homer I*").

[23] 87 Fed. Reg. 21,027, 21,028 (Apr. 11, 2022).

[24] *Luminant Generation*, 675 F.3d at 927-29 (rejecting EPA attempt to enforce non-statutory requirements through SIP review process).

[25] *Com. of Va. v. EPA*, 108 F.3d 1397, 1410 (D.C. Cir.), *decision modified on reh'g*, 116 F.3d 499 (D.C. Cir. 1997).

[26] Id. at 1407.

[27] *EME Homer I*, 696 F.3d at 49 ("States are fully capable of measuring interstate transport of emissions by conducting modeling, and they have done so before and continue to do so[.]").

[28] Every "good neighbor" obligation is regional by definition, therefore Congress must have understood that such "regional" issues would still be primarily the subject of state responsibility, authority, and reasonable judgment.
[29] *EME Homer I*, 696 F.3d at 39; see also id. at 43.
[30] *Id*. at 47 ("Nowhere does the [Clean Air Act] place a requirement on EPA to quantify each State's amount of 'significant contribution' to be eliminated pursuant to the 'good neighbor' provision[.]").
[31] EPA Region 6, *2015 8-Hour Ozone Transport SIP Proposal, Technical Support Document*, Docket No. EPAR06-OAR-2021-0801-0002, at 39, 66 (Feb. 2022) ("Proposed TSD") (emphasis added).
[32] 87 Fed. Reg. at 9,801.
[33] *Id*. at 9,810.
[34] *See* 2006 Guidance at 5.
[35] *See EME Homer II*, 572 U.S. at 509.
[36] *EME Homer I*, 696 F.3d at 43.
[37] *Id*. at 49.
[38] *Id*.
[39] 86 Fed. Reg. 71,830, 71,830 (Dec. 20, 2021).
[40] *See Westar Energy, Inc. v. EPA*, 608 Fed. Appx. 1, *3 (D.C. Cir. 2015) (affirming EPA disapproval where Kansas had not analyzed the downwind impact of in-state emissions and had not concluded that it did not contribute).


**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The good neighbor provision, at its core, is a state obligation. It is codified in Section 110 of the CAA, which is the section granting states primary decision-making authority for developing SIPs to achieve the NAAQS. EPA's role under section 110 is to review and approve those plans, not to substitute its own policy preferences or decisions for those made by the states. As long as a state's plan is reasonable and complies with the requirements of the CAA, EPA must approve it. The U.S. Supreme Court and multiple Circuit Courts have repeatedly endorsed this cooperative federalism approach codified in Section 110.[18]

[…]

States have wide discretion in determining how to achieve the NAAQS, including their interstate transport obligations, and EPA cannot force the states to adopt approaches reflecting the Agency's policy preferences. A "SIP basically embodies a set of choices . . . that the state must make for itself in attempting to reach the NAAQS with minimum dislocation."[65] EPA also cannot substitute its own judgment or a one-size-fits-all approach for that of the states when crafting a SIP, as the courts have recognized over and over.[66] This is especially true when a state's SIP relied on guidance put forth by EPA.

[…]

The CAA does not require states to address their Good Neighbor obligations in a specific manner, nor does it "enable EPA to force particular control measures on the states."[83] EPA has not adopted any nationwide regulatory standards that purport to define the requirements for interstate transport SIPs with respect to the 2015 ozone NAAQS.[84] Specifically, EPA has previously explained that "[t]he precise nature and contents of such a submission is not stipulated in the statute. [Therefore,] EPA believes that

417

the contents of the SIP submission required by section 110(a)(2)(D)(i) may vary depending upon the facts and circumstances related to the specific NAAQS."[85] This is one of the reasons the CAA assigns development of implementation plans to the states – they are able to use their local knowledge and familiarity with regional conditions to best design the right type of plan for their location and citizens' values and priorities.

EPA claims it "has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings."[86] But EPA rejects the flexibilities it previously provided to the states and instead insists on a one-size-fits-all approach when assessing significant contribution to NAAQS. In fact, EPA's disapprovals force Utah and other states to "complete something similar to EPA's analysis" or "an alternative approach" that meets EPA's policy choices and preferred methods.[87]

The Proposed Disapproval fails to recognize EPA's limited role and obligation: "the Administrator shall approve [a SIP or SIP revision] as a whole if it meets all of the applicable requirements of this chapter."[88] EPA has long recognized its limited role, as stated in a recent SIP approval:

> [T]he Administrator is required to approve a SIP submission that complies with the provisions of the CAA and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, EPA's role is to approve state choices, provided that they meet the criteria of the CAA.[89]

It is inappropriate given the ozone situation in the West and EPA's limited role for EPA to claim in the Proposed Disapproval that it must "apply a consistent set of policy judgments across all states for purposes of evaluating interstate transport obligations and the approvability of interstate transport SIP submittals for the 2015 ozone NAAQS."[90] New policy judgments, even if labeled as uniform and nationwide, have no place in determining whether a SIP meets applicable CAA requirements (which support tailoring to the needs of the particular state), especially when those judgments contradict previous EPA policies and practices.[91]

[…]

Additionally, EPA partially based its Proposed Disapproval on its own opinion of what factors Utah should have considered:

> UDAQ's analysis failed to evaluate emissions and emissions-reduction opportunities from most of the highest emitting NOx sources in the State, including multiple electric generating units located further east of the Salt Lake City, Utah area and thus closer to the Denver area receptors to which Utah contributes greater than 1 percent of the NAAQS. A state conducting a Step 3 analysis should undertake an evaluation of these kinds of substantial and potentially cost-effective emissions reduction opportunities, and the failure to do so is grounds for disapproval.[95]

However, EPA cannot require Utah to adopt EPA's non-statutory policy preferences through the SIP review process since states, not EPA, are primarily responsible for quantifying and determining the preferred method to prevent their own significant contribution.[96]

---

[18] *See, e.g., Train*, 412 U.S. 60 (1975); *Union Elec. Co. v. EPA*, 427 U.S. 246 (1976); *Fla. Power & Light Co. v. Costle*, 650 F.2d 579 (5th Cir. 1981).

[65] *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777, 780–81 (3rd Cir. 1987); *see also Com. of Virginia.*, 108 F.3d at 1410 (CAA Section 110 "does not enable EPA to force particular control measures on the states.").

[66] *Bridesburg*, 836 F.2d at 781 (quoting *Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975)) (internal citations and quotations omitted) ("EPA has limited authority to reject a SIP . . . . The [CAA] gives the Agency no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of [Section 110(a)(2)], and the Agency may devise and promulgate a specific plan of its own only if a State fails to submit an implementation plan which satisfies those standards.").

[83] *Com. of Va. v. EPA*, 108 F.3d 1397, 1410 (D.C. Cir.), *decision modified on reh'g*, 116 F.3d 499 (D.C. Cir. 1997); *see also id.* at 1407 (stating that the CAA "expressly gave the states initial responsibility for determining the manner in which air quality standards were to be achieved.").

[84] Compare with 40 C.F.R. §§ 51.123, 52.124 (outlining requirements for NOx and SO2 SIPs).

[85] EPA, W. Harnett, Guidance For State Implementation Plan (SIP) Submissions To Meet Current Outstanding Obligations Under Section 110(A)(2)(D)(I) For The 8-Hour Ozone And Pm2.5 National Ambient Air Quality Standards (Aug. 15, 2006) at 3, available at https://www3.epa.gov/ttn/naaqs/aqmguide/collection/cp2/20060815_harnett_final_section_110(a)(2)(D)(i)_guidance.pdf ("2006 Guidance").

[86] See 87 FR at 31,481.

[87] *Id.* at 31,482.

[88] *See North Carolina v. EPA*, 531 F.3d 896, 923 (D.C. Cir. 2008) ("the text of section 110 . . . establishes the state as the appropriate primary administrative unit to address interstate transport of emissions.") (citations omitted); *see also Michigan v. EPA*, 213 F.3d 663, 671 (D.C. Cir. 2000) (affirming EPA's approach of "leav[ing] to the States the task of determining how to obtain NOx reductions).

[89] Air Plan Approval; Wisconsin; Redesignation of the Wisconsin Portion of the Chicago- Naperville, Illinois-Indiana-Wisconsin Area to Attainment of the 2008 Ozone Standard, 87 FR 21,027, 21,028 (Apr. 11, 2022).

[90] *See* 87 FR at 31,472.

[91] *See, e.g.*, 81 FR 74,504, 74,506 (October 26, 2016), EPA, Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, Oct. 26, 2016 (declining to include western states in CSAPR program due to differences in western ozone transport); EPA, S. Page, Director, OAQPS, "Information on Interstate Transport 'Good Neighbor' Provision for the 2008 Ozone National Ambient Air Quality Standards (NAAQS) under Clean Air Act (CAA) Section 110(a)(2)(D)(i)(I)" (January 2015) at 4 (recommending ozone transport in western states should be evaluated on a case-by-case basis).

[95] 87 FR at 31,483.

[96] *See, e.g., Luminant Generation Company LLC v. EPA*, 675 F.3d 917, 927–29 (5th Cir. 2012) (rejecting EPA's attempt to enforce non-statutory requirements through SIP review process); *Com. of Va.*, 108 F.3d at 1410 (D.C. Cir.) (stating that CAA Section 110 "does not enable EPA to force particular control measures on the states."); *see also Concerned Citizens of Bridesburg*, 836 F.2d 777, 780–81 ("[A] SIP basically embodies a set of choices . . . that the state must make for itself in attempting to reach the NAAQS with minimum dislocation.); *EME Homer I*, 696 F.3d at 49 (Judge Rogers, dissenting) ("States are fully capable of measuring interstate transport of emissions by conducting modeling, and they have done so before and continue to do so[.]").


**Commenter:** PacifiCorp (Berkshire Hathaway Energy Company Proposed FIP Comments Attachment)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

BHE supports the authority granted under the CAA to states as the entities best suited to develop and adopt implementation plans that are tailored to the geography, populations, meteorology and other localized conditions of the specific state. The "good neighbor" provision, at its core, is a state obligation.

It is codified in Section 110 of the CAA, which is the section granting states the primary decision-making authority for developing state implementation plans to achieve the NAAQS. EPA's role under section 110 is to review and approve those plans, not to substitute its own policy decisions for those made by the states. As long as a state's plan is reasonable and complies with the requirements of the CAA, EPA must approve it. The D.C. Circuit has repeatedly endorsed this cooperative federalism approach codified in Section 110.[42] However, the Proposed Rule threatens to impose a one-size-fits-all approach onto this complex program rather than working with the western states to find the best solution, which must be tailored to the conditions and resources in each state. EPA may feel backed into a corner because of legal suits and its own delays in reviewing and approving each of the western state's SIPs. BHE believes the CAA provides, and in fact requires, a different and more effective approach.

[…]

States are uniquely positioned to identify the right mix of requirements for the unique emission sources in their jurisdictions and to determine how best to align those requirements with other regulatory efforts that target some of the same units and pollutants, like regional haze. In addition, states are best positioned, and have a sovereign duty, to evaluate and implement the measures necessary to ensure they achieve the required good neighbor provisions while also not jeopardizing their coal communities and the bulk electric systems that serve their citizens.

[…]

BHE supports state authority to adopt a SIP to replace the FIP and recognizes the states' ability to ensure their SIP contains adequate provisions to prevent significant interference with attainment or maintenance of the NAAQS in a downwind state. The good neighbor provision, at its core, is a state obligation. It is codified in Section 110 of the Clean Air Act, which is the section granting states the primary decision-making authority for developing SIPs to achieve the NAAQS. EPA's role under section 110 is to review and approve those plans, not to substitute its own policy preferences or decisions for those made by the states. As long as a state's plan is reasonable and complies with the requirements of the Clean Air Act, EPA must approve it. The D.C. Circuit has repeatedly endorsed this cooperative federalism approach codified in Section 110.[110]

The D.C. Circuit and the U.S. Supreme Court have confirmed in litigation over EPA's prior transport rules that EPA has authority under Section 110 to set the basic parameters of what states must do to comply with the good neighbor provision. Those courts have also confirmed that EPA may issue a FIP only if a state's SIP is deemed to be insufficient based on EPA's parameters. In addition, provisions in the Proposed Rule dictate SIP requirements not found in the CAA and essentially eliminate any reasonable opportunity for states to make a future SIP submission. EPA has undermined the central principles underlying both Section 110 and the Administrative Procedure Act by rejecting state good neighbor SIPs that were based on EPA's own guidance at the time those SIPs were written. For some states like Nevada, Utah, and Wyoming, EPA did not even propose to reject those SIPs until after it had already proposed a federal implementation plan with explicit requirements specifically targeted at those states. Even if EPA ultimately cures its failure to observe the proper sequencing of responding to a state SIP before proposing a FIP, its actions run roughshod over the states' primary role in addressing nonattainment under Section 110 and suggest that EPA never gave the state SIP submittals a considered review, preferring instead to impose its own solution, in violation of legal principles. Agency action

420

"must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made."[111]

[42] *Train v. NRDC*, 412 U.S. 60 (1975); *Union Elec. Co. v. EPA*, 427 U.S. 246 (1976); *Fla. Power & Light Co. v. Costle*, 650 F.2d 579 (5th Cir. 1981).
[110] *Train v. NRDC*, 412 U.S. 60 (1975); *Union Elec. Co. v. EPA*, 427 U.S. 246 (1976); *Fla. Power & Light Co. v. Costle*, 650 F.2d 579 (5th Cir. 1981)
[111] *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000).

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

By simultaneously proceeding with a FIP, EPA's actions supplant states' rights and authority under the clean air act as Congress contemplated.

U. S. EPA Cannot Replace Sound State Decisions that Comply with the Clean Air Act with Federal "Judgment" or "Policy". It is well established that States have much latitude in developing and implementing State Implementation Plans (SIPs.) While U.S. EPA may prefer a different approach or alternative, a SIP can only be disapproved when is irrefutably shown to be inconsistent with the Clean Air Act. In the proposed disapproval, U.S. EPA has not shown that the state submittals did not comply with the Clean Air Act. The proposed disapproval of the SIPs is tied closely to EPA's proposed FIP that would have a "one-size fits all" approach that would inappropriately supplant the States' individual authority under the Clean Air Act.

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

EPA has a role in the SIP process. However, that role should be a narrow one that gives deference to the state pursuant to the cooperative federalism system established under the Clean Air Act ("CAA"). EPA's proposal to disapprove Arkansas's interstate transport SIP for the 2015 ozone NAAQS[1] goes beyond the authority given to EPA by the CAA. State's, such as Arkansas, are given discretion under the CAA to address NAAQS through appropriate plans.[2] EPA's proposal oversteps the agency authority under the CAA. The Arkansas SIP should be re-evaluated by EPA solely on the basis of whether Arkansas has met

421

the applicable CAA requirements. EPA should not use the SIP disapproval process to try to create a "national ozone transport policy".

[1] *See* 42 U.S.C. § 7410(a) (requiring States to submit plans to implement, maintain, and enforce NAAQS); *see also Com. of Va. v. EPA*, 108 F.3d 1397, 1407 (D.C. Cir.), decision modified on reh'g, 116 F.3d 499 (D.C. Cir. 1997) (stating that the CAA "expressly gave the states initial responsibility for determining the manner in which air quality standards were to be achieved.").

[2] *See Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976) ("Each State is given wide discretion in formulating its plan."); *Train v. NRDC*, 412 U.S. 60, 79 (1975) ("[EPA] is relegated by the [Clean Air] Act to a secondary role in the process of determining and enforcing the specific, source-by-source emission limitations which are necessary if the national standards it has set are to be met."); *Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 587 (5th Cir. 1981) ("The great flexibility accorded the states under the Clean Air Act is further illustrated by the sharply contrasting, narrow role to be played by EPA.")

**Commenter:** Utah Division of Air Quality

**Commenter ID:** 47

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA's Proposed Disapproval Goes Against the Principles of Cooperative Federalism

Prior to this proposed disapproval, UDAQ was successful in implementing the requirements of the Clean Air Act (CAA) by working closely with our co-regulatory partners at EPA's Region 8 office, as envisioned by the principles of cooperative federalism. This close working relationship directly contributed to significant recent achievements including reducing ambient PM2.5 concentrations and allowing all three of Utah's PM2.5 nonattainment areas to reach attainment by the attainment date for the current NAAQS. As the state regulatory agency, UDAQ understands the nuances of our airsheds and the people's priorities, and can create state implementation plans that are best for Utah. The benefit of cooperative federalism is having the autonomy to do what's best for the state, but do so in partnership with EPA to ensure that the CAA intent and requirements are met.

[…]

The EPA's decision to change the acceptable criteria *after* the development and submission of SIPs, and to do so with no additional guidance, puts states in the difficult position of trying to plan with a moving set of criteria. This whipsaw approach inevitably results in wasted state time and resources. It has become apparent to UDAQ that working closely with our EPA region has no bearing on the outcome of some of EPA's final regulatory actions and is inconsistent with principles of cooperative federalism. As mentioned in Utah's FIP comments, UDAQ respectfully requests EPA to consider ways to align its agency more efficiently so that the policy priorities of the current administration better align with the implementation and timing of CAA requirements at the regional and state level.

**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

Most importantly, the premature development of FIPs upsets the balance of state and federal authority under the CAA conflicting with the principals of cooperative federalism, as was intended under the Act. Congress delegated the authority to develop implementation plans to the states. EPA is only empowered to develop an implementation plan if a state fails to satisfactorily exercise this authority. The MPCA has developed a SIP which was based on guidance available at the time, taking into consideration known NOx reductions. MN was identified as a non-significant contributor (below 0.7 parts per billion) in modeling performed by both EPA and LADCO and thus the MPCA SIP was built upon that information. EPA's disapproval of the MN SIP is based on revised EPA modeling that the MPCA, in their comments, has identified flaws with (including the failure to consider substantial planned NOx emission reductions). Xcel Energy encourages the EPA to allow the SIP process to work its way through the system as provided for under the regulations - allowing for comments on, or reformulation of, the SIP before EPA proposes or implements a FIP for the state of Minnesota. EPA's premature development of FIPs intrudes on authority that Congress specifically delegated to states.

This is particularly the case where, in the highly technical world of modeling, experts may disagree. In reviewing the competing technical evaluations, it is unclear whether EPA has the more correct view. At a minimum, we believe a more detailed technical discussion is warranted to first fully understand the differences, and second, reach some technical consensus on the proper manner in which to evaluate impacts and determine whether the proposed SIP should truly not be approved.

**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Most importantly, the premature development of FIPs upsets the balance of state and federal authority under the CAA conflicting with the principals of cooperative federalism, as was intended under the Act. Congress delegated the authority to develop implementation plans to the states. EPA is only empowered to develop an implementation plan if a state fails to satisfactorily exercise this authority. EPA's disapproval of the Texas SIP is based on revised EPA modeling that TCEQ, in their comments, has identified as flawed. Xcel Energy encourages the EPA to allow the SIP process to work its way through the system as provided for under the regulations - allowing for comments on, or reformulation of, the SIP before EPA proposes or implements a FIP for the state of Texas. EPA's premature development of FIPs intrudes on authority that Congress specifically delegated to states.

This is particularly the case where, in the highly technical world of modeling, experts may disagree. In reviewing the competing technical evaluations, it is unclear whether EPA has the more correct view. At a

minimum, we believe a more detailed technical discussion is warranted to first fully understand the differences, and second, reach some technical consensus on the proper manner in which to evaluate impacts and determine whether the proposed SIP is truly not approvable

*Response*

The EPA responded generally to comments related to cooperative federalism in Section V.A.5 of the preamble. Here, the EPA responds in further detail to comments related to cooperative federalism and the EPA's authority.

The EPA does not agree that it has in any way overstepped its authority in disapproving the SIP submissions in this action. Commenters offer a cavalcade of arguments as to why the EPA cannot or should not be allowed to exercise its independent judgment in evaluating the arguments presented by the states and must approve each state's submission in deference to how states choose to interpret the CAA requirements they must meet. These arguments generally fail to acknowledge the past quarter-century of the EPA's efforts to implement the good neighbor provision through an efficient and equitable allocation of states' responsibility for interstate air pollution and the related case law generally upholding that interstate transport implementation framework. They also generally misstate the roles and responsibilities of the EPA and the states within the structure of the modern CAA as enacted by Congress in 1970 and reflected in fundamental CAA case law. Nonetheless, we will address these arguments in turn.[96]

As an initial matter, the EPA agrees that the CAA establishes a framework for state-federal partnership to implement the NAAQS based on "cooperative federalism." Under the general model of cooperative federalism, the federal government establishes broad standards or goals, states are given the opportunity to determine how they wish to achieve those goals, and if states choose not to or fail to adequately implement programs to achieve those goals, a federal agency is empowered to directly regulate to achieve the necessary ends. Thus, the EPA also agrees that states have the obligation and opportunity in the first instance to develop an implementation plan to achieve the NAAQS under CAA section 110, that state air agencies are fully capable of developing SIP submissions that satisfy the requirements of the CAA, and that the EPA will approve SIP submissions under CAA section 110 that fully satisfy the requirements of the CAA. This sequence of steps is not in dispute.

---

[96] Some topics raised by these comments are addressed in the preamble or in this RTC ("post hoc" justification, alleged changes in EPA practice and policy, CAA section 126 petitions, requests for EPA to delay final action on SIP submission disapprovals and on proposing or finalizing FIPs, EPA's modeling, TCEQ's modeling, comments about EPA's application of the guidance memoranda, and SIP calls). EPA's response to comments about the withdrawal of Alabama's first good neighbor SIP submission for the 2015 ozone NAAQS is also addressed elsewhere in this document. Some commenters argued that EPA should judge a state's SIP submission based only on the information available at some past date; some commenters pointed to the time of the statutory deadline of the state submitting a SIP submission to EPA, while others pointed to the date a date submitted a SIP submission or EPA's statutory deadline to take action on a complete SIP submission. This topic is addressed elsewhere in the preamble and RTC. Other topics raised in these comments are beyond the scope of this rulemaking (i.e., substantive requirements of proposed FIP in separate rulemaking).

The EPA does not, however, agree with the commenters' characterization of the EPA's role in the state-federal relationship as being "secondary" such that the EPA must defer to state choices heedless of the substantive objectives of the Act; such deference would be particularly inappropriate in the context of addressing interstate pollution. The EPA acknowledges that its role could be considered "secondary" in that it occurs "second" in time, after the states submit SIP submissions. The EPA believes that the commenters fundamentally misunderstand or inaccurately describe this action, as well as the "'division of responsibilities' between the states and the federal government" they identify in CAA section 110 citing the *Train-Virginia* line of cases[97] and other cases.[98] Those cases, some of which pre-date the CAA amendments of 1990 resulting in the current good neighbor provision,[99] stand only for the proposition that EPA must approve state plans *if* they meet the applicable CAA requirements. But these cases say nothing about what those applicable requirements are. The EPA is charged under CAA section 110 with reviewing states' plans and approving or disapproving them. Thus, the EPA must ultimately determine whether state plans satisfy the requirements of the Act or not. Abundant case law, including these cases themselves, reflect an understanding that the EPA must evaluate SIP submissions under CAA section 110(k)(2) and (3).[100] If they are deficient, the EPA must so find, and directly implement the relevant requirements through a federal implementation plan under CAA section 110(c).[101]

In CAA section 110(a)(1), Congress imposed the duty upon all states to have a SIP that provides for "the implementation, maintenance, and enforcement" of the NAAQS. In section 110(a)(2), Congress clearly

---

[97] *See Virginia v. EPA*, 108 F.3d 1397, 1407 (D.C. Cir. 1997) (quoting *Train v. Natural Resources Defense Council, Inc.*, 421 U.S. at 79). The "Train-Virginia line of cases" are named for the U.S. Supreme Court case *Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60 (1975) (Train) and to the D.C. Circuit case *Virginia v. EPA*, 108 F.3d 1397 (D.C. Cir. 1997). The D.C. Circuit has described these cases as defining a "federalism bar" that constrains the EPA's authority with respect to evaluation of state SIP submissions under CAA section 110. *See, e.g., Michigan v. EPA*, 213 F.3d 663, 687 (D.C. Cir. 2000).

[98] Commenters also cited the following to characterize the nature of the state-federal partnership in the CAA: *Union Elec. Co. v. EPA*, 427 U.S. 246 (1976), *Am. Elec. Power Co. v. Connecticut*, 565 U.S. 410 (2011), *Fla. Power & Light v. Costle*, 650 F.2d 579 (5th Cir. 1981), *North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir. 2008), *Luminant*, 675 F.3d 917 (5th Cir. 2012), *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777 (3d Cir. 1987), *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028 (7th Cir. 1984), *Luminant Co. LLC v. EPA*, 714 F.3d 841 (5th. Cir. 2013), *North Dakota v. EPA*, 730 F.3d 750 (8th. Cir. 2013), and *Texas v. USEPA*, 829 F.3d 405 (5th. Cir. 2016).

[99] The 1970 version of the Act required SIPs to include "adequate provisions for intergovernmental cooperation" concerning interstate air pollution. CAA section 110(a)(2)(E), 84 Stat. 1681, 42 U.S.C. section 1857c–5(a)(2)(E). In 1977, Congress amended the Good Neighbor Provision to direct States to submit SIP submissions that included provisions "adequate" to "prohibi[t] any stationary source within the State from emitting any air pollutant in amounts which will ... prevent attainment or maintenance [of air quality standards] by any other State." CAA section 108(a)(4), 91 Stat. 693, 42 U.S.C. § 7410(a)(2)(E) (1976 ed., Supp. II). Congress again amended the Good Neighbor Provision in 1990. The Act, in its current form, requires SIPs to "contain adequate provisions ... prohibiting ... any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will ... contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any ... [NAAQS]." CAA section 110(a)(2)(D)(i)(I), 42 U.S.C. § 7410(a)(2)(D)(i) (2006 ed.).

[100] *See, e.g., Virginia*, 108 F.3d at 1406. *See also, e.g., Westar Energy v. EPA*, 608 Fed. App'x 1, 3 (D.C. Cir. 2015) ("EPA acted *well within the bounds* of its delegated authority when it disapproved of Kansas's proposed [good neighbor] SIP.") (emphasis added); *Oklahoma v. EPA*, 723 F.3d 1201, 1209 (10th Cir. 2013) (upholding EPA's disapproval of "best available retrofit technology" (BART) SIP, noting BART "does not differ from other parts of the CAA—states have the ability to create SIPs, but they are subject to EPA review").

[101] *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 495 (2014).

425

set forth the basic SIP requirements that "[e]ach such plan *shall*" satisfy.[102] By using the mandatory "shall" in section 110(a)(2), Congress established a framework of mandatory requirements *within which* states may exercise their discretion to design SIPs to provide for attainment and maintenance of the NAAQS and to meet other CAA requirements, including the good neighbor provision. In other sections of the Act, Congress also imposed additional, more specific SIP requirements (e.g., the requirements in CAA section 182 associated with ozone nonattainment areas depending on their level of classification).

The U.S. Supreme Court's review of the original CSAPR rulemaking in *EME Homer City* directly affirms the critical role the EPA plays in interpreting and, if necessary, implementing the good neighbor provision and directly contradicts commenters' assertions that the EPA has only a limited role to play in reviewing states' approaches to addressing good neighbor requirements. In the original 2012 decision of the D.C. Circuit in *EME Homer City Generation, L.P. v. EPA* (*EME Homer City I*), the D.C. Circuit vacated the Cross-State Air Pollution Rule for two reasons, one being related to statutory interpretation of CAA section 110(a)(2)(D)(i), the other being "a second, entirely independent problem" based on EPA's purported overstep of the federalism bar identified in the *Train-Virginia* line of cases.[103] After recounting a list of decisions that recognize the cooperative federalism structure of the CAA, the D.C. Circuit concluded that even though states have the "primary responsibility" for implementing the NAAQS, in this case the states had no responsibility to address interstate transport until EPA first quantified the obligations of the states.[104] The dissent, however, described the majority's application of the *Train-Virginia* cases as "a redesign of Congress's vision of cooperative federalism in implementing the CAA . . . ."[105] In reversing the *EME Homer City I* case in 2014, the U.S. Supreme Court held that the touchstone for identifying the division of responsibility between the EPA and the states is the text of CAA section 110(a)(2) itself.[106] The Court noted that pursuant to the CAA, after a NAAQS has been issued, a state must propose a SIP submission that meets the requirements of the CAA, including the good neighbor provision. [107] The Court went on to say that "nothing in the statute places EPA under an obligation to provide specific metrics to States before they undertake to fulfill their good neighbor obligations."[108] More relevant here, the Court upheld certain of EPA's interpretations of CAA section 110(a)(2)(D)(i)(I).[109]

After the U.S. Supreme Court's ruling in *EME Homer City*, the EPA's role under CAA section 110's cooperative federalism framework—as the agency charged with interpreting, applying, and, if necessary, ultimately achieving at the national level the fundamental requirements of CAA section 110(a)(2), and applying those reasonably interpreted requirements in evaluating state SIP submissions—cannot

---

[102] CAA section 110(a)(2) (emphasis added); *see EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 509 (2014) (holding that section 110(a)(2) "speaks without reservation" regarding what "components" a SIP "'shall' include"); H. Rept. 101–490, at 217 (calling the provisions of section 110(a)(2)(A) through (M) "the basic requirements of SIPs").

[103] *EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7, 28 (D.C. Cir. 2012) (*EME Homer City I*), rev'd, 572 U.S. 489 (2014).

[104] Id at

[105] *Id.* at 38 (Rogers, J., dissenting).

[106] *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489 (2014) at 507-510.

[107] *Id.* at 509 (citing, *inter alia*, CAA section 110(a)(2)).

[108] *Id.* at 509.

[109] *Id.* at 518-524.

reasonably be in doubt.[110] Several commenters cite the dissent in *EME Homer City I* to argue that states are primarily responsible for quantifying and preventing their own significant contribution. EPA does not dispute that the CAA requires a state to prepare a SIP submission in the first instance before the EPA reviews it, but the EPA does dispute the implication that the EPA must defer in all instances to a state's interpretation of the requirements of the CAA, including a state's determination that its own sources of emissions and other emissions activities do not significantly contribute to nonattainment or interfere with maintenance in other states. The U.S. Supreme Court in *EME Homer City* reiterated that EPA's interpretation of ambiguous statutory language is afforded deference and determined that "[t]he Good Neighbor Provision delegates authority to EPA at least as certainly as the CAA provisions involved in *Chevron*[, *U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)]."[111] EPA is therefore granted deference in its interpretation of the requirements of CAA section 110(a)(2)(D)(i)(I) and is not required to accept at face value a state's interpretation in its own SIP submission that the state has fully satisfied the requirements of the CAA. The EPA notes also that courts have been deferential to the EPA's technical expertise in evaluating scientific data, which is particularly relevant in the context of the complex analyses undertaken to implement the good neighbor provision. *Wisconsin v. EPA*, 938 F.3d 303, 328 (D.C. Cir. 2019) (citing *North Carolina v. EPA*, 531 F.3d 896, 925 (D.C. Cir. 2008) (affording "substantial deference to EPA's technical expertise"); *Westar Energy, Inc. v. EPA*, 608 F. App'x 1 (D.C. Cir. 2015) (agency action "regarding technical matters within its area of expertise warrants particular deference") (citing *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983); *W. Virginia v. EPA*, 361 F.3d 861, 867-68 (D.C. Cir. 2004)); *see also, e.g., Catawba County v. EPA*, 571 F.3d 20, 41 (D.C. Cir. 2009) (we give an "extreme degree of deference to [EPA] when it is evaluating scientific data within its technical expertise") citing *City of Waukesha v. EPA*, 320 F.3d 228, 247 (D.C. Cir. 2003) (internal quotation marks omitted).

Notwithstanding the directly applicable holdings in *EME Homer City* concerning EPA's authority in implementing the good neighbor provision, commenters cite several other cases for arguments that EPA cannot substantively question the conclusions a state reaches about its own good neighbor obligations in a SIP submission: *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461 (2004), *North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir.), *modified on reh'g in part*, 550 F.3d 1176 (D.C. Cir. 2008), *Michigan v. EPA*, 213 F.3d 663 (D.C. Cir. 2000), *Virginia v. EPA*, 108 F.3d 1397 (D.C. Cir. 1997) *modified on reh'g*, 116 F.3d 499 (D.C. Cir. 1997), *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777 (3d Cir. 1987), *Fla. Power & Light v. Costle*, 650 F.2d 579 (5th Cir. 1981), *Luminant Generation Company v. EPA*, 675 F.3d 917 (5th Cir. 2012), *Luminant Co. LLC v. EPA*, 714 F.3d 841 (5th. Cir. 2013), *Texas v. EPA*, 829 F.3d 405 (5th. Cir. 2016), *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028 (7th Cir. 1984), *Oklahoma v. EPA*, 723 F.3d 1201 (10th Cir. 2013), *North Dakota v. EPA*, 730 F.3d 750, 761 (8th Cir. 2013), and *Westar Energy, Inc. v. EPA*, 608 F. App'x 1 (D.C. Cir. 2015).

None of these cases actually support this proposition.

First, *Alaska Dep't of Envt'l Conservation* does not stand for the premise that the EPA's role in the state-federal partnership is limited to rote application of the exact language of the CAA. To the contrary, the Supreme Court in that case held that the EPA's "oversight role" in CAA sections 113(a)(5) and 167

---

[110] *See id.* at 495 (citing *Chevron*, 467 U.S. 837).
[111] *Id.* at 513.

included the authority to inquire whether a state's best available control technology (BACT) determination in a prevention of significant deterioration (PSD) permit is reasonable. Under those provisions, the Court held, "[O]nly when a state agency's BACT determination is 'not based on a reasoned analysis' may EPA step in to ensure that the statutory requirements are honored."[112] The Court went on to note, however, that the EPA's discretion in issuing a "stop order" under these provisions was more constrained than issuing initial approvals or disapprovals: "in contrast, a required approval may be withheld if EPA would come to a different determination on the merits."[113] The court further elaborated that "EPA's limited but vital role in enforcing BACT is consistent with a scheme that 'places primary responsibilities and authority with the States, backed by the Federal Government."[114] This case only underscores the role the EPA must play in assessing whether a SIP submission satisfies the requirements of the CAA. The Court noted, "We fail to see why Congress, having expressly endorsed an expansive surveillance role for the EPA in two independent CAA provisions, would then implicitly preclude the Agency from verifying substantive compliance with the BACT provisions and, instead, limit EPA's superintendence to the insubstantial question whether the state permitting authority had uttered the key words 'BACT.'"[115]

Commenters quote *North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir. 2008) *modified on reh'g in part*, 550 F.3d. 1176 (DC Cir. 2008), the D.C. Circuit's review of the Clean Air Interstate Rule, for the sentence that a state is "the appropriate primary administrative unit to address interstate transport of emissions," but that quote was used in the context of the court determining that EPA may select an entire state, as opposed to part of a state, as the "unit of measurement" in either a SIP Call or a FIP rulemaking.[116] *North Carolina* cannot fairly be described as a case holding that EPA does not have authority to interpret the requirements of CAA section 110(a)(2)(D)(i)(I) when reviewing a good neighbor SIP submission.

Commenters cite *Michigan v. EPA*, 213 F.3d 663 (D.C. Cir. 2000) to argue that states get the first opportunity to identify which sources should be controlled and to what degree under the CAA. One commenter argues that the *Michigan* holding means that EPA can only identify the level of emissions reductions to be achieved by states under CAA section 110(a)(2)(D)(i)(I) and states themselves choose the controls. The *Michigan* court found that the $NO_x$ budgets established in the $NO_x$ SIP call did not impermissibly trigger the 'federalism bar' outlined in the *Train-Virginia* line of cases in part because the action did not dictate which individual sources would be subject to controls.[117] In any event though, the action at issue in *Michigan* was a SIP call, not a SIP disapproval. In this SIP disapproval, EPA is not requiring any controls on any states. The *Michigan* case does not prohibit EPA from interpreting the requirements of CAA section 110(a)(2)(D)(i)(I) in reviewing a SIP submission. *Michigan* noted that under the state-federal partnership in the CAA, even though "states have considerable latitude in fashioning SIPs, the CAA 'nonetheless subject[s] the States to strict minimum compliance requirements' and gives EPA the authority to determine a state's compliance with the requirements."[118]

---

[112] *Alaska Dep't of Envt'l Conservation*, 540 U.S. 461, 490 (2004).

[113] *Id.* at 491.

[114] *Id.* at 491 (citing S. Rep. No. 95-217, p. 29).

[115] *Id.* at 490.

[116] *North Carolina v. EPA*, 531 F.3d 896, 923 (D.C. Cir. 2008).

[117] *Michigan*, 213 F.3d 663, 687 (D.C. Cir. 2000).

[118] *Id.* (citing *Union Elec. Co. v. EPA*, 427 US 246, 256-257 (1976)).

428

Commenters cite *Virginia v. EPA*, 108 F.3d 1397 (D.C. Cir. 1997), *modified on reh'g*, 116 F.3d 499 (D.C. Cir. 1997) for the arguments that states have a primary role and responsibility in implementing NAAQS, the EPA cannot substitute states' judgement with its own, and the EPA cannot require specific controls in a SIP or condition approval of a SIP on specific controls.  In *Virginia,* the Court remanded an EPA SIP call that sought to require states in the Northeast Ozone Transport Region to adopt restrictions on the sale of new cars to either match California's vehicle emission program or adopt a "Substitute Program" in their SIPs.[119] The *Virginia* court determined the Substitute Program was not a meaningful alternative and so EPA had impermissibly sought to specify particular controls in SIPs.[120] However, the D.C. Circuit clarified in *Appalachian Power Co. v. EPA*, 249 F.3d 1032 (D.C. Cir. 2001), "We did not suggest [in *Virginia*] that under § 110 states may develop their plans free of extrinsic legal constraints. Indeed, SIP development . . . commonly involves decision-making subject to various legal constraints."[121] Therefore, *Virginia* cannot be viewed as supporting an argument that EPA is not permitted to assess a state's judgements in a SIP submission for adherence with the requirements of CAA section 110(a)(2)(D)(i)(I). Furthermore, in these SIP disapprovals, EPA is not requiring any controls in any SIP.

One comment, citing *Virginia*, argued that the EPA cannot disapprove Maryland's choices of emissions limitations and replace them with EPA's preferred emissions limitations in a FIP. However, Maryland concluded in its SIP submission that the state has no obligations to reduce any emissions beyond existing levels under the good neighbor provision for the 2015 ozone NAAQS and made no choice of any emissions limitations to include in its SIP. [87 FR 9463, 9469 (February 22, 2022); *see also* Maryland's October 16, 2019, SIP submittal included in docket ID No. EPA–R03–OAR–2021– 0872. (No other state included any enforceable emissions controls in their SIP submissions either.)

Commenters cite *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777 (3d Cir. 1987) for the argument that the EPA is not allowed to make states adopt non-statutory, after the fact policy preferences through the SIP review process. In that case, the court reviewed EPA's action to rescind certain regulations addressing odor, for which there is no NAAQS, in Pennsylvania's SIP, approved by the EPA 13 years previously.[122] The court reached a decision on procedural challenges brought against EPA's action; the court determined that the EPA's action constituted a SIP revision, under an earlier version of the CAA, which was subject to certain procedural requirements, which the EPA failed to follow.[123] However, in this action the EPA is not modifying any prior approval of a SIP addressing CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS by EPA. Instead, the EPA is disapproving SIP submissions that fail to satisfy the requirements of CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. Here, the EPA is not seeking to modify any previously approved SIP to account for updated understanding of the breadth of the EPA's legal authority.

Commenters cite *Fla. Power & Light v. Costle*, 650 F.2d 579 (5th Cir. 1981) to argue states have "extensive discretion" in the contents of their SIPs. In that case, under an earlier version of the CAA, Florida submitted a PSD SIP revision submission to accommodate Florida Power & Light's request for an

---

[119] *Virginia v. EPA*, 108 F.3d 1397 (D.C. Cir. 1997).
[120] *Id at* 1415.
[121] *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1047 (D.C. Cir. 2001)
[122] *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777 (3d Cir. 1987).
[123] *Id.* at 784, 788.

exemption from the approved SIP related to sulfur dioxide emissions.[124] A subsequent "attachment" to the SIP revision submission to the EPA contained a 2-year limit on the exemption, which the EPA approved. Florida later requested to withdraw the 2-year limit, which EPA disapproved. Citing *Train*, the 5th Circuit rejected EPA's inclusion of the 2-year limit in the SIP revision approval on the basis that a 2-year limit was not a substantive requirement of the CAA, and the court rejected EPA's interpretation of Florida law that a 2-year limit would be necessary for the SIP revision to be enforceable under state law. The court's description of the EPA's role under the CAA in that the case did not stand for the premise that the EPA is not permitted to interpret the requirements of CAA; rather that the case concluded that EPA is confined to interpreting the requirements of the CAA. Here, the EPA is not approving, or disapproving, any aspect of a SIP revision that a state no longer wishes to be part of its SIP; the EPA is disapproving these SIP submissions for failing to demonstrate they satisfy the requirements of CAA section 110(a)(2)(D)(i)(I).

Commenters cite *Luminant Generation Company, L.L.C. et al. v. EPA*, 675 F.3d 917 (5th. Cir. 2012), for the premise that the EPA cannot disapprove SIP submissions on the basis of non-statutory policy preferences. Another version of this argument is that the EPA is not allowed to make states adopt non-statutory, after the fact policy preferences through the SIP review process. In *Luminant*, the 5th Circuit remanded the EPA's disapproval of a Texas SIP submission under CAA section 110(*l*) related to New Source Review (NSR) to consider whether the SIP submission comported with the requirements of CAA section 110(a)(2)(C) and 110(*l*); the court found it impermissible for EPA to inquire whether the SIP submission at issue comported with Texas law or satisfied "similar source" and "replicability" requirements, which the court found did not exist in the text of the CAA.

However, the EPA does not view the basis of the EPA's conclusions in the rule at issue in *Luminant* as analogous to this disapproval action. Alabama Power Company did not identify specifically what "non-statutory, policy preferences" they allege the EPA utilized in proposing to disapprove Alabama's earlier SIP submission. Association of Electric Companies of Texas, et. al. cite the EPA's methodology and quantification of Texas's "significant contribution" and "interference with maintenance" as well as EPA's rejection of Texas's analysis as non-statutory factors that cannot be used to assess Texas's SIP submission. A commenter also identifies the EPA modeling as a non-statutory requirement that cannot be used to disapprove Texas's SIP submission. They further argue that EPA has no authority to "second-guess" TCEQ's modeling, particularly because the EPA has not promulgated regulations on modeling. Commenters further argue that the EPA is coercing the states to develop SIP submissions 'comparable' to the EPA's approach, which they say is not a statutory requirement.

The EPA is not disapproving any SIP submission because it did not use the EPA's modeling or methodology for assessing good neighbor obligations, nor is the EPA promulgating a SIP call seeking new SIP submissions. The EPA is disapproving the SIP submissions for failing to support a conclusion that the states have no good neighbor obligations under the 2015 ozone NAAQS. The EPA used its own modeling to inform its assessment of the SIP submissions with the requirements of CAA section 110(a)(2)(D)(i)(I).[125] Additionally, the EPA is authorized in its oversight role under the CAA to examine the analysis put forward by states, so the EPA is well within its authority to "second-guess" TCEQ's

---

[124] *See* 42 U.S.C. section 7410(a)(2) (Supp. 1979).
[125] *See, e.g.*, 87 FR 9798, 9800-9801.

modeling.[126] The EPA is not required by the CAA to promulgate regulations governing the good neighbor analysis. Further, the EPA is not required to provide guidelines for CAA section 110(a)(2)(D)(i)(I).[127] However, each step in the EPA's analysis in this action is guided by the EPA's interpretation and application of each of the key terms of the CAA in this provision, reflecting over a quarter-century of administrative and judicial precedent. The good neighbor provision remains unchanged from the statutory text the EPA first applied in the $NO_x$ SIP Call, and both the D.C. Circuit and the Supreme Court have had occasion to review the EPA's interpretation and application of those terms across several major rulemakings. In each of these rulemakings, the EPA has applied a consistent analytical approach to addressing the problem of interstate pollution, and that approach faithfully adheres to the terms of the statute as Congress enacted it. Each step of this process is tied to the statute: the identification of "nonattainment" and "maintenance" receptors (Step 1); the identification of "contribution" to those receptors by analyzing emissions from "any source or other type of emissions activity" within each state (Step 2); the analysis of what "amount" of that contribution is "significant" (or "interferes" with maintenance) (Step 3); and finally, the evaluation of whether the SIP "contains adequate provisions" "prohibiting" those emissions (Step 4).

*Luminant Co. LLC v. EPA*, 714 F.3d 841 (5th. Cir. 2013) is cited to support an argument that Congress tasked the EPA with setting NAAQS but gave states authority to implement it. Although the court in that case did say that "[T]he Act confines the EPA to the ministerial function of reviewing SIPs for consistency with the Act's requirements[,]" the court nevertheless upheld EPA's judgement of Texas's SIP submission that affirmative defenses for unplanned startup, shutdown, and maintenance/malfunction (SSM) activity conformed with the requirements of the CAA, and the EPA was afforded deference in concluding that affirmative defenses for planned SSM activity did not conform with the requirements of the CAA.[128] That court, citing *Fla. Power & Light Co.* and *Bethlehem Steel*, found the EPA was not arbitrary and capricious in partially approving and partially disapproving Texas's SIP submission.[129] The court also found that CAA section 110(*l*) did not require EPA, in disapproving a SIP submission, to prove a violation of the NAAQS would occur if the Agency approved part of an iSIP submission; rather, the EPA needs to provide "reasoning supporting its conclusion that the disapproved provision would interfere with an applicable requirements of the Act."[130] While the court used the term "ministerial" to describe EPA's role, this case actually reinforces that EPA's role includes interpreting the requirements of the CAA to determine whether a SIP submission comports with those requirements.

Commenters cite *Texas v. EPA*, 829 F.3d 405 (5th. Cir. 2016) to argue that the structure of the CAA itself indicates Congress wanted states to drive the regulatory process, not the EPA. In *Texas*, the 5th Circuit granted a preliminary stay of the EPA's disapproval of Oklahoma's and Texas' regional haze SIP submissions and promulgation of FIPs and did not reach the merits of either the EPA's assessment of the SIP submissions' compliance with the requirements of the CAA or the FIPs.[131] The decision cannot

---

[126] For specific details on EPA's assessment of TCEQ modeling, please refer to the Evaluation of TCEQ Modeling TSD.

[127] *See EME Homer City* at 510.

[128] *Luminant Co. LLC v. EPA*, 714 F.3d 841, 846 (5th. Cir. 2013)

[129] *Id.* at 858-859.

[130] *Id.* at 858.

[131] *Texas v. EPA*, 829 F.3d 405 (5th. Cir. 2016)

reasonably be interpreted to stand for the proposition that the EPA is not authorized to interpret the requirements of CAA section 110(a)(2)(D)(i)(I) in reviewing good neighbor SIP submissions.

Commenters cite *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028 (7th Cir. 1984) for the argument that the EPA is not allowed to make states adopt non-statutory, after the fact policy preferences through the SIP review process. In that case, examining an earlier version of the CAA, the court found that EPA did not follow appropriate procedure in partially approving Indiana's SIP revision but disapproving an exemption provision, because the effect of doing that increased the stringency of the SIP for certain emissions above what Indiana had intended.[132] In the court's view, the EPA could have disapproved the SIP submission and followed the required procedure to promulgate a replacement plan.[133] The case did not conclude the EPA is barred from interpreting the requirements of the CAA in determining whether a SIP submission comports with the requirements of the CAA. Further, in this action the EPA's partial approval and partial disapproval of the SIP submissions from Minnesota and Wisconsin has no effect on the stringency of the states' SIPs, since neither SIP submission included any emissions controls to begin with.

Commenters cited *North Dakota v. EPA*, 730 F.3d 750 (8th. Cir. 2013) for the premise that states have primary responsibility to address interstate transport and the EPA is limited to only reviewing a SIP submission for compliance with the CAA. In *North Dakota*, the court dismissed all challenges but one to an action that simultaneously disapproved two SIP submissions and promulgated FIPs for North Dakota under CAA sections 110 and 169A (the court remanded EPA's best available retrofit technology (BART) determination in a FIP).[134] On one of the cited pages in *North Dakota*, 730 F.3d at 757, the court cited cases including *EME Homer City I*, a case later overturned by the Supreme Court, in its background section characterizing cooperative federalism. On the other page of *North Dakota* cited by commenters, *id.* at 761, the court, citing *Oklahoma v. EPA*, 723 F.3d 1201, 1213 n. 7 (10th. Cir. 2013), said, "Although the CAA grants states the primary role of determining the appropriate pollution controls within their borders, the EPA is left with more than the ministerial task of routinely approving SIP submissions."[135] The *North Dakota* court similarly cited the reasoning in *Alaska Department of Environmental Conservation v. EPA*, 540 U.S. 461 (2004) related to the EPA's authority under CAA section 167, finding it "persuasive" in the context of CAA section 169A.[136] This case does not support an argument that the EPA is not permitted to interpret the requirements of the CAA in reviewing a SIP submission for compliance with them. On the contrary, the case reinforces that EPA may (indeed, must) do so.

Commenters cite *Oklahoma v. EPA*, 723 F.3d 1201 (10th. Cir. 2013) to argue that although SIPs are subject to federal oversight, the EPA's ability to reject a SIP submission is more limited compared to its authority to promulgate a FIP. The implication appears to be that the EPA somehow is so limited in its ability to review a SIP submission that the Agency cannot actually disapprove a SIP submission. But in that case, the court did not suggest that the EPA is barred from interpreting the requirements of the

---

[132] *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028 (7th Cir. 1984).
[133] *Id*. at 1035.
[134] *North Dakota v. EPA*, 730 F.3d 750 (8th Cir. 2013).
[135] *Id.* at 760-761.
[136] *Id.* at 761.

CAA in reviewing SIP submissions.[137] On the contrary, in *Oklahoma* the court found that EPA has the authority to interpret the requirements of the CAA and review SIP submissions accordingly. The court found that EPA lawfully disapproved Oklahoma's SIP submission related to best available retrofit technology (BART) at units at two generating stations for a sulfur dioxide NAAQS on the basis that EPA concluded Oklahoma's cost estimate methodology was flawed, and that the Agency was not arbitrary and capricious in simultaneously promulgating a FIP for Oklahoma in the same case as the SIP disapproval.[138] Although the commenters cite part of footnote 7 from that case: "EPA has less discretion when it takes actions to reject a SIP than it does when it promulgates a FIP" the full footnote went on to say "However, we believe that the EPA had reason to make the adjustments described in Section IV, Part B, even under the higher standard we would apply when evaluating its actions in rejecting a SIP. OG & E has yet to provide any justification for providing estimates that departed from the [BART] guidelines."[139]

A few commenters, citing *Westar Energy, Inc. v. EPA*, 608 F. App'x 1 (D.C. Cir. 2015), argue that EPA is limited to identifying merely whether a SIP submission "explain[s] whether or not emissions from the state' significantly contribute to nonattainment in other states." That characterization of *Westar* is, however, a misleading representation. In that case, the D.C. Circuit upheld the EPA's disapproval of Kansas's good neighbor SIP submission for the 2006 24-hour $PM_{2.5}$ NAAQS.[140]  The court, noting that Agency action "regarding technical matters within its area of expertise warrants particular deference[,] *[s]ee Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983); *W. Virginia v. EPA*, 361 F.3d 861, 867-68 (D.C. Cir. 2004) [(citations cleaned up)]," held that EPA has authority to determine whether SIP submissions comply with the requirements of the CAA and acted within the bounds of its delegated authority when it disapproved Kansas's good neighbor SIP submission.[141] The court noted that a September 2009 guidance document indicated that states "'must explain whether or not emissions from the state' significantly contribute to nonattainment in other states and if so, 'address the impact'" and "that a state's conclusion 'must be supported by an adequate technical analysis.'"[142] The court also rejected arguments from petitioners that EPA was required to provide specific metrics to states before they undertook fulfilling their good neighbor obligations, citing the Supreme Court's decision in *EME Homer City*.[143] In its SIP submission, Kansas concluded it had no good neighbor obligations for the relevant NAAQS, but did not provide an analysis of the downwind impacts of its emissions. Kansas simply pointed out that four utility companies would reduce $NO_x$ and $SO_x$ emissions due to agreements in Kansas's Regional Haze SIP submission, but Kansas did not consider the downwind impacts of these or any other sources within the state. The EPA determined that Kansas's SIP submission lacked technical justification evaluating nonattainment and maintenance problems in downwind states.[144] In upholding

---

[137] *Oklahoma v. EPA*, 723 F.3d 1201, 1209 (10th Cir. 2013) ("[S]tates have the ability to create SIPs, but they are subject to EPA review.").

[138] Id. at 1207, 1224,

[139] *Id.* at 1213, n. 7.

[140] *Westar Energy, Inc. v. EPA*, 608 F. App'x 1 at *3.

[141] *Id.* at 3.

[142] *Id.*, citing William T. Hartnett, Director, Air Quality Policy Division, *Guidance on SIP Elements Required Under Sections 110(a)(1) and (2) for the 2006 24–hour Fine Particle (PM2.5) National Ambient Air Quality Standards (NAAQS)* at 3 (Sept. 25, 2009).

[143] *Id.* at 4 citing *EME Homer City* at 509-510.

[144] *Id.* at 3.

the EPA, the court noted, "EPA acted *well within the bounds* of its delegated authority when it disapproved of Kansas's proposed [good neighbor] SIP." *Id.* at 3 (emphasis added).

Several commenters, pointing to the absence of CFR regulations for the good neighbor provisions for the 2015 ozone NAAQS, a guidance document from August 2006 for the 1997 ozone NAAQS and the 1997 $PM_{2.5}$ NAAQS,[145] the 2018 memoranda (discussed elsewhere in this action), and the text of the proposals themselves argue that the EPA has repeatedly recognized that CAA section 110(a)(2)(D)(i)(I) does not stipulate any one specific approach to addressing interstate transport but that EPA is now assessing SIP submissions against the Agency's policy preferences as opposed to the actual requirements of the CAA. One commenter argues that national consistency is not required by the CAA and so the EPA cannot consider it (or the regional nature of the ozone problem) in reviewing SIP submissions for compliance with CAA section 110(a)(2)(D)(i)(I) (conversely, another commenter says that inconsistent treatment across states would be arbitrary).

The EPA disagrees that the Agency in this action is shifting its approach to assessing SIP submissions under the good neighbor provision. The EPA has consistently analyzed good neighbor SIP submissions for compliance with the statute. As reiterated multiple times, the EPA is not required by the CAA to promulgate either regulations or guidance for good neighbor obligations in CAA section 110(a)(2)(D)(i)(I).[146] Specific comments related to the 2018 memoranda are addressed elsewhere.

The comment letter from the Association of Electric Companies of Texas, et. al. argues that the EPA's August 2006 Guidance required a "comparable" Step 3 analysis to the EPA's, but that the text of the CAA does not require this. Luminant also cites the August 2006 Guidance to argue that EPA has been inconsistent in how it has approached the good neighbor provision, pointing out that the 2006 Guidance suggested states should use a "comparable" assessment for significant contribution as the EPA. The EPA first notes the August 2006 guidance was by its own terms for the 1997 8-hour ozone NAAQS and the 1997 $PM_{2.5}$ NAAQS and in particular was written for states that were not subject to CAIR FIPs for either NAAQS. As such, the document is not applicable to the 2015 ozone NAAQS. It was also issued before the D.C. Circuit issued its opinion and remanded CAIR in *North Carolina v. EPA,* 531 F.3d 896 (DC Cir. 2008), *modified on reh'g,* 550 F.3d. 1176 (DC Cir. 2008), thus many suggestions in the guidance are likely now obsolete. To the extent commenters are suggesting the August 2006 guidance was unlawful, EPA notes that the text of the August 2006 guidance document itself said that "this document is merely guidance that States or EPA may elect to follow or deviate from …, as appropriate. The ultimate determination of whether a given SIP submission by a State meets the statutory requirements of section 110(a)(2)(D)(i)(I) will be accomplished through case-by-case notice and comment rulemaking in which the facts and circumstances of each State will be evaluated by EPA."[147] The general propositions for which

---

[145] "Guidance for State Implementation Plan (SIP) Submissions to Meet Current Outstanding Obligations Under Section 110(a)(2)(D)(i) for the 8-Hour Ozone and $PM_{2.5}$ National Ambient Air Quality Standards" *available at* https://www3.epa.gov/ttn/naaqs/aqmguide/collection/cp2/20060815_harnett_final_section_110(a)(2)(D)(i)_guidance.pdf.

[146] *See EME Homer City* at 510.

[147] "Guidance for State Implementation Plan (SIP) Submissions to Meet Current Outstanding Obligations Under Section 110(a)(2)(D)(i) for the 8-Hour Ozone and $PM_{2.5}$ National Ambient Air Quality Standards" at 2, *available at* https://www3.epa.gov/ttn/naaqs/aqmguide/collection/cp2/20060815_harnett_final_section_110(a)(2)(D)(i)_guidance.pdf.

commenters cited this guidance, that the EPA respects that states may devise their own approvable approaches to addressing good neighbor obligations, is still valid. But for the reasons explained in detail elsewhere in this record, no state that the EPA is acting on in this submission did develop an approvable approach.

The EPA also disagrees with the contention that the EPA significantly changed perspective regarding the purpose of infrastructure SIP submissions beginning with the 2008 ozone NAAQS. The EPA has always expected the portion of iSIPs that address CAA section 110(a)(2)(D)(i)(I) to provide adequate justification to support the conclusions therein. The August 2006 guidance, for the 1997 ozone NAAQS and 1997 PM2.5 NAAQS, indicated that states should submit a "technical demonstration" to support a conclusion that the state does not significantly contribute to nonattainment or interfere with maintenance in other states.[148] The September 2009 guidance, for the 2006 24-hour PM NAAQS, indicated that a "state's conclusion must be supported by an adequate technical analysis."[149] The September 2013 infrastructure SIPs guidance for the 2008 ozone NAAQS, the 2010 nitrogen dioxide NAAQS, the 2010 sulfur dioxide NAAQS, and the 2012 fine particulate matter NAAQS did not include guidance on the good neighbor provision.[150]

In evaluating the SIP submissions here, the EPA used its now well-established 4-step interstate transport framework as a guide, while recognizing that states are not necessarily bound to follow that exact framework. This is not merely the application of an arbitrary "policy preference" but the application of a judicially-tested and upheld framework that provides continuity across multiple NAAQS and provides certainty and predictability with regard to how the EPA will evaluate SIP submissions. While not codified in the CFR, the EPA has a consistent policy and practice of applying this framework both in its evaluation of SIP submissions and in the promulgation of multiple rounds of FIPs to address prior ozone transport obligations. It is altogether reasonable for the Agency to continue to use that general framework as a guide to evaluate these SIP submissions to ensure consistency both across states and with prior good neighbor actions, while continuing to recognize states' discretion to offer alternative approaches that may be satisfactory toward achieving the Act's requirements.

Thus, as explained in the proposals, in this action the EPA is not requiring states to adopt any particular emission limitation or to impose a specific control measure in a SIP submission. Rather, the EPA is determining that the SIP submissions that are the subject of this action do not support a finding that the statutory requirements of CAA section 110(a)(2)(D)(i)(I) have been met. In so doing, the EPA is acting pursuant to its supervisory role under the CAA's cooperative federalism framework, to ensure that SIPs satisfy those broad requirements that section 110(a)(2) mandates SIPs "shall" satisfy.

The EPA also disagrees with the argument that applying the consistent set of policy judgments made in this action across all states for purposes of evaluating interstate transport obligations goes against the

---

[148] *Id.* at 5.

[149] September 2009 Guidance at 3.

[150] "Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Section 110(a)(1) and 110(a)(2)" at 30, available at https://www3.epa.gov/airquality/urbanair/sipstatus/docs/Guidance_on_Infrastructure_SIP_Elements_Multipollut ant_FINAL_Sept_2013.pdf. (EPA noted this guidance may be also informative for "infrastructure SIPs for new or reviewed NAAQS promulgated in the future.")

framework of cooperative federalism or is otherwise not permitted by the CAA. These policy judgments in interpreting the CAA reflect consistency with relevant case law and past agency practice as reflected in the CSAPR and related rulemakings. Nationwide consistency in approach is particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving many smaller contributors. Effective policy solutions to the problem of interstate ozone transport dating back to the NO$_X$ SIP Call (63 FR 57356 (October 27, 1998)) have necessitated the application of a uniform framework of policy judgments to ensure an "efficient and equitable" approach.  *See EPA v. EME Homer City Generation, LP,* 572 U.S. 489, 519 (2014). One commenter argued that the regional nature of the problem of interstate transport does not confer greater authority on the EPA to disapprove a SIP submission. However, in highlighting the regional nature of transport, the EPA is not claiming a qualitatively different authority to scrutinize SIP submissions under CAA section 110(a)(2)(D)(i)(I). The EPA's authority to assess a SIP submission for compliance with the CAA is the same for obligations associated with in-state pollution as is it for interstate pollution. But the regional, interstate nature of the ozone-transport issue simply underscores the value of the EPA's role as referee. In this regard, the EPA notes that at the time these disapprovals were proposed, not a single state out of the 49 states and Washington D.C. that had submitted a good neighbor SIP submission for the 2015 ozone NAAQS concluded that any emissions reductions beyond existing controls were necessary to satisfy CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. This fact is entirely unsurprising, but also confirms the need for federal intervention through disapprovals at this stage of the process. As the D.C. Circuit observed with respect to regional haze, which, like ozone, is another interstate, collective-action problem posed by widespread pollution emitters:

> Regional haze is a problem in which the benefits of each state's emissions controls are largely felt in other states. Without federal intervention, then, a state calculating how hard it should press in limiting pollution has no incentive to consider resulting enhancements of other states' welfare. There is no reason to believe that New Mexico, for example, would without federal pressure tighten limits for in-state polluters an extra notch so that tourists could gaze at clear skies above the Grand Canyon. Even an anti-pollution commitment demonstrated by 'numerous stakeholder meetings and public workshops across the West' does not explain why one state would, absent federal pressure, martyr itself for another, or subject its electric power users (for example) to additional costs for the benefit of out-of-state interests. *Cf. Maryland People's Counsel v. FERC,* 245 U.S. App. D.C. 365, 761 F.2d 768, 778 (D.C. Cir. 1985*)* ('It is ridiculous to assume that' a company would 'engage in . . . self-sacrificing behavior' 'simply because there is nothing that stops it from doing so').

*Center for Energy and Econ. Devel. v. EPA*, 398 F.3d 653, 657-58 (D.C. Cir. 2005) (Williams, J.).

One commenter argued that the EPA's proposed FIPs supplant states' rights and authority. Another commenter argued that by having already proposed a FIP, the EPA is attempting to "coerce" local and state entities to conform with national policy. Another commenter argued EPA was "intentionally exploiting" the *EME Homer City* case to support costly federal policy. These comments are beyond the scope of this action. The proposed FIPs, which are not final at this time, are a separate rulemaking action. In any case, the existence of the proposed FIPs does not undermine the EPA's adherence to the procedural requirements of CAA section 110. Approval of these SIP submissions is not conditioned on any specific controls of any specific sources; rather, these SIP submissions are being disapproved. If any

state were to re-submit a good neighbor SIP submission, the EPA would review it against the requirements of CAA section 110(a)(2)(D)(i)(I) pursuant to CAA section 110(k)(3).

One commenter argued that the EPA cannot use the CAA to force particular control measures on states. EPA is not requiring any control measures in this action. Another commenter cites *Arkansas Elec. Co-op. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375 (1983) for the premise that the regulation of utilities is associated with the police power of the states. EPA is not regulating any sources in this action.

One commenter said the EPA's approach to disapproving the SIPs essentially required states to conduct expensive photochemical grid modeling and amounted to an unfunded mandate. EPA disagrees that it is necessarily required for states to conduct photochemical grid modeling to develop approvable good neighbor SIP submissions. Still, the CAA empowers states in the first instance to implement the NAAQS, as many commenters have observed. "State air quality divisions are no strangers to complex air quality and meteorological modeling of interstate transport of emissions."[151] Federal technical and financial support has always been available to states since the enactment of the modern CAA. Where states do not have or do not wish to dedicate the resources that may ultimately be required to develop an approvable SIP submission, the CAA is designed so that EPA will implement the requisite requirements through a FIP, without the state being obligated to expend its own resources. Thus, the EPA disagrees that it has in any way created an unfunded mandate through this disapproval.

For this same reason, the EPA disagrees that this action violates or implicates anti-commandeering principles. One commenter cites *District of Columbia v. Train*, 521 F.2d 971 (D.C. Cir. 1975), *vacated sub nom. EPA v. Brown*, 431 U.S. 99 (1977), for the proposition that the EPA cannot commandeer states' resources or force them to implement federal policies or programs against their consent. No such commandeering of state regulatory authority or resources is occurring by virtue of this SIP disapproval action. The only consequence of this action is that the EPA has an obligation to promulgate a FIP addressing the relevant good neighbor obligations for the covered states within two years. *See* CAA section 110(c)(1). *Cf. D.C. v. Train,* 521 F.2d at 993 ("[W]here cooperation [from states] is not forthcoming, we believe that the recourse contemplated by the commerce clause is direct federal regulation of the offending activity . . . .").


## 10.4  Reliance on FIP Measures


### *Comment*

**Commenter:** Maryland Department of the Environment

**Commenter ID:** 29

**Docket ID:** EPA-R03-OAR-2021-0872

**Comment:**

---

[151] *EME Homer City I* at 50 (Rogers dissenting).

437

MDE objects to EPA's proposed disapproval of Maryland's 2015 Good Neighbor SIP on the basis that the state relied, in part, on the CSAPR Update, which was not adopted into Maryland' SIP. The CSAPR Update was originally incorporated into Maryland's SIP, but was subsequently withdrawn at EPA's request. Additionally, the CSAPR Update is a federal implementation plan ("FIP"), which stands in place of a SIP. Maryland is not required to submit a SIP to replace that FIP, and can instead operate under the FIP, which is federally enforceable in its own right. For that reason, EPA has historically allowed states to rely on federal measures in a SIP by simple reference, and cannot reasonably reject consideration of emissions reductions from a federal rule in a SIP.

It is unreasonable for EPA to use Maryland's compliance with EPA's directive against it now. EPA is estopped from such action because Maryland reasonably relied on EPA's direction that withdrawal of the 2008 Good Neighbor SIP and IBR would not affect its pending 2015 Good Neighbor SIP submittal. At least, in the spirit of public transparency and consistent with the concept of cooperative federalism upon which the CAA is based, EPA should have acknowledged in the proposed disapproval that the IBR SIP was withdrawn at EPA's request to correct EPA's procedural error. The federal/state relationship is built on trust and that trust is jeopardized when EPA regional offices are not fully transparent with their state counterparts.

Furthermore, the underlying premise that a state cannot rely on emissions reductions required by a FIP is legally flawed. EPA contends that:

[R]elying on a FIP at Step 3 is per se not approvable if the state has not adopted that program into its SIP and instead continues to rely on the FIP. States may not rely on non-SIP measures to meet SIP requirements. See CAA section 110(a)(2)(D) (''Each such [SIP] shall . . . contain adequate provisions . . .''). See also CAA section 110(a)(2)(A); Committee for a Better Arvin v. U.S. E.P.A., 786 F.3d 1169, 1175–76 (9th Cir. 2015) (holding that measures relied on by state to meet CAA requirements must be included in the SIP).

To the contrary, EPA has historically allowed states to meet the "adequate provisions" requirement by citing federal regulations and/or rules in their SIPs. This is true of many federal measures, including but not limited to Corporate Average Fuel Economy standards for on-road mobile vehicles, small off-road engine emission reductions, and commercial marine vessel standards under the federal Emission Control Areas standards. States routinely cite federal rules and regulations within their SIPs and EPA has not disapproved those SIPs as "per se not approvable." The EPA does not require a state to incorporate by reference every federal rule or regulation into state statutes in order for them to be utilized by the state as a federally enforceable regulatory measure to meet SIP requirements. Rather the citing of a federal rule or regulation in the SIP makes it a SIP measure. Therefore, citing a federal measure in a SIP, without incorporating the federal measure into state statute, is sufficient to make the rule or regulation a SIP measure, which allows the state to use the rule or regulation to meet SIP requirements. Moreover, a FIP may only be issued as replacement for a deficient SIP. The FIP stands in place of a SIP, and is federally enforceable by EPA and citizens alike. EPA's contention that Maryland's 2015 Good Neighbor SIP cannot rely on the emissions reductions required by a FIP (which has the same effect as a SIP) is both illogical and counterintuitive. In defense of its position, EPA cites but misapplies the holding of Committee for a Better Arvin v. EPA, 786 F.3d 1169, 1175-76 (9th Cir. 2015). In Arvin, California proposed a SIP that relied in significant part on reductions, which would be achieved through waiver measures implementing

stricter state standards for certain federal standards. Id. at 1175-76. The Ninth Circuit Court of Appeals found the SIP approval improper because the waiver measures were not part of the SIP. At issue there, the waiver measures were neither part of the SIP nor federal standards, and therefore, were not federally enforceable. Id. at 1177 ("We conclude that the enforcement gap for private citizens and EPA in the present SIP is inconsistent with the CAA's requirements and the express aims of Congress."). In contrast, Maryland relied on reductions from a FIP, which is federally enforceable to both EPA and private citizens. As such, EPA acted arbitrarily in rejecting consideration of the emissions reductions anticipated from an implementation plan issued under CAA § 110.

### Response

These comments are responded to in Section V.B.9 of the preamble. The EPA addresses the comments regarding our correspondence with MDE regarding the withdrawal of the CSAPR Update SIP submission in Section 1.6 (EPA Input During SIP Submission Development).

## 10.5  Comments Alleging "Pretext" or Intent to Require Generation Shifting

### Comment

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The Combined Effect of EPA's Proposed Disapproval and Proposed FIP Will Cause Major Economic and Reliability Impacts for the Western United States.

Finalization of the Proposed Disapproval and subsequent imposition of the Proposed FIP will jeopardize energy supply and reliability in the West and cause major economic impacts. The Proposed Disapproval means electric generating units ("EGUs") in Utah will be subject to the selective catalytic reduction or SCR-forcing provisions of the Proposed FIP. As outlined in comments on the Proposed FIP by the state of Utah, other western states, industry, and the BHE Comments, it is simply not possible to either install the costly SCR equipment or retire and replace the energy generated and vital ancillary services provided by so many units subject to the regulatory constraints and timelines of the Proposed FIP. The Proposed Disapproval and subsequent imposition of the Proposed FIP on Utah will also force generation shifting both explicitly and implicitly.[16]

EPA's attempt to use Utah's alleged marginal impact on a neighboring state's ozone monitors to force the state into EPA's Proposed FIP must be rejected. EPA should not use a disapproval based on improper procedures, impossible timelines and flawed reasoning as a ruse to impose the problematic Proposed FIP, with its harsh economic impacts and threats to the reliability of the western electricity system. EPA's flawed administrative procedures, reversal of established guidance and previous positions, and

the extraordinary economic and reliability impacts that will result from the combined effect of the Proposed Disapproval and imposition of the Proposed FIP counsel caution. The Supreme Court in *West Virginia v. EPA* advised EPA against "dictating the optimal mix of energy sources nationwide," even if "that sort of mandate will reduce air pollution from power plants."[17] PacifiCorp requests that EPA take a more judicious path by following its own guidance and legal procedures and working with Utah to enact an ozone transport SIP legally tailored to effectively address the ozone situation in the western region.

[16] First EPA imposes specific, pre-determined generation-shifting requirements using an opaque Integrated Planning Model ("IPM") that it did not make available for review to the states or other stakeholders. The IPM modeling is particularly impactful on Wyoming, which is expected to immediately shift approximately 10% of its generation less than a year after the Proposed FIP was issued (let alone finalized). Second, EPA implicitly forces generation shifting through the untenable uncertainty and risk created by the SCR-forcing provisions of the Proposed FIP.

[17] *West Virginia v. EPA*, 142 S. Ct. 2,587, 2,612 (June 30, 2022).

*Response*

The EPA is not finalizing a SIP submission disapproval for Wyoming in this action, and so comments that are specifically related to Wyoming's circumstances are beyond the scope of this action. In addition, we disagree that the final SIP disapprovals for other states are in any way pretextual. Their basis is grounded in the record for this action, including the EPA's reasoning and analysis as set forth in this record. Our disapprovals are in no way based on a state's failure to include generation shifting as an emissions control measure, nor do they use the proposed FIP as a benchmark or as the basis for disapproval. Nor have commenters cited evidence for these claims. The timing of our actions is addressed in Section V.A of the preamble and Section 1 (Timing of SIP Actions), as well as in the following responses to comment.

## 10.6  Allegation that Disapprovals of Western State SIP Submissions was Predetermined

*Comments*

**Commenter:** Eagle Materials Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

By issuing this Proposed SIP Disapproval *after* publishing a Proposed FIP, EPA is also effectively circumventing required rulemaking procedures by treating the Proposed SIP Disapproval as final, despite its failure to engage with public comments. The Administrative Procedure Act's ("APA") notice-and-comment procedures require EPA to "give interested persons an opportunity to participate in the rule making" before a rule is finalized.[52] Soliciting public comment "allow[s] the agency to benefit from the expertise and input of the parties who file comments with regard to the proposed rule" and "see[s] to it

440

that the agency maintains a flexible and open-minded attitude towards its own rules," creating important safeguards against arbitrary or unreasonable agency action.[53] However, EPA cannot remain flexible and open-minded in its consideration of its proposed disapproval where the validity of its Proposed FIP depends on this disapproval being finalized. Instead, EPA is effectively finalizing its Proposed SIP Disapproval in a manner that circumvents its responsibility to respond to public comments.[54] Such a procedural shortcut is anathema to the APA's carefully crafted rulemaking structure.[55]

In addition, EPA is effectively depriving members of the public from meaningfully engaging with its Proposed SIP Disapproval by issuing it after its Proposed FIP. The comment period for this Proposed Disapproval did not open until over a month after EPA published its Proposed FIP—the comment period for the Proposed FIP closed before any commenters had a chance to submit comments on the Proposed SIP Disapproval.[56] This puts commenters in the untenable position of having to provide feedback on EPA's comprehensive and complex Proposed FIP without first understanding Nevada's obligations under the CAA.

[52] 5 U.S.C. § 553(c).

[53] *See McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1325 (D.C. Cir. 1988) (internal citations omitted).

[54] *See City of Portland, Oregon v. E.P.A.*, 507 F.3d 706, 715 (D.C. Cir. 2007) (emphasizing that an agency must respond to comments that "raise points relevant to the agency's decision and ... if adopted, would require a change in an agency's proposed rule").

[55] *See Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) (emphasizing that agency action "must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made").

[56] See Comments, EPA-R09-OAR-2022-0138, https://www.regulations.gov/search/comment?filter=EPAR09-OAR-2022-0138.

**Commenter:** Idaho Power Company

**Commenter ID:** 23

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

[B]y proposing the FIP first, EPA has made clear that the finalization of the Proposed Disapproval was a foregone conclusion, effectively circumventing required rulemaking procedures by treating the Proposed Disapproval as final before giving any consideration to public comments. The Administrative Procedure Act's ("APA's") notice-and-comment procedures require EPA to "give interested persons an opportunity to participate in the rule making" before a rule is finalized.[32] Soliciting public comment "allow[s] the agency to benefit from the expertise and input of the parties who file comments with regard to the proposed rule" and "see[s] to it that the agency maintains a flexible and open-minded attitude towards its own rules," creating important safeguards against arbitrary or unreasonable agency action.[33] EPA cannot remain flexible and open-minded in its consideration of the Proposed Disapproval where the Proposed FIP depends on this disapproval being finalized. EPA has effectively finalized the Proposed Disapproval in a manner that circumvents its responsibility to respond to public comments.[34] Such a procedural shortcut is anathema to the APA's carefully crafted rulemaking structure.[35]

[32] 5 U.S.C. § 553(c).

[33] *See McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1325 (D.C. Cir. 1988) (internal citations omitted).

[34] *See City of Portland, Oregon v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007) (emphasizing that an agency must respond to comments that "raise points relevant to the agency's decision and ... if adopted, would require a change in an agency's proposed rule").

[35] *See Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) (emphasizing that agency action "must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made").

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The Flawed Procedure and Chronology of the FIP/SIP Result in a Predetermined Outcome and an Abuse of Discretion.

The good neighbor provision, at its core, is a state obligation. It is codified in Section 110 of the CAA, which is the section granting states primary decision-making authority for developing SIPs to achieve the NAAQS. EPA's role under section 110 is to review and approve those plans, not to substitute its own policy preferences or decisions for those made by the states. As long as a state's plan is reasonable and complies with the requirements of the CAA, EPA must approve it. The U.S. Supreme Court and multiple Circuit Courts have repeatedly endorsed this cooperative federalism approach codified in Section 110.[18] Courts have also confirmed that EPA may issue a FIP *only if a state's SIP is deemed to be insufficient* according to the requirements of the CAA. EPA has undermined the central principles underlying both Section 110 and the Administrative Procedure Act by not even proposing to reject Utah's SIP until *after* it had already issued the Proposed FIP with explicit requirements specifically targeted at Utah. Even if EPA claims to cure its failure to observe the proper sequencing by projecting (and predetermining) that it will finalize its disapproval of Utah's SIP before finalizing the Proposed FIP, its actions run roughshod over both the sequence ordered by the CAA and the states' primary role in addressing nonattainment under Section 110. EPA should explain why this disapproval was issued without providing time for Utah to respond. EPA had nearly three years to do this. The flawed procedure suggests that EPA isn't giving Utah's SIP submittal a considered review, preferring instead to impose its own Proposed FIP solution in violation of legal principles. Agency action "must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made."[19]

By delaying the Proposed Disapproval for Utah's SIP until May 23, 2022, a full month and a half after proposing its FIP and based on a shift in its thinking in the years since the SIPs were originally submitted, EPA is trying to take over the role Congress granted to states. A logical conclusion from this series of actions, and the fact that EPA conducted extensive analysis assuming Utah is subject to the FIP, is that EPA has predetermined the outcome, even if that meant EPA took shortcuts to the required administrative procedures and disregarded the work Utah put into developing its Ozone Transport SIP

according to EPA's guidance. EPA's nonsequential process demonstrates serious disregard for Utah's well-founded determinations underlying its SIP.[20]

[18] *See, e.g., Train*, 412 U.S. 60 (1975); *Union Elec. Co. v. EPA*, 427 U.S. 246 (1976); *Fla. Power & Light Co. v. Costle*, 650 F.2d 579 (5th Cir. 1981).

[19] *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000).

[20] EPA also put Utah and other stakeholders in a difficult position, forcing them to devote scarce resources to simultaneously digest and respond to the voluminous Proposed FIP and the Proposed Disapproval and denying numerous formal and informal requests for sorely needed additional time.


**Commenter:** PacifiCorp (Berkshire Hathaway Energy Company Proposed FIP Comments Attachment)

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The western states where BHE operates affected EGUs (Nevada, Wyoming, and Utah) submitted their good neighbor SIPs to EPA between October 2018 and October 2019, years in advance of EPA's Proposed Rule. Each of these SIPs, in reliance upon EPA guidance and modeling, demonstrated that there were no significant impacts on ozone nonattainment and maintenance in downwind states. Yet EPA took no action on these SIP submissions for two and a half to three and a half years. It was not until February 2022, when EPA signed the Proposed Rule imposing a FIP on these states (later publishing it for public notice and comment on April 6), that these states learned that EPA did not intend to approve their good neighbor SIPs. EPA did not even propose disapproval for these SIPs until May 23, 2022, a full month and a half after proposing its FIP. And EPA has yet to finalize disapproval (the proper legal predicate for a FIP). What's more, EPA's disapproval of these SIPs is based on a shift in its thinking in the years since the SIPs were originally submitted.

BHE can only conclude from this series of actions that EPA predetermined that these states would be subject to this FIP as its chosen policy outcome without following the required administrative procedure or working in good faith with the states to develop their SIPs. EPA's nonsequential process demonstrates serious disregard for the well-founded state determinations underlying their good neighbor SIPs.43 In failing to observe the appropriate process, EPA has undermined western state authority in contravention of the cooperative federalism underpinning Section 110 of the Clean Air Act.


**Commenter:** Utah Division of Air Quality

**Commenter ID:** 47

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

UDAQ thinks that EPA's proposed rule to disapprove Utah's SIP is not rooted in the technically accurate analysis but instead is motivated by the desire to include Utah in the proposed interstate transport FIP:

Upon review, UDAQ finds the timing and sequence of the proposed actions in question to be highly irregular compared to a traditional rulemaking process. The fact that EPA proposed to include Utah in the broad and highly impactful FIP prior to issuing proposed disapproval of the state's SIP is unusual. This may suggest that EPA's proposed SIP disapproval aims to regulate a select set of point sources by including Utah in the proposed FIP.

The UDAQ disagrees with EPA's disapproval of the SIP for the following reasons. […] Third, UDAQ thinks that EPA's proposed rule to disapprove Utah's SIP is not rooted in the technically accurate analysis but instead is motivated by the desire to include Utah in the proposed interstate transport FIP. Fourth, UDAQ thinks that the modeling and logic justifying Utah's inclusion in the proposed FIP are flawed. […]

EPA's Proposed Disapproval is Motivated by the Desire to Include Utah in the FIP

Upon review, UDAQ finds the timing and sequence of the proposed actions in question to be highly irregular compared to a traditional rulemaking process. The fact that EPA proposed to include Utah in the broad and highly impactful FIP prior to issuing proposed disapproval of the state's SIP is unusual. This may suggest that EPA's proposed SIP disapproval aims to regulate a select set of point sources by including Utah in the proposed FIP.

EPA's Inclusion of Utah in the FIP Relies on Flawed Logic

As noted above and outlined in our comments related to the proposed FIP, UDAQ believes that the proposed disapproval of Utah's SIP is an effort to fulfill an agenda outside of the original intent of the interstate transport provisions of the CAA. Specifically, the intent is to force Utah's inclusion in the FIP to target emission reductions from fossil fuel-fired electric generating units (EGUs) located in the state.


**Commenter:** Utah Petroleum Association and the Utah Mining Association

**Commenter ID:** 48

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

EPA must promulgate a Federal Implementation Plan ("FIP") within two years any time that EPA finds that the State failed to make the required SIP submission, finds that the SIP submission did not meet minimum criteria, or disapproves a SIP submitted by the State unless the State corrects the deficiency and EPA approves the plan prior to promulgating the FIP.

On April 6, 2022, EPA proposed its Good Neighbor Rule ("Proposed GNR") with a finding that emissions from 25 States including Utah contribute significantly to nonattainment of the 2015 ozone NAAQS for States downwind. EPA's Proposed GNR includes a FIP to address these emissions.

EPA jumped the gun. The timing of this Proposed Disapproval, six weeks after proposing a FIP as part of the GNR, is out of order and contrary to the requirements of the CAA, which requires that a Disapproval **be finalized** before EPA promulgates a FIP such as the GNR.

The timeline suggests that EPA has no intention of paying heed to the comments on the Proposed Disapproval. Such disregard for comments would be a violation of required administrative procedures. EPA must fairly and completely consider all comments submitted.

*Response*

The sequencing of our actions here with regard to California, Nevada, and Utah is consistent with the procedural requirements of the CAA and the APA and with the EPA's past practice in our efforts to timely address good neighbor obligations. Comments pertaining to Wyoming are beyond the scope of this action. We have generally responded to comments on the timing of our action in Section V.A.1. of the preamble (comments related to the relationship between timing of proposals to disapprove SIPs and promulgate FIPs), Section V.A.2. of the preamble (comments related to requests for more time to revise SIP submissions), and Section V.A.3. of the preamble for (alleged harms to states caused by time between SIP submission and the EPA's action). .

Here, we further elaborate on those responses, specific to these comments about the timing of our western state disapproval proposals. First, neither the Act nor the APA impose any limitations on the timing for when the EPA can propose a SIP or FIP action under CAA section 110. Second, EPA's timing is motivated by the need to address good neighbor obligations as expeditiously as practicable and no later than the next attainment date. Third, allegations that the disapprovals were a foregone conclusion or otherwise prejudiced for any reason is demonstrably proven false by the fact that we are deferring action on Wyoming at this time in light of the updated air quality information. Fourth, there is nothing unprecedented in the EPA proposing FIPs in conjunction with or even before its proposed action on SIP submissions. For example, at the time the EPA proposed the CSAPR Update FIPs for the 2008 ozone NAAQS in December of 2015, we had not yet proposed action on several states' SIP submissions, but proposed and finalized those SIP disapproval actions prior to finalization of the FIPs. The proposed CSAPR Update was published on December 3, 2015, and included proposed FIPs for Indiana, Louisiana, New York, Ohio, Texas, and Wisconsin. 80 FR 75705. At that time, the EPA had not yet proposed action on good neighbor SIP submissions for the 2008 ozone NAAQS from those states; however, the EPA subsequently proposed and finalized these disapprovals. *See* 81 FR 38957 (June 15, 2016) (Indiana); 81 FR 53308 (Aug. 12, 2016) (Louisiana); 81 FR 58849 (Aug. 26, 2016) (New York); 81 FR 38957 (June 15, 2016) (Ohio); 81 FR 53284 (Aug. 12, 2016) (Texas); 81 FR 53309 (Aug. 12, 2016) (Wisconsin) before finalizing the CSAPR Update FIPs, published on October 26, 2016 (81 FR 74504).

As for Utah, the EPA has had the authority to promulgate a FIP for the state since January 6, 2020, which is the effective date of the EPA's finding of failure to submit for the state. 84 FR 66612 (December 5, 2019).

The public has been afforded an opportunity to comment on our proposed action on all three states' ozone transport SIP submissions, in addition to the opportunity to comment on the proposed FIP. The EPA has evaluated and responded to these comments as relevant and within scope of this final action. Other issues raised by these comments are addressed in the following sections of this RTC document: 10.3 (Cooperative Federalism and the EPA's Authority), 10.5 (Comments Alleging "Pretext" or Intent to Require Generation Shifting), and 11.4 (Transport Policy - Western State Ozone Regulation).

## 10.7  EPA's Response to Comment on Proposed Actions Related to Alabama

*Comments*

**Commenter:** Alabama Department of Environmental Management

**Commenter ID:** 02

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

In an effort to quickly provide a SIP based on the newer modeling (February 2022), ADEM rescinded the 2018 SIP, and presented EPA with a revised SIP, including a Weight of Evidence (WOE) argument based on the readily available data.

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

In February 2022, EPA reversed course and proposed to disapprove ADEM's 2018 Submittal. EPA explained that new modeling—not available at the time Alabama's SIP was due and developed well after the statutory deadline for review—suggested emissions from Alabama could affect ozone concentrations in Texas. In light of EPA's reliance on new 2022 modeling, ADEM withdrew its 2018 SIP submittal and, on April 21, 2022, separately submitted to EPA a new SIP package (including its SIP revisions and comments received on the SIP revision), which addressed and disputed EPA's new modeling (the "2022 SIP"). On June 14, 2022, EPA notified ADEM of minor administrative deficiencies in the 2022 SIP and, as a result of these errata, found the SIP technically "incomplete." EPA provided that ADEM may correct those deficiencies and resubmit its SIP for EPA's review, and ADEM promptly supplemented its SIP to address those minor deficiencies on June 21, 2022. EPA is now proposing to disapprove Alabama's 2022 SIP submittal.

[…]

EPA should certainly not object to comments raised herein on any claim of lack of specificity or explanation given that EPA refused to provide sufficient time to comment in the first instance and denied a reasonable request for additional time.  Notably, in its letter denying ADEM's request for an extension of the comment period, EPA states that "the technical bases underlying the EPA's proposed rationale to disapprove the June 21, 2022, SIP submittal are similar to those underlying the EPA's proposed rationale to disapprove" the prior SIP and that Alabama provided comments in that prior

proposed rulemaking.  Because EPA has intertwined its prior proposal to justify its denial of any extension, EPA should have addressed comments made on that prior proposal in this proposal.  As a result, EPA should re-propose its action after addressing all the comments received in its previous proposal.

*Response*

The EPA is electing to respond to comments received on the EPA's February 2022 proposed disapproval of Alabama's now-withdrawn SIP submission (submitted on August 20, 2018) and is also responding to the comments received on the October 2022 proposed disapproval of Alabama's SIP submission (submitted on June 21, 2022), to the extent these comments are relevant to this final action, within scope, and "reasonably specific." Nothing in the APA or the CAA requires the EPA to respond to comments on a notice of proposed rulemaking that is not the action being finalized, even when a second proposal is on the same or similar grounds as the first one. In this case, Alabama chose to withdraw its first SIP submission, and EPA is proposing to disapprove its SIP submission submitted on June 21, 2022.

447

# 11  Miscellaneous

## 11.1  Incorporation of Other's Comments by Reference

*Comments*

**Commenter:** Arkansas Electric Cooperative Corporation

**Commenter ID:** 08

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Arkansas Electric Cooperative Corporation (AECC) shares the concerns of both the Arkansas Department of Energy and Environment, Division of Environmental Quality (DEQ) and the the Arkansas Environmental Federation (AEF)  regarding the referenced proposed rule. Therefore, AECC herein incorporates by reference the comments on the proposed rule submitted by ADEQ on April 22, 2022, and AEF on April 25, 2022.

**Commenter:** Arkansas Forest & Paper Council

**Commenter ID:** 10

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

The commenters support, non-exclusively, and incorporate by reference the comments submitted in this docket by the Arkansas Division of Environmental Quality as well that of the Midwest Ozone Group and Arkansas Environmental Federation.

**Commenter:** City Utilities of Springfield, Missouri

**Commenter ID:** 13

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

City Utilities supports the Midwest Ozone Group's comment for extension in light of technical review and resources needed to appropriately comment.

**Commenter:** Cleco Corporate Holdings LLC

**Commenter ID:** 14

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Cleco adopts and incorporates by reference the comments submitted to EPA by Louisiana Electric Utility Environmental Group (LEUEG), dated April 25, 2022, concerning the Proposal.


**Commenter:** Louisiana Electric Utility Environmental Group

**Commenter ID:** 28

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

LEUEG adopts and incorporates by reference the comments submitted to EPA by the Louisiana Chemical Association ("LCA"), dated April 25, 2022, concerning the Proposed SIP Disapproval.


**Commenter:** Ohio Utilities and Generators Group

**Commenter ID:** 36

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

OUG also supports the efforts of the Midwest Ozone Group (hereinafter "MOG") and endorses the more detailed comments filed by MOG.


**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

For the reasons set forth above and those provided in the comments filed by DEQ and AEF, U. S. Steel requests EPA approve the Arkansas SIP.


**Commenter:** Utah Associated Municipal Power System

**Commenter ID:** 46

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

UAMPS supports the comments filed by the State of Utah and those comments filed by PacifiCorp opposing the Proposed Rule.

**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

Xcel Energy endorses the comments filed by the Minnesota Pollution Control Agency (MPCA) in response to EPA's SIP disapproval for Minnesota. In addition to EPA not including all the NOx emission reductions taking place within the state, the EPA erred in the approach taken modeling the influence Lake Michigan has on receptor sites located near the air/water shoreline boundaries, which was factored into the modeling performed by Lake Michigan Air Directors Consortium (LADCO) supporting Minnesota's SIP submittal. We understand that other parties, such as Midwest Ozone Group (MOG), will provide more detail on this matter in their comments.

**Commenter:** Xcel Energy

**Commenter ID:** 52

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Xcel Energy endorses the comments filed by the Texas Commission on Environmental Quality (TCEQ) in response to EPA's SIP disapproval for Texas. The EPA erred in the approach taken to modeling the influence Lake Michigan has on the receptor sites located near the air/water shoreline boundaries in Cook County Illinois, Kenosha, and Racine Wisconsin, which was factored into the modeling performed by both TCEQ, further supported by comments filed by the Association of Electric Companies of Texas (AECT) and the associated modeling analysis performed by Sonoma Technology.

*Response*

Comments submitted on the proposed actions which have been "incorporated by reference" by other commenters are responded to elsewhere in this Response to Comments. Where commenters have "incorporated by reference" and submitted as their own attachment a comment made on the proposed FIP or other materials, the EPA has taken those materials into consideration in this rule to the extent that commenters explained with reasonable specificity how the information included in those referenced comments is relevant and within scope of this action.

## 11.2 CAA Section 126 Petitions

*Comments*

**Commenter:** Kentucky Division for Air Quality

**Commenter ID:** 25

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

In this proposed action, EPA specifies that if a state must make emission reductions to prevent emissions from impacting a downwind monitor, the state must submit a separate SIP revision that makes those emission reductions permanent and enforceable. Kentucky maintains that the purpose of the I-SIP is to verify that the state has the authority, regulations, and programs in place to address the requirements of the CAA, not to determine if, and how much, an upwind source may be impacting a downwind monitor. If an upwind state impacts a downwind state and EPA is called upon to determine the reductions necessary, then EPA's authority comes from a different section of the CAA, specifically section 126.

**Commenter:** Louisiana Department of Environmental Quality

**Commenter ID:** 27

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

To date, there have been no FCAA Section 126 actions filed against Louisiana. FCAA section 126 gives a state the authority to ask EPA to set emission limits for specific sources of air pollution in other states that significantly contribute to nonattainment or interfere with maintenance of one or more NAAQS in the petitioning state.

*Response*

The EPA's duty under CAA section 110(a)(2)(D)(i)(I) is to evaluate whether a state's SIP submission includes adequate provisions to prohibit emissions from within the state that significantly contribute to nonattainment or interfere with maintenance of the NAAQS in other states. While CAA section 126 allows downwind jurisdictions to separately petition the EPA to make a finding that upwind sources emit in violation of the good neighbor provision, such a petition is voluntary in nature and can only be initiated by the impacted state or political subdivision. *See Genon Rema v. EPA*, 722 F.3d 513, 520-22 (3d Cir. 2013) (discussing the independent nature of the processes under CAA section 110(a)(2)(D)(i)(I) and 126(b)). Thus, the lack of a petition does not demonstrate that Louisiana's SIP submission meets the

451

requirements of CAA section 110(a)(2)(D)(i)(I) nor is it dispositive of the existence (or lack thereof) of an interstate transport concern.

## 11.3 Transport Policy

*Comments*

**Commenter:** Ducote, Samuel

**Commenter ID:** 15

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

I strongly oppose the EPA's decision here. As a region of this nation responsible for fueling the needs of the nation, the Louisiana-Texas-Arkansas-Oklahoma region needs to extend special "good neighbor" exceptions for the contribution to the nation at large, especially considering the states have valid SIPs in place that meets the NAAQS requirements within each state individually.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851, EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

EPA's proposed Good Neighbor SIP disapprovals are both legally and technically flawed in that EPA seeks to advance the Good Neighbor SIP disapprovals based on incorrect air quality assumptions and calculations and in the absence of consideration of implementation of the flexibility guidance issued by EPA for application to 2015 ozone NAAQS Good Neighbor SIPs

[...]

[T]he Midwest Ozone Group urges that EPA withdraw the subject proposed SIP disapprovals in favor of correcting the legal and technical errors that have been identified in its analysis and proposing an appropriate opportunity for states to address any deficiencies EPA may find in any Good Neighbor Plans implementing the 2015 ozone NAAQS.

**Commenter:** Midwest Ozone Group

452

**Commenter ID:** 30

EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

EPA's proposed Good Neighbor SIP disapprovals are both legally and technically flawed in that EPA seeks to advance the Good Neighbor SIP disapprovals based on incorrect air quality assumptions and calculations.

[…]

MOG specifically objects to EPA's approach to implementation of the flexibility guidance issued by EPA in 2018 for the specific application by states to the development of 2015 ozone NAAQS Good Neighbor SIPs.

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Oklahoma is Being Penalized for Having Cleaner Air Than Downwind States

Oklahoma is in attainment of the NAAQS. Oklahoma stakeholders have shared concerns with ODEQ that EPA is penalizing Oklahoma sources for the interstate transport of pollutants allegedly emitted by sources in Oklahoma, but which impact receptors in the Dallas-Fort-Worth (DFW) metroplex. These stakeholders note that the emissions from the DFW metroplex impacting receptors in Oklahoma far exceed Oklahoma's impacts on receptors in Texas. While the ultimate goal of the good neighbor provision of the CAA is to ensure that everyone breathes cleaner air, it does seem that Oklahoma sources are required to install costly controls to address a much smaller quantity of emissions moving south while sources in Texas have no requirement to address emissions impacting Oklahoma receptors. Furthermore, the fact that sources in Texas will be required to control emissions to reduce impacts on receptors in Wisconsin and Illinois, but not Oklahoma (since Oklahoma is in attainment), only makes the process appear more absurd. Further, as previously stated, had EPA acted on Oklahoma's SIP in a timely manner, using the data available at the time EPA was supposed to review and approve the SIP, and honored the flexibilities it held out in the 2018 Tsirigotis Memos, it is likely Oklahoma would have already had an approved SIP in place by now. Oklahoma challenges the assumption that its sources are contributing to nonattainment in the DFW metroplex or the Chicago area. Nevertheless, it is nonsensical and unjust to force sources in Oklahoma, a state that is mostly rural, to make up for the poor air quality in the major metropolitan areas of the DFW metroplex and Chicago. The practical outcomes of EPA's decision-making in this instance are unduly burdensome and misplaced.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

*Recent modeling performed by the State of Colorado demonstrates the Proposed Disapproval is misguided.*

EPA must consider relevant Colorado emission reductions when determining Utah's impacts on Colorado monitors, as well as recent modeling performed for the State of Colorado that supports Utah's SIP. In the Proposed Disapproval, EPA states that "EPA does not find . . . the impacts of emissions from sources other than upwind states to be relevant to the analysis of interstate transport to Denver area nonattainment receptors." But this runs contrary to EPA's prior practice. In all of its prior interstate transport rules, EPA has reasonably assumed such "home states" will do their fair share in reducing ozone by employing control measures similar to those required from the upwind states significantly contributing to downwind ozone problems. For example, in the Revised CSAPR Update, which EPA adopted about a year ago, EPA maintained its long-standing position on this important point.

Assuming downwind states will pull their weight in improving air quality is reasonable. After all, the CAA requires states to attain ambient air quality standards, and nothing in the CAA requires upwind states to carry the full burden of bringing a downwind state into attainment. In that sense, the assumption that downwind states like Colorado will do their fair share is also lawful, since EPA should presume that states will meet their legal obligations under the CAA, and EPA is required by law to consider all relevant information in crafting its programs.[38] In fact, the D.C. Circuit advises EPA to recognize home-state efforts, not ignore them. In *Maryland v. EPA*, the court noted that downwind states have "the concomitant responsibility to limit their own emissions," even if their in-state monitors show attainment.[39] *Maryland* supports EPA's consideration of home states' responsibility to limit their own emissions.

The fair-share assumption is outcome-determinative for Utah when Colorado-specific data is included in the analysis. For example, Utah appropriately considered oil- and gas-related emissions reductions in Colorado that will reduce ozone in the impacted monitor areas.[40] Additionally, the Denver Regional Air Quality Council, along with the Colorado Department of Public Health and Environment is preparing a 2023 Severe/Moderate ozone SIP for the Denver Metro/Northern Front Range ("DM/NFR") ozone nonattainment area ("NAA"). The Colorado SIP analysis includes 2026 future year modeling to address attainment of the 2008 NAAQS and 2015 NAAQS. The Colorado ozone SIP modeling provides more reliable and accurate 2023 and 2026 ozone projections than the new and problematic modeling EPA relied on to disapprove Utah's SIP for several reasons[.]

---

[38] *Michigan v. EPA*, 576 U.S. 743, 750 ("agency action is lawful only if it rests on a consideration of the relevant factors") (quoting *Motor Vehicle Mfrs. Assn. v. State Farm Mut. Automobile Ins.* Co., 463 U.S. 29, 43 (1983)).
[39] 958 F.3d 1185, 1201 (D.C. Cir. 2020).
[40] *See, e.g.*, Colorado Oil & Gas Association, Comments on Proposed Reclassification of Colorado Ozone Nonattainment Areas under 2008 and 2015 NAAQS, submitted June 13, 2022, to Docket Nos. EPA-HQ-OAR-2021-0741 and EPA-HQ-OAR-2021-0742 (outlining recent applicable Colorado O&G air regulations); Proposed Consent Decree between EPA and Colorado with DCP, Civil Action No. 1: 22-cv-01829-NRN (July 25, 2022) (reporting a

proposed consent decree to cut emissions of volatile organic compounds by more than 288 tons and methane releases by some 1,300 tons in Weld County at the western border of Colorado).

*Response*

Regarding the comment that the EPA must take account of some "fair share" of emissions reductions in the downwind states where receptors are located in assessing whether upwind state contribution exists at Steps 1 and 2, the EPA disagrees. First, our consideration of home-state "fair share" emissions in the CSAPR Update and the Revised CSAPR Update takes place in the assessment of air quality impacts of emissions control strategies at Step 3, including as to the assessment of whether a FIP emissions control strategy overcontrols. *See* 86 FR at 23106; 81 at 74550. In this analysis, we assume the home state would implement emissions reductions at least up to the stringency of the control strategy we would select for upwind states. Comments regarding the FIP action proposed on April 6, 2022, are outside the scope of this action, however, it is illustrative to point out that the EPA once again made this same assumption in the proposed FIP to address the 2015 ozone NAAQS good neighbor obligations, at Step 3, consistent with prior rules, *see* 87 FR 20036, 20092 n.190.[152]

That role for "fair share" analysis is irrelevant to this action. A "fair share" assumption has never been a relevant part of the analysis at Steps 1 and 2. Indeed, a "fair share" assumption cannot even be calculated if the upwind states have not offered to implement an emissions control strategy at Step 3 against which a "fair share" for the downwind could be derived.

While we *do* take account of known on-the-books controls in downwind states, we have never assumed some additional amount of emission reduction in downwind states that has not yet occurred and is not known with certainty based on on-the-books requirements. Further, making such an assumption to conclude that a receptor will no longer exist and therefore an upwind state should not have obligations to reduce its own emissions that may be significantly contributing to that receptor is in conflict with the case law. *Wisconsin* and *North Carolina* both recognized that, regardless of other contributing factors to a downwind receptor, each state must be held responsible for its own significant contribution. 938 F.3d at 324; 531 F.3d at 921. And in *Maryland*, the court expressly recognized that upwind states must eliminate significant contribution regardless of the degree of emissions reductions the downwind state has itself achieved, holding that upwind states have an obligation to eliminate their significant contribution by the Marginal area attainment date for ozone under CAA section 181(a), even if the downwind nonattainment area faces relatively little regulatory obligation at that classification. 958 F.3d at 1204. The court observed "that does not make Delaware's obligation to attain the NAAQS by 2021 any less binding. And an upgrade from a marginal to a moderate nonattainment area carries significant consequences, such as a requirement to provide for annual emissions reductions in SIPs." *Id.*

---

[152] EPA also questioned in that proposal whether recent case law had called the need for such an assumption into question. *See id.* n. 206 ("In *Maryland*, the EPA had argued that good neighbor obligations should not be required by the Marginal area attainment deadline in part because ''marginal nonattainment areas often achieve the NAAQS without further downwind reductions, so it would be unreasonable to impose reductions on upwind sources based on the next marginal attainment deadline.'' 958 F.3d 1185, 1204. The D.C. Circuit rejected that argument, noting regulatory consequences for the downwind state for failure to attain even at the Marginal date, and, citing *Wisconsin*, the court held that upwind sources violate the good neighbor provision if they significantly contribute even at the Marginal area attainment date. *Id.*").

455

Commenter cites *Maryland* for a different proposition, that states in a multistate nonattainment area have "a concomitant responsibility to limit their own emissions." 958 F.3d at 1201. But commenter takes this quote out of context, putting the thrust of the observation on the downwind state rather than the upwind state. Thus, commenter derives an opposite meaning from what the court intended. In fact, the court held that Delaware had a valid basis for its Section 126(b) petition against Pennsylvania based on a monitor violating the NAAQS located in Pennsylvania but within a multistate nonattainment area that Delaware shared with Pennsylvania. *Id.* at 1200-01. The court observed that Delaware faced regulatory consequences due to the violating monitor in Pennsylvania, because "Delaware remains bound by the corresponding nonattainment designation. . . . [I]t is stuck in regulatory limbo, affected by an upwind source yet unable to avail itself of the intended remedy for addressing upwind contributions to nonattainment." *Id.* at 1200. The court rejected the EPA's arguments that Delaware could not use Section 126(b) to force emissions controls on the offending upwind sources in Pennsylvania. The court then observed:

> [C]ontrary to EPA's characterization, Delaware is not trying to 'relieve [itself] ... of the specific planning obligations associated with its inclusion in an area designated nonattainment.' Rather, it asks merely that upwind sources contributing to air quality problems in the multistate nonattainment area shoulder a comparable regulatory burden, as the section 126(b) petition process contemplates.

> In sum, states in a multistate nonattainment area share not only a nonattainment designation *but also the concomitant responsibility to limit their own emissions*. To equalize the burdens between upwind and downwind states, the Clean Air Act authorizes a state to petition the EPA for a finding that upwind emissions significantly contribute to that state's nonattainment of the ozone NAAQS.

*Id.* at 1200-01 (emphasis added).

Commenter's attempt to use this passage to argue that an upwind state like Utah should not face good neighbor obligations until a downwind state like Colorado has done its "fair share" is not availing. First, there is no multistate nonattainment at issue here, so the facts are somewhat different than what the court was analyzing in *Maryland*. Nonetheless, Colorado is still in a situation comparable to Delaware. It has a nonattainment area and faces mandatory nonattainment area planning requirements under subpart 2 of title I of the CAA (as commenter acknowledges). Colorado has taken measures to reduce emissions (and if on-the-books, these are reflected in the EPA's modeling), and Colorado may face additional requirements to further reduce its emissions if nonattainment continues to persist. But, under *Maryland* and prior cases, that does not relieve upwind states of the obligation to eliminate their own significant contribution to the air quality problem in Colorado. And without the elimination of that significant contribution, Colorado, like Delaware, faces the prospect of implementing ever more stringent and costly emissions controls on its own, while the upwind states' significant contribution to that problem goes unabated. Therefore, EPA rejects commenter's contention that we must assume some additional level of emissions reduction in Colorado at Steps 1 or 2 beyond what is already included in our baseline modeling.

Regarding the contention that Oklahoma would likely already have an approvable SIP submission had the EPA honored the flexibilities it held out in the 2018 Tsirigotis Memo and acted on Oklahoma's SIP

456

submission by the statutory deadline, we disagree. The EPA engaged with the justification put forward by each state that attempted to provide a rationale to support the use of an alternative contribution threshold and found each one deficient and otherwise evaluated each of the arguments put forward by the states. *See* 87 FR at 9818-22 (evaluating each of ODEQ's arguments at Steps 1 and 2). In both EPA's 2011 and 2016-based modeling of 2023, Oklahoma was projected to have at least one linkage above 1 ppb and so reliance on the August 2018 memorandum to conclude Oklahoma had no linkages would not have been availing in any case. And EPA explained in the proposal why ODEQ's reliance on TCEQ's alternative modeling was not approvable. The EPA further addresses comments related to Oklahoma and the August 2018 memorandum in Section 7.4.

As commenter points out, the modeling relied upon by Oklahoma as well as the updated modeling conducted by the EPA does not identify any nonattainment or maintenance receptors in Oklahoma. However, if nonattainment or maintenance receptors were identified in Oklahoma, states upwind to Oklahoma would have been evaluated under the same 4-step interstate transport framework the EPA is applying to states in this action. Additionally, while the good neighbor provision seeks to ensure that upwind states eliminate their own "significant contribution" to nonattainment or maintenance receptors in downwind states, other provisions of the CAA impose requirements on downwind states with nonattainment areas. *See* CAA sections 181-185. Thus, the CAA ensures that the responsibility of addressing ozone nonattainment and maintenance issues does not rest solely with the downwind or the upwind states.

Further, the EPA disagrees that it is penalizing certain upwind states or that it requires upwind states to make up for the poor air quality in certain metropolitan areas in downwind states. While it is correct that emissions from in-state sources often contribute to attainment and maintenance problems at receptors, this does not address the question of whether there is also significant contribution from emissions sources or activities in upwind states. The good neighbor provision establishes a standard of contribution, not causation. *See* CAA section 110(a)(2)(D)(i)(I). The good neighbor provision does not make upwind states solely responsible for downwind states reaching attainment, but rather requires the elimination of their own significant contribution to the problem. States are obligated to eliminate their own ''significant contribution'' or ''interference'' with the ability of other states to attain or maintain the NAAQS. The court in *Wisconsin* explained that downwind jurisdictions often may need to rely on emissions reductions from upwind states to achieve attainment of the NAAQS. *Wisconsin*, 938 F.3d at 316–17. Such states would face increased regulatory burdens including the risk of bumping up to a higher nonattainment classification if attainment is not reached. *Maryland*, 958 F.3d at 1204. Therefore, a state is not excused from eliminating its significant contribution on the basis that emissions from other states or in-state emissions also contribute some amount of pollution to the same receptors to which the state is linked.

Finally, we note that we are also finalizing a disapproval of Texas' good neighbor SIP submission in this action. While this disapproval is not premised on a linkage to receptors in Oklahoma, Texas faces the prospect of possible additional emissions controls to address its good neighbor obligations resulting from this action just as Oklahoma does. Further, Texas has three nonattainment areas that failed to attain the 2015 ozone NAAQS by 2021 and that have been "bumped-up" to Moderate nonattainment, with associated emissions reduction obligations under CAA section 182 now applicable under that classification. *See* 87 FR 60897, 60899 (Oct. 7, 2022).

457

Comments regarding the March, August, and October 2018 memoranda are addressed in Sections V.B.2, V.B.7, and V.B.3 of the preamble, respectively, and further addressed in Sections 1.3, 7.4, and 6.4. Comments regarding the timing of our action on the SIP submissions are addressed in Section V.A. of the preamble. Comments on economic impacts are addressed in Section 11.6.

## 11.4  Transport Policy- Western State Ozone Regulation

*Comments*

**Commenter:** Nevada Division of Environmental Protection

**Commenter ID:** 33

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA's July 22, 2022, proposal to elevate the non-attainment status of the Las Vegas Area to Moderate from Marginal non-attainment for the 2015 ozone NAAQs as a consequence of EPA's rejection of Clark County's analysis of exceptional event demonstrations due to wildfires and stratospheric ozone intrusion underscores the need for a more strategic approach. As regulatory agencies, our collective limited resources should be spent on addressing the most significant sources of ozone formation and transport.

While NDEP acknowledges that interstate ozone transport is a regional scale pollution problem that requires an integrated approach, the proposed FIP does not adequately consider differences between Eastern states and the West. The threshold of 1% modeled ozone contribution may be appropriate for Eastern states, where ozone transport is a problem involving many smaller contributors. However, in the West, there are considerable concerns that EPA has not addressed, including the following mentioned in the June 17, 2022, letter from the Western States Air Resources Council on the FIP proposal:

    1. Significant impact of background, interstate, and international ozone.

    2. Significant impact from wildfire smoke.

    3. Reliability upon a complex array of multiple models and assumptions, whose performance and limitations for the western region have been raised for more than a decade.

    4. Expansion of the Cross-State Air Pollution Rule (CSAPR) and its emission trading program spatially (i.e., by including western states) but not in a contiguous manner, and by including separate electrical interconnections, which may make EPA's proposed remedy for interstate transport from EGU sources less effective.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The dual benefits for both Utah and Colorado nonattainment areas of reducing ozone in the Uinta Basin merit serious consideration by EPA. Resolving ozone issues in the Uinta Basin is likely to produce better results than installing controls on EGUs that are further away from the affected monitors. A recent academic study of ozone in the Uinta Basin found that ozone-contributing emissions could be significantly reduced if oil and gas industry equipment is electrified.

**Commenter:** Utah Division of Air Quality

**Commenter ID:** 47

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

[W]e note region-specific challenges in regulating ozone pollution, which underscore a need for stronger cooperation between Utah and EPA.

Regionally-Specific Ozone Challenges

The UDAQ would also like to note the exceptional challenges of reducing ozone in the Western United States. States in the West face significant and regionally-specific challenges in meeting ozone standards including elevated natural background ozone levels, increasing instances of wildfire, significant biogenic contributions, as well as the influence of internationally transported pollutants. Beyond these regionally-specific challenges, a significant portion of the emissions of Oxides of Nitrogen ($NO_x$) in Utah comes from mobile sources, an area over which the State has limited regulatory authority. These combined regionally-specific challenges paired with the fact that a substantial portion of emissions is under federal jurisdiction make successful ozone reductions exceedingly challenging, furthering the need for strong cooperative federalism and active collaboration between our respective agencies. The actions proposed by the EPA to deny our SIP to fulfill a specific agenda undermine the trust required for successful cooperative federalism, which only serves to further complicate the shared goals of reducing ozone concentrations and protecting public health.

*Response*

We respond to comments generally asserting the need for some different or alternative treatment of ozone transport in the western U.S. elsewhere in the record, including in Section V.C.3 of the preamble and in Section 4. We further respond to several specific comments here.

In response to commenters' assertion that emissions from the Uinta Basin are more impactful on downwind ozone concentrations in Colorado than emissions from EGUs in Utah, the EPA agrees with the commenter that the Uinta Basin ozone nonattainment area is geographically closer to the Colorado

459

nonattainment receptors to which Utah is linked than the EGUs (such as Hunter and Huntington). However, we disagree that not being the nearest source to a downwind receptor might justify the lack of evaluation of emissions sources with substantial and potentially cost-effective emissions reduction opportunities in a state found to contribute to downwind nonattainment or maintenance receptor(s). Additionally, the EPA disagrees that the Uinta Basin emissions reductions the Agency recently finalized are more likely to produce significant reductions at the Colorado receptors than would reductions from the Utah EGUs. 87 FR 75334 (December 8, 2022). As stated in the FIP for the Uintah and Ouray Indian Reservation, "the EPA has concluded that winter ozone levels in the Uinta Basin are most significantly influenced by VOC emissions." 87 FR 75345. The EPA has determined that the action "will result in large reductions of VOC emissions" and "may result in very small $NO_x$ emission increases." 87 FR 75344, n. 63. These VOC reductions from the oil and gas sector are aimed to address high ozone levels during the winter in the Uinta Basin area which are associated with stagnant meteorological conditions that result in the build-up of local ozone precursor emissions and snow cover which enhances the reflectivity of solar radiation which, in turn, accelerates photochemical reactions of the trapped precursors to form locally high ozone concentrations. While the reductions of VOC emissions in the Uinta Basin will serve to address local winter ozone episodes, ozone production in the Uinta Basin in summer is expected to be $NO_x$ limited, and VOC reductions are unlikely to have nearly as pronounced an impact on reducing summer ozone transport contributions at the Colorado receptors. As stated regarding past ozone interstate transport rulemakings, "EPA and others have long regarded $NO_x$ to be the more significant ozone precursor in the context of interstate ozone transport," and "EPA's review of the data leads to the finding that, as proposed, a focus on $NO_x$ emission reductions is appropriate for the purpose of addressing interstate ozone transport." *See* 86 FR at 23087.

Nevada DEP (NDEP) argues that a 1 percent threshold is not an appropriate screening threshold for western states but that it did not include in its infrastructure SIP submission support for a 1 ppb screening threshold because its modeled contribution to downwind nonattainment or maintenance receptors was below 1 percent of the NAAQS. We acknowledge that NDEP could not have foreseen a need to include a demonstration supporting a 1 ppb screening threshold based on the modeling results available at the time of its SIP submission. Nonetheless, as we stated in the proposed action to disapprove the Nevada infrastructure SIP, "following receipt and review of 49 good neighbor SIP submittals for the 2015 8-hour ozone NAAQS, EPA's experience has been that nearly every state that attempted to rely on a 1 ppb threshold did not provide sufficient information and analysis to support a determination that an alternative threshold was reasonable or appropriate for that state." 87 FR 31490. Further, based on the 2016v3 modeling for 2023, Nevada's contribution exceeds 1 ppb to nonattainment receptors in Davis and Salt Lake Counties in Utah.

In response to comments on the impact of wildfires, the EPA agrees that there are more and larger wildfires and, therefore potentially greater impacts of wildfire emissions on ozone in the West compared to the East. Where states have provided some information in their SIP submissions to suggest that atypical events related to wildfire incidents may have impacted the EPA modeling results, the EPA engaged with these arguments. For example, in the EPA's evaluation of California's evaluation of atypical events, the Agency did not necessarily disagree on the state Agency's findings.[153] However, the

---

[153] 87 FR 31443 at 31454.

EPA found that the removal of data associated with atypical events (e.g., wildfires), as identified by the state still resulted in projected violations at downwind receptors. In addition, the EPA removed all concurred exceptional events data from the base period design values when projecting these data to 2023. To the extent commenters suggest the EPA should or is even required to complete an analysis to identify the impact of atypical events associated with wildfires, consistent with the EPA's guidance on Exceptional Events, we note that the onus is not on the EPA to complete such an analysis. In fact, the guidance commenters suggest the EPA abide by indicates that any such analysis which identifies days impacted by an atypical event needs to be initiated and completed by the state, not the Agency.[154]

Regarding commenter's calls for a unique consideration when evaluating good neighbor obligations in the western U.S., the EPA notes that emissions from wildfires were included as part of the emissions inventories used in the air quality modeling. Moreover, in the source apportionment modeling quantified the impacts of fires (wild and prescribed) on ozone concentrations at individual monitoring sites nationwide. In a similar manner, the impacts from international anthropogenic emissions outside the EPA's 12 km modeling domain are transported into the U.S. as "boundary conditions" from global scale modeling, as described in the final rule Air Quality Modeling TSD.

In response to comments, we analyzed the contributions from fires[155] and from non-US sources (i.e., anthropogenic emissions in Canada and Mexico as well as anthropogenic and natural sources outside the U.S.) to quantify and compare the contributions from these types of sources at receptors in the eastern versus western U.S. Table 11-1 below provides the contributions from fires and from non-U.S. sources on average for each receptor area.[156] In this table the receptor areas are listed based on the magnitude of the contribution from fires. Overall, the contribution from fires declines progressively from west to east. The data indicate that each receptor area appears to fall into one of three geographic bins, based on the magnitude of the contributions. In the farthest western areas (i.e., California Tribal Lands, Yuma, and Salt Lake City) fires contribute approximately 3 ppb. In the areas that include the receptors in Texas, Las Cruces/Carlsbad/Hobbs/El Paso, and Denver the contributions from fires are about 2 ppb lower than in the far western areas at approximately 1 ppb. At receptors in Chicago, Coastal Wisconsin, and Coastal Connecticut, the contributions from fires are an order of magnitude lower than the contributions from fires at the receptors in the far western areas.

Examining the contributions from non-U.S. sources indicates a clear distinction between the east and the west. For example, in western areas (i.e., California Tribal Lands, Denver, Las Cruces/Carlsbad/ Hobbs/El Paso, Salt Lake City, and Yuma) the contribution from non-U.S. sources ranges from approximately 40 ppb to 55 ppb. In contrast, in receptor areas in the East (i.e., Dallas, Houston/Brazoria/Galveston, Chicago, Coastal Wisconsin, and Coastal Connecticut) the contribution from non-US sources ranges from approximately 16 ppb to 22 ppb.

This analysis demonstrates that the EPA's modeling already captures the geographical differences between the west and the east in terms of the contributions from fires and non-U.S. sources. However,

---

[154] 81 FR 68216 (October 2016), Treatment of Data Influenced by Exceptional Events.
[155] In the source apportionment modeling the fires source tag includes emissions from fires in the U.S. as well as fires from the portions of Canada and Mexico that are inside the EPA's 12 km modeling domain.
[156] The data in this table are based on the top 10-day average contribution metric which is calculated using the same method the EPA uses to calculate this metric for upwind states.

those differences supply no inherent justification why the anthropogenic emissions of western states should be ignored or discounted in evaluating their obligations under the good neighbor provision. In view of these results, the EPA disagrees with the commenter's request that the EPA should treat western states differently than eastern states when evaluating ozone transport.

*Table 11-1*

| Receptor Area | Fires | Non-U.S. Sources |
|---|---|---|
| Yuma | 3.1 | 54.0 |
| Salt Lake City | 2.9 | 52.4 |
| California Tribal Lands | 2.9 | 40.9 |
| Denver | 1.3 | 44.1 |
| Las Cruces/Carlsbad/ Hobbs/El Paso | 1.0 | 52.7 |
| Houston/Brazoria/ Galveston | 1.0 | 22.4 |
| Dallas | 0.9 | 20.7 |
| Coastal Connecticut | 0.3 | 21.6 |
| Coastal Wisconsin | 0.2 | 16.5 |
| Chicago | 0.2 | 19.6 |

The EPA has made a number of updates and improvements to the 2016v2 modeling in response to comments and we find, as discussed in Section 4.2 (Model Performance), that 2016v3 achieves better modeling performance and can be considered reliable to inform air quality and contribution analysis at Step 1 and Step 2, including in the western regions. See Section 4.2 (Model Performance) for further discussion.

Nevada's concern with the expansion of the CSAPR trading program for power plants is beyond the scope of this rulemaking, which is focused on the adequacy of state SIP submissions in addressing the good neighbor provisions for the 2015 ozone NAAQS. Other issues raised by these comments are addressed in Section V.C.1. of the preamble (mobile sources), as well as Sections 10.6 (Comments Alleging "Pretext" or Intent to Require Generation Shifting), 10.6 (Allegations that Disapprovals of Western State SIP Submissions was Predetermined), and 11.8 (Mobile Source Emissions).

## 11.5  International Contributions

*Comment*

**Commenter:** Utah Associated Municipal Power System

**Commenter ID:** 46

462

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The Proposed Rule Overlooks Factors Specific to Utah and the West

Inclusion of Utah and other western states in the Proposed Rule is inappropriate and fails to consider specific geographic factors unique to western states. EPA's analysis of Utah's upwind responsibility for downwind nonattainment under the Proposed Rule did not appropriately account for the impacts on downwind receptors of emissions from international and non-anthropogenic sources, emission reductions in the downwind state (Colorado), and emission reductions being achieved in Utah.

*Response*

See Section V.C.2. of the preamble for discussion of international contributions. The modeling accounts for all sources of contributions, including international and biogenic.

## 11.6 Economic Impacts

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Every single state that is contributing above the 1 percent threshold (except for Oregon, as noted previously) is having their SIP disapproved, and the proposed FIP will control and impose unnegotiable costs on citizens and sources in those states.

**Commenter:** City Utilities of Springfield, Missouri

**Commenter ID:** 13

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Missouri has proven to be a *Good Neighbor*, and the utilities and the citizens of Missouri have more than paid for the ambient air quality improvements realized in Missouri and in downwind states. These reductions are no small task for the customer-owners in the Springfield-Greene County area. It is inappropriate to require additional costs and economic hardships for the rate payers of CU when we

have consistently been a good actor by operating control equipment and our area has met the applicable ozone NAAQS.

**Commenter:** Evergy, Inc.

**Commenter ID:** 16

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

Further, by establishing a link between Missouri and these downwind receptors, EPA is forcing immense compliance costs onto Missouri customers.

**Commenter:** Mississippi Department of Environmental Quality

**Commenter ID:** 32

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Disapproving Mississippi's iSIP without allowing the state adequate time to address any EPA concerns prior to imposing the proposed draconian FIP will have economic effects that disproportionally affect lower-income, disadvantaged, and minority Mississippians. In the current economic conditions (unchecked inflation, increased reliance on imported energy sources, eastern European conflicts, etc.), it is imprudent to apply such extreme and unnecessary federal restrictions on energy production and transmission, which will inevitably cause costs of essential goods and services to rise.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

The Combined Effect of EPA's Proposed Disapproval and Proposed FIP Will Cause Major Economic and Reliability Impacts for the Western United States.

Finalization of the Proposed Disapproval and subsequent imposition of the Proposed FIP will jeopardize energy supply and reliability in the West and cause major economic impacts. The Proposed Disapproval means electric generating units ("EGUs") in Utah will be subject to the selective catalytic reduction or SCR-forcing provisions of the Proposed FIP. As outlined in comments on the Proposed FIP by the state of Utah, other western states, industry, and the BHE Comments, it is simply not possible to either install

464

the costly SCR equipment or retire and replace the energy generated and vital ancillary services provided by so many units subject to the regulatory constraints and timelines of the Proposed FIP.

[…]

EPA's One-Size-Fits-All Approach Does a Disservice to Utah's Coal Communities.

The Proposed Disapproval does not give adequate consideration to the impacts the Disapproval will have on the communities surrounding the Utah Units due to the forced acceleration of coal-unit retirements that will result from the Proposed FIP. President Biden has committed that U.S. coal communities will experience a just transition as the energy economy changes: "We're never going to forget the men and women who dug the coal and built the nation. We're going to do right by them and make sure they have opportunities to keep building the nation . . ." The Proposed Disapproval is inconsistent with these principles because it will set in motion an inflexible regulatory scheme to be implemented on an unrealistic timeline with disproportionate and adverse impacts for affected communities. Under its own guidelines, EPA must meaningfully engage with affected communities to clearly understand and address the barriers to a just transition that will result from the Proposed Disapproval.

The Utah Units are very important to the local economies surrounding the power plants. The Hunter plant directly employs approximately 186 people, and the Huntington plant employs approximately 136, and thousands of other people are employed by industries that support the Utah Units. Emery and Carbon counties rely on the plants for a significant part of their tax and employment base. For example, PacifiCorp paid $22.6 million in property taxes to Emery County for 2021. This represented almost 70%, or more than two-thirds, of the county's total property tax revenues. These revenues provide funding for the county law enforcement agency, the county governmental operations, and the Emery County School District.

A new Kem Gardner study on Utah's Coal Country ("Coal Country Study") identifies Carbon and Emery counties as among the least economically diverse counties in the state. There are approximately 4,000 jobs in Emery and Carbon counties in mining and other industry services. Wages for plant workers are higher than the overall industrial workforce, and closure of a Utah Unit would have a significant impact on wages earned in the surrounding communities. Because the communities currently rely so heavily on the Utah Units and associated mining and industry services, it is especially important to balance local interests, efficiencies, economics, and impacts to people while pursuing strategies to decrease environmental impacts and grow a cleaner power system.

It is estimated that the early retirement of even a single unit at the Hunter plant would result in an approximate 20-25% employee reduction. Beyond the loss of plant jobs, any unit retirement would have broader impacts to associated industry jobs serving the plants and the local community.

The Coal Country Study explains, "These two counties form a regional economy, with a shared commuter shed, shared industries, and consumer spending patterns. Together, these counties face challenges with changing economic circumstances from declining coal production and the future closures of power plants." The report finds time is a critical factor to diversify the local economies and address the expected employment declines in the natural resource/coal sector. Both Carbon and Emery

465

County have experienced population loss since 2010, a significant portion of which coincided with the retirement of PacifiCorp's Carbon power plant and the closure of its Deer Creek mine in 2015.

The welfare of the affected communities, which is intertwined with and dependent upon the presence of the Utah Units, is an important factor EPA must consider when weighing the potential impact of the Proposed Disapproval.

**Commenter:** Utah Associated Municipal Power System

**Commenter ID:** 46

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Requiring SCR will Adversely Impact UAMPS' Participating Members and Jeopardize Reliability

UAMPS opposes any regulatory requirement to install SCR on Hunter Unit 2, which would constitute overcontrol and adversely impact UAMPS and its members. EPA's required timeline of 36 months to install SCR is patently unreasonable and not feasible. In addition to owning interests in or directly operating power plants and other sources of electrical power, UAMPS and its members regularly purchase power off the grid, and are, therefore, sensitive to market and regulatory forces that impact electricity affordability and reliability. Western power markets are already being tested by retiring power generation facilities; premature closures caused by the Proposed Rule will only exacerbate the western power markets, increase wholesale prices, and result in increased costs to end-use customers within UAMPS' member communities. With an undivided 14.582% ownership interest in Hunter Unit 2, UAMPS and its participating members could face significant adverse economic impacts from a regulatory requirement for PacifiCorp to install SCR on Hunter Unit 2. Further, the Proposed Rule will likely cause early coal-unit retirements that will undermine the reliability of the bulk electric system and adversely impact affected coal communities as well as customers and electricity consumers in the West, significant factors and impacts which EPA failed to take into account.

*Response*

The EPA is sensitive to commenter's concerns regarding the economic impact of the EPA's regulatory actions.  However, these comments do not change the EPA's analysis and conclusion that the SIP submissions being disapproved in this action cannot be found to satisfy the requirements of CAA section 110(a)(2)(D)(i)(I). This final action to disapprove SIP submissions does not require any action from states or emissions sources and therefore does not impose any additional costs or economic hardships on sources or communities. Comments regarding economic and other impacts of the proposed FIP action (87 FR 20036 (April 6, 2022) (Docket ID No. EPA-HQ-OAR-2021-0668)) are outside the scope of this rulemaking.

Comments on the topic of SIP/FIP timing are addressed in Section V.A of the preamble and Section 1.1 of this RTC document. Comments on EPA's proposal in a separate rulemaking to not find error in its

previous approval of Oregon's good neighbor SIP for the 2015 ozone NAAQS is outside the scope of this action.

## 11.7 Environmental Justice

*Comments*

**Commenter:** California Air Resources Board

**Commenter ID:** 12

**Docket ID:** EPA-R09-OAR-2022-0394

**Comment:**

In summary, CARB urges the federal government to help achieve emissions reductions from sources subject to federal controls that significantly impact environmental justice communities and the State's ability to reach air quality Standards. California would like to work alongside the federal government as we all strive for cleaner air and regulatory attainment for all areas. CARB appreciates the opportunity to work with EPA to submit any additional information necessary to support the approval of the "interstate transport" portion of the California 2018 Infrastructure SIP.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851, EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

EPA is also obligated pursuant to Executive Orders 12898 (Feb. 11, 1994) and 14008 (Jan. 27, 2021), to ensure its actions support the principal of environmental justice, particularly in energy communities. Environmental justice is the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income, with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies.

*Response*

This action disapproves SIP submissions from states under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. EPA does not impose emissions reductions in a SIP disapproval. As articulated in the final action, the EPA is determining that certain SIPs do not meet certain minimum requirements, and the

467

EPA is disapproving those SIPs. Specifically, this action disapproves certain SIP submissions as not containing the necessary provisions to satisfy good neighbor requirements under CAA section 110(a)(2)(D)(i)(I). In a wholly separate regulatory action, the EPA has proposed to address the CAA "good neighbor" requirements under section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS for these states under its CAA section 110(c) FIP authority.  The EPA acknowledges the importance of giving consideration to the impact of the EPA's actions on environmental justice communities. Although separate from this action, we note that the EPA conducted an environmental justice analysis of the EPA's proposed interstate transport FIP for the 2015 ozone NAAQS. *See* 87 FR 20036-20155 (April 6, 2022).

Executive Orders 12898 and 14008 by their own terms do not create a right to judicial review (Executive Order 12898 section 6-609 and Executive Order 14008 section 301(c)). *See Sur Contra La Contaminacion v. EPA*, 202 F.3d 443, 449-50 (1st Cir. 2000) (judicial review is not available under EO 12898); *Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 8-9 (D.C. Cir. 1999) (holding that a claim under another executive order with nearly identical judicial review language was not judicially reviewable and that petitioner's claim that the action at issue was arbitrary and capricious because of the Agency's alleged violation of the order was "nothing more than an indirect—and impermissible—attempt to enforce private rights under the order").

## 11.8  Mobile Sources Emissions

*Comments*

**Commenter:** California Air Resources Board

**Commenter ID:** 12

**Docket ID:** EPA-R09-OAR-2022-0394

**Comment:**

Emissions from primarily-federally regulated sources are a growing proportion of emissions in California. CARB welcomes assistance and dialogue from EPA and the U.S. government in addressing this challenge. As an example, statewide emissions from primarily federally regulated sources (aircraft, trains, ocean-going vessels, interstate trucks, and preempted off-road equipment) are projected to be the source of more than 45 percent, or approximately 450 tons per day, of anthropogenic $NO_X$ emissions in 2026 (CEPAM2022 v1.01, including ocean going vessels out to 100 nautical miles from shore). Without federal action, by 2030, $NO_X$ emissions from these primarily-federally regulated sources will be double California-regulated mobile sources. Therefore, it is imperative that the federal government act decisively to reduce emissions from air pollution sources under its control in California, as these sources contribute significantly to California's nonattainment challenges. Primarily-federally regulated mobile source emission reduction actions are critically needed alongside California's aggressive and effective control of sources under our authority.

In summary, CARB urges the federal government to help achieve emissions reductions from sources subject to federal control that significantly impact environmental justice communities and the State's ability to reach air quality standards.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851

**Comment:**

Mobile sources are the primary cause of remaining air quality problems.

Available source apportionment data clearly shows that the most significant contributor of ozone in the East is mobile sources. Even EPA recognized that mobile and other local sources are the likely cause of high ozone in Connecticut. In a May 14, 2018, presentation titled "Analysis of Ozone Trends in the East in Relation to Interstate Transport," Norm Possiel of the EPA Office of Air Quality Planning and Standards showed the following slide regarding high ozone in costal Connecticut:

[slide in full comment]

More recently, in a November 9, 2021, presentation to the Ozone Transport Commission (OTC), Dr. Jeff Underhill, Chair of the OTC Modeling Committee, showed hourly source apportionment results that demonstrate that onroad and nonroad emissions dominate ozone formation in the modeled simulation at the Connecticut monitor example provided.

Alpine Geophysics, on behalf of MOG, prepared a summary of source apportionment data in March of 2022 that documents recent ozone source apportionment modeling and associated results of the EPA 2016v2 modeling platform and associated 2023fj projections. For each monitor in the modeling domain, Alpine produced a standard set of products representing the relative contribution of region and category emissions to projected 2023 ozone concentrations.

An example of the relative contribution of EGU and non-EGU point source emissions to the downwind receptor (90099002) at New Haven, Connecticut is presented in Figure 2. Note the small contribution of both EGU and non-EGU point source emissions (6 percent) toward the total contribution of emissions forming ozone in the 2023 modeled simulation.

[Figure 2 available in full comment]

Figure 2. Relative contribution of emissions (by percent) from major source sectors to modeled ozone concentrations in 2023 at the New Haven, Connecticut monitor 90099002.

A similar level of emissions from EGU and non-EGU NOx contribution is seen in Figure 3 at the Kenosha, Wisconsin nonattainment monitor (550590019), where almost 43% of NOx contributions is from mobile and area source sectors.

469

[Figure 3 available in full comment]

Figure 3. Relative contribution of emissions (by percent) from major source sectors to modeled ozone concentrations in 2023 at the Kenosha, Wisconsin monitor 550590019.

Based on these findings, it is questionable whether additional upwind regional ozone season NOx reductions from EGUs or non-EGU point sources would have the intended impact at downwind receptors compared to other, higher contributing, and local, source sectors.

As can easily be seen in the data, the contribution of nearby sources, and especially mobile sources, dwarfs the contribution of upwind state point sources. The data for all monitors in the Northeast are similar. Mobile sources are the dominant source of ozone in the Northeast now and are projected to continue to dominate in 2023.

The EPA Strategic Plan at page 43 states that "EPA will collect and evaluate mobile source emission data to help guide future program priorities related to reducing criteria pollutant and greenhouse gas emissions from light-duty cars and trucks, heavy-duty trucks and buses, nonroad engines and equipment, and from the fuels that power these engines. The Agency will develop the next round of multi-pollutant emission standards for light-duty and highway heavy-duty vehicles, which will improve air quality and reduce pollution near roads and other areas of high truck activity, such as warehouses and ports. EPA will also continue to work to ensure that Clean Air Act requirements are met for new transportation projects with heavy-duty diesel traffic, such that they do not worsen air quality near communities with environmental justice concerns. The Agency will address air quality concerns in these communities through implementing regulations, developing improved air quality models and mitigation measures, and collaborating with a broad range FY 2022-2026 EPA Strategic Plan – Objective 4.1 44 of stakeholders — including state air quality agencies and communities with environmental justice concerns — to develop targeted, sector-based, and place-based strategies for diesel fleets (including school buses, ports, and other goods movement facilities). EPA will support and oversee projects for the replacement of existing school buses with low- or zero-emission school buses funded under the Bipartisan Infrastructure Law, which will be implemented in alignment with Justice."

> MOG notes that EPA plans to deal with mobile sources in the future and has initiated regulatory work in this regard as noted in the EPA Strategic Plan. Specifically, EPA has finalized "Late Model Year Light-Duty Vehicle Greenhouse Gas Emission Standards." 86 Fed. Reg. 74,434 (December 30, 2021). EPAS has also proposed "Control of Air Pollution From New Motor Vehicles: Heavy-Duty Engine and Vehicle Standards," 87 Fed. Reg. 17,414 (March 28, 2022). EPA revised the GHG emission standards for passenger cars and light trucks under the authority provided by section 202(a) of the CAA. This section is found within the Chapter 85 of the U.S. Code titled, "Air Pollution Prevention and Control" and is incorporated into the chapter reference found within the state implementation plan obligations found under Section 110(a)(2), Each implementation plan submitted by a State under **this chapter** shall be adopted by the State after reasonable notice and public hearing. Each such plan shall – (A) include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of **this chapter**; (Emphasis added).

470

In summary, nonattainment plans are required to meet the applicable requirements of the Clean Air Act also described as Chapter 85 of Title 42 of the U. S. Code. Approvable NAAQS implementation plans are required to incorporate relevant sections of the Clean Air Act, to include the programs promulgated under Subchapter II – Emission Standards for Moving Sources such as the GHG emissions standards for light-duty vehicles for 2023 and later model years. The air quality impacts from this rule will have tailpipe emissions are measurable and warrant incorporation into the overall calculation of emissions reductions from CAA programs that will improve ozone air quality. 86 Fed. Reg. 74,490.

The proposed Heavy-Duty Engine and Vehicle Standards rule is anticipated to "reduce air pollution from highway heavy-duty vehicles and engines, including ozone, particulate matter, and greenhouse gases." 87 Fed. Reg. 17.414. EPA expects the standards in the proposed Options 1 and 2 to result in meaningful reductions in emissions of NOx, VOC, CO and PM2.5. 87 Fed. Reg. 17,581. Also, EPA predicts, "The proposal would reduce 8-hour ozone design values 26 significantly in 2045." Id. at 17,582. These observations support the known impact of mobile sources on ozone ambient air quality.

As stated earlier in these comments, aligning the obligations to control significant sources of ozone precursors with the upwind and downwind ozone attainment obligations is the only path that leads to successful state implementation plan development as guided by the Clean Air Act. EPA's failure to recognize the impact of the timing of mobile source controls on implementation of the Good Neighbor provisions and the disapprovals being proposed is arbitrary and capricious and exceeds EPA's authority under the CAA.

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

Available source apportionment data clearly shows that the most significant contributor of ozone is mobile sources.

**Commenter:** Nevada Division of Environmental Protection

**Commenter ID:** 33

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

While EPA has proposed to disapprove Nevada's 2018 iSIP, it has not clearly demonstrated that the proposed FIP controls on Nevada stationary sources will achieve meaningful reductions in ozone concentrations in Nevada or neighboring states. The proposed FIP fails to consider and address that in Nevada, mobile sources, not stationary sources, emit the plurality of nitrogen oxide precursors to ozone formation.

**Commenter:** New Jersey Department of Environmental Protection

**Commenter ID:** 34

**Docket ID:** EPA-R02-OAR-2021-0673

**Comment:**

EPA states that an approvable GN SIP revision must demonstrate enforceable emission control measures that achieve at least the same amount of emission reductions achieved by the FIP. With this in mind, New Jersey would like to note that its 2017 NOx annual emissions inventory indicates that 79% of the state's emissions are from mobile sources (onroad and nonroad), while EGUs make up a mere 3%, and non-EGU point sources make up 14%. This breakdown of New Jersey's NOx emissions inventory reflects not only the extensive and various control strategies implemented in New Jersey but also that EGUs and non-EGU point sources located in New Jersey are already well controlled. Considering the large contribution of NOx from onroad and nonroad mobile sources in New Jersey, it is unclear how New Jersey would demonstrate a significant reduction from the sources that make up such a small fraction of the state's NOx emissions. Additionally, New Jersey's Board of Public Utilities recently approved a plan to shut down the two-remaining coal-fired power plants in the state by the end of May 2022. Therefore, due to the large portion of mobile source emissions compared to stationary sources, and the limited authority for states to implement emission reduction strategies for mobile sources, EPA should advance measures to reduce mobile source emissions as soon as practicable including but not limited emission reductions for new medium and heavy-duty vehicles, new light duty passenger vehicles, and widescale electrification of new onroad and nonroad mobile sources.

EPA also states that New Jersey's GN SIP failed to "contain the necessary provisions to eliminate emissions in amounts that will contribute significantly to nonattainment or interfere with maintenance of the NAAQS in any other state." As noted in New Jersey's 2008 75 ppb 8- Hour Ozone Attainment Demonstration Northern New Jersey-New York-Connecticut Nonattainment Area, the 2023 Ozone Transport Commission (OTC) source apportionment modeling, using the OTC 2011 12km SIP modeling platform predicted that New Jersey's mobile sector contributed 70% of New Jersey's overall contribution to ozone nonattainment while EGUs were merely 5%.  These percentages are likely to be similar using EPA's recent 2016 modeling platform that was used to support the latest 2015 Ozone FIP, which predicts New Jersey's overall contribution to ozone nonattainment in Connecticut to be approximately 9 ppb. Therefore, it is estimated that 6.3 ppb of New Jersey's transported ozone is attributed to mobile sources and less than one-half ppb to EGUs. New Jersey has addressed the sources it can control to reduce their significant contribution to downwind nonattainment. Additionally, New Jersey continues to address emissions from mobile sources to the extent that state action is not pre-empted by the Clean Air Act. New Jersey has adopted the more-stringent California new vehicle rules for light-duty vehicles (Low Emission Vehicle and Zero Emission Vehicle programs) and medium/heavy duty vehicles (Advanced Clean Trucks) to ensure that the lowest emitting vehicles in the nation are sold in New Jersey, including increasing numbers of zero emission vehicles.  Other states have not made the same commitment. New Jersey also has some of the most stringent rules in the country for vehicle idling and heavy-duty vehicle inspection and maintenance using on-board diagnostics (OBD) technology. EPA should recognize New Jersey for these actions by approving New Jersey's GN SIP.

**Commenter:** Ohio Utilities and Generators Group

**Commenter ID:** 36

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

Ohio developed its proposed SIP consistent with the Act and the applicable guidance. US EPA's proposed disapproval is inconsistent with its own guidance. The purported modeling upon which US EPA relies does not accurately assess the impact of mobile sources in the nonattainment areas and arbitrarily attributes contributions from Ohio's (& other states) EGU sector. In short, the SIP proposed by Ohio EPA is appropriate and should be approved by US EPA.

**Commenter:** PacifiCorp

**Commenter ID:** 38

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

Utah's Uinta Basin borders Colorado and is closer to the affected Colorado monitors than the referenced EGUs. The Uinta Basin is currently nonattainment for ozone and significant reductions are and will be made to address its own ozone concerns. These Uinta Basin-based reductions are more likely to produce significant reductions at the impacted monitors in Colorado than EPA's EGU preferences. Recent analysis using data from EPA's 2016v2 modeling platform shows that Utah and Wyoming EGUs contribute less than 0.4% to the Colorado nonattainment monitors. Mobile sources and oil and gas sources are greater contributors (although still relatively small compared to background and natural sources).

**Commenter:** West Virginia Department of Environmental Protection

**Commenter ID:** 49

**Docket ID:** EPA-R03-OAR-2021-0873

**Comment:**

DAQ contends 2015 8-hour Ozone NAAQS design values at downwind monitors in nonattainment or maintenance areas will continue to respectively be above or near the standard whilst the instruments are adjacent to and generally downwind of major interstate highway arteries, including Interstate 95 and its various spurs and loops. Local mobile NOx sources have always been and continue to be the primary driver of nonattainment and maintenance issues in the areas of concern. This was illustrated quite clearly on page I-6 of Appendix I of the WV 2015 Ozone Good Neighbor SIP. DAQ maintains that should all upwind stationary sources of NOx cease to operate, then these monitors would continue to report much higher than background levels of ground-level ozone, with many in nonattainment. It would be considerably more prudent for EPA to encourage downwind states with nonattainment and

maintenance areas to implement tighter emissions limits or increased tolling for mobile sources located within their respective jurisdictions.

*Response*

The EPA responds generally to comments regarding mobile source emissions in Section V.C.1 of the preamble. Here, the EPA addresses comments raising arguments pertinent to specific states.

In response to Midwest Ozone Group, the EPA addressed the cited May 14, 2018, presentation at proposal. 87 FR 9859 (February 22, 2022); 87 FR 9873 (February 22, 2022). Substantive comments on mobile source rulemakings are outside the scope of this action.

The EPA describes the emissions inventories of mobile sources in the preamble in Section III.A.3. Additional information about emissions inventories is available in the 2016v3 Emissions Modeling TSD. The EPA addresses comments on methodology for determining future year contribution in Section 7.1 and comments related to mobile source emissions inventories in Section 3.2. Ohio Utilities and Generators Group did not specify which EPA guidance it referenced with sufficient specificity for the EPA to be able to respond, but the EPA responded to other comments related to guidance in Sections 1.2, 6.4, and 7.4 of this RTC document.

<u>California</u>

In response to one comment (CARB) regarding emissions in the state of California from sources in sectors regulated by the federal government, the EPA disagrees that emissions from mobile sources are entirely beyond the regulatory reach of the state. To the extent that CARB is suggesting that the EPA focus on reducing emissions from mobile sources of air pollution in our proposed FIP, we note that comments on the proposed FIP are outside the scope of this action on the California transport SIP submission. As previously stated, we recognize that mobile sources are important contributors to emissions of criteria pollutants and greenhouse gasses. As one commenter points out, the EPA has finalized a rulemaking to reduce emissions of several air pollutants, including $NO_X$, from heavy-duty vehicles and engines starting in model year 2027[157]. The rule is consistent with President Biden's Executive Order 14037, "Strengthening American Leadership in Clean Cars and Trucks,"[158] and helps ensure that the heavy-duty vehicles and engines that drive American commerce are as clean as possible while charting a path to advance zero-emission vehicles in the heavy-duty fleet.

The Final Rule for control of air pollution from heavy-duty engine and vehicle standards targets emissions reductions beginning in the year 2027. Therefore, these emissions reductions will not begin to take place until after 2023, the relevant analytic year used in this action and is therefore not included in the modeling for this action

---

[157] On December 20, 2022, the EPA finalized more stringent emissions standards for $NO_X$ and other pollutants from heavy-duty vehicles and engines, beginning with model year 2027. *See https://www.epa.gov/regulations-emissions-vehicles-and-engines/final-rule-and-related-materials-control-air-pollution*. EPA is also developing new multi-pollutant standards for light- and medium-duty vehicles as well as options to address pollution from locomotives.
[158] 86 FR 43583 (August 10, 2021).

New Jersey

One commenter argues that New Jersey's SIP submissions should be approved because, according to the commenter, New Jersey's sources, including mobile sources, are already strongly controlled.

The EPA acknowledges New Jersey has many emissions controls in place, however, the EPA does not view New Jersey's SIP submission as supporting a conclusion that the state has satisfied the requirements of CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. The EPA proposed to disapprove New Jersey's transport SIP submission in part because the state did not evaluate the availability of additional emissions controls to improve downwind air quality at nonattainment and/or maintenance receptors at Step 3, even though New Jersey emissions are linked to receptors at Step 2 as indicated by both the state and the EPA's air quality modeling. The comment does not change the EPA's assessment of the SIP submission. The EPA is finalizing the disapproval of New Jersey's SIP submission for the reasons in the proposal (87 FR 9484, Feb. 22, 2022) and in this final rule.

The commenter also indicated there are more $NO_x$ emissions from mobile sources than stationary sources in New Jersey, and so it is unclear to the commenter what else New Jersey can do. The EPA recognizes that mobile sources represent a large portion of $NO_x$ emissions in New Jersey and would be expected to have a large impact on downwind nonattainment and maintenance receptors in proportion to other sectors.  However, simply noting that mobile source emissions are a large portion of New Jersey's $NO_x$ emissions, noting they represent a large portion of New Jersey's contribution to downwind nonattainment and maintenance receptors, and listing existing controls, does not, as an analytical matter, support a conclusion that all necessary emission reductions have been sufficiently achieved to meet the state's interstate transport obligations. Mobile source emissions are among the types of anthropogenic "emissions activity," CAA section 110(a)(2)(D)(i), assigned to states at Step 2. Thus, the EPA includes mobile source emissions in the 2016v2 and 2016v3 modeling to identify state linkages at Steps 1 and 2.  For example, New Jersey's adoption of California's LEV criteria pollutant regulations for light-duty vehicles was reflected in the emissions inventory. MOVES3 harmonizes the emission rate standards with CA LEV for ozone precursors in all states starting with model year 2017.  ZEV programs are not explicitly modeled, but the light-duty EV population as of 2020 was reflected and grown to the future years using AEO 2022 trends. Both the 2016v2 and 2016v3 modeling indicated that New Jersey continues to be linked at Step 2 of the 4-step interstate transport framework.

Lastly, the commenter seems to be mischaracterizing statements the EPA made in the proposed FIP, separate from this rulemaking, regarding SIP submissions to replace that FIP in the event that a FIP is finalized. The EPA views comments on the proposed FIP to be outside the scope of this rulemaking. If, instead, the commenter is characterizing the EPA's disapproval of New Jersey's good neighbor SIP submissions for the 2008 ozone NAAQS, the EPA clarifies that comparison to a FIP in that action was limited to the Revised CSAPR Update, which was finalized before the EPA's action on the SIP submission and resolved good neighbor obligations for the 2008 ozone NAAQS for New Jersey. 87 FR 55692 (September 12, 2022).

Utah

Regarding the comment that mobile sources and oil and gas sources are greater contributors to Colorado ozone nonattainment than Utah and Wyoming EGUs, this does not answer the question

475

regarding the adequacy of the Utah's or Wyoming's SIP submissions (though we are not taking final action on Wyoming here), because both states have mobile and oil and gas sources themselves that are "sources or other type of emissions activity" under CAA section 110(a)(2)(D)(i). Utah's transport SIP submission did not include a sufficient examination or a technical justification that could support the conclusion that the state has no good neighbor obligations for the 2015 8-hour ozone NAAQS. As such, the EPA must disapprove the Utah SIP submission for failing to satisfy the statutory requirements of CAA section 110(a)(2)(D)(i)(I). Response to comments regarding oil and gas emissions reductions in the Uinta Basin are addressed in Section 11.4 (Transport Policy-Western State Ozone Regulation).

West Virginia

As stated in the NPRM, the "good neighbor" or "interstate transport" requirements of the CAA requires that each state's SIP contain adequate provisions to prohibit emissions from within the state from significantly contributing to nonattainment or interfering with maintenance of the NAAQS in other states. The question therefore is not whether other sources, such as mobile sources, also contribute to high ozone readings in downwind areas.  The question is whether sources in West Virginia are contributing significantly to multiple downwind receptors. The EPA considers a state to be "linked" if it has a contribution value equal to or exceeding the threshold of 1 percent of the NAAQS (i.e., 0.70 parts per billion (ppb) for the 2015 8-hour ozone NAAQS) to a downwind receptor. The EPA's 2016v2 modeling shows that sources in West Virginia are linked to ozone nonattainment and/or maintenance receptors in certain downwind areas in amounts greater than that threshold. As WVDEP mentioned in their comment, shutting down all point sources in the state may not result in the affected receptors achieving attainment, but that is not the relevant standard under the good neighbor provision. Also, the EPA does not disagree that emissions from mobile sources are an issue in ozone nonattainment areas, separate from interstate transport. The EPA has been regulating mobile source emissions since it was established as a federal agency in 1970, and all mobile source sectors are currently subject to NOX emissions standards. However, mobile source emissions remain, and are included in the identification of receptors at Step 1 and state-level contribution at Step 2. West Virginia's good neighbor SIP submission did not show that emissions from West Virginia sources were not contributing significantly to, or interfering with maintenance by, the NAAQS in certain downwind states and therefore this element of the SIP submission did not meet the requirements of CAA section 110(a)(2)(D)(i)(I).


## 11.9 Typographical Concerns


*Comment*


**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

ODEQ notes that EPA Region 6 notified Oklahoma on March 2, 2022, that there was a mistake in the proposed action in the description of EPA's method for calculating 2023 contributions from upwind states, specifically in regards to the days with the highest projected ozone levels on page 9809 of the proposed disapproval. The correct description of EPA's methodology is included in at least two Technical Support Documents included in the docket. However, the correct description should be included in the proposed disapproval itself.

There is the second occurrence of the mistake in the description of EPA's method for calculating 2023 contributions from upwind states, specifically regarding the days with the highest projected ozone levels, on pages 9814-15 of the proposed disapproval.

*Response*

As the commenter notes, the preamble for the proposed action addressing the SIP submissions for states in Region 6 misstated the EPA's method for calculating future year contributions from upwind sates. The Evaluation of TCEQ Modeling TSD identified where the misstatement was specifically located in the preamble and included the correct description of the EPA's method for calculating future year contributions from upwind states. Additionally, on March 2, 2022, the EPA staff sent an email to the Region 6 states to inform them of the issue and where they could find the correct description. We also included a copy of the email in Docket No. EPA-R06-OAR-2021-0801.[159] The misstatement does not affect any aspect of EPA's action or rationale, and other materials included in this action correctly describe the method for how the EPA calculates future year contributions. Based on these actions, the EPA believes that it adequately addressed any potential issues caused by the errant language in the preamble.

## 11.10  Tribal Concerns

*Comment*

**Commenter:** Kaw Nation

**Commenter ID:** 24

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

Kaw Nation is one of the federally recognized Indian Tribes, pursuant to 25 CFR § 11.100 (x), located in Oklahoma, that has a Tribal authority and capability of qualified professionals that could manage Tribal

---

[159] *See*, Errant language in Proposed Rule; Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, Texas Interstate Transport of Air Pollution 2015 Ozone NAAQS. Attachments to this EPA Region 6, Mar 2, 2022, E-Mail message, available in Docket ID No. EPA–R06–OAR–0801–0663-0011.

Air Quality. It is one of the few Tribes who met the Treatment As State (TAS) eligibility requirements under 40 CFR, 49.6 and approved for Sec. 301(d) of the CAA, 42 U.S.C § 7401 et seq., for the purpose of financial assistance under Sec. 105 of the CAA for TAS under Sec. 505 (a)(2) of the CAA.

Kaw Nation was monitoring Ozone precursors particularly Particulate matters in the Northern parts of Oklahoma for a while and it's within the Attainment zone for Ozone National Ambient Air Quality Standards (NAAQS).

Pursuant to Federal Clean Air Act (CAA), Kaw Nation would propose U.S. EPA to promulgate a federal implementation plan (FIP) than State Implementation Plan (SIP) so that Tribes can address interstate transport requirement.

Kaw Nation also propose to reconsider the approval of SAFETA and make the Oklahoma SIP to be inclusive of Indian Authority and have discussion with Tribal governments.

Kaw Nation is thankful to the U.S. EPA for inviting Tribal Authorities for government-to-government consultation to maintain our environment safe and secured for our future generation to come.


*Response*

The EPA appreciates the partnership and work that the Kaw Nation does with its air program, which includes participating in numerous regional and national workgroups, conducting an emissions inventory, reviewing air permits, and re-establishing their PM$_{2.5}$ air monitoring site.

The Kaw Nation asked that the EPA promulgate a FIP, rather than a SIP, to enable tribes to address interstate transport issues. In this action, the EPA is disapproving the portion of Oklahoma's SIP submission addressing interstate transport for the 2015 ozone NAAQS, which includes the portion of Oklahoma's SIP submission that would apply in certain areas of Indian country consistent with EPA's October 1, 2020, approval of the state's request pursuant to section 10211(a) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act of 2005: A Legacy for Users, Pub. Law 109-59, 119 Stat. 1144, 1937 (August 10, 2005) ("SAFETEA").  Based on this proposed disapproval, the EPA in a separate action proposed FIPs for several states including the state of Oklahoma and for areas of Indian country within the borders of those states.[160] A tribe may seek Treatment in a Manner Similar to a State (TAS) approval to develop their own CAA regulatory program, including the implementation of a Tribal Implementation Plan (TIP) which could allow tribes to address interstate transport requirements.[161]

Although not part of this rulemaking, on December 22, 2021, the EPA proposed to withdraw and reconsider the October 1, 2020, SAFETEA approval.[162] The EPA engaged with tribes in consultations before and after the EPA's proposal to withdraw and reconsider the October 1, 2020, SAFETEA approval,

---

[160] Proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Primary Ozone National Ambient Air Quality Standard, available in EPA-HQ-OAR-2021-0668. As proposed, the FIP would apply in areas of Indian Country in Oklahoma, whether by virtue of authority under CAA section 110(c) or 301(d).

[161] For Oklahoma tribes, SAFETEA 10211(b) requires that the State and Tribe enter into a cooperative agreement prior to seeking TAS approval for a regulatory program.  EPA encourages and would support the Nation in seeking such a cooperative agreement and TAS approval should the Nation desire to implement a TIP.

[162] *See* https://www.epa.gov/ok/proposed-withdrawal-and-reconsideration-and-supporting-information.

and is currently considering feedback received from tribes, including the Kaw Nation. The EPA expects to engage in further discussions with tribal governments and the state of Oklahoma as part of this reconsideration.

## 11.11  Executive Order 13132

*Comment*

**Commenter:** Tennessee Department of Environment and Conservation

**Commenter ID:** 41

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Tennessee believes EPA's proposed Disapproval May Contravene Executive Order 131132 including: (1) the action directly affects the relationship between the states and national government; and (2) EPA's approach to infrastructure SIPs will have a chilling effect on states' abilities to fully develop and implement their obligations under section 110 of the Clean Air Act.

*Response*

Because action on Tennessee's SIP submission is not included in this final action, to the extent this comment is relevant to Tennessee it is out of scope. The EPA disagrees that this disapproval action is inconsistent with the cooperative federalism framework of the CAA. The EPA addresses comments on cooperative federalism in Section 10.3 (Cooperative Federalism and the EPA's Authority).

Based on footnote 60 of the comment letter, the EPA believes the reference to Executive Order 131132 was a typographical error and that the comment intended to refer to Executive Order 13132. The EPA disagrees that this action contravenes the requirements of Executive Order 13132.

In CAA section 110(k)(3), Congress directed the EPA, not the states, to determine whether SIP submissions satisfy the requirements of the CAA. It is only after a SIP is approved that state measures included in a SIP submission become federally enforceable. And, by disapproving a SIP submission, EPA is not invalidating any state law or regulation. As such, the EPA's disapprovals do not take away any authority that a state would otherwise have to regulate air pollution. This rulemaking thus does not alter the legal relationship between the states and the federal government, nor does it create any substantial new burden affecting the states. Indeed, this rulemaking does not directly regulate any state or local governments at all. Accordingly, the EPA believes that this rule is consistent with the CAA and its policies as well as the Executive Order. The EPA also disagrees with the claim that the disapprovals will impact states' abilities to fully develop and implement their obligations under the CAA should they choose to do so following this action, and the EPA approves their SIP submissions.

Executive Order 13132 by its own terms does not create a right to judicial review (Executive Order 13132 section 11). *See Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 8-9 (D.C. Cir. 1999) (holding that a

479

claim under another executive order with nearly identical judicial review language was not judicially reviewable and that petitioner's claim that the action at issue was arbitrary and capricious because of the Agency's alleged violation of the order was "nothing more than an indirect—and impermissible—attempt to enforce private rights under the order").

## 11.12  Consent Decrees

*Comments*

**Commenter:** Midwest Ozone Group

**Commenter ID:** 30

**Docket ID:** EPA-R02-OAR-2021-0673, EPA-R03-OAR-2021-0872, EPA-R03-OAR-2021-0873, EPA-R04-OAR-2021-0841, EPA-R05-OAR-2022-0006, EPA-R06-OAR-2021-0801, EPA-R07-OAR-2021-0851, EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138

**Comment:**

Pursuant to the January 12, 2022, Consent Decree entered in *Downwinders at Risk et al. v. Regan*[4] EPA must by April 30, 2022, approve or disapprove the interstate ozone state implementation plans (SIPs) of 21 states: Alabama, Arkansas, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, New Jersey, New York, Ohio, Oklahoma, Tennessee, Texas, West Virginia and Wisconsin.  Also, if EPA by February 28, 2022, proposes full or partial disapproval of a SIP from one of the 21 states, along with a proposed FIP to directly regulate interstate ozone emissions from that state, it must finalize its full or partial disapproval of the state's own plan by December 15, 2022. MOG also notes that the proposed *Downwinders* Consent Decree was provided for comment and that the concerns of the upwind states and the regulated community were ignored.  *See* comments of Alabama, Missouri, Wyoming, and MOG in docket EPA-HQ-OGC-2021-0692.

[4] U.S. District Court for the Northern District of California, Case No. 4:21-cv-3551. [This footnote is footnote 5 in MOG's letter in EPA-R08-OAR-2022-0315, EPA-R09-OAR-2022-0394, EPA-R09-OAR-2022-0138]

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

On October 15, 2021, EPA published a proposed consent decree in the federal register that provided court enforceable timeframes for EPA to act on the good neighbor SIP submissions for the 2015 ozone standard from 32 states, including Missouri. For most of these states, including Missouri, the proposed

consent decree provided EPA with incentive, by granting it additional time, to propose SIP disapprovals and to also quickly propose federal plans for any state where it proposed a disapproval of the good neighbor SIP submission. The Air Program submitted comments to the docket on that proposed consent decree on November 8, 2021. The comments expressed concerns about the "sue and settle" process EPA was using to justify a hurried imposition of a FIP without providing states sufficient time to address any deficiencies that EPA may identify in their upcoming SIP disapprovals.

EPA never offered any summary of comments it received, nor provided any responses to any of the comments it received on the proposed consent decree. Instead, on January 12, 2022, EPA quietly executed the consent decree, as proposed, in the U.S. District Court for the Northern District of California, Oakland Division, and the U.S. Ninth Circuit Court of Appeals. EPA also never posted the final consent decree after it was executed, nor made any type of public announcement to indicate that it had executed the consent decree. Since the final consent decree and EPA's proposed disapproval of Missouri's SIP are inextricably linked, the Air Program is attaching and incorporating the comments submitted to docket on the proposed consent decree. EPA must address those comments before it can finalize this action, and EPA must explain why it decided not to provide any responses or notice that it had even considered the comments it received before executing the consent decree that impacted the rights of so many states, including Missouri.

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

It should also be noted that EPA's delay shortens the lead time available to address ongoing nonattainment and maintenance problems due to upwind contributions. Because of these delays, EPA would be advised to seek court approval to expand the review period to accommodate additional time to negotiate compromise language for SIPs proposed for disapproval as well as additional review time to address concerns raised by the substantive policy change noted in the proposed FIP.

*Response*

The commenters referenced the consent decree entered in *Downwinders at Risk, et al. v. Regan*, No. 21-cv-03551 (N.D. Cal.). They generally argue that the EPA should have provided responses to comments raised on the cited proposed consent decree. The proposed consent decree cited by the commenters, as well as two others,[163] established deadlines for the EPA to take action on the SIP submissions and do not dictate the substantive outcome of EPA's actions. The EPA views comments related to the terms of the consent decrees, and the EPA's compliance with CAA section 113(g) as related to public notice and

---

[163] EPA also solicited public comment on the other two relevant consent decrees. *New York et al. v. Regan, et al.*, No. 1:21-CV-00252 (S.D.N.Y.) (Indiana, Kentucky, Michigan, Ohio, Texas, and West Virginia); *Our Children's Earth Foundation* v. *EPA,* No. 20-8232 (S.D.N.Y.) (New York).

comment, as beyond the scope of this rulemaking, which is determining whether certain SIP submissions meet the requirements of CAA section 110(a)(2)(D)(i)(I). This rulemaking action is not the appropriate forum to bring challenges against the consent decree or EPA's compliance with CAA section 113(g) in relation to it.

While the EPA is not obligated to further respond to comments regarding these consent decrees, we note that the EPA is not required under the CAA to post a final notice regarding its legal settlements or post publicly its evaluation of comments under CAA section 113(g) for proposed consent decrees, and the EPA has never had a practice of doing so. CAA section 113(g) states in whole:

> At least 30 days before a consent order or settlement agreement of any kind under this chapter to which the United States is a party (other than enforcement actions under this section, section 7420 of this title, or subchapter II of this chapter, whether or not involving civil or criminal penalties, or judgments subject to Department of Justice policy on public participation) is final or filed with a court, the Administrator shall provide a reasonable opportunity by notice in the Federal Register to persons who are not named as parties or intervenors to the action or matter to comment in writing. The Administrator or the Attorney General, as appropriate, shall promptly consider any such written comments and may withdraw or withhold his consent to the proposed order or agreement if the comments disclose facts or considerations which indicate that such consent is inappropriate, improper, inadequate, or inconsistent with the requirements of this chapter. Nothing in this subsection shall apply to civil or criminal penalties under this chapter.

CAA section 113(g).

The EPA followed the requirements of CAA section 113(g) with regard to all three consent decrees establishing deadlines relevant to this action. Pursuant to CAA section 113(g), the EPA solicited public comment on the draft proposed consent decree in *Downwinders at Risk, et al. v. Regan*, No. 21-cv-03551 (N.D. Cal.) in the *Federal Register*. 86 FR 57423 (Oct. 15, 2022).[164] The EPA also posted information about soliciting public comment on the draft proposed consent decree on its website (https://www.epa.gov/ogc/proposed-consent-decrees-and-draft-settlement-agreements) and sent out an email notification to members of the public who had signed up for email alerts at https://www.epa.gov/ogc/email-subscriptions-notifications-about-new-litigation. The public comment period ended on November 15, 2021. 86 FR 57423 (Oct. 15, 2021).[165] All comments are available in the public docket for that notice (Docket No. EPA-HQ-OGC-2021-0692, available at regulations.gov). Consistent with the requirements of CAA section 113(g), the EPA and the United States Department of Justice reviewed the comments. As the EPA publicly stated to the court, "The comments received did not disclose facts or considerations that indicate that Defendant or the United States Department of Justice should withhold consent." Joint Motion to Enter Consent Decree, *Downwinders at Risk, et al. v.*

---

[164] The notice and docket for the *New York et al. v. Regan, et al.* consent decree can be found at 86 FR 40825 (July 29, 2021) and EPA-HQ-OGC-2021-0444 (available on regulations.gov). The notice and docket for the *Our Children's Earth Foundation v. EPA* consent decree can be found at 86 FR 66546 (Nov. 23, 2021) and EPA-HQ-OGC-2021-0800 (available on regulations.gov).
[165] The comment period for the *New York et al. v. Regan* consent decree ended on August 30, 2021. 86 FR 40825. The comment period for the *Our Children's Earth Foundation* ended on December 23, 2021. 86 FR 66546.

*Regan*, No. 21-cv-03551 (N.D. Cal.), ECF 22 at para. 4.[166] The joint motion to enter the consent decree, and the court's entry of the consent decree, are both public documents available in the docket for that litigation. *Downwinders at Risk, et al. v. Regan*, No. 21-cv-03551 (N.D. Cal.) (ECF 22 and ECF 23).

One commenter, representing Missouri, claimed that the final consent decree and the EPA's decision to *disapprove* Missouri's good neighbor SIP submission were "inextricably linked" and impacted states' rights. The EPA disputes that the consent decree requires the EPA to *disapprove* any good neighbor SIP submission, including Missouri's submission, or that it impacted any state's rights. The consent decree only establishes deadlines for EPA to take final action on various SIP submissions; by its own terms it does not predetermine whether the EPA shall approve, disapprove, conditionally approve, or approve in part and conditionally approve or disapprove in part any SIP submission. Consent Decree, *Downwinders at Risk, et al. v. Regan*, No. 21-cv-03551 (N.D. Cal.) ECF 23 at paras. 3-6. Commenters have established no evidence that these dates were negotiated in bad faith or prejudiced the Agency in its review and action on the SIP submissions. In fact, the EPA has taken action to both approve and disapprove SIP submissions covered by EPA's deadlines in the consent decree. *See e.g.*, 87 FR 19390 (April 4, 2022) (approval of Kansas's SIP); 87 FR 21578 (May 15, 2022) (approval of Montana's SIP).[167] All proposed actions on SIP submissions for which EPA had deadlines to take final action pursuant to the consent decree were put out for public comment, and the EPA evaluated those comments pursuant to CAA section 113(g). Furthermore, Missouri itself submitted lengthy comments in the course of the notice and comment procedure for the EPA's proposed action on the state's SIP submission, to which EPA is responding in this document and in the preamble. The EPA notes that for Missouri specifically, the EPA's statutory deadline to take final action on the state's good neighbor SIP submission was in November 2020, whereas the consent decrees, as modified by stipulation, now require EPA to take final action on Missouri's SIP submission by January 31, 2023.[168]

## 11.13  General Recommendations

*Comment*

**Commenter:** Anonymous

**Commenter ID:** 06

---

[166] EPA made similar statements regarding public comments to the Southern District of New York, also in public dockets containing the entered consent decrees. *See* JOINT LETTER addressed to Judge Andrew L. Carter, Jr. from Peter Aronoff dated 11/1/2021 re: seeking the entry of a proposed consent decree to resolve this matter, *New York et al. v. Regan, et al.*, No. 1:21-CV-00252 (S.D.N.Y.) (ECF 36); JOINT LETTER addressed to Judge J. Paul Oetken from Peter Aronoff dated 1/13/2022 re: joint request to enter proposed consent decree, *Our Children's Earth Foundation* v. *EPA*, No. 20-8232 (S.D.N.Y.) (ECF 30).

[167] EPA also took final action to approve several states' good neighbor SIPs after the CAA section 113(g) public comment process and before entry of the *Downwinders at Risk* consent decree, as noted in a "whereas" clause of that consent decree. These states were Florida, Georgia, North Carolina, and South Carolina (86 FR 68413, Dec. 2, 2021), Connecticut (86 FR 71830, Dec. 20, 2021), and Hawaii (86 FR 73129, Dec. 27, 2021).

[168] *Downwinders at Risk et al. v. Regan*, No. 21-cv-03551 (N.D. Cal.), Docket No. 32.

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

I recommend Utah be held to the highest standard and no extension or exclusion be given. Utah has the worst sir quality and the corrupt politicians are failing to fix this as well as any other issue that would affect their personal wealth or standing. In addition, Mike Lee attempted a coup and insurrection and shpuld not be allowed to run for office.

*Response*

This comment covers a range of topics that are generally beyond the scope of this action. It appears the comment is generally supportive of the disapproval of Utah's SIP submission.

*Comments*

**Commenter:** Hagerty, Logan

**Commenter ID:** 22

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

EPA Should Provide Explicit Guidance to States Drafting SIPs in the Proposed Rule

The EPA should provide closer guidance to the five states drafting future SIPs because it promotes enforcement efficiency.

If the EPA passes this rule and needs to create FIPs, the EPA must insure those FIPs are created as quickly as possible.

[…]

Thus, in the proposed rule, the EPA should provide examples of how specific procedures— like providing standardized outlines for SIPs—could be used to mitigate potential delays between SIP approval and EPA enforcement. Because the FIP process can take up to two years and because these five states are in the same Region, could the EPA draft one cohesive FIPs for these five states at the same time? The EPA could also solve future delays caused by inadequate SIP submissions by hiring or lending staff to state-level agencies that are less familiar with drafting SIPs.

In the proposed rule, the EPA had no issues with the outside data modeling group the five states used, the Lake Michigan Air Directors Consortium ("LADCO"). Still, the EPA should preemptively address the ways in which third-party data can be prevented from being incorrectly applied to states' SIPs. Moreover, if the EPA through investigation determines these five states intentionally misused the March 2018 Memorandum, the EPA should hold persons or parties accountable. The proposed rule should include: any state which intentionally drafts an inadequate SIP should be held liable for the harms

484

arising in other states, due to their lack of compliance. Here, the use of sanctions against these five states may be fair if they caused a delay in CAA enforcement which, in turn, affects neighboring states.

**Commenter:** Maryland Department of the Environment

**Commenter ID:** 29

**Docket ID:** EPA-R03-OAR-2021-0872

**Comment:**

MDE requests that EPA develop and publish official guidance that states can use in their Good Neighbor SIPs. That guidance must include the required elements and analyses EPA expects to see in every Good Neighbor SIP. Formal guidance levels the playing field by providing the same set of rules within which to work, and eliminates any confusion going forward.

*Response*

The EPA appreciates commenters' feedback and will take the suggestion to issue guidance for future good neighbor SIP development under consideration.

Comments on the proposed FIP are outside the scope of this action. Based on context of the full comment from Commenter ID 22, the EPA believes the reference to the March 2018 Memorandum by one commenter refers to Attachment A to the March 2018 Memorandum. Comments on that topic are addressed in Section 1.3 (Attachment A to the March 2018 Memorandum).

*Comment*

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

For future actions, the Oklahoma respectfully requests that EPA release the [Emissions Modeling Platform] under a Notice of Data Availability (NODA), take comment on the EMP, and resolve any outstanding issues before pursuing complex air quality modeling in support of rule development.

*Response*

The EPA will take the suggestion to issue a Notice of Data Availability for Emissions Modeling Platform releases for future actions under consideration.

485

## 11.14  Out of Scope

*Comment*

**Commenter**: Anonymous

**Commenter ID:** 06

**Docket ID:** EPA-R08-OAR-2022-0315

**Comment:**

In addition, Mike Lee attempted a coup and insurrection and shpuld not be allowed to run for office.

*Response*

This comment is out of the scope of this action.

*Comment*

**Commenter:** Emley, Margaret

**Commenter ID:** 17

**Docket ID:** EPA-R02-OAR-2021-0673

**Comment:**

Various health impacts result from air pollution exposure, including ozone and particulate matter. The evidence of public health concerns underlines the importance of each state's contribution to air quality, and its ability to take responsibility to reduce emissions that contribute to climate change.  It is important to utilize the Clean Air Act, the World Health Organization, the Paris Agreement, and 2030 sustainability goals to regulate states at an appropriate standard. The new WHO guidelines are expected to save millions of lives if countries implement the guidelines.

*Response*

The EPA agrees that ozone has a number of adverse health impacts. However, the EPA considers the comments regarding the health impacts of ozone and other pollutants to be outside the scope of this action, which evaluates whether certain SIP submissions adequately address interstate transport requirements in CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS.

For clarification, the EPA notes that the evaluation of air quality standards, including the impacts to public health and welfare, are part of the standard setting process for a NAAQS, rather than a step in determining whether a state has adequate provisions in its SIP submission to address their interstate transport obligations for a particular NAAQS. Section 109(d)(1) of the Act requires periodic review and, if appropriate, revision of existing air quality criteria to reflect advances in scientific knowledge concerning

the effects of the pollutant on public health and welfare. Under the same provision, the EPA is also required to periodically review and, if appropriate, revise the NAAQS, at five-year intervals, based on the revised air quality criteria.

For informational purposes, the EPA notes that the Agency last revised the primary and secondary ozone NAAQS in October 2015.[169] In December 2020, the EPA announced its decision to retain the ozone standards without revision [170] The EPA is currently reconsidering the December 2020 final action.[171]

The commenter also states that it is important to utilize the Clean Air Act, the World Health Organization, the Paris Agreement, and 2030 sustainability goals to regulate states at an appropriate standard.  While the EPA acknowledges that there are many efforts, globally, to address air quality, the authority for this action is CAA section 110 as related to implementing the 2015 ozone NAAQS.

*Comment*

**Commenter:** Emley, Margaret

**Commenter ID:** 17

**Docket ID:** EPA-R02-OAR-2021-0673

**Comment:**

Rapid urbanization along with industrial growth is one of the major causes of elevated air pollution levels in urban areas. To manage and control deteriorating urban air quality, an efficient and effective urban air quality management plan is required consisting of systematic sampling, monitoring and analysis; modeling; and control protocols (Gulia et al, 2020). Air quality monitoring is the essential and basic step that develops the foundation of any management plan. It also describes step-by-step procedures for chemical characterization of both organic and inorganic constituents of ambient particulate matter along with molecular markers, which are essential to identify the corresponding sources of particulate matter. Additionally, an appropriate air quality management plan discusses the need for coupling low-cost wireless sensor-based stations with a limited number of real-time ambient air monitoring stations to make it cost-effective, yet robust (Gulia et al, 2020). Satellite-based remote sensing monitoring calibrated with ground-level measurement has the potential for regional-scale air quality monitoring that captures transport of transboundary pollution and makes it easier to quantify levels of pollution by state, ensuring each state can create and submit appropriate SIPs.

---

[169] 80 FR 65292 (October 26, 2015).
[170] 85 FR 87256 (December 31, 2020).
[171] https://www.epa.gov/ground-level-ozone-pollution/epa-reconsider-previous-administrations-decision-retain-2015-ozone

*Response*

The comment does not explain the relevancy of the recommendations for urban air quality management plans to the EPA's action to disapprove certain good neighbor SIP submissions for the 2015 ozone NAAQS. The EPA considers the comment to be outside the scope of this action.

*Comment*

**Commenter:** Hagerty, Logan

**Commenter ID:** 22

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

EPA Should Consider the Use of Sanctions in the Proposed Rule

The proposed rule states that "[d]isapproval [of SIPs] does not start a mandatory sanctions clock." However, U.S.C. § 7413(a)(2) says that damages or sanctions should and can be triggered upon future violations of the same nature. For example, if ". . . [the EPA] Administrator finds that violations of an applicable implementation plan . . .are so widespread that such violations appear to result from a failure of the State in which the plan or permit program applies to enforce the plan or permit program effectively," the Administrator may require the state to fix its SIP through administrative penalties or civil action. In instances where a state is responsible for following an explicit instruction, it is only fair that state is held accountable. Currently, the proposed rule problematically places zero penalties on these five states for drafting inadequate SIPs. Meanwhile, other states suffer from the effects of ozone far more. For example, California and Arizona contain the top seven cities affected by ozone in our nation. It is important to note California and Arizona submitted appropriate SIPs that gained EPA approval.

Current EPA Administrator Michael S. Regan stated: "Air pollution doesn't stop at the state line. This step will help our state partners meet air quality health standards, saving lives and improving public health in smog-affected communities across the United States." Because ozone is a national concern, the EPA should consider how these five states acted unfairly towards other states like California and Arizona by drafting inappropriate SIPs. The proposed rule states that "[e]ffective policy solutions to the problem of interstate ozone transport . . . have necessitated the application of a uniform framework of policy judgments to ensure an 'efficient and equitable' approach.'" In SIP disapproval instances, the EPA has discretion to bring penalties where, as here, several states do not comply with explicit instructions to create SIPs. That is critical because noncompliant states derail national efforts under the CAA to jointly combat air pollution. Under the CAA, the EPA can bring injunctive penalties:

Whenever, on the basis of any available information, the Administrator finds that a State is not acting in compliance with any requirement or prohibition of the chapter relating to the construction of new sources or the modification of existing sources, the Administrator may—

(A) issue an order prohibiting the construction or modification of any major stationary source in any area to which such requirement applies . . .

488

Here, orders may be appropriate because the five states may have failed to comply with new source requirements. For example, these states may have permitted current ozone polluters to expand despite the states not holding approved SIPs. The proposed rule should prohibit these five states from approving the expansion, through construction or modification, of any ozone source that contributes to the state's current violation of the NAAQS and CAA. Specifically, the EPA should order restrictions on the modification or expansion of major power plants in these five states. This is because power plants are major stationary sources of ozone. Coal-fired power plants are major stationary sources because they create nitrogen oxides. In turn, nitrogen oxides create "lower-level ozone" pollution. Science has shown that ". . .NOx emissions could be mitigated if power plants continue to transition from coal to natural gas and renewable energy sources." Some of the nation's largest power plants are in the states the proposed rule affects – Michigan and Indiana. Michigan and Indiana contain the Monroe and Gibson power plants, respectively. These are both coal-fired power plants, owned by DTE Electric and Duke Energy. The EPA might propose these power plants cannot develop their facilities until Michigan and Indiana submit adequate SIPs. On a broader note, if the EPA is to impose penalties, the penalties should be fairly construed to target the largest producers of ozone pollution. The EPA should be careful to not burden the citizens of these states who are already harmed by ozone pollution because of these polluters.

*Response*

In this action, the EPA is finalizing disapproval and partial approval/partial disapproval for 21 good neighbor SIP submissions for the 2015 ozone NAAQS. The EPA views this recommendation as beyond the scope of this rulemaking.

## 11.15  Out of Scope - Comments on the Proposed FIP

The EPA notes initially that PacifiCorp attached two comments submitted by Berkshire Hathaway Energy Company (BHE) and Ramboll on the Proposed FIP to its own comment on this SIP action. To the extent the BHE and Ramboll attachments made comments relevant to *this* action, the EPA responded in the preamble or in this RTC document. The EPA considers the comments in the BHE and Ramboll attachments specific to the Proposed FIP to be out of the scope of this rulemaking and they will not be reproduced here, but they are available in full in the docket (and are included in the same document as PacifiCorp's comments). The EPA anticipates responding to comments on the Proposed FIP in any final rulemaking resulting from that proposal.

*Comments*

**Commenter:** Air Pollution Control Program, Missouri Department of Natural Resources

**Commenter ID:** 01

**Docket ID:** EPA-R07-OAR-2021-0851

**Comment:**

The following paragraphs explain the flaws of EPA's step-3 analysis that it has proposed in the FIPs for 26 states, including Missouri.

EPA is intentionally exploiting the Supreme Court decision in EME Homer City vs. EPA to jusify any costs or requirements it deems necessary to further federal policy decisions. The court decision permitted EPA to impose cost effective controls on any state that was deemed to be a significant contributor so long as such controls don't result in over-control of any state. However, the decision did not indicate what might be considered "cost effective controls". For this reason, EPA is using this decision to assume new authority to implement anything it deems as a "cost effective control" requirement. Further, EPA's step 3 process completely ignores the real question at hand with the enabling statute, which ties contribution to an amount which contributes significantly to downwind maintenance or nonattainment problems. Instead, EPA completely ignores the statutory contribution issue and instead is imposing controls that suit federal policy choices regardless of their impact on the downwind receptors that EPA used as justification for disapproving the SIPs to begin with.

EPA's decisions at step three in their proposed FIP are severely flawed. EPA completely ignores the contribution analysis and makes no attempt to address what it considers as significant contribution when it proposes new control requirements.

**Commenter:** Alabama Power Company, Southern Power Company, and PowerSouth Energy Cooperative

**Commenter ID:** 04

**Docket ID:** EPA-R04-OAR-2021-0841

**Comment:**

Finally, EPA should approve Alabama's SIP submittal as discussed in these comments. However, if EPA finalizes this proposed disapproval and ultimately issues a FIP for Alabama within two years of June 2022, EPA must clarify that such action relies only on the disapproval for EPA's FIP authority. At that point, EPA's prior, unlawful finding of failure to submit should effectively be rendered moot.

**Commenter:** Arkansas Department of Energy and Environment, Division of Environmental Quality

**Commenter ID:** 07

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

In their proposed FIP, EPA did not identify specific sources or emissions activities in Arkansas that significantly contribute to downwind air quality problems (as the rule requires), but instead chose from a nationwide set of sources with available control technologies as being subject to emission reduction requirements in their proposed FIP. There was no further analysis provided by EPA to show that specific sources in Arkansas are actually contributing significantly to the Harris County monitor or interfering with maintenance of the NAAQS by other receptors, thus EPA is effectively contending that a 1% linkage

490

is the same as a significant contribution, which is not consistent with their guidance or Clean Air Act 110(a)(2)(D)(i).

**Commenter:** Nevada Division of Environmental Protection

**Commenter ID:** 33

**Docket ID:** EPA-R09-OAR-2022-0138

**Comment:**

EPA's Proposed Ozone FIP jeopardizes anticipated Nevada greenhouse gas emission reductions

EPA's Proposed FIP, along with EPA's failure to meaningfully collaborate with NDEP on the Proposed FIP, may have the unintended consequence of eliminating greenhouse gas (GHG) emission reductions anticipated in Nevada's upcoming updated Regional Haze State Implementation Plan (Regional Haze SIP). The Regional Haze SIP currently anticipated shutdown of certain stationary sources to meet Regional Haze targets. However, the Proposed FIP may require these stationary sources to place pollution controls to meet short term ozone reduction requirements and maintain grid reliability. Once these controls are placed on to meet short term ozone requirements, the stationary sources may be able to meet Regional Haze requirements without shutting down. This would have the net effect of eliminating the potential future reductions in greenhouse gas emissions.

**Commenter:** Oklahoma Department of Environmental Quality

**Commenter ID:** 37

**Docket ID:** EPA-R06-OAR-2021-0801

**Comment:**

It should also be noted that EPA's delay shortens the lead time available to address ongoing nonattainment and maintenance problems due to upwind contributions.

[…]

The original CSAPR rule established ozone-season NOx reductions based on a $500 per ton cost threshold. The CSAPR Update increased the cost threshold to $1,400 and the Revised CSAPR Update to $1,800. For the current proposal, the cost threshold for NOx reductions ranges from $7,500 to over $11,000 per ton.9 This escalation does not constitute a simple expansion of an existing policy but, rather, constitutes a change significant enough to warrant reevaluation. In addition, the previous CSAPR rules only sought emissions reductions from EGUs. The current proposal seeks reductions from an expanded list of sectors: reciprocating internal combustion engines in pipeline transportation of natural gas; kilns in cement and cement product manufacturing; boilers and furnaces in iron and steel mills and ferroalloy manufacturing; furnaces in glass and glass product manufacturing; and high-emitting equipment and large boilers in basic chemical manufacturing, petroleum and coal products

manufacturing, and pulp, paper, and paperboard mills. By significantly increasing the cost and widely expanding the sectors subject to the remedy, the EPA has changed the policy to such a degree that a fundamental rethinking of the approach is in order.

Oklahoma asserts that if EPA moves forward with its disapproval of state SIPs (and a subsequent FIP), EPA should work with states and other air agencies to develop an approach that addresses downwind air quality in a more cost-effective manner. This approach may necessitate variable cost-effectiveness thresholds for different upwind states, but that change is warranted to avoid the significant cost increases seen in the current proposal. In working with states, EPA is encouraged to assist state agencies in the use of modeling (either the CAMx model or the AQAT) while states are preparing SIPs rather than after SIPs have been submitted and rejected. Due to these concerns, it would be appropriate for EPA to defer final action on the Oklahoma SIP until this process can be brought to a more mutually acceptable conclusion.

**Commenter:** United States Steel Corporation

**Commenter ID:** 45

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

Second, to the extent that U. S. EPA somehow still finds that emissions from these sources "contribute" or "interfere" with downwind states' ability to attain and maintain the ozone NAAQS [after consideration of updated emissions inventory information], which does not seem plausible, U. S. EPA will need to re-evaluate its costs determinations in the separate ozone transport FIP rulemaking.

**Commenter:** Wisconsin Department of Natural Resources

**Commenter ID:** 51

**Docket ID:** EPA-R05-OAR-2022-0006

**Comment:**

EPA must ensure its transport rule for the 2015 ozone NAAQS fully resolves upwind state obligations to Wisconsin's nonattainment areas.

On February 28, 2022, EPA proposed a transport rule to resolve "good neighbor" obligations for the 2015 ozone NAAQS for the states for which it is proposing SIP disapprovals. Based on WDNR's initial assessment, EPA will need to adjust its final rule so that it constitutes a "full remedy" for upwind state transport obligations to all of Wisconsin's nonattainment and maintenance monitors, including Sheboygan. Wisconsin will provide comments on that proposal separately.

*Response*

To the extent these comments concern the substance of the proposed FIP for the 2015 ozone NAAQS, such as the EPA's proposed determinations of cost-effective controls available in that action, or the EPA's authority to finalize FIPs, those comments are outside the scope of this action. Additionally, the EPA disagrees that the decisions proposed in the FIP necessitates any kind of delay or deferral on a state's SIP submission. This action is not determining what, if any, cost effective controls exist at Step 3 of the 4-step interstate transport framework. Instead, the EPA is evaluating the states' interstate transport SIP submissions to determine whether the submission satisfies the statutory obligations provided for in CAA section 110(a)(2)(D)(i)(I).

One commenter claims that the EPA's use of AQAT to justify the inclusion of Utah in the proposed 2015 ozone interstate transport FIP is inappropriate and goes against the EPA's own guidance. We first note that, in this action, the EPA is not using the Step 3 analysis in the proposed FIP action to support its action on the SIP submission. The EPA's reasoning for disapproving the Utah SIP submission is based on an evaluation of the SIP submission itself, as well as EPA modeling results and air quality analysis. To the extent that the commenter is implying that the EPA is using the AQAT results in any way in this action this is simply inaccurate. Nowhere in the proposed disapproval of Utah's SIP has the EPA made this claim. The EPA further addresses claims that the EPA is relying on the results of the FIP to support or pre-judge action on a state's SIP submission in Section 10.5 (Comment Alleging "Pretext" or Intent to Require Generation Shifting). Comments regarding the appropriateness of the use of the AQAT tool in the proposed FIP is outside of the scope of this action. However, we note that, regarding the alleged differences in EGU emissions projections between EPA's Step 1 and Step 2 analysis using IPM and the emissions projections using engineering analytics in the proposed FIP at Step 3, this is easily explained by the different assumptions and methodologies used. The higher emissions estimates for EGUs used to propose budgets in the FIP reflected a more conservative assessment relying only on known and historical information about fleet operation. Had the EPA used the engineering analysis values for EGUs from the Step 3 analysis of the proposed FIP in our analysis of Steps 1 and 2 in this SIP disapproval action, the effect, generally, would have been to have higher EGU emissions estimates in the baseline, which would have only served to reinforce our conclusions as to which upwind states are linked to downwind receptors.

In response to Wisconsin Department of Natural Resources' call for the EPA's proposed FIP to constitute a full remedy for all receptors in Wisconsin, we address this commenter's concern regarding the identification of the monitor in Sheboygan County, Wisconsin as a projected receptor in Section 7.1 (Methodology for Determining Future Year Contribution). The EPA is not, in this action, making a determination whether the April 2022 proposed FIP is a complete remedy for states' good neighbor obligations under the 2015 ozone NAAQS. In response to APC et al., the EPA explained the basis for the disapproval of Alabama's SIP submission, submitted on June 21, 2022, at proposal. 87 FR 64412 (October 25, 2022). The EPA is not promulgating a FIP for Alabama in this action, so comments on the EPA's FIP authority are beyond the scope of this rulemaking.

**EXHIBIT 3**

EPA, Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I) (Mar. 27, 2018) ("March Memo")



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
RESEARCH TRIANGLE PARK, NC 27711

MAR 2 7 2018

OFFICE OF
AIR QUALITY PLANNING
AND STANDARDS

## MEMORANDUM

**SUBJECT:** Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)

**FROM:** Peter Tsirigotis
Director

**TO:** Regional Air Division Directors, Regions 1–10

The purpose of this memorandum is to provide information to states and the Environmental Protection Agency Regional offices as they develop or review state implementation plans (SIPs) that address section 110(a)(2)(D)(i)(I) of Clean Air Act (CAA), also called the "good neighbor" provision, as it pertains to the 2015 ozone National Ambient Air Quality Standards (NAAQS). Specifically, this memorandum includes EPA's air quality modeling data for ozone for the year 2023, including newly available contribution modeling results, and a discussion of elements previously used to address interstate transport. In addition, the memorandum is accompanied by Attachment A, which provides a preliminary list of potential flexibilities in analytical approaches for developing a good neighbor SIP that may warrant further discussion between EPA and states.

The information in this memorandum provides an update to the contribution modeling analyses provided in EPA's January 2017 Notice of Data Availability (NODA) of ozone transport modeling data for the 2015 ozone NAAQS and builds upon information provided in the October 2017 interstate transport memorandum.[1] The October 2017 memorandum provided projected ozone design values for 2023 based on EPA's updated nationwide ozone modeling with the primary goal of assisting states in completing good neighbor transport actions for the 2008 ozone NAAQS.

---

[1] *See* Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 Ozone National Ambient Air Quality Standard (NAAQS), 82 FR 1733 (January 6, 2017). This memorandum also supplements the information provided in the memorandum, *Supplemental Information on the Interstate Transport State Implementation Plan Submissions for the 2008 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)*. Memorandum from Stephen D. Page, Director, U.S. EPA Office of Air Quality Planning and Standards, to Regional Air Division Directors, Regions 1–10. October 27, 2017. Available at *https://www.epa.gov/sites/production/files/2017-10/documents/final_2008_o3_naaqs_transport_memo_10-27-17b.pdf.* (The October 27, 2017, memorandum includes links to all supporting documentation, including modeling and emissions technical support documents.)

EPA's goal in providing this information is to assist states' efforts to develop good neighbor SIPs for the 2015 ozone NAAQS to address their interstate transport obligations. While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the good neighbor provision. Any such determination would be made through notice-and-comment rulemaking.

**The Good Neighbor Provision**

Under CAA sections 110(a)(l) and 110(a)(2), each state is required to submit a SIP that provides for the implementation, maintenance and enforcement of each primary and secondary NAAQS. Section 110(a)(1) requires each state to make this new SIP submission within 3 years after promulgation of a new or revised NAAQS. This type of SIP submission is commonly referred to as an "infrastructure SIP." Section 110(a)(2) identifies specific elements that each plan submission must meet. Conceptually, an infrastructure SIP provides assurance that a state's SIP contains the necessary structural requirements to implement the new or revised NAAQS, whether by demonstrating that the state's SIP already contains or sufficiently addresses the necessary provisions, or by making a substantive SIP revision to update the plan provisions to meet the new standards.

In particular, CAA section 110(a)(2)(D)(i)(I) requires each state to submit to EPA new or revised SIPs that "contain adequate provisions ... prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will ... contribute significantly to nonattainment in, or interfere with maintenance by, any other state with respect to any such national primary or secondary ambient air quality standard." EPA often refers to section 110(a)(2)(D)(i)(I) as the good neighbor provision and to SIP revisions addressing this requirement as good neighbor SIPs.

On October 1, 2015, EPA promulgated a revision to the ozone NAAQS, lowering the level of both the primary and secondary standards to 70 parts per billion (ppb).[2] Pursuant to CAA section 110(a), good neighbor SIPs are, therefore, due by October 1, 2018. As noted earlier, EPA intends that the information conveyed through this memorandum should assist states in their efforts to develop good neighbor SIPs for the 2015 ozone NAAQS to address their interstate transport obligations.

**Framework to Address the Good Neighbor Provision**

Through the development and implementation of several previous rulemakings, including most recently the Cross-State Air Pollution Rule (CSAPR) Update,[3] EPA, working in partnership with states, established the following four-step framework to address the requirements of the good neighbor provision for ozone and fine particulate matter ($PM_{2.5}$) NAAQS: (1) identify downwind air quality problems; (2) identify upwind states that contribute enough to those downwind air

---

[2] National Ambient Air Quality Standards for Ozone Final Rule, 80 FR 65292 (October 26, 2015).

[3] *See* Finding of Significant Contribution and Rulemaking for Certain States in the Ozone Transport Assessment Group Region for Purposes of Reducing Regional Transport of Ozone (also known as the $NO_X$ SIP Call), 63 FR 57356 (October 27, 1998); Clean Air Interstate Rule (CAIR) Final Rule, 70 FR 25162 (May 12, 2005); CSAPR Final Rule, 76 FR 48208 (August 8, 2011); CSAPR Update for the 2008 Ozone NAAQS (CSAPR Update) Final Rule, 81 FR 74504 (October 26, 2016).

quality problems to warrant further review and analysis; (3) identify the emissions reductions necessary (if any), considering cost and air quality factors, to prevent an identified upwind state from contributing significantly to those downwind air quality problems; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions. EPA notes that, in applying this framework or other approaches consistent with the CAA, various analytical approaches may be used to assess each step. EPA has undertaken several previous regional rulemakings applying this framework, and its analytical approaches have varied over time due to continued evolution of relevant tools and information, as well as their specific application.

This memo presents information regarding EPA's latest analysis for purposes of assisting states in developing SIPs for the 2015 ozone NAAQS, and, in doing so, generally follows approaches that EPA has taken in its regional rulemaking actions addressing prior ozone NAAQS. EPA also notes that, in developing their own rules, states have flexibility to follow the familiar four-step transport framework (using EPA's analytical approach or somewhat different analytical approaches within these steps) or alternative frameworks, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA. In various discussions, states and other stakeholders have suggested specific approaches that may warrant further consideration, and have indicated that they may be exploring other approaches as well. Over the next few months, EPA will be working with states to evaluate potential additional flexibilities for states to consider as they develop their good neighbor SIPs for the 2015 ozone NAAQS. Such potential flexibilities could apply to modeling conducted by states or to states' use of EPA's updated modeling presented here. Attachment A provides a preliminary list of potential flexibilities that may warrant further discussion. EPA looks forward to discussing these and other potential flexibilities with states over the next few months, which will help inform states' development of their good neighbor SIP submittals, as well as EPA's development of further information on good neighbor SIPs.

**Air Quality Modeling Projection of 2023 Ozone Design Values**

As noted previously and as described in more detail in both the 2017 NODA and the October 2017 memorandum, EPA uses modeling to identify potential downwind air quality problems. A first step in the modeling process is selecting a future analytic year that considers both the relevant attainment dates of downwind nonattainment areas impacted by interstate transport[4] and the timeframes that may be required for implementing further emissions reductions as expeditiously as practicable.[5] For the 2015 ozone NAAQS, EPA selected 2023 as the analytic year in our modeling analyses primarily because it aligns with the anticipated attainment year for Moderate ozone nonattainment areas.[6]

---

[4] *North Carolina v. EPA*, 531 F.3d 896, 911–12 (D.C. Cir. 2008) (holding that compliance timeframes for necessary emission reductions must consider downwind attainment deadlines).

[5] *See* October 2017 memorandum, pp. 4-6 (discussion of timing of controls).

[6] On November 16, 2017 (82 FR 54232), EPA established initial air quality designations for most areas in the United States. On December 22, 2017 (83 FR 651), EPA responded to state and tribal recommendations by indicating the anticipated area designations for the remaining portions of the U.S. In addition, EPA proposed the maximum attainment dates for nonattainment areas in each classification, which for Moderate ozone nonattainment is 6 years (81 FR 81276, November 17, 2016). Based on the expected timing for final designations, 6 years from the likely effective date for designations would be summer 2024. Therefore, the 2023 ozone season would be the last full ozone season before the 2024 attainment date.

3

As noted in the aforementioned October 2017 memorandum, EPA then used the Comprehensive Air Quality Model with Extensions (CAMx v6.40)[7] to model emissions in 2011 and 2023, based on updates provided to EPA from states and other stakeholders.[8] EPA used outputs from the 2011 and 2023 model simulations to project base period 2009-2013 average and maximum ozone design values to 2023 at monitoring sites nationwide. In projecting these future year design values, EPA applied its own modeling guidance,[9] which recommends using model predictions from the "3 x 3" array of grid cells surrounding the location of the monitoring site.[10] In light of comments on the January 2017 NODA and other analyses, EPA also projected 2023 design values based on a modified version of the "3 x 3" approach for those monitoring sites located in coastal areas. Briefly, in this alternative approach, EPA incorporated the flexibility of eliminating from the design value calculations those modeling data in grid cells that are dominated by water (*i.e.*, more than 50 percent of the area in the grid cell is water) and that do not contain a monitoring site (*i.e.*, if a grid cell is more than 50 percent water but contains an air quality monitor, that cell would remain in the calculation).[11] For each individual monitoring site, the base period 2009-2013 average and maximum design values, 2023 projected average and maximum design values based on both the "3 x 3" approach and the alternative approach affecting coastal sites, and 2014-2016 measured design values are provided in an attachment to the October 27 memorandum. The same information is available in Excel format at *https://www.epa.gov/airmarkets/october-2017-memo-and-information-interstate-transport-sips-2008-ozone-naaqs*.

In the CSAPR Update rulemaking process, EPA considered a combination of monitoring data and modeling projections to identify receptor sites that are projected to have problems attaining or maintaining the NAAQS.[12] Specifically, EPA identified nonattainment receptors as those monitoring sites with current measured values exceeding the NAAQS that also have projected (*i.e.*, in 2023) average design values exceeding the NAAQS. EPA identified maintenance receptors as those monitoring sites with maximum design values exceeding the NAAQS. This included sites with current measured values below the NAAQS with projected average and maximum design values exceeding the NAAQS, and monitoring sites with projected average design values below the NAAQS but with projected maximum design values exceeding the NAAQS. The projected 2023 ozone design values and 2014-2016 measured design values for monitors in the United States have not changed since they were first presented in the October 2017 memorandum.

---

[7] CAMx v6.40 was the most recent public release version of CAMx at the time EPA updated its modeling in fall 2017. ("Comprehensive Air Quality Model with Extension version 6.40 User's Guide" Ramboll Environ, December 2016. *http://www.camx.com/*.)

[8] For the updated modeling, EPA used the construct of the modeling platform (*i.e.*, modeling domain and non-emissions inputs) that we used for the NODA modeling, except that the photolysis rates files were updated to be consistent with CAMx v6.40. The NODA Air Quality Modeling Technical Support Document describing the modeling platform is available at *https://www.epa.gov/airmarkets/notice-data-availability-preliminary-interstate-ozone-transport-modeling-data-2015-ozone*.

[9] *http://www.epa.gov/ttn/scram/guidance/guide/Draft_O3-PM-RH_Modeling_Guidance-2014.pdf*.

[10] EPA's modeling uses 12 kilometer$^2$ grid cells.

[11] A model grid cell is identified as a "water" cell if more than 50 percent of the grid cell is water based on the 2006 National Land Cover Database. Grid cells that meet this criterion are treated as entirely over water in the Weather Research Forecast (WRF) modeling used to develop the 2011 meteorology for EPA's air quality modeling.

[12] *See* 81 FR 74530-74532 (October 26, 2016).

In this memorandum, EPA is identifying 2023 potential nonattainment and maintenance receptors with respect to the 2015 NAAQS, following its approach taken for previous NAAQS. This information is based on applying the CSAPR method for identifying potential nonattainment and maintenance receptors, and presents the design values in two ways: first, following the "3 x 3" approach to evaluating all sites, and second, following the modified approach for coastal monitoring sites in which "overwater" modeling data were not included in the calculation of future year design values. After incorporating these approaches, the modeling results suggest, based on the approach used for previous NAAQS, 11 monitoring sites outside of California as potential nonattainment receptors and 14 monitoring sites outside of California as potential maintenance receptors. *See* Attachment B for this receptor information.

**Air Quality Modeling of 2023 Contributions**

After identifying potential downwind air quality problems by projecting base period 2009-2013 average and maximum ozone design values to 2023 at monitoring sites nationwide, EPA next performed nationwide, state-level ozone source apportionment modeling using the CAMx Anthropogenic Precursor Culpability Analysis (APCA) technique[13] to provide information regarding the expected contribution of 2023 base case nitrogen oxides ($NO_X$) and volatile organic compound (VOC) emissions from all sources in each state to projected 2023 ozone concentrations at each air quality monitoring site. In the source apportionment model run, EPA tracked the ozone formed from each of the following contribution categories (*i.e.*, "tags"):

- States – anthropogenic $NO_X$ and VOC emissions from each of the contiguous 48 states and the District of Columbia tracked individually (EPA combined emissions from all anthropogenic sectors in a given state);
- Biogenics – biogenic $NO_X$ and VOC emissions domain-wide (*i.e.*, not by state);
- Initial and Boundary Concentrations – concentrations transported into the modeling domain from the lateral boundaries;
- Tribal Lands – the emissions from those tribal lands for which EPA has point source inventory data in the 2011 NEI (EPA did not model the contributions from individual tribes);
- Canada and Mexico – anthropogenic emissions from sources in those portions of Canada and Mexico included in the modeling domain (EPA did not separately model contributions from Canada or Mexico);
- Fires – combined emissions from wild and prescribed fires domain-wide (*i.e.*, not by state); and
- Offshore – combined emissions from offshore marine vessels and offshore drilling platforms (*i.e.*, not by state).

EPA performed the CAMx source apportionment model simulation for the period May 1 through September 30 using the 2023 future base case emissions and 2011 meteorology for this

---

[13] As part of this technique, ozone formed from reactions between biogenic and anthropogenic VOC and $NO_X$ are assigned to the anthropogenic emissions.

time period.[14] EPA processed hourly contributions[15] from each tag to obtain the 8-hour average contributions corresponding to the time period of the 8-hour daily maximum concentration on each day in the 2023 model simulation. This step was performed for those model grid cells containing monitoring sites to obtain 8-hour average contributions for each day at the location of each site. EPA then processed the model-predicted contributions on each day at each monitoring site location to identify the contributions on the subset of days in the 2023 modeling with the top 10 model-predicted maximum daily 8-hour average concentrations. The daily 8-hour average contributions on the top 10 concentration days in 2023 were applied in a relative sense to quantify the contributions to the 2023 average design value at each site.

In the CSAPR and CSAPR Update modeling efforts, EPA had used a slightly different approach by basing the average future year contribution on future year modeled values that exceeded the NAAQS or the top 5 days, whichever was greater. While technically sound, EPA's previous approach resulted in different contributions for an individual linkage depending on the level of the NAAQS. For the modeling effort described in this memorandum, EPA considered comments on the January 2017 NODA and developed and incorporated the flexibility of calculating the contribution metric using contributions on the top 10 future year days. As some commenters have indicated, this approach makes the contribution metric values more consistent across monitoring sites and more robust in terms of being independent of the level of the NAAQS. The contributions from each tag to each monitoring site identified as a potential nonattainment or maintenance receptor in 2023 are provided in Attachment C.[16]

**Conclusion**

States may consider using this national modeling to develop SIPs that address requirements of the good neighbor provision for the 2015 ozone NAAQS. When doing so, EPA recommends that states include in any such submission state-specific information to support their reliance on the 2023 modeling data. Further, states may supplement the information provided in this memorandum with any additional information that they believe is relevant to addressing the good neighbor provision requirements. States may also choose to use other information to identify nonattainment and maintenance receptors relevant to development of their good neighbor SIPs. If this is the case, states should submit that information along with a full explanation and technical analysis. EPA encourages collaboration among states linked to a common receptor and among linked upwind and downwind states in developing and implementing a regionally consistent approach. We recommend that states reach out to EPA Regional offices and work together to accomplish the goal of developing, submitting, and reviewing approvable SIPs that address the good neighbor provision for the 2015 ozone NAAQS.

Finally, as indicated previously in this memorandum, in addition to the flexibilities already incorporated into EPA's modeling effort (*i.e.*, considering the removal of modeled values in "over water" grid cells and EPA's modified approach for calculating the contribution metric), EPA is

---

[14] *See* the October 2017 memorandum for a description of these model inputs.

[15] Ozone contributions from anthropogenic emissions under "$NO_X$-limited" and "VOC-limited" chemical regimes were combined to obtain the net contribution from $NO_X$ and VOC anthropogenic emissions in each state.

[16] Given stakeholder input on the 2017 NODA and other analyses, EPA elected to represent the contribution information in this memorandum using the alternative approach for projecting design values for sites in coastal areas.

evaluating whether states may have additional flexibilities as they work to prepare and submit approvable good neighbor SIPs for the 2015 ozone NAAQS (*see* Attachment A). EPA looks forward to discussing these and other potential flexibilities with states over the next few months, which will help inform states' development of their good neighbor SIP submittals, as well as EPA's development of further information on good neighbor SIPs.

Please share this information with the air agencies in your Region.

**For Further Information**

If you have any questions concerning this memorandum, please contact Norm Possiel at (919) 541-5692, *possiel.norm@epa.gov* for modeling information or Beth Palma at (919) 541-5432, *palma.elizabeth@epa.gov* for any other information.

Attachments

A. Preliminary List of Potential Flexibilities Related to Analytical Approaches for Developing a Good Neighbor State Implementation Plan
B. Projected Ozone Design Values at Potential Nonattainment and Maintenance Receptors Based on EPA's Updated 2023 Transport Modeling
C. Contributions to 2023 8-hour Ozone Design Values at Projected 2023 Nonattainment and Maintenance Sites

**Attachment A**

**Preliminary List of Potential Flexibilities Related to Analytical Approaches for Developing a Good Neighbor State Implementation Plan**

The Environmental Protection Agency believes states may be able to consider certain approaches as they develop good neighbor state implementation plans (SIPs) addressing the 2015 ozone National Ambient Air Quality Standards (NAAQS). To that end, EPA has reviewed comments provided in various forums, including comments on EPA's January 2017 Notice of Data Availability (NODA) regarding ozone transport modeling data for the 2015 ozone NAAQS, and seeks feedback from interested stakeholders on the following concepts. This list is organized in the familiar four-step transport framework discussed on pages 2-3 of the memorandum above, but EPA is open to alternative frameworks to address good neighbor obligations or considerations outside the four-step process. The purpose of this attachment is to identify potential flexibilities to inform SIP development and seek feedback on these concepts. EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches. Determinations regarding states' obligations under the good neighbor provision would be made through notice-and-comment rulemaking.

EPA has identified several guiding principles to consider when evaluating the appropriateness of the concepts introduced in this attachment, including:

- Supporting states' position as "first actors" in developing SIPs that address section 110(a)(2)(D) of the CAA;
- Consistency with respect to EPA's SIP actions is legally required by the statute and regulations (*see* CAA § 301(a)(2) and 40 CFR part 56) and is a particularly acute issue with respect to regional transport issues in which multiple states may be implicated;
- Compliance with statutory requirements and legal precedent from court decisions interpreting the CAA requirements;
- Encouraging collaboration among states linked to a common receptor and among linked upwind and downwind states in developing and applying a regionally consistent approach to identify and implement good neighbor obligations; and
- The potential value of considering different modeling tools or analyses in addition to EPA's, provided that any alternative modeling is performed using a credible modeling system which includes "state-of-the-science" and "fit for purpose" models, inputs, and techniques that are relevant to the nature of the ozone problem. The use of results from each alternative technique should be weighed in accordance with the scientific foundation, construct and limitations of the individual techniques.

EPA intends to reflect on feedback received on these concepts and communicate closely with air agencies as they prepare and submit SIPs to address the good neighbor provisions for the 2015 ozone NAAQS.

**Analytics**
- Consideration of appropriate alternate base years to those used in EPA's most recent modeling (*e.g.*, appropriate alternative base years should be selected consistent with EPA's air quality modeling guidance suggesting that years with meteorology conducive to ozone formation are appropriate).
- Consideration of an alternate future analytic year. EPA has identified 2023 as an appropriate analytic year to consider when evaluating transport obligations for the 2015 ozone NAAQS; however, another year may also be appropriate.
- Use of alternative power sector modeling consistent with EPA's emission inventory guidance.
- Consideration of state-specific information in identifying emissions sources [*e.g.*, electric generating units (EGUs) and non-EGUs] and controls (*e.g.*, combustion/process controls, post-combustion controls) that are appropriate to evaluate.

**Step 1 – Identify downwind air quality problems**
- Identification of maintenance receptors.
  - Evaluate alternative methodologies to give independent meaning to the term "interfere with maintenance" under CAA section 110(a)(2)(D)(i)(I).
  - Identify maintenance receptors that are at risk of exceeding the NAAQS (even if they do not currently violate the standard) using an alternative approach that does not rely on the projection of maximum design values.
  - Identify maintenance receptors where current, presumably "clean," measured data are shown through analysis to occur during meteorological conditions conducive to ozone formation such that exceedances are unlikely to reoccur in the future.
- Consideration of downwind air quality context.
  - Consider the role of designations issued in FY 2018 based on approved air quality monitors.
  - Assess current and projected local emissions reductions and whether downwind areas have considered and/or used available mechanisms for regulatory relief.
- Consideration of model performance.
  - Consider removal of certain data from modeling analysis for the purposes of projecting design values and calculating the contribution metric where data removal is based on model performance and technical analyses support the exclusion.

**Step 2 – Identify upwind states that contribute to those downwind air quality problems to warrant further review and analysis**
- Considerations related to determining contributions.
  - EPA has used the Anthropogenic Precursor Culpability Analysis (APCA) approach for the purpose of quantifying contribution to downwind receptors. We have received questions regarding the use of other modeling approaches (*e.g.*, Ozone Source Apportionment Technology, Decoupled Direct Method, and zero-out brute force sensitivity runs) to help quantify ozone impacts from upwind states.
- Considerations related to evaluating contributions (contributions contained in Attachment C are not based upon a particular significance threshold).
  - Establishing a contribution threshold based on variability in ozone design values that leverage some of the analytics and statistical data created to support the development of the Significant Impact Level for ozone.

- Consideration of different contribution thresholds for different regions based on regional differences in the nature and extent of the transport problem.
- An evaluation of "collective contribution" in the receptor region to determine the extent to which a receptor is "transport influenced." The results of this analysis could be applied before assessing whether an individual state is linked to a downwind receptor (*i.e.*, above the contribution threshold).

**Step 3 – Identifying air quality, cost, and emission reduction factors to be evaluated in a multifactor test to identify emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, if any**

- Consideration of international emissions, in a manner consistent with EPA's Ozone Cooperative Compliance Task Force efforts to fully understand the role of background ozone levels and appropriately account for international transport.[17]
  - Develop consensus on evaluation of the magnitude of international ozone contributions relative to domestic, anthropogenic ozone contributions for receptors identified in step 1. As contained in Attachment C, EPA recognizes that a number of non-U.S. and non-anthropogenic sources contribute to downwind nonattainment and maintenance receptors.
  - Consider whether the air quality, cost, or emission reduction factors should be weighted differently in areas where international contributions are relatively high.
- For states that are found to significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, apportioning responsibility among states.
  - Consider control stringency levels derived through "uniform-cost" analysis of $NO_X$ reductions.
  - Consider whether the relative impact (*e.g.*, parts per billion/ton) between states is sufficiently different such that this factor warrants consideration in apportioning responsibility.
- Considerations for states linked to maintenance receptors.
  - Consider whether the remedy for upwind states linked to maintenance receptors could be less stringent than for those linked to nonattainment receptors.
  - For example, consider whether upwind states could satisfy linkage(s) to maintenance receptors based on recent historic or base case emissions levels.

**Step 4 – Adopt permanent and enforceable measures needed to achieve emissions reductions (translating the control levels identified in Step 3 into enforceable emissions limits)**

- EPA welcomes concepts from stakeholders regarding Step 4, including potential EPA actions that could serve as a model as well as the relationship to previous transport rules.

---

[17] See *Final Report on Review of Agency Actions that Potentially Burden the Safe, Efficient Development of Domestic Energy Resources Under Executive Order 13783* (October 25, 2017) and *Report to Congress on Administrative Options to Enable States to Enter into Cooperative Agreements to Provide Regulatory Relief for Implementing Ozone Standards* (August 14, 2017).

**Attachment B**

**Projected Ozone Design Values at Potential Nonattainment and Maintenance Receptors Based on EPA's Updated 2023 Transport Modeling**

This attachment contains projected ozone design values at those individual monitoring sites that are projected to be potential nonattainment or maintenance receptors based on the Environmental Protection Agency's updated transport modeling for 2023. The scenario name for the updated modeling is "2023en." The data are in units of parts per billion (ppb).

The following data are provided in the table below:

1. Base period 2009 – 2013 average and maximum design values based on 2009 – 2013 measured data.

2. Projected 2023 average and maximum design values based on the "3 x 3" approach and a modified "3 x 3" approach in which model predictions in grid cells that are predominately water and that do not contain monitors are excluded from the projection calculations ("No Water"). Note that the modified approach only affects the projection of design values for monitoring sites in or near coastal areas.

3. 2016 ozone design values based on 2014 – 2016 measured data (N/A indicates that a 2016 design value is not available). The following Web site has additional information on the 2016 design values: *https://www.epa.gov/air-trends/air-quality-design-values#report*.

Note: A value of 70.9 ppb (or less) is considered to be in attainment of the 2015 ozone NAAQS, and a value of 71.0 ppb (or higher) is considered to be in violation of the 2015 ozone NAAQS.

Note also: Site 550790085 in Milwaukee Co., WI would be a nonattainment receptor using projected design values based on the "No Water" cell approach, but would not be a receptor with the "3 x 3" approach. Conversely, site 360850067 in Richmond Co., NY would be a nonattainment receptor using the "3 x 3" approach, but would not be a receptor with the "No Water" cell approach.

| Site ID | St | County | 2009-2013 Avg | 2009-2013 Max | 2023en "3x3" Avg | 2023en "3x3" Max | 2023en "No Water" Avg | 2023en "No Water" Max | 2014-2016 |
|---|---|---|---|---|---|---|---|---|---|
| 40130019 | AZ | Maricopa | 76.7 | 79 | 69.3 | 71.4 | 69.3 | 71.4 | 73 |
| 40131004 | AZ | Maricopa | 79.7 | 81 | 69.8 | 71.0 | 69.8 | 71.0 | 75 |
| 60190007 | CA | Fresno | 94.7 | 95 | 79.2 | 79.4 | 79.2 | 79.4 | 86 |
| 60190011 | CA | Fresno | 93.0 | 96 | 78.6 | 81.2 | 78.6 | 81.2 | 89 |
| 60190242 | CA | Fresno | 91.7 | 95 | 79.4 | 82.2 | 79.4 | 82.2 | 86 |
| 60194001 | CA | Fresno | 90.7 | 92 | 73.3 | 74.4 | 73.3 | 74.4 | 91 |
| 60195001 | CA | Fresno | 97.0 | 99 | 79.6 | 81.2 | 79.6 | 81.2 | 94 |
| 60250005 | CA | Imperial | 74.7 | 76 | 73.3 | 74.6 | 73.3 | 74.6 | 76 |
| 60251003 | CA | Imperial | 81.0 | 82 | 79.0 | 80.0 | 79.0 | 80.0 | 76 |
| 60290007 | CA | Kern | 91.7 | 96 | 77.7 | 81.3 | 77.7 | 81.3 | 87 |

| Site ID | St | County | 2009-2013 Avg | 2009-2013 Max | 2023en "3x3" Avg | 2023en "3x3" Max | 2023en "No Water" Avg | 2023en "No Water" Max | 2014-2016 |
|---------|----|--------|------|------|------|------|------|------|------|
| 60290008 | CA | Kern | 86.3 | 88 | 71.3 | 72.8 | 71.3 | 72.8 | 81 |
| 60290014 | CA | Kern | 87.7 | 89 | 74.1 | 75.2 | 74.1 | 75.2 | 84 |
| 60290232 | CA | Kern | 87.3 | 89 | 73.7 | 75.2 | 73.7 | 75.2 | 77 |
| 60295002 | CA | Kern | 90.0 | 91 | 75.9 | 76.8 | 75.9 | 76.8 | 87 |
| 60296001 | CA | Kern | 84.3 | 86 | 70.9 | 72.4 | 70.9 | 72.4 | 81 |
| 60311004 | CA | Kings | 87.0 | 90 | 71.7 | 74.2 | 71.7 | 74.2 | 84 |
| 60370002 | CA | Los Angeles | 80.0 | 82 | 73.3 | 75.1 | 73.3 | 75.1 | 88 |
| 60370016 | CA | Los Angeles | 94.0 | 97 | 86.1 | 88.9 | 86.1 | 88.9 | 96 |
| 60371201 | CA | Los Angeles | 90.0 | 90 | 79.8 | 79.8 | 79.8 | 79.8 | 85 |
| 60371701 | CA | Los Angeles | 84.0 | 85 | 78.1 | 79.1 | 78.1 | 79.1 | 90 |
| 60372005 | CA | Los Angeles | 79.5 | 82 | 72.3 | 74.6 | 72.3 | 74.6 | 83 |
| 60376012 | CA | Los Angeles | 97.3 | 99 | 85.9 | 87.4 | 85.9 | 87.4 | 96 |
| 60379033 | CA | Los Angeles | 90.0 | 91 | 76.3 | 77.2 | 76.3 | 77.2 | 88 |
| 60392010 | CA | Madera | 85.0 | 86 | 72.1 | 72.9 | 72.1 | 72.9 | 83 |
| 60470003 | CA | Merced | 82.7 | 84 | 69.9 | 71.0 | 69.9 | 71.0 | 82 |
| 60650004 | CA | Riverside | 85.0 | 85 | 76.7 | 76.7 | 76.7 | 76.7 | N/A |
| 60650012 | CA | Riverside | 97.3 | 99 | 83.6 | 85.1 | 83.6 | 85.1 | 93 |
| 60651016 | CA | Riverside | 100.7 | 101 | 85.2 | 85.5 | 85.2 | 85.5 | 97 |
| 60652002 | CA | Riverside | 84.3 | 85 | 72.4 | 73.0 | 72.4 | 73.0 | 81 |
| 60655001 | CA | Riverside | 92.3 | 93 | 79.5 | 80.1 | 79.5 | 80.1 | 87 |
| 60656001 | CA | Riverside | 94.0 | 98 | 78.3 | 81.6 | 78.3 | 81.6 | 91 |
| 60658001 | CA | Riverside | 97.0 | 98 | 87.0 | 87.9 | 87.0 | 87.9 | 94 |
| 60658005 | CA | Riverside | 92.7 | 94 | 83.2 | 84.4 | 83.2 | 84.4 | 91 |
| 60659001 | CA | Riverside | 88.3 | 91 | 73.7 | 75.9 | 73.7 | 75.9 | 86 |
| 60670012 | CA | Sacramento | 93.3 | 95 | 74.5 | 75.9 | 74.5 | 75.9 | 83 |
| 60675003 | CA | Sacramento | 86.3 | 88 | 69.9 | 71.3 | 69.9 | 71.3 | 79 |
| 60710005 | CA | San Bernardino | 105.0 | 107 | 96.2 | 98.1 | 96.2 | 98.1 | 108 |
| 60710012 | CA | San Bernardino | 95.0 | 97 | 84.1 | 85.8 | 84.1 | 85.8 | 91 |
| 60710306 | CA | San Bernardino | 83.7 | 85 | 76.2 | 77.4 | 76.2 | 77.4 | 86 |
| 60711004 | CA | San Bernardino | 96.7 | 98 | 89.8 | 91.0 | 89.8 | 91.0 | 101 |
| 60712002 | CA | San Bernardino | 101.0 | 103 | 93.1 | 95.0 | 93.1 | 95.0 | 97 |
| 60714001 | CA | San Bernardino | 94.3 | 97 | 86.0 | 88.5 | 86.0 | 88.5 | 90 |
| 60714003 | CA | San Bernardino | 105.0 | 107 | 94.1 | 95.8 | 94.1 | 95.8 | 101 |
| 60719002 | CA | San Bernardino | 92.3 | 94 | 80.0 | 81.4 | 80.0 | 81.4 | 86 |
| 60719004 | CA | San Bernardino | 98.7 | 99 | 88.4 | 88.7 | 88.4 | 88.7 | 104 |
| 60990006 | CA | Stanislaus | 87.0 | 88 | 74.8 | 75.7 | 74.8 | 75.7 | 83 |
| 61070006 | CA | Tulare | 81.7 | 85 | 69.1 | 71.9 | 69.1 | 71.9 | 84 |
| 61070009 | CA | Tulare | 94.7 | 96 | 76.1 | 77.2 | 76.1 | 77.2 | 89 |

| Site ID | St | County | 2009-2013 Avg | 2009-2013 Max | 2023en "3x3" Avg | 2023en "3x3" Max | 2023en "No Water" Avg | 2023en "No Water" Max | 2014-2016 |
|---------|-----|---------|------|------|------|------|------|------|------|
| 61072002 | CA | Tulare | 85.0 | 88 | 68.9 | 71.4 | 68.9 | 71.4 | 80 |
| 61072010 | CA | Tulare | 89.0 | 90 | 73.1 | 73.9 | 73.1 | 73.9 | 83 |
| 61112002 | CA | Ventura | 81.0 | 83 | 70.5 | 72.2 | 70.5 | 72.2 | 77 |
| 80050002 | CO | Arapahoe | 76.7 | 79 | 69.3 | 71.3 | 69.3 | 71.3 | N/A |
| 80350004 | CO | Douglas | 80.7 | 83 | 71.1 | 73.2 | 71.1 | 73.2 | 77 |
| 80590006 | CO | Jefferson | 80.3 | 83 | 71.3 | 73.7 | 71.3 | 73.7 | 77 |
| 80590011 | CO | Jefferson | 78.7 | 82 | 70.9 | 73.9 | 70.9 | 73.9 | 80 |
| 80690011 | CO | Larimer | 78.0 | 80 | 71.2 | 73.0 | 71.2 | 73.0 | 75 |
| 81230009 | CO | Weld | 74.7 | 76 | 70.2 | 71.4 | 70.2 | 71.4 | 70 |
| 90010017 | CT | Fairfield | 80.3 | 83 | 69.8 | 72.1 | 68.9 | 71.2 | 80 |
| 90013007 | CT | Fairfield | 84.3 | 89 | 71.2 | 75.2 | 71.0 | 75.0 | 81 |
| 90019003 | CT | Fairfield | 83.7 | 87 | 72.7 | 75.6 | 73.0 | 75.9 | 85 |
| 90099002 | CT | New Haven | 85.7 | 89 | 71.2 | 73.9 | 69.9 | 72.6 | 76 |
| 240251001 | MD | Harford | 90.0 | 93 | 71.4 | 73.8 | 70.9 | 73.3 | 73 |
| 260050003 | MI | Allegan | 82.7 | 86 | 69.0 | 71.8 | 69.0 | 71.7 | 75 |
| 261630019 | MI | Wayne | 78.7 | 81 | 69.0 | 71.0 | 69.0 | 71.0 | 72 |
| 360810124 | NY | Queens | 78.0 | 80 | 70.1 | 71.9 | 70.2 | 72.0 | 69 |
| 360850067 | NY | Richmond | 81.3 | 83 | 71.9 | 73.4 | 67.1 | 68.5 | 76 |
| 361030002 | NY | Suffolk | 83.3 | 85 | 72.5 | 74.0 | 74.0 | 75.5 | 72 |
| 480391004 | TX | Brazoria | 88.0 | 89 | 74.0 | 74.9 | 74.0 | 74.9 | 75 |
| 481210034 | TX | Denton | 84.3 | 87 | 69.7 | 72.0 | 69.7 | 72.0 | 80 |
| 482010024 | TX | Harris | 80.3 | 83 | 70.4 | 72.8 | 70.4 | 72.8 | 79 |
| 482011034 | TX | Harris | 81.0 | 82 | 70.8 | 71.6 | 70.8 | 71.6 | 73 |
| 482011039 | TX | Harris | 82.0 | 84 | 71.8 | 73.6 | 71.8 | 73.5 | 67 |
| 484392003 | TX | Tarrant | 87.3 | 90 | 72.5 | 74.8 | 72.5 | 74.8 | 73 |
| 550790085 | WI | Milwaukee | 80.0 | 82 | 65.4 | 67.0 | 71.2 | 73.0 | 71 |
| 551170006 | WI | Sheboygan | 84.3 | 87 | 70.8 | 73.1 | 72.8 | 75.1 | 79 |

**Attachment C**

**Contributions to 2023 8-hour Ozone Design Values at Projected
2023 Nonattainment and Maintenance Sites**

This attachment contains tables with the projected ozone contributions from 2023 anthropogenic nitrogen oxide and volatile organic compound emissions in each state to each potential nonattainment receptor and maintenance receptor (based on the 2015 ozone National Ambient Air Quality Standards) in the United States, following the approach for identification of such receptors EPA has used in the past, with slight modification.[18] In addition to the state contributions, we have included the contributions from each of the other categories tracked in the contribution modeling, including point source emissions on Tribal lands, anthropogenic emissions in Canada and Mexico, emissions from offshore sources, fires, biogenics, and contributions from initial and boundary concentrations.

The contribution information is provided in a three-part table for all of the projected receptors throughout the country, except California, and a separate three-part table for the projected receptors in California. For each monitoring site, we provide the site ID, county name, and state name in the first three columns of the table. This information is followed by columns containing the projected 2023 average and maximum design values based on the "No Water" cell approach. Next, in Parts 1 and 2 of each table, we provide the contributions from each state and the District of Columbia, individually. Finally, in Part 3 of each table, we provide the contributions from the Tribal lands, Canada and Mexico, offshore, fires, initial and boundary concentrations (Boundary), and biogenics categories. The units of the 2023 design values and contributions are parts per billion (ppb). Note that the contributions presented in these tables may not sum exactly to the 2023 average design value due to truncation of the contributions to two places to the right of the decimal.

---

[18] For the purposes of creating the contribution tables, data are provided for sites identified as potential nonattainment and maintenance receptors using projected design values based on the "No Water" cell approach. In addition, we provide the contributions to the Richmond Co., NY site that would be a nonattainment receptor in the "3 x 3" approach.

| Site ID | County | State | 2023en Average | 2023en Maximum | AL | AZ | AR | CA | CO | CT | DE | DC | FL | GA | ID | IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO | MT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40130019 | Maricopa | AZ | 69.3 | 71.4 | 0.00 | 25.19 | 0.00 | 1.87 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40131004 | Maricopa | AZ | 69.8 | 71.0 | 0.00 | 27.40 | 0.00 | 2.03 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 80050002 | Arapahoe | CO | 69.3 | 71.3 | 0.00 | 0.29 | 0.00 | 1.20 | 22.94 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.00 | 0.00 | 0.00 | 0.28 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 |
| 80350004 | Douglas | CO | 71.1 | 73.2 | 0.00 | 0.38 | 0.01 | 1.27 | 24.71 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.00 | 0.00 | 0.00 | 0.26 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| 80590006 | Jefferson | CO | 71.3 | 73.7 | 0.01 | 0.49 | 0.03 | 1.32 | 25.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.03 | 0.03 |
| 80590011 | Jefferson | CO | 70.9 | 73.9 | 0.01 | 0.30 | 0.02 | 1.50 | 24.72 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.32 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.02 |
| 80690011 | Larimer | CO | 71.2 | 73.0 | 0.00 | 0.46 | 0.00 | 1.55 | 21.74 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.00 | 0.10 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.04 |
| 81230009 | Weld | CO | 70.2 | 71.4 | 0.01 | 0.49 | 0.02 | 0.95 | 24.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.06 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| 90010017 | Fairfield | CT | 68.9 | 71.2 | 0.08 | 0.03 | 0.07 | 0.03 | 0.07 | 8.70 | 0.18 | 0.04 | 0.02 | 0.09 | 0.01 | 0.39 | 0.44 | 0.11 | 0.09 | 0.34 | 0.05 | 0.01 | 1.18 | 0.06 | 0.50 | 0.17 | 0.03 | 0.21 | 0.03 |
| 90013007 | Fairfield | CT | 71.0 | 75.0 | 0.14 | 0.05 | 0.13 | 0.05 | 0.09 | 4.64 | 0.35 | 0.06 | 0.05 | 0.17 | 0.01 | 0.72 | 0.97 | 0.16 | 0.13 | 0.89 | 0.11 | 0.01 | 1.80 | 0.12 | 0.70 | 0.15 | 0.07 | 0.38 | 0.02 |
| 90019003 | Fairfield | CT | 73.0 | 75.9 | 0.14 | 0.05 | 0.13 | 0.05 | 0.09 | 3.71 | 0.40 | 0.08 | 0.05 | 0.17 | 0.01 | 0.67 | 0.83 | 0.17 | 0.13 | 0.79 | 0.11 | 0.00 | 2.17 | 0.10 | 0.63 | 0.14 | 0.07 | 0.37 | 0.02 |
| 90099002 | New Haven | CT | 69.9 | 72.6 | 0.06 | 0.04 | 0.08 | 0.05 | 0.08 | 9.10 | 0.30 | 0.04 | 0.02 | 0.07 | 0.02 | 0.46 | 0.50 | 0.16 | 0.14 | 0.32 | 0.08 | 0.01 | 1.37 | 0.18 | 0.73 | 0.19 | 0.04 | 0.29 | 0.04 |
| 240251001 | Harford | MD | 70.9 | 73.3 | 0.31 | 0.07 | 0.17 | 0.07 | 0.12 | 0.00 | 0.03 | 0.65 | 0.11 | 0.32 | 0.02 | 0.84 | 1.35 | 0.23 | 0.23 | 1.52 | 0.19 | 0.00 | 22.60 | 0.00 | 0.79 | 0.13 | 0.08 | 0.59 | 0.04 |
| 260050003 | Allegan | MI | 69.0 | 71.7 | 0.35 | 0.08 | 1.64 | 0.09 | 0.18 | 0.00 | 0.00 | 0.00 | 0.09 | 0.18 | 0.03 | 19.62 | 7.11 | 0.77 | 0.77 | 0.58 | 0.70 | 0.00 | 0.01 | 0.00 | 3.32 | 0.11 | 0.40 | 2.61 | 0.06 |
| 261630019 | Wayne | MI | 69.0 | 71.0 | 0.11 | 0.07 | 0.27 | 0.13 | 0.17 | 0.00 | 0.00 | 0.00 | 0.05 | 0.09 | 0.05 | 2.37 | 2.51 | 0.44 | 0.44 | 0.65 | 0.22 | 0.00 | 0.02 | 0.00 | 20.39 | 0.31 | 0.09 | 0.92 | 0.08 |
| 360810124 | Queens | NY | 70.2 | 72.0 | 0.11 | 0.06 | 0.09 | 0.08 | 0.11 | 0.57 | 0.38 | 0.05 | 0.07 | 0.16 | 0.03 | 0.73 | 0.69 | 0.26 | 0.19 | 0.42 | 0.13 | 0.00 | 1.56 | 0.24 | 1.26 | 0.17 | 0.04 | 0.38 | 0.05 |
| 360850067 | Richmond | NY | 67.1 | 68.5 | 0.24 | 0.08 | 0.13 | 0.09 | 0.12 | 0.27 | 0.43 | 0.05 | 0.09 | 0.28 | 0.02 | 0.80 | 0.92 | 0.23 | 0.21 | 0.84 | 0.16 | 0.00 | 1.74 | 0.03 | 0.98 | 0.12 | 0.08 | 0.46 | 0.03 |
| 361030002 | Suffolk | NY | 74.0 | 75.5 | 0.12 | 0.06 | 0.12 | 0.08 | 0.11 | 0.83 | 0.22 | 0.04 | 0.04 | 0.12 | 0.03 | 0.64 | 0.69 | 0.20 | 0.20 | 0.49 | 0.13 | 0.01 | 1.24 | 0.04 | 0.94 | 0.18 | 0.06 | 0.39 | 0.06 |
| 480391004 | Brazoria | TX | 74.0 | 74.9 | 0.35 | 0.08 | 0.90 | 0.21 | 0.30 | 0.00 | 0.00 | 0.00 | 0.21 | 0.14 | 0.08 | 1.00 | 0.32 | 0.40 | 0.47 | 0.14 | 3.80 | 0.00 | 0.00 | 0.00 | 0.22 | 0.34 | 0.63 | 0.88 | 0.10 |
| 481210034 | Denton | TX | 69.7 | 72.0 | 0.49 | 0.07 | 0.58 | 0.13 | 0.27 | 0.00 | 0.00 | 0.00 | 0.27 | 0.34 | 0.06 | 0.23 | 0.16 | 0.10 | 0.40 | 0.11 | 1.92 | 0.00 | 0.01 | 0.00 | 0.08 | 0.11 | 0.33 | 0.24 | 0.07 |
| 482010024 | Harris | TX | 70.4 | 72.8 | 0.39 | 0.04 | 0.29 | 0.12 | 0.13 | 0.00 | 0.00 | 0.00 | 0.39 | 0.26 | 0.05 | 0.34 | 0.13 | 0.17 | 0.17 | 0.10 | 3.06 | 0.00 | 0.00 | 0.00 | 0.06 | 0.06 | 0.50 | 0.38 | 0.05 |
| 482011034 | Harris | TX | 70.8 | 71.6 | 0.32 | 0.03 | 0.54 | 0.10 | 0.15 | 0.00 | 0.00 | 0.00 | 0.53 | 0.16 | 0.04 | 0.51 | 0.12 | 0.27 | 0.32 | 0.05 | 3.38 | 0.00 | 0.00 | 0.00 | 0.17 | 0.23 | 0.39 | 0.63 | 0.05 |
| 482011039 | Harris | TX | 71.8 | 73.5 | 0.37 | 0.04 | 0.99 | 0.12 | 0.20 | 0.00 | 0.00 | 0.00 | 0.23 | 0.13 | 0.05 | 0.88 | 0.24 | 0.33 | 0.33 | 0.11 | 4.72 | 0.00 | 0.00 | 0.00 | 0.27 | 0.20 | 0.79 | 0.88 | 0.07 |
| 484392003 | Tarrant | TX | 72.5 | 74.8 | 0.37 | 0.08 | 0.78 | 0.15 | 0.33 | 0.00 | 0.00 | 0.00 | 0.18 | 0.26 | 0.07 | 0.29 | 0.18 | 0.19 | 0.69 | 0.13 | 1.71 | 0.00 | 0.01 | 0.00 | 0.13 | 0.15 | 0.27 | 0.38 | 0.10 |
| 550790085 | Milwaukee | WI | 71.2 | 73.0 | 0.14 | 0.04 | 0.40 | 0.07 | 0.08 | 0.00 | 0.00 | 0.00 | 0.06 | 0.06 | 0.03 | 15.10 | 5.28 | 0.79 | 0.35 | 0.77 | 0.72 | 0.00 | 0.03 | 0.00 | 2.01 | 0.40 | 0.28 | 0.93 | 0.10 |
| 551170006 | Sheboygan | WI | 72.8 | 75.1 | 0.14 | 0.08 | 0.51 | 0.12 | 0.11 | 0.00 | 0.00 | 0.00 | 0.07 | 0.07 | 0.04 | 15.73 | 7.11 | 0.45 | 0.46 | 0.81 | 0.84 | 0.00 | 0.03 | 0.00 | 2.06 | 0.28 | 0.30 | 1.37 | 0.06 |

| Site ID | County | State | 2023en Average | 2023en Maximum | NE | NV | NH | NJ | NM | NY | NC | ND | OH | OK | OR | PA | RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40130019 | Maricopa | AZ | 69.3 | 71.4 | 0.00 | 0.09 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.06 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.01 |
| 40131004 | Maricopa | AZ | 69.8 | 71.0 | 0.00 | 0.14 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.06 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 |
| 80050002 | Arapahoe | CO | 69.3 | 71.3 | 0.34 | 0.33 | 0.00 | 0.00 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.11 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.30 | 1.23 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 1.04 |
| 80350004 | Douglas | CO | 71.1 | 73.2 | 0.32 | 0.32 | 0.00 | 0.00 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.10 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.36 | 1.08 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 1.00 |
| 80590006 | Jefferson | CO | 71.3 | 73.7 | 0.41 | 0.31 | 0.00 | 0.00 | 0.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.24 | 0.10 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 1.02 | 0.83 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.81 |
| 80590011 | Jefferson | CO | 70.9 | 73.9 | 0.36 | 0.38 | 0.00 | 0.00 | 0.38 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.10 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.94 | 1.04 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 1.03 |
| 80690011 | Larimer | CO | 71.2 | 73.0 | 0.25 | 0.37 | 0.00 | 0.00 | 0.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.10 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.40 | 1.05 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.88 |
| 81230009 | Weld | CO | 70.2 | 71.4 | 0.27 | 0.24 | 0.00 | 0.00 | 0.77 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.04 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 1.05 | 0.54 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.58 |
| 90010017 | Fairfield | CT | 68.9 | 71.2 | 0.06 | 0.00 | 0.01 | 6.24 | 0.04 | 17.31 | 0.29 | 0.07 | 1.04 | 0.15 | 0.00 | 5.11 | 0.01 | 0.06 | 0.03 | 0.15 | 0.30 | 0.03 | 0.01 | 1.27 | 0.02 | 0.68 | 0.26 | 0.07 |
| 90013007 | Fairfield | CT | 71.0 | 75.0 | 0.07 | 0.01 | 0.02 | 6.94 | 0.06 | 14.12 | 0.40 | 0.07 | 1.84 | 0.21 | 0.00 | 6.32 | 0.02 | 0.11 | 0.02 | 0.31 | 0.44 | 0.04 | 0.01 | 1.51 | 0.01 | 1.10 | 0.24 | 0.08 |
| 90019003 | Fairfield | CT | 73.0 | 75.9 | 0.07 | 0.01 | 0.02 | 7.75 | 0.06 | 15.80 | 0.43 | 0.06 | 1.60 | 0.21 | 0.01 | 6.56 | 0.02 | 0.12 | 0.02 | 0.28 | 0.45 | 0.04 | 0.01 | 1.91 | 0.01 | 1.14 | 0.20 | 0.08 |
| 90099002 | New Haven | CT | 69.9 | 72.6 | 0.09 | 0.01 | 0.03 | 5.06 | 0.04 | 15.03 | 0.32 | 0.15 | 1.17 | 0.24 | 0.01 | 4.87 | 0.02 | 0.04 | 0.04 | 0.12 | 0.41 | 0.04 | 0.02 | 1.26 | 0.04 | 0.61 | 0.25 | 0.10 |
| 240251001 | Harford | MD | 70.9 | 73.3 | 0.13 | 0.01 | 0.00 | 0.07 | 0.09 | 0.16 | 0.42 | 0.07 | 2.77 | 0.35 | 0.02 | 4.32 | 0.00 | 0.11 | 0.04 | 0.43 | 0.74 | 0.05 | 0.00 | 5.05 | 0.04 | 2.78 | 0.24 | 0.12 |
| 260050003 | Allegan | MI | 69.0 | 71.7 | 0.16 | 0.02 | 0.00 | 0.00 | 0.16 | 0.00 | 0.05 | 0.09 | 0.19 | 1.31 | 0.01 | 0.05 | 0.00 | 0.04 | 0.05 | 0.65 | 2.39 | 0.06 | 0.00 | 0.04 | 0.05 | 0.11 | 1.95 | 0.12 |
| 261630019 | Wayne | MI | 69.0 | 71.0 | 0.17 | 0.03 | 0.00 | 0.01 | 0.08 | 0.06 | 0.20 | 0.12 | 3.81 | 0.62 | 0.05 | 0.18 | 0.00 | 0.05 | 0.04 | 0.27 | 1.12 | 0.09 | 0.00 | 0.16 | 0.07 | 0.23 | 1.08 | 0.18 |
| 360810124 | Queens | NY | 70.2 | 72.0 | 0.12 | 0.02 | 0.06 | 8.57 | 0.07 | 13.55 | 0.35 | 0.12 | 1.88 | 0.32 | 0.02 | 7.16 | 0.04 | 0.09 | 0.05 | 0.13 | 0.58 | 0.07 | 0.07 | 1.56 | 0.03 | 1.01 | 0.38 | 0.14 |
| 360850067 | Richmond | NY | 67.1 | 68.5 | 0.12 | 0.02 | 0.00 | 10.53 | 0.09 | 6.57 | 0.37 | 0.09 | 2.05 | 0.36 | 0.01 | 10.41 | 0.00 | 0.10 | 0.04 | 0.36 | 0.70 | 0.07 | 0.00 | 1.67 | 0.02 | 1.54 | 0.30 | 0.12 |
| 361030002 | Suffolk | NY | 74.0 | 75.5 | 0.12 | 0.02 | 0.01 | 8.88 | 0.06 | 18.11 | 0.23 | 0.20 | 1.76 | 0.34 | 0.03 | 6.86 | 0.00 | 0.05 | 0.05 | 0.22 | 0.60 | 0.07 | 0.02 | 0.99 | 0.06 | 0.81 | 0.25 | 0.14 |
| 480391004 | Brazoria | TX | 74.0 | 74.9 | 0.23 | 0.06 | 0.00 | 0.00 | 0.08 | 0.00 | 0.04 | 0.06 | 0.06 | 0.90 | 0.05 | 0.01 | 0.00 | 0.04 | 0.05 | 0.28 | 26.00 | 0.14 | 0.00 | 0.02 | 0.06 | 0.02 | 0.40 | 0.27 |
| 481210034 | Denton | TX | 69.7 | 72.0 | 0.15 | 0.04 | 0.00 | 0.00 | 0.13 | 0.01 | 0.09 | 0.03 | 0.08 | 1.23 | 0.03 | 0.04 | 0.00 | 0.09 | 0.03 | 0.14 | 26.69 | 0.10 | 0.00 | 0.05 | 0.05 | 0.04 | 0.08 | 0.25 |
| 482010024 | Harris | TX | 70.4 | 72.8 | 0.08 | 0.03 | 0.00 | 0.00 | 0.05 | 0.00 | 0.14 | 0.04 | 0.05 | 0.20 | 0.03 | 0.02 | 0.00 | 0.14 | 0.02 | 0.26 | 25.62 | 0.08 | 0.00 | 0.06 | 0.03 | 0.05 | 0.07 | 0.14 |
| 482011034 | Harris | TX | 70.8 | 71.6 | 0.16 | 0.03 | 0.00 | 0.00 | 0.04 | 0.00 | 0.09 | 0.04 | 0.05 | 0.68 | 0.02 | 0.01 | 0.00 | 0.10 | 0.03 | 0.09 | 25.66 | 0.07 | 0.00 | 0.03 | 0.02 | 0.03 | 0.22 | 0.15 |
| 482011039 | Harris | TX | 71.8 | 73.5 | 0.19 | 0.03 | 0.00 | 0.00 | 0.06 | 0.00 | 0.04 | 0.06 | 0.05 | 0.58 | 0.03 | 0.01 | 0.00 | 0.03 | 0.04 | 0.30 | 22.82 | 0.08 | 0.00 | 0.02 | 0.04 | 0.01 | 0.28 | 0.20 |
| 484392003 | Tarrant | TX | 72.5 | 74.8 | 0.30 | 0.04 | 0.00 | 0.00 | 0.14 | 0.01 | 0.09 | 0.05 | 0.10 | 1.71 | 0.05 | 0.05 | 0.00 | 0.08 | 0.07 | 0.15 | 27.64 | 0.15 | 0.00 | 0.05 | 0.09 | 0.05 | 0.13 | 0.28 |
| 550790085 | Milwaukee | WI | 71.2 | 73.0 | 0.06 | 0.01 | 0.00 | 0.00 | 0.08 | 0.02 | 0.04 | 0.23 | 0.87 | 0.76 | 0.02 | 0.33 | 0.00 | 0.02 | 0.03 | 0.31 | 1.22 | 0.04 | 0.00 | 0.12 | 0.09 | 0.59 | 13.39 | 0.09 |
| 551170006 | Sheboygan | WI | 72.8 | 75.1 | 0.06 | 0.03 | 0.00 | 0.00 | 0.14 | 0.02 | 0.04 | 0.10 | 1.10 | 0.95 | 0.04 | 0.41 | 0.00 | 0.02 | 0.02 | 0.31 | 1.65 | 0.06 | 0.00 | 0.10 | 0.07 | 0.64 | 9.09 | 0.12 |

| Site ID | County | State | 2023en Average | 2023en Maximum | Tribal | Canada/ Mexco | Offshore | Fire | Boundary | Biogenic |
|---------|--------|-------|----------------|----------------|--------|---------------|----------|------|----------|----------|
| 40130019 | Maricopa | AZ | 69.3 | 71.4 | 0.06 | 3.29 | 0.37 | 0.49 | 34.74 | 2.52 |
| 40131004 | Maricopa | AZ | 69.8 | 71.0 | 0.06 | 2.70 | 0.34 | 0.56 | 33.85 | 2.24 |
| 80050002 | Arapahoe | CO | 69.3 | 71.3 | 0.22 | 0.55 | 0.14 | 0.46 | 34.84 | 4.24 |
| 80350004 | Douglas | CO | 71.1 | 73.2 | 0.21 | 0.71 | 0.16 | 0.47 | 34.74 | 4.19 |
| 80590006 | Jefferson | CO | 71.3 | 73.7 | 0.21 | 0.90 | 0.17 | 0.66 | 31.41 | 5.40 |
| 80590011 | Jefferson | CO | 70.9 | 73.9 | 0.16 | 0.70 | 0.16 | 0.45 | 32.96 | 4.74 |
| 80690011 | Larimer | CO | 71.2 | 73.0 | 0.25 | 0.78 | 0.19 | 1.74 | 34.54 | 5.71 |
| 81230009 | Weld | CO | 70.2 | 71.4 | 0.23 | 1.04 | 0.15 | 1.57 | 31.11 | 6.08 |
| 90010017 | Fairfield | CT | 68.9 | 71.2 | 0.00 | 1.64 | 0.65 | 0.20 | 16.73 | 3.28 |
| 90013007 | Fairfield | CT | 71.0 | 75.0 | 0.01 | 1.35 | 1.93 | 0.34 | 17.17 | 4.01 |
| 90019003 | Fairfield | CT | 73.0 | 75.9 | 0.01 | 1.37 | 1.96 | 0.33 | 17.00 | 4.09 |
| 90099002 | New Haven | CT | 69.9 | 72.6 | 0.01 | 1.58 | 2.15 | 0.22 | 17.17 | 4.13 |
| 240251001 | Harford | MD | 70.9 | 73.3 | 0.01 | 0.79 | 0.32 | 0.42 | 15.28 | 5.32 |
| 260050003 | Allegan | MI | 69.0 | 71.7 | 0.02 | 0.54 | 0.36 | 0.93 | 11.85 | 8.91 |
| 261630019 | Wayne | MI | 69.0 | 71.0 | 0.02 | 3.13 | 0.17 | 0.44 | 20.06 | 6.93 |
| 360810124 | Queens | NY | 70.2 | 72.0 | 0.01 | 1.73 | 1.39 | 0.25 | 17.87 | 4.45 |
| 360850067 | Richmond | NY | 67.1 | 68.5 | 0.01 | 1.44 | 0.83 | 0.35 | 15.46 | 4.75 |
| 361030002 | Suffolk | NY | 74.0 | 75.5 | 0.01 | 1.85 | 1.24 | 0.30 | 18.94 | 4.49 |
| 480391004 | Brazoria | TX | 74.0 | 74.9 | 0.02 | 0.44 | 2.31 | 2.05 | 24.02 | 5.60 |
| 481210034 | Denton | TX | 69.7 | 72.0 | 0.01 | 0.92 | 1.23 | 0.87 | 24.69 | 6.42 |
| 482010024 | Harris | TX | 70.4 | 72.8 | 0.01 | 0.28 | 4.83 | 0.77 | 27.83 | 2.66 |
| 482011034 | Harris | TX | 70.8 | 71.6 | 0.01 | 0.24 | 3.91 | 1.75 | 25.71 | 3.44 |
| 482011039 | Harris | TX | 71.8 | 73.5 | 0.01 | 0.47 | 4.04 | 2.09 | 24.67 | 4.50 |
| 484392003 | Tarrant | TX | 72.5 | 74.8 | 0.02 | 1.24 | 1.18 | 1.34 | 24.38 | 6.44 |
| 550790085 | Milwaukee | WI | 71.2 | 73.0 | 0.01 | 0.82 | 0.43 | 0.37 | 16.67 | 6.70 |
| 551170006 | Sheboygan | WI | 72.8 | 75.1 | 0.01 | 0.69 | 0.55 | 0.64 | 17.53 | 7.51 |

| Site ID | County | State | 2023 Average | 2023 Maximum | AL | AZ | AR | CA | CO | CT | DE | DC | FL | GA | ID | IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO | MT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 60190007 | Fresno | CA | 79.2 | 79.4 | 0.00 | 0.16 | 0.00 | 35.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60190011 | Fresno | CA | 78.6 | 81.2 | 0.00 | 0.15 | 0.00 | 35.20 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60190242 | Fresno | CA | 79.4 | 82.2 | 0.00 | 0.21 | 0.00 | 31.98 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60194001 | Fresno | CA | 73.3 | 74.4 | 0.00 | 0.03 | 0.00 | 34.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60195001 | Fresno | CA | 79.6 | 81.2 | 0.00 | 0.12 | 0.00 | 35.79 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60250005 | Imperial | CA | 73.3 | 74.6 | 0.00 | 0.62 | 0.00 | 9.28 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60251003 | Imperial | CA | 79.0 | 80.0 | 0.00 | 0.67 | 0.00 | 11.34 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290007 | Kern | CA | 77.7 | 81.3 | 0.00 | 0.07 | 0.00 | 29.99 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290008 | Kern | CA | 71.3 | 72.8 | 0.00 | 0.17 | 0.00 | 26.44 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290014 | Kern | CA | 74.1 | 75.2 | 0.00 | 0.11 | 0.00 | 31.54 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290232 | Kern | CA | 73.7 | 75.2 | 0.00 | 0.03 | 0.00 | 32.66 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60295002 | Kern | CA | 75.9 | 76.8 | 0.00 | 0.13 | 0.00 | 28.33 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60296001 | Kern | CA | 70.9 | 72.4 | 0.00 | 0.16 | 0.00 | 28.50 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60370002 | Los Angeles | CA | 73.3 | 75.1 | 0.00 | 0.23 | 0.00 | 39.68 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60370016 | Los Angeles | CA | 86.1 | 88.9 | 0.00 | 0.27 | 0.00 | 46.61 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60371201 | Los Angeles | CA | 79.8 | 79.8 | 0.00 | 0.37 | 0.00 | 35.55 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60371701 | Los Angeles | CA | 78.1 | 79.1 | 0.00 | 0.27 | 0.00 | 42.09 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60372005 | Los Angeles | CA | 72.3 | 74.6 | 0.00 | 0.32 | 0.00 | 37.39 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60376012 | Los Angeles | CA | 85.9 | 87.4 | 0.00 | 0.42 | 0.00 | 39.86 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60379033 | Los Angeles | CA | 76.3 | 77.2 | 0.00 | 0.34 | 0.00 | 25.79 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60392010 | Madera | CA | 72.1 | 72.9 | 0.00 | 0.20 | 0.00 | 28.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60470003 | Merced | CA | 69.9 | 71.0 | 0.00 | 0.10 | 0.00 | 28.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60650004 | Riverside | CA | 76.7 | 76.7 | 0.00 | 0.22 | 0.00 | 41.92 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60650012 | Riverside | CA | 83.6 | 85.1 | 0.00 | 0.21 | 0.00 | 38.65 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60651016 | Riverside | CA | 85.2 | 85.5 | 0.00 | 0.22 | 0.00 | 35.47 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60652002 | Riverside | CA | 72.4 | 73.0 | 0.00 | 0.27 | 0.00 | 16.57 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60655001 | Riverside | CA | 79.5 | 80.1 | 0.00 | 0.20 | 0.00 | 24.70 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60656001 | Riverside | CA | 78.3 | 81.6 | 0.00 | 0.17 | 0.00 | 39.14 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60658001 | Riverside | CA | 87.0 | 87.9 | 0.00 | 0.27 | 0.00 | 47.69 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60658005 | Riverside | CA | 83.2 | 84.4 | 0.00 | 0.25 | 0.00 | 45.60 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60659001 | Riverside | CA | 73.7 | 75.9 | 0.00 | 0.16 | 0.00 | 37.28 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60670012 | Sacramento | CA | 74.5 | 75.9 | 0.00 | 0.01 | 0.00 | 35.91 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60675003 | Sacramento | CA | 69.9 | 71.3 | 0.00 | 0.00 | 0.00 | 34.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60710005 | San Bernardino | CA | 96.2 | 98.1 | 0.00 | 0.23 | 0.00 | 48.09 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60710012 | San Bernardino | CA | 84.1 | 85.8 | 0.00 | 0.46 | 0.00 | 24.28 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60710306 | San Bernardino | CA | 76.2 | 77.4 | 0.00 | 0.14 | 0.00 | 29.72 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60711004 | San Bernardino | CA | 89.8 | 91.0 | 0.00 | 0.35 | 0.00 | 47.69 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60712002 | San Bernardino | CA | 93.1 | 95.0 | 0.00 | 0.14 | 0.00 | 51.11 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60714001 | San Bernardino | CA | 86.0 | 88.5 | 0.00 | 0.21 | 0.00 | 41.23 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60714003 | San Bernardino | CA | 94.1 | 95.8 | 0.00 | 0.10 | 0.00 | 52.53 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60719002 | San Bernardino | CA | 80.0 | 81.4 | 0.00 | 0.45 | 0.00 | 22.21 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60719004 | San Bernardino | CA | 88.4 | 88.7 | 0.00 | 0.10 | 0.00 | 49.35 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60990006 | Stanislaus | CA | 74.8 | 75.7 | 0.00 | 0.03 | 0.00 | 34.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61070006 | Tulare | CA | 69.1 | 71.9 | 0.00 | 0.06 | 0.00 | 7.37 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61070009 | Tulare | CA | 76.1 | 77.2 | 0.00 | 0.07 | 0.00 | 23.74 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61072002 | Tulare | CA | 68.9 | 71.4 | 0.00 | 0.12 | 0.00 | 30.91 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61072010 | Tulare | CA | 73.1 | 73.9 | 0.00 | 0.03 | 0.00 | 30.19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61112002 | Ventura | CA | 70.5 | 72.2 | 0.00 | 0.32 | 0.00 | 29.51 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

| Site ID | County | State | 2023 Average | 2023 Maximum | NE | NV | NH | NJ | NM | NY | NC | ND | OH | OK | OR | PA | RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 60190007 | Fresno | CA | 79.2 | 79.4 | 0.00 | 0.51 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.29 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.08 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.01 |
| 60190011 | Fresno | CA | 78.6 | 81.2 | 0.00 | 0.44 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.09 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.01 |
| 60192242 | Fresno | CA | 79.4 | 82.2 | 0.00 | 0.64 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.10 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.01 |
| 60194001 | Fresno | CA | 73.3 | 74.4 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 |
| 60195001 | Fresno | CA | 79.6 | 81.2 | 0.00 | 0.38 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.33 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 |
| 60250005 | Imperial | CA | 73.3 | 74.6 | 0.00 | 0.09 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.20 | 0.05 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.04 |
| 60251003 | Imperial | CA | 79.0 | 80.0 | 0.00 | 0.25 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.06 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.03 |
| 60290007 | Kern | CA | 77.7 | 81.3 | 0.00 | 0.29 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.37 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.10 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.03 |
| 60290008 | Kern | CA | 71.3 | 72.8 | 0.00 | 0.31 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.01 |
| 60290014 | Kern | CA | 74.1 | 75.2 | 0.00 | 0.38 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 |
| 60290232 | Kern | CA | 73.7 | 75.2 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.00 |
| 60295002 | Kern | CA | 75.9 | 76.8 | 0.00 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.06 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 |
| 60296001 | Kern | CA | 70.9 | 72.4 | 0.00 | 0.58 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.26 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 |
| 60370002 | Los Angeles | CA | 73.3 | 75.1 | 0.00 | 0.12 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.03 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.01 |
| 60370016 | Los Angeles | CA | 86.1 | 88.9 | 0.00 | 0.14 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.03 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 |
| 60371201 | Los Angeles | CA | 79.8 | 79.8 | 0.00 | 0.17 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.09 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.03 |
| 60371701 | Los Angeles | CA | 78.1 | 79.1 | 0.00 | 0.11 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.03 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 |
| 60372005 | Los Angeles | CA | 72.3 | 74.6 | 0.00 | 0.08 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 0.06 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.02 |
| 60376012 | Los Angeles | CA | 85.9 | 87.4 | 0.00 | 0.18 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 0.08 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.04 |
| 60379033 | Los Angeles | CA | 76.3 | 77.2 | 0.00 | 0.15 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.04 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.02 |
| 60392010 | Madera | CA | 72.1 | 72.9 | 0.00 | 0.65 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.12 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.02 |
| 60470003 | Merced | CA | 69.9 | 71.0 | 0.00 | 0.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 |
| 60650004 | Riverside | CA | 76.7 | 76.7 | 0.00 | 0.14 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.03 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.01 |
| 60650012 | Riverside | CA | 83.6 | 85.1 | 0.00 | 0.24 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.02 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 |
| 60651016 | Riverside | CA | 85.2 | 85.5 | 0.00 | 0.28 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 |
| 60652002 | Riverside | CA | 72.4 | 73.0 | 0.00 | 0.18 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.04 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.02 |
| 60655001 | Riverside | CA | 79.5 | 80.1 | 0.00 | 0.11 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.26 | 0.03 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.02 |
| 60656001 | Riverside | CA | 78.3 | 81.6 | 0.00 | 0.19 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.07 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.02 |
| 60658001 | Riverside | CA | 87.0 | 87.9 | 0.00 | 0.15 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.03 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.01 |
| 60658005 | Riverside | CA | 83.2 | 84.4 | 0.00 | 0.14 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.03 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.01 |
| 60659001 | Riverside | CA | 73.7 | 75.9 | 0.00 | 0.15 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.01 |
| 60670012 | Sacramento | CA | 74.5 | 75.9 | 0.00 | 0.30 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.57 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 | 0.00 |
| 60675003 | Sacramento | CA | 69.9 | 71.3 | 0.00 | 0.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.45 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.00 |
| 60710005 | San Bernardino | CA | 96.2 | 98.1 | 0.00 | 0.25 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.03 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.01 |
| 60710012 | San Bernardino | CA | 84.1 | 85.8 | 0.00 | 0.15 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.06 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.03 |
| 60710306 | San Bernardino | CA | 76.2 | 77.4 | 0.00 | 0.06 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.01 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 |
| 60711004 | San Bernardino | CA | 89.8 | 91.0 | 0.00 | 0.14 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.04 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 |
| 60712002 | San Bernardino | CA | 93.1 | 95.0 | 0.00 | 0.16 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.01 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 |
| 60714001 | San Bernardino | CA | 86.0 | 88.5 | 0.00 | 0.19 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.01 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 |
| 60714003 | San Bernardino | CA | 94.1 | 95.8 | 0.00 | 0.21 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.08 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.01 |
| 60719002 | San Bernardino | CA | 80.0 | 81.4 | 0.00 | 0.14 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.28 | 0.05 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.04 |
| 60719004 | San Bernardino | CA | 88.4 | 88.7 | 0.00 | 0.20 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.07 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.01 |
| 60990006 | Stanislaus | CA | 74.8 | 75.7 | 0.00 | 0.24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.47 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.05 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.01 |
| 61070006 | Tulare | CA | 69.1 | 71.9 | 0.00 | 0.05 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 |
| 61070009 | Tulare | CA | 76.1 | 77.2 | 0.00 | 0.11 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 |
| 61072002 | Tulare | CA | 68.9 | 71.4 | 0.00 | 0.21 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.32 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 |
| 61072010 | Tulare | CA | 73.1 | 73.9 | 0.00 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.00 |
| 61112002 | Ventura | CA | 70.5 | 72.2 | 0.00 | 0.18 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.08 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.03 |

Contributions to 2023 Nonattainment and Maintenance Sites in California (Part 3)

| Site ID | County | State | 2023 Average | 2023 Maximum | Tribal | Canada/ Mexco | Offshore | Fire | Boundary | Biogenic |
|---|---|---|---|---|---|---|---|---|---|---|
| 60190007 | Fresno | CA | 79.2 | 79.4 | 0.00 | 0.29 | 1.19 | 1.39 | 32.52 | 6.85 |
| 60190011 | Fresno | CA | 78.6 | 81.2 | 0.01 | 0.33 | 1.13 | 1.62 | 32.34 | 6.78 |
| 60190242 | Fresno | CA | 79.4 | 82.2 | 0.00 | 0.31 | 1.24 | 1.48 | 34.92 | 7.88 |
| 60194001 | Fresno | CA | 73.3 | 74.4 | 0.00 | 0.12 | 1.68 | 0.87 | 27.76 | 7.90 |
| 60195001 | Fresno | CA | 79.6 | 81.2 | 0.00 | 0.20 | 1.75 | 1.12 | 32.10 | 7.66 |
| 60250005 | Imperial | CA | 73.3 | 74.6 | 0.01 | 19.87 | 1.17 | 0.71 | 38.68 | 2.11 |
| 60251003 | Imperial | CA | 79.0 | 80.0 | 0.01 | 18.74 | 1.14 | 0.61 | 43.58 | 2.08 |
| 60290007 | Kern | CA | 77.7 | 81.3 | 0.00 | 0.30 | 1.59 | 3.27 | 33.68 | 7.70 |
| 60290008 | Kern | CA | 71.3 | 72.8 | 0.01 | 0.67 | 1.96 | 1.05 | 32.77 | 7.30 |
| 60290014 | Kern | CA | 74.1 | 75.2 | 0.00 | 0.31 | 1.68 | 0.85 | 31.31 | 7.37 |
| 60290232 | Kern | CA | 73.7 | 75.2 | 0.00 | 0.13 | 1.67 | 1.11 | 29.43 | 7.73 |
| 60295002 | Kern | CA | 75.9 | 76.8 | 0.00 | 0.35 | 1.34 | 3.80 | 33.45 | 7.68 |
| 60296001 | Kern | CA | 70.9 | 72.4 | 0.00 | 0.50 | 1.59 | 0.63 | 30.55 | 7.98 |
| 60370002 | Los Angeles | CA | 73.3 | 75.1 | 0.01 | 1.47 | 3.53 | 0.82 | 24.67 | 2.15 |
| 60370016 | Los Angeles | CA | 86.1 | 88.9 | 0.01 | 1.73 | 4.14 | 0.97 | 28.98 | 2.53 |
| 60371201 | Los Angeles | CA | 79.8 | 79.8 | 0.02 | 1.74 | 4.20 | 1.29 | 32.92 | 2.83 |
| 60371701 | Los Angeles | CA | 78.1 | 79.1 | 0.01 | 1.82 | 4.16 | 0.97 | 25.57 | 2.35 |
| 60372005 | Los Angeles | CA | 72.3 | 74.6 | 0.01 | 1.76 | 4.10 | 1.17 | 24.34 | 2.37 |
| 60376012 | Los Angeles | CA | 85.9 | 87.4 | 0.02 | 2.27 | 4.69 | 1.22 | 32.85 | 3.43 |
| 60379033 | Los Angeles | CA | 76.3 | 77.2 | 0.01 | 1.82 | 3.52 | 0.45 | 40.73 | 2.75 |
| 60392010 | Madera | CA | 72.1 | 72.9 | 0.00 | 0.23 | 1.22 | 1.30 | 32.12 | 7.30 |
| 60470003 | Merced | CA | 69.9 | 71.0 | 0.00 | 0.37 | 1.94 | 1.12 | 30.92 | 5.97 |
| 60650004 | Riverside | CA | 76.7 | 76.7 | 0.01 | 1.37 | 3.64 | 0.72 | 25.79 | 2.34 |
| 60650012 | Riverside | CA | 83.6 | 85.1 | 0.00 | 1.30 | 3.33 | 0.31 | 36.48 | 2.66 |
| 60651016 | Riverside | CA | 85.2 | 85.5 | 0.00 | 1.60 | 3.00 | 3.09 | 38.71 | 2.54 |
| 60652002 | Riverside | CA | 72.4 | 73.0 | 0.01 | 2.29 | 1.39 | 2.24 | 46.66 | 2.08 |
| 60655001 | Riverside | CA | 79.5 | 80.1 | 0.01 | 2.71 | 2.67 | 3.03 | 42.81 | 2.40 |
| 60656001 | Riverside | CA | 78.3 | 81.6 | 0.00 | 1.13 | 4.03 | 0.53 | 30.14 | 2.55 |
| 60658001 | Riverside | CA | 87.0 | 87.9 | 0.01 | 1.76 | 4.77 | 0.77 | 28.27 | 2.68 |
| 60658005 | Riverside | CA | 83.2 | 84.4 | 0.01 | 1.68 | 4.56 | 0.73 | 27.04 | 2.57 |
| 60659001 | Riverside | CA | 73.7 | 75.9 | 0.00 | 1.71 | 4.96 | 1.03 | 25.56 | 2.43 |
| 60670012 | Sacramento | CA | 74.5 | 75.9 | 0.00 | 0.12 | 0.88 | 1.16 | 29.33 | 5.92 |
| 60675003 | Sacramento | CA | 69.9 | 71.3 | 0.00 | 0.06 | 0.79 | 1.26 | 26.47 | 6.04 |
| 60710005 | San Bernardino | CA | 96.2 | 98.1 | 0.00 | 1.36 | 3.68 | 0.44 | 38.71 | 2.77 |
| 60710012 | San Bernardino | CA | 84.1 | 85.8 | 0.02 | 1.33 | 1.83 | 0.33 | 53.12 | 1.93 |
| 60710306 | San Bernardino | CA | 76.2 | 77.4 | 0.00 | 0.67 | 2.10 | 0.50 | 40.62 | 2.02 |
| 60711004 | San Bernardino | CA | 89.8 | 91.0 | 0.01 | 2.03 | 4.00 | 0.95 | 31.07 | 2.74 |
| 60712002 | San Bernardino | CA | 93.1 | 95.0 | 0.00 | 1.58 | 4.58 | 0.75 | 31.34 | 2.82 |
| 60714001 | San Bernardino | CA | 86.0 | 88.5 | 0.00 | 0.91 | 2.69 | 0.37 | 37.56 | 2.45 |
| 60714003 | San Bernardino | CA | 94.1 | 95.8 | 0.00 | 0.98 | 4.15 | 0.69 | 31.70 | 2.90 |
| 60719002 | San Bernardino | CA | 80.0 | 81.4 | 0.01 | 2.80 | 2.23 | 3.20 | 45.72 | 2.29 |
| 60719004 | San Bernardino | CA | 88.4 | 88.7 | 0.00 | 0.92 | 3.90 | 0.65 | 29.78 | 2.72 |
| 60990006 | Stanislaus | CA | 74.8 | 75.7 | 0.00 | 0.34 | 2.19 | 1.77 | 30.24 | 5.06 |
| 61070006 | Tulare | CA | 69.1 | 71.9 | 0.00 | 0.33 | 0.55 | 4.43 | 53.61 | 2.46 |
| 61070009 | Tulare | CA | 76.1 | 77.2 | 0.00 | 0.43 | 1.44 | 3.40 | 39.41 | 7.08 |
| 61072002 | Tulare | CA | 68.9 | 71.4 | 0.00 | 0.25 | 1.58 | 0.95 | 26.88 | 7.42 |
| 61072010 | Tulare | CA | 73.1 | 73.9 | 0.00 | 0.15 | 1.78 | 1.17 | 30.26 | 8.67 |
| 61112002 | Ventura | CA | 70.5 | 72.2 | 0.02 | 1.65 | 4.60 | 1.01 | 29.69 | 2.75 |

## **EXHIBIT 4**

EPA, Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards (Aug. 31, 2018) ("August Memo")



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
RESEARCH TRIANGLE PARK, NC  27711

OFFICE OF
AIR QUALITY PLANNING
AND STANDARDS

## AUG 3 1 2018

### MEMORANDUM

**SUBJECT:** Analysis of Contribution Thresholds for Use in Clean Air Act Section
110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for
the 2015 Ozone National Ambient Air Quality Standards

**FROM:** Peter Tsirigotis
Director

**TO:** Regional Air Division Directors, Regions 1–10

The purpose of this memorandum is to provide analytical information regarding the degree
to which certain air quality threshold amounts capture the collective amount of upwind
contribution from upwind states to downwind receptors for the 2015 ozone National Ambient Air
Quality Standards (NAAQS). It also interprets that information to make recommendations about
what thresholds may be appropriate for use in state implementation plan (SIP) revisions addressing
the good neighbor provision for that NAAQS. This document does not substitute for provisions or
regulations of the Clean Air Act (CAA), nor is it a regulation itself. Rather, it provides
recommendations for states using the included analytical information in developing SIP
submissions, and for the Environmental Protection Agency (EPA) Regional offices in acting on
them. Thus, it does not impose binding, enforceable requirements on any party. State air agencies
retain the discretion to develop good neighbor SIP revisions that differ from this guidance.

Following these recommendations does not ensure that the EPA will approve a SIP revision
in all instances where the recommendations are followed, as the guidance may not apply to the
facts and circumstances underlying a particular SIP. Final decisions by the EPA to approve a
particular SIP revision will only be made based on the requirements of the statute and will only be
made following an air agency's final submission of the SIP revision to the EPA, and after
appropriate notice and opportunity for public review and comment. Interested parties may raise
comment about the appropriateness of the application of this guidance to a particular SIP revision.
The EPA and air agencies should consider whether the recommendations in this guidance are
appropriate for each situation.

**Introduction**

CAA section 110(a)(2)(D)(i)(I), otherwise known as the good neighbor provision, requires SIPs to prohibit emissions "which will contribute significantly to nonattainment in, or interfere with maintenance by, any other state with respect to any" NAAQS. The EPA has historically used a 4-step framework to address upwind state obligations under the good neighbor provision for regional pollutants like ozone, which includes the following steps: (1) identify downwind areas, referred to as "receptors," expected to have problems attaining or maintaining the NAAQS; (2) identify upwind states that contribute to those downwind air quality problems and warrant further review and analysis; (3) identify the emissions reductions (if any) necessary to eliminate an upwind state's significant contribution to nonattainment and/or interference with maintenance of the NAAQS in the downwind areas, considering cost and air quality factors; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions. The EPA notes that, in developing their SIP revisions for the 2015 ozone NAAQS, states have flexibility to follow this framework or develop alternative frameworks to evaluate interstate transport obligations, so long as a state's chosen approach has adequate technical justification and is consistent with the requirements of the CAA

At Step 2, the EPA has used an air quality screening threshold to determine whether or not a state contributes to a downwind air quality problem in amounts that warrant further evaluation as part of a multi-factor analysis in Step 3. Upwind states that impact a downwind receptor by less than the screening threshold do not contribute to the downwind air quality problem at Step 2. The EPA has previously determined that such states do not significantly contribute to nonattainment or interfere with maintenance of the NAAQS under the good neighbor provision without additional analysis. Upwind states that impact a downwind receptor at or above the threshold are identified as contributing to a downwind air quality problem (i.e., they are said to be "linked" to that downwind receptor). The Step 3 analysis is then used to determine if the linked upwind state's contribution is "significant" or will "interfere with maintenance" of the NAAQS at the downwind receptor(s).[1]

Determining an appropriate screening threshold is a critical component of designing and then applying Step 2. Each time EPA sets a new or revised NAAQS, states and EPA can evaluate collective contribution to identify an appropriate threshold for that NAAQS. This assessment uses data and air quality analyses that are specifically applicable to the NAAQS being considered and the relevant air quality conditions (e.g., pollutant concentrations and the magnitude of interstate transport). As a result, conclusions made with respect to one NAAQS are not by default applicable to another NAAQS. In previous federal actions,[2] EPA's analysis of collective contribution concluded that a screening threshold equivalent to 1 percent of the 1997 and 2008 ozone NAAQS was appropriate at Step 2. In this document, we evaluate data pertinent to several alternative thresholds that could be applicable to the development of SIP revisions to address the 2015 ozone

---

[1] Note that upwind states that are linked to a downwind receptor at Step 2 may nevertheless be found to not significantly contribute to nonattainment or interfere with maintenance at the receptor depending on the outcome of the Step 3 analysis.

[2] In the Cross-State Air Pollution Rule (CSAPR), the EPA used 0.80 parts per billion (ppb) as the threshold, which is 1 percent of the 1997 ozone NAAQS. 76 FR 48208, 48238 (August 8, 2011). Most recently, in the Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS (CSAPR Update), the EPA used 0.75 ppb as the threshold, which is 1 percent of the 2008 ozone NAAQS. 81 FR 74504, 74518 (October 26, 2016).

NAAQS of 70 ppb. We compare a threshold equivalent to 1 percent of the 2015 ozone NAAQS (i.e., a threshold of 0.70 ppb), consistent with EPA's previously applied screening thresholds at Step 2, as well as two alternative thresholds: 1 ppb and 2 ppb. The purpose of this analysis is to examine the amount of collective upwind contribution—i.e., the sum of contributions from states that are linked to each receptor—for each of these alternative thresholds. The data provided in this analysis are drawn from the results of EPA's updated 2023 modeling, which was released in a memorandum in March 2018.[3] The analysis presented here is similar to the analysis of alternative thresholds conducted to select the screening thresholds used in both the CSAPR and CSAPR Update rulemakings.[4,5] Based on the data and analysis summarized here, the EPA believes that a threshold of 1 ppb may be appropriate for states to use to develop SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS.

**Methodology for Analyzing Alternative Thresholds**

The EPA's 2023 state-by-state contribution modeling is used to calculate the absolute and relative amount of total upwind "collective contribution" captured by each of the three alternative thresholds evaluated in this analysis: 0.70 ppb (1 percent of the 2015 ozone NAAQS), 1 ppb, and 2 ppb. The ozone concentration and collective contribution data for each alternative threshold are provided in several tables, as described below. In the analysis of alternative screening thresholds, the EPA focused on data for the receptors outside of California since no other states were projected to impact any of the receptors in California at or above a threshold equivalent to 1 percent of the 2015 ozone NAAQS.[6] Data are therefore provided for each of the 2023 nonattainment and maintenance receptors outside of California identified using the CSAPR methodology for determining future year receptors.[7] In Table 1 below, we provide the projected 2023 average design value and the sum of the contributions from all upwind states (i.e., total upwind contribution) for each of these receptors. Table 1 further provides data on the amount of the total upwind contribution (ppb) that is captured by each of the three thresholds (i.e., the collective contribution) and at each receptor considered in this analysis. In Table 2 below, we express the amount of contribution captured at each alternative threshold considered in this analysis as a percent of the amount of the total upwind contribution. Finally, in Table 3 below, we compare the net amount of contribution captured at the 1 ppb and 2 ppb thresholds as a percentage of the amount of contribution captured at the 0.70 ppb, 1 percent threshold.

---

[3] Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I) (March 2018). *https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015.*

[4] Air Quality Modeling Technical Support Document for the Final Cross State Air Pollution Rule Update (August 2016). *https://www.epa.gov/airmarkets/air-quality-modeling-technical-support-document-final-cross-state-air-pollution-rule.*

[5] Air Quality Modeling Final Rule Technical Support Document (for the Final Transport Rule now known as CSAPR; June 2011). *https://www.epa.gov/csapr/air-quality-modeling-final-rule-technical-support-document.*

[6] March 2018 Memo and Supplemental Information Regarding Interstate Transport SIPs for the 2015 Ozone NAAQS (March 2018). *https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015.*

[7] *See* 81 FR 74530-531.

**Results**

The data in the tables below indicate that, for the 2015 ozone NAAQS, the amount of upwind collective contribution captured using a 1 ppb threshold is generally comparable to the amount captured using a threshold equivalent to 1 percent of the NAAQS. In particular, the data in Table 1 indicate that using a 1 percent threshold captures 77 percent of the total upwind contribution when summed across all receptors. Overall, using a 1 ppb threshold captures 70 percent, which is a similar and only slightly lower amount of contribution. By contrast, using a 2 ppb threshold captures 55 percent, much less of the total contribution summed across all receptors. The data in Table 2 indicate that the percent of upwind contribution captured by a 1 percent and 1 ppb threshold at individual receptors are also of a similar magnitude at most sites. However, a 2 ppb threshold captures a notably lower portion of the total upwind contribution at most receptors. Finally, the data in Table 3 indicate that, on average across all receptors, a 1 ppb threshold captures 86 percent of the net contribution captured using a 1 percent threshold, whereas, a 2 ppb threshold captures only half of the net contribution using 1 percent.

Because the amount of upwind collective contribution captured with the 1 percent and 1 ppb thresholds is generally comparable, overall, we believe it may be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2 of the 4-step framework in developing their SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS. Although the 1 ppb threshold captures somewhat less upwind contribution across receptors than the 1 percent threshold, the 1 ppb threshold still generally captures a substantial amount of transported contribution from upwind states to downwind receptors. Thus, the use of a 1 ppb threshold to identify linked upwind states still provides the potential, at Step 3, for meaningful emission reductions in linked upwind states in order to aid downwind states with attainment and maintenance of the 2015 ozone NAAQS. However, the amount of upwind contribution captured using a 2 ppb threshold is notably less at most receptors than the amount captured with either a 1 ppb or 1 percent threshold, and therefore emission reductions from states linked at that higher threshold may be insufficient to address collective upwind state contribution to downwind air quality problems.

Please share this information with the air agencies in your Region.

**For Further Information**

If you have any questions concerning this memorandum, please contact Norm Possiel at (919) 541-5692, *possiel.norm@epa.gov* for modeling information or Beth Palma at (919) 541-5432, *palma.elizabeth@epa.gov* for any other information.

Table 1. Total upwind contribution and the sum of upwind contribution at each receptor captured using each alternative threshold (units are ppb).

| Site | State | County | 2023 Average Design Value | Total Upwind State Contribution | Sum of Upwind Contribution Captured with 0.70 ppb Threshold | Sum of Upwind Contribution Captured with 1 ppb Threshold | Sum of Upwind Contribution Captured with 2 ppb Threshold |
|---|---|---|---|---|---|---|---|
| 40130019 | AZ | Maricopa | 69.3 | 2.55 | 1.87 | 1.87 | 0.00 |
| 40131004 | AZ | Maricopa | 69.8 | 2.58 | 2.03 | 2.03 | 2.03 |
| 80050002 | CO | Arapahoe | 69.3 | 5.98 | 3.47 | 3.47 | 0.00 |
| 80350004 | CO | Douglas | 71.1 | 5.94 | 3.35 | 3.35 | 0.00 |
| 80590006 | CO | Jefferson | 71.3 | 7.06 | 4.68 | 2.34 | 0.00 |
| 80590011 | CO | Jefferson | 70.9 | 6.98 | 4.51 | 3.57 | 0.00 |
| 80690011 | CO | Larimer | 71.2 | 6.33 | 3.48 | 2.60 | 0.00 |
| 81230009 | CO | Weld | 70.2 | 5.63 | 2.77 | 1.05 | 0.00 |
| 90010017 | CT | Fairfield | 68.9 | 37.44 | 32.15 | 32.15 | 28.66 |
| 90013007 | CT | Fairfield | 71.0 | 41.29 | 36.91 | 33.63 | 27.38 |
| 90019003 | CT | Fairfield | 73.0 | 44.24 | 38.55 | 36.93 | 32.28 |
| 90099002 | CT | New Haven | 69.9 | 35.25 | 29.49 | 28.76 | 24.96 |
| 240251001 | MD | Harford | 70.9 | 25.88 | 20.16 | 17.79 | 14.92 |
| 260050003 | MI | Allegan | 69.0 | 42.90 | 38.87 | 36.63 | 31.73 |
| 261630019 | MI | Wayne | 69.0 | 17.63 | 11.81 | 10.89 | 8.69 |
| 360810124 | NY | Queens | 70.2 | 30.68 | 23.73 | 23.00 | 15.73 |
| 361030002 | NY | Suffolk | 74.0 | 28.82 | 22.31 | 18.74 | 15.74 |
| 480391004 | TX | Brazoria | 74.0 | 13.36 | 7.48 | 4.80 | 3.80 |
| 481210034 | TX | Denton | 69.7 | 8.64 | 3.15 | 3.15 | 0.00 |
| 482010024 | TX | Harris | 70.4 | 8.19 | 3.06 | 3.06 | 3.06 |
| 482011034 | TX | Harris | 70.8 | 9.86 | 3.38 | 3.38 | 3.38 |
| 482011039 | TX | Harris | 71.8 | 13.01 | 8.26 | 4.72 | 4.72 |
| 484392003 | TX | Tarrant | 72.5 | 10.06 | 4.20 | 3.42 | 0.00 |

| Site | State | County | 2023 Average Design Value | Total Upwind State Contribution | Sum of Upwind Contribution Captured with 0.70 ppb Threshold | Sum of Upwind Contribution Captured with 1 ppb Threshold | Sum of Upwind Contribution Captured with 2 ppb Threshold |
|---|---|---|---|---|---|---|---|
| 550790085 | WI | Milwaukee | 71.2 | 32.58 | 28.45 | 23.61 | 22.39 |
| 551170006 | WI | Sheboygan | 72.8 | 36.53 | 31.62 | 29.02 | 24.90 |
| | | | | | | | |
| Percent of Overall Upwind Contribution Captured => | | | | | 77% | 70% | 55% |

Table 2. Percent of the upwind contribution captured by each alternative threshold at each receptor.

| Site | State | County | Percent of Upwind Contribution Captured using a 0.70 ppb Threshold | Percent of Upwind Contribution Captured using a 1 ppb Threshold | Percent of Upwind Contribution Captured using a 2 ppb Threshold |
|---|---|---|---|---|---|
| 40130019 | AZ | Maricopa | 73.3% | 73.3% | 0.0% |
| 40131004 | AZ | Maricopa | 78.7% | 78.7% | 78.7% |
| 80050002 | CO | Arapahoe | 58.0% | 58.0% | 0.0% |
| 80350004 | CO | Douglas | 56.4% | 56.4% | 0.0% |
| 80590006 | CO | Jefferson | 66.3% | 33.1% | 0.0% |
| 80590011 | CO | Jefferson | 64.6% | 51.1% | 0.0% |
| 80690011 | CO | Larimer | 55.0% | 41.1% | 0.0% |
| 81230009 | CO | Weld | 49.2% | 18.7% | 0.0% |
| 90010017 | CT | Fairfield | 85.9% | 85.9% | 76.5% |
| 90013007 | CT | Fairfield | 89.4% | 81.4% | 66.3% |
| 90019003 | CT | Fairfield | 87.1% | 83.5% | 73.0% |
| 90099002 | CT | New Haven | 83.7% | 81.6% | 70.8% |
| 240251001 | MD | Harford | 77.9% | 68.7% | 57.7% |
| 260050003 | MI | Allegan | 90.6% | 85.4% | 74.0% |

6

| Site | State | County | Percent of Upwind Contribution Captured using a 0.70 ppb Threshold | Percent of Upwind Contribution Captured using a 1 ppb Threshold | Percent of Upwind Contribution Captured using a 2 ppb Threshold |
|---|---|---|---|---|---|
| 261630019 | MI | Wayne | 67.0% | 61.8% | 49.3% |
| 360810124 | NY | Queens | 77.3% | 75.0% | 51.3% |
| 361030002 | NY | Suffolk | 77.4% | 65.0% | 54.6% |
| 480391004 | TX | Brazoria | 56.0% | 35.9% | 28.4% |
| 481210034 | TX | Denton | 36.5% | 36.5% | 0.0% |
| 482010024 | TX | Harris | 37.4% | 37.4% | 37.4% |
| 482011034 | TX | Harris | 34.3% | 34.3% | 34.3% |
| 482011039 | TX | Harris | 63.5% | 36.3% | 36.3% |
| 484392003 | TX | Tarrant | 41.7% | 34.0% | 0.0% |
| 550790085 | WI | Milwaukee | 87.3% | 72.5% | 68.7% |
| 551170006 | WI | Sheboygan | 86.6% | 79.4% | 68.2% |

Table 3. Percent of the contribution captured with a 0.70 ppb threshold that is captured using 1 ppb and 2 ppb thresholds.

| Site | State | County | Contribution Captured with 1 ppb Threshold vs a 0.70 ppb Threshold | Contribution Captured with 2 ppb Threshold vs a 0.70 ppb Threshold |
|---|---|---|---|---|
| 40130019 | AZ | Maricopa | 100.0% | 0.0% |
| 40131004 | AZ | Maricopa | 100.0% | 100.0% |
| 80050002 | CO | Arapahoe | 100.0% | 0.0% |
| 80350004 | CO | Douglas | 100.0% | 0.0% |
| 80590006 | CO | Jefferson | 50.0% | 0.0% |
| 80590011 | CO | Jefferson | 79.2% | 0.0% |
| 80690011 | CO | Larimer | 74.7% | 0.0% |
| 81230009 | CO | Weld | 37.9% | 0.0% |
| 90010017 | CT | Fairfield | 100.0% | 89.1% |

7

| Site | State | County | Contribution Captured with 1 ppb Threshold vs a 0.70 ppb Threshold | Contribution Captured with 2 ppb Threshold vs a 0.70 ppb Threshold |
|---|---|---|---|---|
| 90013007 | CT | Fairfield | 91.1% | 74.2% |
| 90019003 | CT | Fairfield | 95.8% | 83.7% |
| 90099002 | CT | New Haven | 97.5% | 84.6% |
| 240251001 | MD | Harford | 88.2% | 74.0% |
| 260050003 | MI | Allegan | 94.2% | 81.6% |
| 261630019 | MI | Wayne | 92.2% | 73.6% |
| 360810124 | NY | Queens | 96.9% | 66.3% |
| 361030002 | NY | Suffolk | 84.0% | 70.6% |
| 480391004 | TX | Brazoria | 64.2% | 50.8% |
| 481210034 | TX | Denton | 100.0% | 0.0% |
| 482010024 | TX | Harris | 100.0% | 100.0% |
| 482011034 | TX | Harris | 100.0% | 100.0% |
| 482011039 | TX | Harris | 57.1% | 57.1% |
| 484392003 | TX | Tarrant | 81.4% | 0.0% |
| 550790085 | WI | Milwaukee | 83.0% | 78.7% |
| 551170006 | WI | Sheboygan | 91.8% | 78.7% |
| | | | | |
| Average Percent Captured => | | | 86% | 51% |

# **EXHIBIT 5**

EPA, Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards (Oct. 19, 2018) ("October Memo")



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
RESEARCH TRIANGLE PARK, NC  27711

OFFICE OF
AIR QUALITY PLANNING
AND STANDARDS

OCT **1 9** 2018

## **MEMORANDUM**

**SUBJECT:**  Considerations for Identifying Maintenance Receptors for Use in Clean Air Act
Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan
Submissions for the 2015 Ozone National Ambient Air Quality Standards

**FROM:**  Peter Tsirigotis
Director

**TO:**  Regional Air Division Directors, Regions 1–10

The purpose of this memorandum is to present information that states may consider as they
evaluate the status of monitoring sites that the Environmental Protection Agency (EPA) identified
as potential maintenance receptors with respect to the 2015 ozone National Ambient Air Quality
Standards (NAAQS) based on EPA's 2023 modeling.[1] States may use this information when
developing state implementation plans (SIPs) for the 2015 ozone NAAQS addressing the good
neighbor provision in Clean Air Act (CAA) section 110(a)(2)(D)(i)(I). In brief, this document
discusses (1) using alternative technical methods for projecting whether future air quality warrants
identifying monitors as maintenance receptors and (2) considering current monitoring data when
identifying monitoring sites that, although projected to be in attainment, as described below,
should be identified as maintenance receptors because of the risk that they could exceed the
NAAQS due to year-to-year (*i.e.*, inter-annual) variability in meteorological conditions.

This document does not substitute for provisions or regulations of the CAA, nor is it a
regulation itself. Rather, it provides recommendations for states using the included analytical
information in developing SIP submissions, and for EPA Regional offices in acting on them. Thus,
it does not impose binding, enforceable requirements on any party. State air agencies retain the
discretion to develop good neighbor SIP revisions that differ from this guidance.

Following the recommendations in this guidance does not ensure that EPA will approve a
SIP revision in all instances where the recommendations are followed, as the guidance may not
apply to the facts and circumstances underlying a particular SIP. Final decisions by EPA to approve

---

[1] Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National
Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I) (March 2018).
*https://www.epa.gov/airmarkets/2015-ozone-naaqs-mem.*

a particular SIP revision will only be made based on the requirements of the statute following an air agency's final submission of the SIP revision to EPA and after appropriate notice and opportunity for public review and comment. Interested parties may raise comments about the appropriateness of the application of this guidance to a particular SIP revision. EPA and air agencies should consider whether the recommendations in this guidance are appropriate for each situation.

## Introduction

CAA section 110(a)(2)(D)(i)(I), otherwise known as the good neighbor provision, requires states to prohibit emissions "which will contribute significantly to nonattainment in, or interfere with maintenance by, any other state with respect to any" NAAQS. EPA has historically used a 4-step framework to determine upwind state obligations (if any) under the good neighbor provision for regional pollutants like ozone: (1) identify downwind areas, referred to as "receptors," expected to have problems attaining or maintaining the NAAQS; (2) identify upwind states that contribute to those downwind air quality problems and warrant further review and analysis; (3) identify the emissions reductions (if any) necessary to eliminate an upwind state's significant contribution to nonattainment and/or interference with maintenance of the NAAQS in the downwind areas, considering cost and air quality factors; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions. EPA notes that, in developing their SIP revisions for the 2015 ozone NAAQS, states have flexibility to follow this framework or develop alternative frameworks to evaluate interstate transport obligations, so long as a state's chosen approach has adequate technical justification and is consistent with the requirements of the CAA.

At Step 1, EPA has historically used base year and future year air quality modeling coupled with base period measured ozone design values to project design values to a future analytic year.[2] In a memo issued in March 2018, EPA released updated modeling, which uses 2011 as the base year and 2023 as the future analytic year, to evaluate interstate transport for the 2015 ozone NAAQS.[3] As part of EPA's 2023 modeling analysis, EPA projected the average and maximum base period 2009 – 2013 design values to 2023.[4,5] EPA evaluated the projected 2023 design values in combination with measured 2016 design values using the same methodology used in the Cross-State Air Pollution Rule Update (CSAPR Update)[6] to identify receptors with anticipated potential nonattainment and maintenance issues with respect to the 2015 ozone NAAQS in 2023. Under the CSAPR Update methodology, those sites that are violating the NAAQS based on 2016 design values (*i.e.*, currently not attaining) and that also have projected 2023 *average* design values that exceed the NAAQS (*i.e.*, 2023 average design values of 71 parts per billion (ppb) or greater) are

---

[2] Air Quality Modeling Technical Support Document for the Final Cross State Air Pollution Rule Update (August 2016). *https://www.epa.gov/airmarkets/air-quality-modeling-technical-support-document-final-cross-state-air-pollution-rule*.

[3] Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I) (March 2018). *https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015.*

[4] The base period includes the three design values that contain 2011 monitoring data (*i.e.*, 2009-2011, 2010-2012, and 2011-2013).

[5] The base period maximum design value is the highest of the three design values in the period 2009-2013.

[6] *See* 81 FR 74504 (October 26, 2016).

identified as potential nonattainment receptors in 2023.[7] Under the CSAPR Update methodology, those sites with a 2023 *maximum* 3-year design value that exceeds the NAAQS are identified as potential maintenance receptors. This methodology considers the effects of inter-annual variability in ozone-conducive meteorology to identify sites that may have difficulty maintaining the ozone NAAQS. A projected maximum design value that exceeds the NAAQS indicates that when meteorology is conducive to ozone formation, the receptor struggles with maintenance of the standard. Under the CSAPR Update methodology, maintenance-only receptors therefore include both (1) those sites with projected average and maximum design values above the NAAQS that are currently measuring clean data and (2) those sites with projected average design values below the level of the NAAQS but with projected maximum design values of 71 ppb or greater.[8]

**Considerations for Identifying Maintenance Receptors**

The D.C. Circuit's decision in *North Carolina v. EPA* requires that EPA and the states identify separate nonattainment and maintenance receptors to give independent significance to the "contribute significantly" and "interfere with maintenance" clauses of the good neighbor provision when identifying downwind air quality problems that must be addressed.[9] In particular, the court held that the good neighbor provision requires states to address emissions that interfere with maintenance in downwind areas struggling to meet the NAAQS despite air quality modeling projecting attainment.[10] While the court did not specify a particular methodology for identifying downwind areas that would struggle to maintain the NAAQS, the court cited the state petitioner's demonstration regarding historic variability in ozone concentrations in areas otherwise projected to attain the NAAQS in support of its holding.[11]

In rules promulgated after *North Carolina*, EPA has relied on projections of base period maximum design values to identify those sites that are at risk of being nonattainment in the future due to inter-annual variability in ozone-conducive meteorology, as indicated above. EPA acknowledges that there may be other valid methodologies for identifying such areas. However, consistent with the holding in *North Carolina*, EPA believes that any alternative methods used to identify maintenance receptors must be different than those used to identify nonattainment receptors and should demonstrate that the alternative method considers variability in meteorological conditions that are conducive for ozone formation in the area containing the monitoring site.

---

[7] In determining compliance with the NAAQS, EPA truncates ozone design values to integer values. For example, EPA truncates a design value of 70.9 ppb to 70 ppb, which is attainment. Similarly, EPA considers design values at or above 71.0 ppb to be violations of the 2015 ozone NAAQS.
[8] The nonattainment receptors are also identified as maintenance receptors because the maximum design values for each of these sites is always greater than or equal to the average design value.
[9] 531 F.3d 896, 909-911 (2008).
[10] *Id.*
[11] *Id.* at 909.

3

**Flexibilities Related to Identifying Maintenance Receptors**

In response to comments received through stakeholder outreach, EPA has identified two potential flexibilities that states may use to identify maintenance receptors with an appropriate technical demonstration. First, EPA believes that states may, in some cases, eliminate a site as a maintenance receptor if the site is currently measuring clean data. Second, EPA believes that a state may, in some cases, use a design value from the base period that is not the maximum design value.[12] For either of these alternative methods to satisfy the D.C. Circuit's instruction to consider areas struggling to meet the NAAQS, EPA would expect states to include with their SIP demonstration technical analyses showing that:

(1) meteorological conditions in the area of the monitoring site were conducive to ozone formation during the period of clean data or during the alternative base period design value used for projections;

(2) ozone concentrations have been trending downward at the site since 2011 (and ozone precursor emissions of nitrogen oxide (NOx) and volatile organic compounds (VOC) have also decreased); and

(3) emissions are expected to continue to decline in the upwind and downwind states out to the attainment date of the receptor.

The intent of these analyses is to demonstrate that monitoring sites that would otherwise be identified as maintenance receptors under the CSAPR Update approach, as previously described, are not likely to violate the NAAQS in the future analytic year. EPA expects that, with such analyses, the state could justify exclusion of a monitoring site as a maintenance receptor, notwithstanding modeling projections showing a maximum design value exceeding the 2015 ozone NAAQS.

To assist states with the recommended analyses, EPA is providing the following information related to analyzing meteorological conduciveness and ozone and emissions trends:

(1) information on meteorological conduciveness for ozone formation based on regional and state-level historical and current climatological data for summertime monthly and seasonal temperature (*see* Attachment A);

(2) a data file containing ozone design values for individual monitoring sites nationwide for the years 2008 through 2017 and for 2023, based on EPA's modeling. This information is available on EPA's website at: *https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015-0*; and

(3) a data file containing state-level annual NOx and VOC emissions from anthropogenic sources with a breakout by major source category, for individual years from 2011 through 2017 and for 2023, based on EPA's projections. This information is available on EPA's website at:

---

[12] Stakeholder comments on potential 2015 NAAQS transport flexibilities can be found at *https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015*.

*https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015-0.*

States developing the technical analyses necessary to support use of the flexibilities described in this memo are encouraged to supplement EPA-provided information with additional data (as appropriate) to support a showing that a specific monitoring site is not at risk of exceeding the NAAQS in the future. For example, states may show that such a site should not be identified as a maintenance receptor by providing (1) a more refined analysis of meteorological conduciveness that considers additional relevant or more locally tailored meteorological parameters, (2) a more temporally or spatially refined emissions trends analysis, and/or (3) an analysis of historical ozone trends that considers, in addition to the design value, trends in other ozone metrics such as annual 4th high 8-hour daily maximum ozone concentrations and the number of days with measured exceedances of the 2015 NAAQS.

Please share this information with the air agencies in your Region.

**For Further Information**

If you have any questions concerning this memorandum, please contact Norm Possiel at (919) 541-5692, *possiel.norm@epa.gov* for modeling information or Chris Werner at (919) 541-5133, *werner.christopher@epa.gov* for any other information.

Attachment

Attachment A

Information on Meteorological Conduciveness
for Ozone Formation

Meteorological conditions including temperature, humidity, winds, solar radiation, and vertical mixing affect the formation and transport of ambient ozone concentrations. Ozone is more readily formed on warm, sunny days when the air is stagnant and/or when the winds are favorable for transport from upwind source areas. Conversely, ozone production is more limited on days that are cloudy, cool, rainy, and windy (*http://www.epa.gov/airtrends/weather.html*). Statistical modeling analyses have shown that temperature and certain other meteorological variables are highly correlated with the magnitude of ozone concentrations (Camalier, et al., 2007).[1] The overall extent to which meteorological conditions vary from year-to-year (*i.e.*, inter-annual variability) depends on the nature of large scale meteorological drivers such as the strength and position of the jet stream. Inter-annual cycles in the jet stream contribute to inter-annual variability in the degree to which summertime meteorological conditions are favorable for ozone formation within a particular region. Meteorological conditions that frequently correspond with observed 8-hour daily maximum concentrations greater than the National Ambient Air Quality Standards (NAAQS) are referred to as being conducive to ozone formation.

This attachment contains information to help evaluate whether particular summers had ozone-conducive or unconducive meteorology within the 10-year period 2008 through 2017. Information is provided on a state-by-state basis and for individual regions (*see* Figure 1).

- Table A-1 contains tabular summaries of the difference (*i.e.*, anomaly[2]) of monthly average temperature compared to the long-term average.[3]
- Figure A-2 contains maps of the 3-month (June, July, August) statewide anomalies and rank[4] for average temperature compared to the long-term average.
- Figure A-3 contains maps showing spatial fields of daily maximum temperature anomalies (percentiles) for the period June through August for the years 2011 through 2017 (maps are unavailable for years prior to 2011).
- Figure A-4 contains graphical summaries of the total number of cooling degree days for the 3-month period June through August in each region.

The above tabular and graphic information was obtained from the NOAA National Centers for Environmental Information (NCEI) at *https://www.ncdc.noaa.gov/temp-and-precip/us-maps/* and *https://www.ncdc.noaa.gov/cag/*.

---

[1] Additional references related to ozone formation and meteorology are provided on page A-3.

[2] "The term temperature anomaly means a departure from a reference value or long-term average. A positive anomaly indicates that the observed temperature was warmer than the reference value, while a negative anomaly indicates that the observed temperature was cooler than the reference value." *https://www.ncdc.noaa.gov/monitoring-references/faq/anomalies.php*.

[3] Note that because of the relatively large inter-annual variability in certain meteorological conditions such as temperature and precipitation, long-term "average" conditions, usually referred to as "normal," are often the mathematical mean of extremes and thus, "average" or "normal" values of temperature or precipitation should not necessarily be considered as representing "typical" conditions.

[4] "In order to place each month and season into historical context, the National Centers for Environmental Information assigns ranks for each geographic area (division, state, region, etc.) based on how the temperature or precipitation value compares with other values throughout the entire record when sorted from lowest to highest value. In other words, the numeric rank value within the area represents the position or location of the sorted value throughout the historical record (1895-present)." *https://www.ncdc.noaa.gov/monitoring-references/dyk/ranking-definition*.

In general, below average temperatures are an indication that meteorological conditions are unconducive for ozone formation, whereas above average temperatures are an indication that meteorology is conducive to ozone formation. Within a particular summer season, the degree that meteorology is conducive for ozone formation can vary from region to region and fluctuate with time within a particular region. For example, the temperature-related information presented below suggests that summer meteorology was generally conducive for ozone formation in 2010, 2011, 2012, and 2016 in most regions. In contrast, the summer of 2009 was generally unconducive for ozone formation, overall, in most regions. In addition, the summers of 2013 and 2014 were not particularly conducive for ozone formation in the Upper Midwest, Ohio Valley, South, Southeast.

Additional information on the relationships between ozone and meteorological conditions can be found in the following publications:

Blanchard et al., 2010 - *NMOC, ozone, and organic aerosol in the southeastern United States, 1999-2007: 2. Ozone trends and sensitivity to NMOC emissions in Atlanta, GA.*
Reinforces the relationship between temperature, relative humidity and winds to ozone formation.
*https://www.sciencedirect.com/science/article/pii/S1352231010005996?via%3Dihub*

Blanchard et al., 2014 - *Ozone in the southeastern United States: An observation-based model using measurements from the SEARCH network.*
Update to the 2007 paper by Camalier with data from the SEARCH network from 2002-2011.
*https://www.sciencedirect.com/science/article/pii/S1352231014001022?via%3Dihub*

Bloomer et al., 2009 – *Observed relationships of ozone air pollution with temperature and emissions.*
Statistical analysis of 21 years of ozone and temperature data (1987-2008). From a climate scenario perspective, authors examine the climate penalty or how ozone levels change as temperature changes. Reinforces the standing that as temperature increases, ozone concentrations increase, but indicates that due to decreasing emissions, the rate is slower in future scenarios.
*https://agupubs.onlinelibrary.wiley.com/doi/full/10.1029/2009GL037308*

Kavassalis & Murphy, 2017 - *Understanding ozone-meteorology correlations: A role for dry deposition.*
Authors observe the strong correlation between temperature and relative humidity, but work to understand other reasoning why models under predict the strength of the correlation between relative humidity and ozone. Includes a statistical analysis of 28 years of data and examines vapor pressure deficit and dry deposition as factors. Reinforces meteorological conditions that lead to high ozone days.
*https://agupubs.onlinelibrary.wiley.com/doi/full/10.1002/2016GL071791*

Reddy & Pfister, 2016 - *Meteorological Factors contributing to the interannaul variability of midsummer surface ozone in Colorado, Utah, and other western US States.*

A-3

Authors found strong correlation between 500-mb and 7008-mb patterns, surface temperature, and zonal winds with the resulting high 8-hour daily maximum ozone values.
*https://agupubs.onlinelibrary.wiley.com/doi/full/10.1002/2015JD023840*

Tawfik and Steiner, 2013 - *A proposed physical mechanism for ozone-meteorology correlations using land-atmosphere coupling regimes.*
Discusses the north-south gradient of temperature and relative humidity correlations with ozone formation. Examines 17 years of ozone, NOx, and isoprene measurements.
*https://linkinghub.elsevier.com/retrieve/pii/S1352231013001672*

White et al., 2007 - *Comparing the impact of meteorological variability on surface ozone during the NEAQS (2002) and ICARTT (2004) field campaigns.*
Authors found that while deep boundary layers are noted during periods of elevated ozone, this is likely due to being coincident with other meteorological factors (high temperatures, high pressure systems, low winds).
*https://agupubs.onlinelibrary.wiley.com/doi/10.1029/2006JD007590*

Zhang et al., 2017 – *Quantifying the relationship between air pollution events and extreme weather events.*
Authors examined ozone from 1980-2009 and built a statistical model to examine the impacts of extreme meteorological events on extreme air quality conditions. Found ozone extremes have decreased over the last 30 years, more rapidly recently, but remain highly correlated to extreme temperature events. Highest correlation was found in the eastern United States (U.S.).
*https://www.sciencedirect.com/science/article/pii/S0169809516306093?via%3Dihub*

Figure 1. U.S. climate regions.
*http://www.ncdc.noaa.gov/monitoring-references/maps/us-climate-regions.php*



Table A-1. Temperature anomalies by month for May through September for each climate region for the years 2008 through 2017.[1]

| 2008 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | C | W | W | C | N |
| Southeast | C | WW | N | C | N |
| Ohio Valley | C | W | C | C | N |
| Upper Midwest | C | N | N | N | W |
| South | N | W | N | C | CC |
| Northern Rockies | C | C | N | N | N |
| Southwest | N | W | W | W | N |
| Northwest | N | N | W | W | N |
| West | N | W | W | WW | W |

[1]Unshaded boxes with the "N" marker represent near-normal temperatures that fall within the interquartile range. Blue colors indicate cooler than normal conditions, with the number of "C"s indicating the degree of the anomaly. CCC = coolest on record, CC = coolest 10th percentile, C = coolest 25th percentile. Red colors indicate warmer than normal conditions, with the number of "W"s indicating the degree of the anomaly. WWW = warmest on record, WW = warmest 10th percentile, W = warmest 25th percentile. N/A = data not available. More on the definition of temperature ranks can be found at:

*https://www.ncdc.noaa.gov/monitoring-content/monitoring-references/dyk/images/ranking-definition-legend.png.*

| 2009 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | N | C | CC | W | C |
| Southeast | N | W | CC | N | N |
| Ohio Valley | N | W | CC | C | N |
| Upper Midwest | N | C | CC | C | W |
| South | N | W | N | N | C |
| Northern Rockies | N | C | C | C | WW |
| Southwest | WW | C | W | W | W |
| Northwest | W | C | WW | W | WW |
| West | WW | C | W | N | WWW |

| 2010 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | WW | W | WW | W | W |
| Southeast | WW | WW | WW | WW | W |
| Ohio Valley | W | WW | W | WW | N |
| Upper Midwest | W | N | W | WW | C |
| South | W | WW | N | WW | W |
| Northern Rockies | C | N | N | W | N |
| Southwest | C | W | W | W | WWW |
| Northwest | CC | C | N | N | W |
| West | CC | W | W | N | W |

| 2011 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | W | W | WW | N | WW |
| Southeast | N | WW | WW | WW | N |
| Ohio Valley | N | W | WW | W | C |
| Upper Midwest | N | N | WW | W | N |
| South | N | WW | WWW | WWW | N |
| Northern Rockies | C | N | W | W | W |
| Southwest | C | W | WW | WWW | W |
| Northwest | CC | C | C | W | WW |
| West | C | C | N | W | WW |

| 2012 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | WW | N | WW | W | N |
| Southeast | WW | C | WW | N | N |
| Ohio Valley | WW | N | WW | N | C |
| Upper Midwest | W | W | WW | N | N |
| South | WW | W | WW | N | N |
| Northern Rockies | W | W | WW | W | W |
| Southwest | WW | WW | W | WW | W |
| Northwest | N | C | W | WW | W |
| West | W | W | N | WWW | WW |

| 2013 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | W | W | WW | N | N |
| Southeast | C | W | C | C | N |
| Ohio Valley | N | N | C | C | N |
| Upper Midwest | N | N | N | N | W |
| South | C | W | C | N | W |
| Northern Rockies | N | N | N | W | WW |
| Southwest | W | WW | W | W | W |
| Northwest | W | W | WW | WW | WW |
| West | W | WW | WW | N | W |

A-7

| 2014 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | W | W | N | N | W |
| Southeast | W | W | C | N | W |
| Ohio Valley | N | W | CC | N | N |
| Upper Midwest | N | W | CC | N | N |
| South | N | N | C | N | N |
| Northern Rockies | N | C | N | N | N |
| Southwest | N | W | W | C | WW |
| Northwest | W | N | WW | W | W |
| West | W | W | WW | N | WW |

| 2015 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | WWW | N | N | W | WW |
| Southeast | W | WW | W | N | N |
| Ohio Valley | W | W | N | C | W |
| Upper Midwest | N | N | N | N | WWW |
| South | C | N | W | N | WW |
| Northern Rockies | C | WW | N | N | WW |
| Southwest | C | WW | C | WW | WWW |
| Northwest | W | WWW | W | W | N |
| West | N | WWW | C | WW | WW |

| 2016 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | N | W | W | WWW | WW |
| Southeast | N | W | WW | WW | WW |
| Ohio Valley | N | W | W | W | WW |
| Upper Midwest | N | W | N | W | WW |
| South | C | W | WW | N | W |
| Northern Rockies | N | WW | N | N | W |
| Southwest | C | WWW | WW | N | N |
| Northwest | W | WW | C | W | N |
| West | N | WW | W | W | N |

| 2017 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | N | W | N | N | WW |
| Southeast | N | N | W | N | N |
| Ohio Valley | N | N | W | CC | N |
| Upper Midwest | N | W | N | C | WW |
| South | C | N | W | C | N |
| Northern Rockies | N | W | WW | N | W |
| Southwest | N | WW | WW | W | W |
| Northwest | W | W | WW | WWW | W |
| West | W | WW | WW | WW | N |

A-8

Figure A-2. Statewide average temperature ranks for the period June through August for the years 2008 through 2017. Note that the NCEI changed the display format of temperature rank maps beginning in 2014.

















Figure A-3. Spatial fields of daily maximum temperature anomalies (percentiles) for the period June through August for the years 2011 through 2017. Note that the NCDC began creating these maps in 2011.





A-15









Figure A-4. Cooling degree days for June through August for each climate region. Note that (1) data are provided back to 1990 and (2) the range of the y-axis differs in some cases by climate region.



Southeast Climate Region, Cooling Degree Days, June-August



Ohio Valley Climate Region, Cooling Degree Days, June-August



A-19





Southwest Climate Region, Cooling Degree Days, June-August



Northern Rockies and Plains Climate Region, Cooling Degree Days, June-August



A-21



Northwest Climate Region, Cooling Degree Days, June-August



West Climate Region, Cooling Degree Days, June-August

A-22

**EXHIBIT 6**

Oklahoma, Certification of SIP Elements, Oklahoma's 110(a)(1) and 110(a)(2)

"Infrastructure" State Implementation Plan Requirements for National

Ambient Air Quality Standard for Ozone, Promulgated in 2015 (Oct. 25, 2018)

*Michael J. Teague*
*Secretary of Energy & Environment*



*Mary Fallin*
*Governor*

## STATE OF OKLAHOMA
### OFFICE OF THE
### SECRETARY OF ENERGY & ENVIRONMENT

October 25, 2018

CERTIFIED MAIL, RETURN RECEIPT REQUESTED

Anne Idsal, Regional Administrator (6RA)
U.S. Environmental Protection Agency - Region 6
1445 Ross Avenue, Suite 1200
Dallas, TX 75202-2733

Subject: Certification of SIP Elements for the 2015 Primary and Secondary Ozone NAAQS under Clean
Air Act Sections 110(a)(1)-(2)

Dear Administrator Idsal:

In a letter dated September 24, 2013 Governor Mary Fallin appointed me as her designee for the purpose
of submitting documents to the U.S. Environmental Protection Agency (EPA) for approval and
incorporation into the State Implementation Plan (SIP) for the State of Oklahoma.    The Oklahoma
Department of Environmental Quality (DEQ) is given the primary responsibility and authority to prepare
and implement the state's air quality management plan under Oklahoma Statutes.

Sections 110(a)(1) and (2) of the Clean Air Act requires that each state review and revise as necessary its
SIP following promulgation of a revised National Ambient Air Quality Standards (NAAQS) (See U.S.C.
§ 7410(a)(1) and (2)).    On October 1, 2015, the EPA administrator signed the Primary National Ambient
Air Quality Standards for Ozone (80 Fed. Reg. 65292, October 26, 2015).    EPA issued the "Guidance on
Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and
110(a)(2)" in September 2013.    Under this guidance, states may certify that their existing SIPs meet the
"infrastructure" elements of § 110(a)(2), rather than submitting a revised SIP for the revised NAAQS such
as the 2015 Ozone NAAQS.    Oklahoma's SIP is codified in 40 CFR Part 52, Subpart LL.

On behalf of the State of Oklahoma, I hereby certify that, as indicated in the enclosed table titled
"Oklahoma's State Implementation Plan (SIP) Submittal 'Infrastructure' Checklist," and the enclosed
Technical support document titled "Oklahoma Demonstration of Compliance with the Good Neighbor
Requirements of Clean Air Act Section 110(a)(2)(D)(i)(I) for the 2015 Ozone National Ambient Air
Quality Standard," Oklahoma's SIP meets the infrastructure and Good Neighbor obligations for the 2015
Primary and Secondary Ozone NAAQS.    To date, the only SIP change required to meet the revised 2015
Ozone NAAQS was a revision to Appendix E and F of OAC 252:100, to add the new 8-hour Ozone
standard [CAA § 110(a)(2)(H)], which became effective September 15, 2016.

State public participation procedures for such SIP submittals were submitted to EPA for review under 40
CFR § 51.102. In a letter dated August 23, 2012, EPA concurred that Oklahoma's procedures are
consistent with the requirements of 40 CFR § 51.102 and associated guidance.    Public notice for this
submittal was posted on DEQ's web site on August 15, 2018, to allow the opportunity to provide comments
and to request a public hearing preliminarily scheduled for September 17, 2018 at DEQ's Central Office.

Ms. Anne Idsal
October 25, 2018
Page 2

No hearing request was received during the minimum 30-day comment period (8/15/18 – 9/14/18). Therefore, a notice of hearing cancellation was published on DEQ's website on September 14, 2018. Attached is documentation of the public notice and submittal process. Also attached are copies of comments received during the comment period and a Response to Comments document. It is our understanding that the final results of EPA's review of this submittal will be determined through rulemaking and will be published in the *Federal Register*.

Please note that Oklahoma currently has no designated Ozone nonattainment or maintenance areas so no nonattainment plans are due.

If you have questions, please contact Mr. Eddie Terrill, Director, Air Quality Division, Department of Environmental Quality at (405) 702-4100.

Sincerely,

Michael Teague
Secretary of Energy and Environment

Enclosures

ec:    Scott Thompson, Executive Director, Department of Environmental Quality
       Eddie Terrill, Director, Air Quality Division, DEQ
       Guy Donaldson, Associate Director, Air Branch, EPA Region 6 (6MM-A)
       Mary Stanton, Chief, State Implementation B, Air Branch, EPA Region 6 (6MM-AB)
       Carrie Paige, State Implementation B, Air Branch, EPA Region 6 (6MM-AB)
       Carl Young, State Implementation B, Air Branch, EPA Region 6 (6MM-AB)

# Oklahoma's State Implementation Plan (SIP) Submittal "Infrastructure" Checklist
## CAA § 110(a)(2)(A)-(M) Requirements in the Current SIP or Pending SIP Revisions

### Updated for the 2015 Primary and Secondary Ozone National Ambient Air Quality Standard (NAAQS)

On October 1, 2015, the U.S. Environmental Protection Agency (EPA) revised the levels of the primary and secondary 8-hour ozone National Ambient Air Quality Standards (NAAQS) to 0.070 parts per million (ppm) [40 CFR § 50.19, 80 Fed. Reg. 65292, Oct. 26, 2015].  Section 110(a)(1) of the federal Clean Air Act (CAA) requires each state to submit a State Implementation Plan (SIP) to provide for the implementation, maintenance, and enforcement of each newly promulgated or revised NAAQS.  The SIP contains state regulations, source-specific requirements, and non-regulatory items such as plans and inventories.  The initial SIPs for states were approved by the EPA on May 31, 1972 (46 Fed. Reg. 40005).  The Oklahoma Department of Environmental Quality (DEQ) is given the primary responsibility and authority to prepare and implement Oklahoma's air quality management plan under the Oklahoma Environmental Quality Act and the Oklahoma Clean Air Act (*see generally* Title 27A Oklahoma Statutes (O.S.) §§ 2-1-101 et seq.).  The federally enforceable SIP for Oklahoma is compiled in 40 CFR Part 52, Subpart LL.  Approval of additional SIP submittals is pending.

SIPs are reviewed and revised by the state as necessary to accommodate changes in State and Federal statutes, rules, policies, and program requirements.  In addition to SIP revisions to address specific program requirements (e.g., PSD/NSR Program), including those changes that directly result from a new or revised NAAQS, EPA has interpreted § 110(a)(1) of the federal CAA to require the state to demonstrate that the SIP meets the "infrastructure" requirements of CAA Section 110(a)(2)(A)-(M) each time a NAAQS is issued or revised.[1]  The resulting submittal is commonly referred to as an "infrastructure SIP" or "I-SIP."  Under its September 2013 <u>Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2)</u>[2] ("2013 I-SIP Guidance"), EPA allows for certification that "… the already-approved SIP contains or references provisions that satisfy all or some of the requirements of section 110(a)(2), as applicable, for purposes of implementing the new or revised NAAQS."  The following table summarizes how and where the applicable infrastructure requirements are addressed in Oklahoma's current SIP or pending SIP revisions.  In addition to a summary of infrastructure elements as they relate to the various existing NAAQS, the table lists any changes or pertinent information specific to the subject NAAQS change.

**This Submittal:  2015 Primary and Secondary Ozone NAAQS**
In this I-SIP submittal, Oklahoma is demonstrating that it has adequate resources and authority to implement, maintain, and enforce the 2015 Primary and Secondary Ozone NAAQS.  This submittal was prepared under EPA's 2013 I-SIP Guidance and 40 CFR Part 51, Appendix V – Criteria for Determining the Completeness of Plan Submissions.

---

[1] For Example, EPA approved Oklahoma's Infrastructure SIP (or "I-SIP") for the 1997 Ozone and the 1997 and 2006 PM$_{2.5}$ NAAQS on January 26, 2012 (77 Fed. Reg. 3933).

[2] Distributed under September 13, 2013 memorandum from Stephen D. Page, Director, Office of Air Quality Planning and Standards, to EPA's Regional Air Directors, Regions 1-10.

| Section 110(a)(2) Element | Summary of Element (Statutory Language) | Provisions in State statutes and rules, and the Current SIP or Recent SIP Revision Submittals | Where Codified or Approved by EPA |
|---|---|---|---|
| § 110(a)(2)(A) – Emission Limits and Other Control Measures | *include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance as may be necessary or appropriate to meet the applicable requirements of this Act.* | Oklahoma Environmental Quality Act (27A O.S. §§ 1-1-101 thru 1-4-107), Oklahoma Environmental Quality Code (27A O.S. §§ 2-1-101 thru 2-16-107) including the Oklahoma Clean Air Act (27A O.S. §§ 2-5-101 thru 2-5-117), and other relevant portions, Oklahoma Administrative Code (OAC) 252:4, Rules of Practice and Procedure, and OAC 252:100, Oklahoma Air Pollution Control Rules.<br><br>Oklahoma has an EPA-approved air permitting program for both major/part 70 sources (OAC 252:100-8) and minor facilities (OAC 252:100-7). *[see discussion under element 110(a)(2)(C) – Program for enforcement of control measures.]*<br><br>EPA actions on several SIP revisions are pending.  These include portions of the February 14, 2002 SIP submittal ("Big SIP"); portions of the June 24, 2010 SIP submittal (SC-8 revision); the July 16, 2010 SIP submittal (SC-9 excess emissions reporting requirements revision[3]); portions of the July 23, 2010 SIP submittal ("Big SIP2"); the July 23, 2010 SIP submittal (NSR Reform); and the March 26, 2012 SIP submittal (GHG and $PM_{2.5}$); as well as the annual SIP revisions for 2010 (December 28, 2010), 2011 (February 6, 2012) and 2012 (February 4, 2013), a multiyear revision for years 2013 through 2016 (February 23, 2017), and an annual revision for 2017 (January 12, 2018).<br><br>Oklahoma currently has no designated Nonattainment or maintenance areas.<br><br>**This NAAQS Revision:**<br>No additional specific enforceable emission limitations or other control measures, means, or techniques have been identified as necessary to attain or maintain the 2015 Ozone NAAQS ("revised Ozone NAAQS"). OAC 252:100 includes Subchapter 33, Control of Emission of Nitrogen Oxides (252:100-33), Subchapter 37, Control of Emission of Volatile Organic Compounds (VOCs) (252:100-37), and Subchapter 39, Emission of Volatile Organic Compounds (VOCs) in Nonattainment Areas and Former Nonattainment Areas (252:100-39).  The July 23, 2010 SIP submittal ("Big SIP2") included changes to Subchapters 33 and 37.  At this time, it is not anticipated that OAC 252:100-33 or 100-37 will need to be revised as a result of the new NAAQS.  Any particular issues or changes related to implementation of the 2015 Ozone NAAQS through Oklahoma's permitting program would be addressed through a separate SIP submission. | 40 CFR §§ 52.1920 and 52.1960 (c)(48) |

[3] In a letter dated March 14, 2014 and at EPA's request, DEQ withdrew its July 16, 2010 SIP submittal, which included changes to implement EPA's policy on excess emissions associated with Start-up, Shut-down, and Malfunction (SSM) that was in place at the time. Withdrawal allows EPA to deal with the revised policy issues on a national basis.

| Section 110(a)(2) Element | Summary of Element (Statutory Language) | Provisions in State statutes and rules, and the Current SIP or Recent SIP Revision Submittals | Where Codified or Approved by EPA |
|---|---|---|---|
| **§ 110(a)(2)(B) – Ambient Air Quality Monitoring/Data System** | *provide for establishment and operation of appropriate devices, methods, systems, and procedures necessary to monitor, compile, and analyze data on ambient air quality, and upon request, make such data available to the Administrator;* | The Oklahoma Clean Air Act (27A O.S. §§ 2-5-101 thru 2-5-117) provides the authority to establish and operate ambient air quality monitors.  OAC 252:100-3, in conjunction with Appendices E and F, enumerates the NAAQS and PSD increments.<br><br>Oklahoma operates an air quality monitoring network consistent with EPA regulations (40 CFR Part 58), and regularly reports results to EPA under previously-approved SIP provisions.  Each fiscal year, DEQ posts an Annual Network Review (ANR) on its web site for public review. Following the 30-day public review period, DEQ evaluates and responds to any comments, and submits the review to EPA Region 6 monitoring staff for their review.  The FY18 ANR was posted for public review from May 1, 2017 to June 1, 2017.  No public comments were received, and the final FY18 ANR was submitted to EPA. Monitoring results may also be accessed through DEQ's web site at: http://www.deq.state.ok.us/aqdnew/monitoring/index.htm<br><br>**This NAAQS Revision:**<br>Oklahoma's program has monitored ozone from the 1970's to present. Oklahoma's ambient air monitoring network is consistent with the ozone-related monitoring requirements of 40 CFR Part 58.  No changes to the ozone monitoring network were required by the 2015 Ozone NAAQS. | 40 CFR §§ 52.1920 and 52.1960(c)(22) |

Oklahoma's SIP Submittal "Infrastructure" Checklist
2015 Primary and Secondary Ozone NAAQS Update

| Section 110(a)(2) Element | Summary of Element (Statutory Language) | Provisions in State statutes and rules, and the Current SIP or Recent SIP Revision Submittals | Where Codified or Approved by EPA |
|---|---|---|---|
| § 110(a)(2)(C) – Program for Enforcement of Control Measures | *include a program to provide for the enforcement of the measures described in subparagraph (A) and regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program as required in parts C and D;* | Oklahoma's EPA-approved air permitting program includes appropriate enforcement authority and permitting for modification and construction of stationary sources. DEQ's powers and duties to implement air quality programs (including implementing Oklahoma's SIP) are described in 27A O.S. § 2-5-105, and include authority to "… *[e]nforce rules of the Board and orders of the Department and the Council." 27A O.S. § 2-5-105(4)*. More specific enforcement authorities are described throughout the Oklahoma Clean Air Act, 27A O.S. §§ 2-5-101 et seq., and in OAC 252:4-9, Administrative Proceedings.<br><br>Oklahoma's requirements for construction and operating permits for minor facilities and (minor) modifications to minor facilities are in OAC 252:100-7, Permits for Minor Facilities.  The requirements for construction and operating permits for all sources, regardless of size, that are subject to the Part 70 (Title V) operating permit program, are in OAC 252:100-8, Permits for Part 70 Sources and Major New Source Review.  These include construction permit requirements for PSD and other major sources, and requirements for both major and minor modifications to PSD and other major sources, as well as requirements for the Part 70 (Title V) operating permit program.  OAC 252:4-7, Environmental Permit Process, contains additional permit requirements.<br><br>Although no areas in Oklahoma are currently designated as nonattainment or maintenance areas, Oklahoma's SIP contains the provisions for the nonattainment area New Source Review (NSR) permitting program in OAC 252:100-8, Part 9 Major Sources Affecting Nonattainment Areas.  The EPA interprets the portion of § 110(a)(2)(C) that pertains to a permitting program that applies to nonattainment NSR within nonattainment areas (CAA Title I part D) to be outside the scope of the infrastructure SIP requirements[4] and does not otherwise address it in the 2013 I-SIP Guidance.<br><br>Note that Oklahoma's PSD and Title V/Part 70 permitting program applies to sources that emit greenhouse gases (GHGs) in accordance with EPA's tailoring rule, and subsequent narrowing of EPA's approval of the PSD program.<br><br>A number of changes to Oklahoma's permitting program are included in pending SIP revisions noted under element § 110(a)(2)(A) – *Emission Limits and Other Control Measures.* | 40 CFR §§ 52.1920 and 52.1929 |

---

[4] Page 4, Section II.  General Guidance on Infrastructure SIPs, *2013 I-SIP Guidance*

Oklahoma's SIP Submittal "Infrastructure" Checklist
2015 Primary and Secondary Ozone NAAQS Update

| Section 110(a)(2) Element | Summary of Element (Statutory Language) | Provisions in State statutes and rules, and the Current SIP or Recent SIP Revision Submittals | Where Codified or Approved by EPA |
|---|---|---|---|
| | | **This NAAQS Revision:**<br>No additional specific enforceable emission limitations or other control measures, means, or techniques have been identified as necessary to attain or maintain the 2015 Ozone NAAQS. Any particular issues or changes related to implementation of the 2015 Ozone NAAQS through Oklahoma's permitting, compliance, and enforcement programs (e.g., PSD) would be addressed through a separate SIP submission. | |
| **§ 110(a)(2)(D)(i) – Interstate Transport Provisions** | *contain adequate provisions—*<br><br>*(i) prohibiting, consistent with the provisions of this title, any source or other type of emissions activity within the state from emitting any air pollutant in amounts which will--*<br>*(I) contribute significantly to nonattainment in, or interfere with maintenance by, any other state with respect to any such national primary or secondary ambient air quality standard, or* | The 2013 I-SIP guidance states that EPA expects to issue guidance with respect to this Sub-element,[5] but does not otherwise address interstate transport provisions which prohibit significant contribution to nonattainment in, or interfere with maintenance by, any other state with respect to the NAAQS. EPA has indicated that it expects to address § 110(a)(2)(D)(i)(I) separately through issuance of further guidance, and that the requirements would likely be addressed in a separate Transport SIP.[6]<br><br>However, Oklahoma's air quality control rule at OAC 252:100-8-35 requires major stationary sources to demonstrate that the source's emissions would not cause or contribute to any increase in ambient concentrations that would exceed any NAAQS in any air quality control region. The State's PSD program meets the basic requirements for implementing all NAAQS. A SIP revision submitted on January 12, 2018 which is pending EPA action, contains modifications to OAC 252:100-8-35.<br><br>EPA concluded that emissions from Oklahoma significantly contribute to, or interfere with maintenance of the 8-hour 2008 Ozone NAAQS in another state and issued a Federal Implementation Plan (FIP) in an update rule (81 Fed. Reg. 74599, Oct. 26, 2016) to the Transport Rule (aka Cross State Air Pollution Rule (76 Fed. Reg. 48208, Aug. 8, 2011)) requiring Oklahoma to participate in the $NO_X$ Ozone Season trading program. | 40 CFR §§ 52.1920 and 52.1930 |

---

[5] Page 3, Section I. Introduction, *2013 I-SIP Guidance*

[6] Oklahoma submitted its *Interstate Transport SIP for an Assessment of Oklahoma's Impact on Downwind Nonattainment for the National Ambient 8-hour Ozone and PM$_{2.5}$ Air Quality Standards* ("Transport SIP") to EPA in May 2007, with supplemental information submitted in November 2007. EPA approved portions of the Transport SIP relating to § 110(a)(2)(D)(i)(I) for the 1997 PM$_{2.5}$ NAAQS and the 2006 24-hour PM$_{2.5}$ NAAQS (76 Fed. Reg. 81838, Dec. 29, 2011). In the same action, EPA approved the portions of the Transport SIP relating to the prohibition against significant contribution to nonattainment of the 8-hour 1997 Ozone NAAQS in any other state. EPA's analyses performed in conjunction with issuance of the Transport Rule (aka Cross State Air Pollution Rule, 76 Fed. Reg. 48208, Aug. 8, 2011) concluded that emissions from Oklahoma significantly contribute to interference with maintenance of the 8-hour 1997 Ozone NAAQS in another state and issued a Federal Implementation Plan (FIP) in a supplemental rule (76 Fed. Reg. 80760, Dec. 27, 2011) requiring Oklahoma to participate in the NO$_X$ Ozone Season trading program. On February 2016, EPA revised the CSAPR implementation schedule following resolution of extensive litigation, and on September 2016, EPA finalized an update to the CSAPR for the 2008 Ozone National Ambient Air Quality Standard.

| | | **This NAAQS Revision:**<br>On March 27, 2018, EPA issued a Memorandum from Peter Tsirigotis, EPA OAQPS, to Regional Air Division Directors, entitled *Information on the Interstate Transport State Implementation Plan Submission for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)*.  The Tsirigotis March 2018 Memo provided newly-available contribution modeling results, along with a list of potential flexibilities in analytical approaches for developing good neighbor SIPs for the 2015 Ozone NAAQS.  The State of Oklahoma, through DEQ, has used those flexibilities, and is requesting EPA approve the *Oklahoma Demonstration of Compliance with the Good Neighbor Requirements of Clean Air Act Section 110(a)(2)(D)(i)(I) for the 2015 Ozone National Ambient Air Quality Standard* as a revision to the SIP. This revision supplements EPA's *Determination Regarding Good Neighbor Obligations for the 2008 Ozone National Ambient Air Quality Standard* proposal [83 Fed. Reg. 31915, 10 July 2018], in which EPA finds that the 2016 CSAPR Update fully addresses CAA section 110(a)(2)(D)(i)(I) (i.e., "Good Neighbor") requirements for Oklahoma. | |

Oklahoma's SIP Submittal "Infrastructure" Checklist
2015 Primary and Secondary Ozone NAAQS Update

| § 110(a)(2)(D)(i) – Interstate Transport Provisions | *contain adequate provisions—* <br><br> *(i) prohibiting, consistent with the provisions of this title, any source or other type of emissions activity within the state from emitting any air pollutant in amounts which will--* <br><br> *(II) interfere with measures required to be included in the applicable implementation plan for any other State under part C to prevent significant deterioration of air quality or to protect visibility,* | New major stationary sources and modifications are subject to a comprehensive PSD permitting program. Under OAC 252:100-8, Part 7, Oklahoma's EPA-approved air permitting program includes pre-construction review of PSD sources, including review for impacts of emissions of all "regulated NSR pollutants," and requires demonstration that any increase in emissions would not cause or contribute to any increase in ambient concentrations that would exceed any NAAQS in any air quality control region. EPA approved the portion of Oklahoma's Transport SIP relating to § 110(a)(2)(D)(i)(II) (PSD) for the 2008 Ozone NAAQS on December 9, 2016 (81 Fed. Reg. 89008). | 40 CFR § 52.1920(c) and (e) |
| | | Oklahoma's *Regional Haze Implementation Plan Revision,* ("RH SIP"), submitted in February 2010, describes Oklahoma's measures to protect visibility and assure that emissions do not interfere with any other state's measures to protect visibility. These measures include provisions in OAC 252:100-8, Part 11. EPA partially approved and partially disapproved Oklahoma's Regional Haze SIP on December 28, 2011 (76 Fed. Reg. 81728). EPA stated that the RH SIP did not incorporate some emission reductions that were relied on to demonstrate non-interference with other states' visibility protections. In the same *Federal Register* notice, EPA also partially approved and partially disapproved portions of the *Interstate Transport SIP for an Assessment of Oklahoma's Impact on Downwind Nonattainment for the National Ambient 8-hour Ozone and PM$_{2.5}$ Air Quality Standards* ("Transport SIP"), submitted May 10, 2007 and supplemented December 10, 2007, that address § 110(a)(2)(D)(i)(II) with respect to protection of visibility. EPA issued a FIP requiring reduction of SO$_2$ emissions for six units, and found that "the controls under this FIP, in combination with the controls required by the portion of the Oklahoma RH submittal that we are approving, will serve to prevent sources in Oklahoma from emitting pollutants in amounts that will interfere with efforts to protect visibility in other states." Oklahoma submitted a revision to its RH SIP and Transport SIP on June 14, 2013 to replace the FIP as it relates to two of the six units concerned. EPA approved this revision effective April 7, 2014. (79 Fed. Reg. 12944 & 12954, March 7, 2014). | 40 CFR §§ 52.1920(d) and (e), 52.1923, and 52.1928 |
| | | **This NAAQS Revision:** <br> Any specific ozone-related issues in Oklahoma's permitting program (e.g., increments or significant impact levels) would be addressed through a separate submission. | |
| | | Ozone from ozone precursor emissions is not believed to contribute significantly to visibility impairment. Oklahoma's *Regional Haze Implementation Plan Revision,* submitted in February 2010, demonstrates that Oklahoma's PM$_{2.5}$ emissions do not interfere with any other state's measures to protect visibility. This portion was approved by EPA on December 29, 2011 (76 Fed. Reg. 81838). | 40 CFR § 52.1920(e) |

| | | | |
|---|---|---|---|
| § 110(a)(2)(D)(ii) – Interstate and International Transport Provisions | *contain adequate provisions—*<br><br>*(ii) insuring compliance with the applicable requirements of sections 126 and 115 (relating to interstate and international pollution abatement);* | Oklahoma's EPA-approved Title V Operating (and PSD) Program includes requirements for providing a notice of draft permit to affected states under OAC 252:100-8-8 (SIP revision approved November 26, 2010 at 75 Fed.Reg. 72695). This notice meets the requirements of § 126 of the CAA.<br><br>Evaluation requirements under the PSD Program are adequate to assure compliance with international pollution abatement requirements. There are no final findings under § 115 of the CAA against this State with respect to any existing NAAQS. | 40 CFR § 52.1920(c) |
| | | **This NAAQS Revision:**<br>No source or sources within Oklahoma are the subject of an active finding under § 126 of the CAA with respect to the 2015 Ozone NAAQS.<br><br>There are no final findings under § 115 of the CAA against this State with respect to this NAAQS.<br><br>Oklahoma does not anticipate that significant changes would be required to implement the 2015 Ozone NAAQS. | |
| § 110(a)(2)(E)(i) – Adequate Resources | *provide*<br>*(i) necessary assurances that the state (or, except where the Administrator deems inappropriate, the general purpose local government or governments, or a regional agency designated by the state or general purpose local governments for such purpose) will have adequate personnel, funding, and authority under state (and, as appropriate, local) law to carry out such implementation plan (and is not prohibited by any provision of federal or state law from carrying out such implementation plan or portion thereof);* | Oklahoma has previously demonstrated that it currently has and will continue to have adequate personnel and other resources to carry out its air quality programs. The powers and duties of the DEQ to implement air quality programs (including implementing Oklahoma's SIP) are described in 27A O.S. § 2-5-105, and include authority to accept and expend funds necessary to carry them out. DEQ receives air quality program funds through state appropriations, permit application fees, annual operating fees, and federal grants under CAA §§ 103 & 105, among others. | 40 CFR §§ 52.1920(e) and 52.1960(c)(45)(i) |
| | | **This NAAQS Revision:**<br>Oklahoma will continue to provide the resources needed to carry out its air quality responsibilities. No significant additional personnel or other resources have been identified as required to implement the 2015 Ozone NAAQS, except as otherwise noted. | |
| § 110(a)(2)(E)(ii) – Adequate Resources (State Boards) | *provide*<br>*(ii) requirements that the state comply with the requirements respecting state boards under section 128, and* | The Oklahoma Environmental Quality Code lays out the composition and powers & duties of the Environmental Quality Board (EQB) (27A O.S. § 2-2-101) and the Air Quality Advisory Council (27A O.S. §§ 2-2-201(H) and 2-5-107). These powers & duties include their roles in promulgating DEQ rules, but do not include approving permits or enforcement orders under the CAA. The powers & duties and conflict of interest provisions for DEQ staff and Executive Director are described in 27A O.S. § 2-3-101 and 27A O.S. § 2-3-201, respectively. | 40 CFR § 52.1920(e) and 40 CFR § 52.1960(c)(17) and (45)(i) |

| | | | |
|---|---|---|---|
| | | This NAAQS Revision:<br>Oklahoma does not anticipate that significant changes would be required as a result of a change in a particular NAAQS, including the 2015 Ozone NAAQS. | |
| **§ 110(a)(2)(E)(iii) – Adequate Resources (Local or Regional Implementation)** | *provide*<br>    *(iii) necessary assurances that, where the state has relied on a local or regional government, agency, or instrumentality for the implementation of any plan provision, the state has responsibility for ensuring adequate implementation of such plan provision;* | Not Applicable. | |
| **§ 110(a)(2)(F) – Stationary Source Monitoring System and Reporting** | *require, as may be prescribed by the Administrator—*<br><br>    *(i) the installation, maintenance, and replacement of equipment, and the implementation of other necessary steps by owners or operators of stationary sources to monitor emissions from such sources,*<br>    *(ii) periodic reports on the nature and amounts of emissions and emissions-related data from such sources, and*<br>    *(iii) correlation of such reports by the state agency with any emission limitations or standards established pursuant to this Act, which reports shall be available at reasonable times for public inspection;* | Source emissions monitoring requirements are addressed in OAC 252:100-43, Testing, Monitoring and Recordkeeping.<br><br>Source emissions inventory requirements are addressed in OAC 252:100-5, Registration of Air Contaminant Sources.<br><br>Area, mobile, and non-road data are reported to EPA on a 3-year cycle.<br><br>Public access to agency records is assured through OAC 252:100, Air Pollution Control; OAC 252:4-1-5, Availability of a Record; and 51 O.S. §§ 24A.1 Oklahoma Open Records Act. | 40 CFR § 52.1960(c)<br><br>40 CFR § 52.1920(c)<br><br>40 CFR § 52.1920(c) |
| | | This NAAQS Revision:<br>Oklahoma does not anticipate that significant changes would be required as a result of a change in a particular NAAQS, including the 2015 Ozone NAAQS. | |

| § 110(a)(2)(G) – Emergency Episodes | *provide for authority comparable to that in section 303 and adequate contingency plans to implement such authority;* | Chapter 6 of Oklahoma's SIP, as submitted in 1972 and revised in 1988, sets forth the state's Emergency Episode Plan (EEP), as required under § 110(a)(2)(G) and 40 CFR Part 51, Subpart H – Prevention of Air Pollution Emergency Episodes and, along with provisions included in the February 2002 SIP update, describes and implements State authority comparable to that in § 303.  *(For the purpose of EEPs, 40 CFR § 51.150 classifies regions separately with respect to the following pollutants: sulfur oxides, particulate matter, carbon monoxide, nitrogen dioxide, and ozone, based on ambient concentrations. § 51.152 requires a contingency plan for priority I, IA, & II regions.)*<br><br>As indicated in 40 CFR §§ 52.1934 and 52.1960(c)(38), EPA approved the plan as submitted in 1972 and revised in 1988 (56 Fed. Reg. 5656, Feb. 12, 1991).<br><br>The Executive Director of the DEQ is empowered by the Oklahoma Environmental Quality Code to respond to air pollution episodes and other air quality emergencies, and the DEQ has contingency plans to implement emergency episode provisions in the SIP. Oklahoma's Emergency Episode Plan was approved into the SIP by EPA on February 12, 1991 (56 FR 05653). Oklahoma's Emergency Episode Plan includes alert, warning, and emergency levels for emergency episodes involving $PM_{10}$ and ozone concentrations. The episode criteria and contingency measures are found in the Emergency Episode Plan. The criteria for ozone are based on a 1-hour average ozone level. These episode criteria and contingency measures are adequate to address ozone emergency episodes and are in the federally approved SIP. We propose that the Oklahoma Emergency Episode Plan provides for the pollutants specified under 40 CFR 51.150 and is consistent with the provisions of 40 CFR 51.151 and 152, and Appendix L to Part 51.<br><br>**This NAAQS Revision:**<br>The measures in place in Oklahoma's approved EEP are adequate to address an emergency episode and do not need to be updated due to the 2015 Ozone NAAQS. | 40 CFR §§ 52.1934 and 52.1960(c)(38) |

| § 110(a)(2)(H) – Future SIP Revisions | *provide for revision of such plan—* <br> *(i) from time to time as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of attaining such standard, and* <br> *(ii) except as provided in paragraph (3)(C), whenever the Administrator finds on the basis of information available to the Administrator that the plan is substantially inadequate to attain the national ambient air quality standard which it implements, or to otherwise comply with any additional requirements established under this Act;* | Under authority of OAC 252:100-3-2 and 252:100-3-3, Appendices E and F of OAC 252:100 enumerate the primary and secondary air quality standards (NAAQS), respectively. <br><br> DEQ's powers and duties to implement air quality programs (including implementing Oklahoma's SIP) are described in 27A O.S. § 2-5-105, and include authority to: <br> *"3. Prepare and develop a general plan for proper air quality management in the state in accordance with the Oklahoma Clean Air Act;"* <br> and <br> *"20. Carry out all other duties, requirements and responsibilities necessary and proper for the implementation of the Oklahoma Clean Air Act and fulfilling the requirements of the Federal Clean Air Act."* <br> [27A O.S. § 2-5-105(3) and (20)] <br><br> Any substantive changes to Oklahoma's SIP, such as NAAQS updates and resulting program modifications, are initiated through the rulemaking process, which includes agency, public, gubernatorial, and legislative review processes. Public notice is provided (published/posted) for all steps in the rulemaking process, in accordance with the state Administrative Procedures Act (75 O.S. §§ 250.1 through 323), Open Records Act (51 O.S. §§ 24A.1 through 24A.29), and Open Meetings Act (25 O.S. §§ 301 through 314), along with corresponding DEQ and state procedural rules. The notices include the opportunity to provide comments prior to and at the public hearing before the Air Quality Advisory Council and at the public hearing before the Environmental Quality Board. <br><br> Documentation of these changes, along with documentation of any implementation or infrastructure changes, is then submitted by the Governor (or the Oklahoma Secretary of Energy and Environment, acting as the Governor's designee) to EPA as a SIP revision. This process is followed regardless of whether it results from a NAAQS update or a finding by the Administrator. State public participation procedures for SIP submittals that do not include rulemaking were submitted to EPA on August 17, 2012 for review. In a letter dated August 23, 2012, EPA concurred that the procedures are consistent with the requirements of 40 CFR § 51.102 and associated guidance. <br><br> **This NAAQS Revision:** <br> Appendix E of OAC 252:100 was updated to incorporate the 2015 Ozone NAAQS effective September 15, 2016. The updated Appendix E was submitted to EPA as a SIP revision in February 2017. <br><br> This SIP submittal fulfills the stated requirement. | 40 CFR §§ 52.1920 and 52.1960 |

| § 110(a)(2)(I) – Nonattainment Area Plan Requirements | *in the case of a plan or plan revision for an area designated as a nonattainment area, meet the applicable requirements of part D (relating to nonattainment areas);* | Not applicable.  EPA's 2013 I-SIP Guidance interprets the requirements of § 110(a)(2)(I), which pertain to specific requirements for attainment plans for designated nonattainment areas, to be outside the scope of the I-SIP requirements.[7] | |
| --- | --- | --- | --- |
| § 110(a)(2)(J) – Consultation with Government Officials (§ 121) | *meet the applicable requirements of section 121 … (relating to consultation), …* | Oklahoma's approved SIP includes established consultation with various entities.  Section 2-5-105 of the Oklahoma Clean Air Act specifically gives the DEQ the authority to advise, consult, and cooperate with other agencies of the State, towns, cities and counties, industries, other states and the federal government, and with affected groups in the prevention and control of new and existing air contamination sources within the State. Oklahoma does not anticipate that significant changes would be required as a result of a change in a particular NAAQS. | 40 CFR §§ 52.1920 and 52.1960 |
| § 110(a)(2)(J) – Public Notification (§ 127) | *meet the applicable requirements of … section 127 …* | Public notification procedures to meet the requirements of § 127 of the CAA are established in Oklahoma's SIP. DEQ provides notification of ambient air concentration levels for all NAAQS through its annual Air Data Reports, forecasting reports, and health advisories.<br><br>**This NAAQS Revision:**<br>The 2015 Ozone NAAQS is included in Oklahoma's SIP public notification requirements. DEQ provides notification of ozone concentration levels through its annual Air Data Reports, near real-time health advisories, and Ozone Watch days. Oklahoma does not anticipate that any significant public notification changes would be required to implement this NAAQS. | 40 CFR §§ 52.1920 and 52.1960 |

[7] Page 52, Section III. Guidance on Individual Infrastructure SIP Elements, Element I – Section 110(a)(2)(I): Plan Revisions for Nonattainment Areas, *2013 I-SIP Guidance*

| § 110(a)(2)(J) – PSD and Visibility Protection (Part C) | *meet the applicable requirements of … part C … (relating to prevention of significant deterioration of air quality and visibility protection);* | Oklahoma's EPA-approved PSD permitting program, which addresses all regulated NSR air pollutants, operates under OAC 252:100-8, Part 7 – Prevention of Significant Deterioration (PSD) Requirements for Attainment Areas; the existing PSD delegation agreement; and approved and pending portions of the SIP. . [*See discussion under Element § 110(a)(2)(C) – Program for Enforcement of Control Measures.*] | 40 CFR § 52.1920(c) |
|---|---|---|---|
| | | Oklahoma's *Regional Haze Implementation Plan Revision* ("RH SIP"), submitted in February 2010 and amended in a revision submitted June 14, 2013, describes Oklahoma's measures to protect visibility, including provisions in OAC 252:100-8, Part 11. [*See discussion under Element § 110(a)(2)(D)(i) – Interstate Transport Provisions, Subelement (II)*]. | 40 CFR §§ 52.1920(c), (d) & (e), 52.1923, and 52.1928 |
| | | In the 2013 I-SIP Guidance, EPA stated the belief that there are no new visibility protection requirements under Part C of the CAA that would result from a revised NAAQS.  Therefore, the visibility sub-element of Element J need not be addressed in an infrastructure SIP submission[8]. | |
| | | **This NAAQS Revision:** Specific issues or changes related to implementation of the 2015 Ozone NAAQS through Oklahoma's PSD permitting program would be addressed through a separate SIP submission. | |
| | | As noted, no visibility protection obligations under § 110(a)(2)(J) are anticipated as a result of this NAAQS. | |
| § 110(a)(2)(K) – Air Quality Modeling/Data | *provide for:     (i) the performance of such air quality modeling as the Administrator may prescribe for the purpose of predicting the effect on ambient air quality of any emissions of any air pollutant for which the Administrator has established a national ambient air quality standard, and     (ii) the submission, upon request, of data related to such air quality modeling to the Administrator;* | Under its general statutory authority (e.g., 27A O.S. §§ 2-3-202 and 2-5-105), DEQ conducts air quality modeling to support its demonstrations of attainment, and reports results to EPA. Source modeling requirements are also authorized in 27A O.S. § 2-5-112, and included in the PSD permitting program in OAC 252:100-8-35. Oklahoma currently has no designated nonattainment areas. Oklahoma will continue to update modeling protocols as appropriate to accommodate evolving program requirements and standards. | 40 CFR §§ 52.1920 and 52.1960 |
| | | **This NAAQS Revision:** Oklahoma's modeling program includes modeling for ozone. Oklahoma has not had a designated nonattainment areas for ozone since 1990, and no ozone SIP modeling has been required. DEQ will continue to review and update modeling protocols as appropriate to implement the revised ozone NAAQS.  DEQ will also continue to utilize appropriate modeling to evaluate the significant sources of emissions of ozone precursors in Oklahoma that potentially impact attainment of the ozone NAAQS. | |

---

[8] page 55, Section III. Guidance on Individual Infrastructure SIP Elements, Element J – Section 110(a)(2)(J): Consultation with Government Officials, Public Notification, and PSD and Visibility Protection, *2013 I-SIP Guidance*

| § 110(a)(2)(L) – Permitting Fees | *require the owner or operator of each major stationary source to pay to the permitting authority, as a condition of any permit required under this Act, a fee sufficient to cover—* <br>  *(i) the reasonable costs of reviewing and acting upon any application for such a permit, and* <br>  *(ii) if the owner or operator receives a permit for such source, the reasonable costs of implementing and enforcing the terms and conditions of any such permit (not including any court costs or other costs associated with any enforcement action), until such fee requirement is superseded with respect to such sources by the Administrator's approval of a fee program under title V;* | 27A O.S. § 2-5-106 authorizes the DEQ through the EQB to promulgate rules regarding permit fees and 27A O.S. § 2-5-113 establishes that the owner or operator of any source required to have a permit must pay a permit fee to cover the cost of implementing and enforcing Oklahoma's Air Quality permit program.  Oklahoma's EPA-approved Title V Operating Program includes permit application fees and annual operating fees under OAC 252:100-8-1.7 and 252:100-5-2.2, respectively (*formerly* Regulation 1.4.1(d) Permit fees). <br><br> **This NAAQS Revision:** <br> Oklahoma does not anticipate that significant changes would be required to implement the 2015 Ozone NAAQS. | 40 CFR §§ 52.1920(c) and 52.1960(c)(48)(ii)(A) |
| § 110(a)(2)(M) – Consultation/ Participation by Affected Local Entities | *provide for consultation and participation by local political subdivisions affected by the plan.* | Oklahoma's approved SIP includes established opportunities for consultation and participation by local political subdivisions affected by Oklahoma's SIP. <br><br> DEQ's powers and duties to implement air quality programs (including implementing Oklahoma's SIP) described in 27A O.S. § 2-5-105 authorizes the DEQ to advise, consult and cooperate with other agencies of the State, towns, cities and counties, industries, other states and the federal government, and with affected groups in the prevention and control of new and existing air contamination sources within the State. The powers and duties of the Air Quality Advisory Council, as listed in 27A O.S. § 2-5-107, include the "authority and discretion to provide a public forum for the discussion of issues it considers relevant to the air quality of the state, and to … hold public hearings to receive public comment in fulfillment of federal requirements regarding the [SIP] and make recommendations to the [DEQ] concerning the [SIP]." <br><br> Any substantive changes to Oklahoma's SIP, such as NAAQS updates and resulting program modifications, are initiated through the rulemaking process, which includes public notice and hearing procedures.  *(See the Oklahoma Administrative Procedures Act [75 O.S. §§ 250 – 323], DEQ procedural rules in OAC 252:4, and procedures approved under 40 CFR § 51.102(g).)*  Documentation of these changes, along with documentation of any implementation or infrastructure changes, is then submitted to EPA as a SIP revision. <br><br> Oklahoma does not anticipate that significant changes would be required as a result of a change in a particular NAAQS. | 40 CFR §§ 52.1920 and 52.1960 |



SCOTT A. THOMPSON
Executive Director

**OKLAHOMA DEPARTMENT OF ENVIRONMENTAL QUALITY**

MARY FALLIN
Governor

October 25, 2018

Anne Idsal, Regional Administrator (6RA)
U.S. Environmental Protection Agency – Region 6
1445 Ross Avenue, Suite 1200
Dallas TX 75202-2733

RE: Documentation of Procedures for Submittal of Certification of SIP Elements for the 2015
Ozone NAAQS under Clean Air Act Sections 110(a)(1) and (2)

Dear Administrator Idsal:

This letter is to certify that the procedures for preparation and submittal of Oklahoma's
Certification of State Implementation Plan (SIP) Elements for the 2015 Primary and Secondary
Ozone National Ambient Air Quality Standards (NAAQS) under Clean Air Act Sections 110(a)(1)
and (2) were in compliance with the requirements of the Oklahoma Administrative Procedures
Act, 75 O.S. §§ 250.1 through 323, and 40 CFR § 51.102 and 40 CFR Part 51, Appendix V, 2.1(g).
State public participation procedures for such SIP submittals were submitted to EPA for review
under 40 CFR § 51.102. In a letter dated August 23, 2012, EPA concurred that the procedures are
consistent with the requirements of 40 CFR § 51.102 and associated guidance.

The Notice of Opportunity for Public Hearing and Comment on the proposed certification that
Oklahoma has adequate resources and authority to implement, maintain, and enforce the 2015
Primary and Secondary Ozone NAAQS was posted on the Oklahoma Department of
Environmental Quality's (DEQ) web site on Wednesday, August 15, 2018. The notice set a
tentative public hearing for Monday, September 17, 2018, and included information on how the
public could request a public hearing and submit written or oral comments on the proposed
submittal. The notice provided that if no request for a public hearing was received by 10:00 a.m.,
Friday, September 14, 2018 (the close of the minimum 30-day notice period), the hearing would
be cancelled, and a notice announcing the cancellation would be posted on the DEQ web site at
least 24 hours prior to the scheduled time for the hearing. A contact phone number for information
on the public hearing was also included in the notice. No hearing requests were received during
the comment period (8/15/2018 – 9/14/2018). Therefore, a notice of hearing cancellation was
posted on the DEQ web site before 10:00 a.m. on September 16, 2018. In addition to posting the
two notices on DEQ's web site, an electronic notification (email) was sent to those on AQD's
standing email mailing list. Because the submittal involves no rules or program changes, nor
matter of significant public interest, newspaper and direct mail notifications were not prepared.

Ms. Anne Idsal
2015 Ozone NAAQS I-SIP Certification Documentation
October 25, 2018
Page 2

No comments were received on the I-SIP Checklist.  One set of comments was received from EPA on the "Oklahoma Demonstration of Compliance with the Good Neighbor Requirements of Clean Air Act Section 110(a)(2)(D)(i)(I) for the 2015 Ozone National Ambient Air Quality Standard." Therefore, a Response to Comments document was prepared.  Enclosed with this letter are copies of the Notice of Opportunity for Public Hearing and Comment and the Notice of Hearing Cancellation, along with copies of comments received during the comment period and a Response to Comments document, and screen shots of relevant DEQ web pages.

If you have questions or require additional information, please contact Ms. Melanie Foster, Environmental Programs Manager, at (405) 702-4218.

Sincerely,

*Beuerh Bettchlet-Smith*

for Eddie Terrill, Director
Air Quality Division

Enclosures:
    Notice of Opportunity for Public Hearing and Comment
    Notice of Hearing Cancellation
    Screen Shots of Relevant DEQ Web Pages
    Summary of Comments and Responses

**OKLAHOMA DEPARTMENT OF ENVIRONMENTAL QUALITY**
**Notice of Opportunity for Public Hearing and Comment**
**Oklahoma's Section 110 Infrastructure SIP Certification**
**2015 Primary and Secondary Ozone NAAQS**

The Oklahoma Department of Environmental Quality (DEQ) hereby announces an opportunity to comment on and request a public hearing on the proposed certification that Oklahoma has adequate resources and authority to implement, maintain, and enforce the 2015 Primary and Secondary Ozone National Ambient Air Quality Standards (NAAQS).  The hearing, if one is requested, will be held on Monday, September 17, 2018 from 10:00 a.m. to 12:00 noon in the 1st Floor Multipurpose Room of the DEQ, 707 North Robinson Avenue, Oklahoma City, OK 73102. **NOTE**: If no request for a public hearing is received by 10:00 a.m., Friday, September 14, 2018 (the close of the minimum 30-day notice period), the hearing will be cancelled, and a notice announcing that the hearing has been cancelled will be posted on the DEQ web site (http://www.deq.state.ok.us/aqdnew/RulesAndPlanning/index.htm) at least 24 hours prior to the scheduled time for the hearing.  You may call (405) 702-4100 to find out if the hearing has been cancelled.

Under the Oklahoma Clean Air Act (27A O.S. §§ 2-5-101 thru -117), DEQ is given the primary responsibility and authority to prepare and implement Oklahoma's air quality management plan, compiled in 40 CFR Part 52, Subpart LL. The DEQ prepared the proposed certification to comply with the requirements contained in Section 110 of the federal Clean Air Act and 40 CFR Part 51, Requirements for Preparation, Adoption, and Submittal of Implementation Plans.  This certification was prepared for submittal to the U.S. Environmental Protection Agency (EPA) under EPA's Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2), issued September 13, 2013.

All persons interested in these matters are invited to submit written comments prior to the scheduled close of the public hearing (*i.e.*, 12:00 noon on Monday, September 17, 2018) and/or provide oral comments at the public hearing (if a hearing is requested and held).  Persons planning to comment at the hearing may submit a written statement and/or additional information relevant to this matter for inclusion in the record of proceedings of the public hearing.  The hearing officer may limit the length of oral presentations to allow all those who wish to provide oral comments an opportunity to do so.

The proposed certification is available on the DEQ web site at http://www.deq.state.ok.us/aqdnew/RulesAndPlanning/index.htm.  Copies may also be obtained from the Department by contacting Melanie Foster, Environmental Programs Manager, at (405) 702-4100 or Melanie.Foster@deq.ok.gov.

Written comments and/or a public hearing request regarding the proposed 2015 Primary and Secondary Ozone NAAQS § 110 Infrastructure SIP Certification should be emailed to DEQ at AQDSIPComments@deq.ok.gov or mailed to:

> Department of Environmental Quality, Air Quality Division
> P.O. Box 1677
> Oklahoma City, Oklahoma 73101-1677
> ATTN: Melanie Foster

Comments may be submitted by fax to the Air Quality Division, ATTN: Melanie Foster, at (405) 702-4101.

Should you desire to attend the public hearing but have a disability and need an accommodation, please notify the Air Quality Division three (3) days in advance at (405) 702-4172.  For the hearing impaired, the TDD relay number is 1-800-522-8506 or 1-800-722-0353, for TDD machine use only.

**OKLAHOMA DEPARTMENT OF ENVIRONMENTAL QUALITY**

# Notice of Cancellation of Public Hearing

### Oklahoma's Section 110 Infrastructure SIP Certification
### 2015 Ozone NAAQS

The Oklahoma Department of Environmental Quality (DEQ) hereby announces that no request for a public hearing was received by the close of the 30-day notice period (8/15/2018 – 9/14/2018) on the proposed certification that Oklahoma has adequate resources and authority to implement, maintain, and enforce the 2015 Ozone National Ambient Air Quality Standards (NAAQS). Therefore, the hearing scheduled for Monday, September 17, 2018 has been cancelled, as provided for in the notice announcing the opportunity to request a public hearing and comment on the proposal. This announcement is in accordance with the public notice requirements of 40 CFR § 51.102.

Written comments on the proposal will be accepted through noon on Monday, September 17, 2018. The public notice and proposed certification are available on the DEQ website at http://www.deq.state.ok.us/aqdnew/RulesAndPlanning/index.htm. Copies may also be obtained from the Department by contacting Melanie Foster, Environmental Programs Manager, at (405) 702-4100 or Melanie.Foster@deq.ok.gov.



http://www.deq.state.ok.us/aqdnew/index.htm#

File   Edit   View   Favorites   Tools   Help

Update email Password   NACAA   IT   Welcome to the Oklahom...   Air Markets Program Data...   Mesonet Home Page   Web Slice Gallery ▼

**Oklahoma Department of Environmental Quality**   RULES & REGULATIONS   PUBLICATIONS & FORMS   PROGRAMS

air quality • water quality • land protection • state environmental laboratory services • environmental complaints & local services • office of external affairs



### Welcome to the Air Quality Division

SIP COMMENTS   LAWNMOWERS   SMOKE   VOLKSWAGEN   VILLAGE GREEN

Forms

Multimedia

What's New

Air Rules

Education

Clean
Diesel/Funding

Lead-Based
Paint

Contact AQD

AQD Site Index

Excess
Emissions
Reporting

Environmental
Complaints

## Open for Comments:

### Clean Air Act §110(a)(2) Infrastructure State Implementation Plan
### 2015 Primary and Secondary Ozone National Ambient Air Quality Standards

We are taking comments until noon September 17, 2018 and hearing requests until 10 AM Friday, September 14, 2018 on our infrastructure review for implementing the 2015 changes to the Primary and Secondary Ozone National Ambient Air Quality Standards.

Documents Are Posted On Our I-SIP Page

**What is air quality?**
The amount of pollution in the air from all sources - natural and human - defines the quality of the air we breathe. Air pollution isn't limited to our cities; it can blow into any part of Oklahoma from neighboring states.

**Why is it important?**
Bad air quality can affect everybody's health. It can have direct effects on the



http://www.deq.state.ok.us/aqdnew/whatsnew/index.htm

File   Edit   View   Favorites   Tools   Help

Update email Password   NACAA   IT   Welcome to the Oklahom...   Air Markets Program Data...   Mesonet Home Page   Web Slice Gallery

**Oklahoma Department of Environmental Quality**   RULES & REGULATIONS   PUBLICATIONS & FORMS   PROGRAMS

air quality • water quality • land protection • state environmental laboratory services • environmental complaints & local services • office of external affairs



Forms

Multimedia

What's New

Air Rules

Education

Clean Diesel/Funding

Contact AQD

AQD Site Index

## What's New in Air Quality?

### Special Announcements

**NEW!**   **Open for Comments: Proposed 2015 Ozone NAAQS I-SIP**

AQD is taking comments and hearing requests on the proposed certification that Oklahoma has adequate resources and authority to implement, maintain, and enforce the 2015 Ozone National Ambient Air Quality Standards (NAAQS). The comment period runs through noon on Monday, September 17th. A hearing (if one is requested by 10:00 a.m. Friday, 9/14/2018) would be held on Monday, September 17, 2018 from 10:00 a.m. to 12:00 noon in DEQ's 1st Floor Multipurpose Room. See the linked public notice, proposed "infrastructure review" checklist, Good Neighbor support document, and draft certification letter for more specifics. You may check this website or call 405-702-4100, 24 hours prior to the scheduled hearing time, to find out if it is cancelled. **Posted August 14, 2018**

**NEW!**   **2017 Air Data Report**

The 2017 Air Data Report has now been posted. The report charts air quality monitoring data collected at 30 monitors for criteria pollutants. The report shows Oklahoma is in attainment for all the NAAQS, along with analysis of each pollutant. View the 2017 Report... **Updated August 7, 2018**

**Volkswagen Settlement**

DEQ and the office of the Oklahoma Secretary of Energy and Environment (SOEE) submitted the Oklahoma Beneficiary Mitigation Plan (BMP) to Wilmington Trust on June 8, 2018. The BMP is a high-level plan describing the State's intentions for utilizing Oklahoma's funding allocation from the Volkswagen Environmental Mitigation Trust. This submittal follows a public comment period on the proposed BMP which ran from April 24, 2018 to May 24, 2018. Read the final BMP here. **Updated June 19, 2018**

**E-Permitting for Air Quality Permits**

Our new online permitting system is live. The following materials provide an overview of creating individual accounts for the system, creating and tracking permit applications, and optimizing your experience.



http://www.deq.state.ok.us/aqdnew/RulesAndPlanning/index.htm

File   Edit   View   Favorites   Tools   Help

Update email Password   NACAA   IT   Welcome to the Oklahom...   Air Markets Program Data...   Mesonet Home Page   Web Slice Gallery ▼

**Oklahoma Department of Environmental Quality**   RULES & REGULATIONS | PUBLICATIONS & FORMS | PROGRAMS

air quality * water quality * land protection * state environmental laboratory services * environmental complaints & local services * office of external affairs



Forms

Multimedia

What's New

Air Rules

Education

Clean
Diesel/Funding

Contact AQD

AQD Site Index

## Air Quality Rules & Planning

**Ozone Infrastructure SIP Open for Comments and Hearing Requests:** AQD is taking comments and hearing requests on the proposed certification that Oklahoma has adequate resources and authority to implement, maintain, and enforce the 2015 Ozone National Ambient Air Quality Standards (NAAQS). The comment period runs through noon on Monday, September 17th. A hearing (if one is requested by 10:00 a.m. Friday, 9/14/2018) would be held on Monday, September 17, 2018 from 10:00 a.m. to 12:00 noon in DEQ's 1st Floor Multipurpose Room. See the linked public notice, proposed "infrastructure review" checklist, Good Neighbor support document, and draft certification letter for more specifics. You may check this website or call 405-702-4100, 24 hours prior to the scheduled hearing time, to find out if it is cancelled. **Posted August 14, 2018**

### What is a State Implementation Plan?
The State Implementation Plan (SIP) lays out goals and procedures to protect the state's air quality. The federal Clean Air Act (CAA), which became law in 1971 and was amended in 1990, provides the national framework for efforts to protect air quality. The US EPA has delegated most of the available programs for implementing and enforcing the act to the Air Quality Division of DEQ. Regulation at the state level means that local needs and conditions are better understood, responded to, and managed.

Oklahoma's EPA-approved SIP lays out the goals and procedures for the daily operations of AQD. It includes the Oklahoma Air Quality Rules and other strategies developed at the state level for implementing the various federal air quality programs. The core focus of the air quality program is to implement, maintain, and enforce the National Ambient Air Quality Standards (NAAQS). The SIP is regularly reviewed and amended as necessary. In addition, EPA requires the state to demonstrate that the SIP meets the "infrastructure" requirements of CAA Section 110(a)(2) (A)-(M) each time a NAAQS is issued or revised. These "infrastructure SIPs", or I-SIPs, are posted for public comment on this page when proposed, and are then archived on the I-SIP page once they are finalized and submitted to EPA.

### How are Oklahoma's Air Quality Rules Made?
The AQD Rules and Planning Section proposes rule updates to the Air Quality Advisory Council, which consists of nine members appointed by the Governor to represent various Oklahoma stakeholders. After proposed rule changes have been open for public review and comment, public hearings are held. If a rule change is approved by the Council, it is recommended to the Oklahoma Environmental Quality Board. Once adopted by the Board, the new rules proceed to the State Legislature and the Governor for final approval.

Upcoming Air Quality Advisory Council meeting dates, proposed rules and agendas can be found here.

Click here for a Quick Reference Guide to Public Participation in the Air Quality Rulemaking Process!



← → http://www.deq.state.ok.us/aqdnew/index.htm#

File    Edit    View    Favorites    Tools    Help

👍 🔁 Update email Password  🔵 NACAA  🔵 IT  🔁 Welcome to the Oklahom...  🔵 Air Markets Program Data...  🔵 Mesonet Ho

**Oklahoma Department of Environmental Quality**    RULES & REGULATIONS | PUBLICATIONS & FORMS | PROGRA

air quality • water quality • land protection • state environmental laboratory services • environmental comp



Forms

Multimedia

What's New

Air Rules

Education

Clean
Diesel/Funding

Lead-Based
Paint

Contact AQD

AQD Site Index

**Excess
Emissions
Reporting**

**Environmental
Complaints**

## Welcome to the Air Quality Division

SIP COMMENTS | AIR REPORT | SMOKE | VOLKSWAGEN | OCTOBER COUNCIL

*Open for Comments:*

*Clean Air Act §110(a)(2) Infrastructure
State Implementation Plan
2015 Primary and Secondary Ozone
National Ambient Air Quality Standards*

We are taking comments until noon September 17, 2018 on our infrastructure review for implementing the 2015 changes to the Primary and Secondary Ozone NAAQS. *No request for a public hearing was received by the close of the 30-day notice period. Therefore, there will be no hearing.*

Documents Are Posted On Our I-SIP Page

**What is air quality?**
The amount of pollution in the air from all sources - natural and human - defines the quality of the air we breathe. Air pollution isn't limited to our cities; it can blow into any part of Oklahoma from neighboring states.

**Why is it important?**
Bad air quality can affect everybody's health. It can have direct effects on the lungs, and it can worsen an existing condition, such as asthma. Some people are more sensitive to air pollution than others. These include young children who are growing rapidly and older adults who have reduced immune systems.

Poor public health also incurs economic costs for society, e.g., increased healthcare costs and loss of working days. And a clean environment makes Oklahoma an attractive place to live, work and play: something we can all be proud of.

**What does the Air Quality Division do?**
Most importantly, we work to effectively *protect the public health in Oklahoma*. We do this by:

• Monitoring the air quality across Oklahoma and warning and advising the

http://www.deq.state.ok.us/aqdnew/RulesAndPlanning/Infrastructure_index.htm

        



http://www.deq.state.ok.us/aqdnew/RulesAndPlanning/index.htm

File    Edit    View    Favorites    Tools    Help

Update email Password    NACAA    IT    Welcome to the Oklahom...    Air Markets Program Data...    Mesonet Home Page    Web Slice G



**Oklahoma Department of Environmental Quality**    RULES & REGULATIONS  PUBLICATIONS & FORMS  PROGRAMS

air quality * water quality * land protection * state environmental laboratory services * environmental complaints & local servic



Forms

Multimedia

What's New

Air Rules

Education

Clean
Diesel/Funding

Contact AQD

AQD Site Index

## Air Quality Rules & Planning

**Ozone Infrastructure SIP Open for Comments and Hearing Requests:** AQD is taking comments and hearing requests on the proposed certification that Oklahoma has adequate resources and authority to implement, maintain, and enforce the 2015 Ozone National Ambient Air Quality Standards (NAAQS). The comment period runs through noon on Monday, September 17th. A hearing (if one is requested by 10:00 a.m. Friday, 9/14/2018) would be held on Monday, September 17, 2018 from 10:00 a.m. to 12:00 noon in DEQ's 1st Floor Multipurpose Room. See the linked public notice, proposed "infrastructure review" checklist, Good Neighbor support document, and draft certification letter for more specifics. You may check this website or call 405-702-4100, 24 hours prior to the scheduled hearing time, to find out if it is cancelled. **Posted August 14, 2018**

Notice of Cancellation of Public Hearing: No request for a public hearing was received by the close of the 30-day notice period (8/15/2018 - 9/14/2018) on the proposed certification. Therefore, the hearing scheduled for Monday, September 17, 2018 has been cancelled, as provided for in the above notice. The division will continue to accept comments on the proposal until noon, Monday, September 17, 2018. **Posted September 14, 2018**

**What is a State Implementation Plan?**
The State Implementation Plan (SIP) lays out goals and procedures to protect the state's air quality. The federal Clean Air Act (CAA), which became law in 1971 and was amended in 1990, provides the national framework for efforts to protect air quality. The US EPA has delegated most of the available programs for implementing and enforcing the act to the Air Quality Division of DEQ. Regulation at the state level means that local needs and conditions are better understood, responded to, and managed.

Oklahoma's EPA-approved SIP lays out the goals and procedures for the daily operations of AQD. It includes the Oklahoma Air Quality Rules and other strategies developed at the state level for implementing the various federal air quality programs. The core focus of the air quality program is to implement, maintain, and enforce the National Ambient Air Quality Standards (NAAQS). The SIP is regularly reviewed and amended as necessary. In addition, EPA requires the state to demonstrate that the SIP meets the "infrastructure" requirements of CAA Section 110(a)(2) (A)-(M) each time a NAAQS is issued or revised. These "infrastructure SIPs", or I-SIPs, are posted for public comment on this page when proposed, and are then archived on the I-SIP page once they are finalized and submitted to EPA.

**How are Oklahoma's Air Quality Rules Made?**
The AQD Rules and Planning Section proposes rule updates to the Air Quality Advisory Council, which consists of nine members appointed by the Governor to represent various Oklahoma stakeholders. After proposed rule changes have been open for public review and comment, public hearings are held. If a rule change is approved by the Council, it is recommended to the Oklahoma Environmental Quality Board. Once adopted by the Board, the new rules proceed to the State Legislature and the Governor for final approval.

Upcoming Air Quality Advisory Council meeting dates, proposed rules and agendas can be found here.

Click here for a Quick Reference Guide to Public Participation in the Air Quality Rulemaking Process!

**Smoke Management Plan**

        

## Draft Section 110 Infrastructure SIP Certification
## 2015 Primary and Secondary Ozone NAAQS

Given below is draft language for the body of the certification letter.  The language would be provided to the Governor's office to assist in preparing the certification letter for the Governor's signature or her designee (e.g., the Secretary of Energy and Environment).

Draft Section 110 Infrastructure SIP Certification
2015 Primary and Secondary Ozone NAAQS

Sections 110(a)(1) and (2) of the Clean Air Act requires that each state review and revise as necessary its SIP following promulgation of a revised National Ambient Air Quality Standards (NAAQS) (See U.S.C. § 7410(a)(1) and (2)).  On October 1, 2015, the EPA administrator signed the Primary National Ambient Air Quality Standards for Ozone (80 Fed. Reg. 65292, October 26, 2015).   EPA issued the "Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2)" in September 2013.  Under this guidance, states may certify that their existing SIPs meet the "infrastructure" elements of § 110(a)(2), rather than submitting a revised SIP for the revised NAAQS such as the 2015 Ozone NAAQS. Oklahoma's SIP is codified in 40 CFR Part 52, Subpart LL.

On behalf of the State of Oklahoma, I hereby certify that, as indicated in the enclosed table titled "Oklahoma's State Implementation Plan (SIP) Submittal 'Infrastructure' Checklist," and the enclosed Technical support document titled "Oklahoma Demonstration of Compliance with the Good Neighbor Requirements of Clean Air Act Section 110(a)(2)(D)(i)(I) for the 2015 Ozone National Ambient Air Quality Standard," Oklahoma's SIP meets the infrastructure and Good Neighbor obligations for the 2015 Primary and Secondary Ozone NAAQS.  To date, the only SIP change required to meet the revised 2015 Ozone NAAQS was a revision to Appendix E and F of OAC 252:100, to add the new 8-hour Ozone standard [CAA § 110(a)(2)(H)], which became effective September 15, 2016.

State public participation procedures for such SIP submittals were submitted to EPA for review under 40 CFR § 51.102. In a letter dated August 23, 2012, EPA concurred that Oklahoma's procedures are consistent with the requirements of 40 CFR § 51.102 and associated guidance. Public notice for this submittal was posted on DEQ's web site on August 15, 2018, to allow the opportunity to provide comments and to request a public hearing scheduled for September 17, 2018 at DEQ's Central  Office, 707 North Robinson, Oklahoma City, Oklahoma, 73102.

*Either Passage #1 or #2 will be included in the letter depending upon whether public hearing was conducted.*

#1 No hearing request was received during the minimum 30-day comment period (8/15/18 – 9/14/18).  Therefore, a notice of hearing cancellation was published on DEQ's website on September 14, 2018.  Attached is documentation of this public notice of cancellation and comment submittal process.

#2 DEQ conducted a public hearing on September 17, 2018.  A copy of the transcript from that hearing is included.   Also attached are copies of comments received during the comment period and a Response to Comments document.  It is our understanding that the final results of EPA's review of this submittal will be determined through rulemaking and will be published in the *Federal Register*.

Please note that Oklahoma currently has no designated Ozone nonattainment or maintenance areas so no nonattainment plans are due.

# Oklahoma Demonstration of Compliance
# with the Good Neighbor Requirements of
# Clean Air Act Section 110(a)(2)(D)(i)(I)
# for the 2015 Ozone National Ambient Air Quality Standard

## October 2018

Oklahoma Department of Environmental Quality
707 N Robinson
Oklahoma City, OK 73101

[This page intentionally left blank.]

# Table of Contents

1.0. Introduction ........................................................................................................................ 1

2.0. Request ............................................................................................................................... 1

3.0. Background ......................................................................................................................... 2

4.0. Ozone ................................................................................................................................. 4

4.1. Formation ........................................................................................................................... 4

4.2. Ozone Precursors – NOx and VOC .................................................................................. 4

4.3. EPA's Designation Process ................................................................................................ 5

4.4. Transport Modeling ............................................................................................................ 6

4.4.a. EPA ................................................................................................................................. 6

4.4.b. Texas Commission on Environmental Quality ............................................................... 6

4.5. New Information on Analytical Approaches ..................................................................... 7

4.6. Ozone Transport Assessment for Good Neighbor SIPs 4-step framework ...................... 10

4.7. EPA Modeling Data ........................................................................................................... 10

5.0. Weight of Evidence ........................................................................................................... 14

6.0. Conclusions ....................................................................................................................... 15

**Oklahoma Demonstration of Compliance**
**with the Good Neighbor Requirements of**
**Clean Air Act Section 110(a)(2)(D)(i)(I)**
**for the 2015 Ozone National Ambient Air Quality Standard**

## 1.0.    Introduction

Sections 110(a)(1) and (2) of the Clean Air Act (CAA) require all states to adopt and submit to the Environmental Protection Agency (EPA) any necessary revisions to its State Implementation Plans (SIP) which provide for the implementation, maintenance, and enforcement of a new or revised National Ambient Air Quality Standard (NAAQS). Such revisions are commonly referred to as "infrastructure SIPs." The EPA revised the ozone NAAQS in October 2015 and completed the designation process to identify most nonattainment areas in April 2018, and finalized designations on July 25, 2018. The Oklahoma Department of Environmental Quality (DEQ) is submitting this document to satisfy the transport SIP requirements of CAA Section 110(a)(2)(D)(i)(I), which is commonly referred to as the "Good Neighbor" provision.

## 2.0.    Request

CAA section 110(a)(2)(D)(i)(I) prohibits emissions from states that will contribute significantly to nonattainment or interfere with maintenance in any other state with respect to any primary or secondary NAAQS. However, EPA stated in the notice for the Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS ("2016 CSAPR Update"), that "… EPA does not view the obligation under the good neighbor provision as a requirement for upwind states to bear all of the burden for resolving downwind air quality problems. Rather, it is an obligation that upwind and downwind states share responsibility for addressing air quality problems. If, after implementation of reasonable emissions reductions by an upwind state, a downwind air quality problem persists, whether due to international emissions or

emissions originating within the downwind state, the EPA can relieve the upwind state of the obligation to make additional reductions to address that air quality problem. But the statute does not absolve the upwind state of the obligation to make reasonable reductions in the first instance." [81 Fed. Reg. 74536, 26 Oct 2016]

The State of Oklahoma, through DEQ, is requesting the EPA to approve the *Oklahoma Demonstration of Compliance with the Good Neighbor Requirements of Clean Air Act Section 110(a)(2)(D)(i)(I) for the 2015 Ozone National Ambient Air Quality Standard* as a revision to the SIP. This revision supplements EPA's *Determination Regarding Good Neighbor Obligations for the 2008 Ozone National Ambient Air Quality Standard* proposal [83 Fed. Reg. 31915, 10 July 2018], in which EPA finds that the 2016 CSAPR Update fully addresses CAA section 110(a)(2)(D)(i)(I) (i.e., "Good Neighbor") requirements for Oklahoma.

## 3.0.   Background

On October 26, 2015, EPA promulgated a revised NAAQS for ozone based on 8-hour average concentrations [80 Fed. Reg. 65292]. EPA revised the level of the 8-hour ozone NAAQS to 0.070 parts per million (ppm). EPA completed the designation process to identify nonattainment areas in April 2018; all areas of Oklahoma were designated as attainment/unclassifiable [83 Fed. Reg. 25825, 4 June 2018].

Pursuant to section 110(a) of the CAA, states are required to submit SIPs to provide for the implementation, maintenance, and enforcement of a new or revised NAAQS within three (3) years following the promulgation of such NAAQS, or within a shorter period as EPA may prescribe. More specifically, section 110(a)(1) provides the procedural and timing requirements for SIPs. Section

110(a)(2) lists specific elements that states must meet for ''infrastructure'' SIP requirements related to a newly established or revised NAAQS. These requirements include basic SIP elements such as requirements for monitoring, basic program requirements, and legal authority that are designed to assure attainment and maintenance of the NAAQS.

On January 28, 2015, DEQ submitted a plan to satisfy the requirements of section 110(a)(2) of the CAA for the 2008 ozone NAAQS. This submittal addressed the following infrastructure elements, or portions thereof: section 110(a)(2)(A), (B), (C), (D), (E), (F), (G), (H), (I), (J), (K), (L), and (M) of the CAA. On December 9, 2016, EPA approved the submittal [81 Fed. Reg. 89008]. DEQ did not make a submittal to address the transport portion, (§110(a)(2)(D)(i)(I)) of the Infrastructure SIP, and on July 13, 2015, [80 Fed. Reg. 39961], EPA made a *Finding of Failure To Submit a Section 110 State Implementation Plan for Interstate Transport for the 2008 National Ambient Air Quality Standards for Ozone* for 24 states, which included Oklahoma. This finding of failure to submit establish a 2-year deadline for EPA to promulgate a Federal Implementation Plan (FIP) to address the interstate transport SIP requirements pertaining to significant contribution to nonattainment and interference with maintenance unless, prior to EPA promulgating a FIP, the state submits, and the EPA approves, a SIP that meets these requirements.

On June 29, 2018, the EPA proposed [83 Fed. Reg. 31915, July 10, 2018] that the 2016 CSAPR Update [81 Fed. Reg. 74504, October 26, 2016] fully addresses 20 states' interstate pollution transport obligations for the 2008 ozone NAAQS. The proposal relies on EPA's latest data and modeling to assess air quality nonattainment and maintenance for the 2008 ozone NAAQS. This analysis found that there are projected to be no remaining nonattainment or maintenance receptors in the eastern United States by 2023. In accordance with this finding, EPA is proposing to determine that the 20 states covered by this proposal would not need to submit SIPs establishing additional control requirements

beyond the 2016 CSAPR Update to address transported ozone and ozone precursors with respect to the 2008 ozone NAAQS. Also, EPA would have no obligation to establish additional control requirements for sources in these states.

## 4.0.   Ozone

### 4.1.   Formation

Ground-level ozone ($O_3$) is a gas that is not usually emitted directly into the air, but is a secondary pollutant formed by the reaction of oxides of nitrogen (NOx) and volatile organic compounds (VOCs) in the presence of sunlight. Many types of sources emit these precursor pollutants, including power plants and industrial facilities, on-road and off-road motor vehicles, engines, and small sources collectively referred to as area sources. Ozone is predominately a summertime pollutant; however, high ozone concentrations have been observed in cold months when snow on the ground reflects ultraviolet light so it makes a double pass through the atmosphere and provides more energy for the ozone formation reaction. Ozone and ozone precursors (NOx and VOCs) can be transported hundreds of miles.

### 4.2.   Ozone Precursors – NOx and VOCs

The Good Neighbor provision of the CAA "provides both the states and the EPA with the flexibility to develop a remedy targeted at a particular air quality problem, including the flexibility to tailor the remedy to address the particular precursor pollutants and sources that would most effectively address the downwind air quality problem."[1] "In order to address the regional transport of ozone…., the EPA has promulgated four (4) regional interstate transport rules focusing on the reduction of NOx

---

[1] Response to December 9, 2013, Clean Air Act Section 176A Petition From Connecticut, Delaware, Maryland, Massachusetts, New Hampshire, New York, Pennsylvania, Rhode Island and Vermont, 82 Fed. Reg. 6516, 19 Jan 2017.

emissions, as the primary meaningful precursor to address regional ozone, from certain sources located in states in the eastern half of the U.S.[2]" The Ozone Transport Assessment Group's (OTAG) Regional and Urban Scale Modeling, and Air Quality Analysis Work Groups concluded, with which EPA agreed, "Regional NOx emissions reductions are effective in producing ozone benefits; the more NOx emissions reduced, the greater the benefit to air quality; and VOC controls are effective in reducing ozone locally and are most advantageous to urban nonattainment areas." The EPA concluded, "a regional strategy focusing on NOx reductions across a broad portion of the region will help mitigate the ozone problem in many areas of the East" [82 Fed. Reg. 6517, 19 Jan 2017].

## 4.3.    EPA's Designation Process

On October 1, 2015, the EPA revised both the primary and secondary NAAQS for ozone to a level of 0.070 ppm; annual fourth-highest daily maximum 8-hour average concentration, averaged over 3 years [80 Fed. Reg. 65292, 26 Oct. 2015]. On November 6, 2017, EPA designated approximately 85% of the counties in the United States as attainment/unclassifiable with the 2015 ozone standard based on 2014 – 2016 design values [82 Fed. Reg. 54232]. EPA completed additional area designations for most of the remaining portions of the United States in accordance with the requirements of CAA section 107(d) on April 30, 2018, [83 Fed. Reg. 25825] and designated eight counties in the San Antonio area on July 25, 2018 [83 Fed. Reg. 35136]. All counties in Oklahoma were designated "unclassifiable/attainment" for the 2015 8-hour ozone NAAQS [82 Fed. Reg. 54232 and 83 Fed. Reg. 25825].

---

[2] Ibid

## 4.4.    Transport Modeling

### 4.4.a.   EPA

EPA has provided air quality modeling using a 2011-base platform to help states address the requirements of CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. This modeling was provided in its *Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 Ozone National Ambient Air Quality Standard* [82 Fed. Reg. 1733, 6 Jan. 2017].

### 4.4.b. Texas Commission on Environmental Quality (TCEQ)

TCEQ has developed modeling specifically to address the 2015 ozone standard Good Neighbor SIP requirements.    The    modeling    results    and    reports    can    be    found    at http://www.deq.state.ok.us/aqdnew/rulesandplanning/o3isip2015/17039SIP_2015OzoneTransport_ado_backup.pdf.

One major way the TCEQ modeling differs from the EPA modeling is that TCEQ uses a 2012 base year instead of a 2011 base year.  DEQ and TCEQ have both submitted comments on the unsuitability of meteorological data from the May through September 2011 episode for ozone modeling in response to several EPA ozone model updates. DEQ specifically submitted comments in response to the *Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 Ozone National Ambient Air Quality Standard* [82 Fed. Reg. 1733, 6 Jan. 2017].  Evidence supporting the fact that 2011 was a meteorologically anomalous year for Oklahoma and Texas is found in Attachment A of the October Memorandum from Peter Tsirigotis, EPA OAQPS, to Regional Air Division Directors, Regions 1-10, entitled *Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State*

*Implementation Plan Submission for the 2015 Ozone National Ambient Air Quality Standards* ("Tsirigotis October 2018 Memo"). 2011 was the hottest year on record, and the single-worst drought year recorded in Texas since 1895.  In Oklahoma, the 2011 ozone season was the warmest on record, with the five-month period from May to September showing a positive temperature departure from the 20th century mean of 5.3 ̊F, and was the third driest period on record.

## 4.5     New Information and Analytical Approaches

On March 27, 2018, EPA issued a Memorandum from Peter Tsirigotis, EPA OAQPS, to Regional Air Division Directors, Regions 1-10, entitled *Information on the Interstate Transport State Implementation Plan Submission for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)* ("Tsirigotis March 2018 Memo"). The Tsirigotis March 2018 Memo provided newly-available contribution modeling results, which are still based on the year 2011, along with a list of potential flexibilities in analytical approaches for developing good neighbor SIPs for the 2015 Ozone NAAQS.

Since EPA developed CSAPR, the original rule and subsequent update were based on EPA's modeling that used a screening threshold of one percent (1%) of the NAAQS to identify contributing upwind states warranting further review and analysis. EPA has acknowledged this threshold represents a policy choice, rather than a health-based threshold grounded in risk assessment.  In essence, this threshold represents a compromise that allowed the responsibilities for upwind reductions to be spread over a sufficiently-large number of states so that no state would be unduly burdened (individually) with requirements for NOx reductions.  Further, in the 2015 transport NODA,[3] the EPA acknowledged that

---

[3] Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 Ozone National Ambient Air Quality Standard (NAAQS), 82 Fed. Reg. 1740 (January 6, 2017).

a contribution of 1% of the NAAQS from an upwind state alone does not determine whether the upwind state significantly contributes to nonattainment or interferes with maintenance of a NAAQS to a downwind state. The 1% threshold represents a screening level and the magnitude of the reductions required were determined by a cost-effectiveness analysis with modeling performed to confirm that the cost-effective reductions would have the desired result (attainment of the ozone NAAQS in all but a handful of downwind monitoring sites). It is entirely possible that estimated emissions reductions resulting from emission controls selected based on the cost-effectiveness analysis would be greater than that required to bring an upwind state below the 1% significance threshold and it is also possible that, after achieving the cost-effective reductions, a state's contributions could remain above the threshold. For the original CSAPR and 2016 CSAPR Update, the 1% threshold represented an effective policy choice that balanced the need to achieve reductions with cost and distributional concerns. This approach was especially well-suited to these rules, because the targeted sector (fossil-fueled Electricity Generating Units – EGUs) represented an especially target-rich environment for cost-effective NOx emission reductions at that time. Many facilities (older coal-fired boilers, natural gas-fired turbines, etc.) were decades old and had not been equipped with simple, cost-effective technologies like low-NOx burners. In addition, the distribution of NOx allowances tipped the economic calculus in favor of dispatching newer, less-polluting units (e.g., combined-cycle turbines with selective catalytic reduction). Because the electric market is regional, it made sense to bring in a larger pool of upwind states to participate in the program to mitigate the possibility that power generation would switch to states left out of the program, yielding increased NOx emissions from nonparticipating facilities that would negate the reductions achieved by participating states.

DEQ concurs with this approach for the original CSAPR and 2016 CSAPR Update, but DEQ believes that transport issues that need to be addressed in response to the adoption of the 2015 ozone NAAQS are more granular and would benefit from a more focused approach. The possibility of using a different

significance threshold was one of the areas of flexibility addressed in the Tsirigotis March 2018 Memo[4], and later in his August 2018 Memo[5].  For the 2015 ozone NAAQS, DEQ believes that 1.0 ppb would be a more appropriate significant impact level for ozone transport.  If EPA recommends a Significant Impact Level (SIL) for ozone of 1.0 ppb for Prevention of Significant Deterioration (PSD) determinations,[6] then the significant impact level for ozone transport should be at least 1.0 ppb. It is illogical to allow a new single source to have a higher impact before requiring additional controls than what is required for an entire state.  DEQ believes this is especially relevant for this transport evaluation, because the previous rulemakings have harvested most of the low-hanging fruit represented by available controls on EGUs, most of which were already equipped with continuous emissions monitoring systems (CEMS) and whose emissions were already reported to the Clean Air Markets Division (CAMD).  Attainment of the 2015 ozone NAAQS will likely require more targeted reductions on smaller sources and enhanced compliance verification on facilities already covered by New Source Performance Standards (NSPS).  For example, states with recalcitrant ozone attainment problems which are experiencing a boom in oil and gas development would do well to address control of NOx and VOC emissions in counties not currently classified nonattainment.  These efforts require a more granular approach, including the adoption of presumptive best available control technologies (BACT) for new installations.  With additional focus on New Source Review (NSR), it is important to use a similar metric to evaluate potential impacts.  Adoption of a 1.0 ppb significance threshold to assess interstate transport would represent a step toward achieving that goal.

---

[4] Memorandum from Peter Tsirigotis, EPA OAQPS, to EPA Regional Air Division Directors, Regions 1-10, "Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program," April 17, 2018.

[5] Memorandum from Peter Tsirigotis, EPA OAQPS, to EPA Regional Division Directors, Regions 1-10, "Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards," August 31, 2018

[6] Also from the April 17, 2018 Tsirigotis memo.

## 4.6    Ozone Transport Assessment for Good Neighbor SIPs 4-step framework

EPA developed a 4-step framework for addressing the requirements of the "Good Neighbor" provision in the CSAPR for the 1997 ozone NAAQS and the 1997 and 2006 $PM_{2.5}$ (particulate matter less than 2.5 microns) NAAQS:

(1) identify downwind receptors that are expected to have problems attaining or maintaining the NAAQS;

(2) determine which upwind states significantly contribute (or are "linked") to the downwind air quality problems;

(3) for states that are "linked," quantify the level of upwind emissions that need to be addressed to satisfy the "Good Neighbor" provision; and,

(4) adoption of permanent and enforceable emission reductions in "linked" upwind states.

EPA has used this 4-step process for each successive ozone standard.

## 4.7 EPA Modeling Data

DEQ utilized the data provided by EPA[7] to perform step one and two above for Oklahoma. We eliminated all sites that had an Oklahoma contribution of less than 0.70 ppb, then eliminated all of the sites that did not have a 2023 average DV, or 2023 maximum DV greater than 70.9 ppb. The result was the six sites listed below:

---

[7] The data EPA obtained from its modeling for the 2015 ozone transport, is located at
https://www.epa.gov/sites/production/files/2018-05/updated_2023_modeling_dvs_collective_contributions.xlsx

| Site ID | County | State | 2023en[8] Average | 2023en Maximum | Oklahoma Contribution |
|---------|--------|-------|-------------------|----------------|----------------------|
| 260050003 | Allegan | MI | 69.0 | 71.7 | 1.31 |
| 481210034 | Denton | TX | 69.7 | 72.0 | 1.23 |
| 484392003 | Tarrant | TX | 72.5 | 74.8 | 1.71 |
| 480391004 | Brazoria | TX | 74.0 | 74.9 | 0.90 |
| 550790085 | Milwaukee | WI | 71.2 | 73.0 | 0.76 |
| 551170006 | Sheboygan | WI | 72.8 | 75.1 | 0.95 |

Next, the flexibility EPA has allowed – a modified step 2, using a Significant Impact Level of 1.0 ppb – would eliminate three sites from consideration, and leave only the three sites listed below that need further review and analysis of any Significant Impacts from Oklahoma emissions:

| Site ID | County | State | 2023en Average | 2023en Maximum | Oklahoma Contribution |
|---------|--------|-------|----------------|----------------|----------------------|
| 260050003 | Allegan | MI | 69.0 | 71.7 | 1.31 |
| 481210034 | Denton | TX | 69.7 | 72.0 | 1.23 |
| 484392003 | Tarrant | TX | 72.5 | 74.8 | 1.71 |

To address its responsibilities for the interstate transport of ozone, TCEQ performed ozone modeling using a 2012 base year. The TCEQ future year modeling used growth and control factors based on projected growth in the demand for goods and services, along with the reduction in emissions expected from state, local, and federal control programs. This modeling data can be found at: http://www.deq.state.ok.us/aqdnew/rulesandplanning/o3isip2015/texas_ot_2023_dvf_with_state_contributions.xlsx. In this spreadsheet, note that the 2023 design value for Denton County TX (481210034) is 68 ppb, and Tarrant County TX (484392003) is 66 ppb. The modeling performed by Texas demonstrates that both of these sites are in attainment in the year 2023, and therefore there is no need to assess the impact of interstate transport on these sites.

---

[8] Note, 2023en is the scenario name for the updated EPA modeling.

In the TCEQ modeling, Texas used an alternative method for developing Maintenance DVs, using annual 4th high values for years 2012 through 2014. The 2012 through 2014 DVs for the Denton and Tarrant county monitoring sites are 81 and 77.7 ppb respectively. Using the EPA method of the highest DV of the three DVs surrounding the base year, the DVs for Denton and Tarrant County monitoring sites are both 87 ppb. Applying the Relative Reduction Factors (RRF) of 0.813 and 0.803 respectively, the 2023 DVs for these sites are 65.9 and 62.4 for the Texas method, and 70.7 and 69.9 for the EPA method. Although Texas's modeling shows a greater reduction, both sites demonstrate attainment in 2023 using either EPA's or Texas's method.

The TCEQ "Transport Demonstration for Ozone" assesses the impacts of anthropogenic emission sources that are the largest contributors of NOx in the 10-county Dallas-Fort Worth ozone nonattainment area.[9] Figure 2-5 of the TCEQ SIP shows that mobile sources represent the largest source category (67,595 tons in 2014 out of 125,981 tons total). However, anthropogenic NOx contributions regionally, and mobile sources in particular, have decreased significantly since 2005 (where mobile NOx sources contributed 138,704 tons and anthropogenic sources totaled 232,311 tons). The mobile source fleet turnover in the Dallas-Ft Worth area is responsible for approximately a 1 ppb per year reduction in ozone. These trends are expected to continue as newer vehicles continue to replace existing vehicles over the next 5 years. Extrapolating from recent trends, it is expected that the Denton and Tarrant sites will be in attainment by 2023.

Data relating to the remaining site to examine, Allegan County Michigan, is listed below.

---

[9] The link to the TCEQ Transport SIP was provided on page 6 of this document.

| Site ID | County & State | 2023en Average | 2023en Maximum | Oklahoma Contribution | International Contribution | Initial & Boundary |
|---------|---------------|----------------|----------------|----------------------|---------------------------|--------------------|
| 260050003 | Allegan, MI | 69.0 | 71.7 | 1.31 | 0.54 | 11.85 |

The 2023en Average value is below 71 ppb, which means this site is assumed to demonstrate attainment by 2023. Since the 2023en Maximum is above 71 ppb, it is assumed to be a maintenance area in 2023. The DV for the Allegan site has had a substantial reduction in the last 6 years from 84 ppb in 2012 to 73 ppb in 2017, a 1.8 ppb per year decrease. The Allegan county site is substantially influenced by mobile sources from the Chicago area, and like the DFW area, these emissions are expected to be greatly reduced in the near future, by roughly a 1 ppb per year decrease, leading to Attainment for the Allegan site.

A flexibility provided by EPA in the Tsirigotis March 2018 Memo was to determine a state's share of the ozone in excess of the standard for the downwind monitor to determine the amount of ozone reduction they are modelled to be responsible for. In the EPA modelling, the sum of contributions from all upwind states to the Allegan site is 42.90 ppb, and the Oklahoma contribution is 1.31 ppb, which is 3%. We believe that our weight-of-evidence approach (below) is sufficient to demonstrate trends that will bring the Allegan County site into attainment by 2023. However, even if that analysis was rejected, the relatively small contribution from Oklahoma (3% of total upwind state contributions) combined with the distance between Oklahoma sources and the receptor, warrants a focus on nearby states with greater proportional contributions as the most prudent approach to addressing interstate transport of ozone precursors.

## 5.0 Weight of evidence

Due to the emission reductions required by rules like CSAPR, the 2016 CSAPR Update, and the regional haze requirements, the NOx emissions from electric generation in Oklahoma has dropped significantly during the ozone season in the last seven years. Oklahoma EGU Acid Rain Ozone Season Emissions are listed below:

| Oklahoma EGU Acid Rain Ozone Season Emissions | |
|---|---|
| Year | NOx Emissions TPY |
| 2011 | 38,285 |
| 2012 | 31,242 |
| 2013 | 23,462 |
| 2014 | 16,230 |
| 2015 | 12,997 |
| 2016 | 12,163 |
| 2017 | 10,435 |

The Southwest Power Pool (SPP) footprint changed in 2015 from part or all of 8 mostly central and southern states to 13 states, including Montana, North and South Dakota, and Wyoming. The SPP runs a day-ahead market to provide the lowest cost electricity possible. This means that in the summertime when the southern states are in need of additional generation, the northern states can supply it, reducing emissions in the southern states on high electric demand days.

Electric generation in the state of Oklahoma in the last 8 years has been very dynamic, with the changes in the SPP, building of additional windfarms, and electric utilities installing solar generation facilities having all led to NOx reductions for the state.

The low-cost emission reductions have been obtained from the electric generation sector, and any additional reductions would require more costly emission controls.

Due to time and resource constraints, the modelling EPA performed for the states to use for Good Neighbor SIPs, used a 2011 base year (performing a 12 year projection to 2023), and therefore the Maintenance Monitor calculations were based on the Maximum design value for years 2009 through 2013. The value for the Allegan County monitor was 86 ppb (4 ppb higher than any other Michigan monitor). If the modelling were performed using a 2016 base year (performing a 7 year projection), the Maintenance monitor design value would have been 75 ppb. Assuming a constant rate of reduction, 86 ppb minus 71.7 ppb (future year modelled value) equals a 14.3 ppb difference. 14.3 divided by 12 (years) equals a 1.1917 ppb reduction per year from EPA's modeling. Applying the 1.1917 ppb per year reduction to the 2016 Allegan County Maximum design value of 75 ppb, results in a 66.66 ppb Design Value in the seventh year (2023) , easily demonstrating attainment.

Oklahoma anthropogenic NOx and VOC data provided as supporting data for the previously mentioned Tsirigotis October 2018 Memo demonstrate a substantial reduction of NOx and VOC from 2011 to 2023. The reductions for NOx are from 405,000 to 235,000 tpy and VOC are from 414,000 to 295,000 tpy. These reductions should result in considerable ozone reductions.

## 6.0 Conclusions

DEQ has control measures in place to address ozone precursor emissions and these measures have resulted in significant decreases in 8-hour ozone design values in Oklahoma. The average reduction in 8-hour ozone design values for the State of Oklahoma monitoring sites is 0.79 ppb per year for the last 15 years (2004 – 2017). Additional NOx controls would not be cost effective.

Also, DEQ has a robust, SIP-approved NSR permitting program and therefore has met the CAA infrastructure requirements relating to PSD. The DEQ has also determined that Oklahoma meets the

visibility transport provisions for the 2015 ozone NAAQS, as the state is not contributing significantly to nonattainment or maintenance issues in any other state.

In conclusion, this SIP revision demonstrates that Oklahoma meets the interstate transport requirements of CAA section 110(a)(2)(D)(i)(I) as well as the requirements of section 110(a)(2)(D)(i)(II) for PSD and visibility protection, and the interstate pollution abatement and international air pollution requirements of section 110(a)(2)(D)(ii) without further reductions.

# Summary of Comments and Responses

**Oklahoma's I-SIP Submittal for the Oklahoma Demonstration of Compliance with the Good Neighbor Requirements of Clean Air Act Section 110(a)(2)(D)(i)(I) for the 2015 Ozone National Ambient Air Quality Standard**

DEQ received no request for a public hearing during the notice period, therefore, as stated in the public notice, a hearing was not held. One set of comments was received on September 17, 2018 from Guy Donaldson, Associate Director for Air, Multimedia Division, EPA Region 6. EPA's comments were limited to the "Good Neighbor" transport portion of the SIP submittal and all page numbers below are references thereof.

1. **COMMENT:**
**Section 4.5 New Information and Analytical Approaches**
EPA suggests factoring in information from the EPA memo of August 31, 2018, "Analysis of Contribution Thresholds for use in Clean Air Act Section 110(a)(2)(D)(i)(I)Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards."

**RESPONSE:** We have added a reference to the memo on page 9.

2. **COMMENT:**
**Section 4.7 EPA Modeling Data**
EPA suggests an evaluation of the collective contribution in the Dallas/Ft. Worth (DFW) and Allegan, Michigan areas. Also, EPA is interested in Oklahoma's recommendations on whether different contribution thresholds are appropriate based on regional differences in the nature or extent of the transport problem.

**RESPONSE:** The first sentence of this comment is addressed on pages 12 and 13. As for the second sentence in this comment, Oklahoma as not analyzed the regional differences in the nature or extent of the transport problem, so for now, we have no recommendation on whether different contribution thresholds are appropriate.

3. **COMMENT:**
**Section 4.7 EPA Modeling Data**
It would be helpful to add additional discussion about the differences between the EPA and TCEQ' s modeling results and why the two modeling approaches reach different conclusions regarding whether monitors in DFW will be in attainment in 2023 and whether the DFW area monitors should be considered maintenance receptors. This discussion should also include evaluation of the difference between the EPA and TCEQ's maintenance receptor methodology calculations and the ozone conduciveness of the 2011 vs. 2012 period.

**RESPONSE:** Most of page 12, and the first paragraph of page 13 was added to address these comments.

**4.  COMMENT:**
**Section 4.7 EPA Modeling Data**
As weight of evidence in support of Oklahoma's conclusion that the DFW monitors will be in attainment and should not be considered maintenance receptors, EPA also suggests evaluation of recent ozone levels coupled with monitoring trends and modeling analyses for the DFW area. When considering recent monitoring data, please assess whether the recent period was conducive to ozone formation. The TCEQ monitoring analyses indicate that DFW 8-hour ozone monitoring values have been dropping at a rate of over 1 ppb/year largely due to mobile fleet turnover which is also supported by past TCEQ modeling for future years 2017 and 2018. Much of this information can be found in recent TCEQ Attainment Demonstration SIP submittal materials for the DFW area, which also include conceptual model and analyses of high ozone events in DFW.

 **RESPONSE:**  We provide a link to the Texas Good Neighbor SIP data and documents on page 6.  We address the annual decrease in ozone on page 12.

**5.  COMMENT:**
**Section 4.7 EPA Modeling Data**
EPA notes the TCEQ modeling which Oklahoma is relying upon for its SIP has Allegan projected to be a nonattainment receptor in 2023 and the EPA's modeling has Allegan projected to be a maintenance receptor. Oklahoma may want to consider recent DV trends at Allegan (2015-2017 is 73 ppb) and any information on ozone formation and DV trends due to fleet turnover, etc. that could support a conclusion that the Allegan monitor will be in attainment in 2023 and should not be considered a maintenance receptor.

**RESPONSE:**  We address this on pages 12 and 13.

**6.  COMMENT:**
**Section 4.7 EPA Modeling Data**
Regarding international contributions, EPA suggests that a conclusion that the monitor will not have attainment or maintenance issues in 2023 will require a more fulsome discussion with respect to the relative contributions of anthropogenic international emissions and upwind domestic anthropogenic emissions, and such discussion should address why it is technically and legally supportable to "subtract I00%" of anthropogenic and non-anthropogenic contributions from Canada and Mexico as well as 2% of the initial and boundary contribution.

**RESPONSE:**  On page 12 we used other arguments to substantiate our case that the Allegan county site will gain attainment by 2023.

**7.  COMMENT:**
**Section 4.7 EPA Modeling Data**
The proposed SIP revision indicates that reductions of nitrogen oxide emissions from Oklahoma electric generators to comply with the 2016 Cross-State Air Pollution Rule Update should be enough to address any Oklahoma obligation to reduce emissions that interfere with maintenance of the 2015 ozone NAAQS at the Allegan receptor. The EPA did estimate these

CSAPR emission reductions and take them into account in the 2023 EPA modeling. If there are additional reductions in NOx and/or VOC emissions at Oklahoma EGUs or other industry sectors that have not been included in the EPA's 2023 modeling, please provide details on the sources and reason for additional reductions, amount of additional reduction, some relative comparison to total emissions for their industry sector(s) in Oklahoma and how these additional reductions might meet any transport obligations. EPA understands that Oklahoma's EGU sector may have recently switched to a market based dispatch system and it may help to explore if this will result in changes in NOx emissions in the future compared to the EPA's projections.

**RESPONSE:**  These comments are addressed on page 14.

**8.  COMMENT:**
**Section 4.7 EPA Modeling Data**
Finally, EPA notes that the EPA's analysis does indicate impacts from Oklahoma emissions on DFW and Allegan monitors. Because of these potential impacts, Oklahoma may wish to consider proceeding to step 3 of the transport framework and considering whether there are reasonable controls that might be implemented to assure the state meets the Clean Air Act's transport requirements.

**RESPONSE:**  Oklahoma believes that the 2016 CSAPR Update is the only reasonable control warranted based on Oklahoma's limited contributions to the DFW and Allegan County monitors.

**EXHIBIT 7**

EPA Region 6, 2015 8-Hour Ozone Transport SIP Proposal, Technical Support

Document ("TSD"), EPA-R06-OAR-2021-0801 (Feb. 2022)

**EPA REGION 6**

**2015 8-HOUR OZONE TRANSPORT SIP PROPOSAL**

**TECHNICAL SUPPORT DOCUMENT**

**FDMS Docket No. EPA-R06-OAR-2021-0801**

**February 2022**

**By**

**Erik Snyder**

**Lead Regional Air Quality Modeler**

**EPA Region 6 – Dallas, TX**

# Contents

Introduction ............................................................................................................................... 3

1. Maintenance Receptor Methodology .................................................................................. 4

    1.a. Use of Single DV To Project Maintenance Receptors ......................................... 4

    1.b. Review of History of EPA's Guidance .................................................................. 10

    1.c. Relative Effects of Long-Term Emissions Trends ................................................ 12

    1.d. Meteorological Adjusted Trends Analysis of 2010-2014 Monitored Ozone Data ........... 31

2. Potential Underestimation of Projected Design Values and Model Performance Evaluation ......
............................................................................................................................................ 38

    2.a. Potential Underestimation in TCEQ's Modeling 2023 Future year projections at DFW &
    HGB receptors and High DV monitors ....................................................................... 39

    2.b. Potential Underestimation in TCEQ's 2023 Future year projections at downwind areas . 44

    2.c. Model Performance Evaluation of TCEQ's 2012 base case at downwind areas in the
    Midwest and West .......................................................................................................... 51

    2.d. Model Performance Evaluation of TCEQ's 2012 base case at DFW and HGB monitors 57

    2.e. Summary ................................................................................................................ 66

3. Comparison of TCEQ and EPA 2023 future modeling and identified maintenance and
nonattainment receptors ......................................................................................................... 67

4.     Other Potential Modeling Concerns ................................................................................ 72

    4.a. EGU Emissions ..................................................................................................... 72

    4.b. Contribution Calculation ...................................................................................... 73

    4.c. Future Year Boundary Conditions ........................................................................ 76

5. TCEQ Other Factor Analysis (Weight of Evidence) ......................................................... 76

    5.a. TCEQ indicated that there are problems with DV trends ..................................... 78

    5.b. TCEQ evaluated the number of elevated ozone days (over 70 ppb) annually for monitors
    in the Denver and Southern California areas. ............................................................... 81

    5.c. TCEQ Back Trajectory Analysis .......................................................................... 81

    5.d. Texas contribution on all days in 2023 with ozone greater than 70 ppb. ............. 86

    5.e. Collective Interstate Contribution to Future DV ................................................... 89

    5.f. TCEQ also performed Direct Decoupled Method (DDM) modeling for receptors in
    Colorado ....................................................................................................................... 92

    5.g. Southern California Ozone Conceptual Model ..................................................... 97

    5.h. Summary ............................................................................................................... 97

6. EPA Summary .................................................................................................................. 99

**Introduction**

This Technical Support Document (TSD) provides additional analysis of the Texas Commission on Environmental Quality's (TCEQ) air quality modeling relied upon in its August 17, 2018, State Implementation Plan (SIP) submission addressing interstate transport obligations for the 2015 ozone national ambient air quality standards (NAAQS). As discussed in the notice of proposed disapproval, the EPA has identified several concerns with the reliability of TCEQ's modeling and the application of those modeling results in assessing Texas's potential contributions to downwind ozone. States are free to develop their own modeling in support of SIP submissions. That modeling, its application, and other technical analyses must be technically supportable, and the EPA is obligated to assess and evaluate the reliability of each state's technical demonstration when determining whether the Clean Air Act's (the Act, or CAA) requirements are met. Based on the EPA's evaluation of the SIP submission, the EPA is proposing to find that TCEQ's August 17, 2018, SIP submission does not meet the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state. *See* Federal Register Notice, "Air Plan Disapproval; Arkansas, Louisiana, Oklahoma and Texas; Interstate Transport of Air Pollution for the 2015 8-hour Ozone National Ambient Air Quality Standards" (Docket ID No. EPA-R06-OAR-2021-0801; proposed action). Certain legal, policy, and technical bases for that determination are discussed in the preamble of the notice of proposed disapproval. In addition, the Oklahoma Department of Environmental Quality (ODEQ) also relied on TCEQ's modeling analysis in their SIP. Thus, the EPA's concerns with TCEQ's modeling also impact the approvability of the Oklahoma 2015 Ozone Transport SIP. The EPA's further assessment and evaluation of the reliability of the technical demonstration in TCEQ's SIP is discussed in this

document. In Section 1, we evaluate TCEQ's maintenance receptor methodology. In Section 2, we analyze TCEQ's modeling results, both future year projections and base case model performance. In Section 3, we provide results of EPA's modeling and analyze results of TCEQ's modeling compared with recent monitoring data. In Section 4, we analyze other potential concerns with TCEQ's modeling analysis. In Section 5, we evaluate TCEQ's other factors analysis. In Section 6, we summarize our technical evaluation.

## 1.    Maintenance Receptor Methodology

As discussed in Section V.A of the notice of proposed disapproval, in addition to the use of an alternative modeling platform, TCEQ also created its own method for identifying maintenance receptors. This section of the TSD provides further discussion as to why the EPA proposes TCEQ has not provided a sufficient technical basis for its chosen method. In subsection 1.a, we evaluate the effect of using TCEQ's approach and find that it produces anomalous results. In subsection 1.b, we review the history of EPA's modeling guidance recommending the use of a 5-year (i.e., spanning three design values) rather than a 3-year (i.e., only one design value) base period. In subsection 1.c, we evaluate inter-annual variation in design values (DVs) due to meteorological variability and long-term ozone trends due to emissions trends. In subsection 1.d, we analyze meteorological adjusted ozone concentrations for the 2010-2014 period.

### *1.a. Use of Single DV To Project Maintenance Receptors*

As explained in the preamble, in defining maintenance receptors, TCEQ used only the most recent DV of the set of three DVs it relied on for its base period modeling, regardless of whether that most recent design value was the highest of the three. TCEQ's proffered explanation for using the most recent DV to identify maintenance receptors was that the latest

DV "takes into consideration both meteorological variability (since the latest regulatory design value is itself an average of the fourth highest measured concentrations for three years) and any emissions reductions that might have occurred."[1] However, as discussed below, the EPA does not believe this approach adequately takes into account meteorological variability in identifying those areas that are projected to meet the NAAQS but may nevertheless struggle to maintain the NAAQS.

To develop a better technical understanding of the effects of TCEQ's approach (in addition to those reasons presented in the preamble), the EPA conducted a review of potential receptors to which Texas has been linked in differing modeling analyses. The EPA identified 21 potential receptors to which Texas contributed 0.7 parts per billion (ppb) or more in either EPA's 2016v2-based modeling for 2023, or TCEQ's 2012-based modeling for 2023. The EPA then evaluated the results of using TCEQ's alternate maintenance methodology. To identify nonattainment receptors, the nonattainment methodology calculates 2023 average DVs (also referred to as 2023 Nonattainment DVs) using the 5-year center weighted average ambient design values centered on the base modeling years and the Relative Response factors (RRFs).[2]

In Table 1.1 below, the EPA compiled the 2023 average DVs used for identifying nonattainment receptors, for potential receptors in Illinois, Wisconsin, Colorado, Arizona, and California. The EPA then utilized TCEQ's 2012-based modeling results to obtain the data needed to calculate 2023 maintenance DVs using TCEQ's approach.

---

[1] TCEQ Interstate Transport State Implementation Plan Revision for the 2015 Ozone National Ambient Air Quality Standards, August 17, 2018 (TCEQ SIP Submission) at pages 3-39 to 3-40.
[2] The approach used by TCEQ for identifying nonattainment receptors is consistent with EPA's air quality modeling guidance. U.S. Environmental Protection Agency, 2018. Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM2.5, and Regional Haze, Research Triangle Park, NC, included in Docket ID No. EPA-HQ-OAR-2021-0663.

Of the identified 21 receptors, 15 receptors would have 2023 DVs based on TCEQ's methodology for identifying *maintenance* receptors that are lower than the 2023 average DVs at these same locations using the methodology for identifying *nonattainment* receptors. This is highly anomalous since the maintenance methodology should result in either equal or slightly higher 2023 DVs than the methodology to identify future year nonattainment receptors in order to capture conditions under which areas expected to be in attainment may still struggle to maintain the NAAQS. The EPA found that, under TCEQ's method, of these 15 receptors, three have 2023 maintenance DVs that are 3 ppb lower than their 2023 nonattainment methodology DVs, five have 2023 maintenance DVs that are 2 ppb lower than their 2023 nonattainment methodology DVs, and seven receptors have 2023 maintenance DVs that are 1 ppb lower than their 2023 nonattainment methodology DVs. In fact, TCEQ's method identified one receptor in their SIP submission as a nonattainment receptor in 2023 that it separately characterized under its maintenance methodology as not having a problem maintaining the NAAQS.

In comparison, using the EPA's maintenance methodology and EPA's 2016v2 modeling results all 21 2023 maintenance DVs have maximum DVs that are equal to or up to 4 ppb higher than the 2023 nonattainment DVs. (Again, the EPA uses the average of the three DVs that contain the base year modeled for the nonattainment methodology and the maximum of these three DVs for the maintenance methodology.) Under the EPA's methodology all nonattainment receptors are also considered to be maintenance receptors.

**Table 1.1 Comparison of Nonattainment methodology (Avg DV) and Maintenance methodology results for receptors identified by EPA and TCEQ in modeling of 2012 and 2016 base case years.**

| Receptor (AQS Monitor ID, County, State) | TCEQ 2023 Average DV (ppb) | TCEQ 2023 Maintenance DV (ppb) | TCEQ DV Delta (Maintenance - Average) (ppb) | EPA 2023 Average DV (ppb)[3] | EPA 2023 Maximum DV (ppb)[4] | EPA DV Delta (Maximum - Avg) (ppb) |
|---|---|---|---|---|---|---|
| 80350004, Douglas, CO | 73 | 72 | -1 | 71 | 72 | 1 |
| 80590006, Jefferson, CO | 72 | 73 | 1 | 72 | 73 | 1 |
| 80590011, Jefferson, CO | 71 | 71 | 0 | 73 | 74 | 1 |
| 80690011, Larimer, CO | 72 | 71 | -1 | 71 | 72 | 1 |
| 80050002, Arapahoe, CO | 70* | 71 | 1 | 68 | 68 | 0 |
| 40038001, Cochise, AZ | 71 | 69** | -2 | - | - | - |
| 60371201, Los Angeles, CA | 80 | 78 | -2 | 82 | 85 | 3 |
| 60371701, Los Angeles, CA | 80 | 82 | 2 | 85 | 88 | 3 |
| 60376012, Los Angeles, CA | 87 | 86 | -1 | 91 | 93 | 2 |
| 60658001, Riverside, CA | 88 | 85 | -3 | 89 | 90 | 1 |
| 60658005, Riverside, CA | 84 | 83 | -1 | 87 | 90 | 3 |
| 60710001, San Bernardino, CA | 71 | 72 | 1 | 74 | 75 | 1 |
| 60710306, San Bernardino, CA | 76 | 77 | 1 | 76 | 78 | 2 |
| 60711004, San Bernardino, CA | 91 | 90 | -1 | 97 | 100 | 3 |
| 60714001, San Bernardino, CA | 82 | 79 | -3 | 82 | 83 | 1 |
| 60714003, San Bernardino, CA | 94 | 91 | -3 | 95 | 98 | 3 |
| 170310001, Cook, IL | 60 | 58 | -2 | 69 | 73 | 4 |
| 170310032, Cook, IL | 68 | 66 | -2 | 69 | 72 | 3 |
| 170314201, Cook, IL | 64 | 62 | -2 | 69 | 73 | 4 |

---

[3] Projected DVs were not calculated for the Cochise monitor in EPA's modeling because the 2016 base year model predictions did not meet the criteria in EPA's modeling guidance for calculating a valid RRF.

[4] Projected DVs were not calculated for the Cochise monitor in EPA's modeling because the 2016 base year model predictions did not meet the criteria in EPA's modeling guidance for calculating a valid RRF.

| Receptor (AQS Monitor ID, County, State) | TCEQ 2023 Average DV (ppb) | TCEQ 2023 Maintenance DV (ppb) | TCEQ DV Delta (Maintenance - Average) (ppb) | EPA 2023 Average DV (ppb)[3] | EPA 2023 Maximum DV (ppb)[4] | EPA DV Delta (Maximum - Avg) (ppb) |
|---|---|---|---|---|---|---|
| 170317002, Cook, IL | 66 | 65 | -1 | 70 | 73 | 3 |
| 550590019, Kenosha, WI | 67 | 66 | -1 | 72 | 73 | 1 |
| 550590025, Kenosha, WI | No data*** | No data*** | No data*** | 69 | 72 | 3 |
| 551010020, Racine, WI | No data*** | No data*** | No data*** | 71 | 73 | 2 |

* TCEQ did not include this value in their SIP submission narrative (this cell was blank). The EPA obtained this value from data that was in TCEQ's spreadsheet of future 2023 DVs with state contribution.

** Calculated from the Relative Response Factor in TCEQ spreadsheet of future 2023 DVs with state contributions and the monitor's 2012-2014 DV (0.983 X 71 ppb, truncation applied).

*** Monitors were installed in 2013 and 2014 so they did not have a 3-year DV period (2012-2014) or previous years, so no projections of future year DVs are possible with TCEQ's modeling. Kenosha 550590025 was installed and began operating May 13, 2013, so the first three-year DV available is 2013-2015. Racine 551010020 was installed April 14, 2014 so the first three-year DV available is 2015-2017

NOTE: TCEQ's SIP reported projected 2023 DVs as whole numbers. Consistent with the EPA's modeling guidance, the EPA reported projected DVs with one digit to the right of the decimal. For comparison with TCEQ's SIP data, the EPA DVs were truncated to whole numbers for the purpose of the analysis in this TSD. Note that including one digit to the right of the decimal in both the TCEQ and the EPA data would result in a slight difference in outcome in terms of the magnitude of the differences between the average DVs and the corresponding TCEQ maintenance DVs and the EPA's maximum DVs; however, TCEQ's maintenance methodology still results in values lower than nonattainment methodology DVs for many receptors.

In short, because TCEQ's maintenance methodology uses only the most recent DV from its base period 2014 DV (that includes 2012-2014 monitoring data)[5], this very frequently results in "maintenance" DVs at potential receptors that are lower than the 2023 "nonattainment" DVs. TCEQ did not explain this anomalous result. These findings also tend to suggest that the three years that comprise the 2014 design values (i.e., 2012, 2013, and 2014) used in TCEQ's analysis may not have had meteorological conditions particularly conducive for formation of high ozone concentrations. This calls into question whether 2012-2014 would be an appropriate time period for use in projecting whether an area could have difficulty maintaining the standard under ozone conducive meteorology. The EPA's analysis in this TSD confirms that the 2012 to 2014 time period is not particularly conducive to ozone formation, at least for many receptors compared to the other 3-year DV periods of 2012 DV (2010-2012 monitoring data) and 2013 DV (2011-2013 monitoring data). See subsection 1.d below for analysis of meteorology adjusted values for monitors in the continental U.S for 2010-2014. The consequence of TCEQ's maintenance method, as demonstrated by our analysis, is that it often results in lower projected DVs than TCEQ's nonattainment method for the same receptors. This indicates that TCEQ's method often fails to account for conditions when an area would have difficulty maintaining the standard. From a technical perspective, it is unreasonable and internally inconsistent to apply a methodology that identifies receptors as being in nonattainment while at the same time concluding that same receptor will not have a problem maintaining the NAAQS. The EPA finds that the TCEQ methodology does not adequately identify conditions when receptors would have difficulty maintaining the NAAQS.

---

[5] For nomenclature purposes, the 3-year design value is referred to by the last year of the averaging period. That is, DV 2014 represents ozone air quality data averaged over 2012, 2013, and 2014.

10

### *1.b. Review of History of EPA's Guidance*

Since 2007 and up through its current 2018 version, the EPA's modeling guidance for attainment demonstrations and other analyses has recommended the use of a 5-year center weighted average DV (i.e., the average of the three DVs that include the modeled year). The development of this guidance reflects the EPA's longstanding understanding that meteorological variability should be accounted for in the projection of future design values for the purpose of evaluating whether or not a particular monitoring site is expected to attain the NAAQS in a future year.

The EPA's modeling guidance for 8-hour ozone NAAQS attainment demonstrations (1999-2007) initially considered using a 3-year period that included the modeled year (i.e., the emissions-inventory year modeled) as the middle year of the 3-year period.[6] However, the EPA ultimately recommended using five consecutive years with the modeled year being the middle year (i.e., covering the three DVs that include the base year) to consider potential variability in meteorological/ozone conduciveness and emissions. The EPA analyzed the variability of using this 5-year center-weighted average method compared with using a 3-year average DV and found that the 5-year center-weighted approach was more stable and had a lower standard deviation.[7] Using 5 years of measured data provides a more robust estimate of future design

---

[6] "Draft Guidance on the Use of Models and Other Analyses in Attainment Demonstrations for the 8-Hour Ozone NAAQS", EPA-454/R-99-004, May 1999; "Guidance on the Use of Models and Other Analyses in Attainment Demonstrations for the 8-hour Ozone NAAQS", EPA-454/R-05-002, October 2005; and "Guidance on the Use of Models and Other Analyses for Demonstrating Attainment of Air Quality Goals for Ozone PM2.5, and Regional Haze", EPA-454/B-07-002, April 2007.

[7] The April 2007 guidance states on page 23, "Additionally, the average design value will be more stable (less year to year variability) than any single design value period. An analysis of recent ambient design value data at 471 ozone monitors, over the period 1993-2004, shows that the median standard deviation of design values was 3.3 ppb whereas the standard deviation of the 5 year weighted average design values was 2.4 ppb (Timin, 2005a). Also, moving from the period ending in 2003 to the period ending in 2004, the median change in the ozone design values was 4.0 ppb. The median change in the 5 year weighted average ozone design values was only 0.8 ppb (there was not a long enough data record to do the same analyses for PM2.5). These analyses show that the average design values are clearly more stable and will therefore provide a 'best estimate' baseline year design value (DVBI) for use in future year model projections."

values that are not solely influenced by the particular meteorological conditions that occurred during the three years centered on the base year of emissions. In this respect, using 5 years of measured data is expected to provide ozone DVs that average out the effects of interannual variability in meteorological conditions on ozone concentrations. The guidance also notes that one may want to consider selecting a base design value this is the highest of the relevant base period design values to ensure attainment even in periods with meteorological conditions especially conducive to high ozone concentrations. Consistent with this guidance, the EPA's use of the maximum DV during the 5-year base period is intended to identify areas that may have difficulty maintaining the NAAQS under ozone conducive meteorological conditions.

While it is not mandatory to follow the EPA's modeling guidance, the different approach used by TCEQ lacked adequate justification. TCEQ did not support their claim that there were large reductions in emissions occurring between 2010 and 2014 that would yield lower DVs in 2012-2014 compared to 2010-2012 or 2011-2013 thus making these earlier DVs inappropriate to use for determining a maintenance receptor. Furthermore, TCEQ did not provide sufficient data and analysis of the 2010-2014 period to support their claim that the 2012-2014 period reflects higher ozone-conducive meteorology compared to the 2010-2012 and 2011-2013 periods. By comparison, under the EPA's approach, if the future DV projected from the maximum base period DV is below the NAAQS, one can be reasonably certain the receptor will not have difficulty maintaining the standard due to fluctuations in meteorology and, as such, upwind states will not interfere with maintenance in downwind states. Because the TCEQ method only looks at one DV and does not account for the variability in DVs due to meteorological conditions, it is less likely to successfully identify maintenance receptors than the EPA method.

### 1.c. Relative Effects of Long-Term Emissions Trends

TCEQ asserts that the EPA's maintenance methodology puts too much weight on meteorological variation and not enough weight on emissions changes (i.e., specifically, alleged emissions reductions). TCEQ asserts that the last DV in the period should be used based on the premise that ozone-precursor emissions always trend downward, and therefore, the last DV in the period will always capture the most likely emissions levels going forward. The EPA explained in the preamble why this is not necessarily justified and why TCEQ's method may effectively "double count" emissions trends (because such trends are already accounted for in making the future year projection). To further examine TCEQ's assertion that only the last DV period including the modeled base year should be used in the maintenance methodology, the EPA reviewed a number of ozone DV trends to assess long-term average changes in ozone due to emission changes, including several that were included in TCEQ's SIP submission for this action and in two previous attainment demonstration SIP submissions for the Dallas-Fort Worth Nonattainment Area (DFW) and the Houston-Galveston-Brazoria Nonattainment Area (HGB).[8] TCEQ provided ozone trends analysis in their SIP submission for this action for the areas where TCEQ's modeling identified potential receptors in Colorado, Arizona, and Southern California. TCEQ used this information to indicate that ozone levels are decreasing, as shown in the figures below, and further discussed in Section 5. The EPA also looked at monitoring trends for the most recent 10 years of data (2011 DV up to 2020 DV) using ozone monitoring data from the EPA's

---

[8] TCEQ's "Dallas-Fort Worth (DFW) Attainment Demonstration State Implementation Plan Revision for the 2008 Eight-Hour Ozone Standard Nonattainment Area" Adopted July 6, 2016 (DFW AD SIP) and TCEQ's "Houston-Galveston-Brazoria Serious Classification Attainment Demonstration State Implementation Plan Revision for the 2008 Eight-Hour Ozone National Ambient Air Quality Standard", Adopted March 4, 2020 (HGB AD SIP). The EPA, in this action, is not evaluating the suitability of the modeling presented by TCEQ for purposes of demonstrating attainment of the 2008 NAAQS. Rather, the EPA is simply examining long-term air quality trends that have occurred in both the Dallas-Fort Worth area as well as the Houston-Galveston-Brazoria area. The EPA will evaluate the suitability of modeling presented by TCEQ for purposes of demonstrating attainment of the 2008 Ozone NAAQS in a separate action.

Air Quality System (AQS). The EPA used these data to assess the magnitude of year-to-year variation in ozone levels compared to the long-term trend in ozone levels (i.e., 9 years or more) that may be mainly attributable to overall changes in ozone-precursor emissions.

In general, as shown in the figures below, our evaluation of monitor data for Dallas-Fort Worth and Houston-Galveston-Brazoria as well as at receptors to which TCEQ is linked (that have been identified either by the EPA or TCEQ) in Colorado, Arizona, Southern California, and Midwest Region (Illinois, Michigan, and Wisconsin) demonstrates that the long-term average annual decreases in ozone expected to be the result of emissions reductions are generally on the order of 0-1 ppb/year at monitors in these areas. However, variations in monitored DVs do not always trend downward from year to year and sometimes increase by 2 to 4 ppb from one year to the next. These variations are likely due to inter-annual variations in meteorological conditions which the EPA's method is designed to capture (although this analysis cannot rule out the possibility that short-term increases and decreases in ozone DVs may, in part, be the result of countervailing economic factors that affect short-term or localized emissions increases and decreases).

*DFW and HGB Areas*

For the DFW area, looking at Figures 1.1 and 1.2 (obtained from the DFW attainment demonstration SIP submission),[9] the long-term DFW DV[10] trend is less than 1 ppb/year[11] from 1991 to 2015 (see Figure 1.1) and 1.1 ppb/year from 1997 to 2014 (see Figure 1.2). Focusing on these time periods is a way to assess the average change in ozone DVs due to long-term changes

---

[9] *See* DFW AD SIP, Figure 1-1 at page 1-4 and Figure 5-1 at page 5-5.

[10] DFW DV is the highest DV at any regulatory monitor in the DFW Nonattainment Area, so it can be a different monitor year-to-year that sets the DFW Nonattainment area DV.

[11] *See* DFW AD SIP, at page 1-3. 2015 DV was 83 ppb and 1991 DV was 105 ppb. (105ppb-83ppb)/(24 years)= 0.917 ppb/year.

in emissions. The EPA also evaluated trends in more recent monitoring data. For DFW, we started with the 2012 DV (2010-2012 monitoring data) as there were some emission reductions from a previous DFW ozone SIP that had compliance dates in early 2010. Based on the trends shown in Figure 1.3, the DVs at most of the monitors that are currently monitoring nonattainment, based on 2018-2020 DVs, have been decreasing at approximately 1 ppb/year for the last 9 years of DVs.[12]

---

[12] EPA Analysis of 8-hour Ozone monitor trends. Data and calculations available in "Ozone_Trends_R6_TSD.xlsx" included in Docket ID No. EPA-R06-OAR-2021-0801.

Figure 1.1 – TCEQ's Figure 1-1: One-Hour and 8-Hour Ozone Design Values
from 1991 to 2015 and Population in the DFW Area,
*from* DFW 2008 8-Hour Attainment Demonstration SIP (July 6, 2016).



Figure 1.2 – TCEQ's Figure 5-1: One-Hour and 8-Hour Ozone DVs in the DFW Area
from 1997 through 2014
*from* DFW 2008 8-hour Attainment Demonstration SIP (July 6, 2016).



Figure 1.3 – 8-hour Ozone DV trends at DFW Monitors, 2012-2020.



For the Houston-Galveston-Brazoria area, TCEQ implemented multiple emission reductions for both nitrogen oxides ($NO_X$) and a subset of volatile organic compounds (VOCs) that resulted in large decreases of ozone from 2000 to 2007 in this area. In this regard, the EPA is evaluating trends for DVs from 2010 to 2020. For HGB, looking at Figures 1.4, 1.5, and 1.6 (obtained from the HGB attainment demonstration SIP)[13] the long-term HGB DV trend at most monitors and DV trends at the monitors in the HGB area with higher ozone DVs from 2009 to 2018 shows a decline of less than 1.0 ppb/year. The EPA also evaluated the trends using the most recent DVs (2020 DVs) in Figure 1.7. In Figure 1.7, the DVs at most of the higher HGB

---

[13] *See* HGB AD SIP, Figure 1-1 at page 1-11, Figure 5-1 at page 5-7, and Figure 5-5 at page 5-8.

area monitors (2018, 2019, and 2020 DVs greater than 70 ppb) are decreasing at 1 ppb/year or less for the last 10 years of DVs (2011-2020 DVs).[14]

Figure 1.4 – TCEQ's Figure 1-1: Ozone DVs and Population in HGB Area, *from* TCEQ's HGB Serious Area Attainment Demonstration SIP Revision for 2008 Ozone (2020).



Figure 1-1: Ozone Design Values and Population in the HGB Area

[14] EPA Analysis of 8-hour Ozone monitor trends. Data and calculations available in "Ozone_Trends_R6_TSD.xlsx" included in Docket ID No. EPA-R06-OAR-2021-0801.

Figure 1.5 – TCEQ's Figure 5-4: 8-Hour and One-Hour Ozone DVs in the HGB Area *from* TCEQ's HGB Serious Area Attainment Demonstration SIP Revision for 2008 Ozone (2020)



Figure 1.6 – TCEQ's Figure 5-5: Eight-Hour Ozone DVs by Monitor in the HGB Area
*from*
HGB Serious Area Attainment Demonstration SIP Revision for 2008 Ozone (2020)



Figure 1.7 – 8-hour Ozone DV Trends at Monitors in HGB, 2011-2020

*Potential receptors outside of Texas*

As mentioned above, TCEQ provided ozone trends analysis in their SIP submission for this action for the areas where TCEQ's modeling identified potential receptors (Colorado, Arizona, and Southern California) to indicate that ozone levels are decreasing as shown in the Figures below. The EPA analyzed TCEQ's trends analysis to assess the magnitude of year-to-year variation in ozone levels compared to the long-term trend in ozone levels (i.e., 10 years or more) that may be attributed to overall changes in ozone-precursor emissions. The EPA also analyzed DV trends using the most recent DVs for the last 10 years for receptors outside the State of Texas identified by the EPA's 2011 base year modeling, the EPA's 2016 base year (2016v2) modeling analyses, and/or TCEQ's modeling (2012 base year). These potential

receptor areas are located in Colorado, Arizona, Southern California, and the Midwest Region (specifically, Illinois, Wisconsin, and Michigan).

For the Colorado receptors identified in TCEQ's modeling, this analysis shows ozone DVs from 2007-2016 decreased less than 1 ppb/year on average. See Figure 3-40 from TCEQ's transport SIP submission (included as Figure 1.8 below). The EPA also examined the trends at the Colorado receptors identified in TCEQ's modeling using the most recent DVs. This analysis is reflected in Figure 1.9, which shows that the DVs at Colorado receptors have either increased or slightly decreased at less than 0.5 ppb/year for the last 10 years of DVs (2011-2020 DVs).[15]

---

[15] EPA Analysis of 8-hour Ozone monitor trends. Data and calculations available in "Ozone_Trends_R6_TSD.xlsx" included in Docket ID No. EPA-R06-OAR-2021-0801.____

Figure 1.8 – 8-hour Ozone DVs for Monitors in the Denver-Aurora Area
*from* TCEQ's SIP Submission Figure 3-40



**Figure 3-40: Eight-Hour Ozone Design Values for Monitors in the Denver-Aurora Area**

Figure 1.9 – Denver Nonattainment Area DV Trends at Receptors Identified
in TCEQ Modeling for 2023



For the Arizona receptor identified in TCEQ's modeling, TCEQ's SIP Figure 3-55 (included as Figure 1.10 below) shows ozone DVs from 2007-2016 decreased less than 1 ppb/year on average but had increases or decreases of several ppb from one year to the next. The EPA also examined the trends at the Arizona receptor identified in TCEQ's modeling using the most recent DVs available (see Figure 1.11) which shows that the DVs at the Arizona receptor have decreased at less than 1.0 ppb/year on average for the last 10 years of DVs (2011-2020 DVs).[16]

---

[16] *Id.*

Figure 1.10 DV Tends from 2007 through 2016 for Chiricahua National Monument Monitor
*from* TCEQ's SIP Submission Figure 3-55



**Figure 3-55: Design Value Trends from 2007 through 2016 for Chiricahua National Monument (AQS ID: 040038001)**

Figure 1.11 – Arizona DV Trend at Receptor Identified in TCEQ Modeling for 2023



At the California receptors identified in TCEQ's modeling, TCEQ's SIP Figure 3-56 (included as Figure 1.12 below) shows ozone DVs from 2007-2016 decreased less than 1 ppb/year on average. The EPA also evaluated the trends at the California receptors identified in TCEQ's modeling using the most recent DVs (see Figure 1.13), which show that the DVs at the California receptors identified by TCEQ have either increased or slightly decreased at less than 0.5 ppb/year on average for the last 10 years of DVs (2011-2020 DVs).[17]

---

[17] *Id.*

Figure 1.12 – 8-Hour Ozone DV for Monitors in Los Angeles Area
*from* TCEQ's SIP Figure 3-56



**Figure 3-56: Eight-Hour Ozone Design Values for Monitors in the Los Angeles Area**

Figure 1.13 – Southern California Receptors DV trends at Receptors
Identified in TCEQ Modeling for 2023



Using the most recent DVs, the EPA examined the trends at the monitoring sites in the

Chicago IL-IN-WI Nonattainment Area in Illinois and in Wisconsin that were identified as

receptors in EPA's 2016v2 modeling (see Figure 1.14). This figure shows that the DVs at these

receptors have either increased or have decreased at less than 0.7 ppb/year on average for the last

10 years of DVs (2011-2020 DVs).[18]

---

[18] *Id.*

Figure 1.14 – Chicago IL-IN-WI Nonattainment Area DV Trends at Receptors
Identified in EPA's 2016v2 Modeling for 2023



The EPA evaluated the trends at the previously identified potential Wisconsin and
Michigan receptors in the EPA's March 2018 memorandum using the most recent DVs in Figure
1.15, which show that the DVs at Sheboygan County, Wisconsin and Allegan County, Michigan
receptors identified previously in EPA's 2011 modeling have decreased approximately 1
ppb/year on average for the last 10 years of DVs (2011-2020 DVs).[19]

_____

[19] *Id.*

Figure 1.15 – Wisconsin and Michigan DV Trends at Receptors Identified in EPA's 2011 Base Year Modeling for 2023



Conclusions of this analysis: Reviewing this information in total, the long-term average decreases in ozone due to emissions reductions are usually on the order of 0-1 ppb/year at monitors in DFW and HGB, and at the receptors that have been identified in Colorado, Arizona, Southern California, and Midwest Region (Illinois and Wisconsin). However, critically, the evidence presented here demonstrates that there can be wide variations in monitored ozone DVs from year to year. These year-to-year variations in DVs are not always toward lower ozone DVs, and sometimes DVs can increase by 2-4 ppb from one year to the next. These variations may be primarily due to meteorological variations. We note for instance that TCEQ's monitored trends figure for the Arizona receptor it identified shows increases of 2 ppb and 3 ppb annually, from 66 ppb to 73 ppb. That is a 7 ppb increase over three years from 2009 to 2012. Large annual

fluctuations upward in DVs such as this demonstrate the degree of variation that is possible in DV due to meteorological differences between different three-year design value periods, and/or may indicate increasing emissions activity in upwind states or from local sources. In either case, however, this analysis demonstrates that it cannot simply be assumed, as TCEQ's analysis suggests, that ozone levels will only continue to decline or always track with the general, long-term emissions trends.

### 1.d. Meteorological Adjusted Trends Analysis of 2010-2014 Monitored Ozone Data

A recent analysis was published that included updated techniques to analyze trends in continental U.S ozone concentrations adjusted for interannual variability in meteorological conditions (Wells, et al.).[20] This analysis adjusted long-term trends in monitored maximum daily average 8-hour (MDA8) ozone concentrations for meteorological effects using various statistical and mathematical methods in order to get a better estimate of the long-term changes in ozone concentrations due to changes in precursor emissions such as nitrogen oxides ($NO_X$) and volatile organic compounds (VOCs). This analysis included meteorological adjusted MDA8 ozone values (mean, median, 90th percentile, and 98th percentile) for monitors in the continental U.S for each year from 2010 through 2014. Of particular note is the 98th percentile values as they would correspond with the 4th High MDA8 monitored ozone that is used in the calculation of DVs. In Figure 1.16 (a-e) below are maps showing the magnitude of the adjustments in the May to September MDA8 ozone concentrations for each year, with monitoring site locations colored according to the difference between the adjusted and observed trend values. Red dots represent

---

[20] Wells, Benjamin; Dolwick, Pat; E d e r, Brian; Evangelista, Mark; Foley, Kristen; Mannshardt, Elizabeth; Misenis, Chris; Weishampel, Anthon; "Improved Estimation of Trends in U.S. Ozone Concentrations Adjusted for Interannual Variability in Meteorological Conditions." *Atmospheric Environment* 248 (2021) 118234; Wells, Benjamin; Dolwick, Pat; E d e r, Brian; Evangelista, Mark; Foley, Kristen; Mannshardt, Elizabeth; Misenis, Chris; Weishampel, Anthon "Supplemental Information for: Improved Estimation of Trends in U.S. Ozone Concentrations Adjusted for Interannual Variability in Meteorological Conditions."

downward adjustments of MDA8 ozone concentrations when meteorological conditions were more favorable to ozone formation than normal, while blue dots represent upward adjustments of MDA8 ozone concentrations when meteorological conditions were less favorable to ozone formation than normal. Figures 1.16 (a-e) are for the years 2010, 2011, 2012, 2013 and 2014 respectively. In each Figure, 90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations are shown. In other words, the red dots in the images below indicate when monitored ozone levels at a particular monitor are higher due to ozone conducive meteorological conditions, while blue dots indicate when monitored ozone levels are lower at a particular monitor due to meteorological conditions unfavorable for ozone formation. Since the DVs are calculated using the 98th percentile values and the 90th percentile is representative of other relatively high ozone monitored values, these are the values we focus on for this analysis as they are most relevant to the policy concerns of identifying maintenance receptors.

It is noteworthy that while 2012, the year TCEQ selected as its base year, was conducive to ozone formation in the upper Midwest area around Lake Michigan (Illinois, Wisconsin, and Michigan), 2013 and especially 2014 were not conducive to ozone formation. 2014 was the least conducive year for ozone formation in the upper Midwest area around Lake Michigan of the 2010 through 2014 period. The years 2010 and 2011 both appear to have had meteorological conditions more conducive to ozone formation in the area where the EPA has identified receptors in the EPA's 2011 base case and 2016v2 modeling compared to 2013 and 2014. The 2012 DV (2010-2012 monitoring data) or 2013 DV (2011-2013 monitoring data) both seem to have had meteorological conditions more conducive to ozone formation than the 2014 DV (2012-2014 monitoring data). This may partially explain why TCEQ's methodology, which relied solely on the 2014 DV, failed to identify receptors in this region using its maintenance methodology.

Figure 1.16(a) – Maps showing the magnitude of the adjustments in May to September 90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations for the year 2010



Figure 1.16(b) – Maps showing the magnitude of the adjustments in May to September 90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations for the year 2011



Figure 1.16(c) – Maps showing the magnitude of the adjustments in May to September 90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations for the year 2012



Figure 1.16(d) – Maps showing the magnitude of the adjustments in May to September  90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations for the year 2013



Figure 1.16(e) – Maps showing the magnitude of the adjustments in May to September 90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations for the year 2014



**2.    Potential Underestimation of Projected Design Values and Model Performance Evaluation**

As discussed in this section and in Section 3, below, the EPA has analyzed TCEQ's future-year model projections for the DFW and HGB areas within Texas and also at downwind areas in Colorado, Arizona, Southern California, Illinois, Wisconsin, and Michigan to which Texas contributes at or above 1 percent of the NAAQS in the EPA's 2011 base case modeling, and/or the EPA's 2016v2 modeling, and/or TCEQ's modeling. The EPA also compared TCEQ's 2023 projections with recent DVs (2020) and preliminary DVs (2021) in these areas together with potential changes in DVs in the next two to three years. The results of this comparison indicate that TCEQ's projections likely underestimate future ozone levels. TCEQ's projected ozone concentrations in 2023 are much lower than measured DVs in 2020 and preliminary 2021 DVs without there being an unusual level of emission reductions to support the projected sharp decline in DVs. The EPA compared recent monitoring values and reasonably anticipated decreases (e.g., on the order of approximately 0-1 ppb/year – see discussion on ozone trends in Section 1 above) in DVs by 2023 both within Texas and in other parts of the country. These underestimations likely result in TCEQ's modeling not adequately identifying nonattainment and/or maintenance receptors in 2023.

In subsection 2.a, we evaluate the potential underestimation of TCEQ's DFW and HGB 2023 modeled DVs based on a comparison to recent monitoring and potential DV changes assuming that the average long-term trend in DVs continues over the next 2-3 years. In subsection 2.b, we evaluate the potential underestimation of TCEQ's 2023 modeled DVs in downwind areas (Chicago Nonattainment Area, Wisconsin, Colorado, Arizona, and Southern California) that have receptors identified in either the EPA or TCEQ's modeling compared with recent monitoring and potential DV changes assuming that the average long-term trend in DVs

continues over the next 2-3 years. In subsections 2.c. and 2.d. we review TCEQ's 2012 base case model performance in the DFW and HGB areas and in downwind receptor areas (Chicago NAA, Wisconsin, Colorado, Arizona and Southern California) to assess whether TCEQ's modeling platform provides technically sound data for projecting future year ozone design values and interstate contributions. In subsection 2.e, we summarize the findings of the EPA's review in this Section 2.

### 2.a. Potential Underestimation in TCEQ's Modeling 2023 Future year projections at DFW & HGB receptors and High DV monitors

TCEQ's modeling includes projections of future year 2023 design values for monitors within the large metropolitan areas of DFW and HGB, both of which continue to monitor ozone nonattainment and have been designated as 2015 8-hour ozone nonattainment areas. TCEQ has previously developed attainment demonstration SIP submissions for both of the HGB and DFW nonattainment areas.[21] TCEQ also included in these previous attainment demonstration SIPs long-term ozone monitored DV trend analysis for both the HGB and DFW areas that indicate the average annual decrease in ozone DVs was approximately 1 to 1.2 ppb/year.[22] In Section 1, above, the EPA's analysis in Section 1 above of the most recent 9 years of DVs in DFW and 10 years of DVs in HGB indicate a similar trend of 1 ppb/year or less. Using these DV monitored (not modeled) trends indicates that emissions decreases between 2020 and 2023 could potentially be anticipated to result in a drop in ozone concentrations of approximately 3-4 ppb at most receptors if no variability in meteorology is considered and no large emission reduction

---

[21] TCEQ's "Dallas-Fort Worth (DFW) Attainment Demonstration State Implementation Plan Revision for the 2008 Eight-Hour Ozone Standard Nonattainment Area" Adopted July 6, 2016 and TCEQ's "Houston-Galveston-Brazoria Serious Classification Attainment Demonstration State Implementation Plan Revision for the 2008 Eight-Hour Ozone National Ambient Air Quality Standard", Adopted March 4, 2020.
[22] *Id.*

programs are implemented in Texas or on a national level.[23] That is to say, without significant

unexpected reductions beyond the effects of existing control measures, a 3-4 ppb decline in

ozone concentrations during this 3-year period is the most that could be anticipated at

DFW/HGB monitors. To assess if TCEQ's ozone transport modeling is potentially

underestimating future year 2023 modeled DVs in DFW and HGB areas, the EPA compared

2020 monitored DVs (2018-2020 monitored data) at several of the typically higher ozone

monitors in the DFW and HGB area with TCEQ's projected 2023 DVs in Table 2.1. While not

as exact as developing new modeling of emission changes from 2020 to 2023 to project 2023

DVs (nor appropriate for use in any other context), using the general 3-4 ppb approximation

provides a ballpark estimate to evaluate whether TCEQ's modeling might be underestimating

2023 future DVs. As can be seen in Table 2.1, there are many monitors in DFW and HGB that

would need a drop in ozone DVs over the next 3 years of > 5 ppb (values of -5 ppb or more in

the far right column) to reach TCEQ's 2023 modeled projected levels. The EPA also evaluated

just the 2023 DVs for monitors with 2020 DVs $\geq$ 74 ppb (2018-2020 monitored DV), and for the

monitors that TCEQ projected to be attaining (DV < 71 ppb) EPA examined all monitors that

had a 2020 DV $\geq$ 71 ppb and also the subset of these monitors with a 2020 DV $\geq$ 74 ppb. For

monitors with a 2020 DV $\geq$ 74 ppb, ozone concentrations would have to drop by 3-4 ppb for

these monitors to attain by 2023. For the 15 monitors that TCEQ projected to be attaining in

2023 (red font in table) and had a 2020 DVs $\geq$ 71 ppb, the average amount of decrease in DVs

---

[23] We use this ballpark figure here only as a bounding assumption relevant to an analytical exercise establishing why the TCEQ modeling submitted in its transport SIP submittal likely under-projects future ozone concentrations. The 3 to 4 ppb figure does not represent any analysis or conclusions regarding actual emissions reductions in Texas or any other state. The EPA has no basis to assume even this level of reduction in ozone concentrations will actually occur, nor is this estimate based on any assessment of the effects of permanent and enforceable emissions reductions in any SIP or FIP or resulting from any other known or upcoming CAA requirements. As such, this estimate is not usable in any other CAA action, nor would it be a defensible basis on which to reach any conclusions regarding future air quality conditions, without far greater technical and legal analysis than the Agency can provide at this time.

needed to match TCEQ's 2023 projection is 8.0 ppb. For the eight monitors that TCEQ projected

to be attaining in 2023 and had a 2020 DV of ≥ 74 ppb, the average amount of decrease in DVs

needed to match TCEQ's 2023 projection is 9.25 ppb, and they would have to drop at least 3-4

ppb (up to 8-9 ppb) to have a DV of 70 ppb.[24] In other words, for all the monitors with the

highest 2020 monitored DVs, TCEQ's modeling projections of 2023 would necessitate average

reductions in DVs over this three year period of 9.25 ppb, much larger than the 3-4 ppb that

would be  considered as a possible upper bound based on an extrapolation of long-term trends.

Drops in 8-hour ozone DVs on average of 7.56 ppb over three years at many monitors in these

areas do not typically occur unless there is an unexpectedly large change in emissions and/or

large change in meteorological conduciveness for ozone generation (see multiple trends analysis

figures in Section 1). TCEQ did not identify any such large emission reductions to be

implemented in the 2021-2023 timeframe. This analysis supports a finding that TCEQ's

modeling is likely underestimating future ozone DVs in the two nonattainment areas in Texas.

---

[24] Due to the uncertainty with using the whole number DVs, the truncation method used at the end of the DV calculation impacts the exact value. For a monitor with a 2020 DV of 74 ppb it would take at least a value of 3 ppb or greater and could be 4 ppb or more prior to truncation.

### Table 2.1 TCEQ Projected Future 2023 DVs Compared to 2020 Monitored DVs

| State | County | AQS ID | TCEQ 2023 Future Design Value-DV (ppb) | Monitored Data from AQS 2020 DV (ppb) | Delta in 3 years 2020 Monitor DV - TCEQ 2023 DV (ppb) |
|---|---|---|---|---|---|
| Texas | Brazoria | 480391004 | 78 | 73 | 5 |
| Texas | Brazoria | 480391016 | 60 | 65 | -5 |
| Texas | Collin | 480850005 | 66 | 75 | -9 |
| Texas | Dallas | 481130069 | 64 | 69 | -5 |
| Texas | Dallas | 481130075 | 63 | 74 | -11 |
| Texas | Dallas | 481130087 | 61 | 69 | -8 |
| Texas | Denton | 481210034 | 68 | 72 | -4 |
| Texas | Denton | 481211032 | 66 | 72 | -6 |
| Texas | Ellis | 481390016 | 60 | 64 | -4 |
| Texas | Ellis | 481391044 | 57 | 63 | -6 |
| Texas | Galveston | 481671034 | 67 | 74 | -7 |
| Texas | Harris | 482010024 | 68 | 79 | -11 |
| Texas | Harris | 482010026 | 66 | 69 | -3 |
| Texas | Harris | 482010029 | 67 | 73 | -6 |
| Texas | Harris | 482010046 | 66 | 64 | 2 |
| Texas | Harris | 482010047 | 69 | 72 | -3 |
| Texas | Harris | 482010051 | 68 | 70 | -2 |
| Texas | Harris | 482010055 | 68 | 76 | -8 |
| Texas | Harris | 482010062 | 72 | 67 | 5 |
| Texas | Harris | 482010066 | 68 | 69 | -1 |
| Texas | Harris | 482010416 | 72 | 73 | -1 |
| Texas | Harris | 482011015 | 64 | 67 | -3 |
| Texas | Harris | 482011034 | 71 | 73 | -2 |
| Texas | Harris | 482011035 | 68 | 70 | -2 |
| Texas | Harris | 482011039 | 74 | 78 | -4 |
| Texas | Harris | 482011050 | 68 | 70 | -2 |
| Texas | Johnson | 482510003 | 62 | 73 | -11 |
| Texas | Kaufman | 482570005 | 58 | 64 | -6 |
| Texas | Montgomery | 483390078 | 64 | 74 | -10 |
| Texas | Tarrant | 484390075 | 65 | 75 | -10 |
| Texas | Tarrant | 484391002 | 63 | 72 | -9 |
| Texas | Tarrant | 484392003 | 66 | 73 | -7 |
| Texas | Tarrant | 484393009 | 68 | 76 | -8 |
| Texas | Tarrant | 484393011 | 62 | 69 | -7 |
| | | | | Avg ALL | -4.97 |
| | | | | Avg if 2020 DV ≥ 74 ppb | -7.56 |
| | | | Avg if TCEQ 2023 DV <71 ppb but 2020 DV ≥71 ppb | | -8.00 |
| | | | Avg if TCEQ 2023 DV <71 ppb but 2020 DV ≥74 ppb | | -9.25 |

We also note that ODEQ relied on TCEQ's future year 2023 modeled DVs at three nonattainment/maintenance receptors in their SIP submission. Oklahoma was linked to these three receptors in the EPA's previous modeling results included in the EPA's March 2018 memorandum. These monitors included 2 monitors in the DFW area (Tarrant County AQS ID 484392003 and Denton County AQS ID 481210034) and one monitor in the HGB area (Brazoria County AQS ID 480391004). The EPA's 2016v2 modeling indicates that Oklahoma is linked to the Denton County monitor (AQS ID 48120034) that is identified as a maintenance receptor. Included as Table 2.2 is information from the Oklahoma 2015 Ozone Transport SIP submission that utilized information from the EPA's March 2018 memorandum on Transport Modeling Results.

**Table 2.2 Oklahoma's Transport SIP Information Referring to Linkages to Texas Receptors (EPA March 2018 memorandum)**

| Receptor (Site ID, County, State) | 2023 Average DV (ppb) | 2023 Maximum DV (ppb) | Oklahoma Contribution (ppb) | Oklahoma's Step 1 and 2 Determination |
|---|---|---|---|---|
| 481210034, Denton, TX | 69.7 | 72.0 | 1.23 | Maintenance receptor identified for further analysis. |
| 484392003, Tarrant, TX | 72.5 | 74.8 | 1.71 | Nonattainment receptor identified for further analysis. |
| 480391004, Brazoria, TX | 74.0 | 74.9 | 0.90 | Nonattainment receptor with contribution less than 1 ppb; no further analysis. |

From Table 2.1 we note that the two receptors in the DFW area (based on EPA's March 2018 memorandum) are currently monitoring nonattainment with a 2020 DV of 72 ppb at the Denton County maintenance receptor and a 2020 DV of 73 ppb at the Tarrant County

nonattainment receptor. TCEQ projected 2023 DVs of 68 ppb for the Denton County monitor

and 66 ppb for the Tarrant County nonattainment receptor. We note that the nonattainment

receptor in HGB (Brazoria County AQS ID 480391004) is currently monitoring a 73 ppb (2020

DV) but was projected to be 78 ppb in TCEQ's 2023 modeled projections. We note that in the

HGB area the maximum monitored values can vacillate between monitors depending upon the

variations in local and synoptic meteorology from one year to the next. Based on most recent

DVs at these three monitors, it is possible that they may reach attainment by 2023; however even

if they attain, it is likely that they would be close to the NAAQS, and therefore, may still be

considered maintenance receptors. A drop of 3 ppb (1 ppb/year) would result in DVs of 70 ppb at

two monitors and 69 ppb at the Denton monitor. As discussed above, TCEQ's 2023 model

projections for these three monitors raises likely underestimation concerns for the two DFW

monitors and raises concerns with the adequacy of relying on TCEQ's modeling to conclude that

the two DFW monitors are not at least maintenance receptors in 2023 for which Oklahoma is

linked. The EPA's more recent modeling (2016v2) also indicates Oklahoma is linked to the

Denton monitor which is identified as a maintenance receptor.

### 2.b. Potential Underestimation in TCEQ's 2023 Future year projections at downwind areas

As discussed above, absent variability in meteorology and any unexpectedly large

local/regional/national implementation of emission reductions, the drop in monitored ozone DVs

from 2020 to 2023 would be expected to be at most 3-4 ppb, based on an assumed continuation

of long-term trends at large nonattainment metropolitans that have been identified in TCEQ's

modeling or the EPA's 2011 and 2016v2 modeling. (Once again, we emphasize that this estimate

serves as a bounding exercise in this technical analysis and does not reflect any legal or policy

judgments regarding whether even this degree of reduction in ozone concentrations is reasonable

to assume for any given receptor.) While not as exact as developing new modeling of emission changes from 2020 to 2023 to project 2023 DVs, using the general 3-4 ppb figure provides a ballpark estimate to evaluate if TCEQ's modeling might be underpredicting 2023 future DVs at areas in the Chicago, IL/Wisconsin/Michigan area; the Denver, CO area; Cochise County, AZ receptor; and Southern California areas.[25] We note that in our evaluation of the most recent DV trends in these areas that the annual average change from 2010 to 2020 DVs ranged from increasing to decreasing at most approximately 1 ppb/year, so use of 3-4 ppb is an indicator of the most by which DVs could potentially be estimated to drop between 2020 and 2023. Further, the trends data for these areas indicate the change will likely be less than a 3-4 ppb decrease for many monitors. To assess if TCEQ's modeling is potentially underestimating future year 2023 modeled DVs in these downwind areas, the EPA has compared 2020 monitored DVs at many typically higher ozone monitors in these areas with TCEQ's projected 2023 DVs in Table 2.3, Table 2.4, and Table 2.5.

---

[25] We use this ballpark figure here only as a bounding assumption relevant to an analytical exercise establishing why the TCEQ modeling submitted in its transport SIP submittal likely under-projects future ozone concentrations. The 3 to 4 ppb figure does not represent any analysis or conclusions regarding actual emissions reductions in Texas or any other state. The EPA has no basis to assume even this level of reduction in ozone concentrations will actually occur, nor is this estimate based on any assessment of the effects of permanent and enforceable emissions reductions in any SIP or FIP or resulting from any other known or upcoming CAA requirements. As such, this estimate is not usable in any other CAA action, nor would it be a defensible basis on which to reach any conclusions regarding future air quality conditions, without far greater technical and legal analysis than the Agency can provide at this time.

**Table 2.3 TCEQ Projected Future 2023 DVs Compared to 2020 Monitored DVs (IL, WI, & MI)**

| State | County | AQS ID | TCEQ 2023 Future Design Value-DV (ppb) | Monitored 2020 DV (ppb) | Delta in 3 years 2020 Monitor DV - TCEQ 2023 DV (ppb) |
|-------|--------|--------|------|------|------|
| Chicago and Downwind areas in Wisconsin and Michigan | | | | | |
| Illinois | Cook | 170310001 | 60 | 75 | -15 |
| Illinois | Cook | 170310032 | 68 | 74 | -6 |
| Illinois | Cook | 170310076 | 61 | 69 | -8 |
| Illinois | Cook | 170311003 | 60 | 73 | -13 |
| Illinois | Cook | 170311601 | 61 | 71 | -10 |
| Illinois | Cook | 170314002 | 61 | 71 | -10 |
| Illinois | Cook | 170314007 | 57 | 71 | -14 |
| Illinois | Cook | 170314201 | 64 | 77 | -13 |
| Illinois | Cook | 170317002 | 66 | 75 | -9 |
| Michigan | Allegan | 260050003 | 71 | 73 | -2 |
| Wisconsin | Door | 550290004 | 64 | 72 | -8 |
| Wisconsin | Kenosha | 550590019 | 67 | 74 | -7 |
| Wisconsin | Manitowoc | 550710007 | 65 | 70 | -5 |
| Wisconsin | Milwaukee | 550790010 | 58 | 62 | -4 |
| Wisconsin | Milwaukee | 550790085 | 66 | 70 | -4 |
| Wisconsin | Sheboygan | 551170006 | 70 | 75 | -5 |
| | | | | Avg ALL | -8.31 |
| | | | | Avg if Current DV ≥ 74 ppb | -9.17 |
| | | | | Avg if TCEQ 2023 < 71 ppb but 2020 DV ≥ 71 ppb | -10.00 |
| | | | | Avg if TCEQ 2023 <71 ppb but 2020 DV ≥ 74 ppb | -9.17 |

**Table 2.4 TCEQ Projected Future 2023 DVs Compared to 2020 Monitored DVs (CO)**

| State | County | AQS ID | TCEQ 2023 Future Design Value-DV (ppb) | Monitored 2020 DV (ppb) | Delta in 3 years 2020 Monitor DV - TCEQ 2023 DV (ppb) |
|-------|--------|--------|------|------|------|
| Colorado | Adams | 80013001 | 65 | 69 | -4 |
| Colorado | Arapahoe | 80050002 | 70 | 77 | -7 |
| Colorado | Arapahoe | 80050006 | 66 | 71 | -5 |
| Colorado | Boulder | 80130011 | 67 | 74 | -7 |
| Colorado | Denver | 80310002 | 57 | 70 | -13 |
| Colorado | Douglas | 80350004 | 73 | 81 | -8 |
| Colorado | Jefferson | 80590005 | 68 | 71 | -3 |
| Colorado | Jefferson | 80590006 | 72 | 79 | -7 |
| Colorado | Jefferson | 80590011 | 71 | 80 | -9 |
| Colorado | Larimer | 80690007 | 69 | 70 | -1 |
| Colorado | Larimer | 80690011 | 72 | 75 | -3 |
| Colorado | Larimer | 80691004 | 65 | 67 | -2 |
| Colorado | Weld | 81230009 | 70 | 70 | 0 |
| | | | Avg ALL | | -5.31 |
| | | | Avg if Current DV ≥ 74 ppb | | -6.83 |
| | | | Avg if TCEQ 2023 < 71 ppb but 2020 DV ≥ 71 ppb | | -5.50 |
| | | | Avg if TCEQ 2023 < 71 ppb but 2020 DV ≥ 74 ppb | | -7.00 |

Denver and downwind areas in Colorado

**Table 2.5 TCEQ Projected Future 2023 DVs Compared to 2020 Monitored DVs (AZ & CA)**

| State | County | AQS ID | TCEQ 2023 Future Design Value-DV (ppb) | Monitored 2020 DV (ppb) | Delta in 3 years 2020 Monitor DV – TCEQ 2023 DV (ppb) |
|---|---|---|---|---|---|
| Arizona | Cochise | 40038001 | 71 | 66 | 4 |
| California | Los Angeles | 60370002 | 74 | 97 | -23 |
| California | Los Angeles | 60370016 | 87 | 107 | -20 |
| California | Los Angeles | 60370113 | 59 | 70 | -11 |
| California | Los Angeles | 60371103 | 63 | 76 | -13 |
| California | Los Angeles | 60371201 | 80 | 92 | -12 |
| California | Los Angeles | 60371302 | 52 | 64 | -12 |
| California | Los Angeles | 60371602 | 70 | 78 | -8 |
| California | Los Angeles | 60371701 | 80 | 88 | -8 |
| California | Los Angeles | 60372005 | 72 | 93 | -21 |
| California | Los Angeles | 60375005 | 57 | 62 | -5 |
| California | Los Angeles | 60376012 | 87 | 101 | -14 |
| California | Riverside | 60650012 | 85 | 99 | -14 |
| California | Riverside | 60650016 | 63 | 78 | -15 |
| California | Riverside | 60651016 | 87 | 99 | -12 |
| California | Riverside | 60652002 | 75 | 84 | -9 |
| California | Riverside | 60655001 | 78 | 88 | -10 |
| California | Riverside | 60656001 | 78 | 94 | -16 |
| California | Riverside | 60658001 | 88 | 96 | -8 |
| California | Riverside | 60658005 | 84 | 98 | -14 |
| California | Riverside | 60659001 | 73 | 87 | -14 |
| California | San Bernardino | 60710001 | 71 | 81 | -10 |
| California | San Bernardino | 60710005 | 96 | 90 | 6 |
| California | San Bernardino | 60710012 | 83 | 90 | -7 |
| California | San Bernardino | 60710306 | 76 | 83 | -7 |
| California | San Bernardino | 60711004 | 91 | 106 | -15 |
| California | San Bernardino | 60712002 | 94 | 102 | -8 |
| California | San Bernardino | 60714001 | 82 | 87 | -5 |
| California | San Bernardino | 60714003 | 94 | 114 | -20 |
| California | San Bernardino | 60719002 | 79 | 86 | -7 |
| California | San Bernardino | 60719004 | 88 | 110 | -22 |
| | | | | Avg ALL | -11.29 |
| | | | | Avg if Current DV ≥ 74 ppb | -12.07 |
| | | | Avg if TCEQ 2023 < 71 ppb but 2020 DV ≥ 71 ppb | | -12.00 |
| | | | Avg if TCEQ 2023 < 71 ppb but 2020 DV ≥ 74 ppb | | -12.00 |

As can be seen in Tables 2.3, 2.4, 2.5 there are many monitors in these downwind areas that would need a drop in ozone DVs over the next 3 years of ≥ 5 ppb (values of -5 ppb or more in the far-right column) to reach TCEQ's 2023 modeled projected levels. For each of these downwind areas, the EPA also examined the TCEQ modeled 2023 DVs for monitors with 2020 DVs ≥ 74 ppb, and for the monitors that TCEQ projected to be attaining (DV < 71 ppb) EPA examined all monitors that had a 2020 DV ≥ 71 ppb, and also the subset of these monitors with a 2020 DV ≥ 74 ppb. This DV concentration was chosen since a 2020 DV of 74 ppb or less would drop to a DV below the NAAQS with a 3 to 4 ppb reduction between 2020 and 2023. However even if these monitors show attainment in 2023, it is likely that their DVs would be close to the NAAQS, and therefore, may still be considered maintenance receptors.[26]

For the subset of monitors in Illinois, Wisconsin, and Michigan with 2020 DVs ≥ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 9.17 ppb, which is more than the 3-4 ppb that could be anticipated at most for monitors in these areas. For the 11 monitors that TCEQ projected to be attaining in 2023 (red font in table) and had a 2020 DVs ≥ 71 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 10.0 ppb. For the six monitors that TCEQ projected to be attaining in 2023 and had a 2020 DV of ≥ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 9.17 ppb, and they would have to drop a minimum of 3-4 ppb (up to 7 ppb) to have a DV of 70 ppb. Drops in 8-hour ozone DVs on average of 9.17 ppb or more in three years at many monitors in these areas do not typically occur unless there is an unexpectedly large change in emissions and/or large change in meteorological conduciveness for ozone generation (see figures in Section

---

[26] The EPA is not concluding that the sites identified by TCEQ are or are not "receptors" for purposes of ozone interstate transport policy. Rather, we are analyzing the technical reliability of the TCEQ modeling to project future design values.

1.c). TCEQ did not identify any such large emission reductions to be implemented in the 2021-2023 timeframe. Based on this information, TCEQ's modeling is likely underestimating future ozone levels at monitors/receptors in Illinois, Wisconsin, and Michigan. These underestimations likely prevented TCEQ from identifying nonattainment/maintenance receptors. The EPA's modeling results included in the March 2018 memorandum and/or EPA's 2016v2 modeling collectively have identified nonattainment/maintenance receptors in the Chicago area of Illinois and downwind areas in Wisconsin and Michigan that have or had projected linkages to emissions from Texas (Texas's contribution was greater than 0.7 ppb).

As can be seen in Table 2.4, for the monitors in Colorado with 2020 DVs $\geq$ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 6.83 ppb, which is more than the 3-4 ppb that could be anticipated at most for monitors in these areas. For the four monitors that TCEQ projected to be attaining in 2023 (red font in table) and had a 2020 DVs $\geq$ 71 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 5.50 ppb. For the two monitors that TCEQ projected to be attaining in 2023 and had a 2020 DV of $\geq$ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 7.00 ppb, and they would have to drop a minimum of 3-4 ppb (up to 7 ppb) to have a DV of 70 ppb. Drops in 8-hour ozone DVs on average of 7 ppb or more in three years at multiple monitors in this area would not typically be expected to occur unless there is an unexpectedly large change in emissions and/or large change in meteorological conduciveness for ozone generation (see Figures in Section 1.c).

As can be seen in Table 2.5, for the monitors in Southern California with 2020 DVs $\geq$ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 12.07 ppb, which is more than the 3-4 ppb (see Section 1) that could be anticipated at most for

monitors in these areas. For the three monitors that TCEQ projected to be attaining in 2023 and had a 2020 DV of $\geq$ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 12.00 ppb, and they would have to drop a minimum of 5-6 ppb (up to 8 ppb) to have a DV of 70 ppb. Drops in 8-hour ozone DVs on average of 9.17 ppb or more in three years at many monitors in these areas would not typically be expected to occur unless there is an unexpectedly large change in emissions and/or large change in meteorological conduciveness for ozone generation (see figures in Section 1.c).

Based on this information, TCEQ's modeling appears to be underestimating future ozone levels at monitors/receptors in Illinois, Wisconsin, Michigan, Colorado, and Southern California areas, and these underestimations may have prevented TCEQ from identifying nonattainment/maintenance receptors. Even with the underestimation of projected DVs, TCEQ identified several nonattainment/maintenance receptors in Colorado and California with linkages to Texas with contributions $\geq$ 0.7 ppb. The EPA's modeling results included in the March 2018 memorandum also identified nonattainment/maintenance receptors in the greater Denver area of Colorado (Jefferson County) that also had linkages to emissions from Texas. (Texas' contribution was greater than 0.7 ppb).

### 2.c. Model Performance Evaluation of TCEQ's 2012 base case at downwind areas in the Midwest and West.

TCEQ included a Model Performance Evaluation (MPE) analysis of their 2012 base case modeling in their SIP submission and in an Appendix to the SIP submission "Appendix C – Photochemical Model Performance Evaluation for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard." TCEQ included MPE by climate regions of the U.S. Included as Figure 2.1 below is TCEQ's Table 3-7 in their SIP submission which provides statistical model performance evaluation metrics for

TCEQ's 2012 base case modeling. The EPA reviewed the information in the appendix as well as model performance information available on TCEQ's websites.[27]

The EPA agrees with findings by TCEQ in Appendix C that model performance varied across the U.S. and that TCEQ's 2012 base case under predicted the high end of the distribution of observed MDA8 ozone concentrations in the Midwest and West, including the Chicago area, Southeast Wisconsin, Denver, Arizona, and Southern California areas.[28] These areas include sites that were identified in TCEQ's modeling and in the EPA's 2016v2 modeling as nonattainment/maintenance receptors.

Overall, the modeling indicates some model underestimation in the Upper Midwest, Ohio Valley, Southwest (includes Colorado monitors), and in the West (includes Southern California) regions. While this is mostly within typical ranges seen for Continental U.S. chemical transport modeling, underestimation bias may play some role in the much lower 2023 DVs that TCEQ's modeling is projecting at a number of potential receptor sites.

---

[27] TCEQ's Model Performance Evaluation was reviewed for downwind areas using information from TCEQ's websites (hyperlinks are embedded): 2015 Ozone NAAQS Transport SIP Modeling - Interactive Bar Chart - Texas Commission on Environmental Quality - www.tceq.texas.gov and 2015 Ozone NAAQS Transport SIP Modeling - Model Performance Statistics by Area and Day - Texas Commission on Environmental Quality - www.tceq.texas.gov.

[28] TCEQ SIP Submission, Table 3-7 at page 3-32; TCEQ SIP Submission "Appendix C Photochemical Model Performance Evaluation for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard."

Figure 2.1 - TCEQ's SIP Submission Table 3-7 Model performance evaluation statistical metrics by Region for TCEQ's 2012 base case

**Table 3-7: Statistical Model Performance Evaluation Metrics for TCEQ's 2015 Ozone NAAQS Transport SIP Revision Configuration**

| Climate Region | No. of Obs | MB (ppb) | ME (ppb) | NMB (%) | NME (%) | RMSE (ppb) |
|---|---|---|---|---|---|---|
| Northeast | 5281 | 4.1 | 8.4 | 5.9 | 12.2 | 11.0 |
| Ohio Valley | 9861 | -2.5 | 6.8 | -3.6 | 10.0 | 8.5 |
| Upper Midwest | 2950 | -6.2 | 8.3 | -8.9 | 11.9 | 9.9 |
| Southeast | 3203 | 3.1 | 6.8 | 4.7 | 10.2 | 8.8 |
| South | 5020 | -3.9 | 6.5 | -5.7 | 9.6 | 8.1 |
| Southwest | 7215 | -5.5 | 7.1 | -8.4 | 10.8 | 9.0 |
| Northern Rockies | 1084 | -7.5 | 8.6 | -11.8 | 13.4 | 10.4 |
| Northwest | 193 | -7.0 | 8.2 | -10.9 | 12.7 | 10.2 |
| West | 10672 | -9.2 | 10.4 | -13.1 | 14.9 | 12.7 |
| National | 45479 | -3.9 | 8.0 | -5.7 | 11.7 | 10.1 |

We have included two figures from TCEQ's SIP submission that show Mean Bias and Root Mean Square Error (RMSE) for each monitor in the domain. Included as Figure 2.2 is TCEQ's Figure 3-26 in their SIP submission, which provides mean bias for May through September 2012 at all of the EPA Air Quality System (AQS) monitoring sites for days with observed MDA8 ozone concentration ≥ 60 ppb. Figure 2.2 shows that the mean biases for days with MDA8 ozone concentrations ≥ 60 ppb differ by region, but at a number of monitors in the Chicago, southeastern Wisconsin, Denver, Arizona, and southern California areas, TCEQ's modeling has a negative mean bias.

Figure 2.3 (TCEQ's Figure 3-27 in their SIP submission) provides RMSE[29] for the May through September 2012 at AQS Monitoring Sites for each of the days with observed MDA8 > 60 ppb. The RMSE at most monitors in the modeling domain were in the range of 6 to 12 ppb. However, many monitors in the Midwest, including in the Chicago area and southeastern

---

[29] Root Mean Square Error (RMSE): This performance statistic (in units of ppb or micrograms per cubic meter($\mu$g/m$^3$)) is a measure of the average distance between predicted and observed values. It is calculated as the standard deviation of the difference between modeled and observed values

Wisconsin as well as monitors in Arizona and California, have higher deviations with RMSE in the 8 to 14 ppb range.

Figure 2.2 – TCEQ's SIP Submission Figure 3-26 showing Mean Bias at each monitor



**Figure 3-26: Mean Bias for the May through September 2012 Episode at AQS Monitoring Sites**

Figure 2.3 – TCEQ's SIP Figure 3-27 showing Root Mean Square Error (RMSE) at each monitor



**Figure 3-27: RMSE for May through September 2012 Episode at AQS Monitoring Sites**

The EPA examined TCEQ's model performance at monitors in Cook County, Illinois, Wisconsin, and Michigan that were identified in EPA's 2011-based modeling and its 2016v2 modeling as receptors to which Texas contributes $\geq$ 1 percent of the NAAQS. TCEQ's modeling underestimates MDA8 ozone at these monitors and TCEQ's modeling also underestimates observed values at key monitor/receptors in Colorado. Even with these underprediction concerns, TCEQ's modeling analysis still identified 4 nonattainment/maintenance receptors in Colorado including the Jefferson County (AQS ID 80590011), which the EPA also identified as a receptor with Texas linkage in modeling results included in our March 2018 memorandum. The ability of TCEQ's modeling to replicate the highest days both in Texas and at downwind areas is important to having an adequate modeling analysis to both assess potential nonattainment/maintenance receptors and linkages to upwind states. Both the EPA's modeling included in the March 2018 memorandum and TCEQ's modeling identified nonattainment/maintenance receptors in Jefferson County, CO. We also note that TCEQ's analysis also identified one additional receptor in Jefferson County, CO, one monitor in Larimer County, CO, and one receptor in Douglas County, CO with linkage impacts greater than 0.7 ppb from Texas emissions.

TCEQ's modeling also underestimates observed values at key monitor/receptors in Arizona and California that TCEQ identified as nonattainment and/or maintenance receptors with linkages to Texas. TCEQ did identify Texas emissions as having impacts of more than 0.7 ppb, and thus, linked to some nonattainment/maintenance receptors in Arizona and California.

The EPA finds that although TCEQ's modeling under predicts the highest measured MDA8 concentrations in downwind areas, including downwind areas that have been identified by TCEQ or EPA's 2016v2 modeling to have nonattainment/maintenance receptors, overall model performance does not indicate that TCEQ's modeling was egregiously flawed. That is,

the results of the base year model performance provided by TCEQ in their submittal does not appear to be a clear factor contributing to the likely underestimation of future year 2023 model-predicted DVs.

### 2.d. Model Performance Evaluation of TCEQ's 2012 base case at DFW and HGB monitors

In this section we present an evaluation of TCEQ's 2012 base case model performance in the DFW & HGB areas. We conducted this analysis to identify if there were any serious problems with TCEQ's 2012 base year model performance that might potentially affect the projection of future year DVs. TCEQ provides some model performance evaluation data for their 2012 base case modeling for this transport SIP on a website,[30] which the EPA used to generate the figures below, indicating some low bias at key monitor/receptors in the DFW and HGB area (Figures 2.4 a-f). The EPA has provided a time series using TCEQ's model performance information that indicates the observed Maximum Daily Average 8-hour ozone (MDA8) value in red and modeled value in blue for two monitors in the DFW area and one in the HGB area that were identified in the EPA's March 2018 memorandum that Oklahoma was linked (AQS ID 481210034 Denton County, AQS ID 484392003 Tarrant County, and AQS ID 480391004 Brazoria County). We also evaluated three additional monitors (Eagle Mountain Lake, Grapevine, and Frisco) in the DFW area, which are among the monitors that often have the highest DVs the DFW area. These figures also include quantile-quantile (Q-Q) scatter plots, comparing observed to modeled MDA8.In Table 2.6 the EPA provides statistical metrics for this

---

[30] TCEQ's Model Performance Evaluation was reviewed for DFW, HGB, and downwind areas using information from TCEQ's websites: 2015 Ozone NAAQS Transport SIP Modeling - Interactive Bar Chart - Texas Commission on Environmental Quality - www.tceq.texas.gov
 and 2015 Ozone NAAQS Transport SIP Modeling - Model Performance Statistics by Area and Day - Texas Commission on Environmental Quality - www.tceq.texas.gov

subset of DFW area monitors and for some of the HGB area monitors including the Manvel

Croix monitor (AQS ID 480391004) that typically have the highest DVs in the HGB area.

Figure 2.4(a) – Brazoria County – Manvel Croix Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Figure 2.4(b) – Denton County – Denton Airport South Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Figure 2.4(c) – Tarrant County – FAA Site Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Figure 2.4(d) – Tarrant County – Eagle Mountain Lake Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Figure 2.4(e) – Tarrant County – Grapevine Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Figure 2.4(f) – Collin County – Frisco Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Table 2.6 Model Performance Statistics for Select DFW and HGB monitors including sites identified as receptors in EPA's March 2018 Memorandum and EPA's 2016v2 modeling

| | | Select DFW Sites : Data with Observed ≥ 60 ppb | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Site | Valid Data | Mo ppb | Mm ppb | MB ppb | ME ppb | RMSE ppb | NMB % | NME % | FB % | FE % | R2 |
| Frisco | 480850005 | 68 | 69.25 | 65.49 | -3.76 | 6.43 | 7.95 | -5.43 | 9.28 | -5.66 | 9.55 | 0.345 |
| Denton Airport South | 481210034 | 51 | 69.82 | 65.92 | -3.91 | 5.20 | 6.99 | -5.60 | 7.44 | -5.86 | 7.73 | 0.529 |
| Eagle Mtn. Lake | 483670081 | 45 | 67.20 | 61.19 | -6.01 | 6.86 | 7.92 | -8.94 | 10.21 | -9.40 | 10.69 | 0.501 |
| FAA | 484390075 | 41 | 68.07 | 65.04 | -3.04 | 5.60 | 6.79 | -4.46 | 8.22 | -4.67 | 8.56 | 0.495 |
| Grapevine | 484392003 | 51 | 68.20 | 66.15 | -2.05 | 4.67 | 6.03 | -3.00 | 6.85 | -3.14 | 7.05 | 0.532 |
| | | | | | | | | | | | | |
| | | Select HGB Sites : Data with Observed ≥ 60 ppb | | | | | | | | | |
| Brazoria -Manvel Croix | 480391004 | 36 | 72.25 | 66.9 | -5.35 | 8.44 | 11.08 | -7.40 | 11.68 | -6.80 | 11.39 | 0.566 |
| Harris - Aldine | 482010024 | 18 | 68.00 | 72.76 | 4.76 | 6.37 | 8.61 | 6.99 | 9.37 | 6.47 | 8.90 | 0.424 |
| Harris - Northwest | 482010029 | 24 | 70.04 | 66.2 | -3.84 | 5.10 | 7.70 | -5.49 | 7.29 | -5.74 | 7.54 | 0.547 |
| Harris - Bayland Park | 482010055 | 28 | 70.39 | 72.76 | 2.37 | 6.03 | 7.98 | 3.36 | 8.57 | 3.28 | 8.18 | 0.537 |
| Harris -Deer Park #2 | 482011035 | 20 | 68.35 | 72.35 | 4.00 | 9.19 | 10.8 | 5.85 | 13.45 | 6.13 | 13.03 | 0.215 |

The time series and scatter/Q-Q plots along with the performance statistics show that there is a tendency for some underprediction of high observed ozone levels at these DFW and HGB monitors. However, overall, the ozone model performance statistics in Table 2.6 for the TCEQ 2012 modeling at these monitors are within or close to the ranges found in other recent peer-reviewed photochemical model applications (e.g., Simon et al, 2012 and Emory et al, 2017).[31,32] In this respect, base year model performance does not appear to be a factor in the potential under prediction of 2023 DVs at DFW and HGB area monitors.

### 2.e. Summary

TCEQ's 2023 future year projections may understate anticipated ozone levels at high ozone monitors in DFW and HGB and also in areas downwind of Texas including the Chicago area and downwind receptors in Wisconsin and Michigan, greater Denver area of Colorado, and in Southern California, as shown above by comparing 2020 monitored DVs to the projected 2023 DVs and examining the amount of ozone reductions that would be necessary to meet those projections compared with reasonably anticipated DV reductions based on long-term monitored DV trends. These likely underestimations in 2023 DVs may have prevented TCEQ from identifying nonattainment/maintenance receptors in the Chicago area and downwind receptors in Wisconsin and Michigan. Despite the underprediction, TCEQ's modeling did identify a number of receptors in Colorado and California that Texas emissions were linked (contribution equal or greater than 0.70 ppb).

---

[31] Simon, H., K.R. Baker, and S.B. Phillips, 2012. Compilation and Interpretation of Photochemical Model Performance Statistics Published between 2006 and 2012, *Atmospheric Environment*, 61, 124-139.

[32] Emery, C., Z. Liu, A. Russell, M. T. Odom, G. Yarwood, and N. Kumar, 2017. Recommendations on Statistics and Benchmarks to Assess Photochemical Model Performance. *J. Air and Waste Management Association*, 67, 582-598.

TCEQ's 2012 base case modeling tends to underestimate high MDA8 ozone concentrations at ozone monitors in the DFW and HGB areas and also at monitors in the Chicago, IL area (as well as downwind receptors in Wisconsin and Michigan), the greater Denver area of Colorado, and in Southern California to which Texas is linked in TCEQ's modeling and/or EPA's modeling. However, in view EPA's modeling guidance section 4.1 and as discussed above, the magnitude of MDA8 ozone bias in TCEQ's modeling in Texas and for downwind receptors is unlikely to have been a factor in the underestimating of projected DVs by TCEQ.

**3.     Comparison of TCEQ and EPA 2023 future modeling and identified maintenance and nonattainment receptors**

As described in the notice of proposed disapproval, the EPA has recently updated its air quality modeling for transport using the 2016v2 emissions platform. Using 2016 as a base year shortens the number of years to project ozone concentrations in 2023, compared to TCEQ's projection from a 2012 base year or the EPA's earlier projection from a 2011 base year. Also, using 2016 as a base year versus 2012 or 2011 allows for the use of monitored DVs from a more recent period. The combination of starting with more recent base period DVs and shortening the length of time between the base year and the future year provides more certainty compared to TCEQ's 2012-based or the EPA's 2011-based modeling. Thus, the 2016-based modeling is expected to provide more reliable projection of receptors and contributions in 2023.

The EPA's modeling using both 2011 and 2016 base year periods identified that Texas was linked to nonattainment and/or maintenance receptors in 2023 in the Midwest Region (Illinois, Wisconsin, and Michigan), while TCEQ's modeling using a 2012 base year indicated only linkages to western receptors.

In Table 3.1, the EPA provides the projected 2023 average and maximum DVs based on EPA's 2016v2 modeling, and projected average and maintenance DVs based on TCEQ's modeling for the nonattainment and/or maintenance receptors to which Texas is linked (Texas contributions of ≥ 0.7 ppb) based on EPA's 2016v2 modeling. This table also includes the contributions to these receptors from TCEQ's modeling and EPA's 2016v2 modeling, as well as the 2020 DVs and preliminary 2021 DVs at these receptors.[33]

---

[33] Monitoring data from the EPA's Air Quality System (AQS) (https://www.epa.gov/aqs). 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to the EPA, and reviewed and concurred on by the EPA.

**Table 3.1 Projected 2023 Nonattainment/Maintenance Receptors Identified by EPA Using EPA's 2016 base year modeling**

| Receptor (Site ID, County, State) | Nonattainment/Maintenance (EPA 2023) | EPA: 2023 Average DV/Maximum DV (ppb) | TCEQ: 2023 Average DV/Maintenance DV (ppb) | 2020 DV/Preliminary 2021 DV** (ppb) | EPA: Texas Contribution (ppb) | TCEQ: Texas Contribution (ppb) |
|---|---|---|---|---|---|---|
| 170310001, Cook County, IL | Maintenance | 69.6/73.4 | 60/58 | 75/71 | 0.86 | 1.6 |
| 170310032, Cook County, IL | Maintenance | 69.8/72.4 | 68/66 | 74/75 | 1.46 | 1.31 |
| 170314201, Cook County, IL | Maintenance | 69.9/73.4 | 64/62 | 77/74 | 1.15 | 1.25 |
| 170317002, Cook County, IL | Maintenance | 70.1/73.0 | 66/65 | 75/73 | 1.58 | 1.22 |
| 550590019, Kenosha County, WI | Nonattainment | 72.8/73.7 | 67/66 | 74/74 | 1.72 | 1.44 |
| 550590025, Kenosha County, WI | Maintenance | 69.2/72.3 | No data* | 74/72 | 1.81 | No data* |
| 551010020, Racine County, WI | Nonattainment | 71.3/73.2 | No data* | 73/73 | 1.34 | No data* |

* Kenosha AQS ID 550590025 was installed and began operating May 13, 2013, so the first three-year DV available is 2013-2015. Racine AQS ID 551010020 was installed on April 14, 2014 so the first three year DV available is 2015-2017. TCEQ's modeling used monitored DV data for 2010-2012, 2011-2013, and 2012-2014 to project to the future year. Since these monitors do not have valid DVs for these periods, TCEQ's modeling can't be used to project 2023 values and identify if they would be nonattainment or maintenance receptors.

** 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to the EPA, and reviewed and concurred on by the EPA.

The likely underestimation of anticipated 2023 DVs in the Midwest is a concern, especially in light of the fact that TCEQ did not identify any receptors in the Chicago area and downwind of Chicago areas of Wisconsin and Michigan while the EPA did identify receptors in these areas.

*Cook County, IL*

As shown in Table 3.1, the EPA identified four receptors as maintenance receptors in Cook County, IL. TCEQ's 2023 nonattainment DVs are 9-15 ppb lower than recent monitoring data. The four monitors that the EPA's 2016v2 modeling identified as maintenance receptors to which Texas is linked, all have 2020 DVs ≥ 74 ppb that would need their DVs to drop from a minimum 3-4 ppb up to 7 ppb in the next 3 years. Based on the trends analysis included in Section 1, typical ozone DV changes (no large changes in emissions and/or meteorology ozone conduciveness) would be anticipated to be 0-3 ppb for 3 years, indicating that it is unlikely that all these monitors will attain the NAAQS and would likely need even more ozone DV decreases to not be considered a maintenance receptor. TCEQ's modeling did not identify these four receptors as nonattainment and/or maintenance receptors. In TCEQ's modeling they project 2023 nonattainment DVs of 60 to 68 ppb for the four maintenance receptors that the EPA identified (2016v2), where EPA's 2023 nonattainment DVs range from 69 to 70 ppb for the four receptors. EPA's projected 2023 nonattainment DVs are higher than TCEQ's projected 2023 nonattainment DVs and closer to the recently monitored data. The EPA identified all four receptors as maintenance receptors. TCEQ's maintenance DVs, using only the 2012-2014 monitored DVs, projected 2023 maintenance DVs between 58 ppb and 66 ppb, which is 1 to 2 ppb lower than TCEQ's nonattainment DVs. As discussed above, TCEQ's methodology for identifying maintenance receptors does not identify areas that may struggle with maintaining the standard in

the face of inter-annual variability in ozone-conducive conditions. It is worth noting that if TCEQ's modeling had identified any of these four receptors as maintenance receptors, TCEQ's modeling estimates contributions from Texas sources ranging from 1.22 ppb to 1.6 ppb, and therefore Texas would have been linked to these receptors for further analysis of potential emission reductions.

*Wisconsin*

As shown in Table 3.1, the EPA identified two receptors as nonattainment receptors and one as a maintenance receptor in Wisconsin. As footnoted in Table 3.1, TCEQ modeled a 2012 base case so TCEQ's modeling can only be used for monitors that had a one or more valid DVs in the 2010-2014 period. Only the Kenosha County AQS ID 550590019 monitor had a valid DV during this time, as the other two monitors were not installed until 2013-2014. The EPA's modeling uses a 2016 base case, so the EPA had valid DVs for all three monitors in Wisconsin to project 2023 DVs. TCEQ's projected nonattainment DV is 5 ppb lower than EPA's 2023 nonattainment DV and 7 ppb lower than recent monitored data. The three monitors that the EPA's 2016v2 modeling identified as a nonattainment and/or maintenance receptors to which Texas is linked have 2020 DVs of 73ppb, 74ppb, and 74 ppb and preliminary 2021 DV of 72 ppb, 73 ppb, and 74 ppb. TCEQ's modeling only had projections for one of these receptors but did not identify it as a nonattainment and/or maintenance receptor. Again, TCEQ's maintenance methodology proved to be less stringent than the nonattainment methodology and resulted in the maintenance methodology DV being 1 ppb lower than the nonattainment methodology DV. It is worth noting that if TCEQ's modeling had identified the one Wisconsin receptor that they had valid base DVs as nonattainment or maintenance, TCEQ's modeling indicated that contributions

from Texas sources was 1.44 ppb and therefore Texas would have been linked to these receptors for further analysis of potential emission reductions.

Overall, TCEQ's modeling resulted in no receptors being identified in the Illinois, Wisconsin, Michigan areas. The analysis here shows that by comparing current measured DVs that are only 2 to 3 years from 2023 with the TCEQ 2023 DVs used for identifying maintenance receptors, it is clear that the TCEQ method is flawed. TCEQ claims that five receptors will not have a problem maintaining the NAAQS when, in fact, the current DVs for these five sites are 4 to 7 ppb above the NAAQS using 2020 DVs and 1 to 5 ppb above the NAAQS using preliminary 2021 DVs, indicating that it is unlikely that all these monitors will attain the NAAQS and would likely need even more ozone DV decreases to not be considered a maintenance receptor. While the TCEQ modeling projects lower overall ozone levels for these areas in 2023, TCEQ's modeling does tend to corroborate the amount of projected impact that emissions from Texas may be contributing to 5 of the 7 nonattainment and maintenance receptors identified by the EPA's most recent air quality modeling, EPA MP2016v2 modeling, as having a Texas contribution greater than or equal to one percent of the 2015 ozone NAAQS (0.7 ppb). The EPA MP2016v2 modeling found that Texas is linked to nonattainment and maintenance receptors in Cook County Illinois, and Wisconsin Counties (Kenosha and Racine).

### 4.    Other Potential Modeling Concerns

#### *4.a. EGU Emissions*

TCEQ did not use the latest EGU emissions available at the time they proposed the SIP that incorporated reductions from the CSAPR Update/latest ERTAC projections in their modeling. It is unclear if this made any substantial changes in the modeling analysis without updating the EGU emissions and redoing the modeling.

### 4.b. Contribution Calculation

TCEQ used an alternate methodology for calculating contributions in determining the contributions from Texas emissions at each monitor Texas identified as a receptor in Colorado, Arizona, and Southern California.

To understand the differences, we first describe the EPA's method for calculating the contribution from an upwind state's emissions at downwind monitors. We note that in the Federal Register Notice Section II.B.4 and Section III.B.3, that is also referred to elsewhere in the Federal Register Notice, there is an error in describing how the EPA calculates future year 2023 contributions. The EPA's approach for calculating contributions is summarized below followed by a more detailed four step description of the methodology. For more details on how EPA calculates contributions see the "Air Quality Modeling TSD for 2015 Ozone NAAQS Transport SIP Proposed Actions".[34]

The EPA's approach for calculating 2023 average contribution metric values at individual monitoring sites is to first average daily contributions on the days with the highest predicted MDA8 ozone concentrations in the grid cell containing the monitor based on the air quality modeling for 2023 and then calculate the ratio of the average contribution to the corresponding average MDA8 concentration across the selected days. The resulting ratio is applied to the projected 2023 design value to provide contribution metric values for each state at each monitoring site nationwide. As part of this method, contributions and concentrations are selected from the days with the top-10 MDA8 ozone concentrations in 2023. Note that EPA does not calculate contributions for those monitoring sites where there are fewer than 5 days with 2023 MDA8 ozone concentrations ≥ 60 ppb for that monitor.

---

[34] This TSD can be found in Docket ID No. EPA-HQ-OAR-2021-0663

For clarity and further analysis of the differences with TCEQ's methodology we are including a more detailed four step description of the EPA's methodology (see "Air Quality Modeling TSD for 2015 Ozone NAAQS Transport SIP Proposed Actions").[35]

(1) For the model grid cells containing an ozone monitoring site, calculate the 8-hour average contribution from each source tag[36] to each monitoring site for the time period of the 8-hour daily maximum modeled (i.e., MDA8) concentration on each day in 2023;

(2) Average the MDA8 concentrations for each of the top 10 modeled ozone concentration days in 2023 and average the 8-hour contributions for each of these same days for each tag;[37]

(3) Divide the 10-day average contribution for each tag by the corresponding 10-day average concentration to obtain a Relative Contribution Factor (RCF) for each tag for each monitoring site;

(4) Multiply the 2023 average design values by the corresponding RCF to produce the average contribution metric values at each monitoring site in 2023.

TCEQ's methodology differs in that it selects 2023 contributions from the days with the highest MDA8 ozone concentrations in 2012, not 2023 as in EPA's method. In addition, TCEQ selects contributions from among the 3 x 3 set of model grid cells including and adjacent to the

---

[35] This TSD can be found in Docket ID No. EPA-HQ-OAR-2021-0663.

[36] A "tag" is a contribution category. For example, in the state-by-state source apportionment model run, we "tagged" anthropogenic NOx and VOC emissions for individual states to track the formation of ozone from these emissions.

[37] When calculating the contribution metric values EPA applied a criterion that 5 or more of the top 10 model-predicted concentration days must have MDA8 concentrations >= 60 ppb in the future year in order to calculate a valid contribution metric. The criterion of having at least 5 days with MDA8 ozone concentrations >= 60 ppb was chosen to avoid including contributions on days that are well below the NAAQS in the calculation of the contribution metric. Using 5 days with MDA8 ozone >= 60 ppb aligns with recommendations in EPA's air quality modeling guidance for projecting future year design values, as described above. The EPA did not calculate contribution metric values for any monitor that did not meet this criterion.

grid cell containing the monitor based on whatever grid cells are included in the calculation of projected design values. The EPA's method, on the other hand, uses 2023 contributions from just the grid cell containing the monitor.

More specifically, TCEQ's methodology differs from step 1, above, in that they use the contribution for the cell that had the maximum 2012 MDA8 value from a 3x3 matrix centered around the grid cell that has the monitor, whereas the EPA uses the contribution for the cell that includes the monitor. Note TCEQ is using the 2012 modeled values for selecting the MDA8 value. TCEQ's methodology differs in step 2 in that they use the 10 highest MDA8 days in the 2012 modeling instead of the EPA's method that uses the 10 highest MDA8 days in the 2023 modeling. One artifact of TCEQ's method is that the modeled contributions used to calculate the average contribution metric may be based on contributions on different days and in different grid cells than EPA's method.

TCEQ's also uses 2012 modeled values in step 3 to calculate the Relative Contribution Factor and in step 4 to produce the average contribution metric using the 2012 total modeled concentration values. Whereas the EPA uses the 2023 data in steps 3 and 4.

It is unclear how the methodological differences ultimately affect the contribution values and which receptors Texas is linked compared to the EPA's methodology. As noted in Section 3 for receptors that EPA identified in Illinois and Wisconsin, TCEQ's contribution method did result in contributions that were relatively similar in magnitude compared to EPA's 2016v2 contribution results. The EPA does not agree with TCEQ's use of the 2012 modeled days for selecting the days in 2023 to calculated contribution. Regardless of this issue, TCEQ's methodology  did identify contributions above 0.7 ppb at nonattainment/maintenance receptors in Colorado, Arizona, and Southern California.

### 4.c. Future Year Boundary Conditions

In generating their future year boundary conditions, TCEQ used estimated 2023 emissions from the Representative Concentration Pathway (RCP) scenario 8.5 developed by the Intergovernmental Panel on Climate Change (IPCC). This includes some estimated changes based on climate modeling. The EPA typically has not seen adjustment in future year boundary conditions for climate changes included in SIP modeling; without a modeling sensitivity analysis, the actual impact cannot be quantified. The actual impact is expected to be a relatively small contribution to the total modeled concentrations in TCEQ's transport SIP modeling and would not be expected to significantly change the total modeled concentrations.

### 5.    TCEQ Other Factor Analysis (Weight of Evidence)

TCEQ stated that the Texas contribution to a receptor should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. To try and assess persistent and consistent patterns, TCEQ did some additional analysis of several different factors such as DV trends, number of elevated ozone days, back trajectory analyses on elevated ozone days, modeled concentrations on future expected elevated ozone days, total interstate contributions at tagged monitors, consideration of conceptual model of downwind area, and responsiveness of ozone to emissions from Texas. Based on their assessment, TCEQ concluded that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at any downwind monitors.

### TCEQ Summary

For Colorado receptors, TCEQ provided analysis of: current attainment status and design value trends, number of days with elevated observed ozone, back trajectory analysis on elevated

ozone days, the modeled contributions on expected elevated ozone days, collective interstate contribution, alternate contribution method analysis, and the responsiveness of ozone formation at the tagged Colorado monitors to Texas $NO_X$ emissions. TCEQ evaluated these factors in a general weight of evidence approach and concluded that Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the tagged monitors in Colorado.

For California receptors, TCEQ provided analysis of: current attainment status and design value trends, number of days with elevated observed ozone, back trajectory analysis on elevated ozone days, the modeled contributions on expected elevated ozone days, collective interstate contribution, TCEQ evaluated these factors in a general weight of evidence approach and concluded that Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the tagged monitors in California.

While these additional factors can be informative to supplement an air quality modeling-based analysis of some of the complexities of ozone formation in downwind areas, how ozone is changing in those areas, areas that may contribute to downwind areas, modeled contributions from upwind areas, and potential responsiveness to upwind changes in emissions, most of these analyses do not provide the quantitative assessment that chemical transport modeling with source contribution analyses that air quality modeling provides. Chemical transport modeling is the most technically credible tool available to project future year ozone levels, contributions from upwind states, and frequency of the impacts of upwind states.

The EPA has reviewed these analyses that TCEQ provided in a Weight of Evidence approach for receptors in Colorado and California and found significant concerns with some of the analyses. Specifically, the EPA's assessment of the totality of TCEQ's Weight of Evidence

factors for Colorado and California receptors is that they were in conclusive or do not provide sufficient, substantial evidence that counters the results of photochemical modeling, including the contribution analysis using EPA's contribution methodology. The EPA does not concur with TCEQ's conclusion that Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the tagged monitors in California. The EPA has included some comments, concerns, and limitations with using these factors that Texas used to negate the findings of the chemical transport model below.

### 5.a. TCEQ indicated that there are problems with DV trends

TCEQ provided analyses of recent DV trends at the 4 Colorado monitors that TCEQ identified as nonattainment/maintenance receptors. TCEQ stated that 2013 was a high monitored ozone year but that the most recent DVs at the time of their SIP submittal (2016 DVs) at most monitors show attainment and long-term ozone decreases are modest for the time evaluated (see Figure 1.8 above that is TCEQ's SIP Figure 3-40).

TCEQ also provided analyses of recent DV trends at the tagged California monitors along with the other monitors located in the Los Angeles CSA. These trends are displayed in TCEQ's SIP Figure 3-56: Eight-Hour Ozone Design Values for Monitors in the Los Angeles Area that is included above (see Figure 1.12 above that is TCEQ's SIP Figure 3-56). TCEQ colored the tagged California monitors and used gray coloring for the other monitors in the Los Angeles CSA. The 10 monitors tagged had eight-hour ozone design values ranging from 101 ppb to 80 ppb in 2016. TCEQ indicated that 8-hour ozone DVs values in the area have decreased overall for the past 10 years and the 10 monitors tagged for further review have observed eight-hour ozone design value decreases from 2007 through 2016 ranging from 13% at Reseda (AQS ID: 60371201) to 5% at Victorville-Park Avenue (AQS ID: 60710306).

The most recent monitoring data and trends are useful to help identify whether the monitors are currently near or above the 8-hour ozone NAAQS. See Figures 1.9 and 1.13, above, and Table 5.1 below, which includes the 2021 preliminary DV.[38] We note that the AQS ID 80590011 (Jefferson County, Colorado) monitor 2016 DV is similar to the 2012 monitor DV despite four more years of fleet turnover in the Denver area. Overall, the DV trends show that ozone levels are reducing at a slow pace. Based on the data for the Colorado monitors and the ten California area monitors identified by TCEQ as receptors, the 2020 DVs and the long-term trends do not clearly show that the receptors in California or Colorado are expected to be below the NAAQS, and thus, not be potential nonattainment or maintenance receptors in 2023. The modeling trends analysis for California and Colorado receptors do not provide evidence that these receptors will attain by 2023.

---

[38] EPA Analysis of 8-hour Ozone monitor trends. Data and calculations available in "Ozone_Trends_R6_TSD.xlsx" included in Docket ID No. EPA-R06-OAR-2021-0801.

**Table 5.1  2020 DV and Preliminary 2021 DV and TCEQ 2023 projections and contributions for receptors identified by TCEQ**

| Receptor (Monitor ID, County, State) | TCEQ 2023 Average DV (ppb) | TCEQ 2023 Maintenance DV (ppb)* | Texas Contribution (ppb) | 2020 DV / Preliminary 2021 DV** (ppb) |
|---|---|---|---|---|
| 80350004, Douglas, CO | 73 | 72 | 1.42 | 81/83 |
| 80590006, Jefferson, CO | 72 | 73 | 1.26 | 79/81 |
| 80590011, Jefferson, CO | 71 | 71 | 1.26 | 80/83 |
| 80690011, Larimer, CO | 72 | 71 | 1.22 | 75/77 |
| 80050002, Arapahoe, CO | 70*** | 71 | 1.15 | 77/80 |
| 40038001, Cochise, AZ | 71 | 69**** | 1.06 | 66/66 |
| 60371201, Los Angeles, CA | 80 | 78 | 0.76 | 92/87 |
| 60371701, Los Angeles, CA | 80 | 82 | 0.72 | 88/90 |
| 60376012, Los Angeles, CA | 87 | 86 | 0.9 | 101/101 |
| 60658001, Riverside, CA | 88 | 85 | 0.73 | 96/95 |
| 60658005, Riverside, CA | 84 | 83 | 0.71 | 98/97 |
| 60710001, San Bernardino, CA | 71 | 72 | 0.84 | 81/77 |
| 60710306, San Bernardino, CA | 76 | 77 | 0.81 | 83/83 |
| 60711004, San Bernardino, CA | 91 | 90 | 0.88 | 106/103 |
| 60714001, San Bernardino, CA | 82 | 79 | 0.86 | 87/87 |
| 60714003, San Bernardino, CA | 94 | 91 | 0.74 | 114/114 |

* Uses TCEQ's Maintenance receptor methodology that EPA has concerns (see Section 1 on maintenance receptor methodology discussion).

** 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to the EPA, and reviewed and concurred on by EPA.

*** From TCEQ spreadsheet of future 2023 DVs with state contributions.

**** TCEQ did not provide calculations for this receptor so EPA calculated from the Relative Response Factor in TCEQ spreadsheet of future 2023 DVs with state contributions and the monitor's 2012-2014 DV (0.983 X 71 ppb, truncation applied).

### 5.b. TCEQ evaluated the number of elevated ozone days (over 70 ppb) annually for monitors in the Denver and Southern California areas.

For the greater Denver area Colorado, TCEQ provided number of days over 70 ppb trends for 2007-2016 indicating decreases in the number of such days over the long-term and that 2012 was the highest year in terms of the number of exceedance days at the five monitors evaluated. However, in 2016 3 of 5 monitors had more than 10 days of monitored exceedances and one monitor had more exceedances in 2016 than it had in 2014 and 2015. TCEQ also provided a similar analysis of trends in California for 2012 thru 2016, which shows a general decrease in monitored ozone days above 70 ppb from 2012 for most of the 10 monitors tagged by TCEQ's modeling, but most monitors still have 30-95 monitored exceedance days (MDA8 > 70 ppb) in 2016. This data supports that the number of ozone exceedance days are improving but neither the Colorado nor California analysis of number of exceedance days annually provide any evidence to refute the photochemical modeling analysis results.

### 5.c. TCEQ Back Trajectory Analysis

TCEQ provided multi-year back trajectory analyses (2012-2016) for all the monitored ozone exceedance days at the five monitors in Colorado and at the 10 monitors in Southern California using National Oceanic and Atmospheric Administration (NOAA) HYbrid Single Particle Lagrangian Integrated Trajectory (HYSPLIT)[39]. TCEQ performed 72-hour back trajectories for both Colorado and California monitors. Given the large distance from Texas to Colorado and Texas to California, 120-hour back trajectories should have been considered. Most

---

[39] HYbrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) model is a complete system for computing both simple air parcel trajectories and complex dispersion and deposition simulations. The model is designed to support a wide range of simulations related to the atmospheric transport and dispersion of pollutants and hazardous materials to the Earth's surface.

of the Colorado back trajectories only reached central or northern Texas so longer back trajectories should have been completed (see TCEQ SIP submission, Figure 3-42). TCEQ used start heights of 500 m Above Ground Level (AGL), 1000 m AGL, and 1500 m AGL. The EPA would also recommend running a 100 m AGL start height as well since both areas have complex terrain nearby or in the potential pathways that could result in different back trajectory paths due to the difference in meteorology between 100 m AGL and 500 m AGL. Another concern is that TCEQ used the 1st hour of the 8-hour exceedance as the start time instead of mid 8-hour or highest 1-hour number as the start time. The EPA typically uses a mid-8-hour or later start time, or runs multiple trajectories with varying start times as the transport patterns often change throughout the monitored 8-hour exceedance. Not running multiple hours for the start time, or at least the highest 1-hour or the middle of the 8-hour period when monitored 1-hour values are typically higher than the 1st hour of the 8-hour period, results in uncertainty and a general concern that the analysis is not complete. This translates into a concern that trajectories provided by TCEQ are incomplete and may not be representative of transport patterns that occurred during monitored 8-hr ozone exceedances because of the way TCEQ structured and performed the HYSPLIT analyses that results in only a limited set of trajectories. For example, just the trajectory length time results in a number of trajectories for Colorado and California that could have crossed Texas if a longer trajectory time had been used.

TCEQ also screened the back trajectories out if they touched the ground at some point and also screened out any trajectories that were not below the Planetary Boundary Layer (PBL) over Texas. TCEQ also screened out back trajectories if the back trajectory start height at the point above the receptor was above the PBL. The EPA has multiple concerns with the screening out of trajectories that TCEQ performed.

Before we explain our specific concerns with the screening out of back trajectories, it is important to understand what HYSPLIT back trajectories represent and their limitations. HYSPLIT back trajectory analyses use archived meteorological modeling that includes actual observed data (surface, upper air, airplane data, etc.) and modeled meteorological fields to estimate the most likely route of an air parcel transported from a particular location at a specified time. The method essentially follows a parcel of air backward in hourly steps for a specified length of time. HYSPLIT estimates the central path in both the vertical and horizontal planes. The HYSPLIT central path represents the centerline with the understanding that there are areas on each side horizontally and vertically that also contribute to the end point at the monitor. The horizontal and vertical areas from the centerline grow wider the further back in time the trajectory goes. Therefore, a HYSPLIT centerline does not have to pass directly over emissions sources or emission source areas, but merely relatively near emission source areas. Nor does the HYPSLIT centerline have to be below the PBL over Texas as the vertical spread area on the centerline for distances of 300 to 600 miles or more would most likely be below the PBL even if the centerline was well above the PBL. Likewise, even if a centerline is indicated as touching down, that adds some uncertainty but does not void the back trajectory. Given the distance from Texas to Colorado receptors and Texas to California receptors, it is unclear how many back trajectories TCEQ inappropriately screened out when the centerline was close to Texas such that the horizontal spread area could encompass areas of Texas but did not directly cross any parts of Texas. In addition, Figure 3-42 in TCEQ's SIP submission indicates that many of the 72-hour trajectories that pass over Texas end before they have fully traversed Texas. Some of these trajectories may have been screened out because they were not below the PBL, but may have been below the mix layer in Texas and thus retained for the analysis if longer than 72-hour

trajectories had been performed. Starting the back trajectories with only the 1st hour of the 8-hour ozone exceedance means that the trajectory is started when the PBL is usually the lowest. With a later start hour (middle of the 8-hour, multiple start hours, etc.) the PBL would be higher in most cases. Thus, the TCEQ only using the 1st hour may have resulted in back trajectories not being performed or being screened out when a later start time would have resulted in a back trajectory that passed TCEQ's screening based on start height and PBL. Regardless, the EPA does not agree with screening out of trajectories as TCEQ has done in their analysis. The multiple ways that TCEQ inappropriately screened out trajectories, along with the several other issues mentioned above, limits the information that can be gleaned from TCEQ's HYSPLIT and Endpoint trajectory analysis for receptors in Colorado and California.

The EPA finds back trajectory analysis can be potentially useful as a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model "linkages." Since the back trajectory calculations do not account for any air pollution formation, dispersion, transformation, or removal processes as influenced by emissions, chemistry, deposition, etc., the trajectories cannot be used to develop quantitative contributions. Therefore, back trajectories cannot be used to quantitatively evaluate the magnitude of contributions from upwind states to downwind receptors.

For Colorado, TCEQ proffered that their trajectory analysis of transport from Texas to Colorado indicates that emissions from Texas are unlikely to affect ozone concentrations in the mixing layer over Colorado on elevated ozone days and Texas contribution should not be deemed significant. TCEQ asserted that filtering the back trajectories by only looking at trajectories from the beginning of elevated ozone episodes, that start within Colorado's mixing

layer, that do not hit the surface, and that have endpoints within Texas' mixing layer is an attempt to find a clear case where emissions in Texas would affect the ozone in Colorado. TCEQ concluded that, using those filters, 6% of elevated ozone days in Colorado had trajectories that reached the mixing layer in Texas, and 66% of those days during the 2007-2016 period occurred in 2011 and 2012. The EPA finds this analysis is flawed by the way TCEQ performed the HYSPLIT back trajectories and by the inappropriate screening out of back trajectories. TCEQ concluded that there are many years where no back trajectories reach Texas from Colorado and that in the years where TCEQ determined that no back trajectories reached Texas, the tagged monitors still observed a high number of elevated ozone days and fourth-highest eight-hour ozone concentrations above 70 ppb. The EPA finds these conclusions to be inadequately supported due to the way TCEQ performed and generated the back trajectories and TCEQ's excessive use of filters. For these reasons, EPA also disagrees with TCEQ's conclusion that Texas may not be upwind in 2015 and 2016 during any elevated ozone days at any of the five sites shown in Figure 3-44 of TCEQ's SIP submission. The EPA notes that endpoint analysis and percentage of endpoints generally provides limited value but due to the concerns with the overall back trajectory analysis, the EPA finds little value in the endpoint analysis that TCEQ provided.

TCEQ did indicate that there were also many more elevated eight-hour ozone days observed in 2012 compared to other years and that this may indicate that there were some unusual meteorological patterns that occurred in 2012 that resulted in a more severe ozone season. TCEQ noted that overall, trends in the fourth-highest eight-hour ozone concentrations have only slightly decreased at the Colorado receptors that TCEQ identified. The EPA concludes that TCEQ's HYSPLIT back trajectory analysis for the Colorado receptors is flawed and does

not in itself provide sufficient evidence to counter the results of TCEQ's modeling regarding the downwind distance of interstate transport due to emissions from Texas.

For California, TCEQ performed a similar HYSPLIT back trajectory analysis for ozone exceedance days at the 10 monitors that TCEQ identified in Southern California to which TCEQ found Texas potentially linked. TCEQ performed the HYPSLITs the same way that they did for the Colorado receptors including the inappropriate screening of trajectories, and other issues discussed above in review of TCEQ's back trajectory and endpoint analysis for ozone exceedances for the Colorado receptors.

For the same reasons the EPA finds TCEQ's Colorado back trajectory and endpoint analyses flawed, we conclude that TCEQ's HYSPLIT back trajectory and endpoint analyses for the California receptors is flawed and does not provide evidence rebutting TCEQ's photochemical modeling that Texas may be linked to these California receptors.

### 5.d. Texas contribution on all days in 2023 with ozone greater than 70 ppb.

TCEQ evaluated contributions from Texas on projected future year elevated ozone days in their chemical transport modeling. TCEQ evaluated the subset of 2023 days with modeled MDA8 greater than 70 ppb, and TCEQ calculated the average modeled Texas contributions for this subset of days (i.e., the "TX-ALT" method). Table 3-14 in TCEQ's SIP submission is included below as Table 5.2. TCEQ also provided this same analysis for the receptors identified in Southern California and included the results in its SIP submission in Table 3-17, which is included below as Table 5.3.

**Table 5.2 TCEQ evaluation of Texas contribution to 2023 modeled days with MDA8 values greater than 70 ppb at receptors in Colorado**

Table 3-14: Modeled Elevated Ozone Days in the Future Year at the Tagged Colorado Monitors

| Site Name | AQS ID | Number of Future Elevated Days | Average Texas Contribution on Future Elevated Ozone Days (ppb) | Average MDA8 on Future Elevated Ozone Days (ppb) | Percentage of Texas Contribution in MDA8 |
|---|---|---|---|---|---|
| Chatfield State Park | 80350004 | 9 | 0.77 | 73.05 | 1.06% |
| Rocky Flats | 80590006 | 10 | 0.89 | 73.64 | 1.21% |
| National Renewable Energy Labs-NREL | 80590011 | 11 | 0.86 | 74.09 | 1.16% |
| Fort Collins-West | 80690011 | 2 | 0.56 | 73.06 | 0.77% |
| Highland Reservoir | 80050002 | 8 | 0.52 | 73.80 | 0.71% |

TCEQ proffered in assessing this information that for the Colorado monitors, the expected average Texas contribution using all days greater than 70 ppb is a small percentage of the projected average MDA8 on these days. As a result, TCEQ argued that these impacts are not significant, since the average contribution is less than one ppb for all the monitors and high ozone occurs on relatively few days (2-11 days). TCEQ further discounted these results by alleging that there are uncertainties associated with model predictions.

**Table 5.3 TCEQ evaluation of Texas contribution to 2023 modeled days with MDA8 values greater than 70 ppb at receptors in Southern California**

| Table 3-17: Modeled Elevated Ozone Days in the Future Year | | | | | |
|---|---|---|---|---|---|
| Site Name | AQS ID | Number of Elevated Days in 2023 | Average Texas Contribution on Elevated Ozone Days in 2023 (ppb) | Average MDA8 on Elevated Ozone Days in 2023 (ppb) | Percentage of Texas Contributions in MDA8 |
| Reseda | 60371201 | 9 | 0.53 | 73.33 | 0.73% |
| Pomona | 60371701 | 60 | 0.26 | 76.87 | 0.35% |
| Santa Clarita | 60376012 | 13 | 0.41 | 73.94 | 0.56% |
| Rubidoux | 60658001 | 57 | 0.30 | 77.67 | 0.39% |
| Mira Loma (Van Buren) | 60658005 | 57 | 0.30 | 77.67 | 0.39% |
| Barstow | 60710001 | 1 | 0.00[33] | 70.82 | 0.00% |
| Victorville-Park Avenue | 60710306 | 5 | 0.19 | 72.24 | 0.27% |
| Upland | 60711004 | 57 | 0.31 | 77.21 | 0.41% |
| Hesperia-Olive Street | 60714001 | 12 | 0.23 | 73.50 | 0.32% |
| Redlands | 60714003 | 54 | 0.29 | 77.12 | 0.38% |

For California monitors, TCEQ indicated that the calculated average Texas contribution on projected future elevated ozone days (2023 modeled days with MDA8 greater than 70 ppb) is less than 1% of the projected average MDA8 at all of the monitors on these days.

As stated earlier in Section 4 of this TSD, TCEQ's methodology for calculating contributions from Texas to downwind receptors is based on the average contribution on the same days and grid cells that TCEQ used for calculating RRFs to project base period DVs to 2023. Specifically, in that method, TCEQ used the 2023 contributions for the top 10 days (with a minim of five days) in the 2012 modeling among the 3 x 3 matrix of grid cells that include and surround the location of the monitoring (i.e., the "TX-Primary" method). The EPA's concerns with this method are described in Section 4.b, above. For comparison with this alternative contribution analysis that uses all days with modeled 2023 MDA8 values over 70 ppb (TX-ALT

method), contributions based on TCEQ's TX-Primary method using 5 to 10 days for these Colorado and California receptors is included in Table 5.1 above. The EPA notes that there are large differences in contributions at individual receptors in Colorado and, in particular, California between the two methods. Both methods demonstrate that Texas contributes above the 1 percent of the NAAQS threshold to receptors Colorado. However, this is not the case for the California receptors where the contributions based on the TX-ALT method are below the 1 percent threshold to all receptors to which Texas was linked using the TX-Primary method. For example, the contributions from Texas to the Reseda, CA receptor are 0.76 ppb and 0.53 ppb using the TX-Primary and TX-ALT-based methods, respectively. In addition, the contributions to the Hesperia-Olive Street receptor are 0.86 ppb and 0.23 ppb using the TX-Primary and TX-ALT-based methods, respectively. For both receptors, the TX-Primary contributions represent the average contribution in 2023 over approximately the top-10 modeled days whereas the TX-ALT method represents the average contribution for all days with 2023 MDA8 values above 70 ppb. Thus, the only known difference between the two methods is the number of days used in calculating the average contribution and that TX-ALT only uses days with 2023 modeled MDA8 values > 70 ppb (without a minimum or maximum number of days) which is different than TX-Primary method. In their submittal, TCEQ did not provide any explanation for the large inconsistencies in contributions between the two methods at these and other sites. These inconsistencies call into question the ability of either or both of the TCEQ methods to provide technically credible robust estimates of 2023 contributions from Texas to downwind receptors.

### 5.e. Collective Interstate Contribution to Future DV

TCEQ provided an analysis of collective interstate contribution to the 2023 DVs for the five Colorado and ten California receptors. The collective interstate contribution at tagged Colorado receptors ranges from 9.32% to 10.27% of the corresponding 2023 DV (see Table 5.3

below). The collective interstate contribution at tagged California receptors ranges from 3.2% to

4.58% of the corresponding 2023 DV (see Table 5.4 below). TCEQ argues that these are small

percentages (Colorado and California) and not as high as the collective interstate contribution

percentages the EPA calculated for monitors in Eastern States, which ranged from 17% to 67%.

TCEQ also notes that a significant portion of the tagged Colorado monitors' 2023 modeled DVs

is due to background emissions (sum of contributions from to biogenic, fires, and boundary

conditions). For the California receptors TCEQ argues that these percentages are small compared

to Intra-State contribution.

As an initial matter, the EPA is not solely relying on TCEQ's findings of linkages to

Colorado and California but is also relying on its own findings of linkages to areas in the

Midwest Region. As such, TCEQ's analysis of collective contributions to Colorado and

California does not provide justification for not addressing downwind impacts. Nonetheless, the

EPA has found in the past that certain California receptors are so heavily impacted by local

emissions, and total upwind contribution is so low, that those receptors may not be considered to

be affected by interstate ozone transport. *See* 81 FR 15200 (Mar. 22, 2016). However, this is a

narrow circumstance that does not apply in the vast majority of cases and has never been applied

outside of California. The EPA has previously found, for instance, that receptors in Colorado are

heavily impacted by upwind-state contribution. *See* 82 FR 9155 (Feb. 3, 2017); 81 FR 71991

(Oct. 19, 2016). The EPA need not draw any conclusions here regarding whether the California

sites TCEQ identified should or should not be considered receptors for ozone-transport purposes.

EPA affirms, contrary to TCEQ's suggestion, that the Colorado receptors TCEQ analyzed are

impacted by upwind state contributions. However, the EPA's finding that Texas is linked to

receptors in other states is based on still other linkages found in the EPA's modeling to receptors

in other states, which are clearly impacted by the collective contribution of multiple upwind states, including Texas. Under CAA section 110(a)(2)(D)(i)(I), downwind states are not obligated to reduce emissions on their own to resolve nonattainment or maintenance problems. Rather, states are obligated to eliminate their own significant contribution or interference with the ability of other states to attain or maintain the NAAQS.

**Table 5.3 – Collective Interstate Contribution to Future DVs at Tagged Colorado Monitors *from* TCEQ's SIP Table 3-15**

**Table 3-15: Collective Interstate Contribution to Future Design Value at Tagged Colorado Monitors**

| Site Name | AQS ID | Percentage of 2023 $DV_F$ from Background Contribution | Percentage of 2023 $DV_F$ from Collective Interstate Contribution | Percentage of 2023 $DV_F$ from Intra-State Contribution |
|---|---|---|---|---|
| Chatfield State Park | 80350004 | 62.12% | 9.86% | 25.44% |
| Rocky Flats | 80590006 | 60.57% | 10.21% | 26.88% |
| National Renewable Energy Labs-NREL | 80590011 | 60.33% | 10.27% | 27.04% |
| Fort Collins-West | 80690011 | 67.42% | 9.32% | 20.88% |
| Highland Reservoir | 80050002 | 62.47% | 9.88% | 25.28% |

**Table 5.4 –Collective Interstate Contribution to Future Design Value at Tagged California Monitors *from* TCEQ's SIP Table 3-18**

Table 3-18:   Collective Interstate Contributions to Future Design Values at Tagged California Monitors

| AQS ID | Site Name | Percentage of 2023 $DV_F$ from Background Contribution | Percentage of 2023 $DV_F$ from Collective Interstate Contribution | Percentage of 2023 $DV_F$ from Intra-State Contribution |
|--------|-----------|------|------|------|
| 60371201 | Reseda | 32.49% | 3.62% | 52.55% |
| 60371701 | Pomona | 30.88% | 4.05% | 54.87% |
| 60376012 | Santa Clarita | 37.41% | 3.60% | 49.00% |
| 60658001 | Rubidoux | 29.22% | 3.20% | 57.20% |
| 60658005 | Mira Loma (Van Buren) | 29.22% | 3.20% | 57.20% |
| 60710001 | Barstow | 58.53% | 4.58% | 30.64% |
| 60710306 | Victorville-Park Avenue | 36.58% | 3.98% | 49.55% |
| 60711004 | Upland | 30.74% | 4.22% | 54.69% |
| 60714001 | Hesperia-Olive Street | 32.09% | 3.97% | 53.35% |
| 60714003 | Redlands | 29.70% | 3.25% | 57.19% |

The maximum collective interstate contribution to the future design value is 4.58% at the Barstow (AQS ID: 60710001) monitor, which is insignificant compared to the intra-state contribution of 30.64%. A similar trend is seen at all 10 of the tagged monitors, thereby supporting the conclusion that interstate transport does not contribute significantly to nonattainment at these monitors.

### *5.f. TCEQ also performed Direct Decoupled Method (DDM) modeling for receptors in Colorado.*

DDM provides a first derivative of the changes in ozone (linear relationship where the DDM value is the slope of the line for changes in ozone) from changes in $NO_X$ emissions in this case. As TCEQ noted in their SIP (page 3-60), "Ozone formation is highly non-linear and therefore DDM results are only useful for a limited range of input perturbations, about ±15% of the input parameter value in a given simulation." TCEQ indicated that they used DDM to gauge the responsiveness (i.e., percent change in ozone per percent change in emissions) of Texas NOx

emissions at tagged Colorado monitors. From the analysis provided in the SIP and spreadsheet[40] of DDM it appears that TCEQ used the DDM responsiveness factors to estimate the impacts of 100 percent of NOx emissions in Texas which is well beyond ±15% of Texas emissions which TCEQ states is the useful limit for applying DDM. DDM is typically used to see what an additional reduction in emissions might yield in ozone reductions, but not as a method to estimate the impacts from 100% of the emissions from a given state. In their SIP, TCEQ provided the DDM timeseries plots below (See Figure 5.1). Below we describe the results of the DDM analysis that TCEQ provided in their submittal. Because TCEQ's application of DDM is outside the range that would provide credible results, as indicated by TCEQ in their submittal, the EPA considers the results of the DDM analysis to be of limited value and not as technically sound as the contribution data based on source apportionment modeling.

---

[40] TCEQ_DDM_fy2023_CO_EPA_Review.xlsx

Figure 5.1 – TCEQ DDM results for select monitors



**Figure 3-51: DDM Responsiveness of Ozone in July 2023 at National Renewable Energy Labs-NREL**



**Figure 3-52: DDM Responsiveness of Ozone in August 2023 at National Renewable Energy Labs-NREL**



**Figure 3-47: DDM Responsiveness of Ozone in July 2023 at Chatfield State Park**

Figure 5.1 (continued) – TCEQ DDM results for select monitors



**Figure 3-49:  DDM Responsiveness of Ozone in July 2023 at Rocky Flats**



**Figure 3-50:  DDM Responsiveness of Ozone in August 2023 at Rocky Flats**



**Figure 3-45:  DDM Responsiveness of Ozone in July 2023 at Highland Reservoir**

In their submittal, TCEQ indicated that Rocky Flats (AQS ID: 80590006) shows approximately 2 ppb impact from Texas $NO_X$ emissions (100% of Texas NOx emissions) in mid to late July. TCEQ continued that  when ozone at the monitor is responsive to Texas $NO_X$ emissions, elevated ozone was not modeled except for a minor response on one day, July 23. TCEQ summarized their DDM modeling analysis indicating that there is some minor impacts from Texas's $NO_X$ emissions on two high ozone days in the third week of July, but similar to other Colorado monitors studied, the magnitude of the impact is much smaller than the impact from Colorado $NO_X$ and "Other $NO_X$" emissions. TCEQ also summarized that for the days with MDA8 greater than 70 ppb and at least 1 ppb or greater impact there were three days that met these criteria at 2 monitors (NREL and Rocky Flats)  these 2 criteria.

The DDM modeling does show some impact of Texas $NO_X$ emissions but from the scale in the Figures it is hard to discern the magnitude. EPA analyzed TCEQ's information and the impact from Texas $NO_X$ emissions ranges from 0 to1.89 ppb range for 2023 modeled ozone values $\geq$ 60 ppb.[41] The DDM modeling does show much larger impact from the Colorado $NO_X$ group and Other $NO_X$ group (which represents all other NOx sources in the modeling other than Texas and Colorado), but the impact from the Texas $NO_X$ group is not zero for some days with modeled MDA8 ozone over 60 ppb. TCEQ's analysis of the number of days with Texas contribution to MDA8 values over 70 ppb used a 1 ppb threshold, which is not consistent with using 0.7 ppb for contribution that TCEQ utilized in identifying receptors that are linked to Texas. Again, the EPA considers the results of the DDM analysis to be of limited value and not as technically sound as the contribution data based on source apportionment modeling.

---

[41] TCEQ_DDM_fy2023_CO_EPA_Review.xlsx

### 5.g. *Southern California Ozone Conceptual Model*

TCEQ briefly discussed conceptual model for ozone in Southern California indicating the topography and climate of the area's severe air pollution problem is a consequence of the combination of emissions from the nation's second largest urban area and meteorological conditions that are adverse to the dispersion of those emissions. TCEQ asserted that the unique features of Southern California result in the Southern California basin area make it a relative isolated area. We note that TCEQ's modeling already takes into account the unique meteorological, topographical, and amount of local emissions in Southern California and in the rest of the Continental U.S. (CONUS) including Texas emissions. TCEQ's assessment of the Southern California conceptual model does not provide substantial evidence that refutes the photochemical modeling analysis results.

### 5.h. *Summary*

TCEQ indicated that Texas contribution should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. TCEQ provided an Other Factor/Weight of Evidence analysis in support of their position that contributions from Texas were not "significant". Overall, these additional Other Factors/Weight of Evidence analyses performed by TCEQ do not provide sufficient evidence to refute the modeling results that TCEQ's modeling indicates downwind nonattainment and/or maintenance receptors in Colorado and Southern California are impacted by Texas emissions and Texas' contribution is 0.7 ppb or greater.[42] Although Texas asserted that its additional air quality factor analysis is a permissible way to interpret which contributions are "significant" because that

---

[42] TCEQ also identified a monitor in Cochise County, Arizona (ID 40038001), but the monitor's recent DVs are below the NAAQS. From AQS, the 2014-2016 and 2015-2017 DVs are each 65 ppb; 2016-2018, 2017-2019, and 2018-2020 DVs are 66 ppb; and preliminary 2019-2021 DV is 66 ppb.

analysis examines whether there was a "persistent and consistent pattern of contribution on several days with elevated ozone" we find that such pattern is already established by the EPA's and TCEQ's air quality modeling. Specifically, the EPA believes source apportionment modeling, as performed by the EPA and also by TCEQ, to determine which states are linked is an appropriate tool to identify impacts that are persistent enough to impact a downwind receptors ability to attain or maintain the standard. This approach is described in more detail above in Section 4 of this action, but, in summary, averages the contributions from an upwind state for up to 10 days, which is preferred, (but at a minimum 5 days) at a given receptor. As noted in the EPA's air quality modeling guidance, since DVs are based on the seasonal 4th high observed values, the EPA technique of using the average impacts for 5-10 days, is appropriate to identify impacts of sufficient persistence to impact a downwind receptor's ability to attain or maintain the standard. We note that TCEQ used the same methodology of up to 10 days but at a minimum of 5 days, with differing calculations methods (See Section 4) to identify nonattainment and/or maintenance receptors and contribution at those receptors.

In addition, the contributions based on the EPA's 2011-based modeling and 2016v2 modeling indicate that Texas is linked to receptors in the Midwest Region but not to receptors in Arizona and California identified by TCEQ. Given that there are wide unexplained differences in the contributions from Texas to downwind receptors, particularly in California between the two contribution methods used by TCEQ in their SIP submittal, we cannot speculate as to the factor(s) leading to differences in contributions between the EPA's modeling and TCEQ's modeling. Regardless, the contributions to downwind receptors based on the two TCEQ methods and the EPA's modeling results are consistent in showing that Texas's emissions were substantial enough to generate linkages to downwind receptors, under varying assumptions and

meteorological conditions, even if the precise set of linkages changed between the different sets of modeling

As noted above, TCEQ indicated that Texas' contributions should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. In this regard, modeling for three different years of meteorology (2011, 2012, and 2016) have all indicated that Texas is linked to downwind nonattainment and/or maintenance receptors. We think this common result indicates that Texas's emissions were substantial enough to generate linkages to various downwind receptors, under varying assumptions and meteorological conditions which provides a further indication that there is a persistent pattern of Texas' emissions contributing above a 1% to ozone at downwind nonattainment and/or maintenance receptors. In sum, the EPA's more recent 2016 base year modeling platform (2016v2) indicates that Texas is linked to several receptors in the Midwest Region as does the EPA's earlier 2011 base year modeling. TCEQ's 2012 base case modeling showed linkages to states in the West. As discussed, the EPA does not find the additional factors/weight of evidence evaluations conducted by TCEQ provide compelling reasons to discount the impacts indicated in Colorado and California by the TCEQ modeling. In fact, we think TCEQ's modeling likely underestimates these issues.

## 6.    EPA Summary

The EPA has reviewed TCEQ's modeling, alternate maintenance receptor methodology, recent monitoring data and long-term ozone trends, whether there is underestimation bias in TCEQ's modeling, and TCEQ's Weight of Evidence analyses (or "other factors" analyses). Overall, we find the TCEQ's alternate maintenance receptor methodology to be flawed and not acceptable because it fails to identify receptors that may have difficulty maintaining the standard

in the future. We identified that TCEQ's modeling understated the magnitude of projected 2023 design values to the extent that TCEQ's analysis likely resulted in not correctly identifying nonattainment and/or maintenance receptors in Illinois, Wisconsin, Michigan. EPA 2016v2 modeling identified nonattainment and/or maintenance receptors in Illinois and Wisconsin with Texas's contributions more than 1% and TCEQ's modeling also indicated that Texas's contribution was more than 1% at these same receptors.

The contributions calculated from TCEQ's two contribution methods result in very different contribution values and is so inconsistent that it calls into question the validity of either or both methods and TCEQ provides no explanation for the large differences in the outcome of the two methods. TCEQ's Other factors/WOE analysis does not provide sufficient compelling technically supported information to counter the conclusions from photochemical modeling in terms of linkages from Texas to downwind receptors.

TCEQ indicated that Texas contribution should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. We note that modeling for three different years of meteorology (2011, 2012, and 2016) have all indicated that Texas was linked to downwind nonattainment and/or maintenance receptors. We think this consistent result indicates that Texas's emissions are substantial enough to link Texas to downwind receptors, under varying assumptions and meteorological conditions which further indicates that there is a persistent pattern of Texas' emissions contributing above 1 % to ozone at downwind nonattainment and/or maintenance receptors.

## **EXHIBIT 8**

Declaration of Rona Birnbaum, Director of the Clean Air Markets Division,

Office of Atmospheric Protection, Office of Air and Radiation, EPA

("Birnbaum Declaration").

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

| | | |
|---|---|---|
| STATE OF UTAH, et al., | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | No. 23-9509 |
| | ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., | ) | |
| | ) | |
| Respondents. | ) | |

| | | |
|---|---|---|
| STATE OF OKLAHOMA, et al., | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | No. 23-9514 |
| | ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., | ) | |
| | ) | |
| Respondents. | ) | |

**DECLARATION OF RONA BIRNBAUM AS TO THE STATES OF
UTAH AND OKLAHOMA**

1.      I, Rona Birnbaum, under penalty of perjury, affirm and declare that the following statements are true and correct to the best of my knowledge and belief, and are based on my own personal knowledge, or on information contained in the records of the United States Environmental Protection Agency ("EPA"), or supplied to me by EPA employees under my supervision.

2.      I am the Director of the Clean Air Markets Division in the Office of Atmospheric Protection within the Office of Air and Radiation at EPA. The Clean

1

Air Markets Division, which was initially created to implement the acid rain provisions of the Clean Air Act Amendments of 1990, designs and operates market-based programs to reduce emissions of sulfur dioxide ("$SO_2$") and nitrogen oxides ("$NO_X$"), generates and provides public access to power plant emissions data, facilitates and oversees emissions monitoring and reporting, assesses emissions control technology options, conducts atmospheric deposition monitoring and analysis, develops information systems for market-based programs, assesses environmental and human health effects, assesses benefits and costs of programs, and educates the public regarding regional air pollution problems and market-based programs. The currently operated market-based programs were established under the Acid Rain Program, the Cross-State Air Pollution Rule ("CSAPR"), the CSAPR Update, and the Revised CSAPR Update.

3.    In my current capacity as Director of the Clean Air Markets Division, I oversee EPA's implementation of components of the Clean Air Act including Title IV (acid deposition control) and parts of Title I (air quality standards and associated emission limitations). In coordination with other EPA offices, I manage the promulgation and implementation of regulations pursuant to the Clean Air Act including the suite of CSAPR programs. I manage all of the Clean Air Markets Division's activities as listed in paragraph 2, including overseeing EPA's collection of emissions data from the power sector (and some other stationary emissions sources) under the Acid Rain Program and the suite of CSAPR programs.

4.    Prior to becoming Director of the Clean Air Markets Division in 2022, I held several management positions in the Office of Atmospheric Protection including in the early years of the Acid Rain Program. I joined EPA in 1988 and the Office of Atmospheric Protection in 1991. I hold a bachelor's and master's degree in environmental and natural resource policy from The George Washington University.

5.    The purpose of this declaration is to provide information responsive to certain allegations made in the Utah and Oklahoma Petitioners' Motions for Stay filed on June 6, 2023 and their accompanying Declarations.

## I. The Emission Allowance Trading Program Established by the Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards.

### A. Overview of the Good Neighbor Plan

6. Once EPA sets new or revised national ambient air quality standards ("NAAQS," or "air quality standard"), states must submit state implementation plans ("SIPs") to satisfy certain Clean Air Act requirements, including the good neighbor provision. 42 U.S.C. § 7410(a)(2)(D)(i)(I). With respect to the 2015 NAAQS for ozone, EPA reviewed states' good neighbor SIPs, and it approved 24 plans, disapproved 19 plans including Oklahoma's and Utah's and partially approved / partially disapproved 2 plans. *See* 88 FR 9336 (Feb. 13, 2023). (Ozone is commonly referred to as smog pollution.) A SIP disapproval imposes no legal obligation on the state or sources within the state, but rather imposes a legal obligation on EPA to promulgate a federal implementation plan ("FIP"), at any time, within two years of the disapproval. 42 U.S.C. § 7410(c)(1).

7. EPA Administrator Michael S. Regan signed a FIP action related to these requirements, referred to as the "Good Neighbor Plan"[1] (or the "Plan"), on March 15, 2023, to achieve emissions reductions required by the good neighbor provision of the Clean Air Act, 42 U.S.C. § 7410(a)(2)(D)(i)(I), with respect to the 2015 NAAQS for ozone. The Plan establishes federal requirements for qualifying power-plant and industrial sources in 23 covered states, to reduce ozone pollution during the May 1-to-September 30 "ozone season" by reducing emissions of $NO_X$, which is an ozone precursor pollutant.

8. The objective of the Plan is to eliminate the covered states' significant contribution to nonattainment and interference with maintenance of the ozone air quality standard in other states as expeditiously as practicable and in alignment with the statutory attainment schedule.

9. With respect to fossil fuel-fired power plants in 22 states, including Utah and Oklahoma, this action will prohibit those emissions by implementing an allowance-based trading program beginning in the 2023 ozone season, although the majority of the emission reductions captured in the trading program will not begin

---

[1] Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards, 88 FR 36654 (June 5, 2023). The rulemaking docket is EPA-HQ-OAR-2021-0668 and can be accessed through www.regulations.gov. A number of key supporting materials and additional information are available at EPA's website, Good Neighbor Plan for 2015 Ozone NAAQS, https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs (last visited June 5, 2023).

until the phase-in of reductions associated with new post-combustion control technology retrofits over the 2026 and 2027 ozone seasons. The Plan also prohibits emissions through emissions limitations and associated requirements for certain other industrial stationary sources in 19 of those 22 states, and one other state, beginning in the 2026 ozone season.[2]

10.    In assisting downwind states with attaining and maintaining the 2015 ozone NAAQS, the Plan will deliver substantial public health and environmental benefits across wide swaths of the United States. The benefits of the Plan far exceed its anticipated costs. Its predecessor programs, the $NO_X$ SIP Call,[3] Clean Air Interstate Rule ("CAIR"),[4] and CSAPR,[5] each were successfully implemented without disruption to the reliability or affordability of the electrical power supply.

**Estimated Monetized Health and Climate Benefits, Compliance Costs, and Net Benefits of the Good Neighbor Plan, 2023 Through 2042 (Millions 2016$, Discounted to 2023)[6]**

|  |  | 3% Discount Rate | 7% Discount Rate |
|---|---|---|---|
| **Present Value** | Health Benefits | $200,000 | $130,000 |
|  | Climate Benefits | $15,000 | $15,000 |

---

[2] Information and data presented in this declaration regarding the Good Neighbor Plan are reflective of the rule as it was signed on March 15, 2023, and do not account for potential impacts of subsequent administrative or judicial stays.

[3] "Finding of Significant Contribution and Rulemaking for Certain States in the Ozone Transport Assessment Group Region for Purposes of Reducing Regional Transport of Ozone," 63 FR 57356 (Oct. 27, 1998).

[4] "Rule to Reduce Interstate Transport of Fine Particulate Matter and Ozone (Clean Air Interstate Rule)," 70 FR 25162 (May 12, 2005).

[5] "Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals," 76 FR 48208 (Aug. 8, 2011) (generally referred to as the Cross-State Air Pollution Rule, or "CSAPR").

[6] Adapted from Good Neighbor Plan Executive Summary. For explanations, caveats, and table notes associated with these figures, see 88 FR 36654, 36666.

| | | | |
|---|---|---|---|
| | Compliance Costs | $14,000 | $9,400 |
| | **Net Benefits** | **$200,000** | **$140,000** |
| **Equivalent Annualized Value** | Health Benefits | $13,000 | $12,000 |
| | Climate Benefits | $970 | $970 |
| | Compliance Costs | $910 | $770 |
| | **Net Benefits** | **$13,000** | **$12,000** |

The estimated annualized compliance costs for the Plan of $910 million (3% discount rate, 2016$) or $770 million (7% discount rate, 2016$) are comparable to prior interstate transport rulemakings EPA has undertaken. For example, EPA estimated that the $NO_X$ SIP Call would cost $1.7 billion (1990$) annually to implement. 63 FR at 57478. Similarly, CAIR was estimated to cost the power sector $2.4 billion in 2010 and $3.4 billion in 2015 (1999$). 70 FR at 25305. CSAPR was estimated to cost the power sector $810 million in 2014 (2007$). 76 FR at 48215.

11.     The Plan will deliver substantial public health and environmental benefits. On average, the ozone levels at the identified "receptor" locations around the country are projected to decrease by 0.66 parts per billion (ppb). Good Neighbor Plan, Table V.D.3-1 (88 FR at 36748). The Plan will help many downwind areas make substantial progress toward coming into compliance with the 2015 ozone NAAQS. In some cases, such as for receptors in Colorado, coastal Connecticut, and Texas, the Plan is projected to make substantial progress toward achieving full attainment of the standard.

12.     According to the air quality analysis for the SIP disapproval Final Rule, there are 43 air quality monitoring sites throughout the United States that are identified as "receptors"—i.e., these are areas that are projected to struggle to attain or maintain the 2015 ozone NAAQS. *See* Final Rule, 88 FR at 9351-52. The combined population of the designated ozone nonattainment areas associated with

these receptors in 2021 is 82.3 million people, representing roughly 25 percent of the total U.S. population.

13.    The air quality benefits of the Plan will also reach many other people beyond the specific areas where receptor sites are located. The map below graphically illustrates the reduction in ozone levels that is projected to occur across the United States with full implementation of the Plan.



14.    The emissions control strategies on which the Plan is premised are all conventional, widely-used, at-the-source technologies that have been available to power plants and industrial sources for decades. This level of control is widely mandated for these types of sources in downwind areas with ozone air quality problems. For example, selective catalytic reduction ("SCR") control technology is already installed at roughly two-thirds of the coal-fired power plant capacity in the U.S. fleet. Good Neighbor Plan, 88 FR at 36768.

15.    As can be seen in the figures below, several fossil fuel-fired power plants in the Oklahoma and Utah that are included in the Good Neighbor Plan have relatively high, poorly controlled $NO_X$ emissions contributing to ozone pollution. These sources along with other anthropogenic emissions sources in the States are impacting air quality hundreds of miles away.



Emissions from Utah power plants are highlighted in red.[7]



Emissions from Oklahoma power plants are highlighted in red.

---

[7] The Bonanza Power Plant is located on the Uintah and Ouray Reservation and is not highlighted in red. *See* Good Neighbor Plan, 88 FR at 36690-92.

7

16.     A delay in the implementation of the Plan would result in the continuation of significant contribution to harmful levels of air pollution across the United States. Delays of as long as three years in the implementation of two prior good neighbor rulemakings ($NO_X$ SIP Call and CSAPR) have been experienced as a result of stay litigation. In both cases, the regulations were largely upheld once courts were able to adjudicate the merits. EPA is applying this same, now-Supreme Court-upheld analytical framework in this Plan. A delay of three years or more here would delay the full elimination of significant contribution under this Plan until 2029 or later. This would be eight years after the 2021 Marginal area attainment deadline, five years after the 2024 Moderate area attainment deadline, and two years after the 2027 Serious area attainment deadline.[8] In the meantime, many Americans could suffer illness and premature death from the harmful pollution that would be allowed to continue, while downwind areas that fail to attain the health-based NAAQS will be subject to ever more stringent regulatory requirements under the Act without relief from the contributing effects of upwind-state pollution. For example, the forgone emissions reductions in 2023 alone could result in forgone reductions in avoided ozone-related premature mortalities and illnesses equal to as much as $820 million (2016$, 3% discount rate).

B.     Establishment, Applicability, and Relationship to Other Trading Programs

17.     Among other things, the Plan implements a revised and expanded allowance trading program for electricity generating units – the CSAPR $NO_X$ Ozone Season Group 3 Trading Program (the "Trading Program"). This program generally applies to fossil fuel-fired boilers and combustion turbines that are located in covered states and serve generators larger than 25 megawatts producing electricity for sale. 40 CFR 97.1004.

18.     The Plan amends the existing CSAPR $NO_X$ Ozone Season Group 3 Trading Program established for twelve states in 2021 under the Revised CSAPR Update.[9] The CSAPR $NO_X$ Ozone Season Group 3 Trading Program was first established to achieve emissions reductions required by the good neighbor provision with respect to the 2008 ozone NAAQS. For several other states, the Trading Program will replace the CSAPR $NO_X$ Ozone Season Group 2 Trading Program established in 2016 under the CSAPR Update and currently still being implemented for ten states.[10] The CSAPR $NO_X$ Ozone Season Group 1 Trading Program was first established in the original CSAPR rulemaking in 2011 to

---

[8] Further discussion of the disruptive consequences of a stay of the Final Rule is in section V below.
[9] "Revised CSAPR Update for the 2008 Ozone NAAQS," 86 FR 23054 (April 30, 2021).
[10] "CSAPR Update for the 2008 Ozone NAAQS," 81 FR 74504 (October 26, 2016).

address good neighbor obligations associated with the 1997 ozone NAAQS, and currently applies only in the State of Georgia.[11]

19.    Under the Plan, power plants in seven states, including Oklahoma, will transition from the CSAPR Group 2 Trading Program to the CSAPR Group 3 Trading Program, and power plants in three states not currently covered by a CSAPR trading program for seasonal $NO_X$ emissions, including Utah, will be added to the CSAPR Group 3 Trading Program.

20.    Virtually all of the electric generating units covered by the Plan, including those in the three states not currently covered by a seasonal $NO_X$ emissions program, nonetheless participate in the Acid Rain emissions trading program under Title IV of the Clean Air Act and already meet rigorous monitoring and reporting requirements in compliance with 40 CFR Part 75.[12]

21.    Power plants have deep familiarity with Clean Air Act compliance assurance and permitting obligations and face minimal administrative burdens associated with entry into the Trading Program. All of the Oklahoma units that will participate in the Trading Program already participate in another CSAPR trading program and all but one of the Utah units participate in the Acid Rain Program.

22.    The emissions reduction requirements associated with the new Trading Program emissions budgets established by the Plan will only apply as of the effective date of the Plan, which will be on August 4, 2023, 60 days after publication of the Plan in the Federal Register on June 5 (88 FR 36654).[13]

23.    For units in the states already covered by either the CSAPR $NO_X$ Ozone Season Group 2 or Group 3 trading programs, the Plan has transitional provisions so that the new budgets will apply only after the Plan's effective date.[14] For units in the remaining states that will be newly covered by the Trading Program, no requirements, either in terms of emissions reductions or in terms of other administrative requirements, will apply until the effective date.

---

[11] CSAPR, 76 FR 48208 (Aug. 8, 2011).

[12] Approximately 97 percent of ozone season $NO_X$ emissions reported under Part 75 are determined using continuous emissions monitoring systems ("CEMS"). Gas- or oil-fired units that qualify as peaking units or low mass emissions units under the regulations have options to determine reported emissions using other methodologies.

[13] *See* Good Neighbor Plan Preamble Section VI.B.12.a (88 FR at 36811-13).

[14] *See id*.

C.     How Emissions Trading Programs Work and the Enhancements to the Trading Program

24.     The Clean Air Markets Division operates or has operated a number of allowance trading programs, the earliest of which started more than 25 years ago. These include the $NO_X$ Budget Trading Program for ozone-season $NO_X$ emissions under the $NO_X$ SIP Call,[15] programs for ozone-season and annual $NO_X$ emissions under CSAPR and CAIR,[16] and programs for annual $SO_2$ emissions under CSAPR, CAIR, and the Acid Rain Program.[17] Most of the units that participate in the Trading Program also participate or participated in some of these other programs. There has not been, nor have Declarants identified, a single instance where implementation of these EPA trading programs has caused an adverse reliability impact.

25.     EPA provides robust technical analysis for identifying its emission reduction requirements. For power plants, this includes starting with reported data for recent historical operations. It further tests these requirements against future expectations for the sector by using a state-of-the-art, peer-reviewed programming model of the contiguous U.S. electric power sector (the Integrated Planning Model, or IPM). IPM provides forecasts of least-cost capacity expansion, electricity dispatch, and emissions control strategies while meeting energy demand and environmental, transmission, dispatch, and reliability constraints.

26.     The Trading Program, like the other current and former allowance trading programs operated by the Clean Air Markets Division, does not impose any fixed limits on the operations or emissions of individual affected units. Instead, each affected unit is required to monitor and report its emissions, and each source with affected units is required to hold quantities of emission "allowances" based on the reported emissions from all its affected units for each "control period" for the program. (For the Trading Program, the control period is the May-September ozone season.) Allowances can be traded with other sources covered by the program in the same or other states or with third parties (e.g., brokers). The aggregated emissions from all the affected units under such a program are limited

---

[15] "Finding of Significant Contribution and Rulemaking for Certain States in the Ozone Transport Assessment Group Region for Purposes of Reducing Regional Transport of Ozone," 63 FR 57356 (Oct. 27, 1998).
[16] "Rule to Reduce Interstate Transport of Fine Particulate Matter and Ozone (Clean Air Interstate Rule)," 70 FR 25162 (May 12, 2005).
[17] CAA subchapter IV-A, 42 U.S.C. 7651-7651*o*; 40 CFR parts 72-78.

by the total number of allowances issued for use in the program, each of which authorizes the emission of up to one ton of $NO_X$.

27.    The Trading Program budgets are set based on an evaluation of available $NO_X$ mitigation control technologies. As in the prior CSAPR rulemakings, as well as the earlier CAIR and $NO_X$ SIP Call rulemakings, EPA assessed several well-understood, widely-available, at-the-source emissions control strategies. Following a multifactor assessment at "Step 3" of the interstate transport framework, EPA arrived at a suite of control strategies that obtain cost-effective emissions reductions delivering meaningful downwind air quality benefits. EPA's assessment of these technologies is set forth in Section V.B-C of the Plan preamble, 88 FR at 36720-40.

28.    The primary strategies for power plants that emerged from this analysis are: starting in 2023, optimizing existing post-combustion controls; starting in 2024, upgrading to state-of-the-art combustion controls at the few remaining coal facilities without them; and, over the 2026-2027 ozone seasons, retrofitting post-combustion controls on large emitting units currently lacking them. *See* Good Neighbor Plan Preamble Section VI.A, 88 FR at 36754-58.

29.    It bears noting that the 2023 and 2024 strategies of optimizing existing post-combustion controls and upgrading combustion controls are essentially identical to the emissions control strategies that were identified in CSAPR, the CSAPR Update, and the Revised CSAPR Update. EPA's analysis in the Good Neighbor Plan is that these strategies remain widely available on a relatively near-term basis and additional, cost-effective emissions reductions can be obtained from these strategies across the fleet of existing power plants in the covered upwind states.

30.    For each control period, the total quantity of allowances is initially allocated among the affected units.[18] Allocations in Good Neighbor trading programs have followed a similar methodology for many years, relying on historical heat input and emissions data to determine how many allowances to allocate to each unit, as well as to new units. The Plan generally follows this approach with some minor changes from prior programs. *See generally* Good Neighbor Plan Preamble Section VI.B.9, 88 FR at 36801-08. Among the features

---

[18] CSAPR trading programs are designed to allow states to easily replace EPA's allocation methodology with their own. States may also leave the FIP through adopting the trading program in full (in addition to replacing EPA's allocation methodology) into their state program or developing their own approaches for approvable SIPs that can replace the FIP. *See* Good Neighbor Plan Preamble Section VI.D, 88 FR at 36838-43.

of the Plan's allocation methodology, similar to prior programs, is a "new unit set aside," which is available for any power plants that would not otherwise receive allocations, mainly (but not exclusively) new power plants that come online after the Plan is issued. Power plants that have gone offline but are then returned to operation also qualify to receive allocations from the new unit set aside if the plants are no longer eligible to receive allocations as existing units. Often, there are allowances remaining in each state's new unit set aside, and if so, these are recycled back to existing units in proportion to their original allocation. Thus, the entire budget for each compliance period is fully allocated, and units typically will receive more allowances than their initial allocation figures suggest.

31.     The allowance allocation methodology is distinct from the method of determining the emissions budget for each state. The number of initial allocations each affected unit receives is not an emission limit, nor is it an express or implied prohibition on how much that source may emit; rather, sources may buy or sell allowances with any other party and use them for compliance. This incentivizes units that can reduce their emissions easily or cheaply to make those reductions and reap the benefits from selling their unneeded allowances, while units with relatively more expensive reduction opportunities can comply by purchasing those allowances. For a more comprehensive overview of emissions trading programs, see the Division's website at *https://www.epa.gov/emissions-trading-resources*.

32.     Sources with affected units under the Trading Program are not required to hold allowances to cover their emissions before or at the actual time of the emissions (e.g., in or during the 2023 ozone season). Instead, each source is obligated to surrender allowances to cover its affected units' emissions for a control period by the program's "allowance transfer deadline," which is June 1 of the year *after* the year of the control period.  40 CFR 97.1002, 97.1006(c)(1). For the 2023 ozone season, the allowance transfer deadline will be June 1, 2024. Thus, a source in the Trading Program has an extended period of time—eight months after the end of the ozone-season control period on September 30—in which to acquire any additional allowances that may be needed for compliance.

33.     Each state's budget determines the total number of allowances to be allocated among the state's affected units for each control period. However, a state budget is not a limit on how much $NO_X$ a state's affected units may emit, in the aggregate, during the control period. Under the Trading Program (like the trading programs under the original CSAPR), the aggregated emissions from a state's affected units can exceed the state's budget up to a certain level, called the "assurance level," without triggering any further obligations beyond each source's basic compliance obligation to hold allowances equal to the sum of its affected

units' emissions. If the aggregated emissions from the affected units in a single state exceed the state's assurance level during a control period, the sources that contributed to the state's exceedance must surrender two additional allowances for each ton of their respective shares of the exceedance. 40 CFR 97.1025. The assurance levels include "variability limits" beyond the respective state emissions budgets that allow for potential inter-annual variability in operating needs for each state. At the same time, the assurance levels function within the structure of an interstate trading program to meet the Act's requirement that each state's sources are held to the elimination of the state's significant contribution.

34.    The Trading Program is fully achievable without any need for sources to reduce their operations or retire, because the emission budgets are premised on widely available pollution control technologies described above whose use would achieve the required emission reductions without need to reduce operations or retire any affected electric generating unit (EGU). However, under the Trading Program, no power plant is *required* to follow these strategies. In general, a power plant owner has options to operate the emissions controls identified by the EPA for a type of unit (including installation or upgrade of controls), operate other types of emissions controls, or adapt the unit's levels of operation to produce less emissions. The Plan generally preserves the compliance flexibility of prior transport trading programs in reserving these decisions to sources' owners and operators.

35.    In addition to the intrinsic emissions trading compliance flexibilities noted above that are preserved in the Plan, the Trading Program contains several enhancements relative to prior trading programs. These enhancements operate together to ensure that, within the structure of an interstate trading program, sources continue to achieve a degree of emissions reduction consistent with the Act's requirement to eliminate "significant contribution" and "interference with maintenance." As EPA discusses in the Plan, experience with prior trading programs has produced evidence that over time sources may not be properly incentivized to operate emissions controls to the degree needed to eliminate significant contribution on an ongoing basis. The enhancements included in the Trading Program continue to provide flexibility while providing greater assurance that significant contribution will be eliminated on the most critical days of the ozone season and will remain eliminated on a permanent basis. EPA made several adjustments to these enhancements from the proposal in light of comments regarding grid reliability, as discussed in the following section beginning at paragraph 37.

13

36.     There are four enhancements to the Trading Program in the final Plan, compared to prior CSAPR programs: dynamic budgeting; annual bank recalibration; unit-specific backstop daily emissions rates; and a secondary emissions limitation:

    a.   *Dynamic Budgets:* Prior trading rules used a single, fixed emissions budget, set based on power sector data as of the date of the action. In the Revised CSAPR Update, EPA established preset budgets for several years into the future, to better reflect known changes in the power sector over time. In the Good Neighbor Plan, EPA is again establishing preset budgets as floors for the 2023 to 2029 control periods. Beginning in 2026, dynamic budgets (i.e., budgets set by applying the emission control strategies selected in the Plan to more recent operating data) will be calculated for each control period. From 2026 through 2029, a state's dynamic budget will be used only if it is higher than the state's preset budget for that control period. Beginning in 2030, dynamic budgeting will be the sole method of budget calculation. *See* Good Neighbor Plan Preamble Section VI.B.4, 88 FR at 36777-79.

    b.   *Bank Recalibration:* If a source does not use all of its allowances to demonstrate compliance in a given control period, the Trading Program, like all the other allowance trading programs operated by the Clean Air Markets Division, allows the unused allowances to be banked for use in the program in future control periods. In the CSAPR Update and the Revised CSAPR Update, EPA executed one-time conversions of available banked allowances from prior trading programs into initial allowance banks appropriately scaled to the budgets under the new trading programs. The Plan carries that process forward by limiting the collective allowable number of banked allowances for the Trading Program that can be carried over each year to 21% of the sum of the states' emissions budgets, starting with the 2024 ozone season. This will prevent the buildup of an excessively large bank of allowances that would undermine program stringency in the latter years of a program. *See* Good Neighbor Plan Preamble Section VI.B.6, 88 FR at 36788-91.

    c.   *Unit-specific Backstop Daily Emissions Rates:* To ensure more consistent operation of installed controls on sources with the highest level of emissions potential throughout each day of ozone seasons going forward, the Plan includes backstop daily emission rates applied to each of a subset of the covered sources. This rate applies beginning in 2024

for large, coal-fired sources that have SCR post-combustion emissions controls already installed. The rate is set at a level that reflects seasonal optimization of the control (not daily maximal performance), and sources must surrender additional allowances for the emissions associated with exceedances of this rate (after a 50-ton threshold, which accommodates the potential unavoidable emissions sources might have above the daily rate associated with activities like start-up). The same rate is applied for large coal-fired units with SCR-retrofit potential in the second control period after such control is installed or in 2030, whichever occurs first. *See* Good Neighbor Plan Preamble Section VI.B.7, 88 FR 36791-97.

d. *Secondary Emissions Limitations:* To avoid foreseeable exceedances of the state-by-state assurance levels, the Plan establishes the conditions for an enforceable Clean Air Act violation in defined circumstances of egregious failure to operate existing pollution controls, starting with the 2024 ozone season. *See* Good Neighbor Plan Preamble Section VI.B.8, 88 FR at 36797-801.

D.      Key Changes in the Good Neighbor Plan from Proposal

37.    The proposal underwent a comment period of 76 days, and EPA held many stakeholder meetings, including with electricity reliability coordinators, to receive feedback as well. This public engagement provided useful information to the Agency and produced a number of important changes in the Good Neighbor Plan.

38.    It is standard practice in EPA rulemaking development that changes to a proposal contemplated by the Agency are considered deliberative and are not shared on an *ex parte* basis prior to finalization and public release of an action. Therefore, the information regarding the contents of the Good Neighbor Plan, reflective of these changes, became available to the general public on or about March 15, 2023, with the release of the unofficial, pre-publication copy of the Plan on EPA's website.

39.    Several changes in the Good Neighbor Plan bear directly on the claims of harm put forward by Declarants. These changes respond to concerns raised by commenters that the Plan, as proposed, could have unintended effects on power sector grid-reliability.

40.     Commenters observed that the fleet of fossil-fuel fired power plants is undergoing a period of transition to cleaner fuels and technologies. Many power plant owners and operators highlighted their interest in seeing flexibility in this program that would facilitate their business decisions, while, in their view, the Plan as proposed could force uneconomical decisions either to retire power plants earlier than intended or to force expensive pollution-control retrofits for sources that in their judgment would otherwise not continue in operation for much longer. *See* Good Neighbor Plan Preamble Section VI.B.1.d, 88 FR at 36770-75.

41.     During rule development, EPA also actively engaged with key stakeholders in the electricity sector, including system operators, regional transmission operators ("RTOs"), the U.S. Department of Energy ("DOE"), the Federal Energy Regulatory Commission ("FERC"), and other parties that have the responsibility for ensuring reliability. EPA hosted a series of meetings with reliability organizations who had commented on the proposal to ensure we had a solid understanding of their concerns and perspectives. *See* Good Neighbor Plan Preamble Section III.B.1.c, 88 FR 36678-80.

42.     In light of these viewpoints, EPA adopted multiple changes from the proposal to address the reliability-related concerns identified in comments and brought into greater focus through consultations with RTOs and other agencies. These changes have been carefully crafted to ensure the statutory mandate to eliminate significant contribution to interstate pollution problems under the Clean Air Act is met without disrupting the reliable operation of the bulk power grid. *See* Good Neighbor Plan Preamble Section VI.B.1.d, 88 FR at 36770-75.

   a.  EPA had proposed to apply "preset" state emissions budgets only for the control periods in 2023 and 2024, with dynamic budgeting allowing for changes in the budget both upward and downward beginning in 2025. EPA had proposed to use only one year of data in the dynamic budget-setting process. In the Final Good Neighbor Plan, preset budgets will operate as floors from 2023 through 2029. This will establish predictable minimum quantities of allowances available during the period when commenters have expressed concern that the reliability-related need for such predictability is greatest. In addition, the dynamic budgets will be set using multiple years of operating data to prevent an anomalous year of data from skewing the budgets. *See* Good Neighbor Plan Preamble Section VI.B.1.b.i, 88 FR at 36764-66.

    b. The target percentage of the state emission budgets used to annually recalibrate the allowance bank will not be set at the proposed 10.5 percent level until the 2030 control period. For the control periods from 2024 through 2029, a target percentage of 21 percent will be used instead. The adoption of the higher target percentage for use through the 2029 control period is intended to enhance the availability of allowances during this period by allowing power plant owners and operators to "bank" allowances at a higher level through 2030. *See* Good Neighbor Plan Preamble Section VI.B.1.b.ii, 88 FR at 36766-67.

    c. The application of the backstop daily emissions rate for units without existing SCR controls is deferred until the 2030 control period from the 2027 control period as EPA had proposed. This change extends by several years the period during which the highest emitting sources in the fleet may continue surrendering only one allowance per ton emitted, as opposed to three allowances per ton emitted, while operating without widely available pollution control technology within the Trading Program. *See* Good Neighbor Plan Preamble Section VI.B.1.c.i, 88 FR 36767-69.

    43.     Additionally, EPA made several other key changes in the Good Neighbor Plan from the proposal that will also help ensure it can be implemented on a feasible and cost-effective basis in light of comments and other record-based considerations that in EPA's judgment warranted attention:

    a. The Good Neighbor Plan does not require any emission reductions associated with projected generation shifting using EPA's Integrated Planning Model. *See* Good Neighbor Plan Preamble Section V.B.1.f, 88 FR at 36731-32.

    b. EPA finalized a phase-in approach for emission reductions associated with the SCR-retrofit strategy. These reductions are phased in over 2026-2027 in the final Good Neighbor Plan, as opposed to just 2026 at proposal. This change provides an additional year for the full implementation of reductions associated with this strategy relative to the proposal. *See* Good Neighbor Plan Preamble Section VI.A, 88 FR at 36757-58.

    c. Emissions control stringency associated with combustion control upgrades does not go into effect for any state until the start of the 2024

ozone season. *See* Good Neighbor Plan Preamble Section V.A, 88 FR 36754-55.

## II.   NO$_X$ Mitigation Strategies and Timing: Further Detail

44.    The Plan assumes two mitigation strategies in setting emission budgets for the 2023 ozone season. This is the optimization of two types of existing post-combustion controls—SCR and selective non-catalytic reduction ("SNCR"). Therefore, no new pollution control equipment is assumed in 2023, only the operation of existing equipment. EPA uses its database of reported historical power sector operations and emissions performance to derive state emissions budgets based on these (and other) strategies. According to EPA data, power plants have demonstrated through their historical operation (for more than 90% of such units) that they have already achieved this level in the past, in many cases significantly out-performing the representative performance rates used by EPA to establish budgets based on these strategies.

45.    The vast majority of SCR-controlled units (nationwide and in the 22 states subject to the Trading Program) at least partially operated these controls during the 2021 and 2022 ozone seasons, based on reported emissions rates. Existing SCRs operating at partial capacity still provide functioning, maintained systems that may only require increased frequency or quantity of delivered chemical reagents (i.e., ammonia or urea), which can be accomplished within a few weeks. In many cases, units with SCR have historically achieved more efficient NO$_X$ removal rates than their current performance and therefore are capable of reverting to earlier operation and maintenance plans that achieved demonstrably better SCR performance.

46.    There is ample evidence of units restoring optimal performance of post-combustion controls within a timeframe of two months or less. *See* Good Neighbor Plan Preamble Section V.B.1.a, 88 FR at 36720-25. Not only have units reactivated SCR performance levels at the start of an ozone season or when requirements took effect, but unit-level data also shows instances where sources demonstrated the ability to quickly alter their emissions rate within an ozone-season and even within the same day in some cases. Moreover, this emissions control technique is familiar to sources and was analyzed and included in the Revised CSAPR Update emissions budgets finalized in 2021 and the CSAPR Update emissions budgets finalized in 2016.

47.    The recently implemented Revised CSAPR Update was finalized on March 15, 2021, with emissions reductions premised on the same technology and

nearly identical implementation schedules as this Plan regarding existing control optimization. See paragraph 51. Sources were able to comply with a 100% success rate in meeting their allowance-holding requirements, and units optimized their controls, showing significant improvement in emissions performance relative to prior years.  Neither sources nor state agencies and reliability authorities reported any difficulty maintaining compliance with electric reliability standards as a function of achieving compliance with the Revised CSAPR Update.

48.    The recent experiences with both the Revised CSAPR Update and CSAPR Update underscore the eminently achievable nature of the control strategies informing the establishment of the Trading Program budgets for 2023 and 2024.

49.    In the Plan, EPA finds that new SCR retrofit installation is cost-effective and is included as part of the overall strategy to eliminate significant contribution. Corresponding emission reductions are reflected in state emissions budgets, phasing in over the 2026 and 2027 ozone seasons. EPA extended the timeframe for installation of SCR controls from 36 months at proposal to 36-48 months in the final Plan. There are many instances of individual SCR-retrofit projects being completed well within a three-year timeframe; however, a 36-48 month period corresponds with EPA's expectations regarding timing needs for fleetwide implementation of this strategy. There is significant engineering literature and third-party testimonials as to the feasibility of this timing for sources pursing this compliance option. This technology is widely available. SCR controls already exist on over 60 percent of the coal fleet in the states covered by the Trading Program. Nearly every pulverized coal unit larger than 100 MW built in the last 30 years has installed this control.

50.    The timeframes by which the requirements of the Plan go into effect are all keyed to the finalization of the Plan. Thus, the phasing in of the SCR-retrofit stringency over the 2026-2027 ozone seasons corresponds to a 36-48 month period from the date of issuance of the Plan. *See* Good Neighbor Plan Preamble Sections V.B.1.e, 88 FR at 36726-31, and VI.A, 88 FR at 36757-58.

51.    Even for near-term measures like optimization of existing controls in 2023, EPA's record shows that no work need have occurred prior to finalization of the Plan. The implementation of the Plan's budgets reflecting that control strategy as of the effective date 60 days after publication in the Federal Register accommodates the two-month period EPA finds to be the maximum amount of time needed to implement these strategies. These exact technology and timing assumptions were just successfully implemented on an identical schedule in the

Agency's Revised CSAPR Update rule, which was finalized on March 15, 2021 and included emission reduction requirements premised on optimization of existing controls going into effect upon the effective date of the rule during the 2021 ozone season. *See* Good Neighbor Plan Preamble Section V.B.1.a., 88 FR at 36720-21; *see also* Revised CSAPR Update, 86 FR 23054.

52.    EPA had observed in the proposal that sources could begin "planning now" for compliance, and this would afford them additional time. 87 FR 20036, 20101 (April 6, 2022). Such preparation may indeed be prudent and likely not costly, but it was never required. Preliminary analysis and engineering steps involve no capital costs; these include pre-construction activities, such as engineering studies, conceptual design, schedule, specifications, and cost estimates.[19]

## III.    Achievability of the Good Neighbor Plan

53.    The emissions reductions implemented through the Plan's Trading Program are readily achievable for the covered power plants, and the Program is designed so as not to threaten resource adequacy or otherwise degrade electric system reliability in any state or region.

54.    Under the Trading Program, for each control period EPA allocates an amount of allowances equal to each state budget among the affected units in the respective state. For control periods after 2023, a state may submit a state implementation plan revision replacing EPA's unit-level allocations with unit-level allocations of its choosing, provided that the total number of allocations does not exceed the state budget. 40 CFR 52.38.

55.    The sum of the preset state budgets under the Trading Program for 2023 is 208,119 tons. (For the set of states that would be subject to the trading program for the entire 2023 ozone season, prorating of the budgets to account for the effective date of the plan, as discussed in paragraphs 22-23, will increase this amount by 20,123 tons.) Adding the amount of allowances in the anticipated starting bank (see paragraph below), EPA estimated that the total number of allowances that will be available for compliance in 2023 will be approximately 269,479 allowances prior to any 2023 prorating due to the August 4 effective date. Under EPA's prorating approach, the quantity of allowances available per day of compliance increased in proportion to each day of delay in the FIP's effective date beyond May 1, 2023.

---

[19] *See* document titled "Typical SCR and SNCR Schedules 2023" in the docket for the Good Neighbor Plan (EPA-HQ-OAR-2021-0668).

56.     In addition to allowances allocated for each control period and already banked under the Group 3 Trading Program, the EPA will convert for use in the Trading Program an amount of allowances banked under the existing CSAPR NO$_X$ Ozone Season Group 2 trading program. 40 CFR 97.826. Any affected unit (or other entity) that holds banked allowances issued under the CSAPR Group 2 program will be issued a proportional number of converted allowances that can be used under the Trading Program just like allowances allocated from the Trading Program state budgets. Based on preliminary emissions data for 2022, in total, the already-banked and converted allowances collectively will constitute a "starting bank" of approximately 61,360 allowances available for 2023 compliance prior to any 2023 prorating due to the August 4 effective date.

57.     Total emissions from the sources that would be covered by the Trading Program in 2021 were 239,450 tons, and in 2022 were 207,605 tons. As EPA has observed in prior CSAPR trading programs, EPA fully anticipates that sources will in fact optimize existing controls during the 2023 ozone season and/or pursue other emissions reduction opportunities, in response to the allowance price signal and in order to maintain or increase the respective amounts of banked allowances they hold for their own use or for sale to others. Nonetheless, these numbers indicate that even if no sources chose to reduce emissions in 2023 below where they already were in 2022, there would be adequate allowances available for compliance.

58.     EPA conducted a "resource adequacy" assessment for the Good Neighbor Plan. This assessment shows that accredited capacity projections, and therefore reserve margins, are expected to be virtually identical for the power sector between the baseline and the Good Neighbor Plan "policy case." In particular, in 2023, 2025, and 2030, reserve margin projections under the Plan remain consistent with baseline projections and are at or above target reserve margins.[20]

59.     For all North American Electric Reliability Corporation (NERC) reliability assessment regions and for all years, adequate reserve margins are projected to be maintained under the Good Neighbor Plan. Projected changes in

---

[20] *See* Resource Adequacy and Reliability Analysis Final Rule TSD 2, Tbl. 1, *available at* https://www.epa.gov/system/files/documents/2023-03/Resource%20Adequacy%20and%20Reliability%20Analysis%20TSD.pdf.

reserve margins under the Plan through 2030 are exceedingly small relative to the baseline without the rule.[21]

60.    The Plan's projected effect on retail electricity prices relative to baseline projections is also projected to be exceedingly small. In 2023, there is a 0% change projected. In 2025, the changes are on the order of -1% to 1%. In 2030, the changes are of a similar magnitude, with only one area (not covering Utah or Oklahoma) projected to see a greater than 2% change in electricity prices.[22]

61.    Compliance with the Good Neighbor Plan is anticipated to be even less costly than EPA's primary analysis of compliance costs in the Plan's regulatory impact analysis (RIA) suggests (see paragraph 10). EPA conducted a supplementary analysis to assess the effects of the Inflation Reduction Act of 2022, Pub. L. 117-169 ("IRA"). That analysis indicates that the annualized cost of the Plan for the power sector over the 2023-2045 period declines under the IRA from $449 million/year to $196 million/year (2016$). *See* RIA Appendix 4A, Table 4A-2. For comparison, the annualized costs of the $NO_X$ SIP Call were estimated at $1.7 billion (1990$), which would be $2.8 billion in 2016$.

62.    There has never been a shortage of allowances in any allowance trading program operated by the Clean Air Markets Division from 1995 – the first year of the Acid Rain Program's trading program for $SO_2$ emissions – to the present. After the allowance transfer deadline for every control period for every such program, a bank of unused allowances has always been available for carryover to future control periods.  See the Division's progress reports at *https://www3.epa.gov/airmarkets/progress/reports/index.html*.

63.    Under the Trading Program, like EPA's other allowance trading programs, affected units are required to report their hourly emissions data to the Clean Air Markets Division on a quarterly basis, and all allowance allocations and transfers are also recorded by the Division. 40 CFR 97.1020—97.1035. The Division maintains publicly accessible databases of the reported emissions data and the recorded allocation and transfer data at *https://campd.epa.gov/*. Sources and other participants in the market for emissions allowances, such as brokers, can

---

[21] *Id.* Tbl. A3, B3, C3.
[22] *See* Regulatory Impact Analysis for the Final Federal Good Neighbor Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard 166-68, Tbl. 4-15, 4-16, 4-17, *available at* https://www.epa.gov/system/files/documents/2023-03/SAN%208670%20Federal%20Good%20Neighbor%20Plan%2020230315%20RIA_Final.pdf.

use these data to assess the potential supply of and demand for allowances and to identify potential buyers and sellers.

64. Buyers and sellers of allowances are generally not required to report transaction prices to the Clean Air Markets Division. However, subscription data services regularly survey and report market prices for allowances in EPA's allowance trading programs. As of May 30, 2023, one such service reported a market price of $1,238 per Group 2 allowance and $9,000 per Group 3 allowance.[23] The recently reported Group 3 allowance price of $9,000/ton represents a decline of about one-third from reported prices immediately prior to the mid-March pre-publication release of the Plan.

65. While prices reported for the first part of the 2022 ozone season were higher than prices in the later part of and after the ozone season, relatively few allowance transfers among unrelated parties took place during the period of the highest reported prices. Moreover, EPA's data indicates that there were more than enough allowances available for compliance with the Group 3 program in 2022. Our data indicate total emissions in the Group 3 program of around 90,458 tons in the 2022 ozone season, while available allowances (including banked allowances) total 128,724 tons.

66. The allowance price increase that was observed in the summer of 2022 in the pre-existing Group 3 trading program has since declined about 80 percent from its reported peak of $47,250 (see "CSAPR Allowance Price Data" in the docket for the Good Neighbor Plan). It is notable that reported Group 3 allowance trading prices are now close to (and in fact less than) the representative SCR retrofit costs that EPA calculated in the Plan ($11,000/ton as a representative figure).

67. Finally, reported allowance prices do not necessarily reflect actual costs to sources for each ton emitted. EPA allocates allowances for free to existing source owners and operators. Most sources have all or nearly all of their allowances freely available to them through allocations or existing banks. Therefore, these sources only need to purchase a minority, if any at all, of their total needed allowances, as well as pursuing further emissions reductions as desired.

---

[23] Price data are reported by S&P Global Market Intelligence and are available by subscription at https://www.SNL.com.

68.     Multiplying total expected emissions by the highest historically reported allowance price would generate a wildly inflated estimate of compliance burden, not only because that highest historical price is by no means indicative of the average allowance price going forward, but also because it ignores the fundamental expectation within a market-based program that sources will rationally pursue any emissions-reduction opportunities that are less costly than the purchase of additional allowances.

## IV.    Achievability of the Plan for Utah and Oklahoma Power Plants

### A.    Utah

69.     The proposed and final rules are implemented through an interstate trading program. While there are state emission budgets, no state is limited to its budget level, and if sources in the state need additional allowances to emit up to the state's assurance level, they can use banked allowances or allowances purchased from other states.

70.     In the final Good Neighbor Plan, the Utah budget is 15,755 tons in 2023 before prorating as described in paragraph 71. Utah's state emissions budget is 15,917 in 2024 and 2025, reflecting known, planned fleet changes in the State. Utah's budgets are 6,258 tons and 2,593 tons in 2026 and 2027, respectively (reflecting the two-year phase in of SCR-retrofit stringency). Utah has two of the largest emitting uncontrolled plants for summer ozone NOx, and the reductions reflected in 2027 budgets reflect installation of a widely practiced control technology (SCR). In addition, approximately 5,994 tons of budget reduction in the 2026 and 2027 budgets for Utah is due to the already-planned retirement of Intermountain Units 1SGA and 2SGA scheduled for July of 2025.

71.     As explained in paragraphs 22-23, based on the publication date of June 5, 2023 and corresponding effective date of August 4, 2023, EPA identifies a prorated 2023 state emissions budget for Utah of 5,972 tons reflecting the abbreviated ozone season for which they will be subject to the rule.

72.     Because Utah is not currently in a CSAPR ozone season trading program, its sources are not assumed to hold banked allowances that could be converted for use in the new Trading Program. However, Utah's sources may, if they choose, acquire allowances on the interstate market available for 2023 compliance (for example, see paragraph 56 regarding the anticipated starting bank of allowances[24]).

---

[24] Amount calculated prior to any 2023 prorating due to the August 4 effective date.

73.    Utah power plants' 2021 ozone season $NO_X$ emissions were 15,762 tons and their 2022 ozone season $NO_X$ emissions were 13,238 tons. Utah power plants' emissions from August 4, 2022 through September 30, 2022 were 6,061 tons.

74.    For the Trading Program, each state's variability limit is 21 percent of the state budget, and each state's assurance level is therefore the state budget plus 21 percent. 40 CFR 97.1025. *See* paragraph 33. Utah's assurance level in 2023 is therefore 19,064 tons (prior to any pro-rating). No enhanced allowance-surrender penalty is applied for emissions up to the assurance level.

75.    Table 1 summarizes the Trading Program final state budgets and assurance levels in the final Plan for Utah, and the actual 2021 and 2022 ozone-season $NO_X$ emissions reported to the Clean Air Markets Division by affected units (available at *https://campd.epa.gov/*). The table also shows the prorated 2023 budget. Utah is only subject to the portion of the 2023 ozone season from August 4 to September 30, 2023, for allowance surrender purposes.

### Table 1: Comparison of Expected 2023 Allowance Holdings and Recently Reported Emissions at Utah EGUs

| 2023 Utah emissions budget (tons) | 2023 Prorated Utah Budget (tons) | 2023 Utah Variability Limit (tons) (before prorating) | 2023 Utah Assurance Level (tons) (before prorating) | 2021 Reported Emissions from Utah EGUs (tons) | 2022 Reported Emissions from Utah EGUs (tons) | Reported Emissions from Utah EGUs for Aug. 4 to Sept. 30, 2022 |
|---|---|---|---|---|---|---|
| 15,755 | 5,972 | 3,309 | 19,064 | 15,762 | 13,238 | 6,061 |

B.    Oklahoma

76.    The proposed and final rules are implemented through an interstate trading program. While there are state emission budgets, no state is limited to its budget level, and if sources in the state need additional allowances to emit up to the state's assurance level, they can use banked allowances or allowances purchased from other states.

77.     In the final Good Neighbor Plan, the Oklahoma budget is 10,271 tons in 2023 before prorating as described in paragraph 78. Oklahoma's budgets are 9,384 tons and 9,376 tons in 2024 and 2025, respectively, reflecting known, planned fleet changes in the State and the availability of a combustion control upgrade at one unit. Oklahoma's budgets are 6,631 tons and 3,917 tons in 2026 and 2027, respectively (reflecting the two-year phase in of SCR-retrofit stringency at some of the larger uncontrolled plants in the country).

78.     As explained in paragraphs 22-23, based on the publication date of June 5, 2023, and corresponding effective date of August 4, 2023, EPA identifies a prorated 2023 state emissions budget for Oklahoma of 11,122 tons reflecting the fact that they will be subject to the higher budget previously established under the CSAPR Update for the portion of the 2023 ozone season before August 4 and will be subject to the lower budget established under the Plan only for the portion of the 2023 ozone season after August 4.

79.     The Plan includes provisions to convert most allowances banked under the CSAPR $NO_X$ Ozone Season Group 2 trading program into a quantity of banked Group 3 allowances available for use in the Trading Program. This is no different than the conversion of banked allowances for use in updated trading programs that was done in two prior Good Neighbor rules, the CSAPR Update and the Revised CSAPR Update. While the number of new Group 3 allowances created in the conversion is smaller than the number of Group 2 allowances converted, the new Group 3 allowances each are worth more, preserving value to their holder. Based on the August 4 effective date, and the number of Group 2 allowances held by sources in Oklahoma that are available for conversion, Oklahoma EGUs are anticipated to start with at least 840 banked Group 3 allowances created through conversion of Group 2 allowances.

80.     This brings the combined anticipated number of allowances initially held by affected EGUs in Oklahoma for the 2023 ozone season to around 11,962 allowances. Under the interstate Trading Program, Oklahoma EGUs will also have the opportunity to purchase additional allowances from account holders in other states. Based on preliminary emissions data for 2022, in total, we estimate the already-banked and converted allowances collectively will constitute a "starting bank" of approximately 61,360 Group 3 allowances available for 2023 compliance (prior to any prorating, and inclusive of the 840 converted allowances estimated above to be initially held by Oklahoma EGUs).

81. For the Trading Program, each state's variability limit is 21 percent of the state budget, and each state's assurance level is therefore the state budget plus 21 percent. 40 CFR 97.1025. *See* paragraph 33. Oklahoma's assurance level in 2023 is 12,428 tons (prior to any pro-rating). No enhanced allowance-surrender penalty is applied for emissions up to the assurance level.

82. Oklahoma power plants' 2021 ozone season $NO_X$ emissions were 10,470 tons and their 2022 ozone season $NO_X$ emissions were 10,560 tons.

83. Table 1 summarizes the Trading Program final 2023 state budget and assurance level in the final Plan for Oklahoma, and the actual 2021 and 2022 ozone-season $NO_X$ emissions reported to the Clean Air Markets Division by affected units (available at *https://campd.epa.gov/*). The table also shows the prorated 2023 budget and the estimated starting emissions bank for Oklahoma.

### Table 2: Comparison of Expected 2023 Allowance Holdings and Recently Reported Emissions at Oklahoma EGUs

| 2023 Oklahoma emissions budget (tons) | 2023 Prorated Oklahoma Budget (tons) | 2023 Estimated Banked Allowances Held by Oklahoma EGUs | 2023 Oklahoma Variability Limit (tons) | 2023 Oklahoma Assurance Level (tons) | 2021 Reported Emissions from Oklahoma EGUs (tons) | 2022 Reported Emissions from Oklahoma EGUs (tons) |
|---|---|---|---|---|---|---|
| 10,271 | 11,122 | 840 | 2,157 | 12,428 | 10,470 | 10,560 |

C.    Observations

84. Movant's allegations that the Plan will impact the reliability of the power grid in either Utah or Oklahoma are not borne out at the state-level by the evidence provided above and in the power sector emissions and operating data in the final Plan. There are sufficient allowances available for compliance in 2023 even if emissions were held constant at 2022 levels. Petitioners have not cited any reliability issues in 2022 and have not explained how operating at the same levels as in 2022 would somehow cause reliability issues when operating at those levels did not cause reliability issues in 2022. While the updated budgets are set to incentivize power plants to continue to optimize emissions performance, this control stringency through 2025 is effectively no different than what EPA previously set for other states in the Revised CSAPR Update rulemaking two years

ago, which was upheld by the D.C. Circuit earlier this year (61 F.4th 187) and is currently being successfully implemented with no reliability issues.

85.     Over the 2026 and 2027 control periods, the Trading Program budgets reflect the onset of emissions control strategies (i.e., the retrofit of post-combustion controls such as SCR) that were found to be achievable and cost-effective to eliminate significant contribution in the final Plan, with sufficient lead time built in. See paragraphs 49-50. The fact that budgets will decline as the final Plan is implemented simply reflects the emission reduction measures needed to ensure the elimination of significant contribution as required by the Clean Air Act. See paragraphs 7-9.

86.     Declarants' claims that power plants that fail to install SCR will be forced to close early or will be forced to make uneconomical investments due to already-planned retirements (with attendant alleged effects on the reliability or cost of electrical service in Utah or Oklahoma) are not factually supported, reflect a misunderstanding of the compliance obligation under the Group 3 Trading Program, and ignore key flexibilities included in the Final FIP. The Trading Program establishes emissions budgets *premised* on widely available pollution control technologies like SCR, but it does not require or mandate any specific pollution control installation. Rather it requires allowance surrender for each ton of emissions. For those units facing relatively costly pollution-control retrofit decisions or already-planned retirements, the Plan reflects input from power sector stakeholders to accommodate that planning by deferring the start of a daily backstop emissions rate to 2030 (among other changes). See paragraphs 37-43. Even after 2030, units without SCR may continue to operate so long as they comply with enhanced allowance-surrender requirements for those emissions subject to the backstop rate. See paragraph 36.c.

## V.     Consequences of Not Implementing the Good Neighbor Plan for Utah and Oklahoma

87.     Not implementing the Good Neighbor Plan for Utah or Oklahoma or other upwind states will be harmful to public health, highly disruptive to the implementation of the Good Neighbor Plan, and will undermine the planning efforts for downwind areas that are impacted by the upwind states' emissions, increasing their regulatory burdens.

88.     The implementation of the Good Neighbor Plan has already been substantially disrupted by judicial stays of the Final Rule entered by other circuit courts. EPA is now in the process of taking administrative measures to stay the

28

Plan as to these states and must undertake a series of revisions to ensure that the status quo is maintained, including maintaining sources' participation in earlier CSAPR trading programs to ensure the respective states continue to meet their Good Neighbor obligations under prior ozone NAAQS.[27]

89.    Implementing these administrative measures has necessitated the reallocation of staff time and resources, during a time when the Agency would have focused its resources on assisting stakeholders in the implementation of the Plan to effectuate its public health and welfare benefits. However, the disruption caused by state-specific judicial stays of the Final Rule extends well beyond EPA's administrative burdens.

90.    By far the most concerning consequence of a stay is the effect on the downwind areas in other states that face continuing violating ozone levels and ratcheting, mandatory ozone-nonattainment requirements. Beyond the continuing harm to public health that ozone levels above the NAAQS signify, the failure to eliminate upwind states' significant contribution under the Good Neighbor Provision is also contributing to downwind areas' increased regulatory burdens under the Act, and a stay impacting EPA's ability to implement the Good Neighbor Plan will exacerbate the consequences of this already-delayed implementation.[28]

91.    Utah's emissions are linked to receptors in the Denver Metro/North Front Range designated ozone nonattainment area in Colorado, and Oklahoma's emissions are linked to receptors in the following designated ozone nonattainment areas: Chicago, Illinois-Indiana-Wisconsin; Allegan County, Michigan; Muskegon County, Michigan; Dallas-Fort Worth, Texas; and Houston-Galveston-Brazoria, Texas.[29] Each of these areas is now in Moderate nonattainment of the 2015 ozone NAAQS.[30] Downwind state obligations to attain the NAAQS, including for these five states, are now driven by the statutory attainment date of August 3, 2024, for

---

[27] *See* Notice of Forthcoming EPA Action to Address Judicial Stay Orders (June 1, 2023), *available at* https://www.epa.gov/csapr/notice-forthcoming-epa-action-address-judicial-stay-orders.

[28] In *Maryland v. EPA*, 958 F.3d 1185, the D.C. Circuit held that states and EPA are obligated to eliminate significant contribution under the Good Neighbor Provision for the 2015 ozone NAAQS no later than the Marginal area attainment date, which fell on August 3, 2021. Thus, 2020 should have been the relevant year for analysis and, to the extent possible, elimination of significant contribution. *See* Final Rule, 88 FR 9336, 9340-41 (discussing EPA's interpretation of the *Maryland* holding).

[29] Air Quality Modeling Final Rule TSD, Appendix C, *available at* https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs.

[30] EPA Green Book, 8-Hour Ozone (2015) Nonattainment Areas (data current as of May 31, 2023), https://www3.epa.gov/airquality/greenbook/jnc.html.

Moderate areas. Areas that fail to attain by that date will be reclassified (or "bumped up") to Serious nonattainment, indicating persistent unhealthy air and triggering even greater regulatory obligations. *See* 42 U.S.C. §§ 7511(b)(2), 7511a(c).

92.     Because attainment is determined using an average of the three prior calendar years' monitoring data, the last year that air quality data may impact whether nonattainment areas are found to have attained by the 2024 attainment date is 2023. Thus, the objective of the Plan is to obtain emissions reductions from power plants that EPA found were achievable using existing, installed control technology in 2023 to improve ozone levels in downwind areas through eliminating, to the extent possible, the upwind states' "significant contribution" by this year. This aspect of the Plan's design was done to comply with judicial holdings in *Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019) and *Maryland v. EPA*, 958 F.3d 1185 (D.C. Cir. 2020), among others. *See* Good Neighbor Plan, 88 FR at 36754-58.

93.     Nonattainment areas that had been classified originally as Marginal nonattainment have already faced one attainment deadline under the 2015 ozone NAAQS with no relief from the significant contribution of upwind states. Under the CAA, Marginal areas that failed to attain by the August 3, 2021 attainment date were mandatorily reclassified to Moderate nonattainment, making them subject to a January 1, 2023 deadline to submit a new SIP and, by that same date, to implement, among other requirements, reasonably available control measures (RACM) and reasonably available control technology (RACT). *See* 87 FR 60897, 60900 (Oct. 7, 2022).[32]

94.     This schedule is driven by the statute at §§ 7511 and 7511a, as well as EPA's implementation regulations, 40 CFR 51.1312(a)(3)(i). These regulations established a RACT implementation deadline for areas initially classified Moderate as no later than January 1, 2023. The need for emissions reductions in 2023 is also informed by the modeling and attainment demonstration requirements in 40 CFR 51.1308(d), which requires a state to provide for implementation of all control measures needed for attainment no later than the beginning of the attainment year ozone season (i.e., 2023).

---

[32] Other substantial requirements are triggered by the Moderate classification, including: making an attainment demonstration, implementing reasonable further progress (RFP) requirements, establishing a motor vehicle inspection and maintenance program, and complying with a higher emissions offset ratio before new major sources can be permitted to construct. *See generally* 42 U.S.C. § 7511a(b).

95.    If the Good Neighbor Plan was not implemented for Utah or Oklahoma, their emissions that significantly contribute to the ozone nonattainment areas in six downwind states will continue unabated at least through 2023. Downwind areas like Denver, Chicago, Allegan, Muskegon, Dallas-Fort Worth, and Houston will once again face an attainment deadline with no relief from the significant contribution from upwind sources.

96.    If these nonattainment areas fail to attain based on the monitoring data for the 2021-2023 period, they would likely be reclassified to Serious nonattainment as of the August 3, 2024 attainment date, meaning a cascade of additional, statutorily mandated requirements would be triggered on top of the requirements already mandated for Moderate areas. *See generally* 42 U.S.C. § 7511a(c). Among other things, the application of RACT on existing sources and major new source permitting requirements begins to apply to sources half the size of those subject to these requirements at lesser ozone-nonattainment classifications (i.e., sources with the potential to emit just 50 tons per year of ozone precursors, rather than 100 tons per year). *Id.*; *id.* § 7511a(f)(1).[33]

97.    These ratcheting statutory requirements have obvious implications for industrial expansion, economic development, and tax base in nonattainment areas. Meanwhile, with no Good Neighbor requirements in place, an upwind state's existing sources may continue to emit at levels that are significantly contributing to the downwind area's ozone violations, even when cost-effective emissions control measures for those sources have been found to be available.

98.    Finally, areas that stand to benefit from and which are relying upon the air quality improvements of the Good Neighbor Plan extend beyond just those "receptor" areas that were identified in EPA's modeling. Areas throughout the country were reclassified to Moderate nonattainment in EPA's October 2022 action (see paragraph 93), including cities such as Baltimore, Cincinnati, Louisville, Philadelphia, Salt Lake City, San Antonio, St. Louis, and Washington, DC. *See* 87 FR at 60899 (Table 1) (listing all areas that failed to attain). EPA and state air planning agencies had counted on taking the air quality benefits of the Good Neighbor Plan into account in numerous regulatory actions associated with these areas. Indeed, actions have already been planned or have been taken that rely

---

[33] The Denver/North Front Range, Dallas-Fort Worth, and Houston-Galveston-Brazoria nonattainment areas are currently in Severe nonattainment for the 2008 ozone NAAQS. EPA Green Book, 8-Hour Ozone (2008) Nonattainment Areas (data current as of May 31, 2023), https://www3.epa.gov/airquality/greenbook/hnc.html. Chicago, Allegan, and Muskegon are not designated nonattainment for the 2008 ozone NAAQS or prior ozone NAAQS and so would face these requirements for the first time.

on the air quality benefits of the Good Neighbor Plan, assuming it would take effect in 2023. *See, e.g.,* Air Plan Approval; Michigan; Redesignation of the Detroit MI Area to Attainment for the 2015 Ozone Standards, 88 FR 32594, 32605 (May 19, 2023).

99.     The nationwide improvement in ozone levels from the Plan illustrated in paragraph 13 thus provides both health and regulatory-relief benefits to both upwind and downwind states across a wide swath of the country. Staying the Final Rule for upwind states disrupts the planning of both EPA and state air agencies, shifts the regulatory compliance burden to the sources in downwind areas, and frustrates the fundamental purpose of the Act to expeditiously meet and maintain the nation's air quality standards.

SO DECLARED:

RONA
BIRNBAUM    Digitally signed by RONA BIRNBAUM
Date: 2023.06.26 15:42:28 -04'00'

_____
Rona Birnbaum, Director
Clean Air Markets Division

DATED:  June 26, 2023

# EXHIBIT 9

Declaration of Scott Mathias, Director of the Air Quality Policy Division,

Office of Air and Radiation, EPA ("Mathias Declaration").

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

_____

|                                      |     |            |
|--------------------------------------|-----|------------|
| STATE OF OKLAHOMA, ET AL.,           | )   |            |
|                                      | )   |            |
| _Petitioners_,                       | )   |            |
|                                      | )   |            |
| v.                                   | )   | No. 23-9514 |
|                                      | )   |            |
| UNITED STATES ENVIRONMENTAL          | )   |            |
| PROTECTION AGENCY, et al.,           | )   |            |
|                                      | )   |            |
| _Respondents_.                       | )   |            |

_____

## DECLARATION OF SCOTT MATHIAS

1.      I, Scott Mathias, affirm and declare that the following statements are true and correct to the best of my knowledge and belief and that they are based upon my personal knowledge, or on information contained in the records of the United States Environmental Protection Agency, or on information supplied to me by EPA employees.

2.      I am the Director of the Air Quality Policy Division ("AQPD") within the Office of Air and Radiation ("OAR") at EPA, a position I have held since May 2020. AQPD is the division at EPA Headquarters that has primary responsibility for developing national programs, technical policies, regulations, and guidance to implement the national ambient air quality standards ("NAAQS") under the Clean Air Act ("CAA" or the "Act").

3.      As part of my duties as Director of AQPD, I oversee the development and implementation of national policies, regulations, and guidance relevant to section 110 of the CAA, 42 U.S.C. § 7410, including those developed or promulgated to implement section 110(a)(2)(D)(i)(I), known as the "good neighbor" or "interstate transport" provision, regarding air pollution that significantly contributes to nonattainment or interferes with maintenance of the NAAQS in other states. My responsibilities include ensuring consistent implementation of the interstate transport provision across the United States

1

through coordination of the substantive evaluation of state implementation plans ("SIPs") and the development of federal implementation plans ("FIPs") where necessary. I or my staff also coordinate closely with EPA's Regional offices in reviewing and acting on SIPs and addressing other issues related to NAAQS implementation.

## I.     The Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards.

4.     EPA Administrator Michael S. Regan signed the "Good Neighbor Plan"[1] (or the "Plan"), on March 15, 2023, to achieve emissions reductions required by the Good Neighbor Provision of the Clean Air Act, 42 U.S.C. § 7410(a)(2)(D)(i)(I), with respect to the 2015 National Ambient Air Quality Standards ("NAAQS") for ozone. The Plan establishes federal requirements for qualifying power-plant sources in 22 states and industrial sources in 20 states, to reduce ozone pollution during the May 1-to-September 30 "ozone season" by reducing emissions of $NO_X$, which is an ozone precursor pollutant.[2]

5.     The objective of the Plan is to eliminate the covered states' "significant contribution" to nonattainment and interference with maintenance of the ozone NAAQS in other states as expeditiously as practicable and in alignment with the statutory attainment schedule.

6.     With respect to industrial sources in 20 states, including Oklahoma, the Plan will prohibit those emissions that "significantly contribute" to downwind air-quality problems through emissions limitations and associated requirements for certain high-emitting units in several industries. Among the covered emissions units are kilns in the Cement and Cement Product Manufacturing industry. These emissions limits do not require compliance until the start of the 2026 ozone season at the earliest.

---

[1] Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards, 88 FR 36654 (June 5, 2023). The rulemaking docket is EPA-HQ-OAR-2021-0668 and can be accessed through www.regulations.gov. A number of key supporting materials and additional information are available at EPA's website, Good Neighbor Plan for 2015 Ozone NAAQS, https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs (last visited June 5, 2023).
[2] Information and data presented in this declaration regarding the Good Neighbor Plan reflect the rule as signed on March 15, 2023, and do not account for potential impacts of subsequent administrative or judicial stays. *See* Notice of Forthcoming EPA Action to Address Judicial Stay Orders (June 1, 2023), *available at* https://www.epa.gov/csapr/notice-forthcoming-epa-action-address-judicial-stay-orders.

7. The emissions control strategies on which the Plan is premised are all conventional, widely used, at-the-source technologies that have been available to power plants and industrial sources for decades. These control strategies are widely mandated for these types of sources in downwind areas with ozone air quality problems. However, as explained below, the Plan also includes key flexibilities that allow industrial facilities meeting specified criteria to obtain compliance extensions or alternative emissions limits.

## II. Plan Requirements and Compliance-Relief Options for Kilns in the Cement Industry

8. The Plan establishes the following emissions limits depending on kiln-type for kilns in the Cement and Cement Products Manufacturing industry:

| Kiln Type | NOx Emissions Limit (lb/ton of clinker) |
|---|---|
| Long Wet | 4.0 |
| Long Dry | 3.0 |
| Preheater | 3.8 |
| Precalciner | 2.3 |
| Preheater/Precalciner | 2.8 |

9. According to the declaration of Adam Doppenberg, selective catalytic reduction ("SCR") technology is "likely the only technology that may be capable of achieving" the emissions limits in the Federal Plan that apply to the cement kilns at the Fernley Plant.[3] However, it was not EPA's intention in the Plan to set emissions limits at a level that would require kilns in the cement industry to install SCR controls.

10. The technical support document ("TSD") supporting EPA's requirements for industrial sources provides the bases for the numerical emissions limits for each covered unit-type. For the cement industry, EPA specifically stated its expectation that, "[g]enerally, the emission limits in the final rule can be met through installation and operation of [selective non-catalytical reduction] SNCR on all types of cement kilns covered by the final rule."[4]

---

[3] *See* Declaration of Adam Doppenberg ¶ 24.
[4] EPA, Technical Support Document (TSD) for the Final Rule, Docket ID No. EPA-HQ-OAR-2021-0668, "Final Non-EGU Sectors TSD," at 32, *available at* https://www.epa.gov/system/files/documents/2023-03/Final%20Non-EGU%20Sectors%20TSD.pdf.

3

11.     It is my understanding from the Doppenberg Declaration that the cement kilns at the Tulsa Cement Plant have recently installed SNCR but may still emit at levels that exceed the emissions limits applicable to these kilns in the Plan. Based on the record for the Plan and taking the information in the Doppenberg Declaration at face value, it appears that the Tulsa Cement Plant may have unique operating conditions, source materials, or fuel types that would cause it difficulty in meeting the Plan's limits using only its existing SNCR technology. These circumstances do not appear to be generally applicable to many other cement kilns throughout the covered region of the Plan.

12.     EPA recognized that while the emissions-control requirements it set for industrial sources in the Plan were generally expected to be achievable and implementable by the 2026 ozone season, not all facilities may be able to meet the requirements. Good Neighbor Plan, 88 FR at 36758-60, 36818-19. Recognizing this, and in consideration of numerous comments making similar observations, EPA created a number of compliance flexibilities for industrial sources in the final Plan.

13.     Two regulatory provisions in the Plan appear to be of particular relevance to the circumstances Declarant Doppenberg describes in relation to the Tulsa Cement Plant. Without a more detailed assessment of the specific conditions at this facility, EPA cannot at this time state definitively that it would qualify for either of these flexibilities. However, accepting the information in the Doppenberg Declaration at face value, the Tulsa Cement Plant may qualify for relief under one or both of these provisions, consistent with the criteria and procedures established in the Plan.

14.     First, under 40 CFR § 52.40(e), the owner or operator of an affected unit that "cannot comply with the applicable requirements in [the Federal Plan] due to technical impossibility or extreme economic hardship may submit to the Administrator," within 425 days after the date the Plan publishes in the Federal Register, a request for approval of a "case-by-case emissions limit."[5]

---

[5] 40 CFR § 52.40(e) (88 FR at 36871). Subparagraph (2) of 40 CFR § 52.40(e) specifies the information that the owner or operator must include in a request for a case-by-case emissions limit and subparagraphs (5) through (8) of this section specify the criteria and procedures that EPA will apply to evaluate and grant or deny such a request within a specified timeframe.

4

15.    If EPA determines that the request contains information sufficient to confirm that the affected unit is unable to comply with the applicable emissions limit due to technical impossibility or extreme economic hardship, EPA may establish an appropriate case-by-case emissions limit that applies to the affected unit in lieu of the emissions limit that would otherwise apply under the Federal Plan.[6]

16.    These provisions for establishing case-by-case emissions limits reflect EPA's recognition that there may be "unique circumstances" that "would, for a particular source, render the final emissions control requirements [of the Federal Plan] technically impossible or impossible without extreme economic hardship."[7]

17.    It is my understanding that any decision by EPA to grant or deny a request for a case-by-case emissions limit under 40 CFR § 52.40(e) would be a final action subject to judicial review under CAA § 307(b)(1).

18.    Second, under 40 CFR § 52.40(d), the owner or operator of an affected unit that cannot comply with the applicable requirements of the Federal Plan by May 1, 2026 due to "circumstances entirely beyond the owner or operator's control" may request an initial compliance extension of up to 1 year and may thereafter request a second compliance extension of up to 2 additional years (i.e., until May 1, 2029).[8] These provisions for limited compliance extensions reflect EPA's recognition that "labor shortages, supply shortages, or other circumstances beyond the control of source owner/operators may, in some cases, render compliance by 2026 impossible for a particular industrial source."

19.    It is my understanding that any decision by EPA to grant or deny a request for a compliance extension under 40 CFR § 52.40(d) would be a final action subject to judicial review under CAA § 307(b)(1).

20.    Any owner or operator of an affected unit may request both a case-by-case emissions limit and a compliance extension under the Plan. Should Tulsa Cement submit both a request for a case-by-case emissions limit and a request for a

---

[6] 40 CFR § 52.40(e)(4).
[7] Good Neighbor Plan, 88 FR at 36818.
[8] 40 CFR § 52.40(d) (88 FR at 36870). Subparagraph (3) of 40 CFR § 52.40(d) specifies the information that the owner or operator must include in each request for a compliance extension, and subparagraphs (6) through (10) of this section specify the criteria and procedures that EPA will apply to evaluate and grant or deny such a request within a specified timeframe.

compliance extension under 40 CFR § 52.40(e) and (d), respectively, it is possible that Tulsa Cement could obtain relief under both provisions.

21.    Because it is still very early in the process of implementing the Good Neighbor Plan, and the deadlines for applying for these types of relief are still months off, Tulsa Cement has not submitted any request for relief under either provision, and EPA thus has not taken final action on any such request from Tulsa Cement in accordance with the applicable procedures in 40 CFR § 52.40(d) or (e).


SO DECLARED:


Scott Mathias, Director
Air Quality Planning Division

DATED:  June 26, 2023

## **EXHIBIT 10**

EPA, Notice of Forthcoming EPA Action to Address Judicial Stay Orders (June 1, 2023).

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

June 1, 2023

OFFICE OF
AIR AND RADIATION

### MEMORANDUM

**SUBJECT:**    Notice of Forthcoming EPA Action to Address Judicial Stay Orders

**FROM:**        Joseph Goffman
                Principal Deputy Assistant Administrator
                Office of Air and Radiation

On February 13, 2023, EPA published a final action fully or partially disapproving state implementation plans (SIPs) submitted by 21 states to address the states' obligations under Clean Air Act section 110(a)(2)(D)(i)(I), commonly referred to as the "good neighbor" provision, with respect to the 2015 national ambient air quality standards (NAAQS) for ozone. *See* "Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards," 88 Fed. Reg. 9,336 (February 13, 2023). Following that action, on March 15, 2023, EPA signed a separate final action, the "Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards," establishing federal implementation plan (FIP) requirements to address the states' good neighbor obligations consistent with EPA's obligation under Clean Air Act section 110(c)(1). A pre-publication version of this rule was made available on EPA's website[1] and the rule will soon publish in the *Federal Register*. The Good Neighbor Plan's requirements are set to take effect 60 days after the date of publication.

In May 2023, the United States Courts of Appeals for the Fifth and Eighth Circuits issued orders staying, pending judicial review, EPA's SIP disapproval action with respect to the SIPs submitted by Arkansas, Louisiana, Missouri, and Texas.[2] The United States Court of Appeals for the Sixth Circuit issued an administrative stay of EPA's SIP disapproval, staying EPA's action with respect to the SIP submitted by Kentucky pending a decision on Kentucky's motion for stay pending judicial review.[3] EPA's authority to establish the Good Neighbor Plan's requirements for sources in Arkansas, Kentucky, Louisiana, Missouri, and Texas stems from the disapproval of the states' SIPs. Accordingly, in recognition of the orders staying the SIP disapproval action as to Arkansas, Kentucky, Louisiana, Missouri, and Texas, EPA will take action in the near future that will ensure the Good Neighbor Plan's requirements issued to implement good neighbor obligations for the 2015 ozone NAAQS as to sources in Arkansas, Kentucky, Louisiana, Missouri and Texas will not take effect while the stays of the SIP disapproval action with respect to those states remain in place. This forthcoming action will become effective by no later than the effective date of the Good Neighbor Plan's requirements for sources in other states.

---

1 *See* https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs.

2 *See* Unpublished Order, *Texas, et al. v. EPA, et al.*, No. 23-60069 (5th Cir. May 1, 2023) (staying SIP disapprovals for Louisiana and Texas), Unpublished Order, *Arkansas, et al. v. EPA, et al.*, No. 23-1320 (8th Cir. May 25, 2023) (staying SIP disapproval for Arkansas), and Unpublished Order, *Missouri v. EPA, et al.*, No. 23-1719 (8th Cir. May 26, 2023) and Unpublished Order, *Union Elec. Co. d/b/a Ameren Missouri v. EPA, et al.*, No. 23-1751 (8th Cir. May 26, 2023) (staying SIP disapproval for Missouri).

3 *See* Unpublished Order, *Kentucky v. EPA*, No. 23-3216 (6th Cir. May 31, 2023) (administrative stay of SIP disapproval for Kentucky).